IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
COLUMBUS DIVISION

| | | |
|---|---|---|
| RODRIGO ARREOLA, as parent of Hector Arreola, Deceased, and as Personal Representative and Administrator of the Estate of Hector Arreola, CONCEPCION ARREOLA, as parent of Hector Arreola, and S.A., minor child of Hector Arreola, by next friend Jezreel Imee Custodio, | * * * * * * * * * | |
| Plaintiffs, | * * | |
| v. | * * | Civil Action File Number: 4:19-cv-00005-CDL |
| THE CONSOLIDATED GOVERNMENT OF COLUMBUS, GEORGIA, OFFICER MICHAEL AGUILAR, in his individual and official capacity, OFFICER BRIAN DUDLEY, in his individual and official capacity, OFFICER AARON EVRARD, in his individual and official capacity, and COLUMBUS POLICE DEPARTMENT CHIEF OF POLICE RICHARD T. BOREN, in his individual and official capacity, | * * * * * * * * * * * * * * | |
| Defendants. | * | |

## DEFENDANTS' BRIEF IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT

The Consolidated Government of Columbus, Georgia ("CCG"), Officer Michael Aguilar, in his individual and official capacity ("Officer Aguilar"), Officer Brian Dudley, in his individual and official capacity ("Officer Dudley"), Officer Aaron Evrard, in his individual and official capacity ("Officer Evrard"), and Columbus Police Department Chief of Police Richard T. Boren ("Chief Boren"), submit this Brief in Support of their Motion for Summary Judgment, respectfully showing the Court the following:

## **INTRODUCTION**

This is an excessive force case brought by the family of Hector Arreola, who died on January 10, 2017 as the result of methamphetamine toxicity. The night before, a deranged Mr. Arreola engaged in a violent struggle with Officers Aguilar, Dudley, and Evrard, after violating their verbal instructions, and then fighting, kicking, and resisting their efforts to place him in custody. The tragedy is that Officers Aguilar, Dudley and Evrard, with the assistance of Mr. Arreola's own mother, tried to reason with Mr. Arreola to get him the help he needed, but Mr. Arreola refused their repeated pleas.

Now we have this lawsuit, which is not at all about helping Mr. Arreola. It is entirely about Plaintiffs seeking compensation by blaming the police officers that so desperately tried to protect the public from Mr. Arreola, and Mr. Arreola from himself. This being a constitutional excessive force case, Plaintiffs must

1

show that Officers Aguilar, Dudley, and Evrard violated an "objective reasonableness" standard, *Graham v. Connor*, 490 U.S. 386, 395 (1989), and this they cannot do.   The undisputed evidence shows that Mr. Arreola's arrest was entirely justified, and only such force as was necessary to diffuse the situation and bring him into custody was utilized.   Mr. Arreola's death was certainly unfortunate, but it was caused by him and him alone, and not caused by any constitutional violation.   Defendants' Motion for Summary Judgment is due to be **GRANTED**.

## **SUMMARY OF FACTS**

In accordance with Local Rule 56, Defendants have filed a Statement of Undisputed Material Facts in Support of their Motion for Summary Judgment ("SMF"), which is incorporated herein by reference.

## **PROCEDURAL POSTURE**

This Court entered a Scheduling and Discovery Order dated April 17, 2019, which allowed Defendants to file motions for summary judgment related to immunity and the alleged violation of Mr. Arreola's constitutional rights after the close of the initial bifurcated discovery period.   [Doc. no. 7, ¶ III(D)].   In accordance with the Court's Scheduling and Discovery Order, as modified by the Court's text order granting an extension requested by Plaintiffs [Doc. no. 11], Defendants have moved for summary judgment on the grounds that Mr. Arreola's

federal and state constitutional rights were not violated, and that all of the individuals named in this case have immunity from the claims asserted.

## SUMMARY JUDGMENT STANDARD

Summary judgment shall be granted where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). An issue of fact is "material" if, under the applicable law, it might affect the outcome of the case, and an issue of fact is "genuine" if the record, taken as a whole, could lead a rational trier of fact to find for the non-moving party. *Allen v. Tyson Foods*, 121 F.3d 642, 646 (11th Cir. 1997). Summary judgment shall be granted against a party who fails to establish the existence of an element essential to their case, and on which that party bears the burden of proof. *Allen v. Bd. of Public Educ. for Bibb Cnty.*, 495 F.3d 1306, 1313 (11th Cir. 2007).

