IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
COLUMBUS DIVISION

| | |
|---|---|
| RODRIGO ARREOLA, as parent of Hector Arreola, Deceased, and as Personal Representative and Administrator of the Estate of Hector Arreola, CONCEPCION ARREOLA, as parent of Hector Arreola, and S.A., minor child of Hector Arreola, by next friend Jezreel Imee Custodio, <br><br>  Plaintiffs, <br><br> v. <br><br> THE CONSOLIDATED GOVERNMENT OF COLUMBUS, GEORGIA, OFFICER MICHAEL AGUILAR, in his individual and official capacity, OFFICER BRIAN DUDLEY, in his individual and official capacity, OFFICER AARON EVRARD, in his individual and official capacity, and COLUMBUS POLICE DEPARTMENT CHIEF OF POLICE RICHARD T. BOREN, in his individual and official capacity, <br><br> Defendants. | Civil Action File Number: <br> 4:19-cv-00005-CDL |

**DEFENDANTS' STATEMENT OF MATERIAL UNDISPUTED FACTS**

In accordance with Fed.R.Civ.P. 56 and Local Rule 56, The Consolidated Government of Columbus, Georgia ("CCG"), Officer Michael Aguilar, in his individual and official capacity ("Officer Aguilar"), Officer Brian Dudley, in his

1

individual and official capacity ("Officer Dudley"), Officer Aaron Evrard, in his individual and official capacity ("Officer Evrard"), and Columbus Police Department Chief of Police Richard T. Boren ("Chief Boren"), submit this Statement of Undisputed Material Facts in Support of their Motion for Summary Judgment, respectfully showing the Court the following:

## MATERIAL UNDISPUTED FACTS

A.    The Parties

1. Plaintiff Rodrigo Arreola is the father of Hector Arreola, deceased. [Pl's. Compl., ¶ 1].

2. Plaintiff Concepcion Arreola is the mother of Hector Arreola, deceased. [*Id.*, ¶ 2].

3. Plaintiff S.A. is the minor daughter of Hector Arreola, deceased. [*Id.*, ¶ 3].

4. Officer Michael Aguilar is a police officer employed by the Columbus Police Department, and he served in that capacity on January 9, 2017. [*Id.*, ¶ 13].

5. Officer Brian Dudley is a police officer employed by the Columbus Police Department, and he served in that capacity on January 9, 2017. [*Id.*, ¶ 14].

6. Officer Aaron Evrard is a police officer employed by the Columbus Police Department, and he served in that capacity on January 9, 2017. [*Id.*, ¶ 15].

7.     Chief Richard T. Boren is the Chief of Police of the Columbus Police Department, and he served in that capacity on January 9, 2017. [*Id.*, ¶ 16].

8.     The Columbus Consolidated Government is the governing body for Columbus, Muscogee County, Georgia. [*Id.*, ¶ 17].

B.     The Events Leading Up to the Arrest

9.     At approximately 3:40 a.m. on January 9, 2017, Hector Arreola contacted the Columbus Police Department via their 911 assistance system, to check on the welfare of his mother, Concepcion Arreola. [*Id.*, ¶¶ 20-21].

10.    Officers Aguilar and Dudley were dispatched to 760 Moss Drive, found Concepcion Arreola to be fine, and then departed. [*Id.*, ¶ 22].

11.    At approximately 4:55 a.m. on January 9, 2017, Hector Arreola placed another call to 911 requesting a welfare check on his mother, Concepcion Arreola. [*Id.*, ¶ 23].

12.    Officers Aguilar and Dudley were again dispatched to 760 Moss Drive. [*Id.*, ¶ 22].

13.    When Officers Aguilar and Dudley arrived at 760 Moss Drive, they encountered Hector Arreola at the residence. [Deposition of Michael Aguilar ("Aguilar Dep."), pp. 29:9-30:2].

14.    Officer Aaron Evrard later responded to the location. [Deposition of Aaron Evrard ("Evrard Dep."), p. 21:9-16].

C.      Training of Officers Aguilar, Dudley, and Evrard

15.      Officers Aguilar, Dudley, and Evrard were all involved in the subsequent arrest of Mr. Arreola on January 9, 2017.  [Aguilar Dep., pp. 29:9-30:2; Evrard Dep., p. 21:9-16].

16.      Officer Aguilar received Crisis Intervention Training from the Columbus Police Department.  [Aguilar Dep., p. 36:14-20].

17.      Crisis Intervention Training trains officers to identify characteristics of people who could be having a mental health crisis.  [*Id.*].

