IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
COLUMBUS DIVISION

| | |
|---|---|
| RODRIGO ARREOLA, as parent of Hector Arreola, Deceased, and as Personal Representative and Administrator of the Estate of Hector Arreola, CONCEPCION ARREOLA, as parent of Hector Arreola, and S.A., minor child of Hector Arreola, by next friend Jezreel Imee Custodio, <br><br> Plaintiffs, <br><br> v. <br><br> THE CONSOLIDATED GOVERNMENT OF COLUMBUS, GEORGIA, OFFICER MICHAEL AGUILAR, in his individual and official capacity, OFFICER BRIAN DUDLEY, in his individual and official capacity, OFFICER AARON EVRARD, in his individual and official capacity, and COLUMBUS POLICE DEPARTMENT CHIEF OF POLICE RICHARD T. BOREN, in his individual and official capacity, <br><br> Defendants. | * <br> * <br> * <br> * <br> * <br> * <br> * <br> * <br> * <br> * <br> * <br> CASE NO. 4:19-cv-00005-CDL <br> * <br> * <br> * <br> * <br> * <br> * <br> * <br> * <br> * <br> * <br> * <br> * |

## **AFFIDAVIT OF W. RONNIE OAKES**

Personally appeared before me the undersigned officer duly authorized by law to administer oaths, Ronnie Oakes, who after first being duly sworn, deposes and states under oath, as follows:

1.

My name is Ronnie Oakes. I am more than eighteen (18) years of age and competent to give this Affidavit. I make this Affidavit based upon my personal knowledge and for use in support of Defendants' Motion for Summary Judgment in *Arreola et al. v. The Consolidated*

*Government of Columbus, Georgia et al.*, Case No. 4:19-cv-5(CDL), and for any other legal purpose.

2.

I am a currently employed as an officer with the Columbus Police Department ("CPD") assigned to the patrol unit. I have been employed by the CPD since 2015.

3.

On January 13, 2017, I was interviewed by members of the CPD's Office of Professional Standards ("OPS") regarding the January 9, 2017 incident involving Hector Arreola. A copy of that OPS transcript is attached hereto as Exhibit "A".

4.

I have read my January 13, 2017 OPS interview transcript and swear and affirm that it is accurate and that everything I stated during the January 13, 2019 OPS interview is true and correct to the best of my knowledge.

This __7__ day of November, 2019.

                                                                _____(L.S.)
                                                              W. RONNIE OAKES

STATE OF GEORGIA
MUSCOGEE COUNTY

    I, the undersigned, a Notary Public in the aforesaid State and County, hereby certify that W. RONNIE OAKES, whose name is signed to the foregoing instrument, and who is known to me, acknowledged before me on this day that, being informed of the contents of said instrument, she executed the same voluntarily for and as the act of herself.

Given under my hand this 7th day of November, 2019.

_____
Notary Public
(SEAL) My Commission Expires: 9/1/23

# Exhibit A

# January 13, 2017 OPS Interview Transcript

Exhibit to Affidavit of W. Ronnie Oakes
*Arreola et al. v. The Consolidated Government of Columbus, Georgia et al.,* Case No. 4:19-cv-5-CDL

---

**OFFICE OF PROFESSIONAL STANDARDS**
Columbus Police Department

---

INTERVIEW WITH: Officer W. Ronnie Oakes                                             CASE: 17-01
Date/Time Taped: Friday, January 13, 2017/8:06 a.m.

