OFFICE OF PROFESSIONAL STANDARDS
Columbus Police Department

INTERVIEW WITH: James Barnes
Date/Time Taped: Tuesday, January 17, 2017/9:56 a.m.

CASE: 17-01

| | |
|---|---|
| Sgt. Bridges: | This is a recorded interview with James Barnes. He can be reached at cell phone number of ▓▓▓▓▓▓▓ He has been employed with the Columbus Fire and E.M.S. for the past ten years as a Fire Medic.<br><br>This interview is being conducted in the Office of Professional Standards located in the Public Safety Center. Present during the interview are myself Sergeant J. G. Bridges and Lieutenant R. L. Graham. This . . . the Office of Professional Standards is conducting an investigation ordered by R. T. Boren, Chief of Police.<br><br>Mr. Barnes, before we started the recording, you read over and signed a "Witness Statement" form, is that correct? |
| Mr. Barnes: | Yes, sir. |
| Sgt. Bridges: | You have any questions about that form? |
| Mr. Barnes: | No, sir. |
| Sgt. Bridges: | So, if you would, Mr. Barnes, for the record, just state your knowledge of the facts involving the arrest of Hector Arreola, which occurred on January 9, 2017, on Moss Drive? |
| Mr. Barnes: | All right. Well, after we . . . after 9:00 p.m., they . . . they call the phone unless they tone out a . . . an engine or ladder truck with you, so . . . They called the phone at the station, they gave me the address, and told me it was . . . like, a psych . . . I think they said psych . . . eval . . . and our policy is . . . it's always been, when we go to psych . . . evals, we always have to wait for CPD or whatever entity it is to clear the scene. So, she gave me the address . . . was . . . which is . . . I knew of Moss Drive, and I knew that was way out of our territory, but I meant to say way, but it was not . . . definitely not our territory. So, she told me that the other trucks were out, so we were next up. So it was either us going to Moss Drive or a truck going from Pratt and Whitney to Moss Drive. So, obviously, we'd be a little closer, coming from Tenth Street. So, we left the station. While we were en route there, she might have said . . . you know, we're just . . . just referring . . . got . . . getting the address, something about . . . you know, CPD would be there to clear the scene. They always repeat themselves. We're probably like halfway there . . . I think, and she said that CPD had cleared the scene. So we get to Moss Drive . . . and it was just us because they . . . usually on psych . . . evals, they just send an ambulance unless something else dictates it. So we get there, and we park right in front of the street or right in front of the . . . the address was given, and it's . . . it's dark outside, so we see . . . I can . . . I don't know how many cops are out there, but we got out of the truck. One of the officers met us. Can't remember his name, but was just saying that . . . you know, we need a . . . I guess, evaluation on him. Good . . . being . . . like, a psych . . . like, combative or whatnot. I was like all right. |



PLAINTIFF'S EXHIBIT
P-2

INTERVIEW WITH: James Barnes  CASE: 17-01
Date/Time Taped: Tuesday, January 17, 2017/9:56 a.m.  Page 2 of 16

Like we always do, we walk . . . I walked up there to him and there was a few cops standing around him, one behind him. He was sitting on his rear end . . . like, he was sitting with his legs out in front. He had handcuffs behind his back and he had leg shackles on him, and he was just sitting there. I could see him breathing, and they were trying to tell me . . . you know, kind of . . . like, what happened, but they said . . . I guess he was being combative prior to us getting there, and they needed, probably, to be evaled . . . you know to . . . or medical eval . . . or some type of eval . . . So I was like, well, that's fine, and so, they were like . . . they had their flashlights, and I could see him breathing but . . . you know, shined a flashlight down and I looked up . . . you know, looked at him. Looked like his eyes were a little glazed, he may be a little sluggish. Didn't   . . . didn't seem all the way right, but when it come to . . . like . . . you know, being combative or possible drug usage or anything, you just never know. Or the . . . or he might not be talking to me because he didn't want to talk to me. So I turned to his . . . I want to say it was his mom, and I said, "Does he do any kind of drugs or anything that you know of," and she told me, "Not that she knew of." But I can ask 500 people there I'm gonna go off me . . . you know, 'cause I mean I . . . they . . . they might not be telling me the truth, so . . . So I said, "All right." I told them . . . I said, "Well we'll walk right here and get the stretcher," which was . . . I mean, it was right at the end of the driveway. So we got the stretcher, put it up next to him. We lowered it down. We didn't make him get up. We all . . . like, just kind of like picked him up and sat him on there. 'Cause in my mind still, you called me out, y'all got him in leg shackles and handcuffs, he might still be combative. So I told them, "Keep him in the leg shackles and handcuffs." So we put our shoulder straps over him and the waist belt buckle that connects to 'em and we put the one that goes over his legs, just to make sure . . . you know, if . . . if he was gone be combative. I wasn't sure at that time. So we get him into the truck . . . we take him down, get him into the truck, and shut the doors. Me and Aaron Bush[1] got back there. And he was still breathing, he wasn't . . . he wasn't talking at all. He was just making like . . . like some non-specific moaning, weird sounds . . . you know. So, still at the time, I'm like   . . . ah, you're doing this on purpose or is this something else. I'm trying to kind of figure it out, myself. So we hook the blood pressure cup up to him . . . and off the cardiac monitor, and it's taking the blood pressure. We loosen up the . . . the shoulder straps and the . . . the waist strap and lean him forward, 'cause we're gone use one of his hands . . . get a blood sugar . . . 'cause I mean you never know, that could cause people to comba . . . be combative and whatnot. So, when we lean him forward, he . . . like, makes . . . like, an ugh noise . . . you know . . . like, we leaned him forward and I'm like, okay. So we get a blood sugar, the blood sugar, if I remember correctly, was 85. I'm like, okay, well that's not a problem. So we lean him back, kind of make sure he's still strapped back in. At that point and time, I was still looking at him, and I was like, ugh . . . So Aaron Bush asked me . . . we . . . sometimes we swap calls. Depending on the type of call, like he might ride one end. I ride one end, and I was like . . . well, I'll ride this one. So he goes and gets to the front, and I noticed that the timeframe that he did that, the . . . the monitor went all the way up . . . I think it was . . . like, maybe, 150 . . . 160, which is systolic blood pressure and goes all the way back down. Usually, it'll start reading it somewhere and it'll give you a blood pressure. Well, it didn't give me one. I'm like, oh, that's kind of weird. So, but I'm looking at him, he's still breathing, so Aaron is . . . I guess turning us around. We're, maybe . . . it might be the third or fourth house in on Moss Drive, which is right next to River.[Road] So, I was like, well, could have been a malfunction. I hit it one more time, and I'm get . . . hitting the blood pressure button on the cart monitor one more time, and I'm gone get the . . . the leads out, which are like the cardiac monitor leads. Kind of read what the heart's doing. It's like the . . . well, one version will read how the hearts doing, and it was doing it's thing. The monitor was trying to read. He turns around. I mean I think we were right at River . . . gonna turn onto River. And I was looking at him and . . . well, I went to . . . the . . . our jump bag was next to us, so I was gone get a . . . if something happens, sometimes monitors do funny thing. I was just gone get a manual blood pressure

