**1**

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
COLUMBUS DIVISION

RODRIGO ARREOLA, as parent of )
Hector Arreola, Deceased, and )
as Personal Representative )
and Administrator of the )
of Estate of Hector Arreola, )
CONCEPCION ARREOLA, as Parent )
of Hector Arreola, and S.A., )
minor child of Hector Hector )
Arreola, by next Friend )
Jezreel Imee Custodio, )
)
            Plaintiffs, )
)
vs. )CIVIL ACTION FILE NO:
)4:19-CV-00005-CDL
THE CONSOLIDATED GOVERNMENT )
OF COLUMBUS, GEORGIA, OFFICER )
MICHAEL AGUILAR, in his )
individual and official )
capacity, OFFICER BRIAN )
DUDLEY, in his individual and )
official capacity, OFFICER )
AARON EVRARD, in his )
individual and official )
capacity, and COLUMBUS POLICE )
DEPARTMENT CHIEF OF POLICE )
RICHARD BOREN, in his )
individual and official )
capacity, )
)
            Defendants, )

Oral deposition of WILLIAM M. HARMENING,
witness, called by the Defendants, before Alan M.
Causey, Certified Court Reporter in and for the
State of Georgia, taken at the law offices of Page,
Scrantom, Sprouse, Tucker & Ford, Synovus Centre,
Third Floor, 1111 Bay Avenue, Columbus, Georgia, on
the 23rd day of September, 2019, commencing at

**2**

APPEARANCES

On behalf of the Plaintiffs:

MR. MARK C. POST
Mark Post Law, LLC
Attorney at Law
3 Bradley Park Court, Suite F
Columbus, Georgia 31904
(706) 221-9371
mpost@markpostlaw.com

On behalf of the Defendants:

MR. JAMES C. CLARK, JR.
Page, Scrantom, Sprouse, Tucker & Ford
Attorneys at Law
Synovus Centre, Third Floor
1111 Bay Avenue  31901
Post Office Box 1199
Columbus, Georgia  31902-1199
(706) 324-0251
jcc@psstf.com
ags@psstf.com
tcc@psstf.com

**3**

EXAMINATION INDEX

WILLIAM M. HARMENING                PAGE

CROSS BY MR. CLARK . . . . . . . . . . . . 8
DIRECT BY MR. POST . . . . . . . . . . . 165
RECROSS BY MR. CLARK  . . . . . . . . . 172

EXHIBIT INDEX

PAGE

Defendants'
1   Copy of Notice of Taking Deposition        9
2   Thumb Drive                               10
3   Current Testimony List and Statement of   24
    Fees

4   Copy of CV                                26

5   Copy of Expert Witness Agreement          30

6   Copy of Invoice Dated 1/17/18             30

7   Copy of Witness' Report                   37

8   Copy of Article on Effect of Seated       39
    Restraint and Body Size on Lung Function
9   Copy of Chicago Police Training Bulletin  39
    on Positional Asphyxia

10  Copy of FBI Law Enforcement Bulletin      40
    Dated May 1996

**4**

11   Copy of National Law Enforcement         40
     Technology Center on Positional Asphyxia

12   Copy of New Orleans Police Department     41
     Operations Manual on Handcuffing and
     Restrant Devices

13   Copy of Sherman vs. Sepanski Compliant    41
     and Demand for Jury Trial
14   Copy of Autopsy Report                   120
15   Copy of Toxicology Report                122
16   Copy of Prehospital Care Report          122

William M. Harmening   9/23/2019

---

5

1           STIPULATIONS
2       IT IS STIPULATED AND AGREED by and between
3   counsel appearing for the respective parties that:
4
5       1) The oral deposition of WILLIAM M.
6   HARMENING, witness, shall be taken by the
7   Defendants, for all purposes under the Georgia Civil
8   Practice Act, before Alan M. Causey, Certified Court
9   Reporter, at the law offices of Page, Scrantom,
10  Sprouse, Tucker & Ford, Synovus Center, Third Floor,
11  1111 Bay Avenue, Columbus, Georgia, commencing at
12  12:08 p.m., on the 23rd day of September, 2019;
13      2) ALL FORMALITIES with reference to notice
14  of taking, notice of time and place of taking, and
15  all other matters precedent to the taking of
16  depositions are WAIVED;
17      3) THAT THE READING of this deposition to,
18  or by, the witness and the signing thereof by the
19  witness are hereby expressly NOT WAIVED;
20      4) ALL OBJECTIONS, EXCEPT as to the form of
21  the question and responsiveness of the answer, are
22  RESERVED to the time of the hearing of the case; and
23      5) ALL FORMALITIES with reference to the
24  filing of depositions, including notice of filing,
25  et cetera, are WAIVED.

---

7

1       4) Causey Peterson Reporting, Inc., has no
2   exclusive contract to provide reporting services
3   with any party to the case, any counsel in the case,
4   or any reporter or reporting agency from whom a
5   referral might have been made to cover this
6   deposition;
7
8       5) Causey Peterson Court Reporting, Inc.,
9   will charge its usual and customary rates to all
10  parties in the case, and a financial discount will
11  not be given to any party to this litigation.
12
13      This 23rd day of September, 2019.
14      Alan M. Causey, CCR #B-1445
15
16
17
18
19
20
21
22
23
24
25

---

6

1       COURT REPORTER'S DISCLOSURE STATEMENT
2
3       I, ALAN M. CAUSEY, Georgia Certified Court
4   Reporter, Certificate No. B-1445, pursuant to
5   Article 10.B of the Rules and Regulations of the
6   Board of Court Reporting of the Judicial Council of
7   Georgia, make the following disclosure:
8
9       1) I am a Georgia Certified Court Reporter.
10  I am here as a representative of Causey Peterson
11  Reporting, Inc.  I am not disqualified for a
12  relationship of interest under the provisions of
13  O.C.G.A. §9-11-28 (c);
14
15      2) Causey Peterson Reporting, Inc., was
16  contacted by the law offices of Page, Scrantom,
17  Sprouse, Tucker & Ford to provide court reporting
18  services for this deposition;
19
20      3) Causey Peterson Reporting, Inc., will
21  not be taking this deposition under any contract
22  that is prohibited by O.C.G.A. §15-14-37 (a) and
23  (b);
24
25

---

8

1   (Deposition commenced at 12:08 p.m.)
2       MR. CLARK:  All right, do you want to swear
3   him in.
4       THE REPORTER:  Sure.
5   THEREUPON:
6           WILLIAM M. HARMENING,
7   Was called as a witness, and having first been duly
8   sworn, testified on examination as follows:
9           CROSS-EXAMINATION
10  BY MR. CLARK:
11  Q.  All right, sir, I'm Jim Clark.  We just
12  met.  I represent the defendants in this lawsuit
13  that I understand you've been hired to be an expert
14  witness in.  I know you know how -- you've given a
15  bunch of depositions; right?
16  A.  Yes.
17  Q.  So you -- you know the rules?
18  A.  (Nods head affirmatively)
19  Q.  I don't think this is going to be a real
20  lengthy deposition, but, if you need a break at any
21  time, just let me know.  I just ask that the
22  question that's on the table is answered before we
23  take a break.  If there's something you don't
24  understand about my question -- and I'm sure
25  there'll be some questions that I ask that probably

---

William M. Harmening   9/23/2019

---

**9**

1  need to be reworded, so let me know that.
2      A.  (Nods head affirmatively.)
3      Q.  If I -- if you don't ask me that, I'm going
4  to assume that you understood the question.
5      Is that fair enough?
6      A.  Yes.
7      Q.  And you are a veteran of depositions, so
8  I'm sure you'll do a good job of -- of letting me
9  finish my question before you give a response, and
10  I'll do the same thing with respect to your -- your
11  answers.
12      MR. CLARK:  Will he be reading and signing?
13      Q.  Or will you be reading and signing your
14  deposition?
15      A.  I usually -- at the end of it --
16      MR. POST:  Yeah.
17      Q.  Okay.  All right.  Good.
18      (DEPOSITION EXHIBIT NUMBER 1 WAS MARKED FOR
19          IDENTIFICATION)
20      Q.  Well, let me show you what we've marked as
21  Exhibit 1, which is the notice to your deposition.
22  I'm -- have you seen that before?
23      A.  Yes.
24      Q.  Okay, there are -- there is an exhibit to
25  that notice, Exhibit A.  If you'll turn to that,

---

**10**

1  please.  I just want to make sure I understand what
2  information we have here today.  I want to make a
3  record of it.
4      Did you bring your entire file related to this
5  case?
6      A.  Yes, in one form or another.  I don't have
7  a paper file, but a combination of the drive and
8  what I've printed out would be everything.
9      Q.  Okay.
10      MR. CLARK:  And the drive you mentioned is
11  a thumb drive that was -- that was provided to
12  me before the deposition started, and I'm going
13  to go over what I'm seeing as the contents of
14  that in just a minute.
15      And we will -- we will mark the thumb drive
16  as Exhibit 2.  How about that?  I'll go ahead
17  and do that.
18      (DEPOSITION EXHIBIT NUMBER 2 WAS MARKED FOR
19          IDENTIFICATION)
20      MR. CLARK:  And -- but we'll go over that
21  in a minute.
22      Q.  So what you're telling me, then, is -- you
23  also brought -- you brought the thumb drive, which
24  we've marked as Exhibit 2.  And then you've also
25  brought some additional materials; correct?

---

**11**

1      A.  Yes.
2      Q.  And the combination of the additional
3  materials that you brought that are sitting in front
4  of you and the thumb drive, would that constitute
5  your entire file?
6      A.  Yes.
7      Q.  All right.  Now, let's first go over
8  Exhibit 2, the thumb drive, if you would, and let me
9  just kind of go through -- and if you need to -- or
10  maybe I'll come over there if I need to.  But I'm
11  going through -- I have opened up the thumb drive,
12  and I'm going to -- I'm going to refer to the titles
13  of various documents and folders and make sure I
14  understood -- understand what's on here.
15      But before I do that, earlier -- if I understand
16  correctly, Exhibit 2, which is the thumb drive, are
17  the materials that you refer to as those that were
18  received from the Columbus Consolidated Government?
19      A.  Yes.
20      Q.  And you mentioned in discovery -- but
21  whether it's open records or discovery, all of the
22  items on this thumb drive are items that were
23  provided by my client to Mark Post and then he in
24  turn provided them to you; is that correct?
25      A.  Yes.

---

**12**

1      Q.  All right.  And then the items that you
2  brought with you are items that you pulled that were
3  not provided by my client; correct?
4      A.  Yes.
5      Q.  All right.  On Exhibit 2, the thumb drive,
6  the first folder is CCG Open Records Response.
7  What's contained in that folder?
8      A.  I would have to take a look.
9      Q.  All right, it has -- one, two three -- four
10  items.  The first one is CSI Report.  They all start
11  with a 17-00680.
12      Do you know in general what these items are?
13      A.  Well, if it -- if they're labeled CSI
14  Report, I'm assuming that would be the crime lab
15  reports in this matter.
16      Q.  Okay.  And it's all underneath the folder
17  of Open Records Response.
18      A.  I'm not sure, but I'll take your word for
19  it, yes, sir.
20      Q.  Okay.  Would that be -- do you think those
21  are -- those items are items that are part of the --
22  the investigation?
23      A.  Yes.  And I may have some duplicates in
24  there, too.
25      Q.  Okay.  The next folder is a folder labeled

---

William M. Harmening   9/23/2019

---

13

1 Body Cams, and it has a Dropbox link in it.
2   What is that?
3   A.   Those are the body cams of the officers at
4 the scene.  The Dropbox link would be just that, a
5 link to those videos in the Dropbox.  I had -- a
6 couple of videos were in that folder, but...
7   Q.   Okay.  And those videos, I think, may exist
8 elsewhere on this -- on this thumb drive.
9   A.   Yes, I believe they do.
10   Q.   All right.  So did you obtain videos via a
11 Dropbox from Attorney Mark Post?
12   A.   Either a Dropbox link or CDs -- DVDs.  I'm
13 not sure which that would be.
14   Q.   Okay.  Did you in turn create your own
15 Dropbox to house items to this case?
16   A.   No.  If there is a Dropbox link, then
17 that's how I got the -- that particular material.
18   Q.   Okay.
19   A.   And the reason I didn't, because I use
20 OneDrive as opposed to Dropbox.  So if I get
21 something on a DVD that I'm going to keep on my hard
22 drive, I usually put it on OneDrive rather than the
23 Dropbox.
24   Q.   All right.  The next folders on here, it
25 appears that there are three folders, one for each

---

14

1 officer.
2   Does that sound familiar?
3   A.   Yes.
4   Q.   There's a folder that's labeled CCG000012
5 and 000013, dash, Officer Evrard.  And then
6 underneath that there is a folder that says Disc 1
7 that has three -- what appear to be movie clips or
8 three videos.
9   A.   Yes.
10   Q.   Does that sound familiar?
11   A.   Yes.
12   Q.   What are those?
13   A.   I believe those are the body cam clips.
14   Q.   So those would be the -- Evrard's body
15 cams, then, in that folder?
16   A.   Yes.  And I -- I don't recall if one of
17 them is a videotaped interview.  I'm not -- I'd have
18 to go back and pull them up.
19   Q.   Okay.  And there's a Disc 2 that also --
20 that has a fourth video underneath that same folder
21 of Officer Evrard.
22   A.   Yeah, I would have to pull them up to --
23   Q.   All right, and I'll look at them.
24   But generally your memory is that those are
25 videos that are associated with Evrard such that

---

15

1 they are body cam?
2   A.   Body cam, dash cam.  I believe that's it
3 for Evrard.
4   Q.   Okay.
5   A.   I don't think there's a videotaped
6 interview.
7   Q.   All right, the next folder is for Officer
8 Aguilar, and there are four -- appear to be --
9 they're dot MOV files.
10   So I would assume those are video files for
11 Aguilar?
12   A.   Yes.
13   Q.   The same answer for Aguilar, those are
14 videos that are associated with Aguilar, either dash
15 cam or body cam?
16   A.   Yes.
17   Q.   All right.  The next folder is Officer
18 Dudley.  The same thing.  There's four videos --
19 appear to be videos.
20   Would the -- would the answer be the same for
21 Dudley?
22   A.   Yes.
23   Q.   All right, your next folder is -- it says
24 Unit 524, dash, Discs 1 and 2.
25   Do you know what that folder is?

---

16

1   A.   I believe -- if it's a unit number, I
2 believe that might be the training materials from
3 the Georgia POST.
4   Q.   Okay, let's see.  Underneath that main
5 folder is a subfolder that says CPD 524, Disc 1, and
6 then in that folder there is a dot AVI file that
7 says CPD, dash, 524, January 9th, 2017.
8   A.   I believe one of those would be CPD policy.
9 I'm not sure what the AVI is.  That would be a video
10 clip, I believe.
11     MR. CLARK:  Let's see what happens when I
12 clip on it.
13   Q.   All right, that file appears to be a dash
14 cam.
15   A.   Okay.  Yeah, I'm not sure whose dash cam
16 that would be without looking at it.
17   Q.   Okay.  All right.  Okay, underneath the
18 same Unit 524 main folder there's another subfolder
19 for Disc 2, which has several dot MOV files and two
20 dot JPG files.
21   Do you know what those are?
22   A.   Not specifically, but I think -- I believe
23 they're probably duplicates of dash cam or body cam.
24   Q.   Okay.  Your next folder is a dash cam main
25 folder, and underneath that there are subfolders for

---

William M. Harmening   9/23/2019

17

1 Unit 720, Unit -- and Unit 736.
2     Do you believe those are dash cams?
3     A.  Those would be dash cams for those
4 particular units.  I'm not sure which one belongs to
5 which officer at this point.
6     Q.  All right, the next folder is a O-O-P-S
7 audio and Officer Evrard on-scene interviews, and
8 there's a subfolder that says K17-01, and then
9 within that subfolder there are -- one, two, three,
10 four, five, six, seven, eight, nine -- ten maybe --
11 I'm counting -- interviews.
12     Do you know what those are?
13     A.  I believe those are the -- the
14 investigative interviews of the Office of -- OOPS --
15     Q.  Office of Professional Standards?
16     A.  Professional Standards, yes.
17     Q.  All right, your next folder is the
18 Office of Professional Standards investigation
19 written reports, and underneath that folder there
20 are numerous PDFs, it appears some of which are
21 personnel files.
22     Is that just the written reports from the Office
23 of Professional Standards --
24     A.  Yes.
25     Q.  -- contained in that folder?

18

1     A.  I believe that's their -- their main
2 investigative report that would include all reports
3 and other documents.
4     Q.  Okay.  The next folder says O-O-P-S audio
5 and Officer Evrard on-scene interviews and has
6 two -- two dot WAV files that say interview with PO
7 W. R. Oakes and interview with Sergeant R. M. Keel.
8     What are those two files?
9     A.  Those are on-scene interviews.  I believe
10 they're -- they're audio of Officers Oakes and
11 Keel -- Sergeant Keel.
12     Q.  Okay.  And while I'm at it, all of the
13 items that are on Exhibit 2 are items that you had
14 and that you reviewed prior to writing your report
15 that we'll get to in a minute; is that correct?
16     A.  I believe I had everything by the time I
17 finalized the report, yes.  The report was a
18 work-in-progress for a while.
19     Q.  But that's what I mean by my question, is
20 that the report that I've been given is dated June
21 4th, 2019?
22     A.  Yes.
23     Q.  And so by the time you finalized the report
24 you had had all of the material that's in this thumb
25 drive and considered everything that you wanted to

19

1 consider from this thumb drive; correct?
2     A.  Yes.  There's -- there's two items I got
3 later, Mr. -- Mr. Connor's report and Dr. Sperry's
4 report.  I saw those later.
5     Q.  Doctor who?
6     A.  Sperry -- Spurry -- Sperry.
7     THE WITNESS:  Sperry?
8     MR. POST:  I don't think I gave you
9 Dr. Sperry's report.
10     His -- what's your second answer for this
11 guy?
12     THE WITNESS:  I'm sorry.  You have me the
13 other doctor --
14     MR. POST:  Yeah, your second expert.
15     MR. CLARK:  Okay.
16     MR. POST:  It's all scanned in together.  I
17 don't recall his name.
18     MR. CLARK:  All right.
19     THE REPORTER:  So the spelling was a little
20 undecided.  So is it Spurry, Sperry --
21     THE WITNESS:  No --
22     MR. POST:  No --
23     THE WITNESS:  -- it's the other doctor, and
24 I -- I'm lost --
25     THE REPORTER:  Okay.

20

1     THE WITNESS:  -- at what his name was, and
2     Gregory Connor.
3 BY MR. CLARK:
4     Q.  Okay, so other than those two reports,
5 which are not on Exhibit 2, you had everything on
6 Exhibit 2 and considered everything that you wanted
7 to off of Exhibit 2; correct?
8     A.  Yes.
9     Q.  All right, let's see.  So the next folder
10 is -- it's labeled other docs not received from CCG.
11     What does that mean?
12     A.  I -- that's not my label.
13     Q.  Oh.  Whose label is that?
14     A.  I frankly don't know.  That's what came in
15 the Dropbox.
16     Q.  Okay.  So all of these folders, the way
17 they are labeled, is how you got them?
18     A.  That's correct.
19     Q.  Okay.  And he's not here to answer
20 questions, but I'm going to assume that probably
21 that was the attorney for the plaintiff.
22     Does that sound fair to you -- or someone
23 working for him?
24     A.  I'm assuming the attorney for the defense,
25 if that's where we got them from.

William M. Harmening   9/23/2019

21

1    Q.  Okay.  All right.
2    A.  But I'm not sure.
3    Q.  All right.  That could -- that could be,
4  too.
5        And under the other docs not received from CCG,
6  the first subfolder says Autopsy and Crime Lab
7  Reports.  And underneath that folder there is a --
8  there's three PDFs.  One says Autopsy, one's Blood
9  Alcohol, and one's Drug Lab Report.
10   A.  Yes.
11   Q.  Okay.  And you reviewed those?
12   A.  I did.
13   Q.  All right.  The next subfolder is Autopsy
14  Labs and Coroner Death Report from Client?
15       MR. POST:  Jim, just -- I'll just clarify
16   it for the record.  That file that you're
17   looking at was labeled by me, Mark Post, and
18   that most of those items in it have since been
19   served on the plaintiffs by the defense, with
20   the exception of maybe some medical records
21   and --
22       MR. CLARK:  Okay.
23       MR. POST:  -- anything else I think I've
24   served on you in discovery, so...
25       MR. CLARK:  That makes sense.

22

1  BY MR. CLARK:
2    Q.  So -- so with that clarification, then, the
3  folders on here, as they came to you, were labeled
4  by plaintiff's counsel.  So this particular folder
5  says Autopsy Labs and Coroner Death Report from
6  Client, would mean from the -- Arreola's family?
7    A.  Yes.
8    Q.  Okay.  Incidentally, did you notice any
9  difference with the autopsy labs and coroner death
10  report from the client versus the autopsy labs and
11  coroner death report that was -- that was provided
12  elsewhere?
13   A.  No.
14   Q.  Okay.  I just want to make sure there's
15  nothing sinister that I need to be aware of, okay.
16       The next folder is Death Certificate.  You
17  reviewed the death certificate?
18   A.  Yes.
19   Q.  The next folder is EMS Report.  It's an EMS
20  Comprehensive Report.  Was that records from the --
21  the emergency medical folks?
22   A.  Yes.
23   Q.  And the next folder is a Medical Records
24  Folder, and within that folder says TMC Records.
25       Were those records from The Medical Center?

23

1    A.  I'm -- I'm assuming, yes.
2    Q.  Did you review those?
3    A.  Yes.
4    Q.  Okay.  And the next folder -- we talked
5  about this off the record, but the next folder says
6  SanDisk Secure Access.
7        But that's something that's unrelated that just
8  exists on the thumb drive?
9    A.  That's correct.
10   Q.  All right.  Okay.
11       All right, now let's deal with -- with the
12  additional information.  So that takes care of the
13  thumb drive, Exhibit 2.
14       I'd like to go through what you've brought and
15  make sure I understand.  The rest of your file would
16  be items that are sitting in front of you that you
17  brought, so let's just go through them one by one,
18  if we could, and you can --
19   A.  Yeah.
20   Q.  -- you can -- let's see, I've got a stack
21  over here somewhere.
22       Why don't you go through it in the order that
23  you would like to go through it.  I think I have a
24  stack that's the same as what you have, but let's
25  make sure.

24

1        So what's your first one?
2    A.  I've got two stacks.  I've got those things
3  that are -- those items that are cited in the
4  report.
5    Q.  Okay.
6    A.  And I've got things that are not cited in
7  the report.
8    Q.  All right.
9    A.  So the first thing would be --
10   Q.  So you're going to go through the stack
11  that's not cited in the report first?
12   A.  That's correct.
13   Q.  All right.
14   A.  It starts right there.
15   Q.  Got it.
16   A.  The first item is -- is an updated
17  testimony list.  There have been a few additional
18  depositions since the report in June.
19       MR. CLARK:  All right, so I'm going to mark
20   as Exhibit 3 -- actually, let's trade.  I'll
21   mark as Exhibit 3 your updated current testimony
22   list and statement of fees.
23       THE WITNESS:  Yes.
24   (DEPOSITION EXHIBIT NUMBER 3 WAS MARKED FOR
25        IDENTIFICATION)

William M. Harmening   9/23/2019

---

25

1    Q.  What has been added to that?  Is it just
2  the last two depositions?
3    A.  It looks like the last -- there's a trial
4  and two depositions at the end --
5    Q.  Okay.
6    A.  -- that have been added.
7    Q.  All right.  And the deposition of
8  Wuenschel, I know about that one.
9    THE REPORTER:  Who?  I'm sorry.
10   MR. CLARK:  W-U-E-N-S-C-H-E-L.
11   THE REPORTER:  Thanks.
12   Q.  Okay.  And then you've got a deposition up
13  in Maryland?
14   A.  Yes.
15   Q.  Okay, what was that case about in Maryland?
16   A.  That is an active shooter-case where one of
17  the police officers ended up shooting another police
18  officer and killing him.
19   Q.  And what was your -- your -- what were your
20  opinions in that case?
21   A.  Well, I did write a report in that case of
22  the trial scheduled.  My opinion was that the
23  officer who fired did so recklessly and did so
24  against department policy, for a lot of reasons.
25   Q.  Okay.

---

26

1    A.  He -- he intended to shoot the officer
2  (sic).  The officer was a -- was an undercover
3  officer who showed up to assist in the active
4  shooter case, and he shot him at a long distance
5  with a high-powered rifle.
6    Q.  Okay.
7    All right, what's your next item, then?
8    A.  My CV.
9    MR. CLARK:  Okay, let's mark it Exhibit 4.
10   (DEPOSITION EXHIBIT NUMBER 4 WAS MARKED FOR
11        IDENTIFICATION)
12   MR. CLARK:  Off the record.
13   (OFF-THE-RECORD DISCUSSION)
14  BY MR. CLARK:
15   Q.  All right, so we've marked Exhibit 4.
16  What is Exhibit 4?
17   A.  This would be my CV.
18   Q.  Okay.  Did you bring that with you because
19  it's different from what has been provided in your
20  report?
21   A.  Well, it's more comprehensive than what's
22  in my report.
23   Q.  Can you point out to me what's different
24  about it or more comprehensive?
25   A.  I don't provide a CV in my -- in my report.

---

27

1  I provide a very short overview of my experience.
2  In my -- I think I provided my publications as well,
3  but --
4    Q.  All right, well -- and I don't mean to
5  interrupt you, but when -- when you were disclosed
6  as an expert, I believe your CV came --
7    MR. POST:  It did.
8    Q.  -- along with it.
9    A.  Okay.  It would not have changed.
10   Q.  Okay, that's all I wanted to --
11   A.  Yeah.
12   Q.  -- wanted to find out.  So I've got your
13  CV.
14   And -- and I interrupted you, but did you finish
15  your response?
16   A.  I did.
17   Q.  Okay.  While we're on that subject, in
18  the -- I call it the Redwine litigation -- but the
19  Wuenschel case that you referenced that you've given
20  a deposition in, that deposition was given July 2nd
21  of this year; correct?
22   A.  I'll take your word for that, yes.
23   Q.  I've got -- I've got a transcript sitting
24  right here for you.
25   And it'll save some time in this deposition, I

---

28

1  think, that your -- your background, your CV, areas
2  that were -- that you were asked about in that
3  deposition -- you were asked quite a bit about that
4  in that deposition.
5    Do you recall that?
6    A.  Not specifically.  But it was a long
7  deposition.  I'm assuming --
8    Q.  Right.
9    And you read that deposition, reviewed that
10  deposition, actually made a couple of changes on an
11  errata sheet and signed off on the deposition.
12   Do you recall that?
13   A.  I did.
14   Q.  All right.  Is there anything about that
15  deposition since you have signed off on it that you
16  believe is inaccurate or that you would disagree
17  with in terms of your testimony?
18   A.  No.  Just the -- the one issue I put on the
19  errata sheet.
20   Q.  Okay.  So with respect to, you know, any
21  questions that were asked about your background,
22  about your CV, about your articles, anything like
23  that, all that information contained in your
24  deposition given July 2nd, 2019 would equally apply
25  to this case and there's nothing that you believe to

---

William M. Harmening   9/23/2019

---

29

1   be inaccurate or incorrect?
2       A.   That's correct.  I believe I testified that
3   I have since retired from teaching as well.
4       Q.   Okay.
5       A.   And I have not -- on my CV I haven't
6   included that yet.  I need to update that.  But I
7   did testify to that.
8       Q.   All right.
9       A.   I'll testify here today as well that I've
10  retired from that.
11      Q.   So when was the last time you taught?
12      A.   The spring semester 2019.
13      Q.   Okay.  So what is your -- what do you do
14  for a living now?
15      A.   I'm -- I'm totally retired except for
16  providing expert witness services.
17      Q.   Okay.  So other than doing what you're
18  doing here today, you don't receive a check from any
19  other source of employment?
20      A.   That's correct.
21      Q.   All right.  What's your next document?
22      A.   Would be the contract that I had with
23  Mr. Post.
24      Q.   Okay.
25      A.   Or that I currently have.

---

30

1       Q.   So this is your fee agreement to work on
2   this case?
3       A.   Yes.
4       Q.   And your hourly rate in this case is what?
5       A.   A hundred and fifty, two hundred for
6   testimony.
7       Q.   Okay.  And how much have you billed so for?
8       A.   Twenty-one hundred dollars.
9       Q.   Okay, do you have any -- did you bring
10  billing information also?
11      A.   I did.  That's my invoice.
12          MR. CLARK:  All right, let's mark that as
13  Exhibit 6.
14          THE REPORTER:  We marked the other one
15  Exhibit 5?
16          MR. CLARK:  I'm still on Exhibit 5, that
17  one Exhibit 5, the expert witness agreement.
18      (DEPOSITION EXHIBIT NUMBER 5 WAS MARKED FOR
19          IDENTIFICATION)
20          MR. CLARK:  And then Exhibit 6 will be your
21  invoice for twenty-one hundred dollars.
22      (DEPOSITION EXHIBIT NUMBER 6 WAS MARKED FOR
23          IDENTIFICATION)
24  BY MR. CLARK:
25      Q.   All right, and on Exhibit 6 it looks

---

31

1   like -- well, strike that.  Let me ask you this.
2       This Exhibit 6 is an invoice for all your work
3   to date on this case; correct?
4       A.   For all work that I actually invoiced for,
5   yes.
6       Q.   Well, do you -- do you do work that you
7   don't invoice for?
8       A.   I do.
9       Q.   Why is that?
10      A.   Well -- kind of a long answer to that, but
11  I -- I really never got into this for the money, and
12  I have a very simple way of invoicing.  I invoice
13  only to write the initial report.  I don't invoice
14  for updates.  I don't invoice for travel to
15  depositions.  I keep it very simple.  It's just a
16  personal thing.
17      Q.   Okay.
18      So you don't invoice for updating the report and
19  you don't invoice for travel to depositions?
20      A.   Or phone calls or emails or meetings.  I --
21  it's -- I invoice for three things, the initial
22  report, a deposition and a trial.
23      Q.   Okay.  With respect to the initial report,
24  though, when you say you initial -- you invoice for
25  the -- drafting the initial report, that includes

---

32

1   your review of these items that we just went over on
2   Exhibit 2; correct?
3       A.   It does, but I don't invoice for that
4   either.
5       Q.   It does include that, though?
6       A.   It does.
7       So the way I typically work is an attorney who
8   contacts me will provide me whatever discovery he or
9   she has.  I review it.  I give an initial tentative
10  opinion.  They decide whether or not they want to
11  hire me.  I don't charge for that.  There have been
12  a number of cases where they didn't hire me because
13  I sided with the officers.
14      So, no, I -- again, I only charge to write the
15  initial report, to testify in a deposition, to
16  testify in trial.
17      Q.   Okay.  And the work that you did to write
18  the initial report is essentially what's included on
19  this invoice?
20      A.   That's correct.
21      Q.   And that's all that's included on this
22  invoice?
23      A.   That's correct.
24      Q.   So you've got four entries on here
25  beginning January 9th, 2019; correct?

---

William M. Harmening   9/23/2019

33

1    A.  Yes.
2    Q.  And each of those invoices has to do with
3  drafting the -- and completing the report?
4    A.  Completing the first draft of the report,
5  yes.
6    Q.  Okay.  Is there a second draft of the
7  report?
8    A.  Well, I don't know specifically, but
9  sometimes there are additional drafts.  I work on --
10  I work on one report.  So there are additional
11  updates.  I may get deposition testimony.  I may get
12  additional evidence.  I don't record that on an
13  invoice.
14    So what I do is, when I got the final draft, the
15  date you see on the report is the date of the final
16  draft.
17    Q.  And that -- there's no entry on here for
18  anything beyond January 17th, 2018, where you
19  completed the report?
20    A.  That's correct.
21    Q.  So you completed the report that -- that is
22  at issue in this case a year and a half ago;
23  correct?
24    A.  No.  I completed the report in June of this
25  year.

34

1    Q.  Okay, well --
2    A.  I only invoiced to that date.
3    Q.  Okay.  So as of January 17th, 2018, though,
4  you indicated in an invoice to Mr. Post that you had
5  completed the report?
6    A.  Well, I indicated that I'd completed the
7  first draft of the report.
8    Q.  Well, it says -- it says completed report
9  on that last -- that item, is the reason I'm asking
10  about it.
11    A.  Well, it says:  Completed report, finished
12  first draft and forwarded to Attorney Post.
13    Q.  Okay.
14    A.  So where it says "completed report" is a --
15  there's a drop-down box that's already in there.  So
16  it's the only place I can put that.  And I put my
17  own terminology in after that, which is "finished
18  first draft of the report".
19    Q.  What do you mean there's a drop-down box?
20  What does that mean?
21    A.  They're already predetermined in my -- my
22  little invoice system, completed -- so, in other
23  words, there's no drop-down that says completed
24  first draft.  It just says completed report.
25    Q.  Okay.

35

1    A.  So I click on that and then I put my own
2  verbiage in after that, which indicates that I'd
3  completed the first draft of the report.
4    Q.  All right, why wouldn't you just use the --
5  you apparently had a drop-down that says "continue
6  drafting report".
7    A.  Yes.
8    Q.  Why wouldn't you have just used that, then,
9  if it's not completed?
10    A.  Probably because -- that's just the way I
11  do it.  Probably because that's the completion of
12  what I'm going to invoice for.
13    Q.  All right.  So you completed the first
14  draft of the report January 17th, 2018; correct?
15    A.  Correct.
16    Q.  And sent that to Mark Post --
17    A.  Yes.
18    Q.  -- correct?
19    A.  Yes.
20    Q.  All right.  Your report that we'll get
21  to -- ultimately the final report was made final
22  on -- what date?
23    A.  June 4th, 2019.
24    Q.  All right.  What is different about the
25  original January 17th, 2018 version and the June

36

1  4th, 2019 version?
2    MR. POST:  I'm going to object.  That's not
3  discoverable.  The initial drafts are not
4  discoverable under the rules.
5    A.  And I really don't know, because I work
6  from one document.  So I don't have a 1.1, 1.2.
7  It's -- I just work from one document and update it.
8    Q.  Is it possible nothing changed?
9    A.  It's possible, but I do remember adding to
10  the time line.  I do remember listening again and
11  trying to enhance the audio to hear it better.  I
12  remember just an addition there.  I don't
13  remember -- I don't remember anything beyond that.
14    Q.  Okay.
15    A.  Other than additional testimony at the
16  beginning -- additional testimony -- my testimony at
17  the beginning, where I show my depositions.  So I --
18    Q.  Oh.  You're talking about your list of
19  deposition --
20    A.  Yes.
21    Q.  -- testimony?
22    A.  Yes.
23    Q.  Okay.
24    A.  So I updated it for June 4th and then I
25  provided you a further update today.

William M. Harmening   9/23/2019

---

37

1    Q.  All right.  Fair enough.
2    Did -- do you remember whether you added any
3  opinions after January 17, 2018?
4    A.  I did not.
5    Q.  Okay.  And your -- in front of you there is
6  your report, correct --
7    A.  Yes.
8    Q.  -- that you're flipping through?
9    MR. CLARK:  We might as well mark that real
10  quick since you're referring to it.
11    What are we up to, Exhibit --
12    THE WITNESS:  7.
13    MR. CLARK:  7?
14    THE WITNESS:  I've got three different
15  copies here.
16    (DEPOSITION EXHIBIT NUMBER 7 WAS MARKED FOR
17       IDENTIFICATION)
18    MR. CLARK:  All right, I just want to make
19  sure that we don't end up with different
20  versions.
21  BY MR. CLARK:
22    Q.  So Exhibit 7 is your report.  It's dated at
23  the bottom June 4th, 2019.
24    Which this is the same report that was provided
25  to us in this litigation; is that correct?

