# DEFENDANT'S EXHIBIT 12

CHAPTER: 1.3.1.1                                                          Page 1 of 10



# NEW ORLEANS POLICE DEPARTMENT
# OPERATIONS MANUAL

## CHAPTER: 1.3.1.1

## TITLE: HANDCUFFING AND RESTRAINT DEVICES

**EFFECTIVE: 12/6/15**
**REVISED: Replaces Policy/Procedure 306**

### PURPOSE

This Chapter governs handcuffing and otherwise restraining suspects during detentions and arrests to provide adequately for the safety and security of the suspect being detained or in custody, the transporting officer, and the public.

### POLICY STATEMENT

1. The New Orleans Police Department authorizes the use of handcuffs and restraint devices in order to control suspects who are actively, aggressively, or aggravatedly resisting a lawful detention or arrest in accordance with this Chapter, **Chapter 1.3 - Use of Force** and department training.

2. Restraint devices **shall not** be used to demean, embarrass, punish, or display authority; they also shall not be used as a show of force.

3. Consistent with NOPD Policy concerning use of force generally, force shall not be use against an individual in handcuffs or other restraint device except as reasonably necessary to prevent imminent bodily harm to the officer or another person or persons.

4. The improper use of force against individuals in handcuffs or other restraining devices can constitute excessive force in violation of the United States Constitution and State law, and it may result in criminal prosecution as well as civil liability.

### DEFINITIONS:
Definitions relevant to this Chapter include:

**Active Resistance**—Resistance exhibited by a suspect that is between passive resistance and aggressive resistance (e.g., attempts to leave the scene, flee, hide from detection, or pull away from the officer's grasp). Verbal statements, bracing, or tensing alone do not constitute active resistance.

**Aggressive Resistance**—Is a subject's attempt to attack or an actual attack of an officer. Exhibiting aggressive behavior (e.g., lunging toward the officer, striking the officer with hands, fists, kicks or any instrument that may be perceived as a weapon such as a knife or stick) are examples of aggressive resistance. Neither passive nor active resistance, including fleeing, pulling away, verbal statements, bracing, or tensing, constitutes aggressive resistance.



**Aggravated Resistance**—When a subject's actions create an objectively reasonable perception on the part of the officer that the officer or another person is subject to imminent death or serious physical injury as a result of the circumstances and/or nature of an attack. Aggravated resistance represents the least encountered but most serious threat to the safety of law enforcement personnel or another person.

**Agitated delirium** (also known as excited delirium)—A syndrome or condition characterized by extreme physical agitation, paranoid or irrational behavior, and/or pain insensitivity, often but not necessarily caused by mental illness or substance use.

**Positional or compression asphyxia**—When a subject's body position interferes with his or her breathing, either when the chest is restricted from expanding properly or when the position of the subject's head obstructs the airway. Death may occur from positional asphyxia.

**Sudden tranquility**—When a subject who was acting violent suddenly becomes calm, sleepy, and appears to be resting.

## ISSUANCE, MAINTENANCE AND CARRYING RESTRAINT DEVICES

5. Restraint devices described in this Chapter may be carried and used by officers of this Department only if the device has been issued or approved by the Superintendent of Police or his authorized designee.

6. Only officers, who have successfully completed Department training, maintained and demonstrated their qualifications in the use of any approved restraint devices are authorized to carry and use those devices.

7. Restraint devices may be used to restrain or arrest suspects who actively resist, aggressively resist, aggravatedly resist, or demonstrate an intent to resist (actively, aggressively, or aggravatedly) a lawful detention or arrest, and the use of the restraint appears reasonable under the circumstances.

## USE OF RESTRAINTS

8. Officers are responsible for the safety and well-being of the suspects in their custody and control. Suspects under restraint may evidence signs of **positional asphyxia, agitated delirium** or **sudden tranquility** due to recent physical exertions, existing physical conditions, or drug use, and they must be continually monitored while under restraint.

9. Restraint devices described in this Chapter are authorized for use by officers who have successfully completed Department-approved training in the use of those devices.

10. All routine maintenance of a restraint device shall be the responsibility of the officer to whom it is issued, who carries it, or who uses it.

