```
     IN THE UNITED STATES DISTRICT COURT
       FOR THE MIDDLE DISTRICT OF GEORGIA
                 COLUMBUS DIVISION


RODRIGO ARREOLA, as a parent of   )
Hector Arreola, Deceased, and as  )
Personal Representative and       )
Administrator of the Estate of    )
Hector Arreola, CONCEPCION        )
ARREOLA, as parent of Hector      )
Arreola, and S.A., minor child    )
of Hector Arreola, by next friend )
Jezreel Imee Custodio,            )
                                  )
         Plaintiffs,              )  CASE NO.:
                                  )  4:19-cv-00005-CDL
vs.                               )
                                  )
THE CONSOLIDATED GOVERNMENT OF    )
COLUMBUS, GEORGIA, OFFICER        )
MICHAEL AGUILAR, in his individual)
and official capacity, OFFICER    )
AARON EVRARD, in his individual   )
and official capacity, and        )
COLUMBUS POLICE DEPARTMENT CHIEF  )
OF POLICE RICHARD T. BOREN, in his)
individual and official capacity, )
                                  )
         Defendants.              )
```

Oral deposition of **OFFICER BRIAN J. DUDDLEY**, witness, called by the plaintiffs, before Eric Cavanaugh, Certified Court Reporter, held at the law offices of Page, Scrantom, Sprouse, Tucker & Ford, 1111 Bay Avenue, Third Floor, Columbus, Georgia 31901, on the **16th day of October, 2019**, commencing at 9:10 a.m.

1

---

**APPEARANCE OF COUNSEL**

On Behalf of the Plaintiff:

        Mark C. Post
        MARK POST LAW
        3 BRIAN Park Court
        Suite F
        Columbus, Georgia 31904
        706.221.9371 Telephone
        mpost@markpostlaw.com

On Behalf of the Defendants:

        Tyler C. Cashbaugh
        Page Scrantom Sprouse Tucker & Ford
        1111 Bay Avenue, Third Floor
        Columbus, Georgia 31901
        706.324.0251 Telephone
        tcc@psstf.com

---

**INDEX OF EXAMINATIONS**

|  | Page |
|---|---|
| By Mr. Post.................................. | 06 |

2

---

**INDEX OF EXHIBITS**

| Plaintiff's | | Page |
|---|---|---|
| 1 | Amended Notice of Taking Deposition........ | 17 |
| 2 | Police Roster.............................. | 18 |
| 3 | Field Use-Of-Force Report.................. | 22 |
| 4 | Office of Professional Standards........... | 23 |
| 5 | Annual Training Dashboard.................. | 60 |
| 6 | Roster CPD Training........................ | 62 |
| 7 | Use-Of-Force Issues 2016 In-Service........ | 62 |

3

---

**COURT REPORTER'S DISCLOSURE STATEMENT**

I, ERIC CAVANAUGH, Georgia Certified Court Reporter, Certificate Number 2560, in compliance with Code Section 9-11-28 and Code Section 15-14-37, make the following disclosure about all arrangements, financial and otherwise, involving the foregoing deposition:

1.) I was contacted directly by telephone regarding scheduling of the deposition as to date, time and place by the office of the scheduling attorney, or received a message from the office of the scheduling attorney by answering machine and returned the call, with scheduling of the deposition as to date, time and place confirmed, and no prior financial arrangements were negotiated between counsel and myself.

    This 15th day of October, 2019.


        Eric Cavanaugh, CCR #2560.

4

## S T I P U L A T I O N S

IT IS STIPULATED AND AGREED by and between counsel appearing for the respective parties that:

(1) The oral deposition of **OFFICER BRIAN DUDDLEY,** called by the plaintiffs, taken before Eric Cavanaugh, at Page, Scrantom, Sprouse, Tucker & Ford, 1111 Bay Avenue, Third Floor, Columbus, Georgia, commencing at 9:10 a.m. on the 16th day of October, 2019;

(2) ALL FORMALITIES with reference to notice or taking, notice of time and place of taking, qualifications of the court reporter, and all other matters precedent to the taking of deposition, are WAIVED;

(3) With consent of deponent, the reading and signing of the deposition by deponent is **WAIVED;**

(4) ALL OBJECTIONS, EXCEPT as to the form of the question and responsiveness of the answer, are RESERVED to the time of the hearing of the case; and

(5) ALL FORMALITIES with reference to the filing of deposition, including notice of filing, et cetera, are WAIVED.

5

**BRIAN J. DUDDLEY,**
**Having been duly sworn, testified under oath as follows:**

MR. POST: This will be the deposition of Officer Brian Duddley taken by the plaintiffs for the purposes of discovery and all other purposes allowed by law.

The deposition is taken by agreement of counsel and pursuant to notice. All objections will be reserved except for those going to the form of the question or the responsiveness of the answer.

Is that agreeable?

MR. CASHBAUGH: Yes.

**EXAMINATION**
BY MR. POST:

Q. If you would, please, sir -- we've already met obviously. I am the counsel for the plaintiffs in the case.

Could you tell us what your full name is and tell us what any nicknames are that you have.

A. No nicknames. Full name is Brian Jeremy Duddley.

Q. You go by Brian?

A. Correct, sir.

6

Q. Before I forget, what is your weight, height, and age?

A. Six foot and 107 this morning. And my age is 31.

Q. 107?

A. 107.

Q. 207?

A. 207. I apologize. I'm glad you caught that.

Q. 207 pounds. Okay. I just wanted to make sure.

A. My scale is broke.

Q. Have you been -- were you about the same size, about the same weight back in January 9th of 2017?

A. Correct. Yes, sir.

Q. Have you ever given a deposition before?

A. No.

Q. Okay. Well, you know you're here today to give a deposition. And since you haven't ever given any depositions, let me say this to you.

If you would, wait until I finish my question to you before you start the answers. Is that okay?

A. Perfect.

Q. And I'll try to do the same for you. I'll try to let you finish your answer before I ask another question.

7

A. Correct. Thank you.

Q. Witnesses and lawyers have a tough time doing that sometimes. I was a prosecutor for over 20 years and I've seen it happen a lot. I've done it.

A. Understood.

Q. And I will try not to.

Have you received any police training with regard to testifying in court?

A. Yes.

Q. Okay. So you know a bit about how to testify in court. And, of course, a deposition is under oath so it's just as important as court. Right?

A. Correct.

Q. Okay. Have you ever testified in a jury trial before?

A. No, I haven't had to.

Q. That was out of curiosity.

Do you have any difficulty hearing?

A. No.

Q. So if for any reason you think you did not completely hear what I asked you or you don't understand what I asked you, please ask me to repeat the question. Okay?

A. Understood.

Q. Okay. Do you agree that if you answer a

8

question, we can assume that you fully heard it?
A. Correct.
Q. Okay. I know this is pretty obvious, the answer to this question but I'm going to ask you anyway. Are you suffering from any physical or mental condition today that would keep you from testifying truthfully and fully and understanding questions?
A. No, I'm perfectly healthy.
Q. Okay. So you've not taken any drugs and you've not had any alcohol that would affect your ability to take part in this deposition. True?
A. No.
Q. Okay. Where do you live?
A. 6000 River Road.
Q. Okay. And, of course, that's here in Columbus, right?
A. Correct. Yes, sir.
Q. Do you rent or own?
A. Rent.
Q. Is that an apartment complex?
A. Yes.
Q. Which one?
A. Graystone at the Woodlands.
Q. Okay. Are you married?

9

A. No.
Q. Do you have any -- have you had any prior marriages?
A. No.
Q. Congratulations.
A. Exactly.
Q. Let's see, do you have any children?
A. No.
Q. Do you go to church anywhere?
A. No.
Q. Okay. Are your parents still alive?
A. Yes.
Q. Okay. Where does your mom live, mom and dad live?
A. My mom lives in Columbus, Georgia. And my dad lives in -- I always get the city wrong, but it's in Indiana. Nineveh or Nineveh or something like that. It's outside of Indianapolis.
Q. Got you. Where in Columbus does your mom live?
A. Off of Milgen Road.
Q. Is that the house you grew up in?
A. Partially. I mean, yeah. Teenage, late adult life.
Q. Where were you born?

10

A. Cosal, Germany. Military brat.
Q. How long did you live in Germany?
A. Two different times. Maybe a total of like seven years.
Q. What does your mom do for a living -- or what did she do for a living if she retired?
A. She is a groomer.
Q. Like a dog groomer?
A. Dog groomer.
Q. So since you've got a K-9 recently, that makes some sense, huh?
A. I get free baths.
Q. And just for the record, what I have referred to is what you mentioned earlier is that you have recently become a K-9 handler for the police department; is that correct?
A. Correct. Yes, sir.
Q. Do you have any brothers or sisters?
A. I do.
Q. How many?
A. One brother, no sisters.
Q. How old is he?
A. He is 24. Sorry.
Q. Where does he live?
A. Atlanta.

