---

**OFFICE OF PROFESSIONAL STANDARDS**
Columbus Police Department

---

INTERVIEW WITH: Officer Brian J. Dudley                               CASE: 17-01
Date/Time Taped: Wednesday, January 11, 2017/7:59 a.m.

Major Blackmon:    This is a recorded interview with Officer Brian Dudley. His cell number is ▒▒▒▒▒▒
▒▒▒▒ He has been employed with the Columbus Police Department for the past
four years and three months as a police officer.

This interview is being conducted in the Office of Professional Standards located
in the Public Safety Center. Present during the interview are myself Major F. D.
Blackmon, Sergeant J. G. Bridges. Presently, Sergeant T. L. Birris-Mayo is not in
this office, although, she may enter in shortly. The Office of Professional Stan-
dards is conducting an . . . an investigation ordered by R. T. Boren, Chief of Police.

So, Officer Dudley, before we begin with your summary, I, previously, gave you
the "Garrity Warning," which you read and signed, so are there any questions
based on what you read and signed?



PLAINTIFF'S
EXHIBIT
B.D. 4
10·16·19   TC

Ofc. Dudley:       No.

Major Blackmon:    All right and . . . and you do acknowledge that you did read and sign the "Garrity
Warning?"

Ofc. Dudley:       Correct, I did.

Major Blackmon:    Okay. Okay, so, Officer Dudley, would you please state for the record your knowl-
edge of the facts involving the incident that occurred on Moss Drive[747] at . . . on
January 9, 2017,[Monday] with the arrest of Hector Arreola?

Ofc. Dudley:       The morning of the ninth, approximately 4:00,[a.m.] we received a call, whom we
suspect was Hector Arreola, calling 911 stating that he wanted us to check on his
mother. At that time, we were dispatched, myself and Officer Aguilar,[1] went to
760 Moss Drive and made contact with his mother. At that time, we knocked on
the door. She arrived to the door. As . . . it appeared to be that she woke up just
a few seconds after us knocking on the door. She had a slightly shocked look to
see the police at the door. We asked if she was fine, in good health, and she said,
"yes." So, we told her that her son called 911 and wanted us to check on her. Mr.
Arreola stated that . . . I'm assuming to 911, that something was strange about
the situation with his mother. No other details about that. We spoke to her brief-
ly, and we asked her if she could contact her son and make sure that he was okay.
And being that it was 4:00 in the morning, she appeared to be in good health, so
there was no . . . I guess what we thought, no reason for us to be there at 4:00 in
the morning, you know, with her being in good health. At that time, we left, got
in our patrol cars. I went in . . . I drove into a driveway and backed out and went

---

[1] Officer First Class Michael S. Aguilar, Bureau of Patrol Services

CCG000224

INTERVIEW WITH:  Officer Brian J. Dudley
Date/Time Taped:  Wednesday, January 11, 2017/7:59 a.m.

CASE: 17-01
Page 2 of 23

west on Moss Drive to go towards River Road. About when we got to Station 8 to work on other reports, dispatch raised us and asked if we knocked on a . . . another resident's door. I can't remember the exact address. But we told them, it might have been the address where we pulled in to do a U-turn, or well . . . to get turned around to go back towards River Road. And, at that time, dispatch, I guess, took care of the call. I was told the . . . I'm assuming the caller, that police were just in the area just short of them calling. That call, in particular, was . . . they called 911 because someone was knocking on their door. And again, I don't remember that address. Nor did we physically go out there and service a call where someone was knocking on the door. We went to . . . I think I went to two other calls after 760 Moss Drive. One of which was a burglary and then an 8760, the area after the burglar . . . canvassed the area, and then, I went to an alarm call at a restaurant. I serviced those calls. A call came back in for 760 Moss Drive. This time, it was saying that we needed to meet with Mr. Arreola in reference to his mother because he wanted us to check on his mother. So, we went to the address, met with Mr. Arreola, who was driving unknown model Subaru, and it was blocking his mother's driveway. I stopped behind his vehicle and Officer Aguilar was behind me. At which time, I got out of the vehicle, Hector got out of the vehicle, and Officer Aguilar got out, as well. We approached Mr. Arreola, began to speak with him about why we were back out here again to check on his mother just, approximately, an hour later after the first call to 760 Moss Drive. While speaking to Mr. Arreola, he continued to tell us that something wasn't right about the situation. We couldn't really gather what he meant about something not being right. At one time, he told me that there was flashlights . . . or told us, I should say. There were flashlights in his mother's house. I remember looking back over my shoulder towards the house, 760, and I didn't see any flashlights. To be honest, I don't even think there was any lights on. If there was, it was just the porch light and the carport light. When I . . . continued talking to Mr. Arreola and was trying to figure out what was going on, what was wrong, he appeared to be either under the influence of either alcohol or drugs. I really couldn't determine at that point of the investigation or speaking to him. Or he had some type of mental condition. We can't really determine that either. While I was talking to him, I looked back again at the mother's house just because Mr. Arreola was so hung up on that there's something going on in his mother's house. He wanted us to escort him to his mother's house and speak to her. We told him that everything was fine an hour ago. And we were . . . in my view, we were just trying to really get a better understanding of Mr. Arreola and see what his state of mind was. That's why we didn't want to just go straight to his house. In all honesty, I didn't even know if there was possibly a TPO against him or anything like that, so I didn't want to kind of . . . you know, grant him access to his mother's house if there was a TPO or anything like that. So, we just kind of stayed at the road and continued talking to him. When I looked back again, I saw Hector's mother poke her head out the door, and at that time, she didn't acknowledge me or anything like that, was just kind of watching the situation. We continued to talk to him. And at one point, I was able to kind of breakaway and go towards Hector's mother and speak to her for very short time. I asked if . . . if she's known Hector to use any drugs, and she said, "no," kind of like unsure, maybe. And then I told her, okay, well, we're gonna continue talking to Hector. I left her at the house and went back to Officer Aguilar and continued speaking with Hector. At that time, I was just standing there, typically, how I stand on any call anytime of the day when I'm wearing . . . my uniform is. My right hand's on my hip, which is kind of more so just resting on the top portion of my pistol, and then my other hand is kind of resting over my magazines and my holster. Mr. Arreola became kind of, I guess, upset that I was standing like that and thought that we were gonna possibly shoot him. At which time, he stated that, "Why is your gun in your holster?" verbatim like that. And I told him, well, my gun is supposed to be in the holster unless I'm going to use it. And my gun still, at that time, was never out of the holster. We were standing there, and all of a sudden, he bolted to . . . or right across the street behind a . . . I think it was a plastic trash can and kind of ducked behind it. At which time, I looked at Aguilar to make sure that he didn't make some sudden movement to where he thought, maybe, we

INTERVIEW WITH: Officer Brian J. Dudley
Date/Time Taped: Wednesday, January 11, 2017/7:59 a.m.

