Title:                          Use of Force Issues for 2016 In-Service

Lesson Purpose:                 To complete the POST requirement for annual
                                Firearms Qualification and Deadly Force and
                                Constitutional issues

Student Performance             1. Review Ga. Code 17-4-20
Objectives:
                                2. Review the Columbus Police Department
                                   Deadly Force Policy.
                                3. Review the Use of Force Continuum and
                                   Officer-Subject Factors.
                                4. Review Applicable Court Decisions

Hours:                          One

Instructional Method:           Classroom Lecture, Power Point

Materials Needed:               Computer and projector

References:

Prepared by:                    Tim Wynn, Lt.
                                Columbus Police Department
                                Training Division

Date Prepared:                  January 18, 2016

Approved By:_____

Date Approved:_____


PLAINTIFF'S
EXHIBIT
B.D. 7
10-16-19 qc

## COLUMBUS  POLICE  DEPARTMENT
## TRAINING DIVISION
## IN-SERVICE 2016
## USE of FORCE and Deadly Force
## (CONSTITUTIONAL ISSUES)

## Introduction

Since 2006, the Georgia Peace Officers Standards and Training Council required Law Enforcement officers to obtain a minimum standard of 80 % for all Qualification scores. This score had to be obtained on demand and executed between January 1 thru December 31 of the calendar year .  Also the Officers  were required to receive one (1) hour of training on Deadly Force Issues annually.

## Student Performance Objectives

Review Ga. Code 17-4-20

Review the Columbus Police Department Deadly Force Policy.

Review the Use of Force Continuum and Officer-Subject Factors.

Review Updated information on Excited Delirium Syndrome

Review Applicable Court Decisions

This block of instruction will complete the P.O.S.T. requirement for the new firearms requirement.

CCG001754

(Handout)
**Georgia Law 17-4-20 (b)**

(b) Sheriffs and peace officers who are appointed or employed in conformity with Chapter 8 of Title 35 may use deadly force to apprehend a suspected felon only when the officer reasonably believes that the suspect possesses a deadly weapon or any object, device, or instrument which, when used offensively against a person, is likely to or actually does result in serious bodily injury; when the officer reasonably believes that the suspect poses an immediate threat of physical violence to the officer or others; or when there is probable cause to believe that the suspect has committed a crime involving the infliction or threatened infliction of serious physical harm. Nothing in this Code section shall be construed so as to restrict such sheriffs or peace officers from the use of such reasonable non-deadly force as may be necessary to apprehend and arrest a suspected felon or misdemeanant.

Georgia Law has three parts that constitute the Use of Deadly Force.

What are they?

**The ABILITY to cause death or great bodily harm to the Officer or a third party.**

It means the bad guy has the ability to kill you.  If he has ability- YOU get ability.

Question to the class: What qualifies an object as a deadly weapon?

Second Part

**The OPPORTUNITY to use his ability to cause death or great bodily Harm.**

It means the bad guy has the opportunity to kill you!
Third Part

CCG001755

**<u>Jeopardy</u>!! Does the perpetrator make a substantial step towards employing his    ability and opportunity and actually place someone (yourself or a third person) in <u>JEOPARDY</u> of receiving death or great bodily harm.**

It means the bad guy has placed you or a third party's life in jeopardy by trying to kill you!

(Handout)
**The Columbus Police Department's Deadly Force Policy.**

**DEADLY FORCE**
<u>PURPOSE</u>

It is the intent of the Columbus Police Department to be responsive to, and protect the constitutional rights of citizens.  The use of deadly force by employees shall be governed by the provisions set forth in Section 17-4-20 (b), as amended, of the Official Code of Georgia Annotated.  Deadly force shall be used only as a last resort, and then only to prevent death or serious bodily injury to the officer or in the defense of others.

<u>POLICY</u>

It shall be the policy of the Columbus Police Department to comply with the Georgia Law and to investigate all instances of the Use of Deadly Force by members of the Columbus Police Department.

3-2.1
<u>GENERAL</u>

Deadly force is defined as that force intended to likely cause death or serious bodily harm.  It includes discharging a firearm in the direction of a person, even though there is no intent to kill.  Deadly force shall never be used on mere suspicion that a crime, no matter how serious, was committed or that the person being pursued committed that crime.  Facts unknown to the officer at the time of discharge of the deadly force, by whatever means, cannot be considered in later determining justification for the act.  Justification for the use of deadly force is limited to the facts known by the officer at the time he decides to employ deadly force.

3-2.2
AUTHORIZED USE OF DEADLY FORCE

Under OCGA 17-4-20, officers are authorized to use deadly force to apprehend a suspected felon only under the following circumstances:

A.   The officer reasonably believes that the suspect possesses a deadly weapon or any object, device or instrument which, when used offensively against a person is likely to or actually does result in serious bodily injury;

B.   When the officer reasonably believes that the suspect poses an immediate threat of physical violence to the officer or others; or

C.   When there is probable cause to believe that the suspect has committed a crime involving the infliction or threatened infliction of serious physical harm.

3-2.3
UNAUTHORIZED USE OF DEADLY FORCE

The use of deadly force is specifically prohibited under the following conditions;

To halt the flight of any suspect or prisoner under conditions which do not meet the criteria listed in 3-2.2 above

To affect the arrest of a suspect wanted for a misdemeanor.

3-2.4
DEFINITIONS

Deadly Force:  Any force that is likely to cause death or serious bodily harm.

Non-deadly Force:  Any use of force other than that which is considered deadly force.

Reasonable Belief:   The person concerned, acting as a reasonable man, believes that the described facts exist.  (OCGA 16-1.3 16)

Serious Bodily Injury:  A bodily injury that creates a substantial risk of death; causes serious, permanent disfigurement; or results in long-term loss of or impairment of the functioning of any bodily member or organ.

