IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
COLUMBUS DIVISION

RODRIGO ARREOLA, as a parent of )
Hector Arreola, Deceased, and as )
Personal Representative and )
Administrator of the Estate of )
Hector Arreola, CONCEPCION )
ARREOLA, as parent of Hector )
Arreola, and S.A., minor child )
of Hector Arreola, by next friend )
Jezreel Imee Custodio, )
 )
    Plaintiffs, ) CASE NO.:
 ) 4:19-cv-00005-CDL
vs. )
 )
THE CONSOLIDATED GOVERNMENT OF )
COLUMBUS, GEORGIA, OFFICER )
MICHAEL AGUILAR, in his individual)
and official capacity, OFFICER )
AARON EVRARD, in his individual )
and official capacity, and )
COLUMBUS POLICE DEPARTMENT CHIEF )
OF POLICE RICHARD T. BOREN, in his)
individual and official capacity, )
 )
    Defendants. )

   **Oral** deposition of **OFFICER MICHAEL AGUILAR**, **defendant**, called by the plaintiffs, before Eric Cavanaugh, Certified Court Reporter, held at the law offices of Page, Scrantom, Sprouse, Tucker & Ford, 1111 Bay Avenue, Third Floor, Columbus, Georgia 31901, on the **16th day of October, 2019**, commencing at 12:26 p.m.

1

---

**APPEARANCE OF COUNSEL**

On Behalf of the Plaintiff:

    Mark C. Post
    MARK POST LAW
    3 Bradley Park Court
    Suite F
    Columbus, Georgia 31904
    706.221.9371 Telephone
    mpost@markpostlaw.com

On Behalf of the Defendants:

    Tyler C. Cashbaugh
    Page Scrantom Sprouse Tucker & Ford
    1111 Bay Avenue, Third Floor
    Columbus, Georgia 31901
    706.324.0251 Telephone
    tcc@psstf.com

**INDEX OF EXAMINATIONS**

                                                   Page
By Mr. Post................................  06
By Mr. Cashbaugh...........................  64

2

---

**INDEX OF EXHIBITS**

Plaintiff's                                        Page

1   Amended notice of deposition...............
2   Transcript of OPS Interview................  27
3   Personnel History..........................  41
4   POST Printout & Employment History.........  51
5   CPD Training History.......................  53

3

---

**COURT REPORTER'S DISCLOSURE STATEMENT**

   I, ERIC CAVANAUGH, Georgia Certified Court Reporter, Certificate Number 2560, in compliance with Code Section 9-11-28 and Code Section 15-14-37, make the following disclosure about all arrangements, financial and otherwise, involving the foregoing deposition:

1.)   I was contacted directly by telephone regarding scheduling of the deposition as to date, time and place by the office of the scheduling attorney, or received a message from the office of the scheduling attorney by answering machine and returned the call, with scheduling of the deposition as to date, time and place confirmed, and no prior financial arrangements were negotiated between counsel and myself.

   This 15th day of October, 2019.


            Eric Cavanaugh, CCR #2560.

4

**S T I P U L A T I O N S**

IT IS STIPULATED AND AGREED by and between counsel appearing for the respective parties that:

(1) The oral deposition of **OFFICER MICHAEL AGUILAR**, called by the plaintiffs, taken before Eric Cavanaugh, at Page, Scrantom, Sprouse, Tucker & Ford, 1111 Bay Avenue, Third Floor, Columbus, Georgia, commencing at 12:26 p.m. on the 16th day of October, 2019;

(2) ALL FORMALITIES with reference to notice or taking, notice of time and place of taking, qualifications of the court reporter, and all other matters precedent to the taking of deposition, are WAIVED;

(3) With consent of deponent, the reading and signing of the deposition by deponent is **WAIVED;**

(4) ALL OBJECTIONS, EXCEPT as to the form of the question and responsiveness of the answer, are RESERVED to the time of the hearing of the case; and

(5) ALL FORMALITIES with reference to the filing of deposition, including notice of filing, et cetera, are WAIVED.

---

**MICHAEL AGUILAR,**
**Having been duly sworn, testified under oath as follows:**

MR. POST: This will be the deposition of Officer Michael Aguilar taken by the plaintiffs for purposes of discovery and all purposes allowed by law.

The deposition is taken by agreement of counsel and pursuant to notice. All objections will be reserved except for those going to the form of the question or the responsiveness of the answer.

Is that agreeable, Mr. Cashbaugh?

MR. CASHBAUGH: Agreed.

MR. POST: If you would, please, sir, we just met. My name is Mark Post. I represent the plaintiffs in the case.

**EXAMINATION**
**BY MR. POST:**

Q. Tell us your full name.
A. Michael Steven Aguilar.
Q. All right. And before I forget, what is your weight, height, and age?
A. Current weight?
Q. Yes.

---

A. Okay. Approximately 300 pounds. I'm 5'10".
Q. And how old are you?
A. I'm 35.
Q. And were you about the same weight and height on January 9th of 2017?
A. I believe I weighed a little bit less. I can't exactly know what weight.
Q. Because I think I heard you comment standing behind the ambulance that you weighed about 300 pounds --
A. Yeah.
Q. -- something along those lines. Would that be ballpark?
A. Ballpark. Yeah, I wasn't really worried about my weight back then. I should have been, but...
Q. As you grow older, things change. I promise.
Have you ever given a deposition before?
A. No, sir.
Q. Well, just since you have not, obviously, you're under oath. It's the same importance of trial -- as trial testimony. You understand that, right?
A. Yes, sir.
Q. Have you ever testified in a jury trial before?
A. Yes, sir.

