**OFFICE OF PROFESSIONAL STANDARDS**
Columbus Police Department

INTERVIEW WITH: Officer First Class Michael S. Aguilar                    CASE: 17-01
Date/Time Taped: Tuesday, January 10, 2017/8:23 a.m.

| | |
|---|---|
| Major Blackmon: | This is a recorded interview with Officer First Class Michael Aguilar. His cell number is ▮▮▮▮▮▮▮▮ He has been employed with the Columbus Police Department for the past seven years as a police officer. |
| | This interview is being conducted in the Office of Professional Standards located in the Public Safety Center. Present during the interview is . . . are myself Major F. D. Blackmon, Lieutenant R. L. Graham, Sergeant T. L. Birris-Mayo, and Sergeant J. G. Bridges. The Office of Profession.. . . the Office of Professional Standards is conducting an investigation ordered by R. T. Boren, Chief of Police. |
| | So, before we began with your statement, Officer Aguilar, you did sign and you . . . you . . . you read and signed the "Garrity Warning?" |
| OFC Aguilar: | Yes. |
| Major Blackmon: | Do you have any questions regarding the "Garrity Warning?" |
| OFC Aguilar: | No. |
| Major Blackmon: | Okay. So, if you would please, Officer Aguilar, state for the record your knowledge of the facts concerning the incident that occurred on January 9, 2017,[Monday] on Moss Drive involving the arrest of Hector Arreola . . . Arreola? |
| OFC Aguilar: | Okay. We were dispatched to the residence. I believe the address was 760 Moss Drive in reference to a welfare check at approximately . . . sometime around 4:00 a.m. to check on the wellbeing of a . . . the mother of the complaining party called police. While en route or once we got on scene, we made contact with the mother after several knocks and ringing of doorbells. The call came in as a welfare check, and I believe the . . . the statements in the call . . . our dispatch advised that they . . . that the mother was acting weird. And the . . . the complaining party wanted to see if she was okay. Just, basically, conduct a welfare check. So, we knock on the door. She . . . she comes to the door. She appears that she was asleep and we had woken[sic] her up by knocking on the door and ringing the doorbell. At that time, we advised her that . . . myself and Officer Dudley[1] arrived on the scene, and we advised her that . . . that her son called, and you know, we were here to check on her. She acknowledged that she was okay, and we advised her to call her son and let him know that . . . that she was, in fact, okay. As we left, we got back in our patrol un . . . patrol vehicles. I pulled up a driveway and then backed out of a driveway and then headed west towards River Road. A short time after we left the area, dispatch advised that another neighbor or a neighbor around |



---

[1] Officer Brian J. Dudley, Bureau of Patrol Services' Squad 23

that residence called 911 in reference to somebody knocking on . . . on their door or banging on their door. And we advised that, you know, that could have been us driving up the driveway, and you know, the noises from the car could have possibly been . . . you know, I took it as it could have been, maybe, they heard it and thought somebody was knocking. And we asked if we needed to be . . . Dud . . . Officer Dudley asked if we needed to be back en route. Well, Dispatch informed . . . I . . . I don't think Dispatch in-formed us to be back en route to investigate what appeared to be knocking or someone banging on a door knocking so we stayed in service. I think shortly after that, we responded to an alarm activation that ended up being a valid burglary at one . . . at a computer shop near Cross Country Plaza or . . . not Cross Country Plaza but Columbus Park Crossing. And then, after searching the area a little bit for suspects on that, we went to another alarm activation at The Egg and I breakfast café. After servicing that call or in the middle of servicing that call, another call came out at 760 Moss Drive. I believe it was for another wel-fare check of a mother. While en route to that, I asked Dispatch if . . . if a phone number at the bottom of the screen was, in fact, the number of the complaining party, 'cause I wanted to call him to try to make contact with him to see if and why we continue to go back to the house to . . . to do this welfare check when we just checked on it 'cause I don't know if he's been notified prior. I'm . . . I call the number. Di-spatch informed me that . . . that was the number but I didn't receive an answer. Dispatch attempted to call him, but she didn't receive an answer from him. So, we returned to the residence, 760 Moss Drive. And upon our arrival, Mr. Arreola was at the residence at that time. He wasn't at the residence the first time. He was at the residence the second time. We got out of the vehicle, made contact with him. We, basically, you know, asked him . . . you know, what was the welfare check about or we . . . we made some reference about why we . . . why we're coming here twice at 4:00 in the morning or 5:00 in the morning, whatever time it was, to check on, you know, his mother. What's going on. He began to talk and he . . . it . . . it . . . it started, to me, to . . . I believed at that time just by the way he was talking, he just wasn't acting normal. He wasn't . . . you know, he wasn't in his, you know, maybe in his right state of mind. Because he just . . . he wouldn't really give us an answer on why he kept wanting us to come out to make a welfare check of . . . of his mother. We attempted to gather some more information. And he made references to-wards she might be in trouble with the people inside. We later found out that he lived there while we were still talking to him, and he started to demand to see his mother. But we didn't know that he lived there at that particular time, so, he wanted us to go back and knock on the door, 'cause he wanted to phy-sically see her with his own two eyes. So I said, it . . . "it's late. I just spoke to her an hour ago. She was fine. It's 4:30 . . . 5:00 in the morning, I'm not gonna be go knock . . ." "knock on her door to see if she's okay when we just did it an hour ago. She appeared to be asleep when we knocked on the door the first time." So, then we found out he lived there and I . . . I advised him or Officer Dudley advised him, "Well, if you live there, why don't you go inside and see if you can make contact with her" or "you go inside and make contact with your mom to see if she's okay." Then he started to make a reference to, you know, "I don't want to go in there," "I'm afraid," or he made some sort of . . . I believe he made some statement about people might get him or hurt him or harm him in some way. And at that time, I thought, maybe, he had something going on and, you know, maybe he had some mental health issues. So I recommended him . . . I . . . I asked him if he wanted to speak to an ambulance, or you know, someone from . . . from E.M . . . E.M.S. personnel, and maybe, try to see if we can help him out with his . . . you know, with his state of mind to see where he was at or if he was sane or if he was, you know, mentally ill. And I do believe I . . . I called for an ambulance at that time. He didn't want to talk to an ambulance. He . . . he began to question if we were the real police. And then, he . . . he said he just wanted to see his mom. Well, at some point during all this conversation that we had, his mother . . . or he made a statement about seeing lights or flashlights on his mom's house at 760 Moss Drive. And we looked back and we didn't see any flashlights pointed at the house or anything like that. And at that time, the mother opened up the front door and

she stood in the doorway of the door and just kind of looked out, and like they communicated back and forth. He asked him mom to come out, and you know, I said, "You know, she's in her nightgown. She's not gonna come out. It's 20 degrees outside . . ." or "20 something degrees outside and it's 5:00 or 4:00 in the morning." I said, "You know, I wouldn't want to come out in this temperature." You know trying to . . . tried to, basically, say that she probably doesn't need to come out. But he just kept fearing that something was going on . . . on the inside of the residence, so . . . His mom shut the door, went back inside, got clothed, and then, eventually, came back out. So, when she came outside, we were kind of standing in a circle, and she . . . we were trying to get some information on her to see if he's got a history of, you know, drug use or . . . or anything. Just by the way he was acting, to me, it just seemed like he was . . . he . . . he was either mentally . . . he had some mental . . . he was mentally ill or he . . . he was on some sort of narcotics that would make him be delusional or see things, or maybe be . . . have signs of paranoia or schizophrenia. So, while the mother was there, right when she walked up, you know, he . . . he made a statement about, you know, asking his mother to get in the car; "mom, get in the car," "let's go for a drive," you know. And I, immediately, said, "no, that's not gonna happen." And I, basically, said that because . . . the way he was talking, the way he was acting, I wouldn't have felt comfortable letting her leave with him because I didn't know what his intentions were. If he wanted to possibly hurt his mother or . . . or . . . or what the deal was with him. You know, wanting to separate us from her so badly, so the . . . the . . . I believe the mother said, no, she's not gonna go for a ride. And he, you know, didn't get angry, he just begged and plead[sic] to go for a ride and go have some coffee, and they needed to talk. And a couple of minutes later, we, basically, asked him why he wanted to leave, you know, or what . . . what his deal was. We were still trying to get more information from him, but he wasn't giving us very much. And at that time, he just kind of like started like, you know, panicking a little bit like and that's when he started to question us about us not being real police or . . . I don't know the exact statements about what he said, but at that time, he . . . he . . . he like turned around and like started walking away and then he looked back and then he turned around again then he like took two steps like if he was running. Like he . . . like actually physically ran two steps and then stopped and then turned around and came back and looked at us. And then he started like pacing back and forth trying to figure out which way he was gonna go. And then, he just kind of started walking down the street. We told him to come back, and you know, we . . . we just kind of let him have some space a little bit because we didn't want to scare him or anything like that. Or, at least, I didn't want to scare him, so I gave him space. You know, we were trying to get more information on the mother, I believe, at that time, and he said something about going over to the neighbor's house and knocking . . . knocking on the doors and stuff, and we advised him not to do that. Not to go up to the house, knock on doors, and he . . . he didn't really have a reason to go knock on the doors. He was just going to knock on doors. So, we started walking towards his direction because he started going up a driveway at 747 . . . I believe, Moss Drive was the address. And from . . . from a distance, we heard a knocking or banging on the front door or near the front door. And at that time, that's when we had to go over there, 'cause you know, it's 5:00 in the morning, and he's banging on people's residence waking 'em up and causing a scene. And you know, we're . . . we're trying to keep him from knocking on the door. We asked him to step down. At that time, we're at the street and he was up by the door, and he said he wasn't coming down. We told him that he . . . that he'd be arrested if he didn't come down, 'cause he . . . you know, he's . . . he's knocking on the doors, or whatever, and waking up the neighbors. And he made a reference right after I said he'd be arrested if he didn't come back down here towards the street, or towards us . . . he made a reference right after I said that. He . . . he advised us, "Well, where's your backup," or he made some sort of reference about having . . . where's my backup, and I said, well, what do I need backup for. And so, he didn't come down, so at that time, we made a . . . we . . . we went up to where he was at, and now, we're in somebody else's yard. And you know, we're trying to get him to come down. And he's just

