**OFFICE OF PROFESSIONAL STANDARDS**
Columbus Police Department

INTERVIEW WITH: Officer First Class Aaron D. Evrard  CASE: 17-01
Date/Time Taped: Thursday, January 12, 2017/8:14 a.m.

| | |
|---|---|
| Major Blackmon: | This is a recorded interview with Officer First Class Aaron Evrard. His cell number is ▇▇▇▇▇▇▇▇ He has been employed with the Columbus Police Department for the past seven years as a police officer. |
| | This interview is being conducted in . . . in the Office of Professional Standards located in the Public Safety Center. Present during the interview are myself Major F. D. Blackmon, Lieutenant R. L. Graham, and Sergeant T. L. Birris-Mayo and Sergeant J. G. Bridges. The Office of Professional Standards is conducting an investigation ordered by R. T. Boren, Chief of Police. |
| | So, Officer Evrard, before you give us your statement, I want to state that you were given the "Employee Voluntary Statement" form, which you've read and signed, is that correct? |
| OFC Evrard: | That's correct. |
| Major Blackmon: | Do you have any questions regarding the "Employee Voluntary Statement" form? |
| OFC Evrard: | I do not. |
| Major Blackmon: | Okay, so Officer Evrard, if you would please, state for the record your knowledge of the facts involving the arrest of Hector Arreola, which occurred on January 9, 2017, on Moss Drive? |
| OFC Evrard: | On . . . on that night, I was . . . Dispatch called me up and actually dispatched me to a call on Moss Drive. I believe it was an advice call. I was just pulling behind a truck that I was preparing to pull over on a traffic stop. I said, "Dispatch, just went out on traffic. I'll get that advice call as soon as I'm done." I conducted a traffic stop. I took the guy's license . . . I . . . computer . . . I'm in a loaner car. It doesn't work, so I went over to DMV. Ran the license and the tag. They checked out. Went back, issued a verbal warning to the driver. Went back to Sector A, advised them that I was 10-8 and asked 'em if I want . . . if they wanted me to be en route to that call. I was advised that 25[1] and 28[2] were en route to the call. So I got 10-8. A few minutes later, Officer Aguilar[2] came over the radio and asked for dispatch to hold traffic. Sounded as if he was having a problem, so I activated my lights and sirens and my body camera and I drove to his location, which I . . . I . . . you know, I know Moss Drive. I know where it is. En route there, he keyed up again and advised that he needed another unit. There was a lot of commotion over the radio. It sounded like an officers in trouble, so I continued on to that lo- |



---

[1] Officer Brian J. Dudley, Bureau of Patrol Services
[2] Officer Michael S. Aguilar, Bureau of Patrol Services

INTERVIEW WITH: Officer First Class Aaron D. Evrard         CASE: 17-01
Date/Time Taped: Thursday, January 12, 2017/8:14 a.m.        Page 2 of 15

