

# Transcript of Gregory J. Connor

**Date:** October 10, 2019
**Case:** Arreola, et al. -v- The Consolidated Government of Columbus, GA, et al.

**Planet Depos**
**Phone:** 888.433.3767
**Email::** transcripts@planetdepos.com
**www.planetdepos.com**

Transcript of Gregory J. Connor
Conducted on October 10, 2019

---

**Page 1**

```
             UNITED STATES DISTRICT COURT

             MIDDLE DISTRICT OF GEORGIA

                 COLUMBUS DIVISION

- - - - - - - - - - - - - -x
RODRIGO ARREOLA, as        :
parent of Hector Arreola,
Deceased, and as Personal  :
Representative and
Administrator of the       : Case No. 4:19-cv-00005-CDL1
Estate of Hector Arreola,  :
et al.
         Plaintiffs,       :
   v.                      :
THE CONSOLIDATED
GOVERNMENT OF COLUMBUS,    :
GEORGIA, OFFICER MICHAEL
AGUILAR, et al.            :
         Defendants.
- - - - - - - - - - - - - -x



         Deposition of GREGORY J. CONNOR

             Chicago, Illinois

           Thursday, October 10, 2019

                 9:02 a.m.








Job No.:  267139
Pages:  1 - 148
Reported by:  THERESA A. VORKAPIC,
              CSR, RMR, CRR, RPR
```

---

**Page 2**

```
     Deposition of Gregory J. Connor, held at the

location of:



     JW MARRIOTT

     151 West Adams Street

     LaSalle Conference Room

     Chicago, Illinois 60603

     312-660-8200






     Pursuant to notice before Theresa A. Vorkapic,

a Certified Shorthand Reporter, Registered Merit

Reporter, Certified Realtime Reporter, Registered

Professional Reporter and a Notary Public in and

for the State of Illinois.
```

---

**Page 3**

```
           A P P E A R A N C E S

ON BEHALF OF THE PLAINTIFFS:

     MARK C. POST, ESQUIRE

     MARK POST LAW, LLC

     3 Bradley Park Court

     Suite F

     Columbus, Georgia 31904

     706-221-9371


ON BEHALF OF THE DEFENDANTS:

     JAMES C. CLARK, JR., ESQUIRE

     PAGE SCRANTOM SPROUSE TUCKER FORD

     Synovus Center

     1111 Bay Avenue, Third Floor

     Columbus, Georgia 31901

     706-243-5619
```

---

**Page 4**

```
           C O N T E N T S

EXAMINATION OF GREGORY J. CONNOR        PAGE

    Examination By Mr. Post               5


           E X H I B I T S

      (Attached to transcript.)


GREGORY J. CONNOR DEPOSITION EXHIBITS    PAGE

 Exhibit 1     Notice of deposition       6

 Exhibit 2     Email on May 07, 2019      11

 Exhibit 3     Invoice                    11

 Exhibit 4     Crisis Intervention Training

               For Police Officers Effective

               in Helping Respond to

               Individuals With Behavioral

               Disorders                  16

 Exhibit 5     Hand Written note          24

 Exhibit 6     Report and Resume          39

 Exhibit 7 & 8 Chicago Police Department

               Training Bulletin          87

 Exhibit 9     Excerpts from the Georgia

               basic law enforcement

               training center basic

               law enforcement course     93

 Exhibit 10    Force Analysis             114
```

---

Transcript of Gregory J. Connor
Conducted on October 10, 2019

2 (5 to 8)

---

**5**

1        P R O C E E D I N G S
2        (The witness was duly sworn.)
3        MR. POST:  This will be the deposition of
4   Gregory J. Connor taken by the plaintiffs for
5   purposes of discovery and all of the purposes
6   allowed by law.  The deposition is taken by
7   agreement of counsel and pursuant to notice.  All
8   objections will be reserved except for those going
9   to the form of the question or the responsiveness
10  of the answer.
11       Is this agreeable, Mr. Clark?
12       MR. CLARK:  That's fine.
13             GREGORY J. CONNOR,
14  called as a witness herein, having been first duly
15  sworn, was examined and testified as follows:
16             EXAMINATION
17  BY MR. POST:
18       Q  If you would please, sir, tell us your
19  full name and any nicknames you go by.
20       **A  It's Gregory John Conner.  I don't have**
21  **any nicknames.**
22       Q  As I understand it -- well, let me do this
23  first.
24       MR. POST:  Let me mark our notice of
25  taking of deposition as Plaintiffs' Exhibit No. 1.

---

**6**

1        (A certain document was marked Plaintiffs'
2        Deposition Exhibit 1 for identification,
3        as of 10/10/2019.)
4   BY MR. POST:
5        Q  You received this, sir?
6        **A  Yes.**
7        Q  And you received the request for
8   production; is that right?
9        **A  Yes.**
10       Q  You've given depositions many times in the
11  past as I understand it so obviously you know
12  you're under oath today, correct?
13       **A  That's correct.  Yes.**
14       Q  I understand we're here because you
15  weren't able to travel by airplane; is that true?
16       **A  I decided that -- I just felt it was**
17  **easier to go to Chicago than it was to go**
18  **down through --**
19       Q  The reason I ask you that is are you
20  suffering from any physical or mental condition
21  today that would interfere with your ability to
22  testify fully and truthfully?
23       **A  No.**
24       Q  So then you've not taken any drugs or
25  anything like that that would adversely affect

---

**7**

1   your ability to testify --
2        **A  No.**
3        Q  -- truthfully today; is that right?
4        **A  That's correct.**
5        Q  Did you consume any alcohol in the last
6   24 hours?
7        **A  No.  I don't drink.**
8        Q  Do you have any difficulty hearing?
9        **A  Not that I know of.  My wife claims I do**
10  **at times.**
11       Q  Join the club.  If for any reason, you
12  feel you did not completely hear the question that
13  I asked today, please do not answer the question
14  and let me know that you did not hear it, okay?
15       **A  Yes.**
16       Q  So you agree if you answer a question, we
17  can assume that you fully heard it, right?
18       **A  That's correct.**
19       Q  Same thing with understanding my
20  questions.  I have a southern accent as you have
21  no doubt noticed.
22       **A  That's fine.**
23       Q  If you don't understand what I say or what
24  I ask you, tell me to slow down and it's probably
25  already pretty slow, but just ask me to repeat it,

---

**8**

1   okay?
2        **A  No problem.  Thank you.**
3        Q  Where do you live?  Is it okay if I call
4   you Mr. Conner or --
5        **A  Greg.  I don't know if Greg is a nickname**
6   **rather than Gregory.  I live at** ███████████
7   ███████████.
8        Q  How long have you lived there?
9        **A  Five years probably.**
10       Q  Where are you from?
11       **A  Originally I grew up in a small town**
12  **called Minooka, Illinois which is north where I**
13  **live now and near Joliet.  That's where I spent**
14  **most of my growing years I guess.**
15       Q  Obviously you were hired in this case to
16  provide an expert opinion with regard to the use
17  of force as it relates to the injury of Hector
18  Arreola on January the 9th, 2017, which was
19  followed by his death the next day; is that
20  correct?
21       **A  That's correct.**
22       Q  Who hired you?
23       **A  I believe it was the law firm -- I'm not**
24  **familiar with the exact name of the law firm, but**
25  **it's the law firm that I'm working for today.  I**

---

Transcript of Gregory J. Connor
Conducted on October 10, 2019

3 (9 to 12)

---

**9**

1  don't know all the different names.
2    Q  It's the law firm the gentleman to your
3  right Mr. Jim Clark works with, correct?
4    A  Right, that's correct.
5    Q  And of course he's a partner in that firm,
6  Page Scrantom Sprouse Tucker Ford, maybe some
7  other names that I'm leaving out.
8    A  That was my worry that I wouldn't get them
9  all.  All right.
10    MR. CLARK:  I think you got it.
11  BY MR. POST:
12    Q  Do you have any idea how they found you to
13  hire you as an expert?
14    A  I have done some training of officers in
15  the Georgia area and had represented the Peace
16  Officers Association of Georgia in a couple of
17  national seminars on use of force, but I don't
18  know directly how they came to my e-mail.
19    Q  Do you have a written contract in this
20  case?
21    A  I don't think I have a written contract,
22  no.
23    Q  What about any invoices or billing or
24  anything of that nature that you have or brought
25  with you today?

**10**

1    A  What I have is just a notification of what
2  back in May what I charged and then I believe that
3  that was later confirmed.  I don't have a copy of
4  the confirmation of that.  Sorry.
5    Q  Do you have any invoices that you have --
6    A  And then the only invoice I have is an
7  invoice that I sent in reference to my work
8  prior -- I have that.
9    Q  Have you been paid --
10    MR. CLARK:  Before you hand it to him, let
11  me take a look at it.
12  BY MR. POST:
13    Q  -- for this invoice of 4200?  Have you
14  been paid for that to date?
15    A  Yes.
16    Q  Is that all you've been paid so far in
17  this case?
18    A  Yes.
19    Q  We need to make copies of these or can I
20  mark these?
21    A  You can take them.  That's not a problem
22  for me if it's not a problem for you.
23    MR. CLARK:  Go ahead and mark them and
24  then we'll make some copies before we leave.  How
25  about that.

**11**

1    MR. POST:  Let me ask you this while we're
2  talking about it.  Do you want to leave the
3  exhibits with the court reporter and let her take
4  custody of them?
5    MR. CLARK:  Sure.  Absolutely.  I don't
6  ever take exhibits.
7    MR. POST:  All right.  I'll mark this as
8  Plaintiffs' Exhibit 2, which is dated May the 7th,
9  2019 which is the e-mail that you referenced
10  earlier with $150 per hour review of materials and
11  $1800 a day for deposition or trial testimony.
12    (A certain document was marked Plaintiffs'
13    Deposition Exhibit 2 for identification,
14    as of 10/10/2019.)
15  BY THE WITNESS:
16    A  That's correct.
17  BY MR. POST:
18    Q  That's Plaintiff's 2.  Plaintiff's 3 is
19  the invoice for $4,200.
20    (A certain document was marked Plaintiffs'
21    Deposition Exhibit 3 for identification,
22    as of 10/10/2019.)
23  BY MR. POST:
24    Q  Have you been paid any travel expenses in
25  this case?

**12**

1    A  No.
2    Q  Do you expect to be?
3    A  I'm sorry?
4    Q  Do you expect to be paid for travel
5  expenses?
6    A  Yes.
7    Q  Do you have a ball park cost of your
8  travel expenses to date?
9    A  To me I think the room is going to be --
10  the room, the two days of the room would be paid
11  and probably the per diem that the university
12  would charge.  I'm not familiar with exactly what
13  that would be.
14    Q  Which university are we talking about?
15    A  The University of Illinois.
16    Q  Are you staying at this hotel, the JW
17  Marriott where we're talking the deposition today?
18    A  Yes, I am.
19    Q  Just for the record, we're in Chicago.
20    In what area, sir, do you consider
21  yourself an expert?
22    A  I would say in the area of police use of
23  force and police strategies and tactics.
24    Q  Mr. Conner, in what areas or disciplines
25  are you offering yourself as an expert in this

Transcript of Gregory J. Connor
Conducted on October 10, 2019

---

13

1  case?
2  **A Primarily here the use of force and if**
3  **asked, I would comment on certain strategies**
4  **utilized by the officers or tactics that they**
5  **deployed.**
6  Q Any other area or discipline that you're
7  offering yourself as an expert at all in this
8  case?
9  **A Right now I can't think of anything that**
10 **wouldn't be in that generic realm.**
11 Q Do you intend to offer any opinion that's
12 not contained in your written report in this case?
13 **A No.**
14 Q Let's see what documents you brought with
15 you today in response to my request. We've
16 already gone through the billing and the invoices.
17 While Mr. Clark is taking a look at them,
18 obviously I've asked you to bring your entire
19 file.
20 Have you done that?
21 **A Yes.**
22 Q Did you bring a current copy or an updated
23 copy of your CV or your resume or is it exactly
24 what we had earlier?
25 **A I believe it is the same as what we had.**

---

14

1  **These are just copies of their expert --**
2  MR. CLARK: All right. So, Mark, there's
3  a couple of e-mails in here that would probably
4  not be subject to discovery, but they only deal
5  with the mechanics of this deposition. So I'm
6  going to let him go ahead and give these to you,
7  but I don't want to be waiving anything with
8  respect to communications between us, my law firm,
9  and Professor Conner that might otherwise not be
10 subject to discovery, but with that understanding
11 here you go.
12 MR. POST: Very good.
13 BY MR. POST:
14 Q Mr. Connor, I'm looking at what purports
15 to be an e-mail from you to Tyler Cashbaugh,
16 tcc@psstf.com, dated Friday September 27, 2019
17 which as Mr. Clark says discusses the mechanics of
18 this deposition. I'll show these to you in order.
19 I may mark them all together.
20 The second document is your reply or
21 Mr. Cashbaugh's reply same day and then there is
22 an article here American Psychiatric Association
23 April 1, 2014, Crisis Intervention Training For
24 Police Officers Effective in Helping Respond to
25 Individuals With Behavioral Disorders. I'll ask

---

15

1  you about that. That's two pages.
2  And 1966 Mustang convertible --
3  **A I unfortunately write notes on -- this is**
4  **just a car that was for sale. I did not buy it.**
5  Q Those are your notes having to do with
6  this case then on that Mustang bill or is that
7  something totally separate from this case?
8  **A All they are are what I wrote in reference**
9  **to writing the billing. I just put them in that**
10 **order, but I put them on that sheet. It's nothing**
11 **significant. I can assure you.**
12 Q Yes, it doesn't appear to be particularly
13 significant. We'll let you keep that.
14 **A That's fine. Like I said, I didn't buy**
15 **the car anyway.**
16 MR. POST: I don't see where these two
17 e-mails are particularly relevant. I'm not even
18 going to mark those.
19 MR. CLARK: I didn't want it to seem
20 sinister so that's why I wanted you to go ahead
21 and look at them.
22 MR. POST: Thank you. I'll give those
23 back. But I will mark this article, this two-page
24 article as Plaintiffs' Exhibit 4 that you brought
25 with you that I mentioned earlier, Crisis

---

16

1  Intervention Training For Police Officers
2  Effective in Helping Respond to Individuals With
3  Behavioral Disorders as Plaintiffs' Exhibit 4.
4  (A certain document was marked Plaintiffs'
5  Deposition Exhibit 4 for identification,
6  as of 10/10/2019.)
7  BY MR. POST:
8  Q Don't you tell me about Plaintiffs'
9  Exhibit 4 and what it means to you. We may come
10 back to it.
11 **A Mainly I had this in my files, general**
12 **understanding of what was being done in police**
13 **training, one of the areas was crisis intervention**
14 **training. This was a brief overview done by the**
15 **American Psychiatric Association and the most --**
16 **the concern I had, the primary concern I had of**
17 **keeping this article was the amount of research**
18 **that had been done and/or lack of it in reference**
19 **to bringing both police and crisis intervenors**
20 **together. So that's the only reason I kept that**
21 **article I guess. I'm not sure it's that intensive**
22 **or extensive.**
23 Q I may come back to that later and ask you
24 a bit more about it but I'm just going to leave it
25 right here so we can both maybe remember to do

---

**17**

1  that.
2      Did you bring any other documents with you
3  today in response to my request?
4      **A  I brought a thumb drive that is in my --**
5      MR. CLARK:  He's got a thumb drive that
6  just has the same information that -- it's all
7  information similar to your expert that you've
8  got.
9  BY THE WITNESS:
10     **A  It's the body camera footage from the**
11 **three officers.  Actually it's written down in the**
12 **material that I reviewed.**
13     MR. CLARK:  Let me see -- which exhibit
14 was that because, Mark, I actually asked him
15 because I knew this would come up, let me see
16 your -- which exhibit was that, three?  Two and
17 three.
18     MR. POST:  Two and three is the billing.
19     THE WITNESS:  Maybe it's in my expert
20 report.  It probably is.
21     MR. CLARK:  So the items on this thumb
22 drive are referenced in your report.
23     THE WITNESS:  Yes.
24 BY MR. POST:
25     Q  What I will do is I will look at those, at

**18**

1  the thumb drive during a break when we take a
2  break this morning and see if I need to ask you
3  some questions about it and we may mark that as
4  Plaintiff's No. 5 if I can keep that thumb drive.
5      **A  That's fine.**
6      MR. CLARK:  Is there anything else on it?
7      THE WITNESS:  It's only things that you
8  have sent me.  I did not put anything else on it.
9      MR. POST:  Why don't we just take a break.
10     MR. CLARK:  We don't even need to take a
11 break actually.
12     MR. POST:  Let's go off the record for a
13 second.
14     (A recess was had.)
15     MR. POST:  Back on the record.
16 BY MR. POST:
17     Q  Mr. Connor, we're looking at the jump
18 drive which you brought today which contains the
19 materials you reviewed for this case, correct?
20     **A  Yes.**
21     Q  On here we see what is labeled OPS Case
22 No. 17-01, which is a PDF document which I have
23 opened which appears to be 270 pages beginning
24 with CCG 14, Bates stamped at the bottom righthand
25 corner.

**19**

1      **A  Yes.**
2      Q  Through CCG 283 is the last page.
3      Do you agree?
4      **A  That's right.**
5      Q  So you reviewed that case report?
6      **A  Yes.**
7      Q  And then training documents is a PDF
8  document that I'm opening now which is Use of
9  Force Issues For 2016 in-Service.  It appears to
10 be one of 86, and it begins with CCG 1756 and
11 continues consecutively to the end of this labeled
12 CCG 1838.  And you reviewed those documents,
13 correct?
14     **A  Yes, I did.**
15     MR. POST:  Miss Court Reporter, just so
16 you know, the City of Columbus, Mr. Clark's firm,
17 they have provided the plaintiffs with a good bit
18 of discovery and they number them generally with
19 CCG numbers in that fashion and we'll be referring
20 to those today.
21     THE COURT REPORTER:  Thank you.
22 BY MR. POST:
23     Q  Moving to the second set of documents
24 here, we have what's labeled 911 audio transcript?
25     **A  That's correct.**

**20**

1      Q  Which I am opening which is a 23-page
2  document labeled 911 recording date/time Monday
3  January 9, 2017, Case No. 17-01 with two officers'
4  names in the upper righthand corner, which is
5  Bates stamped CCG 3188 and numbered consecutively
6  to CCG 3210.
7      You reviewed that, correct, sir?
8      **A  That's correct.**
9      Q  I see two files here called trashes and
10 spotlight.  That's just something that was
11 originally contained on your jump drive that
12 doesn't have anything to do with the case; is that
13 right?
14     **A  I have no idea.  I am not -- this was sent**
15 **to me so I have no idea.**
16     Q  You don't know how to get anything out of
17 that?
18     **A  I have nothing -- nope.**
19     Q  That's not something you reviewed in those
20 three folders, right?
21     **A  I did not see those.**
22     Q  Now, the next three file folders on this
23 jump drive are labeled Officer Aguilar,
24 A-g-u-i-l-a-r, body cam, second one being Officer
25 Dudley, D-u-d-l-e-y, body cam and the third one

Transcript of Gregory J. Connor
Conducted on October 10, 2019

21

1  being Officer Evrard body cam, E-v-r-a-r-d.
2      Do you confer with that?
3  **A Yes.**
4      Q You reviewed the contents of Officer
5  Aguilar body cam which are videos labeled AMBA 8,
6  AMBA the, AMBA 10 and AMBA 11, correct?
7  **A That's correct.**
8      Q So you played those videos and reviewed
9  each of them; is that right?
10 **A Yes.**
11     Q And the next electronic file is Officer
12 Dudley's, and there are four videos in here
13 labeled respectively AMBA 1, ABMA 2, AMBA 3,
14 AMBA 4; is that correct?
15 **A That's correct.**
16     Q And you reviewed each of those?
17 **A I did.**
18     Q And the next one is Officer Evrard's body
19 cam, that electronic file also contains four
20 videos; is that right?
21 **A That's correct.**
22     Q There are a lot of zeros at the end of
23 each one of these body cams and before those zeros
24 there is 300000 on each of them, but the numbers
25 just before that, the five numbers and letters

22

1  just before that are each different, and in order
2  are 4456 X, 1725 X, 5809 X, and 1244 X; is that
3  correct?
4  **A That's correct.**
5      Q And those are the videos that you were
6  provided and viewed as well, correct?
7  **A That's correct, yes.**
8      MR. POST: Mr. Clark, can we stipulate
9  that the contents that I just reviewed are
10 discovery and provided to the plaintiffs and
11 numbered seminally.
12     MR. CLARK: I don't know. Probably but
13 I'm not sure.
14     MR. POST: I don't necessarily need to put
15 the jump drive in as Plaintiffs' Exhibit 5.
16     MR. CLARK: No, no. What's your question
17 now?
18     MR. POST: Can we stipulate that what I
19 just gone over with Mr. Connor is the same
20 material that you all, the defense, has provided
21 to the plaintiffs already and in the same fashion,
22 numbered in the same fashion.
23     MR. CLARK: I believe so. Yes. I think
24 so but I -- yes.
25 BY MR. POST:

23

1      Q I just want to confirm -- and what we've
2  just gone over is what has been provided to you by
3  Mr. Clark and the defense lawyers; is that right?
4      MR. CLARK: We sent him this, whatever you
5  call this drive, thumb drive is what I call them,
6  we sent him this thumb drive so what's on this
7  thumb drive is what we sent him.
8  BY THE WITNESS:
9  **A Right.**
10 BY MR. POST:
11     Q Other than those materials that I've just
12 gone through, you have not reviewed any other
13 materials in this case; is that right?
14 **A I have seen other materials and I**
15 **mentioned that yesterday, but I have not fully**
16 **reviewed the materials. I got them like day**
17 **before I came.**
18     Q What other materials did you receive?
19 **A I just made a list of the -- I was advised**
20 **to mark a list of the --**
21     MR. CLARK: Mark, what I did to try to
22 help, I told him yesterday why don't you just list
23 out whatever materials you've looked at to help
24 you. Is that what you did here?
25 BY HE WITNESS:

24

1  **A I did. Again, I guess my thing is I**
2  **looked at them but I wouldn't say that I did the**
3  **same intensity of review that I did with the other**
4  **stuff. It's these and then it goes over to the**
5  **next pages and if you need help on my writing.**
6      MR. CLARK: I figured this would come up
7  so I had him go ahead and list it up for him.
8  BY MR. POST:
9      Q I may ask you about this.
10 **A Okay.**
11     Q The jump drive that we just went over, is
12 that something that I can have for this deposition
13 or is that your only copy?
14     MR. CLARK: No, that's his. You see
15 what's on there. It's all the same stuff you've
16 got.
17 BY MR. POST:
18     Q I'm going to go over this. I'm going to
19 tear this off so we can talk about Plaintiff's
20 No. 5.
21     (A certain document was marked Plaintiffs'
22     Deposition Exhibit 5 for identification,
23     as of 10/10/2019.)
24     MR. CLARK: Are you okay with him marking
25 that.

25

1    THE WITNESS:  It's just handwritten.
2    MR. CLARK:  We'll get you a copy of it.
3    THE WITNESS:  That's fine.
4    MR. CLARK:  So that's five, Mark?
5  BY MR. POST:
6    Q  Yes.  Can you see the top of Plaintiffs'
7  Exhibit No. 5, your handwritten notes?
8    A  Yes.
9    Q  What is the first word at the top, starts
10  with a C?
11    A  Up here?
12    Q  Uh-huh.
13    A  I think it's either correlative or
14  creative.  I'm not sure -- I think it's
15  cumulative.
16    Q  That was my guess.
17    A  I'm not familiar with my own writing I
18  hate to say, but it does look like cumulative.
19    Q  Under that is Page 100 with a line.  What
20  is the word with a line?  What is the word next to
21  it?
22    A  That is the name -- I'm not sure I have
23  the correct pronunciation with the opposite expert
24  in that case.
25    MR. CLARK:  Harmening.

26

1  BY THE WITNESS:
2    A  Harmening.  I was referencing Page 100 or
3  reference to that.
4  BY MR. POST:
5    Q  Page 100 of Harmening, something he wrote?
6    A  His deposition.
7    Q  The deposition in which case?
8    MR. CLARK:  So just to move it along, I
9  got a rough draft of Harmening's deposition.
10    MR. POST:  You mean in this case?
11    MR. CLARK:  In this case.
12  BY MR. POST:
13    Q  You have reviewed the rough draft of
14  William Harmening's -- Bill Harmening's deposition
15  in this case?
16    A  What I got, I got the night before I came
17  here 196 pages.  I cannot say I reviewed every
18  page to the level of confidence that I normally
19  review.
20    Q  But you made note of Page 100 in the rough
21  draft?
22    A  Yes.  I was here and Mr. Clark mentioned
23  to me it starts at Page 100 and if I would look at
24  it to see if I have any information on that where
25  Mr. Harmening talked about how the officers had

27

1  some degree of paranoia or should have developed
2  some degree of paranoia based upon their
3  expertise.  That's the only thing I had seen.
4    MR. CLARK:  I don't think there's any
5  notes in there, but if you'll stick to 100 or 101
6  I think you're save because I don't have any
7  attorney work product on them.
8  BY MR. POST:
9    Q  Page 99 and 100, I may have you read that
10  in?  Would you do that for us?
11    MR. CLARK:  You want him to read it in?
12    MR. POST:  Might as well and then I can
13  ask you about it if I need to just starting at the
14  last paragraph on 99 which leads into Page 100 on
15  that draft.
16  BY THE WITNESS:
17    A  So it's significant to me?
18  BY MR. POST:
19    Q  Yes.
20    MR. CLARK:  That's fine.
21  BY THE WITNESS:
22    A  "So it's significant to me in the sense
23  that they didn't immediately do that and they
24  didn't immediately call for backup because there
25  is no doubt people in this situation demonstrate

28

1  strength.  You know, they are hard to control.
2  Every" -- and there is a couple of dashes "I think
3  every police officer knows that because they're
4  all dealt with people like that and they don't
5  have to be taught that in training."
6    MR. CLARK:  For the record he's reading
7  out of the Harmening rough draft deposition.
8  BY THE WITNESS:
9    A  This is the start of Page 100, one
10  sentence.  "So to answer your -- I want to make
11  sure I answer your question.  It's significant to
12  me because they knew they had an involuntary
13  commitment, No. 1, and they should have known at
14  that point they needed some more officers and they
15  needed EMS to respond to the scene and they need
16  to get him in custody as quickly as possible.
17  Question:  And what makes you believe that they
18  knew that they had someone that was -- needed
19  crisis intervention?  Answer:  Well, I think they
20  knew that they had someone that was going to need
21  an involuntary commitment.  They knew they were
22  not going to leave at that point.  Question:  All
23  right.  And at what point did they know that?
24  Answer:  I think at the -- I think that they knew
25  that -- certainly at the point they said we're

Transcript of Gregory J. Connor
Conducted on October 10, 2019

---

29

1  going to need a psych eval. I'd have to look at
2  the time of that. Question: But would you agree
3  with me, though, that when officers got to the
4  scene, they didn't know that, that they -- that
5  they learned these things by talking to
6  Mr. Arreola, correct? Final answer: Yes, but I
7  would -- but I would suggest, on Page 101, that
8  based on the comments made by Officer Aguilar that
9  they knew that very quickly in talking to him
10 because you know that in talking to someone who
11 is -- Question: Right? -- in the middle of an
12 episode, there is no talking to them. So I think
13 there's the period of time where -- and I don't
14 know how long, I really don't. I don't know if it
15 was as soon as they got there and talked to him or
16 if it was when they talked to his mother. I don't
17 know, but there was a period of time where they
18 were certainly evaluating the situation. I don't
19 know how long though. Question: It appeared to
20 me in looking -- looking at the video and frankly
21 in talking to the officers that the officers when
22 they got there tried to talk to Mr. Arreola to try
23 to use your words deescalate the situation, would
24 you agree with that? Answer: Yes."
25 BY MR. POST:

---

30

1      Q  Is that essentially what your note -- what
2  you noted on your paper that we've gone through?
3      A  Yes.
4      Q  Is there anything that you just read or
5  that you read in that transcript on those pages
6  that you disagreed with as far as Mr. Harmening or
7  Professor Harmening's testimony?
8      A  My only I guess word disagreement would be
9  the deescalate. I'm not sure that's the way I
10 would describe deescalate the situation or if it
11 would be even appropriate.
12     Q  Let's keep going through these handwritten
13 notes here.
14     Underneath that it appears to say paranoia
15 and involuntary commitment and leg restraints; is
16 that right?
17     A  Yes. I had asked a question about if
18 there was a photograph or if anyone knew the
19 nature of the leg restraints used. I was never
20 able to see the leg restraints that were actually
21 in use.
22     Q  Why would that be of some importance in
23 this case?
24     A  In my experience, if there are leg
25 restraints that automatically have a -- what's

---

31

1  referred to as a tail on them and many times it's
2  clipped to the handcuffs and this has prompted the
3  hog-tying phenomenon. Normally if they don't have
4  a tail hooked on, then some other rope or
5  something else would have to be used in that
6  device, and I didn't see any of that being used.
7  But I just didn't -- I would like to have known
8  what leg restraints were used. My feeling was the
9  way it sounded and, again, it was based on an
10 audio, it sounded like a click which sounded to me
11 like they were simply oversized handcuffs which
12 many departments carry in the glove box.
13     Q  And I believe that there are places where
14 you can see Mr. Hector Arreola being loaded onto
15 the gurney by the ambulance or the EMT and the
16 paramedic.
17     If there had been hog-tying in this case,
18 you would tend to be able to observe that? Is
19 that true?
20     A  I'm almost positive you would be able to
21 see that.
22     Q  You don't really have any evidence of
23 hog-tying in this case to your knowledge, do you?
24     A  No. It was just a component of the hog
25 tie would be leg restraints, and I wanted to make

---

32

1  sure that that didn't occur.
2      Q  That's significant with regard to
3  positional asphyxiation, correct?
4      A  It has had significance, yes.
5      Q  And we'll discuss that some later, but I
6  don't disagree with you. There is no evidence of
7  hog-tying in this case. "Beyond the" --
8      A  Oh, beyond the norm. I just put that in
9  my notes did the officers perform beyond what
10 would be the norm for police officers in that
11 situation, and my feeling was that that was just
12 more or less a question to me, was it beyond the
13 norm?
14     Q  And underneath that is list-file, I guess
15 that was --
16     A  That was in reference to his suggestion.
17     Q  No. 1 would be New Orleans police
18 positional Chapter 1.3.1.1, ten pages, is that
19 something that you reviewed that William Harmening
20 provided with his report?
21     A  The only person -- I was provided that
22 from one of the attorneys in the firm, but I had
23 that -- that had been -- I had that in my files.
24 That had been published I would say at least
25 20 years ago.

---

Transcript of Gregory J. Connor
Conducted on October 10, 2019

---

33

1    Q  You didn't bring a copy of that with you
2  today?
3    **A  I did not.**
4    Q  I suspect that I have that, but if not, I
5  if I don't have any of these one through five,
6  would you mind providing that to me?
7    **A  Absolutely.  I can get those.  That's**
8  **fine.**
9    Q  The second one listed here is National Law
10 Enforcement Technology Center Positional Asphyxia,
11 Sudden Death, 1995.
12   **A  Right.  That, too is very dated.**
13   Q  But it is a well-known piece of
14 literature, right?
15   **A  It's a piece of literature.  It may be**
16 **well known because of its being dated.**
17   Q  I'm certain I have that and we may talk
18 about it later.
19     The FBI Law Enforcement Bulletin:
20 R-e-a-y.  Tell me what the last name is there?
21   **A  Dr. Reay.  No, it's just hog tied,**
22 **Dr. Reay talked about hog tying but this was back**
23 **in 1996.  This to me is dated, too.**
24   Q  I believe I do have that one as well.  The
25 next one is --

---

34

1    **A  I believe Reay is out of Seattle.**
2    Q  Spell that O word.
3    **A  That says Chicago unfortunately.  I was in**
4  **a hurry writing.  I'm sorry.**
5    Q  Chicago Police Positional Asphyxia, that's
6  actually the policy statement; is that right?
7    **A  It's their equivalent of the bulletin.**
8    Q  And original article Effect of Seated
9  Restraint?
10     MR. CLARK:  These are all Harmening
11 deposition exhibits.
12 BY MR. POST:
13   Q  Something body size, on body size, you
14 reviewed that, too?
15   **A  Yes.**
16   Q  All right, sir.  I'm going to put this in
17 and we'll give you a copy of this back.
18   **A  That's fine.**
19   Q  I just wanted to make sure I understood
20 what all of it was.  Sometimes I cannot read my
21 writing.
22     Did you bring any other documents with you
23 in response to the notice?
24   **A  Yes.**
25     MR. POST:  Let's go off the record for a

---

35

1  second.
2      (A recess was had.)
3  BY MR. POST:
4    Q  While we were off the record, we went
5  through some of the additional documents that you
6  brought with you, some may be attorney-client
7  privileged and others were insignificant, but do
8  you have with you some of the pages of William
9  Harmening's report; is that correct?
10   **A  That's correct.**
11   Q  We can talk about his report later on in
12 this deposition.  I don't see any particular need
13 to put those pages in, but at this point we've
14 covered everything you brought with you in
15 response to the notice of the deposition; is that
16 correct?
17   **A  That's correct, yes.**
18   Q  So we have everything that you have in
19 your file other than your written report which you
20 have already provided to the defense lawyers,
21 correct?
22   **A  Right.  And we did mention this thing.**
23     MR. CLARK:  The thumb drive.  We dealt
24 with that.
25 BY THE WITNESS:

---

36

1    **A  Okay.  That's fine.**
2  **BY MR. POST:**
3    Q  So we have all your notes.  There really
4  aren't any or notes other than what we have
5  already been through?
6    **A  No.  That's correct.**
7    Q  One thing I did want to ask you about, do
8  you have a list of depositions that you have given
9  previously in other cases?
10   **A  Yes, I've sent them to the firm.**
11   Q  And the same question with respect to
12 trials that you have testified in, do you have a
13 list of those?
14   **A  I think it's on the same list in the sense**
15 **of if I gave testimony or if I gave a deposition.**
16   Q  I do not think that was provided with
17 regard to your expert report, but I could be
18 wrong.
19   **A  I could be wrong, but it was sent.**
20     MR. POST:  If I could get that at a break?
21     MR. CLARK:  I don't know if he has it with
22 him, but we'll get it to you.
23 BY MR. POST:
24   Q  The report that you wrote in this case,
25 how long did you work on it?

Transcript of Gregory J. Connor
Conducted on October 10, 2019

37

1    A I would say it evolved after several hours
2 of work and reading the materials and trying to
3 extrapolate from the materials the areas that I
4 wanted to identify in the report. I would say
5 probably over a period of I think the total thing
6 was 20-some hours, 25, 28 hours.
7    Q So you've testified as a use-of-force
8 expert before, correct?
9    A Yes.
10    Q When is the last time you testified as a
11 use-of-force expert?
12    A In New Orleans in 2008, maybe 2009.
13    Q Was that a federal or state case?
14    A Federal case.
15    Q Was it civil or criminal?
16    A It was a civil case.
17    Q Did you testify for the plaintiffs or for
18 the defense?
19    A I testified on behalf of the State Police
20 so it would be the plaintiffs I guess is how
21 they -- I'm not sure how that worked out. I
22 believe the Louisiana State Police were being sued
23 so you would have to tell me which side is which
24 on that particular --
25    Q So you testified for the people that were

38

1 being sued, that being the State Police?
2    A Yes.
3    Q Normally that would be the defense.
4    A Okay. Sorry.
5    Q Do you know what the result was in that
6 case?
7    A I don't. I remember that I just gave my
8 testimony and then I left. I don't know what
9 happened.
10    Q So that was a deposition or a trial?
11    A That was at a trial.
12    Q Obviously Mr. Clark indicated he would
13 give me a list of your depositions and trials.
14    A Yes.
15    Q Has a court ever declined to qualify you
16 as an expert in any deposition or trial?
17    A Never, and I believe I dealt primarily
18 with Tyler Cashbaugh. I think I sent it to him.
19 I don't think I sent it to Mr. Clark.
20    Q Has your testimony ever been restricted by
21 a court by virtue of a Daubert or a similar
22 motion?
23    A No.
24    Q Have you ever offered your expertise in
25 any court or similar situation other than as a

39

1 use-of-force expert or a police strategies and
2 tactics expert?
3    A Earlier in my career, we did do some
4 training with correctional officers in the State
5 of Illinois where many of the things paralleled
6 what we did in law enforcement. I have testified
7 or been deposed and testified as far as the
8 tactics used in corrections cases, but to me,
9 again, they paralleled the techniques and I felt
10 it was reasonable to do that.
11    Q I have here what I'm going to mark as
12 Plaintiffs, 6 which I believe to are your report,
13 which is your report as provided to me by the
14 defense in this case along with a resume of ten
15 pages. I want you and your counsel to look at
16 that and let me know if that resume is up to date
17 and if that is -- Plaintiff's 6 is your complete
18 report in this case.
19        (A certain document was marked Plaintiffs'
20        Deposition Exhibit 6 for identification,
21        as of 10/10/2019.)
22 BY THE WITNESS:
23    A I would say that is as complete as I have
24 seen it, in reference to both the report and the
25 resume.

