IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
COLUMBUS DIVISION

RODRIGO ARREOLA, *ex rel*. HECTOR   *
ARREOLA, CONCEPCION ARREOLA, *ex*
*rel*. HECTOR ARREOLA, and S.A.,   *
*ex rel*. JEZREEL IMEE CUSTODIO,
  *
    Plaintiffs,
  *
vs.                           CASE NO. 4:19-CV-5 (CDL)
  *
COLUMBUS GEORGIA CONSOLIDATED
GOVERNMENT, OFFICER MICHAEL   *
AGUILAR, OFFICER BRIAN J.
DUDLEY, OFFICER AARON EVRARD,   *
and CHIEF RICHARD T. BOREN,
  *
    Defendants.
  *

## O R D E R

Plaintiffs contend that their son and father, Hector Arreola, suffered compressional/positional asphyxia when, during his arrest, the arresting police officers applied pressure to his back which led to brain damage and his eventual cardiac and respiratory arrest. They bring claims against the officers and their employer, the Consolidated Government of Columbus, Georgia ("CCG"), pursuant to 42 U.S.C. § 1983, asserting that the officers used excessive force in accomplishing the arrest and were deliberately indifferent to Hector's serious medical needs.[1] The individual

---

[1] Plaintiffs originally brought claims against the Columbus Police Department Chief of Police, Richard Boren, but they subsequently withdrew all claims against Boren. *See* Pls.' Br. in Opp'n to Summ. J. 13, ECF No. 22. Plaintiffs also withdrew all state law claims against

officers seek summary judgment based on qualified immunity while CCG moves for summary judgment, contending that no constitutional violation occurred (ECF No. 12).  For the reasons explained in the remainder of this order, the Court grants summary judgment in favor of all Defendants on Plaintiffs' deliberate indifference to medical needs claims but denies summary judgment on Plaintiffs' excessive force claims.

SUMMARY JUDGMENT STANDARD

Summary judgment may be granted only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  In determining whether a *genuine* dispute of *material* fact exists to defeat a motion for summary judgment, the evidence is viewed in the light most favorable to the party opposing summary judgment, drawing all justifiable inferences in the opposing party's favor.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).  A fact is *material* if it is relevant or necessary to the outcome of the suit.  *Id.* at 248.  A factual dispute is *genuine* if the evidence would allow a reasonable jury to return a verdict for the nonmoving party.  *Id.*

---

Defendants.  *Id.*  Accordingly, Defendants are entitled to summary judgment on these claims.

FACTUAL BACKGROUND

Viewed in the light most favorable to Plaintiffs, the record reveals the following facts.[2]

## I.   Hector's 911 Calls

On January 9, 2017 at 3:40 a.m., Hector called 911 to request a welfare check on his mother.  Officers Michael Aguilar and Brian Dudley responded to the call by going to Hector's mother's house. Hector's mother answered the door and told the officers she was fine.

Hector called 911 again at 4:55 a.m. asking for officers to check on his mother.  Again, Officers Aguilar and Dudley responded to the request.  When they arrived at Hector's mother's house this time, Hector was in the front yard and spoke with the officers. When the officers encountered Hector, "something seemed to be off with him."  Aguilar Dep. 30:3-4, ECF No. 18.  He made statements about lights being on in his mother's house, but there were no lights on.  *Id*. at 30:4-7.  He also said people were "trying to get him."  *Id*. at 30:7-8.  The officers asked Hector if he had

---

[2] The present record includes video recordings of the incident.  In determining whether there is a genuine fact dispute, the Court must view "the facts in the light depicted by the" recordings and may not adopt a version of the facts that is "utterly discredited" by the recordings. *Scott v. Harris*, 550 U.S. 372, 380-81 (2007).  "But where the recording does not clearly depict an event or action, and there is evidence going both ways on it," the Court must take Plaintiffs' version of what happened.  *Shaw v. City of Selma*, 884 F.3d 1093, 1097 n.1 (11th Cir. 2018).

paranoia, schizophrenia, or any similar mental disorders.  Hector denied mental illness and alcohol use and said he was "clean."  Pls.' Notice of Manual Filing Ex. A, AMBA0002 Body Cam Video of Brian Dudley 3:56-4:11, ECF No. 21 ("Dudley Body Cam").  At some point during the conversation, Hector's mother joined the officers outside.  She and the officers attempted to coax Hector inside her house.  Hector refused.  He then began to question the identity of the officers.  *Id*. at 6:24-35.

Around this time, Officers Dudley and Aguilar separately requested that Emergency Medical Services ("EMS") respond to the scene.  Specifically, at 5:21 a.m., Officer Dudley requested EMS come for a "psych eval."  *Id*. at 10:30-48.  And, at 5:24 a.m., Officer Aguilar requested EMS "just come routine, no lights, no sirens- hard no sirens."  Pls.' Notice of Manual Filing Ex. B, AMBA0010 Body Cam Video of Michael Aguilar 12:41-50, ECF No. 21 ("Aguilar Body Cam").

Hector then began walking away from the officers and into a neighbor's yard.  He proceeded to knock on the neighbor's door.  The officers instructed Hector not to knock on the door and requested that he return to the street.  Dudley Body Cam 10:38-50.  Hector did not comply.  The officers approached Hector and told him that if he did not leave his neighbor's yard, he would face jail time.  *Id*. at 12:50-13:00. When Hector refused to leave the neighbor's yard, the officers attempted to grab his hands to

arrest him for disorderly conduct.  At that point, a struggle began that took them all to the ground.

