IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
COLUMBUS DIVISION

| | | |
|---|---|---|
| RODRIGO ARREOLA, as parent of Hector Arreola, Deceased, and as Personal Representative and Administrator of the Estate of Hector Arreola, CONCEPCION ARREOLA, as parent of Hector Arreola, and S.A., minor child of Hector Arreola, by next friend Jezreel Imee Custodio, | * * * * * * * * * | |
| Plaintiffs, | * * | |
| v. | * * | Civil Action File Number: 4:19-cv-00005-CDL |
| THE CONSOLIDATED GOVERNMENT OF COLUMBUS, GEORGIA, OFFICER MICHAEL AGUILAR, in his individual and official capacity, OFFICER BRIAN DUDLEY, in his individual and official capacity, OFFICER AARON EVRARD, in his individual and official capacity, | * * * * * * * * * * * * | |
| Defendants. | * | |

**DEFENDANTS' STATEMENT OF MATERIAL UNDISPUTED FACTS**

In accordance with Fed.R.Civ.P. 56 and Local Rule 56, The Consolidated Government of Columbus, Georgia ("CCG"), Officer Michael Aguilar, in his individual and official capacity ("Officer Aguilar"), Officer Brian Dudley, in his individual and official capacity ("Officer Dudley"), and Officer Aaron Evrard, in his individual and official capacity ("Officer Evrard"), submit this Statement of

1

Undisputed Material Facts in Support of their Renewed Motion for Summary Judgment, respectfully showing the Court the following:

## BACKGROUND UNDISPUTED FACTS

Discovery was bifurcated in this case and Defendants originally moved for summary judgment on constitutional issues and qualified immunity on November 8, 2019. The following facts were alleged as undisputed at that time, and Plaintiffs admitted they were undisputed. These are followed by additional undisputed facts relevant only to the present Renewed Motion for Summary Judgment.

A.   The Parties

1. Plaintiff Rodrigo Arreola is the father of Hector Arreola, deceased. [Pl's. Compl., ¶ 1].

2. Plaintiff Concepcion Arreola is the mother of Hector Arreola, deceased. [*Id.*, ¶ 2].

3. Plaintiff S.A. is the minor daughter of Hector Arreola, deceased. [*Id.*, ¶ 3].

4. Officer Michael Aguilar is a police officer employed by the Columbus Police Department, and he served in that capacity on January 9, 2017. [*Id.*, ¶ 13].

5. Officer Brian Dudley is a police officer employed by the Columbus Police Department, and he served in that capacity on January 9, 2017. [*Id.*, ¶ 14].

6. Officer Aaron Evrard is a police officer employed by the Columbus Police Department, and he served in that capacity on January 9, 2017. [*Id.*, ¶ 15].

7. Chief Richard T. Boren is the Chief of Police of the Columbus Police Department, and he served in that capacity on January 9, 2017. [*Id.*, ¶ 16].

8. The Columbus Consolidated Government is the governing body for Columbus, Muscogee County, Georgia. [*Id.*, ¶ 17].

B. The Events Leading Up to the Arrest

9. At approximately 3:40 a.m. on January 9, 2017, Hector Arreola contacted the Columbus Police Department via their 911 assistance system, to check on the welfare of his mother, Concepcion Arreola. [*Id.*, ¶¶ 20-21].

10. Officers Aguilar and Dudley were dispatched to 760 Moss Drive, found Concepcion Arreola to be fine, and then departed. [*Id.*, ¶ 22].

11. At approximately 4:55 a.m. on January 9, 2017, Hector Arreola placed another call to 911 requesting a welfare check on his mother, Concepcion Arreola. [*Id.*, ¶ 23].

12. Officers Aguilar and Dudley were again dispatched to 760 Moss Drive. [*Id.*, ¶ 22].

13. When Officers Aguilar and Dudley arrived at 760 Moss Drive, they encountered Hector Arreola at the residence. [Deposition of Michael Aguilar ("Aguilar Dep."), pp. 29:9-30:2].

14. Officer Aaron Evrard later responded to the location. [Deposition of Aaron Evrard ("Evrard Dep."), p. 21:9-16].

C. Training of Officers Aguilar, Dudley, and Evrard

15. Officers Aguilar, Dudley, and Evrard were all involved in the subsequent arrest of Mr. Arreola on January 9, 2017. [Aguilar Dep., pp. 29:9-30:2; Evrard Dep., p. 21:9-16].

