IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
COLUMBUS DIVISION

RODRIGO ARREOLA, as parent     \*
of Hector Arreola, Deceased, and    \*
as Personal Representative and     \*
Administrator of the Estate of Hector  \*
Arreola, CONCEPCION ARREOLA,  \*
as parent of Hector Arreola, and S.A.,  \*
minor child of Hector Arreola, by   \*
next friend Jezreel Imee Custodio,   \*
                                \*
    Plaintiffs,              \*
                                  \*
v.                                \*    Civil Action File Number:
                                  \*    4:19-cv-00005-CDL
THE CONSOLIDATED        \*
GOVERNMENT OF COLUMBUS,  \*
GEORGIA, OFFICER MICHAEL   \*
AGUILAR, in his individual and   \*
official capacity, OFFICER BRIAN  \*
DUDLEY, in his individual and    \*
official capacity, OFFICER      \*
AARON EVRARD, in his individual  \*
and official capacity,          \*
                                  \*
    Defendants.             \*

## DEFENDANTS' BRIEF IN SUPPORT OF THEIR
## RENEWED MOTION FOR SUMMARY JUDGMENT

The Consolidated Government of Columbus, Georgia ("CCG"), Officer

Michael Aguilar, in his individual and official capacity ("Officer Aguilar"), Officer

Brian Dudley, in his individual and official capacity ("Officer Dudley"), and

Officer Aaron Evrard, in his individual and official capacity ("Officer Evrard")[1] file this Brief in Support of their Renewed Motion for Summary Judgment, respectfully showing the Court the following:

## **INTRODUCTION**

This is an excessive force case brought by the family of Hector Arreola, who died on January 10, 2017.  The night before, a deranged Mr. Arreola engaged in a violent struggle with Officers Aguilar, Dudley, and Evrard, after violating their verbal instructions, and then fighting, kicking, and resisting their efforts to place him in custody.  The tragedy is that Officers Aguilar, Dudley and Evrard, with the assistance of Mr. Arreola's own mother, tried to reason with Mr. Arreola to get him the help he needed, but Mr. Arreola refused their repeated pleas.

Discovery was bifurcated.   In the first phase, the parties engaged in discovery solely related to whether a constitutional violation occurred and whether qualified immunity applied.  The Court entered a summary judgment order dated March 3, 2020 [Doc. no. 30], in which the Court found that Officers Aguilar, Dudley, and Evrard were not deliberately indifferent to the medical needs of Mr. Arreola and were thus entitled to summary judgment on Plaintiffs' Fourteenth

---

[1]As recognized by the Court's summary judgment order dated March 3, 2020 [Doc. no. 30], Plaintiffs have withdrawn all claims against Richard T. Boren, and the Court has granted summary judgment to Richard T. Boren on these claims.  [Doc. no. 30, n. 1].   Plaintiffs have also withdrawn all state law claims against Defendants, and the Court has granted summary judgment on those claims.  [*Id.*].

Amendment claims.   [Doc. no. 30, p. 30].   The Court further found Officers Aguilar, Dudley, and Evrard were not liable for any Fourteenth Amendment excessive force claims, with the possible exception of an approximate two minute and fourteen second time period between the time when Mr. Arreola was handcuffed and the time leg shackles were applied.   [Doc. no. 30, p. 27].   With respect to that time period, *and that time period only*, there was potentially a question of fact for the jury to resolve.   [Id., p. 27].[2]

Because the parties bifurcated discovery, the Court's Order was, of course, based on what Plaintiffs said their case was about at that time.   That has, to say the least, changed dramatically.   Plaintiffs originally preserved their claims against the CCG, contending that they might uncover evidence of a custom or policy sufficient to impose liability under *Monell v. Department of Social Services of the City of New York*, 436 U.S.  658 (1978).   They have not, and summary judgment is due to be granted on all claims against the CCG.[3]

---

[2]According to this Court, "[i]t is primarily from the testimony of Hector's mother, which is admittedly inconsistent, but when she is given the benefit of favorable inferences, that testimony clearly supports the conclusion that Hector had ceased resisting at the time the handcuffs were applied.  And if a jury finds that in fact is what happened, then Defendants are not entitled to qualified immunity and a jury would be authorized to find that Hector's Fourth Amendment right to be free from excessive force was violated."  [Doc. no. 30, p. 27].

