DEPOSITION OF: LT. TIM WYNN 6-18-2020

SHEET 1   PAGE 1

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
COLUMBUS DIVISION

RODRIGO ARREOLA, as parent of ) CASE NO.:
Hector Arreola, Deceased, and ) 4:19-CV-00005-CDL
as Personal Representative )
and Administrator of the )
Estate of Hector Arreola, )
CONCEPCION ARREOLA, as parent )
of Hector Arreola and S.A., )
minor child of Hector Arreola )
by next friend Jezreel Imee )
Custodio, )
          Plaintiffs, )
 )
 )
v. )
 )
THE CONSOLIDATED GOVERNMENT OF)
COLUMBUS, GEORGIA, OFFICER )
MICHAEL AGUILAR, in his )
individual and official )
capacity, OFFICER BRIAN DUDLEY)
in his individual and official)
capacity, OFFICER AARON )
EVRARD, in his individual and )
official capacity, and )
COLUMBUS POLICE DEPARTMENT )
CHIEF OF POLICE RICHARD T. )
BOREN, in his individual and )
official capacity, )
          Defendants, )

     The deposition of LT. TIM WYNN, taken by the
Plaintiff, before Russell D. Anderson, a Georgia
Certified Court Reporter, at Page, Scrantom,
Sprouse, Tucker & Ford, 1111 Bay Avenue, Third
Floor, Columbus, Georgia, 31901, on the 18th of
June, 2020, beginning at 10:00 A.M.

PAGE 2

A P P E A R A N C E S

FOR THE PLAINTIFF:
     HON. MARK POST
     3 Bradley Park Court, Suite F
     Columbus, Georgia, 31904
     mpost@markpostlaw.com

FOR THE DEFENDANTS:
     HON. TYLER CASHBAUGH
     HON. ALAN SNIPES
     HON. JAMES C. CLARK, JR.
     3rd Floor, Synovus Building
     Bay Avenue
     Columbus, Georgia, 31902
     tcashbaugh@psstf.com
     ags@psstf.com
     jcc@psstf.com

     RUSSELL D. ANDERSON, COURT REPORTER
          P.  O. BOX 2572
          COLUMBUS, GEORGIA  31902-2572
               (706) 905-1759

PAGE 3

D I S C L O S U R E

STATE OF GEORGIA
COUNTY OF MUSCOGEE

          Deposition of: LT. TIM WYNN

     Pursuant to Article 8.B of the rules and
regulations of the Board of Court Reporting of
the Judicial Council of Georgia, I make the
following disclosure:
     I am a Georgia Certified Court Reporter.  I
am here as a sole practitioner of ANDERSON COURT
REPORTING.
     I was contacted by the Plaintiff to provide
court reporting services for the deposition.
     I will not be taking this deposition under
any contract that is prohibited by O.C.G.A.
15-14-37 (a) and (b).
     I have no contract / agreement to provide
reporting services with any party to the case,
any counsel in the case, or any reporter or
reporting agency from whom a referral might have
been made to cover this deposition.  I will
charge my usual and customary rates to all
parties in the case, and a financial discount
will not be given to any party to this
litigation.

_____, CCR# B-403
RUSSELL D. ANDERSON
Certified Court Reporter

OPTIONAL SIGNATURES:

_____ Date:_____
Attorney for Plaintiff/Complainant

_____ Date:_____
Attorney for Defendant/Respondent

PAGE 4

STIPULATIONS

     IT IS STIPULATED AND AGREED, by and between
the parties through their respective counsel that
the deposition of LT. TIM WYNN, may be
taken before Russell D. Anderson, a Georgia
Certified Court Reporter, at 1111 Bay Avenue,
Third Floor, Columbus, Georgia, on the 18th of
June, 2020, beginning at 10:00 P.M.
     IT IS STIPULATED AND AGREED, that the
signature and reading of the deposition by the
witness is not waived, the deposition to have the
same force and effect as if full compliance had
been had with all laws and rules of court
relating to the taking of depositions.
     IT IS FURTHER STIPULATED AND AGREED, that it
shall not be necessary for any objections to be
made by counsel to any questions, except as to
the form of the question and that counsel for the
parties may make objections and assign grounds at
the time of trial, or at the time said deposition
is offered in evidence, or prior thereto.
     IT IS FURTHER STIPULATED AND AGREED, that
notice of filing of the deposition by the court
reporter is waived.

DEPOSITION OF: LT. TIM WYNN  6-18-2020

SHEET 2    PAGE 5

1                    INDEX
2                                         PAGE
3  Examination by Mr. Post ............... 7
4  Certificate of Reporter .............. 104
5                INDEX OF EXHIBITS
6  Plaintiff's Exhibit 2 ................. 20
7  Plaintiff's Exhibit 3 ................. 28
8  Plaintiff's Exhibit 4 ................. 35
9  Plaintiff's Exhibit 5 ................ 100

PAGE 7

```
 1     Q.   Tell us your full name, Lieutenant.
 2     A.   Timothy Frank Wynn.
 3     Q.   How old are you?
 4     A.   I'm 56.
 5     Q.   Have you given a deposition before?
 6     A.   I have.
 7     Q.   Okay.  So obviously you know you're
 8  under oath here today?
 9     A.   That's correct.
10     Q.   And you know this is just as important
11  as a jury trial, correct, sir?
12     A.   Yes, sir.
13     Q.   All right.  Some lawyers have a bad
14  habit of interrupting the witness before they
15  finish answering the question.  Sometimes
16  witnesses will do it to lawyers.  If you would
17  please, sir, do the best that you can to let me
18  finish asking you the question before you answer
19  and I'll try to do the same with you; is that
20  okay?
21     A.   That's good.
22     Q.   Okay.  Do you have any trouble with
23  your hearing, Lieutenant?
24     A.   I do not.
25     Q.   Okay.
```

PAGE 6

```
 1               D-E-P-O-S-I-T-I-O-N
 2              LIEUTENANT TIMOTHY WYNN
 3        having been first duly sworn, testified
 4                    as follows:
 5                 CROSS-EXAMINATION
 6  BY MR. POST:
 7     Q.   This will be -- well, if you would
 8  please tell us your name and your rank?
 9     A.   Tim Wynn, I'm a lieutenant.
10     Q.   All right, sir.
11     MR. POST:  This will be the deposition
12  of Lieutenant Tim Wynn taken by the
13  Plaintiffs for the purposes of discovery and
14  all other purposes allowed by law.  The
15  deposition is taken by agreement of counsel
16  and pursuant to notice.
17        I'm assuming, Alan, that all objections
18  -- that you intend to reserve all objections
19  except for those going to the form of the
20  question and responsiveness of the answer?
21  Is that your intentions?  Is that agreeable
22  to you?
23     MR. SNIPES:  That's agreeable.
24     MR. POST:  All right.
25  BY MR. POST:
```

PAGE 8

```
 1     A.   Not that I'm aware of anyway so.
 2     Q.   Well, if for some reason you think you
 3  didn't completely hear a question, just ask me to
 4  repeat it.  Don't answer, just call it to my
 5  attention.  Because I'm going to assume that you
 6  heard the complete question if you answer it,
 7  okay?  And answer out loud for our Court Reporter
 8  if you would, please.  Are you suffering from any
 9  physical or mental condition which would
10  interfere with your ability to testify fully and
11  truthfully today?
12     A.   No.
13     Q.   Have you taken any drugs or alcohol
14  that would cause you to be unable to testify
15  fully and truthfully today?
16     A.   Diet Coke is about as hard as I get.
17     Q.   I've got you, that would be a no.  What
18  materials have you reviewed to prepare for this
19  deposition?
20     A.   I just looked over some lesson plans
21  that we had during this time frame.
22     Q.   Do you have them there with you?
23     A.   I do.
24     Q.   Okay.  Can I see what we're talking
25  about just generally?
```

DEPOSITION OF: LT. TIM WYNN  6-18-2020

SHEET 3  PAGE 9

```
1        A.   Yes, sir.  I believe it's the lesson
2  plan from -- this is from use of force, 7/16.
3  It's a PowerPoint lesson plan and I have our
4  policy here and I have some other things here
5  with Taser.
6        Q.   Good.  Okay.  Good, good.  We'll take a
7  look at those as needed.  I requested a few
8  things in the Notice of Deposition, I see that
9  Counsel down there has -- appears to have them, I
10 suspect.
11       MR. CASHBAUGH:  I will tell you, Mark,
12       that we did not get the interoffice -- let's
13       see, CPD interoffice directive manual
14       because according to the CPD that would
15       involve pulling emails off different
16       department head's computers and there is no
17       way we're going to do that by the time for
18       the deposition today.
19       MR. POST:  I've got you.  Not much of a
20       manual, is it?  I understand.  A lot of this
21       will be directed toward the Chief anyway.
22       Maybe the training division, operating
23       procedures will be something I could ask the
24       lieutenant about.
25 BY MR. POST:
```

PAGE 10

```
1        Q.   Okay.  Where do you live, Lieutenant?
2        A.   Here in Columbus.
3        Q.   Okay.  What is the section of town, I
4  don't need an address?
5        A.   I live off north end.
6        Q.   Okay.  Do you rent or own?
7        A.   I own.
8        Q.   Are you married?
9        A.   Yes.
10       Q.   What is your wife's name?
11       A.   Why is that pertinent to this?
12       Q.   Because I may have to pick a jury in
13 this case?
14       A.   I'm sorry, what now?
15       Q.   I may have to pick a jury in this case
16 so --
17       A.   Okay.
18       Q.   -- I'm going to ask you some personal
19 information but if for some reason it goes out to
20 court then those things would be redacted.
21       A.   Okay.
22       Q.   Blocked out.  And I'm going to try and
23 limit it, because I understand that you don't
24 love --
25       A.   In the day and time you understand why
```

PAGE 11

```
1  I'm asking that so.
2        Q.   I didn't like it 15 or 20 years ago.
3        A.   Yes, sir.
4        Q.   So but in these types of proceedings we
5  do ask.
6        A.   It's Joani.
7        Q.   Okay, J-O-N-I?
8        A.   J-O-A-N-I.  Well, it's Joan actually,
9  her real name is Joan, so.
10       Q.   Okay.  What's her occupation?
11       A.   He's a major at the Sheriff's
12 Department.
13       Q.   All right.  Is she planning to retire
14 any time soon?
15       A.   Probably in December, we'll see.
16       Q.   You understood my question clearly.
17       A.   Yes, sir.
18       Q.   Do you have any children, Lieutenant?
19       A.   We do not.  Unless you count my Boxer.
20       Q.   That might count.  Do you attend
21 church?
22       A.   We do.
23       Q.   Where do you go to church?
24       A.   Cascade Hills.
25       Q.   Do you have any brothers or sisters?
```

PAGE 12

```
1        A.   I do.  Two -- well, three brothers, one
2  is deceased, two sisters.
3        Q.   Where do they live?
4        A.   They're kind of scattered all over.
5  Two of my brothers live, one lives in Phenix City
6  over in Seale, one lives here in Columbus.  One
7  of my sisters lives in Jackson, the other lives
8  in Oklahoma City and the other one is deceased.
9  My other brother is.
10       Q.   I've got you.  So let me ask you about
11 your brothers, since they're kind of in the area.
12 What do they do for a living?
13       A.   One owns his own business, he's
14 self-employed, the other one is a RN.
15       Q.   Where at?
16       A.   Martin Army.
17       Q.   And the self-employed, what kind of
18 self-employment is that?
19       A.   He does cleaning, it's a cleaning
20 business.  Commercial.
21       Q.   Is it located here in Columbus or
22 Phenix City?
23       A.   Yes, sir, here.
24       Q.   What is the name of the business?
25       A.   JussaWynn.
```

DEPOSITION OF: LT. TIM WYNN  6-18-2020

SHEET 4  PAGE 13

1    Q.    W-Y-N-N, is that --
2    A.    J-U-S-S-A-W-Y-N-N, yes.
3    Q.    Okay.
4    A.    It's pretty catchy.
5    Q.    Not bad.  Where did you go -- did you
6  go to high school here in Columbus?
7    A.    Jordan.
8    Q.    What education past high school do you
9  have?
10   A.    A BS.
11   Q.    From where?
12   A.    Georgia Southwestern State.
13   Q.    What year did you graduate?
14   A.    '87.
15   Q.    What's the BS in?
16   A.    Education.
17   Q.    So you did end up being an educator
18 after all, didn't you?
19   A.    Well, things happen sometimes.
20   Q.    Just prior to -- well, when did you get
21 hired by CPD?
22   A.    The official date is April of '88 I
23 believe it was either -- I think it's the 18th of
24 April '88.
25   Q.    Have you worked continuously for the

PAGE 14

1  Police Department since then?
2    A.    I have.
3    Q.    All right.  What was your employment
4  just prior to being hired by the Columbus Police
5  Department?
6    A.    I worked at UPS.
7    Q.    Since you left patrol -- I assume you
8  were in patrol at some point, correct?
9    A.    Yes, sir.
10   Q.    After you left patrol can you kind of
11 give us a description of your rise through the
12 ranks?
13   A.    I was in patrol for my first, I guess
14 four years or so.  Well, I was in patrol actually
15 for a year, I went to motors.  I was in motors
16 for three, went to training for a couple, came
17 back to motors.  I stayed in motors until I guess
18 '04, '03-04 I think it was, I got promoted to
19 sergeant.  I went back to training for
20 approximately four or five years and -- yeah
21 about five years and then I went back to motors
22 and I was in motors up till maybe 2000 -- don't
23 hold me to this 2008, 2009.  I was there until I
24 got promoted to lieutenant and I've been in
25 training ever since.

