DEPOSITION OF: CHIEF RICHARD BOREN 6-18-2020

SHEET 1  PAGE 1

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
COLUMBUS DIVISION

RODRIGO ARREOLA, as parent of )  CASE NO.:
Hector Arreola, Deceased, and )  4:19-CV-00005-CDL
as Personal Representative )
and Administrator of the )
Estate of Hector Arreola, )
CONCEPCION ARREOLA, as parent )
of Hector Arreola and S.A., )
minor child of Hector Arreola )
by next friend Jezreel Imee )
Custodio, )
        Plaintiffs, )
 )
 )
v. )
 )
THE CONSOLIDATED GOVERNMENT OF)
COLUMBUS, GEORGIA, OFFICER )
MICHAEL AGUILAR, in his )
individual and official )
capacity, OFFICER BRIAN DUDLEY)
in his individual and official)
capacity, OFFICER AARON )
EVRARD, in his individual and )
official capacity, and )
COLUMBUS POLICE DEPARTMENT )
CHIEF OF POLICE RICHARD T. )
BOREN, in his individual and )
official capacity, )
        Defendants, )

     The deposition of CHIEF RICHARD T. BOREN,
taken by the Plaintiff, before Russell D.
Anderson, a Georgia Certified Court Reporter, at
Page, Scrantom, Sprouse, Tucker & Ford, 1111 Bay
Avenue, Third Floor, Columbus, Georgia, 31901, on
the 18th of June, 2020, beginning at 1:00 P.M.

---

PAGE 2

A P P E A R A N C E S

FOR THE PLAINTIFF:
     HON. MARK POST
     3 Bradley Park Court, Suite F
     Columbus, Georgia, 31904
     mpost@markpostlaw.com

FOR THE DEFENDANTS:
     HON. TYLER CASHBAUGH
     HON. ALAN SNIPES
     HON. JAMES C. CLARK, JR.
     3rd Floor, Synovus Building
     Bay Avenue
     Columbus, Georgia, 31902
     tcashbaugh@psstf.com
     ags@psstf.com
     jcc@psstf.com

     RUSSELL D. ANDERSON, COURT REPORTER
     P.  O. BOX 2572
     COLUMBUS, GEORGIA  31902-2572
     (706) 905-1759

---

PAGE 3

D I S C L O S U R E

STATE OF GEORGIA
COUNTY OF MUSCOGEE

     Deposition of: CHIEF RICHARD T. BOREN

     Pursuant to Article 8.B of the rules and
regulations of the Board of Court Reporting of
the Judicial Council of Georgia, I make the
following disclosure:
     I am a Georgia Certified Court Reporter.  I
am here as a sole practitioner of ANDERSON COURT
REPORTING.
     I was contacted by the Plaintiff to provide
court reporting services for the deposition.
     I will not be taking this deposition under
any contract that is prohibited by O.C.G.A.
15-14-37 (a) and (b).
     I have no contract / agreement to provide
reporting services with any party to the case,
any counsel in the case, or any reporter or
reporting agency from whom a referral might have
been made to cover this deposition.  I will
charge my usual and customary rates to all
parties in the case, and a financial discount
will not be given to any party to this
litigation.

_____, CCR# B-403
RUSSELL D. ANDERSON
Certified Court Reporter

OPTIONAL SIGNATURES:

_____ Date:_____
Attorney for Plaintiff/Complainant

_____ Date:_____
Attorney for Defendant/Respondent

---

PAGE 4

STIPULATIONS

     IT IS STIPULATED AND AGREED, by and between
the parties through their respective counsel that
the deposition of CHIEF RICHARD T. BOREN, may be
taken before Russell D. Anderson, a Georgia
Certified Court Reporter, at 1111 Bay Avenue,
Third Floor, Columbus, Georgia, on the 18th of
June, 2020, beginning at 1:00 P.M.
     IT IS STIPULATED AND AGREED, that the
signature and reading of the deposition by the
witness is not waived, the deposition to have the
same force and effect as if full compliance had
been had with all laws and rules of court
relating to the taking of depositions.
     IT IS FURTHER STIPULATED AND AGREED, that it
shall not be necessary for any objections to be
made by counsel to any questions, except as to
the form of the question and that counsel for the
parties may make objections and assign grounds at
the time of trial, or at the time said deposition
is offered in evidence, or prior thereto.
     IT IS FURTHER STIPULATED AND AGREED, that
notice of filing of the deposition by the court
reporter is waived.

DEPOSITION OF:  CHIEF RICHARD BOREN  6-18-2020

SHEET 2   PAGE 5

1                      INDEX
2                                    PAGE
3  Examination by Mr. Snipes ............. 6
4  Certificate of Reporter .............. 76
5              INDEX OF EXHIBITS
6  Plaintiff's Exhibit 2 ................ 47

PAGE 7

1  and sometimes witnesses have a bad habit of
2  interrupting a question with an answer.  So if
3  you would, I'll try to wait before I ask another
4  question until you finish your answer and if you
5  would wait till I finish my question until you
6  answer, I think that would probably help us move
7  this all along; is that agreeable with you?
8      A.   That's fine.  Yes, sir.
9      Q.   And if I don't do that don't hesitate
10 to interrupt me.
11     A.   Okay.
12     Q.   How many times have you testified under
13 oath for depositions and jury trials?  And I
14 phrase it that way to exclude grand juries,
15 juvenile, Municipal Court and Recorder's Court
16 because I know that would probably be in the
17 thousands.
18     A.   At least a 100 times, probably more.
19     Q.   Do you have any difficult with your
20 hearing?
21     A.   No.
22     Q.   For some reason you think you did not
23 completely hear a question or if I get tired and
24 taper off, stop me and ask me to repeat it if you
25 don't fully hear it, okay.

PAGE 6

1                D-E-P-O-S-I-T-I-O-N
2           MR. POST:  This will be the deposition
3      of Chief Richard T. Boren taken by the
4      Plaintiffs for the purposes of discovery and
5      all purposes allowed by law.  The deposition
6      is taken by agreement of Counsel and
7      pursuant to notice, which is Plaintiff's
8      Exhibit Number 1 as amended.
9  BY MR. POST:
10     Q.   All right.  Chief, if you would please,
11 sir, tell us what your full name is?
12     A.   It's Richard Thomas Boren.
13     Q.   Okay.  And you go by Ricky?
14     A.   Ricky, correct, R-I-C-K-Y.
15     Q.   I expect you've given many depositions,
16 correct?
17     A.   Not many but a few.
18     Q.   Okay.  Obviously you know you're under
19 oath here today?
20     A.   I do.
21     Q.   And this is just as important as a jury
22 trial; you understand that?
23     A.   I do.
24     Q.   As you know, lawyers have a bad habit
25 of interrupting an answer with another question

PAGE 8

1      A.   Sure.
2      Q.   Are you suffering from any mental or
3  physical condition which would cause you to be
4  unable or that would interfere with your ability
5  to testify fully and truthfully today?
6      A.   No.
7      Q.   What materials have you reviewed in
8  preparation for this deposition?
9      A.   I have looked at a portion of the GBI
10 report.  I have looked at a portion of the Office
11 of Professional Standards report.  I have looked
12 at tapes, videotapes and body cam tapes that was
13 taken by my officers at the scene.  And I have
14 talked to my major in charge of the OPS Division.
15     Q.   Okay.  Which major is that?
16     A.   Major Blackmon.
17     Q.   Fred Blackmon?
18     A.   Correct.
19     Q.   And you say you reviewed part of the
20 GBI report, what part of the GBI's report do you
21 have?
22     A.   The portion of the autopsy.
23     Q.   Okay.  You got the autopsy and the
24 crime lab reports essentially; is that right?
25     A.   Correct.

DEPOSITION OF:  CHIEF RICHARD BOREN  6-18-2020

SHEET 3  PAGE 9

1    Q.    Okay.  But nothing else?  You don't
2  have the complete report?
3    A.    No.
4    Q.    That makes two of us.  You still live
5  in the Upatoi area, correct?
6    A.    I do.
7    Q.    How long have you been married to
8  Nancy?
9    A.    We were married in '85.
10   Q.    Do you have children?
11   A.    Yes, I do.  I have three children.
12   Q.    What are their ages?
13   A.    Twenty-two, twenty, and seventeen.
14   Q.    You're getting close to getting some of
15  them off the dough, maybe.  Don't answer that.
16  The 17 year old still in high school?
17   A.    Columbus High School.
18   Q.    Where did the other two go to high
19  school, the same place?
20   A.    The same place.
21   Q.    The 22 and 20 year olds, are they
22  employed?  Are they going to college or?
23   A.    Twenty-two just graduated from UGA, the
24  20 year old is a junior at UGA.
25   Q.    Are they coming home?  Well, is the one

PAGE 10

1  that's graduated coming home to work?
2    A.    Don't know yet.  She's at home now
3  trying to figure out what she wants to do with
4  the remainder of her education.
5    Q.    Got it.  What church do you go to?
6    A.    I don't attend a church on a regular
7  basis.  I attend several churches around Columbus
8  on different events.
9    Q.    I understand.  Do you have any brothers
10  or sisters?
11   A.    I have five sisters, all of them still
12  live in Columbus.
13   Q.    You're the only boy?
14   A.    Only boy.
15   Q.    Okay.  What are their professions?
16   A.    Three of them are retired.  One of them
17  works at Synovus and the other one is or was
18  partial owner of a bakery.
19   Q.    Did the bakery have financial issues
20  with the COVID-19 or just about to sell it?
21   A.    Not that I'm aware of.
22   Q.    Okay.  The one that works for Synovus,
23  are they in management -- is she in management
24  or?
25   A.    She is, I think she's in the

PAGE 11

1  secretarial area of Synovus.
2    Q.    And the three retired sisters, what did
3  they retire from?
4    A.    Two -- one of them retired from one of
5  the local banks and the other two were Blue
6  Cross/Blue Shield.
7    Q.    Which one of the banks it was?
8    A.    Well, it started off at First National
9  and then I think it ended up being Wells Fargo.
10   Q.    Okay.  Did you bring your CV with you
11  today?
12   A.    Okay.  Did I bring my --
13   Q.    It sound like Mr. Cashbaugh may have
14  it.
15   A.    Did I bring my what?
16   Q.    Your resume?
17   A.    I did not.
18   Q.    Fancy people say a CV?
19   A.    Okay.
20   Q.    Curriculum vitae.
21   A.    And I do not have my reading glasses.
22  Okay.
23   Q.    Is that it?  Does that -- is that the
24  CV?
25   A.    Yes.