## ARGUMENT AND CITATION OF AUTHORITY

Plaintiffs assert five separate claims for relief: (1) a Fourth Amendment Excessive Force claim under the United States Constitution against Officers Aguilar, Dudley, and Evrard [Pl's. Compl., Doc. no. 1, Count 1]; (2) a Fourteenth Amendment Deliberate Indifference to Serious Medical Needs claim under the United State Constitution against Officers Aguilar, Dudley and Evrard [*Id.*, Count 2]; (3) a supervisory liability claim against Chief Boren and a *Monell* liability

claim against the CCG [*Id.*, Count 3]; (4) a Georgia state constitutional claim [*Id.*, Count 4]; and (5) Georgia State law battery claim [*Id.*, Count 5].   As set forth herein, none of these claims have any merit on the undisputed facts here.[1]

1. **Federal Claims Against All Defendants: No Constitutional Violations**

   A. **There Was No Fourth Amendment Violation**

   To establish a Fourth Amendment violation based upon excessive force, Plaintiffs must show that Officers Aguilar, Dudley, and Evrard violated an "objective reasonableness" standard.   *Graham*, *supra*, 490 U.S. at 395.   In analyzing this standard, the Court must view the facts "from the perspective of a reasonable officer on the scene with knowledge of the attendant circumstances and facts, and balance the risk of bodily harm to the suspect against the gravity of the threat the officer sought to eliminate."   *McCullough v. Antolini*, 559 F.3d 1201, 1206 (11th Cir. 2009).   Because "police officers are often forced to make split-second judgments," their conduct "must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight."   *Graham*, 490 U.S. at 396-97.   In other words, courts must view the use of force "through the eyes of the officer on the scene."   *Crosby v. Monroe Cnty.*, 394 F.3d

---

[1]Because the Court has bifurcated discovery, any issues related to potential *Monell* liability have not yet been briefed.   As set forth herein, because Mr. Arreola suffered no violation of his constitutional rights, neither Chief Boren nor the CCG could face any liability in this case.   Likewise, there is no evidence supporting any potential supervisory liability on the part of Chief Boren.   *See* Section 3 *infra*.

1328, 1333-34 (11ᵗʰ Cir. 2004).   Three factors are relevant: (1) the need for application of force; (2) the relationship between the need and amount of force used; and (3) the extent of the injury inflicted.  *Stephens v. DeGiovanni*, 852 F.3d 1298, 1324 (11ᵗʰ Cir. 2017).

Viewed from the perspective of Officers Aguilar, Dudley, and Evrard, it is apparent that Mr. Arreola's constitutional rights were not violated.  The evidence is undisputed that when Officers Aguilar and Dudley confronted Mr. Arreola, they immediately tried "to de-escalate the situation so it doesn't result in a struggle or fight."  [SMF, ¶ 30].  Before the struggle even began, Officer Aguilar called EMS to evaluate Mr. Arreola.  [SMF, ¶ 31].  Officers Aguilar and Dudley continued to talk to Mr. Arreola in hopes of avoiding a confrontation.  [SMF, ¶¶ 30-31, 37-38.].  As Officer Aguilar stated, the Officers' main concern "was getting him help and trying to figure out why we are here."  [SMF, ¶ 38].

It was only *after* Mr. Arreola defied their instructions and began knocking on a neighbor's door that Officers Aguilar and Dudley felt the need to detain Mr. Arreola.  That decision was a rational, thoughtful one made by Officer Aguilar:

> And my only thought on that is the fact that he's a mentally unstable person, he is seeing stuff that's not there, saying stuff like some people are there to possibly hurt him or his mother, which is the reason for the welfare check.  So knowing that he's knocking on somebody's door, what's likely to happen?  Somebody is going to open the door.  Well, I don't want this mentally unstable person to knock on a door, then open it.  He goes inside and then it's unknown

if anybody else's life is in jeopardy.  And I don't know if there's guns, knives, weapons inside the house.

[SMF, ¶ 36].