18.      Officers Dudley and Evrard also completed Crisis Intervention Training from the Columbus Police Department.  [Deposition of Brian Dudley ("Dudley Dep."), p. 61:13-20; Evrard Dep., p. 45:18-21].

19.      Officers Aguilar, Dudley, and Evrard are all POST certified and have received extensive periodic training during their service as officers for the Columbus Police Department.  [Aguilar Dep., Ex. 4; Dudley Dep., Ex. 5; Evrard Dep., Ex. 4].

20.      Part of the in-service training received by Officer Aguilar, Officer Dudley, and Officer Evrard included training on the use of force.  [Aguilar Dep., p. 62:16-23; Dudley Dep., p. 53:6-16; Evrard Dep., p. 48:-6:20].

21. The in-service use of force training provided to Officers Aguilar, Dudley, and Evrard included training on Excited Delirium. [Aguilar Dep., p. 54:23-55:5; Dudley Dep., p. 64:3-64:11; Evrard Dep., p. 49:5-18].

22. The in-service use of force training provided to Officers Aguilar, Dudley and Evrard included training on positional asphyxia. [Aguilar Dep., p. 56:23-57:5; Dudley Dep., p. 65:13-65:19; Evrard Dep., p. 50:3-50:11].

23. Officers Aguilar, Dudley, and Evrard were all trained by the Columbus Police Department on the use of force policy that was in effect by the Columbus Police Department on January 9, 2017. [Aguilar Dep., p. 61:14-62:1; Dudley Dep., p. 70:13-71:3; Evrard Dep., p. 52:24-53:13].

24. Officers Aguilar, Dudley, and Evrard were all trained by the Columbus Police Department to monitor a suspect who was in custody. [Aguilar Dep., p. 57:2-5; Dudley Dep., p. 65:20-25; Evrard Dep., p. 50:12-17].

D. The Arrest of Mr. Arreola

25. When Officers Dudley and Aguilar first encountered Mr. Arreola on January 9, 2017, "something seemed to be off with him." [Aguilar Dep., p. 30:3-4].

26. It was later determined that Mr. Arreola was under the influence of methamphetamine. [Deposition of William M. Harmening ("Harmening Dep."), Ex. 14, Autopsy Report].

27. Mr. Arreola made statements about lights being on in his mother's house when there were none on, and made statements that people were "trying to get him." [Aguilar Dep., p. 30:3-8].

28. Officers Aguilar and Dudley began talking to Mr. Arreola asking whether he had ever had paranoia or schizophrenia or any similar mental disorders. [Aguilar Dep., p. 31:13-20].

29. Officers Aguilar and Dudley talked to Mr. Arreola for several minutes, but he was not compliant in staying with the officers and trying to speak with them. [Deposition of Brian Dudley ("Dudley Dep."), p. 28:13-21].

30. Officers Aguilar and Dudley were "trying to de-escalate the situation so it doesn't result in a struggle or a fight." [Aguilar Dep., p. 34:20-22].

31. At approximately 5:24:30 a.m., Officer Aguilar called for Emergency Medical Services ("EMS") to respond to the scene to evaluate Mr. Arreola because "if he was going through some sort of mental health crisis I wanted him to seek the treatment that could, you know, better the situation for him at that time." [Pl's. Compl., ¶ 40; Aguilar Dep., p. 31:7-12].

32. Officer Aguilar requested that EMS respond with no lights or sirens. [Aguilar Dep., p. 36:1-5].

33. Within minutes thereafter, Mr. Arreola started to act like he was running away from Officers Aguilar and Dudley, but they did not chase him. [Aguilar Dep., p. 32:12-19].

34. Mr. Arreola accused Officers Aguilar and Dudley of not being real police officers. [Aguilar Dep., p. 34:23-25:2].

35. Mr. Arreola then went to a neighbor's house and began knocking on the door. [Aguilar Dep., p. 33:7-12].

36. Officer Aguilar thought: "And my only thought on that is the fact that he's a mentally unstable person, he is seeing stuff that's not there, saying stuff like some people are there to possibly hurt him or his mother, which is the reason for the welfare check. So knowing that he's knocking on somebody's door, what's likely to happen? Somebody is going to open the door. Well, I don't want this mentally unstable person to knock on a door, then open it. He goes inside and then it's unknown if anybody else's life is in jeopardy. And I don't know if there's guns, knives, weapons inside the house." [Aguilar Dep, p. 33:7-19].

37. Officers Aguilar and Dudley asked Mr. Arreola to come down off the neighbor's porch to talk to them and warned him that if he did not do so, he could go to jail. [Dudley Dep., p. 29:7-13].