| | |
|---|---|
| Sgt. Bridges: | This is a recorded interview with Officer Ronnie Oakes. He can be reached at cell phone number ▇▇▇▇▇▇▇▇. He has been employed with the Columbus Police Department for the past one year and six months as a police officer. |
| | This interview is being conducted in the Office of Professional Standards located in the Public Safety Center. Present during the interview are myself Sergeant J. G. Bridges, Major F. D. Blackmon, Lieutenant R. L. Graham, and Sergeant T. L. Birris-Mayo. The Office of Professional Standards is conducting an investigation ordered by R. T. Boren, Chief of Police. |
| | Officer Oakes, before we get started, prior to the recording being turned on you read and signed an "Employee Voluntary Statement" form, is that correct? |
| Ofc. Oakes: | Yes, sir. |
| Sgt. Bridges: | You understand everything on there and understand why you're here, this morning? |
| Ofc. Oakes: | Yes, sir. |
| Sgt. Bridges: | Okay. Officer Oakes, would you please, for the record, state your knowledge of the facts involving the arrest of Hector Arreola, which occurred on January 9, 2017,[Monday] on Moss Drive? |
| Ofc. Oakes: | Yes, sir. So the call the came out, I believe it was an 8400, which was meet a person. Officer Aguilar[1] and Officer Dudley[2] responded to the call. I was currently working a burglary call that came out at Graphicom[3] on Veterans Parkway. Officer Aguilar then asked for an additional unit ... I'm not sure what the purposes was ... was for. Officer Evrard[4] responded to that call as far as asking for an additional unit, and then, I then heard Officer Aguilar key up on the radio, and then I just heard screaming from his radio. From what I could tell, it sounded like it was Aguilar screaming ... I wasn't sure exactly who it was. I finished up what I needed from the burglary, and then, I went over there to Moss Drive to see what was going on. When I arrived on scene, I could see Officer Aguilar and Dudley looked like they were completely winded. Officer Evrard was on top of ... I can't ... what his ... what his name is. He was down on the ground. Had his arms like he was putting cuffs on him. Suspect was still kicking around, so I ran up the hill, grabbed him by his legs. Dudley then ran back to his car, got leg restraints to put on his legs to stop him from kicking. We got leg restraints on him, we flipped him over, sat him up, and then Aguilar called for E.M.S. to come out for a psych ... eval ... E.M.S. got on scene, we picked him up, put him on the ... the stretcher that they had out there, and then they were gonna go to the |

---

[1] Officer First Class Michael S. Aguilar, Bureau of Patrol Services
[2] Officer Brian J. Dudley, Bureau of Patrol Services
[3] Graphicom, 6770 Veterans Parkway
[4] Officer First Class Aaron D. Evrard, Bureau of Patrol Services

INTERVIEW WITH:  Officer W. Ronnie Oakes  
Date/Time Taped:  Friday, January 13, 2017/8:06 a.m.

CASE: 17-01  
Page 2 of 10

|  |  |
|---|---|
|  | hospital. Aguilar told the mother, "We were just gone go over to the Medical Center, get him . . . get him checked out for a psych . . . eval . . . Aguilar checked his pupils, and his pupils were completely dilated. He was breathing, not really talking . . . saying anything to anybody. Once he was put in restraints, he just . . . all his fight just stopped. They then go on to the hospital. Aguilar said he was gonna follow the ambulance to the hospital, and then, I was gonna go back to the precinct so I could finish my burglary report. And then, I heard over the radio, "hey, we need you to go back over to the house." Aguilar called over the radio saying that the ambulance pulled over into River Road . . . not sure why. Told sarge he can meet him over there. The dispatcher said cardiac arrest over the radio, so I was assuming that the person that was in the ambulance went into cardiac arrest. The sarge went over there. Sarge called me, told me to go back to the house. "We're gone treat the house as a crime scene." So then, I just went back to the house, and I stayed there until we got really to relieved to come out take over the crime scene. |
| Sgt. Bridges: | Okay. You refer to the . . . you heard a call on the radio to an address on Moss Drive . . . |
| Ofc. Oakes: | Yes, sir. |
| Sgt. Bridges: | . . . had you heard any previous calls? |
| Ofc. Oakes: | There was one previous call. I believe the mother called. 'Cause I was riding in Section 6 and that was a Section 5 call. I believe the mother called out there from before, and it was just . . . I think it was a 10-8 advice. I'm not sure exactly what the disposition was on that call. But I believe it was Aguilar and Dudley went to that first call, initially. But I know there was that one previous call, where the mother called it in. And then the second call was, I believe, whenever the . . . the gentleman called it in. |
| Sgt. Bridges: | When you heard the second call . . . |
| Ofc. Oakes: | Uh huh.[Yes] |
| Sgt. Bridges: | . . . how long after that time did you hear screaming or whatever on the . . . on the radio that . . . that . . . |
| Ofc. Oakes: | I'm . . . I'm . . . |
| Sgt. Bridges: | . . . caused you to respond? |
| Ofc. Oakes: | I'm not exactly sure . . . exactly, how long that timeframe was because, whenever the burglary call came out on my beat, the units came over there, and they started to check the area. So as far as the timeframe from whenever that call went out to whenever he called for assistance, I'm not sure exactly how long that was. 'Cause I was getting information for the burglary call. |
| Sgt. Bridges: | Did you hear an officer come on the radio and ask for backup? |