---

[1] Aaron Bush, Columbus Department of Fire and Emergency Medical Services

CCG000193

if something changed. But I looked at him, and I was like . . . he . . . he seemed to, maybe, change his breathing pattern a little bit. 'Cause the only thing I noticed, between being on scene, when he was sitting in front of the cops . . . like, the cop was behind him, the only thing I noticed wrong besides the . . . the . . . the glassiness of the . . . the . . . the weird look in his eyes was he had like a small . . . I wouldn't say small, but it was . . . like, a . . . like a hematoma/like a little laceration or abrasion right here on his left eyebrow area. That's the only thing I noticed. Even when I got in the truck that's still the only thing I noticed. I mean, of course, I didn't cut his clothes off or anything at that time, but that's the only thing I noticed, period. Besides his eyes looking kind of funny. And I got . . . we got right there at the stop sign about to get on River Road and I noticed he kind of was breathing funny, so I got . . . like I said I had the . . . the cardiac monitor leads out. And I was about to hook him up to those and I can start the process of . . . 'cause in my mind now, I'm not sure if he had done some type of drugs, so I'm gone start like our protocol on like, maybe, starting an IV, hooking up to the monitor, putting him on oxygen, and all that stuff that we do. It's like a protocol for us. So I was gone start that process, and then, soon as we turned on . . . we're turning onto River Road . . . 'cause I could feel the . . . like, the truck moving, he . . . like, just went . . . he talk . . . took a breath. He . . . like, took a deep kind of . . . somewhat deep breath in and let it out, and then, that was it. He didn't move, he didn't make a noise, he didn't take another breath, and I was like . . . I mean it's all . . . like, in seconds. And I'm looking at him, and I said I took my hand and . . . like, put it right here on his chest and . . . like, just kind of wrapped . . . you know, see if I can rouse him up. I was like, "hey, buddy." Like, "Hey!" . . . like that. Nothing. So I had those leads in my hand, I . . . I mean it takes like one second . . . boom . . . boom . . . boom. I mean, maybe, a couple of seconds, but I . . . oh . . . oh, yeah. I put the leads on him, which are . . . you put one on each leg or lower abdominal area, and you put one on each arm or the upper chest torso area. And it had . . . like, way below the bare . . . the bare minimum. I mean like, maybe, two beats per every . . . like, six to eight seconds. And I was like . . . well that's . . . that's not good, that's not bad at all. He's not breathing. That's very bad, so I yelled at Aaron to pull over on the side of River Road, which is al . . . we were almost at Piggly Wiggly at River, and I told him to pull over, I said, 'cause this guy, possibly, just arrested. Some . . . I know I wasn't sure what type of arrest it was . . . like, respiratory, cardiac, or trauma, but he just arrested. So he pulled over, I lowered him into the supine position. We immediately started . . . start CPR on him. Aaron started doing chest compressions, add a BVM, which is a back vowel . . . valve mask. Turn on the oxygen, we're trying to bag him. I was gonna intubate him. He continued doing CPR. We kept the cardiac monitor leads on him. I put the AED pads on him, and hey, there's a part on the cardiac monitor that'll count down. It'll be the two-minute CPR. It'll do it for you. So it will count down the two minutes, then it'll say, analyze . . . it'll analyze what's going on with the heart, and it'll tell you if it needs to shock it or not. So, we started that whole process, and I called at the same time . . . all . . . this is all like simultaneously, I . . . I told dispatch to send me an engine. I might have said Engine 8 or the closest engine to come help, "'cause we have an arrest out here." I said, "I need 'em 10-18" or quickly. So they got them en route. Before they got there, you've got Aaron doing CPR on . . . on him. We had all . . . the AED pads and the . . . and the cardiac monitor leads on him. I intubated him to get an airway. Well, we hook . . . we hooked a $CO_2$ monitor up to him, which is . . . is another way of verifying that you . . . your intubation was successful. So, just because he had stopped breathing, I hooked him right up and started bagging him to try to get him . . . you know, to get . . . like, oxygen flowing through his body again. 'Cause if you've got CPR going, I mean we've got to get him going. So, by the time Engine 8 got there, I was already . . . had him intubated, was bagging him. Aaron was continuing with CPR. The monitor had not said anything about shocking him as far as the rhythm. I still couldn't get a pulse. His rhythm changed a couple of times just to different stuff, but I couldn't feel a pulse at all, so we just resumed CPR. Engine 8 got there, they, immediately . . . once they opened the door, I told one of 'em to throw me a C-collar. We have an adjustable like ready to . . . C-collar, just because now, at this time