---

38

1    A.  Yes.
2    Q.  All right.  All right, back to your Exhibit
3  6, your invoice.
4    So where it says "quantity", is that hours?
5    A.  It is, yes.
6    Q.  Okay.  So where it says on the first line
7  three hours -- you spent three hours drafting under
8  that line item to begin drafting the report;
9  correct?
10    A.  Yes.
11    Q.  And then your next line is four hours
12  continue drafting and then four hours continue
13  drafting and then three hours to finish the report?
14    A.  That's correct.
15    Q.  For a total of 14 hours?
16    A.  Correct.
17    Q.  All right.  All right, what's your next
18  item -- I guess we just did -- we just marked your
19  report.  So what -- what's your next item in your
20  file?
21    A.  The next number of items are things that I
22  cited in the report.  There's an article by
23  Dr. Parkes -- P-A -- P-A-R-K-E-S -- on seated
24  restraint.
25    Q.  And, again, these are items that were cited

---

39

1  in your report?
2    A.  Yes.
3    MR. CLARK:  All right, so we'll mark his
4  article Exhibit 8.
5    MR. POST:  Can I see what that one looks
6  like?  Let's see.
7    MR. CLARK:  Okay?
8    MR. POST:  I've got it.  Just...
9    (DEPOSITION EXHIBIT NUMBER 8 WAS MARKED FOR
10       IDENTIFICATION)
11    A.  The next one is a training bulletin put out
12  by the Chicago Police Department on positional
13  asphyxia.
14    THE REPORTER:  What was it on again, to
15  make sure --
16    THE WITNESS:  Positional.
17    THE REPORTER:  Positional.
18    THE WITNESS:  Asphyxia.
19    MR. CLARK:  All right, so we'll mark
20  that -- what are we up to?
21    THE REPORTER:  9.
22    MR. CLARK:  9.
23    (DEPOSITION EXHIBIT NUMBER 9 WAS MARKED FOR
24       IDENTIFICATION)
25  BY MR. CLARK:

---

40

1    Q.  Again, this was referenced in your report?
2    A.  Yes -- cited, yes.
3    Q.  Okay.
4    A.  The next is an FBI law enforcement bulletin
5  on suspect restraint and sudden death by Dr. Reay,
6  R-E-A-Y.
7    MR. CLARK:  All right, we'll mark that
8  Exhibit 10.
9    (DEPOSITION EXHIBIT NUMBER 10 WAS MARKED FOR
10       IDENTIFICATION)
11  BY MR. CLARK:
12    Q.  And you -- did you reference this in your
13  report as well?
14    A.  I did.
15    Q.  Okay.
16    A.  The next is a U.S. Department of Justice
17  publication called Positional Asphyxia, dash, Sudden
18  Death.
19    MR. CLARK:  Okay, we'll mark that one
20  Exhibit 11.
21    (DEPOSITION EXHIBIT NUMBER 11 WAS MARKED FOR
22       IDENTIFICATION)
23  BY MR. CLARK:
24    Q.  Again, referenced in your report?
25    A.  Yes.

---

William M. Harmening   9/23/2019

---

41

1    The next is a copy of a policy from the New
2  Orleans Police Department.  It's titled Handcuffing
3  and Restraint Devices.
4        MR. CLARK:  All right, we'll mark that one
5  Exhibit 12.
6    (DEPOSITION EXHIBIT NUMBER 12 WAS MARKED FOR
7              IDENTIFICATION)
8  BY MR. CLARK:
9    Q.  Because it's also referenced in your
10  report?
11   A.  Yes.
12    And the last one is a copy of a lawsuit.  It's
13  titled Sherman versus Sepanski.
14   Q.  Is that referenced in your report?
15   A.  Yes.
16        THE REPORTER:  12?
17        MR. CLARK:  12 was the New Orleans, unless
18  I got messed up.
19        THE WITNESS:  12 is the New Orleans.
20        THE REPORTER:  Okay.
21        MR. CLARK:  So we're on 13?
22        THE REPORTER:  13.
23    (DEPOSITION EXHIBIT NUMBER 12 WAS MARKED FOR
24              IDENTIFICATION)
25  BY MR. CLARK:

---

42

1    Q.  So 13, this -- I'm sorry.  You said this
2  was also referenced in your report?
3    A.  Yes.
4    Q.  What's the significance of this Sherman
5  lawsuit?
6    A.  Well, it's a -- it's an indirect citation.
7  I'm not -- I'm not using that lawsuit in any way
8  except that they referenced the Georgia POST
9  training, and I referenced it for that -- for that
10  purpose.
11   Q.  Where -- where is that raised?
12   A.  Well, I've got to find it.
13   Q.  Were you involved in this lawsuit?
14   A.  I was not, no.
15   Q.  How did you know about this lawsuit?
16   A.  I'm not sure.  I have a library of
17  different research items, lawsuits and so forth.  I
18  think I just pulled it out of there.
19    I believe it's page 7, paragraph 30.
20   Q.  Okay.
21    Whatever happened to this lawsuit?  Do you know?
22   A.  I don't know.
23   Q.  All right.
24    All right, now, so does that complete your
25  entire file?

---

43

1    A.  Yes.
2    Q.  Okay.  Any other information that you
3  referred to or referenced in order to form your
4  opinions in this case?
5    A.  No.
6    Q.  Okay.
7    All right, going back to Exhibit 2, which is the
8  notice of taking deposition --
9        THE REPORTER:  What's the -- what's the
10  thumb drive?
11        MR. CLARK:  Oh, I'm sorry.  It -- the thumb
12  drive is Exhibit 2.  Thank you.
13   Q.  Going back to Exhibit 1 -- is that -- is
14  that labeled Exhibit 1?
15   A.  1.
16   Q.  Okay, thank you.
17    The notice of taking deposition, we were going
18  down Exhibit A, which got us down on that trail of
19  your entire file.
20    So have we now looked at and referenced
21  everything that would be included under item number
22  1, which is your entire file related to your review
23  of this case?
24   A.  Yes.
25   Q.  All right, number 2 is your CV.  You

---

44

1  provided an updated copy of that; correct?
2    A.  Yes.
3    Q.  All right.  Number 3, have we covered
4  everything that would be covered under item 3?
5    A.  Yes.
6    Q.  How about item 4?
7    A.  Yes.
8    Q.  How about item 5, did you bring any notes
9  that you prepared as part of this case?
10   A.  No.
11   Q.  Where are those notes?
12   A.  I have no notes.
13   Q.  You have not made any notes at all?
14   A.  No.
15   Q.  Okay.  You don't even make notes when
16  you're reviewing articles or anything like that?
17   A.  No.  Everything I do is paperless on the
18  computer screen.
19   Q.  Well -- but even if it's on a computer
20  screen, did you make notes anywhere regarding this
21  case?
22   A.  No.
23   Q.  Okay, so the only thing -- the only words
24  literally that you would write down as part of this
25  case would be contained in Exhibit 7, which is your

---

William M. Harmening   9/23/2019

45

1  report?
2     A.  That's correct.
3     Q.  Number 6 is record reflecting the
4  compensation.
5     You've given me everything in that regard, just
6  the one invoice?
7     A.  Yes.
8     Q.  Number 7, we touched on everything there?
9     A.  Yes.
10    Q.  Number 8 is articles and treatises, et
11  cetera.
12    Have we referenced everything?
13    A.  Yes.
14    Q.  And Number 9, it's a bit of a catch-all,
15  but have we covered everything with respect to
16  Number 9?
17    A.  Yes.
18    Q.  All right.
19    All right, what have you done, if anything, to
20  prepare for this deposition?
21    A.  I believe I just went back through my
22  report, which I hadn't read in quite a while.  I
23  looked at Mr. Connor's report just recently.  And I
24  believe that's probably about it.  I think I read
25  some of these articles again that I hadn't read in a

46

1  while.  So I basically just prepared by reading my
2  report and a couple of the articles.
3     Q.  Okay.  And did you have -- did you confer
4  with Plaintiff's counsel?
5     A.  Just -- yeah, I met with him this morning,
6  yes.
7     Q.  Okay.  How long?
8     A.  I think about an hour.
9     Q.  Have you interviewed any potential
10  witnesses in this case?
11    A.  No.
12    Q.  Talked with anyone who might be a witness
13  in the case?
14    A.  No.
15    Q.  Reviewed any depositions?
16    A.  No.
17    Q.  When did you first -- were you first
18  contacted by Mr. Post to work on this case?
19    A.  I would have to refer to my invoice and
20  estimate it.
21    Q.  I mean -- and that's the thing.  You can't
22  really tell from the invoice, right --
23    A.  No.
24    Q.  -- because you don't bill for -- until you
25  start drafting; right?

47

1     A.  That -- that's correct.  But what I was
2  going to say is, I tend to -- once I get contacted,
3  I tend to be fairly quick --
4     Q.  Right.
5     A.  -- in writing the draft.  So it looks like
6  January 9th of 2018 was my first entry.  I would
7  estimate that in the month prior to that is when I
8  was contacted.
9     Q.  All right.  And do you recall how Mr. Post
10  got in touch with you?  How did he get your name?
11    A.  I believe he got it from a -- another
12  attorney.
13    Q.  Okay, which other attorney?
14    A.  Craig Jones.
15    Q.  And that -- that case that Craig Jones used
16  you on -- and it might be more than one -- is the
17  Dyksma case?
18    A.  That's one of them, yes.
19    Q.  All right, have you worked for Craig Jones
20  on more than one occasion?
21    A.  Yes.
22    Q.  How many times?
23    A.  I believe -- I'd have to look, but I
24  believe there was six cases.
25    Q.  Oh, you've worked with him six times?

48

1     A.  Yes.
2     Q.  Okay.
3     THE REPORTER:  What was the name of that
4  case?
5     MR. CLARK:  Dyksma, D-Y-K-S-M-A.
6     THE REPORTER:  Thank you.
7     MR. CLARK:  Yeah.  I think that's right.
8  BY MR. CLARK:
9     Q.  Okay, and one thing back on your invoice, I
10  noticed that this invoice is for Mark Post but also
11  Steve Couch.
12    Is that just an error?
13    A.  That's an error.  My invoice system cost me
14  four dollars, so it's got some bugs in it.  Steve is
15  co-counsel on the other case.
16    Q.  Yeah.  Okay.
17    A.  So I --
18    Q.  And when you say the other case, you're
19  talking about the Redwine case?
20    A.  Yes.
21    Q.  All right.  So you believe that -- that you
22  were contacted because of your involvement in the
23  Dyksma case; correct?
24    A.  That's what I recall, yes.
25    Q.  All right.  You gave a deposition in the

William M. Harmening   9/23/2019

49

1  Dyksma case?
2    A.  Yes.
3    Q.  Did you ever testify at trial in the Dyksma
4  case?
5    A.  No.  It settled.
6    Q.  Okay.  How long have you worked as an
7  expert witness?
8    A.  Since 2014.
9    Q.  So the list of -- the testimony list that
10 is Exhibit 3, the earliest deposition listed on here
11 is 2017.
12   A.  That's correct.
13   Q.  Is there a reason that it doesn't go back
14 further than that?
15   A.  That was my first deposition.  A number of
16 early cases settled without deposition.
17   Q.  Okay.
18   A.  And then, of course, it just took that long
19 to get to the deposition in some of these.
20   Q.  All right, so -- so in the last two years
21 you've given all of these depositions?
22   A.  Yes.
23   Q.  You've been quite busy in the last two
24 years, it looks like.
25   A.  I have.

50

1    Q.  Would you agree?
2    A.  Busier than I want to be, yes.
3    Q.  Okay.  For instance, in the year 2018 you
4  gave 12 separate depositions?
5    A.  Yes.
6    Q.  In 12 different cases?
7    A.  Yes.
8    Q.  Were all of those police force cases?
9    A.  Yes.
10   Q.  And did you represent or work for the
11 plaintiff in all those cases?
12   A.  Yes.
13   Q.  Are any of these depositions listed here
14 cases in which you've worked on behalf of law
15 enforcement?
16   A.  No.
17   Q.  Have you ever as an expert witness worked
18 on behalf of law enforcement?
19   A.  Yes.
20   Q.  When was that?
21   A.  I've got -- I've got three cases that I was
22 contacted and hired by the defense -- I'm sorry --
23 two cases, and then one I submitted a report on, but
24 I didn't charge for it on another case.  And then I
25 have four cases -- I'm sorry -- I have five cases

51

1  where I was contacted by the plaintiff.  I sided
2  with the police and they ended up not hiring me.
3  And then there's another category of cases --
4  criminal cases that I don't do depositions on.
5    Q.  All right, well, let me go at it this way.
6  I'm not interested in the criminal cases, all right.
7  So let's stick to civil cases.
8    And I want to know in what cases have you been
9  hired since 2014 -- because before 2014 you didn't
10 work as an expert at all?
11   A.  That's correct.
12   Q.  All right, so since 2014 --
13   A.  Can I -- can I add to that?
14   Q.  Uh-huh.
15   A.  I did, but it was not in this area.
16   Q.  Not as a litigation expert?
17   A.  Not in the use of force or police
18 practices.
19   Q.  What area did you work in?
20   A.  White collar crime.
21   Q.  White collar crime.
22   A.  Yes.  Specifically investment fraud.
23   Q.  Okay.  And that's where a large part of
24 your experience lies; right?
25   A.  Yes.

52

1    Q.  All right, so since 2014 have you been
2  hired as an expert for law enforcement in a civil
3  matter?
4    A.  No.  One is an administrative matter
5  related to termination of employment.
6    Q.  Yeah, I'm talking civil litigation --
7    A.  No civil.
8    Q.  -- related to police use of force.
9    A.  No.
10   Q.  Okay.  This current testimony list and
11 statement of fees, it just lists the deposition
12 testimony; correct?  It doesn't list the cases that
13 you may have been hired on where you did not give
14 depositions?
15   A.  That's correct.
16   Q.  Are there additional cases that would be on
17 here if -- if it was a list of all cases in which
18 you've worked on?
19   A.  Yes.
20   Q.  Do you know those off the top of your head?
21   A.  I know them off the top of my phone.
22   Q.  Oh, okay.  Well --
23   A.  There's approximately a hundred and four
24 cases.
25   Q.  So you're in a hundred and four cases right

William M. Harmening   9/23/2019

---

53

1  now?
2      A.  That would include closed cases, pending
3  cases where everything's done --
4      Q.  All right.
5      A.  -- pending cases where I haven't even
6  started yet.
7      Q.  So there's a lot more cases, then, that you
8  would be involved in that would not be on Exhibit 3
9  because you have not given a deposition yet?
10      A.  That's correct.
11      Q.  All right.
12      A.  A number of them settled without
13  deposition.
14      Q.  Yeah.
15      So since 2014 I think we've already established
16  that you've always worked -- with respect to civil
17  cases involving police use of force, you've always
18  worked against law enforcement, on the other side of
19  the law enforcement officer; correct?
20      A.  Yes.
21      Q.  And since 2014 how many cases have you
22  worked on?
23      A.  I've got a hundred and four.  I would -- I
24  would estimate that ten of those I haven't even
25  started on.  So about 90.

---

54

1      Q.  Okay.  And how many of those are still
2  ongoing?
3      A.  I could count them.  I would -- I would
4  estimate that there are probably 40 still ongoing at
5  various stages.
6      Q.  Okay.  If I were to ask you to give me --
7  get me a list of all cases since 2014 that you've
8  worked on, is that something -- it sounds like
9  you've got it in your phone.
10      A.  I do.
11      Q.  That you could provide to Mr. Post and --
12      A.  Yes.
13      Q.  -- if Mr. Post sees fit, he'd provide to
14  me.
15      MR. CLARK:  So we'd make that request that
16  you do that.  And, Mark, I guess we'd make a
17  request that you provide that to us if you're
18  willing to do it.
19      THE WITNESS:  I also categorize them so you
20  can see what level -- or where I'm at with that
21  case, closed, pending.
22      MR. CLARK:  All right.
23      MR. POST:  Can you say that again being I
24  was doing something?
25      MR. CLARK:  Yeah, yeah, yeah.  So -- and

---

55

1  I'm not asking for your response on the record,
2  but what I'm -- what I'm asking is that -- it
3  sounds like Mr. Harmening can provide a list of
4  all cases that he's worked on since 2014 in some
5  sort of organized fashion -- it sounds like it
6  might be very organized -- and I'm asking that
7  he would provide that list to you, and I'm
8  asking that you provide that list to us after
9  you've looked at it.
10      MR. POST:  Now I heard you.  Thanks.
11      THE WITNESS:  I have a few, just to be
12  clear -- because I don't know the answer to
13  this -- I have a few with nondisclosure orders.
14  I don't know if it covers that or not.
15      MR. CLARK:  That's something that probably
16  Mark could probably -- I wouldn't think it
17  would, but -- at least not the name of it --
18      THE WITNESS:  Yeah.
19      MR. CLARK:  -- but --
20      THE WITNESS:  Yeah.
21      MR. CLARK:  -- you know, if there's
22  something that can't be, then I guess you guys
23  can redact or -- and, you know, go at it that
24  way.
25      THE WITNESS:  There's just a few, so --

---

56

1      MR. CLARK:  Okay.
2  BY MR. CLARK:
3      Q.  How many times have you testified in court,
4  exclude -- and let me exclude the white collar crime
5  cases.  Again, what I'm interested in in this case,
6  at least for purpose of this question, is times in
7  which you've testified in trial with respect to
8  police use of force?
9      A.  Twice.
10      Q.  Okay, and what cases were those?
11      A.  Dontre Johnson versus Dolton, Illinois.
12  And the last name is Casillas, K -- or
13  C-A-S-I-L-L-A-S -- versus Fresno, California.
14      Q.  Okay.  Were -- were verdicts reached in
15  each of those cases?
16      A.  Yes.
17      Q.  What was the verdict in the Dontre Johnson
18  case?
19      A.  The Johnson case, it was for the defense.
20  The Casillas case was for the plaintiff.
21      Q.  And what was the verdict for the plaintiff
22  in the Casillas case?
23      A.  The dollar amount?
24      Q.  Yes.
25      A.  Four point three million.

---

William M. Harmening   9/23/2019

57

```
 1      Q.  What -- what were the facts of the Casillas
 2   case, just briefly?
 3      A.  Mr. Casillas was a motorcycle officer in
 4   Fresno, attempted to pull him over for a seat belt
 5   violation.  Mr. Casillas took off.  It was not a
 6   high-speed chase.  He just wouldn't stop.  He pulled
 7   into his house.  He ran to an apartment, like a
 8   detached garage in the back.  A bunch of officers
 9   showed up.  They went in with canines.  He ran out
10   the back door as they were going in the front door,
11   and he ran in through a breezeway to get out the
12   front, and there happened to be an officer standing
13   there, and he just immediately shot him when he came
14   through the -- came through the door, shot and
15   killed him.
16      Q.  Okay.  Was your testimony limited in the
17   Casillas case by the trial judge?
18      A.  No.
19      Q.  Was it limited in any way at all?
20      A.  Not that I know of.
21      Q.  Okay.  What was your opinion in that case?
22      A.  My opinion was that, in the context of
23   police training and standards of practice, the
24   shooting was inappropriate and excessive under the
25   circumstances.
```

58

```
 1      Q.  Did the -- did the judge let you testify in
 2   that fashion, that based upon what you understood of
 3   the facts your opinion was that it was not
 4   justified?
 5      A.  I frankly don't recall what I tell you --
 6   it was a rather lengthy testimony.  I don't know to
 7   what extent I testified to that.
 8      Q.  Okay.
 9      All right, any other trials in which you've
10   testified?
11      A.  No.
12      Q.  Has any judge restricted your opinions by
13   virtue of a Daubert motion?
14      A.  Yes.
15      Q.  Okay, where did that occur?
16      A.  I -- I think it was a Daubert motion.
17   There's a case, Gerald Cole versus Indianapolis
18   Metropolitan -- or City of Indianapolis.  I'm not
19   sure I totally understand what happened.  There were
20   four experts and none of us were allowed to testify.
21   And I -- honestly, I don't know if that was in
22   response to a Daubert motion, but --
23      Q.  It was in response to some -- some --
24      A.  Yes.
25      Q.  -- sort of motion?
```

59

```
 1      A.  Yes.
 2      Q.  Okay.
 3      A.  I was going to -- we were exploring the
 4   possibility of me testifying as an investigator, not
 5   as an expert, and they settled the case.  There was
 6   no trial.
 7      Q.  Explain that to me, how you were going to
 8   testify as an investigator.
 9      A.  Well, we were -- I don't know if I was
10   going to be allowed, but the attorney was exploring
11   the possibility of using me to get the evidence in
12   as his investigator.
13      Q.  What were you hoping to testify to in that
14   case?
15      A.  In the Cole case -- and I did do a report
16   and a deposition -- my opinion in that case was it
17   was an inappropriate shooting, it was excessive.
18   Mr. Cole was shot in the back as he was running
19   away.  He was unarmed.  He did survive.  He is -- he
20   is a paraplegic today, I believe.  So I was going to
21   testify that it was excessive and inappropriate that
22   the officer fired and went ahead.
23      Q.  And why were you not allowed to so testify?
24      A.  I don't know.  I saw the language from the
25   order.  It just said that -- the judge gave a reason
```

60

```
 1   for all of us.  In my case it said that the
 2   plaintiff's attorney had not demonstrated my
 3   expertise, I think is how it was worded.  I did not
 4   do an affidavit.  I frankly don't know what the
 5   attorney did in that case, but --
 6      Q.  So is it your understanding that you were
 7   challenged based on your qualifications?
 8      A.  Honestly, I don't know.
 9      Q.  You don't know?
10      A.  I just know I was not allowed to testify.
11      Q.  And what court was that in?
12      A.  Federal court in Indianapolis.  I'm not
13   sure what district that would be.
14      Q.  Okay.  I think there's just one in Indiana.
15   Okay, did you tell me there was another case
16   that you were disallowed?
17      A.  There's -- there's a couple pending that I
18   know of.
19      Q.  Okay.  So -- so just to break this down a
20   little bit, on how many occasions do you believe you
21   have been disallowed from testifying?  Just the Cole
22   case?
23      A.  Yes.
24      Q.  All right, and then you think there's some
25   motions pending --
```

Causey Peterson Reporting, Inc.
(706) 317-3111

61

1    A.  Yes.
2    Q.  -- with respect to your opinions in some
3 other cases?
4    A.  Yes.
5    Q.  Which ones are those?
6    A.  There's one here in Georgia.  It is Matthew
7 Schantz, S-C-H-A-N-T-Z, versus Appling County.
8    There is -- there was one filed in another
9 Georgia case, which was found to be moot because
10 summary judgment was awarded.  And that's under
11 appeal now.  And that's the case of the Estate of
12 Billy Darren Wilson versus -- I got -- is it Bartow
13 County?  Does that sound familiar?  Up north?  Yes.
14    Q.  Yeah.  Bartow?
15    A.  Yes.
16    Q.  Okay.
17    A.  And then there's one pending, I believe, in
18 New Mexico.  That would be Manuel -- or the Estate
19 of Manuel Gonzalez versus Bernalillo County.
20 B-E-R-N-I-L-I-L-L-O, I believe.
21        THE REPORTER:  You're going to have to help
22    me with that.
23    A.  It's Albuquerque.  I have no idea.  I
24 terminated my involvement in that case for
25 nonpayment.  So I really don't know what's going on

62

1 with that case.  I took my report back.
2    Q.  Okay.
3    A.  But I do believe they filed a motion.
4    Q.  With respect to the Schantz case, do you
5 know what the substance to that motion -- what the
6 motion was based on?  Is it based on your
7 qualifications or something else?
8    A.  I'm not sure.  I've not read it.
9    Q.  All right, how about the Billy Darren
10 Wilson case?
11    A.  I did read that one, and it -- it was based
12 on qualifications, specifically related to
13 trajectory analysis, bullet trajectories, as I
14 recall.
15    Q.  All right, so the opposing side is -- filed
16 a motion suggesting that you were not qualified to
17 give trajectory analysis?
18    A.  Yes.
19    Q.  Okay.  Did you provide testimony with
20 respect to trajectory analysis?
21    A.  I did.
22    Q.  Okay.
23    All right, what about the New Mexico case, do
24 you know what that motion was based on?
25    A.  No.  I haven't read anything from that case

63

1 since I terminated my employment.
2    Q.  All right.
3    Okay, other than those cases, are you aware of
4 any other times you've been challenged as an expert
5 witness in a case by way of motion?
6    A.  Yes.  I mean there have been a number where
7 I was -- I was found to be qualified.
8    Q.  Okay.  And maybe I should reword that
9 question, I guess.
10    Are you aware of any other instances where you
11 were found to not be qualified or otherwise
12 disallowed from providing the testimony that you
13 intended to provide?
14    A.  No.
15    Q.  Okay.
16    A.  If there are, I don't know about them.
17    Q.  All right.  What do you -- what areas do
18 you hold yourself out as being qualified to give
19 testimony about?
20    A.  Essentially three areas:  Use of force,
21 police practices and more specifically CIT, crisis
22 intervention practices.
23    Q.  All right, I'm sorry.  Use of force is the
24 first one.
25    A.  Yes.

64

1    Q.  What's the second one?
2    A.  General police practices.
3    Q.  So any police practices?
4    A.  Yes.  Yes.
5    Q.  Okay.  And the third one?
6    A.  And crisis intervention.
7    Q.  Okay.  Now, in our particular case that
8 we're here about, which of these areas -- is it just
9 use of force that you're providing expert testimony
10 about or is it these other areas as well?
11    A.  No, it's all three.
12    Q.  All three?  Okay.
13    A.  I think Number 3 is a -- is a major one in
14 this case, but all three.
15    Q.  Okay.  Number 3 is the major one?
16    Why do you say that?
17    A.  Well, I believe this is a CIT case that
18 demanded a CIT response, and I think that's totally
19 different than an offender arrest and apprehension
20 response.  And that's one of my criticisms --
21    Q.  Okay.
22    A.  -- in this case.
23    Q.  Do you -- and I don't want to jump ahead
24 too much here, but do you believe in this case that
25 the way in which the crisis was dealt with was

William M. Harmening   9/23/2019

65

1 inadequate?
2    A.  Yes.
3    Q.  And do you believe that that inadequacy
4 rose to the level of a Constitutional violation?
5    A.  Oh, I --
6    Q.  That's outside your area --
7    A.  I couldn't --
8    Q.  -- of expertise?
9    A.  Yes.
10    Q.  All right.  So you just deal with what you
11 believe is -- what you think is proper or not -- or
12 suitable for police practices; correct?
13    A.  Well, yes, based on experience and my own
14 training, yes.
15    Q.  Yeah.  And you're not offering opinions as
16 to whether something rises to the level of a
17 Constitutional violation, are you?
18    A.  No.
19       MR. POST:  Object to the form of the
20 question.
21    Q.  Okay.
22    A.  No, I am not.
23    Q.  Yeah.  Okay.
24       When -- when were you last -- when did you last
25 perform police duties?

66

1    A.  Well, it would've been just prior to my
2 retirement, but I think you're probably asking
3 uniform police duties, which would've been -- and
4 maybe you're not -- but I'll answer it both ways.
5 Uniform police duties ended in 1993.
6    Q.  Okay.  And when you say "uniform police
7 duties", meaning you're -- you're out on the streets
8 or, you know, walking a beat, so to -- so to
9 speak --
10    A.  (Nods head affirmatively)
11    Q.  -- performing the duties of a police
12 officer?
13    A.  Yes.
14    Q.  And that was what year?
15    A.  1993.
16    Q.  All right.
17    A.  1981 through 1993.
18    Q.  All right.  So with respect to the last
19 time that you performed an arrest it would've been
20 prior to '93?
21    A.  No.  It -- the last time I -- I did a
22 warrantless arrest would have been prior to 1993 or
23 1993, but we certainly made many warrant arrests in
24 my last position.
25    Q.  Okay, and your last position was dealing

67

1 with the white collar crime?
2    A.  For most of it, yes.  There was a three-
3 year period where I switched over into digital
4 crimes, which were mostly child pornography, child
5 exploitation, anything involving digital evidence.
6    Q.  And who were you working for when you were
7 doing either the white collar crime or the -- what
8 you just mentioned?
9    A.  The white -- and it wasn't all white collar
10 crime.  It was specifically investment fraud.
11    Q.  Okay.
12    A.  And that was for -- and also investment
13 fraud and things related to it, which would be money
14 laundering, mail fraud, different things.
15       That would have been for the Illinois Secretary
16 of State, Department of Securities.  And I was the
17 chief special agent.
18    Q.  All right.
19    A.  The digital crimes would have been the
20 Office of the Illinois Attorney General, and I was
21 the deputy chief of investigating --
22    Q.  Office of what?
23    A.  The Illinois Attorney General.
24    Q.  Okay.  And you were -- I'm sorry.
25    A.  Deputy chief of investigations.

68

1    Q.  All right.
2    A.  And I transferred there specifically to
3 develop that program.
4    Q.  Okay.  So post 1993 your career consisted
5 of investment fraud --
6    A.  (Nods head affirmatively)
7    Q.  -- and the digital crimes --
8    A.  Yes.
9    Q.  -- what you call it?
10    A.  Yes, that's correct.
11    Q.  And so after 1993 any arrests that you were
12 involved with would've been folks involved with
13 investment fraud or digital crimes?
14    A.  Yes.
15    Q.  All right.  With respect to the last time
16 you were involved in an arrest where the suspect
17 being arrested resisted arrest, that would've been
18 sometime before 1993?
19    A.  No.  No.  We had a number that -- where we
20 had warrants for them and certainly they resisted.
21    Q.  Okay.
22    A.  I don't believe we made any warrantless
23 arrests with the digital crimes.  I recall some --
24 some obstructing arrest -- we usually went out with
25 the police department.  Most of those cases were in

William M. Harmening   9/23/2019

---

69

1 Chicago.  So we would take CPD uniform guys.  There
2 were times there were obstructing charges, but they
3 would take care of that.  We wouldn't.  We would go
4 out with the warrant, make the warrant arrest.
5      Q.   That's what I was -- my next question was
6 going to be with respect to the investment fraud and
7 the digital crimes you wouldn't be the officer
8 actually laying hands on and making the arrest,
9 would you?
10     A.   Yes.  The warrant we would, yes.
11     Q.   Okay.
12     A.   We just -- if we had to enter in someplace,
13 we had the uniform officer -- especially in
14 Chicago -- we had the uniform officers do the entry
15 for us, if we needed to go in --
16     Q.   Just the entry?
17     A.   Yes.  And then if there were things that
18 happened at the scene, like obstructing, it was
19 typically the CPD guys or one of the other
20 departments that would take care of that charge and
21 that arrest.
22     Q.   That's kind what I'm driving at.
23     A.   Yes.
24     Q.   With respect to suspects that might be
25 resisting arrest, when you were working on this

---

70

1 investment fraud or digital crimes, wouldn't that be
2 something that would be left to the local
3 authorities, the police officers -- uniform police
4 officers?
5      A.   Yes, I think we almost always did that.
6      Q.   Yeah.  It would make sense.
7           So, again, the last time, then, you would've
8 been the arresting officer, laying hands on the
9 suspect and dealing with the suspect that's
10 resisting arrest, would've been prior to 1993?
11     A.   Yes.
12     Q.   All right.  And do you recall -- I'll just
13 ask you.  I don't know if you would.  But do you
14 recall the last time prior to 1993 that you had --
15 you were involved hands-on arresting a suspect that
16 resisted substantially such as we have in this
17 Arreola case?
18     A.   I don't remember the last time.
19     Q.   Okay.
20     A.   I can certainly remember specific ones, but
21 I don't remember --
22     Q.   And I was actually going to ask that.  You
23 know, this -- a situation where an officer is
24 involved arresting a suspect that is resisting to
25 the degree that Mr. Arreola did in our case is not

---

71

1 an everyday circumstance for a typical police
2 officer; would you agree?
3      A.   Well, I think it depends on the officer or
4 the department.  I have to explain.  My -- my
5 department was a very small, rural department, very
6 few deputies --
7      Q.   Where was it again?
8      A.   Menard County, Illinois, M-E-N-A-R-D.
9      Q.   Okay.
10     A.   I -- when I worked midnights, I was the
11 only officer for about 325 square miles.
12     Q.   Okay.
13     A.   We fought every night.  We had a lot of
14 alcohol.  We just had a lot of problems in a rural
15 county.  I'm sure rural counties in Georgia see the
16 same thing.
17     Q.   Okay.
18     A.   And the problem then, in the '80s and '90s,
19 there wasn't a lot of ramifications for these people
20 to fight with us.  I mean they'd get charged and it
21 wasn't a big deal.  It wasn't like it is today.  So
22 we just -- there were many.
23     Q.   Okay.
24     A.   I came home many nights bloodied up.
25     Q.   Gotcha.

---

72

1      Do you remember, though -- it was a long time
2 ago, 1993.  I can't do the math in my head.  But do
3 you remember particular instances --
4      A.   Yes.
5      Q.   -- still?
6      A.   I do.
7      Q.   You do?
8      A.   I do.  And there's one that came to mind,
9 in fact, as I was working this case, because it's
10 very similar to it, and in considering the officers
11 in this case, how they could've done it differently,
12 doing it better, I got a case very similar to it
13 that I was on that I recall.
14     Q.   And do you recall that you could've done it
15 better, the one you were on, or you think you got
16 yours just right?
17     A.   I think I got it just right.
18     Q.   With respect to you fought every night --
19 or -- that's your words, right, almost every night?
20     A.   (Nods head affirmatively)
21     Q.   Were there -- were there instances that you
22 were involved in where you had to fight with
23 suspects where after the fact -- the next day, the
24 next week, the next month -- you felt like you
25 could've done things differently?

---

William M. Harmening   9/23/2019

73

1    A.   Oh, absolutely.
2    Q.   And done things better?
3    A.   Absolutely.
4    Q.   And you made mistakes?
5    A.   Yes.
6    Q.   Okay.  Wouldn't that be true for most
7  any -- most any police officer?
8    A.   Yes.
9    Q.   Okay.  And you would agree with me that
10  police officers -- you were one yourself -- or law
11  enforcement officers are thrust into situations that
12  are not their making; correct?
13    A.   Yes.
14    Q.   And they're fluid?
15    A.   Yes.
16    Q.   And that things happen rapidly --
17    A.   Yes.
18    Q.   -- correct?
19       And they have to make split-second decisions and
20  judgments; correct?
21    A.   Yes.
22    Q.   And you did that when you were a law
23  enforcement officer?
24    A.   Yes.
25    Q.   What -- how many use of force cases did you

74

1  investigate while you worked as a law enforcement
2  officer?
3       So I guess what I'm saying is -- I'm obviously
4  not interested in your expert work here.
5    A.   Uh-huh.
6    Q.   I'm interested in use of force cases that
7  you actually investigated.
8    A.   From -- from 1990 to 1993, I was the chief
9  deputy.  So I was responsible for discipline and the
10  deputies.  And there were a number, but there were
11  no deadly force cases.  We were precluded from doing
12  that in Illinois, and we still are in Illinois.  The
13  state police does those.
14       So anything less than deadly force, yes, I would
15  do an internal investigation.  We would come to a
16  decision about what to do.  There weren't that many.
17  I'd say half a dozen in three years, mostly
18  involving fights.
19    Q.   And that was for Menard County?
20    A.   Yes.
21    Q.   Did -- you said those were mainly for
22  fights.  What do you mean by that?
23    A.   A deputy fighting with somebody who later
24  complains that they got roughed up.  I recall,
25  again, about a half a dozen or so of -- we didn't --

75

1  we didn't carry tasers.  We didn't carry pepper
2  spray.  We didn't even carry batons.  We carried
3  our -- our weapons and a large flashlight.
4       So the complaints, as I recall, usually involved
5  physical force or maybe use of a flashlight.
6    Q.   So, I mean, if you -- if when you were
7  doing it you were fighting every -- every night, I
8  guess I understand that most of those don't rise to
9  the level of a complaint so that it had to be
10  investigated?
11    A.   I never -- never had a single complaint
12  against me.
13    Q.   Right.
14       So the ones that you investigated, were those as
15  a result of the suspect complaining in some form or
16  fashion --
17    A.   Yes.
18    Q.   -- such that it triggered an investigation?
19    A.   Yes.  Again, it's a different time then.
20  We didn't have police unions.  We didn't have formal
21  investigative processes for -- a process for me was
22  to sit down with the individual, who I probably
23  knew -- it was a small county --
24    Q.   Yeah.
25    A.   -- take his complaint, talk to the deputy,

76

1  try to figure out if the complaint was legit or not
2  and what to do about it.
3    Q.   All right.  And you think there was about a
4  half dozen or so of those?
5    A.   Yes.  And I don't recall any lawsuits.
6    Q.   Okay, of those half dozen investigations,
7  did any of those involve officers that were -- that
8  you found used excessive force?
9    A.   No.  There was one case where the sheriff
10  override my decision.  And then at that time due
11  process was then take it to the county board.  You
12  know, it was just poor farmers that knew nothing
13  about this stuff.  And then they overrode the
14  sheriff.
15       So my decision was it wasn't excessive force.
16  The sheriff said yes, it is, we're going to
17  discipline.  He took it to the county board, and
18  they -- they agreed with me.
19    Q.   All right, so in all the ones you
20  investigated the officers were exonerated?
21    A.   Yes.  And, again, there was no lawsuits.
22    Q.   Okay, other than those half dozen or so
23  investigations, have you ever involved -- been
24  involved with investigating the use of force by a
25  police officer?