11. The following devices are approved for use:

    (a) Handcuffs –
        1. Smith and Wesson; Model 100; nickel or blue finish
        2. Peerless Model 700 (or equivalent); nickel or blue finish with universal size key
    (b) Flex cuffs - a commercially produced plastic flexible band cuff with a one-way locking system that can be fastened as a restraint around a person's wrists.
    (c) Leg restraints – Smith and Wesson Model 1900; satin nickel finish

12. When deciding whether to use an approved restraint device described in this Chapter, officers should carefully balance all safety concerns with factors that include, but are not limited to:

    (a) The circumstances of the detention or crime leading to the arrest;
    (b) The demeanor and behavior of the detained/arrested suspect;
    (c) The age and health of the person;
    (d) Whether the person is known to be pregnant;
    (e) Whether the person has a hearing or speaking disability. In such cases, consideration should be given, safety permitting, to handcuffing to the front in order to allow the person to sign or write notes;
    (f) Whether the individual has an injury or disability that may be aggravated by handcuffing, and what reasonable accommodations may be made for such disability; and
    (g) Any other apparent disability or condition.

13. Once handcuffed, the arrested suspect shall be secured in the rear seat of the police unit. The safety belt shall be properly utilized. Once secured in the vehicle, the primary responsibility for the safety of the detainee or arrested suspect is with the transporting officer.

14. Officers shall use caution when securing a suspect in a police vehicle utilizing a seat belt. Seat-belting a suspect places officers in an awkward physical position, exposing them to potential harm during the belting procedure. If possible, two officers should be present when belting suspects in a police vehicle.

## DANGERS OF RESTRAINTS

15. Officers are reminded of the danger of "**positional asphyxia**," and will follow the guidelines for care of restrained subjects listed below:

    (a) Follow training guidelines for physical restraint of subjects.
    (b) If a subject has been placed on his or her stomach, turn him or her on the side or in a seated position as soon as handcuffs are properly applied.
    (c) If the subject continues to struggle, **do not** sit, lie or kneel on the subject's back. Hold the subject's legs down and secure their ankles with leg restraints (leg shackles, Hobble leg restraints, or flex ankle cuffs). The use of these restraints may require specialized training.
    (d) **Never** attach the handcuffs to leg or ankle restraints. The **use of any "hog-tying" technique is strictly prohibited.**
    (e) Ask the subject if he or she has used drugs recently or suffers from a cardiac, respiratory disease or condition such as asthma, bronchitis, or emphysema.
    (f) Monitor the subject carefully, looking for breathing difficulties or loss of consciousness. Immediately transport to a medical facility or call for EMS.
    (g) If the subject is transferred to a detention facility, inform the facility's custodians of any preexisting conditions, treatment received or requested because of respiratory difficulty or loss of consciousness.

16. Officers are reminded of the danger of "**agitated delirium**" and will follow the guidelines for care of restrained subjects listed below. Subjects in the state of agitated delirium have easily identifiable symptoms and behavioral patterns. For the safety of both officers and subjects, recognition of these signs is important. This is especially true in cases when more than two or three of the symptoms are exhibited at the same time by the same person. Once a subject suspected of agitated delirium is in custody, EMS should be immediately contacted to evaluate the subject. Some of the symptoms include:

    (a) Bizarre and/or aggressive behavior such as self-inflicted injuries; jumping into water; shouting (frequently irrationally); hiding behind cars, trees, and bushes; public disrobing (due to high body temperature or hyperthermia);
    (b) Irrational or incoherent speech;
    (c) Dilated pupils; shivering; high body temperatures (as high as 106 - 108 degrees Fahrenheit +); or profuse sweating (due to high body temperature);
    (d) Fear, paranoia, or panic;
    (e) Violence toward others; violence toward objects, especially glass; or violence in general;
    (f) High resistance to pain (standard defensive tactics and OC spray may be ineffective); and
    (g) Unexpected physical strength;
        1. For officer safety, **NEVER** engage a subject displaying symptoms of agitated delirium one-on-one.
        2. Subjects who display these symptoms and initially resist arrest violently may become extremely tranquil, appearing to have given up and accepted their fate. They may seem to be sleepy and resting. This is termed "**sudden tranquility**" and usually occurs just prior to death.
        3. When faced with a subject displaying these symptoms, officers will follow the guidelines for "positional asphyxia" listed above.

**RESTRAINT OF SUSPECTS BEING DETAINED**

17. It may be necessary to restrain an individual who is detained but not under arrest. The use of restraints on suspects being detained should only continue for as long as is reasonable to assure the safety of the suspect, officers and the public.

18. **Investigative Stops**—Officers have authority to handcuff a person when the officer has a reasonable suspicion, based on individually articulable facts that the person has committed a crime, <u>and</u>:

    (a) A reasonable suspicion based on articulable facts that the person will flee if not restrained;
    (b) A reasonable suspicion based on articulable facts that the person might present an immediate threat of serious physical injury to the officer or others present if not restrained; or
    (c) The person is, or the officer reasonably suspects based on articulable facts that the person will be, physically uncooperative with the officer in a way that interferes with the officer's ability to pursue the investigation or conduct the stop safely if the person is not restrained.