11

Q. What's his name?
A. Demonte Dudley. Do you want me to spell it for you?
Q. Sure.
A. D-e-m-o-n-t-e. Last name the same.
Q. You said your mom is a dog groomer. What's the name of the business?
A. She works for Second Avenue Veterinarian Clinic, Dr. Lefranc.
Q. Doctor who?
A. Dr. Lefranc.
Q. Okay. And I ask you these questions mainly because if we have to pick a jury, it would be relevant for that.
A. Correct.
Q. Tell us a little bit about your educational background. Not the police education. But high school, any advanced college, that kind of thing.
A. High school, no college.
Q. Where did you go to high school?
A. Part at Hardaway and part at Shaw.
Q. Where did you get a diploma from?
A. I got my GED.
Q. Okay. Is there a specific place you got that from?

12

A. I can't remember -- Tillinghurst when it was there.

Q. Okay. Where was that at?

A. You know, I only went there one day just to get the GED. Literally walked in there, got the GED and walked back out. I think it was right there at Buena Vista and Morris. I think the exact address was Morris Road. I can't remember.

Q. Okay. What about any employment prior to you working at the Columbus Police Department?

A. All retail. And it's going to be Kohl's and Dick's Sporting Goods.

Q. Okay. Your employment at Kohl's, there was some in Columbus and some in Auburn or Opelika?

A. Opelika technically, yeah.

Q. Okay.

A. They all cheer for Auburn though.

Q. I'll keep my comments to myself.

A. Exactly.

Q. What was it that moved you to become a Columbus Police Officer?

A. Part of it was curiosity I always had. And then also my grandfather was a long time police officer up in Pittsburgh -- well, outside of Pittsburgh.

13

Q. Is your grandfather still alive?

A. Yes, sir.

Q. Okay. Take advantage of them while you can.

A. You know what, I actually don't.

Q. That's just advice from somebody that's getting older that doesn't have any grandparents any more.

A. Yeah. My cousins do. They still live close by him, so...

Q. You said just outside of Pittsburgh. Is there another little town?

A. Yeah, he lives in Canonsburg. It's a small town.

Q. When were you hired with the Columbus Police Department?

A. I don't know the exact month, but it was -- I always say fall of 2012, if we have a fall.

Q. Maybe we did back then. And, of course, that would be more fully reflected in your employment application.

A. Yes, sir. Correct. Sorry.

Q. Do you plan to stay with the police department long term?

A. Absolutely.

Q. Okay. What's your rank now?

14

A. Officer.

Q. Okay. Are you still in Patrol for the Columbus Police Department?

A. I work for Special Operations now in the Investigation Bureau.

Q. Okay. Who's in charge of Special Ops now?

A. Currently, Captain Kennedy.

Q. Captain Charlie Kennedy?

A. No. Debra Kennedy. Debbie. I was just going to reference that. He's a major now. Sorry.

Q. That's what I thought.

A. Yeah.

Q. Are you friends with Corporal Aaron Evrard?

A. Yes. Outside of work, definitely.

Q. So you socialize together and that sort of thing?

A. Occasionally. Yes, sir.

Q. What about Officer First Class Michael Aguilar?

A. Same.

Q. What about Officer Ronnie Oakes?

A. Same. Less outside socializing.

Q. What other officers or employees of the Columbus Police Department do you socialize with outside of work?

15

A. Outside of work? Dillon Tally.

Q. Who?

A. Dillon Tally.

Q. He's in Patrol?

A. Correct. Honestly, that might be it. Yeah, that's it.

Q. Okay. What about EMTs, paramedics, fire, personnel with the Columbus Police Department, friends, any of those people?

A. Since I do have a K-9, Captain Scott Boatner. He also has a tracking dog and him and I work together outside of work.

Q. Do you use your dog for any other purposes besides police work?

A. Tracking -- well, no. She just sits at home and barks all day.

Q. When you say tracking, that's tracking fugitives, tracking people that are lost, that sort of thing?

A. Any human. Living human.

Q. Okay. Do you know or are you friends with Brad Barnes with the Fire Department?

A. It does not ring a bell. I may know him if I see him.

Q. I think it might be James Brad Barnes. What

16

1  about Aaron Bush, same question?
2     A. I think I know who you're speaking of. I
3  think I went on a couple of calls with him.
4  Honestly, I don't know most of them because they
5  don't -- usually their names aren't really visible.
6     Q. Safe to say you're not close friends or pals
7  with either one of them, right?
8     A. Police and fire, we're really separated is
9  what the joke is.
10    Q. So the answer to that question is yes then.
11    A. Yes.
12    Q. Okay. I'm going to ask you a few questions
13 about -- well, before I forget, I want to put in
14 Plaintiff's Exhibit Number 1 which is our Amended
15 Notice of Taking the Deposition, your deposition
16 mainly to help the court reporter.
17        But it does ask you to bring any reports or
18 documents prepared in the case that have not been
19 previously provided to us by your counsel.
20        Did you bring anything with you? Is there
21 anything that you know of that we have not received?
22    A. No.
23    Q. Okay. And it also asks you to bring any body
24 camera recording or any other electronic recording
25 made with regard to the case which has not been

                                                      17

1  previously provided to us by your counsel. You have
2  not brought anything else with you.
3     A. No, sir.
4     Q. So there's nothing else then, right?
5     A. No.
6     Q. I know that the Columbus Police Department has
7  Sectors A, B and C as far as how you divide up patrol
8  areas. Which sector were you in on January the 9th
9  of 2017?
10    A. We were in Sector A.
11    Q. And I am going to mark as Plaintiff's Exhibit
12 Number 2 --
13       MR. POST: Do you want a copy, Tyler?
14       MR. CASHBAUGH: Just the roster. No.
15 BY MR. POST:
16    Q. I'll show that to you. This is what has been
17 provided -- Plaintiff's Exhibit Number 2 is what has
18 been provided to us through discovery as the roster
19 in effect on January the 9th of 2017.
20       Looking at the bottom of the page there, I
21 would take it that next to the names where it says
22 1A, 85, 1A 25 and so forth, that would be the
23 officers assigned to Sector A on January the 9th,
24 2017; is that right?
25    A. Correct. Those are our unit numbers that we

                                                      18

1  use on the radio.
2     Q. Okay. So on that particular date, you were
3  1-A-25? One Adam 25?
4     A. Correct. One Adam 25 is how we say it.
5     Q. And that would be your call sign.
6     A. Correct.
7     Q. And Sergeant Randy -- is it Kiel or Kiel?
8     A. Kiel.
9     Q. Okay. Sergeant Randy Kiel, K-i-e-l, was One
10 Adam 85. Correct?
11    A. Correct. Sometimes we just refer to it as
12 just the last number. So 85, 25 and so forth.
13    Q. And Michael Aguilar was One Adam 28 on that
14 date of January 9th, 2017; correct?
15    A. Correct.
16    Q. And Officer William Oakes was One Adam 31,
17 correct?
18    A. Correct.
19    Q. And As I understand it at times, some people
20 call Officer Oakes by another name. Would that be --
21 I'm trying to remember. Is that Randy?
22       MR. CASHBAUGH: Ronnie?
23       MR. POST: Ronnie.
24       THE WITNESS: Correct.
25 BY MR. POST:

                                                      19

1     Q. Ronnie Oakes.
2     A. Yes, sir.
3     Q. And, of course, Officer Aaron Evrard was One
4  Adam 35, correct?
5     A. Correct.
6     Q. Okay. Evrard, E-v-r-a-r-d.
7     A. Yes.
8     Q. Okay. I have a Use of Force Report numbered
9  1701. I'm just going to show it to you at this point
10 without marking it. It is CCG 1945 through CCG 1950.
11 When I say that, those -- I'm referring to the little
12 numbers at the bottom right-hand corners of these
13 pages.
14       That is how your counsel has provided
15 discovery to us. They mark these things and stamp
16 them with what's called a Bates stamp so we can keep
17 track of -- or they can keep track of what they have
18 provided to the plaintiffs in this case. Sometimes
19 we refer to these CCG numbers just so we can keep
20 track of it for purposes of this deposition.
21       What I'm looking at and what you have before
22 you that I've just referenced says Reporting Officer
23 Brian Duddley at the top. Do you see that?
24    A. Yes, sir.
25    Q. And there is a narrative of circumstances

                                                      20

**Page 21**

1  having do with suspect data, Hector Rodrigo Arreola
2  for the date of January 9th of 2017.  Do you see
3  that?
4     A. Yes, sir.
5     Q. And flipping to the next page, 1946, I see at
6  the bottom of that page, it says Reporting Officer's
7  signature.  Is that your signature?
8     A. Yes, sir.
9     Q. Okay.  Because I see next to it where it says
10 Name of Supervisor, Sergeant Randy Kiel.  And then it
11 says by Michael Aguilar.  But that's actually by you,
12 correct?
13    A. Correct.
14    Q. Okay.  I just wanted to be clear on that so I
15 knew who had submitted this.
16    A. Well -- and if I'm looking correctly, I think
17 it's just saying name of supervisor notified and then
18 who notified it, which would mean Aguilar notified
19 Sergeant Kiel and then I'm just the reporting
20 officer.
21    Q. So you prepared the report.
22    A. I prepared the report.  And then Michael
23 Aguilar notified Sergeant Kiel about the --
24    Q. Use of force.
25    A. -- event.  Correct.