CASE: 17-01
Page 3 of 23

were gonna shoot him or tase him or use any force at that time. We asked him what's going on, and he yelled, immediately, that we . . . we were trying to shoot him. We told him, "No, we're not. We're still trying to communicate with you." His mother, shortly after that, came outside and was standing out there with us and trying to communicate with him to get him in the house. As he came around from the trash-can, he told us that, you know, he had his hands up and told us not to shoot him or kill him and then, he began to kind of, I guess, lose . . . lose faith in us . . . I guess you could say, about us being police officers. He started to say that, you know, we weren't police and that we needed to get some other officers out there. At that time, Officer Aguilar and I, we kind of . . . kind of made eye contact about, you know, that we were thinking he was unstable. Around that time, Officer Aguilar requested E.M.S. to come, routine . . . no lights no sirens, just due to the fact of how Hector was acting. Didn't want to spook him some more thinking that more police were coming or possibly wanting to kill him as he thought was gonna happen. So, we continued talking to him, his mother was out there, actually, trying to speak with him, too, about the situation. She was trying to tell him to come in, go to sleep. He insisted that there was something wrong in the house. His mother said that there's nobody in the house, just her. She's been sleeping, and she was woken up by us, so . . . earlier. He wanted his mother to get in the car and go for a ride. At which time, we told her, "no, do not get in the car." Even if he was to get in the car like just let him go. We'll deal with the situation at that time. She didn't even want to get in the car anyways. It's 5:00 in the morning, and it was 20-something degrees. Just not ideal just to get in the car and go riding around for the night. So, he kind of got upset. He didn't know why we were trying to get him to go in the house, even though that he thought there was something wrong with that house. I don't know what it was. Like he said, there was flashlights in there earlier. He then walked west to . . . I can't remember the address where it all happened. He walked over there, and he was saying something about he was going to go to a neighbor's house and use their phone. I can't remember if he said he wanted to call 911 or anything like that, but he did say he was gonna go to a neighbor's house to use their phone. At that time, his mom was speaking Spanish to him with some English trying to get him to come back to the house and continue talking with us. I think she kind of understood if we had him near the house or by his car, he was a little bit more calm. And at this time, he was just kind of walking away from us. I told Ag . . . Officer Aguilar, I think it might be best that we try to detain him so that when E.M.S. comes, there wouldn't be any issues of him trying to run or have a struggle with them. Again, he's giving us the signs that he thinks we're gonna try to kill him. So, we approach the house, where he was standing, and knocked on the door. At this time, I didn't know what he said to the neighbors. I do know that he knocked on the door. I saw lights come on in the house, and so I knew, obviously, he had knocked, and they heard the knocking or banging. So we approached the bottom part of the hill, where the driveway is and we have our flashlights on Hector, 'cause at that point, it was kind of dark in that area. Initially, he's standing under a light where Hector's car was, so we could see him. This place, we couldn't, so we have flashlights on him. Again, Hector's mom is still trying to talk to him. This . . . at this point, she's speaking, probably, 90 percent-ish Spanish to him, so I don't know what she was communicating with him, but I felt comfortable with her communicating with him, so I let her continue to try to get him to come back down the hill. When we approached the bottom of the hill, we told him that . . . you know, "Hector, you need to come down here and talk with us or we're gonna take you to jail for disorderly conduct." At that time, he told us, "Well, where's your backup." To me, he . . . that right there, he understood that we were police and there was no reason for him having to call 911 or anything like that to get other officers out there. I think, at one point, I even offered to get another unit out there for him, but with the state of mind that he was in, I don't even think he may have heard me, or maybe, he was conversating with Aguilar or his mother. But anyways, so, we make it up to the hill, and at that time, there was one last plea from his mother to just come and talk to us. We told him, all right, well, let's go ahead and place your hands behind your back. Officer Aguilar grabbed for his right arm and I

grabbed for his left arm. After, he kind of started to pull from Officer Aguilar, I was able to get a grip of his arm. At this time, he's pretty much probably a foot away from the building. And when he grabbed away from Aguilar, I immediately pressed my chest up against his and grabbed . . . tried to grab for his arm. We were right by the steps that he walked up to go knock on the door. I was able to get at his left arm and we were able to move him, not easily or anything like that, but we were able to get him from against the house, away from the steps, and away from the sidewalk. I tried to . . . when we were struggling with him, I tried to take his arm and use a leg sweep to try to get him onto the ground, but he stepped right over it, and I couldn't get both Aguilar and him down to the ground, so that was ineffective. We continued wrestling around with him. We were still standing up, and then, eventually, we fell down to the ground. I remember hitting my right shin/knee area on the concrete area, and Hector and Aguilar falling into the grass area. While struggling with Hector, I heard Officer Aguilar tell him that he needed to let go of his body camera. I guess he was grabbing for the radio and other equipment, so we continued struggling trying to get his hands back. We were telling him, you know, "quit resisting," "put your hands behind your back." All while, he was screaming, "don't let them arrest me," "they're gonna kill me," "I can't breath." Just . . . continued yelling. I do remember, at one point when I had my . . . want to say it's my left forearm/-elbow area on the . . . I guess, the large, mid-part of his back, he did say he couldn't breath so I did let up a little bit, while still trying to maintain . . . maintain control of his left arm. At which time or during the struggle, I do remember him breaking away. And at one point, Officer Aguilar and I switched, basically, maintaining the . . . which hand we originally grabbed for. During the struggle, Aguilar was able to finally get a hold of his radio . . . radio in for additional units. And at that time, we could . . . started hearing sirens coming very far in the distance. Continued struggling. I was able to grab a handcuff while still trying to maintain some type of control over him. I got one cuff out, was still struggling to get his hand. Was able to put a cuff on his . . . I want to say it was his right hand first, and then we were able to get his left arm behind his back and barely get the cuff on there. I noticed at one point that I was struggling to get the cuff on there because of his jacket, so we still had to try to move the jacket out of the way while still trying to maintain control of Hector while he was rolling, yelling, and screaming and trying to get away from us. When we got him cuffed, Officer Evrard[2] arrived on scene and asked how could he assist. And I told him that we needed to get leg irons on him. Officer Evrard, basically, told me to wait until he was able to get a control of him or get a good position on him to where he was able to have control of him while I ran to my vehicle and get[sic] leg irons. I ran down to my vehicle, unlocked my car, got the leg irons out, ran back up to him. And at that time, Hector was pretty com . . . I wouldn't say compliant, but he was well controlled at this point due to us having the cuffs on. He wasn't flailing his legs much or anything like that, but I still felt that we need to put leg irons on him due to the struggle that we just had with him and E.M.S. still coming en route. It would be easier for them to have control of him with leg irons on and cuffs. So, I put leg irons on him. Since I suffer from asthma and the thin air, I had to, basically, step away and kind of let the officers take control of Hector. My . . . walked around the carport area and the yard to try and gain my breath, and at that time, I determined that I needed my inhaler. So I mentioned to the officers that I need to get my inhaler and to let sarge know . . . Sergeant Neal[3] know that I was gonna run to my house real quick to get my inhaler. I could have gotten an E.M.S. unit, but I knew they were tied up with Hector, so . . . At that time, I took my gloves off. I spoke to the witness that was standing there, saw pretty much everything from start to finish, and you know, told him that I . . . I couldn't breath, and he, basically, said that he wasn't giving . . . you know, Hector was not giving up to me. So I got . . . I went back down to my vehicle. I told them, one more time, if sarge was to arrive on scene and I wasn't here to let him know that I was gonna run to my house real quick and get my inhaler. I raised sarge on the radio. I told him, are you

---

INTERVIEW WITH: Officer Brian J. Dudley
Date/Time Taped: Wednesday, January 11, 2017/7:59 a.m.