## Columbus Police Department Use of Force Continuum

Level One:        Officer Presence

Level Two:        Verbal Commands

Level Three:      Soft Empty Hands

Level Four:       Chemicals

Level Five:       Hard Empty Hands

Level Six:        Impact Tools

Level Seven:      Deadly Force

Again, this has been the traditional way that we have looked at the Force Continuum. Force Options.

<u>Use of Force Diagram</u>

Officer           Verbal
Presence        Commands

Deadly        Officer        Soft
Force                  Empty
                          Hands

Impact           Chemicals
Tools          (OC-Pepper-Ball)

Hard
Empty
Hands

While using the old Force Continuum which appeared as a step-by-step method Officers possibly miss interpreted the Continuum as though they had to go to each level before using the proper force option. Using the Force Continuum as a pie and the officer applies which force option necessary. Each Officer must <u>Articulate </u>the reasons for using the force they used.


**Totality of Circumstances**

The Totality of Circumstances is a decision making list of items that help the officer make quick escalations and de-escalations on the Use of Force Continuum.

They are divided into two sections- Officer-Subject Factors and Special Circumstances.

<u>Officer-Subject factors.</u>
Age
Sex
Size
Skill Level
Multiple officers or suspects.


<u>Special Circumstances</u>
Close proximity to a firearm
Special knowledge
Injury or exhaustion
Ground position
Disability

(Bean Bag engagement range- 30 to 60 feet/Target Area Belt Buckle Down excluding the groin and tailbone)
(OC- 1 to 3 second burst.)

CCG001759

(Taser-engagement distance 7 to 15 feet)

**Excited Delirium**-is a state in which a person is in a psychotic and extremely agitated state.   Mentally the subject is unable to focus and process any rational thought or focus his/her attention to any one thing. Physically the organs within the subject are functioning at such an excited rate that they begin to shut down.   These two factors occurring at the same time cause a person to act erratically enough that they become a danger to themselves and to the public.   This is typically where law enforcement comes into contact with the person

Essentially **three** things bring on **excited delirium**:

- **Overdose on stimulant or hallucinogenic drugs**
- **Drug withdrawl**
- **Mental subject who is off of medical for a significant amount of time**

Symptoms of Excited Delirium
- panic

- paranoia

- profuse sweating

- public disrobing

- self-inflicted injuries

- shivering

- shouting

- bizarre and aggressive behavior

- dilated pupils

CCG001760

- fear

- high temps (106-108)

- hiding behind things

- irrational, incoherent speech

  jumping
- seizures

- unexpected physical strength

- violent behavior (general)

- violence towards others

- violence towards objects (glass)

- *watch for more than one symptom*

## Positional Asphyxia

- The position of the body interferes with the person's ability to breath.

- Interference with proper breathing produces an oxygen deficiency

- **Always monitor any subject you have in custody.**

- **Beware of Sudden Tranquility**

## ***Re-emphasis on the what to do Situations

- Always keep in mind that people that exhibit symptoms and behavioral patterns suggesting cocaine psychosis or excited delirium they are experiencing a medical emergency. If time allows

CCG001761

contact EMS before confronting the individual and attempt to avoid confrontation with subject until EMS arrival. OFFICER SAFETY MUST ALWAYS BE A PRIORITY # 1.

- Manic depressants taking Lithium will sometimes discontinue taking their meds.  These subjects often appear to be in a state of Excited Delirium and may well be.

- Excited Delirium is regarded as a "medical emergency with a psychological presentation"

- *BEWARE of SUDDEN TRANQUILITY*

- Try to minimize the appearance of "mishandling" suspect.


(Handout)

Excited delirium: A challenge for EMS and police

There are a lot of things that make people delirious, and we need to find out what they are quickly to start mitigating the damage

## A. RELATED CONTENT SPONSORED BY

The study, being conducted by Dr. Michael Curtis, former EMS medical director for Portage County, WI, is documenting cases among seven Wisconsin ambulance services whose paramedics have administered the drug ketamine, a potent sedative, to physically violent individuals before transporting them to a hospital. Curtis, an ER physician in Stevens Point (Wis.), says more than 50 cases involving agitated and combative behavior have been noted so far. Roughly 80 percent met the descriptors for ExDS, he estimates.

Given in the proper dosage, ketamine has proven to be "extremely effective" in sedating almost all of these subjects into a calm, controllable state within three to five minutes, Curtis told FSN, adding that "all survived with no unexpected adverse side effects."

The sedation typically sustained for 20-30 minutes — long enough for the subjects to reach a medical facility where treatment to reduce their symptoms could be pursued.

Many experts believe that rapid calming reduces the extreme physiological stress caused by an extended struggle with police and continued agitation after restraint that contribute to the risk of death in ExDS events. "Moreover, before emergency medical professionals can deliver a lifesaving treatment, they have to initiate an IV, which is often impossible until the patient is made calm," Curtis says.

Traditionally, ketamine has been used as an anesthetic or analgesic (pain reliever), Curtis explains. But of late, an increasing number of EMS units in the US have begun injecting it in ExDS subjects and other violent parties, once police have established sufficient restraint to allow it. The ideal dosage, Curtis says, appears to be five mg per kg of a subject's weight (450 mg for a 200 lb. subject, for example). More can be administered if necessary without dire consequences, he says.

In a recently published paper, a team led by Dr. Jeffrey Ho, a prominent researcher of in-custody deaths, reports on two cases in which ketamine was used successfully as part of an ExDS response.