---

Q. Okay. So you've had some training and some experience with regard to testifying.
A. Yes, sir.
Q. Is that fair to say?
A. Yes, sir.
Q. Of course, if you can, wait until I finish asking you the question before you respond. Okay?
A. Yes, sir.
Q. And I'll try to do the same thing with you. Although lawyers are bad about it sometimes, but I'll try to let you finish your answer before I ask you another question. Okay?
A. Yes, sir.
Q. I assume you received some police training about testifying; is that right? A little bit?
A. I mean, yeah, just FTO. You know, court presentations and stuff like that.
Q. Couldn't hear you.
A. Court presentations.
Q. FTO means Field Training Officer?
A. Yes, sir.
Q. Do you have any difficulty hearing at all?
A. No, sir.
Q. Okay. If for some reason you think you did not completely hear a question or you don't

```
 1  understand it, just ask me to repeat it.  Okay?
 2      A. Yes, sir.
 3      Q. If you answer the question, we can assume that
 4  you heard the question fully.  Right?
 5      A. Yes, sir.
 6      Q. Okay.  Of course, I've got a southern accent
 7  so if you don't understand what I'm saying, you know,
 8  just do ask me to repeat it.
 9      A. Yes, sir.
10      Q. Are you suffering from any sort of physical or
11  mental condition which would cause you not to be able
12  to testify truthfully or answer the questions fully
13  today?
14      A. No, sir.
15      Q. I know you're a police officer so this might
16  be a silly question.  But you're not under the
17  influence of any drugs or alcohol at this time; is
18  that right?
19      A. No, sir.
20      Q. I was a prosecutor for over 20 years so
21  assumptions will get you in trouble sometimes.  So
22  that's why I ask those types of questions.
23      A. Yes, sir.
24      Q. Where do you live?
25      A. In east Columbus.
                                                        9
```

```
 1      Q. At an apartment complex?
 2      A. Residence.
 3      Q. Residence.  You don't have to tell me the
 4  specific address, although I'm sure I have it in
 5  discovery.  But can you tell me the general area of
 6  east Columbus?
 7      A. Near Macon Road and Reese Road.
 8      Q. All right.  A lot of these initial questions
 9  are designed to find out about you and your
10  background.  And for several reasons, but one of
11  those reasons being in case we have a jury trial at
12  some point, I know who to watch for on the jury and
13  what questions to ask.
14         MR. CASHBAUGH:  It's not meant to pry.  He
15    just doesn't want your next door neighbor being on
16    the stand -- or in the jury box.
17  BY MR. POST:
18      Q. That's right.  Are you married?
19      A. Yes, sir.
20      Q. How long have you been married?
21      A. Since 2012.  So six years.
22         MR. CASHBAUGH:  Seven.
23         THE WITNESS:  Seven years.  Don't tell my
24    wife.
25  BY MR. POST:
                                                       10
```

```
 1      Q. Piece of advice, just don't miss an
 2  anniversary and you'll be all right.  I did that
 3  once.
 4         What's your wife's name?
 5      A. Kristina with a K.
 6      Q. Is she from here?
 7      A. Originally from California, southern
 8  California.  And then moved up here when she was a
 9  child.
10      Q. What's her maiden name?
11      A. Nester.  N-e-s-t-e-r.
12      Q. What are her parent's names?
13      A. Donald Nester is her father and Cathy Nester
14  is her mother.
15      Q. Do they live here?
16      A. Donald lives in Columbus near Primrose and
17  Macon.  And Cathy lives in -- I believe Salem,
18  Alabama or Opelika or somewhere over there.  One of
19  the Smiths or something in Phenix City.
20      Q. Smiths Station or something?
21      A. Yeah.
22      Q. What does her dad do for a living?
23      A. He is a sergeant at the Muscogee County
24  Sheriff's Office.
25      Q. I thought I recognized his name.  All right.
                                                       11
```

```
 1  How long has he been a sergeant there or how long has
 2  he been at the Sheriff's? Office?
 3      A. I believe he's been there close to 20 years if
 4  I'm not mistaken.
 5      Q. What does her mom do for a living?
 6      A. I believe she works at Home Depot.  She's been
 7  in retail for as long as I've known my wife.
 8      Q. Okay.  And that's Home Depot somewhere in
 9  Alabama?
10      A. I believe the Home Depot here in Columbus is
11  the one she works at.
12      Q. Okay.  I'm sure she's checked me out before
13  then or something.  Who knows.  What does she do for
14  them?
15      A. Honestly, I have no idea.
16      Q. Okay.  All right.  What about your parents?
17      A. My mother just retired.  She closed down her
18  business.  She used to have a Wee Care day care
19  business for children.  And my step-father who is
20  married to my mom is a truck driver.
21      Q. Over-the-road truck driver?
22      A. Yes.
23      Q. Does he have his own company or --
24      A. No, he works for a company.
25      Q. What's the name of that company?
                                                       12
```

```
 1      A. Hodges.  Hodges.  I don't know the exact name,
 2   but I know it's Hodges Trucking maybe.  And my father
 3   lives in Portland, Oregon and he works for a produce
 4   company.  He's been there for about 34, 35 years, I
 5   think.
 6      Q. Okay.  What's your mom's name?
 7      A. Jo Ann Ogle.
 8      Q. Ogle?
 9      A. Yeah.  O-g-l-e.
10      Q. And your dad's -- I mean your step-dad's?
11      A. Randy Ogle.
12      Q. Where do they live?
13      A. Literally seven houses away from me.  Like on
14   the same street as me, near Macon and Reese.
15      Q. Okay.
16      A. I haven't counted the exact houses, but I
17   think it's seven.
18      Q. Approximately seven houses.
19      A. Yeah.  Right.
20      Q. What about children, do you have any children?
21      A. I have a baby girl.
22      Q. How old?
23      A. She's two.
24      Q. Congratulations.
25      A. Thank you.
                                                       13
```

```
 1      Q. They're into everything at that age, aren't
 2   they?
 3      A. Uh-huh.  (indicating in the affirmative).
 4   Those terrible twos are real.
 5         MR. CASHBAUGH:  I'll find out in about four
 6      months.
 7   BY MR. POST:
 8      Q. All right.  Do you go to church?
 9      A. No, sir.
10      Q. What about your parents, mom, step-dad?
11      A. I believe my dad goes to church.
12      Q. Not so much your mom and step-dad here?
13      A. Yeah.
14      Q. Do you have any prior marriages, prior to your
15   current wife?
16      A. No, sir.
17      Q. Congratulations.  What about brothers and
18   sisters?
19      A. I've got a sister who lives in Columbus.  Her
20   name is Monica Ogle.  She lives near Primrose and
21   Macon Road.  And I have a brother who is in middle
22   school.
23      Q. Here?
24      A. Yes.
25      Q. What's his name?
                                                       14
```

```
 1      A. R.J.  Randy, Jr.
 2      Q. Which middle school does he go to?
 3      A. I want to say it's the one over there off the
 4   end of Warm Springs Road near Psalmond Road.  Midland
 5   maybe?
 6         MR. POST:  Is that right?
 7         MR. CASHBAUGH:  I think so.
 8   BY MR. POST:
 9      Q. Close enough.
10      A. And then I have a little brother named Conner.
11   He's in the fifth grade -- fourth or fifth grade.  He
12   goes to Reese Road Elementary.  And I have an older
13   brother who's currently incarcerated in Portland,
14   Oregon.  His name is Tony.
15      Q. Okay.  Your sister that lives here in
16   Columbus, what does she do?
17      A. She does not work.  I believe she's just a
18   stay-at-home mother.
19      Q. Okay.  Is she married?
20      A. No, sir.
21      Q. Does she live with your parents or --
22      A. She lives with her boyfriend.
23      Q. Okay.  All right.  And what is her name?
24      A. The...
25      Q. Is it Monica Ogle?
                                                       15
```

```
 1      A. Monica.
 2      Q. You told me that.  I see my note now.  What's
 3   her husband's name -- I mean her boyfriend's name?
 4      A. He goes by J.C.  I'm trying to think of his
 5   real name.  Maybe Chandler is his last name.
 6      Q. Do you have any idea what he does?
 7      A. He works -- I believe he still works at
 8   Hostess.
 9      Q. Tell us a little bit about your educational
10   background prior to being employed with the Columbus
11   Police Department.
12      A. Started in elementary school at Woodstock
13   Elementary.  And then went to Kellogg Middle School
14   and then graduated from high school at Franklin High
15   School in Portland, Oregon.
16      Q. When did you move to Columbus?
17      A. 2008.
18      Q. Okay.  How old were you when you moved?  24?
19      A. Yes.  24, I believe.
20      Q. What was the purpose of the move?
21      A. To become a police officer.
22      Q. Okay.
23      A. That was my ambition.
24      Q. Did you have family here in Columbus already?
25      A. Yes, my mother lived here.
                                                       16
```

Q. Okay. Prior to being employed with the Columbus Police Department, were you employed by any other law enforcement agency?
A. No, sir.
Q. Tell me about your employment prior to being hired by the Columbus Police Department.
A. I had a lot of jobs.
MR. CASHBAUGH: One second. Off the record.
(Brief break)
(Upon resuming)
MR. POST: All right. Back on the record.
BY MR. POST:
Q. You were about to tell us about some of the jobs you had before the Columbus Police Department.
A. Yes. I mean, I worked at -- my first job was at a pizza place in Portland, Oregon. Then I played a little bit of baseball for the Kansas City Royals organization. Not very long, but I got drafted out of high school, signed and then still managed in the off season to play.