INTERVIEW WITH: Officer First Class Michael S. Aguilar                          CASE: 17-01
Date/Time Taped: Tuesday, January 10, 2017/8:23 a.m.                          Page 4 of 31

not . . . not willing to come down. So, at that time, we try to place him in handcuffs for "Disorderly Con-
duct." So, as soon as I went in to grab his arm, he immediately started to pull away. He started to yell,
scream, and fight. Not necessarily throwing punches but trying to get away. At that time, myself and Offi-
cer Dudley were attempting to get him to the ground for better advantage of handcuffing because of the
way he was fighting or struggling to get away. I believe the . . . at first, when we first grabbed him, he like
backed himself into a corner of the stairs that's right there in front of the residence and kind of went
down. And then we were able to pull him away and then we went towards the . . . the stairs and then,
eventually, we made our way to the grass to where, I believe, he was taken to the ground using "Soft Emp-
ty Hands." I don't necessarily know how he went to the ground. I just know that it was a pretty good strug-
gle, and we . . . somehow, we ended up on the ground. I don't know if it was Officer Dudley's momentum
that pulled him or my momentum that pulled him, but we were able to get him on the ground, and I was
able to call for backup at that time or I advised Dispatch to . . . to hold traffic somewhere in the middle of
that and to . . . to let them know that we were fighting 'cause . . . I mean the struggle was, you know . . .
he was screaming in the background, so . . . But when we got to the ground, the struggle continued, and
I've been in a lot of struggles and . . . and apprehensions of . . . of people that have been fighting over my
career, and this is by far the . . . the biggest struggle for someone attempting to get away. And . . . and he
. . . when . . . once we got on the ground, he started to . . . to push off the ground, and I kind of . . . I kind
of had . . . I had my left arm around his left shoulder and my right arm underneath his right shoulder. And
at that time, he just kept pushing off with his hands. And at that time, I . . . I continued to remove his
hands from the ground and flatten 'em out. It was a technique that I was using and advising Officer Dudley
to use. Just keep 'em flat on the ground so he couldn't push off. Because I was afraid if he pushed off, he
could, subsequently, get up and take off running and get away. So at that time, I was telling Officer Dud-
ley just to flatten 'em out . . . flatten 'em out, backup's coming. I . . . I don't know if I, specifically, said
backup's coming, but I just wanted to keep 'em flat on the ground, 'cause I knew if he was flat on the
ground, he wasn't able to get away. After I would say . . . I mean I don't know how long the fight was. It
felt like 20 minutes. But it probably was three, four, five minutes. The whole time he sounded like, after
we flattened him, he just kept rolling over. He had his hands clinched together like outside of . . . like in
. . . tucked in the middle of his body, and he just wasn't releasing his hands. And after several minutes of
struggle, we, finally, were able to get his hands behind his back and put him in handcuffs. And at that time,
backup was arriving the minute we put him in handcuffs. He . . . Officer Aaron Evrard came up to the
scene, walked up, and then, you know, he . . . he . . . we were still on top of the individual when he walked
up. And then, he's like, "What can I do?" and I said, "You just stand right here," 'cause I was so tired, I
needed to . . . you know, I needed to get up. My arms were weak; my body was weak. At that time, Evrard
took position where I was and I believe it was . . . it was on the legs of the suspect at that time. And then,
I got up and I don't . . . like I said, I . . . I don't remember if he was still struggling after we got him in hand-
cuffs . . . on. I was just . . . I was . . . I was walking around and I was trying to gain my . . . my breath, 'cause
I was . . . I was out of breath, and I was tired. And then a short time later, I came over and it was decided
to sit him up in the upright position that . . . until ambulance arrived and am . . . the . . . the E.M.Ts. were
already en route, 'cause I believe I called them before . . . before the . . . the . . . the struggle ensued. And
I . . . I believe I do inform . . . I did inform dispatch to have them come routine with no lights or sirens be-
cause I didn't want him to get spooked by the lights and sirens. Just in case he was a mental health patient,
and you know, I didn't want him to take off running or become violent with us or anything like that prior
to us knowing that he was going to be under arrest for "Disorderly Conduct." So, he . . . he was sat up in
the upright position and Officer Evrard attempted to pull him up, and then, he . . . he . . . I remember him
being laid on his side or on his back, but he wouldn't . . . he didn't want to come up to his stomach. He
just was like he was stiff and he struggled with us just to get him up in the upright position. So I . . . I said,

CCG000253

INTERVIEW WITH: Officer First Class Michael S. Aguilar
Date/Time Taped: Tuesday, January 10, 2017/8:23 a.m.

CASE: 17-01
Page 5 of 31

"Come on, man" and then like I . . . I . . . I think I grabbed about like right here underneath the belly and I grabbed his left shoulder and attempted to like bend him up to where he can lean against my . . . my legs, 'Cause I was standing with my feet together, and basically, propping him up so he can . . . so he can lean on me until E.M.S. arrived. A short time later, E.M.S. arrived. They evalu . . . ed him. They seen[sic] that he had a laceration on his head. It's unknown how the lacera . . . at that time, it was unknown how the laceration got there. We never used knees, fist, no ASP baton, no Taser, no pepper spray. Excuse me. And, we never used any kicks or anything. Everything we used was soft empty hands, and it was just, basically, trying to get him in custody. So, E.M.S. got there and we . . . Officer Dudley went to the . . . his patrol vehicle . . . I believe, or he went to another officer's vehicle and reached . . . re . . . got some leg shack . . . excuse me. He . . . he got leg shackles from his vehicle. He would . . . they brought 'em back up to where we were, and we put leg shackles on him just in case he was gonna try to run or fight or do anything else. At that time, E.M.S. checked him out, and I believe they asked, "Well, you know, what would you like us to do?" And I said, "Well, I think he's got to be, you know, examined or possibly treated for his injuries," maybe. And so, they . . . they went and got the stretcher, and they came back and we picked him up, put him on the stretcher, and they restrained him down and E.M.S. personnel made the statement of "Well, you know, one of your guys need to follow us," or something. Either . . . "The handcuffs need to be left on while we transport." And I said, "Yeah, I wouldn't want to be in that vehicle, you know, without him handcuffed either," but . . . based by the . . . based on the way he fought . . . and so, they loaded him up into the ambulance, and a short time later, the ambulance turned around, went onto River Road, and turned left onto River Road. I got in my patrol car and I followed the ambulance until it turned left onto River Road and went down about a quarter of a mile and then pulled over. And then, I hit my blue . . . my black . . . blue lights to alert traffic to merge left and I got out of my vehicle because the driver was running around to the back of the ambulance. And I asked what's going on, and he advised that the individual was going into cardiac arrest. I didn't really know . . . understand what that meant 'cause, you know, I . . . I didn't understand. But later on, I found out that he was . . . he didn't have a pulse or he wasn't breathing properly or . . . or something in that effect, and they began CPR. A fire truck arrived a short . . . a short time later. Another individual jumped in the . . . the back of the ambulance and assisted on treating Mr. Arreola. And at that time, somebody else jumped in the driver's seat and they took off and went down to the Medical Center, where they were doing chest compressions, and I found out that he . . . after several rounds of . . . of CPR, they were able to get a pulse. And then, at that . . . at that time, they put him on a breathing . . . assisting breathing tube, which is, you know, I don't really know what the machine is officially called. I talked to the doctor a short time later to try to get his medical condition or like to see what . . . what was his status. And he said that he was in critical condition and that he was unable to breath on his own and the breathing machine was helping him breath. So, but they did have a pulse and a short . . . like several . . . I'd say about an hour later, after he went to a CT scan, a corporal from ID . . . I don't know her name, Aretina,[2] I believe it was. She . . . she photographed his injuries that he sustained or the . . . the laceration he had above his left eye. A short time later, I spoke to a doctor . . . and I was trying to get more information on the laceration, 'cause I was still unsure how that laceration occurred because of the . . . you know, we . . . we didn't use any fists or anything or elbows or knees or anything. So, the doctor said that he thinks that something was inside of the eye . . . just by the way he's feeling around. And then, he . . . he actually took a pair . . . little needle-nose pliars and he removed a piece of glass that was about an inch long and about a half inch wide. And the glass was collected and eventually taken by Georgia Bureau of Investigation's personnel. I . . . I don't know any . . . I don't how that glass got in his eye, and I don't know where the glass came from. If it was on the ground and then, during the struggle, it just happened to penetrate his skin or what, so there . . . there's no . . . I have no idea where the glass came from. But

---

[2] Corporal Aretina R. Benning, Bureau of Investigative Services' Crime Scene Investigative Division

CCG000254

the . . . the glass was removed by the doctor. And subsequently, after . . . after sitting at the hospital for quite some time, I came to police headquarters, where I had my interview with . . . with the G.B.I. investigators in reference to the incident.

**Major Blackmon:**   Okay . . . okay, Officer Aguilar, a couple of questions I wanted to ask you. Just for clarity, when you said, "We were dispatched," then you later referred to Officer Dudley being there to assist you . . .

**OFC Aguilar:**   Uh huh.[Yes]

**Major Blackmon:**   . . . so, you and Officer Dudley received the call to go to this welfare check?

**OFC Aguilar:**   Yes, I believe it was Officer Dudley's call as . . . as he was the primary officer during the call, and I went as backup.