cation. As I was approaching somewhere near the intersection of Moss and River,[Road] I heard him say that he had one in custody and that could slow it down. Pulled up to 760 Moss Drive. There were two patrol cars there. Got out of my patrol car, I looked and I saw . . . I didn't see anybody. So, I looked around, I looked behind me, several yards behind me and on the opposite side of the street, 760 Moss Drive, I saw some flashlights. And I seen[sic] persons then. And then I could see some people standing up in that yard, so I jogged over there. And I saw that Aguilar and Dudley[1] had one in custody, and he was laying[sic] on the ground. Aguilar was somewhere around his mid-section, I believe, and Dudley was somewhere around his feet. I asked 'em if they needed help, if they needed a break, or something to that effect, and Aguilar indicated that he did. I looked on the ground, I saw some blood on the ground near the suspect's head, so I put on my gloves . . . 'cause I . . . you know, to eliminate any exposure that I would have. I grabbed the suspect's hands and I got down on the ground with him. And Dudley had run off to get some leg shackles. I believe, at this time, Ronnie Oakes[3] came in right behind me. He . . . I think he held the suspect's legs. I held his wrists, and I remember he was grabbing my hands through his handcuffs like . . . you know, they were . . . he was handcuffed behind his back, and they was grabbing at my hands. And I told 'em something to the effect of . . . don't touch my hands, let go of my hands. I either pulled 'em away or pushed his . . . his hands so that he would release my hands. And Officer Dudley . . . I think that's Officer Dudley, put the leg shackles . . . somebody put leg shackles on him. So I turned him on his . . . once he had the shackles on, I turned him on his side. He was resisting . . . you know, he didn't . . . when I went to pull him on his side, he tried to pull away from me and pulled back, you know, to lay his body back on the ground. But on . . . I felt his pocket, and I turned his pocket out. I don't recall exactly what he had in his pocket. I think, maybe, some keys in one pocket, and maybe, a wallet or something in the other. At any rate, I turned one way, I turned the other way, wanted to make sure he didn't have any weapons or anything like that. I turned him the other way, he kind of resisted me, as well. And then, once I had the items out of his pocket, turned him over on his front side and I tried to set him upright. You know, just to make sure that he was okay and was . . . you know, I . . . I know they had been fighting, so I knew he was probably, out of breath, whatever. When I tried to pull him upright, he stiffened out like he . . . he didn't want to comply with that either. I think I may have given him some verbal commands to sit up right or sit up, buddy, that kind of thing. At that time, Aguilar lifted him up with his knees behind his back, so he would be upright. And, right around then, I saw the ambulance pull up on River and Moss, so I walked down towards the driveway a little bit. I flashed my light at 'em and they came in and they started to care for him. Started to care for the suspect and . . . you know, he's upright. He was breathing. He was leaning up against Aguilar's legs when the . . . when the EMTs got there. I don't know how much more detail you want. About after that, I had to take Dudley to his apartment to get his inhaler. Sergeant Kiel[4] asked for somebody to breakaway, come meet with him and Dudley. I guess Dudley was . . . was like cold air and struggling, so he was having like an asthmatic reaction or something. So I got up to where they were, which is up near River and Moss, and Sarge said, "Why don't you take Dudley home. He . . ." "He needs his inhaler, and I don't want to take a chance of him driving," 'cause . . . you know, he needed his inhaler. So, he hopped in my car, drove him to his apartment, grabbed his inhaler, puff . . . puff, he said he was better. So, then we drove back to the scene and that's when we saw the ambulance down on River Road, down, maybe a block or two south of Moss Drive. For . . . concerned that, maybe, he was fighting again, because . . . you know, I don't know why it was stopped, but there was a patrol car behind it. So we pulled up there to see if they needed any assistance. And that's when . . . got out and appeared that they were do . . . doing chest compressions in the back of the ambulance.

---

[3] Officer W. Ronnie Oakes, Bureau of Patrol Services
[4] Sergeant Randolph M. Kiel, Bureau of Patrol Services

CCG000153

INTERVIEW WITH: Officer First Class Aaron D. Evrard  
Date/Time Taped: Thursday, January 12, 2017/8:14 a.m.

CASE: 17-01  
Page 3 of 15

| | |
|---|---|
| Major Blackmon: | Okay, so there was . . . there are a couple of things I go over just to get some information . . . more detailed information. You said that, did you self-initiate on this call or did dispatch . . . were you dispatched to this call by 911 dispatcher? |
| OFC Evrard: | I self-initiated when I heard 'em ask to hold traffic. It sounded like something . . . you know, like he needed help. I don't remember exactly what he said, but it sounded like he needed . . . he needed help. |
| Major Blackmon: | Okay, and then, earlier, when you said that you were 10-8, and that 10-8 means that you were back in service . . . |
| OFC Evrard: | Yes, sir. |
| Major Blackmon: | . . . from the traffic stop? |
| OFC Evrard: | Yes, sir. |
| Major Blackmon: | So, upon arriving to this address, which . . . 747 Moss Drive, what position was Arreola in at that time? |
| OFC Evrard: | When I came up into the yard, he was laying[lying] on his stomach with his handcuffs behind him. |
| Major Blackmon: | And, where was Officer Aguilar and Officer Dudley? |
| OFC Evrard: | I believe Officer Dudley was controlling his legs. Officer Aguilar was controlling his upper body. But I could see 'em both . . . like I could hear 'em. Both's facing me, I believe. |
| Major Blackmon: | Did the suspect say anything to you upon your arrival or anytime while you were there? |
| OFC Evrard: | I never heard him say anything, sir. |
| Major Blackmon: | But you said, he . . . he grabbed your hands? |
| OFC Evrard: | . . . |
| Major Blackmon: | At what . . . what point did he grab your hands? |
| OFC Evrard: | When I was attempting to control him to give Aguilar a break, I grabbed his wrists, and he was grabbing . . . through the handcuffs, reaching around and grabbing at my hands. |
| Major Blackmon: | And is that when you were in the process of lifting him up in an upright position? |