40

1 BY MR. POST:
2    Q I want to make sure that what we're
3 putting in is your report and your resume and
4 there's nothing else that you want to add to it.
5    A I don't believe there is anything right
6 now, but I could add there are some publications,
7 but I haven't had any notification of the
8 publication.
9    Q What do you mean?
10    A In the sense of the resume. If there was
11 a publication, one it's published, I would put it
12 in my resume but if it's not been published yet,
13 it's just being reviewed basically.
14    Q So I asked you to bring today an updated
15 resume if you had one.
16        So what you're telling us is that what you
17 have in front of you, Plaintiff's 6, is actually
18 the most up-to-date resume, correct?
19    A That's correct.
20    Q I'm going to ask you about -- you can look
21 at it if you want to.
22    A That's fine.
23    Q I'm going to ask you about Plaintiff's 6 a
24 bit today. That's why want to make sure that
25 we're all working from the same document.

**41**

1        Let's talk about your education I guess,
2  which is on page -- starts on the bottom of Page 1
3  of your resume.
4        Can you tell us about your educational
5  background?
6        **A  Yes.  I started with a Bachelors degree in**
7  **police administration at Michigan State and then**
8  **got a Masters in -- it's actually considered a**
9  **dual Masters, one in sociology and the other in**
10 **social science.  I usually use the social science**
11 **because I think they pretty much parallel the same**
12 **thing.  That's my own opinion.**
13       Q  What's the difference in sociology and
14 social science?
15       **A  I don't think there is a great deal of**
16 **difference personally.  One is a study but it's**
17 **composed of the social sciences in my opinion, and**
18 **then I did advanced graduate studies at the**
19 **University of Illinois.  I had graduate studies up**
20 **to the point of a thesis and I was advised by my**
21 **supervisors not to do a thesis because they felt**
22 **it would alienate the police entities that we**
23 **train.**
24       Q  What were you thinking about doing a
25 thesis on?  What was your plan?

**42**

1        **A  My thesis was on the -- this is back --**
2  **utilization in the area of breath testing for**
3  **drivers under the influence of alcohol.  The state**
4  **eventually did use my material in developing that**
5  **for the State of Illinois, but at that time I felt**
6  **it was a very practical and tactical area of**
7  **study.**
8        Q  How are you employed now?
9        **A  I'm retired now.  I simply write articles.**
10 **I'm writing a book.  So I just have a pension from**
11 **the University of Illinois.**
12       Q  Tell us about your career with the Police
13 Training Institute and what that is.
14       **A  The Police Training Institute was started**
15 **in 1955 by an act of the Illinois legislature.**
16 **The concept was the best police training could be**
17 **done if people had academic credentials along with**
18 **actual police experience.  So they set it up in an**
19 **area of Illinois that was considered central**
20 **Illinois as opposed to near the City of Chicago**
21 **because the City of Chicago had not had the image**
22 **in those days or even today of being a**
23 **professional organization.  So we train -- since**
24 **1955, we train, trained all law enforcement**
25 **officers with the exception of the Chicago Police**

**43**

1  **Department and the Illinois State Police.**
2        Q  The Illinois State Police, how is that
3  different than other police officers in Illinois?
4        **A  The Illinois State Police evolved from**
5  **road patrol and just picked up portions of**
6  **policing.  Just recently I would say within the**
7  **last 10, probably 12 years they've gotten into**
8  **where they will go off the road, per se, to handle**
9  **something like a domestic or a burglary.  Normally**
10 **that's left up to the county or city police.**
11 **They're primarily highway patrol.**
12       Q  Very similar to what we call the Georgia
13 State Patrol?
14       **A  I think very similar to many state**
15 **patrols, yes.**
16       Q  Now, you said that the Police Training
17 Institute was located in central Illinois.  Where?
18       **A  It's on the campus at the University of**
19 **Illinois in Champaign, Urbana.**
20       Q  So the Police Training Institute was or is
21 and I'll let you clarify, the accrediting agency
22 for law enforcement officers in Illinois?
23       **A  It is -- the word accrediting is rather**
24 **nebulous in the sense that -- an officer does not**
25 **have to be trained in the State of Illinois to be**

**44**

1  a police officer.
2        Q  Go ahead and explain.
3        **A  There could be a small department that**
4  **wants to have a policeman and they can have one**
5  **without any training whatsoever.  That is getting**
6  **to be further and further and further away from**
7  **the norm, and much closer to the idea of the**
8  **exception.  If they want training, then they can**
9  **get the training free through the State of**
10 **Illinois through the Police Training Institute.**
11       Q  Who pays for that training?
12       **A  The State of Illinois, the citizens in the**
13 **State of Illinois.**
14       Q  How long has that been true?
15       **A  Well, it's been -- as far as extremely**
16 **small departments it's been true since I think the**
17 **history of man.  I think most recently most**
18 **agencies in contemporary, 20 years have seen the**
19 **value of being trained properly and once they're**
20 **trained properly they continue to be trained.**
21       **I would say most professional in air**
22 **quotes, most professional agencies in the State of**
23 **Illinois are trained and are consistently trained**
24 **by either what we do directly or indirectly**
25 **through our writings or videos or something that**

Transcript of Gregory J. Connor
Conducted on October 10, 2019

12 (45 to 48)

---

**45**

1  we put out.

2  Q  Now, the Police Training Institute is
3  located on land owned by the University of
4  Illinois, correct?

5  **A  That's correct.**

6  Q  Police Training Institute is not a part of
7  University of Illinois; is that correct?

8  **A  It's a part of the University of Illinois**
9  **like the Firemanship Training Academy is part of**
10  **the University of Illinois.  You do have to have**
11  **academic credentials in order to teach there, and**
12  **there are -- I mean, I think there are certain**
13  **qualifications in the sense that there has to be**
14  **some form of testing, not necessarily the level**
15  **that we would see in other academic pursuits, but**
16  **I would say it's considered part of the University**
17  **of Illinois.**

18  Q  It's not considered an academic department
19  of the University of Illinois, is that right?

20  **A  It is not the academic provision at**
21  **Champaign-Urbana.  There is an academic provision**
22  **at Circle Campus here in Chicago, University of**
23  **Illinois Circle Campus.  You can get a degree, I**
24  **believe it is in -- it's not law enforcement**
25  **police administration but it's something like**

---

**46**

1  **police administration, something like that.**

2  Q  How long has the Circle Campus been
3  around?

4  **A  Oh, 35, 40 years, that's a minimal.  It's**
5  **been around for a long time certainly.**

6  Q  What kind of degree did you say you can
7  get?

8  **A  I believe it's police science.  There is**
9  **the traditional criminology degree and they have**
10  **now incorporated a police -- policing curriculum**
11  **within that realm, but historically criminology**
12  **and police science have been really the flagship.**

13  Q  Is that a degree from the University of
14  Illinois or a degree from the Police Training
15  Institute?

16  **A  No, it's the University of Illinois,**
17  **Circle Campus.  That's a degree from there.  What**
18  **you get from the Police Training Institute at the**
19  **University of Illinois Champaign-Urbana is a**
20  **certificate.  And then we can redefine or define**
21  **certificate if you would like to try that.**

22  Q  Go ahead.

23  **A  My feeling is it certifies you to do**
24  **nothing, but it does grant you a certificate.**

25  Q  Just to clarify, the Circle Campus of the

---

**47**

1  University of Illinois that's in Chicago is not
2  part of the Police Training Institute; is that
3  right?

4  **A  It is not.  It is not.**

5  Q  I just want to make sure I'm understanding
6  you right.

7  **A  Yes.**

8  Q  As I understand it, you are familiar with
9  Georgia law enforcement; is that true somewhat?

10  **A  I'm somewhat familiar.  I have been**
11  **involved in some of the programming of Georgia law**
12  **enforcement, but I would say my understanding of**
13  **Georgia law enforcement is probably certainly**
14  **minimal compared to so what my understanding is of**
15  **Illinois law enforcement.**

16  Q  Let me ask you this.  Can you tell us how
17  the certification process compared in Georgia with
18  the certification process of police officers in
19  Illinois or lack thereof?

20  **A  I believe the certification process is**
21  **stronger in the State of Georgia than it is in the**
22  **State of Illinois.  I would not want to state that**
23  **I could look at that and say that it is as strong**
24  **as I would desire it to be, but I believe it is**
25  **stronger and I believe that in the State of**

---

**48**

1  **Georgia, you must have some training.**

2  Q  And have you to be POST certified in the
3  State of Georgia to act as law enforcement
4  officer; is that correct?

5  **A  That is correct.  And there is some**
6  **question as far as can you be in an interim basis**
7  **and I don't know the ins and outs of that**
8  **particular thing, but I feel it's a tighter demand**
9  **for credentials -- for credentialing, I should say**
10  **that, than is the State of Illinois.**

11  Q  When I say POST certify, of course we're
12  both talking about Peace Officers Standards
13  Training is what the acronym stands for; is that
14  right?

15  **A  That's correct.**

16  MR. CLARK:  Not Mark Post certified.

17  BY MR. POST:

18  Q  To be POST certified in Georgia you have
19  to go through the basic law enforcement course
20  which is a 408-hour course, right?

21  **A  Right.**

22  Q  That has been true for a decade or more,
23  right?

24  **A  I think it has been.  Personally I will**
25  **throw out 13 years.  I don't know if I'm correct**

---

**49**

1  in that but I think that's true.
2  Q  That would put it back in 2006 by my math
3  approximately, correct?
4  A  That's correct.  And it may have been
5  before that.  I'm not that familiar.
6  Q  At least as far back as 2006?
7  A  Right.  It amazes me, I would have to say
8  this, and nothing against the south, that a
9  southern agency would have more attainment levels
10  necessary to be a police officer than a northern
11  agency.  That's just my own gut reaction.
12  Q  You've got two lawyers here that are
13  probably surprised as well.
14  MR. CLARK:  I'm not surprised at all.
15  BY THE WITNESS:
16  A  I can't believe it.  So there we go.
17  BY MR. POST:
18  Q  I am surprised that you don't have to be
19  certified to be a law enforcement officer in
20  Illinois.  I digress.
21  Let's talk about your employment history a
22  little bit more.  I see 1966 through 1967,
23  Illinois Bureau of Criminal Identification and
24  Investigation.  What was that?
25  A  I was a crime scene technician for the

**50**

1  Illinois Bureau, it's a crime laboratory.  They
2  now have it stationed throughout the State of
3  Illinois where if there's a major crime scene,
4  they would go to the crime scenes.
5  Q  Were you trained as a tab technician or it
6  was it an internship or what?
7  A  It was an internship at first and then I
8  was trained to collect evidence.  I was not
9  trained to process the evidence.  I didn't have
10  the credentials to process the evidence.
11  Q  When I say internship, that was an
12  internship through what?
13  A  Internship through Michigan State
14  University and through the newly formed state
15  crime laboratory.  They just brought in people who
16  were interested in learning about that.
17  Q  That was when were you a student at
18  Michigan State; is that right?
19  A  Then and also later after I had graduated
20  from Michigan State.
21  Q  You graduated -- was it a summer
22  internship when you were at Michigan State, is
23  that what it was?
24  A  It actually extended -- there was a period
25  of time where I was undercover working -- in 1966

**51**

1  you could do some things that possibly today you
2  could not do, okay.  People would like to do
3  certain things and engage in certain activities
4  with certain groups like Students for a Democratic
5  Society or things of that nature that you would
6  not be allowed to do today and you could function
7  part-time in that position, then you could go over
8  and work in this position and then you could work
9  in another position.  So it was kind of a
10  hodgepodge in my opinion at that particular time,
11  but I took it as a chance to gain experience.
12  That's the main thing.
13  Q  So what you're saying is that sometimes
14  you could work in different areas and get paid
15  more than one check; is that what you're saying?
16  A  Well, for instance, Students For a
17  Democratic Society was not a paid position.  It
18  was a position where they were attempting to
19  overthrow the country.
20  Q  I want to make sure I was understanding
21  we're talking about some protest movement and that
22  sort of thing?
23  A  You got to remember this is 1960.
24  Q  You were undercover infiltrating
25  organizations at that time?

**52**

1  A  Yes, exactly.
2  Q  Now I understand.  1967 through 1969, Ann
3  Arbor Police Department.  Tell us about that?
4  A  In 1966 and 1967, eventually I joined the
5  Ann Arbor Police Department.  I worked for member
6  an undercover capacity for a period of time and
7  then went on the street as a regular patrol
8  officer in 1967.  That is the way it was set up,
9  the latter part of 1969 into 1970.
10  Q  Were you making felony arrests at the
11  time?
12  A  Yes.
13  Q  How many felony arrests did you make
14  approximately?
15  A  I wouldn't know in sheer numbers.  I know
16  I lead the department each year that I was on the
17  department.  So I stayed as a patrol officer and I
18  did not want to get into the detective division
19  and remember that was one of the points of
20  contention, if you're going to make those type of
21  arrests, you should be a detective.  Again, we're
22  probably talking about hundreds, but I don't know,
23  if we classified it in seriousness, talking about
24  arresting people for homicide, there probably was
25  no more than four or five homicides committed in

Transcript of Gregory J. Connor
Conducted on October 10, 2019

53

1 Ann Arbor each year. It was a good time at the
2 time.
3    Q So detectives would have worked those
4 cases and not a patrol officer, correct?
5    A Yes. We had what was called a generalist
6 specialist system and a generalist specialist
7 system which sounds like hodgepodge again, an
8 officer would go out and I would do as much work
9 as I could do say on a burglary. If I needed to
10 have latent prints taken, I could call in the
11 person to do the latent prints, et cetera,
12 et cetera. I was in charge of the investigation.
13 Eventually that moved into and evolved so that the
14 detective division took over everything.
15    Q Let's go on to the University of Illinois
16 Police Training Institute which we touched on
17 before.
18    A Yes.
19    Q You worked there how long?
20    A I was there 37 years.
21    Q And retired in 2000; is that right?
22    A Yes, latter part of 2000.
23    Q Tell us what your duties were for the
24 Police Training Institute.
25    A I taught I believe every aspect of the

54

1 curriculum with the exception of law. When we had
2 law being taught, it was co-taught by an attorney
3 and what was referred to as a practitioner, not to
4 insult attorneys, but practitioners, and I would
5 come in as the practitioner. I was the person who
6 would teach patrol strategies, or I was the person
7 who would teach vehicle stops, and when it came to
8 teaching the Illinois Vehicle Code, I would be in
9 there to show -- to give kind of a tactical
10 overview of what to do on a top but an attorney
11 would be there to describe the statutes, statutory
12 language, elements, et cetera.
13    Q I notice on your resume that at the time
14 you were employed at the Police Training
15 Institute, you also list some other employment.
16    Can you tell us about that, how you had
17 multiple employment at the same time that were you
18 at the Police Training Institute?
19    A Yes. I felt that an officer or that a
20 trainer or a professor or whatever should practice
21 what they preach in the sense that I worked as a
22 patrol officer in the City of Naperville and then
23 later worked with the Federal Law Enforcement
24 Training Center in Glencoe, Georgia developing
25 some of the applications of force and

55

1 visualizations of force utilization, and then from
2 1986 until probably I guess it was 1995, I was in
3 a little town called Mahomet and I was a police
4 officer there Friday through Sundays.
5    Q And with regard to Naperville Police
6 Department, '77 through '78, were you part-time
7 there as well?
8    A No, I was full-time. I was full-time in
9 Naperville. I actually took a leave of absence.
10 The university gave me a leave of absence for that
11 period of time. They no longer do that just from
12 the standpoint of liability issues.
13    Q So you did not work for the Police
14 Training Institute during 1977 through '78
15 actively?
16    A That's correct. I did some teaching for
17 them when it was in the area and I would do it.
18    Q The Mahomet Police Department, tell us
19 about your activities there?
20    A I wanted to have the experience of working
21 small agencies. So I was living in the City of
22 Mahomet with my wife and children and I took on
23 the job of becoming a police officer in Mahomet,
24 going through the testing, et cetera, going
25 through the Institute and becoming "certified" as

56

1 a police officer, and the university did not want
2 me to do any more work than Friday night through
3 Sunday. They wanted me to be available to do
4 teaching the rest of the week.
5    Q Did you make felony arrests when you were
6 a member of the Mahomet Police Department?
7    A Yes.
8    Q How many?
9    A I would say they were minimal in the sense
10 that we didn't have that many felonies.
11    Q What do you mean by that?
12    A In the period that I worked, probably --
13 felony arrests probably no more than five a year.
14    Q Tell us about the Federal Law Enforcement
15 Training Center employment from 1990 through
16 1992.
17    A I was selected by a review committee by
18 the Federal Law Enforcement Training Center in
19 Glencoe to develop for the multitude of agencies a
20 singular standardized use of force policy and a
21 visualization of the use of force for these
22 agencies.
23    At one time, I believe at one time there
24 were 52 federal law enforcement agencies and each
25 of them had their own policies, each of them

57

1  looked at force differently. Now I believe
2  there's something like 70 federal law enforcement
3  agencies. Some still look at their own force
4  separately, the FBI does, for instance. Where I
5  got the majority of them, I would say at least
6  60-some agencies to agree with the visualization
7  of the use of force continuum and a policy of
8  standardization of force.
9      Q  What do you mean by use of force
10 continuum?
11     A  A continuum of force where the officers
12 will respond in kind to a balanced application of
13 force based upon the subject's degree of
14 noncompliance to a particular enforcement
15 activity.
16     Q  Did you create some sort of training or
17 visual device to train officers with during your
18 employment there?
19     A  Yes. We had the use of force -- well, it
20 was myself and Franklin Graves who was from FLETC,
21 they referred to it as FLETC.
22     Q  FLETC is --
23     A  Federal Law Enforcement Training Center so
24 we had a use of force model and the model
25 basically had a structure of subject action,

58

1  officer response, and the nature of the
2  environment. So they had mainly three elements
3  that you would consider when you used force toward
4  an individual, let's say making an arrest or
5  moving a subject from an area or something of that
6  nature. What was the person doing, what was the
7  nature of the environment and what was the
8  activity of the officer, what the officer, in
9  fact, did.
10     Q  What was your position at the Federal Law
11 Enforcement Training Center?
12     A  Course developer, concept developer,
13 something of that nature.
14     Q  Who paid you? Were you an intern? Was it
15 a grant, a fellowship? What was it?
16     A  It was a grant through the Federal
17 government. They didn't pay me, they paid the
18 University of Illinois. The University of
19 Illinois paid me a portion of what the feds paid
20 them.
21     Q  The Somali National Police Headquarters,
22 what's that?
23     A  I took the opportunity in 1993 to spend a
24 year training the Somali National Police. Somalia
25 had gone through a major revolution. They had no

59

1  government. They had no legal system. Our goal
2  was, and this was during the Clinton
3  administration, our goal was to bring this
4  national police entity back to its role, a role
5  that it had as one of the primary law enforcement
6  agencies in Africa, and that's what we tried to
7  assist in doing. That ended abruptly with them
8  downing the helicopters, and the rest is history.
9      Q  Were you there at the time that happened?
10     A  I was there but not present. I was miles
11 away.
12     Q  How long did you remain in the country
13 after the helicopter that was made famous by the
14 movie Blackhawk Down?
15     A  Hours, hours.
16     Q  So you left shortly after that?
17     A  Right. And we left everything.
18     Q  That was the 75th Ranger Regimen; is that
19 right?
20     A  I don't know. I think it would come under
21 fiasco the way I looked at that whole system.
22     Q  Unfortunately, I am old enough to
23 remember.
24     A  Oh, yes. We do have things like that.
25     Q  So since you retired in the year 2000,

60

1  what have you done to earn income essentially or
2  what have you done professionally?
3      A  Actually I do -- once in a while I will do
4  a deposition. I just did a deposition for the
5  State of Massachusetts involving the Massachusetts
6  State Police use of force, and I wrote a book on
7  Stop and Frisk with another -- with an attorney
8  and I'm finishing a book on what I refer to as the
9  challenge of attempting to standardize policing
10 and police performance.
11     Q  How do you go about keeping current with
12 changes in police policies, practices, procedures,
13 legal requirements and things like that since
14 retiring back in 2000?
15     A  The only way I feel like you can do that
16 is to actually work with officers as they are
17 functioning. I think it's more -- it needs to be
18 more intense than a ride along program. I've been
19 lucky enough in the sense that the City of
20 Champaign, a median-sized police department, does
21 allow me to at least associate with officers when
22 they're making arrests and I pretty closely follow
23 how the arrest process takes place and what
24 tactics they use and things of that nature. I
25 don't think you can ever be so close to an officer

Transcript of Gregory J. Connor
Conducted on October 10, 2019

61

1  without being an officer at the time, but I think
2  it gives you some insight.
3      Q  When you were employed with the Police
4  Training Institute, you were more of a trainer
5  than an academic?  Is that fair to say?
6      A  Absolutely.  We did not -- this is one of
7  the reasons they would not give academic credit to
8  people who went through the Police Training
9  Institute.  I spent most of my time in the field
10  and whether or not the field would be the City of
11  Naperville or it would be in southern Illinois
12  with a community that needed someone who thought
13  that this should be done this way or maybe the
14  form should be this way.  We were out in the
15  field.  I was out in the field.  Most of the
16  trainers were much older than I was and, again,
17  I'm older now but I'm just saying at the time.  I
18  could do that.  I could qualify as a police
19  officer in many of the departments even those and
20  especially those that required you to be
21  professional.
22      Q  So when you write on or work in the field
23  of police use of force, it is more in a training
24  this-is-how-you-do-it capacity as opposed to an
25  academic capacity; is that fair to say?

62

1      A  Yes.  I would say it's more hands on.  I
2  firmly believe that officers need to be shown how
3  to do something and that it has to be practical
4  and tactical, and I think there is a major gap
5  unfortunately between the academic and the
6  practical side of policing.
7      Q  I asked you how you keep up with changes
8  in police practices and such.
9         Do you try to keep up with federal
10  training bulletins like those issued by the United
11  States Department of Justice involving use of
12  force?
13      A  I do.  My even feeling is based upon my
14  contact with the Federal Law Enforcement Training
15  Center and some of the departments we've trained
16  like Border Patrol, Capital Police.  I felt that
17  most municipal and county deputies had more skill
18  areas than many of the federal officers.  I
19  thought the federal officers were primarily
20  directed toward investigatory type activities
21  rather than arrest type activities.
22      Q  Do you keep up with particular agencies'
23  training bulletins like Chicago Police Department
24  or other agencies?
25      A  I do.  I'm not on a list where Chicago PD

63

1  sends me things.  I would not put Chicago PD as
2  one of the more progressive.  I think Sonoma,
3  California is I think a very progressive agency.
4  I think Ann Arbor because just I was there they
5  have some progressive movements, and you can pick
6  and choose progressive areas and agencies based
7  many times on the incident itself.  You have no
8  idea how backwards let's say Dallas PD was or is
9  until you have some case that will throw you into
10  Dallas PD or read about it.  I thought Baltimore
11  was much more advanced than they are and I see
12  some of the things they're doing that I didn't
13  think were professional in my opinion.
14      Q  I neglected to ask you how many use of
15  force cases you investigated as a police officer?
16      A  As a police officer, I would say probably
17  in Ann Arbor four major cases as far as providing
18  input into them, and then in the other areas and
19  other agencies, I would be either the go-to person
20  for these cases when they came up, for instance,
21  in Mahomet it came up maybe twice in those years
22  of activity.  In the federal realm, I would just
23  be consulted, but I can't say that I was the lead.
24      Q  When I say use of force with regard to
25  Mahomet which you mentioned two times, what kind

64

1  of cases are we talking about?
2      A  It would be in the sense of maybe it would
3  be a domestic and the officer would go in and
4  berate the husband or the boyfriend or something
5  but not make an arrest, and to me that's a force
6  utilization in a sense, in the sense that he
7  put -- if he put his hands on the person and maybe
8  he would push or shove them or maybe he would tell
9  them to get the hell out of there or whatever, to
10  me that was not appropriate use of force.
11      Q  So you were asked to give an opinion or
12  provide correction to members of those police
13  forces; is that right?
14      A  Yes.  I can remember one, for instance,
15  Rantoul Police asked my opinion in the way a
16  Rantoul officer handled a subject in the jail, and
17  I felt the officer was excessive.
18      Q  Spell that.
19      A  Rantoul, R-a-n-t-o-u-l.
20      Q  That's a city?
21      A  That's a city, yes.
22      Q  You had taught use of force and use of
23  certain control tactics, is that right?
24      A  That's correct.
25      Q  Did you teach proper use of tasers?

Transcript of Gregory J. Connor
Conducted on October 10, 2019

65

1      A   Yes.  I taught the use of tasers.  We
2  taught use the use of tasers.  I'm not sure they
3  were properly used every time we saw them used but
4  I did teach them and have certain guidelines that
5  they followed.
6      Q   What about ASP batons, I think they are
7  PR-24s or something?
8      A   PR 24s, I did all of the baton training
9  and we just varied it only in the sense of the
10 unit itself and it expanded, and we would use that
11 as maybe a factor in drawing and directing the
12 baton, something of that nature, and then some of
13 the come along techniques with the PR-24 baton.
14     Q   How long has it been since you taught
15 anything having to do with PR-24s?
16     A   Four years, five years.
17     Q   What about ASP batons?  Same thing?
18     A   I would say generally.  ASP has been out
19 for a period of time.  There are several
20 variations of the ASP baton and if somebody asked
21 me how to use it and what we should do with it,
22 that would be that duration.
23     Q   Have you taught proper use of choke holds
24 or have you taught that before?
25     A   We did not teach choke holds.  I did not

66

1  personally teach a choke hold.  To me a choke if
2  it was done correctly, it would be deadly force,
3  to me a deadly force would need to be with a
4  vehicle or a firearm as opposed to some type of
5  weaponless technique.
6      Q   What is a true choke hold?
7      A   A true choke hold to me is where you would
8  break the bone structure in the throat and cause
9  the person to gag or choke on their body parts
10 basically.
11     Q   Are there other types of choke holds?
12     A   There are other type of neck restraints.
13 There are carotid neck restraints but somehow
14 someone has thrown choke holds into it's kind of
15 like saying this is -- if you're going to choke
16 someone, they are going to be choked.  If you are
17 going to put someone out in the sense of lack of
18 blood flow, then you would use a carotid neck
19 restraint, single, dual, things of that nature.
20     Q   Are those restraints commonly used by the
21 police now?
22     A   I would say most police departments have
23 enough sense to hesitate to use them since they do
24 require a degree of sophistication in their
25 utilization.

67

1      Q   Why do they need to have sense to use them
2  or not use them?
3      A   Officers need to understand that you could
4  use too much pressure and bring a person to a
5  state of unconsciousness and the subject may not
6  be able to regain consciousness.  You could kill
7  someone with a technique and for a problem where
8  the person was not subject to deadly force.
9      Q   Are there rules with regard to proper
10 police procedure about putting force on someone's
11 head or neck or something along those lines?
12     A   Well, there are rules that say that you
13 must be justified and it must be balanced.  You
14 could strike that person in the head if that
15 person had placed you in fear of your life, let's
16 say, but if this person is refusing to exit the
17 vehicle because they've got an invalid operator's
18 license, you can't choke them out.  That would be
19 excessive in my mind and in the mind of most
20 people.
21     Q   What is a Yawara stick technique out of
22 curiosity, Y-a-w-a-r-a?
23     A   A Yawara stick technique was developed by
24 a Martial artist last name was Kubota,
25 K-u-b-o-t-a, Tak, T-a-k, Kubota.  It's a six-inch

68

1  plastic device that has ribs on the outside of it
2  and it is used mainly as an impacting weapon for
3  pressure points.  It was another tool in the areas
4  of police control tactics.
5      Q   You say was.  Is it used anymore?
6      A   I don't think most people use it
7  skillfully anymore.
8      Q   When is the last time you taught those
9  techniques?
10     A   The Yawara stick probably 15 years ago.
11     Q   What is this publication Tactical
12 Neutralization Techniques?
13     A   Tactical Neutralization Techniques was the
14 basic manual that we gave out to our officers in
15 the sense that they were able to look at that and
16 see the techniques that we would then teach them
17 as far as methodologies for control.
18     Q   When was the last time that book or
19 publication was actually published or updated?
20     A   It was updated in the late nineties.  I
21 can't tell you the exact date.  You would have to
22 check with the publisher, I guess, and it was
23 discontinued when there was new administration in
24 the Police Training Institute.
25     Q   When did that happen?

Transcript of Gregory J. Connor
Conducted on October 10, 2019

69

1    A  It would be either 1999 or 2000, something
2  like that, and the individual that took it over
3  and right now I can't tell you the name of the
4  individual sad to say, maybe it's Freudian, he
5  wrote his own book.
6    Q  Is that one of the reasons or the reason
7  you left the Police Training Institute?
8    A  No. I retired.  I could see the
9  handwriting on the wall and my feeling was that we
10  were getting more and more junior colleges that
11  were going to dilute in my opinion the training of
12  police officers throughout the state.  We went
13  from one agency that did the training to I believe
14  16 junior colleges.
15    Q  Going down to articles on Page 4, what is
16  this Forward Fundamentals?
17    A  Forward Fundamentals, it was a counter
18  article Back to Basics that was at the time there
19  was an American Society of Law Enforcement
20  Trainers and they had a journal, and my feeling
21  was that we should not being going back to
22  anything in law enforcement, we should be moving
23  forward, but to use some type of fundamental
24  standardization, things of that nature.
25    Q  Just Because We Can Doesn't Mean We Should

70

1  is an article that you wrote in the year 2000; is
2  that correct?
3    A  Yes, that was for the same trainer and it
4  dealt primarily with pursuits and many departments
5  according to Illinois law could pursue but my
6  feeling was that they -- it wasn't worth the
7  ramifications of death and destruction.
8    Q  FTO, Fundamental Training Officer, what
9  was that article about?
10    A  It basically said that -- it talked about
11  and provided some degree of research showing that
12  the officers instead of field training officers,
13  what we needed to have is every officer had to
14  understand the fundamentals and we needed to have
15  something different than the best officers to come
16  out and be on the road were recruits.  Officers
17  who had been out on the road for a period of time,
18  street officers, whatever, for a period of time
19  had lost a lot of the skills and a lot of the
20  talents that they had.  So I wanted if we're going
21  to have somebody go out into the field, have them
22  go out and make sure that everybody in the field
23  was up to speed on the skills necessary to be a
24  professional officer.
25    Q  Safety Maximized Handcuffing, American

71

1  Jails, 2009, what was that?
2    A  I'm sorry?
3    Q  What did that deal with, bottom of Page 5.
4    A  Okay.  The Safety Maximized Handcuffing
5  With American Jails, I believe what I worked on
6  with that was the concept that when you're putting
7  handcuffs on an individual, you should put them on
8  the individual so that the individual can't grab
9  your fingers, can't grab your hands, can't grab
10  the handcuffs themselves.  So it would be
11  primarily have the hands to the rear and having
12  control of the subject's back fist.
13    Q  Control Tactics Training, what was that
14  article about on the top of Page 6?
15    A  For the first year of a manual, a journal
16  I should say, deputy and court officer that came
17  out, what it was a follow-up to departments
18  asking them how dated or how contemporary was the
19  way they trained officers in control tactics.  A
20  real quick for instance, we talked earlier about
21  the taser, when you shoot someone with a taser, it
22  requires you to do more than just shoot that
23  person with a taser.  He falls to the ground.  We
24  have to go up and put handcuffs on that individual
25  and we had many officers that didn't understand

72

1  that you taught the total, in terms of you go from
2  the start to the finish of control subject who is
3  handcuffed, searched, removed from the scene,
4  et cetera, more or less that was the gist of it.
5    Q  Handcuff Maintenance and Cleaning, did
6  that deal with essentially what it says in the
7  title?
8    A  It did.  The only reason that we made such
9  a big issue out of it was that so many bloodborne
10  diseases had come from it and even today I would
11  say the average officer has never cleaned their
12  handcuffs.  They may have wiped the blood off,
13  okay, but in the mechanism there are bloodborne
14  pathogens that are there.  Not that you wanted to
15  be arrested next week.
16    Q  Thank you for coming to Georgia in 2014
17  and teaching that.  Please come back.
18    A  Yes.
19    Q  White Paper Control Methodologies in
20  Policing, what was that about?
21    A  The Peace Officers Association of Georgia,
22  we tried to get police agencies in the State of
23  Georgia to standardize control methodologies so
24  that if you're going to put handcuffs on a person,
25  then put them on this way.  If you're going to

Transcript of Gregory J. Connor
Conducted on October 10, 2019

19 (73 to 76)

73

1  control a subject, then you control them this way.
2  Just because you're in a different department
3  doesn't mean that it should be a different way of
4  handling this person or that person.  Most humans
5  have about the same body design as every other
6  human.  So that's what we attempted to do and we
7  tried to develop a use of force policy for every
8  department.  It showed us in my opinion that the
9  departments were not ready for that.
10     Q  So that publication did not happen?
11     A  It happened.  At that time I think it was
12  pending.  I didn't update it, but you could send
13  for it and utilize it but departments basically
14  didn't send for it.
15     Q  What year was that that it was actually
16  published?  Do you remember?
17     A  It probably was published in 2018, 2017,
18  2018.
19     Q  What do you mean that the departments
20  weren't ready for it?
21     A  Departmental training was not standardized
22  to the point where you could take it and say,
23  well, we want to prove it by starting here and
24  moving up to there.  Some departments had not
25  understood fundamentals of gaining control of the

74

1  person before they start to try to handcuff the
2  person.  I actually remember going to classes and
3  courses where you would be putting handcuffs on
4  people that were moving around fighting with you.
5  That's how far beyond reality I think we were.
6     Q  Do you know of any other Georgia training
7  with regard to handcuffing suspects or detainees
8  other than the Georgia Peace Officers standards
9  training, the basic law enforcement course
10  training?
11     A  They basically refer to it as handcuffing.
12  Whatever that may be.  I'm not sure what that is.
13  Did you teach handcuffing?  We did.
14     Q  What do you mean by difference in
15  handcuffing.  I understand what you're saying
16  about the control techniques leading up to
17  handcuffing.
18     A  Right.
19     Q  Was there some different with regard to
20  handcuffing itself?
21     A  Well, I would say, for instance, if you
22  put handcuffs on an individual and the individual
23  has the handcuffs on them and the lock port
24  openings for the handcuff are to the outside as
25  opposed to the inside, then when we go to take the

75

1  handcuffs off, it might be a little bit different
2  and we find that it's as dangerous to take
3  handcuffs off an individual as it is to put
4  handcuffs on an individual.
5     Q  Why does it matter which side --
6     A  Because if you're going to control the
7  hand, let's say we have the subject and we're
8  going to control one of the hands, if your hand is
9  in the area where it should be, it will block the
10  lock port opening for your key to get to it
11  whereas if it's on the inside you can unlatch it,
12  you still have control of the subject's hand and
13  you're able to get the handcuff off.
14     Q  You mean you hold their arms up together
15  and unlock it if it's on the inside which gives
16  you a pressure or control as opposed to having it
17  on the back where you're pushing against it and
18  you lose control?
19     A  Right, the main thing if this is the hand
20  and I've got control of this hand and I could use
21  my other hand to unlatch the handcuff, I still
22  have control of this subject's hand.  Do you see
23  what I mean?  And we are able to put the handcuffs
24  back.  If this hand interferes with the front
25  placement of that handcuff, then you're going to

76

1  have to lift that hand up, take the handcuff off,
2  this guy's a hand is free or minimally controlled.
3  I can show you.
4     Q  We'll do that off the record when we take
5  a break in a few minutes.  I might need you to
6  show me.
7     A  That's fine.
8     Q  Where would I get a copy of that Control
9  Methodologies in Policing article?
10     A  You can get it through the Peace Officers
11  Association of Georgia.  I have a copy of it.  I
12  have no problem providing with you a copy of that.
13     Q  That would be great.  Could you e-mail it
14  to me or mail is fine, too?
15     A  I'll mail it to you.
16     MR. CLARK:  You can get it to me and I'll
17  take care of it.
18     THE WITNESS:  Okay.  That's fine.
19     MR. POST:  Thank you.
20  BY MR. POST:
21     Q  Tactical Tip, Fronting From Cover, what
22  does that involve?
23     A  In my opinion in Georgia, officers many
24  times -- certain times they'll get behind cover
25  and then when the confrontation actually takes

Transcript of Gregory J. Connor
Conducted on October 10, 2019

77

1  place they step out from the cover. My feeling is
2  you need to control the individual, handcuff them,
3  do whatever you have to or want to do with them,
4  from behind cover. That's simply stated I guess.
5      Q  What is the teaching in Georgia now or in
6  2015 when that was published?
7      A  I don't think it was addressed. I don't
8  think it's being addressed even now, and that's
9  not unique to Georgia. Cover is just a brand new
10 concept in law enforcement circles. It's sad but
11 it's something that we see all the time that
12 officers don't even -- don't even become conscious
13 of it or they'll become conscious of it and then
14 go from cover to confront a subject. We see it
15 almost any time you see a YouTube video.
16     Q  ASLET, that acronym stands for what?
17     A  American Society of Law Enforcement
18 Trainers, ASLET.
19     Q  Are you a member of that?
20     A  I was. I am no longer a member of it. I
21 haven't been a member of it for probably ten
22 years. It's gotten to the point where it's
23 more -- there were certain qualifications that you
24 had to be an ASLET trainer. Now I would say the
25 qualifications are much less.