## II.   The Struggle and Aftermath

Descriptions of the officers' struggle with and restraint of Hector are based primarily upon the testimony of Hector's mother, who witnessed Hector's detention, and the audio of the detention that was caught on Officer Dudley's body camera.  The officers' body cameras do not reveal clear video of the incident because Dudley's camera fell off soon after the struggle began and the poor pre-dawn lighting and relative position of Aguilar's camera make it impossible to get a clear image of the events.  The officers' description of what happened is markedly different than the testimony of Hector's mother.  At summary judgment, the Court must accept the testimony that is most favorable to Plaintiffs with all reasonable inferences construed in their favor.  That evidence is as follows.

The struggle began at 5:25 a.m.  *Id*. at 14:41.  At 5:25:57 a.m., an officer instructed Hector, "roll over on your stomach," and another officer called dispatch for back up.  *Id*. at 15:23-25.  At 5:26:50 a.m., an officer said, "just flatten him out." *Id*. at 16:17-18.  At 5:27:15 a.m., the other officer said, "I'm flattening."  *Id*. at 16:41-42.  Around this time, Hector began to scream, "I can't breathe."  *Id*. at 16:39-40.  He repeated his "I can't breathe" plea nine times in the following two minutes.  *Id*.

at 16:43-44, 16:49-52, 17:02-04, 17:08-09, 17:13-14, 17:18-19, 17:22-23, 17:54-55, 18:20-21.

At 5:28:53 a.m., one cuff of a handcuff can be heard clicking closed on the audio, and an officer says, "got one locked." *Id.* at 18:19-22.  At 5:29:03 a.m., the second cuff can be heard clicking closed. *Id.* at 18:29-30.  At 5:29:18 a.m., an officer radioed to dispatch and stated, "we finally got him in handcuffs. You can slow down all the units." *Id.* at 18:43-49.  Ten second later, at 5:29:28 a.m., Hector repeated, "I can't breathe in." *Id.* at 18:54-56.  At 5:29:40 a.m., an officer radioed to dispatch, "Everything's 10-4.  We [inaudible] in custody." *Id.* at 19:06-11.  Hector's screams became noticeably weaker at this point and he began sobbing, moaning, and panting for breath.  At 5:29:43 a.m., 5:29:48 a.m., and 5:29:53 a.m., Hector repeated, "I can't breathe." *Id.* at 19:07-10, 19:15, 19:19-20.

At 5:30 a.m., Officer Aaron Evrard arrived on the scene to assist the officers.  Evrard was wearing a body camera.  His camera captured a seven-second image of the scene that he approached at this point.  Pls.' Notice of Manual Filing Ex. C, 20170109054456X300000_000000 Body Cam Video of Aaron Evrard 3:06-13, ECF No. 21 ("Evrard Body Cam").[3]  The camera showed Hector

---

[3] As a preliminary matter, the Court recognizes that the clock on Evrard's body camera is clearly ahead of the clock on Dudley's body camera by about one minute and thirteen seconds.  *Compare* Dudley Body Cam 19:32-33 (featuring Evrard asking "you need a break" at 5:30:06 a.m.), *with* Evrard Body Cam 3:13-14 (depicting Evrard asking "you need a break" at

lying face down on the ground with his hands handcuffed behind his back, completely still—not moving or resisting. *Id*.  It showed Officer Aguilar sitting on Hector's lower back/rear end.  *Id*. Officer Aguilar weighed around 300 lbs. at the time, and a reasonable jury could find that he was sitting so that his full body weight was bearing down on Hector's back.[4]  *See id*.; Aguilar Dep. 7:1, ECF No. 18. (Aguilar testifying to his weight).  The camera also showed Officer Dudley digging his knee into the middle of Hector's back.  Evrard Body Cam 3:06-13.  Officer Dudley later explained that he put his "forearm kind of on [Hector's] back, shoulder, neck area" during the struggle.  Pls.' Notice of Manual Filing Ex. C, 20170109061725X300000_000000 Body Cam Video of Aaron Evrard 16:17-20, ECF No. 21 ("Evrard Body Cam 2").

When Evrard reached Officers Aguilar and Dudley, he asked if they would like a break.  Dudley Body Cam 19:32-33.  Dudley agreed, stating that he was going to get leg irons.  *Id*. at 19:42-44. Around this time, Hector stated again, "I can't breathe."  *Id*. at

_____

5:31:19 a.m.).  Because the Court relies primarily on the clock according to Dudley's body camera to construct this timeline of events, the Court will adjust the time on Evrard's body camera by one minute and thirteen seconds for purposes of this motion so that it is consistent with the timeline of events.

[4] Defendants argue that the image shows Aguilar balancing on the balls of his feet while straddling Hector's back, rather than applying his full body weight to Hector.  But after reviewing the relevant seven-second image, the Court concludes that this issue is unclear based on the footage and a reasonable jury could find Aguilar applied his full body weight when sitting on Hector's back.  Therefore, the Court draws this inference in Plaintiffs' favor for purposes of this motion.

19:34-36.   Despite Hector's cries, Officer Evrard replaced the officers and positioned himself on Hector's back at about 5:30:35 a.m.   *See* Evrard Body Cam 3:43; Oakes Aff. Ex. 1, Office of Professional Standards ("OPS") Interview with Ronnie Oakes 5, ECF No. 12-3 at 8 (testimony of subsequent responding officer stating that when he walked on the scene, he saw "Evrard . . . on the gentleman's back keeping him down").   Hector continued to moan and sob.   At 5:30:45 a.m., Hector screamed again, "I can't breathe." Dudley Body Cam 20:11-13.   At 5:31:03 a.m., Hector stopped speaking.   *Id*. at 20:29-23:50.