16. Officer Aguilar received Crisis Intervention Training from the Columbus Police Department. [Aguilar Dep., p. 36:14-20].

17. Crisis Intervention Training trains officers to identify characteristics of people who could be having a mental health crisis. [*Id.*].

18. Officers Dudley and Evrard also completed Crisis Intervention Training from the Columbus Police Department. [Deposition of Brian Dudley ("Dudley Dep."), p. 61:13-20; Evrard Dep., p. 45:18-21].

19. Officers Aguilar, Dudley, and Evrard are all POST certified and have received extensive periodic training during their service as officers for the Columbus Police Department. [Aguilar Dep., Ex. 4; Dudley Dep., Ex. 5; Evrard Dep., Ex. 4].

20. Part of the in-service training received by Officer Aguilar, Officer Dudley, and Officer Evrard included training on the use of force. [Aguilar Dep., p. 62:16-23; Dudley Dep., p. 53:6-16; Evrard Dep., p. 48:6-20].

21. The in-service use of force training provided to Officers Aguilar, Dudley, and Evrard included training on excited delirium. [Aguilar Dep., p. 54:23-55:5; Dudley Dep., p. 64:3-64:11; Evrard Dep., p. 49:5-18].

22. The in-service use of force training provided to Officers Aguilar, Dudley, and Evrard included training on positional asphyxia. [Aguilar Dep., p. 56:23-57:5; Dudley Dep., p. 65:13-65:19; Evrard Dep., p. 50:3-50:11].

23. Officers Aguilar, Dudley, and Evrard were all trained by the Columbus Police Department on the use of force policy that was in effect by the Columbus Police Department on January 9, 2017. [Aguilar Dep., p. 61:14-62:1; Dudley Dep., p. 70:13-71:3; Evrard Dep., p. 52:24-53:13].

D.  The Arrest of Mr. Arreola

24. When Officers Dudley and Aguilar first encountered Mr. Arreola on January 9, 2017, "something seemed to be off with him." [Aguilar Dep., p. 30:3-4].

25. Mr. Arreola made statements about lights being on in his mother's house when there were none on, and made statements that people were "trying to get him." [Aguilar Dep., p. 30:3-8].

26. Officer Aguilar requested that EMS respond with no lights or sirens. [Aguilar Dep., p. 36:1-5].

27. Mr. Arreola accused Officers Aguilar and Dudley of not being real police officers. [Aguilar Dep., p. 34:23-25:2].

28. Mr. Arreola then went to a neighbor's house and began knocking on the door. [Aguilar Dep., p. 34:23-35:2].[1]

29. Officer Aguilar thought: "And my only thought on that is the fact that he's a mentally unstable person, he is seeing stuff that's not there, saying stuff like some people are there to possibly hurt him or his mother, which is the reason for the welfare check. So knowing that he's knocking on somebody's door, what's likely to happen? Somebody is going to open the door. Well, I don't want this mentally unstable person to knock on a door, then open it. He goes inside and then it's unknown if anybody else's life is in jeopardy. And I don't know if there's guns, knives, weapons inside the house." [Aguilar Dep, p. 33:7-19].

30. Officers Aguilar and Dudley asked Mr. Arreola to come down off the neighbor's porch to talk to them and warned him that if he did not do so, he could go to jail. [Dudley Dep., p. 29:7-13].

31. After Mr. Arreola refused their commands, Officers Aguilar and Dudley then attempted to grab Mr. Arreola's hands and arrest him for disorderly conduct. [Aguilar Dep., p. 33:20-34:1].

---

[1] Plaintiffs did not dispute this fact, but disputed the citation only. That error has been corrected.

32. When Officers Aguilar and Dudley attempted to grab Mr. Arreola's hands, a struggle began that took them all to the ground. [Dudley Dep., p. 29:14-30:2].

33. Officer Dudley described the struggle as follows:

Officer Aguilar and I went up there, approached him. Again, still trying to figure out what was going on. At that time, Officer Aguilar went to grab for Hector Arreola's right arm and Arreola immediately pulled away from Aguilar coming into my direction, which would be Hector Arreola's left side.