[3]This would, of course, also apply to all official capacity claims against Officers Aguilar, Dudley, and Evrard, as those claims are considered claims against their employer, the CCG.  *Kentucky v. Graham*, 473 U.S. 159, 165 (1985).

As to the individual capacity claims against Officers Aguilar, Dudley, and Evrard, Plaintiffs said that the evidence would show that "Hector suffered positional/compressional asphyxia during the arrest based on the pressure that officers applied to his back when they sat on him and dug their elbows/knees into his back." [Doc. no. 30, p. 9]. But Plaintiffs' own expert, Dr. Sperry, has now testified that Mr. Arreola *did not* die from positional asphyxia. [Deposition of Dr. Kris Sperry ("Sperry Dep."), p. 65:7-12]. Dr. Sperry instead opines that Mr. Arreola died, in part, from acidosis and hypoxia as a result of his "struggle" with law enforcement, but he cannot identify at what point during the "struggle" these medical conditions occurred. [*Id.*, p. 73:1-12]. He has no opinion on which police officer actually caused these medical conditions. [*Id.*, p. 82:3-10]. And he readily admits that Mr. Arreola's methamphetamine toxicity played a part in his death. [*Id.*, p. 45:21-23 ("It [methamphetamine] was part, you know, the -- of all the different factors there, yes. I mean it's present so it's, you know, inescapable.")].

Plaintiffs are therefore left with this case – they have no evidence of when Mr. Arreola suffered an injury that led to his death as a result of alleged excessive force. They instead have a "struggle," the vast majority of which the Court has deemed to be constitutional. [Doc. no. 30, p. 14 ("Here, Plaintiffs do not argue that the amount of force used *before* handcuffing was excessive. At that point, Hector was still resisting arrest and unrestrained."]. And, to make matters worse,

3

Plaintiffs cannot identify which police officer caused the alleged unconstitutional injury.  Their case is built entirely on speculation as to how the injury occurred, when the injury occurred, and who caused it.  That is not enough to raise an issue of fact for a jury to consider.

## SUMMARY OF FACTS

In accordance with Local Rule 56, Defendants have filed a Statement of Undisputed Material Facts in Support of their Motion for Summary Judgment ("SMF"), which is incorporated herein by reference.

## PROCEDURAL POSTURE

This Court entered a Scheduling and Discovery Order dated April 17, 2019, which allowed Defendants to file motions for summary judgment related to immunity and the alleged violation of Mr. Arreola's constitutional rights after the close of the initial bifurcated discovery period.  [Doc. no. 7, ¶ III(D)].  Defendants so moved, and this Court entered a summary judgment order on March 3, 2020, granting in part and denying in part Defendants' Motion for Summary Judgment. [Doc. no. 30].

On March 9, 2020, the Court entered a text order extending the second bifurcated discovery period, and ordering that any further motions for summary judgment be filed on or before July 10, 2020.  [Doc. no. 32].  That order was later

amended [Doc. no. 34], extending the summary judgment deadline until August 9, 2020.[4]  Defendants now move for summary judgment on all remaining claims.

## SUMMARY JUDGMENT STANDARD

Summary judgment shall be granted where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  An issue of fact is "material" if, under the applicable law, it might affect the outcome of the case, and an issue of fact is "genuine" if the record, taken as a whole, could lead a rational trier of fact to find for the non-moving party.  *Allen v. Tyson Foods*, 121 F.3d 642, 646 (11th Cir. 1997).  Summary judgment shall be granted against a party who fails to establish the existence of an element essential to their case, and on which that party bears the burden of proof.  *Allen v. Bd. of Public Educ. for Bibb Cnty.*, 495 F.3d 1306, 1313 (11th Cir. 2007).