PAGE 15

1    Q.    And when you say motors, you mean the
2  motor squad, right?
3    A.    That's correct.
4    Q.    Are you friends with or do you
5  socialize with, I think he's probably be promoted
6  to sergeant by now, Aaron Evrard?
7    A.    I know Aaron, I don't socialize.  I
8  mean, we've been to events.  I'm friends with
9  him, I guess through professional
10 -- professionally.  He's a good man, enjoys
11 -- he's enjoyable to be around.  He's a good guy.
12 I met his wife, I met his kids but we don't
13 hangout or we're not bosom buddies, but I
14 consider him a friend, yes.
15   Q.    Is he a sergeant now?
16   A.    No, I don't think he's got promoted to
17 sergeant.
18   Q.    He was study for it last time I talked
19 to him.
20   A.    Yes, he -- I don't think he's made
21 sergeant yet.
22   Q.    What -- the same question to you about
23 Officer Brian Dudley, he might be a corporal by
24 now, I'm not sure about him really?
25   A.    Yes, sir.  The same through

PAGE 16

1  -- professionally through training and through
2  contact with the department I've got to know him.
3  And I consider all my comrades I work with
4  friends.  I probably spend more time with them
5  than I do my own family so.
6    Q.    And what I'm looking for obviously is
7  if you're -- if you hang out with these guys?
8    A.    No, sir.  I don't hang out with them
9  socially, no.
10   Q.    Okay.  And the answer would be the same
11 for Officer Michael Aguilar and Officer Ronnie
12 Oaks; is that right?
13   A.    That's correct.  Yes.  I trained -- and
14 I've been around Ronnie probably a little bit
15 more because I trained him from when he went to
16 motor so.  You know, you kind of -- when you get
17 in that school, you kind of get a little bit
18 closer to him because you're -- well, it's kind
19 of a bond there.  You know, a former motor
20 officers and all, we kind of share a kind of a
21 different relationship as far as closeness.  But
22 no, I don't hang out with him.  He's totally
23 -- he's young enough to be my son so I don't
24 hangout with him, no.
25   Q.    And just briefly, for somebody that

DEPOSITION OF: LT. TIM WYNN  6-18-2020

SHEET 5  PAGE 17

1  doesn't know what the motor squad is that might
2  read this later, can you tell us what that is?
3      A.    Motor, it's our motorcycle unit.  We
4  are a traffic unit which our primary function is
5  fatality crash investigation, dignitary details
6  and things of this nature.  It's a squad when
7  it's full made up of about 22 people.
8      Q.    Which CPD officers or chain of command
9  do you actually socialize with, if any?
10     A.    Me?
11     Q.    Right.
12     A.    Probably my training division is
13  probably the most I socialize with.  But I'm
14  going to be honest with you, I really don't
15  socialize.  I don't drink, I don't -- I have
16  friends that I care about and I love them like
17  they're my family my training guys, we have a
18  close relationship.  We work closely together and
19  like I said, that group there I do spend more
20  time there than I do with my family so.
21     Q.    Who is in the training division now?
22     A.    I've got sergeant Buddy Taft -- well,
23  we just lost Sergeant Mike Skinner, he left and
24  went to go work for the Federal Government.  We
25  have Mike Patton, he's a sergeant over my in-

PAGE 18

1  service.  Sergeant June Reeves, she's over our
2  recruiting coordinator.  I have Corporal Sam
3  -- Samantha Phillips and Corporal Murray White.
4  I have some part-timers that work every day just
5  part-time, they're senior officers so.
6      Q.    All right.  Tell us what your job title
7  is if you would, please, sir?
8      A.    I'm a training director, lieutenant,
9  training director.
10     Q.    Okay.  In the training division is the
11  that what you call it?
12     A.    Yes, sir.
13     Q.    Who is your immediate supervisor?
14     A.    Captain Bill Rawn, R-A-W-N?
15     Q.    You said you've been the lieutenant in
16  the training division since 2008, 2009 or
17  something like that?
18     A.    No.  No, I was promoted to lieutenant
19  in 2013, July, July -- maybe first of August.
20     Q.    Okay.
21     A.    End of July, first of August, I can't
22  remember the exact date.
23     Q.    Prior to that you were a sergeant in
24  the training division, right?
25     A.    I was a sergeant in motors.  I got

PAGE 19

1  moved to training when I got promoted to
2  lieutenant.
3      Q.    Okay.  Who trained you to be a trainer?
4      A.    Quite a few places, I've been to NTOA
5  has trained me, GPSTC, Georgia Public Safety
6  Training Center.
7      Q.    Go slow because he can't get all that
8  down, I'm betting.  Say that again?
9      A.    National Tactical Officer's
10  Association, I've been to schools there.  I've
11  been through schools, the NRA.  Most of my
12  training has been gained through GPSTC, Georgia
13  Public Safety Training Center in Forsyth.  And
14  I've had a class at IPTN down in Jacksonville,
15  Florida, Institute for Police Technology and
16  Management.  That's where I got my motorcycle
17  instructor certification.  There may be more but
18  I just -- they're not coming to mind right now.
19     Q.    Okay.  What were your duties and
20  responsibilities in 2016, 2017?
21     A.    I was in the training division.
22     Q.    What are your responsibilities and
23  duties in the training division?
24     A.    My responsibilities is to oversee all
25  the training, to make sure that the

PAGE 20

1  certifications for each officer are kept up, all
2  the certifications as well as the certifications
3  that need to be -- the officers in my division
4  that need to be re-certified and basically Meet
5  POST standards to keep our officers certified.
6      Q.    I'm going to mark and show you
7  Plaintiff's Exhibit Number 2 here, which is CCG
8  3215 through -- 3215 through 16 and 3218 through
9  3231, which is essentially starts with the
10  Columbus Police Department Mission Statement and
11  has some of the organization, administration and
12  functional responsibilities in that.  And we may
13  talk about some of your responsibilities that are
14  contained in this, but this -- the lawyers for
15  the Defense have provided the entire policy
16  manual to me.  We use these little CCG numbers
17  for reference.
18     A.    Yes.
19     MR. POST:  Do you want to see this,
20  Alan?
21     MR. SNIPES:  No, you can just show it
22  to him.
23  BY MR. POST:
24     Q.    There's a list of required annual
25  training annual training as a policy of the

DEPOSITION OF: LT. TIM WYNN  6-18-2020

SHEET 6   PAGE 21

1 Columbus Police Department and a couple of those
2 things on that list are deadly force and use of
3 force and legal updates; is that right?
4       A.   Yes, sir.  That's mandated through the
5 Governor's initiative through POST.  Yes, sir.
6       Q.   And that's included in the Columbus
7 Police Department's policy, you do it every year,
8 right?
9       A.   In our annual in-service training.
10 Yes, sir, we do.
11       Q.   And that was going to be my next
12 question, what is in-service training?
13       A.   In-service training, POST guidelines
14 requires us to have 22 hours annually to keep up
15 a peace officer's certification through Peace
16 Officer Standards and Training and that's
17 mandated by the State of Georgia.  Back in 2000,
18 probably around maybe a little before 2007 or 8,
19 the Governor's initiative, that was one of the
20 things that was dictated that we had, that was
21 mandated for us to do is use of force and it's a
22 mandated class that's required.
23       And of course, as time goes on the
24 initiatives have -- they have added different
25 things to the Governor's initiative and this is

PAGE 22

1 mandated through POST.
2       Q.   I'm just going to show this to you;
3 it's CCG 3315 which starts on CCG 3314, which is
4 policy number 2-10.3.  I think on the back is a
5 list, at least as of what was effected in January
6 of 2017 of the mandated training.
7       MR. POST:  Do you want to look at,
8 Alan?
9       THE WITNESS:  These are things that are
10 -- some of this is reading assignments as
11 well, and it's basically a policy refresher.
12 And this is -- these are things that are
13 reading assignments that are posted in here
14 and it's for officers, they read through the
15 -- it's actually in the handouts of in-
16 service and it's like an update so to speak.
17 BY MR. POST:
18       Q.   Okay.  And in 2016 you did all of these
19 things for the in-service; is that accurate?
20       A.   If this is from '16, yes, sir.  This
21 would have been the reading assignments, it's
22 either done through in-service training, it could
23 be done from a standpoint of a reading and the
24 actual reading where the officers go to the
25 briefings and these could have been done from

PAGE 23

1 several -- it could have been done from Power DMS
2 where they had to sign for it, there are several
3 ways they could have gotten the training from
4 this.  Yes, these are updates.
5       Q.   Okay.  And whatever was in the policy
6 and in the effective policy for 2016 on through
7 until the next in-service, that's what you would
8 have trained in 2016, right?
9       A.   Yes, sir.  If it's showing in there as
10 part of the training I can't pull it from total
11 recall.
12       Q.   Right, right.
13       A.   But from here, yes, sir, it should have
14 been.  Yes, sir.
15       Q.   Okay.  Because if it's policy and it
16 says do it annually then that's an order and
17 that's what you do, correct?
18       A.   Well, if this is what we're required to
19 do, we're going to have to do, that's correct.
20       Q.   Okay.  And the training division, when
21 in-service training is completed successfully by
22 the particular officer reports the successful
23 completion of the in-service to POST; correct,
24 that's part of your job?
25       A.   That's correct.  Yes.  What they have

PAGE 24

1 to do, they have a roster, the roster is sent and
2 we have the criteria on file.
3       Q.   Okay.  How did you establish the
4 training curriculum for in- service training in
5 2016?
6       A.   Aside from the mandated training, what
7 we have is a -- we have an in-service committee
8 meeting and it's the officers throughout the
9 department where we -- different portions of the
10 department have so many come in from patrol
11 services, supervisors.  We have some captains,
12 lieutenants, we'll have some sergeants, we'll
13 some come in from the detective division, maybe
14 one from a support unit and maybe one from admin,
15 all of us are from the administrative unit so we
16 get together and what we do is we go around the
17 room and they have a list, a laundry list of
18 things that they would like to see in in-service
19 training.
20       Well, aside from the mandated training that
21 we have which pretty is -- pretty much takes up
22 the bulk of in-service training, we go through
23 and we look at subject matter that we could place
24 in there that is a need for our department to
25 better assist our guys, so to speak where the

DEPOSITION OF: LT. TIM WYNN  6-18-2020

SHEET 7  PAGE 25

1 rubber meets the road.  Because if they're having
2 problems with something out there we try to
3 provide that training to make it easier -- an
4 easier adjustment while they're on there tour of
5 duty so.
6     Q.   So you listened to what is said then
7 you make a decision as to what is needed and put
8 that in the training; is that fair to say?
9     A.   Well, I am the director but now it's
10 not just -- I believe in collective, my whole
11 unit, involving my whole unit in what they think
12 and what was brought to the table by the
13 officers, and we try to meet that need if
14 possible.  Yes.
15    Q.   But the ultimate decision on what the
16 curriculum is, is yours; is that right?
17    A.   Well, I take it to my chain of command,
18 then of course they'll stamp it.
19    Q.   Okay.  And who would you take it to?
20    A.   My captain and major and it would be
21 taken to the staff.
22    Q.   And who was your captain in 2016?
23    A.   I'm not sure if it was Major Blackmon
24 or Jim Pope.  It would have been right there,
25 pretty close change there so it could have been

PAGE 26

1 Major Freddie Blackmon --
2     Q.   Okay.
3     A.   -- or Jim Pope and he's since retired.
4     Q.   Okay.  Did Jim Pope retire as a
5 captain?
6     A.   He did.
7     Q.   Did the mandated training in 2016
8 change any in 2017?
9     A.   I'm sure it would have changed.  What
10 are you referring to?  What training?
11    A.   Well, any of the mandated training.  Do
12 you think that there were substantial changes
13 from 2016 to 2017?
14    A.   Mr. Post, I don't remember.  I know
15 they have different things there, they do change
16 but as far as the use of force, the firearms, or
17 use of force, use of deadly force, firearms,
18 domestic violence those have been on the books
19 for a while.  They've changed it to community
20 oriented policing, cultural diversity and I mean,
21 the policing was another initiative that was
22 added in and it's constantly evolving.  So I
23 don't remember what years they were actually
24 unless I look at the actual schedule.
25    Q.   But the deadly force and use of force

PAGE 27

1 training has been mandate and substantially the
2 same for five or ten years; is that fair to say?
3     A.   Oh, I would say -- it would be fairly
4 safe to say yes.  I know it's been longer than
5 five, yes, sir.
6     Q.   Okay.  What is the purpose of in-
7 service training for Columbus Police Department
8 officers or what was the purpose back in 2016
9 other than POST hours?
10    A.   Okay.  I'm not get getting your
11 question on that one.
12    Q.   Well, what I'm getting at, I'm assuming
13 the training is approved by the chain of command,
14 including the chief; is that right?
15    A.   That's correct.
16    Q.   Okay.  And so for the training I guess
17 there is a determination of what the best
18 practices and procedures for your officers are;
19 is that correct?
20    A.   Yes, sir.  We -- that's why we have
21 repetitive training when we -- our staff, we're
22 require -- I require all my folks to go back and
23 get different disciplines and what I mean by this
24 is, he may have alert which is taught by the
25 federal government, teach a class and you get to