PAGE 12

1    Q.    Let me see what you've got there, if
2  you don't mind.
3    MR. POST:  We don't have any dispute
4  that that's his CV, do we?
5    MR. SNIPES:  No.
6    MR. POST:  Okay.  If I can have that
7  copy I'll just mark it and put it in and I
8  really don't need to ask any questions about
9  it, is that okay, or do you want me to --
10   MR. CASHBAUGH:  Sure, but if you want
11  to use it as -- I think it's got -- it's
12  confidential so I think --
13   MR. POST:  Why don't you just let me
14  have a copy.  Can I have it?
15   MR. SNIPES:  Why don't we just put on
16  the record, Mark, since it has some
17  confidential information in it, that we have
18  produced the CV to you today and there is no
19  dispute that the document you're looking at
20  there is his CV and we'll stipulate to the
21  authenticity of that document if it's ever
22  need for trial.  But for the purposes of
23  today we don't need to attach it to the
24  deposition.  Does that work for you?
25   MR. POST:  That's fine.  That's

DEPOSITION OF: CHIEF RICHARD BOREN 6-18-2020

SHEET 4 — PAGE 13

```
 1      absolutely fine.  I know the Chief well
 2      enough to know some of his professional
 3      background.
 4 BY MR. POST:
 5      Q.   The first page has a heading that says
 6 Professional Experience, 1971 through the
 7 present.  The second page has the heading towards
 8 the bottom called Education and Training, and the
 9 third page just says references available upon
10 request.  So I'll just put this over here and
11 that will be good enough for that.
12      Prior to -- well, let me ask you this,
13 Chief, when did you begin your employment with
14 the Columbus Police Department?
15      A.   December the 13th, 1971.
16      Q.   What was your employment just prior to
17 your employment with the CPD?
18      A.   I worked with my uncle.  My uncle had a
19 few stores and some service centers in Columbus.
20      Q.   Okay.  Obviously when I say CPD I'm
21 referring to Columbus Police Department during
22 this deposition, sir.
23      When did you become chief of police?
24      A.   November the 1st, 2004.
25      Q.   What was your position just prior to
```

PAGE 14

```
 1 that?  Was it assistant chief?
 2      A.   Assistant chief for two years earlier
 3 than that, so since 2002.
 4      Q.   Do you socialize with any of the
 5 officers in this lawsuit, Corporal Aaron Evrard,
 6 or Officer Brian Dudley and Officer Michael
 7 Aguilar?
 8      A.   I do not.
 9      Q.   Okay.  Do you know them?
10      A.   I do know them.
11      Q.   Which officers or employees or command
12 staff do you socialize with?
13      A.   None.
14      Q.   Are you mostly a go to work and go home
15 type of guy?
16      A.   Exactly.
17      Q.   A lot of us tend to do that later on.
18 All right, Chief.  I've got some ordinances, City
19 Ordinances which kind of outline your authority,
20 but I think looking at your policy manual that
21 those ordinances are outlined in the policy
22 manual as far as what your authority; is that
23 fair to say?
24      A.   It should be.
25      Q.   And I'll point you to the specific
```

PAGE 15

```
 1 places here in a minute.  But I want you to look
 2 at this, which is what I've been provided marked
 3 as CCG 3212 through CCG 3845, and they -- the
 4 Defense lawyers have put those little Bates
 5 stamps on them to delineate or to number certain
 6 things that we can refer to.  I understand this
 7 to be the entirety of the Columbus Police
 8 Department policy manual for -- that was in
 9 effect on January the 9th of 2017.  I'm going to
10 let you look at it to make sure I've got the
11 right thing.
12      A.   (Examines document.)  It appears to be,
13 but without going through it page by page I can
14 say it appears to be.
15      MR. POST:  And will y'all -- will you
16      guys, Alan, will y'all stipulate to that so
17      we don't have to make him read the whole
18      thing?  I mean, that's --
19      MR. SNIPES:  Yeah, we'll -- we will
20      stipulate that that was what was provided to
21      us.
22      MR. CASHBAUGH:  Yeah, that's policy
23      provided to us by the Columbus Police
24      Department.
25      MR. POST:  Okay.  That was in effect on
```

PAGE 16

```
 1 -- for January 9, 2017?
 2      MR. CASHBAUGH:  Correct.
 3 BY MR. POST:
 4      Q.   Okay.  Because I want to ask you from
 5 time to time about some of your policy and as I
 6 understand it the Columbus Police Department
 7 manual as it is titled is -- consists of the
 8 policies and procedures of the Columbus Police
 9 Department; is that correct?
10      A.   Correct.
11      Q.   And these are your general orders is
12 what you call them; is that right?
13      A.   Correct.
14      Q.   And from time to time these general
15 orders are amended, true?
16      A.   On a regular basis.
17      Q.   Okay.  And typically when you amend it
18 from one year -- one date to the next date you
19 put in bold the parts that have been changed from
20 the previous issue; is that right?
21      A.   Some of the time.
22      Q.   Okay.  But it -- that's generally true;
23 is that fair to say?
24      A.   It's true when it goes out to the
25 officers, when it's been a change.
```

DEPOSITION OF:  CHIEF RICHARD BOREN  6-18-2020

SHEET 5  PAGE 17

1  Q.  Okay.  It helps one see what was
2  changed, correct?
3  A.  Right.
4  Q.  Okay.  I've noticed that a few times
5  and I just wanted to make sure that I --
6  A.  Correct.
7  Q.  -- was understanding that.
8  A.  Right.
9  Q.  And at the top of these policies and
10  procedures there is a box that says revision date
11  on this first page, it's May of 2007.  And
12  effective date of May of 2007.  And on each one
13  of these general orders it has such markings and
14  -- is that true?
15  A.  That's correct.
16  Q.  And revision date is essentially the
17  last time this general order was revised, right?
18  A.  It should be.  And then again, I would
19  have to see something specific and check our
20  file.  It should be.
21  Q.  Okay.
22  A.  But it's not 100 percent sure that that
23  was the last revision date.
24  Q.  Okay.  And what I'm trying to do is
25  make sure that we're talking about what was in

PAGE 18

1  effect on January 9th of 2017 and not something
2  that has since been revised or revised just prior
3  to January 9th of 2017.  So if you see anything
4  that I'm referring to that has -- that is
5  different from this, let me know, okay.
6  A.  All right.
7  Q.  And previously -- let me see where I
8  put it.  In the deposition we did I introduced
9  Plaintiff's Exhibit 2 of the deposition with
10  Lieutenant Wynn, which was part of the Columbus
11  Police Department Mission Statement, and policies
12  from CCG 3215 and 16 through CCG 3218 through
13  3231.
14  I'm going hand that to you for reference
15  purposes and I may ask you a couple of questions
16  about it.  I've read the policy in your manual
17  and one with thing that -- well, before I get
18  into that, let me ask you this.  Look at 1-1.3, I
19  think it's 3230.  I think that's in there.
20  A.  1.3?
21  Q.  Yes, sir.
22  A.  Okay.
23  Q.  1-1.3 and 1-1.5.  I think I found
24  something wrong, hold on.  Okay.  Yeah, I did.
25  Yeah, I typed CCG number wrong is what I did.

PAGE 19

1  It's 3220 which you've already found, 1-1.3 and
2  then the next page, 3221 it's 1-1.5 and those
3  particular general orders set forth some of the
4  organization of the Columbus Police Department,
5  specifically what your office as chief of police
6  does, correct?
7  A.  Well, I haven't read it, but it should
8  be.
9  Q.  Okay.  Well, take a look at it.
10  A.  (Examines document.)
11  MR. SNIPES:  Can we go off the record
12  for just a second?
13  OFF THE RECORD.
14  ON THE RECORD.
15  BY MR. POST:
16  Q.  So 1-1.3, is -- that we have here is
17  -- describes the Office of the Chief of Police,
18  correct?
19  A.  Correct.
20  Q.  And one of the sentences in that
21  description is the Chief of Police shall
22  formulate departmental policies and see that all
23  general orders, policies and special orders are
24  understood and enforced, true?
25  A.  Correct.