There is simply no question that the conduct of Mr. Arreola on January 9, 2017 justified his arrest.  Ironically, even Plaintiff's own "expert" who has worked with and/or testified for the plaintiffs in twenty-four excessive force cases in the last two years, agrees that Mr. Arreola's conduct on the evening in question justified his arrest.  [Harmening Dep., p. 89:19-21 ("Yes, although I'm – I'm not critical of the fact that they took him to the ground and put him in handcuffs.  I'm not critical of that")].  In fact, this so-called "expert" testified that Officers Aguilar and Dudley could have and maybe even should have arrested Mr. Arreola *sooner*. [*Id.*, pp. 109:11-14; 110:22-111:2].[2]

As to the amount of force used, that is not a close question either. Immediately upon trying to arrest Mr. Arreola, a violent struggle ensued, and Officers Aguilar and Dudley were required to be on his back to keep his arms spread so he could not get off the ground.  [SMF, ¶¶ 39-40, 45].  Both officers repeatedly asked Mr. Arreola to stop resisting, as did Mr. Arreola's own mother.

---

[2]Defendants leave for another day whether Plaintiffs' "expert" is qualified and, if so, whether his opinions are relevant.  *See*, *e.g.*, *Saucier v. Katz*, 533 U.S. 194, 216 n.6 (2001) (Ginsburg, J., concurring in judgment) (internal quotations omitted) ("In close cases, a jury does not automatically get to second-guess these life and death decisions, even though a plaintiff has an expert and a plausible claim that the situation could better have been handled differently.").

[SMF, ¶¶ 42-43].   Mr. Arreola's mother – who is one of the Plaintiffs here –

described the struggle as follows:

> Q:     Okay.   And the two police officers, they're struggling with
> Hector to try and gain control of him and get him cuffed; is that right?
> A:     Yes.
> Q:     And do you remember Hector kicking and trying to get himself
> free?
> A:     He wasn't kicking.   He was going to kick when the police –
> when he was on top of him.
> Q:     And he's – and Hector's trying to get out from under them?
> A:     Yes.
> Q:     -- he's trying to get free?
> A:     Yes.
> Q:     So he's resisting?
> A:     Yes.
> Q:     And it's big wrestling match?  I mean, it's pretty intense; right?
> A:     Yes.

[SMF, ¶ 49].[3]

According to Plaintiffs, Mr. Arreola was placed in handcuffs at 5:29:09, less

than four minutes after the struggle began.   [SMF, ¶ 46].   But, even then, Mr.

Arreola continued to kick and resist, a fact which Mr. Arreola's mother

acknowledged.   [SMF, ¶ 50, Arreola Dep., p. 29:1-3 ("Q: And that Hector was –

---

[3]Defendants recognize that the Court does not have to accept the Officers'
subjective version of events, but rather must "reconstruct the event in the light
most favorable to the non-moving party and determine whether the officer's use of
force was excessive under those circumstances." *Stephens v. DeGiovanni*, 852
F.2d 1298, 1315 (11th Cir. 2017), *quoting Fils v. City of Aventura*, 647 F.3d 1272,
1288 (11th Cir. 2011).   In this case, the "reconstruction" has been done by Mr.
Arreola's own mother who was standing several feet away has admitted that Mr.
Arreola was continuing to resist, struggle, and fight during the entire episode.
[SMF, ¶¶ 49-51].   In other words, Plaintiffs' "best case" is no case at all.

kept resisting even after they got him in handcuffs?  A:  Yes.").  As a consequence, Officer Dudley ran to his car to get leg irons.  [SMF, ¶ 47].  Plaintiffs concede that the officers were no longer on top of Mr. Arreola at 5:31:17 A.M., and Mr. Arreola was placed in a seated position at 5:33:03 A.M.  [SMF, ¶ 54].  The *entire* sequence of events therefore took only about eight minutes, during which entire time Mr. Arreola was continually struggling, fighting, and resisting.[4]

The level of force used by Officers Aguilar, Dudley, and Evrard was consistent with the threat posed by Mr. Arreola and was only applied in the amount necessary to get Mr. Arreola restrained and in custody. No punches were thrown. No batons or tasers were used. And, most importantly, once Mr. Arreola was fully restrained in leg irons and in custody, no further force was applied.  [SMF, ¶¶ 48-53].  The force applied to Mr. Arreola plainly fell within constitutional norms. *See*, *e.g.*, *Graham*, *supra*, 490 U.S. at 396 ("[T]he right to make an arrest or