38. Officers Aguilar and Dudley's main concern "was getting him help and trying to figure out why we are here." [Aguilar Dep., p. 38:5-9].

39. After Mr. Arreola refused their commands, Officers Aguilar and Dudley then attempted to grab Mr. Arreola's hands and arrest him for disorderly conduct. [Aguilar Dep., p. 33:20-34:1].

40. When Officers Aguilar and Dudley attempted to grab Mr. Arreola's hands, a struggle began that took them all to the ground. [Dudley Dep., p. 29:14-30:2].

41. According to Plaintiffs, who base their allegations on their interpretations of body camera video, the struggle began at 5:25:15 A.M. on January 9, 2017. [Pl's. Compl., ¶ 43].[1]

42. Officer Dudley described the struggle as follows:

Officer Aguilar and I went up there, approached him. Again, still trying to figure out what was going on. At that time, Officer Aguilar went to grab for Hector Arreola's right arm and Arreola immediately pulled away from Aguilar coming into my direction, which would be Hector Arreola's left side.

I grabbed his other hand and we attempted to get his hands behind his back. Once we both had his hands, we fell to the ground and that's when the struggle began. During that struggle, I can vividly remember Officer Aguilar telling me to maintain his lower body so that he couldn't get his knees under him so that he could stand back up.

At that time, I was still trying to grab the hand, get it behind his back. Officer Aguilar continued to try to get his hands behind his back and get a pair of cuffs on there. Somewhere in that struggle, I remember

---

[1] Defendants reserve their rights to dispute the timeline Plaintiffs claim as applicable to his case, but for purposes of the present Motion for Summary Judgment use the timeline asserted by Plaintiffs.

Officer Aguilar asking for units to come to the scene for further assistance.

I do remember – correction – his mother pleading to him, telling him to, you know, stop, stop, stop. And, again, that's telling Hector Arreola to stop, quit resisting.

[Dudley Dep.: 29:14-30-16].

43. Officer Aguilar described the struggle as follows:

And I will say this about the struggle, I mean, I've been a police officer for coming up on 10 years now. And the struggle I had with Mr. Arreola is by far the biggest struggle I've ever been in. I've been in struggles with other individuals that's been intoxicated and high on drugs. And up to this day, that's still the biggest struggle that I've had just trying to get somebody in handcuffs. Like I mean, I'm a bigger guy and I had no effect whatsoever, and it took two of us just to get him handcuffed.

[Aguilar Dep., pp. 40:22-41:7].

44. Officers Aguilar and Dudley got Mr. Arreola in cuffs after an intense struggle, but he was still resisting. [Dudley Dep., p. 31:1-7; Evrard Dep., pp. 21:24-22:11].

45. During the struggle, it was necessary for Officers Aguilar and Dudley to keep Mr. Arreola's arms spread out so he could not get off the ground. [Dudley Dep., p. 30:3-7].

46. According to Plaintiffs, Mr. Arreola was placed in handcuffs at 5:29:09, less than four minutes after the struggle began. [Pl's. Compl., ¶ 56].

9

47. At that time, Mr. Arreola was still kicking his legs and rolling side to side attempting to get up or resist in some way, and Officer Dudley ran to his car to get irons for Mr. Arreola's legs. [Evrard Dep., p. 23:2-14; Dudley Dep., p 31:1-7].

48. Plaintiff Concepcion Arreola, who was three feet away from the struggle, testified that Officer Aguilar and Officer Dudley tried to put the handcuffs on Hector Arreola and he jerked away from them. [Deposition of Concepcion Arreola ("Arreola Dep"), pp. 23:21-24:3; 25:6-10].

49. Plaintiff Concepcion Arreola described the struggle as follows:

Q: Okay. And the two police officers, they're struggling with Hector to try and gain control of him and get him cuffed; is that right?

A: Yes.

Q: And do you remember Hector kicking and trying to get himself free?

A: He wasn't kicking. He was going to kick when the police – when he was on top of him.

Q: And he's – and Hector's trying to get out from under them?

A: Yes.

Q: -- he's trying to get free?

A: Yes.

Q: So he's resisting?

A: Yes.

Q: And it's big wrestling match? I mean, it's pretty intense; right?

A: Yes.

[Concepcion Dep., pp. 25:20-26:13].

50. Plaintiff Concepcion agreed that Mr. Arreola was continuing to kick and resist even after he was placed in handcuffs, until the officers placed him in leg restraints. [Concepcion Dep., pp. 29:1-29:12; Affidavit of W. Ronnie Oakes, attached hereto as Exhibit 1, at Exhibit "A", p. CCG000171 ("And his legs were still kicking and I ran up the hill. I grabbed his legs, trying to keep his legs still, so that way he wouldn't come back and try to kick Evrard…He was still kicking whenever I was trying to hold his legs down…I just really wanted to keep his legs from coming up and kicking anybody.")].