INTERVIEW WITH: Officer W. Ronnie Oakes  
Date/Time Taped: Friday, January 13, 2017/8:06 a.m.

CASE: 17-01  
Page 3 of 10

| | |
|---|---|
| Ofc. Oakes: | Yeah, that was Aguilar asking for an additional unit to come over that way. I wasn't sure exactly what was going on, but he asked for another unit to start heading that way. That's whenever Officer Evrard started to go over there. |
| Sgt. Bridges: | When they keyed up on the radio, what could you hear in the background or did you hear anything? |
| Ofc. Oakes: | Once he keyed up and asked for an additional unit . . . like I heard him say that, and then, after that, whenever he was keying up, I could . . . just sounded like everybody was just screaming. I couldn't really tell what was going on. |
| Sgt. Bridges: | Once you responded, where did you position your vehicle? |
| Ofc. Oakes: | I parked my vehicles by the other patrol officers vehicles, which was to the mother's address, 'cause I thought they were still over there at the mom's address. And then, whenever I got out of my car, I saw everybody was up the hill at the other address. I believe it was 747 Moss Drive and that's the . . . the numericals. That's where everybody else was. |
| Sgt. Bridges: | Tell me all the other officers that were on scene when you arrived? |
| Ofc. Oakes: | Other officers that were on scene, it was Officer Aguilar, Officer Dudley, and Officer Evrard, then I was the fourth officer on scene. |
| Sgt. Bridges: | Okay. You explained that he was still struggling, so you ran up the hill and . . . |
| Ofc. Oakes: | Yeah . . . |
| Sgt. Bridges: | . . . helped . . . |
| Ofc. Oakes: | . . . he was . . . |
| Sgt. Bridges: | . . . restrain the individual? |
| Ofc. Oakes: | Yes, sir, he was . . . he was facedown. I could hear Evrard saying, you know, "Stop trying to fight . . . stop trying to fight." And his legs were still kicking, and I ran up the hill. I grabbed his legs, trying to keep his legs still, so that way he wouldn't come back and try to kick Evrard. And then, Dudley said, "I'm gone run to my car and the the restraints. So he ran to his vehicle, got his leg restraints, then came back, and we put 'em on him. |
| Sgt. Bridges: | While you were restraining his legs, did he continue to . . . to struggle or fight? |
| Ofc. Oakes: | He was still kicking whenever I was trying to hold his legs down. I wasn't trying to . . . like, 'cause any . . . like, extra force or anything trying to stop him from moving. I just really wanted to keep his legs from coming up and kicking anybody. |
| Sgt. Bridges: | Was he saying anything? |

CCG000171

INTERVIEW WITH:  Officer W. Ronnie Oakes  
Date/Time Taped: Friday, January 13, 2017/8:06 a.m.