. . . at ten years of doing this, I've seen many different things, so, and this time, I'm covering everything. Like I'm covering . . . trying to cover every base. I'm like, well, you never know if something happened to him. I don't know what happened exactly before me getting there. So I put him in a C-collar just to make sure nothing was going on with his neck area . . . like C-spine area. So, they threw me a C-collar, one guy got back there and did CPR for me. One guy . . . Aaron was trying to look for an IV. I told the lieutenant off . . . or the sergeant off the truck asked me . . . kept asking me, is there anything else we need . . . you need . . . you need. I said, well, I'm gone try to get an IV on him. They were looking in other places, but at the point and time, he's still in the handcuffs only because . . . due to the fact of what was going on at the time, that wasn't dealing with his quality of life at the time. Like, his . . . his . . . him being in handcuffs had nothing to do with him not breathing. I was trying to save the guy's life. So at the point and time, he was still in handcuffs, still had the hand[sic] shackles . . . I mean the leg handcuffs[sic] or shackles. But, I told him . . . I said, well, just have one of your guys drive. I cannot remember which one drove, but I kept me, a fireman . . . I think it was another fireman off Engine 8, and my guy, Aaron Bush, in the back with me. One of their guys drove. We got going to the hospital. I tried to . . . I had a . . . what they call an EJ . . . it's an IV in the external jugular vein on the right side of his neck. I think I put a 16 gauge IV in the right side of his neck, and it . . . sometimes, they're positional, sometimes they act funny, but they're . . . because it is up here . . . you know, like I'll . . . I make sure that it's running 100 percent perfect. It seemed to be not acting exactly right when I was flushing it. I mean it pulled back blood, but just wasn't . . . maybe, it was positional. So, I started an 18 on his left external jug . . . jugular vein, and it ran perfect. So, we hooked the thousand bag of normal saline up to it, had it running wide open. And once you've got a guy driving from River Road, I chose to go to the Medical Center. And the only reason I did that is because, now, I don't know exactly what happened before I got there. You could go to St. Francis, but the Medical Center covers traumas, bleeds . . . anything you can imagine, they cover it. So I chose to go to the Medical Center, number one, because of that. Number two, when I was on scene before any of this ever happened, I had told CPD and the family that I was gonna take him to the Medical Center. It was just the hospital at the time that I chose, and they were like, that's fine. I kind of give everybody the option. So, we continue to go to the Medical Center because of . . . now, I don't know what exactly's going on with the . . . the gentleman. So, it seemed like seconds. I mean I know it was probably a couple of minutes or so, but it seemed like seconds and we were there. And by the time we were at the Medical Center, I was giving him . . . I gave him one milligram of one to ten thousand epinephrine and . . . through his IV. I gave him one amp of . . . what they call sodium bicarb, just 'cause he'd been down for so long . . . through his IV. I tried two milligrams of Narcan . . . just in case it was some opiate or whatnot, and nothing seemed to change. No matter what. Never . . . I got many different rhythms on cardiac monitor, but I never got pulses back where they . . . they would just set like . . . it was . . . just kept changing and changing. So, by the time we got there, we had . . . I probably . . . we had unbuckled his shirt but not his pants, and we had him . . . we threw a sheet on him, got him inside. Obviously, we continued to help him. By the time . . . I don't know how long it was, that he's in that trauma room, but I don't know if it was the medications that I had gave . . . sometimes, they take a minute. I wouldn't say take a minute, but sometimes, it . . . sometimes, you get different reactions. I don't know if it was my medications or was the medications they gave, but then they started kind of getting what would be a blood pressure back and some other things. It started . . . he started kind of coming back around. I don't know if he ever said anything or made any difference than the noises that he made with us, but . . . I mean, that's as far as I got. Like I said, the only thing that I noticed be . . . between being on scene and getting to the hospital about him, in general, was by the time I got him in the truck, he went from what his eye . . . pupils went from . . . like, barely moving, kind of sluggish like, to now, they weren't moving at all. They're . . . like, fixed and dilated type. So, besides the fixed and dilated and the . . . the hemotoma here, they had . . . you can tell it was bleeding at one time, but it kind of . . . like, kind of

INTERVIEW WITH: James Barnes  
Date/Time Taped: Tuesday, January 17, 2017/9:56 a.m.

CASE: 17-01  
Page 5 of 16

|  |  |
|---|---|
|  | stopped itself. That was it, I never got from his normal . . . his sounds that he was making, I never got anything after that. I mean after, when I got on River Road an Engine 8 got there with me, I never got anything back from there to the hospital. When he got . . . they might have gotten something back there, but I never got anything back. |
| Sgt. Bridges: | For the record, Major F. D. Blackmon has entered into the interview of Mr. Bush.[sic] You had . . . you stated earlier, the first part of . . . of when you were talking about what happened . . . |
| Mr. Barnes: | Uh huh.[Yes] |
| Sgt. Bridges: | . . . you said us . . . we responded, and then, you indicated later Aaron Bush was the person with you. That's the person that responded with you, initially? |
| Mr. Barnes: | When . . . initially, it was just me and Aaron Bush. We . . . just us two on an ambulance. It's two on an ambulance at all times. So, it's just me and him, initially, and then, when I called for help, they sent Engine 8, and there's four guys on there. So I'm not sure exactly everybody that was on there, but Engine 8 came. |
| Sgt. Bridges: | You indicated when you . . . when you first saw Mr. Arreola, he had glassy eyes. In you're history as a . . . as a medic, what . . . what things could that indicate? |
| Mr. Barnes: | Just from them being glassy looking and sluggish . . . I mean it can mean many different things. Whether . . . like, ETO acts like some type of maybe alcohol, maybe drugs. I mean it's many different things. I mean everything changes. It depending on how you are . . . like, depending on . . . like, I said, drugs or alcohol or how your body's refusing and . . . and what's going on with your body. I mean many different things. I mean you might not have been arrested . . . like, as far as . . . like, a cardiac arrest or respiratory arrest or even a trauma arrest. But your eyes can dictate a lot of things when you're alive, but at that point and time, they were just really glassy and really . . . and real sluggish. So, I can't tell at the point and time if he was on drugs, but sometimes, your eyes change when you're on drugs or how your body's refusing. So . . . |
| Sgt. Bridges: | His body temperature, is that something that . . . that you check? |
| Mr. Barnes: | Usually we don't . . . we don't do a lot of temperature checks like that, so I know it was cold outside. When I felt his . . . when we were getting a blood sugar, I noticed . . . like . . . like, right now, my hands are cold. I mean they weren't . . . like, freezing, but they were cold. I mean it, obviously, was cold outside. But when we were . . . when I was putting pads on him and stuff, his core temperature . . . like, stomach area, chest area, was not the same temperature . . . like, it was warmer. Now I don't know the exact temp . . . but I know his core temperature was warmer. I . . . I know his hands, probably, from being out in the . . . the climate was changed. But as far as his core temperature, it was . . . it was warm. |