William M. Harmening  9/23/2019

---

77

1     A.  No.
2     Q.  Do you have any formal certifications in
3  the use of force?
4     A.  You mean certification relating to weapons
5  or -- I don't know of any certifications for
6  investigating use of force.
7     Q.  No, I was moving off the investigation
8  part.
9     A.  Okay.
10     Q.  I just mean in general do you have any
11  certifications with respect to police use of force?
12     And I can -- well, let's answer that question
13  first.
14     A.  Well, regarding weapons, I'm not -- I'm not
15  certified with my handgun anymore since I retired.
16  I am -- I still carry a taser certification through
17  Axon, because it extends beyond just carrying the
18  taser.
19     Q.  Okay.
20     A.  But I don't know any certifications
21  regarding investigating use of force.  There are
22  associations out there that will give you their
23  certification.  I don't belong to any of them, no,
24  not anymore.
25     Q.  Do you have any certifications with respect

---

78

1  to defensive tactics for a police officer?
2     A.  No.
3     Q.  Are you a law enforcement officer as we
4  speak today?
5     A.  I carry the status of retired law
6  enforcement officer, so I still carry a badge.
7     Q.  Okay, is that something that -- I'm not
8  familiar with that.  Is that something that law --
9  once a law enforcement officer you can retire and
10  always carry a badge?  How does that work?
11     A.  Well, it -- it allows you to carry a
12  weapon, and to carry the weapon you have to carry
13  the badge.
14     Q.  Okay, do you have to do anything to be
15  re-certified or to be held current?
16     A.  I have to qualify annually.
17     Q.  With a weapon?
18     A.  Yes.
19     Q.  Okay.  And what about with respect to the
20  badge?
21     A.  What about it?
22     Q.  Do you have to re-qualify to be -- to be
23  allowed to carry that badge?
24     A.  No.  No.  Once you retire you --
25     Q.  Okay.

---

79

1     A.  -- you go into that status at -- at our
2  post in Illinois, which is called something else,
3  but you're put in retirement status and it's
4  perpetual.
5     Q.  Okay.  So your badge that you carry, what
6  is it -- who's it with?  What does it say?
7     A.  I'll pull it out, because I'm not quite
8  sure how they worded it.  It's retired --
9     Q.  Is this what you pull out when you get
10  pulled over and say let me show you my license and
11  it's right opposite it?
12     A.  Yeah.
13        MR. POST:  The lawyer would advise you not
14  answer that question.
15        THE WITNESS:  Thank you.
16     A.  It says "Retired Chief, Secretary of State,
17  Securities Department, Badge Number 1".
18     Q.  Okay, so that's your badge essentially from
19  your -- that's your last badge that you had, which
20  is with the Securities Department?
21     A.  That's correct.
22     Q.  Okay.
23     A.  You have to carry the badge and an ID in
24  order to carry a weapon.
25     Q.  Gotcha.

---

80

1     A.  Which I frankly don't do, so --
2     Q.  You don't carry the weapon?
3     A.  No.  I've moved.  I've moved to Louisiana.
4  So it requires that -- that I go through another
5  process.  I haven't done that yet.
6     Q.  Okay.  Everybody carries a gun down there.
7     A.  Pretty much.
8     Q.  You mentioned at the beginning that you've
9  retired from teaching; correct?
10     A.  That's correct.
11     Q.  You used to teach at Washington University?
12     A.  Yes.
13     Q.  Did you teach police officers at Washington
14  University?
15     A.  I did.
16     Q.  What courses did you teach to police
17  officers?
18     A.  I've -- there have been two different --
19  there have been three different places where I've
20  taught police officers, and these are not -- well,
21  okay, let me back up.
22     There have been times when I've taught
23  specifically police officers, no one else.  So I
24  have taught at the Chicago Police Academy.  I taught
25  crisis intervention, a full-semester course.  And I

---

William M. Harmening   9/23/2019

81

1  taught -- it was -- it was an investigative course
2  really bedded in psychology.  So I taught a course
3  that included crime scene analysis from a
4  psychological perspective, profiling, things of that
5  nature, and that was specifically Chicago police
6  officers.  And that was through the Adler School of
7  Professional Psychology in Chicago.  So they
8  contracted with CPD and then they contracted with me
9  to come in and teach the course.
10     Those are the only courses I've taught
11  specifically to police officers in an academic
12  setting.
13     Q.  Right.
14     A.  I have taught at the police academy.
15     Now, apart from that, I've taught a number of
16  courses where police officers would take those
17  courses.  At Wash U, every course --
18         THE WITNESS:  One more --
19     A.  I'm sorry.  Washington University.  Every
20  course I taught had police officers because they got
21  to go for free.  So they were always in there.  I
22  taught --
23     Q.  But that course wasn't designed for police
24  officers; it was just a course at the college.
25     A.  That's correct.

82

1     Q.  So some kid in Washington U that wanted to
2  take that course could just take the course;
3  correct?
4     A.  That's correct.
5     Q.  All right.
6     A.  There were six courses.
7     Q.  Okay.  Six courses.
8     All right, go ahead.
9     A.  And it was a -- it was a certificate
10  program.
11     So police officers who were looking to advance
12  in -- promotional advancement, that's a big deal to
13  them, to get certificates and additional degrees.
14     Those courses -- and it's a program I created.
15  That's why -- that's why I went there, was to create
16  this program.  I taught forensic psychology, crisis
17  intervention, investigative psychology, correctional
18  psychology and juvenile justice and criminology.
19  There were six courses.
20     Q.  All right, with respect to police use of
21  force, what items on your CV qualify you as an
22  expert in those areas?
23         MR. POST:  Can we take a break?
24         MR. CLARK:  Oh, yeah.  Sure.
25         MR. POST:  Thank you.

83

1         (BRIEF RECESS)
2  BY MR. CLARK:
3     Q.  Take a look at your CV.  And I -- what
4  exhibit is that?
5     A.  Exhibit 4.
6     Q.  Okay.
7     A.  Well, I'll start with experience.
8  Certainly basic police experience.  There's not a
9  police officer out there that's not pretty-well
10  trained in the use of force.  I also taught at the
11  police academy -- one of the police academies in --
12  in Illinois.  I think it's on here.  Lincoln Land
13  Police Training Center.
14         THE REPORTER:  Lincoln Land.
15         THE WITNESS:  Lincoln Land Police Training
16  Center.
17     Q.  Yeah, and, if you could -- I -- my question
18  is really to point me to the items on your CV that
19  you believe shows your qualifications --
20     A.  Yes.
21     Q.  -- with respect to police use of force.
22     A.  Okay, under -- under Licenses and
23  Investigative Skills, there are a couple.  So I
24  graduated at the Illinois State Police Academy.
25  That's one where there was a great deal of use of

84

1  force training.
2     Coordinator instructor, Lincoln Land Police
3  Training Center, a couple of lines below that.  I
4  was responsible for all state-mandated behavioral
5  science instruction for new police cadets.  And that
6  included a number of hours of instruction in the use
7  of force or the behavioral dynamics related to the
8  use of force.
9     There are other things on here that included
10  training on the use of force, such as CIT
11  instructor --
12     Q.  All right, before you do that, the
13  graduate -- you graduated in 1982 from the Illinois
14  Police Academy; right?
15     A.  That's correct.
16     Q.  All right, then with respect to the
17  coordinator/instructor item you pointed to, what
18  dates was that?
19     A.  That would've been 1990 to 1993 --
20     Q.  Okay.  All right, go ahead.
21     A.  -- during the time I was chief deputy.
22     There are -- well, the fifth item down, CIT
23  instructor, certainly in the course of that training
24  and in doing the training myself, we certainly
25  addressed the use of force as it related to mental

85

1 illness and cases --
2     Q.   What was the date -- date on that?
3     A.   That would have been in 19 -- that would
4 have been, I think, December of 1990, at the
5 Springfield Police Academy.
6     Q.   All right, go ahead.
7     A.   We were the first class of instructors.
8     In terms of academics, I have at least two
9 textbooks that relate to the use of force to a great
10 extent.  Those are on page 1 of Exhibit 4.
11     Under Publications, the second one down is a
12 textbook on "Forensic Psychology".  I co-authored
13 that with Dr. Ana Gamez from the LA County Sheriff's
14 Office.
15         THE REPORTER:  One more time.  Doctor who?
16         THE WITNESS:  Gamez, G-A-M-E-Z.
17         THE REPORTER:  Okay, it might be on there
18 now and I can get the spelling, but I never
19 know.
20     A.   She -- she's a forensic psychologist with
21 the LA County Sheriff's Department.  Eighty-five
22 percent of the book was written by me.  That's the
23 royalty split.
24     In that book there is a chapter -- pretty
25 extensive chapter devoted to use of force, not just

86

1 the psychology but the mechanics of the force
2 continuum and so forth.
3     The fourth item down --
4     Q.   Was that -- was that book -- was that
5 chapter, was it related to deadly force only?
6     A.   No.  No.  It related to all force.
7     Q.   Okay.
8     A.   In fact, the force continuum is explained
9 in there.  There's a basic overview of some of the
10 legal issues from a -- you know, a non-attorney to
11 undergraduates.  So it's pretty basic on the legal
12 stuff.  I talk about -- I talk about Garner -- I
13 talk about the Garner case.  I talk about the Graham
14 case.  That's about it on the legality -- the legal
15 stuff.
16     The fourth item down under Publications is
17 another textbook.  The first one is published by
18 Pearson.  The fourth one down published by Prentice
19 Hall, is on crisis intervention.  And there is a
20 great deal in that book about the use of force.
21 There is a chapter on the force continuum.  And then
22 throughout that particular textbook, where I talk
23 about a lot of different scenarios that police
24 officers are in where force may be used, I address
25 that issue.  So that's kind of a use of force

87

1 textbook actually.
2     Q.   But all these publications are things
3 you've been -- you've written?
4     A.   Yes.
5     Q.   They don't make you qualified; you'd agree,
6 right?
7     A.   No.
8     Q.   Okay, so I'm really interested in what
9 items on your CV do you point to that say -- that
10 says this is what makes me qualified as an expert
11 with respect to use of force.
12     So you've took me a few things under your
13 Licenses and Investigative Skills.
14     A.   Well, okay, then -- then I'll put them in
15 two categories, because --
16     Q.   Okay.
17     A.   -- most of my knowledge is certainly -- I
18 furthered my own knowledge through training and
19 academics and research.
20     So that -- that category would include the
21 textbooks --
22     Q.   Okay.
23     A.   -- teaching numerous courses that involve
24 the use of force, teaching at the police academy.
25     On the training side, what training have I had

88

1 related to the use of force would be my initial
2 police academy training at the Illinois State police
3 Academy that include, you know, annual updates for
4 the next 37 years.  It would include taser training.
5 I took advanced training.  It was taser evidence
6 recovery and analysis.  I just did that last year
7 through Axon.
8     I went through -- again, I went through CIT
9 instructor training, which obviously deals a lot
10 with the use of force.
11     And I think those -- that's about it.  Police
12 training, CIT training, taser training.
13     Q.   Okay.  And all that training would've been
14 in the -- before 1993; correct?
15     A.   No.  The taser training was last year
16 actually.
17     Q.   Other than the taser training?
18     A.   That's correct, prior to 1993.
19     Q.   All right.  Tell me in general what your
20 opinions are in this case.  I'm going to get to the
21 specifics of your report, but I'm interested in your
22 overall opinions.
23     A.   I have two general areas of opinions;
24 number one, how the officers handled Hector prior to
25 subduing him, and; number two, how they subdued him,

89

1  the length of time that I believe they were on him
2  in a prone position.
3      So my opinions are that in the context of CIT
4  training they did not respond properly.  And in the
5  context of police training on the use of force, they
6  were excessive in how they remained on top of him
7  for an extended period of time after getting him
8  handcuffed.
9      Q.  All right, let me see if I understand that.
10  So -- and, again, I'm going to get to your report
11  and the way you worded it in the report we can get
12  to, but generally you have two categories of
13  opinions.  One is -- has to do with the officers --
14  their actions prior to subduing Mr. Arreola;
15  correct?
16      A.  That's correct.
17      Q.  And number two is what they did during the
18  subduing -- or during -- during the arrest?
19      A.  Yes, although I -- I'm not critical of the
20  fact that they took him to the ground and put him in
21  handcuffs.  I'm not critical of that --
22      Q.  Okay.
23      A.  -- just to be clear.
24      Q.  Okay.  But specifically how long they were
25  on him, but -- but those -- those opinions in the

90

1  second category has to do with what took place
2  during the arrest process?
3      Is that a better way of saying it?
4      A.  That's correct.
5      Q.  All right, so those two -- those two areas.
6      Now, you said something about CIT training.
7  Again, what is CIT training?
8      A.  Well, it's -- CIT is Crisis Intervention
9  Team.  We call -- we generically refer to it as CIT
10  training.  And it involves a number of things.  It
11  involves teaching officers about mental illness,
12  what to look for, the different types of mental
13  illness, how to de-escalate people during the middle
14  of a psychiatric episode, what -- how to -- referral
15  resources, how to engage EMS, how to engage mental
16  health professionals.  Mostly I'd say the -- the
17  majority of the training is de-escalation techniques
18  and basic knowledge about mental illness.
19      Q.  Okay.  So with respect to both of those
20  categories your opinions relate to the actions of
21  Officers Evrard, Aguilar and Dudley; correct?
22      A.  With -- with respect to CIT type issues, my
23  criticism is of Aguilar and Dudley.
24      Q.  Okay.  But overall your opinions relate to
25  the actions of the officers, is all I'm getting

91

1  at --
2      A.  Yes.
3      Q.  -- right?
4      Now, with respect to your first category, then,
5  with respect to your opinion related to things that
6  occurred prior to what you termed subduing Arreola,
7  what standard are you holding the officers to?
8      A.  I'm holding them to at least one of them
9  has -- was properly CIT trained.  I'd have to look
10  which one.  I wasn't sure about the other one.  He
11  may have been --
12      Q.  So -- so put -- put a different way, your
13  opinions with respect to what the officers did prior
14  to subduing Arreola has to do with whether those
15  actions fit within what you're going to tell me
16  about is proper CIT training?
17      A.  Yes, and procedures, yes.
18      Q.  And procedures --
19      A.  Yes.
20      Q.  -- right?
21      All right.  With respect to your second
22  category, with respect to what took place during the
23  arrest, what standard are you holding the officers
24  to there?
25      A.  Those would be the training standards of

92

1  Georgia POST.
2      Q.  Okay.  So your -- your opinions with
3  respect -- in the second category of what took place
4  during the arrest would be that the officers did not
5  comply with the Georgia POST standards with respect
6  to what you do during an arrest of this nature?
7      A.  Yes.
8      Q.  All right.  Are there any other categories
9  of opinions that you intend to offer in this case?
10      A.  No, not what's -- not beyond what I've put
11  in my --
12      Q.  Okay, so everything that you would testify
13  in the case would come within one of those two main
14  areas; correct?
15      A.  And there's a third area, and that --
16      Q.  Oh.
17      A.  The third area is a lesser area that would
18  be related to when should you call for backup, when
19  should you call for EMS, how you have EMS respond,
20  do you have them post up, do you have them respond
21  directly to the scene --
22          THE REPORTER:  I'm sorry.  How you have EMS
23  up --
24          THE WITNESS:  Post up.
25          THE REPORTER:  Post up.

William M. Harmening   9/23/2019

93

1       THE WITNESS: Or staged is another way of
2   saying it.
3       A.  Those standards are -- I would suggest
4   those standards are probably the policies and
5   procedures of the police department.
6       Q.  Okay.  But, again, your criticisms would be
7   of the officers and whether they complied with
8   those; correct?
9       A.  Yes.
10      Q.  I think I asked you this before, but you
11  haven't interviewed any witnesses, have you?
12      A.  I have not.
13      Q.  And you have not visited the scene of this
14  arrest, have you?
15      A.  I have not.  Not physically anyway.
16      Q.  You're not going to offer any opinions or
17  attempt to offer any opinions about the officers
18  involved -- Aguilar, Evrard and Dudley -- their
19  state of mind or what they were thinking during this
20  arrest, are you?
21      A.  No, I'm not.
22      Q.  And you're not offering opinions as to
23  their credibility with respect to any of their
24  testimony, are you?
25      A.  No.

94

1       Q.  All right, let's take a look at your
2   report, which we've marked as -- is it 7 -- Exhibit
3   7.
4       A.  Okay.
5       Q.  All right, on page 15 of your report you
6   list three opinions --
7       A.  Yes.
8       Q.  -- correct?
9       A.  Yes.
10      Q.  And those, in fact, are all of your
11  opinions that you intend to offer in this case;
12  correct?
13      A.  Yes.
14      Q.  All right.  Your first opinion has to do
15  with your belief that the officers delayed the
16  arrival of EMS; is that correct?
17      A.  Yes.
18      Q.  Well, why do you believe that?
19      A.  Well, I believe from the -- the evidence I
20  looked at, I believe they had them post up down the
21  street -- I'm not exactly sure where -- but they did
22  not respond to the scene until they were told to
23  come in.
24      Q.  Do you know why the officers did that?
25      A.  Well -- no.  I mean, I can assume why they

95

1   did that, but -- I have an opinion about that.
2       Q.  Well, what is your opinion?
3       A.  Well, I believe they -- they did it as a
4   matter of practice because they felt it wasn't safe
5   for EMS people to come in.  My opinion is that's --
6   that's improper in this case --
7       Q.  Okay.
8       A.  -- that --
9       Q.  So you -- but you believe, though, that the
10  reason that they may have done that was for the
11  safety of the EMS personnel; correct?
12      A.  Yes.
13      Q.  Okay.  And it's your opinion that it would
14  be better for them to have had EMS be closer to the
15  scene; correct?
16      A.  Yes.  And in that same opinion I talk about
17  backup, the same with both of them.
18      Q.  Okay.  Backup meaning additional officers?
19      A.  Yes.
20      Q.  Okay.
21      All right, your second opinion, tell me what
22  that is.
23      A.  Well, it's police training -- and it's
24  their police training -- that when you do handcuff
25  someone in a prone position that you have to be --

96

1   you have to be aware of their breathing.  You have
2   to monitor their breathing.  And as soon as you get
3   them handcuffed, you have to get them either on
4   their side or standing up or sitting up as quickly
5   as possible, which I don't believe they did.  Even
6   if there are times when they can't get them
7   handcuffed, if their breathing is distressed, I
8   think the training is -- well, I know the training
9   is you have to reposition them somehow.
10  Unfortunately, sometimes that's not possible.  But
11  you have to take steps if their breathing is
12  distressed and, if it's obvious, to put them in a
13  position where they can breathe better.  And I don't
14  believe they did that.
15      Q.  And when -- for an officer to put someone
16  in a position where they could breathe better, you'd
17  agree with me that that can't be done till a suspect
18  is fully restrained and contained; agreed?
19      A.  No -- well, it depends on how you define re
20  -- I wouldn't say restrained.  I would say contained
21  is a good word.  Most of the police training is --
22  if you cannot get them handcuffed and there are
23  problems with breathing and they're in a prone
24  position, the training is grab their feet -- in this
25  case grab their feet, hold their feet still, another

William M. Harmening   9/23/2019

97

1  one take a top mount position on them to --
2       THE REPORTER:  Take a top --
3       THE WITNESS:  Top mount.
4       THE REPORTER:  Mount.
5       THE WITNESS:  Position.
6    Q.  In other words, get on top of them?
7    A.  Yes, without applying their weight, to
8  prevent them from rolling around and whatever they
9  do, but -- so, yes, I believe there are steps you
10  can take if you cannot get them handcuffed to deal
11  with the breathing problem.
12    Q.  Would you agree with me that when an
13  officer is attempting to arrest a suspect that's
14  resisting that that officer is allowed to take
15  whatever action necessary to get that suspect
16  restrained?
17    A.  No, I don't agree with that.
18    Q.  Why not?
19    A.  I think it depends -- first of all, I --
20  there are two situations here, and I don't use the
21  terminology of arrest and apprehension in a CIT
22  case.  That wasn't the purpose for them being there.
23      The purpose for them being there was to get him
24  help and to get him secured.  I -- I view it as --
25  and police are trained in this manner.  I believe it

98

1  is a completely different scenario with a different
2  mind set that they have to go into.  Whereas, in an
3  arrest situation you may -- you may take some
4  extreme measures to get them in handcuffs, depending
5  on the offense they're being arrested for.  I don't
6  think that's true with a CIT situation.  I think
7  their safety is first and foremost and the officer's
8  safety.
9      So there are -- I think that's going to guide
10  their response.  So I don't think the response is
11  going to be do whatever you have to do to get this
12  person in handcuffs.  I don't agree with that.
13    Q.  Okay.  So if in a -- you call it a CIT
14  situation; right?
15    A.  Yes.
16    Q.  Meaning -- in layman's terms, what does
17  that mean?
18    A.  Meaning they're not there to arrest him.
19  They're there to get him help.
20    Q.  Initially they were not there to arrest
21  him?
22    A.  I don't believe they were even -- I don't
23  believe they were there ever to arrest.
24    Q.  You agree, though, that they were -- they
25  did the right thing, the officers did, by attempting

99

1  to arrest Arreola, don't you?
2    A.  Yes.
3    Q.  Okay.
4    A.  I believe they waited too long, but that
5  was the proper thing to do, yes.
6    Q.  You think they should've arrested him
7  before they did?
8    A.  I do.
9    Q.  Yeah.  But once they made the decision to
10  arrest, you don't have fault with that; right?
11    A.  No.  I have no criticism of them taking him
12  to the ground and getting him in handcuffs.
13    Q.  All right.  So do I understand you to say,
14  though, that since this is a -- what you call a CIT
15  situation that you believe that the -- officers in
16  that situation should effectuate the arrest
17  differently than officers in a non-CIT situation
18  that's effecting an arrest?
19    A.  Yes.  Can I give you an example?
20    Q.  Sure.
21    A.  If it's an offender, there's a crime that's
22  being committed, you may start using -- in this
23  case, with Hector on the ground, they can't get his
24  arms out, you may use pain compliance techniques.
25  You may drive stun him.  You may use your OC spray.

100

1      In a CIT case, I don't believe you do that.  I
2  think the risk is too great for -- well, what
3  ultimately happened to him.
4      So, yeah, I do believe they're different how you
5  respond.  With the -- with the underlying foundation
6  that whatever you do, you have to do it in a way
7  that's safe for you, the officer, and him.  I mean,
8  you can't increase the risk by doing it differently.
9    Q.  Right.  And my next question was that
10  whether it's a CIT situation or not, an officer is
11  entitled to defend himself versus the restraint -- I
12  mean the resistance that a suspect is providing?
13      Would you agree?
14    A.  Depending -- I --
15    Q.  I mean an officer doesn't have to take a
16  beating by a -- from a suspect he's attempting to
17  arrest?
18    A.  No.  I agree with you.
19    Q.  All right.
20    A.  Yes.
21    Q.  So if an officer, whether it's a CIT
22  situation or otherwise, attempts to arrest a
23  suspect -- such as happened in this case with
24  Mr. Arreola -- and that suspect begins to fight, an
25  officer is entitled to use force to restrain that

101

1  suspect? Do you agree?
2     A.  In some situations, yes, if they're
3  fighting, if they're actively resisting, as opposed
4  to passive resistance.  But, again, I think it's
5  more a mentality than practice.  I think the
6  officers in this case -- in any case like it -- have
7  to go into it with the mind set that we are here to
8  get this kid to a hospital, not to arrest him.
9     Q.  And you agree that these officers went into
10  this with that mind set, don't you?
11    A.  Well, I think they -- I think officers a
12  lot of times --
13    Q.  No, these officers.
14    A.  I understand, but -- and I'm going to
15  relate them to a number of different cases that
16  work.
17    Q.  Well, first answer that question and then
18  explain, if you would.
19    Do you believe that these officers went into it
20  with the mind set to deal with Mr. Arreola without
21  arresting him?
22    A.  Oh, no.  I believe they went into it with
23  the mind set -- well, I don't know.  They went there
24  because they got called there.  And I think very
25  quickly they realized they had an individual in the

102

1  middle of a psychiatric episode.  I think they knew
2  at that -- well, I know they knew that this had to
3  be an involuntary commitment because one of them
4  said so on the radio.
5     My criticism is not the mind set up to that
6  point or even taking him to the ground.  My
7  criticism is what happened after they took him to
8  the ground and put -- and then I think the mind set
9  either perhaps changed because of his resistance or
10  they just didn't really think about what they were
11  doing in --
12    Q.  Well --
13    A.  -- his situation.
14    Q.  -- you -- you would agree that this is a
15  heck of a fight for these officers?  Would you agree
16  with that?
17    A.  No.
18    Q.  You wouldn't?
19    A.  No.
20    Q.  Would you disagree with eyewitnesses who
21  said that?
22    A.  Well, heck of a fight may be something
23  different to me.  It's my understanding they took
24  him to the ground fairly quickly.  Now, I think he
25  struggled on the ground.

103

1     Q.  So if someone testified that they saw this
2  and that Arreola provided a great degree of
3  resistance and with the officers with great
4  strength, such that the officers were having a hard
5  time containing Mr. Arreola, would you disagree with
6  that?
7     A.  I wouldn't disagree if that happened on the
8  ground, but I would also say that they should've
9  expected that.
10    Q.  Okay, that's fine.  That wasn't my
11  question.
12    But I mean do you -- so it sounds like you
13  agree, then, that Arreola did resist to a large
14  degree and that these officers had a very difficult
15  time controlling Arreola due to his strength?
16       MR. POST:  Object to the form.
17    A.  No.  What I -- what I will agree to --
18  because I don't have video of it and I know what the
19  statements were -- what I would agree to is they got
20  him on the ground, he struggled, he resisted, they
21  had difficulty getting him handcuffed.  No doubt
22  about that.
23    Q.  Your next opinion -- your third opinion has
24  to do with -- well, you tell me.
25    What is the third opinion?  It seems to be a bit

104

1  of a catch-all, but go ahead.  It's separated out as
2  a third opinion.
3     A.  Well, the third opinion is essentially, I
4  think, the same as the second opinion --
5     Q.  Yeah.
6     A.  -- I think, in the context of force.  I
7  just believe it was excessive --
8       THE REPORTER:  I'm sorry.  I think in the
9  context?
10    A.  In the context of force, I believe it was
11  excessive to remain on his back for as long as he
12  did.
13    Q.  And when you say it's excessive, you're
14  referencing that to the POST standards --
15    A.  Yes.
16    Q.  -- that you spoke of earlier?
17    A.  That's correct.
18    Q.  Excessive in the sense of beyond those
19  standards; correct?
20    A.  I'm using excessive there in the context of
21  handcuffing techniques that are put forth in the
22  POST training standards, yes.
23    Q.  All right, if you'll go to page 4 of your
24  report -- I kind of want to go through the report
25  and I had a few questions and get your clarification

William M. Harmening   9/23/2019

105

1  on.
2      A.  Yes, sir.
3      Q.  In the introduction you mentioned that
4  Arreola was showing signs of paranoia and believed
5  there were people inside his house.
6      Do you see that?
7      A.  Yes.
8      Q.  And then you go on to say:  "Officer Dudley
9  advised dispatch to send EMS for a psych eval".
10      What is the significance to you that Arreola was
11  showing signs of paranoia -- or was that
12  significant -- is that significant to you in your
13  opinion?
14      A.  Well, it's significant -- it's very
15  significant to me, number one, not just paranoia but
16  thought disorder in general.
17      There's two things there in that statement that
18  are significant.  Number one, the officers knew that
19  they were going to do an involuntary commitment.
20  They had made that decision.
21      And, number two, CIT training should've informed
22  them that when you have someone with a thought
23  disorder who's in the midst of an episode -- with
24  paranoia especially -- there is no de-escalating
25  those folks.  There's no talking to them.  There's

106

1  no way to make them unparanoid.  The goal, according
2  to CIT training, is get them in custody as quickly
3  and as safely as possible at that point.
4      So it's significant to me in the sense that they
5  didn't immediately do that and they didn't
6  immediately call for backup, because there's no
7  doubt people in this situation demonstrate strength.
8  You know, they're hard to control.  Every -- I think
9  every police officer knows that, because they've all
10  dealt with people like this.  And they don't have to
11  be taught that in training.
12      So to answer your -- I want to make sure I
13  answer your question.  It's significant to me
14  because they knew they had an involuntary
15  commitment, number one, and they should've known at
16  that point they needed more officers and they needed
17  EMS to respond to the scene, and they need to get
18  him in custody as quickly as possible.
19      Q.  And what makes you believe that they knew
20  that they had someone that was -- needed crisis
21  intervention?
22      A.  Well, I think they knew that they had
23  someone that was going to need an involuntary
24  commitment.  They knew they were not going to leave
25  at that point.

107

1      Q.  All right, and at what point did they know
2  that?
3      A.  I think at the -- I think they knew at --
4  certainly at the point they said we're going to need
5  a psych eval.  I'd have to look at the time of that.
6      Q.  But would you agree with me, though, that
7  when the officers got to the scene they didn't know
8  that, that they -- that they learned these things by
9  talking to Mr. Arreola?  Correct?
10      A.  Yes, but I would -- but I would suggest
11  that based on the comments made by Officer Aguilar
12  that they knew that very quickly in talking to him,
13  because you would know that in talking to someone
14  who is --
15      Q.  Right.
16      A.  -- in the middle of an episode.  There's no
17  talking to them.
18      So I think there's a period of time where -- and
19  I don't know how long.  I really don't.  I don't
20  know if it was as soon as they got there and talked
21  to him or if it was when they talked to his mother.
22  I don't know.  But there was a period of time where
23  they were certainly evaluating the situation.  I
24  don't know how long, though.
25      Q.  It appeared to me in looking at -- looking

108

1  at the video -- and, frankly, in talking to the
2  officers -- that the officers, when they got there,
3  tried to talk with Mr. Arreola to try to -- to use
4  your words -- de-escalate the situation.
5      Would you agree with that?
6      A.  Yes.
7      Q.  Would you agree with me that the officers
8  were doing that for the good of Mr. Arreola?
9      A.  Yes.
10      Q.  And out of concern for Mr. Arreola?
11      A.  Yes.
12      Q.  And the officers in that video showed that
13  they, in fact, had compassion for Mr. Arreola?
14  Would you agree with that?
15      A.  Well, I wouldn't agree with that -- I don't
16  know to what -- what extent I would agree that --
17  agree with that based on some of the comments that
18  were made to Mr. Arreola by the officers.  They're
19  certainly not comments that -- that would be used to
20  try to either de-escalate him or keep him from
21  escalating.  They were pretty bad comments, I
22  thought.
23      Q.  Like what?
24      A.  Like you're acting strange; you're acting
25  so strange, I don't want you anywhere near me;

William M. Harmening   9/23/2019

109

1  you're not acting normal; you're extremely paranoid.
2     They no doubt thought that. I'm not criticizing
3  them for thinking that. I'm criticizing them --
4     Q.  So --
5     A.  -- for telling him that.
6     Q.  So you don't criticize the officers for the
7  way in which they engaged Mr. Arreola initially in
8  terms of the verbal, do you?
9     A.  Well, I criticize those comments, yes, I
10  do.
11     Q.  Okay.  It sounds like you believe and you
12  criticize the officers for not immediately arresting
13  Arreola?
14     A.  Yes.
15     Q.  So you believe that when the officers got
16  there that -- you said you can't say exactly when it
17  occurred, but very early on they believed that they
18  had someone who was a psychological -- well, you
19  tell me what terminology do you use -- that they --
20  they had a suspect that was what?
21     A.  Well, they knew they had an involuntary
22  commitment.
23     Q.  An involuntary commitment.  That as soon --
24  that earlier on in this engagement that the officers
25  knew they had an involuntary commitment.

110

1     You can't tell me exactly when that occurred;
2  right?
3     A.  I can tell you at the moment they said they
4  had a -- they were going to have a psych
5  eval.  Certainly they knew at that point.
6     Q.  All right.
7     A.  I can't tell you --
8     Q.  So --
9     A.  -- before that.
10     Q.  So as soon as Dudley says to dispatch to
11  send an EMS for a psych eval, your opinion is at
12  that point they knew they had an involuntary
13  commitment?
14     A.  Yes.
15     Q.  All right.  And at that point, when Dudley
16  says send EMS for a psych eval, your opinion is the
17  officers should've immediately arrested Arreola?
18     A.  Well, my opinion is probably even before
19  that based on the comments that primarily Aguilar
20  was making to him.  I mean, he recognized that he
21  wasn't acting normal.
22     Q.  So -- all right, I'll rephrase it.
23     When the officers got there, as soon as they
24  engaged Arreola and determined that he was not
25  acting normal, they should've immediately arrested

111

1  him?
2     A.  Yes.
3     Q.  All right.  And do you have an opinion as
4  to whether that would have changed the situation at
5  all?
6     A.  Well, perhaps not.  He still would've
7  struggled and perhaps they still would've been on
8  his back for an extended period of time.  I don't
9  know.  But I do think -- and I do think this from my
10  own knowledge and experience -- that a person like
11  that, the longer you let them go and talk to them,
12  the more escalated they're going to get, especially
13  someone demonstrating signs of paranoia.
14     Q.  All right, so you believe that these
15  officers should've arrested Arreola quicker and
16  that, therefore, if they had done that, the
17  situation might not have escalated as much?
18     A.  No.  I don't know that.
19     Q.  Okay.
20     A.  I don't use the word "arrest".  I guess
21  that's what it is.  But my opinion is the minute
22  they got there and started engaging him and realized
23  that he had a -- he had a -- he was in the middle of
24  a psychiatric episode, at that point they have to
25  take him to the ground, get him handcuffed as safely

112

1  as they can and get him to a hospital.
2     Q.  And that's an arrest; right?
3     A.  I think legally it's an arrest.  I don't --
4  I don't use that term.
5     Q.  Okay.  You don't use that -- that term ever
6  or that --
7     A.  No.  No, I -- it goes back to my belief
8  that there are two situations here.  There's an
9  arrest and apprehension versus a CIT response.
10     Q.  Okay.
11     A.  That's all.
12     Q.  Well, let me ask you this.  Do you
13  believe -- after reviewing all this would you agree
14  that the officers were trying to avoid having to
15  arrest Mr. Arreola?
16     A.  (No response)
17     Q.  In other words, that they arrested him only
18  after he went across the street and had started
19  trespassing and knocking on a door?
20     At that point they determined they needed to
21  arrest him.  But prior to that they had not made a
22  decision that they were going to arrest him.
23     A.  I -- true.  I agree with that.
24     Q.  Okay.
25     A.  That's one of my criticisms.

William M. Harmening 9/23/2019

---

113

1    Q. All right. You agree that it was a -- it
2  was a good decision for the officers to take him
3  into custody when he, Arreola, knocked on the
4  neighbor's door -- or attempted to?
5    A. Absolutely. I believe they should've done
6  it quicker, but certainly at that point, absolutely.
7    Q. Okay. All right, you mentioned that on the
8  video Arreola complained about not being able to
9  breathe.
10   A. Yes.
11   Q. And would you agree with me that he began
12 complaining about that a little over a minute into
13 the struggle?
14   I think you said approximately two minutes here.
15 But would you agree with me that it was even quicker
16 than that?
17   A. I'm not --
18   Q. Let me -- let me put it --
19   A. I'm not sure I understand.
20   Q. Let me put it in a better context.
21   All right, if you'll flip over to page 8 --
22   A. Yes.
23   Q. -- you're making some notes about the
24 physical altercation.
25   A. Yes.

---

114

1    Q. The struggle, you say, begins at 5:25 and
2  15 seconds?
3    A. Yes.
4    Q. And -- all right, 5:26:38 you make a
5  reference to Arreola screaming, "Mom, please,
6  they're going to kill me." And then your words are,
7  "It is obvious that his breathing is already
8  labored"?
9    A. Yes.
10   Q. So would you agree with me that he's having
11 trouble breathing immediately when the struggle
12 began?
13   A. Certainly by 5:26:38, yes.
14   Q. Yeah, which is -- which is a minute and a
15 few seconds after the --
16   A. Yes.
17   Q. -- struggle began; right?
18   A. Yes, I would agree.
19   Q. By the way, you don't quarrel with the fact
20 that Mr. Arreola was on methamphetamines, do you?
21   A. No.
22   Q. You're not an expert in that area; right?
23   A. No.
24   Q. Do you know what the term "excited
25 delirium" means?