19. The authority to handcuff during investigatory stops continues only as long as one of the circumstances listed above exists, or as long as continued restraint serves to avoid one of the circumstances. If a change in situation eliminates all justification for the handcuffing, and the officers on scene do not reasonably believe that any of the circumstances listed above will exist if the person is released from the handcuffs, the handcuffs must be removed.

20. Officers shall note on the electronic Field Interview Card if the individual was handcuffed and the reasons why.

21. **Detentions for Investigation of infractions and violations**—Officers have authority to handcuff a person when the officer has authority to detain the person (Traffic Infraction Investigation and Citation), **and**:

    (a) The officer has a reasonable suspicion based on articulable facts that the person will flee if not restrained;
    (b) The officer has a reasonable suspicion based on articulable facts that the person might present an immediate threat of serious physical injury to the officer or other present if not restrained; or
    (c) The person is, or the officer reasonably suspects based on articulable facts that the person will be, physically uncooperative with the officer in a way that interferes with the officer's ability to pursue the investigation or conduct the detention safely if the person is not restrained.

    The authority to handcuff during investigatory stops continues only as long as one of the circumstances listed above exists, or as long as continued restraint serves to avoid one of the circumstances. If a change in situation eliminates all justification for the handcuffing, and the officers on scene do not reasonably believe that any of the circumstances listed above will exist if the person is released from the handcuffs, the handcuffs must be removed.

22. **Other authority to handcuff**—Officers have authority to handcuff a person when they have authority to detain under the following circumstances:

    (a) Detox holds.
    (b) Detentions for conducting mandatory fingerprinting and photographing of sex offenders and Uniform Controlled Substances Act violators.
    (c) Detentions to determine identity of a person for the purpose of issuing a citation for a violation or infraction.
    (d) When an officer has a lawful right to detain the person and has a reasonable suspicion based on articulable facts that the person will flee if not restrained.
    (e) A reasonable suspicion based on articulable facts that the person might present an immediate threat of serious physical injury to the officer or others present if not restrained.
    (f) The person is, or the officer reasonably suspects based on articulable facts that the person will be, physically uncooperative with the officer in a way that interferes with the officer's ability to pursue the investigation or conduct the detention safely if the person is not restrained.

    The authority to handcuff during the above situations continues only as long as one of the circumstances listed above exists, or as long as continued restraint serves to avoid one of the circumstances. If a change in situation eliminates all justification for the handcuffing, and the officer on the scene does not reasonably believe that any of the circumstances listed above will exist if the person is released from the handcuffs, the handcuffs must be removed.

23. **Execution of search warrant at private residence**—Officers have authority to handcuff people they encounter on the premises as is reasonably necessary for the execution of the search warrant with all practicable safety. Subject to the other restrictions contained in this Chapter, officers shall consider the following factors in deciding whether to handcuff individuals at a private residence during the execution of a search warrant:

    (a) The legitimate law enforcement interest in preventing flight in the event that incriminating evidence is found;
    (b) Minimizing the risk of harm to the officers; and
    (c) The orderly completion of the search, which may be facilitated if the occupants of the premises are present.

24. **Execution of search warrants at business premises open to the public** (restaurants, bars, public area of offices, etc.)—Officers engaged in a lawful police activity can justify the handcuffing of a person who is not a suspect if it reasonably appears under the circumstances that handcuffing is necessary to protect an officer or others from physical harm. Resistance to handcuffing under these circumstances does not support a charge of Resisting Arrest because the person is handcuffed not as part of an arrest, but only as a means of self-defense or defense of others. These kinds of detentions are not based on criminal conduct and the justification for the handcuffing can dissipate rapidly. Officers must pay close attention to the circumstances that justify these handcuffings, and if a change in circumstances eliminates all justification for the handcuffing, the handcuffs must be removed.

25. When deciding whether to remove restraints from a suspect, officers should weigh the safety interests at hand against the continuing intrusion upon the suspect's freedom of movement.

## RESTRAINT OF PREGNANT PERSONS

26. Females in labor shall not be handcuffed or restrained except in extraordinary circumstances and only when such restraints are necessary to prevent escape or injury.

27. Females who are known to be pregnant should be restrained in the least restrictive manner effective to assure the safety of the suspect, officers and the public.