**Page 22**

1     Q. Okay.  And you also prepared the following
2  page which was CCG 1947, correct?
3     A. Yes.
4     Q. Okay.  Is there anything on this Use of Force
5  Report that you prepared, CCG 1945 through 1947, that
6  is inaccurate?
7        MR. CASHBAUGH:  Do you want to take a chance
8     to read it?
9        THE WITNESS:  I can read it fully.  (Witness
10    perusing document)  Everything is accurate.
11 BY MR. POST:
12    Q. I think I'm going to mark that as Plaintiff's
13 Exhibit Number 3.
14       What have you reviewed for this deposition
15 today?
16    A. Camera footage.  Obviously, the Use of Force.
17 My O-P-S statement.  That's really it.
18    Q. When you said O-P-S statement, is that the
19 Office of Professional Standards?
20    A. Correct.  I apologize.
21    Q. Sometimes that is also referred to as OOPS by
22 patrol officers; is that correct?
23    A. Yeah, unfortunately.
24    Q. And the reason I say that is sometimes I might
25 call it O-P-S, and I might call it OOPS, and I might

**Page 23**

1  call it the Office of Professional Standards when I'm
2  asking you questions.  Okay?
3     A. Understood.
4        MR. POST:  Do you need a copy?
5        MR. CASHBAUGH:  Yeah, I'll take a copy.
6     Thanks.
7  BY MR. POST:
8     Q. Officer Duddley, I have marked Plaintiff's
9  Exhibit 4 and handed it to you, which appears to be
10 the statement -- or at least a transcript of the
11 statement that you gave to the Office of Professional
12 Standards at the Columbus Police Department on
13 Wednesday, January the 11th of 2017.  Do you see
14 that?
15    A. Yes, sir.
16    Q. Okay.  Take a moment to review the transcript
17 of the OOPS statement, unless you've already done it,
18 which is marks CCG 224 through CCG 249.
19    A. (Witness perusing document).
20    Q. My question to you after you have a chance to
21 review it was, number one:  Is there anything that
22 you need to correct in that transcript?
23    A. No.
24    Q. Okay.  And my second question is:  Was what
25 you told to the Office of Professional Standards on

**Page 24**

1  January 11th of 2017 in that interview true?
2     A. Correct.  It was.
3     Q. Okay.  So everything, therefore, in that
4  transcript is accurate; correct?
5     A. Yes, sir.
6     Q. Okay.  And that's excluding potential typos,
7  but we'll cover those if we need to.
8        What I'd like to do at this point is to let
9  you go ahead and tell us what you remember about the
10 events of January the 9th of 2017 having to do with
11 Hector Rodrigo Arreola.
12    A. Okay.
13    Q. Can you do that?
14    A. Yes.
15    Q. Okay.
16    A. So on that morning, we received a call
17 initially to go check on who we discovered was Hector
18 Arreola's mother.  We went there and knocked on the
19 door, spoke to her -- his mother and asked if
20 everything was okay.
21    Q. When you say his mother, you're talking about
22 Hector Arreola's mother?
23    A. Correct.
24    Q. Go ahead.
25    A. Spoke to Arreola's mother.  At that time, she

seemed to be well, healthy.  Everything seemed to be okay except that she just was woken up by us.  Spoke to her for a few minutes and advised her that her son was concerned about her well-being, that being Hector Arreola.

She said everything was okay.  She didn't really understand why we were there or why he would have called.  At that time, we left it as, hey, you may want to check on your son then.  So we left and then --

Q. When you say we, who is we?

A. We, being Officer Aguilar and myself.

Q. That's Officer Michael Aguilar?

A. Correct.

Q. Go ahead.

A. He and I left and we responded to a few other calls.  While on a -- I think it was a business burglary, we heard that -- over the radio that the address where Hector Arreola just sent us was given back out again for another welfare check.

Due to us -- and I say us being Aguilar and myself -- having prior knowledge of it, we went ahead and took that call.  Went back out and that time, Hector Arreola was standing near a car in front of his mother's driveway.

25

We initially started speaking to Hector Arreola and he stated that things were not right at his mother's house.  He stated that there was people watching his house -- or his mother's house or in the house, and that we should check on her again.

While still talking to him, his mother came out of the house without police even going to her door to ask her to come out.  She stood by while we spoke to Hector primarily.  And that's when we were asking him kind of what's going on, what's the concern, what may have happened to get to this point.  Trying to really, I guess, dig through why we were here -- why we were there.

We continued speaking to him.  At that time, I kind of started to come to the conclusion that he may have not been in the right frame of mind.  I wasn't unsure -- or I wasn't sure if it was mental issues or some type of illegal narcotics and/or maybe alcohol.

So continued to speak to him.  That's when he started to show signs of paranoia, ultimately.  We were speaking to him and I remember him saying that we weren't police, and we were pointing our pistol at him, stuff like that.

Q. Let me ask you this:  Obviously, I've had an opportunity to review the videotapes some.  As I

26

recall, there was some discussion between you and Hector Arreola about your hands being on your pistol or on your holster or something like that.

A. Correct.  He did mention that to me.  And sometimes that's just kind of a comfortable posture that I have.  Usually, I rest one hand -- at that time when I was wearing a different uniform, it would have been my forearm over my taser and then just kind of like my hand or my other forearm resting on my holster or -- yeah, my holster.

And I explained that to Hector, saying that that's just me standing there.  It was not me retrieving my pistol or anything.

During that discussion, that's when he abruptly walked away from us, ran from us and kind of hid behind a trash can and was saying that we were pointing our pistol at him.  We explained to him that no pistol was retrieved at that time.

His mother, while we were still speaking to him, she was trying to get him into the house.  She even explained to him that it was very cold that morning and very -- I guess early in the morning for her.  And she was explaining to him that she needed to be up in the morning.

Shortly after the discussions, that's when

27

Hector Arreola decided to walk away from police and go to a nearby neighbor's residence.

Before that, we had asked for EMS to come to the scene.  I asked for no lights and sirens just due to the fact of how paranoid he was at that time about police being on scene and whether we were police or not.

At this time still, it was no immediate need for police -- I mean EMS.  So it was just going to be simply a psychological eval for us so that he could get the necessary help that we couldn't provide for him.

Again, he walked away and went to a nearby neighbor's house.  Officer Aguilar and I discussed that since he was not complying with us asking to, you know, stay with us and speak to us some more, we decided at the time that it would probably be safer to just detain him until EMS would come to the scene and evaluate him.  So that was an idea that Officer Aguilar and I discussed before we made it to the house.