CASE: 17-01
Page 5 of 23

clear for a call. At that time, he told me that he was almost at the scene, so I drove up to the intersection of Moss and River[Road] and put my hand out the window and just signaled to him that it was me, and I told him that I needed to go to my house and get my inhaler. At which time . . . you know, he felt that it wasn't safe for me to drive to my house . . . which is a couple blocks up the road of River. And so, he radioed Aaron[2] to come down, give me a ride to my house. Went into my house, got my inhaler, took two puffs off of it, and we ran back to the scene. When we got down to the River Road, we noticed that the ambulance was stopped by the elementary school right across from the shopping plaza near their playground. Aaron and I made the decision that we should go check on Aguilar and E.M.S. to make sure that he wasn't struggling again with . . . with E.M.S. I could see Aguilar standing on the back of the ambulance. And he wasn't in there, you know, actively struggling with him or anything like that so I thought that was kind of weird. Approached the ambulance and at the . . . probably, at the same time we were putting the car in park, dispatch came over the radio saying that he just went into cardiac. To be honest, that was shocking to me because right before I left, I saw . . . I saw him sitting up after we had rolled him to his side. He was sitting straight up with his bottom on the ground, feet straight out, and Aguilar's feet were directly behind him pretty much giving him a 90 degree, you know, angle of where he was sitting. And I could see Hector breathing and everything, so it's very surprising that ambulance was on the side of the road with him going into cardiac. I stepped onto the back of the ambulance, and at which time, they just yelled at us to close the door, so we immediately closed the door. As I looked back in the ambulance, I could see them doing chest compressions and Sergeant Kiel[4] arrived at the . . . I guess, third scene that we had, which was the ambulance, and we . . . he arrived and we told him what we had going on and that Hector was in cardiac. As I was conversating with Aguilar and Aaron, occasionally, I would look into the back of the ambulance. I could still see them trying to do chest compressions and trying to intubate his . . . the tube. They were able to finally get the tube in there, and I could see them manually pushing air into Hector. They still, even after they manually got the . . . they were doing the air, they were still working on him and . . . at which time, Officer . . . Sergeant Kiel told myself and Aaron to go back to the scene where the struggle happened and go ahead and set up a caution tape after he contacted his supervisors. We went out there, went back to the scene, and started to set up a perimeter of where we felt comfortable with putting crime scene tape up. I knocked on the front door and there was an older gentleman that answered the door. Well, before he answered the door, he asked, who was it, and I announced the Columbus police. And he asked us what . . . what do we need, and told him that we needed to talk to him. And at the time, he asked me, again, who was it, so I announced myself as Officer Dudley. He opened the door and told us that he didn't want to have . . . make any statements or anything like that. But I wasn't even concerned in talking with the older guy. I wanted to talk to, I guess, the older guy but younger than the homeowner. Because I remember seeing him standing there while we were struggling with Hector. And I knew he would be the witness that we need to speak to and pretty much anybody else would want to speak to since he was right there watching the whole thing happen, along with Hector's mom. So I spoke to that gentleman, I told him exactly what was going on, why we were setting up caution tape, and he, basically, understood that, you know, crime scene tape was appropriate to Hector's going into cardiac at that time. Officer or . . . Sergeant Kiel arrived on scene and I let him take over speaking with witnesses and such. Pretty much after then, I was told to go down to the . . . headquarters and/or come down here and start working on paperwork, my use-of-force and . . . an RMS report. So, I didn't see anything after that nor did I go to the hospital. During that timeframe, we were told to download our videos and body cams and . . . so we went . . . or download our Taser and download our video cameras. During that time, we went down there and spoke to the ladies, who download our cameras. They just at random picked up Aguilar's camera, began to download or populate the files on the screen and asked us which particular files that were needed, and they

---

[4] Sergeant Randolph M. Kiel, Bureau of Patrol Services

started click on 'em. They would scroll through, you know, just so we could see a few seconds of it and tell them yes or no, if that was the file that they needed to download. So I saw bits and pieces of Aguilar's video. At one point, I did notice that when she was scanning, we could see part of the struggle and then all of a sudden the audio knocked out and . . . so we don't know what happened to the audio on that. I . . . I mentioned to them it . . . it shouldn't be a big deal due to the fact that my body camera fell off of my uniform. It was found sitting on the steps, which everyone knows how audio works. Mine would have probably picked up better audio since it wasn't being muffled by uniforms and Hector screaming directly into it. But mine wouldn't capture any video 'cause it was just sitting on the steps. So I told that to the ladies, to pay attention to that because my screen may be black on this . . . on the screen, but it still would have the audio. So we turned in our body cameras and worked on our reports, and that's pretty much it.

**Major Blackmon:** Okay. So, earlier . . . and you may have stated that . . . I may have missed it when you said you were dispatched to the call on Moss Drive. You were dispatched with another officer?

**Ofc. Dudley:** No. Both times . . . the first one was . . . I want to say around 3:56[a.m.] or like 4:00,[a.m.] that was the first time Hector had called and wanted us to check on his mother and that was with Aguilar.

**Major Blackmon:** Excuse me. When you say with Aguilar, what's his first name?

**Ofc. Dudley:** Michael . . .

**Major Blackmon:** Okay . . .

**Ofc. Dudley:** . . . Aguilar.

**Major Blackmon:** . . . all right.

**Ofc. Dudley:** So we went to that call, we serviced it, spoke to the mother, and then, like I said, we went to two other calls. And then I heard that call come out, and I told them that we would . . . I would particularly go with . . . go to that call, just because I was there just an hour ago when the second call came out, so . . .

**Major Blackmon:** Uh huh.[Yes]

**Ofc. Dudley:** . . . and then, Aguilar was dispatched. Michael Aguilar was dispatched with me, again, to the second call.

**Major Blackmon:** Okay.

**Ofc. Dudley:** Which was 5:00.[a.m.]

CCG000229

INTERVIEW WITH:  Officer Brian J. Dudley
Date/Time Taped:  Wednesday, January 11, 2017/7:59 a.m.

**Major Blackmon:** So, on the very first call, when you and Officer Aguilar spoke to the mother the first time, and when Hector Arreola . . .

**Ofc. Dudley:** Correct.

**Major Blackmon:** . . . was not there, you say you left and dispatch communicated something about someone knocking on a door . . .

**Ofc. Dudley:** Correct.

**Major Blackmon:** . . . did . . . did you or Aguilar get dispatched to a call to go to a particular address to check it or what?

**Ofc. Dudley:** I think they were going to dispatch us. But like I said, this was called in by a home-owner at that address I don't know and . . . and they said that someone was knocking on their door, and they asked if we may have like went to the wrong ad-dress trying to locate 760. Now, mind you, I've already been to 760 Moss Drive on an unrelated case or incident that happened, so I was already familiar with 760, so once I arrived to that area, I knew that the mailbox for 760 was on the left in the yard of another address, but I knew the house was to the right, so I was al-ready familiar with it, so I knew that it . . . we did not knock on any other door. We went straight to residence 760 and made direct contact with the mother. There was no hesi . . . you know, no misunderstanding that I . . . I went to a differ-ent address. So we weren't sure what the . . . if, indeed, that a homeowner did hear someone knock on their door or was it us going into a driveway and, you know, bottoming out with our vehicle. We don't know, but I mean it was probably five minutes lat . . . after we just left speaking with . . . with Hector's mother. So, even . . . in my mind, even if we were still at 760, we should have been able to see someone walking around in that area. Because, if I'm not mistaken, the numerics on that call was 77, so that would only put it, you know, probably three or four houses away. And we were standing outside with Hector's mother and we didn't see anybody out there knocking on doors or anything like that. So I think dispatch didn't give it to us because we were, literally, just out there within five minutes, and would have seen it. Even if you work in the delays of, you know, dispatch get-ting the call, and then waiting for us to get 10-8 and stuff like that. So we never went back out there to look for a person that knocked on a door.

**Major Blackmon:** Because y'all were never dispatched to go?

**Ofc. Dudley:** Correct, we were never dispatched. So I'm not sure how dispatch handled it, but we were right there in that area for a good time period.

**Major Blackmon:** Have you received Crisis Intervention Training?

**Ofc. Dudley:** Correct, I did.

INTERVIEW WITH:  Officer Brian J. Dudley                                          CASE: 17-01
Date/Time Taped: Wednesday, January 11, 2017/7:59 a.m.                        Page 8 of 23

Major Blackmon:      What year did you receive that training?

Ofc. Dudley:         I received it in 2013 after my academy, so that would have been, probably, April
                     of 2013.

Major Blackmon:      Explain what . . . just a little summary here . . . a synopsis, what Crisis Intervention
                     Training involves?