In one case, police were called to handle a 35-year-old chronic cokehead, partially nude in 11-degree weather, who was acting bizarrely and trying to enter a closed business. The cops found him raving nonsensically, "remarkably strong," and unresponsive to manual pain-compliance.

Even though eight officers eventually proned him out, he continued to bang his head on the pavement until an EMS responder delivered a 500-mg intramuscular injection of ketamine through his clothing and into his butt. Within four minutes, he was calm. He arrived alive at a hospital and there was "returned to normal" with no negative after-effects.

In the second case, police responded to a domestic and confronted a highly agitated, partly nude 40-year-old B/M with a history of schizophrenia and substance abuse. He was screaming requests to speak with God and engaged officers in "a significant fight" before he was Tasered into submission. The police had wisely summoned EMS early in the call, and once the subject was down a medic injected ketamine. This subject was calm in about three minutes — "overall success with no complications," Ho writes.

CCG001763

"Law enforcement and EMS need to work together to handle excited delirium cases," Curtis says.

"Neither can do it alone. Police need to realize they are dealing with a medical/psychiatric emergency, and EMS needs to be prepared to move in quickly and get the subject sedated immediately and transported by ambulance to the ER. For best results, there has to be a community-wide protocol, involving agencies that are not always accustomed to working together."

Curtis presented a preliminary report on the Wisconsin experience and a review of professional literature related to ketamine and ExDS at the latest annual conference of the Institute for the Prevention of In-Custody Deaths.


(Handout)
**Constitutional Case Law**
Court Decisions

**Tennessee v. Garner (Fleeing Felon)**

***Tennessee v. Garner***, <u>471 U.S. 1</u> (1985)[1], was a case in which the <u>Supreme Court of the United States</u> held that under the <u>Fourth Amendment</u>, when a law enforcement officer is pursuing a fleeing suspect, he or she may use deadly force only to prevent escape if the officer has probable cause to believe that the suspect poses a significant threat of death or serious physical injury to the officer or others.

In **Tennessee v. Garner**, we have placed on the law enforcement community the burden to make sure that deadly force is in fact justified to the crime committed. we have placed on the law enforcement community the burden to make sure that deadly force is in fact justified to the crime

**Garner requirement**- in order for an officer (under Garner) to use deadly force against a fleeing felon:
**Deadly Force Defense Standard**- The suspect must threaten the officer with a weapon or third person.
**Fleeing Felon Standard**-all three (3) elements must be present

simultaneously:

The officer must have probable cause to believe that the suspect has committed a crime involving the infliction or threatened infliction of serious physical harm;

The use of Deadly Force is necessary to prevent the suspect's escape and

**(3) the officer must give some warning of the imminent use of Deadly Force if feasible.**

### Graham v. Conner

The United States Supreme Court decided in Graham v. Conner that the officer must consider 'the reasonableness of the action.'  Furthermore, in this objective test, the officer cannot use the benefit of hindsight.  The officer must have all the information know at the time of the use of force to justify a specific use of force.

### City of Canton v. Harris

In this case a woman was arrested and did not receive necessary medical attention after a shift commander was made aware of her condition and decided she did not need medical attention. Although on the face, the City of Canton policy addressed medical issues, they were grossly negligent in that they did not provide the shift commanders with the proper training to make such a decisions. There were many issues that emerged from this case, however, the primary issue was that of " failure to train" on the part of the city. That negligence amounted to being "deliberately in different" to the rights of the plaintiff. The implications of Canton v. Harris can also go beyond training issues, however, the burden of proving the standard of "deliberate indifference" is on the plaintiff and not easy to prove.

<u>Court Recommendation:</u> The duties that officers are assigned to perform must be accompanied with adequate training to perform that function.

### *ESTATE OF ARMSTRONG V. VILLAGE OF PINEHURST*

C2016 **<u>Jack Ryan</u>**, Attorney, PATC Legal & Liability Risk Management

Institute (LLRMI.com)

In Estate of Armstrong v. Village of Pinehurst et al. the United States Court of Appeals for the 4th Curcuit examined the use of a Taser, in the drive stun mode, on a mentally impaired subject and determined that the officers unconstitutional excessive force, however because the law was not clearly established at the time of the force was used, the officers were granted qualified immunity and the case against the individual officers was dismissed.

The court described the facts as follows:

Ronald *Armstrong* suffered from bipolar disorder and paranoid schizophrenia. On April 23, 2011, he had been off his prescribed medication for five days and was poking holes through the skin on his leg "to let the air out."  His sister, Jinia *Armstrong* Lopez ("Lopez"), worried by his behavior, convinced *Armstrong* to accompany her to Moore Regional Hospital ("Hospital") in *Pinehurst*, North Carolina. He willingly went to the Hospital and checked in, but "[d]uring the course of the evaluation he apparently became frightened and eloped from the [emergency department]."  Based on that flight and Lopez's report about his odd behavior over the previous week, the examining doctor judged *Armstrong* a danger to himself and issued involuntary commitment papers to compel his return. *Armstrong*'s doctor could have, but did not, designate him a danger to others, checking only the box that reads "[m]entally ill and dangerous to self" on the commitment form.

The *Pinehurst* police were called as soon as *Armstrong* left the Hospital, and three members of the department -- all [defendants] in this case -- responded in short order. Officer Gatling appeared on the scene first, followed a minute or two later by Sergeant Sheppard. Lieutenant McDonald arrived about ten minutes after Sheppard. *Armstrong* had not traveled far when Gatling arrived. He was located near an intersection near the Hospital's main entrance.

When the police arrived, *Armstrong*'s commitment order had not yet been finalized. Therefore, Gatling and Sheppard engaged *Armstrong* in conversation. By all accounts, the parties were calm and cooperative at

CCG001766

this point in time.