Worked at the pizza place and then I went to a produce place. Worked at a couple different of produce warehouses. And then I started working loss prevention after I stopped playing baseball, shortly thereafter.

17

Q. Who did you work loss prevention for?
A. A company called Fred Myer in Portland, Oregon. I believe they're a Kroger-owned company if I'm not mistaken. So I worked for them a little while and then I went back to produce. And then subsequently moved here where -- or I worked for K-Mart loss prevention and subsequently transferred to a K-Mart here in Columbus. And then that's when I got hired on at the Police Department.
Q. All right. You mentioned you had always wanted to be a police officer. Explain that.
A. Well, you know, growing up, it's every kid's dream to make it to the show -- you know, big leagues. And I made it kind of, but I didn't. And everybody would always ask well, what's your back-up plan, you know. I said, well, it would be cool to be a police officer, you know.

So, you know, I didn't really -- you know, you see foot chases and stuff and all the stuff on TV and you don't realize that that's like the minimal part of being a police officer. So, you know, I saw that and I'm just like that would be fun to do, you know. So I just applied and realized that it's a good job. It's a good job.
Q. There's a lot to it, right?

18

A. Yes.
Q. What position did you play in minor league baseball?
A. I was a pitcher.
Q. Try again. You're not too old.
(Off-the-record comments)
BY MR. POST:
Q. Let me ask you this: What year were you hired with the Columbus Police Department?
A. 2000 -- I was first hired in 2009. And then resigned for a couple of months and came back in 2010. So February of 2009 and then came back in February 2010.
Q. I don't know if it was you because I've read several personnel files and I'm trying to remember, but it seems like there was somebody that took the test or did an employment application or went through some police training in 2005 and did not make it. Was that you?
A. I applied back in 2005, but I didn't pass the state test. And so I was eliminated as a candidate at that time.
Q. And was that -- the state test that you refer to, was that the Peace Officer Standards Training --
A. No, I believe that was the entry level test.

19

Q. Just like a screening test for --
A. Yeah.
Q. Okay. What was your job that you were doing just after that, were you back at K-Mart or --
A. Oh, that was back in 2005. Let's see, in 2005, I did stay here for, I don't know, six months or something like that. And I believe I worked for a company called Westaff here in Columbus.
Q. Is that a staffing company?
A. Yes. And they put me at the Goody -- Goody plant, the hair product?
Q. Yeah.
A. Is that what it is? Over there off of Macon and Transport or something like that. I worked there and realized that just wasn't for me, and then I moved back to Portland, Oregon and continued to work for different produce companies and stuff.
Q. What were you doing for Goody's Hair Product, were you doing security or --
A. No, just like working in the warehouse, loading pallets.
Q. What are your future plans? Do you plan to stay as a police officer?
A. I would like to be a police officer, yes, until I retire.

20

```
 1    Q. What is your current rank?
 2    A. Just Officer First Class.
 3    Q. When were you promoted to Officer First Class?
 4    A. 2013 or 2014.
 5    Q. Okay.  All right.  Are you friends with
 6  Officer Brian Duddley?
 7    A. Yes.
 8    Q. Corporal Aaron Evrard?
 9    A. Yes.  I mean, we're acquaintances.  Work
10  related.  I mean, we don't hang out.  Like I don't
11  think I've ever hung out with Aaron outside of work.
12  I've seen him at a restaurant, sat with him, ate
13  dinner with him.  But other than, hey, man, let's go
14  to the ball game or something like that, no.  But,
15  yes, we are friends.
16    Q. What about Duddley, do you guys hang out?
17    A. I've hung out with him a couple of times.
18    Q. What about Officer Ronnie Oakes?
19    A. I've hung out with him outside of work, yeah.
20  Dinner, a few times.
21    Q. Which other officers or employees of the
22  Columbus Police Department are you close to or have
23  you socialized with?
24    A. Greg Anderson.
25    Q. What's his rank?
                                                      21
```

```
 1    A. He's a Corporal.
 2    Q. Go ahead.
 3    A. Roy Bohan.  He's a Corporal.
 4    Q. How do you spell his last name?
 5    A. B-o-h-a-n.
 6    Q. Who else?
 7    A. That I hang out with on a normal basis or like
 8  hung out with in the past?
 9    Q. Either one.  And just distinguish.
10    A. Okay.  I would say -- I mean, I've hung out
11  with several others I can't think of off the top of
12  my head like every single officer I've hung out with,
13  but those are the two that I usually associate myself
14  with.
15    Q. Okay.  Are you close to or do you hang out
16  with anybody at the fire department or EMS?
17    A. No, sir.
18    Q. Okay.  Do you know James Brad Barnes or Aaron
19  Bush at all?
20    A. I can't say.
21    Q. All right.  I know that the Columbus Police
22  Department has Sectors A, B and C divided up.  So
23  Dispatch communicates by calling officers in Sector A
24  and Sector A officers can hear those dispatches.
25  True?
                                                      22
```

```
 1    A. Yes.
 2    Q. Previously today, we used what was marked for
 3  Officer Dudley's deposition as Plaintiff's Exhibit 2.
 4  And I'm going to show that to you.  Do you see that?
 5    A. Yes.
 6    Q. Okay.  On January the 9th of 2017, you were in
 7  Sector A.; is that correct?
 8    A. Yes.
 9    Q. Okay.  And your call sign at the time was One
10  Adam 28; is that correct?
11    A. That's correct.
12    Q. Okay.  And Officer Dudley's was One Adam
13  25; is that right?
14    A. Yes.
15    Q. And Sergeant Randy Kiel was One Adam 85,
16  right?
17    A. Yes.
18    Q. And Officer William Oakes was One Adam 31; is
19  that right?
20    A. Yes.
21    Q. And Officer William Oakes is also known as
22  Officer Ronnie Oakes, correct?
23    A. Yes.
24    Q. And Officer Aaron Evrard was One Adam 35,
25  right?
                                                      23
```

```
 1    A. Yes.
 2    Q. And those were the members of your squad on
 3  January the 9th of 2017 that were involved in the
 4  response to Hector Arreola, correct?
 5    A. Yes.
 6    Q. Okay.  Earlier, we used -- or I showed Officer
 7  Duddley Plaintiff's Exhibit Number 3, which is a
 8  Field Use of Force report.  It says Reporting Officer
 9  Brian Duddley at the top of it for January the 9th of
10  2017.  And he indicated to us that that was his
11  signature at the bottom of page CCG 1946.
12    A. Yes.
13    Q. The reason I ask you about this, it says:  By
14  Michael Aguilar.  And what that means is that you
15  told -- or you called Sergeant Kiel yourself, right?
16  It doesn't mean that you wrote this report, right?
17    A. Correct.
18    Q. Okay.  And at times during this deposition,
19  we'll refer to CCG numbers at the bottom of pages of
20  on documents.  What that is is what's called a Bates
21  stamp number.  It's kind of a consecutive number that
22  your lawyers, the defense counsel numbers documents
23  as they give them to us, the plaintiffs.  It kind of
24  helps us keep track of what's what.
25       So if I'm referring to CCG number such and
                                                      24
```

such, you'll know what I'm talking about. Okay?
 A. Yes, sir.
 Q. I'm going to give you a minute to review CCG 1945 through 1947, especially since Officer Duddley is the one that prepared it.
 My question to you is, is there anything that's inaccurate in Plaintiff's Exhibit Number 3?
 A. You said 47 to --
 Q. The first, second, and third page there.
 MR. POST: We'll just go off the record for a minute.
 (Brief break)
 (Upon resuming)
BY MR. POST:
 Q. Officer Aguilar, have you had a chance to take a look at Plaintiff's Exhibit 3 from Officer Dudley's deposition?
 A. Yes.
 Q. With respect to the pages I previously mentioned, is there anything in those pages that you believe is inaccurate or needs to be corrected?
 A. I think everything in here is true and correct.
 Q. All right, sir. I'll give that back to him. I asked you to bring any reports with you that have