**Major Blackmon:**   And what this . . . what's his first name?

**OFC Aguilar:**   Brian Dudley.

**Major Blackmon:**   Brian Dudley. I know you said that Arreola was . . .

**OFC Aguilar:**   Arreola.

**Major Blackmon:**   . . . Arreola was . . . was present. Did he ever state the reason that he requested the welfare check?

**OFC Aguilar:**   No, we . . . like I said, I think we . . . we tried several times to try to figure out exactly why we continued to go out there. And the only thing we could really get out of him was, "'cause, you know, there's people in there that can harm her or me." So, it was under my impression that, possibly, he had some mentally ill stuff going on. And you know that, maybe, he was being . . . had signs of paranoia or schizophrenic at that time. But he didn't really give us a strong reason why he wanted to separate her from the residence, and then, eventually, separate her from us. And for them two to just be alone.

**Major Blackmon:**   And when you said 911 rec . . . dispatched a call concerning someone knocking on a door, did 911 ever state which address that call regarding someone knocking on the door?

**OFC Aguilar:**   I do believe she said an address. I just don't know exactly what address it was. And I don't know the . . . I don't know the . . . the conversation that dispatch had when the . . . when the complainant called. I don't know if . . . if she . . . I didn't know if the . . . person that called 911 to report someone knocking on her door after we left the first time, if they wanted to see police, because we never went back out there in reference to that. So, I don't know if he looked outside

INTERVIEW WITH: Officer First Class Michael S. Aguilar
Date/Time Taped: Tuesday, January 10, 2017/8:23 a.m.

CASE: 17-01
Page 7 of 31

and said, "no one's here. All right, we're going back to bed," or whatever the case was.

**Major Blackmon:** Did you ever receive crisis intervention training?

**OFC Aguilar:** Yes. I'm C.I.T. certified . . .

**Major Blackmon:** [Unintelligible – 00:53:57]

**OFC Aguilar:** . . . I got certified back in 2010, I believe.

**Major Blackmon:** 2010?

**OFC Aguilar:** Yeah.

**Major Blackmon:** All right, so, based on your crisis intervention training, did . . . I noticed earlier you said that . . . you . . . you described the behavior that this person was displaying . . . Arreola was displaying. Did you base your assessment based on the training you received at crisis intervention?

**OFC Aguilar:** I don't understand the question.

**Major Blackmon:** All right. You received crisis intervention training . . .

**OFC Aguilar:** Uh huh. [Yes]

**Major Blackmon:** . . . All right, explain to us what crisis intervention training is?

**OFC Aguilar:** Well, the . . . from what I got out of it . . . I mean, it's just understanding and possibly, you know, understanding people in crisis, you know, could possibly be going through some sort of episode of some sort and trying to be patient with . . . with that person and talk it out more. And trying to get . . . trying to get information out of them and . . . and, you know, trying to . . . to . . . to have a situation de-escalate from what . . . what it could potentially be.

**Major Blackmon:** Okay, so, when you say, individuals experience crisis and you try to de-escalate, did this crisis intervention training focus on some of those crises being mental health issues?

**OFC Aguilar:** At . . . at first, I thought, maybe . . . at first, I thought, maybe, he was maybe having an episode of mental illness. But then, you know, some of the actions he was displaying led me to believe, by the way he was acting, maybe he was on some sort of narcotic that may be like, you know, he . . . he was fidgety, he wasn't staying still. He, you know, I thought, maybe, he was on some sort of narcotic more than, maybe, a mental health incident or situation. So there . . . there were several things running through . . . through my mind. Possibly him being a mental health

INTERVIEW WITH: Officer First Class Michael S. Aguilar                    CASE: 17-01
Date/Time Taped: Tuesday, January 10, 2017/8:23 a.m.                      Page 8 of 31

patient, or possibly, being on some sort of narcotic that's not making him act right.

Major Blackmon:     So, the crisis intervention training . . .

OFC Aguilar:        Uh huh. [Yes]

Major Blackmon:     . . . it teaches you to be alert or try to identify if a person is displaying symptoms of mental illness or drug related issues? The training you received?

OFC Aguilar:        Maybe not as much as drug but, yeah, definitely more mental health.

Major Blackmon:     Okay. So, based on your crisis intervention training, you based your assessment of Arreola in that he was either . . . either on some type drug or experiencing some type mental illness? You . . . you . . . you laid . . . based that assessment based on the training you received through crisis intervention?

OFC Aguilar:        Yes.

Major Blackmon:     So, did you notice any smell of alcohol?

OFC Aguilar:        No, not right away. I don't think we ever got close enough until we started struggling with him before, but I didn't smell any . . . any alcohol.

Major Blackmon:     And have you made alcohol related cases throughout your career?

OFC Aguilar:        Yes.

Major Blackmon:     And in the times you've made alcohol related cases, did you notice a smell of alcohol?

OFC Aguilar:        Yes.

Major Blackmon:     So, based on your training and . . . and your years of experience, you . . . you had the alcohol identification or . . . or person being under the influence of alcohol, you've had that type training so you can identify?

OFC Aguilar:        I mean I . . . I haven't had training but I . . . I mean I know . . . I've been around several . . . several individuals that've been drinking and I've made several D.U.I. And then, you could actually . . . I . . . I could smell alcohol. When I smell alcohol, and in this case, I did not.

Major Blackmon:     You said you have not had training to . . .

OFC Aguilar:        I have not had any training as far as like classes or anything like that, but I . . . I can acknowledge the smell of alcohol on people, if they've been drinking . . .

CCG000257

INTERVIEW WITH: Officer First Class Michael S. Aguilar
Date/Time Taped: Tuesday, January 10, 2017/8:23 a.m.

**Major Blackmon:** When you . . .

**OFC Aguilar:** . . . by . . . by . . . by the smell of breath and . . . and just the alcohol smell.

**Major Blackmon:** When you graduated from the police academy . . . did you graduate from the police academy . . .

**OFC Aguilar:** Yes.

**Major Blackmon:** . . . join the police academy?

**OFC Aguilar:** Yes.

**Major Blackmon:** And when you graduated from the police academy, did you go . . . did you go another week after the academy to be able to identify individuals who are under the influence of alcohol?

**OFC Aguilar:** Yes, I . . . I . . . I went . . . it was a D.U.I . . . D.U.I. course that we . . . we attended. And I mean there they . . . they had people drink and we were able to get close enough, use tactics to see if they . . . we could smell the odor of alcohol, and then, we'd have probable cause to do Standardized Field Sobriety Test" or . . . or whatever the case was to make . . . to make a D.U.I. arrest. So, I guess, yes, I have had training with people that have been drinking alcohol.

**Major Blackmon:** But this person did not display those symptoms?

**OFC Aguilar:** I was never close enough to him at . . . at . . . until we went hands on with him, I was never close enough to him to identify any alcohol because he just kept a distance from us.

**Major Blackmon:** And . . . but you say, based on your training and your experience, he . . . he displayed some type symptoms of either drug or some type mental illness?

**OFC Aguilar:** Yes.

**Major Blackmon:** You said the mother . . . you spoke to the mother and she came out during the time that her son was . . . was present . . .

**OFC Aguilar:** Yes.

**Major Blackmon:** . . . talking to you out in the street on Moss Drive . . .

**OFC Aguilar:** Uh huh.[Yes]

**Major Blackmon:** . . . and do you know the mother's name?

OFC Aguilar:        I do not.

Major Blackmon:     And when you and Officer Dudley were going to the residence at 747 Moss Drive,
                    where Arreola walked up the driveway, did the mother . . . do you know whether
                    or not the mother communicated anything to Arreola while he was in 747 . . . the
                    yard of 747 Moss Drive?

OFC Aguilar:        I do believe . . . I do believe that she made a statement to him. I don't know exactly
                    what it was. We . . . our attention was trying to get him away from the residence
                    because, you know, it's 5:00 in the morning and he's now waking up people. And
                    like I . . . I . . . like I said, I don't . . . I don't know exactly what she said, but our po-
                    lice body cameras were rolling, so if any communication in reference to her telling
                    him to come down, it would be on there. But off hand, I can't tell you what . . .
                    what exactly she was saying to him.

Major Blackmon:     Did she walk up to him?

OFC Aguilar:        Yeah, we . . . I . . . yeah, she walked up. We all walked up there together. She kind
                    of stayed by our sides during the incident.

Major Blackmon:     During your encounter with Arreola, do you . . . are you aware as to whether or
                    not any neighbors were awakened or came outside or anything?

OFC Aguilar:        Yeah, the neighbors, he . . . he knocked on the door. The neighbors that . . . at
                    747, they were awoken[sic] by him knocking on the door. Also, there was another
                    . . . there's another individual that was in a car that drove by, and they had their
                    window rolled down and they were stopped in the middle of the street. I believe
                    it was a white-colored vehicle. And they said that they heard a commotion, so
                    they came outside to see what was going on. I don't know if that was before or
                    after the actual struggle that we had with him, but there was people that came
                    down the street and were in cars and stopped in front of the residence at 747 in
                    reference to the incident that occurred.

Major Blackmon:     That . . . when you were talking to Arreola in the street, out in front of 760 Moss
                    Drive, did you notice any cut above his eye . . .

OFC Aguilar:        No.

Major Blackmon:     . . . at that time?

OFC Aguilar:        No.

Major Blackmon:     And so, as you and Officer Brian Dudley were attempting . . . did you say you were
                    attempting to arrest him and . . . and during that time, you and Officer Dudley be-
                    came unbalanced and just . . . through the attempt of trying to place him in custo-
                    dy, just fell to the ground?