INTERVIEW WITH: Officer First Class Aaron D. Evrard  CASE: 17-01
Date/Time Taped: Thursday, January 12, 2017/8:14 a.m.  Page 4 of 15

| | |
|---|---|
| OFC Evrard: | No, sir, not at that time. This was right when Dudley was putting the ... was gone put the leg shackles on him. |
| Major Blackmon: | So did ... did you assist in bringing him up to the upright position? |
| OFC Evrard: | Well, I tried to, so I turned him on one side and turned him on the other side. And yes, I tried to ... I tried to set him upright, but he kind of pulled back away like he didn't want me to set him upright. |
| Major Blackmon: | And you said, based on what you experienced with him, he showed some resistance to what you were trying to do? |
| OFC Evrard: | Yes, sir. |
| Major Blackmon: | What did he resist? |
| OFC Evrard: | Well, when I first got there, he was kicking his legs, and then, grabbing my hands, was pulling on my ... you know, grabbing my hands. Then when I tried to roll him one-way to ... to get him over on his side, it was if he was pulling to go back towards the ground. And then, again, trying to sit him upright was as if he was trying to almost like ... I don't know what to call it, like a plank. You know, like pulling away that way. |
| Major Blackmon: | Are you saying that he was making his body stiff, is that what you're saying? |
| OFC Evrard: | Yes, sir. |
| Major Blackmon: | And when you say you was rolling him from one side to the other, was that to check him to see if he had any weapons on him? |
| OFC Evrard: | Yes, sir. |
| Major Blackmon: | Did you have your body camera activated while you were on scene? |
| OFC Evrard: | Yes, sir. |
| Major Blackmon: | Sergeant Bridges. |
| Sgt. Bridges: | Officer Evrard, where were you when you ... where was your traffic stop made at? What location was that? |
| OFC Evrard: | In front of the airport on Airport Thruway. |
| Sgt. Bridges: | All right, and where were you at when you self-initiated to respond to Moss Drive? |

Case 4:19-cv-00005-CDL   Document 19-1   Filed 11/08/19   Page 5 of 18

INTERVIEW WITH: Officer First Class Aaron D. Evrard                                    CASE: 17-01
Date/Time Taped: Thursday, January 12, 2017/8:14 a.m.                                  Page 5 of 15

| | |
|---|---|
| OFC Evrard: | In the Home Depot parking lot. I'd heard that they had some trailers stolen. That's actually where I made the traffic stop. There was a vehicle driving through there slowly. The business was closed. The vehicle had a trailer hitch on it and the tag light was out, so I made a traffic stop to investigate. |
| Sgt. Bridges: | When you got on scene, you stated that you noticed a little bit of blood . . . blood on the ground around the suspect's face area, once he got sat up or you rolled him over, what injuries did you notice to him? |
| OFC Evrard: | The only thing I noticed was that his . . . he had some blood on his face, and I don't remember exactly where it was. I just remember a small amount of blood somewhere on his face. |
| Sgt. Bridges: | Okay. When E.M.S. arrived, did they attempt any type of lifesaving procedure, CPR, or anything, on the suspect while on . . . on scene on Moss Drive? |
| OFC Evrard: | Not that I saw. |
| Sgt. Bridges: | I know you're not a doctor or medic, but would you have seen any reason for them to do that? |
| OFC Evrard: | No, sir. |
| Sgt. Bridges: | Uh . . . |
| OFC Evrard: | I wasn't concerned. He wasn't talking to the E.M.Ts., but he was sitting upright. Appeared to be coherent. |
| Sgt. Bridges: | Okay. Your observation of Officer Dudley and Officer Aguilar, did you notice their weapons? Were they in their . . . in their holsters . . . in their pouches? |
| OFC Evrard: | I . . . I didn't take notice. Although, I think I would have noticed if they were in their hands. The only thing I heard about equipment was I heard somebody say, "Your body camera's over there." And I don't know if it was Dudley or Aguilar, but somebody's body camera was laying[sic] on the ground apparently. |
| Sgt. Bridges: | Did either one of them or anybody else out there you talked to indicate that a weapon had been used? |
| OFC Evrard: | Actually, yes. I talked to a gentleman, who lived in the house that the . . . the arrest took place in the front yard. I went back . . . this was quite a while later. I was asked to go back and interview any . . . any witnesses, and I went back and spoke to a young man . . . when I say young man, a man and his father. They both witnessed the arrest and the situation, and the father said that they tased him multiple times. And I wanted to clarify that because it seemed strange. I'd already interviewed the son, and the son didn't indicate that at all. So, I said, "sir . . ." you |

Case 4:19-cv-00005-CDL   Document 19-1   Filed 11/08/19   Page 6 of 18

INTERVIEW WITH: Officer First Class Aaron D. Evrard                                    CASE: 17-01
Date/Time Taped: Thursday, January 12, 2017/8:14 a.m.                                  Page 6 of 15