78

1      Q  You don't think the organization is quite
2  as prestigious as it was?
3      A  It's not as prestigious to me. Now, it
4  may be I believe they actually have their national
5  convention here in the City of Chicago. That
6  shows you how much I know about it, but I just
7  don't think that they've come up with things and
8  have published enough to have it even refuted.
9      Q  Looking at these publications, none of
10 those publications are considered to be academic
11 research; is that fair to say?
12     A  I would say most publications in law
13 enforcement are anecdotal as opposed to true
14 research.
15     Q  So they're not peer-reviewed; is that fair
16 to say?
17     A  Well, they're peer-reviewed depending on
18 the peers, and, again, sometimes peer-reviewed
19 journals, I've had things in peer-reviewed
20 journals, but like I say, there is there just
21 seems to be the major chasm between true academic
22 expertise and practical tactical police expertise.
23 One of the things we'll talk about, I'm sure we'll
24 talk about deescalation of things of that nature,
25 and that primarily was an academic creation. Most

79

1  people would say that an individual perpetrator
2  has to be the person who has to deescalate first
3  and not role switch it to the officer. But,
4  again, there's confusion in both areas and this is
5  where even I think even it mentions in this
6  article. We'll come back to this article again
7  here --
8      Q  When you said "this article," we're
9  talking about Plaintiff's 4 is what you just
10 pointed to, correct?
11     A  That's correct. Here you're talking about
12 crisis intervention as understood by a physician
13 as opposed to crisis intervention that's
14 understood by anybody who takes a crisis
15 intervention course. It could be a two-hour
16 course. There is no standard in my mind for you
17 must have a minimum of X. We don't even think in
18 terms of that in law enforcement. We think in
19 hours as opposed to careers.
20     Q  Understood. Going back to the
21 peer-reviewed articles, which articles or books
22 have you written that were peer-reviewed?
23     A  I had an article that was based on
24 research that I did when I first started at the
25 Police Training Institute, and it dealt with

80

1  officers who would -- if their wives were raped,
2  would they report that rape to the police
3  department, and it was picked up by I think the
4  name of the publication was Social CaseWork and
5  that was peer-reviewed. It appeared in Social
6  CaseWork probably 1970-ish and at that time I was
7  advised that there was not a great deal of
8  interest in officers looking at extensive studies,
9  et cetera, et cetera, et cetera.
10     In those days, Law and Order Magazine had
11 reading times. So it will give you an idea in how
12 much depth we were interested in going into in
13 1970. I don't know if that's changed.
14     Q  That's one, what about any others that
15 were peer-reviewed?
16     A  That's it. As far as any that I followed,
17 that was one I recall. I felt it was a good
18 study. I truly felt it was a good study because I
19 had joined the university and the university meant
20 legitimate research and study groups and this sort
21 of thing and I was expecting that that's what when
22 you bring people with academic credentials into a
23 university, then the people that they train will
24 be academically prepared.
25     Q  So that's the only one that you have?

Transcript of Gregory J. Connor
Conducted on October 10, 2019

81

1    A  That was the only one that I had --
2    Q  Peer-reviewed?
3    A  -- that I thought of as peer-reviewed.  I
4  do not think articles that even when people say
5  they're peer-reviewed now, I don't think they're
6  peer-reviewed in my opinion.
7    Q  I have a couple of more questions on this
8  and then we'll take a break.
9    A  Okay.
10    Q  So essentially none of the articles or
11  books that you've written are scientific or give
12  scientific opinions in the sense that they are
13  theories or techniques that have been tested for
14  accuracy; is that correct?
15    A  Well, I'll take, for instance, the Stop
16  and Frisk book that I just finished with Douglas
17  Mitchell, that book is used primarily in law
18  schools to train lawyers on Stop and Frisk.  The
19  belief I had as a nonlawyer that lawyers would
20  understand criminal codes, and apparently they
21  didn't and it was surprising, and then that book
22  is being used to train citizens within
23  communities.  So I'm not sure you could say it's
24  scientific.  It is or isn't scientific.  It's
25  guess the best word would be practical.

82

1    Q  And that's kind of what I'm getting at.
2  It's not something -- your publications or
3  articles, they're not something that you could
4  actually test for error rates and see where there
5  are variations in some of the numbers you come up
6  with or some of the situations that you come up
7  with?
8    MR. CLARK:  I object to the form of that
9  question.  Go ahead.
10  BY THE WITNESS:
11    A  I would say you could test for error
12  rates.  It's just that usually the readers don't
13  test for error rates.
14  BY MR. POST:
15    Q  I guess I'm talking about you yourself and
16  what you have written and published.
17    You don't use any statistical model to
18  test for variations, true?
19    A  I use statistical models in the sense of
20  what I create, but what I publish I don't put
21  statistics in there because usually it will turn
22  off readers in my opinion.
23    Q  So what kind of statistical testing have
24  you done?  Tell me about that.
25    A  Well, in the latest book we talk about

83

1  statistical analysis in the sense that we're
2  having officers look at certain methodologies of
3  control and do these methodologies work across the
4  board or does this person escape from this
5  particular technique by taking the handcuffs off,
6  let's say somebody in a correctional facility, and
7  we can say, okay, if you put them on this way, it
8  will be safer for the officer and, again, the
9  statistical breakdown is X, and compared it to
10  another approach where we have officers who use
11  the handcuffs or use this handcuffing technique
12  and many times the subject breaks out of the
13  handcuffing mode.  A for instance is many
14  departments will say things like the first time
15  this person became noncompliant was when the
16  officer attempted to handcuff the subject.  Well,
17  the officer didn't have control of the subject
18  and, therefore, it was not established at the
19  level it should have been established in the sense
20  of that standard.
21    One other thing I can say is we can give
22  you and we can tell you certain values that if you
23  use this technique, it's worthy of being weighted
24  a four, let's say; if you use this technique, it's
25  being weighted as a two.  It's not as good as this

84

1  particular one or this particular one.
2    There's research now being done on
3  officers approaching suspect vehicles, should you
4  approach on the driver's side or should you
5  approach on the passenger side.  If you have 13
6  officers get killed by getting hit by oncoming
7  traffic on the driver's side and no officers get
8  killed approaching on the passenger side, you
9  could break that down statistically I guess, but
10  it seems to be -- to me that's a form of research
11  I guess.
12    MR. CLARK:  So now they do the passenger
13  side.
14  BY THE WITNESS:
15    A  Now all the effort we give --
16  BY MR. POST:
17    Q  So you're really not putting any of these
18  things into some sort of statistical model to test
19  for standard deviation, right?
20    A  No.  The traditional statistical models in
21  my -- my feeling is they don't have a place yet in
22  law enforcement circles.
23    Q  So it's not something that would be
24  generally recognized in the scientific community;
25  is that accurate?

85

1    MR. CLARK: Object to form. Go ahead.
2  BY THE WITNESS:
3    **A  I don't feel --**
4    MR. CLARK: I think he's answered that. I
5  don't know if you want to go back to it, but I
6  think it's been asked and answered. He described
7  what he viewed as being scientific.
8    MR. POST: I'm still asking the question.
9    MR. CLARK: I understand.
10 BY THE WITNESS:
11   **A  I don't believe science is anywhere -- I**
12 **don't see where science has moved into law**
13 **enforcement circles in the way I understand**
14 **science.**
15 **BY MR. POST:**
16   Q  And when we're talking about science, I
17 think we're both understanding it to mean science
18 in the realm of psychology, experimental
19 psychology, physics, mechanics, biomechanics, that
20 sort of scientific community; is that what you
21 meant?
22   **A  If and when science goes into law**
23 **enforcement, it will be the less sophisticated**
24 **sciences. The less sophisticated ones. I'm not**
25 **sure that social science is a science where maybe**

86

1  **mechanical science is.**
2    MR. POST: Let's take a break.
3    (A recess was had.)
4    MR. POST: On the record.
5  BY MR. POST:
6    Q  Mr. Connor, we're back on the record.
7  You're still under oath and I've got a few more
8  questions for you, okay?
9    **A  Okay.**
10   Q  You've heard of the term positional
11 asphyxia of course?
12   **A  Yes.**
13   Q  Tell us what you know about that if you
14 would.
15   **A  Basically it's positioning of an**
16 **individual so that the person has restrictions in**
17 **their capacity to breathe and eventually**
18 **inhibiting proper breathing to the point where the**
19 **person could actually die from the condition.**
20   Q  And the existence of that particular
21 phenomenon has been known for at least 20 years
22 plus at this point, is that true?
23   **A  I would say at least 20 years.**
24   Q  And it has been taught in the basic law
25 enforcement course in Georgia since at least 2006;

87

1  is that true?
2    **A  I believe that that's correct. I believe**
3  **it has been taught from the standpoint of that**
4  **phenomenon occurring from the hog-tying for lack**
5  **of a better term or the compression, reverse**
6  **compression of a human body approach.**
7    Q  And we mentioned some articles earlier. I
8  believe most of these have already been attached
9  to another deposition. I think we're on
10 Plaintiffs' No. 7. I'm going to mark one as the
11 Chicago Police Department Training Bulletin as
12 Plaintiffs' Exhibit No. 7. The other one which I
13 am sure has been attached to another deposition,
14 I'm going to mark it as Plaintiffs' Exhibit 8 just
15 to be on the safe side.
16   (Certain documents were marked Plaintiffs'
17   Deposition Exhibit 7 & 8 for
18   identification, as of 10/10/2019.)
19 BY MR. POST:
20   Q  I'm handing you plaintiff Exhibits No. 7
21 and 8 and ask you if you are familiar with
22 Plaintiffs' Exhibit No. 7 which is entitled
23 Chicago Police Training Bulletin Positional
24 Asphyxia, Volume No. 36, No. 2, February 6,
25 1995.

88

1    **A  Yes, I've seen is this.**
2    Q  Plaintiffs' Exhibit No. 7 entitled
3  Positioning Asphyxia Sudden Death, which is a
4  publication of the National Law Enforcement
5  Technology Center which is a National Institute of
6  Justice program dated June of 1995.
7    Are you familiar with that publication as
8  well?
9    **A  Yes, I've seen that publication.**
10   Q  Let's start with the Chicago Police
11 Training Bulletin, Exhibit 7. The second
12 paragraph that particular publication it lists a
13 common sequence of events which can show or which
14 often causes sudden in-custody deaths, drug or
15 alcohol intoxication, which causes bizarre or
16 frenzied behavior, a violent struggle with police
17 which results in police using some sort of
18 restraint techniques, and then the person becoming
19 unresponsive and dying.
20   You are familiar with this sequence of
21 events being common in these types of sudden
22 death; is that fair to say?
23   MR. CLARK: Object to the form.
24 BY MR. POST:
25   Q  Let me rephrase it. Is there anything

Transcript of Gregory J. Connor
Conducted on October 10, 2019

89

1   with respect to Page 1 of this Police Training
2   Bulletin that you disagree with?
3       **A   Again, I guess my feeling is when you're**
4   **talking about positional asphyxia, I think they go**
5   **from a specific to a generic.  I'm not sure I**
6   **would have written it this way, but I would say**
7   **generally speaking it's done in a traditional**
8   **manner.  I guess my feeling is that on one hand if**
9   **you put your hands over the subject's mouth and**
10  **nose, obviously that's positional asphyxia in the**
11  **sense that I'm holding him a certain way.  I guess**
12  **we talk about here is illustration of the word we**
13  **talked about earlier the word and that's research.**
14  **I'm not sure how well researched this was, but it**
15  **strikes me as something we want to condition**
16  **officers to be aware of.**
17      Q   Anything in this particular police
18  bulletin that you disagree with?
19      MR. CLARK:  Have you read that whole
20  thing?
21  BY MR. POST:
22      Q   Take your time and read it.
23      **A   I have seen this.  It may have been 1998**
24  **that I saw it, but I'm just saying.**
25      MR. CLARK:  You asked before if he's seen

90

1   it, and now you're asking if he disagree with
2   anything in it.  I want to make sure he
3   understands your question.
4   BY MR. POST:
5       Q   There was handwritten list that we went
6   over earlier today that this was on that list as
7   well as Plaintiffs' Exhibit 7 and Plaintiffs'
8   Exhibits 8 were on that list as you having I think
9   reviewed that --
10      MR. CLARK:  No.
11  BY THE WITNESS:
12      **A   I just wrote them down.  I think if you**
13  **look, I got those somehow --**
14      MR. CLARK:  You got them from us.  These
15  are exhibits to Harmening's deposition.
16      MR. POST:  Right.
17  BY THE WITNESS:
18      **A   I did not take the time to update myself**
19  **as far as an extensive review of these.  I just**
20  **wrote them down, this is the name of the one.  I**
21  **got another one that's called this.**
22  BY MR. POST:
23      Q   Take a minute.  It's not a long document.
24  Take a look at it and see if there's anything that
25  you specifically disagree with in it, in

91

1   Plaintiff's Exhibit No. 7.
2       MR. CLARK:  Let's go off the record and
3   take a break.  You want him to review this?
4       MR. POST:  Sure.
5       MR. CLARK:  Let's go off the record.  Take
6   your time.
7       (A recess was had.)
8       MR. POST:  Back on the record.
9   BY MR. POST:
10      Q   Mr. Connor, with regard to Plaintiffs' 7
11  and 8, Plaintiff's Exhibit 7 and 8, those
12  publications are consistent with standard police
13  training that has existed for more than a decade;
14  is that correct?
15      **A   I would say that the Chicago Police**
16  **Bulletin covers areas that have been addressed,**
17  **hopefully have been addressed by police trainers**
18  **for at least a decade.**
19      **In reference to the National Law**
20  **Enforcement Technology Center, I don't know of**
21  **anyone who includes this information in the use of**
22  **force reporting reference, key factors in the**
23  **transporting issues relative to the nature of the**
24  **post-arrest restraint procedures.  I follow those**
25  **closely, and I have not seen this being taught.**

92

1       Q   What specifically on Plaintiffs' 8 are you
2   talking about that has not been taught?
3       **A   Well, primarily I would say in the area of**
4   **what should be reported in the officer's use of**
5   **force report.**
6       Q   Where is that on this particular document?
7       **A   On the bottom of Page 2, far right corner.**
8       Q   Collection of potential evidence, is that
9   what you're saying.
10      **A   Yes.  Under the heading.**
11      Q   With the exception of the collection of
12  potential evidence, is there anything else that
13  you believe is not being taught as standard police
14  training?
15      **A   I would say generally the rest of the**
16  **material is being addressed.  Teaching is a**
17  **broad -- teaching to me implies learning.  I think**
18  **it's being covered, mentioned, whatever the term**
19  **is, but that would be the only area that I would**
20  **see any direct confusion, and in my experience, I**
21  **have yet to see that being included in a use of**
22  **force report mechanism.**
23      Q   Specifically under the heading that we
24  mentioned before, the collection of potential
25  evidence is where you have an issue with this

Transcript of Gregory J. Connor
Conducted on October 10, 2019

---

93

1  publication?
2  **A Right, concerning -- again, some of it is**
3  **just pure feasibility. We may not know what**
4  **happens during a transport. You load them into a**
5  **transporting vehicle or something. I don't know.**
6  Q I'm more interested in what positional
7  asphyxia is, the basic physiology of the struggle,
8  predisposing factors to positional asphyxia and
9  advisory guidelines for the care of suspects as
10 well as the New York Police Department's
11 guidelines to prevent deaths in custody, as far as
12 this document goes.
13 **A I understand.**
14 Q I'll show you what's marked as Plaintiffs'
15 Exhibit No. 9 which are some excerpts from the
16 Georgia basic law enforcement training center
17 basic law enforcement course.
18    (A certain document was marked Plaintiffs'
19    Deposition Exhibit 9 for identification,
20    as of 10/10/2019.)
21 MR. CLARK: Has this been produced in
22 discovery?
23 MR. POST: It has.
24 MR. CLARK: You produced it to us?
25 MR. POST: I produced it to you.

---

94

1    MR. CLARK: There is no Bates numbers is
2  the reason I asked.
3  BY MR. POST:
4  Q I just wanted to ask you or point you to a
5  few things on Plaintiffs' Exhibit No. 9.
6    Towards the bottom of the first page which
7  is numbered in the basic law enforcement course
8  manual as 2.4-18, Guidelines For Avoiding
9  Liability For Use of Excessive Force (Brutality)
10 second sentence, says: "Use physical force only
11 when necessary and discontinue the use of force
12 immediately when resistance stops."
13    Of course, that's universally taught and
14 that's universally preached as standard police
15 tactics; is that correct?
16 **A A lot has to do with what comes under the**
17 **heading of use of force. If handcuffing, which is**
18 **a use of force, occurs, the handcuffing has to be**
19 **completed and that's a use of force, and, in fact,**
20 **is considered that.**
21    **To me when the subject is rolled one side**
22 **and then the other side, that's physical force,**
23 **too. My feeling is that we need to search to**
24 **guarantee the officer's safety and the safety of**
25 **others. So I guess I would not -- I can't think**

---

95

1  of how I would rephrase that, but I would make
2  sure that we understand that it just doesn't
3  happen when you click click, it's done.
4  Q I can understand how you might define use
5  of force as continuing to -- having to put
6  somebody -- stand them on their feet or sit them
7  up or something along those lines, but as I would
8  understand it, when you're talking to police
9  officers about discontinuing the use of force,
10 you're talking about the use of active physical
11 force such as putting pressure on somebody,
12 hitting somebody, tasing somebody, actually using
13 physical force against the subject?
14 **A I guess I would just use it as it is**
15 **defined generally that physical force is any time**
16 **you touch a subject or use a physical means, and**
17 **to me I like to control the person while I'm**
18 **turning that person and then turning the person**
19 **the opposite direction. So I'm not sure that this**
20 **is the way I would write -- I would not write it**
21 **this way, that all force ends as soon as the**
22 **handcuffs are on or when resistance stops. The**
23 **subject can stop their resistance, but that still**
24 **doesn't mean we are going to stop utilization of**
25 **force.**

---

96

1  Q You would agree that if there's no more
2  active resistance, that a police officer would not
3  need to continue to place, for instance, weight on
4  a prone subject's back?
5    MR. CLARK: Object to form.
6  BY THE WITNESS:
7  **A I would say that when the subject does not**
8  **resist, the officer by checking the subject's**
9  **capability to possess a firearm or some type of**
10 **dangerous weapon, he should be able to do that**
11 **without putting any pressure on the subject's back**
12 **or neck or anything of that nature.**
13 BY MR. POST:
14 Q In fact --
15 **A It would be contrary to it.**
16 Q In fact, standard police techniques or
17 standard police teachings -- let me rephrase that.
18    Standard police teaching is that you do
19 not place weight on someone when you search them
20 and they teach the proper method of searching
21 which is to roll them over and so forth; is that
22 true?
23 **A Well, in my opinion, there is no standard**
24 **necessarily that everybody agrees with. There are**
25 **times when you may want to control the legs of the**

Transcript of Gregory J. Connor
Conducted on October 10, 2019

---

97

1  subject and still search the upper torso.  Again,
2  just from the standpoint of whether or not the
3  subject is armed or whether or not the subject has
4  explosives, there is a whole variety of things now
5  that come into play, at times we may want to
6  actually apply some type of weight to some portion
7  of the subject.  We would stay away from the
8  areas, of course, where positional asphyxia was
9  potentially likely.
10     Q  What are those areas?
11     A  I would say the area of the scapula, the
12  upper chest area where the lungs are, obviously
13  the neck, throat, nose.  I think those are viewed
14  as areas of potential threat to positional
15  asphyxia.
16     Q  So you wouldn't place a knee on somebody's
17  neck, true?
18     A  There may be a time when you're still
19  controlling the subject or attempting to gain
20  control of the subject where a knee could be in
21  that position for that period of time, but my
22  feeling is once that subject is truly under
23  control, not moving or attempting to bite or
24  anything of that nature, I would not kneel on a
25  subject's neck, no.

---

98

1     Q  What about the back?
2     A  I would not kneel in the area of the
3  scapula blades, the upper chest area of the
4  subject, the small of the back, the buttocks.
5  I've seen officers not only kneel there but
6  straddle there with no potential for positional
7  asphyxia.  I've never seen any research showing
8  that.
9     Q  And flipping on through Plaintiffs'
10  Exhibit 9 to Page No. 7.3-34, I think there may be
11  a color photo on that page.
12     A  Yes.
13     Q  Just above that color photo, again, this
14  is Georgia Basic Law Enforcement course, what does
15  it say?  Directly above it?
16     A  "Be aware of positional asphyxia".  Now,
17  again, I don't know if that -- are we saying that
18  that is --
19     MR. CLARK:  He's just asking you what it
20  says.  That was his question.
21  BY MR. POST:
22     Q  My point is this is lawsuit in the Georgia
23  Basic Law Enforcement course, correct?
24     MR. CLARK:  Object to form.
25  BY THE WITNESS:

---

99

1     A  Yeah, I don't know why that is -- I don't
2  know why it's put there.  I think I would probably
3  put it at the top.  I don't see where there's any
4  correlation between what's the note and what the
5  officer is doing.
6  BY MR. POST:
7     Q  Let's move over to 7.3-105.  Just so you
8  have a the full context, this has do with
9  restraints and control tactics.  At the bottom of
10  7.3-105, the heading is Special Precautions.
11     Do you see that?
12     A  Yes.
13     Q  I'm going to give you a moment to look at
14  that shortly, but let me ask you this question.
15     It appears that the Georgia Basic Law
16  Enforcement course as it has been since around
17  2006 lists special precautions to take with
18  respect to in custody deaths; is that right?  I'll
19  give you a chance to take a look.
20     A  I guess I would ask you to rephrase that
21  question.  Does it talk about --
22     MR. CLARK:  Is your question just that
23  there's special precautions that are taught?
24  BY MR. POST:
25     Q  The Georgia Basic Law Enforcement training

---

100

1  course taught and teaches law enforcement officers
2  to take special precautions to avoid positional
3  asphyxia, also called custody death syndrome,
4  true?
5     MR. CLARK:  And excited delirium, all the
6  ones that are listed?
7  BY MR. POST:
8     Q  Right.  It's taught, correct?
9     A  I think it's covered.
10     Q  And then the pages just after that,
11  7.3-114 through 116, is the Positional
12  Asphyxia-Sudden Death Bulletin from the National
13  Law Enforcement Technology Center dated June 1995
14  that we covered earlier.
15     You see that, right?
16     A  Yes.
17     Q  And I will submit to you that that is also
18  part of the basic law enforcement curriculum and
19  is attached as part of the basic law enforcement
20  course manual in Georgia.
21     Do you know anything about that?
22     A  Whether or not it's part of the course.
23     Q  Yes.
24     A  I think portions of it are part of the
25  course.  I guess my question is is this handout

---

Transcript of Gregory J. Connor
Conducted on October 10, 2019

101

1   what they're taught to do in the State of Georgia.
2   I would say no.
3        Q   Well, let me ask you this.  Standard
4   police practice, what does standard teaching tell
5   police officers to do with regard to putting
6   pressure on the neck of somebody that is being
7   controlled or detained?
8        A   I would say it would be an area of
9   avoidance.
10       Q   Same question with regard to the back?
11       A   Well, the back is different than the neck.
12   The lower back and waist area, buttocks area,
13   again, has been included in back.  My feeling is
14   that it needs to be more specific when we talk
15   about the back.  I say it has to be paralleling to
16   the lungs, but just as similar is the collection
17   of potential evidence.  I don't know of any
18   report, use of force report that deals with this
19   within it.  So if this is what's required since
20   2006, then any that I've seen have not fulfilled
21   that requirement.
22       Q   I'm not asking you about actual written
23   use of force reports.  What I'm asking you about
24   is what is the standard training for a police
25   officer regarding the use of force or the

102

1   application of force to the back when they are in
2   a prone position?
3        A   And I would say that the officers -- the
4   trainer does and should specifically talk about
5   the upper back, the scapula area as opposed to the
6   lower back, waist and buttocks.
7        Q   What's the dividing line between the upper
8   back and the lower back for you?
9        A   I would say that would be something that
10   the expertise of the trainer would be brought into
11   play.  I mean, I would think that the trainer
12   could tell what is the upper back and what is the
13   lower back and what is the buttocks.
14       Q   What about with respect to the chest area
15   in the prone position, what does standard training
16   instruct officers do with regard to that?
17       A   I would think that the chest area would be
18   inclusive of the upper back.
19       Q   What should police officers do, what are
20   they trained to do when a subject that they are
21   trying to control or that is actually detained --
22   when that subject says that he can't breathe?
23       A   Personally, to me --
24       MR. CLARK:  Let me object to the form of
25   the question as an improper hypothetical.  It

103

1   doesn't contain nearly enough facts in the
2   hypothetical for it to be a proper question for
3   the expert.
4        You can answer.  You can go ahead.
5   BY THE WITNESS:
6        A   I would say the officer needs to make sure
7   that he's not blocking the airway, but that it's
8   not uncommon for people to voice they can't
9   breathe or they're in pain.
10   BY MR. POST:
11       Q   So when there is a suspect or a subject
12   that has been handcuffed and is in the prone
13   position and that subject says like ten times "I
14   cannot breathe," what are police officers trained
15   to do at that point?
16       A   I don't know what police officers are
17   trained to do, but most officers would initiate
18   the search of the subject.
19       MR. CLARK:  I should have objected.  I'll
20   object again to this as an incomplete and improper
21   hypothetical.  He hasn't been given enough facts.
22   BY MR. POST:
23       Q   Let me give you one more --
24       MR. CLARK:  We don't know at what point in
25   the struggle we're talking about, we don't know if

104

1   the guy has got a.  Gun, there are so many facts
2   that aren't there.  I object to the question.
3   BY MR. POST:
4        Q   With respect to the question I just asked
5   you, I should have added to that with regard to
6   the use of force.
7        A   If we are going to place hands on, which I
8   would do that for the searching and moving of the
9   body, and once that was done, I would have the
10   person at least on their side and simply continue
11   to monitor them, that subject.
12       Q   Should a police officer discontinue the
13   application of force to the upper back when the
14   subject is complaining of an inability to breathe
15   once they are under control?
16       MR. CLARK:  I'll object to the form of the
17   question.  It's an incomplete hypothetical, but if
18   you can answer, go ahead.
19   BY THE WITNESS:
20       A   Once we've gained control of that person
21   and handcuffed them, I would then say that if by
22   necessity, the subject's actions, the officer's
23   positioning or whatever, that we would want to
24   remove ourselves from being in that upper back
25   area.

105

BY MR. POST:

Q  Have you ever heard of what's called the tranquility phase with regard to positional asphyxia or sudden in custody death?

A  If I'm thinking much the same thing, it's been referred to as the quiet phase.  It could be the person has periods where just kind of ambivalence or whatever.  I've heard of it.  I don't know how accurate it is for us to say they're in this phase or they've moved from this phase to this phase to this phase.

Q  What does tranquility phase mean to you?

A  I would say to me it means that the person, if there is any verbalization it's minimal, usually there is no verbalization whatsoever and there is a degree of breathing but it could be shallow.

Q  Would it be true that observance of a tranquility phase would most often be seen in this situation in a positional asphyxiation situation where the subject had been verbalizing or resistant prior to the onset of the tranquility phase?

A  I don't believe I could say that that's --

106

that there's that cause and effect there.

Q  Let me ask you this.

One of the basic police teachings would be that if a suspect or subject under control is able to speak to you, then that's indicative of a good airway, is that true, and breathing?

A  I would say it's a factor, but I wouldn't say that a person who is able to speak to you isn't choking on something.  I mean, it could happen.

Q  I want to ask you a little bit about this case.

You told us you reviewed certain body cameras and all of what you reviewed was listed on the jump drive which we have in this case.

A  That's true.

Q  Which we went through earlier this morning.

So you did not review all the video in this case, just what was present on that jump drive, correct?

A  That's correct.

Q  Do you recall seeing any video of Officers Aguilar, Dudley and Evrard standing behind an ambulance in this case discussing what happened?

107

A  Yes, I recall -- I'm not sure all the verbalization, but I recall at least two officers, possibly three were standing to the rear of the activated ambulance.

Q  Do you remember listening to an interview or interviews by Evrard with two of the males inside the house where this incident happened on January the 9th of 2017?

A  My immediate recollection is it was the officer talking with the female, the mother, but still I'm not as clear as far as the interaction between that officer and any other subjects in the household.

Q  Do you remember the start of Officer Aguilar's body camera, the first little snippet where he presents as being annoyed with Hector Arreola when he makes first contact with him at his mother's house?

A  I believe when he talked to Arreola, his initial thing was I think trying to gain empathy as far as the confusion, if this person was confused or what are the circumstances, kind of an overall understanding of what is going on here.  I didn't think there was anything negative at that time.

108

Q  You remember him asking Arreola something like "what's the deal, man?"

A  It was an inquiry as far as what's going on.  I would put it more as what's going on, his attempt to kind of get the big picture.

Q  Do you remember him asking -- when I say him, I mean Officer Aguilar asking, "all right, man, listen, we're going to check on her but this is not going to be an ongoing thing?"

A  I believe I remember that, yes.

Q  Did you notice that Officer Aguilar repeatedly asked Hector Arreola what his problem was and also asked him whether he was mentally ill?  Do you remember that?

A  I don't recall him asking him if he was mentally ill.  I think he was trying to recognize the nature of Mr. Arreola's request and kind of the merit of the request more than determining his mental condition.  I think he was trying to get as much information as he could because I think it was early in the morning, they had been there once and I think he just wanted to be complete.

Q  Would it change your opinion in this case if Officer Aguilar was asking Hector Arreola or telling Hector Arreola that he was not acting

109

1  normally?
2      A  No.  I think the officer's -- his
3  determination of what's normal or abnormal,
4  someone outside of his mother's house at 4:00 in
5  the morning probably is not a normal activity and
6  was functioning out of control, but I would say
7  it's generic questions as opposed to specific mean
8  type questions or demeaning type questions.
9      Q  Hector Arreola quickly became suspicious
10 of the police officers when he said: "Why are you
11 fighting me on this, sir," early on in the
12 encounter, is that true?
13     A  I thought Hector Arreola responded
14 inappropriately at a certain period in the
15 interaction in the communication.  It just seemed
16 like he was on another tangent than what the
17 officer was on.  That struck me immediately as
18 being unusual.
19     Q  Would receiving CIT training, crisis
20 intervention team training impact your view on
21 whether an objective police officer properly used
22 physical force to detain someone?
23         MR. CLARK:  Let me object to the question.
24 I don't think I understand the question.  Could
25 you read it back unless you wants to rephrase it.

110

1  Read it back.
2         (The record was read by the reporter.)
3         MR. CLARK:  I don't understand that
4  question so I object to it.  Would receiving
5  training change your opinion.
6  BY MR. POST:
7      Q  Impact.  Would receiving CIT training
8  impact your view on whether an objectively
9  reasonable police officer properly used physical
10 force to detain someone?
11         MR. CLARK:  So you're asking if -- hold
12 on.  So you're asking if Professor Conner, if
13 Professor Connor received training, CIT training
14 would that impact --
15         MR. POST:  No.  Let me rephrase it.
16 BY MR. POST:
17     Q  Would an officer's receiving CIT training
18 impact your view of whether that officer
19 objectively -- acted in an objectively reasonable
20 manner when he used physical force to detain
21 someone?
22         MR. CLARK:  I object to the form of that
23 question, too.  I'm sorry.  I'm not trying to be
24 difficult.  I don't understand that question.  I
25 think what you're getting at is would it help if

111

1  an officer gets CIT training.  That seems like
2  that's kind of what you're getting at, but I
3  object to the form of the question.  It doesn't
4  make sense to me.
5  BY THE WITNESS:
6      A  My feeling is that I don't see where that
7  is a contributing factor.  The nature of the
8  training should not alter that officer's ability
9  to communicate or attempt to communicate with an
10 individual.  I don't think CIT training is
11 designed to interfere with the communicative
12 process.
13 BY MR. POST:
14     Q  So CIT training would actually help a
15 police officer communicate with somebody that was
16 in crisis; is that fair to say?
17     A  I don't think that's fair to say.  We have
18 to really know what is the CIT training that
19 officer is receiving and whether or not the
20 officer, in fact, learned it, and, if the officer
21 then can function with it in their context,
22 utilization and be exposed to a situation where
23 that would be worthwhile.  I'm not sure whether
24 any of those factors -- these things are so out of
25 control, we can't control A-B-C-D-E or whatever it

112

1  is.
2      Q  Let me ask you this.  Would you agree that
3  the Georgia Basic Law Enforcement course and CIT
4  training in general holds that it is often
5  counterproductive to be accusatory or annoyed when
6  dealing with a suspect demonstrating mental health
7  issues such as paranoia, psychosis, mania, or what
8  have you?
9      A  I would say CIT training in Georgia would
10 be supportive of trying to get as much information
11 from an individual and would work -- would be in
12 opposition to anything that would keep us from
13 getting information.
14     Q  So being accusatory such as what's wrong
15 with you, you're mentally ill, that would not be
16 helpful?
17     A  I would say that could prohibit us gaining
18 information.
19     Q  And that's exactly what Aguilar did in
20 this case, didn't he?
21     A  Well, I think, you know, I'm not saying
22 that Aguilar did that.  I'm not saying that I'm
23 able to understand what Arreola was bringing into
24 his -- I mean, I don't know what he was hearing,
25 what he wasn't hearing, what he was processing and

Transcript of Gregory J. Connor
Conducted on October 10, 2019

---

113

1   whatever.  I think that's a real stretch.
2        So I couldn't say that anything the
3   officer did was meant to create animosity on the
4   part of Mr. Arreola.  I didn't feel that.  I
5   thought he was attempting to be informational and
6   trying to gain information how they could help the
7   individual.
8        Q  One of the things that Georgia Basic Law
9   Enforcement course teaches is simple things such
10  as resting your hands on your taser or on your
11  firearm can be perceived as a threat by suspects
12  or somebody that's mentally ill; is that fair to
13  say?
14       A  That has been taught, but it takes on the
15  understanding that we might have that we know what
16  that person is perceiving and I'm not sure we want
17  to say we know what that person is perceiving.
18  There are threatening things I'm sure that people
19  can interpret but some of those we can't control.
20  An officer being in uniform is a threatening thing
21  to some people, but that's just the way we
22  operate.  That's the way we -- I mean, that's what
23  we wear.
24       Q  I'm going to give you what's being marked
25  Plaintiffs' Exhibit 10.

---

114

1        (A certain document was marked Plaintiffs'
2        Deposition Exhibit 10 for identification,
3        as of 10/10/2019.)
4   BY MR. POST:
5        Q  Which is Professor William Harmening's
6   report of June 4 of 2019 which I understand that
7   you have reviewed.
8        A  That's correct.
9        Q  I want to go through the report and ask
10  you specifically what you disagree with.  We don't
11  need to talk about all of the depositions.  Let's
12  start with Page 4, the introduction.  I'll let you
13  take a look at Page 4 and tell us what you
14  disagree with if anything.
15       MR. POST:  If he wants to make notes on
16  it, that's fine.  I don't have a problem with it.
17       MR. CLARK:  All right.
18       MR. POST:  Let's go off the record for a
19  minute.
20       (Discussion was had off the record.)
21       MR. POST:  Back on the record.
22  BY MR. POST:
23       Q  Mr. Connor, I was asking you about what
24  you specifically disagreed with and Page 4 of
25  Professor Retired William Harmening's report and I

---

115

1   was going to go page by page after that.  Let's
2   start by Page 4.  As I understand you've had time
3   to review it, correct?
4        A  That's correct.
5        Q  Go ahead.
6        A  On Page 4 my feeling is that the term
7   apparent is not correct.  The sentence says:
8   "Upon questioning Arreola, it became apparent to
9   the officers that Arreola was suffering from some
10  type of mental illness and/or drug use."
11       Q  Which paragraph are we talking about?
12       A  First paragraph.  I'm sorry.
13       Q  I see that you have marked on your
14  Plaintiffs' 10 I think it was.
15       A  Plaintiffs' 10, yes.
16       Q  It's perfectly okay for you to mark on
17  Plaintiffs' 10.  There were no marks on it
18  previously so that's absolutely fine.  In the
19  first paragraph, apparent, okay.  I see it.  Upon
20  questioning Arreola it became apparent.
21       A  Right.
22       Q  Go ahead and explain that again.
23       A  That at the time in the initial contact, I
24  believe the word apparent is much more -- is a
25  much stronger word than I would use.  I don't

---

116

1   think it was apparent I think the officers would
2   have been rushing to judgment or whatever in that
3   sense.  I think they were just trying to get
4   information.
5        Q  What else did you disagree with on that
6   page?
7        A  In the same paragraph, Arreola -- one
8   sentence down, "Arreola was showing signs of
9   paranoia and believed there were people inside his
10  mother's house."  I'm not sure that is what I
11  would suggest as being a sign of paranoia if you
12  fear that someone is in your mother's house.  I
13  think paranoia is a much greater mental disability
14  than this concept of protecting your parents or
15  protecting your mother or something like that.
16       Q  I would let me ask you this.  I would
17  suspect, of course I cannot speak for William
18  Harmening, that would refer to the part of the
19  videotape or the situation where Arreola was
20  talking about people being inside his mother's
21  house when he came he saw flashlights at the time
22  and the officers as well as his mother did clearly
23  say that that was not the case.
24       A  Right.
25       Q  You would not disagree that that would be

---

Transcript of Gregory J. Connor
Conducted on October 10, 2019

117

1  a sign of paranoia, is that what you're referring
2  to?
3      A  I would say that would be an unusual
4  situation, but I'm not sure that would
5  substantiate in my mind an indication of mental
6  paranoia.
7      Q  What else on the page?
8      A  The last sentence there: "Officer Dudley
9  advised dispatch to send EMS for a psych
10  evaluation." I think that was done as a
11  suggestion to get more minds and eyes on Arreola
12  more from a standpoint of trying help find out
13  what's going on here rather than do a psych
14  evaluation. I don't think either officer had
15  defined it at that time as an a necessity for a
16  psych evaluation.
17      Q  So you don't recall Officer Dudley
18  advising dispatch to send an EMS for a psych
19  eval?
20      A  Well, I'm not sure if you said -- what's
21  the difference between a psych evaluation and
22  calling dispatch for a psych eval, I think the
23  same personnel are going to be coming either way.
24  I would not hold this much merit in that as far as
25  the officer's comments.