Shortly thereafter, Columbus Police Officer Ronnie Oakes arrived on scene, and Evrard told him to hold Hector's legs, which he did.   Evrard Body Cam 3:58-4:00; OPS Interview with Ronnie Oakes 1.   The officers then placed Hector in leg irons, and Officer Evrard stood up to pat Hector down and search him.   Officer Evrard remained on Hector's back until this time, around 5:31:17 a.m. Evrard Body Cam 4:24-27.[5]

Evrard then rolled Hector on his side.   *Id*. at 4:40-46. Hector did not move much, and an officer asked "how's his breathing" while another officer checked his pulse and said "yeah he's breathing."   *Id*. at 5:34-40.   The officers attempted to sit

---

[5] Plaintiffs contend that Officer Evrard remained on Hector's back until 5:32:30 a.m., but they base this assertion on the clock on Evrard's body camera.   As previously discussed, the Court must adjust Evrard's body camera clock by one minute and thirteen seconds to fit it to the timeline developed based on Dudley's body camera.   *See supra* note 3.

Hector up, but he at first appeared to be limp.  *Id*. at 5:40-6:08.
They eventually got him in a seated position and waited for EMS to
arrive.  EMS pulled up to the scene around 5:36:14 a.m.  *Id*. at
9:21.[6]

EMS loaded Hector into the ambulance.  In route to the
Emergency Room, Hector went into cardiac arrest, and the ambulance
pulled over and called for additional resources.  Hector died soon
thereafter.

**III. Cause of Death and Officers' Training**

Because the parties bifurcated discovery, causation is not an
issue for purposes of the present motion.  But, Plaintiffs expect
the evidence to show that Hector suffered positional/compressional
asphyxia during the arrest based on the pressure that officers
applied to his back when they sat on him and dug their elbows/knees
into his back.  Plaintiffs contend that, as a result, there was an
oxygen deficiency, known as hypoxia, in Hector's blood which led
to brain damage and eventual cardiac and respiratory arrest.

They argue that Hector was suffering from a condition known
as "excited delirium" the night of his death, which can be brought
on by mental illness, obesity, narcotics use, or a combination of
these factors.  Plaintiffs assert that applying weight to the back

---

[6] Again, the Court adjusts the clock on Evrard's body camera by one
minute and thirteen seconds to fit it to the timeline developed based
on Dudley's body camera.  *See supra* note 3.

and/or neck of individuals in this state can often lead to sudden death by hypoxia, especially after an intense struggle.

Officers Aguilar, Dudley, and Evrard were trained to recognize the signs of excited delirium; they were taught that individuals suffering excited delirium are experiencing a medical emergency; and their training taught them that "[i]f time allows, [they should] contact EMS before confronting the individual [suffering excited delirium] and attempt to avoid confrontation with [the] subject until EMS arrival." Dudley Dep. Ex. 7, Use of Force Training Overview 1760-62 (Jan. 18, 2016), ECF No. 17-7 ("Use of Force Training"); *see also* Evrard Dep. 50:3-11, ECF No. 19 (acknowledging he received this 2016 training); Dudley Dep. 63:10-69:4, ECF No. 17 (same); Aguilar Dep. 53:1-59:7, ECF No. 18 (same). The officers were also trained on positional asphyxia, and they were taught to "[a]lways monitor any subject [they] have in custody" and "[b]eware of [s]udden [t]ranquility." Use of Force Training 1761.

DISCUSSION

Viewed in the light most favorable to Plaintiffs, the officers were sitting and/or applying pressure to Hector's back from 5:26:50 a.m. (the time the officers began "flattening [Hector] out") to 5:31:17 a.m. (the time Officer Evrard stood up to pat Hector down), for a total of around four minutes and twenty-seven seconds. In that time, Hector cried out that he could not breathe at least

sixteen separate times.  After handcuffing Hector at 5:29:03 a.m., the officers remained on his back an extra two minutes and fourteen seconds while Hector's cries became progressively weaker and turned to moaning/whimpering/panting sobs.

Plaintiffs bring § 1983 excessive force claims against Aguilar, Dudley, and Evrard in their individual capacities, claiming that the officers used excessive force when they continued to apply pressure to Hector's back in the two minutes and fourteen seconds *after* Hector was handcuffed, had stopped resisting, and continued to tell officers he could not breathe.  Plaintiffs also bring § 1983 individual capacity claims against Aguilar, Dudley, and Evrard, asserting that the officers were deliberately indifferent to Hector's medical needs when they did not tell the EMS to hurry or alert the EMS of Hector's deteriorating condition even though they were trained on the need for medical attention in these situations.  The officers seek qualified immunity on these individual capacity claims.  Plaintiffs also bring § 1983 claims against CCG, arguing that CCG's policies and customs were the moving force behind these constitutional violations.[7]  Because the parties bifurcated discovery, CCG only moves for summary judgment

---

[7] Plaintiffs' official capacity claims against the individual officers are considered claims against their employer, CCG. *Kentucky v. Graham*, 473 U.S. 159, 165 (1985) ("Official-capacity suits . . . 'generally represent only another way of pleading an action against an entity of which an officer is an agent.'" (quoting *Monell v. New York City Dep't of Soc. Servs.*, 436 U.S. 658, 690 n.55 (1978)).

of this *Monell* claim on the theory that Hector did not suffer a constitutional violation.