I grabbed his other hand and we attempted to get his hands behind his back. Once we both had his hands, we fell to the ground and that's when the struggle began. During that struggle, I can vividly remember Officer Aguilar telling me to maintain his lower body so that he couldn't get his knees under him so that he could stand back up.

At that time, I was still trying to grab the hand, get it behind his back. Officer Aguilar continued to try to get his hands behind his back and get a pair of cuffs on there. Somewhere in that struggle, I remember Officer Aguilar asking for units to come to the scene for further assistance.

I do remember – correction – his mother pleading to him, telling him to, you know, stop, stop, stop. And, again, that's telling Hector Arreola to stop, quit resisting.

[Dudley Dep.: 29:14-30-16].

34. Officer Aguilar described the struggle as follows:

And I will say this about the struggle, I mean, I've been a police officer for coming up on 10 years now. And the struggle I had with Mr. Arreola is by far the biggest struggle I've ever been in. I've been in struggles with other individuals that's been intoxicated and high on drugs. And up to this day, that's still the biggest struggle that I've had

7

just trying to get somebody in handcuffs.  Like I mean, I'm a bigger guy and I had no effect whatsoever, and it took two of us just to get him handcuffed.

[Aguilar Dep., pp. 40:22-41:7].

35.     Officers Aguilar and Dudley got Mr. Arreola in cuffs after an intense struggle.  [Dudley Dep., p. 31:1-7; Evrard Dep., pp. 21:24-22:11].[2]

36.     During the struggle, it was necessary for Officers Aguilar and Dudley to keep Mr. Arreola's arms spread out so he could not get off the ground.  [Dudley Dep., p. 30:3-7].

37.     According to Plaintiffs, Mr. Arreola was placed in handcuffs at 5:29:09, less than four minutes after the struggle began.  [Pl's. Compl., ¶ 56].

38.     Plaintiff Concepcion Arreola described the struggle as follows:

Q:     Okay.  And the two police officers, they're struggling with Hector to try and gain control of him and get him cuffed; is that right?

A:     Yes.

Q:     And do you remember Hector kicking and trying to get himself free?

A:     He wasn't kicking.  He was going to kick when the police – when he was on top of him.

Q:     And he's – and Hector's trying to get out from under them?

A:     Yes.

Q:     -- he's trying to get free?

---

[2] Plaintiffs admitted this fact in part, and the only part cited is the admitted part.

A:     Yes.

Q:     So he's resisting?

A:     Yes.

Q:     And it's big wrestling match?  I mean, it's pretty intense; right?

A:     Yes.

[Concepcion Dep., pp. 25:20-26:13].[3]

    38.     Plaintiff Concepcion further testified:

Q:     Throughout this – this struggle when they're trying to get him in cuffs and – we can agree that Hector was resisting their attempts to subdue him?

A:     Yes.

Q:     And he was ignoring theirs and your attempts to calm him down?

A:     Probably they didn't know then because he always claim he don't do anything wrong to get arrested.

Q:     Right.  But my question is a little different.  So they're – they're – the officers are telling Hector to calm down?

A:     Yes.

Q:     And he's not listening?  He's still fighting to get free?

A:     Yes.

[Concepcion Dep., p. 31:3-22].

---

[3]Plaintiffs admitted that Ms. Arreola provided the cited testimony.

9

39.     Once the leg shackles were placed on Mr. Arreola, he was searched and Officer Aguilar lifted Mr. Arreola and placed him in a seated position. [Evrard Dep., p. 26:1-13].[4]

40.     According to Plaintiffs, Mr. Arreola was patted down at 5:31:17 A.M., or just slightly more than six minutes after the struggle initially began, and then placed in a seated position at 5:33:03 A.M. [Pl's. Compl., ¶¶ 64, 67].

41.     EMS arrived at the Moss Drive address at 5:36:15 A.M. on January 9, 2017. [Deposition of James Brad Barnes ("Barnes Dep."), p. 68:13-21].

42.     EMS attended to Mr. Arreola eleven minutes after the struggle with Officers Aguilar and Dudley began. [Barnes Dep., p. 68:13-21].