## ARGUMENT AND CITATION OF AUTHORITY

### 1.    Claims Against the CCG:  No *Monell* Liability

The United States Supreme Court has placed strict limitations on municipal liability for constitutional claims.  There is no *respondeat superior* liability under Section 1983 making a municipality liable for the wrongful actions of its police

---

[4]The undersigned counsel for Defendants greatly appreciates the kind cooperation of Plaintiffs' counsel – and the Court – in extending the summary judgment deadline due to a COVID-19 related issue.

officers.  *See Monell*, *supra*, 436 U.S. at 691.  Instead, a municipality may only be held liable for the actions of a police officer when an "official policy or custom" causes a constitutional violation.  *Id.*  Plaintiffs accordingly bear the burden to "identify a municipal policy or custom that caused [the] injury."  *Gold v. City of Miami*, 151 F.3d 1346, 1350 (11th Cir. 1988) (internal quotation omitted) (*citing Board of County Com'rs v. Brown*, 520 U.S. 397 (1997)).

"It is only when the execution of the government's policy or custom…inflicts the injury that the municipality may be held liable under § 1983." *City of Canton v. Harris*, 489 U.S. 378, 385 (1989) (internal quotations omitted). To impose Section 1983 liability on the CCG, Plaintiffs must show: (1) that Mr. Arreola's constitutional rights were violated; (2) that the CCG had a custom or policy that constituted deliberate indifference to his constitutional rights; and (3) that the policy or custom caused the violation.  *McDowell v. Brown*, 392 F.3d 1283, 1289 (11th Cir. 2004) (*citing Canton, supra*, 489 U.S. at 388).

First, there is no evidence of an "official policy" to engage in excessive force promulgated by the CCG or any final policymaker of the Columbus Police Department.[5]  Instead, the evidence shows that the Columbus Police Department is certified through the Commission on Accreditation of Law Enforcement Agencies

---

[5]Defendants do not concede that Mr. Arreola suffered a constitutional violation. This Court has likewise found that there was no violation of Mr. Arreola's constitutional rights for the vast majority of the struggle.  [Doc. no. 30, p. 22].

("CLEA").   [SMF ¶ 47; Boren Dep., p. 27:9-25].   The department follows best practices for law enforcement agencies and establishes training protocols for all officers, including as to subjects such as excessive force, excited delirium, and positional asphyxia.   [SMF ¶¶ 49, 57-59; Wynn Dep., pp. 21:13-22; 40:11-17; 48:23-49:16; 60:9-25)].

There is simply no evidence in this case of any official policy that resulted in a violation of Mr. Arreola's constitutional rights.   In fact, Plaintiffs have admitted the contrary.   [*See*, *e.g.*, Doc. no. 22, Pl's. Br. in Opp. to Def's. Mot. for Summary Judgment, p. 13 ("Plaintiff withdraws the claim against Chief Boren as it has become apparent through discovery that the officers were sufficiently trained with respect to positional/compressional asphyxia to pass constitutional muster.")].   And the undisputed evidence likewise shows extensive training provided by the Columbus Police Department on the very issues Plaintiffs claim (or at least at one time clamed) this case was about.   To the extent Plaintiffs are attempting to establish *Monell* liability based on an official policy of the CCG, that claim fails. *See*, *e.g.*, *Gold*, *supra*, 151 F.3d at 1350 ("[A] municipality rarely will have an express written or oral policy of inadequately training or supervising its employees…).[6]

---

[6]To the extent Plaintiffs are arguing that the "official policy" that resulted in a violation of Mr. Arreola's constitutional rights is a failure to train, that claim fails. Plaintiffs have admitted that "Officers Dudley, Aguilar, and Evrard were trained to

Second, there is no evidence of any unofficial custom or practice that, though unwritten, has the force of law, and which resulted in a violation of Mr. Arreola's constitutional rights.    To prove Section 1983 liability against a municipality based on custom, a plaintiff must show a widespread practice that "although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a custom or usage with the force of law." *St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988) (internal quotations