PAGE 28

1 open another window maybe, you see things from a
2 different angle, maybe cutting edge stuff that
3 you can add that is going to benefit our officers
4 in situations that we didn't see or we didn't use
5 at one point that may better them as far as
6 applying whatever they need to apply to make
7 their job more convenient, to make it easier and
8 to make things run smoother.
9     Q.   So what you're teaching is essentially
10 best practices and policies for the department so
11 your officers will actually -- you put those into
12 use; is that right?
13    A.   That's correct.  This job is ever
14 evolving and you can't just go to a class and
15 expect ten years later it be the same.  We have
16 to continuously change the way that society
17 changes and that's the only way we can survive.
18    Q.   Now I want to show you the training
19 schedules for 2015 through 2017 that I received
20 from Counsel, which will be Plaintiff's Exhibit
21 Number 3 I'm handing you.  I've got a copy for
22 you this time.
23         MR. SNIPES:  I know what that is.
24 BY MR. POST:
25    Q.   Do you see Plaintiff's Exhibit 3 which

DEPOSITION OF: LT. TIM WYNN  6-18-2020

SHEET 8  PAGE 29

1 is CCG 4542 -- excuse me, 4540 through 4542?
2    A.   Okay.  Looking at the number on the
3 bottom, yes, sir.
4    Q.   Yeah.  I think it might be turned over
5 --
6    A.   Yes, I see it.  Yes, sir.
7    Q.   -- the wrong way.  It appears to be
8 training schedules for 2015, 2016 and 2017?
9    A.   That's correct.  Yes, sir.
10    Q.   Okay.  And did you prepare these
11 training schedules or have them prepared for you?
12    A.   Yes, sir.  Our in-service coordinator
13 would have done it.  They -- we come up with the
14 subject matter and they place it into the
15 schedule and I look at it and we take it before
16 the staff and they approve it.
17    Q.   Okay.  And I'm specifically looking at
18 the in-service training schedule for 2016.
19    A.   Yes, sir.
20    Q.   And is that the one you used for 2016?
21    A.   If this is what was sent to you, yes,
22 sir.  I would say that I -- I'm not going to say
23 that I remember what -- in 2016 exactly what we
24 had on there, but this depicts it, it appears to
25 be accurate.  Yes, sir.

PAGE 30

1    Q.   Okay.  And you would have trained the
2 use of force?
3    A.   Yes, sir.
4    Q.   And legal updates in 2016 as required,
5 correct?
6    A.   Yes, sir.  We would have.
7    Q.   And I'm going to set this over here so
8 we don't lose it at the end.
9    A.   Yes, sir.
10    Q.   I'm going to show you three things
11 which we have already put into evidence
12 previously or into deposition previously, so I'm
13 not going to mark them and put them in again, but
14 CCG 1819 through 1822 was Exhibit 6 in Officer
15 Dudley's deposition.  I'm going to show that to
16 you.
17    A.   What is this?
18    Q.   Well, that's what I'm going to ask you.
19 It says, "Welcome.  CPD training."  What do
20 these documents reflect, well with this specific
21 document 1819 through 1822; what does that tell
22 us?
23    A.   It looks like training records where it
24 shows 2016 in-service, 22 hours.
25    Q.   Okay.  And that's what the training

PAGE 31

1 division reports to, I guess administration; is
2 that accurate?
3    A.   These hours, once you do your in-
4 service and complete it successfully, it is then
5 -- we are -- we do a scan.  We used to do it with
6 a score sheet that you had to fill out, it was
7 one of those automated sheets that you had to
8 send to POST and then they did it.  Now we do it
9 with class rosters and it is signed by the
10 officers upon completion of in-service training
11 and then it's sent to POST.
12    Q.   Okay.  So you all send them in and this
13 is a list of the in-service training and some
14 other things completed by Officer Dudley; this
15 particular document?
16    A.   That's what this appears to be, yes,
17 sir.
18    Q.   Okay.  And that appears to show that
19 Officer Dudley completed his in-service training
20 in 2016 on what date?  I think I may have
21 highlighted it there for you?
22    A.   Yes, it's showing March 1st.
23    Q.   Okay.  March 1st of 2016?
24    A.   Yes, sir.
25    Q.   Okay.  And when was the -- what was

PAGE 32

1 date for his in-service training in 2017; would
2 you tell us that?
3    A.   It was in April -- let's see April
4 11th.
5    Q.   Okay.  All right.  So we'll refer back
6 to Exhibit 6 in Officer Dudley's deposition for
7 that if we need it.  And I'm going to show you
8 what was marked as Exhibit 5 in Officer Aguilar's
9 deposition which is essentially the same thing.
10 Exhibit 5 in Officer Aguilar's deposition which
11 is CCG 1813 through CCG 1818 appears to reflect
12 his in-service training for the years of 2016 and
13 2017; is that right?
14    A.   That's correct.
15    Q.   Okay.  Can you tell us when Officer
16 Aguilar received his in-service training in 2016?
17    A.   I'm showing April 26th of 2016.
18    Q.   Okay, what about 2017?
19    A.   May 18 of 2017.
20    Q.   And the same with -- I guess it's
21 Corporal Evrard, which is which was Exhibit 5 in
22 his deposition, CCG 1823 through 1829?
23    A.   It's showing he went in March of 2016,
24 March 8th of 2016 and then do you need the '17 as
25 well?

DEPOSITION OF: LT. TIM WYNN  6-18-2020

SHEET 9  PAGE 33

```
 1      Q.   Please.
 2      A.   September 19 of 2017.
 3      Q.   Okay.  So those would be the dates of
 4  in-service training for Officer or Corporal
 5  Evrard in 2016 and 2017; is that right?
 6      A.   As the records show, yes, I would say
 7  that would be accurate.
 8      Q.   Okay.  As far as you know the records
 9  for -- in the Columbus Police Department are
10  accurate, right?
11      A.   That's correct.  Yes, sir, as far as I
12  know.
13      Q.   So the training listed on the training
14  schedule we looked at just a moment ago on
15  Plaintiff's Exhibit 3 for 2016, would be the
16  training that the three officers I mentioned
17  received in 2016, correct?
18      A.   Well, that's what the sheets indicate,
19  yes, sir.  I'm not going to say that I can recall
20  that from memory, but yes, sir.  That's what is
21  indicated on the sheet, yes, sir.
22      Q.   And that's why you keep records --
23      A.   Yes, sir.
24      Q.   -- is that right?
25      A.   That's correct.
```

PAGE 34

```
 1      Q.   Okay.  And a you don't have any reason
 2  to believe that the records are wrong?
 3      A.   No, sir.
 4      Q.   Or were submitted incorrectly or
 5  anything, do you?
 6      A.   No, sir.
 7      Q.   Okay.  Now, I know you looked at, I
 8  think part of what you said you reviewed for
 9  today is the use of force issues for the 2016 in-
10  service; is that correct?
11      A.   I just kind of glanced at it, but
12  that's one that I did, yes, sir.
13      Q.   Okay.
14      A.   That's my lesson plan.
15      Q.   And I received this through discovery
16  marked as CCG 1753 through CCG 1811 -- excuse me,
17  1812, does yours have the little numbers stamped
18  on it there?
19      A.   It does 1812?
20      Q.   Yes, sir.  I think that's the last page
21  I have.
22      A.   That's correct.  Yes, sir.
23      Q.   And I'm going to ask you some questions
24  about it, but this will be Plaintiff's Exhibit 4.
25  And I think I've got to flipped mine and hand the
```

PAGE 35

```
 1  plaintiff's exhibits to Mr. Snipes if he wants
 2  it.
 3           MR. POST:  Do you don't this?
 4           MR. SNIPES:  Yeah, please.
 5  BY MR. POST:
 6      Q.   And we'll refer to the one that you
 7  have, that will probably work.  Now, this
 8  document, Plaintiff's Exhibit 4 CCG 1753 through
 9  1812, is the approved curriculum for the
10  training, the use of force training that you used
11  in 2016 for every officer that attended; is that
12  correct?
13      A.   Now the portion of that I -- of mine is
14  -- let me see here.  The in-service would have
15  been through 1781, 1753 to 1781 would have been
16  what I covered in the in-service training.
17      Q.   1781, is that what you said?
18      A.   That's correct.
19      Q.   1781.
20      A.   Now, these things that are here when we
21  cover the taser we cover some of the other stuff
22  in the taser portion of it, that is covered by
23  --
24      Q.   Is it 1781 or 1783?
25      A.   I'm showing --
```

PAGE 36

```
 1      Q.   Because I'm seeing on 1784 it says head
 2  instructor Michael Skinner?
 3      A.   It may be 1783, yes, sir.
 4      Q.   Okay.
 5      A.   Yes, 1783, I'm sorry.
 6      Q.   All right.  So 1753 through 1783 was
 7  approved curriculum that you taught in 2016 in-
 8  service, right?
 9      A.   Yes, sir.  I'm trying to look and see
10  right here, let me look at something real quick.
11      Q.   Sure.
12      A.   I believe this is a double print on the
13  back, if you look back in here I'll show you.
14      Q.   There seems to be a lot of the same
15  thing on 1782 and 1783 --
16      A.   Yes, sir.
17      Q.   -- that was already in some of the
18  materials just prior to that?
19      A.   Yes, sir.  That would be part of it
20  though, it had all of this in there.  Yes, sir.
21  So that would be accurate, yes, sir.
22      Q.   Okay.  And I see on 1753 it says date
23  prepared January 18, 2016 and then it has a blank
24  for approved by and date approved?
25      A.   Yes.
```

DEPOSITION OF: LT. TIM WYNN  6-18-2020

SHEET 10  PAGE 37

```
 1     Q.   What I received was not signed by
 2 anyone.
 3     A.   No, that would have been me.  That
 4 would have been me.
 5     Q.   You would have signed the approved?
 6     A.   Yes, sir.
 7     Q.   Okay.  And prior to you signing the
 8 approval did you send it up the chain of command
 9 to your superior and all of the way on up to the
10 chief or did you just sign it first or what?
11     A.   We covered this and I look over it and
12 I have others look over it.  We all kind of sit
13 together at a round table and we cover what we're
14 going to do.  We do it collectively as a division
15 and then of course, it comes directly to me and I
16 go from there with it.  Yes, sir.
17     Q.   At the end of the day you approved it?
18     A.   That's correct.
19     Q.   As lieutenant.  And but what I guess
20 I'm trying to get at, is does it go to your
21 higher ups for approval or are you the decision
22 maker, the policy maker?
23     A.   We show it to our majors and they see
24 the stuff, yes, sir.  But we cover what we're
25 doing, but I pretty much approve this.
```

PAGE 38

```
 1     Q.   Okay.  So you're the one that
 2 ultimately decides what you're going to train as
 3 far as the --
 4     A.   The materials.
 5     Q.   -- practices and the material and that
 6 sort of thing than?
 7     A.   And it's through the agency.  No, now
 8 the chief will have the final say on anything we
 9 do, I want you to understand that.  I don't
10 control the department, I'm just a little head,
11 so.
12     Q.   But the chief has the authority to
13 delegate certain things to his officers and to
14 his chain of command and that sort of thing
15 because obviously he can't make every decision?
16     A.   That's right.  Yes, sir.
17     Q.   And I'm just trying to figure out who
18 makes the decision  then?
19     A.   As far as the material in here, I'm the
20 one that made the -- did the material in this
21 lesson plan here.
22     Q.   Okay.
23     A.   But yes, sir, it was collectively from
24 our division.
25     Q.   And you're not doing anything wrong,
```

PAGE 39

```
 1 you have the authority from the department to
 2 make these policy and procedures decisions?
 3     A.   I make recommendations and of course,
 4 it goes to the staff after that.  I don't have
 5 -- no, I don't have the ability to make -- I have
 6 some abilities but when it comes to department
 7 workings, that comes from the boss.  The chief on
 8 down to the staff, yes.
 9     Q.   So I guess what I'm getting at, do you
10 have to go to the chief and get specific approval
11 for what you're training?
12     A.   What we do is when we have our in-
13 service committee meeting we get together
14 collectively like I mentioned.
15     Q.   Who is --
16     A.   The same officers I told you earlier
17 that is in my training division.
18     Q.   Okay.
19     A.   The sergeants and we make up our list
20 of what we want to do once we get input from the
21 officers.  We collectively make our list, send
22 this through the chain of command and get
23 approval from the chief and the command staff.
24     Q.   Okay.
25     A.   And then we come back and we make our
```