PAGE 20

1  Q.  And in the next sentence, the
2  department operates under the direct supervision
3  of the chief of police, correct?
4  A.  Correct.
5  Q.  And that is your job and has been for a
6  number of years, right?
7  A.  Correct.
8  Q.  And flipping over to 1.15, on the next
9  page, it says department command.  And it
10  indicates that the authorities have chartered the
11  Columbus Consolidated Government of Columbus,
12  Georgia, it places the administrative patrol of
13  the police department under the Mayor and the
14  chief of police as appointed by the Mayor and
15  subject to approval of the Mayor, manages and
16  controls and directs activities of personnel of
17  the police department, correct?
18  A.  Correct.
19  Q.  And you're the executive officer of the
20  Columbus Police Department, right?
21  A.  Correct.
22  Q.  And you're responsible for the
23  selection, training, assignment and promotion of
24  all personnel; is that right?
25  A.  I make the final decision on rank,

DEPOSITION OF: CHIEF RICHARD BOREN 6-18-2020

SHEET 6  PAGE 21

1 correct.
2   Q.  Okay.  And I'm just kind of going down
3 the list there, part B is the one I was referring
4 to that says, "Chief of police shall be
5 responsible for the selection, training,
6 assignment, promotion of all personnel," and that
7 correctly states the policy, right?
8   A.  Correct.
9   Q.  Part C, the chief of police is
10 authorized to propagate, orders policy and
11 procedures governing the conduct of the
12 departmental personnel and the activities and
13 operations of the police department, that's
14 policy, correct?
15   A.  Correct.
16   Q.  And the chief of police may delegate
17 any of the responsibilities of the office to any
18 of the subordinates within the Columbus Police
19 Department, that's part of your authority,
20 correct?
21   A.  Correct.
22   Q.  Okay.  And part -- like I was saying,
23 I've read your policies and procedures manual and
24 one thing that has confused me a little bit is
25 how the CPD training manual, the CPD chain of

PAGE 22

1 command manual and the CPD interoffice directive
2 manual works -- worked together with the policy
3 manual.  And there are some references to those
4 manuals at 1-2.2 which is on page CCG 3225 and
5 26, 1-2.2.  And specifically of course, in part
6 B of 1-2.2 I see that the Columbus Police
7 Department training manual referenced, and I see
8 that the director of the training divisions shall
9 conduct an annual review of the Columbus Police
10 Department training manual.  And that you receive
11 a report annually with respect to; is that right?
12   A.  Correct.  It comes through the bureau
13 major.
14   Q.  Okay.  And that's Lieutenant Wynn's
15 direct supervisor, right?
16   A.  Correct.
17   Q.  Okay.  And then in part C it says the
18 Columbus Police Department training manual,
19 Columbus Police Department interoffice directive
20 manual and the Columbus Police Department chain
21 of command manual shall be bound separately from
22 the Columbus Police Department manual.  So
23 understanding that, what my confusion is a little
24 bit is do those other manuals that I've just
25 named, are they -- do they contain your policies

PAGE 23

1 and procedures?
2   A.  Some of them do, but not all of them.
3 And we don't have -- most of our stuff now is
4 kept on computers.  This was I guess designated
5 at a point in time when it actually existed.  But
6 there is a lot of this stuff now we keep on the
7 computer and not in a bound copy.
8   Q.  But you still refer to it as a manual?
9   A.  Correct.
10   Q.  Correct?
11   A.  Yes.
12   Q.  So --
13   A.  But it won't be in a manual.
14   Q.  Okay.  So how do you know which ones of
15 those are policies and procedures and which ones
16 aren't?
17   A.  Well, most of the interoffice directive
18 manuals are things that come as a result of day
19 to day operations.  And it may not be on a level
20 to be put forth on the street, but some -- an
21 operating procedure in-house rather than an
22 actual operation on the street.
23   Q.  If it's in-house operating procedure,
24 that's something that you would approve or is
25 subject to your approval; is that right?

PAGE 24

1   A.  All of the policies and procedures are
2 talked about in our staff meeting prior to them
3 put in place.
4   Q.  Okay.  So it doesn't happen unless you
5 give it the green light so to speak?
6   A.  Unless we talk about it at the staff
7 table and agree to it at the staff table.
8   Q.  Okay.  And generally you like to have a
9 consensus as far as agreement but you're the
10 actual decider?
11   A.  Correct.
12   Q.  Now we have the Columbus Police
13 Department training manual and we also have some
14 curricula for the various training that CPD
15 officers receive for in-service training?
16   A.  Correct.
17   Q.  Is that curriculum approved by you?
18   A.  It goes through the major, the
19 lieutenant comes in and talks with us and then we
20 basically tell them from year to year what we
21 feel like should be trained that year.  It may
22 not be trained each year, it may be trained every
23 other year.
24   Q.  Okay.
25   A.  And it has a lot to do with the laws or

DEPOSITION OF:  CHIEF RICHARD BOREN  6-18-2020

SHEET 7  PAGE 25

1  the changing of the laws at the state level.  And
2  the State of Georgia mandates certain training.
3  And those are at the top of the list and then the
4  other things that we feel relevant come after
5  that.
6      Q.   Such as use of force and deadly force
7  are mandated to be trained every year, correct?
8      A.   Correct.
9      Q.   And the curriculum that's used is
10 -- you say he brings it to us, the lieutenant
11 brings it to us, you say us you're talking about
12 you and the major for approval; is that right?
13     A.   Majors with an S.
14     Q.   Okay.  And that's the round table or
15 staff meeting that you were talking about before,
16 right?
17     A.   Correct.
18     Q.   Okay.  So whatever the curriculum is
19 it's approved by the chief of police, correct?
20     A.   Correct.
21     Q.   Okay.  For instance, I think applicable
22 to this case we have previously marked
23 Plaintiff's Exhibit Number 3 which are some
24 training division, in-service training schedules
25 for 2015, 2016 and 2017.  And I think 2016 is the

PAGE 26

1  one that's actually relevant to this case.
2      A.   This is the correct format for the
3  training.
4      Q.   And would Lieutenant Wynn have brought
5  that directly to you for approval or would it
6  have just been him getting an okay from you and
7  your command staff to use those specific topics
8  or cover those specific topics?
9      A.   He may not have brought it directly to
10 us, but it either came from him or the major to
11 us.
12     Q.   Okay.
13     A.   It could have come from his bureau
14 major.
15     Q.   So these -- I'm sorry, go ahead.
16     A.   That's it.
17     Q.   So these schedules in Plaintiff's
18 Exhibit 3 from the last deposition, Lieutenant
19 Wynn's deposition were (inaudible) to chief's
20 approval, correct?
21     A.   It came through the staff table,
22 correct.
23     Q.   Okay.  And of course, on each one of
24 those 2015, 2016 and 2017 the use of force and
25 deadly force was covered as is mandated, right?

PAGE 27

1      A.   Correct.
2      Q.   And obviously you had the training
3  division teach these policies and practices in
4  order for your officers to put them in place and
5  use them and follow them; is that right?
6      A.   Correct.
7      Q.   Now Lieutenant Tim Wynn's job title,
8  what is it?
9      A.   It's a director of training.  His rank
10 is a lieutenant with the Columbus Police
11 Department.
12     Q.   Okay.
13     A.   But he's assigned to training as the
14 director of training.
15     Q.   Okay.  And is it the training division
16 is what it's called or is it a training bureau, I
17 don't recall?
18     A.   Training division.
19     Q.   Training division, okay.  And
20 specifically what does he do for you?
21     A.   He teaches.  He trains.  He holds
22 officers accounted -- accountable for
23 certifications and making sure that the correct
24 certifications are obtained in a timely manner,
25 keeps records to that effect and reports to the

PAGE 28

1  State of Georgia.
2      Q.   One of the things that he reports to
3  the State of Georgia is the annual CPD in-service
4  training for each officer; is that right?
5      A.   The records for.
6      Q.   And that's so the officers can stay
7  certified through POST, right?
8      A.   Correct.
9      Q.   And your department is CLEA certified;
10 is that right?
11     A.   We're CLEA accredited.
12     A.   Accredited.
13     A.   And we're State certified.
14     Q.   Okay.  Tell me what CLEA is just
15 generally?
16     A.   CLEA is a group that overseas certain
17 departments, the ones that can pass the
18 curriculum and make sure that we meet up with the
19 best standards that's available at the time.
20     Q.   And CLEA of is -- go ahead.
21     A.   Best practices.
22     Q.   Thank you.  Best practices, exactly.
23 And CLEA is an acronym for?
24     A.   Commission on Law -- Commission on
25 Accreditation of Law Enforcement Agencies.