---

[4]There is no dispute that Mr. Arreola engaged in a tremendous fight and struggle. Officer Aguilar described it as follows:

> And I will say this about the struggle, I mean, I've been a police officer for coming up on 10 years now.  And the struggle I had with Mr. Arreola is by far the biggest struggle I've ever been in.  I've been in struggles with other individuals that's been intoxicated and high on drugs.  And up to this day, that's still the biggest struggle that I've had just trying to get somebody in handcuffs.  Like I mean, I'm a bigger guy and I had no effect whatsoever, and it took two of us just to get him handcuffed.

[SMF, ¶ 43].

investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it."); *Durruthy v. Pastor*, 351 F.3d 1080, 1094 (11th Cir. 2003) ("This circuit has made clear that some use of force by a police officer when making a custodial arrest is necessary and altogether lawful, regardless of the severity of the alleged offense.").[5]

In similar cases, the Eleventh Circuit has held that applications of force akin to that at issue here did not rise to the level of a constitutional violation. In *Nolin v. Isbell*, 207 F.3d 1253 (11th Cir. 2000), the Court reversed the judgment of the district court and held that an officer's use of force was not actionable when he grabbed the plaintiff from behind by the shoulder and wrist, threw him against a van three or four feet away, kneed him in the back, pushed his head into the side of a van, and then handcuffed him. *Nolin*, 207 F.3d at 1258-59. In *Durruthy*, *supra*, the Court reversed the denial of qualified immunity and found that the officer had applied only *de minimis* force when he "force[d] [the plaintiff] down to the ground and placed him in handcuffs." *Durruthy*, 351 F.3d at 1094. And, finally, in *Croom v. Balkwill*, 645 F.3d 1240 (11th Cir. 2011), the Court affirmed the grant of summary judgment in favor of the defendant where the officer forced the plaintiff

---

[5]The facts of this case are in stark contrast to the facts in *Dyksma v. Pierson*, 2018 WL 3430684 (M.D.Ga. July 16, 2018), where an officer pressed his knee to the neck of a suspect for seventeen seconds *after* the suspect was handcuffed and had become "quiet and stopped moving his legs and arms." *Id.* at *7. Mr. Arreola's *active* fighting, resisting, and kicking required the use of force. [SMF, ¶¶ 48-53].

to the ground from a squatting position and held her there for up to ten minutes.
*Croom*, 645 F.3d at 1253 ("Even if unnecessary, the force used against Croom was
de minimis.").

In the present case, as in *Graham*, *Nolin*, *Durruthy*, *Croom*, and the other
authorities cited above, the force applied to Mr. Arreola was only such force as
necessary to bring him into custody and remove the threat associated with his
fighting, kicking, and resisting.  As the United States Supreme Court has so clearly
held, "not every punch or shove, even if it may later seem unnecessary in the peace
of a judge's chambers, violates the constitution."  *Saucier v. Katz*, 533 U.S. 194,
209 (2001).  The force applied to Mr. Arreola was proportionate to the danger he
posed to Officer Aguilar, Officer Dudley, Officer Evrard, himself, and the public.
Mr. Arreola's constitutional rights were not violated.

## B.      There Was No Fourteenth Amendment Violation

Plaintiffs secondly allege that Defendants Aguilar, Dudley, and Evrard are
liable due to their deliberate indifference to serious medical needs of Mr. Arreola.
[Pl's. Compl, ECF No. 1, Count 2].  Specifically, Plaintiffs allege:

> Officers Dudley, Aguilar, and Evrards' deliberate indifference to the
> obvious and serious medical needs of Hector Arreola, who was in
> their custody, violated Hector Arreola's Fourteenth Amendment
> rights.

[*Id.*, ¶ 99].  Of course, the facts are undisputed that Mr. Arreola was not placed in
handcuffs until 5:29:09 A.M. on January 29, 2017 [SMF, ¶ 46], and was not fully

in custody until he was placed in leg irons at 5:31:17 A.M [SMF, ¶ 54].  EMS arrived to evaluate Mr. Arreola at 5:36:15 A.M.  [SMF, ¶ 56].  Apparently, then, Plaintiffs contend that these police officers were "deliberately indifferent" to medical needs in the roughly *five minute period* before EMS arrived to check on Mr. Arreola.  That is impossible under the applicable standard.