51. Plaintiff Concepcion further testified:

Q: Throughout this – this struggle when they're trying to get him in cuffs and – we can agree that Hector was resisting their attempts to subdue him?

A: Yes.

Q: And he was ignoring theirs and your attempts to calm him down?

A: Probably they didn't know then because he always claim he don't do anything wrong to get arrested.

Q: Right. But my question is a little different. So they're – they're – the officers are telling Hector to calm down?

A: Yes.

Q: And he's not listening? He's still fighting to get free?

A: Yes.

[Concepcion Dep., p. 31:3-22].

52. When Officer Evrard arrived, he also observed Mr. Arreola kicking until Officer Dudley was able to get leg shackles on Mr. Arreola's legs. [Evrard Dep., p. 23:1-14].

53. Once the leg shackles were placed on Mr. Arreola, Officer Evrard and Officer Dudley searched Mr. Arreola, stood him up, and then allowed him to sit down against Officer Aguilar's legs. [Evrard Dep., p. 26:1-13].

54. According to Plaintiffs, Mr. Arreola was patted down at 5:31:17 A.M., or just slightly more than six minutes after the struggle initially began, and then placed in a seated position at 5:33:03 A.M. [Pl's. Compl., ¶¶ 64, 67].

55. While Mr. Arreola was seated, Officer Aguilar monitored him prior to EMS arriving. [Evrard Dep., p. 30:5-10].

56. EMS arrived at the Moss Drive address at 5:36:15 A.M. on January 9, 2017. [Deposition of James Brad Barnes ("Barnes Dep."), p. 68:13-21].

57. EMS attended to Mr. Arreola eleven minutes after the struggle with Officers Aguilar and Dudley began. [Barnes Dep., p. 68:13-21].

58. At the time EMS first evaluated Mr. Arreola, he was sitting on the ground in front of the Arreola residence, conscious and alert, but not speaking. [Barnes Dep., pp. 24:22-25:4].

59. During the struggle, Mr. Arreola stated "I can't breathe," which Officer Aguilar understood to be a sign that he could breathe since he had enough breath to talk. [Aguilar Dep., p. 40:16-21].

60. Mr. Arreola was initially assessed at the scene and his eyes were noted to be sluggish, but his skin and face were normal. [Barnes Dep., pp. 29:19-30:23].

61. Mr. Arreola's heart and lungs were assessed after he got in the ambulance. [Barnes Dep., p. 30:24-31:5].

62. At the time Mr. Arreola was loaded into the ambulance, he had a pulse and was breathing. [Barnes Dep., p. 35:17-22].

63. In route to the Emergency Room, Mr. Arreola went into possible cardiac arrest and the ambulance pulled over and called for additional resources. [Barnes Dep., Ex. "3"].

64. Mr. Arreola died on January 10, 2017. [Pl's. Compl., ¶ 84].

65. According to the autopsy report, Mr. Arreola's cause of death was methamphetamine toxicity. [Harmening Dep., Ex. "14"].

Respectfully submitted, this 8th day of November, 2019.

        PAGE, SCRANTOM, SPROUSE,
        TUCKER & FORD, P.C.

        By: /s/ Alan G. Snipes
            James C. Clark, Jr.
            Ga. State Bar No.: 127145
            jcc@psstf.com
            Alan G. Snipes
            Ga. State Bar No.: 665781
            ags@psstf.com

            Tyler C. Cashbaugh
            Ga. State Bar No.: 869622
            tcc@psstf.com
            1111 Bay Avenue, Third Floor
            Columbus, Georgia 31901
            (706) 324-0251

        By: /s/ Clifton C. Fay
            Clifton C. Fay
            Georgia Bar No.: 256460
            Lucy T. Sheftall
            Georgia Bar No.: 639813
            P.O. Box 1340
            Columbus, Georgia 31902

*Counsel for Defendants*

## CERTIFICATE OF SERVICE

I do hereby certify that I am counsel for Defendants and that on this date I served the foregoing document, Defendants' Defendants' Statement of Undisputed Facts through the Court's CM/ECF system, which will ensure delivery to the following::

    Mark C. Post
    Mark Post Law, LLC
    3 Bradley Park Ct., Ste. F
    Columbus, Georgia 31904
    mpost@markpostlaw.com

This 8th day of November, 2019.

                                          /s/ Alan G. Snipes
                                          *Counsel for Defendants*