CASE: 17-01  
Page 4 of 10

| | |
|---|---|
| Ofc. Oakes: | Not from what I could tell . . . no, sir. |
| Sgt. Bridges: | Okay. Once the leg shackles put on, describe exactly what . . . what you and the other officers did again? |
| Ofc. Oakes: | Once the leg shackles are on him, Evrard . . . I'm not sure where exactly he was positioned. I'm not sure if he was . . . had him straddled or over to his side, but he was checking his pockets to make sure he didn't have anything in his pockets. Checked the pockets that was on the back, because that's what he could reach at first. Rolled him over to his side, checked his other pockets, then once they had all his pockets cleared out, made sure nothing was in there, they sat him up. He wouldn't sit up on his own, so Aguilar let the gentleman rest up against his legs while he was standing there. |
| Sgt. Bridges: | He . . . you said he would not sit up on his own. Was that because he was unable to or because . . . |
| Ofc. Oakes: | We . . . we told him to . . . to sit up. He just didn't want to sit. He just was laying[sic] flat on his back, so Aguilar lifted him up by his shoulders and propped him up, and then, put his legs up against him, so he could just lean up against his legs. |
| Sgt. Bridges: | You said he wasn't really saying anything, but was he . . . could you tell that he was able to acknowledge you and . . . |
| Ofc. Oakes: | No, I couldn't tell he was acknowledging anything. |
| Sgt. Bridges: | Was . . . was he breathing . . . was he . . . |
| Ofc. Oakes: | He was breathing. His eyes were wide open. He just . . . once we got him sitting up . . . like, he just was not responding to anything we wanted to say. |
| Sgt. Bridges: | Once E.M.S. arrived, did they attempt any kind of lifesaving procedure . . . CPR, on the scene? |
| Ofc. Oakes: | No, there was no CPR or lifesaving . . . like, nobody thought anything of any kind of conditions like that on scene. They just thought it was a regular psych . . . eval. They asked to leave the restraints on him at the time just because of him fighting the officers at the time. They got him on the . . . the stretcher and then took him . . . to the Medical Center . . . or on the way to the Medical Center. |
| Sgt. Bridges: | Did you speak to any witnesses while you were on scene? |
| Ofc. Oakes: | I . . . I didn't personally . . . no, sir. |
| Sgt. Bridges: | To your knowledge, did . . . did you use a Taser or any other of your weapons or tools . . . |
| Ofc. Oakes: | No, sir. |

INTERVIEW WITH: Officer W. Ronnie Oakes                                           CASE: 17-01
Date/Time Taped: Friday, January 13, 2017/8:06 a.m.                              Page 5 of 10

Sgt. Bridges:   . . . with the suspect?

Ofc. Oakes:     No, sir.

Sgt. Bridges:   To your knowledge, did any of the officers use . . .

Ofc. Oakes:     No, sir.

Sgt. Bridges:   . . . their Taser or any other . . .

Ofc. Oakes:     No, sir.

Sgt. Bridges:   . . . tool?

Ofc. Oakes:     Not . . . not . . . I mean I . . . I arrived, I was fourth on scene. Evrard was . . . looked like he was in control of situation now, 'cause Dudley and Aguilar were trying to, I guess, rest or take a break. And I ran up the hill and held his legs down so he could get the leg shackles on. But . . . I mean I couldn't . . . I didn't see any taser cartridges, any Tasers being drawn, no weapons out, nothing like that.

Sgt. Bridges:   When you arrived, what the officers were there with the suspect, what type of force, if any, was being used against the suspect?

Ofc. Oakes:     The only thing I could tell was Evrard was on the gentleman's back keeping him down, 'cause he was still like he was trying to move around and fight.

Sgt. Bridges:   No punching, kicking . . .

Ofc. Oakes:     Never . . . no punching, kicking, anything.

Sgt. Bridges:   Lieutenant Graham.

Lt. Graham:     Officer Oates . . .

Ofc. Oakes:     Yes, sir.

Lt. Graham:     Did you ever strike the suspect?

Ofc. Oakes:     No, sir.

Lt. Graham:     Okay, and I don't know if you actually answered this, but did you ever see either one of the other officers, either strike the suspect?