CCG000196

INTERVIEW WITH: James Barnes  
Date/Time Taped: Tuesday, January 17, 2017/9:56 a.m.

CASE: 17-01  
Page 6 of 16

| | |
|---|---|
| Sgt. Bridges: | You . . . you stated you noticed a laceration or some type of injury above his left eye, was he bleeding from any other part of his body or face? |
| Mr. Barnes: | Not that I noticed . . . like, I . . . only, man . . . only thing I do remember was that spot above his left eyebrow. I don't remember anything else. And I mean I . . . not that I re . . . can recall, 'cause I mean I even . . . I was the guy that intubated him, which means putting a tube into the . . . which would be going to the trachea so he'll be able to breath. And I even looked all through his mouth when I was doing it I just don't remember seeing anything there. I don't . . . like I said, we only took the shirt off because we were putting the leads and the pads on. So, I don't remember seeing anything, but the on . . . like I said, just the eyebrow. I don't remember seeing anything else. |
| Sgt. Bridges: | Have you responded to any scenes where police officers have had to discharge their Taser? |
| Mr. Barnes: | Probably in ten years, I . . . I have a few times. |
| Sgt. Bridges: | Okay. Was there any indication to you, when you arrived, by looking at . . . at things on the ground, wires, anything that a Taser had been deployed? |
| Mr. Barnes: | I didn't personally . . . |
| Sgt. Bridges: | Did any . . . |
| Mr. Barnes: | . . . see anything. |
| Sgt. Bridges: | Did any of the officers on scene indicate to you that they had used a Taser, any other type of weapon on the . . . |
| Mr. Barnes: | Not . . . |
| Sgt. Bridges: | . . . individual? |
| Mr. Barnes: | . . . that I remember . . . not that I remember. |
| Sgt. Bridges: | How did they describe the . . . the struggle or the . . . placing him in custody to you? |
| Mr. Barnes: | They didn't really . . . like, give me . . . like, a big, long description of exactly what happened. They just, basically, said that he was being combative. And so, they had to end up . . . I guess, putting him in the handcuffs. And they didn't describe exactly how they had to do it or anything like that. They just said he was being combative. And so, I don't know exactly what happened before I got there. |
| Sgt. Bridges: | Would you describe him as combative once you arrived on . . . |
| Mr. Barnes: | No, sir. |

INTERVIEW WITH: James Barnes  
Date/Time Taped: Tuesday, January 17, 2017/9:56 a.m.

CASE: 17-01  
Page 7 of 16

| | |
|---|---|
| Sgt. Bridges: | They placed the handcuffs behind his back prior to you arriving . . . |
| Mr. Barnes: | Yes. |
| Sgt. Bridges: | . . . did they remain behind his back during this entire time of . . . |
| Mr. Barnes: | Yes. |
| Sgt. Bridges: | . . . taking him to the hospital? Is that a normal procedure or just up . . . |
| Mr. Barnes: | Uhm . . . |
| Sgt. Bridges: | . . . to however you feel? |
| Mr. Barnes: | Well, how I feel . . . and I guess it is for my on scene safety mat me . . . I mean my own safety and my partner's safety, if this guy was combative prior to us getting there, and you have him in handcuffs behind your back and you have him in the . . . the leg shackles, I feel like that I'd much rather keep them on him in . . . in case something was to happen with us. So, for me, in my whole career, if that has came[sic] down to it, I'll leave 'em in the handcuffs. Exactly how I found 'em, I leave 'em in the handcuffs, leave 'em in the shackles, and I let the cops know. That way I don't just . . . like, just leave with their stuff, and they're always . . . never have had a problem. They've been like, oh, we'll . . . we'll come right behind you. So I always do . . . always. If you already have them in there, I . . . I leave 'em, so . . . |
| Sgt. Bridges: | When you arrived, there was nothing to indicate that Mr. Arreola needed CPR or anything of that nature . . . at the time that you arrived on scene? |
| Mr. Barnes: | Not right when I got on scene . . . no, sir. |
| Sgt. Bridges: | That occurred once you were inside the ambulance on the way to the hospital? |
| Mr. Barnes: | Yes, sir. |
| Sgt. Bridges: | Did the mom, when you briefly spoke to her, did she . . . I know you stated she indicated she . . . to her knowledge, he didn't use drugs or . . . the individual didn't use drugs. Did she indicate any kind of medical history on the individual? |
| Mr. Barnes: | No, sir. I . . . if I remember . . . I might . . . between . . . between talking to her, I cannot exactly remember if I did ask her about medical history. I know definitely, she told me, no, on . . . like, she did not recall . . . like, if he used drugs of any sort or anything like that. So, it's just the way it was. I . . . you know, when it's dark outside and it's . . . you've got flashlights and whatnot, and my point, I just wanted to get him in the truck so I can actually figure out what's going on. So . . . you know, I don't know who all was behind me. I know the mom was standing right here to my right and the cops were in front of me. And he was in front of me but . . . at that point and time, when she said nothing about drugs or |