---

115

1    A. Yes.
2    Q. What does it mean?
3    A. It's just a -- it's not a -- it's used
4  often. It's not a diagnosis. It's not in the DSM
5  as a psychiatric diagnosis. Excited delirium is
6  just an excited state of agitation that a person
7  gets in when they're fighting. It could be enhanced
8  by drug use, mental illness, lots of different
9  things. And there are a number of physical
10 manifestations that occur when somebody is in that
11 situation. Their body temperature rises. Their
12 heart becomes very stressed. There's a lot of
13 different things that happen with it.
14   Q. But you're not an expert in those -- in
15 that area; right?
16   A. I think you'd need to be a doctor to be an
17 expert in that area.
18   Q. Yeah, yeah.
19   So, I mean, you're speaking about your
20 understanding of it, but you don't hold yourself out
21 as to be an expert in that area --
22   A. No.
23   Q. -- right?
24   A. Only to the extent that it's dealt with in
25 police training.

---

116

1    Q. All right, so -- is cardiac arrest
2  something that you understand can result from
3  excited delirium?
4    A. Oh, I would assume so, yes.
5    Q. In this case, the Arreola case, you're not
6  offering an opinion as to what caused Mr. Arreola's
7  death, are you?
8    A. No, I am not.
9    Q. Am I correct in reading your report that --
10 I think maybe I'm not correct at this point -- but
11 I had a note here that you have no criticism up to
12 the point of putting the handcuffs on Mr. Arreola,
13 but it sounds like you do have criticisms prior to
14 that point.
15   MR. POST: Object to the form. Go ahead.
16   A. I do. And we've discussed my criticism is
17 I believe they waited too long --
18   Q. Okay.
19   A. -- to do that. That's all.
20   Q. All right. So other than waiting too long,
21 up until the point of the handcuffs going on
22 Mr. Arreola, you don't have any criticism of the
23 actions of the officers; correct?
24   A. No. As part of waiting too long, I
25 included not having EMS respond immediately and not

---

William M. Harmening  9/23/2019

117

1 asking for backup. Beyond those, which are included
2 in my opinion, I have no other criticism of --
3 except for his comments.
4    Q.  Okay.  All right, other than all those
5 items -- and specifically, I guess, taking
6 Mr. Arreola to the ground and whatever tactics were
7 used to contain him to get the handcuffs on him, you
8 don't quarrel with what the officers did; correct?
9    A.  I have no criticism of them taking him to
10 the ground and to use proper techniques to handcuff
11 him.  Sometimes it's necessary even to put weight on
12 their back.  I understand that and that's the
13 training.  So up to that point, unless there was
14 weight put on his neck -- I don't know that there
15 was -- my only criticism is what happens after that.
16    Q.  After the handcuffs?
17    A.  And staying on him, yeah, yeah.
18    Q.  All right, moving on to the autopsy results
19 category.
20    A.  Yes.
21    Q.  Yeah, bear with me a second.
22    You mentioned that there is no indication in her
23 summary -- meaning Dr. Laura Darrisaw -- that she
24 was briefed by police about the extent to which the
25 officers applied their body weight to Arreola's

118

1 back, neck and head during the arrest or the number
2 of times and over what duration, dash, Arreola
3 screamed that he was unable to breathe.
4    Why is that significant to mention that?
5    A.  Well, first of all, in almost every
6 asphyxiation case -- well, I think in every case --
7 the medical examiner always discusses those issues,
8 and, in fact, Dr. Darrisaw has before.
9    I think -- and this a nonmedical opinion -- but
10 I believe that if a doctor is going to provide a
11 cause of death they have to understand, you know,
12 what happened during the interaction.
13    You can't see excited delirium.  You can see the
14 results of it.  Excited delirium means a lot of
15 different things.  You can't see the results of
16 someone putting their weight on someone's back.  I
17 think it's important -- maybe they did.  I'm only
18 pointing out that she didn't discuss it.
19    Q.  But you're not a medical expert --
20    A.  No, I'm not.
21    Q.  -- correct?
22    And you can't quarrel with the coroner's autopsy
23 results, can you?
24    A.  No, I do not.
25    Q.  All right, so you don't quarrel with the

119

1 cause of death that was listed either, do you?
2    A.  No, I --
3    Q.  Because you're not qualified to?
4    A.  That's correct.
5    Q.  All right, you mention in this section that
6 Arreola became unresponsive while still on the
7 ground?
8    A.  Yes.
9    Q.  Do you see that?
10    A.  Yes.
11    Q.  Do you agree with me that he was alert when
12 he was placed in the ambulance?
13    A.  I don't know that.
14    Q.  Did you review the EMS reports?
15    A.  Yes.
16    Q.  Did you see in those reports where the EMS
17 personnel indicated that he was?
18    A.  I don't recall.  If they did, I'd accept
19 that they said that.
20    Q.  Okay.
21    A.  I think my opinion there is based on some
22 other things.
23    Q.  And those some other things are the video?
24    A.  The video, the fact that there was some
25 concern by Aguilar -- he was checking for a pulse --

120

1 the fact that his voice -- he meaning Hector's voice
2 trailed off.  There was no further sound coming from
3 him.  Based on those things.  Based on how he was
4 propped up against --
5    Q.  Well, did -- were you aware that his pulse
6 was a hundred and fifteen in the ambulance?
7    MR. POST:  Objection.  And I'm going to ask
8 that you let the witness --
9    Q.  Oh, go ahead.  I'm sorry.
10    A.  I think the only thing I was adding to that
11 was the fact that -- how they had him propped up
12 against, I think, Oakes and seeing that on the
13 video.
14    Q.  Okay.
15    (OFF-THE-RECORD DISCUSSION CONCERNING
16 EXHIBIT NUMBERS)
17    MR. CLARK:  All right, so I'm going to --
18 I'm going to mark these and keep myself more
19 straight.
20    (DEPOSITION EXHIBIT NUMBER 14 WAS MARKED FOR
21 IDENTIFICATION)
22    MR. CLARK:  All right, let me show you --
23 we mentioned it, I'll go ahead and mark it --
24 Exhibit 14, which is the -- that one doesn't
25 have -- isn't marked up?

William M. Harmening   9/23/2019

---

121

1      Flip through that real quick.
2      THE WITNESS: It's not.
3      MR. CLARK: Okay, good. Make sure I don't
4  give you one that's got marks on it.
5  BY MR. CLARK:
6      Q.  That is -- well, tell me what that is.
7  Have you seen it before?
8      A.  I believe this is Dr. -- this is the
9  coroner's report?
10     I don't --
11     Q.  It's the autopsy report --
12     A.  It's the autopsy report of Dr. Darrisaw,
13 yeah.
14     Q.  All right. And if you flip over to page 6
15 of 7 --
16     A.  Yes.
17     Q.  -- it says: "Summary of findings/
18 pathologic diagnosis".
19     Do you see that?
20     A.  It's on page 6?
21     Q.  Page 6 of 7.
22     A.  Okay. Yes.
23     Q.  All right. And it says: "Methamphetamine
24 toxicity".
25     So that's what we were referring to earlier;

---

122

1  correct?
2      A.  Yes.
3      Q.  And is it your understanding that the --
4  and then down further on that page, cause of death,
5  that we mentioned earlier, was listed as
6  methamphetamine toxicity; right?
7      A.  Yes.
8      Q.  All right. And is it your understanding
9  that those methamphetamines were -- were found by
10 virtue of the testing that was done?
11     A.  Yes.
12     (DEPOSITION EXHIBIT NUMBER 15 WAS MARKED FOR
13           IDENTIFICATION)
14     MR. CLARK: I show you what we've marked
15 Exhibit 15.
16     Q.  Have you seen that document before?
17     A.  Yes.
18     Q.  What is that?
19     A.  I believe that's the toxicology report on
20 Hector postmortem.
21     Q.  Okay. Is there anything that you disagree
22 with?
23     A.  No.
24     Q.  All right.
25     (DEPOSITION EXHIBIT NUMBER 16 WAS MARKED FOR

---

123

1           IDENTIFICATION)
2      MR. CLARK: I show you what we've marked --
3  what I've marked Exhibit 16.
4      Q.  Have you seen these records before?
5      A.  Yes.
6      Q.  What are they?
7      A.  These are the hospital records that, I
8  believe.
9      THE REPORTER: Hospital records. What did
10 you say at the end?
11     MR. CLARK: He said "I believe".
12     THE REPORTER: I believe.
13     THE WITNESS: I'm sorry.
14     (OFF-THE-RECORD DISCUSSION BY REPORTER
15      CONCERNING WITNESS SPEAKING UP)
16 BY MR. CLARK:
17     Q.  All right, let's -- I think these are the
18 EMS records?
19     MR. POST: Jim, let me say this to you.
20 That is something I think you all gave to us.
21 It's similar to the one that I gave back to you
22 on the jump drive that you had earlier. So I
23 don't know that he's actually got this
24 particular one, but he's got something similar
25 to it.

---

124

1      MR. CLARK: I'm not sure I follow you. I
2  think it's on the -- the Exhibit 2.
3      THE WITNESS: (Nods head affirmatively)
4      MR. CLARK: I didn't pull it up, but --
5      MR. POST: Back when your 16 --
6  (unintelligible)
7      MR. CLARK: Oh, you're pointing to 16. You
8  think -- you're saying my Exhibit 16 is
9  different -- well, let me just ask him.
10 BY MR. CLARK:
11     Q.  I mean, have you seen these records before?
12     A.  I want to -- I want to read just a bit to
13 see if it refreshes me.
14     Q.  Okay. And I can pull it up -- the Exhibit
15 2, the thumb drive, you have seen --
16     A.  Yes.
17     Q.  -- the stuff that's on here; right?
18     A.  Yes.
19     Q.  All right. I think you've got an EMS
20 comprehensive report on here. It does look
21 different.
22     MR. POST: Yeah, I think --
23     Q.  But I think it has the same information.
24     A.  I'm just not sure --
25     MR. POST: Speak up because he can't hear

---

William M. Harmening   9/23/2019

125

```
 1    you.
 2    A.  Yeah, I'm just not sure if I've seen this.
 3    Sorry.
 4    Q.  All right, let me -- if it's on Exhibit 2,
 5    this thumb drive, have you seen it?
 6    A.  Yes.
 7    Q.  All right.  I'll represent to you that
 8    the -- on the first page that the -- the summary of
 9    events is included on your thumb drive.
10    But, in any event, the records on the thumb
11    drive reference -- relative to the EMS you did
12    review and incorporated them into your evaluation of
13    this case; correct?
14    A.  Yes.
15    Q.  All right.  I'm jumping around a little
16    bit, and I apologize, but I had a note here.
17    With respect to Arreola screaming something
18    along the lines of "I can't breathe", do you believe
19    that that should've affected what the officers did?
20    A.  Yes.
21    Q.  How so?
22    A.  I believe it should've -- they should've
23    realized he was having a difficult time breathing in
24    whatever position they had him at that time and
25    wherever they were on top of him, if they were on
```

126

```
 1    top of him at that time, and I believe it should've
 2    affected them -- they should've followed their
 3    training.  The training suggests that when a person
 4    can't breathe and you don't have handcuffs on them
 5    yet, one officer grabs the legs and controls them
 6    and the other controls the torso by getting a top-
 7    mount position on him but not putting weight on him.
 8    So, yes, I do believe that they should've
 9    stopped what they were doing.
10    Q.  If a suspect that is being arrested says he
11    can't breathe, does that necessarily mean that the
12    suspect cannot breathe?
13    A.  No.  I think there are other things you've
14    got to take into consideration.
15    Q.  On page -- I want you to refer -- flip to
16    page 6 of your report, top paragraph.
17    A.  Yes.
18    Q.  You -- this section is dealing with -- is
19    under Officer's Statements, and you broke down the
20    officers and have separate paragraphs with respect
21    to their statements.
22    Okay?
23    A.  Yes.
24    Q.  Do you see that?
25    A.  Yes.
```

127

```
 1    Q.  First of all, my question is what was the
 2    point of you breaking -- breaking this section out
 3    and having paragraphs with respect to officer
 4    statements?
 5    A.  Well, it's a matter of practice for me to
 6    include officer statements.  And what I'm looking
 7    for in their statements are consistencies or
 8    inconsistencies with each other or internally with
 9    their own statements.
10    Q.  Okay.
11    A.  But I do this in every case.
12    Q.  So are these paragraphs -- for instance,
13    the paragraph for Officer Brian Dudley, you're not
14    putting in all of his statements in here clearly --
15    A.  No.
16    Q.  -- right?
17    So which ones are you putting in and which ones
18    are you not putting in?
19    A.  Well, I indicated in the paragraph before
20    that what I'm doing, specifically relating to the
21    physical interaction with Arreola.
22    Again, I -- I don't have a criticism with them
23    taking him to the ground and handcuffing him.  And I
24    believe their statements were consistent about that.
25    I would not testify otherwise.
```

128

```
 1    Q.  Okay.
 2    A.  But with regard to the -- what happened
 3    afterwards, that's what I'm interested in looking
 4    at, interested in seeing what they had to say about
 5    it and whether it's consistent.
 6    Q.  Okay.  Under the paragraph related to Brian
 7    Dudley, you have a statement that says,
 8    "Surprisingly, the interviewers never addressed this
 9    issue."
10    Do you see that?
11    A.  Yes.
12    Q.  Is that -- why is that meaningful to you?
13    A.  Well, I think any -- any time you have a
14    situation like this where someone has died and
15    there's an issue of handcuffing and putting their
16    weight on the individual, I think anybody who's
17    going to conduct the interview to determine what
18    happened has to deal with that issue.  It's a big
19    issue.
20    Q.  Okay.  But you're not offering an opinion
21    as to whether the interviewers did a good job or
22    not; right?
23    That's not part of your opinion here?
24    A.  Well, I'm just pointing out that they --
25    they never addressed it.  That's all.
```

William M. Harmening   9/23/2019

129

1     Q.  All right, so it really doesn't have
2  anything to do with your opinions in this case; you
3  just are pointing out that an interviewer didn't ask
4  about something?  Is that fair?
5     A.  Yes.
6     Q.  Under Officer Michael Aguilar, down toward
7  the bottom, you point out that Aguilar -- you say,
8  "He admitted that he and Dudley were, quote, all
9  over Arreola as they attempted to handcuff him."
10  Do you see that?
11     A.  Yes.
12     Q.  Do you have any criticism about that?
13     A.  Well, that's -- that's only half the
14  sentence --
15     Q.  I know, and I wanted to stop there, though,
16  and ask about that first.
17     A.  Not necessarily.  Taken by itself, no.
18     Q.  All right, the fact that an officer has to
19  be all over a suspect, that happens all the time;
20  right?
21     A.  Yes.
22     Q.  All right.  Then the second half of that
23  sentence you say that he further admitted to being
24  on his back before, during and after handcuffing
25  him.

130

1  Do you have criticisms about that?
2     A.  I do.  In the context of the rest of the
3  report and the time line, yes, I do.
4     Q.  All right.  Would you agree with me that
5  there are occasions where an officer is attempting
6  to effectuate an arrest on a resisting suspect and
7  has gotten that suspect handcuffed but the suspect
8  continues to resist -- continues to resist in
9  numerous ways, including kicking his legs -- his or
10  her legs -- would agree with me that there are
11  circumstances where an officer may have to be on
12  that suspect's back before, during and after
13  handcuffing?
14         MR. POST:  Object to the form.
15     A.  No, because that's not police training.
16     Q.  All right.
17     A.  I am critical of them being ever on the
18  back when the individual is handcuffed.  There are
19  times during the handcuffing where they have to
20  control the individual.  They're taught to put their
21  weight on the legs and the buttocks.  Training
22  clearly points out that there are times when it's
23  unavoidable, they -- they are on the back, but you
24  get off the back as quickly as you possibly can.
25     Q.  All right, after handcuffing a suspect it's

131

1  your opinion that a police officer can never place
2  force on a suspect's back?  Is that fair?
3     A.  I -- yes.
4     Q.  Okay.  So once a suspect is handcuffed,
5  regardless of what else is -- whatever is going on
6  with that suspect in terms of any resistance, an
7  officer would be using, in your opinion, excessive
8  force if any pressure is placed to the back of that
9  suspect?
10     A.  Well, no, not always.  There are times --
11  and, again, I'm not looking at this as a suspect and
12  an arrest.  There are times when deadly force is
13  probably justified in that situation even.
14  My -- my --
15     Q.  I thought you told me earlier, though, that
16  you can never apply force to the back after a
17  handcuffing.
18  Did I get that wrong?
19     A.  Well, I'm clarifying.
20     Q.  All right.
21     A.  I'm clarifying.
22  In a situation involving a CIT response, where
23  the individual -- well, I'll say specifically to
24  this case -- where they are still in a prone
25  position on their stomach -- number one, you can't

132

1  leave them on their stomach.  That's the police
2  training.  Regardless, you get them off their
3  stomach.
4  I would suggest that -- that while he may be
5  kicking, it's difficult to resist when you're
6  already handcuffed behind your back.  At that point
7  it's over with.  He's under arrest.  He's secure.
8  I think it's quite appropriate to control them
9  still if they're fighting.  I think they have to
10  consider the fact that this is a mentally-ill
11  individual.  They understand excited delirium.
12  They're trained on it.  They know that this is a
13  danger point for a mentally-ill subject in regard to
14  excited delirium.  He's out of breath.  He's
15  fighting.
16     No, you cannot in that situation, I don't
17  believe, ever in a prone position put weight on
18  their back after they're handcuffed -- or their neck
19  or their head.
20     Q.  Incidentally, are you aware of any 11th
21  Circuit authority that suggests that?
22     A.  No.  That's strictly police training.
23     Q.  Okay.  Not case law?
24     A.  That's correct.
25     Q.  With respect to the next paragraph down,

133

1    Officer Aaron Evrard, a similar comment was made by
2    you that: "The O-O-P-S investigators asked no
3    questions to explore the issues of how much weight
4    he applied to Arreola's back and what he observed in
5    terms of Dudley and Aguilar applying their weight to
6    Arreola's back."
7        And I just want to make sure.  That doesn't
8    matter with respect to your opinions in this case,
9    does it?
10    A.  That's correct.
11    Q.  All right.
12        MR. CLARK:  Let's take a short break if we
13    can do it.  I've got to do one quick thing.
14        (BRIEF RECESS)
15    BY MR. CLARK:
16    Q.  All right, continuing with your report,
17    page 7.  I think I understand the importance now,
18    but I want to ask you the verbal exchange.
19    A.  Yes.
20    Q.  What about the verbal exchange did you find
21    significant to your opinions?
22    A.  Well, one of the principles of -- and I
23    will say up front that I don't think you can really
24    negotiate with someone who is schizophrenic,
25    paranoid in the middle of an episode, but I do think

134

1    there are ways you can actually escalate that person
2    and make them worse, and I think judgmental comments
3    is one way to do it.
4        CIT training says in all cases you avoid
5    judgmental comments, regardless of the situation.
6    And, you know, I think these would be perceived as
7    that by Hector, if he received them at all.  I don't
8    know that he did, but I think they're inappropriate.
9    Q.  Okay.  They're not -- they don't qualify as
10    excessive force, though; right?
11    A.  No.
12    Q.  Okay.  So, again, a lot of these -- a lot
13    of your opinions and a lot of your criticism really
14    has to do with how an officer might be trained to
15    deal better with a suspect?
16    A.  Well, that's one-half of the criticism,
17    yes.
18    Q.  Yeah.
19    A.  That's the way at least Aguilar was
20    trained.
21    Q.  Okay.  And we've talked earlier, I think,
22    where you say on page 8 that: "This verbal exchange
23    did little good and was actually counterproductive
24    to continually tell Arreola that he had a problem."
25    A.  Yes.

135

1    Q.  All right.  I may have asked this, but do
2    you agree with me that even though you -- you
3    understand your opinion is that this exchange
4    should've been different that you as a police
5    officer would've -- would've essentially not talked
6    with -- as much to Arreola?  You would've
7    effectuated the arrest or putting him in custody;
8    correct?
9    A.  I would've -- I would've talked.  I
10    would -- I would've talked in a different way while
11    it was very quickly plain that the other officer
12    would take him into custody, yes.
13    Q.  Okay.  But -- but even though you would've
14    done it differently and you believe Arreola -- the
15    officers should've done it differently, again, you
16    don't -- you're not contending that the officers did
17    it out of some dislike of Arreola or some desire to
18    mistreat Arreola, do you?
19    A.  Well, ultimately I don't know why they did
20    it.  I don't think they did it out of empathy for
21    him, by making comments, at least Aguilar.  I don't
22    know why they did that.
23    Q.  Well, because -- I mean, let me just lay it
24    out there.  I mean, I -- you know, I looked at the
25    video, and I've talked to these officers, and I felt

136

1    like that the officers actually went out of their
2    way to try to be nice to Mr. Arreola and to attempt
3    to keep from having to -- this escalate into an
4    arrest.
5        Would you agree with that?
6    A.  I would agree with that.
7    Q.  Okay.
8    A.  I would agree that that was probably their
9    intention, yes.
10    Q.  But you believe that they should've done it
11    differently; and I get that?
12    A.  Yes.
13    Q.  All right.  All right, going to the
14    physical altercation section of your report --
15    A.  Yes.
16    Q.  -- you first point out that the majority of
17    the efforts to subdue and handcuff Arreola cannot be
18    seen on the video; correct?
19    A.  That's correct.
20    Q.  You point out that the verbal exchange can
21    be heard, though --
22    A.  Yes.
23    Q.  -- right?
24        But you would agree with me that the video that
25    you were able to look at in this case does not show

137

1 that most of the -- of the officer's efforts to
2 contain and restrain Mr. Arreola; correct?
3    A.  That's correct.
4    Q.  Put another way, the video does not show
5 the fight that took place?
6    A.  Correct.  That there is a --
7    Q.  The video also does not show the continuing
8 struggle after the handcuffs were placed on
9 Mr. Arreola.
10   Would you agree with that?
11   A.  Well, I believe Evrard's body cam does show
12 a part of that after he's handcuffed.  But the other
13 two, no, it did not.
14   Q.  All right.  And it -- and even his does not
15 show the entirety of that; would you agree?
16   A.  Yes.
17   Q.  Would you also agree generally speaking
18 that videos, especially body cam videos, many times
19 don't capture everything that takes place on the
20 scene of an arrest?
21   A.  Yes.
22   Q.  And that -- would you also agree -- you've
23 handled a lot of cases and been doing this a long
24 time -- would you agree with me that video cannot
25 adequately describe the level of resistance many

138

1 times that occurs from a suspect?
2    A.  Yes.
3    Q.  In other words, the officers that are there
4 with hands on can feel tension that a video doesn't
5 show; correct?
6    A.  Correct.
7    Q.  Flipping over to page 9, at the top, you
8 make mention that "One of the officers advised the
9 dispatch that we finally got him in handcuffs"?
10   A.  Yes.
11   Q.  Do you see that?
12   But by pointing that out you don't mean to
13 suggest that the struggle was over at that point, do
14 you?
15   A.  No.
16   Q.  Yeah.
17   Because it goes on and further down Evrard
18 arrives and he's pointing out "don't grab my
19 fingers".
20   A.  Well, I don't think the struggle --
21 certainly the complexion of the struggle changes.
22 There's still movement, yes.
23   Q.  Okay.  Bear with me.  I'll try not to ask
24 you questions twice, because I've got notes that
25 you've already hit on.

139

1    Page 10 --
2    A.  Yes.
3    Q.  -- the first paragraph.
4    All right, you say that:  "The officers very
5 dangerously allowed him to continue to walk around
6 and even away from their location, including up to
7 the door of the neighbor's house, while they were
8 still a significant distance away."
9    Who was in danger when you say they very
10 dangerously allowed him to continue to walk around?
11   A.  Well, I think Hector was always at risk of
12 being hurt, even by himself, but the neighbors I'm
13 talking about there --
14   Q.  Okay.
15   A.  -- allowing someone in that condition to go
16 up to the door.
17   Q.  All right.  So you point out that at that
18 point their decision -- the officers' -- to grab him
19 was the correct thing to do; right?
20   A.  Yes.  Yes.
21   Q.  You just, again, quarrel with why they took
22 so long to do that?
23   A.  Correct.
24   Q.  You point out that Arreola resisted;
25 correct?

140

1    A.  Yes.
2    Q.  And you agree that there was a large degree
3 of resistance in this case, a big fight?
4    A.  Yes.  Certainly.
5    Q.  Do you agree Arreola was -- I think I may
6 have asked this -- that Arreola was a strong
7 individual?
8    A.  Oh, I believe anybody in that situation
9 demonstrates very significant strength --
10   Q.  And do you --
11   A.  -- no doubt.
12   Q.  Do you agree that there's a concept for
13 suspects that are on methamphetamines can exhibit
14 almost superhuman strength?
15   A.  No, I don't agree with that.
16   Q.  You don't agree with that?
17   A.  No.
18   Q.  Have you ever -- have you ever arrested
19 suspects that were on methamphetamines that
20 exhibited more strength than you might've
21 anticipated they would have?
22   A.  I think on any drug, other than, you know,
23 marijuana or something that depresses their system,
24 they're going to show significant strength.  I don't
25 think it's really the methamphetamine.  I think any

William M. Harmening   9/23/2019

141

1  drug.
2      Q.  Okay.
3      A.  And the -- and there's a psychological
4  component, too.  The things that restrain us and
5  keep us from doing that are gone -- being gone.  I
6  don't -- I don't believe in superhuman strength.
7      Q.  Okay.
8      A.  I don't -- yeah.
9      Q.  All right.  We'll take up the phrase
10 "superhuman strength".
11     You would agree with me it sounds like that
12 suspects that are on certain drugs, let's just say,
13 can exhibit strength greater than they might have
14 otherwise exhibited had they not been on drugs?
15     A.  I'm not sure I agree with that, and I
16 don't -- I don't think -- and, again, I'm not
17 qualified to discuss medical research, but I do
18 believe the medical research would dispute that.
19     What I don't dispute is that someone on a
20 stimulant-type -- stimulant-type drug will
21 demonstrate their potential in strength.
22     Q.  Okay.
23     A.  I don't think it gives them additional
24 strength is what I'm saying.
25     Q.  All right.  But there is a concept within

142

1  the police community that if you're arresting
2  someone that is high on a stimulant that you might
3  be in for a fight if they resist, a serious fight?
4      A.  Absolutely.
5      Q.  All right.
6      A.  And if I could add, they're also trained
7  that that will -- that will contribute to excited
8  delirium.
9      Q.  Okay.  But, you know, again, whether it
10 contributes to excited delirium or not, an officer,
11 if faced with a need to arrest and effectuating an
12 arrest, a suspect that's on a stimulant drug, that
13 officer has to do everything they can to get that
14 suspect arrested; correct?
15     A.  Well, there -- yes, although I think
16 there's a conflict in law enforcement between CIT
17 and standard arrest procedures.
18     I do believe that you can use whatever force
19 necessary to effect the arrest.  On the other side,
20 CIT training suggests that's not always the case.
21 There is a conflict there.  Officers will get
22 training on both and it's conflicting.  I agree with
23 that.  That's one of the problems.  But using
24 whatever force necessary I think has to be weighed
25 against what type of a response you're making.

143

1  That's all.
2      Q.  These officers in this situation, though,
3  you've already said needed to arrest Arreola;
4  correct?
5      A.  Yes.
6      Q.  So they didn't have the option of just
7  saying, Mr. Arreola, go back, you know, go to bed,
8  go to sleep, we're going to go back to work.
9      A.  That's correct.
10     Q.  Right?
11     A.  That's correct.
12     Q.  They had to arrest him?
13     A.  Yes.
14     Q.  And then when they attempted to arrest him
15 they then had to deal with the fight that
16 Mr. Arreola gave them; correct?
17     A.  Yes.
18     Q.  So you'd agree with me they were put in a
19 pretty tough spot here --
20     A.  Yes.
21     Q.  -- right?
22     And it was early morning hours; correct?
23     A.  Yes.
24     Q.  It was very cold out; correct?
25     A.  Yes.

144

1      Q.  And Mr. Arreola was a very strong
2  individual; correct?
3      A.  Yes.
4      Q.  Incidentally, I think part of the thumb
5  drive, Exhibit 2 -- well, did you review the
6  personnel files of these officers?
7      A.  I believe I did, but I don't recall really
8  focusing much on that.
9      Q.  Is there anything about these officers that
10 you know of, that you've read, that leads you to
11 believe that they're not good officers?
12     A.  No.
13     Q.  Do you believe they are, in fact, good
14 officers or do you --
15         MR. POST:  Object to the form.
16     Q.  Do you --
17     A.  I just don't have an opinion about it.
18     Q.  Okay.
19     A.  I don't have any reason to believe they're
20 not.
21     Q.  Can you -- you don't have an opinion one
22 way or the other?
23     A.  No.
24     Q.  I'll use a term that I don't know if it's a
25 term you use.  But have you ever heard the term

William M. Harmening   9/23/2019

145

1  "Rambo Cop"?
2      A.   Yes.
3      Q.   What does that mean to you?
4      A.   Someone who is aggressive, someone who
5  pushes the rules.  I mean, it's -- it's a big
6  problem in law enforcement.  In my day we called
7  them "John Wayne Cops", not "Rambo".  The same
8  thing.
9      Q.   Okay.
10     A.   Yeah.
11     Q.   So a "John Wayne" or a "Rambo Cop" is a cop
12  that -- that's looking for a fight; right?
13     A.   Yes.  They --
14     Q.   And --
15     A.   They love a fight.
16     Q.   Love the fight, enjoy -- enjoys doing that
17  and many times might, you know, go -- go over the
18  line --
19     A.   Yes.
20     Q.   -- so to speak; right?
21     You don't believe these cops are Rambo, slash,
22  John Wayne cops, do you?
23     A.   No, I have no reason to believe that.  And
24  even in the response that I see, I -- it doesn't
25  support that.

146

1      Q.   Further down on page 10, in that last full
2  paragraph, your last sentence says:  "There seemed
3  to be little attention paid to Arreola or his
4  condition once he was in a seated position".
5      Do you see that?
6      A.   Yes.
7      Q.   What do you base that on?
8      A.   I base that on the video, what -- a very
9  small portion of the video.  That and the fact that
10  in the training officers receive on positional
11  asphyxia they are -- they are taught about seated
12  asphyxia and the possibility of that happening.
13  It's usually discussed in relation to how you put
14  them in the back of your car or the -- whatever you
15  transport them in after they're arrested.
16     I see Arreola propped against Oakes.  It doesn't
17  appear he's responsive.  His head is down.  And
18  that's not the position you want him to be in.  And
19  I don't see anybody doing anything about it.
20     Q.   Okay, well, you --
21     A.   In the short period that I saw him.
22     Q.   Yeah, it was a very short period that you
23  saw as well --
24     A.   Yeah-
25     Q.   -- would you agree?

147

1      A.   -- it is.
2      Q.   And would you also agree that the officers
3  used their best efforts to get medical attention to
4  Arreola once they had him restrained and contained?
5      A.   Yes.
6      Q.   And that would also to me -- wouldn't you
7  agree that shows care for Mr. Arreola?
8      They wanted to get him medical treatment as
9  quickly as they could?
10     A.   Yes.
11     Q.   You don't contend that any of these
12  officers knew when they turned Arreola over and got
13  the EMS folks there to help with Mr. Arreola, you
14  don't contend that the officers knew that he was in
15  any kind of medical distress at that time, do you?
16     A.   The only thing I would suggest is that
17  Aguilar knew there was some concern because he was
18  taking his pulse before that point.
19     Q.   Other than that?
20     A.   No, I -- I'm -- could you repeat the
21  question?
22     Q.   Yeah, yeah.  I really am just -- you know,
23  I -- my question is this:
24     You don't believe that the officers knew that
25  Arreola was in any particular medical distress when

148

1  they turned him over to the EMS folks?
2      A.   I think the word I would use is they were
3  indifferent.
4      Q.   Okay.
5      A.   I -- from what I see, it should've been
6  obvious that there was a medical problem -- well,
7  there was a medical problem because they called the
8  EMS, but --
9      Q.   Well, they -- they had EMS there, okay.
10     A.   Yes.
11     Q.   And which is good to do --
12     A.   Yes.
13     Q.   -- right?
14     A.   Yes.
15     Q.   And shows care for the suspect?  Would you
16  agree?
17     A.   Yes.
18     Q.   All right.  And so then they had this big
19  fight and -- which resulted in, I think, some
20  abrasions and other things to Mr. Arreola, and the
21  officers at the end of the fight and at the end of
22  restraining and containing him turned him over to
23  the EMS folks as quickly as they could.
24     Would you agree?
25     A.   Well --

William M. Harmening   9/23/2019

149

1      MR. POST:  Object to the form.
2      A.  I don't think EMS was there.  I think EMS
3  was staged down the street and came in when they
4  were told to.  But aside from that, I don't think my
5  criticism lies there.  I think my criticism lies in
6  the six minutes between handcuffing and finally
7  rolling him onto his side.
8      Q.  No, I get that.  I'm not asking you about
9  that right now.
10     A.  No.
11     Q.  We've addressed that already.
12     A.  Yeah.
13     Q.  I'm not asking you about that.  I
14  understand you have a criticism of that.
15     I'm just saying that you don't contend that the
16  officers -- after he was restrained and contained --
17  that they had any particular belief that he was in
18  medical distress; but rather that they turned him
19  over to the EMS and let the EMS folks make that
20  determination?
21     A.  No.
22     MR. POST:  Objection as to form.
23     A.  Yeah, and I don't agree with that.
24     Q.  Why not?
25     A.  He is handcuffed.  He's unresponsive.

150

1  Aguilar was taking his pulse.  I think there was a
2  concern on Aguilar's part, and it was still, I
3  believe, two minutes before they actually got him
4  onto his stomach.  And that includes when Evrard
5  walks up and he was still on his back.
6      I'm not sure if I answered your question.  I --
7      Q.  Yeah, I don't know either, but --
8      A.  I think my answer is they were indifferent
9  to his medical condition at that point.
10     Q.  Well, to me somebody --
11     THE REPORTER:  I'm sorry.  You're sort of
12  turned that way.
13     Q.  To me, somebody that's indifferent would
14  not be calling EMS to handle the suspect.
15  So they weren't indifferent in that sense.
16     A.  Well, EMS --
17     Q.  You've got to agree; right?
18     MR. POST:  Object to the form.
19     Q.  I mean, they got him medical care?
20     MR. POST:  Object to the form.
21     Q.  Right?
22     A.  EMS was already called.  They followed
23  procedure.
24     If you're going to do an involuntary commitment,
25  you have to have EMS, because that's how you

151

1  transport them.
2      I want to -- I don't want to get off the
3  question here.
4      Q.  And then after they were done containing
5  and restraining the suspect --
6      A.  Yes.
7      Q.  -- they called EMS and said here's our
8  suspect, take care of him; right?
9      Do you agree with that?
10     A.  I agree with that.
11     Q.  All right.  That -- that's really all I'm
12  asking.
13     A.  Okay.
14     Q.  Page 11, you referenced many departments
15  have developed policies and procedures to prevent
16  this type of death and you referenced the New
17  Orleans Police Department that is one of our
18  exhibits.
19     A.  Yes.
20     Q.  Correct?
21     Do you know whether the CCG, Columbus Police
22  Department, has such a policy?
23     A.  I've not seen their policies.
24     Q.  Okay.
25     A.  But I know -- I know it's in the POST

152

1  training standards, but I've not seen the policies.
2      Q.  Well, you know it's in the New Orleans
3  Police Department, but you haven't determined
4  whether CCG has such a policy?
5      A.  I have not seen the policies.
6      Q.  Okay.  Page 13, the same question.  Now
7  you're quoting from this FBI -- is that where that's
8  from, the FBI Law Enforcement Bulletin?
9      A.  Yes.
10     Q.  That -- that italicized quote there?
11     A.  Yes.
12     Q.  Are you aware whether CCG has a policy such
13  as that?
14     A.  Regarding the instructors?
15     Q.  Any policies similar to that --
16     A.  Well, here --
17     Q.  Yeah, involving the instructors?
18     A.  Well, I believe that would relate to
19  Georgia POST, and, yes, they do have that.
20     Q.  I'm not talking about Georgia POST.
21     A.  Well, I --
22     Q.  I'm asking if Columbus Police Department
23  has such a policy?
24     A.  I don't know.  A policy that goes to their
25  instructors, I'm not sure.