28. Females in labor **shall not** be handcuffed or restrained except in extraordinary circumstances when they actively resist, aggressively resist or aggravatedly resist a lawful detention or arrest and the use of the restraint appears reasonable under the circumstances and such restraints are necessary to prevent escape or injury.

29. Supervisory approval is required when officers handcuff pregnant persons or females in labor.

## RESTRAINT OF JUVENILES

30. A juvenile under 10 years of age should not be restrained unless he or she is suspected of a dangerous felony and actively resists, aggressively resists or aggravatedly resists, or demonstrates an intent to resists (actively, aggressively, or aggravatedly) a lawful detention or arrest and the use of the restraint appears reasonable under the circumstances.

31. Mechanical restraints, including handcuffs, shall never be used with juvenile status offenders, including curfew offenders, in the absence of a real and credible threat that the juvenile will use force against another person.

32. Juveniles shall not be handcuffed behind the back in the absence of a real and credible threat that the juvenile will use force against another person.

33. Juveniles shall not be restrained with mechanical restraints other than handcuffs.

34. Juveniles shall never be handcuffed to a fixed object, such as a bench or a pole.

35. In addition to the above provisions, when a child is held in NOPD **secure custody** at the Juvenile Intake Unit:

    (a) Handcuffs should not be used except when cases of uncontrollable behavior present serious threats to the safety of the juvenile or others. All reasonable alternatives including verbal counseling or use of minimum physical restraint shall be attempted before resorting to the use of handcuffs.
    (b) Juveniles who are handcuffed must be isolated to protect them from abuse, and shall be directly observed by an NOPD officer at least twice in every 30 minutes to ensure the safety and well-being of the juvenile.
    (c) Handcuffs shall not be used for a time period in excess of one hour, and shall immediately be removed as soon as the juvenile is no longer a serious threat to his or her own safety or the safety of others.
    (d) NOPD officers shall not handcuff juveniles during juvenile court proceedings absent a reasonable real and credible threat that the juvenile will use force against another person, or specifically directed by the juvenile court judge in each instance.

36. In addition to the above provisions, when a child is held in NOPD **non-secure custody** at the Juvenile Intake Unit:

    (a) Handcuffs shall never be used except when cases of uncontrollable behavior present serious threats to the safety of the juvenile or others. All reasonable alternatives including verbal counseling or use of minimum physical restraint shall be attempted before resorting to the use of handcuffs.
    (b) A supervisor shall approve the use of handcuffs before they are applied.
    (c) Handcuffed juveniles – like all other juveniles in non-secure custody – must be under the continuous observation of an NOPD officer for the duration of their time in NOPD custody.
    (d) Handcuffs shall not be used for a time period in excess of one hour, and shall immediately be removed as soon as the juvenile is no longer a serious threat to his or her own safety or the safety of others.

37. **Reporting**—For each incident when handcuffs are used for a juvenile in custody at the Juvenile Intake Unit, whether secure or non-secure, the officer using the handcuffs must appropriately document the following:

    (a) Name of the juvenile.
    (b) Date and time the restraints were applied and by whom.
    (c) Persons notified, and when and from whom approval is obtained.
    (d) Location and confinement.
    (e) Staff member assigned to supervise.

CHAPTER: 1.3.1.1                                          Page 8 of 10

**RESTRAINTS ON PERSONS WITH DISABILTIES**

38. Unless exigent circumstances do not permit, after securing the scene and reasonably ensuring that there is no threat to human life, officers should make objectively reasonable modifications to standard cuffing and restraint practices in order to provide necessary, reasonable accommodations based on a suspect's known or apparent disability.

**APPLICATION OF HANDCUFFS OR FLEX CUFFS**

39. Handcuffs, including flex cuffs, may only be used to restrain a suspect's hands. Special care should be made to insure that the flex cuffs are not so tight as to cut off circulation to the hands.

40. The same handcuffing procedures used for standard handcuffing should be used for applying flex cuffs.

41. Some of the tactics used in standard handcuffing will not apply due to the nature and characteristics of the flex cuffs.

42. Caution should be taken to ensure flex cuffs are properly fitted and not over tightened.

43. Flex cuffs shall not be removed with any sharp and/or pointed object (i.e., knives, pointed scissors, etc.). A removal tool designed for safely removing flex cuffs should be used.

44. Because of the nature of the ratcheting mechanism of flex cuffs and their inability to be double locked, officers shall make frequent checks to insure the suspect secured has not tightened them restricting blood flow .