Q. And when you're saying to the house, you mean to the house to which Hector Arreola had walked away to; is that right?

A. Correct.  And I can't recall that address, but

28

```
 1  it was still on Moss Drive.
 2     Q. Okay.  The first place where you all responded
 3  to Concepcion Arreola's house was 760 Moss Drive; is
 4  that right?
 5     A. I believe that's the address.  I know it
 6  started with a 7, correct.
 7     Q. Okay.  Go ahead.
 8     A. So he went to the nearby neighbor's house.  We
 9  still tried to speak to him and say, you know, come
10  down and talk to us.  All it is is we're trying to
11  give you help.  We did explain to him that if he did
12  not come down and talk to us, that he would go to
13  jail at that night -- or at that time.
14        Officer Aguilar and I went up there,
15  approached him.  Again, still trying to figure out
16  what was going on.  At that time, Officer Aguilar
17  went to grab for Hector Arreola's right arm and
18  Arreola immediately pulled away from Aguilar coming
19  into my direction, which would be Hector Arreola's
20  left side.
21        I grabbed his other hand and we attempted to
22  get his hands behind his back.  Once we both had his
23  hands, we fell to the ground and that's when the
24  struggle began.  During that struggle, I can vividly
25  remember Officer Aguilar telling me to maintain his
                                                      29
```

```
 1  lower body so that he couldn't get his knees under
 2  him so that he could stand back up.
 3        At that time, it was just still trying to grab
 4  the hand, get it behind his back.  Officer Aguilar
 5  continued to try to keep his arms spread out so that
 6  he doesn't get in -- I guess you could say like a
 7  push-up position so that he could get off the ground.
 8        After a long struggle, intense struggle, we
 9  were able to finally get his hands behind his back
10  and get a pair of cuffs on there.  Somewhere in that
11  struggle, I remember Officer Aguilar asking for units
12  to come to the scene for further assistance.
13        I do remember Officer -- correction -- his
14  mother pleading to him, telling him to, you know,
15  stop, stop, stop.  And, again, that's telling Hector
16  Arreola stop, quit resisting.
17        Once we got him in custody, that's when the
18  first officer arrived on scene and that was Officer
19  Aaron Evrard.  He arrived and he asked if we needed
20  any assistance.  At that time I told him I was going
21  to go retrieve our leg irons so that we could put
22  them on his ankles due to just the intense struggle
23  that we'd just had.  Officer --
24     Q. At that point, you all had him in custody; is
25  that right?
                                                      30
```

```
 1     A. His hands, yes.  He was still trying to resist
 2  some.  Not as intense due to his hands being cuffed,
 3  but he was still resisting.  I ran to my car and got
 4  the leg irons.  I came back, was able to put the leg
 5  irons on his legs.  That's when we rolled him to his
 6  side and searched his pockets and his person for any
 7  weapons or anything like that.
 8        During that time -- I can't remember exactly
 9  whose hands it was, but I do remember them checking
10  his pulse just because he was very, very exhausted.
11  They did say that they felt a pulse.  They sat him up
12  and at that time, EMS arrived on our location.
13        I walked down just after speaking to a witness
14  who was standing there, I went to speak to EMS.  Told
15  them what happened.  I told them, hey, he needs a
16  psychological eval and now a jail clearance due to
17  him going to jail for banging on the neighbor's door
18  and now resisting arrest.
19        I explained to them that we just got into a
20  long struggle.  I'm asthmatic, so I also explained to
21  them that I was also having a hard time breathing.
22  They then went up and tended to him while I went to
23  go speak to my sergeant, which is Randy Kiel.  I
24  explained to Randy Kiel what just happened and I also
25  explained to him that I needed to go get my inhaler.
                                                      31
```

```
 1     Q. So your sergeant was actually in the yard at
 2  that time right after you talked to EMS?
 3     A. Not in the yard.  He was still physically in
 4  the middle of the road.  I spoke to him in the middle
 5  of the road.
 6     Q. He was in his patrol unit or outside of his
 7  patrol unit?
 8     A. Outside of his patrol vehicle, yes.
 9     Q. Okay.
10     A. I do remember looking up there and seeing
11  Hector Arreola still handcuffed and leaning up to
12  Michael Aguilar's shins, knees in an upright
13  position.  Officer Evrard then drove me to my house
14  so that I could go get my inhaler.  And then when we
15  came back to the scene, that's when EMS was on River
16  Road in front of the elementary school playground
17  stopped.
18        We went to go check on them and they advised
19  us that he was in cardiac arrest and that's when they
20  were doing all their procedures in the back of the
21  ambulance.  While they were working on him, our
22  sergeant told us to go ahead and secure the scene.
23        That's when Officer Evard went over there and
24  did his stuff.  I don't know exactly what he did.  He
25  secured the scene and spoke to witnesses and such.
                                                      32
```

```
 1  After a little bit of time of EMS working on him,
 2  they then just took him to the hospital.
 3      Officer Aguilar followed behind them and then
 4  that's when pretty much the incident was over at that
 5  scene.  And I stayed on the scene and continued
 6  speaking to my sergeant.
 7    Q. Okay.  Let me ask you a couple of things about
 8  the Office of Professional Standards statement.  Look
 9  at the top of page CCG 225.  It's the second page of
10  23.  That first sentence, it says:  About when we got
11  to Station 8 to work on other reports, Dispatch
12  raised us and asked us if we knocked on a -- another
13  resident's door.
14      Station 8; is that correct?
15    A. Yes.  And, again, if I remember correct --
16  typically Station 8 where we went to go work on
17  reports was right there at Whitesville Road near the
18  Goo-Goo Car Wash and BRIAN Park, Veterans Parkway,
19  right in between there.
20    Q. Is that a police station?
21    A. No.  Sorry.  Fire station.
22    Q. Oh, okay.  That's why I was confused.
23      What's an 8760 call?
24    A. That is to investigate an area.
25    Q. Okay.  I just saw that lower on that page
                                                      33
```

```
 1  there.  Just to be clear on that.
 2    A. Correct.
 3    Q. So early on in your contact with Hector
 4  Arreola, it was apparent to you that he had some sort
 5  of issue, whether it be a mental health issue or an
 6  issue with narcotics or some type of drug.  True?
 7    A. Substance.  Correct.
 8    Q. All right.  Substance.  And looking at page
 9  225, I think you already might have mentioned that
10  Hector Arreola had his hands up at some point and
11  told you not to shoot; is that accurate?
12    A. Yes.  And that's when he was starting to, I
13  guess get paranoid that we had our pistol pointed at
14  him.
15    Q. And I think you characterized it as Hector
16  starting to lose faith in you all; is that true?
17    A. Yes, he didn't believe we were what we were.
18  Police.
19    Q. Okay.  And Officer Aguilar at that point had
20  been asking Hector repeatedly if he could summon an
21  ambulance to have somebody to talk to him; is that
22  true?
23    A. Correct.  It's typical procedure when we start
24  to notice either him being drug-induced or just legit
25  mental illness, we allow them the option if they want
                                                      34
```

```
 1  to speak to a medical professional.
 2    Q. And that's true because both you and Officer
 3  Aguilar wanted Hector Arreola to be evaluated or be
 4  seen for whatever his mental health situation was.
 5  True?
 6    A. Correct.  We were taught early on that
 7  honestly jail can't really provide those services.
 8    Q. And you mentioned the decision to detain
 9  Hector Arreola being made prior to y'all walking down
10  to, I guess 747 Moss Drive, the place where the
11  struggle happened.  As I recall, there was some
12  remark about -- and I think you said to Michael
13  Aguilar, "Do you have gloves?"  And Aguilar replied
14  something along the lines of, "He's going to fight
15  like hell".  Do you remember that?
16    A. He said fight like a bull maybe.  I can't
17  remember.  But, yes.
18    Q. And at some point, you asked Officer Aguilar,
19  "Are you ready?"  Essentially meaning are you ready
20  to go ahead and detain him; is that right?
21    A. Correct.
22    Q. And Hector Arreola started at some point when
23  y'all walked down the hill and he was up on the hill
24  at 747 Moss Drive making remarks along the lines of,
25  "Where's your back-up?"  Is that true?
                                                      35
```

```
 1    A. Yes.
 2    Q. And he made remarks along the lines of, "This
 3  is not protocol" and comments like that; is that
 4  right?
 5    A. Correct.  Yes.
 6    Q. Okay.  You received CIT training, correct?
 7    A. Yes, sir.
 8    Q. And we'll talk about that a little bit more in
 9  a few minutes.  But what does -- or what did CIT
10  training teach you to do in these circumstances?
11    A. Honestly, they just really told us to get a
12  good feel of how that individual was acting.  And
13  when I say this:  Are they more agitated, are they
14  more calm.  They also taught us that they might be
15  really, really in a different state of mind.
16      And even though they're in that different
17  state of mind, they will essentially still remember
18  it at a later time if that makes sense.  It's kind of
19  hard to explain that.  But they also taught us that,
20  you know, allowing them to just get the help that
21  they need.
22      Again, that's what I was referencing, that
23  jail honestly can't provide that help.  It's going to
24  be they need mental health help.  Keeping them calm,
25  trying to keep that open line of communication,
                                                      36
```

asking them what's wrong, what do they need. Things like that is mainly what they taught us.

They ultimately told us try to avoid, you know, getting into an unsafe scenario. So if we need to back up and let them just be in their state of mind, then that's what we can do. But, ultimately, it was just be as safe as possible during those situations because at any time they can just -- I guess the right word -- or lack of a better word would be flip out and make the scene more chaotic than what it started out to be.

But they really told us, you know, try not to take them to jail if at all possible and let them allow to get that medical treatment by a medical professional.

Q. And one of the key things they taught you in CIT was to be patient with the subject and also try not to antagonize the subject; is that fair to say?

A. Correct.

Q. Okay. And, of course, you all let Hector Arreola's mom talk to him some, correct?

A. Yes. I think it was fair to say she gave it her good attempt to try to get him to go in the house and sleep. She even offered to allow him to stay the night there and stuff like that.