Ofc. Dudley:         It was pretty much everything to do with mental illness; bi-polar, schizophrenia,
                     and we did scenarios. Multiple scenarios, actually talked to people that had those
                     mental illnesses. And they even told us, you know, even though someone's not in
                     their right state of mind, sometimes, they will remember how officers are speak-
                     ing to them and stuff like that, so . . . Reality, they're not there while we're speak-
                     ing to them, but they, in a sense, are there, if that makes sense. But it was just a
                     very good understanding of trying to deal with mental illness. Pretty much trying
                     to be patient with them. Knowing that, you know, taking 'em down to the county
                     jail was not always the solution. Now, sometimes there is cases where they do
                     have to go, but we try to seek the help first. And that would start with E.M.S. and
                     then going down, you know, through their . . . their protocol, which would eventu-
                     ally, you know, go to hospital, be evaluated. And in all honesty, I felt like this was
                     a case of possible mental illness. At one point, I did try to shine my light  on Hec-
                     tor's eyes to see if they're . . . you know, pupils were blown out or extremely pin-
                     point or anything like that. But that was kind of during the timeframe of him get-
                     ting upset with us, you know, trying to get him to go to the house. I didn't want
                     to do too much to aggravate him. But yeah, I mean crisis intervention, in all hon-
                     esty, probably helped me in this situation because I . . . I probably would of kind
                     of . . . and without that training would have just, you know, chalked it up as, oh,
                     well, there's nothing I can do, but with patience, I think we could have helped him
                     if E.M.S . . . you know. If we could of . . . it would have went a different route if
                     we could have got him on the stretcher to go with E.M.S., I mean it would have
                     definitely helped him. It would have helped us rule out that either he was on nar-
                     cotics or that he does have a mental issue. And at least, have it documented and
                     . . . you know, help him get this help he needed.

Major Blackmon:      So, with the Crisis Intervention Training that you mentioned, you mentioned you
                     go through scenarios . . . you went through scenarios, and can you give us an ex-
                     ample of some of the type scenarios you had to go through?

Ofc. Dudley:         I . . . I can't really remember exactly the scenarios, but one I really remember was,
                     you know, one of the actors, I guess you could say, which come to find out actually
                     did suffer from mental illness of the . . . had a first-hand knowledge of mental ill-
                     ness. But . . . you know, one of her scenarios was that . . . you know, she wanted
                     to walk through the wall, which was a black hole, for her to go to, you know, ano-
                     ther place. And you know, she was screaming and crawling at the wall to, basical-
                     ly, you know, try to get to this hole that would take her to another area, and you
                     know, obviously, that's just not common for anyone to act like that. And . . . you

INTERVIEW WITH: Officer Brian J. Dudley
Date/Time Taped: Wednesday, January 11, 2017/7:59 a.m.

CASE: 17-01
Page 9 of 23

know, they're basically seeing things that are not there, but they did tell us that they can remember what happened. So I . . . I think this was kind of like your . . . a mental illness case. I mean he told me that he was seeing flashlights in his mother's house, and when I looked back there and there's no lights being flashed around in the house except one or two . . . can't remember exactly, but a porch light just be on the entire time, that's . . . to me, that's not flashlights being on inside of a house. So, it was very much so he was un . . . either under the influence of narcotics or had a mental illness.

Major Blackmon:     So, the Crisis Intervention Training, you said, did it teach you de-escalation techniques?

Ofc. Dudley:     Correct, and that is purely being patient and communicating. And sometimes, you kind of have to go into this other state of mind that this person's in, and you know, tell them, yes, there is . . . you know, flashlights, or yes, there is a unicorn walking down the street. You kind of have to play along with that so that you can gain a relationship with that individual. Especially if, you know, they're upset. It just depends on the scenario. If they're upset with you, you may want to try to get a better rapport with them. If they gravitate to you and you don't have to use so much conversating with them, then you know, you're pretty golden in that situation. But if . . . if you can't gain them by speaking with them, you . . . you kind of have to play along with that role that they're in and try to understand what they're going through. It . . . it's hard to understand because, if you don't suffer from mental illness, it just . . . it doesn't make sense to you, but you kind of have to communicate with them.

Major Blackmon:     So, is it fair to say that you used some of the . . . the techniques of the crisis intervention training on this call on Moss Drive as you interacted with Arreola?

Ofc. Dudley:     I . . . I went . . . yes, some, and that would be, you know, me being patient and me communicating with him, Officer Aguilar communicating with him. Us trying to really . . . lack of better words, pick his brain to find out what is going on in this situation. You know, him thinking that my . . . you know, he was telling me that my gun is supposed to be in my holster, which clearly it was in the holster. There was no . . . no doubt that it was in the holster. I mean I had my hand on top of my . . . the hood of my gun. And at one time, he just runs from us and hides behind a trash can because he thinks we're pointing a gun at him. So I mean, most definitely, what we learned in CIT definitely helped in this situation in the beginning. After he walked away, I don't think there was too much trying to reel him back towards where we were back at. It's just . . . it was gone after that. I think we lost it. Don't know how, but I think with him just thinking that we were going to kill him or shoot him, he was just afraid to talk to us.

Major Blackmon:     And when you say CIT, you're referring to Crisis Intervention Training?

Ofc. Dudley:     Correct.

CCG000232

| | |
|---|---|
| Major Blackmon: | So, when you . . . when you were in the CIT training, did some of the training . . . some of the instructions, was it that sometimes a person may have to be taken into custody and arrested if . . . if all other attempts have failed to try to assist a person? |
| Ofc. Dudley: | Correct. In our CIT training, you know, it was told to us that, you know, it's not always appropriate to put a charge on someone so that they can just be taken out of the area, and you know, pushed off to the side. It should be that, you know, we honestly try to help them. And if that means detaining them so that they can speak to medical professions,[sic] that was something we were told, you know. Safety was a big key in training, and I mean if someone's wanting to run away from you or try to harm you or others . . . you know, you kind of have to do something to prevent that from happening. And I remember telling Ag . . . Officer Aguiar that we're gonna have to detain him so that he can talk to medical. Because at one point, he didn't . . . when we were offering, "hey, would you like to speak with E.M.S., they may be able to help you," he told us, no, that he didn't need help. But there was clearly something wrong. Like I said, whether it was alcohol, narcotics, or I should just say, under the influence of something, and/or mental illness. There was something wrong, and I can't help him beyond, you know, by just detaining him or taking him to jail. It was someone clearly in a different profession that could help him with that and that was medical. There was no doubt. |
| Major Blackmon: | So, when you said something was clearly wrong, you're making that observation based on what? |
| Ofc. Dudley: | Everything that he was speaking of. Extremely paranoid that we were gonna harm him. Extremely paranoid that his mother was sick when she was clearly in good health. Now, she did state that she had a small cold, but when someone is wanting police to check on a significant other, a small cold isn't usually what we go check on. It's usually someone that's terminally ill, or . . . you know, may have disfigurement . . . disfigurement or something like that. But I mean, all the indications that something was wrong with Hector was there. Like I said, him thinking his mother was sick. Him running from us and hiding behind a trash can when he thought . . . he thought we were gonna shoot him or use force against him. Him telling us that we weren't the real police, and then, when we go to the sec . . . the sec . . . the neighbor's house, he's telling us, "where's your backup?" So, clearly he . . . at one point, he didn't think we were police, and then, realized that we were police. I mean wearing a uniform that has patches and indicates that I'm police. It just . . . it . . . it wasn't . . . it wasn't making sense that he was normal in other words. |
| Major Blackmon: | Did he ever say, don't shoot me? |
| Ofc. Dudley: | He did. When he finally came from behind the trashcan, he said . . . he had his hands up, and then, at one point, they went down to his side, and he said . . . you know, you guys . . . "don't shoot me, don't kill me." And we reassured him that |

... that was not what was going to happen at all. We were purely just trying to talk to him. I think his mother had a good understanding of that. If she didn't, I would ... I would have suspect[sic] that she would have said something to us. But she was still trying to continue to get Hector just to calm down. At least, come in the house and sleep and just rest. Because it was clear that he needed it.

**Major Blackmon:**   Okay, have you ever received field sobriety training?

**Ofc. Dudley:**   Yes.

**Major Blackmon:**   And what do you learn when you're in field sobriety training?

**Ofc. Dudley:**   If it's ... I've only had the alcohol and ... I mean, slurred speech, unable to walk, just typical. They look like they're drunk. I don't think he was under the influence of alcohol. It ... it was something that either altered his state of mind or his mind was just altered on it's own, basically. I didn't see any signs of sweating or anything like that. And usually, when someone's under the influence of alcohol, sometimes they are sweating, and you can kind of get that odor from them if they've been drinking heavily, and I didn't get that ... those signs from him. So I think it was more so narcotics or mental illness.