*Armstrong* was acting strangely, however. When Officer Gatling first initiated conversation, *Armstrong* was wandering across an active roadway that intersects with the Hospital's driveway. Gatling successfully convinced him to withdraw to the relative safety of the roadside, but *Armstrong* then proceeded to eat grass and dandelions, chew on a gauze-like substance, and put cigarettes out on his tongue while the police officers waited for the commitment order.

As soon as they learned that the commitment papers were complete, the three police officers surrounded and advanced toward *Armstrong* -- who reacted by sitting down and wrapping himself around a four-by-four post that was supporting a nearby stop sign. The officers tried to pry *Armstrong*'s arms and legs off of the post, but he was wrapped too tightly and would not budge.

Immediately following finalization of the involuntary commitment order, in other words, *Armstrong* was seated on the ground, anchored to the base of a stop sign post, in defiance of the order. The three police officers at the scene were surrounding him, struggling to remove him from the post. Lopez was in the immediate vicinity as well, along with Jack Blankenship and Johnny Verbal, two Hospital security officers. So *Armstrong* was encircled by six people -- three
*Pinehurst* police officers tasked with returning him to the Hospital, two Hospital security guards tasked with returning him to the Hospital, and his sister, who was pleading with him to return to the Hospital.

Appellees did not prolong this stalemate. Nor did they attempt to engage in further conversation with *Armstrong*. Instead, just thirty seconds or so after the officers told *Armstrong* his commitment order was final, Lieutenant McDonald instructed Officer Gatling to prepare to tase *Armstrong*. Officer Gatling drew his taser, set it to "drive stun mode," and announced that, if *Armstrong* did not let go of the post, he would be tased. That warning had no effect, so Gatling deployed the taser -- five separate times over a period of approximately two minutes. Rather than have its desired effect, the tasing actually increased *Armstrong*'s resistance.

But shortly after the tasing ceased, Blankenship and Verbal jumped in to

CCG001767

assist the three police officers trying to pull *Armstrong* off of his post. That group of five successfully removed *Armstrong* and laid him face down on the ground.

During the struggle, *Armstrong* complained that he was being choked. While no witness saw the police apply any chokeholds, Lopez did see officers "pull[] his collar like they were choking him" during the struggle.

With *Armstrong* separated from the post, Appellees restrained him. Lieutenant McDonald and Sergeant Sheppard pinned *Armstrong* down by placing a knee on his back and standing on his back, respectively, while handcuffs were applied. But even after being cuffed, *Armstrong* continued to kick at Sergeant Sheppard, so the police shackled his legs too.

The officers then stood up to collect themselves. They left *Armstrong* facedown in the grass with his hands cuffed behind his back and his legs shackled. At this point, he was no longer moving -- at all. Lopez was the first to notice that her brother was unresponsive, so she asked the officers to check on him. Appellees did so immediately, but *Armstrong*'s condition had already become dire. When the officers flipped him over, his skin had turned a bluish color and he did not appear to be breathing.

Sergeant Sheppard and Lieutenant McDonald administered CPR, and Lieutenant McDonald radioed dispatch to send Emergency Medical Services ("EMS"). EMS responders transported *Armstrong* to the Hospital's emergency department where resuscitation attempts continued but were unsuccessful. He was pronounced dead shortly after admission. According to the *Pinehurst* Police Department's summary of communications during the incident, just six and one-half minutes elapsed between dispatch advising Appellees that *Armstrong*'s commitment papers were final and Appellees radioing for EMS.

In reviewing the case, the United States Court of Appeals for the 4th Circuit did not simply examine whether the law was clearly established at the time the force was used on Mr. Armstrong, but instead reviewed the facts to determine first, whether the force used was unconstitutional. It is noted that in doing so, the court considers the facts in the light most favorable to the Armstrong family because they are alleging that the

CCG001768

officer's conduct violated a constitutional right.

The 4th Circuit began its analysis by noting that all uses of force are judged by the three-part test from *Graham v. Connor*[i]. Specifically the court noted that in deciding whether an officer's force was objectively reasonable, the court looks at how serious was the offense; the extent to which the subject poses an immediate threat to the officers or others; and whether the subject is actively resisting arrest or attempting to evade arrest. Citing a prior 4th Circuit case, the court wrote: "To properly consider the reasonableness of the force employed we must view it in full context with an eye toward the proportionality of the force in light of the circumstances."

In looking at the first factor, "serious of offense", the court wrote that this factor went in favor of Armstrong because the officers were not arresting him for a crime but were instead trying to take custody of him for a mental health commitment. The court noted that even if the officers had articulated probable cause to arrest Armstrong for resisting their attempt to take him into custody, the offense would be minor, thus the "serious of offense" factor would still go in favor of Armstrong.

The court also took notice of the fact that the officers had notice of two factors prior to contact with Armstrong. The court noted that first factor was that since Armstrong was the subject of an involuntary commitment order, the officers knew he was mentally ill. Thus, the court said that among the facts and circumstances that the officers had to consider in deciding when and how to use force was Armstrong's mental illness. Citing to the United States Court of Appeals for the 9th Circuit the court wrote:

"The diminished capacity of an unarmed detainee must be taken into account when assessing the amount of force to be exerted. The problems posed by, and thus the tactics to be employed against, an unarmed, emotionally distraught individual who is creating a disturbance or resisting arrest are ordinarily different from those involved in law enforcement efforts to subdue an armed and dangerous individual who has recently committed a crime." (citing *Bryan v. MacPherson*, 630 F. 3d 805, 829 (9th Cir. 2010) (alteration omitted) (quoting *Deorle v. Rutherford*,

272 F.3d 1272, 1282-83 (9th Cir. 2001).

The court wrote: "Accordingly, 'the use of officers and others trained in the art of counseling is ordinarily advisable, where feasible, and may provide the best means of ending a crisis.'" (citing *Deorle*). The court did recognize that mental illness covers a wide spectrum of issues and noted that the ideal may not always work. The court directed that even when the ideal is not feasible "officers who encounter an unarmed and minimally threatening individual who is exhibiting conspicuous signs that he is mentally unstable must de-escalate the situation and adjust the application of force downward." (citing *Martin v. City of Broadview Heights,* 712 F.3d 951, 962 (6th Cir. 2013).