25

not been provided to us by your counsel. Did you bring anything new?
 A. I did not.
 Q. All right. There's nothing that you have as far as reports that your counsel doesn't have; is that fair to say?
 A. Yeah, I don't have anything.
 Q. Okay. What did you review in preparation for your deposition today?
 A. I went -- I had an Internal Affairs printout from our my OOPS interview. And I had a little bit -- I think we watched a little bit of the body camera footage, because like I said this is an incident that happened a couple of years ago. So just trying to refresh.
 And then, of course, you just provided me with the Use of Force paperwork and I believe that's the first time I've seen that.
 Q. All right. And you said, "We watched the video". Was that with your lawyers?
 A. Yes.
 Q. And was that just your body cam that you watched?
 A. I can't remember whose body camera it was, if it was mine or Officer Dudley's.

26

 Q. Now, when we refer to OOPS, I know I call it OOPS sometimes, OPS sometimes, and Office of Professional Standards sometimes. It's all the same thing, right?
 A. Yes.
 Q. And for this deposition, I believe we're on Plaintiff's Exhibit Number 2.
 Officer Aguilar, I'm showing you what's been -- I believe we are on Plaintiff's Exhibit Number 2 and I'm showing you Plaintiff's Exhibit Number 2, which is a transcript of apparently your interview with the Office of Professional Standards on January the 10th of 2017, CCG 250 through 283.
 Do you see that?
 A. Yes.
 Q. And this is what you have reviewed in preparation for this deposition today, one of the things; is that right?
 A. Yes.
 Q. And when you reviewed this transcript of your statement to the Office of Professional Standards, OOPS, was there anything in it that was inaccurate?
 A. No.
 Q. So this transcript is accurate and fully correct; is that true?

27

 A. It was correct to the fullest of my knowledge at the time of the incident, yes.
 Q. Okay. And when you gave this statement to the Office of Professional Standards on January the 10th of 2017, what you told them was the truth and the complete truth. Was that accurate?
 A. Yes.
 Q. So, let me just ask you to tell us in your own words at this point what you remember happening on January 9th of 2017 with regard to Hector Arreola and your contact with him.
 A. Okay. All right. We were dispatched to the residence of the Arreola family in reference to a welfare check on the mother. I believe the caller stated that -- or the son wanted us to go check on the mother for whatever reason.
 So we went to the residence, made contact with the mother at the side door. She appeared to be sleeping and was in good health. At that time, Mr. Arreola, Hector, was not on scene. So after checking on her, we notified Dispatch that the mother was okay and in good health, and we probably woke her up or whatever the case was.
 So after that, we left. Went to one or two other calls. And approximately an hour later, I

28

would say, we get another call back out there in reference to another welfare check on the mother.

We show up. At this time, Mr. Hector Arreola was there. We made contact with him. Tried to figure out what the -- you know, why we needed to check on his mother. I think he made some references to being -- having his mother possibly being in some sort of danger inside the house.

Q. Could you tell how Hector Arreola got to be at the scene, what his mode of transportation was?

A. I believe he arrived in a vehicle. Like I said, we never seen him driving or anything like that. But a car wasn't -- the silver -- there was a silver car there, I believe. I think it was silver. It wasn't there the first time. It was there the second time. So I'm assuming he showed up with the vehicle. But, you know, I don't know if somebody drove him or whatever the case is.

So we're out there talking to Hector and explained to him that we just checked on his mother on the previous call and everything was okay. He was persistent on us checking on her. I explained to him that it's 4:00 in the morning, 5:00 in the morning and, you know, we just checked on her and she was okay. And we were trying to get more information

29

from Hector to try to figure out why he wanted us to check on his mother so badly.

And during the encounter with Hector, he -- something seemed to be off with him. He started saying that he sees lights on the houses. At that time, I looked back and I don't see any lights on the houses. And he, I think later on made statements about people were trying to get him.

And when we looked back at the house after he said the lights were pointing at his house, we saw his mother at the door. I believe she was talking to him, trying to get him to come back inside or whatever the case was.

And at that time, he was trying to get her to come out. I told her that -- I told him that it was, you know, 20 something degrees outside or whatever the temperature was at that time. And, you know, she doesn't need to come out because it's cold. So she went back inside and ended up getting dressed and coming out and she stood by us.

And I believe I asked him or her questions related to mental health because some of the characteristics he was showing, I believed maybe he was a mental health patient.

Q. That became apparent to you fairly quickly --

30

A. Yeah.

Q. -- that morning, that he had a mental health issue or was on some sort of drugs or something along those lines; is that true?

A. Correct. Yes.

Q. Go ahead.

A. I called for EMS at some point during the encounter to get him evaluated. I asked him if I can call EMS just to check him out because if he was going through some sort of mental health crisis I wanted him to seek the treatment that could, you know, better the situation for him at that time.

After asking a few questions if he has ever been diagnosed with paranoia or schizophrenia or anything like that, of course, I believe the family said no. Right then, I thought maybe it wasn't a mental health issue. That it was possibly a alcohol or drug related issue because I know some of the side effects of certain drugs may be seeing stuff that's not actually there.

So during the encounter, he wanted to take his mom, go for a drive. Based on my evaluation, I immediately said no, that's not going to happen. I didn't know what his intentions were and why he was trying to separate us from mother so bad. But I felt

31

at that time he was mentally unstable.

Q. And his mom didn't want to go either, right?

A. Right, right. As far as I can remember, I don't think his mom wanted to go either. So at some point during this encounter, he started questioning us as to whether we were real police officers. We were in standard -- we arrived in police vehicles. He came up to us, acknowledged us because he seen two -- well, I can't say what he seen. But we arrived in two police cars. Walked up to him and he started talking to us like -- as if we were police officers.

Q. And you had your uniform on and your badge and everything, right?

A. Right. So at some point he turns around and starts to act like he's running, like he's going to run away from us. But we're not going to chase him or not going to do anything. We don't want to escalate a situation when someone is mentally unstable.

So he goes to the neighbor's house. I don't know the exact address of the neighbor's house. And he's basically saying he's going to go knock on the doors or whatever the case is. So he goes up a driveway into this neighbor's house.

We kind of just give him his space, but follow

32

**Page 33**

him. We're down at the street before he knocks on the door and we're trying to say, Hector, come down here, you're in somebody else's yard, it's 4 or 5 in the morning. You don't need to knock on a door. What are you doing, come down here. If you don't come down here, you can be subsequently be arrested.

And so he starts knocking on the door. And my only thought on that is the fact that he's a mentally unstable person, he is seeing stuff that's not there, saying stuff like some people are there to possibly hurt him or his mother, which is the reason for the welfare check.