INTERVIEW WITH: Officer First Class Michael S. Aguilar                    CASE: 17-01
Date/Time Taped: Tuesday, January 10, 2017/8:23 a.m.                     Page 11 of 31

| | |
|---|---|
| OFC Aguilar: | Yeah. |
| Major Blackmon: | So . . . so, did you make any attempt to pick up Arreola and throw him to the ground? |
| OFC Aguilar: | I mean our main thing . . . my main thing was trying to get him to the ground so he wouldn't run. |
| Major Blackmon: | Right. |
| OFC Aguilar: | I believe Officer Dudley was pulling one way and I was pulling the other way. And then, in the mix of the struggle, we went to the ground. But I don't necessarily know if I like tried to pick him up and throw him on the ground. The main thing was just trying to get him to the ground so we could secure him and . . . for better handcuffing tactics. |
| Major Blackmon: | Did you see Officer Dudley try to pick up Arreola and throw him to the ground? |
| OFC Aguilar: | The struggle was so intense that we . . . I . . . I don't know. We were just . . . we were just trying to get him to the ground or I was trying to get him to the ground because it's been . . . in past history, it's been easier to place somebody in hand-cuffs while they're on the ground or we're on top with him having a better . . . better position. |
| Major Blackmon: | And you say you were wearing your body camera? |
| OFC Aguilar: | Yes. |
| Major Blackmon: | Okay. So, to your knowledge, does your body camera record video and/or can it record video and audio separately as far as being . . . can it record video . . . |
| OFC Aguilar: | Uh huh.[Yes] |
| Major Blackmon: | . . . and not record audio? |
| OFC Aguilar: | I have no idea. I haven't read the policy or I haven't read the . . . the operationals [sic] manual on that. I just . . . check it out downstairs out of our Property and Evi-dence room and I hit the button to activate it and I hit the button to deactivate it. I don't know if it has the capabilities of recording and stopping. So, I don't know if it has the abilities to record video and no audio or if it has the capabilities to only re . . . record audio and no video. I don't know. |
| Major Blackmon: | And I believe you stated earlier but just want to ask just as a refresher, did you use your Taser during this incident to bring Arreola into custody? |

INTERVIEW WITH:  Officer First Class Michael S. Aguilar                                    CASE: 17-01
Date/Time Taped: Tuesday, January 10, 2017/8:23 a.m.                                    Page 12 of 31

OFC Aguilar:        I . . . I thought several times about using a Taser, but no, I did not use a Taser. I
                    thought that it would be ineffective because of the way he was . . . because of the
                    way he was fighting, and I . . . I've actually had incidences in the past where I've
                    attempted to tase an individual I was fighting not quite as hard as he was and the
                    Taser was ineffective. And I thought, maybe, that, you know, it could have been
                    the fact that, maybe, he was on drugs and, you know, maybe, PCP or . . . or . . . or
                    cocaine or methamphetamine that maybe made him stronger than what he could
                    of typically been, and I've had histories, in the past, where I've tased people, and
                    they just haven't been affected by the actual Taser, so . . . but, he was on the
                    ground during this time, and I didn't want to get up for separation for Taser, so
                    it's just decided Soft Empty Hands. Let's just see if we can tire him out, maybe
                    wait for backup to get there to, finally, get him in handcuffs, and we're able to
                    get 'em in handcuffs after several minutes.

Major Blackmon:    So, did you . . . did you use your ASP baton . . . baton to strike . . .

OFC Aguilar:        No.

Major Blackmon:    . . . the . . . Arreola? Did you use O.C. spray?

OFC Aguilar:        No.

Major Blackmon:    Did you use any other weapons . . .

OFC Aguilar:        No.

Major Blackmon:    . . . to strike Arreola?

OFC Aguilar:        No.

Major Blackmon:    So, during the time that Arreola was in your presence, you and Officer Dudley,
                    was he conscious the entire time?

OFC Aguilar:        Yes. After the fight, he wasn't speaking. And after we got him up, we tried to, you
                    know, talk to him. I don't know exactly . . . know what . . . what was said, but he
                    just wouldn't respond to us. I thought it was just, you know, maybe, because he
                    was cause he was tired and just mad that he was in handcuffs, 'cause you know,
                    he put up a little bit of resistance to sit in the upright position, as well. And from
                    there, I mean that . . . that's it. I mean . . .

Major Blackmon:    Did he . . . did Arreola communicate when the E.M.Ts arrived?

OFC Aguilar:        No, he wouldn't respond to them either.

Major Blackmon:    But was his . . . was his physical presence, did he . . . did . . . was his eyes open?
                    Did he appear to be conscious . . .

INTERVIEW WITH: Officer First Class Michael S. Aguilar       CASE: 17-01
Date/Time Taped: Tuesday, January 10, 2017/8:23 a.m.         Page 13 of 31

OFC Aguilar:        I . . .

Major Blackmon:     . . . [unintelligible – 00:39:39]

OFC Aguilar:        I believe his eyes were open, and I believe E.M.S. did check to see if he was con-
                    scious and I mean . . . I'm assuming they did, 'cause, you know, if . . . if he wasn't
                    breathing then, of course, they would have taken immediate action right there.
                    But I'm assuming that . . . that they knew he was breathing and, you know, at that
                    time, maybe, he was okay and just not responding to 'em for whatever reason,
                    but . . . I'm assuming E.M.Ts would of . . . would have seen that he wasn't breath-
                    ing and took immediate action, but they just loaded up in the ambulance and . . .
                    you know, were . . . were on their way to the hospital under the impression that
                    everything was okay, and then, that's when he went into cardiac arrest.

Major Blackmon:     So after you and Officer Dudley were able to get Arreola handcuffed, did you no-
                    tice any cut above his eye at that time?

OFC Aguilar:        I mean I saw . . . I saw blood in the grass right where the struggle ensued. I didn't
                    know exactly where . . . where it came from or how it got there. I know I had a lit-
                    tle laceration on my hand, but it wasn't . . . it wasn't to the extent where it was
                    bleeding but it wasn't to the extent where it would have caused that. And then I
                    looked and then I noticed that he had a laceration over his . . . over his eyes . . .
                    oh . . . over his left eye right here on his forehead. And the . . . the doctor said that
                    it was approximately three millimeters in length or width at the time. Later on,
                    we found that out and that's when I noticed that he had the lac-eration, when we
                    got him handcuffed and rolled him over.

Major Blackmon:     Did . . . to your knowledge, did the E.M.Ts treat that area when they arrived?

OFC Aguilar:        Yeah, they . . . they . . . I believe they . . . they, you know . . . I think they asked,
                    you know, well . . . you know, what do you need us to do or they made a reference
                    to, you know, what . . . what can we do. Then I think I . . . I think somebody said
                    or I said or somebody said, well, we probably need to get him checked out. And
                    that's when they went and got the stretcher and came back.

Major Blackmon:     And you said they did . . . they did attend to that area on the . . .

OFC Aguilar:        I don't know . . .

Major Blackmon:     . . . [unintelligible – 00:37:23]

OFC Aguilar:        . . . if they attended to that specific area that time. I think that they just . . . they
                    just put him on . . . they just . . . we picked him up and put him on the stretcher,
                    and then, they strapped him down and then they rolled him down the hill and put
                    him in the back of the ambulance 'cause the . . . the . . . there's a little hill at 747.
                    So, we took him down the hill and put him in the back of the ambulance like . . . I

CCG000262

|  |  |
|---|---|
|  | like if it was just a routine thing. They weren't like in any kind of hurry. They just kind of . . . they just kind of went down the hill like if it was a patient that needed to go to the hospital for jail clearance or whatever the case was. |
| Major Blackmon: | So, based on what you observed when you was there and the E.M.Ts were there treating Arreola, did you notice them while they were at 747 give any CPR treatment to Arreola? |
| OFC Aguilar: | Not at that time . . . no. |
| Major Blackmon: | Did Arreola communicate in any non-verbal by . . . by nodding his head or shaking his head to the E.M.Ts or to you and Officer Dudley? |
| OFC Aguilar: | No. |
| Major Blackmon: | And you said he . . . |
| OFC Aguilar: | And I . . . and I thought, maybe, he was, you know, maybe just mad because he was in handcuffs, and you know, subsequently, eventually, going to jail. That's maybe why I thought that he wasn't gonna respond to any questions, 'cause he was just mad. But I mean I . . . I don't know if he was able to respond at that time or if . . . if something was going on to cause him not to be able to talk. But he didn't respond to any questions that we had nor E.M.S. or anything like that. |
| Major Blackmon: | So, you and Officer Dudley did ask him some questions? |
| OFC Aguilar: | I believe so, yeah. I believe we, you know, asked him what's wrong or what's wrong with you or what . . . you know, why'd you fight or some . . . or . . . or some . . . I don't know. I mean, like I said, it was . . . we were . . . we were worked up. We . . . we were at the highest level of in . . . like . . . I mean we were just way up here with the fight and the struggle, and I don't know exactly what was said afterwards and . . . and, you know, but good thing the . . . cameras were . . . were record . . . recording where they would be able to, you know, pick up any questions or what . . . communications we had or questions we had. |
| Major Blackmon: | All right. And so, this encounter you said was in the grass . . . |
| OFC Aguilar: | Yes. |
| Major Blackmon: | . . . not the driveway, as far as you recall? |
| OFC Aguilar: | As far as I can recall. I mean, like I said, we were in like . . . we were in like a little area we went . . . we started by the house. We went five feet this way, five feet this way. I mean it was just in a circle where we were. I don't even know if we . . . when we . . . I don't even know if we . . . when we went to the ground we were on the concrete, on the grass. I believe we were on the grass. 'Cause that's where |

INTERVIEW WITH: Officer First Class Michael S. Aguilar

CASE: 17-01

Date/Time Taped: Tuesday, January 10, 2017/8:23 a.m.