|  |  |
|---|---|
|  | know, "did you say that they tased him multiple times," and then, he . . . I think he said, "Maybe . . . well, it was at least once or something like that." And I said, did you see it, did you hear it, you know, wanted to get a little more specific, and he said that . . . well, I don't recall what he said but indicated that . . . that they definitely tased him, and I said, "Have you heard a Taser before?" and he said, "On T.V.," so he made that comment. A little bit later, I went and spoke to the mother of Mr. Arreola and then I came back and spoke to the son again. I said, I just want to clarify, because your dad's statement was different than yours. Is there any reason why he would tell me that the officers, you know, used a Taser, and he shook his head, he's like, "My dad's old and he doesn't know what he's talking about, so" . . . |
| Sgt. Bridges: | Just briefly if you could, kind of take me through what the . . . the son, as you're stating, and what the mother told you when you talked to them . . . |
| OFC Evrard: | Uh . . . |
| Sgt. Bridges: | . . . about the incident? |
| OFC Evrard: | So the son . . . so the son, who's the son not having anything to do with Mr. Arreola, the son of the . . . the owner of 747 Moss Drive, said that somebody knocked on his door. He heard it once. It was kind of quiet, was just getting up, and then he heard it, again, loud. Came to the door and Mr. Arreola was asking to use his phone and . . . to call police. And he . . . he said that he saw flashlights down by the driveway then . . . oh, he stated, I think the guy asked to come in or something like that, and he said, "No, you can't come in." "Can I use your phone?" "Well, no, what do you need to . . ." "I need to call police." He saw the flashlights and put, you know, decided that those were officers. I guess he saw the uniforms and said, "Those are police down there." And he said that Mr. Arreola was . . . I don't know, didn't want to go talk to 'em or didn't think they were police or something like that. I don't remember exactly. But then, he said they came up to . . . to . . . you know, talk to him. He wouldn't come down the driveway, and I don't remember exactly, but the scuffle ensued, and he said that, you know, the guy was like . . . he was wild . . . just like wild and wouldn't comply with the officers. |
| Sgt. Bridges: | So he . . . did he ever describe the officers using any type of forces; of weapons or punching or anything of that nature? |
| OFC Evrard: | No, he did not. I think . . . there's nothing that . . . that I recall him saying. It was like . . . you know, critical. The . . . the . . . his father, that was the one that said some things like, "They gave him a beat down" and they . . . I think the father said, "they were wrestling for like 20 minutes" and they tased him, and said a couple . . . couple of things that seemed, you know, just didn't jive with what the son was saying. |
| Sgt. Bridges: | Okay, he said 20 minutes? |
| OFC Evrard: | Yeah, that's the . . . |

INTERVIEW WITH: Officer First Class Aaron D. Evrard  
Date/Time Taped: Thursday, January 12, 2017/8:14 a.m.

CASE: 17-01  
Page 7 of 15

| | |
|---|---|
| Sgt. Bridges: | From . . . right . . . from . . . from your recollection, from when you got 10-8 from the traffic stop to the time you arrived, just an estimation, how long? |
| OFC Evrard: | From the time I got 10-8 from the traffic stop . . . |
| Sgt. Bridges: | Right. |
| OFC Evrard: | . . . to the time I arrived? Geez! My guess would be . . . I . . . I'm . . . and I'm strictly guessing here, would be five to seven minutes, maybe. |
| Sgt. Bridges: | Okay. What did the mother tell you when you talked to her? |
| OFC Evrard: | Basically, that her son was acting strange, and I . . . he . . . she told him to come inside and go to sleep, but he wouldn't come inside because he . . . I think he was afraid that there were some people in there. Some strangers in the house. I said, "Did he have any reason to think that? Was there anybody in the house?" You know, that kind of thing. Said, "No." She was not particularly forthcoming in the interview, very short answers. I . . . I don't think that she didn't want to share with me, but she just didn't . . . didn't give long detailed answers. She said, he was acting strange and the officers tried to talk to him, and he . . . he . . . he ran off into the neighbor's yard. They went up there and tried to talk to him . . . you know, I . . . honestly, I . . . I mean I don't remember much detail about that interview with the mother. Mostly with her, I was asking about, you know, like, "Was he using drugs, was he under the influence of any kind of drug, anything like that?" Because, well, trying to determine why he was, you know, acting strangely. |
| Sgt. Bridges: | Did any of the three people . . . and is that the only three people you talked to or were there other witnesses that you spoke to? |
| OFC Evrard: | I only talked to three people. |
| Sgt. Bridges: | Did they provide you written statements? |
| OFC Evrard: | Yes, I . . . |
| Sgt. Bridges: | And you have turned those in and . . . |
| OFC Evrard: | I logged 'em in to Property and Evidence. |
| Sgt. Bridges: | Okay. That's all the questions I have. |
| Major Blackmon: | Sergeant Birris-Mayo. |
| Sgt. Birris-Mayo: | Officer, are you assigned to the same squad as Mike Aguilar and Dudley? |
| OFC Evrard: | Yes, ma'am. |

CCG000158

INTERVIEW WITH: Officer First Class Aaron D. Evrard  
Date/Time Taped: Thursday, January 12, 2017/8:14 a.m.