118

1      Q  What else on that page?
2      A  The start of the next paragraph, it says:
3  "During the verbal exchange, Arreola became more
4  agitated and walked away from the officers." I'm
5  not sure he became more agitated. He became more
6  fidgety. I think he came to the point where he
7  did not want to provide any more information, but
8  I don't think that they thought oh, man, this guy
9  is getting more agitated. We need to put the
10  clamp on this guy right off the bat.
11      In that sense, I don't think we can
12  determine or should determine that he was more
13  agitated as he walked away. He just seemed like
14  he aimlessly started to walk away in one direction
15  or another.
16      Further down in that paragraph, "as they
17  attempted to place him in handcuffs," I was not
18  able to see -- to me it was so dark, I was not
19  able to see that they attempted to grab at the
20  wrist to put a handcuff on that particular
21  shouldn't. I thought they were attempting to
22  escort, remove, move the subject from where he was
23  back to the mother's property and that's what was
24  more or less -- it all evolved so rapidly. I'm
25  not sure they said, okay, let's try and get a cuff

119

1  on him and that's what prompted the activity of
2  resistance. I think it was more moving him back
3  to the mother's area than the initiation of a
4  handcuff.
5      Q  Do you recall the conversation between
6  Aguilar and Dudley about going ahead and detaining
7  Arreola for disorderly conduct?
8      A  I remember the idea that he is disorderly
9  and that he is going to be -- he was disorderly --
10  my feeling was he was disorderly now because he
11  was on someone else's property more than he was
12  acting in a disorderly type fashion. That's all
13  I -- that's how I looked at that.
14      Q  When you detain someone, you're taught to
15  handcuff them, correct?
16      A  Well, you can detain people without
17  handcuffing them. I mean, we have detain people
18  on a stop or something and they don't have to be
19  handcuffed.
20      Q  Let me use a different word of art.
21      When you arrest someone for disorderly
22  conduct, you are taught to put them in handcuffs,
23  correct?
24      A  I would say generally if you arrest
25  someone for disorderly, you're going to handcuff

120

1  them prior to transport, yes.
2      Q  What else do you disagree with on that
3  page?
4      A  I did not get a clear picture of the
5  six-minute interval where he was prone on his
6  stomach. That may have been my fault. That may
7  have been the fault of the material I had or
8  whatever. I could not count six minutes of
9  that -- I couldn't see him lying there for six
10  minutes. That could have been, like I say, it
11  could have been my lack of having a proper film or
12  a lighted film, but it just seems to me that
13  approximate six minutes prone on his stomach, I
14  can't verify that. I do feel that during that
15  period, whatever that period was, he was being
16  monitored by each of the officers present at the
17  scene.
18      Q  Prior to them standing up and getting off
19  of him, he was being monitored, is that what
20  you're saying?
21      A  No. After they had gotten up and they had
22  broken off all contact with him that they with
23  still monitoring him. I don't know how that six
24  minutes comes about. I was not able to verify
25  that in my analysis, and that may be my problem

Transcript of Gregory J. Connor
Conducted on October 10, 2019

---

**121**

1  with the tape that I had.
2      Q  Any monitoring that you saw was after he
3  was rolled over from the prone position, correct?
4      A  I would say any monitoring that I saw --
5  that I could see was he was seated.  I did see him
6  still prone when Evrard -- he was still in a prone
7  position, but not disconnected to the officers.
8  Not at any time did I see him disconnected from
9  the officers for six minutes.
10     Q  What else do you disagree with on that
11 page?
12     A  Nothing else on that page.
13     Q  Let's move to Page 5.
14     A  As far as officer statements and autopsy
15 results, I didn't see any direct conflicts with
16 anything on Page 5.
17     Q  What about Page 6?
18     A  I didn't see anything conflicting about
19 Page 6 and the last point I made during the verbal
20 exchange, almost immediately upon confronting
21 Arreola at 5:10:33.
22     Q  This is on Page 7 now?
23     A  Page 7, to me that just goes back to the
24 same thing I said earlier.  I think they were just
25 trying to gather information and I feel that it's

---

**122**

1  rushing to judgment if they would have had it
2  before that particular time.  As a matter of fact,
3  I don't think they they've really came to a
4  conclusion or they wouldn't have called for a
5  psych evaluation or someone else or more eyes or
6  more people to look at him.
7      Q  And what you're referring to is: "Almost
8  immediately upon confronting Arreola at 5:10:33
9  the officers suspected he was suffering from some
10 type of mental illness," that's what you're
11 referring to there?
12     A  Right.  I think we do a real disservice
13 when we meet somebody and then determine they've
14 got certain mental illnesses.  I would have to
15 have a little more contact before I would
16 determine that this person is mentally ill, and
17 that's as far as I've gotten.
18     MR. POST:  Let's go off the record.
19     (Discussion was had off the record.)
20     (A recess was had.)
21 BY MR. POST:
22     Q  That was about a five or ten-minute break,
23 I suppose.  How many more pages did you get
24 through on the break?
25     MR. CLARK:  No, no, no.  I was talking

---

**123**

1  with him.  I had some questions for him so he
2  wasn't reading during that five minutes.
3  BY MR. POST:
4      Q  So you weren't discussing your testimony
5  with regard to Dr. Harmening or Professor
6  Harmening's report, were you?
7      MR. CLARK:  I don't want you to respond to
8  what we were discussing.
9      MR. POST:  I think I've got the right to
10 inquire on whether there was a suggestion on how
11 to answer or coaching with respect to the report.
12 Was there any of that?
13     MR. CLARK:  No, of course not.
14 BY THE WITNESS:
15     A  No.
16     MR. CLARK:  He's a professional.  He
17 doesn't need to be coached.
18 BY MR. POST:
19     Q  I wouldn't expect but I have to ask you.
20     A  That's fine.
21     Q  Because obviously there was some
22 conversation going on there which you're entitled
23 to do on some subjects.
24     So you didn't get through any more pages,
25 correct?

---

**124**

1      A  My suggestion is from what I can do or
2  what I feel comfortable with, I'm comfortable with
3  going down to the analysis of statements and video
4  evidence.  If I can do that.
5      MR. CLARK:  We could but it's five to one.
6  I do need to take my call.  Let's just take our
7  break now.  You can continue reviewing that.  What
8  time do you want to start back up?
9      MR. POST:  It really depends on your call.
10     MR. CLARK:  The quicker I start, the
11 quicker it can be over.
12     MR. POST:  Off the record.
13     (Discussion was had off the record.)
14     (A recess was had.)
15 BY MR. POST:
16     Q  Mr. Conner, it is now two o'clock Central
17 time and we are now resuming.  You are still under
18 oath, sir, my question is what do you disagree
19 with when going through the pages on Professor
20 Harmening's report.
21     Did we get through Page 8 or were we still
22 on Page 8?
23     A  I believe we were still on Page 7, verbal
24 exchange.
25     Q  That's fine.  Go ahead and tell me what

---

125

1 you have.
2    A The only thing I had was a note that the
3 first sentence under the verbal exchange almost
4 immediately upon confronting Arreola at 5:10:33
5 the officers suspected he was suffering from some
6 type of mental illness. I do not conclude that
7 they could conclude that nor did they conclude
8 that.
9       Page 8, my comment here is in the
10 parenthesis psych evaluation. I am not sure that
11 an EMS unit is a properly designed designated unit
12 to give a psych evaluation. I'm not sure that the
13 people are trained there as well as people who
14 give a comprehensive psychiatric evaluation.
15    Q My suspicion would be that that would be
16 for a transport for a psych evaluation?
17    A I think that's the only reason they wanted
18 them to come was to transport him to the hospital.
19       In that same paragraph, "the more they
20 attempted to negotiate," I would not use the word
21 negotiate. I would say communicate because I
22 don't think when an officer and a citizen are
23 communicating, it should be a process of
24 negotiation. I think it should be that the
25 officers are in charge.

126

1    Q Very good.
2    A Further in Page 8, I'm not saying I
3 disagree, I cannot tell you the definitively of
4 the accuracy of the times and the statements on
5 Page 8 and 9 in the area of physical altercation
6 in the sense that this is when the struggle began,
7 this is when --
8    Q That's fine. The videotape will reflect
9 what it reflects.
10    A In that same context, this is at the end
11 of that dialogue, still on Page 9, "at no time
12 after they roll Arreola on his side is his voice
13 heard." Again, to me the absence of evidence is
14 not evidence. I can't say that we did or didn't
15 hear that or we could or couldn't have heard that.
16 He made that conclusion. I would not make that
17 same conclusion. Or that there's no further signs
18 of struggle. There would be no further signs of
19 struggle if we couldn't hear it. I understand
20 that. I'm not sure that is what we didn't hear.
21       Analysis, statements and video evidence.
22 We start off with it is nearly a certain fact that
23 someone in the midst of a thought-disordered
24 episode especially one exhibiting signs of
25 paranoia cannot be negotiated with. It is almost

127

1 guaranteed that they will emotionally -- will be
2 emotionally escalated by any attempts to do so. I
3 do not agree with that statement. I think that's
4 just an extension of an opinion with very little
5 basis. I just don't think we can make such
6 conclusions and such in depth analysis to say
7 that.
8    Q All right, sir.
9    A Further in that same paragraph when
10 Arreola was asked by Aguilar if he had ever been
11 diagnosed with paranoia or schizophrenia, I'm not
12 sure that Aguilar would know the depth of both of
13 those illnesses, but I think it was mainly an
14 inquiry. I don't think it was saying, okay, you
15 got it again or something like that. I thought it
16 was just an inquiry.
17       And then finally the end of that paragraph
18 they had thus made the decision that an
19 involuntary commitment of Arreola for a period of
20 observation would be the course of action they
21 would follow. I feel that they wanted to
22 transport him to aid him, to assist him. They had
23 not concluded that this is going to be a period of
24 observation or whatever. I don't think they were
25 involved in any way, shape or form with the

128

1 analysis or diagnosis or treatment of this
2 person's problem.
3       Then at the final version or the final
4 paragraph on Page 9, I do not agree with the
5 conclusions that have been drawn in the sense that
6 that once Dudley asked for EMS the officer's
7 training should have told them two things; first,
8 they need to get Arreola restrained as quickly as
9 safely as possible I don't think that's what it's
10 telling them, and secondly that Arreola was at a
11 heightened risk for sudden death if a violent
12 struggle were to ensue. I don't feel that that is
13 known to the officers nor do I feel that that
14 should be known or if you have this you'll always
15 get this or this could be Step 2. I would not do
16 step one and step two in that manner and then on
17 Page 10, the idea here that at the point when EMS
18 was requested, the officer should also have
19 requested that more officers respond. I feel the
20 officers felt that sufficient officers were
21 present and that in the assisting process that
22 they provided, they were sufficient in those
23 provisions.
24    Q Okay.
25    A And then the next paragraph, the dangers

Transcript of Gregory J. Connor
Conducted on October 10, 2019

129

1  of allowing him to walk away from their location,
2  I don't feel like they felt that placing the
3  subject under arrest at that point in time had the
4  sufficient elements to do so.  I think they were,
5  again, going down the path of assisting rather
6  than being assertive or trying to bring harm or
7  anything of that nature.
8      The final sentence, they are trained to
9  never apply their weight to a suspect's head or
10  neck, they are also trying to monitor the
11  breathing throughout.  Officers are trained to
12  avoid the head and/or neck, but in a fighting,
13  noncompliant scenario, the head and the neck can
14  sometimes get controlled by the individual to
15  burrow under the officers, to place themselves in
16  a position where the officers will make contact
17  with them and things of that nature, and I don't
18  agree -- I agree with the idea that they're
19  trained to monitor breathing throughout as well as
20  they can, and I felt that the officers did do
21  that.
22      Q  Let me ask you a question.
23      A  Yes, sir.
24      Q  You said their, disagreeing with their
25  trained to never applying weight to a suspect's

130

1  head or neck.  The word apply to me indicates to
2  intentionally apply the force as opposed to
3  burrowing and that sort of thing.
4      Do you make a distinction there?
5      A  Right, my feeling normally if you say
6  apply it means that this person is the person
7  inducing that activity or bringing about that
8  activity.  It can happen, but I don't think it
9  should be initiated by the officers.  That's all
10  I'm saying.  So I think that's an extension.
11  Maybe an extension a little too far.
12      The second to last paragraph, even in this
13  position if an individual is allowed to lean
14  forward with their head down as was the case with
15  Arreola, the risk of death from asphyxia is
16  increased.  I don't disagree with that
17  illustration or that commentary because it was
18  part of what we had seen in articles that had --
19  we've looked over.  I don't feel that Arreola's
20  positioning, mainly because I feel like he was
21  monitored, ever got to that point where this
22  position of asphyxia would have been applicable.
23      Q  Are you saying that you did not see him in
24  a forward leaning position with his head down?
25      A  I did see him --

131

1      Q  As he sat up?
2      A  I did see him leaning, but I would not say
3  that he was leaning to the extent that he was
4  starting to cut off the air flow or breathing to
5  the lungs.
6      Q  Let me ask you this.  Whatever damage was
7  done assuming damage prior to the time they sat
8  Arreola up, is that fair to say?
9      MR. CLARK:  I object to the form.  Hold
10  on.  There wasn't a question in there.
11  BY MR. POST:
12      Q  There was a question.  I said assuming
13  there was damage done, it occurred prior to the
14  officer sitting Arreola up; is that right?
15      MR. CLARK:  Object to the form.
16  BY THE WITNESS:
17      A  I think there is an assumption there we
18  can't assume.  I don't think there was any damage
19  done myself.
20  BY MR. POST:
21      Q  But let me ask you this.  You obviously
22  are not a medical doctor and we're not asking you
23  to give an opinion with regard to causation in
24  this case, is that fair to say?
25      A  Absolutely.

132

1      Q  Go ahead.
2      MR. CLARK:  He was finished.
3  BY MR. POST:
4      Q  What else on that page, if anything?
5      A  Let me just re-read this again.
6      Arreola's pulse was checked, that is
7  procedural.  That is something officers do whether
8  you want to call that monitoring or maintenance or
9  whatever.  It was not as an alarm.  I did not feel
10  that was an alarm.  I thought that was just part
11  of the monitoring process.
12      Q  Anything else on that page?
13      A  I felt nothing further on that page other
14  than I felt that these things were added.  I
15  didn't understand the appropriateness of the
16  addition of these commentaries on positional
17  asphyxia, the dangers of restraints, NYPD's
18  policy, and then finally on Page 13, not finally,
19  but on Page 13, the first major paragraph, in
20  fact, there is no police training that instructs
21  officers that it is appropriate to apply
22  significant weight to a suspect's back.  I would
23  say that when you're talking about no police
24  training, you have to put in there the specificity
25  of the upper back.

133

1      Page 14, to me it's redundant, we're back
2  to the idea that in the second paragraph they knew
3  early on in the encounter that Arreola was
4  suffering from some type of mental illness or drug
5  use. I do not feel that the officers had that
6  degree of knowledge or those indications. Then at
7  the final sentence in that paragraph, it goes back
8  to the term back rather than upper back.
9      Q  Anything else on that page?
10     A  I had nothing else I saw on that page.
11     Q  What about the next page?
12     A  That page I just highlighted the last
13  sentence in the paragraph at the top, I feel this
14  is just opinion, but I feel my expertise is worth
15  it, given all police standards related to the use
16  of force are not necessarily consistent with Grant
17  verse Conner, we can conclude their actions
18  especially after the point where Arreola was
19  handcuffed were unreasonable and excessive. I
20  felt just the opposite. I felt they were
21  reasonable, they were proper and they were
22  empathic. I thought the officers went out of
23  their way to try to assist Arreola.
24     Q  And I would assume based on that that you
25  have some disagreement on the opinions offered?

134

1      A  I would have disagreements on the opinions
2  but I think we've said maybe in the sense that
3  maybe it's redundant, but I don't think CIT
4  training inhibits officers from engaging in
5  policing activities nor encourages them to
6  decrease their police activities. I think they
7  need to be sensitive and they were and empathic
8  and they were and conscientious of positioning and
9  I feel they were.
10     The second opinion there, again, I feel
11  that the officers went above and beyond trying to
12  get additional help and felt that the assistance
13  and the transport was just something they should
14  do out of a feeling of, again, helping an
15  individual more than anything else.
16     And then three, in the context of accepted
17  police training and standards of practice, the
18  level and method of physical force used by the
19  officers to subdue and detain Arreola was both
20  excessive and improperly applied. I felt -- I
21  said no, I felt that the methodology and propriety
22  of the technique was appropriate.
23     Are you okay going to the exhibits?
24     Q  Sure.
25     A  The only comment I made on the exhibits

135

1  was highlighting the potentially -- this is on
2  Page 17, personally I'm not sure we can see what
3  we're saying there, but he is in a position that
4  can potentially contribute to positional asphyxia.
5  I don't feel that he is in that position nor would
6  I want to say based upon looking at that
7  photograph which to me is an inferior photograph
8  that we can say that.
9      Q  Let's talk a bit about your report. I
10  marked that, didn't I?
11     A  It is six.
12     Q  Let's start with Page 1, qualifications,
13  we went through most of that, including acting as
14  an officer of communities with small, medium and
15  large agencies, the large police agency was which
16  one?
17     A  To me the large agency would have been Ann
18  Arbor. I think it's considered large. I think
19  that's more typical than huge. I would put a
20  Chicago or a Minneapolis or a New York as huge.
21     Q  I think we've sufficiently discussed
22  academic expertise and what you meant by that. So
23  we can skip over that part.
24     Your unique status as a professor emeritus
25  at the University of Illinois, what does that

136

1  mean?
2      A  That means that I've retired and a group
3  of other professors have found that my
4  publications, my expertise, my abilities have been
5  of merit and normally it's given to professors,
6  about four or five percent of the professors that
7  eventually retire from the University of Illinois.
8  The last one I can think of that made emeritus was
9  Bardeen who invented the transistor. I would not
10  put myself into the category of a Bardeen.
11     In the sense of what we've tried to do to
12  professionalize police officers, probably we did
13  more than Bardeen did in creating transistors. It
14  is not something it is not something that's
15  automatically given.
16     Q  Which professors determined that? Is it
17  someone from the Police Training Institute?
18     A  No. I don't believe anyone from the
19  Police Training Institute has been part of that
20  committee. They usually are law professors,
21  psychology professors. These people are well
22  known in their fields and I would say very
23  respectable kind of people.
24     Q  And the obvious question, professor of
25  what, professor emeritus of what?

137

1     A  In a that sense they did put professor
2  emeritus, they refer to it as legal training.
3  Again, it was so exceptional in the sense that I
4  was the first that say what you want on that and I
5  would have to say the same thing.
6     Q  You would have preferred it to say
7  professor emeritus of law enforcement training as
8  opposed to legal training?
9     A  Law enforcement training, just saying
10 training to people in the academic field is not
11 necessarily the most positive thing.  It just kind
12 of was left like that.
13    Q  When it's not academic research -- let me
14 rephrase that.
15       When it is training as opposed to academic
16 research, the professors in the academic community
17 aren't enamored with that; is that what you're
18 saying?
19    A  When you use terms like training or the
20 Police Training Institute, you don't go too far
21 beyond some people feeling that animals are
22 trained.  Humans are educated.  Hopefully we do
23 both.
24    Q  Some animals might be trained better.
25    A  This is true.

138

1     Q  We all laughed for the record.
2       MR. CLARK:  I didn't laugh.
3       MR. POST:  Except Jim.  He never laughs.
4  BY MR. POST:
5     Q  The incident summation, I know you're from
6  this area, so cold would probably be subzero but
7  it was actually according to the officer's
8  comments 24 or 25 degrees that night, I think you
9  said subzero or you wrote subzero?
10    A  I don't believe I said that.
11    Q  Fourth paragraph down, middle of it.
12    A  I know the officers commented it was quite
13 cold and they didn't want her to come out or
14 whatever.  I don't know rather than specific, the
15 degree, I'm not sure if I didn't just put that in.
16    Q  Maybe assumed it was subzero since they
17 said cold based on weather in this area?
18    A  Yes.
19    Q  Let's move over to Page 3.  When did you
20 see Hector Arreola become belligerent?
21    A  Hector Arreola to me became belligerent, I
22 sensed it in the sense of primarily from hearing
23 the audio portion of the videotape.
24    Q  That would have been at the point where
25 the police officers tried to take him in a custody

139

1  and he resisted; is that accurate?
2     A  I would say that would be at the point
3  where he was on the property of another.  I don't
4  know for sure what the officers were attempting to
5  do, if they were attempting to place him under
6  arrest, if they were attempting to move him off
7  the premises.  I don't know for sure.  I didn't
8  feel like I could make that determination.
9     Q  Whether they were attempting to arrest him
10 or move him off the property, it was at the point
11 where they actually started making physical
12 contact with Arreola is when you are saying he
13 became belligerent, correct?
14    A  I believe he became noncompliant, yes.
15    Q  Okay.  At that point.  And I don't think
16 there is any dispute about that.  I just want to
17 be clear I'm understanding you.
18    A  Right.
19    Q  Also we've talked about Hector Arreola
20 yelling several times that he was being killed and
21 that he could not breathe, right?
22    A  Yes.
23    Q  What were the officers supposed to do when
24 they heard his complaints about and when they
25 heard his labored breathing?

140

1     A  Well, to me the officers were still
2  engaged in trying to control him when the
3  verbalizations started, and I think everybody's
4  breathing probably.  And I guess my feeling was
5  that the officers were going to continue to engage
6  in what their activity was and that was attempting
7  to control him.  And that's all I would suggest
8  that they should have been concerned about is
9  attempting to control, and I don't think you
10 should discount when people are yelling or
11 screaming or whatever, I'm sure you hear it, but
12 to me it should not influence whether or not the
13 officers are going to be as efficient as they
14 would have been previous to that.
15    Q  I see where you write that once Arreola
16 was controlled and restrained, the officers felt
17 it was technically feasible to turn him on each of
18 his sides for searching purposes and then onto his
19 buttock in a seated stance.
20       Do you see that?
21    A  Yes.
22    Q  Is this a subjective determination as to
23 when they felt it was tactically feasible to turn
24 him on his sides?  I'm reading the words "officers
25 felt."

Transcript of Gregory J. Connor
Conducted on October 10, 2019

141

1    A  Well, I think subjective would be that
2  we're not using the officers.  There is no input
3  from the individual officers.  I thought the
4  officers had individual input.  I guess I was just
5  monitoring what the officers were doing or just
6  voicing what I thought the officers were doing.
7    Q  Isn't there some point when someone is
8  controlled and restrained that it's not only
9  tactically feasible, but it is police training
10  that they are rolled on to their sides for
11  searching purposes; is that right?
12    A  To me that is a very difficult point to
13  determine, and I can't say that I would say that
14  there is a -- if you get to this point, this
15  happens.  To me it's very situational and I would
16  use it -- I would refer to the officers who were
17  directly involved in the sense of the officer at
18  the scene to me determines if they are comfortable
19  with not only controlling and restraining the
20  individual.
21    Q  I guess what I'm really trying to get at
22  is how long do the police officers Aguilar and
23  Dudley get to sit on Hector Arreola after he's in
24  custody and restrained before they have to
25  actually release the pressure on him, on his --

142

1  him in the prone position, the pressure that
2  exists?
3    A  The way I viewed him being straddled on
4  the buttocks, once he did not create any threat to
5  the officers or others, I would come to that
6  conclusion whether or not that would take
7  30 seconds or it would take two and-a-half minutes
8  or it would take four minutes or something, that
9  to me would be left up to the officers at the
10  scene who hopefully knew the most as far as what
11  was the potential being offered as far as the
12  threat.
13    Q  You would agree that once Hector Arreola
14  had quit resisting and could not actively resist
15  anymore, the officers should have ceased putting
16  pressure on his upper back, head or neck, correct?
17    A  Absolutely.
18    Q  You're not suggesting that Hector Arreola
19  was actively resisting any further when his voice
20  trailed off; he stopped talking at that point, are
21  you?
22    MR. CLARK:  I object to the form.  Your
23  question seeks a response -- we're not looking at
24  the video or the audio here so at what point
25  you're talking about is unclear, but if you can

143

1  answer, go ahead.
2  BY THE WITNESS:
3    A  My feeling is I don't think we would have
4  a great deal of difficulty determining when that
5  particular point occurred.  The only difficulty
6  may be the lighting, other situations, but I would
7  say we probably all would agree as a certain point
8  that the noncompliance had ceased, the threat had
9  been resolved and compliance and control had been
10  established.
11  BY MR. POST:
12    Q  To you when was that point?
13    A  I would feel more comfortable being able
14  to say that that point was at the point where we
15  can see and say simultaneously and right now I'm
16  not sure that I can say well, that was when, well,
17  this occurred and that occurred.  I think we would
18  be able to see and say it at the same time.
19    Q  So really right now you don't know; is
20  that right?
21    A  Right now I think we would be in agreement
22  with proximity of that time.  I just can't say
23  that -- when was it, when his third finger on his
24  right hand, whatever, did such such and such.  I'm
25  not sure I can say specifically at this particular

144

1  point in time, but I think there came a point
2  where the officers not only had control, they had
3  searched, and he had been placed in a seated
4  position and they continued to monitor him until
5  further assistance was provided.
6    Q  I know you recall seeing the officers
7  check Hector Arreola's pulse and saying, hey,
8  buddy or words to that effect, are you breathing
9  or something along those lines?
10    A  Yes, I'm not exactly sure what they said.
11    Q  But other than that it looked to me and
12  sounded to me like the officers were just standing
13  around kind of BSing while they were waiting on
14  the ambulance.
15    What would you say?
16    MR. CLARK:  Object to the form.
17  BY THE WITNESS:
18    A  I believe that the officers were focused
19  on what they had been focused on throughout, and
20  that was the welfare of the individual.  I do not
21  believe that the officers went over and sat in the
22  car and had a cigarette or something of that
23  nature.  I think they were right there monitoring
24  the well being of the individual.
25    Q  Well, they didn't hell EMS or 911 dispatch

145

1  that Arreola was in obvious distress, did they?
2  **A  I don't believe they had the expertise to,**
3  **again, that's --**
4  Q  And, in fact, before the struggle began,
5  right before the struggle began, Officer Aguilar
6  tells dispatch, if you could have EMS come,
7  routine, no lights, no siren, do you remember
8  that?
9  **A  I believe I recall that, but I don't -- I**
10 **can't say for sure but I believe at that was,**
11 **again, part of the sensitive nature of Officer**
12 **Aguilar.  That's what I looked at there.  That's**
13 **what I thought.**
14 Q  If Officers Dudley, Aguilar or Evrard had
15 been the subject individually or with other
16 officers on repeated use of force reports, would
17 that have had an effect on how you perceived the
18 reasonableness of their actions in this case?
19 MR. CLARK:  Object to form.
20 BY THE WITNESS:
21 **A  Certainly how they reported the incident,**
22 **I would want it to be consistent with what I was**
23 **able to see during the incident.**
24 MR. CLARK:  His question was if they were
25 the subject of other reports, not related to this

146

1  one, would that affect the way you viewed this I
2  think was his question.
3  BY THE WITNESS:
4  **A  My feeling is that it should parallel --**
5  **the report should parallel what I saw.**
6  **BY MR. POST:**
7  Q  So, in other words, what had gone on
8  before with respect to one or more of these
9  officers would not affect your judgment as far as
10 the reasonableness of their actions?
11 **A  I would parallel it to what I saw, and the**
12 **only conclusions I could draw.  I would not**
13 **compare -- I would not be able to compare this one**
14 **to one two weeks previous, no, I couldn't do that.**
15 **I wouldn't do that.**
16 Q  Would it impact your view of the
17 particular officers or officer or officers'
18 actions if a prior use of force incident involved
19 an inability of the suspect to breathe while he or
20 she was prone during and after a struggle with law
21 enforcement?
22 **A  I'd have to have more information than**
23 **we've got in that sense and then I would question**
24 **whether or not a previous incident could have an**
25 **impact on a current incident that I'm reviewing.**

147

1  MR. POST:  Let's go off the record.
2  (Discussion was had off the record.)
3  MR. POST:  That's all.  We're done unless
4  you have questions.
5  MR. CLARK:  I've got a couple of hours
6  worth.  We're done.
7  MR. POST:  We are leaving Exhibits 1
8  through 10 with the court reporter and we are
9  concluded at 2:44 Central time.
10 (The deposition was concluded at 2:44 p.m.)
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

148

1  CERTIFICATE OF COURT REPORTER - NOTARY PUBLIC
2  I, Theresa A. Vorkapic, Certified
3  Shorthand Reporter No. 084-2589, CSR, RMR, CRR,
4  RPR, and a Notary Public in and for the County of
5  Kane, State of Illinois, the officer before whom
6  the foregoing deposition was taken, do hereby
7  certify that the foregoing transcript is a true
8  and correct record of the testimony given; that
9  said testimony was taken by me and thereafter
10 reduced to typewriting under my direction; that
11 reading and signing was not requested; and that I
12 am neither counsel for, related to, nor employed
13 by any of the parties to this case and have no
14 interest, financial or otherwise, in its outcome.
15 IN WITNESS WHEREOF, I have hereunto set my
16 hand and affixed my notarial seal this 25th day of
17 October, 2019.
18 My commission expires November 6, 2019.
19
20
21 _Theresa A Vorkapic_
22
23 _____
24 THERESA A. VORKAPIC
25 NOTARY PUBLIC IN AND FOR ILLINOIS

Transcript of Gregory J. Connor
Conducted on October 10, 2019                                    38

| A | | | |
|---|---|---|---|

**a-b-c-d-e**
111:25
**a-g-u-i-l-a-r**
20:24
**abilities**
136:4
**ability**
6:21, 7:1,
111:8
**able**
6:15, 30:20,
31:18, 31:20,
67:6, 68:15,
75:13, 75:23,
96:10, 106:4,
106:8, 112:23,
118:18, 118:19,
120:24, 143:13,
143:18, 145:23,
146:13
**abma**
21:13
**abnormal**
109:3
**about**
9:23, 10:25,
11:2, 12:14,
15:1, 16:8,
16:24, 18:3,
24:9, 24:19,
26:25, 27:13,
30:17, 33:18,
33:22, 35:11,
36:7, 40:20,
40:23, 41:1,
41:4, 41:24,
42:12, 48:12,
49:21, 50:16,
51:21, 52:3,
52:22, 52:23,
54:16, 55:19,
56:14, 60:11,
63:10, 64:1,
65:6, 65:17,
67:10, 70:9,
70:10, 71:14,

71:20, 72:20,
73:5, 74:16,
78:6, 78:23,
78:24, 79:9,
79:11, 80:14,
82:15, 82:24,
82:25, 85:16,
86:13, 89:4,
89:12, 89:13,
92:2, 95:9,
95:10, 98:1,
99:21, 100:21,
101:15, 101:22,
101:23, 102:4,
102:14, 103:25,
106:11, 114:11,
114:23, 115:11,
116:20, 119:6,
120:24, 121:17,
121:18, 122:22,
130:7, 132:23,
133:11, 135:9,
136:6, 139:16,
139:19, 139:24,
140:8, 142:25
**above**
98:13, 98:15,
134:11
**abruptly**
59:7
**absence**
55:9, 55:10,
126:13
**absolutely**
11:5, 33:7,
61:6, 115:18,
131:25, 142:17
**academic**
42:17, 45:11,
45:15, 45:18,
45:20, 45:21,
61:5, 61:7,
61:25, 62:5,
78:10, 78:21,
78:25, 80:22,
135:22, 137:10,
137:13, 137:15,
137:16

**academically**
80:24
**academy**
45:9
**accent**
7:20
**accepted**
134:16
**according**
70:5, 138:7
**accrediting**
43:21, 43:23
**accuracy**
81:14, 126:4
**accurate**
84:25, 105:9,
139:1
**accusatory**
112:5, 112:14
**acronym**
48:13, 77:16
**across**
83:3
**act**
42:15, 48:3
**acted**
110:19
**acting**
108:25, 119:12,
135:13
**action**
57:25, 127:20
**actions**
104:22, 133:17,
145:18, 146:10,
146:18
**activated**
107:4
**active**
95:10, 96:2
**actively**
55:15, 142:14,
142:19
**activities**
51:3, 55:19,
62:20, 62:21,
134:5, 134:6
**activity**
57:15, 58:8,

**academically**
63:22, 109:5,
119:1, 130:7,
130:8, 140:6
**actual**
42:18, 101:22
**actually**
17:11, 17:14,
18:11, 30:20,
34:6, 40:17,
41:8, 50:24,
55:9, 60:3,
60:16, 68:19,
73:15, 74:2,
76:25, 78:4,
82:4, 86:19,
95:12, 97:6,
102:21, 111:14,
138:7, 139:11,
141:25
**adams**
2:6
**add**
40:4, 40:6
**added**
104:5, 132:14
**addition**
132:16
**additional**
35:5, 134:12
**addressed**
77:7, 77:8,
91:16, 91:17,
92:16
**administration**
41:7, 45:25,
46:1, 59:3,
68:23
**administrator**
1:9
**advanced**
41:18, 63:11
**adversely**
6:25
**advised**
23:19, 41:20,
80:7, 117:9
**advising**
117:18

advisory
93:9
affect
6:25, 146:1,
146:9
affixed
148:16
africa
59:6
after
37:1, 50:19,
59:13, 59:16,
100:10, 115:1,
120:21, 121:2,
126:12, 133:18,
141:23, 146:20
again
24:1, 31:9,
39:9, 52:21,
53:7, 61:16,
78:18, 79:4,
79:6, 83:8,
89:3, 93:2,
97:1, 98:13,
98:17, 101:13,
103:20, 115:22,
126:13, 127:15,
129:5, 132:5,
134:10, 134:14,
137:3, 145:3,
145:11
against
49:8, 75:17,
95:13
agencies
44:18, 44:22,
55:21, 56:19,
56:22, 56:24,
57:3, 57:6,
59:6, 62:22,
62:24, 63:6,
63:19, 72:22,
135:15
agency
43:21, 49:9,
49:11, 63:3,
69:13, 135:15,
135:17

agitated
118:4, 118:5,
118:9, 118:13
ago
32:25, 68:10
agree
7:16, 19:3,
29:2, 29:24,
57:6, 96:1,
112:2, 127:3,
128:4, 129:18,
142:13, 143:7
agreeable
5:11
agreement
5:7, 143:21
agrees
96:24
aguilar
1:17, 20:23,
21:5, 29:8,
106:24, 108:7,
108:11, 108:24,
112:19, 112:22,
119:6, 127:10,
127:12, 141:22,
145:5, 145:12,
145:14
aguilar's
107:15
ahead
10:23, 14:6,
15:20, 24:7,
44:2, 46:22,
82:9, 85:1,
103:4, 104:18,
115:5, 115:22,
119:6, 124:25,
132:1, 143:1
aid
127:22
aimlessly
118:14
air
44:21, 131:4
airplane
6:15
airway
103:7, 106:6

al
1:11, 1:17
alarm
132:9, 132:10
alcohol
7:5, 42:3,
88:15
alienate
41:22
all
5:5, 5:7, 9:1,
9:9, 10:16,
11:7, 13:7,
14:2, 14:19,
15:8, 17:6,
22:20, 24:15,
28:4, 28:22,
34:10, 34:16,
34:20, 36:3,
40:25, 42:24,
49:14, 65:8,
77:11, 84:15,
95:21, 100:5,
106:14, 106:19,
107:1, 108:7,
114:11, 114:17,
118:24, 119:12,
120:22, 127:8,
130:9, 133:15,
138:1, 140:7,
143:7, 147:3
allison
8:6
allow
60:21
allowed
5:6, 51:6,
130:13
allowing
129:1
almost
31:20, 77:15,
121:20, 122:7,
125:3, 126:25
along
26:8, 39:14,
42:17, 60:18,
65:13, 67:11,

95:7, 144:9
already
7:25, 13:16,
22:21, 35:20,
36:5, 87:8
also
21:19, 50:19,
54:15, 100:3,
100:17, 108:13,
128:18, 129:10,
139:19
alter
111:8
altercation
126:5
always
128:14
amazes
49:7
amba
21:5, 21:6,
21:13, 21:14
ambivalence
105:8
ambulance
31:15, 106:25,
107:4, 144:14
american
14:22, 16:15,
69:19, 70:25,
71:5, 77:17
amount
16:17
analysis
4:25, 83:1,
120:25, 124:3,
126:21, 127:6,
128:1
and-a-half
142:7
anecdotal
78:13
animals
137:21, 137:24
animosity
113:3
ann
52:2, 52:5,

Transcript of Gregory J. Connor
Conducted on October 10, 2019                                    40