## I.   § 1983 Individual Capacity Claims Against the Officers

The officers contend that they are entitled to qualified immunity on Plaintiffs' § 1983 excessive force and deliberate indifference claims.  "Qualified immunity protects a government official from being sued for damages under § 1983 unless preexisting law clearly establishes the unlawfulness of his actions, such that any reasonable official in his position would be on notice that his conduct was unlawful."  *Hunter v. City of Leeds*, 941 F.3d 1265, 1278 (11th Cir. 2019).  To receive qualified immunity, "an official must first establish that he was acting within his discretionary authority when he engaged in the allegedly unlawful conduct."  *Id.*  There is no dispute that Aguilar, Dudley, and Evrard were acting in their discretionary authority here.  Thus, Plaintiffs must show that the officers violated Hector's constitutional rights and that those rights were clearly established at the time of the incident here.  *Id.*  "For a right to be clearly established, '[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.'"  *Id.* (alteration in original) (quoting *Corbitt v. Vickers*, 929 F.3d 1304, 1311 (11th Cir. 2019)).

"A plaintiff can show that his constitutional rights were clearly established in any one of three ways." *Id.* "First, he can point to a materially similar case decided by the Supreme Court, [the Eleventh Circuit], or the highest court of the relevant state that clearly establishes the unlawfulness of the police conduct." *Id.* "Second, even in the absence of such precedent, a plaintiff can point to a 'broader, clearly established principle [that] should control the novel facts in [his] situation,' provided that the principle gives the officer 'reasonable warning that the conduct at issue violated constitutional rights.'" *Id.* (alterations in original) (first quoting *Morton v. Kirkwood*, 707 F.3d 1276, 1282 (11th Cir. 2013) and then *Hope v. Pelzer*, 536 U.S. 730, 740 (2002)). "Third, a plaintiff can show that the conduct at issue 'lies so obviously at the very core of what the [Constitution] prohibits that the unlawfulness of the conduct was readily apparent to the official, notwithstanding the lack of case law.'" *Id.* (quoting *Lee v. Ferraro*, 284 F.3d 1188, 1199 (11th Cir. 2002)).

A. <u>Fourth Amendment Excessive Force Claims</u>

       *i. Did the Officers Violate the Fourth Amendment?*

"The Fourth Amendment's freedom from unreasonable searches and seizures encompasses the plain right to be free from the use of excessive force in the course of an arrest." *Lee*, 284 F.3d at 1197.  Claims for excessive force in the course of an arrest are

13

properly analyzed under the Fourth Amendment's "objective reasonableness" standard. *Graham v. Connor*, 490 U.S. 386, 395 (1989). The Supreme Court "has long recognized that the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." *Id.* at 396. So, in determining whether the force used during an arrest is reasonable, the Court generally considers "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.; accord Lee*, 284 F.3d at 1198 ("*Graham* dictates unambiguously that the force used by a police officer in carrying out an arrest must be reasonably proportionate to the need for that force, which is measured by the severity of the crime, the danger to the officer, and the risk of flight."). The Court must also "examine (1) the need for the application of force, (2) the relationship between the need and amount of force used, and (3) the extent of the injury inflicted." *Lee*, 284 F.3d at 1198.

Here, Plaintiffs do not argue that the amount of force used *before* handcuffing Hector was excessive. At that point, Hector was still resisting arrest and unrestrained. The only use of force Plaintiffs challenge in this case is the officers' decision to *continue* applying significant pressure to Hector's back *after* they

handcuffed him.   At that point, Hector was restrained and, according to Plaintiffs, no longer moving or resisting arrest. Nevertheless, the officers remained on top of Hector for an additional two minutes and fourteen seconds, ignoring Hector's continuous screams that he could not breathe.

Turning to the *Graham* factors, Hector was arrested for a non-serious crime (disorderly conduct), and he posed a minimal threat to the safety of the officers and others.   Hector was unarmed during the entire encounter, and he never did or said anything in his conversation with the officers to indicate that he posed an immediate safety threat beyond acting strange and paranoid and knocking on his neighbor's door.   Hector's hands were handcuffed behind his back at the time in question so, even if he were able to escape, he would not have realistically been able to inflict significant harm on anyone.

Defendants insist that Hector was resisting arrest or attempting to evade arrest by flight after he was handcuffed.   The officers testified that the reason they remained on Hector's back even after he was handcuffed was because Hector continued kicking his legs, rolling side to side, and resisting arrest. But, Plaintiffs contend that his resistance stopped once the handcuffs were secured.

Plaintiffs point to Hector's mother's testimony.   She witnessed the struggle and testified that Hector had stopped

15

resisting after he was handcuffed "because he was unconscious" and "[could not] move." *See* Concepcion Arreola Dep. 26:14-17, ECF No. 14 ("Q: They're trying to get ahold of him, get him in handcuffs, he's trying to get out? A: When they already have him, no, because he was unconscious."); *id.* at 65:7-12 ("Q: Once the police officers got Hector handcuffed behind his back, when they were on him, at that point was Hector resisting anymore? A: When they got him in the handcuffs? Q: Yes ma'am. A: No, because he can't move."). Hector's mother's testimony is consistent with the seven-second image captured on Evrard's body camera, which showed Hector completely still and in handcuffs with Officers Aguilar and Dudley on top of him.  Evrard Body Cam 3:06-13.  Her testimony is also consistent with the body camera footage showing Hector appearing limp and only semi-conscious when the officers tried to place him in a seated position.