43.     At the time Mr. Arreola was loaded into the ambulance, he had a pulse and was breathing. [Barnes Dep., p. 35:17-22].[5]

44.     In route to the Emergency Room, Mr. Arreola went into possible cardiac arrest and the ambulance pulled over and called for additional resources. [Barnes Dep., Ex. "3"].

45.     Mr. Arreola died on January 10, 2017. [Pl's. Compl., ¶ 84].

---

[4] This was admitted in part by Plaintiffs and only the admitted part is included.

[5] Plaintiffs admitted that the deposition testimony supported this statement.

**ADDITIONAL UNDISPUTED FACTS RELEVANT
TO RENEWED MOTION FOR SUMMARY JUDGMENT**

E.    The policies of the Columbus Police Department

46.    The Columbus Police Department conducts regular annual training of its police officers.  [Deposition of Lt. Tim Wynn ("Wynn Dep."), pp. 20:24-25:5].

47.    The Columbus Police Department is certified through the Commission on Accreditation of Law Enforcement Agencies ("CLEA").  [Deposition of Chief Richard Boren ("Boren Dep."), p. 27:9-25].

48.    CLEA sets best practices for law enforcement agencies and the Columbus Police Department implements them to retain their CLEA certification.  [Boren Dep., p. 29:3-12].

49.    Officers receive 22 hours of in-service training annually as POST guidelines require that amount of training to keep up a peace officer's certification through the Peace Officers Standards and Training.  [Wynn Dep., p. 21:13-22].

50.    The in-service training procedures of the Columbus Police Department for all officers, including Officers Dudley, Aguilar, and Evrard, was in place in 2016.  [Wynn Dep., p. 23:5-12].

51.    The curriculum for the in-service training was and is set by Lt. Wynn.  [Wynn Dep., p. 25:15-18].

52. The curriculum for in-service training continually changes "the way that society changes and that's the only way we can survive." [Wynn Dep., p. 28:13-17].

53. After Lt. Wynn sets the curriculum for the in-service training, the curriculum is approved by the Majors with the Columbus Police Department, and then ultimately by Chief of Police Richard Boren ("Chief Boren"). [Boren Dep., p. 25:6-20].

54. Officer Dudley completed his in-service training in 2016 on March 1, 2016. [Wynn Dep., p. 31:12-24].

55. Officer Aguilar completed his in-service training in 2016 on April 26, 2016. [Wynn Dep., p. 32:15-17].

56. Officer Evrard completed his in-service training in 2016 on March 8, 2016. [Wynn Dep., p. 32:20-25].

57. The in-service training provided by the Columbus Police Department included training on defensive tactics and sudden in custody death. [Wynn Dep., p. 40:11-17].

58. The in-service training provided by the Columbus Police Department included training on excited delirium. [Wynn Dep., pp. 48:23-49:16].

59. The in-service training provided by the Columbus Police Department included training on positional asphyxia. [Wynn Dep., p. 60:9-25].

60. Plaintiffs have admitted that "Officers Dudley, Aguilar, and Evrard were trained to watch for and detect the symptoms of compressional/positional asphyxia." [Pl's. Br. in Opp. to Def's. Mot. for Summary Judgment (Doc no. 22), p. 7.].

61. Plaintiffs have admitted that "it has become apparent through discovery that the officers were sufficiently trained with respect to positional/compressional asphyxia to pass constitutional muster." [Pl's. Br. in Opp. to Def's. Mot. for Summary Judgment (Doc no. 22), p. 13.].

62. Having reviewed the video of the arrest of Mr. Arreola, Lt. Wynn believes that the actions of Officers Dudley, Aguilar, and Evrard were in compliance with the polices of the Columbus Police Department on January 9, 2017. [Wynn Dep., p. 64:4-14].

63. Having reviewed the video of the arrest of Mr. Arreola, Chief Boren believes that the actions of Officers Dudley, Aguilar, and Evrard were in compliance with the polices of the Columbus Police Department on January 9, 2017. [Boren Dep., p. 37:4-20].