---

watch for and detect the symptoms of compressional/positional asphyxia." [Pl's Br. in Opp. to Def's. Mot. for Summary Judgment, Doc no. 22, p. 7; *see also id.*, p. 13].  Plaintiffs' admissions and the undisputed evidence regarding the training received by Officers Aguilar, Dudley, and Evrard [SMF ¶¶ 50-59] affirmatively show that the CCG's policies regarding training were not deliberately indifferent to the constitutional rights of Mr. Arreola:

> We hold today that the inadequacy of police training may serve as the basis for § 1983 liability only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact. This rule is most consistent with our admonition ... that a municipality can be liable under § 1983 only where its policies are the "moving force [behind] the constitutional violation." Only where a municipality's failure to train its employees in a relevant respect evidences a "deliberate indifference" to the rights of its inhabitants can such a shortcoming be properly thought of as a city "policy or custom" that is actionable under § 1983.... "[M]unicipal liability under § 1983 attaches where-and only where-a deliberate choice to follow a course of action is made from among various alternatives" by city policymakers. Only where a failure to train reflects a "deliberate" or "conscious" choice by a municipality-a "policy" as defined by our prior cases-can a city be liable for such a failure under § 1983.

*City of Canton, supra*, 489 U.S. at 388-89 (internal citations omitted).

omitted).   In cases of alleged municipal "inaction" (to the extent that is what Plaintiffs are alleging), a municipality's failure to correct the constitutionally offensive actions of its employees can rise to the level of a custom or policy "if the municipality tacitly authorizes these actions or displays deliberate indifference" towards the misconduct.  *Griffin v. City of Opa-Locka*, 261 F.3d 1295, 1308 (11th Cir. 2001).

Proof of such permanent and well-settled customs is not easy.   "It is generally necessary to show a persistent and widespread practice. Moreover, actual or constructive knowledge of such customs must be attributed to the governing body of the municipality. Normally random acts or isolated incidents are insufficient to establish a custom or policy." *Church v. City of Huntsville*, 30 F.3d 1332, 1345 (11th Cir. 1994) (*quoting Depew v. City of St. Marys,* 787 F.2d 1496, 1499 (11th Cir.1986)).

There is no evidence that the CCG has approved of any unconstitutional policy or custom that resulted in a violation of Mr. Arreola's constitutional rights. This case is instead the classic alleged unofficial custom or policy case where the Plaintiffs have failed to show that a custom or policy was "the moving force [behind] the constitutional violation." *Grech v. Clayton Cty., Ga.*, 335 F.3d 1326, 1330 (11th Cir. 2003).  Plaintiffs are apparently arguing that Mr. Arreola died while in the custody of the Columbus Police Department and that, alone, is enough to

potentially impose municipal liability.   But "[p]roof of a single incident of unconstitutional activity is not sufficient to impose liability against a municipality."   *Craig v. Floyd Cty., Ga.*, 643 F.3d 1306, 1310 (11th Cir. 2011) (*quoting City of Okla. City v. Tuttle*, 471 U.S. 808, 823–24 (1985)); *see also McDowell*, supra, 392 F.3d at 1290-91 (finding no *Monell* liability where inmate pointed to one incident where the jail's alleged under-staffing led to an inability to transport an inmate in need of medical attention).

In this case, there is no evidence of any misconduct in the past by Officers Aguilar, Dudley, and Evrard, or any other Columbus Police Department officers for that matter. This is no evidence of any prior similar incidents even remotely similar to Mr. Arreola's death.  And, both Lt. Wynn and Chief Boren have plainly testified that the actions of Officers Aguilar, Dudley, and Evrard were entirely in compliance with the policies of the Columbus Police Department.  [SMF ¶¶ 62, 63; Wynn Dep., p. 64:4-14; Boren Dep., p. 37:4-20].  Plaintiffs have not, and cannot, show a custom or practice by the CCG that was a moving force behind any constitutional violation that Mr. Arreola allegedly suffered.  The Motion for Summary Judgment of the CCG and Officers Aguilar, Dudley, and Evrard in their official capacities is due to be **GRANTED**.