PAGE 40

```
 1 lesson plans and we put it in there the stuff
 2 that we have been trained on.
 3     Q.   Okay.  So the chief and the command
 4 staff, they ultimately approve what you submit to
 5 them?
 6     A.   That's correct.
 7     Q.   Okay.  And that's what happened in 2016
 8 and that's what always happens, correct?
 9     A.   That's the way it's happened every
10 year, yes, sir, so.
11     Q.   All right.  So we'll come back to what
12 you taught in-service.  But I've also received,
13 as you can see the Defensive Tactics, Sudden In
14 Custody Death, it says head instructor Michael
15 Skinner on page CCG 1784 and that runs all
16 through 1812?
17     A.   Yes, sir.
18     Q.   And so what is that?
19     A.   What is --
20     Q.   What is this Defensive Tactics and
21 Sudden In Custody Death cover?
22     A.   What we have cover here is we cover
23 behavior (inaudible) and things of excited
24 delirium and folks that are under the influence
25 of a stimulate or hallucinogenic drug, and it
```

DEPOSITION OF: LT. TIM WYNN 6-18-2020

SHEET 11 PAGE 41

1 kind of gives cues and things to watch for and
2 kinds of -- kind of gives the officer a working
3 knowledge of things you may face when you come
4 out to a call. Because honestly when you go to a
5 call you don't know what you're going to deal
6 with until you get there. Someone's acting
7 bizarre, they're acting strange, they acting
8 -- we try to give them cues on things to look for
9 so you can try to make the situation as -- you
10 want to try to do things that's going to make the
11 situation as best as possible. A lot of times
12 when you're dealing with things it just kind of
13 shows you things that folks that excited delerium
14 is a medical emergency and we try to have
15 protocols to do that.
16     Q.   Okay. And I'm going come back and
17 touch on that in a minute. But this defensive
18 tactics sudden in custody death, was that part of
19 the in-service or was that some other training
20 that these officers received in 2016?
21     A.   These are things that are in the taser,
22 when we do our taser research we have briefings
23 where we do taser research and these are things
24 that we touch on when we're doing the -- we have
25 to an annual re-certification. These are things

PAGE 42

1 that we cover when you're doing our taser.
2     Q.   Okay.
3     A.   We cover our policy in there.
4     Q.   And how do you tell whether a
5 particular police officer received this training
6 from instructor Sergeants Michael Skinner?
7     A.   I'm sorry, what now?
8     Q.   How do you tell that an officer
9 received this training?
10     A.   It would be in the actual syllabus of
11 the class, the 22 hours that you saw there.
12     Q.   Okay. And where are the syllabuses
13 located, do you know? Do you have one? Oh, you
14 mean on the training schedule?
15     A.   Schedule. Yes, sir.
16     Q.   Okay.
17     A.   Taser and pistol re-qualification, it's
18 there. We cover the taser portion.
19     Q.   Okay. So all three of the police
20 officers, Corporal Evrard, then Officer Evrard,
21 Officer Dudley and Officer Aguilar received this
22 training?
23     A.   And they have in the past received it
24 when they received their taser. We cover these
25 things and when you cover the defensive tactics

PAGE 43

1 portion this is -- this -- when any time we cover
2 tactics and this could have been from the taser
3 training, whatever the case may be we always
4 cover defensive tactics we cover the in custody
5 deaths due to the fact that there is so many
6 things that when you're dealing with someone
7 that's under the influence of a stimulate,
8 hallucinogenic drug or maybe off their
9 medication, that can happen.
10     And it's a -- we try to give the officers
11 every advantage we can as possibly dealing with
12 these people that are under the influence so we
13 can try to make the situation as best as
14 possible. Of course, it's not going to always
15 work out for us, but we try to do things and take
16 precautions as best we can.
17     Q.   So the three officers that I named,
18 they received all of this training in 2016 in the
19 in-service training. When I say all of this, I'm
20 referring to CCG 1753 through 1812?
21     A.   Now, this right here I'm not -- I can't
22 say that they got all this here, but I know they
23 got all this and the information from there is
24 attached in this lesson plan.
25     Q.   And tell me what you can't say that

PAGE 44

1 they received?
2     A.   The sudden in custody death, I cannot
3 verify on this, but I will say that -- let me
4 look real quick. If you look here in your
5 -- what exhibit is this, on the 16, use of force?
6     MR. POST: Was that Plaintiff's 4 that
7 I gave you, Alan?
8     MR. SNIPES: Yeah.
9     THE WITNESS: What number did you give
10 for the 16 use of force?
11 BY MR. POST:
12     Q.   Yeah, Plaintiff's number 4, CCG 1753?
13     A.   Okay. If you look, the information I'm
14 talking about in this defensive tactics here,
15 this is directly from things that they probably
16 cover from the taser, but it was covered probably
17 not once, but probably twice because it's on my
18 lesson plan here. If you look positional
19 asphyxia, reemphasis what to do situations,
20 excited delirium, all of this is they probably
21 didn't get it once, they got it twice in 2016,
22 so.
23     Q.   Okay. So because the training topics
24 and some of what is in these materials in 1753
25 through 1783 and then starting at Section 84, a

DEPOSITION OF: LT. TIM WYNN  6-18-2020

SHEET 12  PAGE 45

1  lot of those overlap is what you're saying?
2      A.   That's correct.
3      Q.   Okay.  And you know they got this from
4  1753 through 1812 because they took the taser
5  class, correct?
6      A.   I would say that would be accurate,
7  yes.
8      Q.   Okay.  All right.  If you would flip to
9  page 1757, if you would on that, CCG1757.  Can we
10  agree that the 2016 training taught that deadly
11  force is any force that is likely to cause death
12  or serious bodily harm; can we agree?
13      A.   Under OCGA, you're talking about 17-
14  4-20?
15      Q.   Well, specifically I'm looking at under
16  3-2.4 at the bottom of 1757 where deadly force is
17  defined, any force that is likely to cause death
18  or serious bodily harm?
19      A.   Yes, sir.
20      Q.   Okay.  So we agree that's the correct
21  definition of deadly force, right?  I'm note
22  trying to trick you, I'm just --
23      A.   Yes, sir.  Yes, sir.  Deadly force is
24  any time you employ deadly force there is a very
25  good probability that death will occur.  That's

PAGE 46

1  not our intent but if it's deployed, there
2  -- that could be the consequences, that's
3  correct.
4      Q.   And deadly force --
5      A.   From trying to stop them from doing
6  what they're doing is our intent.
7      Q.   Right.  And it's force that's likely to
8  cause death or serious bodily harm?
9      A.   There's a very good likelihood that
10  death can occur, that's correct.  That's correct.
11      Q.   All right.  So we agree on that
12  definition.  And one of the reasons that I ask
13  you that is it looks like there is probably a
14  typo in 3-2.1 on 1756, right before -- on the
15  page right before that.  Because it says deadly
16  force is defined as that force intended to likely
17  cause death or serious bodily harm.  And from
18  memory from my past life as a prosecutor recall
19  that it's deadly force is defined as that force
20  intended to or likely to cause death or serious
21  bodily harm?
22      A.   Yes, it's a typo.  Yes, sir.
23      Q.   And can we agree that the 2016 training
24  taught that use of deadly force to arrest for a
25  misdemeanor offense is not justified, I believe

PAGE 47

1  that's in 3-2.3?
2      A.   Could you repeat that again?
3      Q.   Can we agree that the 2016 training
4  that you gave taught that use of deadly force to
5  arrest for a misdemeanor offense is not
6  justified?
7      A.   Deadly force for a misdemeanor?
8      Q.   Uh-huh.  (Affirmative response.)
9      A.   Yeah, deadly force is not justified for
10  a misdemeanor, no.
11      Q.   All right.  And can we also agree that
12  the 2016 training that these officers received
13  taught that a serious bodily injury is one that
14  creates a substantial risk of death among other
15  things?  And that's at 3-2.4 on that same page.
16      A.   Any force -- yes, sir.  It's right
17  there in it, yes, sir.  Do you mind if I take a
18  break a second?
19      Q.   Absolutely.  Any time you need to take
20  a break, just let me know.
21      MR. SNIPES:  We've been going for about
22      an hour, why don't we take a five minute
23      break.
24              OFF THE RECORD.
25              ON THE RECORD.

PAGE 48

1  BY MR POST:
2      Q.   Okay.  Lieutenant, we just took a break
3  because your hand was hurting you.  Are you
4  feeling okay to continue now?
5      A.   I'm good.
6      Q.   Okay.  And I want to re-ask you about
7  the question I asked about the use of deadly
8  force to arrest for a misdemeanor offense.  I
9  asked you if we could agree that the 2016
10  training taught that use of deadly force to
11  arrest for a misdemeanor offense is not
12  justified?
13      A.   Yeah, to effect an arrest of suspected
14  one misdemeanor, yes, you cannot.
15      Q.   Okay.
16      A.   One other thing on your deadly force
17  you were asking about, yeah, that's definitely a
18  typo where I had deadly force in there.  So you
19  were right on your typo portion.
20      Q.   I'm old, but I can remember things
21  every once in a while?
22      A.   Yes, sir.
23      Q.   And I'm not under oath.  Let the record
24  reflect I laughed.  Flipping over to CCG 1760, as
25  you mentioned earlier you're familiar with the

DEPOSITION OF: LT. TIM WYNN  6-18-2020

SHEET 13  PAGE 49

1  symptoms of what is commonly called excited
2  delirium, correct?
3      A.   Yes, sir.  I have a good working
4  knowledge of it, how about let's say that.  I
5  won't say that I'm an expert by any means but I
6  have a good working knowledge of it.
7      Q.   Right.  So being familiar with those
8  symptoms and having literature you were able to
9  put a list of symptoms of excited delirium into
10  your materials for the 2016 in-service training,
11  correct?
12     A.   That's correct.  Yes, sir.
13     Q.   Okay.  And what we're looking at on
14  page 1760 and 1761 is the list of those symptoms
15  of excited delirium, correct?
16     A.   That's correct.  Yes, sir.
17     Q.   Okay.  And that's part of what you
18  teach your officers is to watch for these
19  particular symptoms, correct?
20     A.   Yes, sir.
21     Q.   And that's what you taught them in
22  2016, right?
23     A.   Yes, sir.
24     Q.   Okay.  And one of the things you taught
25  of your officers as well is about positional

PAGE 50

1  asphyxia on page 1761 there; is that correct?
2      A.   Yes, sir.  We discussed it.
3      Q.   And you taught them to always monitor
4  any subject they have in custody, correct?
5      A.   Yes, sir.
6      Q.   And you told them to be aware of sudden
7  tranquility, correct?
8      A.   Yes, sir.
9      Q.   Okay.  And that's in bold in your
10  materials, right?
11     A.   Yes, sir.
12     Q.   What does that mean to you?
13     A.   Well, if you have someone that you
14  suspect that's under a stimulant or
15  hallucinogenic, if you are -- have to tussle with
16  them when you -- and struggle with them to get
17  them handcuffed, when you get them up off the
18  ground, you monitor them to make sure they don't
19  have any type of labored breathing, they don't
20  have any issues with any complaints of -- you
21  just mainly monitor them to make sure that
22  nothing changes as far as a health crisis which
23  usually you would call for EMS and have EMS stand
24  by.  And if you have the opportunity, a lot of
25  times you don't have the opportunities when you

PAGE 51

1  get there, the fight is on they're aggravated for
2  whatever reason.
3      If you have the ability to try to stall or
4  tell them to try to stall them, to talk, to try
5  to build a rapport with them, try to plead with
6  them if you can.  A lot of times they don't allow
7  you to do that.  A lot of times they're so
8  aggressive they come right at you and you don't
9  have that ability.  If you have the ability we
10  try to do it that way it gives the ambulance time
11  to get closer to the scene where the results can
12  work in your favor hopefully.  And that's what we
13  try to do.
14     And of course, I think most officers, I
15  don't care who you are, if you can talk to
16  someone and develop a rapport, it's a lot easier
17  to do that if we have the ability to -- a lot of
18  times you're not going to, especially when
19  they're on a stimulant or hallucinogenic, you're
20  not going to be able to talk them down.  So
21  that's the unfortunate side of it, but.
22     Q.   And -- go ahead, I'm sorry.  I didn't
23  mean to interrupt you.
24     A.   That's all right.
25     Q.   Well, you teach your officers to watch

PAGE 52

1  for a suspect who has been yelling and struggling
2  and fighting to watch for a change, such as
3  becoming still and quiet, right?
4      A.   Yes, sir.  That's what sudden
5  tranquility is.  But as you're doing this you
6  monitor them as -- a lot of times your struggles
7  -- the problem you have with a stimulate is the
8  subject does not recognize cues.  They don't get
9  tired.  If you have someone -- we've had to have
10  -- we've had to deal with people that have a
11  history of drug use, obviously I wouldn't say
12  going to the gym and PT is one of their forefront
13  things they would want to do.  I would not say
14  that the obligation they would be committed to so
15  to speak.  It's not a commitment to them.
16     These people, when they're on a stimulant,
17  the subjects that are stimulants they don't have
18  a cue of I'm really exhausted and the strength is
19  pretty -- pretty stout.  I mean pretty incredible
20  strength.  And when things don't register they
21  continue to fight.  Like yourself or myself after
22  a minute and a half we're going to start getting
23  tired.  And it's going to register to you I'm
24  about out of gas here.  I'm losing any gas quick.
25  The stimulant affects that, they don't pick on up

DEPOSITION OF: LT. TIM WYNN  6-18-2020

1  that cue and they keep continuing to fight.
2      Q.    So when they stop and become suddenly
3  tranquil that's a danger sign, wouldn't it?
4      A.    That would be a danger sign.  But yes,
5  sir, that would be danger sign.
6      Q.    And that's what you taught your
7  officers in 2016?
8      A.    Tell them to watch for this, yes, sir,
9  monitor.
10      Q.    You still teach them that today, don't
11  you?
12      A.    Yes, sir, we do.
13      Q.    Okay.  Now flip over to 1773 if you
14  don't mind.  There is a list of factors for all
15  officers and agencies to consider.  Numbers 1
16  through 15 on 1773 through 1774.  You went over
17  those with the officers and the training you gave
18  them in 2016, right?
19      A.    This is in reference to -- here, is
20  this the case law?
21      Q.    It's a case I think.  I believe it's
22  part of what you pulled from the case or cases
23  including -- is that right?
24      A.    Well, let me look and see which one it
25  is first.