DEPOSITION OF:  CHIEF RICHARD BOREN  6-18-2020

SHEET 8  PAGE 29

```
 1      Q.   Sorry to put to you spot.
 2      A.   That's okay.
 3      Q.   I always call it CLEA so sometimes I
 4 don't recall it myself.  And those best practices
 5 are practices that you have put into place at the
 6 Columbus Police Department; is that fair to say?
 7      A.   Correct.
 8      Q.   Now, in this particular case you
 9 ordered the Office of Professional Standards to
10 investigate the conduct of Officers Aguilar and
11 Dudley with respect to this January 9th of 2017
12 death; is that true?
13      A.   I asked them to do an internal
14 investigation on a totality of the incident,
15 correct.
16      Q.   Okay.  And you did not order the Office
17 of Professional Standards to conduct an
18 investigation with regard to Officer Aaron
19 Evrard; is that correct?
20      A.   He would have been part of the totality
21 of that circumstance.
22      Q.   So despite not ordering him
23 specifically to be investigated, it was your
24 intent to find out what happened with regard to
25 all the circumstances; is that fair to say?
```

PAGE 30

```
 1      A.   Correct.
 2      Q.   Okay.  You felt like that would be done
 3 with the Office of Professional Standards looking
 4 at Officers Dudley and Aguilar, the two officers
 5 that responded initially, right?
 6      A.   Anybody that was on the scene.
 7      Q.   Okay.  I'm going show you what is
 8 marked as CCG 14 through 300, that's the Bates
 9 stamps that Counsel for the Defense provided very
10 early on in this case.  And I'll just say for the
11 record CCG 1 through 13 are a bunch of videos and
12 audios and that sort of thing.  And CCG 14
13 through -- I've got some tabs in here, but 300 I
14 think is where this tab is.  I believe this is
15 the Office of Professional Standards report up to
16 300.
17           But I want you to look at it and tell me if
18 that's what your understanding is.
19      A.   As to what it is?
20      Q.   Yes, sir.
21      A.   (Examines documents.)
22           MR. POST:  Let's go off the record a
23 minute and let him look at it.
24                OFF THE RECORD.
25                ON THE RECORD.
```

PAGE 31

```
 1           THE WITNESS:  I don't have a response
 2   to that.
 3 BY MR. POST:
 4      Q.   All right.  Back on the record.  Chief,
 5 what I handed you CCG 14 through 300, is that the
 6 investigative report that you received from the
 7 Office of Professional Standards?
 8      A.   It appears to be.
 9      Q.   Okay.  And how did I -- I had some
10 personnel files and more and more stuff,
11 thousands of pages, but in an Office of
12 Professional Standards report you don't have
13 every prior use of force, every prior police
14 report, every prior personnel file from any
15 officer investigated; is that right?
16      A.   Probably not.
17      Q.   And you actually rely on the Office of
18 Professional Standards to look at whatever they
19 need to look at; is that fair to say?
20      A.   That is correct.
21      Q.   And with regard to that particular
22 investigative report, I saw that there is an
23 investigative summary which is 12 pages on CCG
24 CCG 18 through 29, and an executive summary on 30
25 through 31, 18 through 29.
```

PAGE 32

```
 1      A.   And what it was second one?
 2      Q.   30 through 31.
 3      A.   Correct.
 4      Q.   So my question to you, Chief, is two
 5 parts, you read the investigative summary and the
 6 executive summary from the Office of Professional
 7 Standards, correct?
 8      A.   Correct.
 9      Q.   Did you read the remainder of the 300
10 page report or did you rely on those summaries?
11      A.   I did not read it page for page, but
12 Major Blackmon is the one who came in and filled
13 me in on the entire investigation.
14      Q.   Okay.  So you rely on -- excuse me, you
15 relied on Major Blackmon for this particular
16 Office of Professional Standards investigation as
17 well as the investigative summary and the
18 executive summaries, correct?
19      A.   Correct.
20      Q.   Okay.  Before you adapted the findings
21 of the Office of Professional Standards did you
22 review the video statements of the officers and
23 the complete videos of the incidents?
24      A.   I think I had already done that prior
25 to this.  I had already looked at the videotapes
```

DEPOSITION OF:  CHIEF RICHARD BOREN  6-18-2020

SHEET 9  PAGE 33

1  from the scene.
2      Q.   From the scene.  But you didn't listen
3  to the video statements of the police officers,
4  did you?
5      A.   I did not.
6      Q.   And you didn't listen to any of the
7  videotaped statements of the, for instance EMTs
8  or --
9      A.   I did not.
10      Q.   Okay.  So just how long has it been
11  since you actually looked at and listened to the
12  videos of police contact with Hector Arreola on
13  January the 9th of 2017?
14      A.   On the scene?
15      Q.   Right.
16      A.   Three hours ago.
17      Q.   Okay.  So you watched the -- well, tell
18  me what you watched.  I mean, the gist, which
19  videos you watched?
20      A.   I watched the body cam footage from
21  Aguilar and from Dudley.
22      Q.   Okay.
23      A.   And may have from Evrard.
24      Q.   Okay.  And with respect to Evrard did
25  you see the body cam video that starts out with

PAGE 34

1  him in his patrol car responding, going to the
2  scene?
3      A.   I did.
4      Q.   Quickly.  And with him arriving, then
5  taking his position on the subject or suspect
6  Hector Arreola, you saw that recently?
7      A.   You said take his position on?
8      Q.   Take a position?
9      A.   He was at the scene.
10      Q.   Okay.  I'm just trying to think of the
11  way to phrase it where you can answer it and make
12  sure that you've seen the videotape that I'm
13  referring to.  Did you watch that entire clip of
14  Officer Evrard from the time that he got the call
15  and responded and up through when Hector Arreola
16  was transported from the scene by the ambulance?
17      A.   When the EMS people were there.
18      Q.   Okay.  So you did see that today?
19      A.   Correct.
20      Q.   What I'm trying to do is to make sure
21  you've seen it so we don't have to sit here and
22  go through it again.
23      A.   Sure.
24      Q.   And you saw the videotape of Officer
25  Aguilar, there were actually two portions of

PAGE 35

1  Officer Aguilar's video when he first got there.
2  I think something happened to his body cam, then
3  he turned the camera right back on; did you see
4  that?
5      A.   I can't say that I did see that.  I do
6  know -- I did watch when he arrived at the scene
7  and dealt with Arreola's mother.
8      Q.   The first time?
9      A.   The first time, yes.
10      Q.   And then there was one right
11  after that --
12      A.   The second dealings with the mom.
13      Q.   Right.  When Hector Arreola was at the
14  scene, correct?
15      A.   Correct.
16      Q.   And in the first video you referenced
17  Hector Arreola was not at the scene, that you
18  know?
19      A.   I did not see him there.
20      Q.   He did not appear on the video?
21      A.   He did not.
22      Q.   Okay.  Than on the second one there
23  were two pieces of the segment I believe, where
24  Officer Aguilar made contact with Hector Arreola,
25  then briefly he went off and then he turned it

PAGE 36

1  back on.  I think he might have bumped it; did
2  you see it?
3      A.   It could have been, but I did see that
4  portion where he dealt with him all the way up to
5  the front yard.
6      Q.   Okay.  And by that you mean all the way
7  up to the front yard where there was a struggle
8  and all the way through when he was -- when he,
9  Hector Arreola was removed from the scene by the
10  ambulance, right?
11      A.   I don't know that I saw Aguilar's, I
12  think that I did see him removed from the scene
13  but it came from one of the other officers.
14      Q.   Either Dudley or Evrard?
15      A.   Yeah, I think it was Evrard.
16      Q.   And you're quite correct, because
17  Aguilar's -- well, I think Aguilar had a sound
18  problem at some point on the videotape.
19      A.   One of the officers lost the body cam
20  at some point in time.
21      Q.   And that would be the picture of
22  Dudley's?
23      A.   Correct.
24      Q.   All right.  But the audio remained on?
25      A.   Correct.

DEPOSITION OF:  CHIEF RICHARD BOREN  6-18-2020

SHEET 10  PAGE 37

1      Q.   And you listened to that as well,
2 correct?
3      A.   Correct.
4      Q.   Okay.  And I just want to ask you some
5 questions about those videotapes?
6      A.   Sure.
7      Q.   And I wanted to make sure that you'd
8 seen them recently enough to answer the
9 questions.  Before I get into that though, I want
10 to ask you a few other things.  You concurred
11 with and approved the finding of the Office of
12 Professional Standards investigation, which was
13 that the use of force was justified, lawful and
14 proper with respect to Officer Dudley and
15 Aguilar, correct?
16      A.   Correct.
17      Q.   That is you concurred with the Office
18 of Professional Standards findings that there was
19 no excessive force in this case?
20      A.   Correct.
21      Q.   And the term proper means that you and
22 the Office of Professional Standards found that
23 the officers did not violate CPD policy and
24 procedure that was in effect on January 9th of
25 2017, right?

PAGE 38

1      A.   Correct.
2      Q.   There is a letter dated March the 20th
3 of 2017 from Major Blackmon, Major F. D. Blackmon
4 to you in the OPS report that I received from the
5 lawyers, from your lawyers I think it's at page
6 88.
7      A.   Okay.  Which part, the whole thing?
8      Q.   Well first, did you receive the letter
9 dated March 20th of 2017 from Major Blackmon?
10      A.   I did not initial this, to say yea or
11 nay would be a assumption.
12      Q.   Okay.  Can you read it and see if you
13 recall receiving it?
14      A.   (Examines document.)  This is a common
15 practice from us once the GBI investigation has
16 been concluded and Major Blackmon's investigation
17 has been concluded, rather than having to wait
18 for a disposition from the District Attorney's
19 Office.  I place officers back to duty based on
20 the investigative body, whether it be
21 professional standards or another entity.
22      Q.   And in the letter that Major Blackmon
23 sent to you, it was reported that his
24 investigation found no excessive force from
25 Officers Dudley and Aguilar.  And that the GBI

PAGE 39

1 crime lab autopsy found that the cause of death
2 was methamphetamine toxicity and the manner of
3 death was accident, correct?
4      A.   That's correct.
5      Q.   And then on March 28th, I believe it's
6 on the next two pages, you sent letters that
7 cleared Officer Dudley and Officer Aguilar
8 returning them to full duty as you just said,
9 correct?
10      A.   Correct.
11      Q.   And that's on CCG 89 and 90.  Would you
12 question or re-examine your findings of no
13 excessive force if the medical evidence actually
14 showed that Hector Arreola's death was caused by
15 a combination of the struggle with police, the
16 use of methamphetamine and the weight placed on
17 Hector Arreola's body which resulted in a hypoxia
18 and acidosis, followed by cardiac arrest and
19 subsequent death?
20      A.   That would have to be a decision made
21 by the GBI.
22      Q.   Let's say they made that decision.
23      A.   I'm sorry?
24      Q.   If they changed the cause of death
25 would that cause you to re-examine the findings

PAGE 40

1 of the Office of Professional Standards?
2      A.   I would look at whatever they had.
3      Q.   Well, let me ask it this way, the GBI
4 said the cause of death was a combination of
5 methamphetamine --
6      A.   An amphetamine.
7      Q.   -- the struggle and the weight placed
8 on Hector Arreola's body.
9      A.   I did not see anything about weight on
10 the body.
11      Q.   Right.  But let's say that's what their
12 conclusion was, that was the cause of death the
13 combination of those three things.
14      A.   That's not what they said.
15      Q.   Okay.  So you're saying if they do say
16 that you're not going to consider it?
17      A.   I did not say that.  I said it would be
18 the GBI and then they would have to bring
19 whatever information they had to me.
20      Q.   Right.  And you would get the
21 information, I'm assuming that you received that
22 information.  I'm not saying that it has
23 happened, I'm saying that if that were to happen
24 you would consider it, right?
25      A.   We would take a look at it.