The minimum standard for providing medical care to a pre-trial detainee under the Fourteenth Amendment is the same as the minimum standard required by the Eighth Amendment for a convicted prisoner, and Plaintiffs' Fourteenth Amendment claim must be analyzed under the decisional law of both the Fourteenth and Eighth Amendments.  *Andujar v. Rodriguez*, 486 F.3d 1199, 1203 n. 3 (11th Cir. 2007).  Plaintiffs must satisfy both an objective and a subjective inquiry, *i.e.*, that there was an objectively serious medical need and that Defendants Aguilar, Dudley and/or Evrard acted with deliberate indifference to that serious medical need.  *Id.* at 1203.[6]

There is no evidence meeting these standards.  First, the vast majority of Officers Aguilar, Dudley, and Evrard's encounter with Mr. Arreola occurred

---

[6]An objectively serious medical need is one so obvious that even a lay person would easily recognize the necessity for a doctor's attention.  *Andujar*, 486 F.3d at 1203.  Second, the plaintiff must establish that the official acted with deliberate indifference, *i.e.,* the official subjectively knew of and disregarded the risk of serious harm, and acted with more than mere negligence.  *Gilmore v. Hodges*, 738 F.3d 266, 274 (11th Cir. 2013).

during the struggle to get him contained, during which time the Officers had no ability to assess Mr. Arreola's medical condition.  While Plaintiffs contend that Mr. Arreola complained "I can't breathe," Officer Aguilar took that to mean that he could breathe since he had enough breath to talk.  [SMF, ¶ 59].  Officer Aguilar is not a doctor, and cannot be expected to make a medical judgment within minutes after an intense struggle with a combative detainee.  *See*, *e.g.*, *Adams v. Poag*, 61 F.3d 1537, 1545 (11th Cir. 1995), *quoting Estelle v. Gamble*, 429 U.S. 97, 105-06 (1976) ("[T]he question of whether government actors should have employed additional diagnostic techniques or forms of treatment 'is a classic example of a matter for medical judgment' and therefore not an appropriate basis for grounding liability under the Eight Amendment.").[7]

Second, there is no evidence that Officers Aguilar, Dudley, or Evrard were grossly negligent in disregarding any known risk.  In fact, the evidence shows nothing but concern on their part for the safety of Mr. Arreola.  When Officers Aguilar and Dudley first confronted Mr. Arreola, they were "trying to de-escalate

_____

[7]In fact, there was no evidence Mr. Arreola was suffering from a serious medical condition.  After Mr. Arreola was in custody, he was sitting on the ground, conscious, and alert.  [SMF, ¶ 58].  Officer Aguilar monitored his condition prior to EMS arriving some five minutes later.  [SMF, ¶ 55].  When Mr. Arreola was loaded into the ambulance, he had a pulse, was breathing, and was being treated by medical professionals.  [SMF, ¶ 62].  There is simply no evidence to suggest that in this five minute period any of the officers had notice of any serious medical condition of Mr. Arreola.

the situation so it doesn't result in a struggle or fight."  [SMF, ¶ 30].  Officer

Aguilar called for EMS to come evaluate Mr. Arreola *before* Mr. Arreola was even

taken into custody (which the Officers had no intention to do until Mr. Arreola

began knocking on the neighbors' door), and EMS arrived just minutes after the

struggle with Mr. Arreola.  [SMF, ¶¶ 31-35, 56].    The undisputed evidence in this

case shows *concern* on the part of Officers Aguilar, Dudley and Evrard, not

negligence, much less gross negligence as the law requires.  *See*, *e.g.*, *Bd. of Cty.*

*Comm'rs of Bryan Cty., Okl. v. Brown*, 520 U.S. 397, 410 (1997) ("[D]eliberate

indifference is a stringent standard of fault, requiring proof that a municipal actor

disregarded a known or obvious consequence of his action.").  Officers Aguilar,

Dudley and Evrard did not violate Mr. Arreola's Fourteenth Amendment rights.