Ofc. Oakes:     No, sir. The only contact I saw with any officer and the suspect was just Evrard that was on his back trying to keep him from . . . from moving around once they got the handcuffs

INTERVIEW WITH: Officer W. Ronnie Oakes  CASE: 17-01
Date/Time Taped: Friday, January 13, 2017/8:06 a.m.  Page 6 of 10

|  |  |
|---|---|
|  | on him. But the other two officers were standing up closer to the house and away from the suspect . . . |
| Lt. Graham: | Okay. |
| Ofc. Oakes: | . . . so I didn't see any contact made by the other officers. |
| Lt. Graham: | And can you tell us why . . . or if you recall, why the suspect, when they was transporting him, why did he have a mask on the lower portion of his mouth? Did you observe . . . observe that? |
| Ofc. Oakes: | The . . . I . . . I didn't see 'em put a mask on at all. And unless they put it on in the . . . the ambulance, I didn't see any mask put on him. |
| Lt. Graham: | Okay. Have you ever serviced a call at that residence before, that 760 Moss Drive? |
| Ofc. Oakes: | No, sir. |
| Lt. Graham: | Okay, or have ever had any dealings with that particular suspect prior to that night? |
| Ofc. Oakes: | No, sir, not to my recollection. I know that's . . . that's Beat 25, but I've . . . I've never dealt with that . . . that person to my knowledge. |
| Lt. Graham: | And when you arrived on the scene, apparently, you felt it was necessary to ask Dudley . . . Officer Dudley and Officer Evrard if they needed some relief or a break, did you ever have that conversation with them? |
| Ofc. Oakes: | I didn't ask 'em if they needed any relief. They just looked like they were winded, 'cause I . . . from what I could tell from the time that the screaming started on the radio until I got there was probably, maybe, three to four minutes. They said they were fighting with him until Evrard got there. |
| Lt. Graham: | And both officers appeared to be winded? |
| Ofc. Oakes: | Yes, sir. I know Dudley ended up having like an asthma attack. He had to get his inhaler. |
| Lt. Graham: | And that asthma attack, you feel was a result from the suspect fighting and resisting . . . |
| Ofc. Oakes: | Yes, sir. |
| Lt. Graham: | . . . arrest? |
| Ofc. Oakes: | Yes, sir. Dudley . . . he did say afterwards that's the . . . that's the most he's ever had to put up with somebody trying to resist him. |

CCG000174

INTERVIEW WITH: Officer W. Ronnie Oakes　　　　　　　　　　　　　　　　CASE: 17-01
Date/Time Taped: Friday, January 13, 2017/8:06 a.m.　　　　　　　　　　Page 7 of 10

| | |
|---|---|
| Lt. Graham: | Okay, so in your conversation between Officer Dudley and Officer Aguilar . . . Aguilar, they were actually com . . . the suspect was combative? |
| Ofc. Oakes: | Yes, sir. |
| Lt. Graham: | Okay. Did you see any blood or any bruises to the suspect? |
| Ofc. Oakes: | The suspect, he looked like he had a . . . like a laceration above his right eye. And there was blood that was on the ground right where he was laying[sic] whenever I pulled up on scene. Where he was laying[sic] down on the ground facedown. |
| Lt. Graham: | Okay. Did the suspect make any statements to you? |
| Ofc. Oakes: | No, sir. He . . . he was still yelling whenever I got out of my car, and then, once I ran up the hill, we got the leg shackles on him, and he didn't say anything from then. |
| Lt. Graham: | And . . . and why did the officers that were out there, prior to your arrival, feel that it was necessary for leg shackles? |
| Ofc. Oakes: | 'Cause he was still actively kicking, 'cause Ev . . . Officer Evrard was on his back, and he was still . . . you know, I . . . the best way I can describe it, flopping around like a fish. And his legs were still up and around moving. So, we said, hey, let's get some leg restraints on him, so I held his legs down and Dudley ran to his car and got leg restraints. |
| Lt. Graham: | Okay, did you sustain any injuries during this con . . . |
| Ofc. Oakes: | No, sir. |
| Lt. Graham: | . . . tact? |
| Ofc. Oakes: | No, sir. |
| Lt. Graham: | And you stated that you, also, nev . . . never saw any evidence that a Taser had been deployed . . . |
| Ofc. Oakes: | No, sir. |
| Lt. Graham: | . . . which is taggings or wire or . . . |
| Ofc. Oakes: | I didn't see any . . . |
| Lt. Graham: | . . . probes, any . . . |
| Ofc. Oakes: | . . . I didn't see any . . . |
| Lt. Graham: | . . . of that? |