|               |                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                             |
|---------------|----|
|               | whatnot that she knew of, I just wanted to get him in the truck so I could actually see him and figure out what may be possibly is going on, 'cause . . . at that point and time, I didn't think anything different. Because when you go to calls like that and . . . and we go to a lot of 'em . . . you know, I'm not saying that all of 'em are handcuffed or anything like that, but . . . you know, sometimes, people don't want to talk to you. Like, they don't want to say nothing to you. I mean, even though I'm not cop, they still don't want to talk to you. So I didn't know, at the point and time, if he was just not talking to me or . . . I was gonna try to figure out more once I got in the truck, so . . . |
| Sgt. Bridges: | Was . . . as you were assisting the individual looking at his torso, the rest of his body, you stated the only injury you noticed was to his left eye. There was no other sign of . . . of any type of trauma or injury to . . . that would be outward . . . outwardly visible on the individual? |
| Mr. Barnes:   | Not right off the bat, I didn't see anything. I mean I . . . he . . . I don't even . . . you know, I'm not saying I don't recall anything in the hospital, but I don't recall seeing anything from my knowledge except for the one right above his left eye right there . . . or left eyebrow area. I think I did put it in my report. I think I . . . I put it as like a hematoma/abrasion and laceration, but the bleeding was controlled, 'cause it kind of like controlled itself at the time. I don't know if it's because the temperature outside. But you could tell where it was bleeding, and I mean it might have a smidge . . . a little bit . . . maybe, a small amount of blood coming out, but nothing . . . like, where it was . . . like, gushing blood anywhere, so . . . |
| Sgt. Bridges: | After your arrival at the hospital and dealing with staff there, did you learn anything about that injury or any other injury to the individual? |
| Mr. Barnes:   | No, sir. |
| Sgt. Bridges: | Major Blackmon. |
| Major Blackmon: | Okay, a couple of questions I have, and you may have already answered the questions, may have been asked the questions. But if . . . and if that is the case, you . . . you can just briefly just give me the synopsis based on your previous answer. Upon arriving to the scene, you were able to assess Arreola? Am I correct? |
| Mr. Barnes:   | Yes. |
| Major Blackmon: | Okay, and during your assessment, what was determined . . . the determination as to what medical assistance was needed? |
| Mr. Barnes:   | Well, at the time . . . you know, I didn't know he was gone need anything to the extent of what we provided, but when the cops . . . the . . . the officers that were on scene said that . . . you know, just want to get him . . . like, clear . . . like, medical eval . . . or a psych eval . . . or . . . you know, some type of eval . . . At the point |

and time, you kind of think, okay, well, usually . . . you know, you're . . . just get back there and talk to 'em, and you . . . you know, figure out what's going on. Maybe, get their vital signs. You know, just fit . . . see if there's anything that he needed. But at the point and time . . . you know, like I said, he wasn't talking to me, so I couldn't figure out anything when I first walked up. And then, when I got in the truck, he wasn't . . . he just made . . . he would make these . . . these sounds that . . . you know, like, either on purpose or just 'cause that's what he was doing at the time. And I . . . I couldn't figure that out at . . . at the point and time until he . . . you know, arrested . . . you know, I mean it was shortly after I left the scene, so . . . I mean there's two different circumstances . . . like you . . . you . . . you take somebody in for a psych . . . eval, you get vitals, you get their history. You do you normal . . . your normal thing as far as getting their . . . assessing 'em, but . . . you know, obviously, it went from that to something way different, which would be like you're going through all your ACLS protocols and . . . and treating a resp . . . like I put in the report, a respiratory, a cardiac, or trauma arrest. I kind of justified it, 'cause I wasn't sure which one it was, 'cause, obviously, he arrested of some sort . . . something caused him to arrest. So, obviously, the assessment changed then to something way more advanced than the . . . what the . . . the psych eval . . . or the medical eval . . .

Major Blackmon: So, when you say ACLS, is that what you said?

Mr. Barnes: Yes, sir.

Major Blackmon: What does that stand for?

Mr. Barnes: Advanced Cardiac Life Support.

Major Blackmon: Okay, so, but when you, initially, arrived on the scene, based on your experience and your knowledge, that type of medical assistance, the Advanced Cardiac Life Support, was not needed, initially . . .

Mr. Barnes: Well, just . . .

Major Blackmon: . . . based on your assessment?

Mr. Barnes: Just from looking at him, no. But like I said, I didn't have a . . . the cardiac monitor hooked to him to see what his heart was doing at the time. So, just from looking at him, no, but . . . you know.

Major Blackmon: Right, so . . . and then, once you loaded him onto the truck, you were able to check some vitals, is that correct . . . is that what you said?

Mr. Barnes: Once I got him in the truck, he . . . he was still breathing, but he . . . like I said, he was making nothing but sounds, so that's when we started . . . like . . . you know, getting the blood pressure, getting the blood sugar. I mean off the blood sugar,

INTERVIEW WITH: James Barnes  
Date/Time Taped: Tuesday, January 17, 2017/9:56 a.m.