William M. Harmening  9/23/2019

153

1    Q.  Well, all right, let me ask you about
2 Georgia POST.  I mean, you're citing an FBI Law
3 Enforcement Bulletin.
4    A.  Yes.
5    Q.  Are you aware of there being a similar such
6 instruction with respect to Georgia POST?
7    A.  Yes.
8    Q.  Okay, why didn't you cite that?
9    A.  Well, I think I -- I think I do in the
10 paragraph below there.
11    Q.  Okay.
12    A.  And regarding their -- regarding their
13 policies, I would just say that I have yet to see a
14 department policy that doesn't have that.  And I
15 know that in Georgia and I know Columbus uses the
16 model policy put forth by the Georgia Chiefs, which
17 mirrors the International Chiefs of Police Use of
18 Force Policy, handcuffing policy, transport policy.
19 So I know they have it.  They're CALEA certified or
20 accredited.  In order to be CALEA accredited, you
21 have to include that.
22    But do they have a policy regarding instructors?
23 I don't know.
24    (REPORTER CLARIFICATION ON "CALEA")
25 BY MR. CLARK:

154

1    Q.  All right, page 14, first paragraph, you
2 say: "In this case there's no doubt that Dudley and
3 Aguilar were faced with a difficult situation."
4    A.  Yes.
5    Q.  What do you mean by that?
6    A.  They had a -- an individual -- a thought-
7 disordered individual in the midst of a psychiatric
8 episode.  That is a very difficult situation.
9    Q.  Well, what -- and I think I understand --
10 but what makes that a difficult -- a very -- in your
11 words very difficult situation?
12    A.  Well, because, number one, they're
13 irrational.  They have no judgment.  You cannot
14 de-escalate them if they are escalated.  They are
15 going to resist.  They're going to fight.
16 Especially if they demonstrate signs of paranoia,
17 which he did, which Aguilar recognized.  That is a
18 difficult situation.  They're not going to come
19 easy.
20    Q.  Okay.  And by being -- by being a difficult
21 situation is it also a very dangerous situation?
22    A.  It can be.  It can be, yes, any situation
23 like that.
24    Q.  All right.  On page 14, at the bottom, you
25 point out that sometimes an officer must place

155

1 weight on the suspect's back; correct?
2    A.  Correct.
3    Q.  But then when a suspect continually cries
4 out they cannot breathe and when it's obvious from
5 the sound of their voice that they cannot properly
6 inhale, the priority at that point is to change
7 positions while still controlling the suspect,
8 even if -- even if it is impossible to get the
9 handcuffs on them, in order to allow the suspect to
10 breathe.
11    Do you see that?
12    A.  Yes.
13    Q.  So is your testimony that if the officers,
14 while they were trying to restrain and contain the
15 suspect, had changed position more, that it would've
16 all worked out okay and they could've accomplished
17 the arrest?
18    A.  Well --
19    Q.  By changing positions.
20    A.  Medically, I don't know.
21    Q.  Uh-huh.
22    A.  I'm not qualified to say that.
23    Q.  Right.
24    A.  Could they have changed their positions and
25 still accomplished their goal?  Absolutely.

156

1    Q.  Okay.  Your -- you make a statement here at
2 the end of that paragraph that says, "Given that all
3 police standards relating to the use of force are
4 necessarily consistent with Graham v. Connor, we can
5 conclude that their actions, especially after the
6 point when Arreola was in handcuffs, were
7 unreasonable and excessive."
8    What does that mean?
9    A.  Well, all police training on the use of
10 forces, especially model policies that Columbus
11 used, include the three-prong test of Graham in --
12 in determining the reasonableness of the force; what
13 crime was committed; are they actively resisting;
14 are they attempting to escape.  That's all the use
15 of force training.
16    And my point is -- and I don't -- I'm not making
17 a legal judgment.  I'm not qualified to do that.
18 But in the context of police training, using
19 those -- that three-prong test, which is in police
20 training, it certainly did not meet that, because,
21 number one, he was not a criminal offender.  There
22 was no crime committed.  He was certainly resisting.
23 I don't know if he was attempting to escape.  We
24 don't know.  He had the opportunity to run and he
25 didn't.  So that's all I'm suggesting there.

157

1    Q.  But, I mean -- and that's where I'm
2  confused, because certainly under Graham v. -- v.
3  Connor an officer can use force to arrest an
4  individual that's resisting; correct?
5    A.  Well, you can use force, but the level of
6  force determines -- is depending on other factors,
7  including what --
8    Q.  Absolutely.  But --
9       MR. POST:  I'm going to ask that the
10  witness be allowed --
11      MR. CLARK:  Go ahead.
12    A.  I think that's -- that's all.
13    Q.  But what I'm confused about is your comment
14  that given that all police standards relating to the
15  use of force are necessarily consistent with Graham
16  v. Connor.
17    Are you suggesting that if an officer fails to
18  comply with some police standard that, therefore,
19  that means that his actions were unreasonable and
20  excessive?
21    Is that your testimony?
22    A.  I'm suggesting that if an officer violates
23  their own policies on the use of force then they
24  have necessarily violated Graham.
25    Q.  Okay.  So if they violate some policy as to

158

1  training -- that's part of their training -- that,
2  therefore, they have violated Graham v. Connor --
3    A.  Well, I'm not --
4    Q.  -- the standards of Graham v. Connor?
5    A.  Yes, but I'm not talking about the training
6  standard.  I'm talking about policies and procedures
7  on the use of force.
8    Q.  Use of force.
9    Going to your exhibits, page 16 --
10    A.  Yes.
11    Q.  -- these -- the only thing I'm going to ask
12  you about this is that these frames here are split-
13  second frames taken out of the video; right?
14    A.  That's correct.
15    Q.  All right.  So they don't show how long
16  someone was in a certain position or what all was
17  moving around at all; correct?
18    A.  That's correct.
19    Q.  Do you know -- I won't be able to ask this
20  question right, but do you know how many frames per
21  second these videos captured?
22    A.  I believe body cams, they're -- they're at
23  different speeds.  I believe they're 30 frames a
24  second.
25    Q.  Thirty frames a second?

159

1    A.  Yes.
2    Q.  So one of these frames is 1/30th of a
3  second?
4    A.  That's correct.  And these were both in the
5  same second.
6    Q.  I'm sorry.  What -- you're talking about
7  the two on page 16?
8    A.  Yes.
9    Q.  Those were both --
10    A.  The same second.
11    Q.  The same second, but each of them is a
12  1/30th of a second?
13    A.  That's correct.
14    Q.  You don't know whether it's the first
15  1/30th of that second or the last 1/30th of that
16  second, though; right?
17    A.  That's correct.
18    Q.  All right.  You've reviewed Mr. Connor's
19  report?
20    A.  Yes.
21    Q.  Do you know Greg Connor?
22    A.  Yes.
23    Q.  How do you know him?
24    A.  Well, I only know him from -- I know him
25  indirectly from Illinois.  He used to work at a

160

1  place that I almost became a director of, so -- but
2  I know him from the Dyksma case.  I actually sat in
3  on his deposition.
4    Q.  He's got a lot of experience in the use of
5  force, doesn't he?
6    A.  Well, I have a different opinion about
7  that.
8    Q.  All right.  Good.
9    So you don't -- you don't think he's qualified
10  in use of force?
11    A.  What I think he's not qualified in,
12  especially this case, he has no CIT training, no
13  background, no behavioral science background.
14    Q.  All right, answer my question first and
15  then -- then explain --
16    A.  Okay.
17    Q.  -- if you would.
18    Do you believe he's qualified in the area of
19  police use of force?
20    A.  Yes.
21    Q.  All right.  Now go ahead.
22    A.  But I don't believe he's qualified to deal
23  with a case that is strictly a CIT-type case,
24  given -- understanding that there's force involved,
25  I don't think he has any background and the fact

161

1  he's -- it's not even mentioned in this report.
2      Q.  Okay.
3      A.  I think in a case like this, if you don't
4  have a CIT background or a background in the
5  behavioral sciences, you're probably not qualified
6  to render an opinion about the appropriateness of
7  what they did.
8          (REPORTER CLARIFYING ANSWER)
9  BY MR. CLARK:
10     Q.  All right, but you agree that Connor's got
11 a lot of experience in use of force; correct?
12     A.  (No response)
13     Q.  You're hemming and hawing there.
14     A.  Well, I don't think he has much law
15 enforcement experience. I'll put it that way and --
16     Q.  All right.
17     A.  I'll just leave it at that.
18     I'm very familiar with where he worked and what
19 he did there, and he's a good man, but I'll just
20 leave it to this case. I don't think he's qualified
21 in this case for the CIT reason.
22     Q.  All right, so you don't think that Connor
23 is qualified to render an opinion in this case, do
24 you?
25     A.  No.

162

1      Q.  Okay. What criticisms do you have of
2  Connor's report, his opinions I guess?
3      A.  Well, I don't think it's a complete report,
4  a complete expert report. As I recall, it's only a
5  couple of pages. He doesn't address at all the
6  length of time they were on his back, the number of
7  times he yelled out that he couldn't breathe. He
8  basically ignored all that.
9      Q.  Okay, other than that do you have any other
10 criticisms of his opinions?
11     A.  He didn't provide any time line. He didn't
12 provide any analysis of the video evidence --
13     Q.  Well, I'm really referencing his opinions.
14 I -- it sounds like you -- you would've written his
15 report differently. I get that. But the opinions
16 that he -- that he has in the case, what criticisms
17 do you have of his opinions in the case?
18     A.  You know, I'd have to take a look at it
19 again --
20     Q.  All right.
21     A.  -- if he has his opinions specifically
22 pointed out there.
23     Q.  Okay. Do you agree that the amount of
24 force an officer might otherwise have to use on a
25 suspect to effectuate an arrest depends upon the

163

1  degree of resistance that a suspect may be giving to
2  that officer?
3      A.  Yes, but I'm going to say again that's
4  where the conflict comes in between arrest
5  procedures and CIT, and I'm not -- that's just a
6  conflict in law enforcement in training. But, yes,
7  I generally agree with you.
8      Q.  You don't have any reason to believe that
9  any of the officers in this case are being
10 untruthful, do you?
11     A.  No.
12     Q.  All right, with respect to positional
13 asphyxia, you're not a positional asphyxia expert,
14 are you?
15     A.  Only in terms of police training, not
16 medically, no.
17     Q.  All right. You've not written any articles
18 about positional asphyxia, have you?
19     A.  No.
20     Q.  You've never testified on the subject of
21 positional asphyxia, have you?
22     A.  Only in depositions, only to the extent of
23 police training.
24     Q.  Okay. And how many other positional
25 asphyxia cases have you been involved in?

164

1      A.  I would estimate half a dozen.
2      Q.  Okay. And those are cases that you were
3  hired as an expert to testify against law
4  enforcement?
5      A.  Yes.
6      Q.  I think I probably asked you this, but you
7  don't have any opinions in this case that are not
8  contained in your report; correct?
9      A.  That's correct, I do not.
10     Q.  Let me ask a question I just asked a minute
11 ago a little bit differently.
12     Do you believe that Officers Aguilar, Dudley and
13 Evrard were truthful in their interviews that they
14 gave as part of the investigation?
15         MR. POST:  Object to the form. Go ahead.
16     A.  Yes. To the extent that I remember them, I
17 have no reason to believe they were not.
18     Q.  Okay.
19         MR. CLARK:  All right, I think I'm just
20     about done. If we can take five minutes. I'm
21     going to look at some notes and then I think
22     we'll be done.
23         (OFF-THE-RECORD DISCUSSION)
24             (BRIEF PAUSE)
25         MR. CLARK:  All right, we'll go back on the

165

1 record. I think I am done. I guess I
2 understand you're going to read and sign, so --
3     THE WITNESS: (Nods head affirmatively)
4     MR. CLARK: -- thank you.
5     MR. POST: I have a couple of questions. I
6 just need to clarify a couple. I'm going to try
7 to keep my voice up to make the court reporter
8 happy. I know it's getting late in the day.
9     DIRECT EXAMINATION
10 BY MR. POST:
11   Q. Mr. Harmening, you mentioned noncompliance
12 with Georgia POST standards a few times during the
13 deposition today, I think, or -- by that -- or let
14 me ask you this way.
15   Are Georgia POST standards, those standards that
16 you have mentioned, the same as the objective
17 reasonableness standards of Graham versus Connor
18 that you mentioned or wrote about on page 13 and 14?
19   A. Well, the --
20     MR. CLARK: Object to the form.
21   A. I'm referring to the POST training
22 standards, and the training standards on use of
23 force are consistent with Graham. That's what I'm
24 saying.
25   Q. Okay.

166

1   A. And the three -- the three prongs of Graham
2 are included in the instructional standards.
3   Q. Okay. I just wanted to clarify that.
4   And with regard to the videos, you were asked
5 some questions about that. You didn't observe any
6 resistance from Hector Arreola after he was
7 handcuffed, did you?
8   A. No.
9   Q. Let's see. There was some discussion about
10 excited delirium today.
11   Does the existence of excited delirium, whatever
12 that exactly consists of, make a situation such as
13 this more dangerous in some fashion?
14   A. Yes.
15   Q. Explain that if you could.
16   A. Well, it's dangerous -- more dangerous for
17 everyone, but police training is -- and while it may
18 not be a legitimate medical diagnosis, it's found
19 all through police training. And the training is
20 that if there is excited delirium, especially with
21 drug use, especially with mental illness, there's an
22 increased risk of sudden death following a struggle.
23   So police officers are taught that in the course
24 of handcuffing and detention techniques. In CIT
25 there's lengthy training about that, how to avoid

167

1 that situation, sudden death.
2   Q. Okay. And with Georgia specifically and
3 police -- basic police training generally, is that
4 taught in that training?
5   A. Yes. I believe it's week five in the
6 eleven-week training in Georgia. They get it all in
7 one week. They get handcuffing and transport
8 techniques, crisis intervention. It's not CIT
9 training. It's abbreviated training for new
10 recruits. And mental -- it's mental health issues
11 that they're exposed to, yes. I believe that's all
12 in the same week.
13   Q. I think you noted in your report at some
14 points a number of times that Hector Arreola
15 indicated he could not breathe; is that correct?
16   A. Yes.
17   Q. Can you direct us to that point -- or do
18 you remember the number of times that you added it
19 up?
20   A. I believe 14 times.
21   Q. Okay. Having heard that -- well -- or once
22 someone hears "I can't breathe" 14 times, what
23 should they do regarding medical care as they're
24 trained with police training?
25     MR. CLARK: Object to form. It's an

168

1 improper hypothetical. Go ahead.
2   A. Well, they are trained that in the course
3 of handcuffing a suspect, if there's any indication
4 that there is labored breathing, then they -- they
5 need to take that into account and change positions
6 if they can, to be -- they're trained to monitor the
7 person's breathing throughout, therein and after,
8 and then they're trained in the various ways that
9 they can inhibit a person's breathing by the body
10 position, different things they can do.
11   Q. You were a police officer for a number of
12 years. If you encountered a situation where you had
13 already called for an ambulance and you observed
14 labored breathing, what would you do at that point?
15     MR. CLARK: Object to form, improper
16 hypothetical.
17   A. Well, I've had these situations, and if
18 I -- if there was -- if I had an individual on the
19 ground -- and I, again, say that there are some
20 differences between an arrest -- an offender arrest
21 situation and a CIT situation.
22   The difference is this: If I'm arresting
23 someone for an offense, the police officer
24 doesn't necess -- doesn't have a duty to back off of
25 that individual. They're going to use whatever

169

1  force they can that's necessary to effect that
2  arrest.  That's the conflict with CIT, where you may
3  have to back down and it's appropriate to back down,
4  while still being able to control the subject and
5  perhaps not put them in the handcuffs yet.
6      So in my experience, number one, if there's
7  going to be an involuntary commitment -- and I was
8  the mental health officer for my department, so I
9  did all the involuntary commitments for my
10  department.  I did the petitions.
11     If I went into it knowing it was going to be an
12  involuntary commitment, I already had the ambulance
13  there ready to go.  I don't recall -- you know, I
14  think probably what I did is had them staged
15  somewhere until I was sure there were no weapons and
16  then go ahead -- and advised them to go ahead and
17  come up.  And then get the subject in custody as
18  quickly and as safely as I can and have the
19  ambulance immediately take control.
20     Q.  Whether it's a CIT situation or a regular
21  arrest situation, once you observe labored
22  breathing, would you tell EMS to hurry up?
23     A.  Well, yes.  And certainly if the person was
24  unresponsive to the point where I felt a need to
25  check for a pulse, yes, I would -- I would ask them

170

1  to expedite.  I would hopefully already have them
2  there ready to go.
3      Q.  What is your opinion about the EMS response
4  or request for an EMS response in this case?
5      A.  I believe they waited too long to call for
6  EMS and backup and additional officers.  I believe
7  that given Hector's behavior they probably very
8  quickly understood they had an involuntary
9  commitment.  Certainly at the time they called for a
10  psych eval they knew that.  They should've
11  immediately called for both -- backup especially,
12  EMS especially -- get them both there.
13     Q.  Before the struggle started, they'd called
14  for an ambulance for the psychological evaluation;
15  right?
16     A.  Yes.
17     Q.  Should they have done something else at
18  some point with regard to asking for an ambulance,
19  based on your police training -- or their police
20  training?
21     A.  Well, I think they should've called for the
22  ambulance, had the ambulance respond to the scene
23  and keep them updated as to what was going on
24  medically.  And if the individual like Hector became
25  unresponsive you get on the radio and tell them to

171

1  expedite, that he was unresponsive.
2      Q.  And that didn't happen in this case?
3      A.  I -- no.
4      Q.  Okay.  Let me ask you something.  On page 9
5  of your report, at 5:29 and 28 seconds --
6      A.  Yes.
7      Q.  -- there is -- says, "Arreola screamed,
8  quote, I can't breathe in, end quote, indicating
9  that the officers were still on top of him."
10     A.  Yes.
11     Q.  Is there any difference between "I can't
12  breathe in" and "I can't breathe" based on your
13  experience?
14     A.  Well --
15        MR. CLARK:  Object to the form.
16     A.  I would just say that's a significant
17  statement to me, because he's describing asphyxia.
18  When somebody's on top of you, compressing you, you
19  don't have the ability to -- your diaphragm can't
20  function properly.  You can't expand your chest.
21  The problem is not breathing out.  The problem is
22  breathing back in.
23     And it was significant to me that he said that,
24  because I think he was describing asphyxia, I think,
25  as opposed to, you know, just acting and saying "I

172

1  can't breathe", when in fact he could breathe.  It
2  was significant to me that then all of a sudden he
3  said "I can't breathe in".
4        MR. POST:  I believe that's all the
5  questions I have.
6            RECROSS-EXAMINATION
7  BY MR. CLARK:
8      Q.  So you just testified that the video does
9  not show any resistance after the handcuffs were
10  placed on Mr. Arreola.
11     Do you recall that?
12     A.  Yes.
13     Q.  But, in fact, there was resistance after
14  the handcuffs were placed on Mr. Arreola; true?
15     A.  Well, I'm referring to the video.
16     Q.  You said the video doesn't -- his question
17  was the video doesn't show him.  You said no, the
18  video doesn't --
19     A.  Yes.
20     Q.  -- or I don't see anything in the video?
21     A.  That's correct.
22     Q.  But, in fact, there was resistance, though;
23  correct?
24     A.  I don't know that there was.
25     Q.  Well --

William M. Harmening   9/23/2019

173

1    A.  What I have is Evrard saying, you know,
2  don't -- or don't grab my fingers.
3    Q.  Right.
4    A.  And I think he also said he was kicking.
5    Q.  Right.  So you know that there was, in
6  fact, resistance?
7    A.  Well, I don't know that I'd call that
8  resistance.  He's not resisting -- he's already
9  under arrest.  He's secured in handcuffs.
10    What I see on the video is two segments; number
11  one, when Evrard is walking up he's not moving.  His
12  legs are moving just a little bit.  And then there's
13  a segment where you see him propped up against
14  Oakes, and he's -- I think he's totally unresponsive
15  at that point.
16    Q.  All right, well, then let me ask you this
17  way.  So I want to understand this.  I really want
18  to understand this precisely, what your testimony is
19  here.
20    After the handcuffs were placed on Arreola, are
21  you saying there was no resistance?  Yes or no?  Or
22  you don't know?
23    A.  Well, if --
24    Q.  Yes or no or I don't know.
25    A.  I don't think it's yes or no.  Define

174

1  resistance in -- resisting arrest?
2    Q.  Resisting arrest.
3    A.  No, I don't think so.  I don't think it's
4  possible for him to resist arrest when he's secured
5  in handcuffs in a prone position.
6    Is he still struggling?  I think if I look at my
7  time line and I listen to the audio, I think there's
8  a point where he's no longer -- his voice is
9  trailing off and that's the end of it.
10    Q.  Sure, you're going to a point there.
11    But after the handcuffs were placed on Arreola,
12  you would agree with me that there was still
13  resistance, still struggling, from Mr. Arreola?
14    A.  Can I -- I want to refer --
15    Q.  I'd like to have an answer to that
16  question, though.
17    Don't you agree with that?
18    A.  I don't think I do, but I'd like to read --
19    Q.  Okay.
20    A.  -- I'd like to read something first.
21    He's -- once I -- once he's handcuffed, he is
22  still saying "I can't breathe".  I don't have any
23  evidence at that point that he's still resisting.  I
24  don't see anything or hear anything.  There's a very
25  short time later Evrard walks up and then we have

175

1  his video, and he's clearly not resisting in that
2  part of the video.  And then after that is when
3  they're turning him over and propping him up, and
4  he's clearly not resisting then.
5    Q.  But you've already told me that you can't
6  see everything that takes place on the video, okay.
7    You don't know everything that took place on the
8  scene of this arrest; right?  You agree with that?
9    A.  That's correct.
10    Q.  And you were a cop.  You know that?
11    A.  That's correct.
12    Q.  All right.  And all I'm clarifying here
13  is -- he asked you a question about can you see any
14  resistance on the video.  You said no, no more
15  resistance on the video after the handcuffs.
16    And my only question is, is that -- are you
17  saying there was no more resistance or you're just
18  saying you can't see it on the video?
19    A.  I'm saying I can't see it on the video and
20  I can't determine that from the audio.  That's --
21    Q.  So that's an "I don't know", it seems to
22  me, then.
23    You don't know whether there was resistance or
24  not?
25    A.  Well, I can't say positively that there was

176

1  when I can't -- I have no evidence that there was.
2  I'm not saying any more than what I'm saying.  I --
3    Q.  I'm confused.
4    A.  No --
5    Q.  Are you saying there was resistance or not?
6    A.  No, you're -- I'm -- I can't say that there
7  is or not.
8    Q.  So you don't know?
9    A.  I can say based on the period of -- based
10  on the clips from the -- from the video and the
11  audio -- this is all I'm saying -- there is no
12  resistance apparent to me in the audio or the video.
13    Is there resistance during the period of time
14  when there's -- when I don't see anything on the
15  video?  I don't know.
16    So I'm saying both.  I don't know for some, and
17  I think I do know for other --
18    Q.  Well, but -- but --
19    A.  -- for other times.
20    Q.  -- you point out some resistance on the --
21  on the audio.  You raised it without me even having
22  to raise it with you.  And that is the comment about
23  quit trying to grab my fingers.
24    A.  Well, I don't -- I don't consider that a
25  resistance.

177

```
 1      Q.  What do you consider that?
 2      A.  Grabbing his fingers.  That's not --
 3      Q.  That's not resistance?
 4      A.  No.  No.
 5      Q.  What about kicking, is that resist -- first
 6  of all, is kicking resistance?
 7      A.  I would call it more assault if he's trying
 8  to kick somebody.
 9      Q.  All right.
10      A.  I -- I'm not trying to play with words.  I
11  just don't think you can resist --
12      Q.  Well --
13      A.  -- arrest when you're in handcuffs in a
14  prone position.
15      Q.  I'm going to ask you that, though.  I was
16  going to ask you a question about that, though.
17      Just because a suspect is in handcuffs doesn't
18  mean that they can't resist arrest, first of all?
19      Would you agree?
20      A.  I agree.
21      Q.  It doesn't mean that they can't hurt the
22  officers that are there trying to arrest them?
23      Would you agree?
24      A.  I agree.
25      Q.  It doesn't mean that they can't escape?
```

178

```
 1      Would you agree?
 2      A.  I agree.
 3      Q.  All right.  So just because someone's in
 4  handcuffs is not the end of the story with respect
 5  to an arrest?
 6      You would agree with that?
 7      A.  Well, I agree, but there was a second part
 8  to what I said, in handcuffs and in a prone
 9  positions with officers on top.  I don't think
10  resistance in a -- resisting arrest is really
11  possible at that point.
12      But, aside from that, I repeat, I don't think
13  grabbing somebody's fingers is resistance.  I don't
14  know what that is.  I mean he's got his hand on his
15  back, he's handcuffed behind his back and grabs his
16  fingers.  I don't know what to call that.
17      All I will say is I don't see on those two video
18  clips any sign of resistance when Evrard walks up
19  and when he's propped up against Oakes.
20      Q.  That's right.
21      A.  On the audio I don't hear any sign of
22  resistance as his voice is trailing off and he
23  becomes -- and there's no more sound coming from
24  him.  Beyond that I don't know.
25      Q.  You don't know.
```

179

```
 1      I mean, do you contend that you would hear the
 2  kicking of his legs on the audio?  Are you that good
 3  that --
 4      A.  Well --
 5      Q.  -- you could determine that from the audio?
 6      A.  No.  But I would -- I would suggest that I
 7  would hear the officers taking action and telling
 8  him not to or --
 9      Q.  How do you know that?
10      A.  Well, I don't.
11      Q.  Yeah.
12      A.  I don't.
13      Q.  Okay.
14      MR. CLARK:  That's all.  Thank you.
15      THE WITNESS:  Yeah.
16      (OFF-THE-RECORD DISCUSSION)
17      MR. CLARK:  All right, so we -- my view is
18  we took the deposition pursuant to the Rules of
19  Federal Procedure.  But we were talking here,
20  and we can consider that this deposition is
21  taken and that objections except as to the form
22  of the question and responsiveness were
23  reserved.
24      MR. POST:  Agreed.
25      THE REPORTER:  Okay.
```