45. Handcuffing is not an absolute requirement of the Department. Officers should consider handcuffing any person they have legally detained or arrested when they reasonably believe that degree of restraint is necessary. **Officers should not assume every person should be handcuffed regardless of the circumstances.**

46. If a CEW is used, the officer should attempt to handcuff a suspect during the CEW activation cycle if possible. This is referred to as "controlling/cuffing under power" (see **Chapter 1.7.1 – CEW**).

47. When handcuffs are employed and always prior to the suspect being placed in a unit for transport, handcuffs shall be double-locked and checked to make sure the double-lock is set to prevent tightening and injury.

48. When one pair of handcuffs is not sufficient to restrain the individual due to size, injury or other physical condition and a single pair of handcuffs may cause an unreasonable level of discomfort, officers should consider alternatives, such as using an additional set of handcuffs linked in a chain or multiple flex cuffs.

49. An officer's handcuffs should be removed as soon as reasonable after the person has been seated, accepted for processing/custody by the jailor and is safely confined within a detention facility.

**NOTIFICATION OF RESTRAINT USE OTHER THAN HANDCUFFS**

50. When an officer transports a suspect with the use of restraints **other than handcuffs**, the officer shall inform the jail or detention facility staff upon arrival at the jail or facility that restraints were used.

51. This notification should include all information regarding the circumstances the officer reasonably believes would present a safety concern or medical risk to the suspect (e.g., prolonged struggle, extreme agitation, impaired respiration) that may have occurred prior to, or during, the suspect's transportation to the jail / facility.

**APPLICATION OF AUXILIARY RESTRAINT DEVICES**

52. Only Department authorized devices may be used by officers. Any person in auxiliary restraints and being placed in the custody or control of the NOPD shall be continuously monitored by the officers or members in whose custody or control he or she remains.

**APPLICATION OF LEG RESTRAINTS**

53. An officer may use leg restraints on a suspect when the suspect is actively resisting, aggressively resisting or aggravatedly resisting, or demonstrates the intent to resist actively, aggressively, or aggravatedly, a lawful detention or arrest, the use of the restraint appears reasonable under the circumstances and it is reasonable to do so during the course of detention, arrest or transportation. Only leg restraint devices approved by the Department shall be used.

**ADDITIONAL LEG RESTRAINT CONSIDERATIONS**

54. In determining whether to use a leg restraint, officers should consider:

    (a) Whether the suspect, officers and the public could be injured due to the violent behavior of a suspect and the safety of the suspect, officers and the public requires it;
    (b) Whether it is necessary to protect the suspect from his or her own actions (e.g., hitting his or her head against the interior of the transport unit, running from the arresting officer while handcuffed, kicking at objects or officers); and
    (c) Whether it is necessary to avoid damage to property (e.g., kicking at windows of the transport unit).

**GUIDELINES FOR THE USE OF LEG RESTRAINTS**

55. The following guidelines should be followed when applying leg restraints:

    (a) If practicable, officers should notify a supervisor of the intent to apply the leg restraint device prior to use. A supervisor shall be notified as soon as possible after the application of the leg restraint device.
    (b) Once applied, absent a medical emergency, restraints should remain in place until the officer arrives at the detention facility or the suspect no longer appears to pose a threat.
    (c) Once secured, a suspect **shall not** be placed on his or her stomach for an extended period. This position could reduce the person's ability to breathe. The person should be placed in a seated position in a police unit and secured with a seat belt.

    (d) The restrained suspect shall be continually monitored by an officer while in leg restraints. The monitoring officer should ensure the suspect does not roll onto and remain on his or her stomach.
    (e) Officers shall look for signs of labored breathing and take appropriate steps to relieve and minimize any obvious factors contributing to this condition.
    (f) Ask the prisoner if the circulation is adequate and adjust the tension to the extent necessary for adequate circulation to be maintained
    (g) Visually inspect the prisoner's legs, ankles, and/or feet for swelling, discoloration, or any other indication of inhibited circulation.
    (h) When transported by ambulance/paramedic unit and requested by medical personnel, the restrained person should be accompanied by an officer. The transporting officer should describe to medical personnel any behaviors or circumstances they believe would present potential safety or medical risks to the suspect (e.g., prolonged struggle, extreme agitation, impaired respiration).
    (i) When transported by NOPD the prisoner should be maintained in an upright position using the vehicle's seat belt restraint system.

## EXTENDED TRANSPORT TIMES

56. When the transportation or NOPD custody of a suspect is expected to last for an extended period, officers shall be cognizant of the status and position of restraints on the suspect and the suspect's position at all times. Any adjustment to the status or position of the restraints should be made as soon as the officer(s) become aware of a potential need. For safety, one officer should reapply the restraints while a second officer maintains a cover position.