37

Q. And prior to the struggle, Hector Arreola was walking around some, putting his hands in his pockets, that sort of thing. True?

A. Yes.

Q. And it was pretty cold out that night -- or that morning, I should say. Right?

A. Yes. Yeah, I think his mother even mentioned it's cold outside. I mean, she just -- she was in pajamas, I guess you could say.

Q. I think you mentioned at one point -- and you could see it on the video that you had some sort of hat on. I think you called it a beanie?

A. Yes, sir.

Q. Okay. What was that?

A. Just a beanie.

Q. A little knit cap, is that what that would be?

A. Yeah, it's a polyester -- I don't know exactly what it is. But it just covers my forehead and part of my ears. Forehead and ears.

Q. And, of course, you wear glasses. I can see that.

A. Correct.

Q. And you wore glasses the night of -- or the morning of January 9th of 2017?

A. I wear contacts as well, but primarily

38

glasses. So, yes.

Q. I believe I observed you having glasses on on the videotape. And how would you manage to keep your glasses on in a struggle? Do you have some method to attach them or how do you manage that?

A. Honestly, my glasses have only fallen off twice during all my struggles.

Q. Wow. Are they really tight on your head or --

A. These aren't even the glasses I wore. But I just honestly try to keep stuff away from my face because I know this is -- without my glasses, I can't really see.

Q. I understand. I certainly understand. When I was a kid, I had glasses and tried to play basketball and it was quite annoying when they would get knocked off, so...

A. Ripped out the way. Yeah.

Q. So you all didn't really have a concern prior to the start of the struggle that Hector was a danger to you all or a danger to his mother or anything else as far as possibly having weapons or anything like that, did you?

A. No, I didn't see any, you know, large bulges on him that might have been, you know, a weapon or anything like that. He did not seem upset towards

39

his mother and that's why we allowed her to, you know, talk to him.

In the beginning, he wasn't even upset about the police or anything like that until he started to say we weren't the police, so...

Q. And he wasn't aggressive towards you all or towards his mother. True?

A. No.

Q. And this is prior to the struggle.

A. Correct. Yep, yep.

Q. So it's fair to say that your main concern prior to the struggle was to get Hector Arreola some help for his mental health situation or whatever caused the mental health situation. True?

A. Correct. Just a different state of mind, I guess you can best explain it. Whether that be hospital or mom's house or -- and just getting in his car and leaving on his own accord.

Q. Okay. And I'm looking at page 227 -- CCG 227, which is page four of 23. And I notice that you said that you let up a little bit at one point when you heard Hector Arreola saying, "I can't breathe"?

A. Correct. He did mention that he couldn't breathe, but I've also been -- I have been choked out myself. And when you're being choked out, a lot of

40

the times you can hardly even talk. But the way he was yelling, I knew that he was still able to inhale and exhale a large amount of air during that time.

But even then, I still tried to let up. Obviously, when someone is complaining about can't breathe, you don't want anything traumatic to happen.

Q. Okay. And when you said you let up, you let up from what exactly?

A. Give me a second. I'm trying to figure out which part of the struggle, I guess you could say we were in. (Witness perusing document).

So during that time, I had my forearm/elbow area in his lower back area which would still lead me to believe that I was maintaining his lower part of his body. So at that point, I just, I guess took more weight off of his lower back area or, you know, lower torso area if I'm reading correctly. I think that's when I was trying to get to my radio and such.

Q. So you were trying to control his arms or at least one of his arms at that time. True?

A. Yes, but I was still at his lower back area trying to get that arm towards his lower back where handcuffs typically are, you know, placed.

Q. Okay. Now, once y'all got handcuffs on Hector Arreola, I believe it was Aguilar radioed dispatched

41

to slow down all the units; is that right?

A. Correct. Typically, we'll tell that to units letting them know that they don't have to still drive as fast. Because it happens where they'll try to get to our scene and get into an accident themselves. So to avoid another situation to happen that we'd have to deal with, we tell them they can slow it down. And that meaning just police radio so only police can hear that.

Q. So Officer Evard was the first to show up on scene, the next officer after you and Michael Aguilar; correct?

A. Yes, sir.

Q. And Officer Evard took a position on Hector Arreola's back, correct?

   MR. CASHBAUGH: Object to form. You can answer if you know.

   THE WITNESS: Yeah. I don't know exactly where he took position. I know I was maintaining his lower torso area. And when I got up, that would have been where he would have went, just to maintain that control.

BY MR. POST:

Q. Okay. So when you went to get the leg irons to put on Hector Arreola, Officer Evard maintained

42

control of Arreola; is that right?

A. Along with Officer Aguilar, they were still able to deal with Arreola on the ground.

Q. Okay. And when did Officer Ronnie Oakes or Officer William Oakes arrive?

A. Don't exactly remember. I can tell you definitely after Officer Evard. I don't know where to put them in a time frame, I guess you could say, is the best thing. I mean, after the struggle and if I'm not mistaken, after I got the leg irons on.

Q. Okay. I see on page 227, it says -- towards the bottom, "So I mentioned to the officers that I need to get my inhaler and to let Sarge know -- Sergeant Neal (SIC) know that I was going to run to my house real quick to get my inhaler". And this is on CCG 227, page four of 23 of your statement.

I'm wondering if that was a typographical error and it was actually Sergeant Kiel as opposed to Sergeant Neal?

A. Yeah, I'm not sure how that -- I don't even think Sergeant Mark Neal was a sergeant then.

Q. That makes two of us. Do you even recall Sergeant Mark Neal being on scene at all on January the 9th of 2017?

A. Sergeant Mark Neal was not a sergeant then.

43

And Corporal Mark Neal was definitely not on scene.

   MR. CASHBAUGH: Neal and Kiel sound pretty similar.

   MR. POST: That's what I suspect.

   MR. CASHBAUGH: Do y'all mind if we take a restroom break real quick?

   (Brief break)
   (Upon resuming)

   MR. POST: All right. Back on the record.

BY MR. POST:

Q. When you went down to talk to the ambulance people, the EMS folks that responded on January the 9th, 2017, you did not alert them at that time that Hector Arreola was in any sort of distress, did you?

A. I just told them that he needed a psychological eval and he just struggled with us. And that's what I explained to them.

Q. Okay. So the answer to that is no.

A. Yeah.

Q. Okay. All right. And other than speaking to EMS at the bottom of the driveway, after you stood up from Hector Arreola, you didn't seek any other medical assistance for him; did you?

   MR. CASHBAUGH: Object to form.
   THE WITNESS: The only thing is -- I mean,

44

prior to that, we had already asked for an ambulance to come and check on him before the struggle. So, I mean, we already had them en route virtually.

BY MR. POST:

Q. Right, right. Which is why I phrased the question like I did: After you stood up from Hector Arreola, you did not seek any further medical assistance other than talking to EMS at the bottom of the driveway; right?

A. Correct. Only another officer mentioned that, "Is EMS still en route". And that's when we acknowledged that there was.

Q. And you didn't tell EMS to hurry up or anything like that even though you heard Hector Arreola saying he couldn't breathe several times. True?

A. No, we don't -- they were already en route. We didn't know exactly where they were at as far as en route, where they were at as far as their location. So we didn't radio for them to come any quicker. I mean, he was breathing. Everything seemed to be fine on our end.

Q. So the answer to that question as well is yes; correct?

45

A. Yes, sir.

Q. Well, when you noticed that Hector Arreola screams that he couldn't breathe, I think you described it as rather loud, when you noticed that they tapered off until he was -- all he was doing was moaning, did you let up on Hector Arreola any?

A. Yeah. I mean, I never had a position on him to where I was restricting his breathing. We knew he was chest on the ground. We didn't have any pressure on his lung area or anything like that. So there was nowhere to let up, I guess you could say.

Q. When they rolled Hector Arreola over, did you notice his eyes were wide open or I think you might characterize it as blown?

A. Not that I recall. I mean, it was dark outside. I didn't necessarily look at his eyes. I can't speak for anyone else.

Q. And you, yourself, didn't check Hector Arreola's pulse or his breathing, did you?

A. No, not me.

Q. What did you do when you noticed Hector Arreola laying there non-responsive in the dirt after the struggle ended?

MR. CASHBAUGH: Object to form.

THE WITNESS: He -- he was responsive -- I

46

mean, he was still breathing. He just wasn't talking to us. We weren't necessarily trying to ask him any questions about, you know, why he went up to the house or anything like that. It was just he was -- he was sitting there.

And like I said, I went immediately to go to -- I spoke briefly to a witness and then I went down to EMS when they arrived. So I didn't really have much involvement with him while he was sitting on the ground, you know, in the upright position and such.