**Major Blackmon:**   Have you ever had the opportunity to ... while you were in law enforcement ... while you were in your law enforcement career, have you ever had the opportunity to encounter another person that displayed mental illness?

**Ofc. Dudley:**   Several times, and I mentioned it just briefly earlier. Hector's mother ... and it was on my vi ... when you ... whenever you see the video footage, I will ask Hector's mother, "is this the same guy from last time." Now, what I'm referencing to is when myself and Officer Evrard went to her address, along with a recruit at the time, Officer Grant,[5] we had a situation where a male called 911 saying that he was wanting to commit suicide. Again, when we knock on the door, Hector's mother came to the door. And she was surprised that we were there, and we said, "Did you call police?" And she looked shocked and was like, "No, I didn't call police." And I said, "Well, is there a male subject in the house because that's whom we thought called police, because in our notes, it had a male name on there. So, she said, "Yes, there's a male in here and he's in the bathroom right now." And so, she showed us to the bathroom and ... at which time, we ... she knocked on the door and said ... I can't remember the individual's name or anything. "The police are here to talk to you." He ... he said, "Okay, open the door slowly." At that time, as soon as he said slowly, I knew there might have been something wrong behind the door. Wasn't sure what it was. So I slowly opened the door. I was standing to the left of the doorway. Officer Evrard was to the right of the doorway, and when I opened the door, I immediately saw a gentleman hunched over kind of showing the signs of him holding a knife. I couldn't clearly see that there was a knife immediately, but he was showing it as like he was gonna stab

---

[5] Officer Robert M. Grant II, Bureau of Patrol Services

himself in the abdomen. I immediately deployed or took my Taser out and pointed it at the individual and told him, "Don't do it." It was a small space. He easily could have changed his mind and came towards us, so I had Taser out . . . pointed at him with the red dot activated. We were able to de-escalate it. We, basically, had to wheel and deal with him. He wanted the Taser off of him, but we wanted the knife away from him, so we were able to tell him, "well, you put the knife down, I'll put my Taser down." And he didn't trust us, so I told him, "Well, if you put it down a little bit, I'll put my Taser down a little bit." And we just basically exchanged lowering our . . . his weapon, my Taser, and then. Officer Evrard told me that he was going to go in there, but I knew the knife was still in arms reach, so I told the individual I was going to put my Taser up, but in my mind, I was not gonna put it just due to the situation. So I held my Taser behind Officer Evrard as he was going in the door, just in case he was going to grab for the knife again, I could deploy the Taser and tase him. We were able to get the knife back and get it out of the gentleman's hand. During that time, Hector's mother was very calm, very . . . but surprised that this gentleman, which was her boyfriend, was even attempting to do suicide. We talked to the individual. He was very distraught about life, in general, and stuff like that. So we got E.M.S. out there. They spoke to him. They took him to the hospital, where he could get treatment. Again, like I said, I wasn't sure if Hector was that gentleman that we encountered in the bath . . . in the bathroom, so I asked Hector's mother, "Hey, is that the guy from last time," and she said, "No, this is my son." So, at that time, I . . . I knew to kind of rule out a previous, you know, mental illness situation with a new person so that I could re-eval . . . you know, re-assess the situation. Because if I . . . if it would have been the same guy, I could of, you know, tried to gain a rapport. Say, hey, I, you know . . . I remember . . . you remember me. I helped you last time. Everything worked out fine, let me help you. But it was Hector, so it was a different individual.

Major Blackmon:   So, based on your training and your experience, you've . . . you have been able to encounter and . . . and interact with those, who . . . who display symptoms of mental illness . . .

Ofc. Dudley:   Correct.

Major Blackmon:   . . . and it is your belief that Hector was either displaying a symptom of some type mental illness or some . . . being on some type drug?

Ofc. Dudley:   Correct, very much so.

Major Blackmon:   Earlier, you said that you didn't know whether or not there was a . . . you said TPO, is that, to me, a temporary protective order?

Ofc. Dudley:   Correct . . . yes, sir.

Major Blackmon:   So you didn't know whether or not there was a TPO or not, so did you do a name check or anything?

INTERVIEW WITH: Officer Brian J. Dudley                                                    CASE: 17-01
Date/Time Taped: Wednesday, January 11, 2017/7:59 a.m.                                Page 13 of 23

Ofc. Dudley:     I did not have a chance to do any name check. The only thing I knew about Mr.
                 Arreola, Hector, was that his name was Hector. And the only reason I really knew
                 that was because his mother called him by Hector. Now, I had in my notes Mr. Ar-
                 reola. We didn't have no name . . . date of birth or anything like that. And quite
                 frankly, with the way that Hector was acting, I . . . I . . . I couldn't go do a name
                 check or even get on the radio . . . radio to, you know, take my eyes off the individ-
                 ual to read off some notes off of my notepad or anything like that just due to safe-
                 ty. At that time, I wasn't going to . . . if there was a TPO in place, I was not going
                 to charge Hector with a TPO. That was just running through my mind that he may
                 not want to go to his mother's house in fear that police may arrest him on violat-
                 ing that temporary . . . that temporary protection order. So that was just some-
                 thing that was going through mind, is that why he's so hung up on not going to
                 the house because, in all honesty, if . . . if that's your mother's house, why can't
                 you just knock on the door yourself and speak to your mother. So that was kind
                 of why I thought, maybe, he was hesitant to knock on the door, you know, maybe
                 that he didn't want us to arrest him for, maybe, a TPO or anything like that.

Major Blackmon:  Okay. While you and Officer Aguilar were . . . were there on the scene in front of
                 the address of 760 Moss Drive, and you stated that Arreola walked away from
                 you and went to another residence, you said you don't recall the exact numerical
                 address. It was later determined that . . . that residence that Arreola walked to
                 was 767 Moss Drive . . .

Ofc. Dudley:     Yes.

Major Blackmon:  . . . did you observe him in the yard of that residence or knocking on the door?

Ofc. Dudley:     You're speaking of the one, where he went up to . . .

Major Blackmon:  767.

Ofc. Dudley:     Correct. I saw him go to the door, but I did not see him physically knock on the
                 door. But it was obvious that he'd made some type of commotion to wake them
                 up because that's when the lights came on at that address. And from the distance,
                 you can see a light come on and then you can hear him talking. Now it's audible,
                 it's just audible noise to me because I'm not close enough, and I was also listening
                 to his mother trying to talk to him while listening to Aguilar with us trying to gain
                 a game plan as to how to continue . . . try to get Hector to get help, because we
                 did have E.M.S. en route. It's always a hassle having E.M.S. standby . . . we don't
                 have someone for them to talk to, but we know that they need to talk to some-
                 one, so we . . . you know, we were trying to formulate an idea as to how we can
                 get him to talk to E.M.S.

Major Blackmon:  Do you recall whether or not Arreola was ever told not to go to any residence in
                 that area?

Ofc. Dudley:  Yes, when we were telling . . . when he was walking away, we were telling him . . . you know, don't go to the neighbor's house. Now, I may have said that only once. Officer Ev . . . Officer Evrard . . . Officer Aguilar may have said it once or twice, as well. I can't remember for sure, but it was announced to him that he should not go to anyone else's house due to it being 4:00 . . . 5:00 in the morning.

Major Blackmon:  So, during this encounter, he was at this house, 767 Moss Drive, and you and Officer Aguilar observed him there. Was his mother nearby that address, as well?

Ofc. Dudley:  She was at all times, probably, within five feet of us . . . at all times. So that's from the time she was standing between Officer Aguilar and I telling Hector that it was too cold. It was too early for him to be continuing on with this behavior. She was, probably, at all times five feet away from us. All the way . . . if I'm not mistaken, while we were struggling with him on the ground, she was probably even closer than five feet. I do remember looking up, at one point, and seeing her nearby.

Major Blackmon:  Did . . . did she try to get him to leave that address of 767 Moss Drive . . .

Ofc. Dudley:  When . . .