The second factor the officers had notice of was that the doctor had indicated that Armstrong was a danger to himself. With respect to this factor the court said that where the purpose of the seizure is to protect the person from himself or herself, there is little government interest in using force to accomplish the seizure. The court said that using force to protect the person against self-harm was contrary to the very purpose of the seizure, which was to protect the person from harm.

On the first *Graham* factor the court held: "The first *Graham* factor thus weighs against the imposition of force. The government's interest in seizing Armstrong was to prevent a mentally ill man from harming himself. The justification for the seizure, therefore, does not vindicate any degree of force that risks substantial harm to the subject."

The court then looked to the second and third *Graham* factor, particularly whether Armstrong posed an immediate threat to the officers or anyone else or whether he resisted the seizure. The court found that since Armstrong was wandering in the area of an active roadway and may have tried to flee into the street to avoid being returned to the hospital, some degree of force would be justified to secure him. The court wrote that the amount of force justified would be the amount of force necessary to prevent Armstrong's flight.

The court noted several factors affecting the use of force decision. First, the court noted that Armstrong, who was 5'11" and 262 lbs., was seated and clinging to a pole refusing to move when the officers decided to use

the TASER in the drive-stun mode.   The court pointed out that an officer cannot use much force to prevent a subject from fleeing, if the subject, at the moment the force is used, is refusing to move.

The court did note that Armstrong was resisting by refusing to let go of the pole he clung to for the 30 seconds that officers tried to remove him. The court asserted: "Non-compliance with lawful orders justifies some use of force, but the level of justified force varies based on the risks posed by the resistance." (citing *Bryan*).  The court then described "Armstrong was stationary, non-violent, and surrounded by people willing to help return him to the Hospital."  The court concluded that Armstrong's non-compliance posed little danger or urgency since he merely clung to the pole in a seated position and refused to let go.

The court then moved to look at the force from a proportionality analysis and concluded that the degree of force used, the drive stun TASER deployment was disproportionate to the need for force when dealing with a stationary, mentally impaired subject, who was hanging on to a pole while six people, including officers and hospital personnel stood by to take him into custody.  As such the court found that the force was objectively unreasonable.  The court wrote: "Immediately tasing a non-criminal, mentally ill individual, who seconds before had been conversational, was not a proportional response."

The court then turned to TASER as a use of force.  Without distinguishing the difference between the drive-stun and a probe deployment and citing cases involving both types of use, the court asserted that, "Deploying a TASER is a serious use of force."

The court in analyzing, utilized suggested practices and materials from TASER International in determining whether TASER use under circumstances faced by these officers was reasonable:

These observations about the severe pain inflicted by tasers apply when police officers utilize best practices. The taser use at issue in this case, however, contravenes current industry and manufacturer recommendations. Since at least 2011, the Police Executive Research Forum ("PERF") and the Department of Justice's Office [*21] of Community Oriented Policing Services ("COPS") have cautioned that

CCG001771

using drive stun mode "to achieve pain compliance may have limited effectiveness and, when used repeatedly, may even exacerbate the situation." PERF & COPS, 2011 Electronic Control Weapon Guidelines, at 14 (March 2011) (emphasis omitted). The organizations, therefore, recommend that police departments "carefully consider policy and training regarding when and how personnel use the drive stun mode[] and . . . discourage its use as a pain compliance tactic." Id. In 2013, moreover, Taser International, the manufacturer of the taser Appellees used in this case, warned, "Drive-stun use may not be effective on emotionally disturbed persons or others who may not respond to pain due to a mind-body disconnect." Cheryl W. Thompson & Mark Berman, Stun guns: 'There was just too much use,' Wash. Post, Nov. 27, 2015, at A1. Taser users, the warning goes on, should "[a]void using repeated drive-stuns on such individuals if compliance is not achieved." Id. Even the company that manufactures tasers, in other words, now warns against the precise type of taser use inflicted on Armstrong.

The court wrote: "Our precedent, consequently, make clear that tasers are proportional force only when deployed in response to a situation in which a reasonable officer would perceive some immediate danger that could be mitigated by using the taser." The court noted that in cases where an officer uses more than one deployment, each deployment will be viewed separately and its validity will be determined by what is occurring at the moment of each deployment.

The court reached a conclusion that "taser use is unreasonable force in response to resistance that does not raise the risk of immediate danger. In doing so the court wrote: Our precedent leads to the conclusion that a police officer may only use serious injurious force, like a taser, when an objectively reasonable officer would conclude that the circumstances present a risk of immediate danger that could be mitigated by the use of force. At bottom, 'physical resistance' is not [the same thing as the] 'risk of immediate danger.'"

The court found that because Armstrong did not present a threat to the officers as he sat clinging to the pole, the use of force was excessive and thus the officers were denied summary judgment. The court then concluded that because the law was not clearly established at the time

CCG001772

that Anderson was subjected to the TASER deployment, the officers were not on notice that their actions were improper, thus they were granted qualified immunity and dismissed from the lawsuit.