So knowing that he's knocking on somebody's door, what's likely to happen? Someone is going to open the door. Well, I don't want this mentally unstable person to knock on a door, them open it. He goes inside and then it's unknown if anybody else's life is in jeopardy. And I don't know if there's guns, knives, weapons inside the house.

But I can't let him get inside the house because if he does, everybody's life inside that house based on what I'm seeing is in jeopardy. So when he knocks on the door, we go up there and try to get him down one more time. He says no and at that time, we grab his hand and we go to arrest him for

**Page 34**

disorderly conduct.

Q. And you and Officer Duddley had already had a conversation about arresting him for disorderly conduct before he ever went up the hill, hadn't you?
A. Yes. I believe so, yes.
Q. In fact, Officer Duddley asked you if you had gloves. And you said something to the effect, "He's going to fight like hell".
A. Yeah.
Q. Is that right?
A. Yeah. I believe -- I believe that's right. And also I do remember him saying something on the lines of, "Where's your back-up" in reference to that. When we told him that -- during the conversation of telling him he could be arrested, he did make the statement of, "Where's your back-up" or something like that.

And then I said, well, why do I need back-up, you know what I mean. Like I don't ever want to fight with anybody. You know what I mean. We're trying to de-escalate the situation so it doesn't result in a struggle or a fight.
Q. At that point, he essentially lost faith in you and Officer Duddley and questioned whether you were police officers; right?

**Page 35**

A. He did question whether we were police officers, right.
Q. Okay. And at some point, Hector Arreola questioned Officer Duddley putting his hands or resting his hands on his firearm. Do you remember that?
A. I believe I do remember something like that.
Q. Okay. And did Hector Arreola ever put his hands up at some point after he ran away a little; do you remember that?
A. I can't recall.
Q. It seems like there was something about trash cans. Do you remember anything about hiding behind trash cans?
A. Honestly, I don't remember.
Q. All right. Let's see, so you actually asked Hector Arreola repeatedly whether you could summon an ambulance for him so he could have somebody to talk to. Right?
A. Yes, sir.
Q. Okay. And that was because you and Officer Duddley both wanted to get him evaluated for his mental health situation, or drug use situation, or whatever it was; is that right?
A. Yes.

**Page 36**

Q. Okay. And just prior to walking up the hill to detain Hector Aguilar, you called EMS or Dispatch and asked for EMS to respond routine, no lights, no sirens. Hard, no siren. Correct?
A. Yes.
Q. And you never called Dispatch back to change that request in any way, did you?
A. No, sir.
Q. Okay. And you never told Dispatch to tell EMS to hurry up or step on it, so to speak; did you?
A. No, sir. Not that I can recall.
Q. Okay. Did you receive CIT training?
A. I did.
Q. What does that teach you, essentially?
A. So Crisis Intervention Training, to me, taught me how to identify characteristics of somebody that could potentially be having a mental health crisis. Whether they're dealing with some sort of catastrophic event or they're just having a mental break.

We've been to training to where they've actually brought people in that had mental health and talking to them, they can seem like just a normal individual. And at any point, they could just have some sort of outburst or some sort of, you know,

trigger to become a mental health situation.

So, to me, the course -- what I took from it was it helped me identify characteristics of mental health. It also helped me and taught me how to be patient and talk to people. Instead of just, you know, going up and arresting them, try to talk to them and try to come up with an equal ground to defuse the situation in any way. Because somebody that's having a mental health crisis may not understand someone that's not having a mental health crisis.

So it's basically, to me, was identifying mental health, trying to communicate more with mental health. And that's pretty much what I took from the course.

Q. And having been trained with CIT, you let Hector's mom, Connie Arreola, Concepcion Arreola, talk to him prior to the struggle, correct?

A. Yes.

Q. You let him -- you let Hector Arreola walk around with his hands in his pockets and just walk around some as you talked to him; right?

A. Yes, sir.

Q. As you said, it was pretty cold out.

A. Yes, sir.

37

Q. Your main concern with Hector Arreola when you arrived and prior to the struggle was for his mental health situation, whatever the cause; is that fair to say?

A. I would say that's fair to say. The last thing I wanted to do was arrest Hector Arreola. Our main concern was getting him help and trying to figure out why we are here. Like I didn't want to ever have to go through this or anything like this.

Q. Now, obviously, a struggle ensued when you all went hands-on and tried to take Hector Arreola into custody. Eventually, you radioed Dispatch to slow down all the units; right?

A. Yes. I believe so.

Q. Why --

A. That's standard protocol. Once he's in custody, all units slow down.

Q. And my next question was going to be why did you radio them. I guess that's some of that answer.

A. So when we're actively engaged in a struggle with an individual and we got the opportunity to let units know that we're fighting with one, calling for code 1018 which is officer in distress or officer needs assistance immediately.

Pretty much we get there as quickly as we can.

38

So we got officers running blue lights and sirens going through intersections that are red lights and stuff like that. After I say he's in custody, all units slow it down, that's basically to get them to stop running emergency code and blowing through red lights to protect the public and the officer because there's been several encounters and situations where they've been in custody and officers are still coming and an accident happens.

And there's no need for a vehicle accident when the fight subsequently is partially under control.

Q. Now, after the struggle was over, it was Officer Duddley that actually walked down to meet EMS when they arrived; is that right?

A. I can't recall.

Q. Well, you, yourself, did not alert EMS or the people -- the ambulance that Hector Arreola was in in any sort of distress, did you?

A. Can you repeat the question?

Q. You, yourself, did not alert EMS that Hector Arreola was in any sort of distress, did you?

A. Not that I can recall, no. When I talked to EMS, I basically told them that we needed jail clearances and to check him out because, you know,

39

eventually -- subsequently, we were going to end up at the jail and any time you're involved in a struggle with someone or whatever the case is, these days it's protocol to get them checked out for evaluation and make sure they're okay to go to jail. And if not, then we take them to the hospital and get treatment and then subsequently go to jail.

Q. Okay. You didn't tell EMS personnel or Dispatch that Hector Arreola had been crying and saying that he couldn't breathe for several minutes, did you?

A. Did I -- can you repeat the question?

Q. You didn't tell EMS personnel or anybody that Hector Arreola had been crying and saying that he couldn't breathe for several minutes, did you?

A. I did not. When he made those statements, we were actively engaged in a struggle. And by him talking and being able to say "I can't breathe" multiple times indicated to me that he was breathing just fine. Because if he had enough breath to say it, he had enough breath to breathe.

And I will say about this about the struggle, I mean, I've been a police officer for coming up on 10 years now. And the struggle I had with Mr. Arreola is by far the biggest struggle I've ever

40

been in. I've been in struggles with other individuals that's been intoxicated and high on drugs. And up to this day, that's still the biggest struggle that I've had just trying to get somebody in handcuffs. Like I mean, I'm a bigger guy and I had no effect whatsoever, and it took two of us just to get him handcuffed.

Q. And I'm not going to go through all of it with you. In fact, probably not much at all. But I've got your personnel history including your Use of Force reports and that sort of thing, like you said for about 10 years.

And I think it's CCG 2182 through 3187. It's over a thousand pages. And I'm going to mark as Plaintiff's Exhibit Number 3, I think it is, which is CCG 2200 through 2204.

Plaintiff's Exhibit 3 there reflects your -- a list of your Employer Early Warnings Reports, Employee Personnel Complaints Reports, Officer Use of Force Reports, and Vehicle Pursuit Reports. Is that right?