Page 15 of 31

most of the time that's where we . . . that's where we ended up was on the grass. So I don't . . . I don't recall if we . . . if he fell against any railings or . . . or the concrete at all. But I know the . . . the . . . the best of the fight was in the grass, and · when we got him fini . . . when we got . . . got him handcuffed, it was in the grass.

**Major Blackmon:**   And were you ever on the steps of that residence, do you recall?

**OFC Aguilar:**   Not that I can recall. I mean I . . . I . . . I wasn't over there prior. But I know that, you know, the struggle could have taken us over there. I know Officer Dudley's body camera came off his persons during the struggle and that was on the . . . that was . . . I think it was either facedown . . . you know, I think it was either facedown or face up on the actual steps . . . So that's why I said, I don't know if we fell on the steps or if we fell on the railing or if we fell . . . like if Dudley fell on the steps, I don't know. But I know that it was a pretty intensive struggle.

**Major Blackmon:**   And to your knowledge did either you or . . . I know you said you had a laceration on your hand, did you receive any other injury?

**OFC Aguilar:**   No. I got scratches on my . . . on my legs. Just . . . just minor scratches. It kind of looks like, you know, or looked like just redness from possibly, you know, road . . . road rash, but it . . . it's nothing that's . . . that's visible. It just . . . a little bit of the skin ripped up like if you scratched your . . . your arm on like a little rose bush or something like that.

**Major Blackmon:**   You don't know about Officer Dudley, did he receive any visible . . .

**OFC Aguilar:**   I . . . I don't . . . I don't think . . .

**Major Blackmon:**   . . . injuries?

**OFC Aguilar:**   . . . he received any visi . . . visible injuries. I know . . . I know that he had to go to his residence to get his asthma inhaler because he was, you know. He . . . he said he needed his inhaler to give you an idea about the struggle of the fight, so . . .

**Major Blackmon:**   Okay, Sergeant Bridges.

**Sgt. Bridges:**   Officer Aguilar, after . . . after you had Arreola handcuffed, you indicated that you . . . you were able to kind of try to sit him up. That he was leaning against you, kind of using you. Was he ever able to, between that time and the time that E.M.S. arrived, was he able . . . ever able to use his own power . . . his own physical ability to either sit up on his own or to stand up or to get on the stretcher on his own or was everything done for him?

**Major Blackmon:**   Well, at that time, when we were trying to sit him up . . . like I said earlier, I believe he was still being resistant after we got him in handcuffs. Because we were trying to sit him up and his body was like straight and he was like . . . I guess . . . I

guess it's like, if you're trying to like bend something and it's showing resistance, if you . . . if . . . if he was limp, he would have just been able to roll him over real quick. So, there was still a level of resistance when we were trying to sit him up in the upright position, but basically, I took my hand and I think I put it right here and I . . . I grabbed his left shoulder with assistance of other officers, and we . . . we, basically, pulled him up and . . . and basically, not like . . . like hard, but like we folded him a little bit so he could sit up, and then that's when he leaned against my legs when I . . . I was standing up and . . . then, at that point, he was just leaning on my legs.

**Sgt. Bridges:** And then E.M.S. arrives and then y'all placed him on the stretcher?

**OFC Aguilar:** Yes.

**Major Blackmon:** And just . . . just for clarity, when you say you put his hand right here . . .

**OFC Aguilar:** Yeah.

**Major Blackmon:** . . . before you indicated . . .

**OFC Aguilar:** Like towards like the midsection where your . . . your body can, you know, do crunches or sit ups or anything like that. Just the . . . just the point of where I could put my hand near his stomach and just kind of fold him and pull . . . pull his . . . pull his butt back and push his shoulders forward.

**Major Blackmon:** You put his hands in that area on his body?

**OFC Aguilar:** No . . . no, I put . . . I put my hands on the area of his body . . .

**Major Blackmon:** Okay.

**OFC Aguilar:** . . . to basically pull the bottom part back and the top part forward.

**Sgt. Bridges:** Do you have your Taser downloaded?

**OFC Aguilar:** Yes.

**Sgt. Bridges:** Do you know the results of that?

**OFC Aguilar:** The results was I performed a spark test prior to my tour of duty. I don't know exactly what time, but there was no Taser deployment or any . . . during my shift. It was only at the beginning of my shift, I believe.

**Sgt. Bridges:** Okay. Major Blackmon asked you about . . . about your body cam, you indicated that, basically, to your knowledge, all you know how to do is turn it on and turn

INTERVIEW WITH:  Officer First Class Michael S. Aguilar
Date/Time Taped: Tuesday, January 10, 2017/8:23 a.m.

CASE: 17-01
Page 17 of 31

|  |  |
|---|---|
|  | it off. Have you or . . . or did you . . . have you gone in and tried to manipulate the settings or anything on the body camera? |
| OFC Aguilar: | No. |
| Sgt. Bridges: | That's all the questions I have. |
| Major Blackmon: | Sergeant Birris-Mayo. |
| Sgt. Birris-Mayo: | Officer Aguilar, you stated that you took C.I.T. training in 2010? |
| OFC Aguilar: | Yes. |
| Sgt. Birris-Mayo: | Are you a member of the Mobile Field Force? |
| OFC Aguilar: | No, ma'am. |
| Sgt. Birris-Mayo: | Have you ever had any training with persons who are passively resisting arrest . . . |
| OFC Aguilar: | No. |
| Sgt. Birris-Mayo: | . . . passive resistance? Prior to your shift on yesterday's date, did you work a part-time job? |
| OFC Aguilar: | No, ma'am. |
| Sgt. Birris-Mayo: | How many hours of sleep would you say you received? |
| OFC Aguilar: | I believe I went to sleep about 8:30[a.m.] and maybe woke up at 3:30[p.m.] or 4:00.[p.m.] So I'd say seven and a half hours . . . seven . . . seven and a half hours. |
| Sgt. Birris-Mayo: | How was . . . how . . . how was you dressed yesterday? |
| OFC Aguilar: | I was . . . I was in my standard-issue patrol uniforms. I had the . . . my black boots, my blue-colored pants or my light blue-colored pants, my . . . I had a long-sleeve police shirt that had the patches on the sides indicating that I was a Columbus police officer. And then I also had my vest carrier that contained my vest inside that had my police badge, my name tag, and that was on over my shoulders . . . |
| Sgt. Birris-Mayo: | Okay . . . |
| OFC Aguilar: | . . . and on my . . . |
| Sgt. Birris-Mayo: | . . . did you have a winter coat? |

INTERVIEW WITH: Officer First Class Michael S. Aguilar                    CASE: 17-01
Date/Time Taped: Tuesday, January 10, 2017/8:23 a.m.                    Page 18 of 31

OFC Aguilar:        No. I did . . . I have a winter coat but I . . . it was not . . . I was . . . I did not wear it
                    at that particular time. I was not wearing it.

Sgt. Birris-Mayo:   How was the suspect . . .

OFC Aguilar:        Uh . . .

Sgt. Birris-Mayo:   . . . dressed?

OFC Aguilar:        I believe he was in a black or dark-colored, long sleeve shirt. He had a black base-
                    ball hat or a ball cap on. I believe it was backwards at the time. And I believe he
                    was in blue jean pants.

Sgt. Birris-Mayo:   Okay. Was he perspiring or anything that you . . . I mean for it to be cold out . . .

OFC Aguilar:        Uh huh. [Yes]

Sgt. Birris-Mayo:   . . . was he exhibiting feeling the coldness or anything like that?

OFC Aguilar:        I think he was. I think . . . he had his hands in his pockets quite a bit. And , . . I
                    mean I, you know, yeah . . . I would say yeah, 'cause he had his hands in his pock-
                    ets, and he was shrugging his shoulders up towards his . . . towards his ears like if
                    he was . . . if he was cold. I did see him do that a couple of times, but I don't know.
                    I don't know if he . . . if he was or if he wasn't, but he showed indicators of . . . to
                    me, you know, he's trying to use his arms as body heat, so . . .

Sgt. Birris-Mayo:   The first time you responded to 760 Moss Drive, you stated that the suspect's ve-
                    hicle was not there?

OFC Aguilar:        Correct.

Sgt. Birris-Mayo:   Okay. The second time, when you arrived, it was parked?

OFC Aguilar:        Yes.

Sgt. Birris-Mayo:   Did you or Officer Dudley run that tag upon your arrival? Did it'll . . . you know,
                    surprise you/alert you that, now, your second time going to this residence, a vehi-
                    cle that wasn't there before is there, and yet, you're still being dispatched there?

OFC Aguilar:        I didn't run the tag. I don't know if Officer Dudley did.

Sgt. Birris-Mayo:   While at the Medical Center, did you have the opportunity to retrieve the sus-
                    pect's wallet?

OFC Aguilar:        No, I didn't. I . . . I don't even think I ever touched his wallet.

INTERVIEW WITH: Officer First Class Michael S. Aguilar
Date/Time Taped: Tuesday, January 10, 2017/8:23 a.m.

CASE: 17-01
Page 19 of 31

**Sgt. Birris-Mayo:** And my last question, the notes on your MDT, did it say anything about any history, any information about that particular residence?

**OFC Aguilar:** No, not that I know of . . . no. I mean, when we got the call, I think we were still servicing an . . . an alarm activation, and I didn't read the notes. And then, when we got in the car, I just followed Officer Dudley to the location . . .  .

**Sgt. Birris-Mayo:** Okay.

**OFC Aguilar:** . . . but . . . but I didn't . . . I didn't, you know, see any history about how many times we've been out there or anything like that.

**Sgt. Birris-Mayo:** Okay, and did you see the suspect spitting on . . . towards Officer Dudley, yourself, or anyone else?