CASE: 17-01  
Page 8 of 15

| | |
|---|---|
| Sgt. Birris-Mayo: | Okay. So when you stated that you could hear by the sound . . . he sounded like he was having a problem, is that because of your close relationship and working side by side with him in the same squad? |
| OFC Evrard: | Not necessarily, it was a light . . . okay, it was a very loud screaming at one point on the radio and at a certain point, I thought it was Aguilar screaming because he had miked up and talked. Couldn't tell if it was his voice or the suspect's voice or . . . but I remember thinking, like, that could be him, like, you know, like, usually people aren't screaming in the radio. |
| Sgt. Birris-Mayo: | Okay. And what is your squad assignment? |
| OFC Evrard: | Currently I'm . . . well, I'm on morning watch. It's real different now. |
| Sgt. Birris-Mayo: | You're on the swing? |
| OFC Evrard: | Cur . . . well, no, I'm not on the swing shift, but . . . so I have to ride a different beat to cover for units that are on the swing shift. So, I was riding, 1 Adam . . . I was riding Beat 30 for about the past two . . . three months. But normally, morning watch, it's kind of whatever, I get. |
| Sgt. Birris-Mayo: | Okay, but now, for . . . for the past, let's say two weeks, you and Dudley, as well as Aguilar, you all work all six days together? |
| OFC Evrard: | We . . . we normally do . . . yes. Now, I will say, just the last two weeks, just to be accurate as I can be, I . . . I was on . . . I took some annual leave, so I . . . I think my first week of morning watch is this week . . . I think. |
| Sgt. Birris-Mayo: | Okay, and you stated that Dudley went to get the leg shackles from his patrol vehicle? |
| OFC Evrard: | I'm not certain whether he got 'em from his vehicle or another vehicle. I would assume his vehicle. |
| Sgt. Birris-Mayo: | And would it have been a large volume of blood on the ground or just . . . |
| OFC Evrard: | Uhm . . . |
| Sgt. Birris-Mayo: | . . . drips . . . drops . . . |
| OFC Evrard: | I would call it drops. If I had to estimate, it would be a patch. It was, you know, all the blood was contained in a small area. Maybe, like 12 inches circumference but . . . but not a large volume. |
| Sgt. Birris-Mayo: | Okay, and from your training as a patrolman . . . patrol officer for the last seven years, your observance of Aguilar and Br . . . and Dudley sitting the suspect up w |

Case 4:19-cv-00005-CDL   Document 19-1   Filed 11/08/19   Page 9 of 18

INTERVIEW WITH: Officer First Class Aaron D. Evrard                                CASE: 17-01
Date/Time Taped: Thursday, January 12, 2017/8:14 a.m.                              Page 9 of 15

|||
|---|---|
| | would be in keeping with trying to protect the life of a suspect that might have been having some type of distress? |
| OFC Evrard: | Yes, ma'am. You know, I think everybody there was concerned with as soon as he was contained, idea was to turn him over, make sure there's no weapons, sit him upright, you know, just to . . . I always think to clear the airway, and . . . Aguilar was thinking the same thing. That's why he . . . he kind of lifted him up. Put his legs up against his back just to give him that upright, seated position. |
| Sgt. Birris-Mayo: | Thank you. I have no other questions. |
| Major Blackmon: | Lieutenant Graham. |
| Lt. Graham: | Officer, did you ever observe or see either one of these officers strike the suspect? |
| OFC Evrard: | No, sir. |
| Lt. Graham: | Okay. At any point during this incident, did you ever have to strike the suspect? |
| OFC Evrard: | No, sir. |
| Lt. Graham: | Did you ever have to physically touch the suspect other than the placing of the handcuffs on him? |
| OFC Evrard: | I did not place his handcuffs on, Lieutenant. He . . . they were already on when I got there. The only reason I touched the suspect was because Mike was holding him, and I knew that Mike was worn out. He seemed to be worn out from trying to contain the suspect, so I . . . I held him while leg shackles . . . we put them on. |
| Lt. Graham: | Okay. In reviewing this camera footage, we noticed that as the suspect was being taken away from the scene, being transported by E.M.S., that he had a mask placed on the lower portion of his mouth, what was the reason for that? |
| OFC Evrard: | I wasn't aware of that, sir. |
| Lt. Graham: | Okay. Did the suspect ever make any attempt to . . . to spit on your while you was on the scene? |
| OFC Evrard: | No, sir. |
| Lt. Graham: | Have you ever serviced any calls on that . . . seven . . . at 760 Moss Drive? |
| OFC Evrard: | Yes, sir. |

INTERVIEW WITH: Officer First Class Aaron D. Evrard  
Date/Time Taped: Thursday, January 12, 2017/8:14 a.m.

CASE: 17-01  
Page 10 of 15

Lt. Graham: Okay, outline . . . explain your reason for servicing a call at 760 Moss Ave . . . Drive?