53:1, 63:4,
63:17, 135:17
**annoyed**
107:16, 112:5
**another**
51:9, 60:7,
68:3, 83:10,
87:9, 87:13,
90:21, 109:16,
118:15, 139:3
**answer**
5:10, 7:13,
7:16, 28:10,
28:11, 28:19,
28:24, 29:6,
29:24, 103:4,
104:18, 123:11,
143:1
**answered**
85:4, 85:6
**any**
5:19, 5:21,
6:20, 6:24, 7:5,
7:8, 7:11, 9:12,
9:23, 10:5,
11:24, 13:6,
13:11, 17:2,
23:12, 26:24,
27:4, 27:6,
31:6, 31:22,
33:5, 34:22,
35:12, 36:4,
38:16, 38:25,
40:7, 44:5,
56:2, 74:6,
77:15, 80:14,
80:16, 82:17,
84:17, 92:20,
95:15, 96:11,
98:7, 99:3,
101:17, 101:20,
105:15, 106:23,
107:12, 111:24,
118:7, 121:2,
121:4, 121:8,
121:15, 123:12,
123:24, 127:2,
127:25, 131:18,

139:16, 142:4,
142:19, 148:13
**anybody**
79:14
**anymore**
68:5, 68:7,
142:15
**anyone**
30:18, 91:21,
136:18
**anything**
6:25, 9:24,
13:9, 14:7,
18:6, 18:8,
20:12, 20:16,
30:4, 40:5,
65:15, 69:22,
88:25, 89:17,
90:2, 90:24,
92:12, 96:12,
97:24, 100:21,
107:24, 112:12,
113:2, 114:14,
121:16, 121:18,
129:7, 132:4,
132:12, 133:9,
134:15
**anyway**
15:15
**anywhere**
85:11
**apparent**
115:7, 115:8,
115:19, 115:20,
115:24, 116:1
**apparently**
81:20
**appear**
15:12
**appeared**
29:19, 80:5
**appears**
18:23, 19:9,
30:14, 99:15
**applicable**
130:22
**application**
57:12, 102:1,

104:13
**applications**
54:25
**applied**
134:20
**apply**
97:6, 129:9,
130:1, 130:2,
130:6, 132:21
**applying**
129:25
**approach**
83:10, 84:4,
84:5, 87:6
**approaching**
84:3, 84:8
**appropriate**
30:11, 64:10,
132:21, 134:22
**appropriateness**
132:15
**approximate**
120:13
**approximately**
49:3, 52:14
**april**
14:23
**arbor**
52:3, 52:5,
53:1, 63:4,
63:17, 135:18
**area**
9:15, 12:20,
12:22, 13:6,
42:2, 42:6,
42:19, 55:17,
58:5, 75:9,
92:3, 92:19,
97:11, 97:12,
98:2, 98:3,
101:8, 101:12,
102:5, 102:14,
102:17, 104:25,
119:3, 126:5,
138:6, 138:17
**areas**
12:24, 16:13,
37:3, 51:14,

62:18, 63:6,
63:18, 68:3,
79:4, 91:16,
97:8, 97:10,
97:14
**aren't**
36:4, 104:2,
137:17
**armed**
97:3
**arms**
75:14
**around**
46:3, 46:5,
74:4, 99:16,
144:13
**arreola**
1:5, 1:6, 1:10,
8:18, 29:6,
29:22, 31:14,
107:17, 107:19,
108:1, 108:12,
108:24, 108:25,
109:9, 109:13,
112:23, 113:4,
115:8, 115:9,
115:20, 116:7,
116:8, 116:19,
117:11, 118:3,
119:7, 121:21,
122:8, 125:4,
126:12, 127:10,
127:19, 128:8,
128:10, 130:15,
131:8, 131:14,
133:3, 133:18,
133:23, 134:19,
138:20, 138:21,
139:12, 139:19,
140:15, 141:23,
142:13, 142:18,
145:1
**arreola's**
108:17, 130:19,
132:6, 144:7
**arrest**
58:4, 60:23,
62:21, 64:5,

119:21, 119:24,
129:3, 139:6,
139:9
**arrested**
72:15
**arresting**
52:24
**arrests**
52:10, 52:13,
52:21, 56:5,
56:13, 60:22
**art**
119:20
**article**
14:22, 15:23,
15:24, 16:17,
16:21, 34:8,
69:18, 70:1,
70:9, 71:14,
76:9, 79:6,
79:8, 79:23
**articles**
42:9, 69:15,
79:21, 81:4,
81:10, 82:3,
87:7, 130:18
**artist**
67:24
**asked**
7:13, 13:3,
13:18, 17:14,
30:17, 40:14,
62:7, 64:11,
64:15, 65:20,
85:6, 89:25,
94:2, 104:4,
108:12, 108:13,
127:10, 128:6
**asking**
71:18, 85:8,
90:1, 98:19,
101:22, 101:23,
108:1, 108:6,
108:7, 108:15,
108:24, 110:11,
110:12, 114:23,
131:22
**aslet**
77:16, 77:18,

77:24
**asp**
65:6, 65:17,
65:18, 65:20
**aspect**
53:25
**asphyxia**
33:10, 34:5,
86:11, 87:24,
88:3, 89:4,
89:10, 93:7,
93:8, 97:8,
97:15, 98:7,
98:16, 100:3,
105:4, 130:15,
130:22, 132:17,
135:4
**asphyxia-sudden**
100:12
**asphyxiation**
32:3, 105:21
**assertive**
129:6
**assist**
59:7, 127:22,
133:23
**assistance**
134:12, 144:5
**assisting**
128:21, 129:5
**associate**
60:21
**association**
9:16, 14:22,
16:15, 72:21,
76:11
**assume**
7:17, 131:18,
133:24
**assumed**
138:16
**assuming**
131:7, 131:12
**assumption**
131:17
**assure**
15:11
**attached**
4:6, 87:8,

87:13, 100:19
**attainment**
49:9
**attempt**
108:5, 111:9
**attempted**
73:6, 83:16,
118:17, 118:19,
125:20
**attempting**
51:18, 60:9,
97:19, 97:23,
113:5, 118:21,
139:4, 139:5,
139:6, 139:9,
140:6, 140:9
**attempts**
127:2
**attorney**
27:7, 54:2,
54:10, 60:7
**attorney-client**
35:6
**attorneys**
32:22, 54:4
**audio**
19:24, 31:10,
138:23, 142:24
**automatically**
30:25, 136:15
**autopsy**
121:14
**available**
56:3
**avenue**
3:14
**average**
72:11
**avoid**
100:2, 129:12
**avoidance**
101:9
**avoiding**
94:8
**aware**
89:16, 98:16
**away**
44:6, 59:11,

97:7, 118:4,
118:13, 118:14,
129:1

---

**B**

---

**bachelors**
41:6
**back**
10:2, 15:23,
16:10, 16:23,
18:15, 33:22,
34:17, 42:1,
49:2, 49:6,
59:4, 60:14,
69:18, 69:21,
71:12, 72:17,
75:17, 75:24,
79:6, 79:20,
85:5, 86:6,
91:8, 96:4,
96:11, 98:1,
98:4, 101:10,
101:11, 101:12,
101:13, 101:15,
102:1, 102:5,
102:6, 102:8,
102:12, 102:13,
102:18, 104:13,
104:24, 109:25,
110:1, 114:21,
118:23, 119:2,
121:23, 124:8,
132:22, 132:25,
133:1, 133:7,
133:8, 142:16
**background**
41:5
**backup**
27:24
**backwards**
63:8
**balanced**
57:12, 67:13
**ball**
12:7
**baltimore**
63:10
**bardeen**
136:9, 136:10,

136:13
**based**
27:2, 29:8,
31:9, 57:13,
62:13, 63:6,
79:23, 133:24,
135:6, 138:17
**basic**
4:22, 4:23,
48:19, 68:14,
74:9, 86:24,
93:7, 93:16,
93:17, 94:7,
98:14, 98:23,
99:15, 99:25,
100:18, 100:19,
106:3, 112:3,
113:8
**basically**
40:13, 57:25,
66:10, 70:10,
73:13, 74:11,
86:15
**basics**
69:18
**basis**
48:6, 127:5
**bat**
118:10
**bates**
18:24, 20:5,
94:1
**baton**
65:8, 65:12,
65:13, 65:20
**batons**
65:6, 65:17
**bay**
3:14
**became**
83:15, 109:9,
115:8, 115:20,
118:3, 118:5,
138:21, 139:13,
139:14
**because**
6:14, 17:14,
17:15, 27:6,

27:24, 28:3,
28:12, 29:10,
33:16, 41:11,
41:21, 42:21,
63:4, 67:17,
69:25, 73:2,
75:6, 80:18,
82:21, 108:20,
119:10, 123:21,
125:21, 130:17,
130:20
**become**
77:12, 77:13,
138:20
**becoming**
55:23, 55:25,
88:18
**been**
5:14, 10:9,
10:14, 10:16,
11:24, 16:18,
23:2, 31:17,
32:23, 32:24,
36:5, 38:20,
39:7, 40:12,
44:14, 44:15,
44:16, 46:2,
46:5, 46:12,
47:10, 48:22,
48:24, 49:4,
60:18, 65:14,
65:18, 70:17,
77:21, 81:13,
83:19, 85:6,
86:21, 86:24,
87:3, 87:8,
87:13, 89:23,
91:16, 91:17,
92:2, 93:21,
99:16, 101:13,
103:12, 103:21,
105:6, 105:22,
108:21, 113:14,
116:2, 120:6,
120:7, 120:10,
120:11, 127:10,
128:5, 130:22,
135:17, 136:4,

136:19, 138:24,
140:8, 140:14,
143:9, 144:3,
144:19, 145:15
**before**
2:13, 10:10,
10:24, 21:23,
21:25, 22:1,
23:17, 26:16,
37:8, 49:5,
53:17, 65:24,
74:1, 89:25,
92:24, 122:2,
122:15, 141:24,
145:4, 145:5,
146:8, 148:5
**began**
126:6, 145:4,
145:5
**beginning**
18:23
**begins**
19:10
**behalf**
3:2, 3:10,
37:19
**behavior**
88:16
**behavioral**
4:15, 14:25,
16:3
**behind**
76:24, 77:4,
106:24
**being**
16:12, 20:24,
21:1, 31:6,
31:14, 33:16,
37:22, 38:1,
40:13, 42:22,
44:19, 54:2,
61:1, 69:21,
77:8, 81:22,
83:23, 83:25,
84:2, 85:7,
88:21, 91:25,
92:13, 92:16,
92:18, 92:21,

101:6, 104:24,
107:16, 109:18,
112:14, 113:20,
113:24, 116:11,
116:20, 120:15,
120:19, 129:6,
139:20, 142:3,
142:11, 143:13,
144:24
**belief**
81:19
**believe**
8:23, 10:2,
13:25, 22:23,
28:17, 31:13,
33:24, 34:1,
37:22, 38:17,
39:12, 40:5,
45:24, 46:8,
47:20, 47:24,
47:25, 49:16,
53:25, 56:23,
57:1, 62:2,
69:13, 71:5,
78:4, 85:11,
87:2, 87:8,
92:13, 105:25,
107:19, 108:10,
115:24, 124:23,
136:18, 138:10,
139:14, 144:18,
144:21, 145:2,
145:9, 145:10
**believed**
116:9
**belligerent**
138:20, 138:21,
139:13
**berate**
64:4
**best**
42:16, 70:15,
81:25
**better**
87:5, 137:24
**between**
14:8, 62:5,
78:21, 99:4,

102:7, 107:12,
117:21, 119:5
**beyond**
32:7, 32:8,
32:9, 32:12,
74:5, 134:11,
137:21
**big**
72:9, 108:5
**bill**
15:6, 26:14
**billing**
9:23, 13:16,
15:9, 17:18
**biomechanics**
85:19
**bit**
16:24, 19:17,
40:24, 49:22,
75:1, 106:11,
135:9
**bite**
97:23
**bizarre**
88:15
**blackhawk**
59:14
**blades**
98:3
**block**
75:9
**blocking**
103:7
**blood**
66:18, 72:12
**bloodborne**
72:9, 72:13
**board**
83:4
**body**
17:10, 20:24,
20:25, 21:1,
21:5, 21:18,
21:23, 34:13,
66:9, 73:5,
87:6, 104:9,
106:13, 107:15
**bone**
66:8

**book**
42:10, 60:6,
60:8, 68:18,
69:5, 81:16,
81:17, 81:21,
82:25
**books**
79:21, 81:11
**border**
62:16
**both**
16:19, 16:25,
39:24, 48:12,
79:4, 85:17,
127:12, 134:19,
137:23
**bottom**
18:24, 41:2,
71:3, 92:7,
94:6, 99:9
**box**
31:12
**boyfriend**
64:4
**bradley**
3:5
**brand**
77:9
**break**
18:1, 18:2,
18:9, 18:11,
36:20, 66:8,
76:5, 81:8,
84:9, 86:2,
91:3, 122:22,
122:24, 124:7
**breakdown**
83:9
**breaks**
83:12
**breath**
42:2
**breathe**
86:17, 102:22,
103:9, 103:14,
104:14, 139:21,
146:19
**breathing**
86:18, 105:17,

**book**
106:6, 129:11,
129:19, 131:4,
139:25, 140:4,
144:8
**brief**
16:14
**bring**
13:18, 13:22,
17:2, 33:1,
34:22, 40:14,
59:3, 67:4,
80:22, 129:6
**bringing**
16:19, 112:23,
130:7
**broad**
92:17
**broken**
120:22
**brought**
9:24, 13:14,
15:24, 17:4,
18:18, 35:6,
35:14, 50:15,
102:10
**brutality**
94:9
**bsing**
144:13
**buddy**
144:8
**bulletin**
4:20, 33:19,
34:7, 87:11,
87:23, 88:11,
89:2, 89:18,
91:16, 100:12
**bulletins**
62:10, 62:23
**bureau**
49:23, 50:1
**burglary**
43:9, 53:9
**burrow**
129:15
**burrowing**
130:3
**buttock**
140:19

**buttocks**
98:4, 101:12,
102:6, 102:13,
142:4
**buy**
15:4, 15:14

**C**

**california**
63:3
**call**
8:3, 23:5,
27:24, 43:12,
53:10, 124:6,
124:9, 132:8
**called**
5:14, 8:12,
20:9, 53:5,
55:3, 90:21,
100:3, 105:2,
122:4
**calling**
117:22
**cam**
20:24, 20:25,
21:1, 21:5,
21:19
**came**
9:18, 23:17,
26:16, 54:7,
63:20, 63:21,
71:16, 116:21,
118:6, 122:3,
144:1
**camera**
17:10, 107:15
**cameras**
106:14
**campus**
43:18, 45:22,
45:23, 46:2,
46:17, 46:25
**cams**
21:23
**can't**
13:9, 49:16,
63:23, 67:18,
68:21, 69:3,

Transcript of Gregory J. Connor
Conducted on October 10, 2019

44

71:8, 71:9,
94:25, 102:22,
103:8, 111:25,
113:19, 120:14,
126:14, 131:18,
141:13, 143:22,
145:10
**cannot**
26:17, 34:20,
103:14, 116:17,
126:3, 126:25
**capability**
96:9
**capacity**
52:6, 61:24,
61:25, 86:17
**capital**
62:16
**car**
15:4, 15:15,
144:22
**care**
76:17, 93:9
**career**
39:3, 42:12
**careers**
79:19
**carotid**
66:13, 66:18
**carry**
31:12
**case**
1:9, 8:15,
9:20, 10:17,
11:25, 13:1,
13:8, 13:12,
15:6, 15:7,
18:19, 18:21,
19:5, 20:3,
20:12, 23:13,
25:24, 26:7,
26:10, 26:11,
26:15, 30:23,
31:17, 31:23,
32:7, 36:24,
37:13, 37:14,
37:16, 38:6,
39:14, 39:18,

63:9, 106:12,
106:15, 106:20,
106:25, 108:23,
112:20, 116:23,
130:14, 131:24,
145:18, 148:13
**cases**
36:9, 39:8,
53:4, 63:15,
63:17, 63:20,
64:1
**casework**
80:4, 80:6
**cashbaugh**
14:15, 38:18
**cashbaugh's**
14:21
**category**
136:10
**causation**
131:23
**cause**
66:8, 106:1
**causes**
88:14, 88:15
**ccg**
18:24, 19:2,
19:10, 19:12,
19:19, 20:5,
20:6
**ceased**
142:15, 143:8
**center**
3:13, 4:23,
33:10, 54:24,
56:15, 56:18,
57:23, 58:11,
62:15, 88:5,
91:20, 93:16,
100:13
**central**
42:19, 43:17,
124:16, 147:9
**certain**
6:1, 11:12,
11:20, 13:3,
16:4, 24:21,
33:17, 39:19,

45:12, 51:3,
51:4, 64:23,
65:4, 76:24,
77:23, 83:2,
83:22, 87:16,
89:11, 93:18,
106:13, 109:14,
114:1, 122:14,
126:22, 143:7
**certainly**
28:25, 29:18,
46:5, 47:13,
145:21
**certificate**
46:20, 46:21,
46:24, 148:1
**certification**
47:17, 47:18,
47:20
**certified**
2:14, 2:15,
48:2, 48:16,
48:18, 49:19,
55:25, 148:2
**certifies**
46:23
**certify**
48:11, 148:7
**cetera**
53:11, 53:12,
54:12, 55:24,
72:4, 80:9
**challenge**
60:9
**champaign**
8:7, 43:19,
60:20
**champaign-urbana**
45:21, 46:19
**chance**
51:11, 99:19
**change**
108:23, 110:5
**changed**
80:13
**changes**
60:12, 62:7
**chapter**
32:18

**charge**
12:12, 53:12,
125:25
**charged**
10:2
**chasm**
78:21
**check**
51:15, 68:22,
108:8, 144:7
**checked**
132:6
**checking**
96:8
**chest**
97:12, 98:3,
102:14, 102:17
**chicago**
1:22, 2:8,
4:19, 6:17,
12:19, 34:3,
34:5, 42:20,
42:21, 42:25,
45:22, 47:1,
62:23, 62:25,
63:1, 78:5,
87:11, 87:23,
88:10, 91:15,
135:20
**children**
55:22
**choke**
65:23, 65:25,
66:1, 66:6,
66:7, 66:9,
66:11, 66:14,
66:15, 67:18
**choked**
66:16
**choking**
106:9
**choose**
63:6
**cigarette**
144:22
**circle**
45:22, 45:23,
46:2, 46:17,

**circles**
77:10, 84:22,
85:13
**circumstances**
107:22
**cit**
109:19, 110:7,
110:13, 110:17,
111:1, 111:10,
111:14, 111:18,
112:3, 112:9,
134:3
**citizen**
125:22
**citizens**
44:12, 81:22
**city**
19:16, 42:20,
42:21, 43:10,
54:22, 55:21,
60:19, 61:10,
64:20, 64:21,
78:5
**civil**
37:15, 37:16
**claims**
7:9
**clamp**
118:10
**clarify**
43:21, 46:25
**clark**
3:11, 5:11,
5:12, 9:3, 9:10,
10:10, 10:23,
11:5, 13:17,
14:2, 14:17,
15:19, 17:5,
17:13, 17:21,
18:6, 18:10,
22:8, 22:12,
22:16, 22:23,
23:3, 23:4,
23:21, 24:6,
24:14, 24:24,
25:2, 25:4,
25:25, 26:8,

26:11, 26:22,
27:4, 27:11,
27:20, 28:6,
34:10, 35:23,
36:21, 38:12,
38:19, 48:16,
49:14, 76:16,
82:8, 84:12,
85:1, 85:4,
85:9, 88:23,
89:19, 89:25,
90:10, 90:14,
91:2, 91:5,
93:21, 93:24,
94:1, 96:5,
98:19, 98:24,
99:22, 100:5,
102:24, 103:19,
103:24, 104:16,
109:23, 110:3,
110:11, 110:22,
114:17, 122:25,
123:7, 123:13,
123:16, 124:5,
124:10, 131:9,
131:15, 132:2,
138:2, 142:22,
144:16, 145:19,
145:24, 147:5
**clark's**
19:16
**classes**
74:2
**classified**
52:23
**cleaned**
72:11
**cleaning**
72:5
**clear**
107:11, 120:4,
139:17
**clearly**
116:22
**click**
31:10, 95:3
**clinton**
59:2

**clipped**
31:2
**close**
60:25
**closely**
60:22, 91:25
**closer**
44:7
**club**
7:11
**co-taught**
54:2
**coached**
123:17
**coaching**
123:11
**code**
54:8
**codes**
81:20
**cold**
138:6, 138:13,
138:17
**collect**
50:8
**collection**
92:8, 92:11,
92:24, 101:16
**colleges**
69:10, 69:14
**color**
98:11, 98:13
**columbus**
1:3, 1:15, 3:7,
3:15, 19:16
**com**
14:16
**come**
16:9, 16:23,
17:15, 24:6,
54:5, 59:20,
65:13, 70:15,
72:10, 72:17,
78:7, 79:6,
82:5, 82:6,
97:5, 125:18,
138:13, 142:5,
145:6

**comes**
94:16, 120:24
**comfortable**
124:2, 141:18,
143:13
**coming**
72:16, 117:23
**comment**
13:3, 125:9,
134:25
**commentaries**
132:16
**commentary**
130:17
**commented**
138:12
**comments**
29:8, 117:25,
138:8
**commission**
148:18
**commitment**
28:13, 28:21,
30:15, 127:19
**committed**
52:25
**committee**
56:17, 136:20
**common**
88:13, 88:21
**commonly**
66:20
**communicate**
111:9, 111:15,
125:21
**communicating**
125:23
**communication**
109:15
**communications**
14:8
**communicative**
111:11
**communities**
81:23, 135:14
**community**
61:12, 84:24,
85:20, 137:16

Transcript of Gregory J. Connor
Conducted on October 10, 2019

46

| | | | |
|---|---|---|---|
| compare<br>146:13<br>compared<br>47:14, 47:17,<br>83:9<br>complaining<br>104:14<br>complaints<br>139:24<br>complete<br>39:17, 39:23,<br>108:22<br>completed<br>94:19<br>completely<br>7:12<br>compliance<br>143:9<br>component<br>31:24<br>composed<br>41:17<br>comprehensive<br>125:14<br>compression<br>87:5, 87:6<br>concept<br>42:16, 58:12,<br>71:6, 77:10,<br>116:14<br>concern<br>16:16<br>concerned<br>140:8<br>concerning<br>93:2<br>conclude<br>125:6, 125:7,<br>133:17<br>concluded<br>127:23, 147:9,<br>147:10<br>conclusion<br>122:4, 126:16,<br>126:17, 142:6<br>conclusions<br>127:6, 128:5,<br>146:12 | condition<br>6:20, 86:19,<br>89:15, 108:19<br>conduct<br>119:7, 119:22<br>confer<br>21:2<br>conference<br>2:7<br>confidence<br>26:18<br>confirm<br>23:1<br>confirmation<br>10:4<br>confirmed<br>10:3<br>conflicting<br>121:18<br>conflicts<br>121:15<br>confront<br>77:14<br>confrontation<br>76:25<br>confronting<br>121:20, 122:8,<br>125:4<br>confused<br>107:22<br>confusion<br>79:4, 92:20,<br>107:21<br>conner<br>5:20, 8:4,<br>12:24, 14:9,<br>110:12, 124:16,<br>133:17<br>connor<br>1:21, 2:1, 4:2,<br>4:8, 5:4, 5:13,<br>14:14, 18:17,<br>22:19, 86:6,<br>91:10, 110:13,<br>114:23<br>conscientious<br>134:8<br>conscious<br>77:12, 77:13 | consciousness<br>67:6<br>consecutively<br>19:11, 20:5<br>consider<br>12:20, 58:3<br>considered<br>41:8, 42:19,<br>45:16, 45:18,<br>78:10, 94:20,<br>135:18<br>consistent<br>91:12, 133:16,<br>145:22<br>consistently<br>44:23<br>consolidated<br>1:14<br>consulted<br>63:23<br>consume<br>7:5<br>contact<br>62:14, 107:17,<br>115:23, 120:22,<br>122:15, 129:16,<br>139:12<br>contain<br>103:1<br>contained<br>13:12, 20:11<br>contains<br>18:18, 21:19<br>contemporary<br>44:18, 71:18<br>contention<br>52:20<br>contents<br>21:4, 22:9<br>context<br>99:8, 111:21,<br>126:10, 134:16<br>continue<br>44:20, 96:3,<br>104:10, 124:7,<br>140:5<br>continued<br>144:4 | continues<br>19:11<br>continuing<br>95:5<br>continuum<br>57:7, 57:10,<br>57:11<br>contract<br>9:19, 9:21<br>contrary<br>96:15<br>contribute<br>135:4<br>contributing<br>111:7<br>control<br>28:1, 64:23,<br>68:4, 68:17,<br>71:12, 71:13,<br>71:19, 72:2,<br>72:19, 72:23,<br>73:1, 73:25,<br>74:16, 75:6,<br>75:8, 75:12,<br>75:16, 75:18,<br>75:20, 75:22,<br>76:8, 77:2,<br>83:3, 83:17,<br>95:17, 96:25,<br>97:20, 97:23,<br>99:9, 102:21,<br>104:15, 104:20,<br>106:4, 109:6,<br>111:25, 113:19,<br>140:2, 140:7,<br>140:9, 143:9,<br>144:2<br>controlled<br>76:2, 101:7,<br>129:14, 140:16,<br>141:8<br>controlling<br>97:19, 141:19<br>convention<br>78:5<br>conversation<br>119:5, 123:22<br>convertible<br>15:2 |

Transcript of Gregory J. Connor
Conducted on October 10, 2019                    47

| | | | |
|---|---|---|---|
| **copies** 10:19, 10:24, 14:1 **copy** 10:3, 13:22, 13:23, 24:13, 25:2, 33:1, 34:17, 76:8, 76:11, 76:12 **corner** 18:25, 20:4, 92:7 **correct** 6:12, 6:13, 7:4, 7:18, 8:20, 8:21, 9:3, 9:4, 11:16, 18:19, 19:13, 19:25, 20:7, 20:8, 21:6, 21:7, 21:14, 21:15, 21:20, 21:21, 22:3, 22:4, 22:6, 22:7, 25:23, 29:6, 32:3, 35:9, 35:10, 35:16, 35:17, 35:21, 36:6, 37:8, 40:18, 40:19, 45:4, 45:5, 45:7, 48:4, 48:5, 48:15, 48:25, 49:3, 49:4, 53:4, 55:16, 64:24, 70:2, 79:10, 79:11, 81:14, 87:2, 91:14, 94:15, 98:23, 100:8, 106:21, 106:22, 114:8, 115:3, 115:4, 115:7, 119:15, 119:23, 121:3, 123:25, 139:13, 142:16, 148:8 **correction** 64:12 | **correctional** 39:4, 83:6 **corrections** 39:8 **correctly** 66:2 **correlation** 99:4 **correlative** 25:13 **cost** 12:7 **could** 36:17, 36:19, 36:20, 40:6, 42:16, 44:3, 47:23, 51:1, 51:2, 51:6, 51:7, 51:8, 51:14, 53:9, 53:10, 55:17, 61:18, 67:3, 67:6, 67:14, 69:8, 70:5, 73:12, 73:22, 75:20, 76:13, 79:15, 81:23, 82:3, 82:11, 84:9, 86:19, 97:20, 102:12, 105:6, 105:18, 105:25, 106:9, 108:20, 109:24, 112:17, 113:6, 120:8, 120:10, 120:11, 121:5, 124:5, 125:7, 126:15, 128:15, 139:8, 139:21, 142:14, 145:6, 146:12, 146:24 **couldn't** 113:2, 120:9, 126:15, 126:19, 146:14 **counsel** 5:7, 39:15, 148:12 | **count** 120:8 **counter** 69:17 **counterproductive** 112:5 **country** 51:19, 59:12 **county** 43:10, 62:17, 148:4 **couple** 9:16, 14:3, 28:2, 81:7, 147:5 **course** 4:24, 9:5, 48:11, 48:19, 48:20, 58:12, 74:9, 79:15, 79:16, 86:11, 86:25, 93:17, 94:7, 94:13, 97:8, 98:14, 98:23, 99:16, 100:1, 100:20, 100:22, 100:25, 112:3, 113:9, 116:17, 123:13, 127:20 **courses** 74:3 **court** 1:1, 3:5, 11:3, 19:15, 19:21, 38:15, 38:21, 38:25, 71:16, 147:8, 148:1 **cover** 76:21, 76:24, 77:1, 77:4, 77:9, 77:14 **covered** 35:14, 92:18, 100:9, 100:14 **covers** 91:16 **create** 57:16, 82:20, | 113:3, 142:4 **creating** 136:13 **creation** 78:25 **creative** 25:14 **credentialing** 48:9 **credentials** 42:17, 45:11, 48:9, 50:10, 80:22 **credit** 61:7 **crime** 49:25, 50:1, 50:3, 50:4, 50:15 **criminal** 37:15, 49:23, 81:20 **criminology** 46:9, 46:11 **crisis** 4:12, 14:23, 15:25, 16:13, 16:19, 28:19, 79:12, 79:13, 79:14, 109:19, 111:16 **crr** 1:32, 148:3 **csr** 1:32, 148:3 **cuff** 118:25 **cumulative** 25:15, 25:18 **curiosity** 67:22 **current** 13:22, 60:11, 146:25 **curriculum** 46:10, 54:1, 100:18 **custody** 11:4, 28:16, |

Transcript of Gregory J. Connor
Conducted on October 10, 2019

48

93:11, 99:18,
100:3, 105:4,
138:25, 141:24
**cut**
131:4
**cv**
13:23

**D**

**d-u-d-l-e-y**
20:25
**dallas**
63:8, 63:10
**damage**
131:6, 131:7,
131:13, 131:18
**dangerous**
75:2, 96:10
**dangers**
128:25, 132:17
**dark**
118:18
**dashes**
28:2
**date**
10:14, 12:8,
20:2, 39:16,
68:21
**dated**
11:8, 14:16,
33:12, 33:16,
33:23, 71:18,
88:6, 100:13
**daubert**
38:21
**day**
8:19, 11:11,
14:21, 23:16,
148:16
**days**
12:10, 42:22,
80:10
**deadly**
66:2, 66:3,
67:8
**deal**
14:4, 41:15,
71:3, 72:6,

80:7, 108:2,
143:4
**dealing**
112:6
**deals**
101:18
**dealt**
28:4, 35:23,
38:17, 70:4,
79:25
**death**
8:19, 33:11,
70:7, 88:3,
88:22, 100:3,
100:12, 105:4,
128:11, 130:15
**deaths**
88:14, 93:11,
99:18
**decade**
48:22, 91:13,
91:18
**deceased**
1:7
**decided**
6:16
**decision**
127:18
**declined**
38:15
**decrease**
134:6
**deescalate**
29:23, 30:9,
30:10, 79:2
**deescalation**
78:24
**defendants**
1:18, 3:10
**defense**
22:20, 23:3,
35:20, 37:18,
38:3, 39:14
**define**
46:20, 95:4
**defined**
95:15, 117:15
**definitively**
126:3

**degree**
27:1, 27:2,
41:6, 45:23,
46:6, 46:9,
46:13, 46:14,
46:17, 57:13,
66:24, 70:11,
105:17, 133:6,
138:15
**degrees**
138:8
**delirium**
100:5
**demand**
48:8
**demeaning**
109:8
**democratic**
51:4, 51:17
**demonstrate**
27:25
**demonstrating**
112:6
**department**
4:19, 43:1,
44:3, 45:18,
52:3, 52:5,
52:16, 52:17,
55:6, 55:18,
56:6, 60:20,
62:11, 62:23,
73:2, 73:8,
80:3, 87:11
**department's**
93:10
**departmental**
73:21
**departments**
31:12, 44:16,
61:19, 62:15,
66:22, 70:4,
71:17, 73:9,
73:13, 73:19,
73:24, 83:14
**depending**
78:17
**depends**
124:9

**deployed**
13:5
**deposed**
39:7
**deposition**
1:21, 2:1, 4:8,
4:9, 5:3, 5:6,
5:25, 6:2,
11:11, 11:13,
11:21, 12:17,
14:5, 14:18,
16:5, 24:12,
24:22, 26:6,
26:7, 26:9,
26:14, 28:7,
34:11, 35:12,
35:15, 36:15,
38:10, 38:16,
39:20, 60:4,
87:9, 87:13,
87:17, 90:15,
93:19, 114:2,
147:10, 148:6
**depositions**
6:10, 36:8,
38:13, 114:11
**depth**
80:12, 127:6,
127:12
**deputies**
62:17
**deputy**
71:16
**describe**
30:10, 54:11
**described**
85:6
**design**
73:5
**designated**
125:11
**designed**
111:11, 125:11
**desire**
47:24
**destruction**
70:7
**detain**
109:22, 110:10,

Transcript of Gregory J. Connor
Conducted on October 10, 2019                                    49

110:20, 119:14,
119:16, 119:17,
134:19
**detained**
101:7, 102:21
**detainees**
74:7
**detaining**
119:6
**detective**
52:18, 52:21,
53:14
**detectives**
53:3
**determination**
109:3, 139:8,
140:22
**determine**
118:12, 122:13,
122:16, 141:13
**determined**
136:16
**determines**
141:18
**determining**
108:18, 143:4
**develop**
56:19, 73:7
**developed**
27:1, 67:23
**developer**
58:12
**developing**
42:4, 54:24
**deviation**
84:19
**device**
31:6, 57:17,
68:1
**diagnosed**
127:11
**diagnosis**
128:1
**dialogue**
126:11
**die**
86:19
**diem**
12:11

**difference**
41:13, 41:16,
74:14, 117:21
**different**
9:1, 22:1,
43:3, 51:14,
70:15, 73:2,
73:3, 74:19,
75:1, 101:11,
119:20
**differently**
57:1
**difficult**
110:24, 141:12
**difficulty**
7:8, 143:4,
143:5
**digress**
49:20
**dilute**
69:11
**direct**
92:20, 121:15
**directed**
62:20
**directing**
65:11
**direction**
95:19, 118:14,
148:10
**directly**
9:18, 44:24,
98:15, 141:17
**disability**
116:13
**disagree**
32:6, 89:2,
89:18, 90:1,
90:25, 114:10,
114:14, 116:5,
116:25, 120:2,
121:10, 124:18,
126:3, 130:16
**disagreed**
30:6, 114:24
**disagreeing**
129:24
**disagreement**
30:8, 133:25

**disagreements**
134:1
**discipline**
13:6
**disciplines**
12:24
**disconnected**
121:7, 121:8
**discontinue**
94:11, 104:12
**discontinued**
68:23
**discontinuing**
95:9
**discount**
140:10
**discovery**
5:5, 14:4,
14:10, 19:18,
22:10, 93:22
**discuss**
32:5
**discussed**
135:21
**discusses**
14:17
**discussing**
106:25, 123:4,
123:8
**discussion**
114:20, 122:19,
124:13, 147:2
**diseases**
72:10
**disorderly**
119:7, 119:8,
119:9, 119:10,
119:12, 119:21,
119:25
**disorders**
4:16, 14:25,
16:3
**dispatch**
117:9, 117:18,
117:22, 144:25,
145:6
**dispute**
139:16

**disservice**
122:12
**distinction**
130:4
**distress**
145:1
**district**
1:1, 1:2
**dividing**
102:7
**division**
1:3, 52:18,
53:14
**doctor**
131:22
**document**
6:1, 11:12,
11:20, 14:20,
16:4, 18:22,
19:8, 20:2,
24:21, 39:19,
40:25, 90:23,
92:6, 93:12,
93:18, 114:1
**documents**
13:14, 17:2,
19:7, 19:12,
19:23, 34:22,
35:5, 87:16
**doing**
41:24, 58:6,
59:7, 63:12,
99:5, 141:5,
141:6
**domestic**
43:9, 64:3
**done**
9:14, 13:20,
16:12, 16:14,
16:18, 42:17,
60:1, 60:2,
61:13, 66:2,
82:24, 84:2,
89:7, 95:3,
104:9, 117:10,
131:7, 131:13,
131:19, 147:3,
147:6

Transcript of Gregory J. Connor
Conducted on October 10, 2019

50

doubt
7:21, 27:25
douglas
81:16
down
6:18, 7:24,
17:11, 59:14,
69:15, 84:9,
90:12, 90:20,
116:8, 118:16,
124:3, 129:5,
130:14, 130:24,
138:11
downing
59:8
dr
33:21, 33:22,
123:5
draft
26:9, 26:13,
26:21, 27:15,
28:7
draw
146:12
drawing
65:11
drawn
128:5
drink
7:7
drive
8:6, 17:4,
17:5, 17:22,
18:1, 18:4,
18:18, 20:11,
20:23, 22:15,
23:5, 23:6,
23:7, 24:11,
35:23, 106:15,
106:21
driver's
84:4, 84:7
drivers
42:3
drug
88:14, 115:10,
133:4
drugs
6:24

dual
41:9, 66:19
dudley
20:25, 106:24,
117:8, 117:17,
119:6, 128:6,
141:23, 145:14
dudley's
21:12
duly
5:2, 5:14
duration
65:22
during
18:1, 55:14,
57:17, 59:2,
93:4, 118:3,
120:14, 121:19,
123:2, 145:23,
146:20
duties
53:23
dying
88:19

E

e-mail
9:18, 11:9,
14:15, 76:13
e-mails
14:3, 15:17
e-v-r-a-r-d
21:1
each
21:9, 21:16,
21:23, 21:24,
22:1, 52:16,
53:1, 56:24,
56:25, 120:16,
140:17
earlier
11:10, 13:24,
15:25, 39:3,
71:20, 87:7,
89:13, 90:6,
100:14, 106:17,
121:24
early
108:21, 109:11,