Defendants ask the Court to ignore Hector's mother's testimony about his lack of resistance post-handcuffing because she also testified in her deposition that Hector *continued* resisting after he was handcuffed.  *See* Concepcion Arreola Dep. 29:1-3 ("Q: And that Hector was-kept resisting even after they got him in handcuffs? A: Yes.").  But, Plaintiffs explain that the inconsistency in Hector's mother's testimony is due to her lack of familiarity with the English language and confusion about the question being asked.  In fact, an interpreter was present at the

deposition but was not used during the testimony in question. While the jury may decide not to credit the testimony of Hector's mother at trial based on her inconsistent testimony, the Court is "tasked at th[e] summary judgment stage not with weighing the evidence, making credibility choices or determining the truth of the matter, but with deciding whether there is a genuine issue for trial, viewing the evidence and making reasonable inferences in the light most favorable to Plaintiff[s]." *Wate v. Kubler*, 839 F.3d 1012, 1021 (11th Cir. 2016). Therefore, the Court credits Hector's mother's testimony and, viewing it in the light most favorable to Plaintiffs, concludes for the purposes of this motion that Hector stopped resisting arrest after he was handcuffed.[8]

---

[8] The Court recognizes that the sham affidavit doctrine counsels, "[w]hen a party has given clear answers to unambiguous questions which negate the existence of any genuine issue of material fact, that party cannot thereafter create such an issue with an affidavit that merely contradicts, without explanation, previously given clear testimony." *Allen v. Bd. of Pub. Educ. for Bibb Cty.*, 495 F.3d 1306, 1316 (11th Cir. 2007) (alteration in original) (quoting *Van T. Junkins & Assocs., Inc. v. U.S. Indus., Inc.*, 736 F.2d 656, 657 (11th Cir. 1984)). But, "[t]his rule is applied 'sparingly because of the harsh effect [it] may have on a party's case.'" *Id.* (quoting *Rollins v. TechSouth*, 833 F.2d 1525, 1530 (11th Cir. 1987)). "[T]o allow every failure of memory or variation in a witness' testimony to be disregarded as a sham would require far too much from lay witnesses and would deprive the trier of fact of the traditional opportunity to determine which point in time and with which words the . . . affiant . . . was stating the truth." *Id.* (quoting *Tippens v. Celotex Corp.*, 805 F.2d 949, 953-54 (11th Cir. 1986)). Here, even if the sham affidavit principles applied to the inconsistency within Hector's mother's deposition testimony, it would not preclude the Court from considering her testimony because Plaintiffs offer a valid, plausible explanation for the inconsistency— Hector's mother's first language is not English and she, therefore, had trouble understanding the question when it was asked at one point during her deposition but later understood it better and answered correctly.

Despite the minimal safety threat that Hector posed and his lack of resistance to arrest, the officers used a significant amount of force on him—force that was potentially deadly.  A 300-lb. officer sat on Hector's rear end while another officer dug his elbow into Hector's back, and the officers continued to use this level of force for over two minutes after he was handcuffed—around four minutes total.  The officers applied so much pressure in that time that, according to Plaintiffs, Hector suffered compressional/positional asphyxia as a result.  The officers had reason to know that the force they were applying was potentially deadly: Hector cried out sixteen times throughout the encounter that he could not breathe, and his cries became progressively weaker, ending in whimpering/panting sobs by the end.  The Court finds that the officers' use of this amount of force under the circumstances was objectively unreasonable and, therefore, violated the Fourth Amendment.

The Court rejects Defendants' argument that the officers' use of force was not unconstitutional because the amount of force used was de minimis.  Under the de minimis force principle, even unnecessary use of force does not violate clearly established Fourth Amendment law where "the actual force used and the injury inflicted were both minor in nature."  *Nolin v. Isbell*, 207 F.3d 1253, 1256 (11th Cir. 2000) (quoting *Jones v. City of Dothan*, 121 F.3d 1456, 1460 (11th Cir. 1997)).  The Court acknowledges that

sitting and digging an elbow or knee into an arrestee's back may in some circumstances be a de minimis use of force.  But, given that the prolonged pressure applied to Hector's back here resulted in his asphyxia and death and given that the officers were on notice from the beginning that their use of force was potentially deadly because Hector could not breathe, the Court finds that the actual force used and injury inflicted under the circumstances were not minor.  Therefore, the de minimis force principle does not apply.  *Cf. Nolin*, 207 F.3d at 1255, 1258 (finding de minimis force used when an officer grabbed an arrestee from behind the shoulder and wrist, threw him against a van, kneed him in the back, pushed his head into the van, and searched his groin but only left bruises that did not require medical treatment); *Durruthy v. Pastor*, 351 F.3d 1080, 1085, 1094, 1094 n.10 (11th Cir. 2003) (finding de minimis force used when officer grabbed the arrestee from behind, pulled him to the ground, and kneed him in the back to place handcuffs on him, aggravating the arrestee's pre-existing shoulder injury); *Croom v. Balkwill*, 645 F.3d 1240, 1245, 1252-53 (11th Cir. 2011) (finding de minimis force where an older woman alleged she "suffered medical problems" as a result of an officer pushing her "to the ground from her squatting position and holding her there with a foot (or knee) to the back for up to ten minutes").