F.   <u>Mr. Arreola's Cause and Manner of Death</u>

64. Plaintiffs have identified Dr. Kris Sperry as an expert in this case on Mr. Arreola's cause and manner of death.

65. Dr. Sperry has opined that Mr. Arreola did not die of positional asphyxia and did not suffer from excited delirium. [Deposition of Dr. Kris Sperry ("Sperry Dep."), pp. 65:7-16; 97:17-19].[6]

66. Dr. Sperry opined that the police officers delayed in calling emergency medical services and that delay played a part in Mr. Arreola's death. [Sperry Dep., p. 44:1-9].

67. Dr. Sperry acknowledges that Mr. Arreola was under the influence of methamphetamine at the time of his struggle with the police. [Sperry Dep., pp. 46:6-47:13].

68. Dr. Sperry agrees that methamphetamine can cause sudden death, and he has seen "hundreds" of such cases through the years. [Sperry Dep., pp. 47:21-48:2].

69. The State Medical Examiner, Dr. Lora Darrisaw, has also testified that methamphetamine is a cardiotoxic drug that is a risk factor for sudden cardiac death. [Deposition of Dr. Lora Darrisaw ("Darrisaw Dep."), p. 97:11-17].

70. Dr. Darrisaw testified that Mr. Arreola had a "sudden cardiac death." [Darrisaw Dep., p. 102:17-22].

---

[6]Defendants reserve their right to challenge both the qualifications and opinions of Dr. Sperry, but will take his opinions at face value solely for purposes of the present Renewed Motion for Summary Judgment.

71. Dr. Sperry cannot rule out that methamphetamine toxicity was the cause of death of Mr. Arreola. [Sperry Dep., p. 47:14-20].

72. Dr. Sperry opines that Mr. Arreola's death was caused, in part, by gradual systemic acidosis and hypoxia as a result of an intense struggle with the police. [Sperry Dep., p. 42:8-22].

73. Dr. Sperry cannot testify at what point in the process of the struggle with law enforcement that Mr. Arreola become acidotic. [Sperry Dep., pp. 76:19-78:4; 78:19-79:2].

74. Dr. Sperry testified:

Q: What in your opinion caused the critical acidosis in Hector Arreola?

A: The physical exertion before the struggle, the struggle and the restraint, some element of hypoxia or inadequate oxygen exchange during the course of the restraint and I that those are, you know, those are the main elements, yes.

Q: Okay. And so those elements you've just listed, would you say that all of those taken together is what caused the critical acidosis?

A: Yes.

Q: All right. Are you able to tell me at any point during the struggle how much Hector Arreola's oxygen was decreased?

A: No.

[Sperry Dep., pp. 87:20-88:3].

75. Dr. Sperry cannot offer any opinion as to which officer injured Mr. Arreola. [Sperry Dep., p. 45:4-14].

76.     There is no evidence in this case as to the time when Mr. Arreola suffered a fatal injury, or which officer allegedly caused the fatal injury.

Respectfully submitted, this 7th day of August, 2020.

> PAGE, SCRANTOM, SPROUSE,
> TUCKER & FORD, P.C.
>
> By: /s/ Alan G. Snipes
> James C. Clark, Jr.
> Ga. State Bar No.: 127145
> jcc@psstf.com
> Alan G. Snipes
> Ga. State Bar No.: 665781
> ags@psstf.com
>
> Tyler C. Cashbaugh
> Ga. State Bar No.: 869622
> tcc@psstf.com
> 1111 Bay Avenue, Third Floor
> Columbus, Georgia 31901
> (706) 324-0251
>
>
> By: /s/ Clifton C. Fay
> Clifton C. Fay
> Georgia Bar No.: 256460
> Lucy T. Sheftall
> Georgia Bar No.: 639813
> P.O. Box 1340
> Columbus, Georgia 31902
>
> *Counsel for Defendants*

## CERTIFICATE OF SERVICE

I do hereby certify that I am counsel for Defendants and that on this date I served the foregoing document, Defendants' Defendants' Statement of Undisputed Facts through the Court's CM/ECF system, which will ensure delivery to the following::

>Mark C. Post
>Mark Post Law, LLC
>3 Bradley Park Ct., Ste. F
>Columbus, Georgia 31904
>mpost@markpostlaw.com

This 7th day of August, 2020.

>/s/ Alan G. Snipes
>*Counsel for Defendants*