2.    __Individual Capacity Claims Against Officers – No Proof of Causation__

In the first round of summary judgment briefing, Plaintiffs represented to the Court, and the Court accepted, that this was a positional/compressional asphyxia case.  As the Court noted in its prior summary judgment order:

> Because the parties bifurcated discovery, causation is not an issue for purposes of the present motion.  But, Plaintiffs expect the evidence to show that Hector suffered positional/compressional asphyxia during the arrest based on the pressure that officers applied to his back when they sat on him and dug their elbows/knees into his back.  Plaintiffs contend that, as a result, there was an oxygen deficiency, known as hypoxia, in Hector's blood which led to brain damage and eventual cardiac and respiratory arrest.

> They argue that Hector was suffering from a condition known as "excited delirium" on the night of his death, which can be brought on my mental illness, narcotics use, or a combination of these factors.  Plaintiffs assert that applying weight to the back and/or neck of individuals in this state can often lead to sudden death by hypoxia, especially after an intense struggle.

[Doc. no. 30, pp. 9-10].

Plaintiffs subsequently identified Dr. Kris Sperry as their expert on medical causation issues and the parties have conducted discovery related to those issues.  To say the least, Dr. Sperry's testimony paints a far different picture about this case than the one Plaintiffs previously asserted to the Court.

Mr. Arreola did not suffer compressional/positional asphyxia on January 9, 2017.[7]  Mr. Arreola did not suffer from excited delirium either.[8]  Dr. Sperry cannot rule out that methamphetamine was the cause of Mr. Arreola's death.[9]  He cannot say at what point during the struggle with the police officers that Mr. Arreola's condition became grave, even though the Court has already determined that the force used before Mr. Arreola was handcuffed did not constitute a constitutional violation [Doc. no. 30, p. 14].[10]  And Dr. Sperry cannot tell the Court which officer engaged in any conduct that caused injury to Mr. Arreola.[11]

---

[7]Q:   Right.  But I want to make – to be real clear though about your opinions and what I'm referring to as positional asphyxia.  And you believe that Hector Arreola did not die from positional asphyxia, right?
 A:   Correct.

[SMF ¶ 65; Sperry Dep., p. 65:7-10].

[8]Q:   Do you believe that Hector Arreola suffered from excited delirium?
 A:   No.

[SMF ¶ 65; Sperry Dep., p. 97:17-19].

[9]Q:   It's a reasonable possibility that methamphetamine contributed to his death, correct?
  A:   Yes.

[SMF ¶ 71: Sperry Dep., p. 47:17-20].

[10]Q:   All right.  Are you able to tell me at any point during the struggle how much Hector Arreola's oxygen was decreased?
 A:   No.

[SMF ¶ 74; Sperry Dep., pp. 87:25-88:3].

"The Constitution is the substantive fuel powering § 1983, but its mechanical structure is similar to the common law of Torts." *Dixon v. Burke Cnty, Ga.*, 303 F.3d 1271, 1275 (11th Cir. 2002). "As with any common law tort, Plaintiffs must establish an adequate causal link between the alleged harm and the alleged unlawful conduct." *Id.* (*citing Barts v. Joyner*, 865 F.2d 1187, 1195-96 (11th Cir. 1989)). That is, defendants in Section 1983 cases are, as in common law tort cases, only responsible for the natural and foreseeable consequences of their actions. *Malley v. Briggs*, 475 U.S. 335, 344-45, n.7 (1986). That inquiry focuses on two elements:

> Under traditional tort principles, causation has two required elements: cause-in-fact and legal or proximate cause. *See* W. Page Keeton, et al., *Prosser and Keeton on the Law of Torts,* §§ 41–42, at 263–80 (5th ed.1984). A plaintiff must first show that the constitutional tort was a cause-in-fact of the injuries and damages claimed. To establish cause-in-fact, the plaintiff must show that except for the constitutional tort, such injuries and damages would not have occurred. *Id.* Secondly, a plaintiff must show that the constitutional tort was the legal or proximate cause of the injuries and damages claimed. An act or omission is a legal or proximate cause of a plaintiff's injuries or damages if it appears from the evidence that the injury or damage was a reasonably foreseeable consequence of the act or omission. *Id.*

---

[11]Q:   All right.  Am I correct to assume that you are not offering any opinion as to which of the three officers involved specifically caused any damage to Hector Arreola?