1      Q.    Okay.  I think it starts on --
2      A.    Is this the one with the taser itself
3  or is this one where the state -- of Armstrong
4  versus The Village of Pinehurst, is that --
5      Q.    That's the one it appears to be
6  according to page 1765.
7      A.    Yes, sir.  We covered this one in the
8  classroom and I handed them a copy of the actual
9  case law.  Yes, sir.
10      Q.    Okay.  And so some of the things that
11  you taught them that they should consider is that
12  when a subject of a seizure has not committed any
13  crime, the lack of seriousness of the offense or
14  lack of an offense weighs heavily in the subjects
15  favor, correct?  That's number one on that list.
16      MR. SNIPES:  I'm going to object to the
17  form, Mark.  I don't know where this came
18  from, but these are citations to cases and
19  then quotes out of the -- so I'm going to
20  object since you're asking him for legal
21  conclusions.
22      MR. POST:  Okay.
23      THE WITNESS:  This is dealing with a
24  taser.
25  BY MR. POST:

1      Q.    Right.
2      A.    And this is where he had been tased so
3  that's what this case law was about.
4      Q.    Okay.  But part of your standard
5  training --
6      A.    We covered the meat and potatoes of the
7  taser itself.  This was in reference to a use of
8  a taser and I handed them the case law, we
9  covered the specifics of it and that was the
10  reason for covering it.  Because it was declared
11  a dangerous weapon and that was the -- I'm not
12  going to sit here and say that I covered every
13  aspect of that, no.  It's in a handout.
14      Q.    Well, you don't disagree that the
15  seriousness of the offense or whether any offense
16  had been committed at all is a factor into what
17  kind of force that your officers are allowed to
18  use, do you?
19      A.    If you have a minor offense and someone
20  starts fighting with you, because you're trying
21  to effect an arrest, yes.  You want to look at
22  the severity of the crime but if they start -- if
23  you go arrest them and they start trying to fight
24  you and hurt you, well, that's going to change
25  the game a little bit from the officer's

1  standpoint as well.  Because we're just doing our
2  job and you doing your job, you know, they bring
3  that to the table trying to hurt you at that
4  point, well that changes the game a little bit in
5  my opinion, so.
6      Q.    Well, you tend to take into account if
7  a subject is mentally ill or if they're on drugs
8  and that sort of thing, correct?
9      A.    Well, you think to take that into
10  account, yes, sir.  You -- sure you do.  If
11  they're under the influence of drugs but when you
12  have something that you have to take care of an
13  you were called there to take care of a situation
14  that's become a problem, we can't just walk away
15  and leave.  We don't have that ability to just be
16  able to walk away and leave and say okay, we'll
17  come back tomorrow and see if he's all right.
18      Q.    Well, you were saying earlier that you
19  do try or teach your officers to try to de-
20  escalate the situation, right?
21      A.    Yes, sir, we do.
22      Q.    Okay.  Especially when the subject is
23  unarmed and minimally threatening; is that
24  correct?
25      A.    What was that last part again now?

DEPOSITION OF: LT. TIM WYNN  6-18-2020

SHEET 15  PAGE 57

1    Q.   Especially when the subject is unarmed
2  and minimally threatening, true?
3    A.   You're going to de-escalate it the best
4  you can.  Just like I told you before, any
5  officer is going to try their best to talk them
6  in the back of the car rather than have to fight
7  them in the back of the car because there's a
8  good probability we're going to get hurt too.
9    Q.   Well, and then you're going to treat
10  your use of force continuum a little bit
11  different if you're encountering, and you're
12  teaching this to officers, if you're encountering
13  a subject that's armed and is committing a
14  felony, as opposed to a subject that's unarmed
15  and not committing any crime or a misdemeanor,
16  right?
17    A.   Mr. Post, the thing -- we don't -- we
18  have a lot of unknowns when we come up to a
19  scene.  When we're dealing with something we
20  don't know who we're dealing with.  We've had
21  officers come up and folks present a knife or a
22  firearm and they were just there.  But the answer
23  to your question if we come on up a scene and
24  someone was committing a felony and had a edge
25  weapon yes, it would escalate a little faster

PAGE 58

1  than one that's standing there acting bizarre,
2  maybe beat on his wife or we're going to have to
3  do our job one way or the other.  Where he walked
4  up and he's disturbing the peace or whatever.  We
5  still have a job we have to do and if it's an
6  arrestable offense isn't like we can -- if we're
7  called there it ain't like we just can walk away.
8  We are bound to do something because that's our
9  job to do that.
10    Q.   But that's not always true.  Let's say
11  for instance your officers are called to
12  somebody's home because they're standing in their
13  yard naked and they're having a mental health
14  issue.  Not -- unless they do something you're
15  not necessarily going to have probable cause to
16  take them into custody, right?
17    A.   Well, I don't think can you allow
18  somebody to stand out in the front yard naked, I
19  mean, you know, if you stand out there with no
20  clothes on, yes, sir.  That's a violation of the
21  law itself so.
22    Q.   But your officers are going to try to
23  use less force in that situation as opposed to
24  somebody that has committed a felony?
25    A.   That's what you're come to, yes, sir.

PAGE 59

1  That's what you come to the table looking to do
2  and you want to try to end this as peacefully as
3  possibly as you can.  And the officers are going
4  to adjust to what happens when they have to deal
5  with this issue.
6    Q.   Right.
7    A.   And that's just -- we're not going to
8  stand there and be somebody's punching bag, no
9  we're not going to do that.  And we're not going
10  to stand there and have to try to box with them.
11  I mean that's not our job description.  We're go
12  try to do this as peacefully as we possibly can.
13    Q.   Flip over to 1782 if you would, please,
14  sir.  Part of the training that you gave to the
15  three officers I previously named in 2016, was
16  that looking at 1783, I guess under positional
17  asphyxia, is that interference with proper
18  breathing produces an oxygen deficiency hypoxia
19  in the blood which disturbs the body's chemistry
20  creating a condition for failed rhythm and
21  disturbance in the heart, correct?
22    A.   Yes, sir.
23    MR. SNIPES:  Object to the form.  Are
24  you asking him does this document say that?
25    MR. POST:  I'm asking him if he taught

PAGE 60

1  that.
2    THE WITNESS:  We cover positional
3  asphyxia and we cover what it does.  Now,
4  did I actually cover this right here and
5  read it word for word, I can't say that I
6  did.  I don't -- generalize with a
7  PowerPoint.
8  BY MR. POST:
9    Q.   Okay.  So you put your materials up for
10  the officers to see them on PowerPoint and then
11  you pass them out or what or both?
12    A.   I'll show you.  This the PowerPoint we
13  depict right here.  So I can tell you, but we
14  cover positional asphyxia.  Yes, sir, we do.
15    Q.   Okay.  Can I see the PowerPoint if you
16  have it with you?
17    A.   I don't even think I have it with me,
18  sir.  It's the lesson, it would be directly off
19  the lesson.  It would have been similar to this
20  here.
21    Q.   I'm seeing you've handed me 1761 and
22  underneath positional asphyxia, on that it says
23  interference with proper breathing procedures
24  produces an oxygen deficiency?
25    A.   That's correct.

DEPOSITION OF: LT. TIM WYNN  6-18-2020

```
1       Q.   Okay.  And then you would continue to
2  talk about those things on the PowerPoint and
3  explain, I would assume, correct?
4       A.   Yes, sir.  Yes, sir.
5       Q.   Okay.  And what you explained would
6  have been consistent with the materials, right?
7       A.   That's correct.  Yes, sir.
8       Q.   All right.  What does -- on page 1790
9  just out of curiosity --
10      A.   Seventeen what?
11      Q.   1790, do you have any idea what the
12 inner circles versus outer circle, us against
13 them training was?
14      A.   No, I'm not familiar with that one.  I
15 didn't teach discipline in Sergeant Skinners'
16 lesson plan?
17      Q.   Okay.  Have you seen the video from the
18 contact that the Columbus Police Department had
19 with Hector Arreola on January 9 of 2017?
20      A.   I have not, no.
21      Q.   Okay.  Let's go off the record for a
22 minute.
23                 OFF THE RECORD.
24                 ON THE RECORD.
25           MR. POST:  All right.  Let's go back on
```

```
1  the record.
2  BY MR. POST:
3       Q.   All right.  Lieutenant, I'm going to
4  play for you what we know as CCG 11, which is
5  -- and it's marked as A and B, A2 which is
6  Officer Dudley's body cams which starts at 0510
7  A.M., and 35 seconds.  And I'm going to play a
8  good -- pretty good portion of this and just let
9  you take a look at it.  So go ahead and start it
10 or get comfortable, we can go off the record
11 while we watch.
12                 OFF THE RECORD.
13                 ON THE RECORD.
14 BY MR. POST:
15      Q.   Okay.  Lieutenant Wynn, I've played for
16 you Officer Dudley's body cam up through 2252 on
17 the video which is 0533 A.M. and 25 seconds,
18 January 9, 2017.  And now we're going to play
19 part of Officer Evrard's body cam, CCG 12 which
20 is January 9th at 2017 starting at 0528 A.M., and
21 6 seconds.  There's a slight time discrepancy
22 between Evrard's time and Dudley and Aguilar's
23 time on the videos which really doesn't matter
24 for our purposes today.  So I'm going to swap to
25 that video and go back off the record as you
```

```
1  watch.
2                 OFF THE RECORD.
3                 ON THE RECORD.
4  BY MR. POST:
5       Q.   All right.  Lieutenant, I have shown
6  you Officer Evrard's body camera from the start
7  through 0618 or I guess 0622 on the video, which
8  is on the time stamp, it's 0534 A.M. and 28
9  seconds.  So I'm going to ask you --
10      A.   What time did it start?
11      Q.   It started at 0528:06 and 0534 at 28
12 seconds, is what we went through.
13      A.   Okay.
14      Q.   So I want to ask you a few things.
15 Having watched and listened to those videos that
16 we just looked at and listened to, in your
17 opinion was Officer Dudley's use of force in
18 compliance with the policies, practices and
19 procedures of the Columbus Police Department that
20 were in place on January 9th of 2017?
21           MR. SNIPES:  Objection to the form.
22      Are you asking him for an opinion?
23           MR. POST:  Right.  He's the training
24      officer and he said yes.
25           THE WITNESS:  Is he within the
```

```
1  compliance -- one more time the last part of
2      it?
3  BY MR. POST:
4       Q.   I asked you, having watched and
5  listened to those videos was Officer Dudley's use
6  of force in compliance with policies, practices
7  and procedures of the Columbus Police Department
8  that were in force on January the 9th of 2017?
9       A.   From what I can see, yes.
10      Q.   Okay.  The same question with regard to
11 Officer Aguilar's use of force?
12      A.   Yes, sir.
13      Q.   And the same with Officer Evrard?
14      A.   Yes, sir.
15      Q.   Okay.  And continuing to put weight on
16 Hector Arreola's torso or upper body after he was
17 handcuffed, is that what the officers were
18 trained to do?
19           MR. SNIPES:  Objection to the form,
20      misstates the evidence.
21           THE WITNESS:  I didn't see that in the
22      video.
23 BY MR. POST:
24      Q.   Okay.  Well, I'll ask you to assume
25 that then.
```