DEPOSITION OF: CHIEF RICHARD BOREN 6-18-2020

SHEET 11 PAGE 41

PAGE 43

1    Q.   Okay.  And if the GBI found that to be
2  the cause of death, obviously they would change
3  the manner of death from accident to homicide?
4    A.   I don't know that.  I'm not a medical
5  examiner.
6    Q.   Okay.  You've been doing this a long
7  time, Chief.
8    A.   Yes, sir.
9    Q.   So your know that homicide doesn't
10 necessarily mean murder of course, right?
11   A.   Correct.
12   Q.   And it doesn't imply any particular
13 intent, right?
14   A.   It depend on the circumstances but just
15 because it's a homicide doesn't mean it's a
16 murder.
17   Q.   Okay.  And the way the GBI crime lab
18 pathologist used the word homicide, it just means
19 that the manner of death involved another human
20 being, not that there was anything necessarily
21 wrong with it, right?
22   A.   That is correct.
23   Q.   All right.  So whatever they brought
24 you, you would take a look at and reconsider it,
25 right?

1  use of force reports for these particular
2  officers or -- is that right?
3    A.   That's always considered.  It's always
4  reviewed along with training.  I don't think you
5  mentioned training but.
6    Q.   I hadn't quite got there yet.
7    A.   Oh, okay.  I'm sorry, go ahead.
8    Q.   But those things you would expect in
9  any Office of Professional Standards report
10 having to do with a death, officer involved
11 death, right?
12   A.   Sure.
13   Q.   And to the best of your knowledge you
14 received them and the report was delivered to
15 you?
16   A.   Don't know.  Don't know.
17   Q.   Well, I guess my point really is that
18 you did not personally go back through all of the
19 prior use of force reports, early warning
20 reports, disciplinary histories, the entire file
21 and look at those things, did you?
22   A.   I did not.
23   Q.   Okay.  And that's not something you
24 would normally do; is that right?
25   A.   That's something professional standards

PAGE 42

PAGE 44

1    A.   Sure.  I would.
2    Q.   Okay.  Now, I saw in the Office of
3  Professional Standards investigative report that
4  we have just discuss, that you received a
5  disciplinary summary for both Officers Aguilar
6  and Officer Dudley, correct?
7    A.   I don't know that I did.
8    Q.   I'll refer to you page 285 -- 284 and
9  285, 284 for Officer Dudley and 285 for Officer
10 Aguilar.
11   A.   284.
12   Q.   And 85?
13   A.   And 285.
14   Q.   It's pretty near the end of it I think.
15 So the investigative report that you received
16 contained those two disciplinary summaries,
17 correct?
18   A.   I would have to see the entire report.
19 I do not recall whether these were in there or
20 not.  It should have been in there but sitting
21 right here right now I don't -- I can't say yea
22 or nay.
23   Q.   Okay.  And you received along with this
24 a list of employee early warning reports,
25 employee personnel complaint reports and officer

1  takes care of.
2    Q.   Right.  So these summaries would be in
3  the report for you to see or to document what the
4  Office of Professional Standards looked at,
5  right?
6    A.   Normally that's given to me verbally.
7    Q.   Okay.  So for instance if -- where
8  Officer Aguilar had seven disciplinary violations
9  and Officer Dudley had two, somebody would have
10 told you that; fair to say?
11   A.   Correct.
12   Q.   But unless they found it was relevant
13 and they being the Office of Professional
14 Standards, they wouldn't have got into any
15 particulars of particular discipline, would they?
16   A.   Probably not.
17   Q.   Okay.  And the same would be true for
18 the early warning reports.  I think Aguilar had
19 two and -- employee personnel complaint reports
20 for Aguilar, there were nine with only one letter
21 of counseling.  And officer use of force reports,
22 what I saw on there was 21 use of force reports
23 listed for Officer Aguilar, although later on
24 -- that would be CCG 295 through 296, later on I
25 got a list of -- on CCG 2202 through 03 a list of

DEPOSITION OF:  CHIEF RICHARD BOREN  6-18-2020

SHEET 12  PAGE 45

1  24 use of force reports and possibly that's after
2  the incident was already investigated.  But
3  unless somebody brought it to your attention you
4  wouldn't know any particulars of any of these
5  lists, correct?
6      A.  Well, I usually know the officers
7  fairly well.  And I'm looking at the officer use
8  of force and I was looking for justified uses of
9  force as opposed to non-justified.  And
10  everything I see here says justified so.
11      Q.  And that's based on prior conclusions
12  by somebody in Columbus Police Department?
13      A.  Part of the chain of command.
14      Q.  Okay.  All right.  Part of the purpose
15  of employee early warning reports is that you get
16  an early warning that a police officer might have
17  some issues; is that fair to say?
18      A.  Correct.  And I wouldn't say issues.  I
19  would say that he met the criteria to be brought
20  in and talked to.  We bring people in and talk
21  with them even if they don't have sustained
22  complaints.
23      Q.  Right.  And it's just if a complaint
24  -- there is a certain -- you've got rules in
25  there --

PAGE 46

1      A.  Right.
2      Q.  -- which triggers an early --
3      A.  An early warning.
4      Q.  Okay.  And for instance if Officer
5  Aguilar was to be closely monitored at the time
6  of Hector Arreola's death, you wouldn't know
7  about that necessarily; is that true?
8      A.  That would probably come as a result of
9  a supervisor.
10      Q.  Okay.  And kind of what I'm getting at
11  is I saw, I think it was June 15th of 2016, that
12  Officer Aguilar had been recommended for close
13  monitoring after he had gone to a counseling
14  session.  How does the close monitoring work?
15  Who would be responsible?
16      A.  What counseling session?  Are you
17  saying someone outside of the department?
18      Q.  No, no.  Look at CCG 2207 through 2208;
19  is that the right book?  Let me see if that's the
20  right book, Chief.  It probably isn't.  No, it's
21  not.  Here it is.  I had it to where I could make
22  it easy for us.  We're on number 2 on this list.
23  Famous Exhibit 2.
24      MR. SNIPES:  Do you have one for me?
25      MR. POST:  I do.  Here you go.

PAGE 47

1      MR. CASHBAUGH:  What was the Bates
2  number?
3      MR. POST:  It's 2207.  And just for the
4  record it's Plaintiff's Number 2, CCG 2207
5  and 2208, which is a letter date June 15,
6  2016.
7      THE WITNESS:  (Examines document.)
8  BY MR. POST:
9      Q.  Okay.  Chief, have you had a chance to
10  review the interoffice communication dated June
11  15th of 2016 marked as Plaintiff's Exhibit Number
12  2?
13      A.  Yes.
14      Q.  And obviously this indicates that
15  Sergeant Payton, Lieutenant Dent, and Major Hawk
16  were present for an employee early warning
17  session, correct?
18      A.  Correct.
19      Q.  And at the end of this for a specific
20  recommendations for improved performance and/or
21  future actions, the last sentence says, "Officer
22  Aguilar is to be closely monitored to ensure that
23  he performs his duties without any issues,
24  problems or violations of the policy," right?
25      A.  Correct.

PAGE 48

1      Q.  And my question to you is, how exactly
2  does the close monitoring work?  I've looked at
3  your employee early warning policy in your policy
4  and procedure manual and it really is very
5  specific on what triggers things, who is supposed
6  to be involved in the counseling session, who
7  gets a copy of the counseling session.  But what
8  I don't see and what I'm not clear on is whose
9  responsibility is it to closely monitor Officer
10  Aguilar in the case?
11      A.  The bureau supervisor.
12      Q.  And that would be the patrol bureau?
13      A.  At that time it was patrol bureau,
14  Sergeant Payton.  Sergeant Payton has a closer
15  relationship to an individual on the street than
16  even his bureau major would.
17      Q.  Okay.  So the direct supervisor is the
18  one who is responsible for that?
19      A.  Correct.  Yes.
20      Q.  How long is the close monitoring
21  supposed to take?
22      A.  It's at the discretion of the
23  supervisor.
24      Q.  Okay.  So it could be one day, it could
25  be one year or it could be any?