2.    **Federal Claims Against Officers Aguilar, Dudley and Evrard,**
      **Individually: Qualified Immunity Applies**

Even if Plaintiffs could show a Fourth or Fourteenth Amendment violation,

Officers Aguilar, Dudley, and Evrard would be entitled to qualified immunity.

Public officials are entitled to qualified immunity unless they have "violated a

statutory or constitutional right that was clearly established at the time of the

challenged conduct."  *City & Cnty. of San Francisco v. Sheehan*, 135 S. Ct. 1765,

1776 (2015) (internal quotations omitted).   Courts are "not to define clearly

established law at a high level of generality."  *Ashcroft v. al-Kidd*, 563 U.S. 731,

742 (2011).  This exacting standard "protect[s] all but the plainly incompetent or

those who knowingly violate the law." *Sheehan*, 135 S. Ct. at 1776, *quoting Ashcroft*, 563 U.S. at 743. [8]

While a case directly on point is not required, *Ashcroft*, 563 U.S. at 741, "'existing precedent must have placed the statutory or constitutional question *beyond debate*' and thus given the official fair warning that his conduct violated the law." *Gates v. Khokhar*, 884 F.3d 1290, 1296 (11th Cir. 2018) (emphasis in original), *quoting Coffin v. Brandau*, 642 F.3d 999, 1013 (11th Cir. 2011) (*en banc*). Fair warning is most commonly provided by materially similar precedent from the Supreme Court, the Eleventh Circuit, or the highest state court in which the case arose. *Gates*, 884 F.3d at 1296.

A defendant who asserts qualified immunity only has the initial burden of showing he was acting within the scope of his discretionary authority when he took the allegedly unconstitutional action. *Bennett v. Hendrix*, 423 F.3d 1247, 1250 (11th Cir. 2005). The burden then shifts to the plaintiff to establish that qualified immunity is not appropriate by showing that: (1) the facts alleged make out a violation of a constitutional right; and (2) the constitutional right at issue was

---

[8] *See, e.g., Reichle v. Howards*, 566 U.S. 658, 665 (2012) (quotations and citations omitted) ("[W]e have previously explained that the right allegedly violated must be established, not as a broad general proposition, but in a particularized sense so that the contours of the right are clear to a reasonable official."). In other words, a right must be well-established enough "that *every* reasonable official would have understood that what he is doing violates that right." *Reichle*, 566 U.S. at 664 (emphasis added)(internal quotation marks omitted and alteration adopted).

clearly established at the time of the alleged misconduct.  *Perez v. Suszczynski*, 809 F.3d 1213, 1218 (11th Cir. 2016).

An official performs a discretionary function when his acts "but for the alleged constitutional infirmity, would have fallen with his legitimate job description," and the acts were done "through means that were within his power to utilize."  *Holloman v. Harland*, 370 F.3d 1252, 1266 (11th Cir. 2004).  There can be no realistic dispute that Officers Aguilar, Dudley, and Evrard, who were responding to a 911 call initiated by Arreola, was acting within their discretionary authority at the time of all relevant events in this case.

The burden, then, shifts to Plaintiffs to make out a case for a violation of a constitutional right that was clearly established.  That cannot be done on the facts here.  As set forth above, Mr. Arreola's constitutional rights were not violated on January 9, 2017.  And any constitutional rights of Mr. Arreola were certainly not "clearly established" as of that date.  Plaintiffs cannot point to a single Supreme Court, Eleventh Circuit, or Georgia Supreme Court case that would have put the Fourth and Fourteenth Amendment questions *beyond debate* and thus given Officers Aguilar, Dudley and Evrard fair warning that their conduct violated the law.

In fact, controlling Eleventh Circuit authority is to the contrary. In *Lewis v. City of West Palm Beach, Florida*, 561 F.3d 1288 (11th Cir. 2009), the police

officers encountered a suspect who was behaving irrationally, and was later
diagnosed as having cocaine-induced excited delirium.  The officers struggled with
the suspect, one officer put his knee on the suspect's upper back and neck, and
another officer bound the suspect's legs using a leg restraint.  The suspect later
died.  *Lewis*, 561 F.3d at 1290.  The district court granted the officers' motion for
summary judgment, and the Eleventh Circuit affirmed, holding:

> Here, case law does not provide the necessary precedent, either
> specifically or through broad principles, to clearly establish the right.
> Thus, only if the officers' conduct was so egregious and unacceptable
> so as to have blatantly violated the Constitution would qualified
> immunity be unavailable to them…[Cits].  This standard is met when
> every reasonable officer would conclude that the excessive force used
> was plainly unlawful. *Priester v. City of Riviera Beach, Fla.,* 208 F.3d
> 919, 926–27 (11th Cir.2000).  Appellant argues that because the
> officers further restrained Lewis with the hobble after the need for any
> use of force had passed and tightened it to form a hogtie, the officers'
> conduct rose to this level of egregiousness. This is not the case. Even
> though most of the officers in this case testified that Lewis was not a
> danger to them and was merely resisting arrest, he was, as the district
> court described, "an agitated and uncooperative man with only a
> tenuous grasp on reality." Because of his refusal to sit upright and his
> inability to remain calm, Lewis remained a safety risk to himself and
> to others.

*Id.* at 1292; *see also Bussey-Morice v. Gomez*, 587 Fed. Appx. 621, 625 (11th Cir.
2014) (No clearly established right established where suspect was tased three
times, then taken to the ground by two officers, then further subdued by five
officers with a pillow case placed over the suspect's head).  Officers Aguilar,

Dudley and Evrard are entitled to qualified immunity from all claims asserted in this case.

**3.     Federal Claims Against Boren: No Causal Connection and Qualified Immunity**

Plaintiffs attempt to allege supervisory liability claims against Chief Boren, claiming that Chief Boren has "failed to appropriately train officers" and failed to "institute sufficient, policies, procedures, and training." [Pl's. Compl., Doc. no. 1, ¶¶ 104, 108]. There is no basis for supervisory liability in this case.

It is well established that supervisory officials are not liable under § 1983 for the unconstitutional acts of their subordinates on the basis of respondeat superior or vicarious liability. *Keith v. DeKalb Cty., Ga.*, 749 F.3d 1034, 1047 (11th Cir. 2014). To hold a supervisor liable, a plaintiff must show that the supervisor either directly participated in the unconstitutional conduct or that a causal connection exists between the supervisor's actions and the alleged constitutional violation. *Id.* at 1047-48. The necessary causal connection can be established "when a history of widespread abuse puts the responsible supervisor on notice of the need to correct the alleged deprivation, and he fails to do so…" or when facts support "an inference that the supervisor directed the subordinates to act unlawfully or knew that the subordinates would act unlawfully and failed to stop them from doing so." *Cottone v. Jenne*, 326 F.3d 1352, 1360 (11th Cir. 2003) (internal quotations and citations omitted).

There is no evidence in this case that Chief Boren participated in any unconstitutional conduct or otherwise acted or failed to act in any manner that caused the violation of Mr. Arreola's constitutional rights. To the contrary, the undisputed evidence shows that Officers Aguilar, Dudley, and Evrard all received extensive training from the Columbus Police Department on dealing with suspects with a mental health crisis, the use of force, and monitoring custodial suspects. [SMF, ¶¶ 15-24]. The facts of this case clearly do not show "obvious, flagrant, rampant" and "widespread abuse" sufficient to potentially impose supervisory liability. *Hartley v. Powell*, 193 F.3d 1263, 1269 (11th Cir. 1999).

Second, even if Plaintiffs could satisfy the stringent hurdle required to potentially hold Chief Boren liable on a supervisory liability theory, they must still overcome Chief Boren's qualified immunity by proving (1) that Chief Boren violated their federal constitutional rights, and (2) that the constitutional rights were "clearly established" at the time Chief Boren acted. *Keith*, 749 F.3d at 1048, *citing Pearson v. Callahan*, 555 U.S. 223, 232 (2009). For the same reasons as applicable to Officers Aguilar, Dudley, and Evrard, Chief Boren has qualified immunity as to all of Plaintiffs' claims. *Lewis*, *supra*, 561 F.3d at 1292.

18

4.    **State Claims: Official And Sovereign Immunity Apply**

Plaintiffs' Georgia constitutional claim [Doc. no. 1, ¶¶ 116-119] and Georgia state law battery claim [*Id.*, ¶¶ 120-122] are barred by official and sovereign immunity.