INTERVIEW WITH: Officer W. Ronnie Oakes  
Date/Time Taped: Friday, January 13, 2017/8:06 a.m.

CASE: 17-01  
Page 8 of 10

| | |
|---|---|
| Ofc. Oakes: | . . . any tags, taser cartridges, anything like that on the ground. |
| Lt. Graham: | Were there any talk out there among the other officers or witnesses on the . . . at the location about a Taser or anyone being tased? |
| Ofc. Oakes: | After we went back to the scene, I know I was up by the caution or by the . . . the tape that we had up and Evrard went to ask one of the . . . the homeowners, 'cause there was a the . . . the witness that was outside the whole time, he . . . he saw the whole incident that took place. And then he asked the . . . his father that was inside, what did he hear, what did he see, and he stated that he heard officers tase him multiple times. |
| Lt. Graham: | Okay, but he did not see anything? He just . . . |
| Ofc. Oakes: | He . . . |
| Lt. Graham: | . . . heard . . . |
| Ofc. Oakes: | He . . . he said he heard it and that he knows what tasers sound like, 'cause he's heard it on T.V. before. |
| Lt. Graham: | Okay. I don't have any other questions. |
| Sgt. Bridges: | Sergeant Birris-Mayo. |
| Sgt. Birris-Mayo: | Officer Oakes, what were the lighting conditions when you arrived on the scene? |
| Ofc. Oakes: | There was a street light . . . I believe, towards the bottom of the driveway. It was still . . . maybe like, 5:00 . . . 5:30 in the morning, so it wasn't very well lit, but we just had that . . . that one street light . . . I believe. I'm not sure if there was any house lights or not. So, it wasn't very . . . like, well lit, but we could still kind of see what was going on. |
| Sgt. Birris-Mayo: | Okay. You stated that you observed . . . I believe you said, Officer Dudley struggling with him . . . straddling? |
| Ofc. Oakes: | That was Evrard. |
| Sgt. Birris-Mayo: | Evrard? |
| Ofc. Oakes: | Yes, ma'am. |
| Sgt. Birris-Mayo: | Okay. The area of the ground, where they were at, was it a flat earth . . . |
| Ofc. Oakes: | Uh . . . |

| | |
|---|---|
| INTERVIEW WITH: | Officer W. Ronnie Oakes |
| Date/Time Taped: | Friday, January 13, 2017/8:06 a.m. |

CASE: 17-01
Page 9 of 10

Sgt. Birris-Mayo: . . . or were there decorative rocks or anything . . .

Ofc. Oakes: There was . . .

Sgt. Birris-Mayo: . . . other than a flat surface?

Ofc. Oakes: There was rocks next to the . . . the little sidewalk right . . . that was there. But then, where he was laying,[sic] it was . . . it was flat at that area, but the . . . the grass did kind of slope downhill from there. But they were kind of up at the top, where the grass leveled off.

Sgt. Birris-Mayo: Okay, so he would not have been turned over on his chest and having to endure having rocks pressing in up . . .

Ofc. Oakes: Yeah, he . . .

Sgt. Birris-Mayo: . . . against him?

Ofc. Oakes: . . . he . . . he was in a grassy area.

Sgt. Birris-Mayo: Okay. No other questions.