CASE: 17-01  
Page 10 of 16

|  |  |
|---|---|
| | he's fine, but then, I couldn't really get . . . like, a good blood pressure, but . . . you know, sometimes the monitors do funny things. I mean it . . . it's just . . . it's a machine like any machine. So I was gonna get a manual blood pressure cup, which is like me actually pumping it up and listening, but it's like everything happened just like that. It was just like it . . . I wouldn't say second, but it seemed like seconds. It was just like we pulled out, and the next thing you know, I'm looking at him, he takes a deep breath, and he just lets it out, and he doesn't take another one. He just . . . nothing. And that's when I tried to stimulate him, and he didn't give me anything. So that's when I . . . I actually had the leads in my hand, which are the cardiac monitor leads to read the heart, so I just, boom . . . you know, put 'em on him real fast, and it was just like, maybe, two beats every six to eight seconds, which is not . . . I mean if you survive that you are . . . you're . . . I've never seen it, so two beats every six to eight seconds is not enough to survive. So, but I'm . . . like I said, I'm not a doctor, but just from my experience . . . you know. That's just . . . it wasn't even right and I couldn't feel a pulse at the same time, so whatever happened, it happened right then. He arrested from something. I'm not sure what it was. |
| Major Blackmon: | And that's while you were en route to . . . |
| Mr. Barnes: | Yes, sir. |
| Major Blackmon: | . . . the medical facility? |
| Mr. Barnes: | Yes, sir. |
| Major Blackmon: | So . . . so, based on what you described, then . . . then you were not able to continue or complete the blood pressure check, am I correct? |
| Mr. Barnes: | Yes . . . well, I mean it . . . the monitor, itself . . . the monitor, itself, completed itself . . . you know, but I was gone get a manual, 'cause sometimes, the blood pressure's low, or sometimes, it . . . it either, some . . . doesn't pick up or something happens. But like I said, it's a machine, so you even question the machine, you always do it yourself. And a lot of times I do . . . do it myself. I get . . . but at the time, we were just like . . . I was gone hook him up to the monitor, get things running through the monitor, 'cause it does like a . . . I wouldn't say . . . like, a paper trail but it's kind of like a paper trail. Like, you can . . . like, if somebody's writing stuff down on this paper, it's . . . like, your documentation. Well, that monitor can keep the documentation. You can . . . like, just . . . you know, do code summaries and stuff like that, and it's . . . like, a way of . . . you know, figuring out . . . you know, what you did. So, when we started that, and then, we did the blood sugar, and then I was looking at him, I was like, well, I'll . . . I'll run this call, just cause I was gone start the . . . in case he did do drugs protocol for myself, I was gone start an IV on him and have him on oxygen and hook him up to the cardiac monitor, get . . . try to get another blood pressure, and try to figure things out. Maybe, try |

|  |  |
|---|---|
|  | to troubleshoot, but then, everything just went south . . . like that, so we had to go a different route . . . |
| Major Blackmon: | Right . . . |
| Mr. Barnes: | . . . so . . . |
| Major Blackmon: | So . . . so you never got opportunity to do the manual? |
| Mr. Barnes: | No, sir, we never got . . . we . . . we never got . . . |
| Major Blackmon: | The manual . . . |
| Mr. Barnes: | . . . a blood . . . |
| Major Blackmon: | . . . blood . . . |
| Mr. Barnes: | . . . pressure . . . |
| Major Blackmon: | . . . pressure . . . |
| Mr. Barnes: | . . . period . . . |
| Major Blackmon: | . . . check? |
| Mr. Barnes: | . . . at one . . . 'cause once that happened . . . |
| Major Blackmon: | Right. |
| Mr. Barnes: | . . . he didn't have a pulse. I mean, you're not gone get a blood pressure anyways, so . . . you know, we had him hooked up to the monitor and had the . . . everything trying to analyze, but we never got anything . . . |
| Major Blackmon: | Right. |
| Mr. Barnes: | I mean . . . |
| Major Blackmon: | And then, as far as the . . . the laceration you was speaking of . . . |
| Mr. Barnes: | Yes, sir. |
| Major Blackmon: | . . . above his left eye, did you or your counterpart do anything to reduce the bleeding to that laceration? |
| Mr. Barnes: | No, sir, because, at the time, you can tell where it had bled before, but it was not . . . like, shooting blood or blood wasn't piling out of it. Even when we were doing |

INTERVIEW WITH: James Barnes  
Date/Time Taped: Tuesday, January 17, 2017/9:56 a.m.

CASE: 17-01  
Page 12 of 16

|  |  |
|---|---|
|  | CPR and whatnot, it wasn't like piling out of it or anything. So, obviously, if his . . . if his body . . . I wouldn't say, is shutting down or he's not getting profusion, it's not gonna bleed. So . . . you know, like . . . like, they got him . . . let's just say they got him back in the hospital, and they got everything going, and he had a blood pressure, well, it's gone start . . . like, unless it's tamping out or clotted itself off big time, then it's gone start bleeding. So, with us, it wasn't, so it was just either it had clotted itself off 'cause of the temperature or it done[sic] it itself, and then, we got in the truck, it still wasn't. It was just kind of swollen right there. You can see . . . like . . . like, it's a little mark or whatnot or laceration or abrasion, but . . . and it had been bleeding, 'cause there was some dried blood or some blood that had . . . like, stopped onto the face. I wouldn't even call it dried, but it might have just stopped there . . . you know. But . . . you know, I think the . . . the temperature, I'm not gone say it was . . . like, the coldest day ever, but I think . . . you know, temperature does affect a lot of things, so . . . |
| Major Blackmon: | And . . . and then, upon arrival to the medical facility, you and your partner were able to get him in to get further treatment from the . . . |
| Mr. Barnes: | Yes, sir. |
| Major Blackmon: | . . . medical staff at the . . . |
| Mr. Barnes: | Like I said . . . |
| Major Blackmon: | . . . medical facility? |
| Mr. Barnes: | . . . by the time we got there, we had . . . I would say . . . I mean, obviously, we don't have CT scans and all this stuff on our trucks, but we had everything possibly, to my knowledge, that we could have done. It was done. I mean, he . . . I mean I work at Midtown Medical Center, too, so I know the after effects of when you bring somebody in like that, 'cause I do the after care, too. And for us to have everything done and have him set up for them, they didn't . . . they . . . I mean they pushed drugs and did their . . . their thing, what they always do, their assessment. But I mean we had him intubated and drugs running and . . . and I wouldn't . . . I'm not gone say that IV in your AC, which is like the bigger vein in your arms is any better, but here, you can't get . . . 'cause I was putting like a central line in your body . . . like, going inside the body. Here is . . . like, the best IV you could get. So, usually, everything . . . I mean it . . . everything gets there faster to try to get the body going, the heart going, and I was running everything straight through . . . like, the vein inside of his neck. So, I mean it was . . . I was giving him everything I had. I mean for the timeframe. So I gave him . . . I did everything I possibly could do. And then, obviously, they continued doing everything they could while . . . when I got him inside, so . . . |
| Major Blackmon: | Okay, all right. That's enough, thank you. |

INTERVIEW WITH: James Barnes  
Date/Time Taped: Tuesday, January 17, 2017/9:56 a.m.