180

```
 1      (AND FURTHER DEPONENT SAITH NOT)
 2  (Deposition concluded at 4:11 p.m.)
 3
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

William M. Harmening   9/23/2019

181

1   STATE OF GEORGIA
2   COUNTY OF MUSCOGEE
3                    CERTIFICATE
4           .
5           The foregoing transcript of the
6   proceedings was taken before me as a Certified
7   Court Reporter and reduced to this transcript
8   under my direction and supervision, and I
9   certify that it is a true and correct transcript
10  of the proceedings to the best of my ability.
11          This 10th day of October, 2019.
12
13
14
15          Alan M. Causey
16          Alan M. Causey, CCR
17          Certificate No.  B-1445
18
19
20
21
22
23
24
25

**A**

**Aaron** 1:13 133:1
**abbreviated**
    167:9
**ability** 171:19
    181:10
**able** 113:8 136:25
    158:19 169:4
**abrasions** 148:20
**absolutely** 73:1,3
    113:5,6 142:4
    155:25 157:8
**academic** 81:11
**academics** 85:8
    87:19
**academies** 83:11
**academy** 80:24
    81:14 83:11,24
    84:14 85:5
    87:24 88:2,3
**accept** 119:18
**Access** 23:6
**accomplished**
    155:16,25
**account** 168:5
**accredited**
    153:20,20
**Act** 5:8
**acting** 108:24,24
    109:1 110:21,25
    171:25
**action** 1:9 97:15
    179:7
**actions** 89:14
    90:20,25 91:15
    116:23 156:5
    157:19
**active** 25:16 26:3
**actively** 101:3
    156:13
**add** 51:13 142:6
**added** 25:1,6
    37:2 167:18
**adding** 36:9
    120:10

**addition** 36:12
**additional** 10:25
    11:2 23:12
    24:17 33:9,10
    33:12 36:15,16
    52:16 82:13
    95:18 141:23
    170:6
**address** 86:24
    162:5
**addressed** 84:25
    128:8,25 149:11
**adequately**
    137:25
**Adler** 81:6
**administrative**
    52:4
**Administrator**
    1:4
**admitted** 129:8
    129:23
**advance** 82:11
**advanced** 88:5
**advancement**
    82:12
**advise** 79:13
**advised** 105:9
    138:8 169:16
**affidavit** 60:4
**affirmatively**
    8:18 9:2 66:10
    68:6 72:20
    124:3 165:3
**agency** 7:4
**agent** 67:17
**aggressive** 145:4
**agitation** 115:6
**ago** 33:22 72:2
    164:11
**agree** 50:1 71:2
    73:9 87:5 96:17
    97:12,17 98:12
    98:24 100:13,18
    101:1,9 102:14
    102:15 103:13

103:17,19 107:6
    108:5,7,14,15
    108:16,17
    112:13,23 113:1
    113:11,15
    114:10,18
    119:11 130:4,10
    135:2 136:5,6,8
    136:24 137:10
    137:15,17,22,24
    140:2,5,12,15
    140:16 141:11
    141:15 142:22
    143:18 146:25
    147:2,7 148:16
    148:24 149:23
    150:17 151:9,10
    161:10 162:23
    163:7 174:12,17
    175:8 177:19,20
    177:23,24 178:1
    178:2,6,7
**agreed** 5:2 76:18
    96:18 179:24
**agreement** 3:17
    30:1,17
**ags@psstf.com**
    2:18
**Aguilar** 1:11 15:8
    15:11,13,14
    90:21,23 93:18
    107:11 110:19
    119:25 129:6,7
    133:5 134:19
    135:21 147:17
    150:1 154:3,17
    164:12
**Aguilar's** 150:2
**ahead** 10:16
    59:22 64:23
    82:8 84:20 85:6
    104:1 116:15
    120:9,23 157:11
    160:21 164:15
    168:1 169:16,16

**Alan** 1:19 5:8 6:3
    7:14 181:16
**Albuquerque**
    61:23
**alcohol** 21:9
    71:14
**alert** 119:11
**allow** 155:9
**allowed** 58:20
    59:10,23 60:10
    78:23 97:14
    139:5,10 157:10
**allowing** 139:15
**allows** 78:11
**altercation**
    113:24 136:14
**ambulance**
    119:12 120:6
    168:13 169:12
    169:19 170:14
    170:18,22,22
**amount** 56:23
    162:23
**Ana** 85:13
**analysis** 62:13,17
    62:20 81:3 88:6
    162:12
**annual** 88:3
**annually** 78:16
**answer** 5:21
    15:13,20 19:10
    20:19 31:10
    55:12 66:4
    77:12 79:14
    101:17 106:12
    106:13 150:8
    160:14 161:8
    174:15
**answered** 8:22
    150:6
**answers** 9:11
**anticipated**
    140:21
**anybody** 128:16
    140:8 146:19

**anymore** 77:15
    77:24
**anyway** 93:15
**apart** 81:15
**apartment** 57:7
**apologize** 125:16
**apparent** 176:12
**apparently** 35:5
**appeal** 61:11
**appear** 14:7 15:8
    15:19 146:17
**APPEARANC...**
    2:1
**appeared** 107:25
**appearing** 5:3
**appears** 13:25
    16:13 17:20
**applied** 117:25
    133:4
**Appling** 61:7
**apply** 28:24
    131:16
**applying** 97:7
    133:5
**apprehension**
    64:19 97:21
    112:9
**appropriate**
    132:8 169:3
**appropriateness**
    161:6
**approximately**
    52:23 113:14
**area** 51:15,19
    65:6 92:15,17
    92:17 114:22
    115:15,17,21
    160:18
**areas** 28:1 63:17
    63:20 64:8,10
    82:22 88:23
    90:5 92:14
**arms** 99:24
**Arreola** 1:3,3,5,5
    1:6,7 70:17,25

89:14 91:6,14
99:1 100:24
101:20 103:2,5
103:13,15 105:4
105:10 107:9
108:3,8,10,13
108:18 109:7,13
110:17,24
111:15 112:15
113:3,8 114:5
114:20 116:5,12
116:22 117:6
118:2 119:6
125:17 127:21
129:9 134:24
135:6,14,17,18
136:2,17 137:2
137:9 139:24
140:5,6 143:3,7
143:16 144:1
146:3,16 147:4
147:7,12,13,25
148:20 156:6
166:6 167:14
171:7 172:10,14
173:20 174:11
174:13
**Arreola's** 22:6
116:6 117:25
133:4,6
**arrest** 64:19
66:19,22 68:16
68:17,24 69:4,8
69:21,25 70:10
89:18 90:2
91:23 92:4,6
93:14,20 97:13
97:21 98:3,18
98:20,23 99:1
99:10,16,18
100:17,22 101:8
111:20 112:2,3
112:9,15,21,22
116:1 118:1
130:6 131:12

132:7 135:7
136:4 137:20
142:11,12,17,19
143:3,12,14
155:17 157:3
162:25 163:4
168:20,20 169:2
169:21 173:9
174:1,2,4 175:8
177:13,18,22
178:5,10
**arrested** 68:17
98:5 99:6
110:17,25
111:15 112:17
126:10 140:18
142:14 146:15
**arresting** 70:8,15
70:24 101:21
109:12 142:1
168:22
**arrests** 66:23
68:11,23
**arrival** 94:16
**arrives** 138:18
**article** 3:20 6:5
38:22 39:4
**articles** 28:22
44:16 45:10,25
46:2 163:17
**aside** 149:4
178:12
**asked** 28:2,3,21
93:10 133:2
135:1 140:6
164:6,10 166:4
175:13
**asking** 34:9 55:1
55:2,6,8 66:2
117:1 149:8,13
151:12 152:22
170:18
**asphyxia** 3:22 4:1
39:13,18 40:17
146:11,12

163:13,13,18,21
163:25 171:17
171:24
**asphyxiation**
118:6
**assault** 177:7
**assist** 26:3
**associated** 14:25
15:14
**associations**
77:22
**assume** 9:4 15:10
20:20 94:25
116:4
**assuming** 12:14
20:24 23:1 28:7
**attempt** 93:17
136:2
**attempted** 57:4
113:4 129:9
143:14
**attempting** 97:13
98:25 100:16
130:5 156:14,23
**attempts** 100:22
**attention** 146:3
147:3
**attorney** 2:6
13:11 20:21,24
32:7 34:12
47:12,13 59:10
60:2,5 67:20,23
**Attorneys** 2:15
**audio** 17:7 18:4
18:10 36:11
174:7 175:20
176:11,12,21
178:21 179:2,5
**authorities** 70:3
**authority** 132:21
**autopsy** 4:6 21:6
21:8,13 22:5,9
22:10 117:18
118:22 121:11
121:12

**Avenue** 1:23 2:16
5:11
**AVI** 16:6,9
**avoid** 112:14
134:4 166:25
**awarded** 61:10
**aware** 22:15 63:3
63:10 96:1
120:5 132:20
152:12 153:5
**Axon** 77:17 88:7

---

**B**

**b** 6:23
**B-1445** 6:4 7:14
181:17
**B-E-R-N-I-L-I...**
61:20
**back** 14:18 38:2
43:7,13 45:21
48:9 49:13 57:8
57:10 59:18
62:1 80:21
104:11 111:8
112:7 117:12
118:1,16 123:21
124:5 129:24
130:12,18,23,24
131:2,8,16
132:6,18 133:4
133:6 143:7,8
146:14 150:5
155:1 162:6
164:25 168:24
169:3,3 171:22
178:15,15
**background** 28:1
28:21 160:13,13
160:25 161:4,4
**backup** 92:18
95:17,18 106:6
117:1 170:6,11
**bad** 108:21
**badge** 78:6,10,13
78:20,23 79:5

79:17,18,19,23
**Bartow** 61:12,14
**base** 146:7,8
**based** 58:2 60:7
62:6,6,11,24
65:13 107:11
108:17 110:19
119:21 120:3,3
170:19 171:12
176:9,9
**basic** 83:8 86:9
86:11 90:18
167:3
**basically** 46:1
162:8
**batons** 75:2
**Bay** 1:23 2:16
5:11
**bear** 117:21
138:23
**beat** 66:8
**beating** 100:16
**bed** 143:7
**bedded** 81:2
**began** 113:11
114:12,17
**beginning** 32:25
36:16,17 80:8
**begins** 100:24
114:1
**behalf** 2:3,12
50:14,18
**behavior** 170:7
**behavioral** 84:4,7
160:13 161:5
**belief** 94:15 112:7
149:17
**believe** 13:9
14:13 15:2 16:1
16:2,8,10,22
17:2,13 18:1,9
18:16 27:6
28:16,25 29:2
42:19 45:21,24
47:11,23,24

48:21 59:20
60:20 61:17,20
62:3 64:17,24
65:3,11 68:22
83:19 89:1
94:18,19,20
95:3,9 96:5,14
97:9,25 98:22
98:23 99:4,15
100:1,4 101:19
101:22 104:7,10
106:19 109:11
109:15 111:14
112:13 113:5
116:17 118:10
121:8 122:19
123:8,11,12
125:18,22 126:1
126:8 127:24
132:17 135:14
136:10 137:11
140:8 141:6,18
142:18 144:7,11
144:13,19
145:21,23
147:24 150:3
152:18 158:22
158:23 160:18
160:22 163:8
164:12,17 167:5
167:11,20 170:5
170:6 172:4
**believed** 105:4
109:17
**belong** 77:23
**belongs** 17:4
**belt** 57:4
**Bernalillo** 61:19
**best** 147:3 181:10
**better** 36:11
72:12,15 73:2
90:3 95:14
96:13,16 113:20
134:15
**beyond** 33:18

36:13 77:17
92:10 104:18
117:1 178:24
**big** 71:21 82:12
128:18 140:3
145:5 148:18
**bill** 46:24
**billed** 30:7
**billing** 30:10
**Billy** 61:12 62:9
**bit** 28:3 45:14
60:20 103:25
124:12 125:16
164:11 173:12
**Blood** 21:8
**bloodied** 71:24
**board** 6:6 76:11
76:17
**body** 3:21 13:1,3
14:13,14 15:1,2
15:15 16:23
115:11 117:25
137:11,18
158:22 168:9
**book** 85:22,24
86:4,20
**BOREN** 1:15
**bottom** 37:23
129:7 154:24
**box** 2:16 34:15,19
**Bradley** 2:6
**break** 8:20,23
60:19 82:23
133:12
**breaking** 127:2,2
**breath** 132:14
**breathe** 96:13,16
113:9 118:3
125:18 126:4,11
126:12 155:4,10
162:7 167:15,22
171:8,12,12
172:1,1,3
174:22
**breathing** 96:1,2

96:7,11,23
97:11 114:7,11
125:23 168:4,7
168:9,14 169:22
171:21,22
**breezeway** 57:11
**Brian** 1:12
127:13 128:6
**BRIEF** 83:1
133:14 164:24
**briefed** 117:24
**briefly** 57:2
**bring** 10:4 26:18
30:9 44:8
**broke** 126:19
**brought** 10:23,23
10:25 11:3 12:2
23:14,17
**bugs** 48:14
**bullet** 62:13
**bulletin** 3:22,23
39:11 40:4
152:8 153:3
**bunch** 8:15 57:8
**Busier** 50:2
**busy** 49:23
**buttocks** 130:21

### C

**c** 2:5,14 6:13
**C-A-S-I-L-L-A...**
56:13
**cadets** 84:5
**CALEA** 153:19
153:20,24
**California** 56:13
**call** 27:18 68:9
90:9 92:18,19
98:13 99:14
106:6 170:5
173:7 177:7
178:16
**called** 1:19 8:7
40:17 79:2
101:24 145:6

148:7 150:22
151:7 168:13
170:9,11,13,21
**calling** 150:14
**calls** 31:20
**cam** 14:13 15:1,2
15:2,15,15
16:14,15,23,23
16:24 137:11,18
**cams** 13:1,3
14:15 17:2,3
158:22
**canines** 57:9
**capacity** 1:12,13
1:14,16
**capture** 137:19
**captured** 158:21
**car** 146:14
**cardiac** 116:1
**care** 4:8 23:12
69:3,20 147:7
148:15 150:19
151:8 167:23
**career** 68:4
**carried** 75:2
**carries** 80:6
**carry** 75:1,1,2
77:16 78:5,6,10
78:11,12,12,23
79:5,23,24 80:2
**carrying** 77:17
**case** 5:22 7:3,3,10
10:5 13:15
25:15,20,21
26:4 27:19
28:25 30:2,4
31:3 33:22 43:4
43:23 44:9,21
44:25 46:10,13
46:18 47:15,17
48:4,15,18,19
48:23 49:1,4
50:24 54:21
56:5,18,19,20
56:22 57:2,17

57:21 58:17
59:5,14,15,16
60:1,5,15,22
61:9,11,24 62:1
62:4,10,23,25
63:5 64:7,14,17
64:22,24 70:17
70:25 72:9,11
72:12 76:9
86:13,14 88:20
92:9,13 94:11
95:6 96:25
97:22 99:23
100:1,23 101:6
101:6 116:5,5
118:6,6 125:13
127:11 129:2
131:24 132:23
133:8 136:25
140:3 142:20
154:2 160:2,12
160:23,23 161:3
161:20,21,23
162:16,17 163:9
164:7 170:4
171:2
**cases** 32:12 47:24
49:16 50:6,8,11
50:14,21,23,25
50:25 51:3,4,6
51:7,8 52:12,16
52:17,24,25
53:2,3,5,7,17,21
54:7 55:4 56:5
56:10,15 61:3
63:3 68:25
73:25 74:6,11
85:1 101:15
134:4 137:23
163:25 164:2
**Casillas** 56:12,20
56:22 57:1,3,5
57:17
**catch-all** 45:14
104:1

**categories** 87:15
89:12 90:20
92:8
**categorize** 54:19
**category** 51:3
87:20 90:1 91:4
91:22 92:3
117:19
**cause** 118:11
119:1 122:4
**caused** 116:6
**Causey** 1:20 5:8
6:3,10,15,20
7:1,8,14 181:16
**CCG** 12:6 20:10
21:5 151:21
152:4,12
**CCG000012** 14:4
**CCR** 7:14 181:16
**CDs** 13:12
**Center** 4:1 5:10
22:25 83:13,16
84:3
**Centre** 1:22 2:15
**certain** 141:12
158:16
**certainly** 66:23
68:20 70:20
83:8 84:23,24
87:17 107:4,23
108:19 110:5
113:6 114:13
138:21 140:4
156:20,22 157:2
169:23 170:9
**certificate** 6:4
22:16,17 82:9
181:3,17
**certificates** 82:13
**certification** 77:4
77:16,23
**certifications**
77:2,5,11,20,25
**certified** 1:20 5:8
6:3,9 77:15

153:19 181:6
**certify** 181:9
**cetera** 5:25 45:11
**challenged** 60:7
63:4
**change** 155:6
168:5
**changed** 27:9
36:8 102:9
111:4 155:15,24
**changes** 28:10
138:21
**changing** 155:19
**chapter** 85:24,25
86:5,21
**charge** 7:9 32:11
32:14 50:24
69:20
**charged** 71:20
**charges** 69:2
**chase** 57:6
**check** 29:18
169:25
**checking** 119:25
**chest** 171:20
**Chicago** 3:22
39:12 69:1,14
80:24 81:5,7
**chief** 1:15 67:17
67:21,25 74:8
79:16 84:21
**Chiefs** 153:16,17
**child** 1:6 67:4,4
**Circuit** 132:21
**circumstance**
71:1
**circumstances**
57:25 130:11
**CIT** 63:21 64:17
64:18 84:10,22
88:8,12 89:3
90:6,7,8,9,22
91:9,16 97:21
98:6,13 99:14
100:1,10,21

105:21 106:2
112:9 131:22
134:4 142:16,20
160:12 161:4,21
163:5 166:24
167:8 168:21
169:2,20
**CIT-type** 160:23
**citation** 42:6
**cite** 153:8
**cited** 24:3,6,11
38:22,25 40:2
**citing** 153:2
**City** 58:18
**civil** 1:9 5:7 51:7
52:2,6,7 53:16
**clarification** 22:2
104:25 153:24
**clarify** 21:15
165:6 166:3
**clarifying** 131:19
131:21 161:8
175:12
**Clark** 2:14 3:4,6
8:2,10,11 9:12
10:10,20 16:11
19:15,18 20:3
21:22,25 22:1
24:19 25:10
26:9,12,14
30:12,16,20,24
37:9,13,18,21
39:3,7,19,22,25
40:7,11,19,23
41:4,8,17,21,25
43:11 48:5,7,8
54:15,22,25
55:15,19,21
56:1,2 82:24
83:2 120:17,22
121:3,5 122:14
123:2,11,16
124:1,4,7,10
133:12,15
153:25 157:11

161:9 164:19,25
165:4,20 167:25
168:15 171:15
172:7 179:14,17
**class** 85:7
**clear** 55:12 89:23
**clearly** 127:14
130:22 175:1,4
**click** 35:1
**client** 11:23 12:3
21:14 22:6,10
**clip** 16:10,12
**clips** 14:7,13
176:10 178:18
**closed** 53:2 54:21
**closer** 95:14
**co-authored**
85:12
**co-counsel** 48:15
**cold** 143:24
**Cole** 58:17 59:15
59:18 60:21
**collar** 51:20,21
56:4 67:1,7,9
**college** 81:24
**Columbus** 1:2,10
1:14,23 2:7,17
5:11 11:18
151:21 152:22
153:15 156:10
**combination** 10:7
11:2
**come** 11:10 74:15
81:9 92:13
94:23 95:5
154:18 169:17
**comes** 163:4
**coming** 120:2
178:23
**commenced** 8:1
**commencing** 1:24
5:11
**comment** 133:1
157:13 176:22
**comments** 107:11

108:17,19,21
109:9 110:19
117:3 134:2,5
135:21
**commitment**
102:3 105:19
106:15,24
109:22,23,25
110:13 150:24
169:7,12 170:9
**commitments**
169:9
**committed** 99:22
156:13,22
**community** 142:1
**compassion**
108:13
**compensation**
45:4
**complained**
113:8
**complaining**
75:15 113:12
**complains** 74:24
**complaint** 75:9
75:11,25 76:1
**complaints** 75:4
**complete** 42:24
162:3,4
**completed** 33:19
33:21,24 34:5,6
34:8,11,14,22
34:23,24 35:3,9
35:13
**completely** 98:1
**completing** 33:3
33:4
**completion** 35:11
**complexion**
138:21
**compliance** 99:24
**Compliant** 4:4
**complied** 93:7
**comply** 92:5
157:18

component 141:4
comprehensive
  22:20 26:21,24
  124:20
compressing
  171:18
computer 44:18
  44:19
CONCEPCION
  1:5
concept 140:12
  141:25
concern 108:10
  119:25 147:17
  150:2
CONCERNING
  120:15 123:15
conclude 156:5
concluded 180:2
condition 139:15
  146:4 150:9
conduct 128:17
confer 46:3
conflict 142:16
  142:21 163:4,6
  169:2
conflicting
  142:22
confused 157:2
  157:13 176:3
Connor 20:2
  156:4 157:3,16
  158:2,4 159:21
  161:22 165:17
Connor's 19:3
  45:23 159:18
  161:10 162:2
consider 19:1
  132:10 176:24
  177:1 179:20
consideration
  126:14
considered 18:25
  20:6
considering

72:10
consisted 68:4
consistencies
  127:7
consistent 127:24
  128:5 156:4
  157:15 165:23
consists 166:12
Consolidated
  1:10 11:18
constitute 11:4
Constitutional
  65:4,17
contacted 6:16
  46:18 47:2,8
  48:22 50:22
  51:1
contacts 32:8
contain 117:7
  137:2 155:14
contained 12:7
  17:25 28:23
  44:25 96:18,20
  147:4 149:16
  164:8
containing 103:5
  148:22 151:4
contend 147:11
  147:14 149:15
  179:1
contending
  135:16
contents 10:13
context 57:22
  89:3,5 104:6,9
  104:10,20
  113:20 130:2
  156:18
continually
  134:24 155:3
continue 35:5
  38:12,12 139:5
  139:10
continues 130:8,8
continuing

133:16 137:7
continuum 86:2
  86:8,21
contract 6:21 7:2
  29:22
contracted 81:8,8
contribute 142:7
contributes
  142:10
control 106:8
  130:20 132:8
  169:4,19
controlling
  103:15 155:7
controls 126:5,6
Coordinator 84:2
coordinator/ins...
  84:17
cop 145:1,11,11
  175:10
copies 37:15
cops 145:7,21,22
copy 3:13,16,17
  3:18,19,20,22
  3:23 4:1,2,4,6,7
  4:8 41:1,12
  44:1
coroner 21:14
  22:5,9,11
coroner's 118:22
  121:9
correct 10:25
  11:24 12:3
  18:15 19:1 20:7
  20:18 23:9
  24:12 27:21
  29:2,20 31:3
  32:2,20,23,25
  33:20,23 35:14
  35:15,18 37:6
  37:25 38:9,14
  38:16 44:1 45:2
  47:1 48:23
  49:12 51:11
  52:12,15 53:10

53:19 65:12
  68:10 73:12,18
  73:20 79:21
  80:9,10 81:25
  82:3,4 84:15
  88:14,18 89:15
  89:16 90:4,21
  92:14 93:8 94:8
  94:12,16 95:11
  95:15 104:17,19
  107:9 116:9,10
  116:23 117:8
  118:21 119:4
  122:1 125:13
  132:24 133:10
  135:8 136:18,19
  137:2,3,6 138:5
  138:6 139:19,23
  139:25 142:14
  143:4,9,11,16
  143:22,24 144:2
  151:20 155:1,2
  157:4 158:14,17
  158:18 159:4,13
  159:17 161:11
  164:8,9 167:15
  172:21,23 175:9
  175:11 181:9
correctional
  82:17
correctly 11:16
cost 48:13
Couch 48:11
could've 72:11,14
  72:25 155:16
Council 6:6
counsel 5:3 7:3
  22:4 46:4
count 54:3
counterproduc...
  134:23
counties 71:15
counting 17:11
county 61:7,13
  61:19 71:8,15

74:19 75:23
  76:11,17 85:13
  85:21 181:2
couple 13:6 28:10
  46:2 60:17
  83:23 84:3
  162:5 165:5,6
course 49:18
  80:25 81:1,2,9
  81:17,20,23,24
  82:2,2 84:23
  166:23 168:2
courses 80:16
  81:10,16,17
  82:6,7,14,19
  87:23
court 1:1,20 2:6
  5:8 6:1,3,6,9,17
  7:8 56:3 60:11
  60:12 165:7
  181:7
cover 7:5
covered 44:3,4
  45:15
covers 55:14
CPD 16:5,7,8
  69:1,19 81:8
Craig 47:14,15
  47:19
create 13:14
  82:15
created 82:14
credibility 93:23
cries 155:3
crime 12:14 21:6
  51:20,21 56:4
  67:1,7,10 81:3
  99:21 156:13,22
crimes 67:4,19
  68:7,13,23 69:7
  70:1
criminal 51:4,6
  156:21
criminology
  82:18

crisis 63:21 64:6
64:25 80:25
82:16 86:19
90:8 106:20
167:8
critical 89:19,21
130:17
criticism 90:23
99:11 102:5,7
116:11,16,22
117:2,9,15
127:22 129:12
134:13,16 149:5
149:5,14
criticisms 64:20
93:6 112:25
116:13 130:1
162:1,10,16
criticize 109:6,9
109:12
criticizing 109:2
109:3
CROSS 3:4
CROSS-EXA...
8:9
CSI 12:10,13
current 3:15
24:21 52:10
78:15
currently 29:25
Custodio 1:7
custody 106:2,18
113:3 135:7,12
169:17
customary 7:9
CV 3:16 26:8,17
26:25 27:6,13
28:1,22 29:5
43:25 82:21
83:3,18 87:9

**D**

D-Y-K-S-M-A
48:5
danger 132:13

139:9
dangerous
154:21 166:13
166:16,16
dangerously
139:5,10
Darren 61:12
62:9
Darrisaw 117:23
118:8 121:12
dash 14:5 15:2,14
15:24 16:7,13
16:15,23,24
17:2,3 40:17
118:2
date 31:3 33:15
33:15 34:2
35:22 85:2,2
dated 3:18,24
18:20 37:22
dates 84:18
Daubert 58:13,16
58:22
day 1:24 5:12
7:13 72:23
145:6 165:8
181:11
de-escalate 90:13
108:4,20 154:14
de-escalating
105:24
de-escalation
90:17
deadly 74:11,14
86:5 131:12
deal 23:11 65:10
71:21 82:12
83:25 86:20
97:10 101:20
128:18 134:15
143:15 160:22
dealing 66:25
70:9 126:18
deals 88:9
dealt 64:25

106:10 115:24
death 21:14 22:5
22:9,11,16,17
40:5,18 116:7
118:11 119:1
122:4 151:16
166:22 167:1
Deceased 1:3
December 85:4
decide 32:10
decision 74:16
76:10,15 99:9
105:20 112:22
113:2 139:18
decisions 73:19
defend 100:11
defendants 1:17
1:19 2:12 5:7
8:12
Defendants' 3:12
defense 20:24
21:19 50:22
56:19
defensive 78:1
define 96:19
173:25
degree 70:25
103:2,14 140:2
163:1
degrees 82:13
delayed 94:15
delirium 114:25
115:5 116:3
118:13,14
132:11,14 142:8
142:10 166:10
166:11,20
Demand 4:5
demanded 64:18
demonstrate
106:7 141:21
154:16
demonstrated
60:2
demonstrates

140:9
demonstrating
111:13
department 1:15
4:2 25:24 39:12
40:16 41:2
67:16 68:25
71:4,5,5 79:17
79:20 85:21
93:5 151:17,22
152:3,22 153:14
169:8,10
departments
69:20 151:14
depending 98:4
100:14 157:6
depends 71:3
96:19 97:19
162:25
DEPONENT
180:1
deposition 1:18
3:13 5:5,17
6:18,21 7:6 8:1
8:20 9:14,18,21
10:12,18 24:24
25:7,12 26:10
27:20,20,25
28:3,4,7,9,10,11
28:15,24 30:18
30:22 31:22
32:15 33:11
36:19 37:16
39:9,23 40:9,21
41:6,23 43:8,17
45:20 48:25
49:10,15,16,19
52:11 53:9,13
59:16 120:20
122:12,25 160:3
165:13 179:18
179:20 180:2
depositions 5:16
5:24 8:15 9:7
24:18 25:2,4

31:15,19 36:17
46:15 49:21
50:4,13 51:4
52:14 163:22
depresses 140:23
deputies 71:6
74:10
deputy 67:21,25
74:9,23 75:25
84:21
describe 137:25
describing
171:17,24
designed 81:23
desire 135:17
detached 57:8
detention 166:24
determination
149:20
determine 128:17
175:20 179:5
determined
110:24 112:20
152:3
determines 157:6
determining
156:12
develop 68:3
developed 151:15
Devices 4:3 41:3
devoted 85:25
diagnosis 115:4,5
121:18 166:18
diaphragm
171:19
died 128:14
difference 22:9
168:22 171:11
differences
168:20
different 26:19
26:23 35:24
37:14,19 42:17
50:6 64:19
67:14 75:19

80:18,19 86:23
90:12 91:12
98:1,1 100:4
101:15 102:23
115:8,13 118:15
124:9,21 135:4
135:10 158:23
160:6 168:10
**differently** 72:11
72:25 99:17
100:8 135:14,15
136:11 162:15
164:11
**difficult** 103:14
125:23 132:5
154:3,8,10,11
154:18,20
**difficulty** 103:21
**digital** 67:3,5,19
68:7,13,23 69:7
70:1
**direct** 3:5 165:9
167:17
**direction** 181:8
**directly** 92:21
**director** 160:1
**disagree** 28:16
102:20 103:5,7
122:21
**disallowed** 60:16
60:21 63:12
**Disc** 14:6,19 16:5
16:19
**discipline** 74:9
76:17
**disclosed** 27:5
**disclosure** 6:1,7
**discount** 7:10
**discoverable** 36:3
36:4
**discovery** 11:20
11:21 21:24
32:8
**Discs** 15:24
**discuss** 118:18

141:17
**discussed** 116:16
146:13
**discusses** 118:7
**discussion** 26:13
120:15 123:14
164:23 166:9
179:16
**dislike** 135:17
**disorder** 105:16
105:23
**disordered** 154:7
**dispatch** 105:9
110:10 138:9
**dispute** 141:18
141:19
**disqualified** 6:11
**distance** 26:4
139:8
**distress** 147:15
147:25 149:18
**distressed** 96:7
96:12
**district** 1:1,1
60:13
**DIVISION** 1:2
**docs** 20:10 21:5
**doctor** 19:5,13,23
85:15 115:16
118:10
**document** 29:21
36:6,7 122:16
**documents** 11:13
18:3
**doing** 29:17,18
54:24 67:7
72:12 74:11
75:7 84:24
100:8 102:11
108:8 126:9
127:20 137:23
141:5 145:16
146:19
**dollar** 56:23
**dollars** 30:8,21

48:14
**Dolton** 56:11
**Dontre** 56:11,17
**door** 57:10,10,14
112:19 113:4
139:7,16
**dot** 15:9 16:6,19
16:20 18:6
**doubt** 103:21
106:7 109:2
140:11 154:2
**dozen** 74:17,25
76:4,6,22 164:1
**Dr** 19:3,9 38:23
40:5 85:13
117:23 118:8
121:8,12
**draft** 33:4,6,14
33:16 34:7,12
34:18,24 35:3
35:14 47:5
**drafting** 31:25
33:3 35:6 38:7
38:8,12,13
46:25
**drafts** 33:9 36:3
**drive** 3:14 10:7
10:10,11,15,23
11:4,8,11,16,22
12:5 13:8,22
18:25 19:1 23:8
23:13 43:10,12
99:25 123:22
124:15 125:5,9
125:11 144:5
**driving** 69:22
**drop-down** 34:15
34:19,23 35:5
**Dropbox** 13:1,4,5
13:11,12,15,16
13:20,23 20:15
**drug** 21:9 115:8
140:22 141:1,20
142:12 166:21
**drugs** 141:12,14

**DSM** 115:4
**Dudley** 1:12
15:18,21 90:21
90:23 93:18
105:8 110:10,15
127:13 128:7
129:8 133:5
154:2 164:12
**due** 76:10 103:15
**duly** 8:7
**duplicates** 12:23
16:23
**duration** 118:2
**duties** 65:25 66:3
66:5,7,11
**duty** 168:24
**DVD** 13:21
**DVDs** 13:12
**Dyksma** 47:17
48:5,23 49:1,3
160:2
**dynamics** 84:7

------

**E**

**earlier** 11:15
104:16 109:24
121:25 122:5
123:22 131:15
134:21
**earliest** 49:10
**early** 49:16
109:17 143:22
**easy** 154:19
**effect** 3:20 142:19
169:1
**effecting** 99:18
**effectuate** 99:16
130:6 162:25
**effectuated** 135:7
**effectuating** 142:11
**efforts** 136:17
137:1 147:3
**eight** 17:10
**Eighty-five** 85:21

**either** 13:12
15:14 32:4 67:7
96:3 102:9
108:20 119:1
150:7
**eleven-week** 167:6
**emails** 31:20
**emergency** 22:21
**empathy** 135:20
**employment** 29:19 52:5 63:1
**EMS** 22:19,19
90:15 92:19,19
92:22 94:16
95:5,11,14
105:9 106:17
110:11,16
116:25 119:14
119:16 123:18
124:19 125:11
147:13 148:1,8
148:9,23 149:2
149:2,19,19
150:14,16,22,25
151:7 169:22
170:3,4,6,12
**encountered** 168:12
**ended** 25:17 51:2
66:5
**enforcement** 3:23
4:1 40:4 50:15
50:18 52:2
53:18,19 73:11
73:23 74:1 78:3
78:6,9 142:16
145:6 152:8
153:3 161:15
163:6 164:4
**engage** 90:15,15
**engaged** 109:7
110:24
**engagement** 109:24

engaging 111:22
enhance 36:11
enhanced 115:7
enjoy 145:16
enjoys 145:16
enter 69:12
entire 10:4 11:5
  42:25 43:19,22
entirety 137:15
entitled 100:11
  100:25
entries 32:24
entry 33:17 47:6
  69:14,16
episode 90:14
  102:1 105:23
  107:16 111:24
  133:25 154:8
equally 28:24
errata 28:11,19
error 48:12,13
escalate 134:1
  136:3
escalated 111:12
  111:17 154:14
escalating 108:21
escape 156:14,23
  177:25
especially 69:13
  105:24 111:12
  137:18 154:16
  156:5,10 160:12
  166:20,21
  170:11,12
essentially 32:18
  63:20 79:18
  104:3 135:5
established 53:15
Estate 1:5 61:11
  61:18
estimate 46:20
  47:7 53:24 54:4
  164:1
et 5:25 45:10
eval 105:9 107:5

110:5,11,16
  170:10
evaluating
  107:23
evaluation
  125:12 170:14
event 125:10
events 125:9
Everybody 80:6
everyday 71:1
everything's 53:3
evidence 33:12
  59:11 67:5 88:5
  94:19 162:12
  174:23 176:1
Evrard 1:13 14:5
  14:21,25 15:3
  17:7 18:5 90:21
  93:18 133:1
  138:17 150:4
  164:13 173:1,11
  174:25 178:18
Evrard's 14:14
  137:11
exactly 94:21
  109:16 110:1
  166:12
examination 3:1
  8:8 165:9
examiner 118:7
example 99:19
exception 21:20
excessive 57:24
  59:17,21 76:8
  76:15 89:6
  104:7,11,13,18
  104:20 131:7
  134:10 156:7
  157:20
exchange 133:18
  133:20 134:22
  135:3 136:20
excited 114:24
  115:5,6 116:3
  118:13,14

132:11,14 142:7
  142:10 166:10
  166:11,20
exclude 56:4,4
exclusive 7:2
exhibit 3:10 9:18
  9:21,24,25
  10:16,18,24
  11:8,16 12:5
  18:13 20:5,6,7
  23:13 24:20,21
  24:24 26:9,10
  26:15,16 30:13
  30:15,16,17,18
  30:20,22,25
  31:2 32:2 37:11
  37:16,22 38:2
  39:4,9,23 40:8
  40:9,20,21 41:5
  41:6,23 43:7,12
  43:13,14,18
  44:25 49:10
  53:8 83:4,5
  85:10 94:2
  120:16,20,24
  122:12,15,25
  123:3 124:2,8
  124:14 125:4
  140:13 141:13
  144:5
exhibited 140:20
  141:14
exhibits 151:18
  158:9
exist 13:7
existence 166:11
exists 23:8
exonerated 76:20
expand 171:20
expected 103:9
expedite 170:1
  171:1
experience 27:1
  51:24 65:13
  83:7,8 111:10

160:4 161:11,15
  169:6 171:13
expert 3:17 8:13
  19:14 27:6
  29:16 30:17
  49:7 50:17
  51:10,16 52:2
  59:5 63:4 64:9
  74:4 82:22
  87:10 114:22
  115:14,17,21
  118:19 162:4
  163:13 164:3
expertise 60:3
  65:8
experts 58:20
explain 59:7 71:4
  101:18 160:15
  166:15
explained 86:8
exploitation 67:5
explore 133:3
exploring 59:3,10
exposed 167:11
expressly 5:19
extended 89:7
  111:8
extends 77:17
extensive 85:25
extent 58:7 85:10
  108:16 115:24
  117:24 163:22
  164:16
extreme 98:4
extremely 109:1
eyewitnesses
  102:20

_____

F

F 2:6
faced 142:11
  154:3
fact 72:9,23 86:8
  89:20 94:10
  108:13 114:19

118:8 119:24
  120:1,11 129:18
  132:10 144:13
  146:9 160:25
  172:1,13,22
  173:6
factors 157:6
facts 57:1 58:3
fails 157:17
fair 9:5 20:22
  37:1 129:4
  131:2
fairly 47:3 102:24
familiar 14:2,10
  61:13 78:8
  161:18
family 22:6
farmers 76:12
fashion 55:5 58:2
  75:16 166:13
fault 99:10
FBI 3:23 40:4
  152:7,8 153:2
Federal 60:12
  179:19
fee 30:1
feel 138:4
fees 3:15 24:22
  52:11
feet 96:24,25,25
felt 72:24 95:4
  135:25 169:24
fifteen 120:6
fifth 84:22
fifty 30:5
fight 71:20 72:22
  100:24 102:15
  102:22 137:5
  140:3 142:3,3
  143:15 145:12
  145:15,16
  148:19,21
  154:15
fighting 74:23
  75:7 101:3

115:7 132:9,15
**fights** 74:18,22
**figure** 76:1
**file** 1:9 10:4,7
11:5 16:6,13
21:16 23:15
38:20 42:25
43:19,22
**filed** 61:8 62:3,15
**files** 15:9,10
16:19,20 17:21
18:6,8 144:6
**filing** 5:24,24
**final** 33:14,15
35:21,21
**finalized** 18:17
18:23
**finally** 138:9
149:6
**financial** 7:10
**find** 27:12 42:12
133:20
**findings/** 121:17
**fine** 103:10
**fingers** 138:19
173:2 176:23
177:2 178:13,16
**finish** 9:9 27:14
38:13