## REQUIRED DOCUMENTATION

57. If a suspect is detained, restrained and released without arrest, the officer shall document the details of the detention, restraint and release. This documentation shall be in the form of a Departmental Electronic Field Interview Card or on an Electronic Police Report under an appropriate signal.

58. If a suspect is arrested, the use of restraints shall be documented in the related Electronic Police Report and any reports / forms (Blue Team and **Form 114**) required under **Chapter 1.3.6 – Reporting Use of Force**. The reporting officer shall include, as appropriate:
    (a) The amount of time the suspect was restrained;
    (b) How the suspect was transported and the position of the suspect;
    (c) Observations of the suspect's behavior during arrest and transport as well as any signs of physiological problems;
    (d) Any known or suspected drug use or other possible medical problems; and
    (e) The type and manner of restraints used.

Home    Seminars    Products    Blog    Studies & Consultation    Our Trainers    Contact Us

# America's Combatives and Liability Trainer
TRAINING WITH REAL-WORLD IMPACT

<< Why Do We Teach: "Sul" Position | Pointing Firearms: Range Safety or Real World? >>

## A New Idea in Safely Restraining the Proned Handcuffed Prisoner

by George on February 24, 2013 11:11

Search    Go

### Tag cloud

accidental discharge
active killer
active shooter
agency ammo
ammo selection
appendix carry
approved ar15
armed civilian
armed prone suspect
attention
attentional focus
auditory exclusion
be safe blue-on-blue
boston marathon
bombing
brazilian jiu jitsu
breakfall car stops
casualty collection
point
ccp ccw
chechen terrorist
civil civil liability
civilian close range
cognitive load
combat combat tuck
combatives
command
compression
asphyxia
concealed appendix
carry
concealed carry
concealed handgun
concealed pisol
license
concealed pistol
permit
concealed weapon
concealment
contact shots
context
contextually correct
cop courage cover
deadly force
decision-making
deescalation
de-escalation
deescalation of force
defensive
defensive tactics
devante hart
discipline draw dt
ecq

It's no secret that there are unreasonable people in this world—otherwise, you wouldn't have a job. A suspect who resists the inevitability of being handcuffed, forces you and other officers to use your body weight to control him long enough to get him restrained. But what of the handcuffed prisoner who continues to struggle and attempts to harm officers? In the past, hobbles and continued body weight have been the answer. This method of continued restraint, however, is being misrepresented to courts around the country as something that predictably results in suspect death, leading to adverse judgments and case law negatively affecting your ability to control the unreasonable suspect safely.

The possibility of a prisoner suddenly dying in custody from "excited delirium" must be considered by arresting officers whenever a prisoner continues to violently thrash and flail about. When a prisoner unexpectedly dies following being restrained in handcuffs, allegations of unlawful death soon follow. In the inevitable lawsuit, plaintiffs allege that the officers' actions killed—or even murdered—the decedent, despite the autopsy's finding of minor bruising and scrapes with no forensic evidence of fatal abuse. Their theory is, "The police used force. The suspect died. Ergo, the police killed him. Pay us money."

Plaintiffs will advance the discredited theory of "positional asphyxia," especially if a hobble is employed during the restraint —which they label as "hogtying." They accuse the officers of knowingly placing the suspect into a possibly deadly situation—proned out with multiple officers kneeling on top of him. This act of kneeling upon the suspect while attempting to restrain his arms is alleged to have compressed his upper torso, causing his death due to asphyxiation. They and their experts (often high-ranking former police officers) reject the science of physiology and the history of excited delirium and in-custody deaths, blaming officers and their methods. The latest case adverse to the police is *Abston v. City of Merced* (9th Circuit 2013. NOTE: *Abston* was not a published case and cannot be cited, but is indicative of the trend of the courts' views—rightly or wrongly—of bodyweight applied to suspect's during the arrest process.).

Excited delirium is not a new theory that was developed, as alleged by plaintiffs, to justify officer misconduct and the murder of people. Dr. Luther Bell, a physician specializing in mental health issues recognized that some patients died while in an agitated state. He named this manner of death, "Bell's Syndrome," or "excited delirium" in 1849. We have seen this syndrome manifest in suspect and prisoner deaths in modern policing where various methods of restraint or force have been blamed

- 1986: Neck Restraints. As a result of multiple in-custody deaths, LA County Deputy Coroner Ronald N. Kornblum, M.D , publishes a report concluding that the bar-arm restraint taught to LAPD officers was the cause of death due to compression of the trachea and vessels of the neck. 60% of all police departments banned the carotid restraint leading to a 650% increase in suspect injuries, and a 560% increase in officer injuries the following year (Source: LAPD).
- Mid-1990s: Oleoresin Capsicum Spray. OC, or pepper spray, because it inflames the mucous membranes and decreases the airways, causes death according to the ACLU.
- Mid-1990s to present: TASER. The TASER is alleged to cause the subject's eventual death minutes or hours later.
- Mid-1990s to present: Police body weight. Kneeling on a person, even though that individual remains alive after the weight is removed, inevitably causes death.