Q. And the witness, would that be one of the people that were in the house there at 747 Moss Drive?

A. Yes. I don't know exactly how he lived there, you know, who exactly it was. I know it was a gentleman who literally saw the whole event.

Q. Okay. And was that -- as I understand it, there were two males and a female in that house. An older male and his wife, I think Raymond Tarveren (phonetic) and his wife. And then Allen Tarveren, the son, the younger one. Do you recall which of those -- was it the younger one or the older one --

A. I spoke to the younger one briefly.

Q. All right.

47

MR. POST: Let's go off the record for a second.

(Brief break)

(Upon resuming)

BY MR. POST:

Q. Officer Duddley, can you see the monitor that has the video on it?

A. Yes, sir.

Q. Okay. This is Officer Aaron Evrard's body cam identified as CCG 12, disc one provided to us by the defense -- or counsel for the defendants.

The numbers on that are 2017 0109054456X followed by 3 and a bunch of zeros. And I am going to show you a few frames here from about three minutes and six seconds through three minutes and 10 seconds into the video which is approximately 5:31:14 in the morning and shortly thereafter according to the time on the video.

A. Okay.

(Video playing)

Q. Do you see the time?

A. Yeah. 5:31:11.

Q. All right. So I'm showing you 3:06, 3:07, 3:08. Let's see, all right. At 3:10, which is where I stopped it for right now, the officer on the right

48

```
 1  is who?
 2      A. Officer Aguilar.
 3      Q. Okay.  And the officer with the beanie leaning
 4  down is who --
 5      A. Myself.
 6      Q. -- on the left?
 7      A. Myself.
 8      Q. Okay.  Let me move back a little bit.  I was
 9  trying to see if you had your glasses on there.  Can
10  you tell?
11      A. I saw them.  I did.
12      Q. Okay.
13      A. Whichever frame you had initially was perfect.
14  I could see them.
15      Q. And right to the left, you can see the lady in
16  the white.  Is that Connie Arreola, the mother of
17  Hector?
18      A. Unless the resident -- the one female that
19  lives in that residence came out, that would be the
20  mother.  That was the only female on scene other than
21  that.
22      Q. Okay.  Can you tell who that is talking to
23  her?
24      A. That's the witness I was referencing to, one
25  of the Tarverens.
                                                      49
```

```
 1      Q. Okay.
 2      A. I can't remember which name it is.
 3              (Video played)
 4      Q. Okay.  Three minutes and 24 seconds on there,
 5  we just heard you say, "I'm going to go get my leg
 6  irons", correct?
 7      A. Uh-huh.  (indicating in the affirmative).
 8      Q. Is that right?
 9      A. Yes, sir.
10      Q. And is that the point where you stood up to
11  let Officer Evrard take over to go get your leg
12  irons?
13      A. Correct.
14              (Video playing)
15      Q. And you're already having breathing problems
16  yourself at that point, right?
17      A. Oh, yeah.  Most definitely.  Before that,
18  actually.
19      Q. Okay.  All right.  Now, I'm showing you --
20      A. The same night.
21      Q. -- CCG 11 in a video that is labeled
22  AMVA-0001.  Do you see that?
23      A. Yes, sir.
24      Q. And this particular video which lasts for
25  about one minute and 32 seconds at just after 4:00 in
                                                      50
```

```
 1  the morning is consistent with you and Officer
 2  Aguilar making contact with Concepcion Arreola also
 3  known as Connie Arreola the first time; is that
 4  right?
 5      A. Yes.  Yes, this is.  This is the first
 6  incident or interaction.
 7      Q. Okay.  And this next video that I'm showing
 8  which is the same CCG number, AMVA number two,
 9  beginning just after 5:10 in the morning for 30
10  minutes and one second, is that the start of your --
11  and consists of your body camera from when you made
12  initial contact with Hector Arreola on January the
13  9th of 2017, you and Officer Aguilar?
14      A. Yes, sir.
15      Q. Now, earlier today, you said you believe you
16  were the officer that asked for no lights and no
17  sirens and for the ambulance to come in that fashion,
18  correct?
19      A. Correct.
20      Q. And I'm showing you part of Officer Aguilar's
21  body camera, AMVA 10.  And we are 12 minutes and 36
22  seconds into it, and I'm going to let it play for a
23  moment so you can listen to it.  Okay?
24      A. Yes, sir.
25              (Video playing)
                                                      51
```

```
 1      Q. Okay.  Did you hear that EMS -- the call to
 2  dispatch saying come routine -- well, let me play it
 3  back again.
 4              (Video playing)
 5      Q. No lights, no siren.  Hard, no siren.  And it
 6  said 28 Dispatch.  Correct?
 7      A. Correct.
 8      Q. Was 28 you or that was Aguilar, right?
 9      A. That's Aguilar asking for it at the other
10  residence.
11      Q. Okay.
12      A. If I'm not mistaken, I asked for it while we
13  were closer to the mother's address as well.
14      Q. Right.  And you actually -- when you called
15  prior to that, you asked for the ambulance to come
16  for a psych evaluation, right?
17      A. Correct.
18      Q. All right.  I just wanted to make clear that
19  that was Officer Aguilar speaking and making that
20  particular remark.
21      A. Okay.
22      Q. Okay.  It's been a long time.  You were a lot
23  clearer on this and fresher on this back when you
24  talked to the Office of Professional Standards.  Fair
25  to say?
                                                      52
```

```
 1      A. Fair.
 2      Q. Okay.  At some point during the struggle with
 3  Hector Arreola, your body camera got knocked off your
 4  uniform; is that fair to say?
 5      A. Correct.
 6      Q. But it was still recording audio and recording
 7  properly, to your knowledge.  Right?
 8      A. Yes.  It was somewhere I think closer to the
 9  house, if I'm not mistaken.
10      Q. Okay.  I want to go back to your body camera,
11  which is CCG 11, AVA 0002.
12              (Video playing)
13      Q. I'm going to let you listen for a minute and
14  then I'm going to ask you a couple of questions about
15  what we hear from around 1730 to about 1839.  And
16  that's the time -- not clock time, but the video
17  time.  Okay?
18      A. Correct.
19              (Video playing)
20      Q. Okay.  1733 sounds like the first cuff is
21  clicking locked.  Let me let you listen to that
22  again.
23              (Video playing)
24        That's also at 1758.  I want you to listen to
25  that, too.
                                                       53
```

```
 1              (Video playing)
 2        Right there at 1758 when we heard a cuff or
 3  cuffs click and somebody said, "I got one", was that
 4  you or Officer Aguilar that said that?
 5      A. Aguilar.
 6              (Video playing)
 7      Q. All right.  Right there when we heard the
 8  cuffs click again and somebody said, "Got one
 9  locked", was that you or Officer Aguilar who said
10  that?
11      A. It sounded like me.
12      Q. Okay.  Would that be the same cuff, the first
13  cuff or the second one?
14      A. It would have been the second one.
15      Q. Because you said got one locked as opposed to
16  I got one which was said just before.  I was just
17  wondering what the distinction was.
18      A. And, honestly, I --
19         MR. CASHBAUGH:  Could we keep playing it,
20      Mark, because I think there is going to be --
21         MR. POST:  We'll play that again just so you
22      can listen and I'll go farther a little bit.
23         MR. CASHBAUGH:  Yeah.
24              (Video playing)
25   BY MR. POST:
                                                       54
```

```
 1      Q. Okay.  You heard, "I got one locked" again.
 2  That was you that said that, right?
 3      A. Correct.
 4      Q. Okay.  We'll keep going.
 5              (Video playing)
 6        It sounded like at 1830, there was another
 7  cuff locking.  So listen to that if you would.
 8              (Video playing)
 9        Did you hear that second cuff locking at 1830?
10      A. Yes.  And...
11         MR. CASHBAUGH:  If you'll play it for two more
12      seconds, I think that'll clarify it.
13              (Video playing)
14   BY MR. POST:
15      Q. And who said, "Got it" just then?
16      A. Play it one more time, again.  Sorry.
17      Q. I'd be glad to.
18      A. I do apologize.
19      Q. And that's at 1835.
20              (Video playing)
21      A. It sounds like -- it's a little -- it's in the
22  distance.  I really can't tell if it was me or not,
23  but...
24      Q. Well, it was either you or Aguilar, obviously.
25  Right?
                                                       55
```

```
 1      A. Yes, sir.
 2      Q. Okay.
 3      A. And I'm not sure if we -- like if I went for
 4  one of my own cuffs.  Like I had my own pair of cuffs
 5  and Officer Aguilar had his own cuffs.  I may have
 6  gotten one on and then what we usually do is hook the
 7  two cuffs together.  So I don't know if that was the
 8  scenario.  I honestly can't remember.
 9      Q. Okay.  I'm going to let you keep listening a
10  little bit further.
11              (Video playing)
12        And that was Officer Aguilar speaking at 1842
13  when he said, "28 to Dispatch, we finally got him in
14  handcuffs, you can slow down all the units".
15  Correct?
16      A. Correct.
17              (Video playing)
18      Q. And that siren we just heard about 1901 or
19  1902, that was Officer Evrard arriving, right?
20      A. Passing our scene, yes.
21      Q. And he actually drove past 747 Moss Drive to
22  start with and went to 760 Moss Drive.
23      A. Correct.  That was the initial -- on his
24  screen, he saw that address not knowing that we went
25  there and I was trying to signal him with my
                                                       56
```