Major Blackmon:  She being his mother.

Ofc. Dudley:  Correct. I wouldn't say that she was trying to get him to leave it, because at that point, it was too late for him to leave because we were already walking up . . . we were already approaching him and trying to tell him, hey look, you need to talk with us. But prior to him making it to that address, she was communicating with him, saying, "Let's go back to the house." Now, again, she was speaking Spanish to him. I don't know what she was telling him. I would assume, just based on her demeanor that she was trying to get him to stay away from the neighbor's house so that he wouldn't cause more distraction in the neighborhood.

Major Blackmon:  So, you said, you observed the neighbor come outside of that residence of 767 Moss Drive?

Ofc. Dudley:  Yes. Now this was . . . I didn't . . . I didn't see them come out the house and speak to Hector when he knocked on that door. When I observed him being outside was when I was struggling with him and that was Alan,[Tarvin] I believe, was his first name. I don't remember Tarver . . . Tarvin, maybe, was his last name. He was indi-vidual that came out of the house, and I saw standing there when we were strug-gling.

Major Blackmon:  So, you and Officer Aguilar approached Arreola while he was in the . . . on the property of 767 Moss Drive and you and Officer Aguilar made an attempt to place him into custody?

CCG000237

| | |
|---|---|
| Ofc. Dudley: | Correct. At that . . . as we were walking towards Hector, in my mind, I was already trying to establish which laws he was breaking, and basically, gathering my probable cause to, you know, detain him. And I, basically, came up with loitering and prowling could be a charge and disorderly conduct. By time I saw lights turning on in the house and Hector continuously talking loud in front of the people's yard, I decided that my charge would have been disorderly conduct, and of course, I would have talked it over with Officer Aguilar afterwards. But my charge would have been disorderly conduct, just due to the fact that he was in someone's yard causing a disturbance by waking them up. At this time, it was probably 5:15, 5:20, or whatnot, in the morning, asking to . . . now this is information that I gathered after talking to the witness. But he wanted . . . he asked them, "I need to use your phone," and the witness told them . . . or told him, "what's the number," so that they could dial it for him. And he said, "911." At that time, he looked down the driveway, down the hill, and saw us standing down there with our flashlights on him. And basically, told him, "911 is behind you," and meaning that police . . . there was no need for him to call 911 because were . . . you know, a couple of feet away from you." So, at that time, that was where I made the decision that we were gonna detain him on the charge of . . . you know, disorderly conduct. Do I want to charge him? No, I'd rather him get the help. It's my discretion to make a charge, and in all honesty, he probably would of . . . if he would have never resisted in this whole scenario would have happened, I would have just let him go straight to seek medical attention. I mean it was just obvious that he needed it. But like I said, he was definitely causing a disturbance out there. |
| Major Blackmon: | So . . . and I stated earlier the address being 767, actually, it's 747 . . . |
| Ofc. Dudley: | Uh huh.[Yes] |
| Major Blackmon: | . . . Moss Drive. So, as you were . . . as you approached him . . . along with Officer Aguilar, as you approached Arreola, and you took him in custody or made an attempt to take him in custody, he began to resist? |
| Ofc. Dudley: | . . . |
| Major Blackmon: | And during that time he was resisting, you said you had your body camera on? |
| Ofc. Dudley: | Correct. It was initiated long before the struggle happened. I want to say I [unintelligible – 00:22:26] and turned it on probably right after I started to talk with Hector. And from there on out . . . yeah, I mean, when you see the video footage, I remember looking down and seeing the red light on even when I went to my house to go get my inhaler. I mean you'll hear my dogs barking in the background, everything in my house. So, I mean it was on the entire time. |
| Major Blackmon: | So, during the . . . the time that you and Officer Aguilar were attempting to place Arreola in custody, did you ever use your Taser? |

| | |
|---|---|
| Ofc. Dudley: | Not . . . never. If I did, probes would have been out. The little data dots would have been everywhere. I didn't even have time to barely get a handcuff out. Not to mention, even if I wanted to take the cartridge off and do a drive-stun, I . . . I mean I wouldn't have had time to do that. It was just . . . I didn't have time to get a handcuff out. Aguilar could barely get on the radio to raise for, you know, additional units, so . . . so, no, never used a Taser. I'll be honest, didn't even think about my Taser. I knew I just needed to get control of his arms and keep him right where we had him. I wasn't worried about trying to use a Taser, O.C., ASP baton, or anything like that. It was just maintaining control of his hands and feet. |
| Major Blackmon: | So that was my next question, did you use your ASP baton or OC spray? |
| Ofc. Dudley: | Never. |
| Major Blackmon: | Did you use your firearm? |
| Ofc. Dudley: | Not at all. I remember even getting up, checking to see if all my equipment was still on there, because . . . I mean, it felt like my belt was just all adjusted all wrong and everything was still in the holsters, everything was snapped up tight. |
| Major Blackmon: | And . . . and during the encounter, did you state that your body camera fell off? |
| Ofc. Dudley: | Correct, it did. I didn't realize that it fell off during the struggle. The only way I found out was I saw the red light sitting on the steps and . . . which I knew my . . . you know, that was more than likely my body camera. Because I remember hearing Officer Aguilar telling Hector to stop grabbing his body camera. So I knew that was my body camera laying[sic] on the ground. Which it still had the red light on, which meant that it was still engaged to record. |
| Major Blackmon: | So, as his mother was trying to get him to comply, you . . . you stated? |
| Ofc. Dudley: | During the struggle? |
| Major Blackmon: | Yes. |
| Ofc. Dudley: | I don't re . . . to be honest, I don't really remember if she was saying anything to Hector. There was . . . he was yelling and screaming so much that I . . . I don't really remember any other audible noises around us. Except when . . . after I heard Aguilar raise for additional units, I'm always . . . when I've always asked for additional units, I try to gauge how far the sirens are so I know, you know, kind of when to signal where I'm at. I remember Aaron, or Officer Evrard, passing us up, and I was fumbling to get to my flashlight to press the strobe button so that I can, you know, illuminate where we're at or get his attention or so . . . yeah. |

INTERVIEW WITH:  Officer Brian J. Dudley
Date/Time Taped:  Wednesday, January 11, 2017/7:59 a.m.

**Major Blackmon:** So, during that encounter with Arreola, did either you or Officer Aguilar have your hands around his . . . Arreola's throat, nose or mouth or any area that would have constricted his breathing?

**Ofc. Dudley:** Not that I recall. If we did, it was briefly. I mean I was more worried about maintaining control of his hands so that he doesn't hit Aguilar or hit me. That was just my main concern. I wasn't worried about trying to gain control by . . . you know, choking him from behind or from the front. It was just maintaining control of his appendages. It was my main concern.

**Major Blackmon:** I . . . I didn't understand clearly what you were saying when you said, you wouldn't gain control by doing what now?

**Ofc. Dudley:** Just gaining control of his hands, that's all I was worried about. I didn't want him to hit Officer Aguilar or hit me. At that time, there was . . . Hector never hit us. We never hit Hector. It was just a matter of him struggling to get away from us. And that . . . in all honesty, it was kind of perfect that no one . . . Hector wasn't hitting us so that we had to escalate to a higher force. It was just, basically, trying to gain control of hands . . .

**Major Blackmon:** Okay.

**Ofc. Dudley:** . . . that's all it was.

**Major Blackmon:** Okay. And . . . and earlier, when I said I didn't understand clearly what you were saying, you know, you had mentioned something about choking. Did you say that no one choked him?

**Ofc. Dudley:** I don't think I ever placed my hand around his neck. If I did, it was probably just trying to grab his arm that he was clinching. I know he was clinching his arms near the front of his chest, so there was probably an attempt to grab his arm again. But there was no attempt to choke him at all.

**Major Blackmon:** And so, the witness that you spoke to was the residence . . . the resident of 747 . . .

**Ofc. Dudley:** Correct.

**Major Blackmon:** . . . Moss Drive?

**Ofc. Dudley:** If I'm not mistaken, he said he was like a son or stepson or something like that of the actual homeowner.