Although the officers were dismissed from this lawsuit, the United States Court of Appeals set significant restrictions on the use of the TASER prospectively.  Agencies within the 4th Circuit's jurisdiction are now on notice of the restrictions on TASER as well as the court's analysis on use of force with respect to persons of diminished capacity, particularly those that are not subjected to arrest, but rather are to involuntary committed. Agencies within the 4th Circuit's jurisdiction must review policy and training related to TASER, Use of Force, and Persons of Diminished Capacity to ensure compliance with this decision.

Factors for all officers and agencies to consider:

1. Not an arrest-mental health commitment-"When the subject of a seizure has not committed any crime, this [seriousness of offense] factor weighs heavily in the subject's favor."

2. Among the facts and circumstances an officer has to consider in deciding when and how to use force is the fact, when known, that the subject if mentally ill, particularly if the subject is unarmed.

3. "Officers who encounter an unarmed and minimally threatening individual who is exhibiting conspicuous signs that he is mentally unstable must de-escalate the situation and adjust the application of force downward."

4. When the purpose of taking custody is to protect a person from harming him or herself, any force that causes harm is contrary to the mission of protecting the person.

5. An officer who is trying to prevent a subject from fleeing cannot use much force if the subject is refusing to move.

6. "Non-compliance with lawful orders justifies some use of force, but the level of justified force varies based on the risks posed by the resistance."

7. Proportionality analysis-How much force was used in relation to what the subject was doing?

8. "Deploying a TASER is a serious use of force."

9. "Tasers are proportional force only when deployed in response to a situation in which a reasonable officer would perceive some immediate danger that could be mitigated by using the Taser."

10. The court noted that in cases where an officer uses more than one TASER deployment, each deployment will be viewed separately and its validity will be determined by what is occurring at the moment of each deployment.

11. Use of TASER is unreasonable in response to resistance that does not raise a risk of immediate danger.

12. "'Physical resistance' is not [the same thing as the] 'risk of immediate danger."

13. "Our precedent leads to the conclusion that a police officer may only use serious injurious force, like a taser, when an objectively reasonable officer would conclude that the circumstances present a risk of immediate danger that could be mitigated by the use of force."

14. Court notes that while subject clung to pole and refused to move, officers were not faced with any exigency or "immediate danger so severe that the officer" had to cause harm to the individual he or she was trying to protect from harm.

15. **Note:** Court holdings can vary significantly between jurisdictions. As such, it is advisable to seek the advice of a local prosecutor or legal adviser regarding questions on specific cases. This article is not intended to constitute legal advice on a specific case.

## CITATIONS:
[i] *Graham v. Connor,* 490 U.S. 386 (1989).

# Mullenix v. Luna

In Mullenix v. Luna, the United States Supreme Court reviewed a high-speed chase where a trooper, from the Texas Department of Public Safety shot into the fleeing vehicle from an overpass in an attempt to disable the vehicle.  In doing so he shot the driver four times in the upper body killing him.

Held:  The law is not clearly established as to whether Trooper Mullenix's shooting at a fleeing vehicle, where the driver had threatened to shoot police officers; was possibly intoxicated; and led law enforcement on a one hundred mile an hour chase, was unconstitutional.

The Court outlined the facts as follows:

On the night of March 23, 2010, Sergeant Randy Baker of the Tulia, Texas Police Department followed Israel Leija, Jr., to a drive-in restaurant, with a warrant for his arrest. When Baker approached Leija's car and informed him that he was under arrest, Leija sped off, headed for Interstate 27. Baker gave chase and was quickly joined by Trooper Gabriel Rodriguez of the Texas Department of Public Safety (DPS). Leija entered the interstate and led the officers on an 18-minute chase at speeds between 85 and 110 miles per hour. Twice during the chase, Leija called the Tulia Police dispatcher, claiming to have a gun and threatening to shoot at police officers if they did not abandon their pursuit. The dispatcher relayed Leija's threats, together with a report that Leija might be intoxicated, to all concerned officers.

As Baker and Rodriguez maintained their pursuit, other law enforcement officers set up tire spikes at three locations. Officer Troy Ducheneaux of the Canyon Police Department manned the spike strip at the first location Leija was expected to reach, beneath the overpass at Cemetery Road. Ducheneaux and the other officers had received training on the deployment of spike strips, including on how to take a defensive position so as to minimize the risk posed by the passing driver. DPS Trooper

Chadrin Mullenix also responded. He drove to the Cemetery Road overpass, initially intending to set up a spike strip there. Upon learning of the other spike strip positions, however, Mullenix began to consider another tactic: shooting at Leija's car in order to disable it. Mullenix had not received training in this tactic and had not attempted it before, but he radioed the idea to Rodriguez. Rodriguez responded "10- 4," gave Mullenix his position, and said that Leija had slowed to 85 miles per hour. Mullenix then asked the DPS dispatcher to inform his supervisor, Sergeant Byrd, of his plan and ask if Byrd thought it was "worth doing." Before receiving Byrd's response, Mullenix exited his vehicle and, armed with his service rifle, took a shooting position on the overpass, 20 feet above I- 27. Respondents allege that from this position, Mullenix still could hear Byrd's response to "stand by" and "see if the spikes work first." As Mullenix waited for Leija to arrive, he and another officer, Randall County Sheriff 's Deputy Tom Shipman, discussed whether Mullenix's plan would work and how and where to shoot the vehicle to best carry it out. Shipman also informed Mullenix that another officer was located beneath the overpass. Approximately three minutes after Mullenix took up his shooting position, he spotted Leija's vehicle, with Rodriguez in pursuit. As Leija approached the overpass, Mullenix fired six shots. Leija's car continued forward beneath the overpass, where it engaged the spike strip, hit the median, and rolled two and a half times. It was later determined that Leija had been killed by Mullenix's shots, four of which struck his upper body. There was no evidence that any of Mullenix's shots hit the car's radiator, hood, or engine block.