A. I'm sorry -- oh, I've got --

Q. Just a list of those things, right?

A. Yes.

Q. And by my count, there's 24 Officer Use of

41

Force Reports. You can count them if you want to. That's on page CCG 2202 and through 03.

A. 24, is that what you said?

Q. Is that what you got?

A. I got 24. Yes, sir.

Q. And any Field Use of Force -- UF Reports as they say -- Officer Use of Force Reports that you prepared would be accurate; correct?

A. Yes.

Q. I'm not going to spend our time today going through a thousand pages of Use of Force Reports, but you've had some pretty significant fights over your time --

A. Yes.

Q. -- in law enforcement. True?

A. True. And I will say this about Use of Force Reports: So if we arrest somebody for a suspended license or whatever the case is and they pull away and a struggle ensues, and we end up on the ground and they scuff a knee up, and they're not hurt in any way, these days, we do Use of Force for that because they got a scratch on their leg. And, you know, a Use of Force is usually done in a situation like that, too.

Q. And things can go wrong when you get somebody

42

on the ground, right?

A. Yes, sir.

Q. As this case obviously shows --

MR. CASHBAUGH: Object to form.

BY MR. POST:

Q. Did you notice that as Hector Arreola screamed that he couldn't breathe, his screams tapered off until all he was doing was moaning that morning?

A. Not during the struggle, I couldn't.

Q. What did you say?

A. I said not during the struggle, I could not tell if it was tapered off because of the struggle is -- you know, we were actively trying to get his hands behind his back and he continued to resist by pulling away and everything.

Q. What about after you had him handcuffed and the struggle ended?

A. I believe he was moaning, but I don't know -- you know, I don't know what you're asking, I guess.

Q. Did you notice that instead of screaming, he had tapered off into moaning and not talking any more?

A. Yes.

Q. Okay. Did you notice that Hector's eyes were wide open -- or I would call it maybe blown? Do you

43

know what I'm referring to?

A. I believe his eyes were open, but I don't know what you're referring to as blown.

Q. Like wide open --

A. I can't -- I can't recall. I just know his eyes were open.

Q. Did you notice when Hector became completely non-responsive when he was laying there in the dirt?

MR. CASHBAUGH: Object to form. You can answer if you can.

THE WITNESS: Do what?

MR. CASHBAUGH: You can answer though.

THE WITNESS: Okay. What's your question again? I'm sorry.

BY MR. POST:

Q. I said did you notice when Hector became completely unresponsive when he was laying there in the dirt?

MR. CASHBAUGH: Same objection, but you can answer.

THE WITNESS: Yeah. I mean -- I don't recall like, you know, when he was laying in the dirt. I mean, we were all tired. It was a pretty good struggle. So once back-up got there, we got him sat up in the upright position.

44

BY MR. POST:
Q. Right. Officer Evrard was the first police officer to arrive on the scene other than you and Officer Duddley; correct?
A. Yes, I believe so.
Q. And Officer Evrard took a position on Hector Arreola to relieve you and Officer Duddley. True?
A. Yes.
Q. Okay. Did you review any -- well, you already told us you reviewed some body camera footage from January 9th of 2017. Right?
A. Yes, several months ago.
Q. Okay.
MR. POST: Off the record for just a minute. Let's take a break and hook up our little video.
(Brief break)
(Upon resuming)
BY MR. POST:
Q. All right. I'm going to show you --
(Video playing)
I am showing you right now what is CCG 10, your body cam labeled AMVA 0009. I believe that it's about a minute and four seconds, around 5:10 in the morning on January the 9th of 2017, when you first made contact with Hector Arreola.

45

Take a look at it and see if you can confirm that's what this is.
(Video playing)
BY MR. POST:
Q. So what we see in that minute -- what we see and hear in that minute and four seconds of your body cam is you speaking to Hector Arreola; is that correct?
A. Yes, sir.
Q. And, of course, we can see in the video what you believed to be his vehicle; correct?
A. Yes.
Q. A silver color typed vehicle you talked about earlier.
A. Yes.
Q. Now, that vehicle was located at the end of his mother's driveway, correct? Parked there.
A. Near the residence, I would say. Yes.
Q. And then obviously something happens to your body camera momentarily and then it starts up again with what's marked as AMVA 10.
Do you know what happened to your body cam that made it come on and go off again?
A. No, I don't.
Q. It seems like it was very brief.

46

A. Yeah, I think if I would have turned it off at all, you would have seen my hand come across it and let it go. I don't know. I mean, I don't know what kind of body cameras we were using at the time.
(Video playing)
Q. Could it possibly have been that you were about to try to show him the previous footage and you mashed the button or something, would that have been a possibility?
A. Honestly, I have no idea.
Q. That makes two of us.
A. Was there any gap of times like minutes or seconds or --
Q. Not long if there is any, at least in my opinion. So it's not particularly important.
Now, to my recollection, there was -- your body cam worked and functioned fine up to a certain point in your encounter with Hector Arreola where the audio stopped and it just became video. Is that right?
A. I believe so. During the struggle, I remember like he reached back -- like when we had one of his hands behind his back, he reached back and grabbed like at my uniform. And I always kept it in the middle of my shirt.

47

And I believe during the struggle, he reached back and actually grabbed my body camera and the front of my shirt. And I think I told him to get his hands off the body camera.
Q. You actually said don't grab my body camera at some point.
A. And maybe that's when it went off or something. I have no idea.
Q. It makes sense, but let's take a look here.
(Video playing)
BY MR. POST:
Q. Well, what I am seeing is that your body camera audio is lost about 14:52, 14 minutes and 52 seconds into this particular part of the video when you're engaged in the struggle with Hector Arreola and Officer Duddley has just asked Dispatch to send another unit out.
So I'm not sure it says on yours, but let's look at maybe Officer Dudley's video. It might show us that.
(Brief break)
(Upon resuming)
BY MR. POST:
Q. All right. What I'm showing you now is Officer Evrard's body cam at 3:08 -- 3:10 seconds

48

**Page 49**

into the video. Maybe 3:06 to 3:10. It's marked as Officer Evrard's body cam, CCG 12, disk one, number 20170109054456X3 and a bunch of zeros after that.
    Can you see the monitor okay?
    A. Yes.
        (Video playing)
    Q. Right there at 3:09 to 3:10 -- you might be able to see it more clear on 3:09. Who is that officer on the right at 5:31 and 15 seconds?
    A. That's me.
    Q. Okay. And who is the officer on the left?
    A. That's Brian Duddley.
    Q. Okay. And that is in the front yard at 747 Moss Drive on January the 9th of 2017 where the struggle occurred. Right?
    A. Yes.
    Q. And off to the left as Officer Evrard is walking up -- do you see where my cursor is?
    A. Yes.
    Q. That appears to be Connie Arreola, the mother. Is that what you recall? I'll let you see it.
        (Video playing)
    A. Yes.
    Q. Right then you said, "Minimal force used" as Officer Evrard walked up and asked you if you needed

**Page 50**

a break. What did you mean by that?
    A. That we were just simply using -- we didn't use like any fists or knees or anything. It was just minimal force used to get the individual in custody. Soft empty hands indicating that we didn't deploy a taser or we didn't have pepper spray or anything like that, too.
    Q. And you are well-versed in the continuum of force and the Columbus Police Department policy because you've been in struggles before as a police officer, right?
    A. Yes, sir.
    Q. Therefore, you were familiar with the terminology used in Use of Force Reports and policy, right?
    A. Yes.
        MR. POST: All right. That's good enough. Let's go off the record for a minute to move this out of the way.
        (Brief break)
        (Upon resuming)
        MR. POST: Let's go back on the record.
    BY MR. POST:
    Q. Of course, to become a Columbus Police Officer, you had to go through the basic law