**OFC Aguilar:** No, I don't think so.

**Sgt. Birris-Mayo:** Okay. And all shots are up to date . . .

**OFC Aguilar:** Uh . . .

**Sgt. Birris-Mayo:** . . . for you?

**OFC Aguilar:** Yes.

**Sgt. Birris-Mayo:** Okay, no other questions.

**OFC Aguilar:** I believe so.

**Major Blackmon:** Lieutenant Graham.

**Lt. Graham:** Officer Aguilar, did y'all retrieve any weapons or take any weapons off the suspect?

**OFC Aguilar:** No, not that I know of. I didn't search him.

**Lt. Graham:** Were any drugs confiscated?

**OFC Aguilar:** No.

**Lt. Graham:** Belonging to the suspect?

**OFC Aguilar:** No.

INTERVIEW WITH:  Officer First Class Michael S. Aguilar          CASE: 17-01
Date/Time Taped:  Tuesday, January 10, 2017/8:23 a.m.        Page 20 of 31

Lt. Graham:    In line with the same question Major Blackmon asked you earlier, was this individual displaying any erratic behavior that may have possibly indicated he was on some type of drugs?

OFC Aguilar:    Just with him, you know, being fidgety and couldn't stay still and just like looking around a lot, I mean, to me, those are indicators of somebody being on some sort of narcotic. Maybe . . . possibly either methamphetamine and . . . and/or crack cocaine.

Lt. Graham:    Okay, if you would for the record, give an overall description of you physically?

OFC Aguilar:    Five foot ten[Inches] or five foot 11.[Inches] I'm approximately 300 pounds. I guess heavyset. Got brown hair, blue eyes, and . . .

Lt. Graham:    And, how would you rate your physical strength?

OFC Aguilar:    I would say average. I mean I'm . . . I don't . . . I don't ever lift weights. I don't . . . you know, I work out every once in a while but that's just more like a . . . a cardio. You know, but as far as . . . as far as lifting weights, I . . . I . . . I don't like lifting anything, so I'm not gonna go out of my way to lift weights or anything like that.

Lt. Graham:    And with regards to the suspect, what would you say his physical strength was at that time?

OFC Aguilar:    At that time, stronger than anybody I've ever had to deal with.

Lt. Graham:    Okay, and what was his height and weight?

OFC Aguilar:    I believe he was right around five foot ten[Inches], maybe six foot. I would say 200 pounds.

Lt. Graham:    Okay.

OFC Aguilar:    Not heavy set not skinny.

Lt. Graham:    Okay. Is . . . and then, your assessment of . . . of the two of you, to include Officer Dudley, at the time had Officer Dudley not been present to assist you, do you think that you would have been able to subdue that individual?

OFC Aguilar:    Absolutely not.

Lt. Graham:    And that's based on what?

OFC Aguilar:    The fact that both of us, together, were having the hardest time trying to restrain him to keep him on the ground, and he just continued to get up, so I mean, without . . . without Dudley grabbing his legs or wherever he was at . . . I know I was up towards his like upper body towards his midsection, and he was still, you know, almost getting away. And there

INTERVIEW WITH: Officer First Class Michael S. Aguilar
Date/Time Taped: Tuesday, January 10, 2017/8:23 a.m.

CASE: 17-01
Page 21 of 31

... without him continuing to pull legs or ... or stay on top of his legs or doing whatever he was doing there, I don't think I would have been able to hold onto him there.

Lt. Graham:   Is that what raised concern for you to call backup?

OFC Aguilar:   Yes.

Lt. Graham:   Once or prior to y'all attempting to arrest the suspect, what criminal charges had y'all decided on at that point?

OFC Aguilar:   At that point, we were gonna charge him with "Disorderly Conduct." Based on the fact that he's ... based on the fact that he's going to these doors and ... and waking up the neighbors at ... at 5:00 in the morning and banging on the doors. And you know, I do believe he yelled a few times like in the mix, before we even went hands on with him. But just ... just "Disorderly Conduct."

Lt. Graham:   Now, was there other charges that you could have charged him with?

OFC Aguilar:   No, not at that time. But, you know, one ... once the struggle continued then it definitely would of increased to "Obstruction."

Lt. Graham:   Who was the senior officer?

OFC Aguilar:   I was.

Lt. Graham:   You were asked earlier in reference to your attire, what were you wearing, and you outlined your police uniform? Also, did you have a flashlight?

OFC Aguilar:   I did.

Lt. Graham:   You had your police radio?

OFC Aguilar:   I did.

Lt. Graham:   Was your police radio on?

OFC Aguilar:   Yes, it was.

Lt. Graham:   Could this in ... were there any calls that you remember as being ... or communication on the radio at the time you was addressing the suspect?

OFC Aguilar:   I ... I don't necessarily remember if there was radio communication. I'm assuming there was just 'cause we ... we got ... not so much on the morning watch with ... with constant radio traffic, but I do believe a traffic stop was made at some point during that ... during that incident, or possibly, some sort of radio traffic, possibly, could have went on,

but I can't be for sure like I said. But we did have body cameras going and than that'll be able to outline and indicate that if it was.

Lt. Graham:      And at the time, you and Officer Dudley, y'all both were in marked city police . . . police vehicles?

OFC Aguilar:     Correct.

Lt. Graham:      Okay, and if you would, for the record, outline the description of those vehicles?

OFC Aguilar:     They are both Crown Vics, and they were blue and white. They have "Columbus Police" on the side of 'em. And they had the light bar on the top of the vehicles. And when . . . when we got out and initially made contact with him, he did . . . he did, you know, come up to us as if he did call us to the scene to . . . to maybe help him out with his . . . with his situation or . . . or problem, you know, with . . . with his mother, or whatever the case was. And then, once again, when we were trying to get him down and that he would be arrested if he didn't come back, he made a statement about, "Well, where's your backup" . . .

Lt. Graham:      Okay.

OFC Aguilar:     . . . and that to me indicates that he knows that we're police. Because, you know, when we call for backup that, you know, pol . . . he's showing signs that he knows knowledge that, you know, that we need backup.

Lt. Graham:      Have you ever or Officer Dudley ever been to that residence in the past?

OFC Aguilar:     I . . . personally, I don't think I ever have. I . . . I . . . I'm almost a hundred percent positive I haven't. I don't know about Officer Dudley. But . . . but Dud . . . Officer Dudley did make a statement about the residence possibly being the same residence of somebody that was possibly attempting to commit suicide. And an individual at that time had a knife to his stomach. I don't know if he said that's the house for sure of if that's possibly the same house. But I know a conversation did ensue about that, but it wasn't . . . I don't think it was with that individual.

Lt. Graham:      Have you ever had any interaction with the suspect . . .

OFC Aguilar:     Not . . .

Lt. Graham:      . . . in the past?

OFC Aguilar:     Not that I know of. I've made several . . . probably, several thousand traffic stops. I don't . . . I don't know if I've ever came[sic] into contact with him indirectly.

Lt. Graham:      Okay. The lighting conditions out there, how would you outline those lighting conditions?

INTERVIEW WITH: Officer First Class Michael S. Aguilar
Date/Time Taped: Tuesday, January 10, 2017/8:23 a.m.

CASE: 17-01
Page 23 of 31

OFC Aguilar:   I would say that it was . . . that . . . I say that it was pretty well lit, because I believe I kept my headlights on. And I believe Officer Dudley, also, kept his headlights on when we were communicating with the suspect. Up towards the house, I don't know . . . I can't recall if there was a streetlight or anything like that, but it was well known that our presence was . . . was observed, and we were present.

Lt. Graham:   Okay. Was it lit enough to where you could clearly see the suspect's face?

OFC Aguilar:   Yes.

Lt. Graham:   Okay, and at that time, did you notice any injuries to the suspect?

OFC Aguilar:   No.

Lt. Graham:   Did he ever mention any injuries that he was dealing with at that time?

OFC Aguilar:   No.

Lt. Graham:   At some point during your interaction with the suspect, he made the comment . . . a defined comment that you need to call backup, what was he indicating?

OFC Aguilar:   Well, when I made the statement about he'd be arrested if he didn't come down here or something in that line, he said something about . . . I don't know if he said . . . I don't know his exact words, but I think he said, "Where's your backup?" I don't know if that was an indicator that he was gonna fight or if that was an indicator maybe he didn't . . . you know, maybe, he thought that we needed more officers or whatever the case was, but it was definitely a red flag saying, uh-oh, he's . . . you know, we're threatening him with arrest, and now he's asking about backup, so . . . I mean it was definitely a concern at that time. But if I would have known the struggle was gonna be so severe, I mean we're . . . we . . . we don't have very many officers on the streets at that particular time. If I'd have known the struggle would have been that severe, I would have called five more units out there. Just to . . . just to be able to restrain him and get him into custody a little faster.

Lt. Graham:   As you and Officer Dud . . . approached him, did he take a combative stand?

OFC Aguilar:   No, he . . . he . . . when . . . when . . . I went to go grab him, when I went hands on, he immediately clinched down and kind of like put himself against the wall. And at that time, we tried to pull him off the wall, said, "no . . . no . . . no . . . no . . . no," "stop . . . stop . . . stop," and then, the fight was on.

Lt. Graham:   Okay, did he ever attempt to strike you or Officer Dudley?