OFC Evrard: I think, approximately four months ago, I was . . . if I'm not mistaken, I . . . I was . . . had at trainee with me, Mike Grant, I believe. And I was dispatched there regarding . . . I don't know if it's a welfare check or somebody called in making strange statements or something. But we went to the house, knocked on the door, Officer Dudley was there, as well. And Mrs. Arreola, the mother of . . . of Hector Arreola came to the door, and we asked if somebody needed police assistance. She . . . "Everything's fine here." Said, "Is there anybody else in the house?" "Well, yeah." "Let me talk to him, make sure he's okay." "Sure." She took us to . . . over to the bathroom. I guess he was . . . she knew he was in the bathroom. And we opened the bathroom door and there was a male about . . . like mid-50s, maybe, and he was in the bathtub with a big butcher knife stuck in his . . . not in, but stuck up against his belly with both hands on the handle of the knife. And clearly distraught and looked ike he was suicidal. So, I think Dudley . . . Dudley had his Taser out. I think . . . I think I had my weapon out, and I didn't want Dudley to tase him because the knife and the position and the possibility of falling forward. So, I got his name and . . . and just talked to him and processed with him. Tried to figure out what's going on. Talked him down, got him to set the knife down. I remember I grabbed that knife and he had another one in his jeans pocket. I took that knife as well. Just talked to him, comforted him, E.M.S. came took him off to like Bradley Center or something like that for evaluation.

Lt. Graham: Was that the same suspect as . . . was that individual the same suspect that was dealt with on the ninth . . .

OFC Evrard: Yes, I . . .

Lt. Graham: . . . of this . . .

OFC Evrard: I was . . . I was curious about that when I ran up into the yard, giving the behavior of the . . . I guess I didn't mention the . . . the previous incident with the older gentleman . . . I don't recall his name. He was suffering from some paranoid delusions, and he thought . . . I don't remember exactly, that people were out to get him, that kind of thing. So I thought it possible it was the same person. And I remember when we turned him over, I said . . . I thought to myself, is that the same guy. It was kind of hard to tell. He had his bangs in his face. He looked younger to me, but it would not have been the same person.

Lt. Graham: Had you ever had any dealings with Arreola . . .

OFC Evrard: No.

Lt. Graham: . . . prior to the . . . the . . . of the week of . . . this incident this week?

OFC Evrard: Not that I recall.

Lt. Graham: If you would, could you explain your reason that you asked Dudley or Aguilar did they need to take a break?

INTERVIEW WITH: Officer First Class Aaron D. Evrard  
Date/Time Taped: Thursday, January 12, 2017/8:14 a.m.

CASE: 17-01  
Page 11 of 15

OFC Evrard: Aguilar seemed like he was . . . and I . . . I directed it more towards Aguilar, I think. Just seemed like he was winded and wiped out. Just wanted to know if he needed . . . if he needed somebody to contain the suspect so that, you know, you can catch your breath and . . ."

Lt. Graham: And . . .

OFC Evrard: . . . [unintelligible – 00:08:36]

Lt. Graham: . . . you mean winded in what sense?

OFC Evrard: Breathing heavy, like he had been struggling for . . . particular that sub . . . subject.

Lt. Graham: And what was the reason or the necessity for going to get leg irons to place on the suspect?

OFC Evrard: He was kicking his legs when I got there, and if I'm not . . . and again, I'm [unintelligible – 00:08:10] . . . I was facing towards River Road, but I believe Ronnie Oakes grabbed his legs because he'd been kicking his legs. When I . . . when I . . . when I got there, he was kicking, and I think Brian Dudley was holding his legs . . . certainly down by his leg area. If I remember correctly, and it . . . I guess, Dudley felt the need to contain his legs, and I . . . I would concur, 'cause I think . . . like, Ronnie Oakes had to control his legs because of his kicking.

Lt. Graham: So, his kicking, did it appear that he was kicking as . . . with the attempt to kick an officer?

OFC Evrard: Again, I was facing the opposite way, so . . . so I don't know, but . . . you know, his legs were definitely kicking around and could have hurt somebody. Also, been an attempt to get away from us.

Lt. Graham: Do you know if any officer was kicked by the suspect?

OFC Evrard: Not that I'm aware of.

Lt. Graham: Was the suspect combative towards E.M.S. personnel?

OFC Evrard: Not that I saw.

Lt. Graham: Did you sustain any injuries?

OFC Evrard: No, sir. Although, I believe a first injury was done based on something having to do with the sepsis or something with his blood. And I received a call from a nurse told me that if I wanted to I could go to the ER, but I should do so within four hours the . . . of the exposure. That was about 35 hours after the incident, so . . . but I don't know that I had any blood exposure. I don't . . . I don't think I touched any blood while I was there.