133:3
earn
60:1
easier
6:17
educated
137:22
education
41:1
educational
41:4
effect
34:8, 106:1,
144:8, 145:17
effective
4:13, 14:24,
16:2
efficient
140:13
effort
84:15
either
25:13, 44:24,
63:19, 69:1,
117:14, 117:23
electronic
21:11, 21:19
elements
54:12, 58:2,
129:4
else
18:6, 18:8,
31:5, 40:4,
92:12, 116:5,
117:7, 118:1,
120:2, 121:10,
121:12, 122:5,
132:4, 132:12,
133:9, 133:10,
134:15
else's
119:11
email
4:10
emeritus
135:24, 136:8,
136:25, 137:2,
137:7

emotionally
127:1, 127:2
empathic
133:22, 134:7
empathy
107:20
employed
42:8, 54:14,
61:3, 148:12
employment
49:21, 54:15,
54:17, 56:15,
57:18
ems
28:15, 117:9,
117:18, 125:11,
128:6, 128:17,
144:25, 145:6
emt
31:15
enamored
137:17
encounter
109:12, 133:3
encourages
134:5
end
19:11, 21:22,
126:10, 127:17
ended
59:7
ends
95:21
enforcement
4:22, 4:24,
33:10, 33:19,
39:6, 42:24,
43:22, 45:24,
47:9, 47:12,
47:13, 47:15,
48:3, 48:19,
49:19, 54:23,
56:14, 56:18,
56:24, 57:2,
57:14, 57:23,
58:11, 59:5,
62:14, 69:19,
69:22, 74:9,

Transcript of Gregory J. Connor
Conducted on October 10, 2019

51

77:10, 77:17,
78:13, 79:18,
84:22, 85:13,
85:23, 86:25,
88:4, 91:20,
93:16, 93:17,
94:7, 98:14,
98:23, 99:16,
99:25, 100:1,
100:13, 100:18,
100:19, 112:3,
113:9, 137:7,
137:9, 146:21
**engage**
51:3, 140:5
**engaged**
140:2
**engaging**
134:4
**enough**
59:22, 60:19,
66:23, 78:8,
103:1, 103:21
**ensue**
128:12
**entire**
13:18
**entities**
41:22
**entitled**
87:22, 88:2,
123:22
**entity**
59:4
**environment**
58:2, 58:7
**episode**
29:12, 126:24
**equivalent**
34:7
**error**
82:4, 82:11,
82:13
**escalated**
127:2
**escape**
83:4
**escort**
118:22

**especially**
61:20, 126:24,
133:18
**esquire**
3:3, 3:11
**essentially**
30:1, 60:1,
72:6, 81:10
**established**
83:18, 83:19,
143:10
**estate**
1:10
**et**
1:11, 1:17,
53:11, 53:12,
54:12, 55:24,
72:4, 80:9
**eval**
29:1, 117:19,
117:22
**evaluating**
29:18
**evaluation**
117:10, 117:14,
117:16, 117:21,
122:5, 125:10,
125:12, 125:14,
125:16
**even**
15:17, 18:10,
30:11, 42:22,
61:19, 62:13,
72:10, 77:8,
77:12, 78:8,
79:5, 79:17,
81:4, 130:12
**events**
88:13, 88:21
**eventually**
42:4, 52:4,
53:13, 86:17,
136:7
**ever**
11:6, 38:15,
38:20, 38:24,
60:25, 105:2,
127:10, 130:21

**every**
26:17, 28:2,
28:3, 53:25,
65:3, 70:13,
73:5, 73:7
**everybody**
70:22, 96:24
**everybody's**
140:3
**everything**
35:14, 35:18,
53:14, 59:17
**evidence**
31:22, 32:6,
50:8, 50:9,
50:10, 92:8,
92:12, 92:25,
101:17, 124:4,
126:13, 126:14,
126:21
**evolved**
37:1, 43:4,
53:13, 118:24
**evrard**
21:1, 106:24,
107:6, 121:6,
145:14
**evrard's**
21:18
**exact**
8:24, 68:21
**exactly**
12:12, 13:23,
52:1, 112:19,
144:10
**examination**
4:2, 4:3, 5:16
**examined**
5:15
**except**
5:8, 138:3
**exception**
42:25, 44:8,
54:1, 92:11
**exceptional**
137:3
**excerpts**
4:21, 93:15

**excessive**
64:17, 67:19,
94:9, 133:19,
134:20
**exchange**
118:3, 121:20,
124:24, 125:3
**excited**
100:5
**exhibit**
4:9, 4:10,
4:11, 4:12,
4:17, 4:18,
4:19, 4:21,
4:25, 5:25, 6:2,
11:8, 11:13,
11:21, 15:24,
16:3, 16:5,
16:9, 17:13,
17:16, 22:15,
24:22, 25:7,
39:20, 87:12,
87:14, 87:17,
87:22, 88:2,
88:11, 90:7,
91:1, 91:11,
93:15, 93:19,
94:5, 98:10,
113:25, 114:2
**exhibiting**
126:24
**exhibits**
4:8, 11:3,
11:6, 34:11,
87:20, 90:8,
90:15, 134:23,
134:25, 147:7
**existed**
91:13
**existence**
86:20
**exists**
142:2
**exit**
67:16
**expanded**
65:10
**expect**
12:2, 12:4,

123:19
**expecting**
80:21
**expenses**
11:24, 12:5,
12:8
**experience**
30:24, 42:18,
51:11, 55:20,
92:20
**experimental**
85:18
**expert**
8:16, 9:13,
12:21, 12:25,
13:7, 14:1,
17:7, 17:19,
25:23, 36:17,
37:8, 37:11,
38:16, 39:1,
39:2, 103:3
**expertise**
27:3, 38:24,
78:22, 102:10,
133:14, 135:22,
136:4, 145:2
**expires**
148:18
**explain**
44:2, 115:22
**explosives**
97:4
**exposed**
111:22
**extended**
50:24
**extension**
127:4, 130:10,
130:11
**extensive**
16:22, 80:8,
90:19
**extent**
131:3
**extrapolate**
37:3
**extremely**
44:15

**eyes**
117:11, 122:5

**F**

**facility**
83:6
**fact**
58:9, 94:19,
96:14, 96:16,
111:20, 122:2,
126:22, 132:20,
145:4
**factor**
65:11, 106:7,
111:7
**factors**
91:22, 93:8,
111:24
**facts**
103:1, 103:21,
104:1
**fair**
61:5, 61:25,
78:11, 78:15,
88:22, 111:16,
111:17, 113:12,
131:8, 131:24
**falls**
71:23
**familiar**
8:24, 12:12,
25:17, 47:8,
47:10, 49:5,
87:21, 88:7,
88:20
**famous**
59:13
**far**
10:16, 30:6,
39:7, 44:15,
48:6, 49:6,
63:17, 68:17,
74:5, 80:16,
90:19, 92:7,
93:11, 107:11,
107:21, 108:3,
117:24, 121:14,
122:17, 130:11,

137:20, 142:10,
142:11, 146:9
**fashion**
19:19, 22:21,
22:22, 119:12
**fault**
120:6, 120:7
**fbi**
33:19, 57:4
**fear**
67:15, 116:12
**feasibility**
93:3
**feasible**
140:17, 140:23,
141:9
**february**
87:24
**federal**
37:13, 37:14,
54:23, 56:14,
56:18, 56:24,
57:2, 57:23,
58:10, 58:16,
62:9, 62:14,
62:18, 62:19,
63:22
**feds**
58:19
**feel**
7:12, 48:8,
60:15, 85:3,
113:4, 120:14,
121:25, 124:2,
127:21, 128:12,
128:13, 128:19,
129:2, 130:19,
130:20, 132:9,
133:5, 133:13,
133:14, 134:9,
134:10, 135:5,
139:8, 143:13
**feeling**
31:8, 32:11,
46:23, 62:13,
69:9, 69:20,
70:6, 77:1,
84:21, 89:3,

89:8, 94:23,
97:22, 101:13,
111:6, 115:6,
119:10, 130:5,
134:14, 137:21,
140:4, 143:3,
146:4
**feet**
95:6
**fellowship**
58:15
**felonies**
56:10
**felony**
52:10, 52:13,
56:5, 56:13
**felt**
6:16, 39:9,
41:21, 42:5,
54:19, 62:16,
64:17, 80:17,
80:18, 128:20,
129:2, 129:20,
132:13, 132:14,
133:20, 134:12,
134:20, 134:21,
140:16, 140:23,
140:25
**female**
107:10
**few**
76:5, 86:7,
94:5
**fiasco**
59:21
**fidgety**
118:6
**field**
61:9, 61:10,
61:15, 61:22,
70:12, 70:21,
70:22, 137:10
**fields**
136:22
**fighting**
74:4, 109:11,
129:12
**figured**
24:6

Transcript of Gregory J. Connor
Conducted on October 10, 2019                                53

| | | | |
|---|---|---|---|
| **file** 13:19, 20:22, 21:11, 21:19, 35:19 | **firmly** 62:2 | **footage** 17:10 | 111:3, 127:25, 131:9, 131:15, 142:22, 144:16, 145:19 |
| **files** 16:11, 20:9, 32:23 | **first** 5:14, 5:23, 25:9, 50:7, 71:15, 79:2, 79:24, 83:14, 94:6, 107:15, 107:17, 115:12, 115:19, 125:3, 128:7, 132:19, 137:4 | **force** 4:25, 8:17, 9:17, 12:23, 13:2, 19:9, 54:25, 55:1, 56:20, 56:21, 57:1, 57:3, 57:7, 57:8, 57:9, 57:11, 57:13, 57:19, 57:24, 58:3, 60:6, 61:23, 62:12, 63:15, 63:24, 64:5, 64:10, 64:22, 66:2, 66:3, 67:8, 67:10, 73:7, 91:22, 92:5, 92:22, 94:9, 94:10, 94:11, 94:17, 94:18, 94:19, 94:22, 95:5, 95:9, 95:11, 95:13, 95:15, 95:21, 95:25, 101:18, 101:23, 101:25, 102:1, 104:6, 104:13, 109:22, 110:10, 110:20, 130:2, 133:16, 134:18, 145:16, 146:18 | **formed** 50:14 |
| **film** 120:11, 120:12 | | | **forth** 96:21 |
| **final** 29:6, 128:3, 129:8, 133:7 | | | **forward** 69:16, 69:17, 69:23, 130:14, 130:24 |
| **finally** 127:17, 132:18 | | | **found** 9:12, 136:3 |
| **financial** 148:14 | **fist** 71:12 | | **four** 21:12, 21:19, 52:25, 63:17, 65:16, 83:24, 136:6, 142:8 |
| **find** 75:2, 117:12 | **five** 8:9, 21:25, 25:4, 33:5, 52:25, 56:13, 65:16, 122:22, 123:2, 124:5, 136:6 | | |
| **fine** 5:12, 7:22, 15:14, 18:5, 25:3, 27:20, 33:8, 34:18, 36:1, 40:22, 76:7, 76:14, 76:18, 114:16, 115:18, 123:20, 124:25, 126:8 | | | **fourth** 138:11 |
| | **flagship** 46:12 | | **franklin** 57:20 |
| | **flashlights** 116:21 | | **frankly** 29:20 |
| | **fletc** 57:20, 57:21, 57:22 | | **free** 44:9, 76:2 |
| **finger** 143:23 | **flipping** 98:9 | | **frenzied** 88:16 |
| **fingers** 71:9 | **floor** 3:14 | **forces** 64:13 | **freudian** 69:4 |
| **finish** 72:2 | **flow** 66:18, 131:4 | **ford** 3:12, 9:6 | **friday** 14:16, 55:4, 56:2 |
| **finished** 81:16, 132:2 | **focused** 144:18, 144:19 | **foregoing** 148:6, 148:7 | **frisk** 60:7, 81:16, 81:18 |
| **finishing** 60:8 | **folders** 20:20, 20:22 | **form** 5:9, 45:14, 61:14, 82:8, 84:10, 85:1, 88:23, 96:5, 98:24, 102:24, 104:16, 110:22, | **front** 40:17, 75:24 |
| **firearm** 66:4, 96:9, 113:11 | **follow** 60:22, 91:24, 127:21 | | **fronting** 76:21 |
| **firemanship** 45:9 | **follow-up** 71:17 | | **fto** 70:8 |
| **firm** 8:23, 8:24, 8:25, 9:2, 9:5, 14:8, 19:16, 32:22, 36:10 | **followed** 8:19, 65:5, 80:16 | | **fulfilled** 101:20 |
| | **follows** 5:15 | | **full** 5:19, 99:8 |
| | | | **full-time** 55:8 |

Transcript of Gregory J. Connor
Conducted on October 10, 2019

54

**fully**
6:22, 7:17,
23:15
**function**
51:6, 111:21
**functioning**
60:17, 109:6
**fundamental**
69:23, 70:8
**fundamentals**
69:16, 69:17,
70:14, 73:25
**further**
44:6, 118:16,
126:2, 126:17,
126:18, 127:9,
132:13, 142:19,
144:5

---
**G**
---

**gag**
66:9
**gain**
51:11, 97:19,
107:20, 113:6
**gained**
104:20
**gaining**
73:25, 112:17
**gap**
62:4
**gather**
121:25
**gave**
36:15, 38:7,
55:10, 68:14
**general**
16:11, 112:4
**generalist**
53:5, 53:6
**generally**
19:18, 65:18,
84:24, 89:7,
92:15, 95:15,
119:24
**generic**
13:10, 89:5,
109:7

**gentleman**
9:2
**georgia**
1:2, 1:16, 3:7,
3:15, 4:21,
9:15, 9:16,
43:12, 47:9,
47:11, 47:13,
47:17, 47:21,
48:1, 48:3,
48:18, 54:24,
72:16, 72:21,
72:23, 74:6,
74:8, 76:11,
76:23, 77:5,
77:9, 86:25,
93:16, 98:14,
98:22, 99:15,
99:25, 100:20,
101:1, 112:3,
112:9, 113:8
**getting**
44:5, 69:10,
82:1, 84:6,
110:25, 111:2,
112:13, 118:9,
120:18
**gist**
72:4
**give**
14:6, 15:22,
34:17, 38:13,
54:9, 61:7,
64:11, 80:11,
81:11, 83:21,
84:15, 99:13,
99:19, 103:23,
113:24, 125:12,
125:14, 131:23
**given**
6:10, 36:8,
103:21, 133:15,
136:5, 136:15,
148:8
**gives**
61:2, 75:15
**glencoe**
54:24, 56:19

**glove**
31:12
**go**
5:19, 6:17,
10:23, 14:6,
14:11, 15:20,
18:12, 24:7,
24:18, 34:25,
43:8, 44:2,
46:22, 48:19,
49:16, 50:4,
51:7, 53:8,
53:15, 60:11,
64:3, 70:21,
70:22, 71:24,
72:1, 74:25,
77:14, 82:9,
85:1, 85:5,
89:4, 91:2,
91:5, 103:4,
104:18, 114:9,
114:18, 115:1,
115:5, 115:22,
122:18, 124:25,
132:1, 137:20,
143:1, 147:1
**go-to**
63:19
**goal**
59:1, 59:3
**goes**
24:4, 85:22,
93:12, 121:23,
133:7
**going**
5:8, 12:9,
14:6, 15:18,
16:24, 24:18,
28:20, 28:22,
29:1, 30:12,
34:16, 39:11,
40:20, 40:23,
52:20, 55:24,
66:15, 66:16,
66:17, 69:11,
69:15, 69:21,
70:20, 72:24,
72:25, 74:2,

75:6, 75:8,
75:25, 79:20,
80:12, 87:10,
87:14, 95:24,
99:13, 104:7,
107:23, 108:3,
108:4, 108:8,
108:9, 113:24,
115:1, 117:13,
117:23, 119:6,
119:9, 119:25,
123:22, 124:3,
124:19, 127:23,
129:5, 134:23,
140:5, 140:13
**gone**
13:16, 22:19,
23:2, 23:12,
30:2, 58:25,
146:7
**good**
14:12, 19:17,
53:1, 80:17,
80:18, 83:25,
106:5, 126:1
**gotten**
43:7, 77:22,
120:21, 122:17
**government**
1:15, 58:17,
59:1
**grab**
71:8, 71:9,
118:19
**graduate**
41:18, 41:19
**graduated**
50:19, 50:21
**grant**
46:24, 58:15,
58:16, 133:16
**graves**
57:20
**great**
41:15, 76:13,
80:7, 143:4
**greater**
116:13

Transcript of Gregory J. Connor
Conducted on October 10, 2019

55

greg
8:5
gregory
1:21, 2:1, 4:2,
4:8, 5:4, 5:13,
5:20, 8:6
grew
8:11
ground
71:23
group
136:2
groups
51:4, 80:20
growing
8:14
guarantee
94:24
guaranteed
127:1
guess
8:14, 16:21,
24:1, 25:16,
30:8, 32:14,
37:20, 41:1,
55:2, 68:22,
77:4, 81:25,
82:15, 84:9,
84:11, 89:3,
89:8, 89:11,
94:25, 95:14,
99:20, 100:25,
140:4, 141:4,
141:21
guidelines
65:4, 93:9,
93:11, 94:8
gun
104:1
gurney
31:15
gut
49:11
guy
104:1, 118:8,
118:10
guy's
76:2

### H

hand
4:17, 10:10,
75:7, 75:8,
75:12, 75:19,
75:20, 75:21,
75:22, 75:24,
76:1, 76:2,
89:8, 143:24,
148:16
handcuff
72:5, 74:1,
74:24, 75:13,
75:21, 75:25,
76:1, 77:2,
83:16, 118:20,
119:4, 119:15,
119:25
handcuffed
72:3, 103:12,
104:21, 119:19,
133:19
handcuffing
70:25, 71:4,
74:7, 74:11,
74:13, 74:15,
74:17, 74:20,
83:11, 83:13,
94:17, 94:18,
119:17
handcuffs
31:2, 31:11,
71:7, 71:10,
71:24, 72:12,
72:24, 74:3,
74:22, 74:23,
75:1, 75:3,
75:4, 75:23,
83:5, 83:11,
95:22, 118:17,
119:22
handing
87:20
handle
43:8
handled
64:16

handling
73:4
handout
100:25
hands
62:1, 64:7,
71:9, 71:11,
75:8, 89:9,
104:7, 113:10
handwriting
69:9
handwritten
25:1, 25:7,
30:12, 90:5
happen
68:25, 73:10,
95:3, 106:10,
130:8
happened
38:9, 59:9,
73:11, 106:25,
107:7
happens
93:4, 141:15
hard
28:1
harm
129:6
harmening
25:25, 26:2,
26:5, 26:25,
28:7, 30:6,
32:19, 34:10,
116:18, 123:5
harmening's
26:9, 26:14,
30:7, 35:9,
90:15, 114:5,
114:25, 123:6,
124:20
hate
25:18
head
67:11, 67:14,
129:9, 129:12,
129:13, 130:1,
130:14, 130:24,
142:16

heading
92:10, 92:23,
94:17, 99:10
headquarters
58:21
health
112:6
hear
7:12, 7:14,
126:15, 126:19,
126:20, 140:11
heard
7:17, 86:10,
105:2, 105:8,
126:13, 126:15,
139:24, 139:25
hearing
7:8, 112:24,
112:25, 138:22
hector
1:6, 1:10,
8:17, 31:14,
107:16, 108:12,
108:24, 108:25,
109:9, 109:13,
138:20, 138:21,
139:19, 141:23,
142:13, 142:18,
144:7
heightened
128:11
held
2:1
helicopter
59:13
helicopters
59:8
hell
64:9, 144:25
help
23:22, 23:23,
24:5, 110:25,
111:14, 113:6,
117:12, 134:12
helpful
112:16
helping
4:14, 14:24,

**here**
6:14, 13:2,
14:3, 14:11,
14:22, 16:25,
18:21, 19:24,
20:9, 21:12,
23:24, 25:11,
26:17, 26:22,
30:13, 33:9,
39:11, 45:22,
49:12, 73:23,
78:5, 79:7,
79:11, 89:12,
107:23, 117:13,
125:9, 128:17,
142:24
**hereby**
148:6
**herein**
5:14
**hereunto**
148:15
**hesitate**
66:23
**hey**
144:7
**highlighted**
133:12
**highlighting**
135:1
**highway**
43:11
**hire**
9:13
**hired**
8:15, 8:22
**historically**
46:11
**history**
44:17, 49:21,
59:8
**hit**
84:6
**hitting**
95:12
**hodgepodge**
51:10, 53:7

**hog**
31:24, 33:21,
33:22
**hog-tying**
31:3, 31:17,
31:23, 32:7,
87:4
**hold**
66:1, 66:6,
66:7, 75:14,
110:11, 117:24,
131:9
**holding**
89:11
**holds**
65:23, 65:25,
66:11, 66:14,
112:4
**homicide**
52:24
**homicides**
52:25
**hooked**
31:4
**hopefully**
91:17, 137:22,
142:10
**hospital**
125:18
**hotel**
12:16
**hour**
11:10, 48:20
**hours**
7:6, 37:1,
37:6, 59:15,
79:19, 147:5
**house**
107:7, 107:18,
109:4, 116:10,
116:12, 116:21
**household**
107:13
**huge**
135:19, 135:20
**human**
73:6, 87:6
**humans**
73:4, 137:22

**hundreds**
52:22
**hurry**
34:4
**husband**
64:4
**hypothetical**
102:25, 103:2,
103:21, 104:17

**I**

**idea**
9:12, 20:14,
20:15, 44:7,
63:8, 80:11,
119:8, 128:17,
129:18, 133:2
**identification**
6:2, 11:13,
11:21, 16:5,
24:22, 39:20,
49:23, 87:18,
93:19, 114:2
**identify**
37:4
**ill**
108:14, 108:16,
112:15, 113:12,
122:16
**illinois**
1:22, 2:8,
2:17, 8:7, 8:12,
12:15, 39:5,
41:19, 42:5,
42:11, 42:15,
42:19, 42:20,
43:1, 43:2,
43:3, 43:4,
43:17, 43:19,
43:22, 43:25,
44:10, 44:12,
44:13, 44:23,
45:4, 45:7,
45:8, 45:10,
45:17, 45:19,
45:23, 46:14,
46:16, 46:19,
47:1, 47:15,

**hundreds**
47:19, 47:22,
48:10, 49:20,
49:23, 50:1,
50:3, 53:15,
54:8, 58:18,
58:19, 61:11,
70:5, 135:25,
136:7, 148:5,
148:25
**illness**
115:10, 122:10,
125:6, 133:4
**illnesses**
122:14, 127:13
**illustration**
89:12, 130:17
**image**
42:21
**immediate**
107:9
**immediately**
27:23, 27:24,
94:12, 109:17,
121:20, 122:8,
125:4
**impact**
109:20, 110:7,
110:8, 110:14,
110:18, 146:16,
146:25
**impacting**
68:2
**implies**
92:17
**importance**
30:22
**improper**
102:25, 103:20
**improperly**
134:20
**in-custody**
88:14
**in-service**
19:9
**inability**
104:14, 146:19
**inappropriately**
109:14

Transcript of Gregory J. Connor
Conducted on October 10, 2019

57

incident
63:7, 107:7,
138:5, 145:21,
145:23, 146:18,
146:24, 146:25
included
92:21, 101:13
includes
91:21
including
135:13
inclusive
102:18
income
60:1
incomplete
103:20, 104:17
incorporated
46:10
increased
130:16
indicated
38:12
indicates
130:1
indication
117:5
indications
133:6
indicative
106:5
indirectly
44:24
individual
58:4, 69:2,
69:4, 71:7,
71:8, 71:24,
74:22, 75:3,
75:4, 77:2,
79:1, 86:16,
111:10, 112:11,
113:7, 129:14,
130:13, 134:15,
141:3, 141:4,
141:20, 144:20,
144:24
individually
145:15

individuals
4:15, 14:25,
16:2
inducing
130:7
inferior
135:7
infiltrating
51:24
influence
42:3, 140:12
information
17:6, 17:7,
26:24, 91:21,
108:20, 112:10,
112:13, 112:18,
113:6, 116:4,
118:7, 121:25,
146:22
informational
113:5
inhibiting
86:18
inhibits
134:4
initial
107:20, 115:23
initiate
103:17
initiated
130:9
initiation
119:3
injury
8:17
input
63:18, 141:2,
141:4
inquire
123:10
inquiry
108:3, 127:14,
127:16
ins
48:7
inside
74:25, 75:11,
75:15, 107:7,

116:9, 116:20
insight
61:2
insignificant
35:7
instance
51:16, 57:4,
63:20, 64:14,
71:20, 74:21,
81:15, 83:13,
96:3
instead
70:12
institute
42:13, 42:14,
43:17, 43:20,
44:10, 45:2,
45:6, 46:15,
46:18, 47:2,
53:16, 53:24,
54:15, 54:18,
55:14, 55:25,
61:4, 61:9,
68:24, 69:7,
79:25, 88:5,
136:17, 136:19,
137:20
instruct
102:16
instructs
132:20
insult
54:4
intend
13:11
intense
60:18
intensity
24:3
intensive
16:21
intentionally
130:2
interaction
107:11, 109:15
interest
80:8, 148:14
interested
50:16, 80:12,

93:6
interfere
6:21, 111:11
interferes
75:24
interim
48:6
intern
58:14
internship
50:6, 50:7,
50:11, 50:12,
50:13, 50:22
interpret
113:19
interval
120:5
intervenors
16:19
intervention
4:12, 14:23,
16:1, 16:13,
28:19, 79:12,
79:13, 79:15,
109:20
interview
107:5
interviews
107:6
intoxication
88:15
introduction
114:12
invalid
67:17
invented
136:9
investigated
63:15
investigation
49:24, 53:12
investigatory
62:20
invoice
4:11, 10:6,
10:7, 10:13,
11:19
invoices
9:23, 10:5,

13:16
**involuntary**
28:12, 28:21,
30:15, 127:19
**involve**
76:22
**involved**
47:11, 127:25,
141:17, 146:18
**involving**
60:5, 62:11
**ish**
80:6
**issue**
72:9, 92:25
**issued**
62:10
**issues**
19:9, 55:12,
91:23, 112:7
**items**
17:21
**itself**
63:7, 65:10,
74:20

**J**

**jail**
64:16
**jails**
71:1, 71:5
**james**
3:11
**january**
8:18, 20:3,
107:8
**jim**
9:3, 138:3
**job**
1:29, 55:23
**john**
5:20
**join**
7:11
**joined**
52:4, 80:19
**joliet**
8:13

**journal**
69:20, 71:15
**journals**
78:19, 78:20
**jr**
3:11
**judgment**
116:2, 122:1,
146:9
**jump**
18:17, 20:11,
20:23, 22:15,
24:11, 106:15,
106:20
**june**
88:6, 100:13,
114:6
**junior**
69:10, 69:14
**justice**
62:11, 88:6
**justified**
67:13
**jw**
2:5, 12:16

**K**

**k-u-b-o-t-a**
67:25
**kane**
148:5
**keep**
15:13, 18:4,
30:12, 62:7,
62:9, 62:22,
112:12
**keeping**
16:17, 60:11
**kept**
16:20
**key**
75:10, 91:22
**kill**
67:6
**killed**
84:6, 84:8,
139:20
**kind**
46:6, 51:9,

54:9, 57:12,
63:25, 66:14,
82:1, 82:23,
105:7, 107:22,
108:5, 108:17,
111:2, 136:23,
137:11, 144:13
**knee**
97:16, 97:20
**kneel**
97:24, 98:2,
98:5
**knew**
17:15, 28:12,
28:18, 28:20,
28:21, 28:24,
29:9, 30:18,
133:2, 142:10
**know**
6:11, 7:9,
7:14, 8:5, 9:1,
9:18, 19:16,
20:16, 22:12,
28:1, 28:23,
29:4, 29:10,
29:14, 29:17,
29:19, 36:21,
38:5, 38:8,
39:16, 48:7,
48:25, 52:15,
52:22, 59:20,
74:6, 78:6,
80:13, 85:5,
86:13, 91:20,
93:3, 93:5,
98:17, 99:1,
99:2, 100:21,
101:17, 103:16,
103:24, 103:25,
105:9, 111:18,
112:21, 112:24,
113:15, 113:17,
120:23, 127:12,
138:5, 138:12,
138:14, 139:4,
139:7, 143:19,
144:6
**knowledge**
31:23, 133:6

**known**
28:13, 31:7,
33:16, 86:21,
128:13, 128:14,
136:22
**knows**
28:3
**kubota**
67:24, 67:25

**L**

**labeled**
18:21, 19:11,
19:24, 20:2,
20:23, 21:5,
21:13
**laboratory**
50:1, 50:15
**labored**
139:25
**lack**
16:18, 47:19,
66:17, 87:4,
120:11
**land**
45:3
**language**
54:12
**large**
135:15, 135:17,
135:18
**lasalle**
2:7
**last**
7:5, 19:2,
27:14, 33:20,
37:10, 43:7,
67:24, 68:8,
68:18, 117:8,
121:19, 130:12,
133:12, 136:8
**late**
68:20
**latent**
53:10, 53:11
**later**
10:3, 16:23,
32:5, 33:18,

Transcript of Gregory J. Connor
Conducted on October 10, 2019

59

35:11, 50:19,
54:23
**latest**
82:25
**latter**
52:9, 53:22
**laugh**
138:2
**laughed**
138:1
**laughs**
138:3
**law**
3:4, 4:22,
4:24, 5:6, 8:23,
8:24, 8:25, 9:2,
14:8, 33:9,
33:19, 39:6,
42:24, 43:22,
45:24, 47:9,
47:11, 47:13,
47:15, 48:3,
48:19, 49:19,
54:1, 54:2,
54:23, 56:14,
56:18, 56:24,
57:2, 57:23,
58:10, 59:5,
62:14, 69:19,
69:22, 70:5,
74:9, 77:10,
77:17, 78:12,
79:18, 80:10,
81:17, 84:22,
85:12, 85:22,
86:24, 88:4,
91:19, 93:16,
93:17, 94:7,
98:14, 98:23,
99:15, 99:25,
100:1, 100:13,
100:18, 100:19,
112:3, 113:8,
136:20, 137:7,
137:9, 146:20
**lawsuit**
98:22
**lawyers**
23:3, 35:20,

49:12, 81:18,
81:19
**lead**
52:16, 63:23
**leading**
74:16
**leads**
27:14
**lean**
130:13
**leaning**
130:24, 131:2,
131:3
**learned**
29:5, 111:20
**learning**
50:16, 92:17
**least**
32:24, 49:6,
57:5, 60:21,
86:21, 86:23,
86:25, 91:18,
104:10, 107:2
**leave**
10:24, 11:2,
16:24, 28:22,
55:9, 55:10
**leaving**
9:7, 147:7
**left**
38:8, 43:10,
59:16, 59:17,
69:7, 137:12,
142:9
**leg**
30:15, 30:19,
30:20, 30:24,
31:8, 31:25
**legal**
59:1, 60:13,
137:2, 137:8
**legislature**
42:15
**legitimate**
80:20
**legs**
96:25
**less**
32:12, 72:4,

77:25, 85:23,
85:24, 118:24
**let's**
13:14, 18:12,
30:12, 34:25,
41:1, 49:21,
53:15, 58:4,
63:8, 67:15,
75:7, 83:6,
83:24, 86:2,
88:10, 91:2,
91:5, 99:7,
114:11, 114:18,
115:1, 118:25,
121:13, 122:18,
124:6, 135:9,
135:12, 138:19,
147:1
**letters**
21:25
**level**
26:18, 45:14,
83:19, 134:18
**levels**
49:9
**liability**
55:12, 94:9
**license**
67:18
**life**
67:15
**lift**
76:1
**lighted**
120:12
**lighting**
143:6
**lights**
145:7
**likely**
97:9
**line**
25:19, 25:20,
102:7
**lines**
67:11, 95:7,
144:9
**list**
23:19, 23:20,

23:22, 24:7,
36:8, 36:13,
36:14, 38:13,
54:15, 62:25,
90:5, 90:6, 90:8
**list-file**
32:14
**listed**
33:9, 100:6,
106:14
**listen**
108:8
**listening**
107:5
**lists**
88:12, 99:17
**literature**
33:14, 33:15
**little**
49:22, 55:3,
75:1, 106:11,
107:15, 122:15,
127:4, 130:11
**live**
8:3, 8:6, 8:13
**lived**
8:8
**living**
55:21
**llc**
3:4
**load**
93:4
**loaded**
31:14
**located**
43:17, 45:3
**location**
2:2, 129:1
**lock**
74:23, 75:10
**long**
8:8, 29:14,
29:19, 36:25,
44:14, 46:2,
46:5, 53:19,
59:12, 65:14,
90:23, 141:22

Transcript of Gregory J. Connor
Conducted on October 10, 2019                                    60

longer
55:11, 77:20
look
10:11, 13:17,
15:21, 17:25,
25:18, 26:23,
29:1, 39:15,
40:20, 47:23,
57:3, 68:15,
83:2, 90:13,
90:24, 99:13,
99:19, 114:13,
122:6
looked
23:23, 24:2,
57:1, 59:21,
119:13, 130:19,
144:11, 145:12
looking
14:14, 18:17,
29:20, 78:9,
80:8, 135:6,
142:23
lose
75:18
lost
70:19
lot
21:22, 70:19,
94:16
louisiana
37:22
lower
101:12, 102:6,
102:8, 102:13
lucky
60:19
lungs
97:12, 101:16,
131:5
lying
120:9

**M**

made
23:19, 26:20,
29:8, 59:13,
72:8, 121:19,

126:16, 127:18,
134:25, 136:8
magazine
80:10
mahomet
55:3, 55:18,
55:22, 55:23,
56:6, 63:21,
63:25
mail
76:14, 76:15
main
51:12, 75:19
mainly
16:11, 58:2,
68:2, 127:13,
130:20
maintenance
72:5, 132:8
major
50:3, 58:25,
62:4, 63:17,
78:21, 132:19
majority
57:5
make
10:19, 10:24,
28:10, 31:25,
34:19, 40:2,
40:24, 47:5,
51:20, 52:13,
52:20, 56:5,
64:5, 70:22,
90:2, 95:1,
103:6, 111:4,
114:15, 126:16,
127:5, 129:16,
130:4, 139:8
makes
28:17, 107:17
making
52:10, 58:4,
60:22, 139:11
males
107:6
man
44:17, 108:2,
108:8, 118:8

mania
112:7
manner
89:8, 110:20,
128:16
manual
68:14, 71:15,
94:8, 100:20
many
6:10, 31:1,
31:12, 39:5,
43:14, 52:13,
56:8, 56:10,
61:19, 62:18,
63:7, 63:14,
70:4, 71:25,
72:9, 76:23,
83:12, 83:13,
104:1, 122:23
mark
3:3, 3:4, 5:24,
10:20, 10:23,
11:7, 14:2,
14:19, 15:18,
15:23, 17:14,
18:3, 23:20,
23:21, 25:4,
39:11, 48:16,
87:10, 87:14,
115:16
marked
6:1, 11:12,
11:20, 16:4,
24:21, 39:19,
87:16, 93:14,
93:18, 113:24,
114:1, 115:13,
135:10
marking
24:24
marks
115:17
marriott
2:5, 12:17
martial
67:24
massachusetts
60:5

masters
41:8, 41:9
material
17:12, 22:20,
42:4, 92:16,
120:7
materials
11:10, 18:19,
23:11, 23:13,
23:14, 23:16,
23:18, 23:23,
37:2, 37:3
math
49:2
matter
75:5, 122:2
maximized
70:25, 71:4
maybe
9:6, 16:25,
17:19, 37:12,
61:13, 63:21,
64:2, 64:7,
64:8, 65:11,
69:4, 85:25,
130:11, 134:2,
134:3, 138:16
mean
26:10, 40:9,
45:12, 56:11,
57:9, 69:25,
73:3, 73:19,
74:14, 75:14,
75:23, 85:17,
95:24, 102:11,
105:12, 106:9,
108:7, 109:7,
112:24, 113:22,
119:17, 136:1
means
16:9, 95:16,
105:14, 130:6,
136:2
meant
80:19, 85:21,
113:3, 135:22
mechanical
86:1

mechanics
14:5, 14:17,
85:19
mechanism
72:13, 92:22
median-sized
60:20
medical
131:22
medium
135:14
meet
122:13
member
52:5, 56:6,
77:19, 77:20,
77:21
members
64:12
mental
6:20, 108:19,
112:6, 115:10,
116:13, 117:5,
122:10, 122:14,
125:6, 133:4
mentally
108:13, 108:16,
112:15, 113:12,
122:16
mention
35:22
mentioned
15:25, 23:15,
26:22, 63:25,
87:7, 92:18,
92:24
mentions
79:5
merit
2:14, 108:18,
117:24, 136:5
method
96:20, 134:18
methodologies
68:17, 72:19,
72:23, 76:9,
83:2, 83:3
methodology
134:21

michael
1:16
michigan
41:7, 50:13,
50:18, 50:20,
50:22
middle
1:2, 29:11,
138:11
midst
126:23
might
14:9, 27:12,
75:1, 76:5,
95:4, 113:15,
137:24
miles
59:10
mind
33:6, 67:19,
79:16, 117:5
minds
117:11
minimal
46:4, 47:14,
56:9, 105:16
minimally
76:2
minimum
79:17
minneapolis
135:20
minooka
8:12
minute
90:23, 114:19
minutes
76:5, 120:8,
120:10, 120:13,
120:24, 121:9,
123:2, 142:7,
142:8
miss
19:15
mitchell
81:17
mode
83:13

model
57:24, 82:17,
84:18
models
82:19, 84:20
moment
99:13
monday
20:2
monitor
104:11, 129:10,
129:19, 144:4
monitored
120:16, 120:19,
130:21
monitoring
120:23, 121:2,
121:4, 132:8,
132:11, 141:5,
144:23
more
16:24, 28:14,
32:12, 48:22,
49:9, 49:22,
51:15, 52:25,
56:2, 56:13,
60:17, 60:18,
61:4, 61:23,
62:1, 62:17,
63:2, 63:11,
69:10, 71:22,
72:4, 77:23,
81:7, 86:7,
91:13, 93:6,
96:1, 101:14,
103:23, 108:4,
108:18, 115:24,
117:11, 117:12,
118:3, 118:5,
118:7, 118:9,
118:12, 118:24,
119:2, 119:11,
122:5, 122:6,
122:15, 122:23,
123:24, 125:19,
128:19, 134:15,
135:19, 136:13,
143:13, 146:8,