*ii. Did the Officers Violate Clearly Established Law?*

By the date of Hector's arrest, January 9, 2017, it was well established that after a suspect is arrested, handcuffed, and completely secured, and after the risks of danger and flight have passed, significant force that is "wholly unnecessary to any legitimate law enforcement purpose" is excessive. *Lee*, 284 F.3d at 1198; *accord Saunders v. Duke*, 766 F.3d 1262, 1265 (11th Cir. 2014) ("We have repeatedly ruled that a police officer violates the Fourth Amendment, and is denied qualified immunity, if he or she uses gratuitous and excessive force against a suspect who is under control, not resisting, and obeying commands.").

For example, in a 2014 case, *Saunders v. Duke*, the Eleventh Circuit ruled that officers' use of force was excessive when they "pushed [a non-resisting, non-threatening arrestee] down on the hot pavement in order to handcuff him," slammed his face into the pavement, and held him there even after he told them he was getting burned.  766 F.3d at 1265-68.  In a 2002 case, *Lee v. Ferraro*, an officers' use of force was excessive when an officer took a motorist arrested for honking her horn to the back of a car and slammed her head against the trunk after she was "arrested, handcuffed, and completely secured and after any danger to the arresting officer as well as any risk of flight had passed."  284 F.3d at 1198-99.  And, in a 2000 case, *Priester v. City of Riviera Beach*, the Eleventh Circuit ruled that officers' use of force was

excessive when they ordered a suspect to get down on the ground, he complied and "did not pose a threat of bodily harm to the officers or anyone else," but the officers still released a dog on the suspect and allowed the dog to attack the suspect for two minutes.  208 F.3d 919, 927 (11th Cir. 2000).

It was also established by the time the officers acted that using significant force "to restrain even a previously fractious arrestee" who attempted to evade arrest is "obviously unnecessary" if the plaintiff later "offer[s] no resistance at all" at the time the force is applied.  *Smith v. Mattox*, 127 F.3d 1416, 1418-20 (11th Cir. 1997) (per curiam) (finding an officer violated clearly established law by breaking an arrestee's arm after the arrestee "docilely submitted to arrest," even though he had previously attempted to flee from the officer).  Officers must continue to assess the situation to determine whether their use of force against a previously fractious arrestee is reasonable in light of the arrestee's continued resistance or lack thereof.

For example, in a 2016 case, *Wate v. Kubler*, the arrestee appeared to be in a delusional state, and he physically fought with officers who tried to calm him.  839 F.3d at 1015-1017. Because he continued resisting the officers even after he was handcuffed, an officer deployed a taser on him five times in the span of two minutes to get him to stop kicking and comply with the officers' commands.  *Id*. at 1017.  When construing the evidence in

the light most favorable to the plaintiff, the Court found the arrestee "was no longer resisting at least after the first two tasings." *Id.* at 1021. The Eleventh Circuit ruled that while the first and maybe second tases were warranted, the following three tases were excessive because, by that time, the man was "handcuffed, immobile and still, such that a reasonable officer in [the officer's] position would conclude that [the man] did not present a risk of flight, or a threat of danger to the officers or to the public." *Id.* The Eleventh Circuit denied the officer qualified immunity because "[a] reasonable officer in [his] position and under the[] circumstances would have had fair warning that repeatedly deploying a taser on [the decedent], after he was handcuffed and had ceased resisting, was unconstitutionally excessive." *Id.; accord Oliver v. Fiorino*, 586 F.3d 898, 902-03, 906-07 (11th Cir. 2009) (finding an officer who used a taser eight times in the course of two minutes on an individual who was not accused of a crime and who was immobilized, limp, and writhing in pain after the first tase was excessive).

Here, Plaintiffs do not dispute that Hector was previously fractious: he resisted arrest before he was handcuffed. But, viewed in the light most favorable to Plaintiffs, he stopped resisting arrest in the two-minute-and-fourteen-second time span after he was handcuffed while the officers continued using force that they had reason to know was potentially deadly. As in *Wate*,

the officers were responsible for assessing whether Hector continued resisting arrest in that two-minute time span and adjusting their level of potentially deadly force accordingly. A reasonable officer in Aguilar, Dudley, and Evrard's positions under the circumstances would have had fair warning that continuing to apply significant pressure to Hector's back after Hector expressed that he could not breathe sixteen separate times and after his voice weakened to whimpering/panting sobs was constitutionally excessive given that he was handcuffed and had ceased resisting.

The Court acknowledges that it has not been pointed to any relevant precedent that is precisely on point with the facts of this case. The Court could not identify a case in which an officer used the same type of force used here—*i.e.*, applying substantial pressure to an arrestee's back for four minutes, two of which were after he stopped resisting, despite the arrestee's repeated cries that he could not breathe and audibly worsening condition. But the law "does not require a case directly on point for a right to be clearly established[;] existing precedent must have placed the statutory or constitutional question beyond debate." *Kisela v. Hughes*, 138 S. Ct. 1148, 1152 (2018) (quoting *White v. Pauly*, 137 S. Ct. 548, 551 (2017)); *see, e.g.*, *Dyksma v. Pierson*, No. 4:17-CV-41 (CDL), 2018 WL 3430684, *3, *6-*8 (M.D. Ga. July 16, 2018) (denying qualified immunity to an officer who placed his knee on

an arrestee's neck for approximately seventeen seconds when the arrestee's hands were cuffed behind his back and he was clearly incapacitated even though the Court could not identify binding precedent in which a similar use of force was employed in this manner), *aff'd* 763 F. App'x 909 (11th Cir. 2019) (per curiam). The Court understands that clearly established law cannot be defined at "a high level of generality." *Plumhoff v. Rickard*, 572 U.S. 765, 779 (2014) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011)).  To do so would impermissibly avoid "the crucial question whether the official acted reasonably in the particular circumstances that he or she faced."  *Id*.  But, the Court finds that on the date of Hector's death, it was beyond debate that a law enforcement officer who continues to apply significant pressure to an arrestee's back over two minutes after the arrestee has been detained, stopped resisting, and screamed sixteen times over the course of four minutes that he could not breathe violates the arrestee's Fourth Amendment right to be free from excessive force.