  A:   Correct.  I'm not.  Yeah, I'm not offering an opinion about anyone specific officer in relation – as opposed to the other two.

[SMF, ¶ 75; Sperry Dep., p. 45:4-10].

*Jackson v. Sauls*, 206 F.3d 1156, 1168, n.16 (11th Cir. 2000).

State law governs the question of causation in a Section 1983 case. 42 U.S.C. § 1988; *Williams v. Bennett*, 689 F.2d 1370, 1389 (11th Cir. 1982) ("Alabama law governs the definition of proximate cause in this case."). Under Georgia state law, where medical questions are raised as to causation, it must be proven that to a reasonable degree of medical certainty, the injury complained of was the result of the tortfeasor's negligent or reckless act. *Anthony v. Chambliss*, 231 Ga. App. 657, 659, 500 S.E.2d 402, 404 (1988). "[W]hen medical questions are raised in such a case, expert evidence is required because the proximate cause of a decedent's death is not one of those matters which jurors [can] be credited with knowing by reason of common knowledge." *Cowart v. Widener*, 296 Ga. App. 712, 714, 675 S.E.2d 591, 594 (2009) (granting summary judgment to the defendants on causation grounds in an ordinary negligence case where the plaintiff's medical evidence only showed a "possible" cause of death).

Proving causation consequently requires more than speculation and guesswork. This principle is perhaps best seen in the Eleventh Circuit's decision in *Mann v. Taser Int'l., Inc.*, 588 F.3d 1291 (2009). There, the plaintiffs brought a death case based on excessive force claims against a municipality, and also brought state law claims against the manufacturer of the Taser. In affirming the grant of summary judgment in favor the defendant manufacturer, the Eleventh Circuit held:

14

Dr. Gowitt opined in his February 2007 report that Melinda's death was caused by "excited delirium." Although he suggests a long list of aggravating factors, nowhere does he state that the use of the Taser was a cause or a contributing cause of death based upon reasonable medical certainty. This was repeated in Dr. Gowitt's deposition of June 27, 2007, wherein he confirmed that in his opinion Melinda's death was caused by "excited delirium." He also discussed the dangers involved with repeated use of methamphetamine and how that can lead to "excited delirium." Dr. Gowitt did opine that the use of the Taser probably made the situation worse, but that simply falls short of the requirements of law.

Georgia law is clear that medical causation must come from expert testimony and must provide a causal connection that is "more than a mere chance or speculation" *Anthony v. Chambless,* 231 Ga. App. 657, 500 S.E.2d 402, 404 (1998). Plaintiffs' evidence fails to meet the causation standard required by Georgia law. Although Plaintiffs correctly contend that there may be more than one cause of an injury, Plaintiffs have provided no admissible evidence to support their claim that use of the Taser caused Melinda's death. Since Plaintiff has failed to make a sufficient showing on an essential element with respect to which they have the burden of proof, summary judgment is appropriate. *See Celotex,* 477 U.S. at 322–23, 106 S.Ct. at 2552.

*Mann*, 588 F.3d at 1304.

With these legal standards in mind, consider the facts of this case. In its prior summary judgment order, the Court construed the body-cam video of the incident in the light most favorable to the Plaintiffs. [Doc. no. 30, pp. 5-7]. Construed in that light, the Court found that the struggle between Mr. Arreola and Officers Aguilar and Dudley began at 5:25 a.m. [*Id.*, p. 5]. Officers Aguilar and Dudley were able to get both handcuffs secured at 5:29:03 a.m. [*Id.*, p. 6]. Officer Evrard arrived approximately sixty seconds later, and his video showed a seven

second image in which Officer Aguilar was on the lower back/rear end of Mr. Arreola, and Officer Dudley had a knee digging into Mr. Arreola's back.  [*Id.*, p. 7].   Officer Dudley then went to get leg shackles from his car and left the immediate scene.  [*Id.*].  When he returned, the leg shackles were applied, and the officers rolled Mr. Arreola to his side at approximately 5:31:17 a.m.  [*Id.*, p. 8].[12]