DEPOSITION OF: LT. TIM WYNN  6-18-2020

```
 1            MR. SNIPES:  Objection to the form.
 2            MR. POST:  I think I'm entitled to ask
 3   these questions, this is cross-examination
 4   and I'm going ask them.
 5            MR. SNIPES:  You're asking
 6   hypotheticals based on incorrect facts.
 7            MR. POST:  Well, these are the facts.
 8   And I'm -- these are the facts.
 9            MR. SNIPES: Well, why don't you ask him
10   if he --
11            MR. POST:  I'm trying to.
12            MR. SNIPES:  You just showed him the
13   video for ten minutes, why don't you ask him
14   if what he saw on the video is consistent
15   with what you're telling him the facts are?
16            MR. POST:  I'm going to ask him --
17 ]          MR. SNIPES:  Because he's going to tell
18   you no.
19            MR. POST:  I'm going to ask him the
20   question that I want to ask the man.
21   BY MR. POST:
22        Q.  And what I'm asking you is, continuing
23   to put weight on the Hector Arreola's torso or
24   upper body after he was handcuffed, is that what
25   Officer Aguilar, Dudley and Evrard were trained
```

```
 1   to do?
 2            MR. SNIPES:  Object to form, misstates
 3   the evidence.
 4            THE WITNESS:  I didn't see them do
 5   that.
 6   BY MR. POST:
 7        Q.  I'm asking you if they put force and
 8   weight on Hector Arreola's torso and body after
 9   he was handcuffed, is that what the officers were
10   trained to do?
11            MR. SNIPES:  Object to form,
12   hypothetical, assumes facts that are aren't
13   in evidence.
14            THE WITNESS:  I didn't see them do
15   that, so you're asking me a question that I
16   can't answer because I didn't see it.
17   BY MR. POST:
18        Q.  Anybody -- if after they're handcuffed,
19   do you train the officers to continue to put
20   weight --
21        A.  No, we do not.
22        Q.  -- on the back and torso?
23        A.  No.
24        Q.  Okay.  So they weren't trained to do
25   that in 2016, correct?
```

```
 1        A.  No.
 2            MR. SNIPES:  Object to form, who is
 3   they?
 4   BY MR. POST:
 5        Q.  The officers.  The three officers in
 6   question, the three officers in question were not
 7   trained to do that in 2016, correct, and 2017?
 8        A.  No.
 9        Q.  Okay.  And that's what you trained
10   everybody to do with regard to putting force on
11   somebody's back and torso after a subject was
12   handcuffed; is that true?
13        A.  That's correct.
14        Q.  Okay.  And so that was commonly known
15   and it was a widespread practice that you taught
16   not to do that, right?
17        A.  Yes.
18        Q.  And you would have taught your officers
19   not to, and these particular officers, these
20   three officers, not to continue to put weight on
21   Hector Arreola's back or any subject's back after
22   they were handcuffed or already in custody and
23   saying that they couldn't breathe, correct?
24            MR. SNIPES:  Object to the form.
25   You're leaving out the part about him
```

```
 1   continuing to kick.
 2            MR. POST:  I can ask the question in
 3   whatever fashion I want to ask.
 4            MR. SNIPES:  Well, no, no, no.
 5            MR. POST:  Yes, I can.
 6            MR. SNIPES:  Not when you add facts in
 7   there or don't include facts.
 8            MR. POST:  You can ask whatever
 9   questions you want to ask but I'm going
10   phrase the question how I want to phrase it.
11            THE WITNESS:  Can you rephrase?  Can
12   you re-ask the question again?
13   BY MR. POST:
14        Q.  I'll try.  You taught continuing to put
15   weight on a subject's back or torso some after
16   they were handcuffed and reported to be in
17   custody didn't comply with CPD policy after they
18   quit resisting, true?
19        A.  Well, from what I saw on the video
20   there they had a pretty violent struggle and the
21   last, what, four and a half minutes and he -- the
22   subject is still kicking.  Just because you have
23   handcuffs on does not necessarily mean they're in
24   custody.
25        Q.  Okay.
```

DEPOSITION OF: LT. TIM WYNN 6-18-2020

SHEET 18  PAGE 69

1    A.   You have them restrained somewhat but
2  if you've got someone that's trained or can be
3  violate with their legs they can injury you just
4  the same, seriously.
5    Q.   So you're saying that continuing to put
6  weight on a subject's torso or back area after
7  they're in custody and handcuffed and saying they
8  couldn't breathe is within policy?
9    A.   No, I'm not saying that.  I'm saying I
10  didn't see that, I saw -- I heard him kicking and
11  I -- they said they had him in custody is the
12  only reason I knew that.  I never saw them
13  putting pressure on his chest or back, so that's
14  just hearsay with you saying that, I didn't see
15  that.
16    Q.   Well, I'm talking about any subject,
17  you don't -- you didn't train your officers --
18    A.   No, we do not train to compress the
19  chest or -- when they're handcuffed.  No, we do
20  not.
21    Q.   Okay.  And that's especially true when
22  the officers or when the subject is saying he
23  can't breathe, true?
24    A.   That would be -- you would be you want
25  to help him, yes.  But I heard him saying he

PAGE 70

1  couldn't breathe probably ten times while he was
2  fighting with them over the four and a half
3  minutes.  So that didn't stop him from fighting.
4    Q.   Well, he said he couldn't breathe
5  during the struggle several times like you said.
6    A.   Yes, sir.
7    Q.   And he said he couldn't breathe after
8  he was handcuffed several times as well, even
9  after Officer Evrard sat on him?
10    A.   I heard him say that a couple times,
11  but I did -- you know, now you've got to search
12  for weapons.  There are several things you've got
13  to search for.  And the wouldn't -- even with the
14  violent struggle they have, I mean I would say
15  -- I would say it would be pretty smart to put
16  leg shackles on him to keep him from kicking more
17  the way he was kicking, from what they were
18  saying on the tape.  So I don't see where that
19  would have been an issue there to stop him from
20  potentially kicking you and injuring you.  So you
21  have to check for weapons once you get the cuffs
22  on them.
23    Q.   Well, let me ask you this, did
24  flattening Hector Arreola out as a strategy
25  comply with CPD policy?

PAGE 71

1    A.   Yes, it does.
2    Q.   Okay.  And --
3    A.   Do you mean initially when the struggle
4  started?
5    Q.   Well, flatten him out throughout the
6  struggle as Officer Aguilar said he was doing,
7  that he was flattening him out, I'm flattening?
8    A.   I would say that's 100 percent, yes.
9    Q.   So that's something you train and
10  something that's within Columbus Police
11  Department policy and had been for a long time?
12    A.   Well, it's in our tactics.  And what
13  you're trying to do is, is if you've got someone
14  standing up it is very hard to get the leverage
15  to handcuff.  So if you to go the ground, but the
16  one thing we do tell them be very careful of
17  hands of disarming you.  And even handcuffed they
18  can disarm you.  So those are things when they're
19  moving their hands back there you've got to be
20  mindful when you're struggling with them.
21    Q.   Okay.
22    A.   So these are -- but yes, that would be
23  along the guidelines of what we teach with
24  handcuffing if you're struggling with a subject,
25  yes.

PAGE 72

1    Q.   Okay.  And would it be within
2  guidelines and policy to continue flat flattening
3  Hector Arreola out even after he was handcuffed
4  and continued to say he couldn't breathe, that is
5  when Officer Evrard took his place on Hector
6  Arreola's back.
7      MR. SNIPES:  Object to the form,
8  misstates the evidence.
9      THE WITNESS:  I couldn't see that, but
10  when I noticed the flash of the camera it
11  appeared to me like he was on his left side.
12  when he come running up there with the
13  flash.  It appeared like Mr. Arreola was on
14  his left side and they were beside him, so I
15  can't, you know, from what it looked like in
16  the picture to me.
17  BY MR. POST:
18    Q.   Well, I would imagine that sometimes
19  police officers might not always believe a
20  suspect's claim that he can't breathe, true?
21    A.   I'll take it for what it's worth.  I
22  mean I took it for what it's worth.  If they tell
23  me something I'm not going to -- but the bizarre
24  nature he was acting and throughout the whole
25  contact, I would say I don't know how much I put

DEPOSITION OF: LT. TIM WYNN  6-18-2020

SHEET 19  PAGE 73

1  into it.
2      Q.    Okay.
3      A.    But I would make sure -- of course, I
4  would make sure that we are -- the things are in
5  compliance.
6      Q.    So what would you teach the officers
7  and it may be no different today with respect to
8  their beliefs as to whether the suspect was
9  telling the truth about whether they couldn't
10 breathe?
11     A.    Well, as soon as possible you want to
12 set them up.  Every arrest is not a cookie cutter
13 and like everybody thinks you put handcuffs on,
14 it's over with, no it's not.  I've seen people
15 jump through the handcuffs and bring their hands
16 in front of them.  And I've seen them do -- I
17 mean, you know, you've got all these MMA fighters
18 out there, you know, these kung fu guys, I mean
19 they do taps on your face with their foot, so
20 just because you have the handcuffed does not
21 necessarily mean that they're 100 percent in
22 custody.  You do have them cuffed and restrained
23 somewhat but until you get them in back seat of
24 that car with the roller coaster bars over and
25 the seat belts on and pinned to the seat, they're

PAGE 74

1  not completely in custody.
2      Q.    Well, you saw Hector Arreola after he
3  was handcuffed, he was done.  I mean he was
4  spent, he was through?
5          MR. SNIPES:  Object to form.  Are you
6      talking about saw him on the movie you
7      showed?
8          THE WITNESS:  I don't -- I don't know
9      that he -- I mean he fought them for four
10     and half minutes, four, three and a half or
11     what was it, three and half, four, four and
12     a half minutes.  If he -- I don't know that
13     he's going to come back off the ground or
14     not.  I couldn't believe somebody would
15     fight two officers for four and half
16     minutes.  I go to the gym -- I go to the gym
17     six days a week and I tell you right now, I
18     can't -- I can't go four and half minutes
19     fighting two officers on top of me.
20 BY MR. POST:
21     Q.    That's a symptom of excited delirium or
22 somebody that's on narcotics or something along
23 those lines; is that right?
24     A.    Stimulate.  I can just tell you I can't
25 do it and I don't take drugs, I don't take any

PAGE 75

1  stimulant or nothing, I can't do it.
2      Q.    Can you hear my question?
3      A.    No.
4      Q.    It's a symptom of excited delirium one
5  of those things that you --
6      A.    It could be, yes.
7      Q.    -- that you watch out for, correct?
8      A.    It's a good -- good probability.
9      Q.    Okay.  It could be something with some
10 other type of issue as well.  So I mean, it could
11 be other than -- things other than that.
12     Q.    So what direction did you give to your
13 officers back in 2016 during their training about
14 believing somebody's claims that they couldn't
15 breathe?
16     A.    I can't speak with somebody about
17 whether they believe them or not.  I mean, if you
18 are saying they can't breathe you try to address
19 it, if at all possible.  You don't want -- you
20 would want to try to address it, yes.
21     Q.    Okay.  And so basically you taught them
22 to assume that they're telling the truth because
23 you can't tell one way or the other; is that fair
24 to say?
25     A.    I guess that would be fair to say.

PAGE 76

1      Q.    Okay.  How does flattening a subject
2  out after they're handcuffed work with all the
3  warnings that you give in the training division
4  and during the 2016 training with regard to
5  hypoxia and acidosis and those kind of things?
6          MR. SNIPES:  Object too the form.  It
7      misstates the training (inaudible).
8          THE WITNESS:  What are you -- you'll
9      have to ask that again.  I don't understand
10     your question.
11 BY MR. POST:
12     Q.    How does flattening a subject as a
13 strategy work with or come in line with all the
14 warnings that the training division gave the
15 three officers regarding hypoxia and acidosis
16 (inaudible) --
17         MR. SNIPES:  Object to the form.  Can
18     you show him the training took, because it
19     didn't say anything about acidosis, it was
20     on positional asphyxia, so.
21         MR. POST:  Oh sure, I'll be glad to
22     show him exactly where it says acidosis.
23         THE WITNESS:  You're talking about
24     metabolic acidosis?
25 BY MR. POST:

DEPOSITION OF: LT. TIM WYNN 6-18-2020

SHEET 20 PAGE 77

1    Q.   Correct.  Exactly.
2    A.   That's dealing with somebody with
3 excited delirium.  It's dealing with stimulate or
4 hallucinogenic drug.
5    Q.   It's a big page right in the --
6    A.   Yes, sir.  Metabolic acidosis.
7    Q.   -- material (inaudible - crosstalk) --
8         MR. SNIPES:  You didn't show him that
9    earlier.
10        THE WITNESS:  That's off the -- that's
11   the lesson plan from Mike Skinner, that's
12   not my in-service.
13        MR. SNIPES:  Correct.
14        THE WITNESS:  That's Mike Skinner's
15   lesson plan.
16 BY MR. POST:
17   Q.   But we have already gone through all of
18 that.
19        MR. SNIPES:  No, you didn't go through
20   that that's why I objected.
21        MR. POST:  Yeah, I did.
22 BY MR. POST:
23   Q.   In any event, you all train the
24 officers about hypoxia and acidosis --
25   A.   When you take someone to the ground,

PAGE 78

1 Mr. Post, when you take them to the ground you're
2 not going to handcuffed in the front because
3 they're a danger to you.  The only way you're
4 going to be able to handcuff them when they're on
5 they're on ground is on their stomach, especially
6 if they're fighting with you.
7    Q.   Right.
8    A.   So I mean, if you get to the front if
9 you've got someone that's wired on drugs I think
10 you would know that from your years in the DA's
11 Office, you know that we have to take them down
12 face first to get them cuffed behind their back,
13 because if it's in the front that's not even a
14 safety at all to us.  They could use it as a
15 weapon.
16   Q.   And it's policy to handcuff suspects
17 behind their back for officer --
18   A.   Especially if --
19   Q.   -- safety, correct?
20   A.   Especially if they've been aggressive
21 to you.  Now there may be some exigent
22 circumstances to where they -- you may have to go
23 in the front but it's going to be very few.  If
24 you do that we have to put belly chains.
25   Q.   Right.