DEPOSITION OF:  CHIEF RICHARD BOREN  6-18-2020

SHEET 13  PAGE 49

1    A.    It could be one week.
2    Q.    Okay.
3    A.    Yeah, I mean it could -- I think this
4  violation was a driving violation.
5    Q.    Okay.  So you don't know whether or not
6  -- well, first you didn't know whether -- let me
7  strike that.
8         At the time of the Office of Professional
9  Standards investigation you wouldn't know whether
10  Sergeant Payton was still closely monitoring
11  Officer Aguilar or not, would you?
12    A.    Would not.
13    Q.    Okay.  Let me ask you one more question
14  about that.  Let's say Sergeant Payton was moved
15  to another unit in the Police Department, would
16  Officer Aguilar's or would Sergeant Payton's
17  replacement get a copy of the early warning
18  report or would that just be the end of the
19  situation?
20    A.    No, the file for the individual stays
21  at the office level in the sergeant's records.
22  And then the main copies of everything goes to
23  the bureau level.
24    Q.    Okay.  And when you say the bureau
25  level, that means that personnel would have a

PAGE 50

1  copy of it?
2    A.    Correct.
3    Q.    Okay.  All right.  We talked about the
4  videos -- about the videos that you watched.  I'm
5  going ask you a few questions about that, but
6  let's go off the record just a minute.
7                   OFF THE RECORD.
8                   ON THE RECORD.
9  BY MR. POST:
10    Q.    Go back on the record.  Having watched
11  and listened to the videos that you've watched
12  earlier today, was Officer Dudley's use of force
13  in compliance with the policies, practices and
14  procedures of the Columbus Police Department on
15  January the 9th of 2017?
16    A.    Yes.
17    Q.    The same question for Officer Aguilar?
18    A.    Yes.
19    Q.    Okay.  The same question for Officer
20  Evrard?
21    A.    Yes.
22    Q.    And would their accounts and actions
23  and/or omissions back on January 9th of 2017
24  still comply with the Columbus Police Department
25  policy today?

PAGE 51

1    A.    What omission?
2    Q.    Well, I'm just saying?
3    A.    Explain that.
4    Q.    Well, I'm just saying if there was an
5  omission.
6    A.    Okay.  So you're not saying that there
7  was an admission?
8    Q.    Omission.
9    A.    Omission, I'm sorry.
10    Q.    I'm just saying acts or omissions.  We
11  can just say acts if you want to.
12    A.    Okay.  Ask me the question one more
13  time.
14    Q.    Would the acts of Officers Evrard,
15  Aguilar and Dudley still be in compliance with
16  CPD policy today as they were on January the 9 of
17  this 2017?
18    A.    Yes.
19    Q.    Okay.  So continuing to put force or
20  weight on a handcuffed suspect's back is what the
21  offices were taught to do back in 2017?
22         MR. SNIPES:  Object to the form.  You
23         can answer if you can.
24         THE WITNESS:  I did not see force put
25         on the back.  I saw force put in the area of

PAGE 52

1         the buttocks.  I saw force put on the right
2         side.  I did not see anything put on the
3         back.  I did not see anything put in the
4         area of the neck.
5  BY MR. POST:
6    Q.    Okay.  You do know that for instance
7  Officer Dudley said that he had his elbow on his
8  back?
9    A.    I do not know that.
10    Q.    Okay.  So Columbus Police Department
11  policy would have prohibited putting weight on
12  the torso and back of Hector Arreola after he was
13  handcuffed and had ceased resisting; is that
14  correct?
15    A.    Correct.
16    Q.    Okay.
17    A.    And I think the key to that is once he
18  had quit resisting.
19    Q.    And how would you define resistance or
20  resisting?
21    A.    Anything that an individual would do to
22  attempt to free himself from your custody.
23    Q.    So just moving and -- let me -- so just
24  breathing and moving your legs wouldn't
25  necessarily be resistance; is that true?

DEPOSITION OF: CHIEF RICHARD BOREN 6-18-2020

SHEET 14  PAGE 53

1    A.   It should not be.  Now kicking is a
2 different story.
3    Q.   If you're kicking at the officers
4 that's, as you're saying a different story.  So
5 if Officers Aguilar and Dudley employed a
6 strategy of flattening Hector Arreola, would that
7 have complied or did that comply with the CPD
8 policy in January of 2017?
9    A.   Describe flattening, what does that
10 mean?
11   Q.   Well, at one point or two points on the
12 video Officer Aguilar says flatten him out, flat
13 him out, and then he says, "I'm flattening him,"
14 meaning Hector Arreola.
15   A.   I do recall him saying rollover,
16 rollover on your stomach.  When I saw him it
17 appeared to me that he was not flat, he was
18 actually elevated to some extent on his side.
19   Q.   But of course, it's dark and we cannot
20 see everything, right?
21   A.   Correct.
22   Q.   And so from the struggle that went on
23 and the remarks of Officer Aguilar, it can or
24 could be taken that Officer Aguilar was putting
25 substantial force on Hector Arreola and

PAGE 54

1 flattening him as he said?
2    A.   That would have to come from the people
3 that were on the scene.  I could not tell any
4 amount of force from watching the tapes that I
5 saw.
6    Q.   What about listening to them?
7    A.   I still could not tell an individual
8 that could be, could be, high on a substance,
9 could have been acting differently at the time
10 that someone that was not on the substance.
11   Q.   Did continuing to flatten Hector
12 Arreola after he was handcuffed comply with CPD
13 policy?
14   A.   I did not see that.
15   Q.   Okay.  Assuming that there was
16 flattening going on, would that comply with CPD
17 policy after Hector Arreola handcuffed?
18   A.   I would have to see whatever the
19 process and procedure was you're talking about.
20 I wouldn't make that assumption not being on the
21 scene.
22   Q.   Okay.  Well, I'm just asking what, you
23 know, because people interpret what they see and
24 the facts could be in dispute.  And so I'm just
25 trying to figure out what the policy was as

PAGE 55

1 applicable to the facts as they may be or as they
2 may not be.  Okay.  At that time that's the facts
3 as I say the facts.  So what I'm trying to get at
4 is once Hector Arreola was in handcuffs and I'm
5 saying handcuffs, not leg irons, okay.
6    A.   Correct.
7    Q.   Would it have been appropriate and
8 within CPD policy to employ a strategy of
9 flattening him out?
10   A.   I don't fully understand the term
11 flattening him out.  I think I understand what
12 you're saying but I don't understand the term.
13 And it would take whatever it could take at the
14 time to bring Hector Arreola into compliance.
15 Now, once he was in compliance, then lay him on
16 the ground or flattening him out would not be
17 within policy.  Because we normally will set an
18 individual up, roll them over, set them up as
19 soon as we have the individual in compliance.
20   Q.   Okay.  And that's your policy, right?
21   A.   Correct.
22   Q.   You would not have approved the
23 training division teaching CPD officers in 2016
24 or 2017 to stay on a suspect's back or torso
25 until the suspect was completely still, would

PAGE 56

1 you?
2    A.   It would it depend on the type force
3 that was being used against the officers.  If the
4 individual was in fact kicking, biting,
5 attempting to punch the officers, then they would
6 be justified to use whatever amount of force they
7 could do until an individual was brought into
8 compliance.
9    Q.   Understood.  But my question was you
10 don't approve of and you didn't approve of it at
11 this time teaching your officers to remain on a
12 suspect after they became completely still?  And
13 when I say remain, I mean on their back or torso.
14   A.   Once an individual is compliant then
15 they should roll him over and set him up.
16   Q.   Okay.  And compliant doesn't even
17 necessarily mean completely still, does it?
18   A.   It would not, no.
19   Q.   Because one could be compliant and
20 still be breathing deeply for instance, correct,
21 moving your upper body?
22   A.   I'm thinking about something a little
23 more serious than that.  I'm thinking in terms of
24 punching or kicking.
25   Q.   Okay.  And trying to rollover to

DEPOSITION OF: CHIEF RICHARD BOREN 6-18-2020

SHEET 15  PAGE 57

1  breathe wouldn't necessarily be out of
2  compliance, would it?
3       A.   As a matter of fact, we should be
4  helping him.
5       Q.   Okay.  And would moving, Hector Arreola
6  moving his feet from side to side, would that be
7  considered being noncompliant?
8       A.   Well, I wasn't there so I don't know
9  how he was moving.  I could not see how he was
10 moving at that point so you would probably need
11 to ask one of the individuals on the scene.
12      Q.   I think I can actually show you that
13 specific part on Officer Evrard's video quickly.
14 Just let me do that just there is one place where
15 you can specifically see.  Let me see if I can
16 find it for us quickly.  All right.  Chief, I'm
17 going to show you part of Officer Evrard's body
18 camera which began at 0528 and 6 seconds.  And
19 specifically I'm going start around 304 on the
20 video which is -- excuse me 302 on the video
21 which is 0531 A.M. and 8 second.
22      And I would just direct your attention to
23 Hector Arreola's feet and legs which you will see
24 between 0531:14 and 0531:16, I believe is the
25 best time.  And the -- toward the lower portion

PAGE 58

1  of this.
2           (Whereupon, the video was played.)
3           (Whereupon, the video was stopped.)
4  BY MR. POST:
5       Q.   You see the feet there?
6       A.   I did.
7       MR. SNIPES:  I'm going to objection to
8  the form of this question and insist if
9  you're going ask him questions about Mr.
10 Arreola's reactions that you show him the
11 entire clip of the video of when Officer
12 Evrard was there.
13      MR. POST:  Do you want to watch the
14 whole --
15      MR. SNIPES:  No, you can start with him
16 running up the hill through the entire
17 encounter but asking him about a 2 second
18 part of a video I don't think is fair.
19      MR. POST:  Okay.  I'll be glad to.  If
20 you -- from the time Officer Evrard arrived,
21 you want to do that?
22      MR. SNIPES:  No, just right where he's
23 running up the hill, where you just started
24 but then for the full few minutes after
25 that.