With respect to any individual capacity state law claims asserted by Plaintiffs, official immunity protects an officer from personal liability arising from his performance of "official functions" as long as the officer did not act with "actual malice" or "actual intent to cause injury." *See* Ga. Const. art. I, § 2, ¶ IX(d).  Similar to qualified immunity, official immunity is intended to "preserve the public employee's independence of action without fear of lawsuits and to prevent a review of his or her judgment in hindsight." *Cameron v. Lang*, 274 Ga. 122, 125, 549 S.E.2d 341, 344 (2001).  It applies to an officer's "discretionary actions taken within the scope of [his] official authority." *Id.*

As set forth above, it is clear that Chief Boren and Officers Aguilar, Dudley, and Evrard were all performing discretionary acts within the scope of their official authority.  Thus, they can only be liable on Plaintiff's state claims if they acted with "actual malice" or "actual intent to cause injury" as required to overcome official immunity.  *See Adams v. Hazelwood*, , 271 Ga. 414, 416 520 S.E.2d 896, 898 (1999).  Under Georgia law, that means a "deliberate intention to do wrong." *Id.*; *see also West v. Davis*, 767 F.3d 1063, 1073 (11th Cir. 2014).  There is no such

evidence in the record here.  Chief Boren and Officers Aguilar, Dudley and Evrard are all therefore immune from Plaintiffs' state law claims.

To the extent Plaintiffs assert official capacity state law claims, those claims are treated as claims against the CCG.  *Bd. of Comm'rs of Glynn Cnty. v. Johnson*, 311 Ga. App. 867, 869,717 S.E.2d 272, 274 (2011)("[S]uits against county employees in their official capacities are in reality suits against the county itself").  The doctrine of sovereign immunity protects counties from suit unless they have waived their immunity.  *Gilbert v. Richardson*, 264 Ga. 744, 752, 452 S.E.2d 476, 484 (1994); *Olivera v. University System of Georgia's Bd. of Regents*, 298 Ga. 425, 428, 782 S.E.2d 436, 438 (2016).  Plaintiffs have not established any waiver of immunity by the CCG, and Defendants are therefore entitled to summary judgment on any official capacity state law claims.[9]

## CONCLUSION

For the aforementioned reasons, and the undisputed facts set forth in Defendants' contemporaneous filing, the Motion for Summary Judgment of Defendants the CCG, Chief Boren, and Officers Aguilar, Dudley, and Evrard should be **GRANTED**.

---

[9] CCG is a consolidated city-county government, and the Court views CCG as a county for purposes of sovereign immunity.  *See Bowen v. Columbus*, 256 GA. 462, 463, 349 S.E.2d 740, 741 (1986).  Any state law claims Plaintiffs are attempting to make against the CCG directly would be barred by sovereign immunity as well.  *Olivera*, 298 Ga. at 428, 782 S.E.2d at 438.

Respectfully submitted, this 8th day of November, 2019.

PAGE, SCRANTOM, SPROUSE,
TUCKER & FORD, P.C.

By: /s/ Alan G. Snipes
      James C. Clark, Jr.
      Ga. State Bar No.: 127145
      jcc@psstf.com
      Alan G. Snipes
      Ga. State Bar No.: 665781
      ags@psstf.com
      Tyler C. Cashbaugh
      Ga. State Bar No.: 869622
      tcc@psstf.com
      1111 Bay Avenue, Third Floor
      Columbus, Georgia 31901
      (706) 324-0251

By: /s/ Clifton C. Fay
      Clifton C. Fay
      Georgia Bar No.: 256460
      Lucy T. Sheftall
      Georgia Bar No.: 639813
      P.O. Box 1340
      Columbus, Georgia 31902

*Counsel for Defendants*

## **CERTIFICATE OF SERVICE**

I do hereby certify that I am counsel for Defendants and that on this date I served the foregoing document, Defendants' Brief in Support of Motion for Summary Judgment through the Court's CM/ECF system, which will ensure delivery to the following:

> Mark C. Post
> Mark Post Law, LLC
> 3 Bradley Park Ct., Ste. F
> Columbus, Georgia 31904
> mpost@markpostlaw.com

This 8th day of November, 2019.

> /s/ Alan G. Snipes
> *Counsel for Defendants*