Ofc. Oakes: Okay.

Sgt. Bridges: Lieutenant Graham.

Lt. Graham: I have no other questions.

Sgt. Bridges: Sergeant Mayo.

Sgt. Birris-Mayo: No other questions.

Sgt. Bridges: Officer Oakes, we've asked you several questions, you've explained to us all your . . . the knowledge of the event, is there anything you feel like we did not ask you or that you need to tell us at this time?

Ofc. Oakes: Think everything was covered.

Sgt. Bridges: Is . . . do you have any knowledge of anyone having . . . besides the officers on scene with body cams, do you have any knowledge of anyone having a video recording of the incident?

Ofc. Oakes: Not from what I seen.[sic] I mean there was the . . . the one gentleman that was standing outside, the officers that were there. I don't . . . I don't believe seeing anybody else outside as far as like family members . . . neighbors. There's one neighbor that came out later, once we came back to the scene and got the . . . the

| | |
|---|---:|
| INTERVIEW WITH: Officer W. Ronnie Oakes | CASE: 17-01 |
| Date/Time Taped: Friday, January 13, 2017/8:06 a.m. | Page 10 of 10 |

                tape up, and she wanted to know if her neighbors were okay. And we said, yeah, your neighbors are fine. It's a non-related incident that's . . . that happened at their house. But as far as I know, there was no other witnesses that . . . that saw anything that happened.

Sgt. Bridges:    Okay. This concludes the interview with Officer Ronnie Oakes. The time is 8:24 a.m.



/db (DS710132 – A 00:16:40)

CCG000178

Recording #: DS 710132
Folder: A

## Case Interview Sheet

Case Number  17 - 01

Today is  Friday  Jan. 13th , 20 17 , and the time is  8:06  (am)/pm. This is a recorded interview with  Ronnie Oakes . His/Her home address is _____, and he/she can be reached at the home/cellular telephone number of ███.

He/She has been employed with  the Columbus Police Dept.  for the past  1 yr 6 mo.  years/~~months~~ as a  police officer .

This interview is being conducted in the Office of Professional Standards located in the Public Safety Center. Present during the interview are Major F. D. Blackmon, Lieutenant R. L. Graham, and Sergeants T. L. Birris-Mayo, and J. G. Bridges. The Office of Professional Standards is conducting an investigation ordered by R. T. Boren, Chief of Police.

Mr./Mrs./Miss/Ms./Rank  Officer Oakes , would you please state for the record your knowledge of the facts involving  the arrest of Hector Arreola which occurred on Jan. 9th, 2017 on Moss Drive .

This concludes the interview with  Officer Oakes .
The time is  8:24  (a.m)/p.m.



R. T. Boren
Chief of Police

**Columbus Police Department**
P. O. Box 1866 · 510 Tenth Street
Columbus, Georgia  31902-1866



L. H. Miller
Assistant Chief

# EMPLOYEE VOLUNTARY STATEMENT

I am giving this statement freely and voluntarily to the Office of Professional Standards. I understand that the Office of Professional Standards is conducting an investigation into:

_the arrest of Hector Arreola which occurred on Jan 9th, 2017 on Moss Drive_

I understand that I am free to leave and conclude the interview at any time I choose to do so. I have not been threatened or coerced in any manner prior to giving this statement. I understand that no disciplinary action will be taken against me if I refuse to answer questions at this time. I am aware that all answers that I give to questions and all statements that I make must be truthful and that giving untruthful statements to investigators is subject to disciplinary action.

Due to the nature of the investigation, I understand it is a requirement that I not discuss the facts in this case with anyone. However, this does not mean that I relinquish my attorney/client privilege.

Ronnie Oclas
Print Your Name

J. D. Blackmon
Witness

_signature_                1-13-17  0806
Signature                  Date/Time

Witness

Witness

Witness

Phone (706) 653-3100     Fax (706) 653-3114

CCG000180

An Equal Opportunity Organization