CASE: 17-01  
Page 13 of 16

| | |
|---|---|
| Sgt. Bridges: | Lieutenant Graham. |
| Lt. Graham: | Mr. Barnes, when we were looking at the videotape, we noticed that the suspect, Mr. Arreola, had a facemask on . . . a face shield, what was the purpose of that mask being placed on him? |
| Mr. Barnes: | Uh . . . face shield . . . face shield. |
| Lt. Graham: | It was a . . . like it was a cloth mask that kind of start . . . started from the lower part of the nose, wrapped around his mouth, tied behind his . . . over his ears, behind his . . . behind his neck . . . behind his neck . . . head. |
| Mr. Barnes: | Oh, in the ambulance? It's . . . |
| Lt. Graham: | Right . . . |
| Mr. Barnes: | . . . yellow? |
| Lt. Graham: | . . . as he was being placed into the ambulance? |
| Mr. Barnes: | Yeah. If anything I could think of, sometimes I put a . . . it's like a . . . what do they call those things, it's not a Hepa mask, it's a . . . I think they call 'em . . . like, a procedure mask. But we don't have the . . . the . . . what they call 'em, spit shields or spit hoods. They actually have them at the hospital. It . . . I mean I could wear it, too. It's not . . . ain't gonna rest . . . restrict breathing or whatnot. It would be in case some . . . like, a joke . . . a joker . . . an individual that wants to be combative and whatnot, I don't know if they're gone spit at me. I don't know what they're gonna do, so we don't have what would be a spit hood, so sometimes, I'll put the procedure mask on there, which you could do whatever you want to in that thing, it's not gonna restrict any type of breathing. I mean it's just preventive . . . you know, he decides he wants to turn at me and spit at me, it'll prevent him from spitting at me, so . . . |
| Lt. Graham: | Is that the reason why you put it on that night? |
| Mr. Barnes: | Oh, yeah, all . . . majority of the time, yeah, if . . . if they're being combative, definitely. I'll . . . I'll put one on. It's not the first person I've ever done that to . . . like, because if we had those spit hood things, I would, probably, put one on 'em because I don't like taking the chance. I mean between the hospital and the . . . and the . . . the truck, I mean I don't want somebody to spit in my face. |
| Lt. Graham: | Was he being combative when you were loading him into the ambulance? |
| Mr. Barnes: | No, like I . . . even when we put him onto the stretcher, he never did anything with us, so I don't . . . like, in my mind, I just don't know if he was doing whatever he was doing before we got there, and he just kind of gave up, or he just wasn't . . . you know, he didn't want to be combative anymore. I didn't know . . . you know, I . . . 'cause sometimes, it's like |

CCG000204

INTERVIEW WITH: James Barnes  
Date/Time Taped: Tuesday, January 17, 2017/9:56 a.m.

CASE: 17-01  
Page 14 of 16

|  |  |
|---|---|
| | that. Sometimes, you . . . you get 'em . . . you get patients like this, and sometimes, they're combative before you get there, then they stop, and then you get 'em in the truck and it's just you and them. Then they're like, uh, well, it's just me and you, and then, they change. So I . . . I don't take any chances. I mean there have been . . . down this road plenty of times in ten years, so . . . |
| Lt. Graham: | While you were out there on the scene, and you was . . . your brief conversation with the mother, did she offer any medical advice regarding her son or medical information? |
| Mr. Barnes: | Not that . . . the only thing I . . . I can remember . . . and I'm . . . I'm trying to remember if there's something else, but I . . . I . . . only thing I can remember is her just telling me that they . . . she didn't think he did any drugs . . . like she didn't know . . . you know, not that she knew. |
| Lt. Graham: | Okay. |
| Mr. Barnes: | And I told her . . . I told the cops and I told her that I was gone take him to the Medical Center, she said that was fine. |
| Lt. Graham: | And during the assessment of Mr. Arreola, did he attempt to offer any medical advice concerning him, or medical information concerning him? |
| Mr. Barnes: | No, sir. He didn't speak to me at all. Never spoke to me. |
| Lt. Graham: | Had you ever . . . ever had any previous dealings with Mr. Arreola? |
| Mr. Barnes: | No, sir, I've never seen him before. As long . . . as far as I can remember, I've never seen him before. Usually, that's not my . . . I mean, obviously, these ambulances go all over the city, but that's usually not my area, so if somebody prior to me has, I don't know. But I personally don't remember going to him before. |
| Lt. Graham: | Okay. During this interview, you have mentioned several medical terms, and one of the medical terms is hematos[sic] . . . |
| Mr. Barnes: | Hematoma. |
| Lt. Graham: | Hematoma, and you were describing that to be over his eye. Is that the . . . the laceration that you're making reference to? |
| Mr. Barnes: | The . . . hematoma is kind of like the swelling . . . like the swelling or bruising/swelling. It's kind of like a knot, and it could be blood. There's many different reasons why you swell, but it's just referring to . . . like, the swelling/bruising above his left eye. I mean . . . then that's why . . . I think in my report, it has a hematoma with possible . . . like, abrasion/laceration. 'Cause I know there was something there with it, but it was swollen, and there was an abrasion/laceration in that area, so . . . |

INTERVIEW WITH: James Barnes  
Date/Time Taped: Tuesday, January 17, 2017/9:56 a.m.