**finished** 34:11,17
**fired** 25:23 59:22
**first** 8:7 11:7 12:6
12:10 21:6 24:1
24:9,11,16 33:4
34:7,12,18,24
35:3,13 38:6
46:17,17 47:6
49:15 63:24
77:13 85:7
86:17 91:4
94:14 97:19
98:7 101:17
118:5 125:8
127:1 129:16
136:16 139:3

154:1 159:14
160:14 174:20
177:5,18
**fit** 54:13 91:15
**five** 17:10 50:25
164:20 167:5
**flashlight** 75:3,5
**flip** 113:21 121:1
121:14 126:15
**flipping** 37:8
138:7
**Floor** 1:23 2:15
5:10
**fluid** 73:14
**focusing** 144:8
**folder** 12:6,7,16
12:25,25 13:6
14:4,6,15,20
15:7,17,23,25
16:5,6,18,24,25
17:6,17,19,25
18:4 20:9 21:7
22:4,16,19,23
22:24,24 23:4,5
**folders** 11:13
13:24,25 20:16
22:3
**folks** 22:21 68:12
105:25 147:13
148:1,23 149:19
**follow** 124:1
**followed** 126:2
150:22
**following** 6:7
166:22
**follows** 8:8
**force** 50:8 51:17
52:8 53:17 56:8
63:20,23 64:9
73:25 74:6,11
74:14 75:5 76:8
76:15,24 77:3,6
77:11,21 82:21
83:10,21 84:1,7
84:8,10,25 85:9

85:25 86:1,5,6
86:8,20,21,24
86:25 87:11,24
88:1,10 89:5
100:25 104:6,10
131:2,8,12,16
134:10 142:18
142:24 153:18
156:3,12,15
157:3,5,6,15,23
158:7,8 160:5
160:10,19,24
161:11 162:24
165:23 169:1
**forces** 156:10
**Ford** 1:22 2:14
5:10 6:17
**foregoing** 181:5
**foremost** 98:7
**forensic** 82:16
85:12,20
**form** 5:20 10:6
43:3 65:19
75:15 103:16
116:15 130:14
144:15 149:1,22
150:18,20
164:15 165:20
167:25 168:15
171:15 179:21
**formal** 75:20 77:2
**FORMALITIES**
5:13,23
**forth** 42:17 86:2
104:21 153:16
**forwarded** 34:12
**fought** 71:13
72:18
**found** 61:9 63:7
63:11 76:8
122:9 166:18
**foundation** 100:5
**four** 12:9 15:8,18
17:10 32:24
38:11,12 48:14

50:25 52:23,25
53:23 56:25
58:20
**fourth** 14:20 86:3
86:16,18
**frames** 158:12,13
158:20,23,25
159:2
**frankly** 20:14
58:5 60:4 80:1
108:1
**fraud** 51:22
67:10,13,14
68:5,13 69:6
70:1
**free** 81:21
**Fresno** 56:13
57:4
**Friend** 1:7
**front** 11:3 23:16
37:5 57:10,12
133:23
**full** 146:1
**full-semester**
80:25
**fully** 96:18
**function** 3:21
171:20
**further** 36:25
49:14 120:2
122:4 129:23
138:17 146:1
180:1
**furthered** 87:18

─────────
**G**

**G-A-M-E-Z**
85:16
**Gamez** 85:13,16
**garage** 57:8
**Garner** 86:12,13
**general** 12:12
64:2 67:20,23
77:10 88:19,23
105:16

**generally** 14:24
89:12 137:17
163:7 167:3
**generically** 90:9
**Georgia** 1:1,10
1:21,23 2:7,17
5:7,11 6:3,7,9
16:3 42:8 61:6
61:9 71:15 92:1
92:5 152:19,20
153:2,6,15,16
165:12,15 167:2
167:6 181:1
**Gerald** 58:17
**getting** 89:7
90:25 99:12
103:21 126:6
165:8
**give** 9:9 32:9
52:13 54:6
62:17 63:18
77:22 99:19
121:4
**given** 7:11 8:14
18:20 27:19,20
28:24 45:5
49:21 53:9
156:2 157:14
160:24 170:7
**gives** 141:23
**giving** 163:1
**go** 10:13,16,20
11:7,9 14:18
23:14,17,22,23
24:10 49:13
51:5 55:23 69:3
69:15 79:1 80:4
81:21 82:8
84:20 85:6 98:2
101:7 104:1,23
104:24 105:8
111:11 116:15
120:9,23 139:15
143:7,7,8,8
145:17,17

157:11 160:21
164:15,25 168:1
169:13,16,16
170:2
**goal** 106:1 155:25
**goes** 112:7 138:17
152:24
**going** 8:19 9:3
10:12 11:11,12
11:12 13:21
20:20 24:10,19
35:12 36:2 43:7
43:13,17 47:2
57:10 59:3,7,10
59:20 61:21,25
69:6 70:22
76:16 88:20
89:10 91:15
93:16 98:9,11
101:14 105:19
106:23,24 107:4
110:4 111:12
112:22 114:6
116:21 118:10
120:7,17,18
128:17 131:5
136:13 140:24
143:8 150:24
154:15,15,18
157:9 158:9,11
163:3 164:21
165:2,6 168:25
169:7,11 170:23
174:10 177:15
177:16
**Gonzalez** 61:19
**good** 9:8,17 96:21
108:8 113:2
121:3 128:21
134:23 144:11
144:13 148:11
160:8 161:19
179:2
**Gotcha** 71:25
79:25

**gotten** 130:7
**Government** 1:10
11:18
**grab** 96:24,25
138:18 139:18
173:2 176:23
**grabbing** 177:2
178:13
**grabs** 126:5
178:15
**graduate** 84:13
**graduated** 83:24
84:13
**Graham** 86:13
156:4,11 157:2
157:15,24 158:2
158:4 165:17,23
166:1
**great** 83:25 85:9
86:20 100:2
103:2,3
**greater** 141:13
**Greg** 159:21
**Gregory** 20:2
**ground** 89:20
99:12,23 102:6
102:8,24,25
103:8,20 111:25
117:6,10 119:7
127:23 168:19
**guess** 38:18 54:16
55:22 63:9 74:3
75:8 111:20
117:5 162:2
165:1
**guide** 98:9
**gun** 80:6
**guy** 19:11
**guys** 55:22 69:1
69:19

**H**

**half** 33:22 74:17
74:25 76:4,6,22
129:13,22 164:1

**Hall** 86:19
**hand** 178:14
**handcuff** 95:24
117:10 129:9
136:17
**handcuffed** 89:8
96:3,7,22 97:10
103:21 111:25
130:7,18 131:4
132:6,18 137:12
149:25 166:7
174:21 178:15
**handcuffing** 4:3
41:2 104:21
127:23 128:15
129:24 130:13
130:19,25
131:17 149:6
153:18 166:24
167:7 168:3
**handcuffs** 89:21
98:4,12 99:12
116:12,21 117:7
117:16 126:4
137:8 138:9
155:9 156:6
169:5 172:9,14
173:9,20 174:5
174:11 175:15
177:13,17 178:4
178:8
**handgun** 77:15
**handle** 150:14
**handled** 88:24
137:23
**hands** 69:8 70:8
138:4
**hands-on** 70:15
**happen** 73:16
115:13 171:2
**happened** 42:21
57:12 58:19
69:18 100:3,23
102:7 103:7
118:12 128:2,18

**happening**
146:12
**happens** 16:11
117:15 129:19
**happy** 165:8
**hard** 13:21 103:4
106:8
**Harmening** 1:18
3:2 5:6 8:6 55:3
165:11
**hawing** 161:13
**head** 8:18 9:2
52:20 66:10
68:6 72:2,20
118:1 124:3
132:19 146:17
165:3
**health** 90:16
167:10 169:8
**hear** 36:11
124:25 174:24
178:21 179:1,7
**heard** 55:10
136:21 144:25
167:21
**hearing** 5:22
**hears** 167:22
**heart** 115:12
**heck** 102:15,22
**Hector** 1:3,5,6,6
1:6 88:24 99:23
122:20 134:7
139:11 166:6
167:14 170:24
**Hector's** 120:1
170:7
**held** 78:15
**help** 61:21 97:24
98:19 147:13
**hemming** 161:13
**high** 142:2
**high-powered**
26:5
**high-speed** 57:6
**hire** 32:11,12

**hired** 8:13 50:22
51:9 52:2,13
164:3
**hiring** 51:2
**hit** 138:25
**hold** 63:18 96:25
115:20
**holding** 91:7,8,23
**home** 71:24
**honestly** 58:21
60:8
**hopefully** 170:1
**hoping** 59:13
**hospital** 101:8
112:1 123:7,9
**hour** 46:8
**hourly** 30:4
**hours** 38:4,7,7,11
38:12,13,15
84:6 143:22
**house** 13:15 57:7
105:5 139:7
**hundred** 30:5,5,8
30:21 52:23,25
53:23 120:6
**hurry** 169:22
**hurt** 139:12
177:21
**hypothetical**
168:1,16

**I**

**ID** 79:23
**idea** 61:23
**IDENTIFICA...**
9:19 10:19
24:25 26:11
30:19,23 37:17
39:10,24 40:10
40:22 41:7,24
120:21 122:13
123:1
**ignored** 162:8
**Illinois** 56:11
67:15,20,23

71:8 74:12,12
79:2 83:12,24
84:13 88:2
159:25
**illness** 85:1 90:11
90:13,18 115:8
166:21
**Imee** 1:7
**immediately**
57:13 106:5,6
109:12 110:17
110:25 114:11
116:25 169:19
170:11
**importance**
133:17
**important** 118:17
**impossible** 155:8
**improper** 95:6
168:1,15
**inaccurate** 28:16
29:1
**inadequacy** 65:3
**inadequate** 65:1
**inappropriate**
57:24 59:17,21
134:8
**Incidentally** 22:8
132:20 144:4
**include** 18:2 32:5
53:2 87:20 88:3
88:4 127:6
153:21 156:11
**included** 29:6
32:18,21 43:21
81:3 84:6,9
116:25 117:1
125:9 166:2
**includes** 31:25
150:4
**including** 5:24
130:9 139:6
157:7
**inconsistencies**
127:8

**incorporated**
125:12
**incorrect** 29:1
**increase** 100:8
**increased** 166:22
**INDEX** 3:1,10
**Indiana** 60:14
**Indianapolis**
58:17,18 60:12
**indicated** 34:4,6
119:17 127:19
167:15
**indicates** 35:2
**indicating** 171:8
**indication** 117:22
168:3
**indifferent** 148:3
150:8,13,15
**indirect** 42:6
**indirectly** 159:25
**individual** 1:11
1:12,14,16
75:22 101:25
128:16 130:18
130:20 131:23
132:11 140:7
144:2 154:6,7
157:4 168:18,25
170:24
**information** 10:2
23:12 28:23
30:10 43:2
124:23
**informed** 105:21
**inhale** 155:6
**inhibit** 168:9
**initial** 31:13,21
31:23,24,25
32:9,15,18 36:3
88:1
**initially** 98:20
109:7
**inside** 105:5
**instance** 50:3
127:12

**instances** 63:10
72:3,21
**instruction** 84:5
84:6 153:6
**instructional**
166:2
**instructor** 84:2
84:11,23 88:9
**instructors** 85:7
152:14,17,25
153:22
**intend** 92:9 94:11
**intended** 26:1
63:13
**intention** 136:9
**interaction**
118:12 127:21
**interest** 6:12
**interested** 51:6
56:5 74:4,6
87:8 88:21
128:3,4
**internal** 74:15
**internally** 127:8
**International**
153:17
**interrupt** 27:5
**interrupted**
27:14
**intervention**
63:22 64:6
80:25 82:17
86:19 90:8
106:21 167:8
**interview** 14:17
15:6 18:6,7
128:17
**interviewed** 46:9
93:11
**interviewer** 129:3
**interviewers**
128:8,21
**interviews** 17:7
17:11,14 18:5,9
164:13

**introduction**
105:3
**investigate** 74:1
**investigated** 74:7
75:10,14 76:20
**investigating**
67:21 76:24
77:6,21
**investigation**
12:22 17:18
74:15 75:18
77:7 164:14
**investigations**
67:25 76:6,23
**investigative**
17:14 18:2
75:21 81:1
82:17 83:23
87:13
**investigator** 59:4
59:8,12
**investigators**
133:2
**investment** 51:22
67:10,12 68:5
68:13 69:6 70:1
**invoice** 3:18
30:11,21 31:2,7
31:12,13,14,18
31:19,21,24
32:3,19,22
33:13 34:4,22
35:12 38:3 45:6
46:19,22 48:9
48:10,13
**invoiced** 31:4
34:2
**invoices** 33:2
**invoicing** 31:12
**involuntary**
102:3 105:19
106:14,23
109:21,23,25
110:12 150:24
169:7,9,12

170:8
**involve** 76:7
87:23
**involved** 42:13
53:8 68:12,12
68:16 70:15,24
72:22 75:4
76:23,24 93:18
160:24 163:25
**involvement**
48:22 61:24
**involves** 90:10,11
**involving** 53:17
67:5 74:18
131:22 152:17
**irrational** 154:13
**issue** 28:18 33:22
86:25 128:9,15
128:18,19
**issues** 86:10
90:22 118:7
133:3 167:10
**it'll** 27:25
**italicized** 152:10
**item** 24:16 26:7
34:9 38:8,18,19
43:21 44:4,6,8
84:17,22 86:3
86:16
**items** 11:22,22
12:1,2,10,12,21
12:21 13:15
18:13,13 19:2
21:18 23:16
24:3 32:1 38:21
38:25 42:17
82:21 83:18
87:9 117:5

---

**J**

**JAMES** 2:14
**January** 16:7
32:25 33:18
34:3 35:14,25
37:3 47:6

jcc@psstf.com
2:18
**Jezreel** 1:7
**Jim** 8:11 21:15
23:19
**job** 9:8 128:21
**John** 145:7,11,22
**Johnson** 56:11,17
56:19
**Jones** 47:14,15
47:19
**JPG** 16:20
**JR** 2:14
**judge** 57:17 58:1
58:12 59:25
**judgment** 61:10
154:13 156:17
**judgmental**
134:2,5
**judgments** 73:20
**Judicial** 6:6
**July** 27:20 28:24
**jump** 64:23
123:22
**jumping** 125:15
**June** 18:20 24:18
33:24 35:23,25
36:24 37:23
**Jury** 4:5
**justice** 40:16
82:18
**justified** 58:4
131:13
**juvenile** 82:18

**K**

**K** 56:12
**K17-01** 17:8
**Keel** 18:7,11,11
**keep** 13:21 31:15
108:20 120:18
136:3 141:5
165:7 170:23
**kick** 177:8
**kicking** 130:9

132:5 173:4
177:5,6 179:2
**kid** 82:1 101:8
**kill** 114:6
**killed** 57:15
**killing** 25:18
**kind** 11:9 31:10
69:22 86:25
104:24 147:15
**knew** 75:23 76:12
102:1,2 105:18
106:14,19,22,24
107:3,12 109:21
109:25 110:5,12
147:12,14,17,24
170:10
**knocked** 113:3
**knocking** 112:19
**know** 8:14,14,17
8:21 9:1 12:12
15:25 16:21
17:12 20:14
25:8 28:20 33:8
36:5 42:15,21
42:22 51:8
52:20,21 55:12
55:14,21,23
57:20 58:6,21
59:9,24 60:4,8
60:9,10,18
61:25 62:5,24
63:16 66:8
70:13,23 76:12
77:5,20 85:19
86:10 88:3
94:24 96:8
101:23 102:2
103:18 106:8
107:1,7,13,19
107:20,22,24
108:16 111:9,18
114:24 117:14
118:11 119:13
123:23 129:15
132:12 134:6,8

135:19,22,24
140:22 142:9
143:7 144:10,24
145:17 147:22
150:7 151:21,25
151:25 152:2,24
153:15,15,19,23
155:20 156:23
156:24 158:19
158:20 159:14
159:21,23,24,24
160:2 162:18
165:8 169:13
171:25 172:24
173:1,5,7,22,24
175:7,10,21,23
176:8,15,16,17
178:14,16,24,25
179:9
**knowing** 169:11
**knowledge** 87:17
87:18 90:18
111:10
**known** 106:15
**knows** 106:9

**L**

**LA** 85:13,21
**lab** 12:14 21:6,9
**label** 20:12,13
**labeled** 12:13,25
14:4 20:10,17
21:17 22:3
43:14
**labored** 114:8
168:4,14 169:21
**labs** 21:14 22:5,9
22:10
**Land** 83:12,14,15
84:2
**language** 59:24
**large** 51:23 75:3
103:13 140:2
**late** 165:8
**laundering** 67:14

**Laura** 117:23
**law** 1:21 2:5,6,15
3:23 4:1 5:9
6:16 40:4 50:14
50:18 52:2
53:18,19 73:10
73:22 74:1 78:3
78:5,8,9 132:23
142:16 145:6
152:8 153:2
161:14 163:6
164:3
**lawsuit** 8:12
41:12 42:5,7,13
42:15,21
**lawsuits** 42:17
76:5,21
**lawyer** 79:13
**lay** 135:23
**laying** 69:8 70:8
**layman's** 98:16
**leads** 144:10
**learned** 107:8
**leave** 106:24
132:1 161:17,20
**left** 70:2
**legal** 86:10,11,14
156:17
**legality** 86:14
**legally** 112:3
**legit** 76:1
**legitimate** 166:18
**legs** 126:5 130:9
130:10,21
173:12 179:2
**length** 89:1 162:6
**lengthy** 8:20 58:6
166:25
**lesser** 92:17
**let's** 11:7 16:4,11
20:9 23:11,17
23:20,24 24:20
26:9 30:12 39:6
51:7 77:12 94:1
123:17 133:12

141:12 166:9
**letting** 9:8
**level** 54:20 65:4
65:16 75:9
137:25 157:5
**library** 42:16
**license** 79:10
**Licenses** 83:22
87:13
**lies** 51:24 149:5,5
**limited** 57:16,19
**Lincoln** 83:12,14
83:15 84:2
**line** 36:10 38:6,8
38:11 130:3
145:18 162:11
174:7
**lines** 84:3 125:18
**link** 13:1,4,5,12
13:16
**list** 3:15 24:17,22
36:18 49:9,9
52:10,12,17
54:7 55:3,7,8
94:6
**listed** 49:10 50:13
119:1 122:5
**listen** 174:7
**listening** 36:10
**lists** 52:11
**literally** 44:24
**litigation** 7:11
27:18 37:25
51:16 52:6
**little** 19:19 34:22
60:20 113:12
125:15 134:23
146:3 164:11
173:12
**living** 29:14
**LLC** 2:5
**local** 70:2
**location** 139:6
**long** 26:4 28:6
31:10 46:7 49:6

49:18 72:1
89:24 99:4
104:11 107:19
107:24 116:17
116:20,24
137:23 139:22
158:15 170:5
**longer** 111:11
174:8
**look** 12:8 14:23
47:23 83:3
90:12 91:9 94:1
107:5 124:20
136:25 162:18
164:21 174:6
**looked** 43:20
45:23 55:9
94:20 135:24
**looking** 16:16
21:17 82:11
107:25,25 127:6
128:3 131:11
145:12
**looks** 25:3 30:25
39:5 47:5 49:24
**lost** 19:24
**lot** 25:24 53:7
71:13,14,19
86:23 88:9
101:12 115:12
118:14 134:12
134:12,13
137:23 160:4
161:11
**lots** 115:8
**Louisiana** 80:3
**love** 145:15,16
**Lung** 3:21

**M**

**M** 1:18,19 3:2 5:5
5:8 6:3 7:14 8:6
18:7 181:16
**M-E-N-A-R-D**
71:8

**mail** 67:14
**main** 16:4,18,24
18:1 92:13
**major** 64:13,15
**majority** 90:17
136:16
**making** 69:8
73:12 110:20
113:23 135:21
142:25 156:16
**man** 161:19
**manifestations**
115:10
**manner** 97:25
**Manual** 4:3
**Manuel** 61:18,19
**marijuana**
140:23
**mark** 2:5,5 10:15
11:23 13:11
21:17 24:19,21
26:9 30:12
35:16 37:9 39:3
39:19 40:7,19
41:4 48:10
54:16 55:16
120:18,23
**marked** 9:18,20
10:18,24 24:24
26:10,15 30:14
30:18,22 37:16
38:18 39:9,23
40:9,21 41:6,23
94:2 120:20,25
122:12,14,25
123:2,3
**marks** 121:4
**Maryland** 25:13
25:15
**material** 13:17
18:24
**materials** 10:25
11:3,17 16:2
**math** 72:2
**matter** 12:15

52:3,4 95:4
127:5 133:8
**matters** 5:15
**Matthew** 61:6
**mean** 18:19 20:11
22:6 27:4 34:19
34:20 46:21
63:6 71:20
74:22 75:6 77:4
77:10 94:25
98:17 100:7,12
100:15 103:12
110:20 115:2,19
124:11 126:11
135:23,24
138:12 145:3,5
150:19 153:2
154:5 156:8
157:1 177:18,21
177:25 178:14
179:1
**meaning** 66:7
95:18 98:16,18
117:23 120:1
**meaningful**
128:12
**means** 114:25
118:14 157:19
**measures** 98:4
**mechanics** 86:1
**medical** 21:20
22:21,23,25
118:7,19 141:17
141:18 147:3,8
147:15,25 148:6
148:7 149:18
150:9,19 166:18
167:23
**medically** 155:20
163:16 170:24
**meet** 156:20
**meetings** 31:20
**memory** 14:24
**Menard** 71:8
74:19

**mental** 84:25
90:11,12,15,18
115:8 166:21
167:10,10 169:8
**mentality** 101:5
**mentally-ill**
132:10,13
**mention** 118:4
119:5 138:8
**mentioned** 10:10
11:20 67:8 80:8
105:3 113:7
117:22 120:23
122:5 161:1
165:11,16,18
**messed** 41:18
**met** 8:12 46:5
**methampheta...**
121:23 122:6
140:25
**methampheta...**
114:20 122:9
140:13,19
**Metropolitan**
58:18
**Mexico** 61:18
62:23
**Michael** 1:11
129:6
**middle** 1:1 90:13
102:1 107:16
111:23 133:25
**midnights** 71:10
**midst** 105:23
154:7
**might've** 140:20
**miles** 71:11
**million** 56:25
**mind** 72:8 93:19
98:2 101:7,10
101:20,23 102:5
102:8
**minor** 1:6
**minute** 10:14,21
18:15 111:21

113:12 114:14
164:10
**minutes** 113:14
149:6 150:3
164:20
**mirrors** 153:17
**mistakes** 73:4
**mistreat** 135:18
**model** 153:16
156:10
**Mom** 114:5
**moment** 110:3
**money** 31:11
67:13
**monitor** 96:2
168:6
**month** 47:7 72:24
**moot** 61:9
**morning** 46:5
143:22
**mother** 107:21
**motion** 58:13,16
58:22,25 62:3,5
62:6,16,24 63:5
**motions** 60:25
**motorcycle** 57:3
**mount** 97:1,3,4
126:7
**MOV** 15:9 16:19
**moved** 80:3,3
**movement**
138:22
**movie** 14:7
**moving** 77:7
117:18 158:17
173:11,12
**mpost@markp...**
2:8
**MUSCOGEE**
181:2

**N**

**name** 19:17 20:1
47:10 48:3
55:17 56:12

**National** 4:1
**nature** 81:5 92:6
**near** 108:25
**necess** 168:24
**necessarily**
  126:11 129:17
  156:4 157:15,24
**necessary** 97:15
  117:11 142:19
  142:24 169:1
**neck** 117:14
  118:1 132:18
**need** 8:20 9:1
  11:9,10 22:15
  29:6 106:17,23
  107:4 115:16
  142:11 165:6
  168:5 169:24
**needed** 69:15
  106:16,16,20
  112:20 143:3
**negotiate** 133:24
**neighbor's** 113:4
  139:7
**neighbors** 139:12
**never** 31:11
  75:11,11 85:18
  128:8,25 131:1
  131:16 163:20
**new** 4:2 41:1,17
  41:19 61:18
  62:23 84:5
  151:16 152:2
  167:9
**nice** 136:2
**night** 71:13 72:18
  72:19 75:7
**nights** 71:24
**nine** 17:10
**Nods** 8:18 9:2
  66:10 68:6
  72:20 124:3
  165:3
**non-attorney**
  86:10

**non-CIT** 99:17
**noncompliance**
  165:11
**nondisclosure**
  55:13
**nonmedical**
  118:9
**nonpayment**
  61:25
**normal** 109:1
  110:21,25
**north** 61:13
**note** 116:11
  125:16
**noted** 167:13
**notes** 44:8,11,12
  44:13,15,20
  113:23 138:24
  164:21
**notice** 3:13 5:13
  5:14,24 9:21,25
  22:8 43:8,17
**noticed** 48:10
**number** 9:18
  10:18 16:1
  24:24 26:10
  30:18,22 32:12
  37:16 38:21
  39:9,23 40:9,21
  41:6,23 43:21
  43:25 44:3 45:3
  45:8,10,14,16
  49:15 53:12
  63:6 64:13,15
  68:19 74:10
  79:17 81:15
  84:6 88:24,25
  89:17 90:10
  101:15 105:15
  105:18,21
  106:15 115:9
  118:1 120:20
  122:12,25
  131:25 154:12
  156:21 162:6

167:14,18
168:11 169:6
173:10
**NUMBERS**
120:16
**numerous** 17:20
87:23 130:9

———————
**O**
**O-O-P-S** 17:6
18:4 133:2
**O.C.G.A** 6:13,22
**Oakes** 18:7,10
120:12 146:16
173:14 178:19
**object** 36:2 65:19
103:16 116:15
130:14 144:15
149:1 150:18,20
164:15 165:20
167:25 168:15
171:15
**Objection** 120:7
149:22
**objections** 5:20
179:21
**objective** 165:16
**observe** 166:5
169:21
**observed** 133:4
168:13
**obstructing**
68:24 69:2,18
**obtain** 13:10
**obvious** 96:12
114:7 148:6
155:4
**obviously** 74:3
88:9
**OC** 99:25
**occasion** 47:20
**occasions** 60:20
130:5
**occur** 58:15
115:10

**occurred** 91:6
109:17 110:1
**occurs** 138:1
**October** 181:11
**OFF-THE-RE...**
26:13 120:15
123:14 164:23
179:16
**offender** 64:19
99:21 156:21
168:20
**offense** 98:5
168:23
**offer** 92:9 93:16
93:17 94:11
**offering** 65:15
93:22 116:6
128:20
**Office** 2:16 17:14
17:15,18,22
67:20,22 85:14
**officer** 1:10,12,13
14:1,5,21 15:7
15:17 17:5,7
18:5 25:18,23
26:1,2,3 53:19
57:3,12 59:22
66:12 69:7,13
70:8,23 71:2,3
71:11 73:7,23
74:2 76:25 78:1
78:3,6,9 83:9
96:15 97:13,14
100:7,10,15,21
100:25 105:8
106:9 107:11
126:5 127:3,6
127:13 129:6,18
130:5,11 131:1
131:7 133:1
134:14 135:5,11
142:10,13
154:25 157:3,17
157:22 162:24
163:2 168:11,23

169:8
**officer's** 98:7
126:19 137:1
**officers** 13:3
18:10 25:17
32:13 57:8
69:14 70:3,4
72:10 73:10,11
76:7,20 80:13
80:17,20,23
81:6,11,16,20
81:24 82:11
86:24 88:24
89:13 90:11,21
90:25 91:7,13
91:23 92:4 93:7
93:17 94:15,24
95:18 98:25
99:15,17 101:6
101:9,11,13,19
102:15 103:3,4
103:14 105:18
106:16 107:7
108:2,2,7,12,18
109:6,12,15,24
110:17,23
111:15 112:14
113:2 116:23
117:8,25 125:19
126:20 135:15
135:16,25 136:1
138:3,8 139:4
142:21 143:2
144:6,9,11,14
146:10 147:2,12
147:14,24
148:21 149:16
155:13 163:9
164:12 166:23
170:6 171:9
177:22 178:9
179:7
**officers'** 139:18
**offices** 1:21 5:9
6:16

William M. Harmening   9/23/2019

**official** 1:11,13
1:14,16
**Oh** 20:13 36:18
43:11 47:25
52:22 65:5 73:1
82:24 92:16
101:22 116:4
120:9 124:7
140:8
**okay** 9:17,24 10:9
12:16,20,25
13:7,14,18
14:19 15:4 16:4
16:15,17,17,24
17:17 18:4,12
19:15,25 20:4
20:16,19 21:1
21:11,22 22:8
22:14,15 23:4
23:10 24:5 25:5
25:12,15,25
26:6,9,18 27:9
27:10,17 28:20
29:4,13,17,24
30:7,9 31:17,23
32:17 33:6 34:1
34:3,13,25
36:14,23 37:5
38:6 39:7 40:3
40:15,19 41:20
42:20 43:2,6,16
44:15,23 46:3,7
47:13 48:2,9,16
49:6,17 50:3
51:23 52:10,22
54:1,6 56:1,10
56:14 57:16,21
58:8,15 59:2
60:14,15,19
61:16 62:2,19
62:22 63:3,8,15
64:5,7,12,15,21
65:21,23 66:6
66:25 67:11,24
68:4,21 69:11

70:19 71:9,12
71:17,23 73:6,9
76:6,22 77:9,19
78:7,14,19,25
79:5,18,22 80:6
80:21 82:7 83:6
83:22 84:20
85:17 86:7 87:8
87:14,16,22
88:13 89:22,24
90:19,24 92:2
92:12 93:6 94:4
95:7,13,18,20
98:13 99:3
103:10 109:11
111:19 112:5,10
112:24 113:7
116:18 117:4
119:20 120:14
121:3,22 122:21
124:14 126:22
127:10 128:1,6
128:20 131:4
132:23 134:9,12
134:21 135:13
136:7 138:23
139:14 141:2,7
141:22 142:9
144:18 145:9
146:20 148:4,9
151:13,24 152:6
153:8,11 154:20
155:16 156:1
157:25 160:16
161:2 162:1,9
162:23 163:24
164:2,18 165:25
166:3 167:2,21
171:4 174:19
175:6 179:13,25
**on-scene** 17:7
18:5,9
**once** 47:2 78:9,24
99:9 131:4
146:4 147:4

167:21 169:21
174:21,21
**one's** 21:8,9
**one-half** 134:16
**OneDrive** 13:20
13:22
**ones** 61:5 70:20
75:14 76:19
127:17,17
**ongoing** 54:2,4
**OOPS** 17:14
**open** 11:21 12:6
12:17
**opened** 11:11
**Operations** 4:3
**opinion** 25:22
32:10 57:21,22
58:3 59:16 91:5
94:14 95:1,2,5
95:13,16,21
103:23,23,25
104:2,3,4
105:13 110:11
110:16,18 111:3
111:21 116:6
117:2 118:9
119:21 128:20
128:23 131:1,7
135:3 144:17,21
160:6 161:6,23
170:3
**opinions** 25:20
37:3 43:4 58:12
61:2 65:15
88:20,22,23
89:3,13,25
90:20,24 91:13
92:2,9 93:16,17
93:22 94:6,11
129:2 133:8,21
134:13 162:2,10
162:13,15,17,21
164:7
**opportunity**
156:24

**opposed** 13:20
101:3 171:25
**opposing** 62:15
**opposite** 79:11
**option** 143:6
**oral** 1:18 5:5
**order** 23:22 43:3
59:25 79:24
153:20 155:9
**orders** 55:13
**organized** 55:5,6
**original** 35:25
**Orleans** 4:2 41:2
41:17,19 151:17
152:2
**outside** 65:6
**overall** 88:22
90:24
**overrode** 76:10
76:13
**overview** 27:1
86:9

─────────────
**P**
**P-A** 38:23
**P-A-R-K-E-S**
38:23
**p.m** 5:12 8:1
180:2
**page** 1:21 2:14
3:2,11 5:9 6:16
42:19 85:10
94:5 104:23
113:21 121:14
121:20,21 122:4
125:8 126:15,16
133:17 134:22
138:7 139:1
146:1 151:14
152:6 154:1,24
158:9 159:7
165:18 171:4
**pages** 162:5
**paid** 146:3
**pain** 99:24

**paper** 10:7
**paperless** 44:17
**paragraph** 42:19
126:16 127:13
127:19 128:6
132:25 139:3
146:2 153:10
154:1 156:2
**paragraphs**
126:20 127:3,12
**paranoia** 105:4
105:11,15,24
111:13 154:16
**paranoid** 109:1
133:25
**paraplegic** 59:20
**parent** 1:3,5
**Park** 2:6
**Parkes** 38:23
**part** 12:21 44:9
44:24 51:23
77:8 116:24
128:23 137:12
144:4 150:2
158:1 164:14
175:2 178:7
**particular** 13:17
17:4 22:4 64:7
72:3 86:22
123:24 147:25
149:17
**parties** 5:3 7:10
**party** 7:3,11
**passive** 101:4
**pathologic**
121:18
**PAUSE** 164:24
**PDFs** 17:20 21:8
**Pearson** 86:18
**pending** 53:2,5
54:21 60:17,25
61:17
**people** 71:19
90:13 95:5
105:5 106:7,10

pepper 75:1
perceived 134:6
percent 85:22
perform 65:25
performed 66:19
performing 66:11
period 67:3 89:7
    107:18,22 111:8
    146:21,22 176:9
    176:13
perpetual 79:4
person 98:12
    111:10 115:6
    126:3 134:1
    169:23
person's 168:7,9
personal 1:4
    31:16
personnel 17:21
    95:11 119:17
    144:6
perspective 81:4
Peterson 6:10,15
    6:20 7:1,8
petitions 169:10
phone 31:20
    52:21 54:9
phrase 141:9
physical 75:5
    113:24 115:9
    127:21 136:14
physically 93:15
place 5:14 34:16
    90:1 91:22 92:3
    131:1 137:5,19
    154:25 160:1
    175:6,7
placed 119:12
    131:8 137:8
    172:10,14
    173:20 174:11
places 80:19
plain 135:11
plaintiff 20:21
    50:11 51:1

56:20,21
plaintiff's 22:4
    46:4 60:2
plaintiffs 1:8 2:3
    21:19
play 177:10
please 10:1 114:5
PO 18:6
point 15:7 26:23
    56:25 83:18
    87:9 102:6
    106:3,16,25
    107:1,4 110:5
    110:12,15
    111:24 112:20
    113:6 116:10,12
    116:14,21
    117:13 127:2
    129:7 132:6,13
    136:16,20
    138:13 139:17
    139:18,24
    147:18 150:9
    154:25 155:6
    156:6,16 167:17
    168:14 169:24
    170:18 173:15
    174:8,10,23
    176:20 178:11
pointed 84:17
    162:22
pointing 118:18
    124:7 128:24
    129:3 138:12,18
points 130:22
    167:14
police 1:14,15
    3:22 4:2 25:17
    25:17 39:12
    41:2 50:8 51:2
    51:17 52:8
    53:17 56:8
    57:23 63:21
    64:2,3 65:12,25
    66:3,5,6,11

68:25 70:3,3
    71:1 73:7,10
    74:13 75:20
    76:25 77:11
    78:1 80:13,16
    80:20,23,24
    81:5,11,14,16
    81:20,23 82:11
    82:20 83:8,9,11
    83:11,13,15,21
    83:24 84:2,5,14
    85:5 86:23
    87:24 88:2,2,11
    89:5 93:5 95:23
    95:24 96:21
    97:25 106:9
    115:25 117:24
    130:15 131:1
    132:1,22 135:4
    142:1 151:17,21
    152:3,22 153:17
    156:3,9,18,19
    157:14,18
    160:19 163:15
    163:23 166:17
    166:19,23 167:3
    167:3,24 168:11
    168:23 170:19
    170:19
policies 93:4
    151:15,23 152:1
    152:5,15 153:13
    156:10 157:23
    158:6
policy 16:8 25:24
    41:1 151:22
    152:4,12,23,24
    153:14,16,18,18
    153:18,22
    157:25
poor 76:12
pornography
    67:4
portion 146:9
position 66:24,25

89:2 95:25
    96:13,16,24
    97:1,5 125:24
    126:7 131:25
    132:17 146:4,18
    155:15 158:16
    168:10 174:5
    177:14
positional 3:22
    4:1 39:12,16,17
    40:17 146:10
    163:12,13,18,21
    163:24
positions 155:7
    155:19,24 168:5
    178:9
positively 175:25
possibility 59:4
    59:11 146:12
possible 36:8,9
    96:5,10 106:3
    106:18 174:4
    178:11
possibly 130:24
post 2:5,5,16 3:5
    9:16 11:23
    13:11 16:3 19:8
    19:14,16,22
    21:15,17,23
    27:7 29:23 34:4
    34:12 35:16
    36:2 39:5,8
    42:8 46:18 47:9
    48:10 54:11,13
    54:23 55:10
    65:19 68:4 79:2
    79:13 82:23,25
    92:1,5,20,24,25
    94:20 103:16
    104:14,22
    116:15 120:7
    123:19 124:5,22
    124:25 130:14
    144:15 149:1,22
    150:18,20

151:25 152:19
    152:20 153:2,6
    157:9 164:15
    165:5,10,12,15
    165:21 172:4
    179:24
postmortem
    122:20
potential 46:9
    141:21
practice 5:8
    57:23 95:4
    101:5 127:5
practices 51:18
    63:21,22 64:2,3
    65:12
precedent 5:15
precisely 173:18
precluded 74:11
predetermined
    34:21
Prehospital 4:8
Prentice 86:18
prepare 45:20
prepared 44:9
    46:1
pressure 131:8
pretty 80:7 85:24
    86:11 108:21
    143:19
pretty-well 83:9
prevent 97:8
    151:15
primarily 110:19
principles 133:22
printed 10:8
prior 18:14 47:7
    66:1,20,22
    70:10,14 88:18
    88:24 89:14
    91:6,13 112:21
    116:13
priority 155:6
probably 8:25
    16:23 20:20

35:10,11 45:24
54:4 55:15,16
66:2 75:22 93:4
110:18 131:13
136:8 161:5
164:6 169:14
170:7
**problem** 71:18
97:11 134:24
145:6 148:6,7
171:21,21
**problems** 71:14
96:23 142:23
**procedure** 150:23
179:19
**procedures** 91:17
91:18 93:5
142:17 151:15
158:6 163:5
**proceedings**
181:6,10
**process** 75:21
76:11 80:5 90:2
**processes** 75:21
**Professional**
17:15,16,18,23
81:7
**professionals**
90:16
**profiling** 81:4
**program** 68:3
82:10,14,16
**prohibited** 6:22
**promotional**
82:12
**prone** 89:2 95:25
96:23 131:24
132:17 174:5
177:14 178:8
**prongs** 166:1
**proper** 65:11
91:16 99:5
117:10
**properly** 89:4
91:9 155:5

171:20
**propped** 120:4,11
146:16 173:13
178:19
**propping** 175:3
**provide** 6:17 7:2
26:25 27:1 32:8
54:11,13,17
55:3,7,8 62:19
63:13 118:10
162:11,12
**provided** 10:11
11:23,24 12:3
22:11 26:19
27:2 36:25
37:24 44:1
103:2
**providing** 29:16
63:12 64:9
100:12
**provisions** 6:12
**psych** 105:9
107:5 110:4,11
110:16 170:10
**psychiatric** 90:14
102:1 111:24
115:5 154:7
**psychological**
81:4 109:18
141:3 170:14
**psychologist**
85:20
**psychology** 81:2
81:7 82:16,17
82:18 85:12
86:1
**publication** 40:17
**publications** 27:2
85:11 86:16
87:2
**published** 86:17
86:18
**pull** 14:18,22
57:4 79:7,9
124:4,14

**pulled** 12:2 42:18
57:6 79:10
**pulse** 119:25
120:5 147:18
150:1 169:25
**purpose** 42:10
56:6 97:22,23