Excited delirium is a medical problem that can lead to death. It is not a police-caused phenomenon. That said, like a bad habit, it is very difficult to eradicate the idea of positional asphyxia because plaintiffs and their experts have a financial interest in keeping this concept alive.

Compression asphyxia is a preventable danger. With sufficient time and weight on the upper body, the suspect's ability to breathe is so limited that suffocation is possible. Like an anaconda snake killing its prey: every time the suspect breathes out, the body weight of the officers prevents the suspect from reinflating his lungs fully—eventually the lung capacity is so limited it cannot support life. If enough weight is kept on the upper torso, oxygen levels become critical and the body dies. However, officers removing their weight from the subject before death occurs permits that individual to recover. Like an

emotionally
integrated
enforcement
escalation
escalation of force
excited delirium
exercises
failure to warn fall
fear ferguson fight
fighting fire firearm
firearms
firearms training
force
force continuum
force on force
force-on-force
formation free hugs
friendly fire funeral
funerals gun
gun safety gunfight
gunfights handcuff
handgun hitting
homicide bomber
how to win
human factors
immediate response
instructing
instruction instructor
integrated force
integrated training
involved officer
islam isosceles
isosceles stance
jiu jitsu justice
lasd video laser
law enforcement
lawsuits
legally armed
legally armed citizen
liability
los angeles sheriff's
department
m16
malfunction drill
martial art
mass murder
massacre mats
michael brown
military mindset
mitigation mma
move and shoot
moving and shooting
multitasking murder
muslim off duty
off-duty
off-duty cop shot
off-duty officer
safety
off-duty officer
survival
off-duty police
shooting
off-duty shooting
officer
officer involved
shootings
officer murder
officer safety
officer safety
officer safety excon
officer survival
officer wilson
officers ois ooda
orientation parolee
pbied perceptual
pistol
plainclothes officer
safety

athlete who works to peak effort, stopping the exercise results in a return to stasis. If the officers remove their weight after handcuffing the individual, and he is able to speak and breathe, it is not the officers' kneeling on him that kills the prisoner —it is likely excited delirium.

Despite plaintiff experts' opining that "Everyone knows that kneeling on a struggling subject kills people, and they ought to restrain them in a manner similar to that used in mental hospitals," there is no practical method that effectively takes charge of a resisting suspect other than body weight until they are handcuffed. The suspect who continues to violently resist or attempts to harm officers remains problematic.

### One Handcuffed Prisoner, Two Officers



When the subject is taken to the ground, the only practicable solution to prevent his rolling on to his back is to use body weight to his upper torso. To date, this is the only practical method developed to initially get him handcuffed. Until now, there has been no real alternative to restraining a violent handcuffed prisoner other than through applied bodyweight. A new method of restraining a violent handcuffed prisoner without bodyweight or significant force by two officers has been developed and promises to be an effective alternative to kneeling on a handcuffed subject. Let's walk through the arrest process.

When a proned suspect refuses to comply, rather than wrestle his arms to the small of his back into cuffing position, it is far simpler and much more practical to simply handcuff each wrist at the first possible moment. This provides a handle on each wrist as well as pain compliance. Now each arm is forced to his back and the empty cuffs are cuffed together—cuff the cuffs. Once the handcuffs are secured and he finally stops resisting, the handcuffs can be adjusted and the prisoner transported in one set of restraints.

If the prisoner continues to unreasonably flail about, attempting to injure himself or others, his health and welfare now becomes the responsibility of the officers. To safely restrain him further, both officers move to either side of his torso. Each officer puts his knees to the ground, and scoots up against the suspect's shoulders and elbows, using their legs to press the suspect's arms against his body.

Both officers working together pin the suspect between them. There is no body weight necessary to press him to the ground. A very strong and determined individual may require an officer to press down on his shoulder blade with fingertip pressure to keep his arm in contact with that officer's legs—the pressure needed is surprisingly light. Sometimes a prisoner will attempt to spin out from the officers, but this is dealt with simply by the officers repositioning, shuffling on their knees to keep the suspect pinned between them both. If he kicks, a hobble can be used to keep the legs together.