**Page 57**

1  flashlight, but he couldn't see it.
2    Q. Were you successful eventually in getting his
3  attention?
4    A. He made it to the scene.
5    Q. I'm going to let you listen to -- I may have
6  to hook up my better speakers, but see if you can
7  make out at around 2046, a little bit later than that
8  actually.
9      And what I'm going to ask you about is who the
10 speaker is that said, "All right, partner. I'm going
11 to roll you over on your side". I couldn't make out
12 if that was Officer Evrard or Officer Ronnie Oakes.
13     So I'm going to let you listen and see if you
14 can tell me that.
15          (Video playing)
16     Did you hear that?
17   A. That's Evrard telling him to roll over and
18 just stay calm.
19   Q. Okay. That was my suspicion, but I wasn't a
20 hundred percent sure. Thank you.
21     And I'm going to back it up a little bit more
22 because -- and I'm going to ask you about around 2040
23 on this, I believe it's Officer Aguilar saying:
24 "Hey, hey, let's pat him down". And then I wasn't
25 sure exactly who the speaker was immediately after

**Page 58**

1  that. So listen for that. Okay?
2          (Video playing)
3     All right. Somebody said, "You guys can" in
4  response to Aguilar saying that. Was that you who
5  said that?
6    A. Honestly, I couldn't make out who that was
7  either.
8    Q. All right. I'll let you hear it again.
9          (Video playing)
10    And somebody said, "You're going to get some
11 leg irons on him"?
12   A. So which -- which sentence do you want who
13 said what?
14   Q. Who said, "You guys can", can you tell that?
15   A. It sounds like me walking away from the
16 distance.
17   Q. And that would make sense based on your
18 breathing situation --
19   A. Correct.
20   Q. -- and that you're going to be the one going
21 to get leg irons. Right?
22   A. Correct. Yes.
23   Q. And was that you asking, "You want to get some
24 leg irons on him"?
25   A. Yes. I remember him still kicking around and

**Page 59**

1  stuff like that.
2    Q. I'm going to ask you about a couple of more
3  and then I'll stop with this.
4          (Video playing)
5     Was that Officer Evrard who said, "Clear your
6  airway, Buddy. You've got to sit up".
7    A. Yes, that's Evrard.
8    Q. And just prior to that was Officer Aguilar
9  saying "Pretty strong, huh"? "I said he's pretty
10 strong". Is that right?
11   A. I was trying to figure out who may have said
12 that. I couldn't tell whose voice that was.
13   Q. Let me back it up again and see if that helps.
14         (Video playing)
15    That was Aguilar, wasn't it?
16   A. Yes.
17   Q. Just for the record, that was Aguilar that
18 said, "Pretty strong, huh?" "I said he's pretty
19 strong". Right?
20   A. (No response).
21   Q. Is that right?
22   A. Oh, yes.
23   Q. I'm going to ask you a couple of more that I
24 wasn't positive on.
25         (Video playing)

**Page 60**

1     Who was that asking, "What's the address here,
2  747?" Is that Aguilar?
3    A. Do you mind rolling it -- yeah, I wasn't sure
4  who you wanted me to listen for.
5          (Video playing)
6    Q. "What's the address here"?
7    A. I think that's Aguilar. I'm not one hundred
8  percent on that one though.
9    Q. All right. Good enough on that.
10     MR. POST: All right. Let's take a break for
11   a minute and go off the record and get that thing
12   out of the way.
13      (Brief break)
14      (Upon resuming)
15 BY MR. POST:
16   Q. All right. Officer Duddley, obviously, you
17 went through the basic law enforcement course and
18 became POST certified in order to be a police
19 officer; correct?
20   A. Correct.
21   Q. I'm going to show you what's going to be
22 marked as Plaintiff's Exhibit Number 5.
23     Plaintiff's Exhibit Number 5 is marked as CCG
24 1833 through 35. That appears to be your POST
25 Training History located on the second and third page

of that.  Do you see that?
   A. Yes, sir, I see it.
   Q. Okay.  And you completed your basic law enforcement training course here in Georgia on March the 22nd of 2013; correct?
   A. Yes.
   Q. Okay.  And that was a 408 hour course that all law enforcement officers are required to take in Georgia prior to becoming certified by the Peace Officer Standards and Training, what we call POST.  Correct?
   A. Yes, sir.
   Q. And on your Training History there, Plaintiff's Number 5, it appears that you completed your CIT training on April the 12th of 2013.  I think it says Crisis Intervention Team Training on the third page; is that right?
   A. Yes.
   Q. Okay.  And that was a 40 hour course?
   A. Yes.
   Q. And it also reflected that on March the 1st of 2016 -- I think this is on the first page -- that you attended 22 hours of in-service training -- annual in-service training at the Columbus Police Department.  Correct?

61

   A. Yes.
   Q. And Plaintiff's Exhibit Number 6, which is CCG 819 through 822 --
      MR. POST:  Do you need a copy?
      MR. CASHBAUGH:  No.
 BY MR. POST:
   Q. It appears to be a list of your Columbus Police Department Training History; is that right?
   A. Let me look over it.  (Witness perusing document).  Yes.
   Q. And on your Columbus Police Department Training History, it also shows that you completed your in-service training in 2016 on March the 1st of 2016?
   A. 22 hours.  Yes.
   Q. Okay.  And I'm going to show you Plaintiffs's Number 7, which is 1753 through 1786 is what I'm going to show you.
      All right.  Part of the in-service training in 2016 that you received consisted of this Use of Force Issues for the 2016 course which was prepared by Lieutenant Tim Wynn.  Do you see that?
   A. Correct.  I do.
   Q. Okay.  And, of course, you attended this training; correct?

62

   A. Yes, sir.
   Q. I'm going to ask you about a little bit of it.  Of course, on your in-service training for the Columbus Police Department in order to maintain your POST certification, you have to make at least an 80 percent score on the test they give you.  Correct?
   A. In in-service?
   Q. Right.
   A. Yes, sir.
   Q. And on page 1754, one of the Student Performance Objectives was review updated information on Excited Delirium Syndrome.  Do you see that?
   A. Yes.
   Q. And, in fact, y'all reviewed that; right?
   A. Correct.
   Q. Okay.  And you went over the Use of Force Continuum.  I'll refer you to page 1758 and 1759.  Is that correct?
   A. Yes.
   Q. Okay.  And on page 1760 is the beginning of the Excited Delirium training, I guess one could call it.  Do you see that?
   A. Yes.
   Q. And so they taught you and you were trained as to this particular definition of Excited Delirium.

63

Correct?
   A. Correct.
   Q. And they taught you that there were essentially three things that might bring on Excited Delirium.  And they list those on that page 1760, correct?
   A. Correct.
   Q. Okay.  And there is a list of symptoms of Excited Dilirium on pages 1760 and 1761.  Do you see that?
   A. Yes.
   Q. And in the case of Hector Arreola, would you say -- and I'm going to go down the list -- would you say that he had panic as a symptom on January 9th of 2017?
   A. Yeah.
   Q. What about paranoia?
   A. Definitely.
   Q. Shouting?
   A. Yes.
   Q. Bizarre and aggressive behavior?  Mainly bizarre behavior.
   A. Yes.  Bizarre.
   Q. What about dilated pupils?
   A. I can't remember.  I do remember trying to