**Major Blackmon:** Once Arreola was placed in custody, did you ever speak to him after that time?

| | |
|---|---|
| Ofc. Dudley: | No. The only thing we did or that we . . . I did was go run to get leg irons, put 'em on his leg . . . legs, and then rolled him to his side. I didn't even help lift him up so that he was sitting upright. All the other officers that responded helped with that. I . . . like I said, I was . . . my asthma was getting to me, so I . . . I . . . I could barely talk to him, so I didn't make any contact to speak with him or anything like that. Or attempt . . . |
| Major Blackmon: | Was . . . to your knowledge, was . . . was Arreola conscious at that time he was placed in handcuffs? |
| Ofc. Dudley: | Yes. I do remember looking back while he was . . . when Officer Aguilar had his legs behind his back to keep him sitting upright, I do remember seeing Hector just looking at his legs and breathing, basically. I remember seeing him kind of . . . re . . . extremely winded as I . . . like I was, too, so I do remember seeing him breathing. |
| Major Blackmon: | Upon the E.M.T . . . the . . . the E.MTs. arrival, did you observe either one of them on the scene of 747 Moss Drive perform any CPR or any particular rescue techniques? |
| Ofc. Dudley: | No, I made contact with them at the bottom of the hill to give them a very quick synopsis of the situation. I told them that, you know, possibly under the influence of narcotics or mental illness. There was a struggle. He did have some blood coming from his face. I guess to talk about that, during the struggle, I did see some blood by his nose area. I suspected that being from when his . . . when he was facedown and us trying to grab arms and stuff like that, he probably just busted his nose. So, I didn't think anything of the blood. Now, I didn't see a large amount of blood while I was struggling with him. And when we placed cuffs on him, he was facedown so I couldn't see the blood either. But back to the original question, I did speak to them about the situation. I let them go up to the . . . where Hector was, and basically, kind of turned it over to them, as I would say. Because I was . . . at that point, I was so winded I was worried about getting to my inhaler somehow. I even noticed when I got in my vehicle that my girlfriend had texted me, and I called her back to see if she would be able to possibly bring my inhaler right down the road. But, you know, it got worked out that I was able to get there, so . . . |
| Major Blackmon: | Sergeant Bridges. |
| Sgt. Bridges: | Officer Dudley, you mentioned that you came to headquarters right after the incident, and you had . . . you turned in your body camera and you had your Taser downloaded? |
| Ofc. Dudley: | Correct. |
| Sgt. Bridges: | Do you remem . . . did you . . . do you know the results of that download? |

Ofc. Dudley:     I test . . . I did a spark tests, I think, on the first, and I didn't have any spark tests all the way up to when . . . oh, I've got a brain fart, Sergeant . . .

Sgt. Bridges:    Bolen?

Ofc. Dudley:     . . . Bolen sparked it before he downloaded. So I have, basically, eight-day gap of no sparks being done on there.

Sgt. Bridges:    Or usages?

Ofc. Dudley:     Yeah, usages. I know we're supposed to test it, but there was none on there.

Sgt. Bridges:    Okay. You stated that Officer Evrard came and you were trying to . . . to notify him as to where you are. I know this would be an assumption on your part, but are you assuming that he was responding to where your vehicles were and that's why he drove past you?

Ofc. Dudley:     Correct. I think, probably, most every officer does it. They always think that we're still at the same location. We didn't notify dispatch that we were walking to a different location, so that was probably, you know, a mess up on our part. Even then, Officer Evrard, I think, when I was speaking to him after the situation, he told me when that address came out, it rang a bell. And I'm assuming that it was the one about when we went there in the past with the gentleman with the knife to his abdomen. So I'm thinking that he already had just associated it being probably that same guy, possibly the same location. So, yeah, it . . . it was just kind of lack of our part where . . . letting 'em . . . notify where we went, changed locations. But yeah, I was able to use a flashlight to let him know where I was at.

Sgt. Bridges:    Prior to the injuries you described after the . . . after the struggle, did you notice any injuries to Mr. Arreola while you were speaking to him in front of 760?

Ofc. Dudley:     No. Glad you asked that. No, I . . . I didn't. I want to say that he did have some discoloration to the temple area of his . . . left temple area. I mean, to me, it looked just more like either a birth defect or something along those lines, but it was not a wound, I guess you could say. It just wasn't normal, I guess you could say. But, again, I don't . . . I don't know the guy. I didn't know him. My first time meeting him, so . . .

Sgt. Bridges:    Did he . . .

Ofc. Dudley:     . . . but . . .

Sgt. Bridges:    Did he indicate verbally that he was injured in any way?

Ofc. Dudley:     We asked him, was there anything wrong with him. He stated that he was fine.

INTERVIEW WITH: Officer Brian J. Dudley                                              CASE: 17-01
Date/Time Taped: Wednesday, January 11, 2017/7:59 a.m.                           Page 20 of 23

| Sgt. Bridges: | Other than the asthma and get . . . you having to get your inhaler, did you suffer any injuries? |
|---|---|
| Ofc. Dudley: | A like a little scratch from where we were, basically, walking on our knees trying to gain control of him, but . . . and then, I have like some soreness to my shin, where I hit the little bricks that outline the sidewalk that was there. But other than that, nothing. |
| Sgt. Bridges: | That's all the questions I have. |
| Major Blackmon: | Sergeant Birris-Mayo. |
| Sgt. Birris-Mayo: | I have no questions. |
| Major Blackmon: | Okay, Officer Dudley, I believe I . . . you were commenting on whether or not you observed any bruises or wounds or cuts above his eye, Arreola's eye . . . |
| Ofc. Dudley: | Uh huh.[Yes] |
| Major Blackmon: | . . . and upon you init . . . you . . . you and Officer Aguilar initially talking to him . . . |
| Ofc. Dudley: | Correct. |
| Major Blackmon: | . . . and you said, you just noticed something that appeared to be like a birth de-fect? |
| Ofc. Dudley: | Yeah, I really don't know what it was. It's just the best way to describe it. It just looked like something was at the temple area. I couldn't really . . . it was, you know, bad light . . . lighting, shadows. It . . . it could have been a sha . . . you know, just the way . . . I mean his hair could have been mak . . . creating a shadow. I real-ly don't know, but I do remember looking at the temp . . . left temple area and just kind of like, wonder what happened . . . you know. Nothing that I thought he needed medical attention for. It was just . . . I don't know how to explain it. It was just there, and I noticed it for some odd reason. |
| Major Blackmon: | Did you notice it after he was placed in handcuffs? |
| Ofc. Dudley: | No, honest, I didn't see his face after we placed him in handcuffs. The only time I saw a glimpse of his face was when I saw some blood near his nose. Like I said, I thought that came from when we had him facedown and trying to gain control of arms. He may have brushed his nose up against the . . . at the time, it was freezing weather, so it could have been frozen, you know, soil, basically, or grass. So I thought that may have . . . where the blood come from. I didn't see an excessive amount of blood while we were struggling with him. Now I did have some blood on my uniform at the shin of my right, uniform leg. And I know I mentioned that |

INTERVIEW WITH: Officer Brian J. Dudley
Date/Time Taped: Wednesday, January 11, 2017/7:59 a.m.

CASE: 17-01
Page 21 of 23

I hit my shin on the concrete, but I had no blood on my . . . on my skin, so it wasn't my blood. It was definitely his blood.

Major Blackmon: So earlier, you stated that some other officers came to assist. Do you recall the officers that came to assist?

Ofc. Dudley: Officer Evrard arrived first, then it kind of gets, as . . . as far as who responded after that, I want to say Officer Ronnie Oakes, and I can't remember if Corporal Schwind[6] arrived while E.M.S. was still there. I can't remember for sure, but I do remember seeing, possibly, Schwind there. I mean I can't even remember if Schwind was there, now, I think about it. But I know Ronnie and them were over there for sure.

Major Blackmon: But as far as placing the person, Arreola in custody, you and Officer Aguilar?