Respondents sued Mullenix under Rev. Stat. §1979, 42 U. S. C. §1983, alleging that he had violated the Fourth Amendment by using excessive force against Leija. Mullenix moved for summary judgment on the ground of qualified immunity, but the District Court denied his motion, finding that "[t]here are genuine issues of fact as to whether Trooper Mullenix acted recklessly, or acted as ]a reasonable, trained peace officer would have acted in the same or similar circumstances."

Mullenix appealed, and the Court of Appeals for the Fifth Circuit affirmed. The court agreed with the District Court that the "immediacy of the risk posed by Leija is a disputed fact that a reasonable jury could find either in the plaintiffs' favor or in the officer's favor, precluding us from concluding

CCG001776

that Mullenix acted objectively reasonably as a matter of law." (Cites Omitted)

## NOTE: An Explanation of Summary Judgment and Qualified Immunity

Whenever there is a lawsuit based upon an allegation that an officer has committed a Constitutional Violation such as excessive force as an unreasonable seizure of the person under the 4th Amendment, two legal strategies are used to defend the officer and have the case thrown out before it ever gets to trial.

The first strategy is **Summary Judgment**.   In a summary judgment motion, the attorney for the officer asserts that even if the court takes the story of the person suing the officer as true, [though the officer may not agree with that story], the officer did not do anything unconstitutional and the officer is entitled to summary judgment.   I sometimes refer to summary judgment as a green light as it is the court's agreement that the officer's actions were constitutional.

In some cases a court will disagree and say that the officer's actions under plaintiff's story would be unconstitutional.   The officer's lawyer then proceeds to the second strategy, **Qualified Immunity**.   Essentially, qualified immunity means that even if the officer's actions are unconstitutional no court that has jurisdiction over the officer has considered a similar case and therefore the law was not clearly established, thus an officer would not know that he or she was acting unconstitutionally.    In cases where the law is not clearly established, the officer gets Qualified Immunity and the case against the officer is dismissed.

In some cases, the courts skip the first question (Summary Judgment) and do not decide whether the officer's actions were constitutional or not.  The court simply proceeds to the second question and determines that the law is not clearly established and dismisses the constitutional claim brought against the officer.

### Back to the Case

The United States Supreme Court decided not to answer the Summary

Judgment question in this case.  Thus, it was not decided whether it was constitutional to shoot from an overpass at a fleeing vehicle under the circumstances faced by Trooper Mullenix.

The Court did decide that the law was not clearly established and therefore Trooper Mullenix was granted qualified immunity and the Fourth Amendment claim against him was dismissed.

In finding that the law was not clearly established the Court noted:

In this case, Mullenix confronted a reportedly intoxicated fugitive, set on avoiding capture through high-speed vehicular flight, who twice during his flight had threatened to shoot police officers, and who was moments away from encountering an officer at Cemetery Road. The relevant inquiry is whether existing precedent placed the conclusion that Mullenix acted unreasonably in these circumstances "beyond debate."  The general principle that deadly force requires a sufficient threat hardly settles this matter. See Pasco v. Knoblauch, 566 F. 3d 572, 580 (CA5 2009) ("[I]t would be unreasonable to expect a police officer to make the numerous legal conclusions necessary to apply Garner to a highspeed car chase . . ."). Far from clarifying the issue, excessive force cases involving car chases reveal the hazy legal backdrop against which Mullenix acted. In Brosseau itself, the Court held that an officer did not violate clearly established law when she shot a fleeing suspect out of fear that he endangered "other officers on foot who [she] believed were in the immediate area," "the occupied vehicles in [his] path," and "any other citizens who might be in the area."  The threat Leija posed was at least as immediate as that presented by a suspect who had just begun to drive off and was headed only in the general direction of officers and bystanders. By the time Mullenix fired, Leija had led police on a 25-mile chase at extremely high speeds, was reportedly intoxicated, had twice threatened to shoot officers, and was racing towards an officer's location.

This Court has considered excessive force claims in connection with high-speed chases on only two occasions since Brosseau. In Scott v. arris, 550 U. S. 372, the Court held that an officer did not violate the Fourth Amendment by ramming the car of a fugitive whose reckless driving "posed an actual and imminent threat to the lives of any

CCG001778

pedestrians who might have been present, to other civilian motorists, and to the officers involved in the chase." Id., at 384. And in Plumhoff v. Rickard, 572 U. S. ___ (2014), the Court reaffirmed Scott by holding that an officer acted reasonably when he fatally shot a fugitive who was "intent on resuming" a chase that "pose[d] a deadly threat for others on the road." 572 U. S., at ___ (slip op., at 10).

**The Court has thus never found the use of deadly force in connection with a dangerous car chase to violate the Fourth Amendment, let alone to be a basis for denying qualified immunity.** Leija in his flight did not pass as many cars as the drivers in Scott or Plumhoff; traffic was light on I-27. At the same time, the fleeing fugitives in Scott and Plumhoff had not verbally threatened to kill any officers in their path, nor were they about to come upon such officers. In any event, none of our precedents "squarely governs" the facts here. Given Leija's conduct, we cannot say that only someone "plainly incompetent" or who "knowingly violate[s] the law" would have perceived a sufficient threat and acted as Mullenix did. (Cites Omitted/Emphasis Added).

The Court rejected an argument forwarded by the dissent that officers should have waited and tried spike strips.  In doing so the Court noted the danger to officers in utilizing spike strips.