**Page 51**

enforcement course; is that right?
    A. Yes, sir.
    Q. I think it's Plaintiff's Exhibit 4. I'm showing you what's marked as Plaintiff's Exhibit 4 which consists of your Peace Officer Standards and Training printout including your employment history, your mandated training history meaning the basic law enforcement course, and a list of your training history which is all contained on CCG 1830 through 1832. Do you see that?
    A. Yes.
    Q. You completed your basic law enforcement training on December the 4th, 2009; is that right? I think it's at the top of the second page.
    A. December 4th, 2009.
    Q. Is that right?
    A. Yes.
    Q. And you completed your CIT training or Crisis Intervention Training, which was a 40 hour class, on April the 16th of 2010; is that correct? It's the last page.
    A. April 27th, 2010.
    Q. Okay. Yeah, I see two of them actually. April 16th and April 27th of 2010. It looks like one was a four hour course and one was a 40 hour course.

**Page 52**

    A. Yeah. 4-16-2010 was the 40 hour course.
    Q. Okay. What was the difference in the two courses; do you recall?
    A. Not off the top of my head, no.
    Q. I'm seeing a 320 hour course of Departmental In-Service Training in 2010. Do you see that?
    A. Yes, sir.
    Q. That's a lot of hours. Do you recall what that was?
    A. I believe that was like an in-house academy after the regional academy or the POST mandated academy.
    Q. Got you. That was out of curiosity.
        Then I'm looking at April the 26th of 2016, indicates that you attended and completed the Columbus Police Department Annual In-Service Training for 22 hours; is that correct?
    A. Yes.
    Q. And I'm going to show you the next which is going to be Plaintiff's Exhibit Number 5.
        All right. Plaintiff's Exhibit Number 5 there is CCG 1813 through 1818, which appears to be a list of your training history at the Columbus Police Department; is that right?
    A. Yes.

**Page 53**

Q. Okay. And on this Plaintiff's Exhibit 5, it also shows that you completed the Annual In-Service Training on April the 26th of 2016; is that correct? I think it's on the first page toward the bottom.

A. Yes.

Q. Now, I want to go through some of that training from 2016, and I want to use an exhibit that we used earlier today. The exhibit I'm showing you from Officer Dudley's deposition is Plaintiff's Exhibit Number 7 from that deposition.

Do you see that?

A. Yes.

Q. That is actually CCG 1753 through -- 1753 through 1776, I believe. Is that what you're seeing there?

A. Yes.

Q. Okay. And this is an outline of -- or at least a partial outline of the training that you received -- in-service training that you received in April of 2016; correct?

A. Yes.

Q. Okay. And, of course, you have to score at least a 80 percent score on the test for in-service training in order to remain a POST certified police officer; is that right?

**Page 54**

A. Yes.

Q. Of course, you did that. You are still a police officer, right?

A. Yes, sir.

Q. Okay. One of the pieces of your training during April of 2016 specifically referring to page CCG 1754 -- I think it's probably the second page in there -- lists student performance objectives as a review of updated information on Excited Delirium Syndrome. Correct?

A. Yes.

Q. Okay. And moving over to page 1758 and 1759 -- we have touched on it, but you had previous to this been trained on the Use of Force Continuum, correct?

A. Yes.

Q. And this was a refresher course as well as an update on the Use of Force Continuum, correct?

A. Yes.

Q. Okay. And, of course, you paid attention and listened to what they told you, correct?

A. Yes, sir.

Q. And the next page, 1760, 1761 and 1762. Specifically 1760 is a -- begins a overview and a refresher with respect to Excited Delirium. Do you

**Page 55**

see the definition at the top of the page?

A. Yes.

Q. And there were -- it lists three things that can bring on Excited Delirium; right?

A. Yes.

Q. Okay. And it also has a list of symptoms of Excited Delirium as defined; is that correct?

A. Yes.

Q. Referring to January 9th of 2017, I want to ask you about the symptoms that you observed with regard to Hector Arreola on January 9th of 2017. Okay?

A. Okay.

Q. Did you see panic?

A. I wouldn't necessarily say panic because, I mean, he wasn't frantically, you know, like -- he was just kind of like talking.