OFC Aguilar:   I . . . you know, the adrenaline was pumping. I don't know. Arms were flail . . . his arms were flailing. He . . . I mean I . . . I don't know if I got hit. Like I said, the adrenaline was up. And I just know that I never used any strikes or anything like that. It was just trying to get him on the ground. But when I woke up this morning, I was pretty sore. My neck was sore,

CCG000272

|  |  |
|---|---|
|  | my legs were sore, and my lower back was sore. Or when I woke up yesterday, 'cause today, you know, we're on the morning watch shift, so I woke up yesterday for today's shift. |
| Lt. Graham: | Do you know if the suspect was struck by Officer Dudley? |
| OFC Aguilar: | I do not know if the officer[sic] struck . . . Officer Dudley. |
| Lt. Graham: | Did you sustain any injuries during this interaction with the suspect? |
| OFC Aguilar: | I just got just a couple of scratches on my legs, a lit . . . a tiny, littles like laceration right here that was bleeding on my hand, left hand, and other than that, no. |
| Lt. Graham: | Were your injuries photographed? |
| OFC Aguilar: | Yes. |
| Lt. Graham: | Okay, and were they documented? |
| OFC Aguilar: | I believe the Georgia Bureau of Investigation's ID technician or the . . . no, the investigator did take photographs of the injury. |
| Lt. Graham: | Okay, and if you would, outline your explanation or understanding of Soft Empty Hands? |
| OFC Aguilar: | Soft Empty Hands, to me, is a . . . it's just, basically, placing an individual on the ground without having to strike him with any kind of fists or elbows or anything like that. Maybe, grab one arm and the other arm on the back or the side, make her . . . just pull him to the ground of some sort, and that's what I consider Soft Empty Hands. I wouldn't consider Soft Empty Hands a slap to the head or face or anything like that. That would be more of a strike, to me. But everything that I use for Soft Empty Hands to attempt to get him to the ground. |
| Lt. Graham: | Okay. Prior to leaving the scene, did y'all ever determine that there were[sic] anyone inside the residence that he was calling . . . that he . . . where he mother live? |
| OFC Aguilar: | No, I believe the mother did make a statement saying nobody else was inside. And I think she even made a reference to him coming inside. |
| Lt. Graham: | Uh huh.[Yes] Now, where . . . do the suspect live with his mother? |
| OFC Aguilar: | Yes, that's . . . that's what the suspect said. And when we got there, he wanted us to go checking. That's when I told him, "Well, if you live there, why don't you go check yourself?" |
| Lt. Graham: | Did the mother indicate that her son live with her? |

INTERVIEW WITH: Officer First Class Michael S. Aguilar                    CASE: 17-01
Date/Time Taped: Tuesday, January 10, 2017/8:23 a.m.                      Page 25 of 31

OFC Aguilar:        I think . . . I think she . . . I . . . I don't know if she indicated that, but I think she did
                    attempt to get him inside. Like I said, you know, so to me that would say, yeah,
                    why don't you just come inside, you know, so I'd indicate that as him living there.

Lt. Graham:         Did you ever learn of . . . were there any issues between the suspect and his
                    mother of concern?

OFC Aguilar:        Not that I know about. But what . . . what's something that alarmed me, or you
                    know, made me cautious of the situation to where I wouldn't have wanted her to
                    drive off with him, was just that he was trying to separate himself and her from
                    us. And that was definitely alarm to me that, you know, what if he's gonna try to
                    hurt her, maybe, you know. Just by the way he was acting, I wouldn't have felt
                    comfortable letting her leave. Of course, I could have talked to her, but I couldn't
                    have made her not be able to not go with him. But I would have advised her, you
                    know, hey, he . . . if he's not acting right, then let's . . . let's not . . . let's not put y
                    yourself in that situation.

Lt. Graham:         Okay. That's all the questions I have.

Major Blackmon:     Okay. Officer Aguilar, during your Crisis Intervention Training, did you learn de-
                    escalation techniques?

OFC Aguilar:        Yes. I mean it was . . . it was a lot of like . . . there was a lot of like talking . . . talk-
                    ing down and like getting them to, you know . . . getting, you know, communica-
                    tion between one another.

Major Blackmon:     And do you recall as to when you should attempt to use de-escalation techni-
                    ques?

OFC Aguilar:        I'm sorry?

Major Blackmon:     Based on your crisis intervention training . . .

OFC Aguilar:        Uh huh. [Yes]

Major Blackmon:     . . . do you recall when you should use de-escalation techniques?

OFC Aguilar:        Yeah, I mean when . . . whenever you can. I mean, if they'll communicate with
                    you.

Major Blackmon:     What type situation?

OFC Aguilar:        I mean just, you know . . . just communication between whatever . . . words com-
                    municated back and forth and . . . I mean, anytime you can get them to get their
                    mind away from whatever it is . . . to me, whatever it is that they're trying to . . .
                    trying to, you know, talk about. Maybe, trying to understand what they're going

INTERVIEW WITH: Officer First Class Michael S. Aguilar
Date/Time Taped: Tuesday, January 10, 2017/8:23 a.m.

through and what . . . what he's actually trying to say. Like we were trying to figure out what was in the house or what's alarming you. What . . . what makes you think that something's, you know, your fears and safety. Your mother's fears and safety inside the house, then why won't you go in there.

**Major Blackmon:** So, these de-escalation techniques were taught to you to be used when you are encountering a person, who's displaying some type crisis situation, whether they're experiencing some type mental illness, crisis, or perhaps, drug-related crisis, or something like that?

**OFC Aguilar:** Yes.

**Major Blackmon:** So, those are the . . . the times in which you . . . you would use those de-escalation techniques?

**OFC Aguilar:** Uh huh. [Yes]

**Major Blackmon:** You said those are the times in which you would use de-escalation techniques?

**OFC Aguilar:** Well, yeah. I mean yeah, anytime we can.

**Major Blackmon:** Okay, so, based on the situation that occurred on Moss Drive, did you try to use some de-escalation techniques?

**OFC Aguilar:** I mean I . . . yeah, I tried. I tried to talk to him, I tried to figure out what his situation was, and you know, what . . . what was going on inside the house to where he wanted to separate his mother from the house, and why he didn't want to go in there.

**Major Blackmon:** Okay. Sergeant Bridges.

**Sgt. Bridges:** Officer Aguilar, you indicated that you had called E.M.S. before you even walked up to 747 Moss Drive. And you indicated that was to . . . to . . . explain to me, again, why you were doing that?

**OFC Aguilar:** Well, prior . . . I . . . I . . . I believe I did call 'em. And I . . . I did ask 'em to come with no lights and no sirens, because I didn't want him to get spooked, but I wanted . . . he . . . he, initially, said, no, and I . . . I believe that he didn't want E.M.S. or he didn't want to talk to anybody. I called anyway, and that was maybe in the attempts to see if E.M.S. could possibly get more from him. Because maybe they . . . I mean they deal with this a lot more than we do on a day to day . . . they deal with it on a day-to-day basis. We don't always deal with it on a day-to-day basis, so I was trying to see if they could see some indicators, maybe, that he was displaying, or maybe, if they recognized him as being a mental health patient in the past. Maybe, they've transported him several times or one . . . one time or they know him from this and that. I, also . . . I wanted to be able to get them over there to see

INTERVIEW WITH: Officer First Class Michael S. Aguilar                    CASE: 17-01
Date/Time Taped: Tuesday, January 10, 2017/8:23 a.m.                     Page 27 of 31

... to ... to check his eyes, 'cause I know, sometimes, when you're on some sort of narcotics or certain alcohol or ... or narcotics, you can look at their eyes and look at their pupils to see if they're dilated to a certain point to where, hey, maybe, they are on some sort of narcotic and ... and now it's not a mental health thing. Now, it's, okay, he's on a narcotic or whatever the case is, so ... but prior to them being able to get there, it was decided to put him in handcuffs.

Sgt. Bridges:      Okay, so, safe to say, your first intention in dealing with him was not to ... to put him in jail. It was to get him the type of help he needed?

OFC Aguilar:       Get him help. Yeah, that's correct.

Sgt. Bridges:      Okay, and after you were able to get him in handcuffs, you still had E.M.S. come out and your concern was still having him looked at?

OFC Aguilar:       Getting him help, and I ... and I even advised the mother when ... when E.M.S. was ... was walking him down on the stretcher, I said, "We're gonna take him up to the hospital and get him the help he needs or get him some sort of treatment for his ... his condition or see what's going on with him, so ... at that time.

Sgt. Bridges:      That's all the questions I have.

Major Blackmon:    Sergeant Birris-Mayo.

Sgt. Birris-Mayo:  You stated that you did not use your Taser because of his strength. You just felt that it would not be effective?

OFC Aguilar:       Correct. I thought ... I thought that separation of ... of ... of letting him go ... to get separation for ... for deployment of the Taser, I ... I know we have a drive-stun technique. But I don't think that would have been effective as well as causing separation to possibly tase the individual with the ... with the probes based on the way he was fighting and the strengths that he had, I thought that it would just be completely ineffective.

Sgt. Birris-Mayo:  It would not have been a good idea to use it at that time anyway because of ... weren't you on an incline?

OFC Aguilar:       Correct.

Sgt. Birris-Mayo:  Okay. Did ... at any point, do you recall if the mother got involved in trying to assist you guys to restrain him?

OFC Aguilar:       I know at one point, her ... I'm thinking several points during the struggle I advised her to step back, 'cause she was like right over ... like right over us. And I was like, "ma'am, stay back," or I said something in the effect of "just stay back." I don't necessarily think she touched us. I don't know what she said during the

struggle. Like I said, the body camera was rolling and we were fighting. He was yelling. I don't know if he was telling him to stop or calm down or put your hands behind your back, whatever the case was, but she . . . she wasn't a . . . she definitely wasn't a threat to us. Because I mean, if she was a threat to us, then she would have been trying to rip us off him.

**Sgt. Birris-Mayo:** Okay, that's all the questions.

**Major Blackmon:** Lieutenant Graham.

**Lt. Graham:** I have no other questions.

**Major Blackmon:** Okay. Officer Aguilar, getting ready to bring the interview . . .

**OFC Aguilar:** Uh huh.[Yes]

**Major Blackmon:** . . . to a close. But before . . . Sergeant Bridges, have any questions?

**Sgt. Bridges:** I do have one ex . . . one more question, Officer Aguilar. You indicated you . . . you wanted to try to get him to the ground to . . . to handcuff him. Was . . . as y'all were trying to do that, you're on his back . . .