INTERVIEW WITH: Officer First Class Aaron D. Evrard  
Date/Time Taped: Thursday, January 12, 2017/8:14 a.m.

CASE: 17-01  
Page 12 of 15

| | |
|---|---|
| Lt. Graham: | And when you were out there, did you see or discover any evidence that a Taser had been deployed; such as taggets, probes, wire? Did you see any of that on the scene? |
| OFC Evrard: | No, sir. |
| Lt. Graham: | Okay, that's all the questions I have. |
| Major Blackmon: | Okay, Officer Evrard, while you were on the scene, did the suspect, Arreola, display any shortness . . . any symptoms or any indication of shortness of breath? |
| OFC Evrard: | No, sir. |
| Major Blackmon: | Can you speak up a little bit when you provide your answer? |
| OFC Evrard: | Yes, sir. |
| Major Blackmon: | All right, so now, I'm gone ask you that question again. When you were on the scene, did the suspect display any shortness of breath or any indication of, perhaps, shortness of breath? |
| OFC Evrard: | No, sir. I didn't notice any [unintelligible – 00:05:34]. |
| Major Blackmon: | And I know Lieutenant Graham asked you, did you see any indication that a Taser was used, so my question to you is did . . . did you use your Taser, O.C., Asp baton, or any other weapon? |
| OFC Evrard: | No, sir. |
| Major Blackmon: | Did you use any force while you were on the scene? |
| OFC Evrard: | Only to . . . to hold him from getting up. Nothing . . . my hands were on his wrist. Yes, sir. The . . . and I'm saying yes, sir, to . . . to . . . to raising my voice. No, I . . . I . . . the only thing I did was . . . was hold his wrist and keep him from . . . from getting up and trying to contain him from moving around for a brief period while they put the leg shackles on him. |
| Major Blackmon: | Did you . . . did you . . . did you receive any crisis intervention training? |
| OFC Evrard: | Yes, sir. |
| Major Blackmon: | What's your understanding of crisis intervention training? |
| OFC Evrard: | The training I received was, basically, to better communicate with people with mental illness, who are in distress. |

CCG000163

INTERVIEW WITH: Officer First Class Aaron D. Evrard  
Date/Time Taped: Thursday, January 12, 2017/8:14 a.m.

CASE: 17-01  
Page 13 of 15

| | |
|---|---|
| Major Blackmon: | Did that training enable you to be able . . . better identify when there is a person, who's displaying signs of mental illness? |
| OFC Evrard: | That training, I think, complimented skills that I have . . . yes. I . . . I think it was so beneficial. |
| Major Blackmon: | So, based on that training and . . . and your experience as a law enforcement officer, did you have any thoughts that, perhaps, Arre . . . Arreola may have been displaying signs of mental illness? |
| OFC Evrard: | Uh . . . |
| Major Blackmon: | . . . or were you there long enough to make that assessment? |
| OFC Evrard: | That . . . that was what I . . . I was gonna say. As . . . the brief interaction I had with him, that without any words being communicated, it would not be possible for me to tell . . . |
| Major Blackmon: | Sergeant Bridges. Excuse me, were you about to say something else? |
| OFC Evrard: | Just . . . you know, I . . . I . . . I kind of put the pieces together that he was in somebody else's yard and . . . but by . . . by the time that, you know, I had . . . let's say, by the time the ambulance got there, I wouldn't have . . . I wouldn't have had enough information to know if . . . if he was suffering from mental illness. |
| Major Blackmon: | Sergeant Bridges. |
| Sgt. Bridges: | Just to go a little bit further on that question. After you spoke to his mother and the witnesses, and they had told you about some of the things that he was doing and . . . Arreola was doing and saying, at that time, did you form an opinion about . . . or a possible opinion about what kind of state of mind he was in? |
| OFC Evrard: | Their statements, the witnesses and the mom, would . . . would lead me to believe that some . . . possible some mental health or . . . or drug use involved. I think one of the witnesses even said that he was acting like he was on meth or bath salts or something like that. |
| Sgt. Bridges: | Okay, that's all the questions I have. |
| Major Blackmon: | Sergeant Birris-Mayo. |
| Sgt. Birris-Mayo: | I have no other questions. |
| Major Blackmon: | Lieutenant Graham. |
| Lt. Graham: | I have no other questions. |

CCG000164

INTERVIEW WITH: Officer First Class Aaron D. Evrard  
Date/Time Taped: Thursday, January 12, 2017/8:14 a.m.