146:22
morning
18:2, 106:18,
108:21, 109:5
most
8:14, 16:15,
40:18, 44:17,
44:21, 44:22,
61:9, 61:15,
62:17, 66:22,
67:19, 68:6,
73:4, 78:12,
78:25, 87:8,
103:17, 105:20,
135:13, 137:11,
142:10
mother
29:16, 107:10,
116:15, 116:22
mother's
107:18, 109:4,
116:10, 116:12,
116:20, 118:23,
119:3
motion
38:22
mouth
89:9
move
26:8, 99:7,
118:22, 121:13,
138:19, 139:6,
139:10
moved
53:13, 85:12,
105:10
movement
51:21
movements
63:5
movie
59:14
moving
19:23, 58:5,
69:22, 73:24,
74:4, 97:23,
104:8, 119:2
much
41:11, 44:7,

Transcript of Gregory J. Connor
Conducted on October 10, 2019

62

53:8, 61:16,
63:11, 67:4,
77:25, 78:6,
80:12, 105:5,
108:20, 112:10,
115:24, 115:25,
116:13, 117:24
**multiple**
54:17
**multitude**
56:19
**municipal**
62:17
**must**
48:1, 67:13,
79:17
**mustang**
15:2, 15:6
**myself**
57:20, 90:18,
131:19, 136:10

**N**

**name**
5:19, 8:24,
25:22, 33:20,
67:24, 69:3,
80:4, 90:20
**names**
9:1, 9:7, 20:4
**naperville**
54:22, 55:5,
55:9, 61:11
**national**
9:17, 33:9,
58:21, 58:24,
59:4, 78:4,
88:4, 88:5,
91:19, 100:12
**nature**
9:24, 30:19,
51:5, 58:1,
58:6, 58:7,
58:13, 60:24,
65:12, 66:19,
69:24, 78:24,
91:23, 96:12,
97:24, 108:17,

111:7, 129:7,
129:17, 144:23,
145:11
**near**
8:13, 42:20
**nearly**
103:1, 126:22
**nebulous**
43:24
**necessarily**
22:14, 45:14,
96:24, 133:16,
137:11
**necessary**
49:10, 70:23,
94:11
**necessity**
104:22, 117:15
**neck**
66:12, 66:13,
66:18, 67:11,
96:12, 97:13,
97:17, 97:25,
101:6, 101:11,
129:10, 129:12,
129:13, 130:1,
142:16
**need**
10:19, 18:2,
18:10, 22:14,
24:5, 27:13,
28:15, 28:20,
29:1, 35:12,
62:2, 66:3,
67:1, 67:3,
76:5, 77:2,
94:23, 96:3,
114:11, 118:9,
123:17, 124:6,
128:8, 134:7
**needed**
28:14, 28:15,
28:18, 53:9,
61:12, 70:13,
70:14
**needs**
60:17, 101:14,
103:6

**negative**
107:24
**neglected**
63:14
**negotiate**
125:20, 125:21
**negotiated**
126:25
**negotiation**
125:24
**neither**
148:12
**neutralization**
68:12, 68:13
**never**
30:19, 38:17,
72:11, 98:7,
129:9, 129:25,
138:3
**new**
32:17, 37:12,
68:23, 77:9,
93:10, 135:20
**newly**
50:14
**next**
8:19, 20:22,
21:11, 21:18,
24:5, 25:20,
33:25, 72:15,
118:2, 128:25,
133:11
**nickname**
8:5
**nicknames**
5:19, 5:21
**night**
26:16, 56:2,
138:8
**nineties**
68:20
**noncompliance**
57:14, 143:8
**noncompliant**
83:15, 129:13,
139:14
**none**
78:9, 81:10

**nonlawyer**
81:19
**nope**
20:18
**norm**
32:8, 32:10,
32:13, 44:7
**normal**
109:3, 109:5
**normally**
26:18, 31:3,
38:3, 43:9,
109:1, 130:5,
136:5
**north**
8:12
**northern**
49:10
**nose**
89:10, 97:13
**notarial**
148:16
**notary**
2:16, 148:1,
148:4, 148:25
**note**
4:17, 26:20,
30:1, 99:4,
125:2
**noted**
30:2
**notes**
15:3, 15:5,
25:7, 27:5,
30:13, 32:9,
36:3, 36:4,
114:15
**nothing**
15:10, 20:18,
40:4, 46:24,
49:8, 121:12,
132:13, 133:10
**notice**
2:13, 4:9, 5:7,
5:24, 34:23,
35:15, 54:13,
108:11
**noticed**
7:21

notification
10:1, 40:7
november
148:18
number
19:18
numbered
20:5, 22:11,
22:22, 94:7
numbers
19:19, 21:24,
21:25, 52:15,
82:5, 94:1
nypd's
132:17

**O**

o'clock
124:16
oath
6:12, 86:7,
124:18
object
82:8, 85:1,
88:23, 96:5,
98:24, 102:24,
103:20, 104:2,
104:16, 109:23,
110:4, 110:22,
111:3, 131:9,
131:15, 142:22,
144:16, 145:19
objected
103:19
objections
5:8
objective
109:21
objectively
110:8, 110:19
observance
105:19
observation
127:20, 127:24
observe
31:18
obvious
136:24, 145:1

obviously
6:11, 8:15,
13:18, 38:12,
89:10, 97:12,
123:21, 131:21
occur
32:1
occurred
131:13, 143:5,
143:17
occurring
87:4
occurs
94:18
october
1:23, 148:17
offer
13:11
offered
38:24, 133:25,
142:11
offering
12:25, 13:7
officer
1:16, 20:23,
20:24, 21:1,
21:4, 21:11,
21:18, 28:3,
29:8, 43:24,
44:1, 48:4,
49:10, 49:19,
52:8, 52:17,
53:4, 53:8,
54:19, 54:22,
55:4, 55:23,
56:1, 58:1,
58:8, 60:25,
61:1, 61:19,
63:15, 63:16,
64:3, 64:16,
64:17, 70:8,
70:13, 70:24,
71:16, 72:11,
79:3, 83:8,
83:16, 83:17,
96:2, 96:8,
99:5, 101:25,
103:6, 104:12,

107:10, 107:12,
107:14, 108:7,
108:11, 108:24,
109:17, 109:21,
110:9, 110:18,
111:1, 111:15,
111:19, 111:20,
113:3, 113:20,
117:8, 117:14,
117:17, 121:14,
125:22, 128:18,
131:14, 135:14,
141:17, 145:5,
145:11, 146:17,
148:5
officer's
92:4, 94:24,
104:22, 109:2,
110:17, 111:8,
117:25, 128:6,
138:7
often
88:14, 105:20,
112:4
oh
32:8, 46:4,
59:24, 118:8
okay
7:14, 8:1, 8:3,
24:10, 24:24,
36:1, 38:4,
51:2, 71:4,
72:13, 76:18,
81:9, 83:7,
86:8, 86:9,
115:16, 115:19,
118:25, 127:14,
128:24, 134:23,
139:15
old
59:22
older
61:16, 61:17
once
44:19, 60:3,
97:22, 104:9,
104:15, 104:20,
108:21, 128:6,

140:15, 142:4,
142:13
oncoming
84:6
one
16:13, 19:10,
20:24, 20:25,
21:18, 21:23,
28:9, 32:22,
33:5, 33:9,
33:24, 33:25,
36:7, 40:11,
40:15, 41:9,
41:16, 44:4,
51:15, 52:19,
56:23, 59:5,
61:6, 63:2,
64:14, 69:6,
69:13, 75:8,
78:23, 80:14,
80:17, 80:25,
81:1, 83:21,
84:1, 87:10,
87:12, 89:8,
90:20, 90:21,
94:21, 103:23,
106:3, 113:8,
116:7, 118:14,
124:5, 126:24,
128:16, 135:16,
136:8, 146:1,
146:8, 146:13,
146:14
ones
85:24, 100:6
ongoing
108:9
only
10:6, 14:4,
16:20, 18:7,
24:13, 27:3,
30:8, 32:21,
60:15, 65:9,
72:8, 80:25,
81:1, 92:19,
94:10, 98:5,
125:2, 125:17,
134:25, 141:8,

Transcript of Gregory J. Connor
Conducted on October 10, 2019

64

141:19, 143:5,
144:2, 146:12
**onset**
105:23
**opened**
18:23
**opening**
19:8, 20:1,
75:10
**openings**
74:24
**operate**
113:22
**operator's**
67:17
**opinion**
8:16, 13:11,
41:12, 41:17,
51:10, 63:13,
64:11, 64:15,
69:11, 73:8,
76:23, 81:6,
82:22, 96:23,
108:23, 110:5,
127:4, 131:23,
133:14, 134:10
**opinions**
81:12, 133:25,
134:1
**opportunity**
58:23
**opposed**
42:20, 61:24,
66:4, 74:25,
75:16, 78:13,
79:13, 79:19,
102:5, 109:7,
130:2, 137:8,
137:15
**opposite**
25:23, 95:19,
133:20
**opposition**
112:12
**ops**
18:21
**order**
14:18, 15:10,

22:1, 45:11,
80:10
**organization**
42:23, 78:1
**organizations**
51:25
**original**
34:8
**originally**
8:11, 20:11
**orleans**
32:17, 37:12
**other**
9:7, 13:6,
17:2, 23:11,
23:12, 23:14,
23:18, 24:3,
31:4, 34:22,
35:19, 36:4,
36:9, 38:25,
41:9, 43:3,
45:15, 54:15,
62:24, 63:18,
63:19, 66:11,
66:12, 73:5,
74:6, 74:8,
75:21, 83:21,
87:12, 94:22,
107:12, 132:13,
136:3, 143:6,
144:11, 145:15,
145:25, 146:7
**others**
35:7, 80:14,
94:25, 142:5
**otherwise**
14:9, 148:14
**ourselves**
104:24
**out**
9:7, 20:16,
23:23, 28:7,
34:1, 37:21,
45:1, 48:25,
53:8, 61:14,
61:15, 64:9,
65:18, 66:17,
67:18, 67:21,

68:14, 70:16,
70:17, 70:21,
70:22, 71:17,
72:9, 77:1,
83:12, 109:6,
111:24, 117:12,
133:22, 134:14,
138:13
**outcome**
148:14
**outs**
48:7
**outside**
68:1, 74:24,
109:4
**over**
22:19, 23:2,
24:4, 24:11,
24:18, 37:5,
51:7, 53:14,
69:2, 89:9,
90:6, 96:21,
99:7, 121:3,
124:11, 130:19,
135:23, 138:19,
144:21
**overall**
107:23
**oversized**
31:11
**overthrow**
51:19
**overview**
16:14, 54:10
**own**
25:17, 41:12,
49:11, 56:25,
57:3, 69:5
**owned**
45:3

---

P

**page**
3:12, 4:2, 4:8,
9:6, 19:2, 20:1,
25:19, 26:2,
26:5, 26:18,
26:20, 26:23,

27:9, 27:14,
28:9, 29:7,
41:2, 69:15,
71:3, 71:14,
89:1, 92:7,
94:6, 98:10,
98:11, 114:12,
114:13, 114:24,
115:1, 115:2,
115:6, 116:6,
117:7, 118:1,
120:3, 121:11,
121:12, 121:13,
121:16, 121:17,
121:19, 121:22,
121:23, 124:21,
124:22, 124:23,
125:9, 126:2,
126:5, 126:11,
128:4, 128:17,
132:4, 132:12,
132:13, 132:18,
132:19, 133:1,
133:9, 133:10,
133:11, 133:12,
135:2, 135:12,
138:19
**pages**
1:30, 15:1,
18:23, 24:5,
26:17, 30:5,
32:18, 35:8,
35:13, 39:15,
100:10, 122:23,
123:24, 124:19
**paid**
10:9, 10:14,
10:16, 11:24,
12:4, 12:10,
51:14, 51:17,
58:14, 58:17,
58:19
**pain**
103:9
**paper**
30:2, 72:19
**paragraph**
27:14, 88:12,

Transcript of Gregory J. Connor
Conducted on October 10, 2019

65

115:11, 115:12,
115:19, 116:7,
118:2, 118:16,
125:19, 127:9,
127:17, 128:4,
128:25, 130:12,
132:19, 133:2,
133:7, 133:13,
138:11
**parallel**
41:11, 146:4,
146:5, 146:11
**paralleled**
39:5, 39:9
**paralleling**
101:15
**paramedic**
31:16
**paranoia**
27:1, 27:2,
30:14, 112:7,
116:9, 116:11,
116:13, 117:1,
117:6, 126:25,
127:11
**parent**
1:6
**parenthesis**
125:10
**parents**
116:14
**park**
3:5, 12:7
**part**
45:6, 45:8,
45:9, 45:16,
47:2, 52:9,
53:22, 100:18,
100:19, 100:22,
100:24, 113:4,
116:18, 130:18,
132:10, 135:23,
136:19, 145:11
**part-time**
51:7, 55:6
**particular**
35:12, 37:24,
48:8, 51:10,

57:14, 62:22,
83:5, 84:1,
86:20, 88:12,
89:17, 92:6,
118:20, 122:2,
143:5, 143:25,
146:17
**particularly**
15:12, 15:17
**parties**
148:13
**partner**
9:5
**parts**
66:9
**passenger**
84:5, 84:8,
84:12
**past**
6:11
**path**
129:5
**pathogens**
72:14
**patrol**
43:5, 43:11,
43:13, 52:7,
52:17, 53:4,
54:6, 54:22,
62:16
**patrols**
43:15
**pay**
58:17
**pays**
44:11
**pd**
62:25, 63:1,
63:8, 63:10
**pdf**
18:22, 19:7
**peace**
9:15, 48:12,
72:21, 74:8,
76:10
**peer-reviewed**
78:15, 78:17,
78:18, 78:19,

79:21, 79:22,
80:5, 80:15,
81:2, 81:3,
81:5, 81:6
**peers**
78:18
**pending**
73:12
**pension**
42:10
**people**
27:25, 28:4,
37:25, 42:17,
50:15, 51:2,
52:24, 61:8,
67:20, 68:6,
74:4, 79:1,
80:22, 80:23,
81:4, 103:8,
113:18, 113:21,
116:9, 116:20,
119:16, 119:17,
122:6, 125:13,
136:21, 136:23,
137:10, 137:21,
140:10
**perceived**
113:11, 145:17
**perceiving**
113:16, 113:17
**percent**
136:6
**perfectly**
115:16
**perform**
32:9
**performance**
60:10
**period**
29:13, 29:17,
37:5, 50:24,
52:6, 55:11,
56:12, 65:19,
70:17, 70:18,
97:21, 109:14,
120:15, 127:19,
127:23
**periods**
105:7

**perpetrator**
79:1
**person**
32:21, 53:11,
54:5, 54:6,
58:6, 63:19,
64:7, 66:9,
67:4, 67:8,
67:14, 67:15,
67:16, 71:23,
72:24, 73:4,
74:1, 74:2,
79:2, 83:4,
83:15, 86:16,
86:19, 88:18,
95:17, 95:18,
104:10, 104:20,
105:7, 105:15,
106:8, 107:21,
113:16, 113:17,
122:16, 130:6
**person's**
128:2
**personal**
1:7
**personally**
41:16, 48:24,
66:1, 102:23,
135:2
**personnel**
117:23
**phase**
105:3, 105:6,
105:10, 105:11,
105:12, 105:20,
105:24
**phenomenon**
31:3, 86:21,
87:4
**photo**
98:11, 98:13
**photograph**
30:18, 135:7
**physical**
6:20, 94:10,
94:22, 95:10,
95:13, 95:15,
95:16, 109:22,

110:9, 110:20,
126:5, 134:18,
139:11
**physician**
79:12
**physics**
85:19
**physiology**
93:7
**pick**
63:5
**picked**
43:5, 80:3
**picture**
108:5, 120:4
**piece**
33:13, 33:15
**place**
60:23, 77:1,
84:21, 96:3,
96:19, 97:16,
104:7, 118:17,
129:15, 139:5
**placed**
67:15, 144:3
**placement**
75:25
**places**
31:13
**placing**
129:2
**plaintiff**
87:20
**plaintiff's**
11:18, 18:4,
24:19, 39:17,
40:17, 40:23,
79:9, 91:1,
91:11
**plaintiffs**
1:12, 3:2, 5:4,
5:25, 6:1, 11:8,
11:12, 11:20,
15:24, 16:3,
16:4, 16:8,
19:17, 22:10,
22:15, 22:21,
24:21, 25:6,

37:17, 37:20,
39:12, 39:19,
87:10, 87:12,
87:14, 87:16,
87:22, 88:2,
90:7, 91:10,
92:1, 93:14,
93:18, 94:5,
98:9, 113:25,
114:1, 115:14,
115:15, 115:17
**plan**
41:25
**plastic**
68:1
**play**
97:5, 102:11
**played**
21:8
**please**
5:18, 7:13,
72:17
**plus**
86:22
**point**
28:14, 28:22,
28:23, 28:25,
35:13, 41:20,
73:22, 77:22,
86:18, 86:22,
94:4, 98:22,
103:15, 103:24,
118:6, 121:19,
128:17, 129:3,
130:21, 133:18,
138:24, 139:2,
139:10, 139:15,
141:7, 141:12,
141:14, 142:20,
142:24, 143:5,
143:7, 143:12,
143:14, 144:1
**pointed**
79:10
**points**
52:19, 68:3
**policeman**
44:4

**policies**
56:25, 60:12
**policing**
43:6, 46:10,
60:9, 62:6,
72:20, 76:9,
134:5
**policy**
34:6, 56:20,
57:7, 73:7,
132:18
**port**
74:23, 75:10
**portion**
58:19, 97:6,
138:23
**portions**
43:5, 100:24
**position**
51:7, 51:8,
51:9, 51:17,
51:18, 58:10,
97:21, 102:2,
102:15, 103:13,
121:3, 121:7,
129:16, 130:13,
130:22, 130:24,
135:3, 135:5,
142:1, 144:4
**positional**
32:3, 32:18,
33:10, 34:5,
86:10, 87:23,
89:4, 89:10,
93:6, 93:8,
97:8, 97:14,
98:6, 98:16,
100:2, 100:11,
105:3, 105:21,
132:16, 135:4
**positioning**
86:15, 88:3,
104:23, 130:20,
134:8
**positive**
31:20, 137:11
**possess**
96:9

**possible**
28:16, 128:9
**possibly**
51:1, 107:3
**post-arrest**
91:24
**potential**
92:8, 92:12,
92:24, 97:14,
98:6, 101:17,
142:11
**potentially**
97:9, 135:1,
135:4
**pr**
65:8, 65:13
**pr-s**
65:7, 65:15
**practical**
42:6, 62:3,
62:6, 78:22,
81:25
**practice**
54:20, 101:4,
134:17
**practices**
60:12, 62:8
**practitioner**
54:3, 54:5
**practitioners**
54:4
**preach**
54:21
**preached**
94:14
**precautions**
99:10, 99:17,
99:23, 100:2
**predisposing**
93:8
**preferred**
137:6
**premises**
139:7
**prepared**
80:24
**present**
59:10, 106:20,

Transcript of Gregory J. Connor
Conducted on October 10, 2019

67

120:16, 128:21
**presents**
107:16
**pressure**
67:4, 68:3,
75:16, 95:11,
96:11, 101:6,
141:25, 142:1,
142:16
**prestigious**
78:2, 78:3
**pretty**
7:25, 41:11,
60:22
**prevent**
93:11
**previous**
140:14, 146:14,
146:24
**previously**
36:9, 115:18
**primarily**
13:2, 38:17,
43:11, 62:19,
70:4, 71:11,
78:25, 81:17,
92:3, 138:22
**primary**
16:16, 59:5
**prints**
53:10, 53:11
**prior**
10:8, 105:23,
120:1, 120:18,
131:7, 131:13,
146:18
**privileged**
35:7
**probably**
7:24, 8:9,
12:11, 14:3,
17:20, 22:12,
37:5, 43:7,
47:13, 49:13,
52:22, 52:24,
55:2, 56:12,
56:13, 63:16,
68:10, 73:17,

77:21, 80:6,
99:2, 109:5,
136:12, 138:6,
140:4, 143:7
**problem**
8:2, 10:21,
10:22, 67:7,
76:12, 108:12,
114:16, 120:25,
128:2
**procedural**
132:7
**procedure**
67:10
**procedures**
60:12, 91:24
**process**
47:17, 47:18,
47:20, 50:9,
50:10, 60:23,
111:12, 125:23,
128:21, 132:11
**processing**
112:25
**produced**
93:21, 93:24,
93:25
**product**
27:7
**production**
6:8
**professional**
2:16, 42:23,
44:21, 44:22,
61:21, 63:13,
70:24, 123:16
**professionalize**
136:12
**professionally**
60:2
**professor**
14:9, 30:7,
54:20, 110:12,
110:13, 114:5,
114:25, 123:5,
124:19, 135:24,
136:24, 136:25,
137:1, 137:7

**professors**
136:3, 136:5,
136:6, 136:16,
136:20, 136:21,
137:16
**program**
60:18, 88:6
**programming**
47:11
**progressive**
63:2, 63:3,
63:5, 63:6
**prohibit**
112:17
**prompted**
31:2, 119:1
**prone**
96:4, 102:2,
102:15, 103:12,
120:5, 120:13,
121:3, 121:6,
142:1, 146:20
**pronunciation**
25:23
**proper**
64:25, 65:23,
67:9, 86:18,
96:20, 103:2,
120:11, 133:21
**properly**
44:19, 44:20,
65:3, 109:21,
110:9, 125:11
**property**
118:23, 119:11,
139:3, 139:10
**propriety**
134:21
**protecting**
116:14, 116:15
**protest**
51:21
**prove**
73:23
**provide**
8:16, 64:12,
118:7
**provided**
19:17, 22:6,

22:10, 22:20,
23:2, 32:20,
32:21, 35:20,
36:16, 39:13,
70:11, 128:22,
144:5
**providing**
33:6, 63:17,
76:12
**provision**
45:20, 45:21
**provisions**
128:23
**proximity**
143:22
**psych**
29:1, 117:9,
117:13, 117:16,
117:18, 117:21,
117:22, 122:5,
125:10, 125:12,
125:16
**psychiatric**
14:22, 16:15,
125:14
**psychology**
85:18, 85:19,
136:21
**psychosis**
112:7
**public**
2:16, 148:1,
148:4, 148:25
**publication**
40:8, 40:11,
68:11, 68:19,
73:10, 80:4,
88:4, 88:7,
88:9, 88:12,
93:1
**publications**
40:6, 78:9,
78:10, 78:12,
82:2, 91:12,
136:4
**publish**
82:20
**published**
32:24, 40:11,

40:12, 68:19,
73:16, 73:17,
77:6, 78:8,
82:16
**publisher**
68:22
**pulse**
132:6, 144:7
**pure**
93:3
**purports**
14:14
**purposes**
5:5, 140:18,
141:11
**pursuant**
2:13, 5:7
**pursue**
70:5
**pursuits**
45:15, 70:4
**push**
64:8
**pushing**
75:17
**put**
15:9, 15:10,
18:8, 22:14,
32:8, 34:16,
35:13, 40:11,
45:1, 49:2,
63:1, 64:7,
66:17, 71:7,
71:24, 72:24,
72:25, 74:22,
75:3, 75:23,
82:20, 83:7,
89:9, 95:5,
99:2, 99:3,
108:4, 118:9,
118:20, 119:22,
132:24, 135:19,
136:10, 137:1,
138:15
**putting**
40:3, 67:10,
71:6, 74:3,
84:17, 95:11,

96:11, 101:5,
142:15

**Q**

**qualifications**
45:13, 77:23,
77:25, 135:12
**qualify**
38:15, 61:18
**question**
5:9, 7:12,
7:13, 7:16,
22:16, 28:11,
28:17, 28:22,
29:2, 29:11,
29:19, 30:17,
32:12, 36:11,
48:6, 82:9,
85:8, 90:3,
98:20, 99:14,
99:21, 99:22,
100:25, 101:10,
102:25, 103:2,
104:2, 104:4,
104:17, 109:23,
109:24, 110:4,
110:23, 110:24,
111:3, 124:18,
129:22, 131:10,
131:12, 136:24,
142:23, 145:24,
146:2, 146:23
**questioning**
115:8, 115:20
**questions**
7:20, 18:3,
81:7, 86:8,
109:7, 109:8,
123:1, 147:4
**quick**
71:20
**quicker**
124:10, 124:11
**quickly**
28:16, 29:9,
109:9, 128:8
**quiet**
105:6

**quit**
142:14
**quite**
78:1, 138:12
**quotes**
44:22

**R**

**r-a-n-t-o-u-l**
64:19
**r-e-a-y**
33:20
**ramifications**
70:7
**ranger**
59:18
**rantoul**
64:15, 64:16,
64:19
**rape**
80:2
**raped**
80:1
**rapidly**
118:24
**rates**
82:4, 82:12,
82:13
**rather**
8:6, 43:23,
62:21, 117:13,
129:5, 133:8,
138:14
**re-read**
132:5
**reaction**
49:11
**read**
27:9, 27:11,
30:4, 30:5,
34:20, 63:10,
89:19, 89:22,
109:25, 110:1,
110:2
**readers**
82:12, 82:22
**reading**
28:6, 37:2,

**80:11, 123:2,**
140:24, 148:11
**ready**
73:9, 73:20
**real**
71:20, 113:1,
122:12
**reality**
74:5
**really**
29:14, 31:22,
36:3, 46:12,
84:17, 111:18,
122:3, 124:9,
141:21, 143:19
**realm**
13:10, 46:11,
63:22, 85:18
**realtime**
2:15
**rear**
71:11, 107:3
**reason**
6:19, 7:11,
16:20, 69:6,
72:8, 94:2,
125:17
**reasonable**
39:10, 110:9,
110:19, 133:21
**reasonableness**
145:18, 146:10
**reasons**
61:7, 69:6
**reay**
33:21, 33:22,
34:1
**recall**
80:17, 106:23,
107:1, 107:2,
108:15, 117:17,
119:5, 144:6,
145:9
**receive**
23:18
**received**
6:5, 6:7,
110:13

receiving
109:19, 110:4,
110:7, 110:17,
111:19
recently
43:6, 44:17
recess
18:14, 35:2,
86:3, 91:7,
122:20, 124:14
recognize
108:16
recognized
84:24
recollection
107:9
record
12:19, 18:12,
18:15, 28:6,
34:25, 35:4,
76:4, 86:4,
86:6, 91:2,
91:5, 91:8,
110:2, 114:18,
114:20, 114:21,
122:18, 122:19,
124:12, 124:13,
138:1, 147:1,
147:2, 148:8
recording
20:2
recruits
70:16
redefine
46:20
reduced
148:10
redundant
133:1, 134:3
refer
60:8, 74:11,
116:18, 137:2,
141:16
reference
10:7, 15:8,
16:18, 26:3,
32:16, 39:24,
91:19, 91:22

referenced
11:9, 17:22
referencing
26:2
referred
31:1, 54:3,
57:21, 105:6
referring
19:19, 117:1,
122:7, 122:11
reflect
126:8
reflects
126:9
refusing
67:16
refuted
78:8
regain
67:6
regard
8:16, 32:2,
36:17, 55:5,
63:24, 67:9,
74:7, 74:19,
91:10, 101:5,
101:10, 102:16,
104:5, 105:3,
123:5, 131:23
regarding
101:25
regimen
59:18
registered
2:14, 2:15
regular
52:7
related
133:15, 145:25,
148:12
relates
8:17
relative
91:23
release
141:25
relevant
15:17

remain
59:12
remember
16:25, 38:7,
51:23, 52:19,
59:23, 64:14,
73:16, 74:2,
107:5, 107:14,
108:1, 108:6,
108:10, 108:14,
119:8, 145:7
remove
104:24, 118:22
removed
72:3
repeat
7:25
repeated
145:16
repeatedly
108:12
rephrase
88:25, 95:1,
96:17, 99:20,
109:25, 110:15,
137:14
reply
14:20, 14:21
report
4:18, 13:12,
17:20, 17:22,
19:5, 32:20,
35:9, 35:11,
35:19, 36:17,
36:24, 37:4,
39:12, 39:13,
39:18, 39:24,
40:3, 80:2,
92:5, 92:22,
101:18, 114:6,
114:9, 114:25,
123:6, 123:11,
124:20, 135:9,
146:5
reported
1:31, 92:4,
145:21
reporter
2:14, 2:15,

2:16, 11:3,
19:15, 19:21,
110:2, 147:8,
148:1, 148:3
reporting
91:22
reports
101:23, 145:16,
145:25
representative
1:8
represented
9:15
request
6:7, 13:15,
17:3, 108:17,
108:18
requested
128:18, 128:19,
148:11
require
66:24
required
61:20, 101:19
requirement
101:21
requirements
60:13
requires
71:22
research
16:17, 70:11,
78:11, 78:14,
79:24, 80:20,
84:2, 84:10,
89:13, 98:7,
137:13, 137:16
researched
89:14
reserved
5:8
resist
96:8, 142:14
resistance
94:12, 95:22,
95:23, 96:2,
119:2
resistant
105:23

resisted
139:1
resisting
142:14, 142:19
resolved
143:9
respect
14:8, 36:11,
89:1, 99:18,
102:14, 104:4,
123:11, 146:8
respectable
136:23
respectively
21:13
respond
4:14, 14:24,
16:2, 28:15,
57:12, 123:7,
128:19
responded
109:13
response
13:15, 17:3,
34:23, 35:15,
58:1, 142:23
responsiveness
5:9
rest
56:4, 59:8,
92:15
resting
113:10
restrained
128:8, 140:16,
141:8, 141:24
restraining
141:19
restraint
34:9, 66:19,
88:18, 91:24
restraints
30:15, 30:19,
30:20, 30:25,
31:8, 31:25,
66:12, 66:13,
66:20, 99:9,
132:17

restricted
38:20
restrictions
86:16
result
38:5
results
88:17, 121:15
resume
4:18, 13:23,
39:14, 39:16,
39:25, 40:3,
40:10, 40:12,
40:15, 40:18,
41:3, 54:13
resuming
124:17
retire
136:7
retired
42:9, 53:21,
59:25, 69:8,
114:25, 136:2
retiring
60:14
reverse
87:5
review
11:10, 24:3,
26:19, 56:17,
90:19, 91:3,
106:19, 115:3
reviewed
17:12, 18:19,
19:5, 19:12,
20:7, 20:19,
21:4, 21:8,
21:16, 22:9,
23:12, 23:16,
26:13, 26:17,
32:19, 34:14,
40:13, 90:9,
106:13, 106:14,
114:7
reviewing
124:7, 146:25
revolution
58:25

ribs
68:1
ride
60:18
right
6:8, 7:3, 7:17,
9:3, 9:4, 9:9,
11:7, 13:9,
14:2, 16:25,
19:4, 20:13,
20:20, 21:9,
23:3, 23:9,
23:13, 28:23,
29:11, 30:16,
33:12, 33:14,
34:6, 34:16,
35:22, 40:5,
45:19, 47:3,
47:6, 48:14,
48:20, 48:21,
48:23, 49:7,
50:18, 53:21,
59:17, 59:19,
64:13, 64:23,
69:3, 74:18,
75:19, 84:19,
90:16, 92:7,
93:2, 99:18,
100:8, 100:15,
108:7, 114:17,
115:21, 116:24,
118:10, 122:12,
123:9, 127:8,
130:5, 131:14,
139:18, 139:21,
141:11, 143:15,
143:19, 143:20,
143:21, 143:24,
144:23, 145:5
righthand
18:24, 20:4
risk
128:11, 130:15
rmr
1:32, 148:3
road
43:5, 43:8,
70:16, 70:17

rodrigo
1:5
role
59:4, 79:3
roll
96:21, 126:12
rolled
94:21, 121:3,
141:10
room
2:7, 12:9,
12:10
rope
31:4
rough
26:9, 26:13,
26:20, 28:7
routine
145:7
rpr
1:32, 148:4
rules
67:9, 67:12
rushing
116:2, 122:1

S

sad
69:4, 77:10
safe
87:15
safely
128:9
safer
83:8
safety
70:25, 71:4,
94:24
said
15:14, 28:25,
43:16, 70:10,
79:8, 109:10,
117:20, 118:25,
121:24, 129:24,
131:12, 134:2,
134:21, 138:9,
138:10, 138:17,
144:10, 148:9

**sale**
15:4
**same**
7:19, 13:25,
14:21, 17:6,
22:19, 22:21,
22:22, 24:3,
24:15, 36:11,
36:14, 40:25,
41:11, 54:17,
65:17, 70:3,
73:5, 101:10,
105:5, 116:7,
117:23, 121:24,
125:19, 126:10,
126:17, 127:9,
137:5, 143:18
**sat**
131:1, 131:7,
144:21
**save**
27:6
**saw**
65:3, 89:24,
116:21, 121:2,
121:4, 133:10,
146:5, 146:11
**saying**
51:13, 51:15,
61:17, 66:15,
74:15, 89:24,
92:9, 98:17,
112:21, 112:22,
120:20, 126:2,
127:14, 130:10,
130:23, 135:3,
137:9, 137:18,
139:12, 144:7
**says**
14:17, 34:3,
72:6, 94:10,
98:20, 102:22,
103:13, 115:7,
118:2
**scapula**
97:11, 98:3,
102:5
**scenario**
129:13

**scene**
28:15, 29:4,
49:25, 50:3,
72:3, 120:17,
141:18, 142:10
**scenes**
50:4
**schizophrenia**
127:11
**schools**
81:18
**science**
41:10, 41:14,
46:8, 46:12,
85:11, 85:12,
85:14, 85:16,
85:17, 85:22,
85:25, 86:1
**sciences**
41:17, 85:24
**scientific**
81:11, 81:12,
81:24, 84:24,
85:7, 85:20
**scrantom**
3:12, 9:6
**screaming**
140:11
**se**
43:8
**seal**
148:16
**search**
94:23, 96:19,
97:1, 103:18
**searched**
72:3, 144:3
**searching**
96:20, 104:8,
140:18, 141:11
**seated**
34:8, 121:5,
140:19, 144:3
**seattle**
34:1
**second**
14:20, 18:13,
19:23, 20:24,

33:9, 35:1,
88:11, 94:10,
130:12, 133:2,
134:10
**secondly**
128:10
**seconds**
142:7
**see**
13:14, 15:16,
17:13, 17:15,
18:2, 18:21,
20:9, 20:21,
24:14, 25:6,
26:24, 30:20,
31:6, 31:14,
31:21, 35:12,
45:15, 49:22,
63:11, 68:16,
69:8, 75:22,
77:11, 77:14,
77:15, 82:4,
85:12, 90:24,
92:20, 92:21,
99:3, 99:11,
100:15, 111:6,
115:13, 115:19,
118:18, 118:19,
120:9, 121:5,
121:8, 121:15,
121:18, 130:23,
130:25, 131:2,
135:2, 138:20,
140:15, 140:20,
143:15, 143:18,
145:23
**seeing**
106:23, 144:6
**seeks**
142:23
**seem**
15:19
**seemed**
109:15, 118:13
**seems**
78:1, 84:10,
111:1, 120:12
**seen**
23:14, 27:3,

39:24, 44:18,
88:1, 88:9,
89:23, 89:25,
91:25, 98:5,
98:7, 101:20,
105:20, 130:18
**selected**
56:17
**seminally**
22:11
**seminars**
9:17
**send**
73:12, 73:14,
117:9, 117:18
**sends**
63:1
**sense**
27:22, 36:14,
40:10, 43:24,
45:13, 54:21,
56:9, 60:19,
64:2, 64:6,
65:9, 66:17,
66:23, 67:1,
68:15, 81:12,
82:19, 83:1,
83:19, 89:11,
111:4, 116:3,
118:11, 126:6,
128:5, 134:2,
136:11, 137:1,
137:3, 138:22,
141:17, 146:23
**sensed**
138:22
**sensitive**
134:7, 145:11
**sent**
10:7, 18:8,
20:14, 23:4,
23:6, 23:7,
36:10, 36:19,
38:18, 38:19
**sentence**
28:10, 94:10,
115:7, 116:8,
117:8, 125:3,

Transcript of Gregory J. Connor
Conducted on October 10, 2019                                    72

129:8, 133:7,
133:13
**separate**
15:7
**separately**
57:4
**september**
14:16
**sequence**
88:13, 88:20
**seriousness**
52:23
**set**
19:23, 42:18,
52:8, 148:15
**several**
37:1, 65:19,
139:20
**shallow**
105:18
**shape**
127:25
**sheer**
52:15
**sheet**
15:10
**shoot**
71:21, 71:22
**shorthand**
2:14, 148:3
**shortly**
59:16, 99:14
**should**
27:1, 28:13,
48:9, 52:21,
54:20, 61:13,
61:14, 65:21,
69:21, 69:22,
69:25, 71:7,
71:16, 73:3,
75:9, 83:19,
84:3, 84:4,
92:4, 96:10,
102:4, 102:19,
103:19, 104:5,
104:12, 111:8,
118:12, 125:23,
125:24, 128:7,