Defendants rely on two Eleventh Circuit cases to argue that the officers should receive qualified immunity here.  First, they point to *Lewis v. City of West Palm Beach*, in which the Eleventh Circuit granted officers qualified immunity when they restrained a disoriented man who kept trying to run into traffic.  561 F.3d 1288 (11th Cir. 2009).  Once the officers got the man to the

ground, an officer put a knee on the man's neck and upper back for about a minute so the man could be handcuffed and put in leg restraints.  The officers attempted to put him in a seated position, but the man would not sit up or heed requests that he calm down.  The officers decided to attach the ankle restraint to the handcuffs with a hobble cord and essentially "hogtied" the man with his hands and feet close together behind his back.  The officers soon realized that the man was unconscious, and they removed the restraints and tried to resuscitate him, but he died. An expert concluded that the cause of death was asphyxia caused by neck compressions.  The Eleventh Circuit granted the officers qualified immunity, finding that the officers' use of force was not constitutionally impermissible because the man continued to be "agitated and uncooperative," had "only a tenuous grasp on reality," did not remain compliantly restrained, refused to sit up, and was unable to stay calm.  *Id*. at 1292.

Defendants also point to *Bussey-Morice v. Gomez*, 587 F. App'x 621 (11th Cir. 2014) (per curiam).  In that case, a man suffering from excited delirium refused to comply with officers' requests that he get on his knees, place his hands behind his back, and turn away from the officers.  When an officer went to handcuff him, he "jumped up, pulled away, and resisted."  *Id*. at 624.  At that point, two officers tased the man.  The man jumped up after or during the tasing, removed the taser prongs from his body, and

approached the officers "in a combative manner." *Id*.  The officers tased him again.  Again, the man got back up and began ripping out the taser prongs.  He then began to fight the officers and continued ignoring their commands, so the officers tased him a third time.  The man continued fighting after the third taser deployment, but the officers were instructed not to tase him anymore, and they proceeded to physically restrain him.  The man later died due to the multiple taser applications, according to the plaintiff's expert.  A panel of the Eleventh Circuit granted the officers qualified immunity, finding their use of force was acceptable because the man was belligerent, agitated, and out of his mind, refused to comply with officers' commands, and "never ceased his resistance to the officers' attempts to restrain him." *Id*. at 630.

Neither *Lewis* nor *Bussey-Morice* control the outcome of this case, though.  Here, unlike in those cases, when the evidence is viewed in the light most favorable to Plaintiffs, Hector ceased resisting arrest, attempting to flee, or fighting officers at the time of the unconstitutional use of force.  Accordingly, this case falls under the clear line of case law establishing that, like here, use of significant, gratuitous force against a non-resisting arrestee who is restrained and no longer poses a threat of flight or risk of danger is unconstitutional.

Quite frankly, the issue here is not as complicated as the foregoing lengthy discussion suggests.  The ultimate question for purposes of the pending motion is whether there is enough evidence in the record from which a reasonable jury could conclude that Hector ceased resisting when he was handcuffed.  The Court finds that Plaintiffs have pointed to enough evidence supporting this version of what happened.  It is primarily from the testimony of Hector's mother, which is admittedly inconsistent, but when she is given the benefit of favorable inferences, that testimony clearly supports the conclusion that Hector ceased resisting at the time the handcuffs were applied.  And if a jury finds that in fact is what happened, then Defendants are not entitled to qualified immunity and a jury would be authorized to find that Hector's Fourth Amendment right to be free from excessive force was violated.

For these reasons, the Court finds that Officers Aguilar, Dudley, and Evrard are not entitled to qualified immunity at this time on Plaintiffs' § 1983 excessive force claims.

### b. Fourteenth Amendment Deliberate Indifference to Serious Medical Needs Claims

Plaintiffs also argue that Aguilar, Dudley, and Evrard were deliberately indifferent to Hector's serious medical needs when they failed to inform EMS of Hector's deteriorating condition after the struggle and to request that they hurry to the scene.  "To

establish a constitutional deliberate-indifference claim, [Plaintiffs] must demonstrate '(1) [that Hector had] a serious medical need; (2) the defendants' deliberate indifference to that need; and (3) causation between that indifference and [Hector's] injury.'" *Taylor v. Hughes*, 920 F.3d 729, 733 (11th Cir. 2019) (quoting *Mann v. Taser Int'l, Inc.*, 588 F.3d 1291, 1306–07 (11th Cir. 2009)).[9]  The Court finds that, even if Hector had a serious medical need, Plaintiffs have not shown that Officers Aguilar, Dudley, and Evrard acted with deliberate indifference to that need here.  To show deliberate indifference, Plaintiffs "must prove three things: (1) subjective knowledge of a risk of serious harm; (2) disregard of that risk; (3) by conduct that is more than [gross] negligence." *Goebert v. Lee Cty.*, 510 F.3d 1312, 1327 (11th Cir. 2007) (alteration in original) (quoting *Bozeman v. Orum*, 422 F.3d 1265, 1272 (11th Cir. 2005) (per curiam), *abrogated on other grounds by Kingsley v. Hendrickson*, 135 S. Ct. 2466, 2477 (2015)).  Plaintiffs emphasize that the officers here were trained on the dangers of excited delirium and, therefore, had a subjective knowledge that their failure to take Hector for immediate medical treatment would result in serious medical consequences, including death.