Under the Court's construction of the facts, considered in light of Dr. Sperry's testimony, it is apparent that Plaintiffs cannot prove causation.  First, as to Officer Dudley, the facts show that he wasn't even there during the relevant time period.[13]  As the Court has previously found, when Officer Evrard arrived at the scene, Officer Dudley went back to his car to get leg irons.  [Doc. no. 30, p. 7].  The *only* time period in which the Court has noted any involvement of Officer Dudley is in the roughly seven-second image recorded on Officer Evrard's body cam as he approached.  But, even according to the Court's favorable construction

---

[12]As it was required to do, the Court construed the body-cam video in the light most favorable to the Plaintiffs in the prior summary judgment order.  Defendants reserve the right to challenge the favorable inferences given to the Plaintiffs' evidence in the event this matter proceeds to trial.

[13]The Court found that no excessive force was used during the part of the struggle that began at 5:25 a.m. up until the time handcuffs were applied at 5:29:18 a.m. [Doc. no. 30, p. 6].  The Court likewise granted summary judgment as to all Fourteenth Amendment deliberate indifference to medical needs claims for the time period after this two minute and fourteen second period.  [*Id.*, p. 27]. The only issue of fact potentially remaining in this case concerns the approximately "to-minute-and-fourteen second time span after he was handcuffed…."  [*Id.*, p. 22].

of the facts for Plaintiffs, Officer Dudley's entire involvement lasted all of *seven seconds*.  Whether viewed from the perspective of causation or qualified immunity, surely Officer Dudley is afforded seven seconds to disengage from a violent struggle with a suspect.   *See*, *e.g.*, *Graham v. Conner*, 490 U.S. 386, 396-97 (1989) (holding that excessive force claims must be viewed "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.").

As to Officers Aguilar and Evrard (and Dudley, to the extent the Court determines he had involvement), Plaintiffs have not proven how any of their actions caused the death of Mr. Arreola.[14]   Dr. Sperry cannot rule out that methamphetamine toxicity was the case of death of Mr. Arreola.  [SMF ¶ 71; Sperry Dep., p. 47:14-20].[15]  He has no opinion as to which officer actually injured Mr. Arreola.  [SMF ¶ 75; Sperry Dep., p. 45:4-14].  He likewise cannot testify at what point in the process of the "struggle" that Mr. Arreola's condition became

---

[14]Defendants recognize that *Priester v. City of Riviera Beach*, 208 F.3d 919 (11th Cir. 2000) recognized potential liability for a police officer who fails to intervene when another officer uses excessive force, but that liability "only arises when the officer is in a position to intervene and fails to do so."  *Priester*, 208 F.3d at 924. There is no evidence that Officers Aguilar, Dudley, or Evrard had an opportunity to intervene to prevent the use of excessive force during the relevant time period. And, again, Officer Dudley wasn't even there.

[15]Dr. Sperry agrees that methamphetamine can cause sudden death, and that he has seen "hundreds" of such cases through the years.  [SMF ¶ 68; Sperry Dep., pp. 47:21-48:2].

critical.  [SMF ¶ 73; Sperry Dep., pp. 76:19-78:4; 78:19-79:2].   He just lumps it all together:

> Q:     What in your opinion caused the critical acidosis in Hector Arreola?
>
> A:     The physical exertion before the struggle, the struggle and the restraint, some element of hypoxia or inadequate oxygen exchange during the course of the restraint and I that those are, you know, those are the main elements, yes.
>
> Q:     Okay.  And so those elements you've just listed, would you say that all of those taken together is what caused the critical acidosis?
>
> A:     Yes.
>
> Q:     All right.  Are you able to tell me at any point during the struggle how much Hector Arreola's oxygen was decreased?
>
> A:     No.