PAGE 79

1    A.   So.
2    Q.   So you teach them to cuff them behind
3 their back.  Sometimes it's unavoidable to get on
4 a suspect's back to make -- to get their hands
5 and cuff them, right?
6    A.   Well, when you're struggling with them
7 trying to cuff them, you're trying to cuff them
8 as best you can.
9    Q.   All right.  But you also teach them to
10 get off their back and off their torso as soon as
11 they can after they're handcuffed, right?
12   A.   We have discussed that, yes, sir.  We
13 do.
14   Q.   All right.  Did the training division
15 teach Officers Aguilar, Evrard, and Dudley to
16 stay on a suspect's back or torso until the
17 suspect was completely still?
18   A.   No.  I don't -- like I said, we have
19 never taught them to stay on someone's back.  If
20 you have to hold them in place and you've had a
21 violent struggle, but you are not to compress the
22 chest in any way, no.
23   Q.   Would a suspect that's breathing deeply
24 or trying to breathe deeply, such that it might
25 jostle the officer on his back, justify the

PAGE 80

1 officer remaining on the suspect's torso under
2 the policy and training that you delivered for
3 Columbus Police Department?
4         MR. SNIPES:  Object to the form.
5         THE WITNESS:  Of course, I didn't
6    understand your question.  It kind of jumped
7    around a little bit.
8 BY MR. POST:
9    Q.   Okay.  Assume a suspect is breathing
10 deeply or trying to breathe deeply with a police
11 officer on his back after he's been handcuffed,
12 okay.  If --
13        MR. SNIPES:  Object to form, what do
14   you mean breathing deeply?
15        MR. POST:  Well, I think that's --
16        THE WITNESS:  If I've been fighting
17   four and half minutes you're going to be
18   breathing deeply.
19 BY MR. POST:
20   Q.   Right.  Right.  And I'm asking you if
21 it complied with policy if that's supposed
22 resistance --
23   A.   If you have no longer have a resistance
24 you're not going to be on their back.
25   Q.   Okay.

DEPOSITION OF: LT. TIM WYNN  6-18-2020

SHEET 21  PAGE 81

1    A.   You have not been trained to stay on
2 their back if you don't have resistence.  Now, if
3 he's still kicking like this gentleman was or
4 this subject was, that's still resistance.  But I
5 think you could probably restrain him from the
6 hands at the back position so.  No, you probably
7 would have some pressure there to avoid him
8 coming up and kicking you or throwing a knee.
9 Now that would be -- I would say would be a
10 reasonable -- maybe the buttock or upper thigh I
11 would say that would be a -- that's not
12 compressing the chest though.  That's compressing
13 the buttock.  His jewels may hurt him but that is
14 not compressing the chest.
15    Q.   And that's what you teach, right?
16    A.   No, I'm just saying that be would
17 acceptable if he was kicking.
18    Q.   All right.
19    A.   There are several things that you have
20 to do if they started kicking and things of this
21 nature there, that depends.  There are several
22 ways you can stop that.
23    Q.   Okay.
24    A.   Leg irons would be one of the better
25 choices.

PAGE 82

1    Q.   Okay.  Would a suspect trying to
2 rollover to breathe justify the the officers
3 remaining on the suspect's torso after he's
4 handcuffed?
5    A.   If he was handcuffed I wouldn't think
6 they would still be on his chest or on his back.
7    Q.   Would a suspect moving his feet from
8 side to side, I'm not saying flaying and kicking
9 his legs but moving his feet from side to side,
10 would that justify the police officers staying on
11 his back after he was handcuffed?
12    A.   I don't know that it would, no.
13    Q.   And would a suspect wiggling his
14 fingers through the handcuffs or grabbing an
15 officer's fingers through the handcuffs that he
16 wore behind his back, justify the police officer
17 continuing to apply force and remain on his back,
18 the suspect's back?
19    A.   If he was grabbing the officer's hands
20 how was he on his back?
21    Q.   Through his -- grabbing his fingers I
22 guess through the handcuffs.  The officer --
23    A.   You're talking about the officer laying
24 on top of him and his hands are sitting there
25 tickling him or?

PAGE 83

1    Q.   Apparently the suspect's fingers are
2 somehow close enough to the officer's fingers to
3 where he could grab them or touch them.
4    A.   Well, if the officer is in an up
5 position around the upper leg then is what you're
6 telling me, right?  I don't know how he would be
7 on top of him and have your hands down there by
8 his lower back, so I don't know how that would
9 happen without laying on top of your own hands
10 and arms.
11    Q.   Okay.
12    A.   So I just -- I'm kind of a lost there
13 on that one.
14    Q.   Well, would that justify the officer
15 staying on top of him?  I mean do you --
16         MR. SNIPES:  Object to the --
17         MR. POST:  Let me --
18         MR. SNIPES:  Object to the --
19 BY MR. POST:
20    Q.   Let me put it another way.  Do you
21 consider that resistence I guess?
22         MR. SNIPES:  Object to the form.  You
23    asked a hypothetical, he said he didn't
24    agree with you, now you just used the word
25    that and I don't know what that means.

PAGE 84

1         MR. POST:  Well let me rephrase.
2         MR. SNIPES:  I think it means
3    hypothetical that didn't make any sense.
4         MR. POST:  Thank you for your colorful
5    commentary there.
6 BY MR. POST:
7    Q.   The -- what I'm asking you is do you
8 consider it to be resistance if a suspect, in
9 this case Hector Arreola, is moving his fingers
10 through his handcuffs and grabbing the police
11 officer's fingers somehow?
12    A.   If he's trying to break it, yeah, I
13 would.  I don't know, is he trying to grab a
14 finger to snap, I mean if you twist you could
15 snap a finger.  I don't know.  What was he trying
16 to do when you say grabbing?  What is he
17 grabbing, I mean, I don't like people grabbing me
18 when I'm handcuffing them but there is things
19 that we have learned in tactics that you can stop
20 that, but.
21    Q.   I'm saying after the suspect is
22 handcuffed?
23    A.   Well, he still could break a finger or
24 whatever he reaches and grabs and considering a
25 four and half minute fight he just gave up, I

DEPOSITION OF: LT. TIM WYNN 6-18-2020

1  would think that would be a pretty easy thing for
2  him to do if he was able to fight two officers
3  and hold them off for four and a half minutes
4  before you can get him cuffed.  He may be a
5  pretty strong fellow.
6      Q.   Well --
7      A.   Because both these officers at the time
8  were over 200 pounds, well over 200 pounds, both
9  of them, so.  Yeah, I'd say he's pretty stout.
10     Q.   The -- and you're talking about Aguilar
11  and Dudley being over two hundred?
12     A.   Yes, sir.  And Aguilar's bigger than I
13  am.  I mean, he's a big fellow and Brian Dudley
14  has trimmed down quite a bit, he's into the
15  running.  Now, he used to be a good sized fellow
16  so this guy probably had -- his strength seemed
17  to be pretty stout.
18     Q.   Okay.
19     A.   I'd be worried if he was grabbing my
20  hands, yes.
21     Q.   And you do teach your officers certain
22  techniques after a suspect's handcuffed to where
23  they can maintain control of the suspect using
24  certain pressure points and such on the arms or
25  hands or what?

1      A.   We have covered that and we -- it's
2  been covered at the academy actually is where,
3  escort positions, but it would not work as well
4  from the ground if you're having to deal with it
5  from the ground.
6      Q.   All right.  As I recall, at least one
7  of the officers testified, and I think maybe both
8  Aguilar and Dudley testified that Hector
9  Arreola's repeated screams that he couldn't
10  breathe indicated to them that he could breathe.
11  Is that something that is taught or was taught in
12  2016 by the training division?
13     A.   Okay.  When was he screaming this,
14  while they were fighting with him?  You're
15  talking about when they were fighting with him?
16     Q.   While they were fighting and --
17     A.   Mr. Post, you know as well as I do, I
18  mean, there's -- we don't teach them that if
19  somebody can't breathe, but when you're in the
20  heat of battle and fighting it ain't -- you can't
21  just take the brakes off and put the brakes on
22  and say okay, time out.  We're going to stop and
23  let's go down the street.  You know, we have got
24  to get him restrained and if he can't breathe, if
25  he would stop restraining and quit resisting we

1  could get him cuffed and things would go a lot
2  smoother when you get him up off the ground.  But
3  they -- at that point they had to continue the
4  fight to get him handcuffed.
5      Q.   Right.  And that's not really my
6  question.  What I think these officers were
7  saying and what I think has been trained, is that
8  if suspect is yelling and screaming then that's
9  an indication that he's breathing and he's taking
10  in air; is that true?
11     A.   I agree with that.
12     Q.   Okay.  And that's something that is
13  widely known and has been a widespread
14  understanding for a number of years with regard
15  to training, true?
16     A.   You take away the breath the fight goes
17  away and that's with anybody, us as well as
18  anything.  We've had some of our officers get in
19  a struggle and they get where they can't breathe,
20  you're going to pass out eventually.  Yes, sir.
21  That happens to our officers so.
22     Q.   Just so I'm clear, so Hector Arreola is
23  yelling loudly in this video, at least part of
24  the time that he can't breathe, you heard that,
25  right?

1      A.   I heard him a couple of times, yes,
2  sir.  I couldn't -- there were some things he
3  hollered I couldn't -- it was inaudible to me.  I
4  couldn't tell what he was saying.
5      Q.   And I can understand that, but the
6  officers were not misstating their understanding
7  of training when they said that they understood
8  that if he's yelling and screaming I can't
9  breathe or yelling and screaming anything that
10  that's an indication that he indeed can breathe,
11  right?
12         MR. SNIPES:  Objection to the form.
13         THE WITNESS:  I haven't spoke to either
14     one of the the officers so I don't know.  I
15     have not discussed the case until someone
16     comes directly to me to discuss something
17     with me, I haven't discussed it.
18  BY MR. POST:
19     Q.   I'm not asking what they said to you,
20  I'm saying assume that's what they said under
21  oath.  Officer Aguilar and Officer Dudley, that
22  it was an indicator to them that Arreola could
23  still breathe if -- when he was screaming and
24  yelling loudly?
25     A.   Mr. Post, I'm not trying to be a smart

DEPOSITION OF: LT. TIM WYNN  6-18-2020

SHEET 23  PAGE 89

1  aleck here, but you're going to have to ask them
2  that.  I don't know what they said, I don't know
3  if they said that, I guess that would be correct,
4  but that's something that needs to be asked them
5  not me.
6      Q.  I'm not asking you about what they said
7  or any of that.  I'm asking that if they're
8  saying that that was part of their training and
9  part of their understanding, that's that's widely
10  known, right?
11     A.  Well if that's what they said --
12         MR. SNIPES:  Object to the form.  I
13     don't understand the question at all.
14     That's why they know, what does that mean?
15     He said that's widely known.
16         MR. POST:  Widely felony.
17         MR. SNIPES:  Widely known, okay.
18  BY MR. POST:
19     Q.  All right.
20     A.  All right.  So this is what they're
21  saying to you, that they admitted to, right?
22     Q.  Right.
23     A.  This is what the officer stated?
24     Q.  I'll read it to you.  Why don't we just
25  do that since I'm not going to --

PAGE 90

1      A.  All right.
2      Q.  Officer Dudley in his deposition said,
3  quote, the way he was yelling I knew he was still
4  able to inhale and exhale a large amount of air
5  during that time.  But even then I still tried to
6  let up, obviously when someone is complaining
7  about can't breathe you don't want anything
8  traumatic to happen.
9      So what I'm asking you with regard to him,
10  is he's not wrong when he says he understands
11  that the yelling indicated to him that Arreola
12  was still able to inhale and exhale a large
13  amount of air, right?
14         MR. SNIPES:  Object to the form.
15         THE WITNESS:  Okay.  I understand he's
16     admitting to that, yes.  He is admitting to
17     that, but the one problem I have in his
18     statement is if you let up, if you don't
19     have him in custody you're taking a big
20     chance of putting yourself in jeopardy.  If
21     he's not in custody, restrained.  But I
22     understand what he said so, if that's what
23     he said, yes, sir.
24  BY MR. POST:
25     Q.  Okay.  And similarly Officer Aguilar

PAGE 91

1  said you didn't -- well, the question to him was
2  you didn't tell EMS personnel or anybody that
3  Hector Arreola had been crying and saying that he
4  couldn't breathe for several minutes, did you?
5  And his answer was, this is on page 140 of that
6  transcript, his answer was I did not.  When he
7  made those statements we were actively engaged in
8  a struggle.  By him talking and being able to
9  say, quote, I can't breathe multiple times,
10  indicated to me that he was breathing just fine.
11  Because if he had enough breath to say it he had
12  enough breath to breathe.
13     So what I'm getting at with regard to that
14  statement, and what I read to you about from a
15  Officer Dudley before, is that's part of their
16  training, right?
17     A.  Yeah.
18         MR. SNIPES:  Object to the form.
19  BY MR. POST:
20     Q.  Is that correct?
21     A.  Yes, sir.
22     Q.  Okay.  And it was in 2016 and still is
23  today, correct?
24     A.  They -- they -- we train them that if
25  all possible you try to get the struggle, get

PAGE 92

1  them restrained, get them off the ground as
2  quickly as possible.  Now, is it always possible
3  to get them directly off the ground, no, it's
4  not.  In a perfect world it is, not in our world
5  it's not because our world ain't perfect, so.
6      Q.  Well, you're training these officers to
7  look for certain cues to maintain or to avoid I
8  guess a medical emergency, right?
9      A.  It appeared to me in the video that
10  Officer Aguilar, that's why he continued to talk
11  with him because he was trying to get more
12  identifying clues.  I honestly believe that's why
13  he called the ambulance because he had identified
14  some clues and of course, once this Mister,
15  what's his last name, Arreola?
16     Q.  Arreola.
17     A.  Arreola went to the other houses and
18  started knocking on doors and disturbing the
19  peace well okay, you can't let him go up there
20  and knock on every door in the neighborhood and
21  wake everybody up.
22     Q.  True.
23     A.  So --
24     Q.  But one of the cues I'm getting at that
25  you're -- because police officers are analyzing

DEPOSITION OF: LT. TIM WYNN  6-18-2020

SHEET 24  PAGE 93

1  lots of things and my question is one of the cues
2  that the officers are trained to look for is
3  whether the person is still yelling and
4  screaming, which indicates that they have
5  sufficient breath to breathe, right?
6      A.   You're monitoring but are you speaking
7  of during the fight or are you speaking of --
8      Q.   Yes, sure.
9      A.   If they're struggling with you my
10 intent is to get them restrained as quickly as I
11 possibly can.  And then try to -- and then we try
12 to address and get them off the ground.
13     Q.   Right.  But I'm talking about what cues
14 the officer is looking for because they're
15 talking about this specific cue or understanding
16 being the yelling and screaming, indicating to
17 you --
18     A.   You're going to hear them struggling
19 against you and saying things and you're going to
20 hear things as you're struggling with them,
21 usually it's grunting or there's cussing or all
22 kind of things.
23     Q.   But if they can do that the point is
24 that the officers are trained that that's an
25 indicator that they can still breathe, correct?