PAGE 59

1       MR. POST:  Okay.  Tell me where you
2  would like to start it, it will be fine with
3  me.  Okay.  He's getting out of his car.  We
4  started it 0242.
5           (Whereupon, the video was played.)
6       MR. POST:  Tell me when you're good.
7       MR. SNIPES:  Keep going.
8       MR. POST:  All right.
9       MR. SNIPES:  We can pause it now.
10          (Whereupon, the video was stopped.)
11 BY MR. POST:
12      Q.   All right.  At the request of the
13 Defense I played that video clip until 0617 which
14 is 0534 A.M. and 23 seconds.  But Chief, what I
15 was asking you about was the one brief instance
16 when we can see Hector Arreola's feet moving
17 slightly, and that was at the time period 304,
18 308, 310, what have you on the video that I
19 mentioned previously, that particular movement
20 you would not say that was out of the compliance
21 or that that consisted of resistance itself,
22 would you?
23      A.   Well, I wasn't there.  I'll say that
24 again I was not there.  I don't know what he had
25 done prior to, I don't know what he had done

PAGE 60

1  afterward, as far as that, but until the leg
2  irons were in place, I would have to say that
3  that could have still been a movement that could
4  have injured an officer.
5       Q.   Just rolling his feet from side to
6  side?
7       A.   I don't know what came before that and
8  I don't know what came after that.
9       Q.   And I'm not asking you about anything
10 before or after.  I'm just saying that one little
11 movement that we saw, that's it.
12      A.   If he was in leg irons I'd have to say
13 no, but he is not in leg irons.  He is still free
14 to get away.
15      Q.   Okay.  So in your mind that little bit
16 of movement of feet could be considered
17 resistance?
18      A.   Correct.
19      Q.   Okay.  Would a suspect wiggling his
20 fingers through the handcuffs and grabbing at the
21 officer's fingers be considered resistence in
22 your opinion?
23      A.   Well, I would not think so, especially
24 after he was in cuffs, and officers had control
25 of his hands.

DEPOSITION OF:  CHIEF RICHARD BOREN  6-18-2020

SHEET 16   PAGE 61

```
 1      Q.  As I recall a couple of the officers
 2 -- let me get that out of the way there.
 3      A.  All right.
 4      Q.  As I recall a couple of the officers
 5 testified that Hector Arreola repeated -- that
 6 his repeated screams that he couldn't breathe
 7 indicated to them, specifically Dudley and
 8 Aguilar, that in fact, he could breathe.  Is that
 9 something that is taught by the Columbus Police
10 Department to your knowledge?
11      A.  You're going to have to explain that,
12 is that what taught?
13      Q.  That an officer that's involved in a
14 struggle or had just been involved in a struggle,
15 if they have the suspect, in this case Hector
16 Arreola, that is screaming and yelling, when they
17 observe that experience that is that an
18 indicator to the officer that Hector Arreola can
19 actually breathe?
20      MR. CLARK:  I'm sorry, are you asking
21      are officers trained to believe that or are
22      you asking if an officer says that, is that
23      something the officer perceives?  Because
24      you did this in the earlier deposition and
25      it's confusing, so I want to understand the
```

PAGE 62

```
 1      question.  Are you asking are the officers
 2      trained to believe that if someone says I
 3      can't breathe that means they can breathe;
 4      is that the question?
 5      MR. POST:  No, absolutely not.
 6      MR. CLARK:  That's not the question,
 7      okay.  So I am confused then.
 8 BY MR. POST:
 9      Q.  What I'm asking you, Chief, is if
10 somebody is yelling and screaming, whether it is
11 saying I can't breathe or something else, is that
12 something that an officer's trained with the
13 Columbus Police Department would tell them that
14 it's an indicator that the suspect can breathe?
15      A.  Do we train that?
16      Q.  Right.  You have been a police officer
17 for a long time.  It's pretty common knowledge
18 and in police circles and repeated frequently
19 that if you're in a struggle and the person is
20 screaming and yelling that they must be able to ^
21 breathe, isn't it?
22      A.  I have not heard that.
23      Q.  You've never heard that.  All right.
24 So any officer that claims or if these two
25 officers claim that they took the screaming of I
```

PAGE 63

```
 1 can't breathe, and mom, and that sort of thing on
 2 the morning of January 9th of 2017 as evidence of
 3 breathing and lack of distress, they would be
 4 wrong if they said that they were taught that by
 5 the Columbus Police Department; is that right?
 6      A.  That's not taught with the Columbus
 7 Police Department.
 8      Q.  So it's not a practice of Columbus
 9 Police Department officers to hold that belief,
10 correct?
11      A.  They are not taught that from the
12 Columbus Police Department.
13      Q.  Okay.  So really the actual training
14 and policy of the Columbus Police Department in
15 2016 and 2017 would have been that screams of I
16 can't breathe should be taken as evidence of a
17 potential serious medical emergency, correct?
18      A.  Well, it's something that we would
19 definitely monitor and once an individual was in
20 compliance he would be rolled over and sat up and
21 we would also contact EMS and have EMS in route
22 to take care of whatever medical issue could be
23 there.
24      Q.  Okay.  And typically if somebody is
25 screaming that they can't breathe and then they
```

PAGE 64

```
 1 peter out and look like Hector Arreola did, you
 2 would get on the radio and say hey, dispatch,
 3 tell the EMS to hurry up and get here?
 4      A.  Well, it would --
 5      MR. SNIPES:  Excuse me, objection to
 6      the form.  You can answer.
 7      THE WITNESS:  You would contact EMS and
 8      then hopefully any recall or call for
 9      assistance would be expedient to any call.
10 BY MR. POST:
11      Q.  And most of the time if something is
12 going south a patrol officers picks up the radio
13 and says step on it, hurry up and get here; isn't
14 that true?
15      A.  Well, that's totally up to the officer.
16      Q.  Wouldn't you want them to do that?
17      A.  Again, that's totally up to the
18 officer.
19      Q.  That's your policy, that they would
20 just use their discretion in that situation?
21      A.  Correct.  That's correct.
22      Q.  And I say that's your policy, I mean
23 that is your policy and it was yours policy back
24 in January of 2017, true?
25      MR. SNIPES:  Objection to the form.
```

DEPOSITION OF:  CHIEF RICHARD BOREN  6-18-2020

SHEET 17  PAGE 65

1        THE WITNESS:  Then again I'd have to
2   look at it.
3   BY MR. POST:
4        Q.   Well, your policy hasn't changed.  I
5   mean it is what it is?
6        A.   I'm not sure.  I'm not sure sitting
7   here right now.  I don't know if any of that has
8   changed or not.  You're looking at something that
9   was three years ago.
10       Q.   What would have change by an officer
11  using his discretion to hurry to tell EMS or the
12  ambulance to hurry up?
13       A.   Well, I don't think that they're
14  trained to do that is what I'm saying.  I think
15  that an officer uses his best judgment when it
16  comes to that.
17       Q.   Right.  And there is a portion in your
18  policy manual that says in some instances an
19  officer has to exercise their discretion, right?
20       A.   Correct.
21       Q.   And that's the same in 2017, January
22  2017 --
23       A.   Correct.
24       Q.   -- as it is now?
25       A.   Correct.

PAGE 66

1        Q.   Okay.  All right.  Just making sure.
2        A.   Sure.
3        Q.   Of course your use of force policy that
4   was in effect on January 9th of 2017 states that
5   any officer that uses excessive force to effect
6   an arrest or continues to use force after the
7   person has submitted to an arrest is subject to
8   disciplinary action or termination from the
9   department, true?
10       A.   Read that again?  Any officer that uses
11  force?
12       Q.   To effect an arrest or continues to use
13  force after the person has submitted to arrest,
14  any officers that uses excessive force to effect
15  an arrest --
16       A.   Correct.
17       Q.   -- or continues to use force after the
18  person has submitted to arrest, is subjected to
19  disciplinary action or termination from the
20  department; is that correct?
21       A.   Correct.
22       Q.   Okay.  And that's CCG 3317 3-1.2 that
23  that's taken from, so if there's any discrepancy
24  and from what I see in your policy then obviously
25  it will be reflected, correct?  Officers Dudley

PAGE 67

1   and Aguilar and I think it's Corporate Evrard are
2   still working for the Columbus Police Department,
3   right?
4        A.   Yes.
5        Q.   Now I received from the lawyers, the
6   chain of command manual this morning, the
7   training division manual and some POST records, I
8   think I already had.  You didn't bring anything
9   else with you, did you?
10       A.   I did not.
11       Q.   So anything else that I asked for with
12  regard to the notice of deposition, either CPD
13  had already provided to the lawyers who provided
14  it to me or doesn't exist, right?
15       A.   I can't say it doesn't exist.  We may
16  not have finished with whatever it is that you
17  had requested.
18       Q.   Well, I know I asked for the
19  interoffice procedure manual.  I don't remember
20  exactly what it's called, interoffice something
21  and as I understand it you have to take it from
22  various electronic places --
23       A.   Correct.
24       Q.   -- and you hadn't had a chance to put
25  all that together, right?