CASE: 17-01  
Page 15 of 16

| | |
|---|---|
| Lt. Graham: | Could you make any determination what was causing the actual swelling, what was there with it? |
| Mr. Barnes: | No, sir. |
| Lt. Graham: | Did he offer any explanation of it . . . what was going on there? |
| Mr. Barnes: | Mr. Arreola? |
| Lt. Graham: | Yes. |
| Mr. Barnes: | No, sir, never spoke to me. |
| Lt. Graham: | Okay, that's all the questions I have. |
| Sgt. Bridges: | Mr. Barnes, just a . . . just a few more questions. When you were out, I know you just said you briefed us about the officers. Did they explain to you in any further detail as to why they would want to . . . wanted a psych . . . evaluation? |
| Mr. Barnes: | I just remember . . . I just remember them . . . I think it was due to being combative, and I . . . if I . . . I . . . it's either be combative or . . . and the . . . and the mark above his eye. I just remember them saying something about those two things . . . you know. Being combative prior to us getting there and then . . . you know, he had the mark above his eye. I remember them . . . you know, letting me know he had the mark above his eye . . . his left eye. But I . . . I don't remember anything else . . . you know, like he might need to get evaluated or have a medical eval . . . due to having the mark and being combative and whatnot prior to us getting there . . . you know. |
| Sgt. Bridges: | Did they say anything about how he was acting before he became combat . . . combative? |
| Mr. Barnes: | Think . . . I don't . . . to be honest with you, I don't recall . . . like, if one of 'em said anything. I . . . there was like four of 'em out there, and I . . . I don't . . . you know, you . . . you have one talking to you, and then, you have another one, and no, I don't mean to call cops another one, but another individual's talking to you, and then, you have another individual, and then, you have your . . . the . . . the mom talking to you. I don't remember them telling me exactly what happened prior to me getting there. I just remember them saying combative for one reason or the other. Not sure why, but combative . . . you know. |
| Sgt. Bridges: | When you arrived, were the officers doing anything to the individual? I know you arrived after he was . . . |
| Mr. Barnes: | Yes, sir. |
| Sgt. Bridges: | . . . you know, allegedly combative. Were they doing anything that would have restric . . . restricted the individual's breathing? |

CCG000206

INTERVIEW WITH: James Barnes  
Date/Time Taped: Tuesday, January 17, 2017/9:56 a.m.

CASE: 17-01  
Page 16 of 16

| | |
|---|---|
| Mr. Barnes: | No, sir. When I got there, there was an officer standing behind him. He was sitting on his butt with his legs straight out, and he was sitting with his . . . he had his hands handcuffed behind his back, and he had his legs in the . . . the . . . the shackles, and nobody was doing anything to him. Like, there was nobody restricting his breathing or anything like that. He was just sitting there. |
| Sgt. Bridges: | Major Blackmon. |
| Major Blackmon: | No questions. |
| Sgt. Bridges: | Lieutenant Graham. |
| Lt. Graham: | No other questions. |
| Sgt. Bridges: | Mr. Barnes, we're done with our questioning. We've asked you several questions and you related to us . . . you know, everything you could remember about the incident. Is there anything you feel like we . . . we failed to ask that you would like to add? |
| Mr. Barnes: | No, sir. |
| Sgt. Bridges: | This concludes the interview with James Barnes. The time is 10:39 a.m. |

✦✦✦✦✦

/db (DS710133 – A 00:41:19)

Recording #: DS 7/0133
Folder: A

## Case Interview Sheet

Case Number  17 - 01

Today is Tuesday Jan 17th, 2017, and the time is 9:56 am/pm. This is a recorded interview with James Barnes. His/Her home address is _____, and he/she can be reached at the home/cellular telephone number of ███. He/She has been employed with Cols. Fire/EMS for the past 10 years/months as a fire medic.

This interview is being conducted in the Office of Professional Standards located in the Public Safety Center. Present during the interview are ~~Major F. D. Blackmon~~, Lieutenant R. L. Graham, and ~~Sergeants~~ T. L. ~~Birris~~ Mayo, and J. G. Bridges. The Office of Professional Standards is conducting an investigation ordered by R. T. Boren, Chief of Police.

Mr./Mrs./Miss/Ms./Rank James Barnes, would you please state for the record your knowledge of the facts involving the arrest of Hector Arreola which occurred on 1/9/17 on Moss Drive.

This concludes the interview with Mr. Barnes.
The time is 10:39 a.m./p.m.




R. T. Boren
Chief of Police

**Columbus Police Department**
P. O. Box 1866 · 510 Tenth Street
Columbus, Georgia 31902-1866

L. H. Miller
Assistant Chief

# WITNESS STATEMENT

This investigation concerns <u>the arrest of Hector Arreola which occurred on 1/9/17 on Moss Dr.</u>. Allegations of employee misconduct or other matters that are referred to the Office of Professional Standards are taken seriously. Under our present system, all complainants are warned that knowingly making false statements may result in their prosecution.

We wish you to understand that the Office of Professional Standards is a fact-finding unit and does not recommend disciplinary measures. The chief of police will make the disciplinary deci-sion when a complaint is sustained by the investigation. The complainant will be notified of the results of the investigation and will be informed that the matter has been handled administrative-ly if the complaint was sustained. The Office of Professional Standards is concerned with finding the truth in a fair and impartial manner.

These investigations are designed to protect many interests, including your own. These investiga-tions, additionally, identify problems in the department's policies and/or training. The correction of which will benefit all of us. Finally, these investigations may protect the public from the con-sequences of misconduct by department employees.

I have read and understand the above information.

_____
Signature

_____
Witness

James Brad Burnes   1/17/17  09:56
Printed Name    Date/Time

_____
Witness

_____
Witness

_____
Witness

Phone (706) 653-3100    Fax (706) 653-3114    CCG000209
An Equal Opportunity Organization