**purposes** 5:7
**pursuant** 6:4
179:18
**pushes** 145:5
**put** 13:22 28:18
34:16,16 35:1
39:11 79:3
87:14 89:20
91:12,12 92:10
96:12,15 102:8
104:21 113:18
113:20 117:11
117:14 130:20
132:17 137:4
143:18 146:13
153:16 161:15
169:5
**putting** 116:12
118:16 126:7
127:14,17,18
128:15 135:7

___

**Q**

**qualifications**
60:7 62:7,12
83:19
**qualified** 62:16
63:7,11,18 87:5
87:10 119:3
141:17 155:22
156:17 160:9,11
160:18,22 161:5
161:20,23
**qualify** 78:16
82:21 134:9
**quantity** 38:4
**quarrel** 114:19
117:8 118:22,25

139:21
**question** 5:21
8:22,24 9:4,9
18:19 56:6 63:9
65:20 69:5
77:12 79:14
83:17 100:9
101:17 103:11
106:13 127:1
147:21,23 150:6
151:3 152:6
158:20 160:14
164:10 172:16
174:16 175:13
175:16 177:16
179:22
**questions** 8:25
20:20 28:21
104:25 133:3
138:24 165:5
166:5 172:5
**quick** 37:10 47:3
121:1 133:13
**quicker** 111:15
113:6,15
**quickly** 96:4
101:25 102:24
106:2,18 107:12
130:24 135:11
147:9 148:23
169:18 170:8
**quit** 176:23
**quite** 28:3 45:22
49:23 79:7
132:8
**quote** 129:8
152:10 171:8,8
**quoting** 152:7

___

**R**

**R** 18:7,7
**R-E-A-Y** 40:6
**radio** 102:4
170:25
**raise** 176:22

**raised** 42:11
176:21
**Rambo** 145:1,7
145:11,21
**ramifications**
71:19
**ran** 57:7,9,11
**rapidly** 73:16
**rate** 30:4
**rates** 7:9
**re-certified** 78:15
**re-qualify** 78:22
**reached** 56:14
**read** 28:9 45:22
45:24,25 62:8
62:11,25 124:12
144:10 165:2
174:18,20
**reading** 5:17 9:12
9:13 46:1 116:9
**ready** 169:13
170:2
**real** 8:19 37:9
121:1
**realized** 101:25
111:22 125:23
**really** 31:11 36:5
46:22 61:25
81:2 83:18 87:8
102:10 107:19
129:1 133:23
134:13 140:25
144:7 147:22
151:11 162:13
173:17 178:10
**reason** 13:19 34:9
49:13 59:25
95:10 144:19
145:23 161:21
163:8 164:17
**reasonableness**
156:12 165:17
**reasons** 25:24
**Reay** 40:5
**recall** 14:16 19:17

28:5,12 47:9
48:24 58:5
62:14 68:23
70:12,14 72:13
72:14 74:24
75:4 76:5
119:18 144:7
162:4 169:13
172:11
**receive** 29:18
146:10
**received** 11:18
20:10 21:5
134:7
**RECESS** 83:1
133:14
**recklessly** 25:23
**recognized**
110:20 154:17
**record** 10:3 21:16
23:5 26:12
33:12 45:3 55:1
165:1
**records** 11:21
12:6,17 21:20
22:20,23,24,25
123:4,7,9,18
124:11 125:10
**recovery** 88:6
**RECROSS** 3:6
**RECROSS-EX...**
172:6
**recruits** 167:10
**redact** 55:23
**reduced** 181:7
**Redwine** 27:18
48:19
**refer** 11:12,17
46:19 90:9
126:15 174:14
**reference** 5:13,23
40:12 114:5
125:11
**referenced** 27:19
40:1,24 41:9,14

42:2,8,9 43:3
43:20 45:12
151:14,16
**referencing**
104:14 162:13
**referral** 7:5 90:14
**referred** 43:3
**referring** 37:10
121:25 165:21
172:15
**reflecting** 45:3
**refreshes** 124:13
**regard** 45:5
128:2 132:13
166:4 170:18
**regarding** 44:20
77:14,21 152:14
153:12,12,22
167:23
**regardless** 131:5
132:2 134:5
**regular** 169:20
**Regulations** 6:5
**relate** 85:9 90:20
90:24 101:15
152:18
**related** 10:4
43:22 52:5,8
62:12 67:13
84:7,25 86:5,6
88:1 91:5 92:18
128:6
**relating** 77:4
127:20 156:3
157:14
**relation** 146:13
**relationship** 6:12
**relative** 125:11
**remain** 104:11
**remained** 89:6
**remember** 36:9
36:10,12,13,13
37:2 70:18,20
70:21 72:1,3
164:16 167:18

**render** 161:6,23
**repeat** 147:20
178:12
**rephrase** 110:22
**report** 3:19 4:6,7
4:8 12:10,14
18:2,14,17,17
18:20,23 19:3,4
19:9 21:9,14
22:5,10,11,19
22:20 24:4,7,11
24:18 25:21
26:20,22,25
31:13,18,22,23
31:25 32:15,18
33:3,4,7,10,15
33:19,21,24
34:5,7,8,11,14
34:18,24 35:3,6
35:14,20,21
37:6,22,24 38:8
38:13,19,22
39:1 40:1,13,24
41:10,14 42:2
45:1,22,23 46:2
50:23 59:15
62:1 88:21
89:10,11 94:2,5
104:24,24 116:9
121:9,11,12
122:19 124:20
126:16 130:3
133:16 136:14
159:19 161:1
162:2,3,4,15
164:8 167:13
171:5
**reporter** 1:20 5:9
6:4,9 7:4 8:4
19:19,25 25:9
25:11 30:14
39:14,17,21
41:16,20,22
43:9 48:3,6
61:21 83:14

85:15,17 92:22
92:25 97:2,4
104:8 123:9,12
123:14 150:11
153:24 161:8
165:7 179:25
181:7
**REPORTER'S**
6:1
**reporting** 6:6,11
6:15,17,20 7:1
7:2,4,8
**reports** 12:15
17:19,22 18:2
20:4 21:7
119:14,16
**reposition** 96:9
**represent** 8:12
50:10 125:7
**representative**
1:4 6:10
**request** 54:15,17
170:4
**requires** 80:4
**research** 42:17
87:19 141:17,18
**reserved** 5:22
179:23
**resist** 103:13
130:8,8 132:5
142:3 154:15
174:4 177:5,11
177:18
**resistance** 100:12
101:4 102:9
103:3 131:6
137:25 140:3
163:1 166:6
172:9,13,22
173:6,8,21
174:1,13 175:14
175:15,17,23
176:5,12,13,20
176:25 177:3,6
178:10,13,18,22

**resisted** 68:17,20
70:16 103:20
139:24
**resisting** 69:25
70:10,24 97:14
101:3 130:6
156:13,22 157:4
173:8 174:1,2
174:23 175:1,4
178:10
**resources** 90:15
**respect** 9:10
28:20 31:23
45:15 53:16
56:7 61:2 62:4
62:20 66:18
68:15 69:6,24
72:18 77:11,25
78:19 82:20
83:21 84:16
87:11 90:19,22
91:4,5,13,21,22
92:3,5 93:23
125:17 126:20
127:3 132:25
133:8 153:6
163:12 178:4
**respective** 5:3
**respond** 89:4
92:19,20 94:22
100:5 106:17
116:25 170:22
**response** 9:9 12:6
12:17 27:15
55:1 58:22,23
64:18,20 98:10
98:10 112:9,16
131:22 142:25
145:24 161:12
170:3,4
**responsible** 74:9
84:4
**responsive**
146:17
**responsiveness**

5:21 179:22
**rest** 23:15 130:2
**restrain** 100:25
  137:2 141:4
  155:14
**restrained** 96:18
  96:20 97:16
  147:4 149:16
**restraining**
  148:22 151:5
**restraint** 3:21
  38:24 40:5 41:3
  100:11
**Restrant** 4:3
**restricted** 58:12
**result** 75:15
  116:2
**resulted** 148:19
**results** 117:18
  118:14,15,23
**retire** 78:9,24
**retired** 29:3,10
  29:15 77:15
  78:5 79:8,16
  80:9
**retirement** 66:2
  79:3
**review** 23:2 32:1
  32:9 43:22
  119:14 125:12
  144:5
**reviewed** 18:14
  21:11 22:17
  28:9 46:15
  159:18
**reviewing** 44:16
  112:13
**reword** 63:8
**reworded** 9:1
**RICHARD** 1:15
**rifle** 26:5
**right** 8:2,11,15
  9:17 11:7 12:1
  12:5,9 13:10,24
  14:23 15:7,17

15:23 16:13,17
17:6,17 19:18
20:9 21:1,3,13
23:10,11 24:8
24:13,14,19
25:7 26:7,15
27:4,24 28:8,14
29:8,21 30:12
30:25 35:4,13
35:20,24 37:1
37:18 38:2,2,17
38:17 39:3,19
40:7 41:4 42:23
42:24 43:7,25
44:3 45:18,19
46:22,25 47:4,9
47:19 48:7,21
48:25 49:20
51:5,6,12,24
52:1,25 53:4,11
54:22 58:9
60:24 62:9,15
62:23 63:2,17
63:23 65:10
66:16,18 67:18
68:1,15 70:12
72:16,17,19
75:13 76:3,19
79:11 81:13
82:5,8,20 84:12
84:14,16,20
85:6 87:6 88:19
89:9 90:5 91:3
91:20,21 92:8
94:1,5,14 95:21
98:14,25 99:10
99:13 100:9,19
104:23 107:1,15
110:2,6,15,22
111:3,14 112:2
113:1,7,21
114:4,17,22
115:15,23 116:1
116:20 117:4,18
118:25 119:5

120:17,22
121:14,23 122:6
122:8,24 123:17
124:17,19 125:4
125:7,15 127:16
128:22 129:1,18
129:20,22 130:4
130:16,25
131:20 133:11
133:16 134:10
135:1 136:13,13
136:23 137:14
139:4,17,19
141:9,25 142:5
143:10,21
145:12,20
148:13,18 149:9
150:17,21 151:8
151:11 153:1
154:1,24 155:23
158:13,15,20
159:16,18 160:8
160:14,21
161:10,16,22
162:20 163:12
163:17 164:19
164:25 170:15
173:3,5,16
175:8,12 177:9
178:3,20 179:17
**rise** 75:8
**rises** 65:16
  115:11
**risk** 100:2,8
  139:11 166:22
**RODRIGO** 1:3
**rolling** 97:8 149:7
**rose** 65:4
**roughed** 74:24
**royalty** 85:23
**rules** 6:5 8:17
  36:4 145:5
  179:18
**run** 156:24
**running** 59:18

**rural** 71:5,14,15
_____
**S**
_____
**S-C-H-A-N-T-Z**
  61:7
**S.A** 1:6
**safe** 95:4 100:7
**safely** 106:3
  111:25 169:18
**safety** 95:11 98:7
  98:8
**SAITH** 180:1
**SanDisk** 23:6
**sat** 160:2
**save** 27:25
**saw** 19:4 59:24
  103:1 146:21,23
**saying** 74:3 90:3
  93:2 124:8
  141:24 143:7
  149:15 165:24
  171:25 173:1,21
  174:22 175:17
  175:18,19 176:2
  176:2,5,11,16
**says** 14:6 15:23
  16:5,7 17:8
  18:4 21:6,8
  22:5,24 23:5
  34:8,8,11,14,23
  34:24 35:5 38:4
  38:6 79:16
  87:10 110:10,16
  121:17,23
  126:10 128:7
  134:4 146:2
  156:2 171:7
**scanned** 19:16
**scenario** 98:1
**scenarios** 86:23
**scene** 13:4 69:18
  81:3 92:21
  93:13 94:22
  95:15 106:17
  107:7 137:20

170:22 175:8
**Schantz** 61:7
  62:4
**scheduled** 25:22
**schizophrenic**
  133:24
**School** 81:6
**science** 84:5
  160:13
**sciences** 161:5
**Scrantom** 1:22
  2:14 5:9 6:16
**screamed** 118:3
  171:7
**screaming** 114:5
  125:17
**screen** 44:18,20
**seat** 57:4
**seated** 3:20 38:23
  146:4,11
**second** 19:10,14
  33:6 64:1 85:11
  90:1 91:21 92:3
  95:21 104:4
  117:21 129:22
  158:13,21,24,25
  159:3,5,10,11
  159:12,15,16
  178:7
**seconds** 114:2,15
  171:5
**Secretary** 67:15
  79:16
**section** 119:5
  126:18 127:2
  136:14
**secure** 23:6 132:7
**secured** 97:24
  173:9 174:4
**Securities** 67:16
  79:17,20
**see** 16:4,11 20:9
  23:20 33:15
  39:5,6 54:20
  71:15 89:9

105:6 118:13,13
118:15 119:9,16
121:19 124:13
126:24 128:10
129:10 138:11
145:24 146:5,16
146:19 148:5
153:13 155:11
166:9 172:20
173:10,13
174:24 175:6,13
175:18,19
176:14 178:17
**seeing** 10:13
120:12 128:4
**seen** 9:22 121:7
122:16 123:4
124:11,15 125:2
125:5 136:18
151:23 152:1,5
**sees** 54:13
**segment** 173:13
**segments** 173:10
**semester** 29:12
**send** 105:9
110:11,16
**sense** 21:25 70:6
104:18 106:4
150:15
**sent** 35:16
**sentence** 129:14
129:23 146:2
**Sepanski** 4:4
41:13
**separate** 50:4
126:20
**separated** 104:1
**September** 1:24
5:12 7:13
**Sergeant** 18:7,11
**serious** 142:3
**served** 21:19,24
**services** 6:18 7:2
29:16
**set** 98:2 101:7,10

101:20,23 102:5
102:8
**setting** 81:12
**settled** 49:5,16
53:12 59:5
**seven** 17:10
**sheet** 28:11,19
**sheriff** 76:9,14,16
**Sheriff's** 85:13,21
**Sherman** 4:4
41:13 42:4
**shoot** 26:1
**shooter** 26:4
**shooter-case**
25:16
**shooting** 25:17
57:24 59:17
**short** 27:1 133:12
146:21,22
174:25
**shot** 26:4 57:13
57:14 59:18
**should've** 99:6
103:8 105:21
106:15 110:17
110:25 111:15
113:5 125:19,22
125:22 126:1,2
126:8 135:4,15
136:10 148:5
170:10,21
**show** 9:20 36:17
79:10 120:22
122:14 123:2
136:25 137:4,7
137:11,15 138:5
140:24 158:15
172:9,17
**showed** 26:3 57:9
108:12
**showing** 105:4,11
**shows** 83:19
147:7 148:15
**sic** 26:2
**side** 53:18 62:15

87:25 96:4
142:19 149:7
**sided** 32:13 51:1
**sign** 165:2 178:18
178:21
**signed** 28:11,15
**significance** 42:4
105:10
**significant**
105:12,12,14,15
105:18 106:4,13
118:4 133:21
139:8 140:9,24
171:16,23 172:2
**signing** 5:18 9:12
9:13
**signs** 105:4,11
111:13 154:16
**similar** 72:10,12
123:21,24 133:1
152:15 153:5
**simple** 31:12,15
**single** 75:11
**sinister** 22:15
**sir** 8:11 12:19
105:2
**sit** 75:22
**sitting** 11:3 23:16
27:23 96:4
**situation** 70:23
98:3,6,14 99:15
99:16,17 100:10
100:22 102:13
106:7 107:23
108:4 111:4,17
115:11 128:14
131:13,22
132:16 134:5
140:8 143:2
154:3,8,11,18
154:21,21,22
166:12 167:1
168:12,21,21
169:20,21
**situations** 73:11

97:20 101:2
112:8 168:17
**six** 17:10 47:24
47:25 82:6,7,19
149:6
**Size** 3:21
**Skills** 83:23 87:13
**slash** 145:21
**sleep** 143:8
**small** 71:5 75:23
146:9
**somebody** 74:23
115:10 150:10
150:13 177:8
**somebody's**
171:18 178:13
**someone's** 118:16
178:3
**someplace** 69:12
**soon** 96:2 107:20
109:23 110:10
110:23
**sorry** 19:12 25:9
42:1 43:11
50:22,25 63:23
67:24 81:19
92:22 104:8
120:9 123:13
125:3 150:11
159:6
**sort** 55:5 58:25
150:11
**sound** 14:2,10
20:22 61:13
120:2 155:5
178:23
**sounds** 54:8 55:3
55:5 103:12
109:11 116:13
141:11 162:14
**source** 29:19
**speak** 66:9 78:4
124:25 145:20
**speaking** 115:19
123:15 137:17

**special** 67:17
**specific** 70:20
**specifically** 16:22
28:6 33:8 51:22
62:12 63:21
67:10 68:2
80:23 81:5,11
89:24 117:5
127:20 131:23
162:21 167:2
**specifics** 88:21
**speeds** 158:23
**spelling** 19:19
85:18
**spent** 38:7
**Sperry** 19:6,6,7
19:20
**Sperry's** 19:3,9
**split** 85:23
**split-** 158:12
**split-second**
73:19
**spoke** 104:16
**spot** 143:19
**spray** 75:2 99:25
**spring** 29:12
**Springfield** 85:5
**Sprouse** 1:22
2:14 5:10 6:17
**Spurry** 19:6,20
**square** 71:11
**stack** 23:20,24
24:10
**stacks** 24:2
**staged** 93:1 149:3
169:14
**stages** 54:5
**standard** 91:7,23
142:17 157:18
158:6
**standards** 17:15
17:16,18,23
57:23 91:25
92:5 93:3,4
104:14,19,22

152:1 156:3
157:14 158:4
165:12,15,15,17
165:22,22 166:2
**standing** 57:12
96:4
**start** 12:10 46:25
83:7 99:22
**started** 10:12
53:6,25 111:22
112:18 170:13
**starts** 24:14
**state** 1:21 67:16
74:13 79:16
83:24 88:2
93:19 115:6
181:1
**state-mandated**
84:4
**statement** 3:15
6:1 24:22 52:11
105:17 128:7
156:1 171:17
**statements**
103:19 126:19
126:21 127:4,6
127:7,9,14,24
**STATES** 1:1
**status** 78:5 79:1,3
**staying** 117:17
**steps** 96:11 97:9
**Steve** 48:11,14
**stick** 51:7
**stimulant** 142:2
142:12
**stimulant-type**
141:20,20
**STIPULATED**
5:2
**STIPULATIO...**
5:1
**stomach** 131:25
132:1,3 150:4
**stop** 57:6 129:15
**stopped** 126:9

**story** 178:4
**straight** 120:19
**strange** 108:24
108:25
**street** 94:21
112:18 149:3
**streets** 66:7
**strength** 103:4,15
106:7 140:9,14
140:20,24 141:6
141:10,13,21,24
**stressed** 115:12
**strictly** 132:22
160:23
**strike** 31:1
**strong** 140:6
144:1
**struggle** 113:13
114:1,11,17
137:8 138:13,20
138:21 166:22
170:13
**struggled** 102:25
103:20 111:7
**struggling** 174:6
174:13
**stuff** 76:13 86:12
86:15 124:17
**stun** 99:25
**subdue** 136:17
**subdued** 88:25
**subduing** 88:25
89:14,18 91:6
91:14
**subfolder** 16:5,18
17:8,9 21:6,13
**subfolders** 16:25
**subject** 27:17
132:13 163:20
169:4,17
**submitted** 50:23
**substance** 62:5
**substantially**
70:16
**sudden** 40:5,17

166:22 167:1
172:2
**suggest** 93:3
107:10 132:4
138:13 147:16
179:6
**suggesting** 62:16
156:25 157:17
157:22
**suggests** 126:3
132:21 142:20
**suitable** 65:12
**Suite** 2:6
**summary** 61:10
117:23 121:17
125:8
**superhuman**
140:14 141:6,10
**supervision** 181:8
**support** 145:25
**sure** 8:4,24 9:8
10:1 11:13
12:18 13:13
16:9,15 17:4
21:2 22:14
23:15,25 37:19
39:15 42:16
58:19 60:13
62:8 71:15 79:8
82:24 91:10
94:21 99:20
106:12 113:19
121:3 124:1,24
125:2 133:7
141:15 150:6
152:25 169:15
174:10
**Surprisingly**
128:8
**survive** 59:19
**suspect** 40:5
68:16 70:9,9,15
70:24 75:15
96:17 97:13,15
100:12,16,23,24

101:1 109:20
126:10,12
129:19 130:6,7
130:7,25 131:4
131:6,9,11
134:15 138:1
142:12,14
148:15 150:14
151:5,8 155:3,7
155:9,15 162:25
163:1 168:3
177:17
**suspect's** 130:12
131:2 155:1
**suspects** 69:24
72:23 140:13,19
141:12
**swear** 8:2
**switched** 67:3
**sworn** 8:8
**Synovus** 1:22
2:15 5:10
**system** 34:22
48:13 140:23

———————
**T**

**table** 8:22
**tactics** 78:1 117:6
**take** 8:23 12:8,18
27:22 69:1,3,20
75:25 76:11
81:16 82:2,2,23
83:3 94:1 96:11
97:1,2,10,14
98:3 100:15
111:25 113:2
126:14 133:12
135:12 141:9
151:8 162:18
164:20 168:5
169:19
**taken** 1:21 5:6
129:17 158:13
179:21 181:6
**takes** 23:12

137:19 175:6
**talk** 75:25 86:12
86:12,13,13,22
95:16 108:3
111:11
**talked** 23:4 46:12
107:20,21
134:21 135:5,9
135:10,25
**talking** 36:18
48:19 52:6
105:25 107:9,12
107:13,17 108:1
139:13 152:20
158:5,6 159:6
179:19
**taser** 77:16,18
88:4,5,12,15,17
**tasers** 75:1
**taught** 29:11
80:20,22,24,24
81:1,2,10,14,15
81:20,22 82:16
83:10 106:11
130:20 146:11
166:23 167:4
**tcc@psstf.com**
2:19
**teach** 80:11,13,16
81:9
**teaching** 29:3
80:9 87:23,24
90:11
**Team** 90:9
**techniques** 90:17
99:24 104:21
117:10 166:24
167:8
**Technology** 4:1
**tell** 46:22 58:5
60:15 88:19
91:15 95:21
103:24 109:19
110:1,3,7 121:6
134:24 169:22

170:25
telling 10:22
  109:5 179:7
temperature
  115:11
ten 17:10 53:24
tend 47:2,3
tension 138:4
tentative 32:9
term 112:4,5
  114:24 144:24
  144:25,25
termed 91:6
terminated 61:24
  63:1
termination 52:5
terminology
  34:17 97:21
  109:19
terms 28:17 85:8
  98:16 109:8
  131:6 133:5
  163:15
test 156:11,19
testified 8:8 29:2
  56:3,7 58:7,10
  103:1 163:20
  172:8
testify 29:7,9
  32:15,16 49:3
  58:1,20 59:8,13
  59:21,23 60:10
  92:12 127:25
  164:3
testifying 59:4
  60:21
testimony 3:15
  24:17,21 28:17
  30:6 33:11
  36:15,16,16,21
  49:9 52:10,12
  57:16 58:6
  62:19 63:12,19
  64:9 93:24
  155:13 157:21

173:18
testing 122:10
textbook 85:12
  86:17,22 87:1
textbooks 85:9
  87:21
thank 43:12,16
  48:6 79:15
  82:25 165:4
  179:14
Thanks 25:11
  55:10
thereof 5:18
they'd 71:20
  170:13
thing 9:10 15:18
  24:9 31:16
  44:23 46:21
  48:9 71:16
  98:25 99:5
  120:10 133:13
  139:19 145:8
  147:16 158:11
things 24:2,6
  31:21 38:21
  67:13,14 69:17
  72:25 73:2,16
  81:4 84:9 87:2
  87:12 90:10
  91:5 105:17
  107:8 115:9,13
  118:15 119:22
  119:23 120:3
  126:13 141:4
  148:20 168:10
think 8:19 12:20
  13:7 15:5 16:22
  19:8 21:23
  23:23 27:2 28:1
  42:18 45:24
  46:8 48:7 53:15
  55:16 58:16
  60:3,14,24
  64:13,18 65:11
  66:2 70:5 71:3

72:15,17 76:3
  83:12 85:4
  88:11 93:10
  96:8 97:19 98:6
  98:6,9,10 99:6
  100:2 101:4,5
  101:11,11,24
  102:1,8,10,24
  104:4,6,8 106:8
  106:22 107:3,3
  107:18 111:9,9
  112:3 113:14
  115:16 116:10
  118:6,9,17
  119:21 120:10
  120:12 123:17
  123:20 124:2,8
  124:19,22,23
  126:13 128:13
  128:16 132:8,9
  133:17,23,25
  134:2,6,8,21
  135:20 138:20
  139:11 140:5,22
  140:25,25
  141:16,23
  142:15,24 144:4
  148:2,19 149:2
  149:2,4,5 150:1
  150:8 153:9,9
  154:9 157:12
  160:9,11,25
  161:3,14,20,22
  162:3 164:6,19
  164:21 165:1,13
  167:13 169:14
  170:21 171:24
  171:24 173:4,14
  173:25 174:3,3
  174:6,7,18
  176:17 177:11
  178:9,12
thinking 93:19
  109:3
third 1:23 2:15

5:10 64:5 92:15
  92:17 103:23,25
  104:2,3
Thirty 158:25
thought 105:16
  105:22 108:22
  109:2 131:15
thought- 154:6
three 12:9 13:25
  14:7,8 17:9
  21:8 31:21
  37:14 38:7,7,13
  50:21 56:25
  63:20 64:11,12
  64:14 74:17
  80:19 94:6
  166:1,1
three- 67:2
three-prong
  156:11,19
thrust 73:11
thumb 3:14
  10:11,15,23
  11:4,8,11,16,22
  12:5 13:8 18:24
  19:1 23:8,13
  43:10,11 124:15
  125:5,9,10
  144:4
till 96:17
time 5:14,22 8:21
  18:16,23 27:25
  29:11 36:10
  66:19,21 68:15
  70:7,14,18 72:1
  75:19 76:10
  84:21 85:15
  89:1,7 103:5,15
  107:5,18,22
  111:8 125:23,24
  126:1 128:13
  129:19 130:3
  137:24 147:15
  162:6,11 170:9
  174:7,25 176:13

times 47:22,25
  56:3,6 63:4
  69:2 80:22 96:6
  101:12 118:2
  130:19,22
  131:10,12
  137:18 138:1
  145:17 162:7
  165:12 167:14
  167:18,20,22
  176:19
titled 41:2,13
titles 11:12
TMC 22:24
today 10:2 29:9
  29:18 36:25
  59:20 71:21
  78:4 165:13
  166:10
told 94:22 131:15
  149:4 175:5
top 52:20,21 89:6
  97:1,2,3,6
  125:25 126:1,16
  138:7 171:9,18
  178:9
top- 126:6
torso 126:6
total 38:15
totally 29:15
  58:19 64:18
  173:14
touch 47:10
touched 45:8
tough 143:19
toxicity 121:24
  122:6
toxicology 4:7
  122:19
trade 24:20
trail 43:18
trailed 120:2
trailing 174:9
  178:22
trained 83:10

91:9 97:25
132:12 134:14
134:20 142:6
167:24 168:2,6
168:8
**training** 3:22
16:2 39:11 42:9
57:23 65:14
83:13,15 84:1,3
84:10,23,24
87:18,25,25
88:2,4,5,9,12,12
88:12,13,15,17
89:4,5 90:6,7
90:10,17 91:16
91:25 95:23,24
96:8,8,21,24
104:22 105:21
106:2,11 115:25
117:13 126:3,3
130:15,21 132:2
132:22 134:4
142:20,22
146:10 152:1
156:9,15,18,20
158:1,1,5
160:12 163:6,15
163:23 165:21
165:22 166:17
166:19,19,25
167:3,4,6,9,9,24
170:19,20
**trajectories** 62:13
**trajectory** 62:13
62:17,20
**transcript** 27:23
181:5,7,9
**transferred** 68:2
**transport** 146:15
151:1 153:18
167:7
**travel** 31:14,19
**treatises** 45:10
**treatment** 147:8
**trespassing**

112:19
**trial** 4:5 25:3,22
31:22 32:16
49:3 56:7 57:17
59:6
**trials** 58:9
**tried** 108:3
**triggered** 75:18
**trouble** 114:11
**true** 73:6 98:6
112:23 172:14
181:9
**truthful** 164:13
**try** 76:1 108:3,20
136:2 138:23
165:6
**trying** 36:11
112:14 155:14
176:23 177:7,10
177:22
**Tucker** 1:22 2:14
5:10 6:17
**turn** 9:25 11:24
13:14
**turned** 147:12
148:1,22 149:18
150:12
**turning** 175:3
**twenty-one** 30:8
30:21
**twice** 56:9 138:24
**two** 12:9 16:19
17:9 18:6,6,8
19:2 20:4 24:2
25:2,4 30:5
49:20,23 50:23
80:18 85:8
87:15 88:23,25
89:12,17 90:5,5
92:13 97:20
105:17,21 112:8
113:14 137:13
150:3 159:7
173:10 178:17
**type** 90:22

142:25 151:16
**types** 90:12
**typical** 71:1
**typically** 32:7
69:19

---
**U**
---
**U** 81:17 82:1
**U.S** 40:16
**Uh-huh** 51:14
74:5 155:21
**ultimately** 35:21
100:3 135:19
**unable** 118:3
**unarmed** 59:19
**unavoidable**
130:23
**undecided** 19:20
**undercover** 26:2
**undergraduates**
86:11
**underlying** 100:5
**underneath**
12:16 14:6,20
16:4,17,25
17:19 21:7
**understand** 8:13
8:24 10:1 11:14
11:15 23:15
58:19 75:8 89:9
99:13 101:14
113:19 116:2
117:12 118:11
132:11 133:17
135:3 149:14
154:9 165:2
173:17,18
**understanding**
60:6 102:23
115:20 122:3,8
160:24
**understood** 9:4
11:14 58:2
170:8
**Unfortunately**

96:10
**uniform** 66:3,5,6
69:1,13,14 70:3
**unintelligible**
124:6
**unions** 75:20
**unit** 15:24 16:1
16:18 17:1,1,1
**UNITED** 1:1
**units** 17:4
**University** 80:11
80:14 81:19
**unparanoid**
106:1
**unreasonable**
156:7 157:19
**unrelated** 23:7
**unresponsive**
119:6 149:25
169:24 170:25
171:1 173:14
**untruthful**
163:10
**update** 29:6 36:7
36:25
**updated** 24:16,21
36:24 44:1
170:23
**updates** 31:14
33:11 88:3
**updating** 31:18
**use** 13:19 35:4
51:17 52:8
53:17 56:8
63:20,23 64:9
73:25 74:6 75:5
76:24 77:3,6,11
77:21 82:20
83:10,21,25
84:6,8,10,25
85:9,25 86:20
86:25 87:11,24
88:1,10 89:5
97:20 99:24,25
100:25 108:3

109:19 111:20
112:4,5 115:8
117:10 142:18
144:24,25 148:2
153:17 156:3,9
156:14 157:3,5
157:15,23 158:7
158:8 160:4,10
160:19 161:11
162:24 165:22
166:21 168:25
**uses** 153:15
**usual** 7:9
**usually** 9:15
13:22 68:24
75:4 146:13

---
**V**
---
**v** 156:4 157:2,2
157:16 158:2,4
**various** 11:13
54:5 168:8
**verbal** 109:8
133:18,20
134:22 136:20
**verbiage** 35:2
**verdict** 56:17,21
**verdicts** 56:14
**version** 35:25
36:1
**versions** 37:20
**versus** 22:10
41:13 56:11,13
58:17 61:7,12
61:19 100:11
112:9 165:17
**veteran** 9:7
**video** 14:20 15:10
16:9 103:18
108:1,12 113:8
119:23,24
120:13 135:25
136:18,24 137:4
137:7,24 138:4
146:8,9 158:13

William M. Harmening   9/23/2019

162:12 172:8,15
172:16,17,18,20
173:10 175:1,2
175:6,14,15,18
175:19 176:10
176:12,15
178:17
**videos** 13:5,6,7
13:10 14:8,25
15:14,18,19
137:18,18
158:21 166:4
**videotaped** 14:17
15:5
**view** 97:24
179:17
**violate** 157:25
**violated** 157:24
158:2
**violates** 157:22
**violation** 57:5
65:4,17
**virtue** 58:13
122:10
**visited** 93:13
**voice** 120:1,1
155:5 165:7
174:8 178:22
**vs** 1:9 4:4

---

**W**

**W** 18:7
**W-U-E-N-S-C-...**
25:10
**waited** 99:4
116:17 170:5
**waiting** 116:20
116:24
**WAIVED** 5:16
5:19,25
**walk** 139:5,10
**walking** 66:8
173:11
**walks** 150:5
174:25 178:18

**want** 8:2 10:1,2
22:14 32:10
37:18 50:2 51:8
64:23 104:24
106:12 108:25
124:12,12
126:15 133:7,18
146:18 151:2,2
173:17,17
174:14
**wanted** 18:25
20:6 27:10,12
82:1 129:15
147:8 166:3
**warrant** 66:23
69:4,4,10
**warrantless**
66:22 68:22
**warrants** 68:20
**Wash** 81:17
**Washington**
80:11,13 81:19
82:1
**wasn't** 67:9 71:19
71:21,21 76:15
81:23 91:10
95:4 97:22
103:10 110:21
**WAV** 18:6
**way** 20:16 31:12
32:7 35:10 42:7
51:5 55:24
57:19 63:5
64:25 89:11
90:3 91:12 93:1
100:6 106:1
109:7 114:19
134:3,19 135:10
136:2 137:4
144:22 150:12
161:15 165:14
173:17
**Wayne** 145:7,11
145:22
**ways** 66:4 130:9

134:1 168:8
**we'll** 10:20 18:15
35:20 39:3,19
40:7,19 41:4
141:9 164:22,25
**we're** 27:17 41:21
64:8 76:16
107:4 143:8
**we've** 9:20 10:24
26:15 53:15
94:2 116:16
122:14 123:2
134:21 149:11
**weapon** 78:12,12
78:17 79:24
80:2
**weapons** 75:3
77:4,14 169:15
**week** 72:24 167:5
167:7,12
**weighed** 142:24
**weight** 97:7
117:11,14,25
118:16 126:7
128:16 130:21
132:17 133:3,5
155:1
**went** 32:1 45:21
57:9 59:22
68:24 82:15
88:8,8 101:9,19
101:22,23
112:18 136:1
169:11
**weren't** 74:16
150:15
**white** 51:20,21
56:4 67:1,7,9,9
**WILLIAM** 1:18
3:2 5:5 8:6
**willing** 54:18
**Wilson** 61:12
62:10
**witness** 1:19 3:17
5:6,18,19 8:7

8:14 19:7,12,21
19:23 20:1
24:23 29:16
30:17 37:12,14
39:16,18 41:19
46:12 49:7
50:17 54:19
55:11,18,20,25
63:5 79:15
81:18 83:15
85:16 92:24
93:1 97:3,5
120:8 121:2
123:13,15 124:3
157:10 165:3
179:15
**Witness'** 3:19
**witnesses** 46:10
93:11
**word** 12:18 27:22
96:21 111:20
148:2
**worded** 60:3 79:8
89:11
**words** 34:23
44:23 72:19
97:6 108:4
112:17 114:6
138:3 154:11
177:10
**work** 30:1 31:2,4
31:6 32:7,17
33:9,10 36:5,7
46:18 50:10
51:10,19 74:4
78:10 101:16
143:8 159:25
**work-in-progress**
18:18
**worked** 47:19,25
49:6 50:14,17
52:18 53:16,18
53:22 54:8 55:4
71:10 74:1
155:16 161:18

**working** 20:23
67:6 69:25 72:9
**worse** 134:2
**would've** 66:1,3
66:19 68:12,17
70:7,10 84:19
88:13 111:6,7
135:5,5,6,9,9,10
135:13 155:15
162:14
**wouldn't** 35:4,8
55:16 57:6 69:3
69:7 70:1 73:6
96:20 102:18
103:7 108:15
147:6
**write** 25:21 31:13
32:14,17 44:24
**writing** 18:14
47:5
**written** 17:19,22
85:22 87:3
162:14 163:17
**wrong** 131:18
**wrote** 165:18
**Wuenschel** 25:8
27:19

---

**X**

---

**Y**

**yeah** 9:16 14:22
16:15 19:14
23:19 27:11
46:5 48:7,16
52:6 53:14
54:25,25,25
55:18,20 61:14
65:15,23 70:6
75:24 79:12
82:24 83:17
99:9 100:4
104:5 114:14
115:18,18
117:17,17,21
121:13 124:22

William M. Harmening  9/23/2019

125:2 134:18
138:16 141:8
145:10 146:22
147:22,22
149:12,23 150:7
152:17 179:11
179:15
**Yeah-** 146:24
**year** 27:21 33:22
33:25 50:3
66:14 67:3 88:6
88:15
**years** 49:20,24
74:17 88:4
168:12
**yelled** 162:7

────────
**Z**
────────

────────
**0**
────────
**000013** 14:5

────────
**1**
────────
**1** 3:13 5:5 6:9
9:18,21 14:6
15:24 16:5
43:13,14,15,22
79:17 85:10
**1.1** 36:6
**1.2** 36:6
**1/17/18** 3:18
**1/30th** 159:2,12
159:15,15
**10** 3:14,23 40:8,9
139:1 146:1
**10.B** 6:5
**10th** 181:11
**11** 4:1 40:20,21
151:14
**1111** 1:23 2:16
5:11
**1199** 2:16
**11th** 132:20
**12** 4:2 41:5,6,16
41:17,19,23
50:4,6

**12:08** 5:12 8:1
**120** 4:6
**122** 4:7,8
**13** 4:4 41:21,22
42:1 152:6
165:18
**14** 4:6 38:15
120:20,24 154:1
154:24 165:18
167:20,22
**15** 4:7 94:5 114:2
122:12,15
**15-14-37** 6:22
**16** 4:8 122:25
123:3 124:5,7,8
158:9 159:7
**165** 3:5
**17** 37:3
**17-00680** 12:11
**172** 3:6
**17th** 33:18 34:3
35:14,25
**19** 85:3
**1981** 66:17
**1982** 84:13
**1990** 74:8 84:19
85:4
**1993** 66:5,15,17
66:22,23 68:4
68:11,18 70:10
70:14 72:2 74:8
84:19 88:14,18
**1996** 3:24

────────
**2**
────────
**2** 3:14 5:13 6:15
10:16,18,24
11:8,16 12:5
14:19 15:24
16:19 18:13
20:5,6,7 23:13
32:2 43:7,12,25
124:2,15 125:4
144:5
**2014** 49:8 51:9,9

51:12 52:1
53:15,21 54:7
55:4
**2017** 16:7 49:11
**2018** 33:18 34:3
35:14,25 37:3
47:6 50:3
**2019** 1:24 5:12
7:13 18:21
28:24 29:12
32:25 35:23
36:1 37:23
181:11
**221-9371** 2:7
**23rd** 1:24 5:12
7:13
**24** 3:15
**26** 3:16
**28** 171:5
**2nd** 27:20 28:24

────────
**3**
────────
**3** 2:6 3:15 5:17
6:20 24:20,21
24:24 44:3,4
49:10 53:8
64:13,15
**30** 3:17,18 42:19
158:23
**31901** 2:16
**31902-1199** 2:17
**31904** 2:7
**324-0251** 2:17
**325** 71:11
**37** 3:19 88:4
**39** 3:20,22

────────
**4**
────────
**4** 3:16 5:20 7:1
26:9,10,15,16
44:6 83:5 85:10
104:23
**4:11** 180:2
**4:19-CV-00005...**
1:9
**40** 3:23 4:1 54:4

**41** 4:2,4
**4th** 18:21 35:23
36:1,24 37:23

────────
**5**
────────
**5** 3:17 5:23 7:8
30:15,16,17,18
44:8
**5:25** 114:1
**5:26:38** 114:4,13
**5:29** 171:5
**524** 15:24 16:5,7
16:18

────────
**6**
────────
**6** 3:18 30:13,20
30:22,25 31:2
38:3 45:3
121:14,20,21
126:16

────────
**7**
────────
**7** 3:19 37:12,13
37:16,22 42:19
44:25 45:8 94:2
94:3 121:15,21
133:17
**706** 2:7,17
**720** 17:1
**736** 17:1

────────
**8**
────────
**8** 3:4,20 39:4,9
45:10 113:21
134:22
**80s** 71:18

────────
**9**
────────
**9** 3:13,22 39:21
39:22,23 45:14
45:16 138:7
171:4
**9-11-28** 6:13
**90** 53:25
**90s** 71:18
**93** 66:20

**9th** 16:7 32:25
47:6