### Prevent the Appearance of Misconduct

When you respond to a call of a disrobing, screaming, growling, grunting individual who is acting wildly, aggressing lights, with an apparent intense dislike of glass and shiny objects and very hot to the touch, this is an individual who is in immediate need of medical aid and sedation by paramedics. However, it is the police who must restrain him using their tactics and force tools so paramedics have the opportunity to save his life. Staging the medics early should always be considered as this person is exhibiting signs of sudden in-custody death.

In order to prevent a prolonged struggle by this drugged or deranged subject who exhibits immunity to pain as well as superhuman strength, the optimal method of quick restraint is a TASER. Once down and under TASER power, he needs to be quickly placed into handcuffs. There is nothing as effective as the officers' body weight to do this, pinning his upper torso to the ground as the wrists are handcuffed.

Once cuffed, all weight is removed from the prisoner's body, and the officers use their knees to pinch him between them, preventing him from significantly moving but not in any way affecting his ability to breathe. If he continues to kick, a hobble can be placed around the ankles and cinched up, with the tail left unattached or held by a third officer. If he attempts to slam his head into the ground, placing a hand on his head and keeping it pinned to the ground is sufficient. If he is so determined that he threatens to roll, a hand to his shoulder blade, requiring little force keeps him secured. In this manner, he may be held indefinitely—and safely—until paramedics arrive and take custody of him.

This is an extremely effective method of protecting the prisoner from himself while also preventing the violently out of control subject from harming officers. It is deceptively simple, and is often greeted with skepticism by officers until they actually attempt it and find it a practical solution to a problem to which there really has been no satisfactory solution.

point gun
pointing guns police
police gunfight
police shooting
police training policy
positional asphyxia
post-shooting
pressure cooker
principle based
prison crouch
prison squat
problem solving
problem-solving
prone prone assault
prone suspect
protestor and police
hug
proximity shots
public safety
public safety
statement
punch rack
recertification
recertify relevance
relevant report
reports
rescue task force
rescue team
response restrain
rifle roll rt rtf rules
rules for surviving a
gunfight
rumi safety violation
salafist scenario
scenario-based
training
school shooter shoot
shooting shootings
sit
situational
awareness
stance stoppage
strategy
suicide bomber sul
sul position survival
surviving suspect
swat tactical
tactical principles
tactics tap teach
teaching techniques
terrorism theory
time
timothy brenton
traffic stop
traffic stops training
training injuries
training to warn
transition
tunnel vision
unintentional
discharge
use of force vendor
violence warning
warrior weapon
weaver
weaver stance
working memory
writing

While the fiction of positional asphyxia will likely not go away, the problem of suspects dying in-custody due to their own drug-taking may be minimized. Additionally, as more and more paramedics are authorized to treat this cluster of signs with ketamine and other injectable drugs to immediately calm and suspend the subject's ability to physically resist, even more will be prevented.

Now there is an alternative to using body weight to control a handcuffed violently resisting prisoner. If the suspect dies following his being restrained, it may not stop plaintiffs and others from accusing the police of causing the death, but it will eliminate some ammunition for their arguments. And it is more effective in maintaining control of the handcuffed prisoner. This is a win-win for officers and the prisoners they are attempting to protect from themselves.

Tags: prone, handcuff, restrain, excited delirium, positional asphyxia, compression asphyxia, handcuff

Categories: Defensive Tactics / Combatives

Permalink | Comments (0) | Post RSS

## Related posts

Defensive Tactics / Combatives: MMA or Fighting Like a Cop? As your agency's defensive tactics or force response trainer, you are undoubtedly the &ldquo;...Abandon "Techniques" All Ye Who Train CombativesA discussion of why principle-based combatives training is superior and why technique-based training...It's About Saving Lives, Not Running Down Martial ArtsCutting Edge Training is not anti-martial arts or jiu-jitsu. Instead, we are pro-problem solving vi...

## Category list

Active Shooter (1)
Commentary (1)
Concealed carry (2)

Defensive Tactics / Combatives (7)

Firearms (14)

Legally Armed Citizen (2)

off-duty shooting, off-duty officer safety, off-duty officer survival, plainclothes officer safety, (2)

Officer Safety (10)

Police Civil Liability (6)

Police Public Policy (6)

Tactical Theory (7)

Training (15)

Why Do We Teach? (5)

Copyright © 2009, Cutting Edge Training. All Rights Reserved. Log in
Website Design by Mindfly