64

```
 1  look at them from a distance, but I can't remember.
 2      Q.  What about hiding behind things?
 3      A.  Definitely.
 4      Q.  Fear?
 5      A.  Yes.
 6      Q.  Irrational, incoherent speech?
 7      A.  At times, yes.
 8      Q.  Unexpected physical strength?
 9      A.  Yes.
10      Q.  And at the end of that list, it says watch for
11  more than one symptom, doesn't it?
12      A.  Correct.
13      Q.  And then right after that, Positional Asphyxia
14  is defined; correct?
15      A.  Uh-huh.  (indicating in the affirmative).
16      Q.  And it puts in bold:  Always monitor any
17  subject you have in custody and be aware of sudden
18  tranquility.  Correct?
19      A.  Correct.
20      Q.  What does "Always monitor any subject you have
21  in custody" mean to you and what did it mean to you
22  at the time?
23      A.  Just to allow that individual to not get in
24  any position to where it could prevent him from
25  breathing while in custody.
                                                      65
```

```
 1      Q.  And what does "Beware of sudden tranquility"
 2  mean to you and what did it mean to you at the time
 3  in January of 2017?
 4      A.  It means, you know, if a sudden change may
 5  happen, like shortness of breath or anything like
 6  that.
 7      Q.  Okay.  And just below "Beware of sudden
 8  tranquility", there's re-emphasis on the "What to do
 9  situations", underlined, bolded with stars next to
10  it.  Right?
11      A.  Correct.
12      Q.  And it says, "Always keep in mind that people
13  that exhibit symptoms and behavioral patterns
14  suggesting cocaine, psychosis or excited delirium,
15  they are experiencing a medical emergency".  This is
16  on CCG 1761.  And I'm about to flip to 1762.
17          It continues on, "If time allows, contact EMS
18  before confronting the individual and attempt to
19  avoid confrontation with subject until EMS arrival".
20          Do you see that?
21      A.  Yes.  And, "Officer safety must always be a
22  priority".
23      Q.  Number one.  Right.  So, obviously, you were
24  trained on this in March of 2016, correct?
25      A.  Correct.
                                                      66
```

```
 1      Q.  And just down the page a bullet point is,
 2  "Excited delirium is regarded as a medical emergency
 3  with a psychological presentation".  Right?
 4      A.  Yes.
 5      Q.  And, again, it lists "Beware of sudden
 6  tranquility again".  Right?  In all caps.
 7      A.  Correct.
 8      Q.  All right.  And flipping on over to page CCG
 9  1764 at the top, it reads, "Law enforcement and EMS
10  need to work together to handle excited delirium
11  cases".  Correct?
12      A.  Curtis says.
13      Q.  Some author.
14      A.  Somebody, yeah.
15      Q.  And it also reads, "Neither can do it alone.
16  Police need to realize they're dealing with a medical
17  slash psychiatric emergency and EMS needs to be
18  prepared to move in quickly and get the subject
19  sedated immediately and transported by ambulance to
20  the ER".  And you were trained on that, correct?
21      A.  Correct.  Yes.  Sorry.
22      Q.  And I want you to flip over to 1782 and 1783.
23      A.  82, 83?
24      Q.  Yes, sir.
25      A.  All right.
                                                      67
```

```
 1      Q.  And you were trained on excited delirium with
 2  regard to the definition at the top of page 1782,
 3  correct?
 4      A.  Yes.
 5      Q.  And, again, the same symptoms are listed as we
 6  went over before; right?
 7      A.  Correct.
 8      Q.  And then again, positional asphyxia is defined
 9  again at the top of CCG 1783.  Right?
10      A.  Correct.
11      Q.  And about mid-page 1783, it again re-emphasis
12  on the what to do situations.
13      A.  Correct.
14      Q.  And just below that, it repeats what we went
15  over before; correct?
16      A.  Yes, sir.
17      Q.  Okay.  So would it be fair to say when you
18  were trained in this in March of 2016, March 1st of
19  2016, there was some pretty substantial emphasis on
20  positional asphyxia and excited delirium and sudden
21  in-custody deaths.
22      A.  Correct.
23      Q.  And the training that you received in March of
24  2016 that we just went over, re-emphasized what you
25  had already been taught in the basic law enforcement
                                                      68
```

course regarding being aware of the risk factors and symptoms having to do with sudden in-custody deaths; correct?

A. Correct.

Q. Would you agree with the basic law enforcement course and CIT training that holds that it is often counter-productive to be accusatory or annoyed with a suspect that demonstrates mental health issues or, you know, such as paranoia, psychosis, mania; that kind of thing?

MR. CASHBAUGH: Object to form. If you could show us what policy you're talking about or what training you're talking about, we could look at it.

BY MR. POST:

Q. Well, let me just ask you then: Do you agree that the basic law enforcement course -- well, let me rephrase that.

Do you agree that your CIT training taught you that it is often counter-productive to be accusatory with suspects that demonstrate mental health issues?

A. Yes.

Q. And the same question with respect to being annoyed with people that show mental health issues, would that also be counter-productive based on your

69

CIT training?

A. Correct.

Q. And your CIT training did teach you to summon EMS just like you did in this case; right?

A. Correct.

Q. Okay. But it also taught you to wait until EMS was on the scene, correct, before you took somebody into custody. Correct?

A. No, we don't have to wait for the ambulance to arrive just to take someone in custody. A lot of times they won't even arrive on scene because they're not sure if the scene is safe.

Q. I'm going to ask you a couple of other things. I'm going to show you what's been provided to us as CCG 51 through CCG -- well, 51 and 52 which is the Columbus Police Department's general order regarding Use of Force. Do you see that?

A. Yes, sir.

Q. Can we agree that you were and that you are familiar with this CPD Use of Force policy which was in effect on January 9th of 2017?

A. Correct.

Q. Of course, you have -- one of the first things or the first thing that the Use of Force policy says is that you must use reasonable force in accordance

70

with the constitutional rights of all citizens. Correct?

A. Yes.

Q. Okay. And you agree with that, right?

A. Yes, sir.

Q. Okay. And under Procedure in the Use of Force policy, according to the policy, you can only use reasonable force to make an arrest. Right?

A. Correct.

Q. All right. And this CPD policy does not train or authorize the use of any neck restraint or any choke hold. Agreed? That would at the bottom of page 51.

A. Oh, yes. That's what I was looking for. Yes, sir.

Q. So you agree with that, right?

A. Yes, I do.

Q. And looking at 3-1-2, Use of Force on CCG 52, CPD policy does not allow the use of excessive force to effect an arrest and it prohibits continued use of force after the person has submitted to an arrest. Agreed?

A. Correct.

Q. Would you agree that Hector Arreola's offense such as it was, was not a serious offense?

71

MR. CASHBAUGH: Object to form. You can answer.

THE WITNESS: Yeah. No, no. I got you. He was just knocking on people's doors and waking people up. So not a serious offense.

BY MR. POST:

Q. Disorderly conduct is not something you would call a serious offense. True?

A. It could lead to something serious. But at that time, no.

Q. He was -- when I say he, Hector Arreola was not threatening you or Officer Aguilar, was he?

A. Until he started to snatch away from Officer Aguilar.

Q. Prior to the struggle, he was not threatening you or Officer Aguilar; correct?

A. No, sir.

Q. And Hector Arreola was unarmed, right?

A. Yes.

Q. And the purpose for your detention was to help Hector Arreola, correct?

A. Correct.

Q. You've been a police officer for how many years now?

A. Six years.

72

```
 1     Q. Okay.  It's pretty common when you grab
 2  somebody and struggle with somebody, that someone
 3  gets hurt, whether it's them or the police officer.
 4  True?
 5     A. Correct.
 6     Q. In this case, couldn't you have just engaged
 7  Hector Arreola and continued conversation while you
 8  waited for EMS to arrive?
 9     A. At that time, he wasn't allowing it.  He was
10  still wanting to be up at the house.  We gave him the
11  chance to come down and talk to us.  At that time, I
12  mean him going and knocking on doors, I just -- I
13  have a duty to keep peace out there.  Nobody deserved
14  to be woken up early in the morning by someone who
15  already has police there.  So at that time, it was
16  necessary to remove him from that area.
17     Q. Okay.  Hector was not on their front porch any
18  more at the time you and Officer Aguilar approached
19  him, right?
20     A. Not their -- I don't think they really had a
21  porch.  It was kind of like their steps.  But he was
22  still on their property.
23     Q. Okay.  He was not on the steps or the entrance
24  way to their front door any more, correct?
25     A. No.
                                                      73
```

```
 1     MR. POST:  That's all I have.
 2     MR. CASHBAUGH:  We're done.
 3
 4        (End of deposition at 11:30 a.m.)
                                                      74
```

```
 1  STATE OF GEORGIA
 2  COUNTY OF MUSCOGEE
 3
 4
 5                    C E R T I F I C A T E
 6
 7     The forgoing transcript of the proceedings
 8  was taken before me as a Certified Court Reporter
 9  in and for the State of Georgia and reduced to
10  typewriting under my direction and supervision, and
11  I certify that it is a true and correct transcript
12  to the best of my ability of the proceedings.
13
14
15            This 27th day of October, 2019.
16
17
18            _____
19            Eric Cavanaugh
              Certified Court Reporter
20            No. 2560
              CCR, GRL
21
22
23
24  EC/jm
25
                                                      75
```