Ofc. Dudley: Yes. We gained control. I actually remember just getting the second cuff on Officer[sic] Arreola's left arm and then seeing Evrard pass us up. At which time, it . . . it . . . the struggle was somewhat over. He was still kind of trying to move around, but I was able to use my flashlight to tell Officer Evrard where we were. So we . . . when it comes to, I guess, placing him in custody, it was Officer Evrard and myself.

Major Blackmon: Okay, just for clarity, earlier you stated it was . . . you said you placed the cuffs on Officer Arreola, you . . . you . . . but do you mean . . .

Ofc. Dudley: Sorry.

Major Blackmon: . . . Hector Arreola?

Ofc. Dudley: Correct . . . yes, sir.

Major Blackmon: . . . and then, you said, as far as placing him in custody, it was Officer Evrard and yourself, did you mean Officer Aguilar and yourself?

Ofc. Dudley: Correct.

Major Blackmon: Okay.

Ofc. Dudley: Aguilar and myself placed cuffs on Hector Arreola . . . yes.

Major Blackmon: Sergeant Bridges.

Sgt. Bridges: I don't have any other questions.

Major Blackmon: Sergeant Birris-Mayo.

---

[6] Corporal Eric R. Schwind, Bureau of Patrol Services

Sgt. Birris-Mayo:     I do have one question. Officer Dudley, did Hector ever speak to you or make what you could have perceived as threats in Spanish, or did he only speak to his mother in Spanish?

Ofc. Dudley:          If he made a threat to me, I wouldn't even have known 'cause I don't know Spanish. But he . . . I don't even think he communicated with his mother in Spanish. If he did, it was probably like, "See," as in yes, or something like that. It was very small conversation. He was mostly responding back in English to her as she was speaking Spanish to him.

Sgt. Birris-Mayo:     Okay, and I want to make sure I understood you to say that he . . . he said he was going to the neighbor's house so that he could get someone to call 911?

Ofc. Dudley:          Correct, he's . . .

Sgt. Birris-Mayo:     Although the original call came in on his cell phone?

Ofc. Dudley:          From my understanding, it might have been the cell phone, yes. I know . . . I know Hector called 911 for our assistance, to have police there. And then, for some reason, he decided that he needed police to come there, but we were already there. So yes, that's when he was going to the neighbor's house to, I guess, make that second call.

Sgt. Birris-Mayo:     Okay, no other questions.

Major Blackmon:       Sergeant Bridges.

Sgt. Bridges:         No other questions.

Major Blackmon:       Okay. Officer Dudley, we're about ready to wind up this interview. So before we conclude, just want to ask you, is there anything you believe that we did not ask you? I know we asked you several questions, but do you think there is something that we should know that we did not ask?

Ofc. Dudley:          I think I covered everything.

Major Blackmon:.      Okay . . . okay, are you aware . . . I know you had body camera and Officer Aguilar had body camera, are you aware of any other person having any type of video of this incident?

Ofc. Dudley:          Officer Evrard. I know his was on because I looked down at one point to make sure that he was recording. Just due to the nature of this whole scenario, I looked at him and I saw the red light on his camera on, as well.

Major Blackmon:       And . . . and you said he arrived shortly after you and Officer Aguilar had placed Arreola in custody . . .

INTERVIEW WITH: Officer Brian J. Dudley
Date/Time Taped: Wednesday, January 11, 2017/7:59 a.m.

CASE: 17-01
Page 23 of 23

Ofc. Dudley:      Correct . . .

Major Blackmon:   . . . am I correct?

Ofc. Dudley:      . . . so he won't have any of the main struggle on his body camera. He'll have post struggle.

Major Blackmon:   Okay. Are you aware of anyone else other than the witness, as the person that resides at 747 Moss Drive, and the mother of Arreola . . . are you aware of any other witness to this incident?

Ofc. Dudley:      I know that three people live in that residence. Two . . . an elderly couple, and then the male, who witnessed everything from start to finish. The elderly male was the one, who answered the door when I went back to the scene to try to get information so that they could speak to my sergeant about the whole altercation. So I know there's three people that reside in that house, but I know they would be the only witnesses that I would know of.

Major Blackmon:   Okay, when you say he witnessed everything from start to finish, are you saying, as you and Officer Aguilar approached Arreola, that witness was already outside?

Ofc. Dudley:      He was not outside when we approached him. They were speaking to him. This is me gathering this information after the fact, but I spoke to them, and they said, we spoke to him through the door. We never came out to talk to him or anything like that. Which I know they didn't because I was already down at the bottom of the hill, so I didn't see them out. They did tell me that they wit . . . witnessed most of it through the window and the other gentleman came outside and watched it all from outside.

Major Blackmon:   Okay. All right, Sergeant Bridges, have any questions?

Sgt. Bridges:     . . .

Major Blackmon:   Sergeant Birris-Mayo.

Sgt. Birris-Mayo: I have no other questions.

Major Blackmon:   Okay, so, Officer Dudley, this concludes the interview. This concludes the interview with Officer Dudley. The time is 9:31 a.m.

★★★★★

/db (DS710130 – A 01:30:52)

Recording #: DS _7/01 3o_
Folder: _A_

### Case Interview
### Sheet

Case Number _17_ - _01_

Today is _Wednesday_, _January 11th_, 20_17_, and the time is _7:59_ am/pm. This is a recorded interview with _Officer Brian Dudley_. His/Her home address is _____

_____, and he/she can be reached at the home/cellular telephone number of ████████

He/She has been employed with _the Columbus Police Dept._ for the past _4 yrs 3 mo_ years/months

as a _police officer_.

This interview is being conducted in the Office of Professional Standards located in the Public Safety Center. Present during the interview are Major F. D. Blackmon, ~~Lieutenant R. L. Graham,~~ and Sergeants T. L. Birris-Mayo, and J. G. Bridges. The Office of Professional Standards is conducting an investigation ordered by R. T. Boren, Chief of Police.

Mr./Mrs./Miss/Ms./Rank _Officer Dudley_, would you please state for the record

your knowledge of the facts involving _the incident occurring on 1/9/17 on Moss_

_Drive involving the arrest of Hector Arreola_

This concludes the interview with _Brian Dudley_

The time is _9:31_ a.m./p.m.



**Columbus Police Department**
P. O. Box 1866 · 510 Tenth Street
Columbus, Georgia 31902-1866



R. T. Boren
Chief of Police

L. H. Miller
Assistant Chief

# GARRITY WARNING

This investigation concerns _the incident involving the arrest of Hector Arreola_ _which occurred on 1/9/17 on Moss Drive_

Allegations of employee misconduct, or other matters that are referred to the Office of Professional Standards, are taken very seriously. Employees, who refuse to cooperate, make false statements, or willfully omit material facts, are subject to disciplinary action, to include termination of employment.

The Office of Professional Standards is a fact-finding unit and does not recommend disciplinary measures. The purpose of this investigation is with finding the truth in a fair and impartial manner.

Cooperating in an internal investigation does not constitute a waiver of any appeal, grievance, or other legal rights. The fact that you wish to exercise any rights will not entitle you to a delay or postponement in the investigative or polygraph process.

1. You are required to answer all questions asked during this administrative investigation into the allegations stated above.

2. No statements or admissions made by you concerning the limited scope of this investigation will be used against you in criminal proceedings.

3. The department will advise you if administrative proceedings cease and criminal proceedings begin. You will be advised of your rights under criminal law at that time.

4. You do not have a right to counsel during an administrative investigation. An administrative investigation shall include, but not be limited to any interview, polygraph examination, or chemical or scientific tests.

5. Your statement can be used as a basis for administrative actions to include termination.

6. Giving a false statement during an administrative investigation is, in itself, a separate criminal act and can result in criminal prosecution.

GARRITY WARNING                                                    Page 2

I have read and understand the Garrity Warning.


_____  _____        _____
Signature               Date/Time       Witness


_____
Brian Dudley
Printed Name                             _____
                                         Witness


_____
F. D. Blackmor
Witness                                  _____
                                         Witness

CCG000249