In an interesting concurring opinion, Justice Scalia indicated that he would not consider the shooting at a vehicle to disable the vehicle as deadly force even where the shooting results in the death of the driver. Justice Scalia said the question for the Court should have been whether it was reasonable to try and disable the vehicle by shooting at it in light of the conduct of Leija rather than an inquiry as to whether or not deadly force was justified.

---

**Note:**  Court holdings can vary significantly between jurisdictions.  As such, it is advisable to seek the advice of a local prosecutor or legal adviser regarding questions on specific cases.  This article is not intended to constitute legal advice on a specific case.

**Georgia Code 17-4-20 (b)**

The Georgia Code is very simple and clear about the use of deadly force. It Clearly spells out the . . .

Ability, Opportunity, and Jeopardy.

**CPD Deadly Force**

Our department policy is taken directly from the Georgia Code section 17-4 20 (b) and follows closely the Georgia Code.

Look at the Force Continuum (Force Options)

Reviewed Less lethal engagement distances

Defined and Reviewed Excited Delirium and symptoms

Discussion and Review of Case law

Use of Force has become a Hot Button Topic in the media and public as of late. Police are scrutinized in every action or decision they make as it relates to Use of Force. These force options are the backbone to survival in certain situations. Lack of preparation, in our profession, can cost you your livelihood as well as your life.

Are there any questions?

**Test Questions**

   1. The three things that justify Deadly Force is_____
   A. Ability, justification, fear
   B. Ability, justification, fear
   C. opportunity, Jeopardy, protecting others
   D. Ability, Opportunity, Jeopardy

CCG001780

2.  What is the State Code for Deadly Force
    A. 17-4-20(b)
    B. 16 4-20(b)
    C. 40-5-209(c)
    D. 20-5.3

3. What are symptoms of Excited Delirium
    a. Bizarre and aggressive behavior, fear
    b. High Body Temperature, jumping into water
    c. irrational, incoherent speech
    d. panic, paranoia, public disrobing, profuse sweating
    e. all of the above

4. _____ is the case law that deals with Reasonable
    Officer. Ex. What would a Reasonable Officer do in similar or like
    situation.

5. What is the optimal engagement distance when deploying the
    Bean Bag Gun to stop a combative individual.
    a. Point blank
    b. 10-15 feet
    c. 30-60 feet
    d. 70-80 feet

6. What is the optimal engagement distance with the Taser.
    a. point blank
    b. 20-25 feet
    c. 15-20 feet
    d. 7-15 feet
7. What is the targeted area for the Bean Bag Gun
    a. center mass
    b. belt buckle down excluding the groin and the tailbone
    c. buttocks
    d. head
    e. both b. and c.

**Excited Delirium**-is a state in which a person is in a psychotic and extremely agitated state. Mentally the subject is unable to focus and process any rational thought or focus his/her attention to any one thing.  Physically the organs within the subject are functioning at such an excited rate that they begin to shut down.  These two factors occurring at the same time cause a person to act erratically enough that they become a danger to themselves and to the public. This is typically where law enforcement comes into contact with the person

Essentially **three** things bring on **excited delirium**:

- **Overdose on stimulant or hallucinogenic drugs**
- **Drug withdrawl**
- **Mental subject who is off of medical for a significant amount of time**

## Symptoms of Excited Delirium

- panic
- paranoia
- profuse sweating
- public disrobing
- self-inflicted injuries
- shivering
- shouting
- bizarre and aggressive behavior
- dilated pupils
- fear
- high temps (106-108)
- hiding behind things
- irrational, incoherent speech
  jumping
- seizures
- unexpected physical strength
- violent behavior (general)
- violence towards others
- violence towards objects (glass)
- *watch for more than one symptom*

CCG001782

## Positional Asphyxia

- The position of the body interferes with the person's ability to breath.

- Interference with proper breathing produces an oxygen deficiency (hypoxia) in the blood which disturbs the body's chemistry and can create a condition for fatal rhythm disturbance in the heart.

## ****AGAINST CPD POLICY****

- Hog tie on suspects with diminished capacity considered excessive force in Sec. 1983 action.
- Court's understanding is that a hog tie is binding legs to hands with 12 inches or less of separation.
- Applying this technique when a subjects diminished capacity is apparent *is* <u>unreasonable</u>.

### ***Re-emphasis on the what to do Situations

- Always keep in mind that people that exhibit symptoms and behavioral patterns suggesting cocaine psychosis or excited delirium they are experiencing a medical emergency. If time allows contact EMS before confronting the individual and attempt to avoid confrontation with subject until EMS arrival.
- Manic depressants taking Lithium will sometimes discontinue taking their meds. These subjects often appear to be in a state of Excited Delirium and may well be.
- Excited Delirium is regarded as a "medical emergency with a psychological presentation"
- *BEWARE of SUDDEN TRANQUILITY*
- Try to minimize the appearance of "mishandling" suspect.

CCG001783

# Defensive Tactics: Sudden In-custody Death

| |
|---|
| Head Instructor<br>Michael Skinner<br>Columbus Police Department<br>706-225-4122<br>mskinner@columbusga.org |

Defensive Tactics:  In-custody Death

CCG001784     1

# Terminal Performance Objective

Upon completion of classroom instruction, the student will identify core concepts associated with the identification and prevention of sudden in-custody deaths.

CCG001785

# Enabling Objectives

- The student will be familiar with the history of sudden in-custody deaths.
- The student will be familiar with recent court decisions regarding sudden in-custody deaths.
- The student will identify the behavioral cues of an individual that is considered high risk for a sudden in-custody death.
- The class will discuss the contemporary theories regarding sudden in-custody deaths.
- The student will list five action steps to follow when dealing with an individual that is considered high risk for a sudden in-custody death.

CCG001786