Q. Okay. What about paranoia?

A. Yes.

Q. What about shouting?

A. I can't recall if he was shouting.

Q. Okay. What about, I guess it would be bizarre behavior more than aggressive behavior. Did you see bizarre behavior?

A. Yes.

**Page 56**

Q. Dilated pupils, did you see that?

A. Yes.

Q. What about fear?

A. I would say yeah because he said people were, you know...

Q. What about hiding behind things?

A. I can't recall. Like you said the trash can earlier, I couldn't recall.

Q. Okay. Irrational speech, incoherent speech?

A. Everything he was saying, I understood. So I don't think it was like -- like he was speaking gibberish or anything.

Q. Maybe not incoherent speech, but irrational speech? Would that be -- would you have seen that or heard that?

A. I would say yeah.

Q. And unexpected physical strength, did you observe that?

A. Yes.

Q. All right. And at the bottom of that list, it says watch for more than one symptom, doesn't it?

A. Yes.

Q. And then right underneath that, your training was positional asphyxia and it defined that again; right?

```
 1    A. Yes.
 2    Q. And in bold, it says, "Always monitor any
 3 subject you have in custody".  And you knew that,
 4 right?
 5    A. Yes.
 6    Q. And it also warned you to be aware of sudden
 7 tranquility, correct?
 8    A. Correct.
 9    Q. Tell us what sudden tranquility means to you.
10    A. Change in behavior.  I don't know.
11    Q. Okay.  Well, just by definition, sudden
12 tranquility would tend to mean that somebody becomes
13 more calm all of a sudden.  Would that make sense to
14 you?
15    A. Yeah.
16    Q. And right under that, it says -- it
17 re-emphasizes on the "what to do" situations is
18 underlined, correct, and in bold?
19    A. Yeah.
20    Q. And you were trained to always keep in mind
21 that people that exhibit symptoms and behavioral
22 patterns suggesting cocaine, psychoses or excited
23 delirium, they are experiencing a medical emergency.
24 Right?
25    A. Right.
                                                    57
```

```
 1    Q. And you were trained that if time allows, that
 2 you should contact EMS before confronting the
 3 individual and attempt to avoid confrontation with
 4 the subject until EMS arrives.  Correct?
 5       MR. CASHBAUGH:  Object to the form.  But you
 6    can answer.  I'd rather you read the whole thing
 7    and then let him answer.
 8       You can answer his question.
 9       THE WITNESS:  Oh.  Correct.
10 BY MR. POST:
11    Q. And, obviously, in bold and big letters right
12 after that sentence, it says, "Officer safety must
13 always be a priority", number one.  And nobody
14 disagrees with that, for sure.  And then underneath
15 that, it says, "Excited delirium is regarded as a
16 medical emergency with a psychological presentation".
17 And you were trained with regard to that, right?
18    A. Right.
19    Q. And, once again, it warns you to be aware of
20 sudden tranquility in capital letters, doesn't it?
21    A. Yes.
22    Q. All right.  And I'm going to skip over to --
23 let's see, it's 1782 through 1783.  On CCG 1782
24 through 1783, essentially during the training, you
25 went over excited delirium, the symptoms of excited
                                                    58
```

```
 1 delirium, positional asphyxia, re-emphasis on the
 2 what to do situations again, correct?
 3    A. Correct.
 4    Q. And the very next page is defense of tactics,
 5 sudden in-custody death.  Right?  I think that's the
 6 title any way.  Flip over the page.
 7    A. Yes.
 8    Q. And this training that you received in April
 9 of 2016, this in-service training emphasized or
10 re-emphasized what you had already been taught in the
11 basic law enforcement course, right?
12    A. I can't remember exactly every single subject
13 we talked about in the 408 hour course.  But, yeah,
14 they did touch on it.
15    Q. Okay.  And I'm going to show you some
16 documents from the basic law enforcement course.  And
17 I've already put these documents and attached these
18 as an exhibit in a deposition of the defense expert
19 in this case.  So I'm just going to refer to certain
20 pages of the basic law enforcement course.
21       But, of course, you went through the
22 handcuffing training in the basic law enforcement
23 course?
24    A. Yes.
25    Q. Okay.  And for whatever reason in the basic
                                                    59
```

```
 1 law enforcement course at 17.3-34, they put in big
 2 bold letters, "Be aware of positional asphyxia".
 3 Right?
 4       MR. CASHBAUGH:  Let me say for the record that
 5    that looks like it's from 2015.  Are you're asking
 6    him if that's the same as it was back when he was
 7    in training?
 8       MR. POST:  It has been since 2006.
 9       MR. CASHBAUGH:  Okay.  Well, you can ask him
10    if he recalls that.  I mean, I don't know if he
11    does or not.
12 BY MR. POST:
13    Q. Do you recall that?
14    A. I do not.
15    Q. Do you remember this bulletin that's been part
16 of the Georgia basic law enforcement course training
17 since at least 2006 that came out in June of 1995
18 that speaks to positional asphyxia and sudden death?
19 It starts at 7.3-114 through 116.  Take a look at
20 that.
21    A. I don't recall this particular -- I don't
22 recall this.
23    Q. Okay.
24    A. I'm not saying it wasn't there.  It was just a
25 long time ago when I went through the academy and I
                                                    60
```

just can't remember if it's the same thing I looked at or was taught.

Q. I understand. But you do remember at the academy of them wanting you to watch for positional asphyxia signs --

A. Right.

Q. -- and to beware of sudden in-custody deaths? Do you remember that?

A. Not off the top of my head, I don't.

Q. Okay. Can we agree that you were familiar with the Columbus Police Department Use of Force policy that was in effect on January the 9th of 2017?

A. Yes.

Q. Okay. Let me show that to you. Well, you probably know these off the top of your head. If not, we'll pull out the Use of Force policy and let you take a look at it.

But would you agree that you're required to use reasonable force in accordance with the constitutional rights of all citizens?

A. Yes.

Q. And under the procedure sections of the Use of Force policy of the Columbus Police Department, you can only use reasonable force to make an arrest. Agreed?

61

A. Agreed.

Q. And Columbus Police Department policy does not train or authorize use of any neck restraint or a choke hold. Agreed?

A. Agreed.

Q. And 3.3-1.2, Use of Force -- and I'm not asking you if that's the right section.

A. Right.

Q. But CPD policy does not allow the use of excessive force to effect an arrest. True?

A. True.

Q. And CPD policy also prohibits continued use of force after the person has submitted to an arrest. Correct?

A. Correct.

Q. Would you agree that the disorderly conduct charge in this case was not a serious offense?

    MR. CASHBAUGH: Object to form. You can answer.

    THE WITNESS: I would say given the circumstances, it was a very -- I would say that it was completely justified and it was a serious offense at the time because of his actions and him possibly being able to get into somebody's house.

BY MR. POST:

62

Q. And I'm not talking -- asking you about whether it was a justified arrest or anything of that nature. What I'm asking you is like in the scheme of things with regard to disorderly conduct as compared to armed robbery, aggravated assault, it's generally considered to be a less serious offense. Right?

A. That's right.

Q. And Hector Arreola wasn't threatening you or Officer Duddley, was he?

A. No, sir. The only thing semi-threatening was, "Where's your back up" --

Q. Yeah.

A. -- but at that point, we were just trying to de-escalate.

Q. Right, right. And Hector Arreola could have well believed that normal police protocol was to send back-up. Right?

    MR. CASHBAUGH: Object to form. I object to the hypothetical and the fact that he would know what's in Hector Arreola's head. But...

BY MR. POST:

Q. I'd be speculating. I'll just withdraw that question.

Based on your experience as a police officer -- well, let me ask you this first: Your purpose for

63

detaining Hector Arreola was to get him help. Right?

A. Correct.

Q. And in your experience as a police officer, it's pretty common that when you grab somebody and you get into a struggle with them, that somebody gets hurt, whether it's the police officer or the subject. True?

A. I've been in a lot of encounters where they haven't been hurt. At the end of the day, it's never our intention. But sometimes it does happen, yes.

Q. And people get lacerations and all sorts of things. You have received lacerations and abrasions in struggles before, right?

A. Yes, sir. And broken bones.

Q. And so have the people that you've struggled with. Right?

A. Yes.

    MR. POST: All right. I think that covers it. Let's quit. How about that?

    MR. CASHBAUGH: I might have one question, quickly.

                    EXAMINATION
BY MR. CASHBAUGH:

Q. Officer Aguilar, Mr. Post showed you Exhibit 7, I think it may have been to Dudley's deposition.

64

It's regarding the Use of Force training and handouts from 2016.

   On CCG 001761, it tells -- the bullet point tells you that, "Always keep in mind the people that exhibit symptoms and behavioral patterns suggesting cocaine, psychosis or excited delirium, they're experiencing a medical emergency".  Did I read that right?

   A. Yes.

   Q. And it goes on to say in the next sentence, "If time allows, contact EMS before confronting the individual and attempt to avoid confrontation with the subject until EMS arrive".  Is that right?

   A. Yes.

   Q. When did you guys contact EMS?

   A. We contacted EMS -- we asked Dispatch to start to have EMS respond prior to even making contact -- like physical contact to arrest Hector.

   Q. Okay.  And why did you end up having to make physical contact with Hector?

   A. Because he was knocking on somebody's door at 4 or 5 in the morning and he was mentally unstable.  Or, to me, if he gets inside that house, if somebody answers the door, I don't know if he's going to go in there and possibly hurt himself or the people that

65

live at the residence.

   So when he started knocking on the door, that's when it became an emergency situation to immediately separate him from that house.  And up to that point, we've exhausted all options to talk him down -- by talking him down and trying to get a peaceful resolution to the situation.

   MR. CASHBAUGH:  All right.  That's all I've got.

   MR. POST:  I don't have anything else.

   (Deposition concluded at 2:15 p.m.)

66

STATE OF GEORGIA

COUNTY OF MUSCOGEE


**C E R T I F I C A T E**


   The forgoing transcript of the proceedings was taken before me as a Certified Court Reporter in and for the State of Georgia and reduced to typewriting under my direction and supervision, and I certify that it is a true and correct transcript to the best of my ability of the proceedings.


   **This 27th day of October, 2019.**


   _____

   **Eric Cavanaugh**
   Certified Court Reporter
   No. 2560
   CCR, GRL


EC/jm

67