**OFC Aguilar:** Well . . .

**Sgt. Bridges:** . . . [unintelligible – 00:05:09]?

**OFC Aguilar:** . . . before we're on the ground, I believe I had . . . I believe I had his right hand or right arm . . . like one hand on his hand and then the other one, maybe, behind here. And I think Officer Dudley and I were possibly, you know, having a tug-of-war effect trying to pull him this way or pull him that way or try to get him to the ground. But ultimately, when they're . . . when they're fighting like that or resisting like that trying to get away, I don't think I've ever in my history or my career have been able to handcuff somebody standing up in the . . . in the struggle that they were doing. I've always had to use Soft Empty Hands to take 'em to the ground to forward the actual handcuffing.

**Sgt. Bridges:** Okay, and when you went to the ground, what was your position?

**OFC Aguilar:** When we went to the ground at . . . at first, I was by his feet, and then I went up towards his stomach area, and then, like we were able to roll him over. We pulled his feet out. I mean, really, I was all over. Like, I mean we . . . we . . . we were both all over . . .

**Sgt. Bridges:** At that . . .

**OFC Aguilar:** . . . you know . . .

CCG000277

INTERVIEW WITH: Officer First Class Michael S. Aguilar
Date/Time Taped: Tuesday, January 10, 2017/8:23 a.m.

CASE: 17-01
Page 29 of 31

| | |
|---|---|
| Sgt. Bridges: | . . . time, was he still communicating . . . still resisting verbally . . . |
| OFC Aguilar: | Uh . . . |
| Sgt. Bridges: | . . . saying anything, holler . . . |
| OFC Aguilar: | Yeah. |
| Sgt. Bridges: | . . . ing . . . |
| OFC Aguilar: | Yeah, I . . . like I said, he was . . . he was yelling and screaming. I don't know exactly what was said. And . . . I mean, yeah, he was . . . he . . . he was trying to get away. I mean, there's . . . there's no doubt about that. I mean . . . but I . . . I . . . the . . . for words and exact words what he was saying, it was . . . . I . . . I . . . I . . . I couldn't tell you what he said. |
| Sgt. Bridges: | But it was obvious that he was not unconscious . . . |
| OFC Aguilar: | Right . . . right . . . |
| Sgt. Bridges: | . . . or he was verbally . . . |
| OFC Aguilar: | Correct. |
| Sgt. Bridges: | . . . [unintelligible – 00:03:36] That's all the questions I have. |
| Major Blackmon: | Okay, during the time, as Sergeant Bridges was stating, when you had him on the ground, were you or Officer Dudley . . . I know you said y'all were all over . . . |
| OFC Aguilar: | Uh huh. [Yes]. |
| Major Blackmon: | . . . the place in trying to subdue this person. So, were either you or Officer Dudley and just ever getting just one position and just lay prostrate across this person or just put all your weight into one area on this person? |
| OFC Aguilar: | Yeah, I mean like just, basically, on . . . on the middle of his back. Like I was on his back and every time he'd push up, I would try to like hit his arms out underneath, like push his arms out underneath to get 'em flat back on the ground, but I believe at one position we were like that, and I was facing, maybe directly east. And then, I believe, when we were handcuffing him, by the time . . . like, a couple of minutes later, I was still on his back area and like his midsection. I think, at the time of the handcuffing, we were facing west. Like his body shifted that much because he just kept bringing his knees up to his stomach and rolling over onto his back. And he was just in . . . we just kept trying to roll him over, and I . . . I think we were just doing circles. I . . . I . . . I don't know, but . . . you know, eventually, we were able to get him handcuffed, and when we did get him handcuffed, he . . . the . . . his |

head was facing west, his feet were facing east, and . . . and then, when we picked him up, we . . . his feet were still facing east. And . . . and you know, that's where we're at.

**Major Blackmon:** And you said, even during that . . . that time in which you and Officer Dudley were trying to get him in custody, he was . . . Arreola was still yelling something, although, you . . . you . . . you don't . . . you don't recall what he was . . .

**OFC Aguilar:** Uh huh.[Yes]

**Major Blackmon:** . . . saying, he was still communicating something?

**OFC Aguilar:** Yes, he was yelling . . .

**Major Blackmon:** Which . . .

**OFC Aguilar:** . . . screaming . . .

**Major Blackmon:** . . . indicates that he was breathing . . .

**OFC Aguilar:** Right.

**Major Blackmon:** . . . and conscious?

**OFC Aguilar:** Yeah, all the way up to the point where we handcuffed him, I think.

**Major Blackmon:** Okay. All right. Sergeant Birris-Mayo.

**Sgt. Birris-Mayo:** No other questions.

**Major Blackmon:** Lieutenant Graham.

**Lt. Graham:** I have no questions.

**Major Blackmon:** Sergeant Bridges.

**Sgt. Bridges:** No other questions.

**Major Blackmon:** Okay. Officer Aguilar, we're getting ready to bring this interview to a close. But before we do, want to ask you . . . I know we asked you several questions. We just want to ask you, do you think that there's something we did not ask you that you feel that we should know?

**OFC Aguilar:** No. I mean . . . no. I mean I think you guys asked a lot of questions. I think all the details are in the . . . in there, and to the best of my knowledge, they're answered truthfully and correct.

CCG000279

INTERVIEW WITH: Officer First Class Michael S. Aguilar          CASE: 17-01
Date/Time Taped: Tuesday, January 10, 2017/8:23 a.m.          Page 31 of 31

| | |
|---|---|
| Major Blackmon: | Okay, are you aware . . . I know you said you had your body camera, and did Officer Dudley have a body camera? |
| OFC Aguilar: | I believe he did have a body camera. |
| Major Blackmon: | Okay. |
| OFC Aguilar: | Like I said, during the struggle, it was . . . I believe it was laying on the steps of the porch. I don't know how it got there. Shifting back and forth. I don't know. We could of . . . we could of even fallen on the steps for all I know. That's how big the struggle was. I mean it was . . . it was a long struggle and . . . |
| Major Blackmon: | Are you aware of any other video that could have been taken . . . |
| OFC Aguilar: | No. |
| Major Blackmon: | . . . that we're not aware of? |
| OFC Aguilar: | No. |
| Major Blackmon: | Are you aware of anyone else that could possibly have additional knowledge or observed this encounter? |
| OFC Aguilar: | Not that I know of . . . no. |
| Major Blackmon: | Okay. All right . . . okay, so this concludes the interview with Officer Aguilar. The time is 9:46 a.m. |

*****

/db (DS710129 – C 01:21:18)

Recording #: DS 7/0/29
Folder: C

**Case Interview
Sheet**

Case Number  17 - 01

Today is _Tuesday_____ _January 10th_, 20 17, and the time is _8:23_ a.m/pm. This is a recorded interview with _Off. First Class Michael Aguilar_____. His/Her home address is _____

_____, and he/she can be reached at the home/cellular telephone number of ████████

He/She has been employed with _the Columbus Police Dept._____ for the past __7__ years/months

as a _police officer_____.

This interview is being conducted in the Office of Professional Standards located in the Public Safety Center. Present during the interview are Major F. D. Blackmon, Lieutenant R. L. Graham, and Sergeants T. L. Birris-Mayo, and J. G. Bridges. The Office of Professional Standards is conducting an investigation ordered by R. T. Boren, Chief of Police.

Mr./Mrs./Miss/Ms./Rank _Off. First Class Michael Aguilar_, would you please state for the record

your knowledge of the facts involving _the incident that occurred on 1/9/17 on_

_Moss Drive involving the arrest of Hector Arrolea_____.

This concludes the interview with _Michael Aguilar_.

The time is _9:46_____ a.m/p.m.

CCG000281



R. T. Boren
Chief of Police

**Columbus Police Department**
P. O. Box 1866 · 510 Tenth Street
Columbus, Georgia 31902-1866



L. H. Miller
Assistant Chief

# GARRITY WARNING

This investigation concerns _the incident regarding Moss DR involving Hector Arrolen_

Allegations of employee misconduct, or other matters that are referred to the Office of Professional Standards, are taken very seriously. Employees, who refuse to cooperate, make false statements, or willfully omit material facts, are subject to disciplinary action, to include termination of employment.

The Office of Professional Standards is a fact-finding unit and does not recommend disciplinary measures. The purpose of this investigation is with finding the truth in a fair and impartial manner.

Cooperating in an internal investigation does not constitute a waiver of any appeal, grievance, or other legal rights. The fact that you wish to exercise any rights will not entitle you to a delay or postponement in the investigative or polygraph process.

1.  You are required to answer all questions asked during this administrative investigation into the allegations stated above.

2.  No statements or admissions made by you concerning the limited scope of this investigation will be used against you in criminal proceedings.

3.  The department will advise you if administrative proceedings cease and criminal proceedings begin. You will be advised of your rights under criminal law at that time.

4.  You do not have a right to counsel during an administrative investigation. An administrative investigation shall include, but not be limited to any interview, polygraph examination, or chemical or scientific tests.

5.  Your statement can be used as a basis for administrative actions to include termination.

6.  Giving a false statement during an administrative investigation is, in itself, a separate criminal act and can result in criminal prosecution.

Phone (706) 653-3100          Fax (706) 653-3114          CCG000282

An Equal Opportunity Organization

GARRITY WARNING

I have read and understand the Garrity Warning.

_____   01/10/17 08:23   _____
Signature                    Date/Time          Witness

Michael Aguilar
_____                       _____
Printed Name                                     Witness

_____                       _____
Witness                                          Witness