CASE: 17-01  
Page 14 of 15

| | |
|---|---|
| Major Blackmon: | Okay, Officer Evrard, we're about ready to bring this interview to a conclusion. But before we do, I just want to ask you . . . I know we asked you a few questions. Do you think there is something that we should know that we didn't ask you but you feel is necessary for us to know? |
| OFC Evrard: | No, sir. |
| Major Blackmon: | Are you aware of anyone, other than the witnesses you've already communicated to us . . . are you aware of anyone, who has any knowledge of this case? |
| OFC Evrard: | Uh, only I think about a few people, you know, through the news and things like that. I . . . |
| Major Blackmon: | No, what I'm . . . |
| OFC Evrard: | . . . may not understand . . . |
| Major Blackmon: | . . . saying is . . . |
| OFC Evrard: | . . . the question. |
| Major Blackmon: | . . . Are you directly aware of anyone, who has knowledge of this particular case? |
| OFC Evrard: | Oh, like another witness or something? |
| Major Blackmon: | Right, someone, who would ever observed it? |
| OFC Evrard: | Come to think of it, it's a small thing, but I thought about it recently. A woman drove up when Major Hawk[5] was there. She pulled up in her SUV, and she said something . . . something like, "I heard something going on" or "I . . ." "somebody came to my door," or something like that. "Is everything okay," that kind of thing. And it sounded like she may have . . . she wasn't talking to me, but I kind of overheard it. Sounded like she may have had some knowledge of the incident. |
| Major Blackmon: | Do you know her name? |
| OFC Evrard: | No, sir. She was in a . . . I believe a silver SUV. |
| Major Blackmon: | Okay. Are you . . . I know you said you had your body camera on . . . |
| OFC Evrard: | Yes. |
| Major Blackmon: | . . . and we know the body camera of the officers, Aguilar and Dudley, were on, are you aware of any other video pertaining to this particular incident? |

---

[5] Major John D. Hawk, Bureau of Patrol Services

CCG000165

INTERVIEW WITH: Officer First Class Aaron D. Evrard
Date/Time Taped: Thursday, January 12, 2017/8:14 a.m.

CASE: 17-01
Page 15 of 15

| | |
|---|---|
| OFC Evrard: | No, sir. |
| Major Blackmon: | Okay . . . okay. Sergeant Bridges, any questions? |
| Sgt. Bridges: | No questions. |
| Major Blackmon: | Sergeant Birris-Mayo. |
| Sgt. Birris-Mayo: | No other questions. |
| Major Blackmon: | Lieutenant Graham. |
| Lt. Graham: | No questions. |
| Major Blackmon: | Okay, so this concludes the interview with Officer Evrard. The time is 8:54 a.m. |

●●●●●

/db (DS710363 – A 00:39:02)

CCG000166

Recording #: DS 710363
Folder: A

## Case Interview Sheet

Case Number  17 - 01

Today is Thursday January 12th, 20 17, and the time is 8:14 a.m./pm. This is a recorded interview with Officer First Class Aaron Evrard. His/Her home address is _____, _____, and he/she can be reached at the home/cellular telephone number of ███████.

He/She has been employed with Columbus Police Dept the past 7 years/months as a police officer.

This interview is being conducted in the Office of Professional Standards located in the Public Safety Center. Present during the interview are Major F. D. Blackmon, Lieutenant R. L. Graham, and Sergeants T. L. Birris-Mayo, and J. G. Bridges. The Office of Professional Standards is conducting an investigation ordered by R. T. Boren, Chief of Police.

Mr./Mrs./Miss/Ms./Rank Officer Evrard, would you please state for the record your knowledge of the facts involving the arrest of Hector Arreola which occurred on 1/9/17 on Moss Drive.

This concludes the interview with Officer Aaron Evrard.
The time is 8:54 a.m./p.m.




**Columbus Police Department**
P. O. Box 1866 · 510 Tenth Street
Columbus, Georgia 31902-1866

R. T. Boren
Chief of Police

L. H. Miller
Assistant Chief

# EMPLOYEE VOLUNTARY STATEMENT

I am giving this statement freely and voluntarily to the Office of Professional Standards. I understand that the Office of Professional Standards is conducting an investigation into:

the arrest of Hector Arreola which occurred on 01·09·17 on Moss Drive

I understand that I am free to leave and conclude the interview at any time I choose to do so. I have not been threatened or coerced in any manner prior to giving this statement. I understand that no disciplinary action will be taken against me if I refuse to answer questions at this time. I am aware that all answers that I give to questions and all statements that I make must be truthful and that giving untruthful statements to investigators is subject to disciplinary action.

Due to the nature of the investigation, I understand it is a requirement that I not discuss the facts in this case with anyone. However, this does not mean that I relinquish my attorney/client privilege.

Aaron Evrard
Print Your Name

_____
Witness

_____     01/12/17  0814
Signature           Date/Time

_____
Witness

J. D. Blackmon
Witness

_____
Witness

Phone (706) 653-3100     Fax (706) 653-3114

CCG000168

An Equal Opportunity Organization