128:14, 128:18,
130:9, 134:13,
140:8, 140:10,
140:12, 142:15,
146:4, 146:5
**shouldn't**
118:21
**shove**
64:8
**show**
14:18, 54:9,
76:3, 76:6,
88:13, 93:14
**showed**
73:8
**showing**
70:11, 98:7,
116:8
**shown**
62:2
**shows**
78:6
**side**
37:23, 62:6,
75:5, 84:4,
84:5, 84:7,
84:8, 84:13,
87:15, 94:21,
94:22, 104:10,
126:12
**sides**
140:18, 140:24,
141:10
**sign**
116:11, 117:1
**signature-8g8ru**
148:21
**significance**
32:4
**significant**
15:11, 15:13,
27:17, 27:22,
28:11, 32:2,
132:22
**signing**
148:11
**signs**
116:8, 126:17,

126:18, 126:24
**similar**
17:7, 38:21,
38:25, 43:12,
43:14, 101:16
**simple**
113:9
**simply**
31:11, 42:9,
77:4, 104:10
**simultaneously**
143:15
**since**
42:23, 44:16,
59:25, 60:13,
65:14, 66:23,
86:25, 99:16,
101:19, 138:16
**single**
66:19
**singular**
56:20
**sinister**
15:20
**sir**
5:18, 6:5,
12:20, 20:7,
34:16, 109:11,
124:18, 127:8,
129:23
**siren**
145:7
**sit**
95:6, 141:23
**sitting**
131:14
**situation**
27:25, 29:18,
29:23, 30:10,
32:11, 38:25,
105:21, 111:22,
116:19, 117:4
**situational**
141:15
**situations**
82:6, 143:6
**six**
120:8, 120:9,

120:13, 120:23,
121:9, 135:11
**six-inch**
67:25
**six-minute**
120:5
**size**
34:13
**skill**
62:17
**skillfully**
68:7
**skills**
70:19, 70:23
**skip**
135:23
**slow**
7:24, 7:25
**small**
8:11, 44:3,
44:16, 55:21,
98:4, 135:14
**snippet**
107:15
**social**
41:10, 41:14,
41:17, 80:4,
80:5, 85:25
**society**
51:5, 51:17,
69:19, 77:17
**sociology**
41:9, 41:13
**somali**
58:21, 58:24
**somalia**
58:24
**some**
9:6, 9:14,
10:24, 18:3,
27:1, 27:2,
28:14, 30:22,
31:4, 32:5,
35:5, 35:6,
35:8, 37:6,
39:3, 40:6,
45:14, 47:11,
48:1, 48:5,

51:1, 51:21,
54:15, 54:25,
55:16, 57:3,
57:6, 57:16,
61:2, 62:15,
63:5, 63:9,
63:12, 65:12,
66:4, 69:23,
70:11, 73:24,
74:19, 82:5,
82:6, 84:18,
87:7, 88:17,
93:2, 93:15,
96:9, 97:6,
113:19, 113:21,
115:9, 122:9,
123:1, 123:21,
123:23, 125:5,
133:4, 133:25,
137:21, 137:24,
141:7
**somebody**
65:20, 70:21,
83:6, 95:6,
95:11, 95:12,
101:6, 111:15,
113:12, 122:13
**somebody's**
97:16
**somehow**
66:13, 90:13
**someone**
28:18, 28:20,
29:10, 61:12,
66:14, 66:16,
66:17, 67:7,
71:21, 96:19,
109:4, 109:22,
110:10, 110:21,
116:12, 119:11,
119:14, 119:21,
119:25, 122:5,
126:23, 136:17,
141:7
**someone's**
67:10
**something**
15:7, 20:10,

20:19, 24:12,
26:5, 31:5,
32:19, 34:13,
43:9, 44:25,
45:25, 46:1,
57:2, 58:5,
58:13, 62:3,
64:4, 65:7,
65:12, 67:11,
69:1, 70:15,
77:11, 82:2,
82:3, 84:23,
89:15, 93:5,
95:7, 102:9,
106:9, 108:1,
116:15, 119:18,
127:15, 132:7,
134:13, 136:14,
142:8, 144:9,
144:22
**sometimes**
34:20, 51:13,
78:18, 129:14
**somewhat**
47:9, 47:10
**sonoma**
63:2
**soon**
29:15, 95:21
**sophisticated**
85:23, 85:24
**sophistication**
66:24
**sorry**
10:4, 12:3,
34:4, 38:4,
71:2, 110:23,
115:12
**sort**
51:22, 57:16,
80:20, 84:18,
85:20, 88:17,
130:3
**sounded**
31:9, 31:10,
144:12
**sounds**
53:7

**south**
49:8
**southern**
7:20, 49:9,
61:11
**speak**
106:5, 106:8,
116:17
**speaking**
89:7
**special**
99:10, 99:17,
99:23, 100:2
**specialist**
53:6
**specific**
89:5, 101:14,
109:7, 138:14
**specifically**
90:25, 92:1,
92:23, 102:4,
114:10, 114:24,
143:25
**specificity**
132:24
**speed**
70:23
**spell**
34:2, 64:18
**spend**
58:23
**spent**
8:13, 61:9
**spotlight**
20:10
**sprouse**
3:12, 9:6
**stamped**
18:24, 20:5
**stance**
140:19
**stand**
95:6
**standard**
79:16, 83:20,
84:19, 91:12,
92:13, 94:14,
96:16, 96:17,

96:18, 96:23,
101:3, 101:4,
101:24, 102:15
**standardization**
57:8, 69:24
**standardize**
60:9, 72:23
**standardized**
56:20, 73:21
**standards**
48:12, 74:8,
133:15, 134:17
**standing**
106:24, 107:3,
120:18, 144:12
**standpoint**
55:12, 87:3,
97:2, 117:12
**stands**
48:13, 77:16
**start**
28:9, 72:2,
74:1, 88:10,
107:14, 114:12,
115:2, 118:2,
124:8, 124:10,
126:22, 135:12
**started**
41:6, 42:14,
79:24, 118:14,
139:11, 140:3
**starting**
27:13, 73:23,
131:4
**starts**
25:9, 26:23,
41:2
**state**
2:17, 37:13,
37:19, 37:22,
38:1, 39:4,
41:7, 42:3,
42:5, 43:1,
43:2, 43:4,
43:13, 43:14,
43:25, 44:9,
44:12, 44:13,
44:22, 47:21,

Transcript of Gregory J. Connor
Conducted on October 10, 2019

74

47:22, 47:25,
48:3, 48:10,
50:2, 50:13,
50:14, 50:18,
50:20, 50:22,
60:5, 60:6,
67:5, 69:12,
72:22, 101:1,
148:5
**stated**
77:4
**statement**
34:6, 127:3
**statements**
121:14, 124:3,
126:4, 126:21
**states**
1:1, 62:11
**stationed**
50:2
**statistical**
82:17, 82:19,
82:23, 83:1,
83:9, 84:18,
84:20
**statistically**
84:9
**statistics**
82:21
**status**
135:24
**statutes**
54:11
**statutory**
54:11
**stay**
97:7
**stayed**
52:17
**staying**
12:16
**step**
77:1, 128:15,
128:16
**stick**
27:5, 67:21,
67:23, 68:10
**still**
57:3, 75:12,

75:21, 85:8,
86:7, 95:23,
97:1, 97:18,
107:11, 120:23,
121:6, 124:17,
124:21, 124:23,
126:11, 140:1
**stipulate**
22:8, 22:18
**stomach**
120:6, 120:13
**stop**
60:7, 81:15,
81:18, 95:23,
95:24, 119:18
**stopped**
142:20
**stops**
54:7, 94:12,
95:22
**straddle**
98:6
**straddled**
142:3
**strategies**
12:23, 13:3,
39:1, 54:6
**street**
2:6, 52:7,
70:18
**strength**
28:1
**stretch**
113:1
**strike**
67:14
**strikes**
89:15
**strong**
47:23
**stronger**
47:21, 47:25,
115:25
**struck**
109:17
**structure**
57:25, 66:8
**struggle**
88:16, 93:7,

103:25, 126:6,
126:18, 126:19,
128:12, 145:4,
145:5, 146:20
**student**
50:17
**students**
51:4, 51:16
**studies**
41:18, 41:19,
80:8
**study**
41:16, 42:7,
80:18, 80:20
**stuff**
24:4, 24:15
**subdue**
134:19
**subject**
14:4, 14:10,
57:25, 58:5,
64:16, 67:5,
67:8, 72:2,
73:1, 75:7,
77:14, 83:12,
83:16, 83:17,
94:21, 95:13,
95:16, 95:23,
96:7, 97:1,
97:3, 97:7,
97:19, 97:20,
97:22, 98:4,
102:20, 102:22,
103:11, 103:13,
103:18, 104:11,
104:14, 105:22,
106:4, 118:22,
129:3, 145:15,
145:25
**subject's**
57:13, 71:12,
75:12, 75:22,
89:9, 96:4,
96:8, 96:11,
97:25, 104:22
**subjective**
140:22, 141:1
**subjects**
107:12, 123:23

**submit**
100:17
**substantiate**
117:5
**subzero**
138:6, 138:9,
138:16
**sudden**
33:11, 88:3,
88:14, 88:21,
105:4, 128:11
**sued**
37:22, 38:1
**suffering**
6:20, 115:9,
122:9, 125:5,
133:4
**sufficient**
128:20, 128:22,
129:4
**sufficiently**
135:21
**suggest**
29:7, 116:11,
140:7
**suggesting**
142:18
**suggestion**
32:16, 117:11,
123:10, 124:1
**suite**
3:6
**summation**
138:5
**summer**
50:21
**sunday**
56:3
**sundays**
55:4
**supervisors**
41:21
**supportive**
112:10
**suppose**
122:23
**supposed**
139:23

Transcript of Gregory J. Connor
Conducted on October 10, 2019

75

sure
11:5, 16:21,
22:13, 25:14,
25:22, 28:11,
30:9, 32:1,
34:19, 37:21,
40:2, 40:24,
47:5, 51:20,
65:2, 70:22,
74:12, 78:23,
81:23, 85:25,
87:13, 89:5,
89:14, 90:2,
91:4, 95:2,
95:19, 103:6,
107:1, 111:23,
113:16, 113:18,
116:10, 117:4,
117:20, 118:5,
118:25, 125:10,
125:12, 126:20,
127:12, 134:24,
135:2, 138:15,
139:4, 139:7,
140:11, 143:16,
143:25, 144:10,
145:10
surprised
49:13, 49:14,
49:18
surprising
81:21
suspect
33:4, 84:3,
103:11, 106:4,
112:6, 116:17,
146:19
suspect's
129:9, 129:25,
132:22
suspected
122:9, 125:5
suspects
74:7, 93:9,
113:11
suspicion
125:15
suspicious
109:9

switch
79:3
sworn
5:2, 5:15
syndrome
100:3
synovus
3:13
system
53:6, 53:7,
59:1, 59:21

**T**

t-a-k
67:25
tab
50:5
tactical
42:6, 54:9,
62:4, 68:11,
68:13, 76:21,
78:22
tactically
140:23, 141:9
tactics
12:23, 13:4,
39:2, 39:8,
60:24, 64:23,
68:4, 71:13,
71:19, 94:15,
99:9
tail
31:1, 31:4
tak
67:25
take
10:11, 10:21,
11:3, 11:6,
18:1, 18:9,
18:10, 73:22,
74:25, 75:2,
76:1, 76:4,
76:17, 81:8,
81:15, 86:2,
89:22, 90:18,
90:23, 90:24,
91:3, 91:5,
99:17, 99:19,

100:2, 114:13,
124:6, 138:25,
142:6, 142:7,
142:8
taken
5:4, 5:6, 6:24,
53:10, 148:6,
148:9
takes
60:23, 76:25,
79:14, 113:14
taking
5:25, 13:17,
83:5
talents
70:20
talk
24:19, 29:22,
33:17, 35:11,
41:1, 49:21,
78:23, 78:24,
82:25, 89:12,
99:21, 101:14,
102:4, 114:11,
135:9
talked
26:25, 29:15,
29:16, 33:22,
70:10, 71:20,
89:13, 107:19,
139:19
talking
11:2, 12:14,
12:17, 29:5,
29:9, 29:10,
29:12, 29:21,
48:12, 51:21,
52:22, 52:23,
64:1, 79:9,
79:11, 82:15,
85:16, 89:4,
92:2, 95:8,
95:10, 103:25,
107:10, 115:11,
116:20, 122:25,
132:23, 142:20,
142:25
tangent
109:16

tape
121:1
taser
71:21, 71:23,
113:10
tasers
64:25, 65:1,
65:2
tasing
95:12
taught
28:5, 53:25,
54:2, 64:22,
65:1, 65:2,
65:14, 65:23,
65:24, 68:8,
72:1, 86:24,
87:3, 91:25,
92:2, 92:13,
94:13, 99:23,
100:1, 100:8,
101:1, 113:14,
119:14, 119:22
tcc@psstf
14:16
teach
45:11, 54:6,
54:7, 64:25,
65:4, 65:25,
66:1, 68:16,
74:13, 96:20
teaches
100:1, 113:9
teaching
54:8, 55:16,
56:4, 72:17,
77:5, 92:16,
92:17, 96:18,
101:4
teachings
96:17, 106:3
team
109:20
tear
24:19
technically
140:17
technician
49:25, 50:5

Transcript of Gregory J. Connor
Conducted on October 10, 2019

76

technique
66:5, 67:7,
67:21, 67:23,
83:5, 83:11,
83:23, 83:24,
134:22
techniques
39:9, 65:13,
68:9, 68:12,
68:13, 68:16,
74:16, 81:13,
88:18, 96:16
technology
33:10, 88:5,
91:20, 100:13
tell
5:18, 7:24,
16:8, 33:20,
37:23, 41:4,
42:12, 47:16,
52:3, 53:23,
54:16, 55:18,
56:14, 64:8,
68:21, 69:3,
82:24, 83:22,
86:13, 101:4,
102:12, 114:13,
124:25, 126:3
telling
40:16, 108:25,
128:10
tells
145:6
ten
32:18, 39:14,
77:21, 103:13
ten-minute
122:22
tend
31:18
term
86:10, 87:5,
92:18, 115:6,
133:8
terms
72:1, 79:18,
137:19
test
82:4, 82:11,

82:13, 82:18,
84:18
tested
81:13
testified
5:15, 36:12,
37:7, 37:10,
37:19, 37:25,
39:6, 39:7
testify
6:22, 7:1,
37:17
testimony
11:11, 30:7,
36:15, 38:8,
38:20, 123:4,
148:8, 148:9
testing
42:2, 45:14,
55:24, 82:23
th
59:18, 148:16
thank
8:2, 15:22,
19:21, 72:16,
76:19
themselves
71:10, 129:15
theories
81:13
thereafter
148:9
therefore
83:18
thereof
47:19
theresa
1:31, 2:13,
148:2, 148:24
thesis
41:20, 41:21,
41:25, 42:1
thing
7:19, 24:1,
27:3, 35:22,
36:7, 37:5,
41:12, 48:8,
51:12, 51:22,

65:17, 75:19,
80:21, 83:21,
89:20, 105:5,
107:20, 108:9,
113:20, 121:24,
125:2, 130:3,
137:5, 137:11
things
18:7, 29:5,
39:5, 51:1,
51:3, 51:5,
59:24, 60:13,
60:24, 63:1,
63:12, 66:19,
69:24, 78:7,
78:19, 78:23,
78:24, 83:14,
84:18, 94:5,
97:4, 111:24,
113:8, 113:9,
113:18, 128:7,
129:17, 132:14
thinking
41:24, 105:5
third
3:14, 20:25,
143:23
this-is-how-you--
do-it
61:24
thought
61:12, 62:19,
63:10, 81:3,
109:13, 113:5,
118:8, 118:21,
127:15, 132:10,
133:22, 141:3,
141:6, 145:13
thought-disorder-
ed
126:23
threat
97:14, 113:11,
142:4, 142:12,
143:8
threatening
113:18, 113:20
three
17:11, 17:16,

17:17, 17:18,
20:20, 20:22,
58:2, 107:3,
134:16
throat
66:8, 97:13
through
6:18, 13:16,
19:2, 23:12,
30:2, 30:12,
33:5, 35:5,
36:5, 44:9,
44:10, 44:25,
48:19, 49:22,
50:12, 50:13,
50:14, 52:2,
55:4, 55:6,
55:14, 55:24,
55:25, 56:2,
56:15, 58:16,
58:25, 61:8,
76:10, 98:9,
100:11, 106:17,
114:9, 122:24,
123:24, 124:19,
124:21, 135:13,
147:8
throughout
50:2, 69:12,
129:11, 129:19,
144:19
throw
48:25, 63:9
thrown
66:14
thumb
17:4, 17:5,
17:21, 18:1,
18:4, 23:5,
23:6, 23:7,
35:23
thursday
1:23
tie
31:25
tied
33:21
tighter
48:8

Transcript of Gregory J. Connor
Conducted on October 10, 2019                    77

**time**
20:2, 29:2,
29:13, 29:17,
37:10, 42:5,
46:5, 50:25,
51:10, 51:25,
52:6, 52:11,
53:1, 53:2,
54:13, 54:17,
55:11, 56:23,
59:9, 61:1,
61:9, 61:17,
65:3, 65:19,
68:8, 68:18,
69:18, 70:17,
70:18, 73:11,
77:11, 77:15,
80:6, 83:14,
89:22, 90:18,
91:6, 95:15,
97:18, 97:21,
107:25, 115:2,
115:23, 116:21,
117:15, 121:8,
122:2, 124:8,
124:17, 126:11,
129:3, 131:7,
143:18, 143:22,
144:1, 147:9
**times**
6:10, 7:10,
31:1, 63:7,
63:25, 76:24,
80:11, 83:12,
96:25, 97:5,
103:13, 126:4,
139:20
**tip**
76:21
**title**
72:7
**today**
6:12, 6:21,
7:3, 7:13, 8:25,
9:25, 12:17,
13:15, 17:3,
18:18, 19:20,
33:2, 40:14,

40:24, 42:22,
51:1, 51:6,
72:10, 90:6
**together**
14:19, 16:20,
75:14
**told**
23:22, 106:13,
128:7
**took**
51:11, 53:14,
55:9, 55:22,
58:23, 69:2
**tool**
68:3
**top**
25:6, 25:9,
54:10, 71:14,
99:3, 133:13
**torso**
97:1
**total**
37:5, 72:1
**totally**
15:7
**touch**
95:16
**touched**
53:16
**toward**
58:3, 62:20
**towards**
94:6
**town**
8:11, 55:3
**traditional**
46:9, 84:20,
89:7
**traffic**
84:7
**trailed**
142:20
**train**
41:23, 42:23,
42:24, 57:17,
80:23, 81:18,
81:22
**trained**
42:24, 43:25,

44:19, 44:20,
44:23, 50:5,
50:8, 50:9,
62:15, 71:19,
102:20, 103:14,
103:17, 125:13,
129:8, 129:11,
129:19, 129:25,
137:22, 137:24
**trainer**
54:20, 61:4,
70:3, 77:24,
102:4, 102:10,
102:11
**trainers**
61:16, 69:20,
77:18, 91:17
**training**
4:12, 4:20,
4:23, 9:14,
14:23, 16:1,
16:13, 16:14,
19:7, 28:5,
39:4, 42:13,
42:14, 42:16,
43:16, 43:20,
44:5, 44:8,
44:9, 44:10,
44:11, 45:2,
45:6, 45:9,
46:14, 46:18,
47:2, 48:1,
48:13, 53:16,
53:24, 54:14,
54:18, 54:24,
55:14, 56:15,
56:18, 57:16,
57:23, 58:11,
58:24, 61:4,
61:8, 61:23,
62:10, 62:14,
62:23, 65:8,
68:24, 69:7,
69:11, 69:13,
70:8, 70:12,
71:13, 73:21,
74:6, 74:9,
74:10, 79:25,

87:11, 87:23,
88:11, 89:1,
91:13, 92:14,
93:16, 99:25,
101:24, 102:15,
109:19, 109:20,
110:5, 110:7,
110:13, 110:17,
111:1, 111:8,
111:10, 111:14,
111:18, 112:4,
112:9, 128:7,
132:20, 132:24,
134:4, 134:17,
136:17, 136:19,
137:2, 137:7,
137:8, 137:9,
137:10, 137:15,
137:19, 137:20,
141:9
**tranquility**
105:3, 105:12,
105:20, 105:23
**transcript**
4:6, 19:24,
30:5, 148:7
**transistor**
136:9
**transistors**
136:13
**transport**
93:4, 120:1,
125:16, 125:18,
127:22, 134:13
**transporting**
91:23, 93:5
**trashes**
20:9
**travel**
6:15, 11:24,
12:4, 12:8
**treatment**
128:1
**trial**
11:11, 38:10,
38:11, 38:16
**trials**
36:12, 38:13

**tried**
29:22, 59:6,
72:22, 73:7,
136:11, 138:25
**true**
6:15, 31:19,
44:14, 44:16,
47:9, 48:22,
49:1, 66:6,
66:7, 78:13,
78:21, 82:18,
86:22, 87:1,
96:22, 97:17,
100:4, 105:19,
106:6, 106:16,
109:12, 137:25,
148:7
**truly**
80:18, 97:22
**truthfully**
6:22, 7:3
**try**
23:21, 29:22,
46:21, 62:9,
74:1, 118:25,
133:23
**trying**
37:2, 102:21,
107:20, 108:16,
108:19, 110:23,
112:10, 113:6,
116:3, 117:12,
121:25, 129:6,
129:10, 134:11,
140:2, 141:21
**tucker**
3:12, 9:6
**turn**
82:21, 140:17,
140:23
**turning**
95:18
**twice**
63:21
**two**
12:10, 15:1,
15:16, 17:16,
17:18, 20:3,

20:9, 49:12,
63:25, 83:25,
107:2, 107:6,
124:16, 128:7,
128:16, 142:7,
146:14
**two-hour**
79:15
**two-page**
15:23
**tying**
33:22
**tyler**
14:15, 38:18
**type**
52:20, 62:20,
62:21, 66:4,
66:12, 69:23,
96:9, 97:6,
109:8, 115:10,
119:12, 122:10,
125:6, 133:4
**types**
66:11, 88:21
**typewriting**
148:10
**typical**
135:19

---

**U**

**uh-huh**
25:12
**unclear**
142:25
**uncommon**
103:8
**unconsciousness**
67:5
**under**
6:12, 25:19,
42:3, 59:20,
86:7, 92:10,
92:23, 94:16,
97:22, 104:15,
106:4, 124:17,
125:3, 129:3,
129:15, 139:5,
148:10

**undercover**
50:25, 51:24,
52:6
**underneath**
30:14, 32:14
**understand**
5:22, 6:11,
6:14, 7:23,
47:8, 52:2,
67:3, 70:14,
71:25, 74:15,
81:20, 85:9,
85:13, 93:13,
95:2, 95:4,
95:8, 109:24,
110:3, 110:24,
112:23, 114:6,
115:2, 126:19,
132:15
**understanding**
7:19, 14:10,
16:12, 47:5,
47:12, 47:14,
51:20, 85:17,
107:23, 113:15,
139:17
**understands**
90:3
**understood**
34:19, 73:25,
79:12, 79:14,
79:20
**unfortunately**
15:3, 34:3,
59:22, 62:5
**uniform**
113:20
**unique**
77:9, 135:24
**unit**
65:10, 125:11
**united**
1:1, 62:10
**universally**
94:13, 94:14
**university**
12:11, 12:14,
12:15, 41:19,

42:11, 43:18,
45:3, 45:7,
45:8, 45:10,
45:16, 45:19,
45:22, 46:13,
46:16, 46:19,
47:1, 50:14,
53:15, 55:10,
56:1, 58:18,
80:19, 80:23,
135:25, 136:7
**unlatch**
75:11, 75:21
**unless**
109:25, 147:3
**unlock**
75:15
**unreasonable**
133:19
**unresponsive**
88:19
**until**
55:2, 63:9,
144:4
**unusual**
109:18, 117:3
**up-to-date**
40:18
**update**
73:12, 90:18
**updated**
13:22, 40:14,
68:19, 68:20
**upper**
20:4, 97:1,
97:12, 98:3,
102:5, 102:7,
102:12, 102:18,
104:13, 104:24,
132:25, 133:8,
142:16
**urbana**
43:19
**use**
8:16, 9:17,
12:22, 13:2,
19:8, 29:23,
30:21, 41:10,

42:4, 56:20,
56:21, 57:7,
57:9, 57:19,
57:24, 60:6,
60:24, 61:23,
62:11, 63:14,
63:24, 64:10,
64:22, 64:25,
65:1, 65:2,
65:10, 65:21,
65:23, 66:18,
66:23, 67:1,
67:2, 67:4,
68:6, 69:23,
73:7, 75:20,
82:17, 82:19,
83:10, 83:11,
83:23, 83:24,
91:21, 92:4,
92:21, 94:9,
94:10, 94:11,
94:17, 94:18,
94:19, 95:4,
95:9, 95:10,
95:14, 95:16,
101:18, 101:23,
101:25, 104:6,
115:10, 115:25,
119:20, 125:20,
133:5, 133:15,
137:19, 141:16,
145:16, 146:18
**use-of-force**
37:7, 37:11,
39:1
**using**
88:17, 95:12,
141:2
**usually**
41:10, 82:12,
82:21, 105:16,
136:20
**utilization**
42:2, 55:1,
64:6, 66:25,
95:24, 111:22
**utilize**
73:13

**utilized**
13:4

### V

**value**
44:19
**values**
83:22
**variations**
65:20, 82:5,
82:18
**varied**
65:9
**variety**
97:4
**vehicle**
54:7, 54:8,
66:4, 67:17,
93:5
**vehicles**
84:3
**verbal**
118:3, 121:19,
124:23, 125:3
**verbalization**
105:15, 105:16,
107:2
**verbalizations**
140:3
**verbalizing**
105:22
**verify**
120:14, 120:24
**verse**
133:17
**version**
128:3
**video**
29:20, 77:15,
106:19, 106:23,
124:3, 126:21,
142:24
**videos**
21:5, 21:8,
21:12, 21:20,
22:5, 44:25
**videotape**
116:19, 126:8,

138:23
**view**
109:20, 110:8,
110:18, 146:16
**viewed**
22:6, 85:7,
97:13, 142:3,
146:1
**violent**
88:16, 128:11
**virtue**
38:21
**visual**
57:17
**visualization**
56:21, 57:6
**visualizations**
55:1
**voice**
103:8, 126:12,
142:19
**voicing**
141:6
**volume**
87:24
**vorkapic**
1:31, 2:13,
148:2, 148:24

### W

**waist**
101:12, 102:6
**waiting**
144:13
**waiving**
14:7
**walk**
118:14, 129:1
**walked**
118:4, 118:13
**wall**
69:9
**want**
11:2, 14:7,
15:19, 23:1,
27:11, 28:10,
36:7, 39:15,
40:2, 40:4,

40:21, 40:24,
44:8, 47:5,
47:22, 51:20,
52:18, 56:1,
73:23, 77:3,
85:5, 89:15,
90:2, 91:3,
96:25, 97:5,
104:23, 106:11,
113:16, 114:9,
118:7, 123:7,
124:8, 132:8,
135:6, 137:4,
138:13, 139:16,
145:22
**wanted**
15:20, 31:25,
34:19, 37:4,
55:20, 56:3,
70:20, 72:14,
94:4, 108:22,
125:17, 127:21
**wants**
44:4, 109:25,
114:15
**way**
30:9, 31:9,
52:8, 59:21,
60:15, 61:13,
61:14, 64:15,
71:19, 72:25,
73:1, 73:3,
83:7, 85:13,
89:6, 89:11,
95:20, 95:21,
113:21, 113:22,
117:23, 127:25,
133:23, 142:3,
146:1
**we'll**
10:24, 15:13,
19:19, 25:2,
32:5, 34:17,
36:22, 76:4,
78:23, 79:6,
81:8
**we're**
6:14, 11:1,

12:17, 12:19,
18:17, 28:25,
40:2, 40:25,
48:11, 51:21,
52:21, 70:20,
75:7, 79:8,
83:1, 85:16,
85:17, 86:6,
87:9, 103:25,
108:8, 131:22,
133:1, 135:3,
141:2, 142:23,
147:6
**we've**
13:15, 23:1,
30:2, 35:13,
62:15, 104:20,
130:19, 134:2,
135:21, 136:11,
139:19, 146:23,
147:3
**weapon**
68:2, 96:10
**weaponless**
66:5
**wear**
113:23
**weather**
138:17
**week**
56:4, 72:15
**weeks**
146:14
**weight**
96:3, 96:19,
97:6, 129:9,
129:25, 132:22
**weighted**
83:23, 83:25
**welfare**
144:20
**well-known**
33:13
**went**
24:11, 35:4,
52:7, 61:8,
69:12, 90:5,
106:17, 133:22,

134:11, 135:13,
144:21
**weren't**
6:15, 73:20,
123:4
**west**
2:6
**whatever**
23:4, 23:23,
54:20, 64:9,
70:18, 74:12,
77:3, 92:18,
104:23, 105:8,
111:25, 113:1,
116:2, 120:8,
120:15, 127:24,
131:6, 132:9,
138:14, 140:11,
143:24
**whatsoever**
44:5, 105:17
**whereas**
75:11
**whereof**
148:15
**whether**
61:10, 97:2,
97:3, 100:22,
108:13, 109:21,
110:8, 110:18,
111:19, 111:23,
123:10, 132:7,
139:9, 140:12,
142:6, 146:24
**white**
72:19
**whole**
59:21, 89:19,
97:4
**wife**
7:9, 55:22
**william**
26:14, 32:19,
35:8, 114:5,
114:25, 116:17
**wiped**
72:12
**within**
43:6, 46:11,

81:22, 101:19
**without**
44:5, 61:1,
96:11, 119:16
**witness**
5:2, 5:14,
11:15, 17:9,
17:19, 17:23,
18:7, 23:8,
23:25, 25:1,
25:3, 26:1,
27:16, 27:21,
28:8, 35:25,
39:22, 49:15,
76:18, 82:10,
84:14, 85:2,
85:10, 90:11,
90:17, 96:6,
98:25, 103:5,
104:19, 111:5,
123:14, 131:16,
143:2, 144:17,
145:20, 146:3,
148:15
**wives**
80:1
**word**
25:9, 25:20,
30:8, 34:2,
43:23, 81:25,
89:12, 89:13,
115:24, 115:25,
119:20, 125:20,
130:1
**words**
29:23, 140:24,
144:8, 146:7
**work**
10:7, 27:7,
36:25, 37:2,
51:8, 51:14,
53:8, 55:13,
56:2, 60:16,
61:22, 83:3,
112:11
**worked**
37:21, 52:5,
53:3, 53:19,

54:21, 54:23,
56:12, 71:5
**working**
8:25, 40:25,
50:25, 55:20
**works**
9:3
**worry**
9:8
**worth**
70:6, 133:14,
147:6
**worthwhile**
111:23
**worthy**
83:23
**wouldn't**
9:8, 13:10,
24:2, 52:15,
97:16, 106:7,
122:4, 123:19,
146:15
**wrist**
118:20
**write**
15:3, 42:9,
61:22, 95:20,
140:15
**writing**
15:9, 24:5,
25:17, 34:4,
34:21, 42:10
**writings**
44:25
**written**
4:17, 9:19,
9:21, 13:12,
17:11, 35:19,
79:22, 81:11,
82:16, 89:6,
101:22
**wrong**
36:18, 36:19,
112:14
**wrote**
15:8, 26:5,
36:24, 60:6,
69:5, 70:1,

Transcript of Gregory J. Connor
Conducted on October 10, 2019                          81

| | | | |
|---|---|---|---|
| 90:12, 90:20,<br>138:9 | **$4,200**<br>11:19 | 21:6<br>**1111**<br>3:14 | 52:4, 52:8<br>**1969**<br>52:2, 52:9 |

**X**

**x**
22:2

**Y**

**y-a-w-a-r-a**
67:22
**yawara**
67:21, 67:23,
68:10
**yeah**
99:1
**year**
52:16, 53:1,
56:13, 58:24,
59:25, 70:1,
71:15, 73:15
**years**
8:9, 8:14,
32:25, 43:7,
44:18, 46:4,
48:25, 53:20,
63:21, 65:16,
68:10, 77:22,
86:21, 86:23
**yelling**
139:20, 140:10
**yesterday**
23:15, 23:22
**york**
93:10, 135:20
**yourself**
12:21, 12:25,
13:7, 82:15
**youtube**
77:15

**Z**

**zeros**
21:22, 21:23

**$**

**$150**
11:10
**$1800**
11:11

**.**

**.1**
32:18

**0**

**00**
109:4
**00005**
1:9
**01**
18:22, 20:3
**02**
1:24
**07**
4:10
**084**
148:3

**1**

**1.3**
32:18
**10**
1:23, 4:25,
6:3, 11:14,
11:22, 16:6,
21:6, 24:23,
39:21, 43:7,
87:18, 93:20,
113:25, 114:2,
114:3, 115:14,
115:15, 115:17,
121:21, 122:8,
125:4, 128:17,
147:8
**100**
25:19, 26:2,
26:5, 26:20,
26:23, 27:5,
27:9, 27:14,
28:9
**101**
27:5, 29:7
**105**
99:7, 99:10
**11**
4:10, 4:11,

**114**
4:25, 100:11
**116**
100:11
**12**
43:7
**1244**
22:2
**13**
48:25, 84:5,
132:18, 132:19
**14**
18:24, 133:1
**148**
1:30
**15**
68:10
**151**
2:6
**16**
4:16, 69:14
**17**
18:22, 20:3,
135:2
**1725**
22:2
**1756**
19:10
**18**
94:8
**1838**
19:12
**19**
1:9
**1955**
42:15, 42:24
**196**
26:17
**1960**
51:23
**1966**
15:2, 49:22,
50:25, 52:4
**1967**
49:22, 52:2,

**1970**
52:9, 80:6,
80:13
**1977**
55:14
**1986**
55:2
**1990**
56:15
**1992**
56:16
**1993**
58:23
**1995**
33:11, 55:2,
87:25, 88:6,
100:13
**1996**
33:23
**1998**
89:23
**1999**
69:1

**2**

**2**
147:9, 147:10
**2.4**
94:8
**20**
32:25, 37:6,
44:18, 86:21,
86:23
**2000**
53:21, 53:22,
59:25, 60:14,
69:1, 70:1
**2006**
49:2, 49:6,
86:25, 99:17,
101:20
**2008**
37:12
**2009**
37:12, 71:1

Transcript of Gregory J. Connor
Conducted on October 10, 2019                                              82

| | | | |
|---|---|---|---|
| **2014** | **300000** | **5809** | **99** |
| 14:23, 72:16 | 21:24 | 22:2 | 27:9, 27:14 |
| **2015** | **312** | **5:** | **9th** |
| 77:6 | 2:9 | 121:21, 122:8, | 8:18, 107:8 |
| **2016** | **3188** | 125:4 | |
| 19:9 | 20:5 | **6** | |
| **2017** | **31901** | **60** | |
| 8:18, 20:3, | 3:15 | 57:6 | |
| 73:17, 107:8 | **31904** | **60603** | |
| **2018** | 3:7 | 2:8 | |
| 73:17, 73:18 | **3210** | **660** | |
| **2019** | 20:6 | 2:9 | |
| 1:23, 4:10, | **33** | **7** | |
| 6:3, 11:9, | 121:21, 122:8, | **7.3** | |
| 11:14, 11:22, | 125:4 | 98:10, 99:7, | |
| 14:16, 16:6, | **34** | 99:10, 100:11 | |
| 24:23, 39:21, | 98:10 | **70** | |
| 87:18, 93:20, | **35** | 57:2 | |
| 114:3, 114:6, | 46:4 | **706** | |
| 148:17, 148:18 | **36** | 3:8, 3:16 | |
| **221** | 87:24 | **75** | |
| 3:8 | **37** | 59:18 | |
| **23** | 53:20 | **77** | |
| 20:1 | **39** | 55:6 | |
| **24** | 4:18 | **78** | |
| 4:17, 7:6, | **4** | 55:6, 55:14 | |
| 65:7, 65:8, | **4** | **7th** | |
| 65:13, 65:15, | 21:14, 109:4 | 11:8 | |
| 138:8 | **40** | **8** | |
| **243** | 46:4 | **8200** | |
| 3:16 | **408** | 2:9 | |
| **25** | 48:20 | **86** | |
| 37:6, 138:8, | **4200** | 19:10 | |
| 148:16 | 10:13 | **87** | |
| **2589** | **44** | 4:20 | |
| 148:3 | 147:9, 147:10 | **9** | |
| **267139** | **4456** | **9** | |
| 1:29 | 22:2 | 1:24 | |
| **27** | **4815** | **911** | |
| 14:16 | 8:6 | 19:24, 20:2, | |
| **270** | **4:-cv--cdll** | 144:25 | |
| 18:23 | 1:9 | **93** | |
| **28** | **5** | 4:24 | |
| 37:6 | **52** | **9371** | |
| **283** | 56:24 | 3:8 | |
| 19:2 | **5619** | | |
| **3** | 3:16 | | |
| **30** | | | |
| 142:7 | | | |