---

[9] The standard for providing medical care to a pre-trial detainee under the Fourteenth Amendment is the same as the standard required by the Eighth Amendment for a convicted prisoner, so the Court refers to both Eighth and Fourteenth Amendment case law in its discussion. *Andujar v. Rodriguez*, 486 F.3d 1199, 1203 n.3 (11th Cir. 2007).

Even if that were true, the Court does not find that the officers' failure to call EMS—who they had already asked to come to the scene *before* any struggle occurred—and tell them to hurry was more than grossly negligent.  Therefore, they did not act with deliberate indifference.  Negligent medical care does not violate the Constitution.  "In the medical context, an inadvertent failure to provide adequate medical care cannot be said to constitute 'an unnecessary and wanton infliction of pain' or to be 'repugnant to the conscience of mankind.'"  *Mann*, 588 F.3d at 1307 (quoting *Estelle v. Gamble*, 429 U.S. 97, 106-07 (1976)).  In *Mann*, for example, the deputies "may have made an error in judgment" but were not deliberately indifferent when they took an arrestee experiencing "excited delirium" to the jail instead of to the hospital.  *Id.* at 1307-08.  And, they "took appropriate action" of applying cold compresses to cool down the arrestee, who they thought was suffering from a heat stroke, and ultimately calling 911 about nineteen minutes after the arrestee became unresponsive with labored breathing.  *Id.* at 1301, 1308.  Here, the officers knew that aEMS was on its way before Hector was ever taken into custody or began to struggle with them.  And EMS arrived on the scene about seven minutes after the officers handcuffed Hector.  After the struggle, the officers checked to make sure that Hector was still breathing and had a pulse, which he did.  This is not a case where officials ignored a serious medical need or

intentionally delayed medical care.  *Cf. Goebert*, 510 F.3d at 1329 (jail commander was deliberately indifferent when he intentionally delayed for one day, with "no good reason," authorizing medical care for an inmate with a serious medical need that was getting progressively worse); *Bozeman*, 422 F.3d at 1273 (finding a prison guard was deliberately indifferent when he failed "for fourteen minutes to check [an inmate who had stopped breathing's] condition, call for medical assistance, administer CPR or do anything else to help").  The officers' decision not to call EMS, who they knew was on the way, and update them on Hector's condition did not amount to deliberate indifference.  And they are entitled to qualified immunity on Plaintiffs' § 1983 Fourteenth Amendment claims.

## IV.  § 1983 Claims Against CCG

CCG only moves to dismiss Plaintiffs' claims against it on the basis that the officers' conduct did not violate Hector's constitutional rights.  For the reasons discussed above, a reasonable jury could conclude that the officers' actions violated Hector's Fourth Amendment right to be free from excessive force in the course of an arrest, but it could not conclude that the officers were deliberately indifferent to Hector's medical needs in violation of the Fourteenth Amendment.  Therefore, the Court grants CCG summary judgment on Plaintiffs' § 1983 Fourteenth Amendment claim against it but not on their § 1983 excessive force claim.

CONCLUSION

For the foregoing reasons, the Court grants in part and denies in part Defendants' motion for summary judgment (ECF No. 12).  The only claims remaining in this action are Plaintiffs' § 1983 excessive force claims against Officers Aguilar, Dudley, Evrard, and the CCG.

*OBITER DICTUM*

Whether Defendants appeal today's ruling should be of no concern to the Court.  But the Court is obliged to point out that the basis of its ruling casts doubt on the Court of Appeals jurisdiction over an interlocutory appeal.  The resolution of the qualified immunity issue here depends on whether sufficient evidence exists in the record from which a reasonable jury could conclude that the arrestee had ceased resisting at the time that he was subjected to potentially deadly force.  If he had, the officers are not entitled to qualified immunity on Plaintiffs' excessive force claims.  If he had not, they are.  A jury must resolve this factual dispute before the qualified immunity decision can be made.  As the Court understands the applicable law, qualified immunity decisions that depend upon the sufficiency of the evidence on an issue that is a factual predicate for such immunity may not be appealed through the interlocutory appeal process.  *See e.g., Koch v. Rugg*, 221 F.3d 1283, 1294-96 (11th Cir. 2000); *Co*t*trell v. Caldwell*, 85 F.3d 1480, 1484 (11th Cir.

1996)); *Dolihite v. Maughon ex rel. Videon*, 74 F.3d 1027, 1033 n.3 (11th Cir. 1996)); *Johnson v. Jones*, 515 U.S. 304, 313 (1995); and *Scott v. Gomez*, 792 F. App'x 749, 751-52 (11th Cir. 2019) (per curiam).  Of course, this Court has no jurisdiction to decide the jurisdiction of the Court of Appeals.  But because the nature of this Court's order may affect the Court of Appeals jurisdiction, the Court finds it appropriate to clarify the basis for its order, hoping that it is not viewed as inappropriate meddling.

IT IS SO ORDERED, this 3rd day of March, 2020.

S/Clay D. Land
CLAY D. LAND
CHIEF U.S. DISTRICT COURT JUDGE
MIDDLE DISTRICT OF GEORGIA