[SMF ¶ 74, Sperry Dep., pp. 87:20-88:3].   The *best* Dr. Sperry could do (from Plaintiffs' standpoint) was to testify that "during the course of being restrained, the officers at different times were on his body, on his chest…"  [Sperry Dep., p. 60:15-20].  He cannot, however, testify as to who, what, or when.[16]

The net result is that the question of causation is left wholly to speculation. Without any evidence as to which officer caused the alleged injury, a jury would

---

[16]Dr. Sperry likewise opined that the police officers delayed in calling emergency medical services and that delay played a part in Mr. Arreola's death.  [SMF ¶ 66, Sperry Dep., p. 44:1-9].   Of course, this Court has already granted summary judgment on those claims.  [Doc. no. 30, pp. 27-30].

18

be forced to speculate as to which officer, if any, caused the injury.  And, even worse, a jury would be forced to speculate as to at what point in the "struggle" the injury occurred, even though the Court has already found that the "struggle" prior to Mr. Arreola being handcuffed passed constitutional muster, as did the actions of the police officers after leg shackles were applied.  This case, like *Mann*, rests causation wholly on chance and speculation, and that is not enough to give rise to a jury question.  *Mann*, 588 F.3d at 1304.[17]

The law is clear that "[f]or damages to be proximately caused by a constitutional tort, a plaintiff must show that, except for that constitutional tort, such injuries and damages would not have occurred and further that such injuries and damages were the reasonably foreseeable consequences of the tortious acts or omissions in issue."  *Sauls,* 206 F.3d at 1168.  Plaintiffs cannot meet this standard and the Motion for Summary Judgment of Officers Aguilar, Dudley, and Evrard, in their individual capacities, is due to be **GRANTED**.

---

[17]Defendants acknowledge that in Dr. Sperry's expert report, he did opine to a reasonable degree of medical certainty that Mr. Arreola did not die of methamphetamine toxicity [Sperry Dep., Ex. "4"], as the doctor in *Mann* apparently did not do.  In his deposition, however, Dr. Sperry made clear that Mr. Arreola's methamphetamine use was a contributing factor in Mr. Arreola's death. [Sperry Dep., p. 45:21-23 ("I mean it's present so it's, you know, inescapable.")]. But irrespective of those backsteps, Dr. Sperry admits he cannot testify who caused Mr. Arreola's injuries or when they occurred.  That makes this case just like *Mann*, where a jury could only speculate whether any injury sustained by Mr. Arreola was casually connected to an unconstitutional act of excessive force, who caused that injury, and whether that injury occurred during the relevant time period.

Respectfully submitted, this 7th day of August, 2020.

PAGE, SCRANTOM, SPROUSE,
TUCKER & FORD, P.C.

By: /s/ Alan G. Snipes
  James C. Clark, Jr.
  Ga. State Bar No.: 127145
  jcc@psstf.com
  Alan G. Snipes
  Ga. State Bar No.: 665781
  ags@psstf.com
  Tyler C. Cashbaugh
  Ga. State Bar No.: 869622
  tcc@psstf.com
  1111 Bay Avenue, Third Floor
  Columbus, Georgia 31901
  (706) 324-0251

By: /s/ Clifton C. Fay
  Clifton C. Fay
  Georgia Bar No.: 256460
  Lucy T. Sheftall
  Georgia Bar No.: 639813
  P.O. Box 1340
  Columbus, Georgia 31902

*Counsel for Defendants*

## **CERTIFICATE OF SERVICE**

I do hereby certify that I am counsel for Defendants and that on this date I served the foregoing document, Defendants' Brief in Support of Motion for Summary Judgment through the Court's CM/ECF system, which will ensure delivery to the following:

> Mark C. Post
> Mark Post Law, LLC
> 3 Bradley Park Ct., Ste. F
> Columbus, Georgia 31904
> mpost@markpostlaw.com

This 7th day of August, 2020.

> /s/ Alan G. Snipes
> *Counsel for Defendants*

21