PAGE 94

1          MR. SNIPES:  Object to the form.
2          THE WITNESS:  I would -- I would say if
3      they're making noises and screaming and
4      hollering momma, and I can't breathe and all
5      this, that they're getting some type of air.
6  BY MR. POST:
7      Q.   Okay.
8      A.   I would say that would be safe to say.
9      Q.   Okay.  And that's what --
10     A.   I won't necessarily say we trained them
11 to listen for that, but it's something that's
12 -- that's -- they are trained to look for cues so
13 to speak.
14     Q.   And that --
15     A.   And not necessarily those words in
16 exact.
17     Q.   But those -- and that would be a cue,
18 right?
19         MR. SNIPES:  Object to the form.
20         THE WITNESS:  I guess if that's -- I
21     guess it could be a cue, they're speaking
22     so.
23 BY MR. POST:
24     Q.   I'm just trying to determine whether
25 what these officers said might have been gained

PAGE 95

1  through their training?
2          MR. SNIPES:  Object to form.  He'S
3      already said it was not.
4          MR. POST:  Well, I don't think that's
5      what he said.
6          MR. SNIPES:  Well, you've asked it a
7      lot of different ways.
8          MR. POST:  Well, I'm still not clear on
9      it.  I'm entitled to make it clear and I do
10     not think it is completely clear, that it
11     the point.
12         THE WITNESS:  Yeah, the question is
13     kind of confusing, Mr. Post.  That's why
14     -- you keep beating around, moving around
15     different areas, I would -- rather than
16     asking a direct question.
17 BY MR. POST:
18     Q.   Well, the direct question is, I've
19 tried to ask it multiple ways because I'm trying
20 -- I don't think I've really got an answer.  I
21 read to you what the two police officers said.
22     A.   Yes, sir.
23     Q.   Right.  And they have gained that
24 understanding somewhere?
25     A.   Yes, sir.

PAGE 96

1      Q.   I'm assuming through training?
2          MR. SNIPES:  Object to the form.
3          THE WITNESS:  They could have got it
4      through training, they could have picked it
5      up a lot of different ways through their
6      training officer.  There is a lot of things
7      they could have picked it up from.
8  BY MR. POST:
9      Q.   You've been in, I would assume
10 struggles and fights --
11     A.   I have.
12     Q.   -- as a patrol officer, right?
13     A.   I have.
14     Q.   If you're hearing a suspect or a
15 subject yelling and screaming you're assuming he
16 can still breathing, correct?
17     A.   I do.
18     Q.   Okay.  And that's why the --
19     A.   I just I can't speak for them.  If
20 you're asking me I could tell you yes, I could
21 say that.  But, the main thing in a struggle that
22 what we're trying to do is stop the struggle as
23 quickly as we possibly can do get them
24 handcuffed.  The longer the struggle, the worst
25 things could turn out.  And when you have someone

DEPOSITION OF: LT. TIM WYNN  6-18-2020

SHEET 25  PAGE 97

1  fighting with you for four and a half minutes
2  that's -- that's almost unheard of.
3      Q.   Okay.  So --
4          MR. CASHBAUGH:  Hold on mark, I've got
5      a text, lunch is here.
6              OFF THE RECORD.
7              ON THE RECORD.
8  BY MR. POST:
9      Q.   So let me just see if I can ask it
10  succinctly.  So any officer, specifically Aguilar
11  and Dudley, that claims that he took the
12  screaming of I can't breathe as evidence of
13  breathing and lack of distress because that is
14  what they were taught by the Columbus Police
15  Department in their in-service training is
16  incorrect; is that correct?
17          MR. SNIPES:  Object to the form.
18          THE WITNESS:  We don't -- we don't talk
19      about they can't breathing part.  You're
20      trying to put words into what we do.  We try
21      to get them into custody as soon as
22      possible, as we possibly can and get them
23      restrained so we can get them up off the
24      ground and get them into the car.  That is
25      the way we're trained.  Now, if they're on

PAGE 98

1      the ground and they're talking I can't say
2      if that's -- that would be a clue that
3      they're breathing, but is that a clue that
4      there's any kind of distress, I don't know.
5      I wasn't out there, you've got to be out
6      there.  I can't sit there and say that's
7      something you have to ask them.  Them saying
8      this I don't feel comfortable me answering
9      for them.  I can answer for myself, if you
10      ask me, but it's a hypothetical question.
11  BY MR POST:
12      Q.   Well, I'm asking about what their
13  training was.  So the actual --
14      A.   The training is what I told you there,
15  we train them to get them in restraints as
16  quickly as we possibly can, and get them off the
17  ground and get them to a car if possible.  If
18  it's feasible.  Now, does that always work, no,
19  it does not, especially if you have to really
20  struggle with someone and fight with someone to
21  get them into custody.  If they continue to
22  struggle after you get the cuffs on them well,
23  there may be another others things and means you
24  have to do.  Maybe get you a -- either maybe a
25  belly chain or either shackles to stop them from

PAGE 99

1  kicking.  So there are several things that could
2  take place after that.  But not one of them is a
3  cookie cutter, they're all different.
4      Q.   But what I'm getting at is why would
5  both of these police officers say, hearing that,
6  hearing the yelling was an indicator to them that
7  Hector Arreola could breathe?
8          MR. SNIPES:  Object to the form.  How
9      in the world would he know that?  Why would
10      somebody say something, is that the
11      question?
12          MR. POST:  Well, he's their training
13      officer.  They have to get it from
14      somewhere.
15          MR. SNIPES:  You're asking the witness
16      why would somebody else say something?
17          THE WITNESS:  If I assumed -- if I
18      assumed he was breathing, if he's talking,
19      yes, I would say he's breathing because I
20      couldn't talk to you if I wasn't breathing.
21  BY MR. POST:
22      Q.   Was the training and policy of Columbus
23  Police Department in 2016 and 2017, would it have
24  been that screams of I can't breathe should be
25  taken as evidence of a potential medical

PAGE 100

1  -- serious medical emergency?
2          MR. SNIPES:  You object to the form,
3      asked and answered multiple times.
4          THE WITNESS:  I don't know that -- I
5      don't know.
6  BY MR. POST:
7      Q.   Well, let me ask you this about the use
8  of force policy in effect in January of 2017.
9      A.   2016 or 2017?
10      Q.   Well, it was -- I think it was the 2016
11  policy was still in effect on January 9th of
12  2017.
13      A.   Okay.
14      Q.   Do you agree, at least that's what I've
15  been given?  That 2016 policy which is CCG 3317
16  through 3333 -- what number are we on?
17  Plaintiff's Exhibit 5 is CCG 3317 through 3333,
18  use of force, revision date 10/16 which was in
19  effect in January of 2017, I believe.  I'll give
20  that to you.
21      A.   All right.  What is it -- what are you
22  asking me now?
23      Q.   This use of force policy that I've
24  handed you, as previously identified is the use
25  of force policy of course, that was in effect on

DEPOSITION OF: LT. TIM WYNN 6-18-2020

SHEET 26  PAGE 101

1  January 9th of 2017, correct?
2      A.   June 9th you said?
3      Q.   January 9 of 2017?
4      A.   If this is the one they said that was
5  revised for this, I would say yes.  It gets
6  revisions multiple times so is this the one that
7  was -- they said was in effect, if it's showing
8  effective 10 of 16, yes, sir.  I'd say that would
9  be our policy.
10     Q.   Okay.  That is what has been given to
11 me through discovery by --
12     A.   Yes, sir.
13     Q.   -- the lawyers saying that that is the
14 policy in effect.
15     A.   It appears this would be it.  Yes, sir.
16     Q.   Okay.  And 3-1.2 on that first page is
17 the use of force policy, correct?
18     A.   Yes, sir.  Use of force, yes, sir.
19     Q.   And then on --
20     A.   Description.
21     Q.   -- at the very back of this is the
22 deadly force policy on 3332 and 3333, correct?
23     A.   Yes, sir.  It looks consistent.  Yes,
24 sir.
25     Q.   Okay.  And of course, a police officer

PAGE 103

1  officers decided to arrest him for disorderly
2  conduct.  Would you consider that a serious
3  offense in this instance?
4      A.   Do I consider it a serious offense, no,
5  it's an offense but.
6      Q.   All right.  That's all I have.  That's
7  good enough.
8          MR. SNIPES:  All done?
9          MR. POST:  Yes .
10         MR. SNIPES:  I don't have any
11 questions.
12         COURT REPORTER:  Copy, Mr. Post?
13         MR. POST:  Of course.
14         COURT REPORTER:  Copy, Mr. Snipes?
15         MR. SNIPES:  Sure.
16     DEPOSITION CONCLUDED AT 1:13 P.M.

PAGE 102

1  has to use reasonable force in accordance with
2  the constitutional rights of all citizens,
3  correct?
4      A.   Yes, sir.
5      Q.   And according to this policy that we're
6  looking at, the Columbus Police Department
7  officers could only use reasonable force to make
8  an arrest in 2016 and 2017, agreed?
9      A.   That's very much always been the case.
10     Q.   And still is?
11     A.   Yes.
12     Q.   And Columbus Police Department policy
13 states that any officer that uses excessive force
14 to effect an arrest or continues to use force
15 after the person has submitted to arrest is
16 subjected to disciplinary action or termination
17 from the department, correct?
18     A.   That's correct.
19     Q.   And Officer Dudley and Aguilar and
20 Evrard are still employed by the CPD, aren't
21 they?
22     A.   They are.
23     Q.   Okay.  And of course, Hector Arreola
24 was undoubtedly knocking on doors or a door at
25 least at 5:00 a.m. in the morning and the

PAGE 104

CERTIFICATE

STATE OF GEORGIA
COUNTY OF MUSCOGEE
     I, Russell D. Anderson, a Georgia Certified
Court Reporter, in and for Muscogee County,
Georgia, do hereby certify that the aforegoing
pages numbered 2 through 103, inclusive, contain
a true and correct transcription of the
stenographic notes taken by me on the 18th of
June, 2020 of the testimony of Lt. Tim Wynn, 1111
Bay Avenue, Third Floor, Columbus, Georgia, to
the best of my skill and ability.
     I further certify that I am not of counsel,
nor am I related to the parties in this action,
nor am I in anywise interested in the result of
said action.
WITNESS MY HAND, this 29th day of June, 2020.




RUSSELL D. ANDERSON
COURT REPORTER
CERTIFICATE NO. B-403

SHEET 27   PAGE 105

LT. TIM WYNN

_____

DEPONENT'S SIGNATURE PAGE AND ERRATA SHEET

MUSCOGEE COUNTY, GEORGIA
    I DO HEREBY CERTIFY that I have read the
foregoing deposition and the following
corrections are required as a result of the

PAGE/LINE             CORRECTION/REASON

_____
_____
_____
_____
_____
_____
_____
_____
_____
_____

Signed before _____, Notary Public,
this the ___ day of _____, 2020.

_____
(NAME OF NOTARY)

PAGE 106

June 29, 2020

IN RE:  SIGNATURE TO DEPOSITION

Dear Mr. Snipes


    Please have Lt. Tim Wynn to read his
deposition and sign the errata sheet.
    After having done this, please have the
errata sheet and the signature page returned to
me for attachment to the original and filing with
the court.
    You have the required 30 days within which
to provide signature.  I will try to accommodate
you as much as possible to accomplish this.
    Should you need to contact me, please call
me at 327-3618 Monday through Friday.

Thank you for your attention to this matter.

Sincerely,

RUSSELL D. ANDERSON