PAGE 68

1        A.   Right.
2        Q.   Other than that there is nothing else
3   that I asked for that I don't have, right?
4        A.   I really don't know.
5        Q.   And I'll let you look at the subpoena.
6        A.   Yeah.
7        Q.   I mean, the notice --
8        A.   I really don't know what it is, but --
9        Q.   Let me see.
10       A.   -- if you've asked for it and we have
11  it you have it.
12       MR. SNIPES:  Well, that's not exactly
13  -- let me put this on the record, Mark.
14       MR. POST:  Sure.
15       MR. SNIPES:  With regard to the
16  subpoena or notice of deposition, the
17  subpoena, item one you ask for the entire
18  file related to this case, I believe you
19  have that.  The current copy of your
20  curriculum vitae you were provide that
21  today.  Any other notes that you or anyone
22  had, you either have those or there weren't
23  any.  Number 4, statistics, records or
24  reports reflecting the number of use of
25  force incidents by Columbus Police

DEPOSITION OF:  CHIEF RICHARD BOREN  6-18-2020

SHEET 18  PAGE 69

```
 1    Department for 2014 to 2017.  That category
 2    is over broad and we object to it.  Just
 3    like we did to your second request for
 4    production because you used the term use of
 5    force.  It has nothing at all to do with
 6    this case.
 7         We can  tell you that we searched for
 8    any positional asphyxia or hypoxia like
 9    deaths and there aren't any.  Nor are we
10    aware of any sudden in custody deaths that
11    have occurred.  So the factors in that
12    -- this case don't exist.  Number 5 statics
13    that relate to death and the State and
14    National averages, we don't maintain those.
15    And number 6, the manual you have that.  So
16    that's the response to the six categories;
17    is that all right?
18         MR. CASHBAUGH:  That's correct.
19         MR. POST:  With the exception of the
20    interoffice thing, right?
21         MR. CASHBAUGH:  Correct.
22         MR. POST:  Okay.  All right.  Good,
23    that clarifies that.
24    BY MR. POST:
25    Q.   I'm going ask you about this.  On
```

PAGE 70

```
 1    Sunday June 8th of this year, Mayor Henderson,
 2    Mayor Skip Henderson, your only superior I guess
 3    in the chain of command so to speak, made the
 4    statement that, quote, we need to focus on the
 5    message -- messages that they're angry, I'm
 6    angry, anybody that saw the life squeezed out of
 7    that man in the city street should be.  This is
 8    the way things change, this is way you begin to
 9    initiate communication.  And I'm here really just
10    to kind of support that.  Do you agree with those
11    comments?
12         MR. SNIPES:  Objection to the form.
13    Who was Mayor Henderson talking about?
14         MR. POST:  That was to a reporter, it's
15    on videotape, I can play it for you.
16         MR. SNIPES:  But he was not talking
17    about this case?
18         MR. POST:  He was obviously talking
19    about George Floyd.
20         MR. SNIPES:  That's what I thought.
21         MR. POST:  I think it's relevant.
22         MR. POST:  I'm going to object to the
23    form of asking him to comment on another
24    person's statement about another case that
25    is not this one.
```

PAGE 71

```
 1         MR. POST:  Well, I believe it is
 2    something that the Chief should give his
 3    opinion on.  I would presume that he
 4    supports and agrees with what his boss said.
 5         THE WITNESS:  I would not give you an
 6    opinion on that.
 7    BY MR. POST:
 8    Q.   Okay.  You're familiar with the George
 9    Floyd case from watching it on TV I presume?
10    A.   I am.
11    Q.   How do you think this case is
12    materially different from that?
13         MR. SNIPES:  Objection to the form.
14         THE WITNESS:  I don't know anything
15    about the George Floyd case, other than what
16    I saw on TV.  I know nothing else from the
17    beginning and nothing after the fact.  I
18    don't know anything.
19    BY MR. POST:
20    Q.   Well, people are concerned about the
21    life being squeezed out of Hector Arreola on the
22    city streets of Columbus, you understand that,
23    right?
24         MR. SNIPES:  Objection to the form,
25    what people are you talking about, your
```

PAGE 72

```
 1    Plaintiffs?
 2         MR. POST:  The Plaintiffs and a lot of
 3    the people that were protesting out there,
 4    I've seen them raising this case.
 5         MR. SNIPES:  I'll objection to the
 6    form, he can answer to the extent he knows.
 7         THE WITNESS:  It's very unfortunate
 8    that any time anybody dies and the police
 9    department is on the scene, it's very
10    unfortunate when that happens.
11    BY MR. POST:
12    Q.   So you're concerned about it?
13    A.   Well, you're not getting into
14    everything on this.  You know, not everybody on
15    the scene is intoxicated with methamphetamine.
16    Q.   True.
17    A.   Not everybody's heart explodes as a
18    result of resisting lawful or from a police
19    officer which could make your heart explode as a
20    result of that.  And, you know, if you're going
21    to compare apples and apples, you got to look at
22    it all the way around and I don't know that this
23    is apples and apples.
24    Q.   So from your point of view it was a
25    heart issue and a medical issue with regard to
```

DEPOSITION OF:  CHIEF RICHARD BOREN  6-18-2020

SHEET 19  PAGE 73

1 the cause of death and not anything that the
2 police officers did?
3     A.   I believe that it was excited delirium
4 based on the consumption and ingestion of
5 methamphetamine and his actions on the scene.
6     Q.   So based on the evidence that you have,
7 including the autopsy, you simply do not believe
8 that anything that the officers did actually
9 contributed to Hector Arreola's death; is that
10 fair to say?
11     A.   I do not.
12     Q.   Okay.  If -- and that's why I was
13 asking you about the autopsy before.  With that
14 said, the autopsy or other medical evidence
15 suggestions otherwise you would potentially have
16 a different view of this situation, wouldn't you?
17     A.   Well the GBI may have a different view.
18     Q.   The GBI -- and that's really -- you're
19 talking about the pathologist or person that
20 conducted the autopsy might have a different
21 view, is that what you mean?
22     A.   I'm talking about the custodian of this
23 investigation is the GBI.  It's not the Columbus
24 Police Department.
25     Q.   Okay.  And we're referring to the

PAGE 74

1 criminal investigation.
2     A.   Correct.
3     Q.   And I'm not really focused on that and
4 I understand that the GBI would make any criminal
5 investigative determination.  And eventually may
6 be potentially hopefully a District Attorney,
7 which none of us have any control over,
8 obviously.
9     A.   Yeah.
10     Q.   But what I'm asking you is this.  From
11 an employee personnel standpoint, if the cause of
12 death and the findings were to change or if the
13 medical evidence was presented to you in a
14 different fashion that would cause to you
15 reconsider this situation, wouldn't it?
16     A.   From what I know right now the Columbus
17 Police Department did not kill this man.
18     Q.   Okay.  That's what you've been told by
19 the GBI from their autopsy, right?
20         MR. SNIPES:  Object to the form.
21         THE WITNESS:  Well, the autopsy shows
22     what he died from, from a medical doctor
23     that's hired by the State of Georgia to make
24     these determinations.
25 BY MR. POST:

PAGE 75

1     Q.   Okay.  That's all I have.
2         MR. SNIPES:  We don't have any
3 questions.
4         COURT REPORTER:  Copy, Mr. Post?
5         MR. POST: Yes, sir.
6         COURT REPORTER:  Copy, Mr. Snipes?
7         MR. SNIPES:  Yes, sir.
8         (DEPOSITION CONCLUDED AT 3:55 P.M.)

PAGE 76

CERTIFICATE
STATE OF GEORGIA
COUNTY OF MUSCOGEE
     I, Russell D. Anderson, a Georgia Certified
Court Reporter, in and for Muscogee County,
Georgia, do hereby certify that the aforegoing
pages numbered 2 through 75, inclusive, contain a
true and correct transcription of the
stenographic notes taken by me on the 18th of
June, 2020 of the testimony of Chief Richard T.
Boren held at 1111 Bay Avenue, Third Floor,
Columbus, Georgia, to the best of my skill and
ability.
     I further certify that I am not of counsel,
nor am I related to the parties in this action,
nor am I in anywise interested in the result of
said action.
WITNESS MY HAND, this 1st day of July, 2020.


RUSSELL D. ANDERSON
COURT REPORTER
CERTIFICATE NO. B-403

DEPOSITION OF:  CHIEF RICHARD BOREN  6-18-2020

SHEET 20  PAGE 77

CHIEF RICHARD BOREN

_____
DEPONENT'S SIGNATURE PAGE AND ERRATA SHEET

MUSCOGEE COUNTY, GEORGIA
     I DO HEREBY CERTIFY that I have read the
foregoing deposition and the following
corrections are required as a result of the
transcription:


PAGE/LINE              CORRECTION/REASON

_____
_____
_____
_____
_____
_____
_____
_____
_____
Signed before _____, Notary Public,
this the ___ day of _____, 2020.

_____
(NAME OF NOTARY)

PAGE 78

July 1, 2020

IN RE:  SIGNATURE TO DEPOSITION

Dear Mr. Snipes

     Please have Chief Richard Boren to read his
deposition and sign the errata sheet.
     After having done this, please have the
errata sheet and the signature page returned to
me for attachment to the original and filing with
the court.
     You have the required 30 days within which
to provide signature.  I will try to accommodate
you as much as possible to accomplish this.
     Should you need to contact me, please call
me at 327-3618 Monday through Friday.

Thank you for your attention to this matter.

Sincerely,

RUSSELL D. ANDERSON

RUSSELL ANDERSON  COURT REPORTING  706-905-1759