

Deposition of:

# Dr. Kris Sperry

*June 3, 2020*

In the Matter of:

# Arreola, Rodrigo v. Consolidated Government of Columbus, Georgia, et al

Veritext Legal Solutions

800.808.4958 | calendar-atl@veritext.com | 770.343.9696

Dr. Kris Sperry                                    June 3, 2020
Arreola, Rodrigo v. Consolidated Government of Columbus, Georgia, et al

Page 1

```
 1              IN THE UNITED STATES DISTRICT COURT
             FOR THE MIDDLE DISTRICT OF GEORGIA
 2                      COLUMBUS DIVISION
 3
      RODRIGO ARREOLA, as parent of )   CASE NO.:
 4    Hector Arreola, Deceased, and )   4:19-CV-00005-CDL
      as Personal Representative    )
 5    and Administrator of the      )
      Estate of Hector Arreola,     )
 6    CONCEPCION ARREOLA, as parent )
      of Hector Arreola and S.A.,   )
 7    minor child of Hector Arreola )
      by next friend Jezreel Imee   )
 8    Custodio,                     )
           Plaintiffs,              )
 9                                  )
      v.                            )
10                                  )
      THE CONSOLIDATED GOVERNMENT OF)
11    COLUMBUS, GEORGIA, OFFICER    )
      MICHAEL AGUILAR, in his       )
12    individual and official       )
      capacity, OFFICER BRIAN DUDLEY)
13    in his individual and official)
      capacity, OFFICER AARON       )
14    EVRARD, in his individual and )
      official capacity, and        )
15    COLUMBUS POLICE DEPARTMENT     )
      CHIEF OF POLICE RICHARD T.     )
16    BOREN, in his individual and  )
      official capacity,            )
17         Defendants.              )
18
19
20         The remote deposition of DR. KRIS SPERRY,
21    taken by the Defendant, before Russell D.
22    Anderson, a Georgia Certified Court Reporter, at
23    Forensic Pathology Consultants, 302 Watermark
24    Drive, Peachtree City, Georgia, 30269, on the 3rd
25    of June, 2020, beginning at 10:00 A.M.
```

Dr. Kris Sperry                                                June 3, 2020
Arreola, Rodrigo v. Consolidated Government of Columbus, Georgia, et al

Page 2

1   A P P E A R A N C E S
2
3
4   FOR THE PLAINTIFF:
5     HON. MARK POST
6     3 Bradley Park Court, Suite F
7     Columbus, Georgia, 31904
8     mpost@markpostlaw.com
9
10   FOR THE DEFENDANTS:
11     HON. JAMES C. CLARK, JR.
12     HON. ALAN G. SNIPES
13     Page, Scrantom, Sprouse, Tucker & Ford, PC
14     3rd Floor, Synovus Building
15     Bay Avenue
16     Columbus, Georgia, 31902
17     JCC@psstf.com
18     ags@passtf.com
19
20
21
22
23
24
25

Page 3

1   D I S C L O S U R E
    VERITEXT LEGAL SOLUTIONS
2
    FIRM CERTIFICATE AND DISCLOSURE
3
4      Veritext represents that the foregoing
    transcript as produced by our Production
5    Coordinators, Georgia Certified Notaries, is a
6    true, correct and complete transcript of the
7    colloquies, questions and answers as submitted by
8    the certified court reporter in this case.
9    Veritext further represents that the attached
10   exhibits, if any, are a true, correct and
11   complete copy as submitted by the certified
12   reporter, attorneys or witness in this case; and
13   that the exhibits were handled and produced
14   exclusively through our Production Coordinators,
15   Georgia Certified Notaries. Copies of notarized
16   production certificates related to this
17   proceeding are available upon request to
18   litsup-ga@veritext.com.
19      Veritext is not taking this deposition under
20   any relationship that is prohibited by OCGA
21   15-14-37(a)and(b).  Case-specific discounts are
22   automatically applied to all parties, at such
23   time as any party receives a discount. Ancillary
24   services such as calendar and financial reports
25   are available to all parties upon request.

Page 4

1   STIPULATIONS
2      IT IS STIPULATED AND AGREED, by and between
3   the parties through their respective counsel that
4   the deposition of DR. KRIS SPERRY, may be
5   taken before Russell D. Anderson, a Georgia
6   Certified Court Reporter, at the offices of
7   Forensic Pathology Consultants, 302 Watermark
8   Drive, Peachtree City, Georgia, 30269, on the 3rd
9   of June, 2020, on or about 10:00 A.M.
10      IT IS STIPULATED AND AGREED, that the
11   signature and reading of the deposition by the
12   witness is not waived, the deposition to have the
13   same force and effect as if full compliance had
14   been had with all laws and rules of court relating
15   to the taking of depositions.
16      IT IS FURTHER STIPULATED AND AGREED, that it
17   shall not be necessary for any objections to be
18   made by counsel to any questions, except as to the
19   form of the question and that counsel for the
20   parties may make objections and assign grounds at
21   the time of trial, or at the time said deposition
22   is offered in evidence, or prior thereto.
23      IT IS FURTHER STIPULATED AND AGREED, that
24   notice of filing of the deposition by the court
25   reporter is waived.

Page 5

1   INDEX
2          PAGE
3   Examination by Mr. Clark ............  6
4   Examination by Mr. Post ..............  120
5   Certificate of Reporter ..............  133
6
7      INDEX OF EXHIBITS
8   Exhibit 2 .................  14
9   Exhibit 3 .................  27
10  Exhibit 4 .................  40
11  Exhibit 5 .................  115
12
13
14
15
16
17
18
19
20
21
22
23
24
25

2 (Pages 2 - 5)

Dr. Kris Sperry                                    June 3, 2020
Arreola, Rodrigo v. Consolidated Government of Columbus, Georgia, et al

Page 6

1    D-E-P-O-S-I-T-I-O-N
2    DR. KRIS SPERRY
3    having been first duly sworn, testified
4    as follows:
5        MR. CLARK:  So I just want to identify,
6    Alan Snipes is here with me in the room.
7    Nobody else is in the room here.  I feel
8    like it's important that we identify whose
9    where.  I assume Mark, you're by yourself?
10       MR. POST:  Yeah, nobody wanted to
11   hangout with me.
12       DIRECT EXAMINATION
13   BY MR. CLARK:
14       Q.  And Dr. Sperry, how are you, are you
15   solo in your room there?
16       A.  Yeah, I'm by myself.  The doors are
17   shut so my little dog won't come join us.
18       Q.  Okay.  Thank you.
19       MR. POST:  Jim, I'm sorry, we'll
20   reserving depositions -- I mean, objections
21   except as to the form of the question,
22   privilege, correct?
23       MR. CLARK:  That will be fine.  We'll
24   just -- that's fine.  Very good.  Thank you.
25       MR. POST:  Thanks.

Page 7

1    BY MR. CLARK:
2        Q.  Dr. Sperry, Jim Clark here.  We have
3    sort of met electronically here.  We're taking
4    this deposition via ZOOM video.  But if you would
5    just for the record, can you give me your
6    complete name, please?
7        A.  Sure.  My name is Kris Lee Sperry,
8    first name is spelled with a K, and my last name
9    is S-P-E-R-R-Y.
10       Q.  Okay.  And I know you've been deposed a
11   bunch of times, do you know how many times you've
12   been deposed?
13       A.  More than a thousand over 37 years, so.
14       Q.  Okay.  So I'm not going to go into the
15   rules, I think you're more of an expert at
16   depositions frankly than I am.  But I would say
17   that it's especially important doing it
18   electronically like this, that you understand my
19   question.  And if there is any difficulty with
20   understanding a question just let me know that so
21   I can rephrase it, okay?
22       A.  Sure.
23       Q.  All right.  And if there is any
24   difficulties, you know, electronically obviously
25   let us know and we can stop and get that sorted

Page 8

1    out.  But, so it's my understanding you've hired
2    as an expert witness in this lawsuit, correct?
3        A.  Yes.
4        Q.  When were you first contacted about
5    working on this case?
6        A.  That would have been in 2018, somewhere
7    in the early part, I think April -- somewhere
8    about April 2018.
9        Q.  All right.  And your report in this
10   case was issued in November of 2018, correct?
11       A.  Yes.
12       Q.  Do you think you were contacted eight
13   months before your report approximately?
14       A.  Yeah.  Well, but the transmittal letter
15   I have from Mr. Post when he worked for Harp and
16   Poydasheff, Post and Sowers is dated April 17th
17   of 2018.  So I know that -- I mean, I can tell
18   you that he contacted me sometime very shortly
19   before that but I can't tell you exactly when.
20       Q.  All right.  And what were you asked to
21   do in this case?
22       A.  I was asked to review a bunch of
23   materials and see if I, you know, basically give
24   an opinion as to what I thought caused or
25   contributed to Mr. Arreola's death.

Page 9

1        Q.  All right.  And if I ask you what is
2    your area of expertise, what would you tell me?
3        A.  I'm a forensic pathologist, forensic
4    pathology and forensic medicine, that's primarily
5    what I've always done.
6        Q.  Okay.  And in simple terms then in this
7    case, you were asked to provide an opinion as to
8    the cause and manner of death?
9        A.  To put it simply, yes.
10       Q.  Okay.  Were there any other areas that
11   you were asked to provide your expertise in?
12       A.  I can't recall that I was really asked
13   to provide my expertise as to anything outside of
14   forensic medicine and forensic pathology.
15       Q.  Okay.  Are you -- and I'm going to get
16   into your opinions obviously in this deposition,
17   but generally speaking, other than providing an
18   opinion or opinions about the cause and manner of
19   death, are you -- have you been hired to do
20   anything else in this case?
21       A.  Well I don't think so.  I mean, just
22   for example I'm not a police officer.  I never
23   have been a sworn police officer so I don't have
24   any opinions as far as saying police standards
25   particularly when it comes to that.  So, you

3 (Pages 6 - 9)

Dr. Kris Sperry                                                    June 3, 2020
Arreola, Rodrigo v. Consolidated Government of Columbus, Georgia, et al

Page 10

1   know, I would not give opinions in relationship
2   to something like that, although the, you know,
3   actions and things, you know, that were
4   undertaken by the police officers that, you know,
5   and eventually I think related to Mr. Arreola's
6   death, well that gets over into my realm of
7   medicine and practice.
8       Q.   Right.  But you're not an expert for
9   instance in the proper use of force by law
10  enforcement, correct?
11      A.   Oh, no.  As far as, well as you said,
12  proper use of force, no.  I'm not trained in
13  that.  I have an awful lot of knowledge about
14  different utilizations of force and well,
15  escalation of force and the effects it has on
16  individuals being restrained or subdued in
17  various ways.  But as far as, you know,
18  promulgating say any standards in relationship to
19  that, you know, that's outside of my realm.
20      Q.   And it would be outside of your realm
21  to suggest whether a police officer's actions in
22  any particular case with respect to use of force,
23  were proper or improper or constitutional or
24  unconstitutional, correct?
25      A.   Well, it's a different question.  I

Page 11

1   mean, as far as constitutional or
2   unconstitutional I can't really tell you.  I
3   don't have any knowledge about, you know,
4   constitutional law regarding application of
5   forces by police officers.  Now, appropriate
6   versus inappropriate it really depends somewhat
7   on the situation, and also what kind of force
8   they're utilizing, because I would say, you know,
9   today there are applications of force that are
10  -- seem to be excessive based upon what effect
11  they may have on the person.
12      And again, depending again on the situation
13  as well.  I mean, sometimes law enforcement
14  officers have to shoot someone because that's
15  just the nature of the incident that they're
16  involved in.  And, you know, so some of it
17  -- some of it is dependent upon exactly what is
18  happening at the time.
19      Q.   All right.  Well I just want to make
20  sure that you're not holding yourself out or are
21  you holding yourself out as an expert with
22  respect to the law enforcement use of force?
23      A.   Okay, no.  I'm not holding myself out
24  as an expert in law enforcement use of force, but
25  excuse me, I'm comfortable with giving opinions

Page 12

1   having to do with the effect of the utilization
2   of different types of force on, you know, a human
3   being.
4       Q.   Right.  And that would connect back
5   into your expertise area which is cause and
6   manner of death, correct?
7       A.   Yes.
8       Q.   All right.  I think that makes sense to
9   me.  What have you reviewed in preparation for
10  your deposition here today?
11      A.   Well, I've reviewed a lot of things.
12      Q.   All right.  Let's just list them, just
13  go over --
14      A.   Well, initially, I mean I have
15  transmittal letter and two pages listing
16  information on -- that were contained on five
17  discs, computer discs that were sent to me back
18  in April of 2018 and that includes -- I mean, I
19  don't even know where to start, body cam videos,
20  OPS audio interviews, let's see, dash cams,
21  different reports, of course the autopsy report,
22  the reports from the crime lab.  Medical records
23  from St. Francis Hospital and Midtown Medical
24  Center and the EMS run sheet, run record from
25  that day.  And 911 calls that were made, I think

Page 13

1   on that specific day that the event occurred.
2       Now since that time, and really very
3   recently, I have -- as a matter of fact, here on
4   -- I'm going to move my keyboard out of the way
5   because I don't need it, that I know of.  I
6   received -- let's see, the Plaintiff's statements
7   of material facts, and the Plaintiff's response
8   to Defendant's statement of material, undisputed
9   facts.  And I have -- I'm trying to get things
10  that -- yeah.  Although I do have a copy of the
11  Complaint, I think I received that originally in
12  2018.
13      And then I have depositions of Officer
14  Aguilar and Concepcion Arreola, and Corporal
15  Evrard and also the Plaintiff's second disclosure
16  of expert witnesses and a couple of more
17  depositions, yeah.  So James Brad Barnes and
18  Brian Dudley.  So I think those are all of the
19  other things that I've received since the time
20  that I generated my report.
21      Q.   Okay.  Have you reviewed any other
22  expert reports that have been provided in this
23  case?
24      A.   I do have, in fact I think I just went
25  over this.  Somewhere I know I have the report,

4 (Pages 10 - 13)

Dr. Kris Sperry                                      June 3, 2020
Arreola, Rodrigo v. Consolidated Government of Columbus, Georgia, et al

Page 14

1  and it's -- well, I think it's the Defendant's
2  listing or statement of expert witnesses but, I
3  have the report of Dr. Newman and that's the only
4  expert report of anyone that I've ever seen.
5      Q.  Okay.  So the only expert report you've
6  reviewed in this case are -- it is Dr. Newman's
7  report, correct?
8      A.  Yes.
9      Q.  All right.  You have not reviewed any
10  of the use of force experts' reports or
11  depositions in this case, correct?
12      A.  Correct.  And I couldn't tell you, you
13  know, their names.
14      Q.  All right.  And that would not be
15  important to you for you to render your opinions
16  in this case, correct?
17      A.  Correct.
18      Q.  All right.  I'm going to mark your CV
19  as an exhibit, bear with me a minute.  Okay.
20  It's been introduced now as Exhibit 2.
21      A.  Okay.
22      Q.  In just a minute I'll ask you some
23  questions about that.  I've sent -- this CV that
24  I'm introducing is the one that was provided to
25  me by Mr. Post.  I guess, take a look at it and

Page 15

1  you -- is it -- can you tell me whether it's your
2  updated CV or has it been updated since this
3  version?
4      A.  Look on the very last page there should
5  be a date at the bottom of the text.
6      Q.  Okay.  October 20, 2019, is the one I
7  have.
8      A.  Yes.  I'm sorry, I didn't mean to speak
9  over you.  But no, that's the most current update
10  I think that I have.
11      Q.  All right.  Okay.  Before I get into
12  that CV, you've reviewed Dr. Newman's report.  Do
13  you know Dr. Newman?
14      A.  No.
15      Q.  Do you know him -- had you ever heard
16  of his name before this case?
17      A.  Yes.  I know of him, yes.
18      Q.  Okay.  Do you know his reputation?
19      A.  No, I can't say that I do really.
20      Q.  Okay.  Have you reviewed studies that
21  have been done by Dr. Newman?
22      A.  I have seen a couple of articles that
23  he, at least was one of the authors concerning,
24  you know, studies that he has assisted in
25  performing.

Page 16

1      Q.  Okay.  And before this case were you
2  aware that Dr. Newman is an expert in the area of
3  positional asphyxia, restrained asphyxia and
4  those types of things?
5      A.  Well, I know that that's an area of
6  professional interest that he has focused on at
7  various times in his career.  I mean, I believe
8  he's an emergency room physician as I recall,
9  but, you know, those -- that context of depths or
10  physiologic abnormalities that may occur during
11  restraint situations.  I know that's an area of
12  focus that he has had.
13      Q.  Okay.  All right.  I'm looking at your
14  CV.  Are there -- there's a lot of material here.
15  I was curious whether -- and I don't want to go
16  through your entire CV.  Are there -- can you
17  point to me on your CV areas that relate to
18  either publications or speaking engagements or
19  those type of things that relate to positional
20  asphyxia?
21      A.  Well, okay.  If you just -- I actually
22  didn't printout a copy of the CV but I can do
23  that right now.  It will take me a few seconds to
24  do, and then I can tell you, just hold on.  Let's
25  see.  Okay.

Page 17

1      MR. POST:  Jim, once he gets it printed
2  would you mind restating your question as
3  much for my benefit as Dr. Sperry's since I
4  was up late writing a brief?
5      THE WITNESS:  Okay.
6      COURT REPORTER:  I can give it back to
7  you, Mark, if you need it.
8      MR. POST:  Thank you, that will be
9  great.
10      COURT REPORTER:  I'll do that while
11  he's reading, if that's okay.
12      MR. POST:  Okay.
13      COURT REPORTER:  Question:  All right.
14  I'm looking at your CV.  Are -- there are a
15  lot of material here.  I was curious whether
16  or not, and I don't want to go through your
17  entire CV, are there or can you point to me
18  on your CV areas that related to either
19  publications or speaking engagements or
20  those type of things, that relate to
21  positional asphyxiation, then the answer.
22      MR. POST:  Okay.  Thank you.
23      COURT REPORTER:  Yes, sir.
24      THE WITNESS:  Okay.  I've never given a
25  lecture just only on, excuse me, positional

5 (Pages 14 - 17)

Dr. Kris Sperry                                    June 3, 2020
Arreola, Rodrigo v. Consolidated Government of Columbus, Georgia, et al

Page 18

1   asphyxia but I've given -- I've taught at
2   lectures -- seminars specifically relating
3   to deaths that occur in custody, that is in
4   relationship to law enforcement trying to
5   gain custody of someone.  And let me just
6   scan the publications.  Okay.  It will take
7   me a little bit here.
8        Yeah.  I think the first one that I see
9   on my CV was back in 1992, I gave a topic of
10  -- I didn't give you the name but it's
11  Medical Forensic Investigation in Police
12  Misconduct cases.  Again, that was not my
13  choice of titles, but it had to do with
14  deaths that occur in custody for a variety
15  of different things, different -- and you
16  can --
17  BY MR. CLARK:
18       Q.  Can you cite the page?
19       A.  That's on page 14, the third one down.
20       Q.  All right.  So the first item that you
21  would point to would be page -- I'm sorry, what
22  page again?
23       A.  Fourteen.
24       Q.  Fourteen, okay.  And it's the -- how
25  many down?

Page 19

1        A.  Third one down.
2        Q.  Okay.  Go ahead, all right.
3        A.  And let's see here.
4        Q.  While you're looking, do you still have
5   the materials on that?
6        A.  Oh, no.  Actually it's -- I just found
7   it a minute ago.  I had forgotten I had ever
8   given it.
9        Q.  Okay.
10       A.  Because it's been, like I said it was
11  1992.  And I think the next one on page 16 it's
12  the fourth one down, so it's called the Forensic
13  Aspects of Deaths in Police Custody.
14       Q.  Okay.
15       A.  And let's see, yeah.  And then halfway
16  down that same page, page 16 is another time I
17  gave, I think basically the same.  Well, that was
18  a different seminar but it was Forensic Aspects
19  of Death in Police Custody.
20       Q.  All right.
21       A.  And let's see.  Now on page 18, the
22  second from the bottom was a talk, it's called
23  Medical Evidence in Custody Deaths.
24       Q.  Okay.
25       A.  Then on page 19, the second one down

Page 20

1   it's the same thing, Medical Evidence in Custody
2   Deaths.  But on page 19 at the bottom I gave a
3   talk called Investigation of Deaths in Law
4   Enforcement Custody.
5        Q.  In any of these, as you're going
6   through them, let me know whether you still
7   retained copies of any of those --
8        A.  Yeah.  I can tell you, at least so far
9   from what I've looked at, I don't have any copies
10  of anything.
11       Q.  Okay.
12       A.  Well, on page 22, although this isn't
13  specifically related to positional asphyxia, but
14  the, what, fifth from the bottom was a talk
15  called Legal Medical and Policy Consideration and
16  Use of a Taser.  And some of that I can recall
17  had to do with deaths and whether they were or
18  were not related to taser utilization.
19       Q.  Would that have anything to do with
20  positional asphyxia though?
21       A.  No, not directly, but, you know,
22  sometimes when tasers are used as a part of the
23  whole different restraint continuum.
24       Q.  Okay.
25       A.  Let's see, I'm about done.

Page 21

1        Q.  All right.
2        A.  Those are the ones that at least that
3   --
4        Q.  All right.
5        A.  -- a quick scan I would say that had
6   -- that incorporated compression or positional
7   asphyxia or straight asphyxia where one was
8   determined.
9        Q.  Do you incidentally for our purposes,
10  is there a particular term that you're more used
11  to using?
12       A.  I would say probably restraint
13  asphyxia, although -- well, just because it's
14  usually a multi-factorial sort of thing that
15  occurs.  I mean, I think the concept that deaths
16  from asphyxial deaths from compression of the
17  chest as an isolated entity are relatively
18  uncommon, except in some certain types of
19  situations.  And I think really over the last 20
20  or 30 years it's become gradually more recognized
21  that there are -- it may not be necessarily just
22  say lack of oxygen or inability to breathe that
23  results in a death, but it's a -- there again
24  there is multiple factors that go into why the
25  death occurs.

6 (Pages 18 - 21)

Dr. Kris Sperry                                                June 3, 2020
Arreola, Rodrigo v. Consolidated Government of Columbus, Georgia, et al

Page 22

1    So that's -- it's probably -- actually I
2 mean I wouldn't say that restraint asphyxia
3 paretically is a terminology, you know, very
4 frequently.  But, you know, a death that occurs
5 during restraint where there is, you know, prone
6 restraint of the individual that is a very
7 common, I would say part of what results in
8 someone's death when they're in a restraint
9 situation.
10    Q.  All right.  And did I hear you say that
11 there have been over the -- you mentioned
12 something about over the years that there has
13 been studies and so forth, what were you
14 referring to?
15    A.  Oh, just I would say early on in my
16 career there were studies, usually collections of
17 cases that were published of individuals who died
18 in police custody during restraint episodes where
19 they thought at the time, at least from the
20 pathology standpoint that it was just, you know,
21 only -- I mean, it was essentially compression of
22 the -- well, inability of the individual to
23 breathe resulting in essentially suffocation or
24 compression such that they can't breathe
25 adequately and the thoughts about that have, well

Page 23

1 I would say changed after over the years such
2 that it's -- although there are some situations
3 where isolated compression alone just results in
4 complete inability of someone to breathe.
5    Like I said there is -- it's more of a
6 factor with -- that produces -- that is
7 restrained or compression during the course of a
8 restraint or prone restraint with inability to
9 oxygenate adequately causes other physiologic
10 problems that then compound the underlying
11 situation of -- well, inadequate oxygenation.  So
12 it's -- like I said it's a multi-factorial thing
13 and not just purely suffocation.
14    Q.  Are you -- so, you mentioned that
15 thoughts have been -- in fact, there have been
16 numerous studies in this area over many years,
17 correct?
18    A.  Oh, yes.
19    Q.  And are you familiar with those
20 studies?
21    A.  I can't tell you that I'm familiar with
22 all of them.  I'm, you know, familiar with many
23 of them from the forensic pathology aspect and
24 some other ones that have been done, you know,
25 carried out in using, I would say clinical

Page 24

1 experimentation on humans, to at least enough of
2 a degree that no one died or was injured.
3    Q.  Have you made yourself aware, have you
4 reviewed or are you otherwise familiar with any
5 of the studies and the research that has been
6 done by Dr. Newman in this area?
7    A.  Some things, yes.  I, you know, I can't
8 tell you that I have looked at or are familiar
9 with everything that he's done but about some
10 things.
11    Q.  And what about Dr. Chan, C-H-A-N, are
12 you familiar with him?
13    A.  Yes.  I mean he's -- I know at least he
14 -- for some period of time he and Dr. Newman
15 often co-authored things, you know, carried out
16 studies in conjunction with each other.  And I
17 know Dr. Chan he ended up -- well, I know he at
18 least did some work with the taser manufacturers
19 from having to do with the effects of tasers on
20 people and trying to develop less than lethal
21 applications of tasers that can be shot through
22 shotguns and things like that.
23    Q.  And you would agree that Dr. Newman and
24 Dr. Chan are noted experts in this field,
25 correct?

Page 25

1    A.  Well, at least that's an area -- the
2 areas that they have been involved in and from a
3 clinical perspective they're not pathologist, but
4 like I said I know that they have themselves been
5 involved in a variety of different things,
6 especially litigation over the years.  I can't
7 -- I don't know that I have ever myself been
8 involved in any litigation of any sort with
9 either one of them as an expert in any capacity.
10    Q.  Well, you have in fact worked with Dr.
11 Chan before, do you not remember that?
12    A.  No, I really don't -- am not aware of
13 what you're talking about.
14    Q.  Okay.  All right.  You worked on a case
15 where he was also an expert on the same side that
16 you were on.  But if you don't recall that,
17 that's okay.
18    A.  I don't.
19    Q.  All right.
20    A.  There's a lot of water under the
21 bridge.  It would probably help if you can tell
22 me what year it was, but.
23    Q.  2005.
24    A.  Okay.  I mean, it's only been 15 years
25 so I can't.

7 (Pages 22 - 25)

Dr. Kris Sperry                                        June 3, 2020
Arreola, Rodrigo v. Consolidated Government of Columbus, Georgia, et al

Page 26

1    Q. Okay. So really what I -- I'm not
2   really driving at that though actually, Doctor.
3   What I really want to make sure I understand is
4   your response to the question as do whether you
5   view Dr. Newman and/or Dr. Chan as well regarded
6   reputable experts in the field of restrained
7   asphyxia?
8    A. Well, okay. I don't know if they're
9   well regarded. It depends on who it is you're
10  speaking with I guess. Because --
11   Q. I'm speaking to you. I'm asking your
12  opinion. If you don't have one, don't --
13   A. No, I don't have one. They're involved
14  in this area but I mean, what I can say is I
15  can't tell you that I've always agreed with, you
16  know positions they have taken or even the
17  application of research they have done to the
18  real world, excuse me, real world situations, so.
19   Q. Okay. All right. So -- all right. So
20  just so I'm clear then, you do not have an
21  opinion one way or the other as to whether Dr.
22  Newman is a well regarded expert in the field of
23  the positional asphyxia, correct?
24   A. Well, correct. He's a clinician, I'm
25  not.

Page 27

1    Q. All right. Would you please do the
2   same thing for me on your CV with regard to the
3   area of excited delirium. Point me to the areas
4   in your CV that relates to excited delirium.
5    A. Well, I don't think I've -- yeah, I've
6   never give any talks on an excited delirium alone
7   that I can recall. But the ones -- the talks
8   that I gave that I listed to you earlier, I can
9   tell you probably in fact would have contained
10  discussions of excited delirium as one of the
11  elements that can occur in someone --
12   Q. All right.
13   A. -- in the process of being restrained.
14   Q. Fair enough. Let me mark, sir, your
15  testimony list that was provided, bear with me.
16  I'm getting pretty good at this electronically
17  marking exhibits.
18   A. Cool.
19   Q. I say -- as soon as I say that I'm
20  going to have some kind of problem with this one,
21  but we'll see.
22   A. No, I wouldn't tempt fate.
23   Q. And let's see, like I said, I found it.
24  Okay. Exhibit Number 3, sir, has been marked
25  now.

Page 28

1    A. Okay.
2    Q. Do you want me to share my screen on
3   this one or do you have it there?
4    A. I mean, actually I think I can -- well,
5   let me see, let me refresh this like she told me
6   to. Yeah, I mean I moved over to the exhibit --
7    Q. Okay. Terrific.
8    A. -- page so yeah, I have -- I can open
9   it.
10   Q. All right, terrific. And so this is a
11  forum and deposition testimony list that was
12  provided to us. It appears to go back to the
13  year 2015 and come forward from there. I would
14  like if you would for you to go through and tell
15  me which of the cases on this list involved
16  positional asphyxia and/or excited delirium. And
17  let me restrict that even a little more for you
18  maybe. Positional asphyxia, specifically
19  restrained asphyxia, I guess. So I'd like to
20  know which dealt with law enforcement and
21  positional asphyxia and/or excited delirium,
22  would you be able to do that?
23   A. Yeah, probably to some degree of
24  accuracy. There is -- let's see, on the first
25  page, the fourth -- yeah. The fourth case down

Page 29

1   from February 6th of 2015, that was a deposition
2   -- oh, I'm sorry, no. Sorry, sorry, sorry,
3   sorry. I just saw that. Okay. Where is this.
4   All right. Let me start over, I'm sorry. Okay.
5   This is going to be on page 6, it's the third one
6   down from July 24th of 2017. It's Forensic/Win
7   versus San Diego County and all that was from San
8   Diego, California.
9    Q. Okay. Let's see, I'm not seeing that,
10  page 6 -- oh, is it at the top?
11   A. Yeah, it's the third one down on page
12  6.
13   Q. Okay. And did you work for the
14  Plaintiff in that case, okay?
15   A. Yeah. I think I'm on page 8 at the
16  moment. On page 8 at the bottom, this is Simms,
17  parenthesis, Baker versus Horizon. I can't
18  recall whether that's -- I mean that involved the
19  death of an inmate in a prison, a contract prison
20  down in Florida. But I honestly can't recall if
21  that -- I mean, related to a positional restraint
22  or not, but it was an inmate anyway. That there
23  was something to do with, you know, he may well
24  have been beaten badly, I just can't recall right
25  now.

8 (Pages 26 - 29)

Dr. Kris Sperry                                          June 3, 2020
Arreola, Rodrigo v. Consolidated Government of Columbus, Georgia, et al

Page 30

1    Q.  All right.
2    A.  Let's see positional asphyxia.
3    Q.  And you worked for the Plaintiff in
4  that case as well?
5    A.  Yes.
6    Q.  Okay.
7    A.  And on page 10, yeah, the fourth one
8  down, that's -- that also involved an inmate who
9  died.  I can tell you that did not have to do
10  with positional restraint, this is a prison
11  inmate, but he sustained other injuries that
12  caused his death, so I think that's it.
13    Q.  All right.  Have you worked on behalf
14  of law enforcement before in a case involving
15  restraint where there was an allegation of
16  restraint asphyxia?
17    A.  I may have in older cases, especially
18  when I worked for the GBI.  I mean, there were
19  cases -- excuse me, or deaths that occurred
20  during custody where, you know, depending on
21  exactly what the facts and the situations were
22  that -- I mean, it may have ended up being, you
23  know, a witness on behalf of law enforcement but
24  that was in my official capacity.  Honestly, you
25  know, I can't remember specifics.  There where

Page 31

1  occasional ones here and there.
2    Q.  Okay.  And really what I'm interested
3  in is any cases you can remember where you worked
4  as an expert outside of your official capacity,
5  but as a consulting expert in a lawsuit on behalf
6  of law enforcement where there were allegations
7  in a lawsuit of restraint asphyxia?
8    A.  I don't -- I can't remember off hand.
9  Like I said there were situations when, you know,
10  when I was the chief medical examiner, but I
11  mean, we dealt with these cases as they came
12  along.  But, you know, sometimes there would be
13  litigation, other times not at all.  So but, I
14  mean I know there have been some where I've, you
15  know, worked or, you know, been asked as a
16  -- retained as a -- well not retained, I mean I
17  worked as an expert for the -- for law
18  enforcement, some -- one agency or another for
19  the State.  But that was, you know, in my
20  official capacity.  I wasn't retained in any way.
21    Q.  All right.  How long did you work for
22  the GBI?
23    A.  Eighteen years and four months or so.
24    Q.  Okay.  Were you terminated from the
25  GBI?

Page 32

1    A.  No, I retired.
2    Q.  Okay.  What were the circumstances of
3  your retirement?  Why did you retire?
4    A.  Well, I had been planning on retiring
5  in 2016 anyway, that was the following year.  I
6  had already discussed that with Mr. Keenan, the
7  director and we kind of, you know, made plans for
8  that, and in -- I think it was October of 2015
9  there was an attack article written about me by
10  the Atlanta Journal Constitution and --
11          OFF THE RECORD.
12          ON THE RECORD.
13  BY MR. CLARK:
14    Q.  All right.  So Doctor, you mentioned
15  that you retired as a result of a -- what you
16  called an attack article by the Atlanta Journal
17  Constitution?
18    A.  Yeah.  Well, I wouldn't say I retired
19  as a result of it, that certainly was one of the
20  elements that I took under consideration, you
21  know, in making my decision.  But like I said, I
22  already planned to retire the next year and after
23  the article came out I really saw no reason to,
24  you know, to wait.  In fact, Director Keenan
25  -- well, he told -- I asked him when I could

Page 33

1  retire and he said I could retire that day if I
2  wanted to.  I said fine, then I retire.
3    Q.  Okay.  And that article, and it's for
4  some reason not loading, I'm trying to introduce
5  it as an exhibit, but isn't it true that the
6  Atlanta Journal Constitution did an investigation
7  into your weekly time sheets and that there were
8  discrepancy that were found with your time
9  sheets?
10    A.  Well, yes.  Yes, there were, you know,
11  mistakes that I had made and I, once I looked at
12  it myself I found that I had myself made errors
13  in dates and times.  So I don't know about
14  discrepancies, but once all that was done
15  -- well, this information -- well, I say a couple
16  -- you can see from the first page there is a
17  couple of criminal defense attorneys in New
18  Orleans who were angry at me and they provided
19  the guy who wrote the article with a lot of
20  resource information and then he used the open
21  records letters to get, you know, pretty much
22  every piece of paper that the State had, you
23  know, with my name on it.  And he found, you
24  know, he found that I had made errors and I
25  acknowledge that.

9 (Pages 30 - 33)

Dr. Kris Sperry                                    June 3, 2020
Arreola, Rodrigo v. Consolidated Government of Columbus, Georgia, et al

Page 34

1      Q.   And the GBI investigated as well,
2  didn't they?
3      A.   No, there was no investigation by the
4  GBI or any agency or any individual, anybody.
5      Q.   All right.  Well, the GBI looked into
6  it and found these inaccuracies and these
7  discrepancies and in fact docked you over 226
8  hours, about five and a half weeks of vacation
9  time because of time entries that showed that you
10 were at work at the GBI when in fact you were
11 working on your other paid cases with litigation,
12 outside litigation, correct?
13     A.   No, that's not correct.  First of all,
14 the information that, you know, where I found
15 that I had made errors that was based on my own
16 comparison of my calendar book, my personal
17 calendar and my time sheets.  Because I always
18 kept my consulting work completely separate from
19 any work I did for the State, because that's, you
20 know, that's a definite no-no.  And at Mr.
21 Keenan's request I went over, as I said, my time
22 sheets and my calendar and found that I had made
23 errors and I gave those, you know, a summary of
24 that to Mr. Keenan.  And that was the extent of
25 it.  And then based upon, you know, as I said I

Page 35

1  acknowledge that I had made mistakes in the time
2  sheets.
3      So in my discussion with Mr. Keenan, excuse
4  me, we agreed that what I would give up was, what
5  did you say 246 hours or something like that, of
6  deferred -- not deferred compensation, it's
7  unused leave that as a State employee I had I
8  think 240 hours a year of a vacation time, that
9  at the end of any calendar year any unused
10 vacation time would go into of a bank more or
11 less that had no cash value.  But if a State
12 employee retires whatever is in that unused leave
13 category can be added onto their service time for
14 purposes only of retirement.
15     But otherwise it had no, you know, if I were
16 to left for any other reason, you know, that was
17 just gone.  Like I said there is no cash value,
18 it had no worth other than towards retirement.
19 And so I had maybe 2,800 hours of unused leave.
20 And like I said, between Mr. Keenan and I, you
21 know, we agreed that I would give up that amount
22 of time which only affected really my retirement.
23 I think it came out to something like, I figured
24 up one day, to maybe like $30 a month or
25 something like that in my pension, so that was

Page 36

1  where it came from.
2      Q.   And it amounted to about five and a
3  half weeks of vacation time, did it not?
4      A.   Well, it was unused -- again, from a
5  hour basis it was unused vacation.  So I could
6  never use it.  Say if I wanted to take leave for
7  two months I could have never used that -- that
8  time towards that sort of endeavor.  Just taking
9  a leave, it was in a separate category that was
10 not accessible for any purpose other than
11 retirement.
12     Q.   All right.  But you don't -- you agree
13 that it amounted to about five and a half weeks
14 worth, correct?
15     A.   Well yes, you know, as compared with
16 -- I think what I said I had 2,800 hours of plus
17 years.  So on an hour for hour basis then that's
18 what that would mean.  But, you know, as I said
19 it was -- it would be -- it was impossible to use
20 that for any other reason than retirement.
21     Q.   And in essence what that time was, was
22 time that you logged in as being at work at the
23 GBI when in fact you were not at work at the GBI,
24 correct?
25     A.   Yes.  Again those were mistakes I had

Page 37

1  made in, you know, my own personal calendar and
2  then transposing that information into, you know,
3  onto the time sheets.  And I fell into a bad
4  habit that many State employees do, I was a
5  salaried employee and so the time sheets almost
6  had really no particular purpose at all.  And so
7  I would fill them out, maybe every six or eight
8  weeks because it made no difference at all as far
9  as what my salary was.  But again, that's -- I
10 had -- I made my own errors and ultimately I
11 found those and acknowledged that.
12     Q.   How many times have you testified in
13 court as a paid expert?
14     A.   Oh, as a paid expert?
15     Q.   Yeah.
16     A.   I don't know.  You have my testimony
17 list.  Let me -- probably I'm going to just go to
18 that real quick.  I mean, I've testified 771
19 times in court.  Let me get back to where I can
20 see you guys again.  Okay.  And of those times, I
21 don't know, maybe -- I'm just -- probably around
22 150 or 160 times over 37 years I testified as a,
23 you know, that's in cases I've been retained in,
24 the others are times I've testified as part of my
25 job.

10 (Pages 34 - 37)

Dr. Kris Sperry                                               June 3, 2020
Arreola, Rodrigo v. Consolidated Government of Columbus, Georgia, et al

Page 38

1      Q.   Have any of your opinions ever been
2   excluded by a court?
3      A.   Not that I'm aware of.
4      Q.   Have you testified either by deposition
5   or trial in any case where you had an opinion
6   related to hypoxia involving a death during an
7   arrest or during incarceration?
8      A.   That's an oddly specific question.  I
9   don't know that I can tell you I have or haven't
10  in relation to the specificity of just what you
11  asked.  I don't know.
12            OFF THE RECORD.
13            ON THE RECORD.
14  BY MR. CLARK:
15     Q.   All right.  So I think the question
16  that I'm driving at, and you indicated that it
17  was a fairly specific question, but I asked
18  whether you had been involved in testifying
19  either by way of deposition or trial testimony,
20  regarding any cases in which hypoxia was an
21  allegation with respect to a death occurring
22  during an arrest or incarceration?
23     A.   I don't know.  I asked you if hypoxia
24  was the allegation, I don't know.  I may have
25  over the years but.

Page 39

1      Q.   All right.
2      A.   But, you know, as far as allegations
3   go, I don't know.
4      Q.   All right.  And how about the same
5   question with respect to whether you rendered any
6   opinion regarding hypoxia in a case involving a
7   death during an arrest or incarceration?
8      A.   Again, I don't know.  It's, you know,
9   possible.
10     Q.   All right.
11     A.   But I can't tell you specifically.
12     Q.   All right.  Well, let me broaden it out
13  and maybe this was your -- what you're commenting
14  on with respect to the specificity.  If I broaden
15  it out to cases involving restraint asphyxia,
16  whether there be an allegation in the case or
17  whether you're offering an opinion with respect
18  to restraint asphyxia, have you testified by way
19  of deposition or trial testimony regarding such a
20  case where there was a death during an arrest or
21  during incarceration?
22     A.   Again, it's possible.  You know, I'm
23  thinking you're asking during an arrest or during
24  incarceration, I'm just thinking.  I don't know,
25  you know, in my deposition testimony I know that

Page 40

1   the case from San Diego involved a restraint by
2   law enforcement but that's been years since, you
3   know, I looked at it and I can't remember the
4   specifics about that.  I remember -- I do
5   remember being personally involved in a case of a
6   young man who was restrained.  He was at a youth
7   camp in North Georgia that was run by DEFACS, and
8   there were some counselors that this young man
9   started to get violent.  And he was restrained
10  for several minutes by a couple of counselors and
11  he ended up dying.
12     I did testify at a hearing regarding that,
13  where was it, in Cherokee County maybe, somewhere
14  up there.  But it had, you know, the decision was
15  made that, you know, not to criminally charge the
16  counselors, but so there never was any, you know,
17  any criminal trial.  And I know there was a civil
18  suit but it was settled before I ever gave any
19  testimony of any sort.  Those are just the ones
20  that come to mind.
21     Q.   Okay.  I've introduced as Exhibit
22  Number 4 I believe, your report in this case.
23  It's dated November 27, 2018.
24     A.   Okay.
25     Q.   Do you see it there?

Page 41

1      A.   Oh, well I have a copy in front of me.
2   I mean --
3      Q.   Okay.  Well, that's fine.  You can use
4   your copy.  The date on the report that was
5   provided is November 27, 2018.  Is that the date
6   on the one you -- you have in front of you?
7      A.   Yes.
8      Q.   All right.  Has there been any changes
9   made to your report since November 27, 2018?
10     A.   No.
11     Q.   All right.  What I'd like to do, sir,
12  and we're going to go into your report.  But I
13  want to make sure that I understand the opinions
14  that you are offering in this case.  And first of
15  all, let me make sure that the opinions that you
16  intend to offer in this case are contained in
17  your report, correct?
18     A.   Yes.
19     Q.   All right.  Now, I'd like to go through
20  and I want to characterize what I believe are
21  your opinions in this case, that I had -- that I
22  read in your report.  And then you can let me
23  know whether there are others.  But I want to go
24  through and sort of bullet point them and so that
25  I can, you know, accurately go through this

11 (Pages 38 - 41)

Dr. Kris Sperry                                        June 3, 2020
Arreola, Rodrigo v. Consolidated Government of Columbus, Georgia, et al

Page 42

1  deposition in a way that makes some sense.  Okay.
2      A.  Sure.
3      Q.  All right.  So the first opinion that I
4  see is you do have an opinion, don't you, sir,
5  that you believe that Hector Arreola did not die
6  solely of methamphetamine toxicity, correct?
7      A.  Yes.
8      Q.  All right.  The second opinion that I
9  glean from your report is that you believe that
10  Hector Arreola developed gradual systemic
11  acidosis and hypoxia as a result of the intense
12  struggle with police, correct?
13      A.  And again, we're going to go back
14  through it?  Okay.  Is this --
15      Q.  I'll give you an opportunity to --
16      A.  -- the bullet points.
17      Q.  But is it correct that you do have the
18  opinion in this case that Hector Arreola
19  developed gradual systemic acidosis and hypoxia
20  as a result of the intense struggle with police?
21      A.  Yes, I see.  You are taking these in
22  order so yes, I see that.  Yes.
23      Q.  Right.  They're not necessarily in
24  order, but it helps just for me to put it in this
25  order and then again, when I get done listing

Page 43

1  them you let me know whether I missed anything or
2  what you want add or subtract, okay?
3      A.  Sure.
4      Q.  All right.  So that would be the second
5  one.  The third one that I glean from your report
6  is that you have the opinion that the EMS delayed
7  their treatment of Hector Arreola?
8      A.  Well, okay.  Okay.  Their treatment was
9  -- well, it was delayed.  Well, yes, they did
10  not start to treat him until he really had bad
11  -- well, had his cardiopulmonary arrest, so there
12  were no vital signs obtained prior to the arrest.
13  So yes, there was no treatment given.
14      Q.  All right.  Well, so maybe better put
15  I'll say for that opinion that you have opinion
16  that EMS -- you have criticism of the EMS
17  treatment of Mr. Arreola, how about that?
18      A.  Yes.
19      Q.  All right.  And we'll go through it in
20  a minute, but generally you have criticisms of
21  the EMS?
22      A.  Yes.  Your voice is getting very faint,
23  I'm sorry.
24      Q.  Okay.
25      A.  Okay.  Back to his positional.

Page 44

1      Q.  The next opinion that I glean from your
2  report is that you believe that the police
3  officers delayed allowing the EMS folks to care
4  for Hector Arreola; is that true that you have
5  that opinion?
6      A.  Well, yes.  So they did not recognize
7  that Mr. Arreola was in imminent medical danger
8  and as a consequence did not alert EMS personnel
9  to that.
10      Q.  All right.  And then lastly you have
11  the opinion, your fifth opinion that I glean from
12  your report, is that you believe that the manner of
13  death should be homicide?
14      A.  Yes.
15      Q.  All right.  Are there any other
16  opinions and again, I'm going to go through each
17  of these opinions that I've listed in some detail
18  and let you, you know, clarify and expand on
19  those particular opinions.  But are there any
20  other opinions that you intend to offer in the
21  case, any other categories of opinions?
22      A.  No, I don't think so.
23      Q.  All right.  All right, good.  I think
24  we covered this, but you're not going to offer an
25  opinion about proper law enforcement tactics,

Page 45

1  correct?
2      A.  Correct, from a law enforcement
3  perspective, no.
4      Q.  All right.  Am I correct to assume that
5  you are not offering any opinion as to which of
6  the three officers involved specifically caused
7  any damage to Hector Arreola?
8      A.  Correct.  I'm not.  Yeah, I'm not
9  offering an opinion about anyone specific officer
10  in relation -- as opposed to the other two.
11      Q.  Okay.  So your opinions in this case,
12  Doctor, are generally provided as to all three of
13  the officers; is that correct?
14      A.  Yes.
15      Q.  All right.  Let's take your first
16  opinion that you believe that he, he being
17  Hector, did not die solely of methamphetamine
18  toxicity.  Do you -- you do believe that
19  methamphetamine toxicity played a part in his
20  death, correct?
21      A.  Yes.  It was part, you know, the -- of
22  all of the different factors there, yes.  I mean,
23  it's present so it's, you know, inescapable.
24      Q.  And without the methamphetamine in his
25  body, you agree that Hector Arreola would not

12 (Pages 42 - 45)

Dr. Kris Sperry                                June 3, 2020
Arreola, Rodrigo v. Consolidated Government of Columbus, Georgia, et al

Page 46

1   have died, correct?
2        A.  No, I don't know that I can say that in
3   and of itself.
4        Q.  Okay.
5        A.  I mean --
6        Q.  Well, how does the methamphetamine
7   contribute -- how did it contribute to his death
8   then, sir?
9        A.  Well, I mean the methamphetamine is a
10  stimulate and produces -- well, hypertension.
11  Well, it also it produces a lot of -- a number of
12  psychological behavioral abnormalities, you know,
13  paranoia, sometimes hallucination, other things
14  that are related to methamphetamine toxicity if
15  you will.  And I think those elements contribute
16  to his behaviors that led to the officers
17  restraining him in the manner that they did.
18       Now as far as the toxic effects of the
19  methamphetamine in relationship physiologically
20  to his death, I don't know that I can say that
21  absent the methamphetamine, with all the other
22  things, everything else being the same, that is
23  the way in which he was restrained and the time
24  period and his own -- his complaints and so on,
25  that he would not have died.  I mean, I think

Page 47

1   everything has to be taken together to look at.
2        But I think the way that I worded it, is
3   probably what you're talking to, I talked about
4   the prolonged struggle and the restraint are
5   specific substantial contributing factors, and
6   absent those events more probably than not he
7   would have died.  But as far as in the absence of
8   the amphetamine, with everything else being the
9   same, you know, I wouldn't have the same, you
10  know, I could not give the same opinion.  That
11  the amphetamine was enough of a contributing
12  factor that even with the restraints that he
13  would survive.
14       Q.  All right.  But you don't rule out that
15  possibility though, correct?
16       A.  Oh, no.  I can't rule it out.
17       Q.  All right.  It's a reasonable
18  possibility that the methamphetamine contributed
19  to his death, correct?
20       A.  Yes.
21       Q.  Methamphetamine can cause sudden death,
22  correct?
23       A.  Yes.
24       Q.  And in fact, I would assume as a
25  medical examiner for the GBI you probably saw

Page 48

1   several methamphetamine sudden deaths, correct?
2        A.  Hundreds.  Over the years, yes.
3        Q.  All right.  Methamphetamine became
4   quite a epidemic, maybe it still is, it probably
5   is still, would you agree with that statement?
6        A.  Yes.  It's waxed and waned.  It's in
7   -- in the last year or so it seems to have become
8   more prevalent than it was say maybe ten years
9   ago, as far as a drug of abuse.  There are
10  unknown numbers but many, many more people who
11  abuse methamphetamine than there are who die from
12  it though.  It's actually relatively uncommon as
13  compared with the prevalence of abuse.  But it's
14  still out there.  I mean, it's an illicit drug
15  and it, you know, it's common.
16       Q.  Okay.  Yeah.  And when you say it's
17  relatively uncommon to die from it, you're just
18  speaking in terms of the percentages of the total
19  number of meth uses versus those number that may
20  experience sudden death, right?
21       A.  Yes.
22       Q.  All right.  But it's known in the
23  medical field that methamphetamine is a dangerous
24  substance to consume, correct?
25       A.  Yes.

Page 49

1        Q.  All right.  And am I correct that
2   methamphetamine use can lead to a sudden cardiac
3   arrest?
4        A.  Yes.
5        Q.  How does it -- help me understand the
6   medical way in which methamphetamine causes
7   sudden death and specifically cardiac arrest?
8        A.  Okay.  Sure.  I mean, methamphetamine
9   deaths from sudden cardiac causes are usually
10  seen much more commonly.  Well, I mean there is
11  two situations, one would be in just over
12  toxicity where the amount of methamphetamine
13  adjusted is just so much that it's lethal and it
14  causes tremendous elevation in blood pressure and
15  induces cardiac arrhythmias.
16       And the usually blood levels are in the
17  neighborhood of, oh, 5 to 10 milligrams per
18  liter.  Somewhere maybe, you know, 5 to 10 times
19  the level that was found in Mr. Arreola.  Now, it
20  is known and recognized that there are some
21  people who die, have experience sudden cardiac
22  arrest and die with much lower levels of
23  methamphetamine in their system.  And sometimes
24  when meth is only found say in the urine, those
25  are individuals where they're chronic users and

13 (Pages 46 - 49)

Dr. Kris Sperry                                          June 3, 2020
Arreola, Rodrigo v. Consolidated Government of Columbus, Georgia, et al

Page 50

1  there is enlargement of the heart with scarring
2  of the heart muscle where there is chronic
3  long-term stimulant damage that is similar to
4  what happens in cocaine or in certain medical
5  conditions where there's excess adrenalin in the
6  body, with scarring of the heart muscle and
7  enlargement of the heart, and this interferes
8  with the normal conduction of the electrical
9  impulses of the heart and can lead to sudden
10  death, those are the primary situations.
11      Q.  Well, and I appreciate that, but what
12  you're determine the primary situations, but what
13  I'm really asking is how does meth use cause
14  sudden death, specifically cardiac arrest?  What
15  does it do to the heart that causes it to go into
16  a cardiac arrest?
17      A.  Well, I told you, but I guess it was
18  buried in everything that I said.
19      Q.  It kind of was, yes.
20      A.  It will induce electrical rhythm
21  disturbances in the heart that, you know, in of
22  themselves, those can be lethal or it may be, you
23  know, the type of rhythm disturbance that is
24  rapidly lethal.  And so that's the primary
25  mechanism.

Page 51

1      Q.  All right.  And as the medical examiner
2  for a bunch of years, have you seen human beings
3  with otherwise normal hearts that used
4  methamphetamine that suffered a cardiac arrest
5  and died?
6      A.  Yes.
7      Q.  And in those cases did you -- were
8  there cases in which you found that the cause of
9  death in those cases was methamphetamine
10  toxicity?  Would be listed as the cause of death?
11      A.  Yes.
12      Q.  What is considered a lethal amount of
13  methamphetamine in the body?
14      A.  Well, you have to look at it in two
15  ways.  From an over toxicity perspective, that is
16  just ingesting so much of the drug that it is
17  poison and kills you, as I said it's the -- most
18  of these deaths are in the realm of 5 to 10
19  milligrams per liter of methamphetamine that's
20  found in the blood.
21      Now having said that, there are occasional
22  cases where there is a sudden unexpected death
23  and the only thing that is found is some level of
24  methamphetamine, sometimes very, very low or even
25  on rare occasion even are found in the, say in

Page 52

1  the urine only, where there is no methamphetamine
2  that is left in the blood and it's all been
3  excreted or almost completely eliminated.  But
4  that's the only relevant thing and there is no
5  other anatomic or there is no other organ induced
6  cause of death that is found.
7      And those cases nearly always are classified
8  as something like complication of methamphetamine
9  abuse or something like that.  But so even low
10  levels of methamphetamine in some people may
11  cause sudden cardiac deaths where there is not
12  just a highly elevated toxic level.
13      Q.  Okay.  Is point nine milligrams per
14  liter of methamphetamine, that's considered a
15  toxic level or a lethal -- excuse me, a lethal
16  level of methamphetamine, correct?
17      A.  It potentially -- excuse me, it
18  potentially can be, yes.
19      Q.  Yeah.  Is there a particular
20  publication that I could go to that would tell me
21  what the lethal level of methamphetamine is
22  considered to be -- or well, what is the Bible so
23  to speak for that topic?
24      A.  I don't know if there is any Bible, but
25  I mean the publications that would more or less

Page 53

1  reflect what I was -- what I've been telling you,
2  probably the most useful one anyway is called the
3  Pathology of Drug Abuse.  It's a textbook that I
4  think it's 4th edition now by Dr. Stephen Karch,
5  K-A-R-C-H.
6      Q.  Okay.
7      A.  That discusses pretty much all the
8  things that I've been talking about.
9      Q.  All right.  The pathology of drug abuse
10  by Dr. Karch?
11      A.  Yeah.  I don't know that I'd
12  characterize it as a Bible, but it's --
13      Q.  Okay.
14      A.  -- at least it's a textbook
15  specifically geared to forensic pathologist so
16  that's the audience and it, you know, discusses
17  abuse of all sorts of different drugs, including
18  methamphetamine and other stimulants.
19      Q.  And is that a publication that you
20  refer to from time to time as part of your work?
21      A.  On occasion, not often but on occasion
22  especially for more unusual types of things that
23  are rarely seen.
24      Q.  All right.  Do you agree with me,
25  Doctor, that an enlarged heart puts someone at a

14 (Pages 50 - 53)

Dr. Kris Sperry                              June 3, 2020
Arreola, Rodrigo v. Consolidated Government of Columbus, Georgia, et al

Page 54

1   increased risk of cardiac arrest?
2       A.   Yes.  If it's saying enlarged I mean,
3   I'm, you know, I'm not trying to phrase your
4   question for you, but I take enlarged to mean
5   it's, you know, it's pathologically enlarged or
6   it's outside of the statistical variance for
7   normal heart ranges or heart weights in an adult.
8   So something that is pathologically enlarged, the
9   heart is pathologically enlarged does carry an
10  increased risk for sudden cardiac death, oh yes.
11      Q.   Okay.  And would you agree with me that
12  someone that has a heart that is 50 grams above a
13  normal heart weight, has a three times increased
14  risk of sudden death?
15      A.   I don't know about -- you'd have to
16  define what 50 grams above a normal heart weight
17  is, because the --
18      Q.   Okay.  I'll do that for you, but first
19  by your definition of a normal heart weight,
20  would you agree with me that someone has a heart
21  that is 50 grams above a normal heart weight that
22  they are three times more likely to die of a
23  sudden death?
24      A.   I don't know.  I'm not sure about that,
25  but -- well, it's 50 grams above at least the

Page 55

1   statistically normal range for variation in heart
2   weights in adult human beings of different
3   weights, I mean, it's, you know, normal heart
4   weights are in ranges, they're not a magical
5   number that, you know, anything above that
6   specific number means it's enlarged.  Unless it's
7   outside or beyond the 95th percentile or I would
8   say the, you know, upper limits of normal, you
9   know.
10      I'm getting very technical here but there's
11  not a magical number that goes along with that.
12  But as far as if hypothetical a heart was 50
13  grams above the upper limits of the range, normal
14  ranges reported for hearts of a man of a given
15  age, I don't know whether there would be a three
16  times greater risk or not.  It certainly -- I
17  would have no problem with it being increased.
18      Q.   Okay.  So the three times you may have
19  a problem with, but not increased?
20      A.   Yeah, I don't know about specific, you
21  know, percentage or, you know, percentage
22  increase or a multiplier for, you know, someone
23  who has -- clearly has an enlarged heart.
24      Q.   Are you aware of any studies that have
25  tried to quantify that in terms of determining

Page 56

1   the increase in the risk of sudden death versus
2   -- as opposed to, you know, when compared to
3   heart weights?
4       A.   No, I don't -- not that I know of.
5       Q.   All right.  Okay.  Do you agree that if
6   a person has a diseased heart, that when you
7   couple that person -- and that person has
8   exertion that there is an increased risk of
9   sudden death with that person?
10      A.   Okay.  I mean, I've got -- say what do
11  you mean by a diseased heart?  There is whole
12  textbooks written on that.
13      Q.   All right.  Well --
14      A.   And I'm not trying to be picky about
15  it, but.
16      Q.   Sure.  It's meant to be broad but can
17  you answer the question the way I asked it or?
18      A.   Well, I mean certainly with some
19  specific things but say a cardiomyopathy or I
20  mean, hypertensive cardiovascular disease,
21  certainly arteriosclerotic coronary artery
22  disease, you know, microscopic or even gross
23  -- grossly appearing visually -- well, myocardial
24  fibrosis, that appears microscopically or
25  grossly, I mean all of those things I would

Page 57

1   consider to be definite abnormalities that would
2   increase the probability or possibility of a
3   sudden cardiac death with exertion, yeah.
4       Q.   Okay.  Would you agree that a normal
5   heart weight is considered to be 300 to 350
6   grams?
7       A.   Well, okay.  For a female an average
8   general number that's -- that at least we started
9   with is about 350 grams.  For a male it's about
10  450 grams.  Now, you know, using that as a place
11  to start with, I mean I could get a reference to
12  tell you but or someone, you know, the ranges and
13  actually of normal heart weights vary a great
14  deal based upon a man or a woman's body weight.
15  So the 450 gram number I gave you is a starting
16  place but to say that a heart then that weighed
17  460 grams is abnormally enlarged is, you know,
18  that's wrong.  That's not appropriate because,
19  you know, like I say, if you want I can get you a
20  reference from the next room that I could tell
21  you what the normal range of weights would be for
22  hearts of --
23      Q.   Well, really what I want to know is
24  whether you agreed that 300 to 350 grams would be
25  a normal weight for a male, and it sounds like

15 (Pages 54 - 57)

Dr. Kris Sperry                                June 3, 2020
Arreola, Rodrigo v. Consolidated Government of Columbus, Georgia, et al

Page 58

1   you do not agree?
2   A.  No.  No.
3   Q.  Are you familiar with the Framingham
4   Study?
5   A.  Oh, yes.
6   Q.  Okay.  And do you agree that that's a
7   good study?
8   A.  Well, looking at the cardio, you know,
9   atherosclerotic coronary disease and the risk of
10  sudden death over the course of, you know,
11  someone's, you know, number of years anyway maybe
12  that's what a lot of treatment anyway of lipids,
13  especially cholesterol levels is based on these
14  days.
15  Q.  Yeah.  Do you have any particular
16  criticisms of the Framingham Study?
17  A.  Oh, I haven't, you know, I haven't read
18  it in years.
19  Q.  Okay.  But nothing comes to mind to you
20  that hey, you know, I remember that study and I
21  think it was a bad study, it wasn't good.  I
22  didn't -- I don't agree with it, nothing like
23  that comes to mind?
24  A.  No.  I mean it's a clinical study
25  looking at specifically lipids, cholesterol and

Page 59

1   triglycerides levels and their relationship to
2   coronary artery disease and sudden death.  I
3   mean, that -- that's what the Framingham Study
4   that I recall is really the -- gives the guidance
5   for clinicians to treat individual patients who
6   have elevated cholesterol.
7   Q.  All right.  Would you agree with me
8   that a person who has an enlarged heart, is on
9   methamphetamine and engages in extreme exertion
10  is at an increased risk of sudden death?
11  A.  Yes, with the understanding that when
12  I'm talking about enlarged hearts, I'm talking
13  about something that is statistically outside of
14  the normal range of heart weights for that
15  individual's body weight.  But if it is truly
16  enlarged heart coupled with the methamphetamine
17  and exertion there -- yes, there is increased
18  risk of sudden death.
19  Q.  All right.  And would that increased
20  risk of sudden death specifically relate to an
21  increased risk of a cardiac arrest?
22  A.  Well, yes.  A cardiac arrhythmia that,
23  you know, ultimately include the cardiac arrest,
24  yes.
25  Q.  All right.  What is your opinion with

Page 60

1   respect to what Mr. Arreola died from?
2   A.  Well, I think he died from -- I think
3   this goes back to --
4   Q.  And let me stop you, I'm sorry to
5   interrupt you.
6   A.  That's okay.
7   Q.  But I want to -- I guess make sure that
8   I'm under the correct understanding which is,
9   you've already told me that he died partially
10  from methamphetamine toxicity, but as your report
11  says he did not die solely from methamphetamine
12  toxicity.  So what I'm driving at now is what
13  else did he die from?  What is the not solely
14  part?
15  A.  Sure.  Well, I think during the course
16  of being restrained the officers at different
17  times were on his body, on his chest and there
18  was, you know, he -- Mr. Arreola is recorded to
19  have said multiple times that I can't breathe, I
20  can't breathe.  And I have to say Officer Aguilar
21  in his deposition he made the statement that if
22  he had enough breath to say it, he had enough
23  breath to breathe and that is a terribly
24  fundamental misunderstanding that -- I don't know
25  why that is still promulgated, but that's

Page 61

1   erroneous.
2   When someone, and it doesn't matter whether
3   they're being sat on or not, if they're saying
4   they can't breathe that really means that in some
5   way they're not getting enough oxygen into their
6   body, such that the drive to breathe is impaired.
7   They can't -- they aren't being -- they aren't
8   able to supply enough oxygen through breathing to
9   meet the oxygen needs of their body.  And there
10  is what, you know, like if you hold your breath
11  eventually your brain stem makes you breathe.
12  You can't hold your breath until you die.
13  And so, you know, if someone complains that
14  they can't breathe, it could be from a whole
15  variety of different things.  I think in Mr.
16  Arreola's case he was being restrained in a
17  manner that interfered with his ability to
18  physically breathe and he was feeling the effects
19  of increased carbon dioxide and somewhat deceased
20  oxygen.  And in this case this caused him to say
21  that he couldn't breathe.
22  But being able to move air across your vocal
23  chords does not equate with suffocation, I guess
24  is the best way to look at it in a way.  And so
25  the physical restraint that impaired his ability

16 (Pages 58 - 61)

Dr. Kris Sperry                                    June 3, 2020
Arreola, Rodrigo v. Consolidated Government of Columbus, Georgia, et al

Page 62

1  to physically breathe with the struggle, I think
2  it was Officer Aguilar who said that this was the
3  strongest or the hardest struggle he had ever
4  been involved with, excuse me, in restraining
5  someone.
6      The physical activity of the struggle causes
7  the development of acidosis in the body which is
8  exacerbated by increased carbon dioxide levels
9  and it's thought that also there is increased
10 levels of potassium in the blood that develop as
11 a consequence of the evolution of acidosis.
12     But of course, we can't experiment on people
13 to, you know, to that extent. But that's
14 something that at least is postulated as far as
15 an element that could resulted in a cardiac
16 arrhythmia. And then with the methamphetamine
17 superimposed on all of this, I think that the
18 totality of all of those different elements
19 caused him to eventually start developing a
20 cardiac arrhythmia that deteriorated to the point
21 where he had a cardiac arrest.
22     Q.  Okay. You can not rule out the
23 possibility that Mr. Arreola died as a result of
24 a cardiac arrest brought on by the exertion
25 coupled with the methamphetamine and the intense

Page 63

1  struggle with the police officers, correct? You
2  can't rule that out?
3      A.  Oh, okay. I can't rule that out only
4  in the sentence that there are deaths that occur
5  where that sequence of facts, as you related
6  them, are, you know, are observed. I mean that
7  is what is involved and there is no restraint
8  that occurs and so --
9      Q.  Right.
10     A.  -- there are deaths where that
11 combination of elements are, you know, is what is
12 operative absent a restraint.
13     Q.  All right. And I want to make sure
14 that I understand, you do not believe that Hector
15 Arreola died from positional asphyxia, correct?
16     A.  No, not from positional asphyxia, no.
17 Not just laying on -- in a prone position that
18 alone, no.
19     Q.  You don't believe he died from
20 asphyxia?
21     A.  No. Not -- yeah. As far as asphyxia
22 meaning the complete absence of ability to
23 oxygenate and then dying because of lack of
24 oxygen, no.
25     Q.  Right. Because someone that dies from

Page 64

1  positional asphyxia dies right there, they don't
2  recover at all, correct?
3      A.  Yes. Yeah, that -- I think that's
4  accurate. They are in whatever position they're
5  in that interferes with their ability to
6  oxygenate properly and they die, you know, they
7  really, you know, they're the ones where if
8  someone checks on them after a while and finds
9  them to be dead, so.
10     Q.  Yeah. And you would agree that if the
11 weight of a police officer on a suspect's back
12 results in positional asphyxia, that that suspect
13 does not recover and dies in place, correct?
14     A.  Yes. I think human being is basically
15 dead right there when the officer's, you know,
16 got off of him the individual would be dead.
17     Q.  And that did not happen here, correct?
18     A.  Correct. Not that any one knows.
19 Well, we -- well, I don't think that Mr. Arreola
20 actually, you know, I guess what is the best way
21 to put it? He didn't experience the ultimate
22 event that culminated in his death until he was
23 inside of the ambulance. So he was --
24     Q.  And I --
25     A.  -- not dead yet, but his, you know, he

Page 65

1  was impaired and I think it was pretty obvious
2  from that, but at least he wasn't, you know, dead
3  at the point where -- say well, the ambulance
4  technicians even came -- or the EMTs, pardon me,
5  came and got him and loaded him onto the gurney
6  and put him into the ambulance.
7      Q.  Right. But I want to make -- to be
8  real clear though about your opinions, and what
9  I'm referring to is positional asphyxia. And you
10 believe that Hector Arreola did not die from
11 positional asphyxia, correct?
12     A.  Correct.
13     Q.  All right. If a suspect regains a
14 blood pressure for instance and a heartbeat then
15 that's not positional asphyxia, correct?
16     A.  Correct.
17     Q.  You touched on this just a minute ago,
18 but let me ask with respect to systemic acidosis
19 and hypoxia, as a result of a direct -- as the
20 direct result of the struggle with the officers,
21 your opinion in that regard is it based on any
22 tests that were performed?
23     A.  Okay. Well, there were, excuse me,
24 there were no tests that were performed on Mr.
25 Arreola at the point where -- well, in the

17 (Pages 62 - 65)

Dr. Kris Sperry                                    June 3, 2020
Arreola, Rodrigo v. Consolidated Government of Columbus, Georgia, et al

Page 66

1  ambulance that -- well, nothing was done until he
2  had already sustained his cardiopulmonary arrest.
3  I mean, the first vital signs that were taken
4  showed that his blood pressure was zero over
5  zero. The pulse of 115 I think was probably on a
6  cardiac monitor which showed he was pulseless
7  electrical activity which actually I think is
8  what Mr. Barnes described. And there was no
9  measurement of his, excuse me, of his oxygen
10  saturation that was recorded, that's on the EMS
11  run sheet.
12      I don't know whether they tried and were
13  unable to get it or what, but that box is blank.
14  And the -- otherwise the first test that was
15  performed to show his blood PH was not done until
16  he got to the hospital. And even then I think it
17  was a little after 8 o'clock and his PH was 6.8
18  something, so that's, your know,  that is in and
19  of itself severe acidosis.
20      Q. Okay. So what I'm trying to get at is
21  are there any specific test or lab results or
22  toxicology reports or anything that you point to,
23  to support your opinion that Hector Arreola
24  suffered from systemic acidosis and hypoxia?
25      A. Okay. Well, it's, you know --

Page 67

1      Q. I'm not really interested in you
2  telling me what things were not done, I'm asking
3  --
4      A. No.
5      Q. -- are there things that you referred
6  to that support your opinion?
7      A. Well, sure. Okay. This is from, what
8  page 125 of the Midtown Medical Center records.
9  There is a blood gas that was done at 8:04, that
10  was the first blood gas but his PH at that time
11  was 6.852 which is a profound acidosis. Anything
12  in an adult --
13      Q. Let me --
14      A. (Inaudible) --
15      Q. Let me --
16      A. -- is not survivable, so --
17      Q. Let me stop you there for a second
18  though.
19      A. Okay.
20      Q. You agree with me that that test there
21  at the hospital is done after he had suffered a
22  massive cardiac event?
23      A. Well, yeah. He suffered a cardiac
24  event, but they had also gotten his heart started
25  again, so by that time by, you know, 8:04 in the

Page 68

1  morning if there was -- well, the PH of 6.8
2  reflects a profound acidosis if is, you know, if
3  they hadn't got his heart started again then
4  -- well, this is what -- there is no other
5  explanation for the 6.8 PH other than severe
6  acidosis because they were able to get his heart
7  started again.
8      Q. But is there anything about that test
9  that was performed at 8 o'clock the next morning,
10  if I understand your testimony, is there anything
11  about that test that indicates to you that Mr.
12  Arreola suffered from acidosis and hypoxia during
13  the restraint or there around the time of the
14  restraint?
15      A. Okay. That was done later in the
16  morning. I mean, it was -- the restraint was,
17  you know, after -- between 5 o'clock and 6
18  o'clock in the morning.
19      Q. Yeah, okay.
20      A. You know, again the first -- that's the
21  first PH that was done, but again, his heart had
22  been, you know, had been restarted and, you know,
23  at that point also his CO2 was low despite the
24  fact that they were giving him high levels of
25  oxygen. So that shows an acidosis that's been

Page 69

1  there for quite a while.
2      Q. What do you mean by quite a while?
3      A. Oh well, probably since the time prior
4  to the arrest.
5      Q. Okay. So what would cause that
6  acidosis that existed prior to the arrest?
7      A. The -- with elements of physical
8  restraint, inadequate oxygenation in the face of
9  increased oxygen demand, CO2 retention and then
10  probably elevation also of lactic acid as well,
11  and increased potassium, all that results in the
12  it evolution of metabolic acidosis. You were
13  younger when that other picture was taken.
14      Q. Yeah, you got that right. I don't use
15  my current picture.
16      A. Yeah. My current picture, I don't have
17  a current picture.
18      Q. Is it your opinion that the PH test
19  taken at the hospital at 8 o'clock in the morning
20  evidences acidosis that existed prior to the
21  cardiac arrest?
22      A. I think it does. I think it indicates
23  -- it's indicative of metabolic acidosis and I
24  think that to what extent and to what degree
25  there was metabolic acidosis at the time of his

18 (Pages 66 - 69)

Page 70

1  cardiac arrest I can't tell you.  I don't think
2  anyone -- certainly I can't tell you, I don't
3  know that anyone can.
4      Q.  Does a cardiac arrest cause metabolic
5  acidosis?
6      A.  It can certainly if someone is not
7  resuscitated, you know, rapidly or given adequate
8  CPR.
9      Q.  And an intense struggle can that cause
10  metabolic acidosis?
11      A.  Yes.
12      Q.  All right.  And methamphetamine use can
13  that cause metabolic acidosis?
14      A.  Potentially, yes.
15      Q.  All right.  Are there any other lab
16  results or tests or anything that you point to to
17  support your opinion that Hector Arreola suffered
18  systemic acidosis and hypoxia?
19      A.  There is no other measurements of
20  oxygen that was done on him until that blood gas
21  that we have been speaking about.  Now, on
22  -- this is on page 121 of the Midtown Medical
23  Center Hospital records, there was some other
24  blood tests that were drawn at 6:32 in the
25  morning which is very shortly after he arrived at

Page 71

1  the hospital.  And at that time his blood $CO_2$ was
2  nine, and the normal is 21 to 31 and this is an
3  indicator of severe metabolic acidosis.  That is
4  the bicarbonate has been used, that is normally
5  in the blood that's what the $CO_2$ is, not only
6  carbon dioxide it's bicarbonate, but that has
7  dropped because of acidosis.
8      Q.  All right.  And what time was that
9  done?
10      A.  6:32 in the morning.
11      Q.  Again, we're at the hospital, correct?
12      A.  Oh, yes.  Yeah.  There was nothing that
13  was done in the ambulance to indicate the blood
14  PH or the oxygen level prior to the arrest.
15      Q.  Okay.
16      A.  Nothing was done afterwards either.
17      Q.  All right.  You -- I think you
18  indicated you viewed all of the video footage,
19  correct?
20      A.  Yes.
21      Q.  All right.  You agree that Hector
22  Arreola resisted arrest, correct?
23      A.  Yes.
24      Q.  And you agree that this was a full
25  blown, all out fight for these officers to regain

Page 72

1  control of Mr. Arreola, agreed?
2      A.  Yes.  I mean, I would say it was an
3  intense struggle and of course, I mentioned, you
4  know, Officer Aguilar characterized it, you know,
5  his own observation of the intensity of the
6  struggle but, you know, I would not differ from
7  that.
8      Q.  Okay.  Do you know how long the
9  struggle lasted?
10      A.  Somewhere on the -- well, depending on
11  how long you define it, somewhere on the order of
12  around six minutes or so.
13      Q.  Okay.  When you say it depends on how
14  you define the struggle, what do you mean by
15  that?
16      A.  I don't know, is that what I just said?
17      Q.  I thought you did.  I asked you how
18  long did the struggle last and I thought you said
19  you said something like, well, it depends on how
20  you define it, but.
21      A.  Well, no.  I mean, somewhere on the
22  order of about six minutes.
23      Q.  Okay.
24      A.  From the time they got him on the
25  ground, now, you know.

Page 73

1      Q.  Right.  And do -- is it your opinion
2  that this acidosis and hypoxia, that those
3  elements occurred and contributed to his death,
4  and that they occurred during the struggle?
5      A.  Yes.
6      Q.  All right.  Are you able to tell me at
7  what point during the struggle he began to suffer
8  from acidosis -- let's take that first?
9      A.  No, I don't know that that's possible
10  to say, you know, it's an evolution.  So I mean
11  to say he's suffering from it, I'm not sure if
12  that is a way that -- I mean a doctor can --
13      Q.  Well, let me re -- let me re --
14      A.  -- (inaudible) it's evolving.
15      Q.  All right, let me rephrase it.  Can you
16  tell me at what point during the struggle Mr.
17  Arreola began experiencing acidosis?
18      A.  Began developing acidosis.  There
19  again, I don't know what you mean by
20  experiencing?
21      Q.  Okay.  I'll use your word then, yeah,
22  develop?
23      A.  It's an evolution, it's a process.  So
24  it's not flicking a light switch.
25      Q.  Right.

19 (Pages 70 - 73)

Dr. Kris Sperry                                          June 3, 2020
Arreola, Rodrigo v. Consolidated Government of Columbus, Georgia, et al

Page 74

1   A.   And so I can't tell you at what point
2   that acidosis began to develop or whether there
3   was some element of acidosis, some -- that was at
4   least clinically insignificant even immediately
5   prior to him being brought to the ground and then
6   the restraint beginning.
7   Q.   Okay.
8   A.   I have no way to know that.
9   Q.   And so you can't -- right, I think I
10  understand but I want to make sure.  You're not
11  able to tell me at any point during the encounter
12  that the police officers had with Mr. Arreola,
13  you're not able to tell me at any point when Mr.
14  Arreola achieved dangerous levels of acidosis,
15  correct?
16  A.   Okay.  I mean, it's kind of hard to
17  answer your question.
18  Q.   Give it a shot.
19  A.   Yeah.  Well, I'm just thinking out,
20  achieving dangerous levels of acidosis.
21  Q.   How would you term what I'm driving at
22  there and I'm use your terms?
23  A.   Well, I think -- I know -- I think I
24  know what you're saying but where perhaps it was
25  the level of acidosis became symptomatic.  I

Page 75

1   can't -- no.  I can't tell you what level or what
2   point that the acidosis reached the degree where
3   I would say it began -- it started impairing him.
4   Although I would say based upon his -- well, his
5   behavior and the fact that he wasn't responding
6   after the officers got off of him, and then they
7   sat him up, but he was -- he never -- well, he
8   stopped speaking, he never spoke again and really
9   didn't react to, you know, any voice commands or
10  questions and remained aphasic.
11       I mean, as Mr. Barnes described it, I think
12  he was acidotic at that point because he was
13  breathing and was able to oxygenate himself
14  sufficiently such that there was some degree of
15  consciousness, but he clearly was impaired and I
16  think acidosis at that point in time had reached
17  the level where it was interfering with his
18  central nervous system capabilities to respond
19  appropriate.
20  Q.   Okay.  I think I understand, at that
21  point you believe he was acidotic but you're not
22  able to say when he became acidotic before that,
23  correct?
24  A.   Again, you know, he may -- he quite
25  readily could have been developing some level of

Page 76

1   a drop in his blood PH prior to the time that he
2   was brought to, you know, that the officers began
3   to restrain him and took him to the ground.
4   Because he had been physically exerting himself,
5   you know, running around.  I don't know hiding
6   behind trash cans and then he was clearly was
7   agitated so there was increased physical
8   activity.  And that, you know, that alone will
9   begin to cause someone's blood PH to drop.
10  That's the physiologic response to exercise is a
11  reduced -- reduction in your blood PH.
12       But it's not critical otherwise none of us
13  would survive, especially those people unlike me
14  who like to go run marathons.  Everyone would
15  die, but we can compensate for it.  But there's
16  -- like I said, some degree of a drop in the
17  blood PH that is clinically insignificant based
18  upon just exertion.
19  Q.   Okay.  So I think I understand what
20  you're telling me, is that you can't tell us at
21  any particular point during the struggle when he
22  became acidotic or to what level he became
23  acidotic.  You just know that over the course of
24  the struggle you believe that he became acidotic;
25  is that fair?

Page 77

1   A.   More or less.  Again, and this is the
2   problem with, you know, you're not a doctor and
3   I'm not an attorney.  But the -- as I said,
4   acidosis is a process and when the blood PH drops
5   to a certain level, I mean normally yours and
6   mine my blood PH is about 7.44, that's normal.
7   When the blood PH gets down around 7.2, 7.1 this
8   will, for the vast majority of individuals this
9   will begin interfering with the function of your
10  central nervous system.
11       And as I mentioned earlier for adults, most
12  adults cannot survive any episode that drops
13  their blood PH below 7.00.  The physiologic
14  disasters are very major and that includes
15  cardiac arrest.  And you may get the heart
16  started again but other organ damage is, you
17  know, is what occurs.  So I think during the
18  process of the restraint Mr. Arreola developed
19  acidosis and I think when he was, you know, as I
20  mentioned -- as I said earlier, when he -- the
21  officers finally got off of him and they tried to
22  roll him over and then he was sitting up leaning
23  against the legs of one of the officers, but he
24  stopped talking, he stopped responding and at
25  that point in time I think he had a level of

20 (Pages 74 - 77)

Dr. Kris Sperry                                    June 3, 2020
Arreola, Rodrigo v. Consolidated Government of Columbus, Georgia, et al

Page 78

1   acidosis that was critical, I guess is the best
2   way to put it.  That was interferring with his
3   -- the ability of his central nervous system to
4   operate properly.
5       Q.   All right.  I'm going to use your term
6   to try to help me, critical acidosis, that's what
7   you just used, correct?
8       A.   Yes.
9       Q.   Does that make sense to you that term
10  critical acidosis?
11      A.   Yes.
12      Q.   For purposes of our conversation, okay.
13      A.   Yeah, that's reasonable.
14      Q.   All right.  So I get what you're saying
15  is that at a certain point there when they, I
16  think you said rolled him over, that he had
17  critical acidosis, right?
18      A.   Yes.
19      Q.   All right.  I just want to make sure
20  that you're not testifying as to when he achieved
21  that critical acidosis?
22      A.   I can't tell you.  Not, well I don't
23  know that I can tell you when that was.  There
24  certainly is a point in the recording where he
25  stops talking.  I mean he had been saying I can't

Page 79

1   breathe.  I can't breathe.  And then he becomes
2   incoherent and moaning and making --
3       Q.   But --
4       A.   -- making nonsensical sounds, even
5   after that he really makes no sounds at all.
6       Q.   Right.
7       A.   So, you know, and now clearly during
8   -- I mean, when that happens that is when he
9   stops being able to say anything.  When he stops
10  verbalizing he was still being restrained with
11  the officers on him, so the level of -- well,
12  oxygen impairment, you know, I can't tell you
13  what is there, but I think the oxygen, inadequate
14  oxygenation coupled with the low -- the acidosis,
15  you know, worked together to cause him to be
16  unable to speak.  I mean, he --
17      Q.   Right.  And I get that, I'm trying to
18  focus though on -- to make sure that you're not
19  going to tell me that you could look at the video
20  and say I know at any one particular point in
21  this video where he achieved critical acidosis,
22  you're not testifying to that, are you?
23      A.   No.  I've been trying to tell you I
24  can't, you know, I think it's -- there's a
25  -- well, they're physiologic --

Page 80

1       Q.   You can tell me but then you go onto
2   other things.
3       A.   You know, I mean, I don't expect you to
4   know about and like I said you're asking -- you
5   ask lawyer questions and I'm not a lawyer.
6       Q.   All right.  That's all I can do, I try
7   to ask good questions but.
8       A.   Hey, I'm -- believe me I'm not being
9   critical of your questions whatsoever.  It's just
10  what's that from Cool Hand Luke, it's the -- what
11  we have here is a failure to communicate.
12      Q.   Right.
13      A.   It's just because we're different
14  animals.
15      Q.   Yeah.  And that's why I want to make
16  sure I get the right terminology.  I think we can
17  communicate with respect to critical acidosis and
18  I think I understand from your testimony that you
19  believe that Hector Arreola at some point
20  experienced a critical acidosis, but you're just
21  not able to tell me at what point during the
22  struggle he experienced that, except to say that
23  at the end there he experienced it; is that fair?
24      A.   I mean, I would say at the end because
25  he was still breathing, you know, he wasn't dead

Page 81

1   from compression asphyxia.  But he was --
2       Q.   Well, first is my statement fair what I
3   said?
4       A.   Yes.  Yeah, that -- and I think I've
5   explained it, you know, in the last few minutes
6   that --
7       Q.   Yeah.
8       A.   -- he regained breathing so he was able
9   to oxygenate and recovered that ability but there
10  was still something that was impairing his
11  ability to neurologically function and increasing
12  and getting more and more problematic to the
13  point that he finally had a cardiac arrest.  And
14  that would be --
15      Q.   Right.
16      A.   -- when the acidosis that had reached
17  some critical level at that point in time.
18      Q.   Okay.  It could also be the
19  methamphetamine coupled with the exertion,
20  correct?
21      A.   Well, possibly in of itself, but
22  methamphetamine, yeah.  I don't know that the
23  methamphetamine alone would have the effect of,
24  you know, what we have really been talking about.
25      Q.   But you can't rule it out, you've

21 (Pages 78 - 81)

Dr. Kris Sperry                                                    June 3, 2020
Arreola, Rodrigo v. Consolidated Government of Columbus, Georgia, et al

Page 82

1  already told me that, correct?
2      A.  No, I can't rule it out, no.
3      Q.  All right.  Now, I think I asked this,
4  but I'm going to ask it a little bit different
5  way.  The same question with respect to this
6  critical acidosis, you're not offering an opinion
7  as to which of the three officers caused the
8  critical acidosis?
9      A.  No, you asked me that before and my
10 answer was no, not any officer specifically, no.
11     Q.  Okay.  All right.  We were speaking I
12 believe about what I termed your second opinion
13 when I did my list of systematic acidosis and
14 hypoxia as a direct resulted of the struggle with
15 the officers, have we covered that opinion?
16     A.  I think so.
17     Q.  Okay.
18     A.  Yeah.  No, I think so.  Actually I
19 think I'm fairly satisfied with, you know, you've
20 asked me the relevant questions and I've answered
21 them.  Yeah, I think so.
22     Q.  Right.  Right.  Are you aware of any
23 studies or any research that supports an opinion
24 that being in a prone position with weight on a
25 suspect's back can lead to hypoxia or acidosis,

Page 83

1  specifically any research or studies?
2      A.  Well no, I am -- I kind of know what
3  you're asking about.  There's immediately -- you
4  know, there is research I know that Dr. Newman
5  has been involved in where, you know, he tried to
6  experimentally recreate just the scenario you're
7  talking about and it did not result in, I think
8  hypoxia or acidosis.  But, you know, that's the
9  -- well, so yes.  I'm aware of studies like that
10 that have been attempted at least to recreate as
11 much as possible the scenario.
12     Q.  All right.  So while you mention that
13 and while we're on it, I was going ask you
14 questions with respect to the progression of this
15 area, with respect to the studies, so I might as
16 well do that now.  You yourself believe that the
17 prone position, known as the hog tie position,
18 does not result in reduced oxygenation or
19 ventilation, correct?
20     A.  Well, I would say for most normal -- I
21 don't even know how you define normal, yeah, non-
22 obese, you know, non-impaired people, usually the
23 prone hog tie restraint, you know, does not at
24 least result in injury or sudden death.  Having
25 said that I mean -- well, I don't know what to

Page 84

1  say but those deaths rarely.  They used to happen
2  with some frequency, they rarely happen in this
3  country any more because hog tying is -- it's
4  either outlawed or specifically not part of the
5  training.  Like for instance in Georgia law
6  enforcement officers are not trained to use hog
7  tie position or anything to facilitate a hog tie,
8  so that really is not done unless they make a
9  decision to do it themselves.
10     Q.  All right.  But you yourself used to
11 believe that the hog tie position caused hypoxia,
12 correct?
13     A.  Yes.  That was --
14     Q.  And that's been disproven, correct?
15     A.  Yeah, I think, you know, reasonably
16 enough, yes.
17     Q.  All right.  And that was done in
18 -- back in the late 90's?
19     A.  Yes.
20     Q.  Proved that.
21     A.  Yeah.
22     Q.  And are you -- do you also agree that
23 it has been studied by Dr. Newman and by Dr. Chan
24 and others that applying a weight to the back of
25 a person in a prone position also does not result

Page 85

1  in any evidence of hypoxia or hypoventilation, do
2  you?
3      A.  Yes.
4      Q.  Do you agree with that?
5      A.  Yes.
6      Q.  And that was shown back in the early
7  2000's?
8      A.  Yeah, I think that's right.
9      Q.  You also are familiar that a few years
10 later by applying an additional weight of up of
11 up to 225 pounds to the back of a person in a
12 prone position that also did not result in
13 ventilation sufficient to cause any asphyxia; do
14 you agree with that?
15     A.  Yeah, based upon their experimental
16 design, yes.
17     Q.  All right.  And you don't have any
18 quarrel with their experimental design, do you?
19     A.  No, they were doing the best they
20 could, you know, without killing someone and
21 obviously not, you know, not doing such an
22 experiment on someone who is impaired in some
23 other way.  But, you know, it was -- they were
24 doing the best that they could with the
25 limitations that we have.

22 (Pages 82 - 85)

Dr. Kris Sperry                                          June 3, 2020
Arreola, Rodrigo v. Consolidated Government of Columbus, Georgia, et al

Page 86

1    Q.  Okay.  And you're not aware of any
2  research or any studies anywhere that suggest
3  that a weight to the back of a suspect in the
4  prone position causes any asphyxia, hypoxia,
5  hypoventilation or other symptoms, correct?
6    A.  Yeah.  I'm not aware of any
7  experimental studies that have been done, that
8  have been able to show that.
9    Q.  Okay.  You have not done any studies in
10  that regard, have you?
11    A.  Oh, no.  I have not conducted
12  experiments along those lines, no.
13    Q.  All right.
14    MR. CLARK:  Can we take just a couple
15  minute break, Mark, is that okay?
16    MR. POST:  Let's go off the record for
17  second a second.
18            OFF THE RECORD.
19            ON THE RECORD.
20  BY MR. CLARK:
21    Q.  Doctor, we have had a few difficulties
22  at length in this a little bit, but that's not
23  really why it's lengthen.  But mainly me, it's
24  going a little bit longer than I thought it
25  would, we can keep going through the lunch hour

Page 87

1  which I would prefer but I want to do whatever
2  you prefer.
3            OFF THE RECORD.
4            OFF THE RECORD.
5  BY MR. CLARK:
6    Q.  So let's go back on the record.
7  Doctor, we were talking about your opinion that
8  at some point during the struggle Mr. Arreola
9  experienced what we are terming critical
10  acidosis?
11    A.  Yeah.
12    Q.  What in your opinion caused the
13  critical acidosis in Hector Arreola?
14    A.  The physical exertion before the
15  struggle, the struggle and the restraint, some
16  element of hypoxia or inadequate oxygen exchange
17  during the course of the restraint and I think
18  those are, you know, those are the main elements,
19  yes.
20    Q.  Okay.  And so those elements you've
21  just listed, would you say that all of those
22  taken together is what caused the critical
23  acidosis?
24    A.  Yes.
25    Q.  All right.  Are you able to tell me at

Page 88

1  any point during the struggle how much Hector
2  Arreola's oxygen was decreased?
3    A.  No.
4    Q.  Are you able to tell me at what point
5  during the struggle did he suffer from decreased
6  oxygen?
7    A.  Again, I don't -- again it's -- I've
8  got to give you the same answer as I did with the
9  acidosis, but it's a process rather than
10  something immediate.  Now, I think it's
11  reasonably evidence that there was not, for
12  instance obstruction of his airway which would
13  mean that the hypoxia would be very rapid.  So I
14  would say there is an evolution of an element of
15  hypoxia that is, you know, superimposed upon the
16  acidosis itself and contributing to the overall
17  effect.
18    Q.  All right.  Incidentally if someone
19  suffers from a cardiac arrest can that cause them
20  to have trouble breathing?
21    A.  That's odd.  I mean, if someone suffers
22  a cardiac arrest then they pretty much stop
23  breathing.
24    Q.  Okay.  But during the course of the
25  cardiac arrest could they experience difficulties

Page 89

1  breathing?
2    A.  Okay.  I was trying to think of a way
3  to answer this that may be easier.
4    Q.  Okay.
5    A.  So when someone has a cardiac arrest
6  the brain has about 10 to 12 seconds of oxygen as
7  reserve before someone lapses into
8  unconsciousness.  Now, prior to the cardiac
9  arrest someone may complain of trouble breathing,
10  shortness of breathe depending on, you know, what
11  is evolving and how it, you know, how it is
12  evolving and progressing.  And after the heart
13  has completely stopped, they said there is
14  consciousness for about 10 to 12 seconds and
15  sometimes people will say I can't breathe and
16  then they fall over or sometimes they just drop
17  without, you know, any warning whatsoever.
18        So I mean, the right answer is it depends
19  but usually, I mean trouble or difficulty
20  breathing is not something that proceeds a
21  cardiac arrest unless it's again a process that's
22  leading into this, say a pulmonary embolism that
23  results in a decreased ability to get oxygen into
24  the blood and causes well, obvious trouble
25  breathing for sometimes minutes or even an hour

23 (Pages 86 - 89)

Dr. Kris Sperry                                          June 3, 2020
Arreola, Rodrigo v. Consolidated Government of Columbus, Georgia, et al

Page 90

1  or two before the person reaches a point where
2  they have a cardiac arrest.
3      So depending upon the nature of what you're
4  speaking about, there are some conditions like
5  heart failure, pulmonary edema where the person
6  will experience shortness of breath or even a
7  long period of time before they have a cardiac
8  arrest but hopefully there is medical
9  intervention before that.
10     Q.  All right.  Do you know how much oxygen
11  Hector Arreola needed to consume in order to
12  survive?
13     A.  No, I'm not sure that's an answerable
14  question.
15     Q.  Okay.  Do you know, for instance how
16  many liters per minute of oxygen Hector Arreola
17  needed in order to survive?
18     A.  Well again, I don't know that that's an
19  answerable question, because it's not -- that's
20  kind of not how it -- that's not how it works.  I
21  mean, how many liters per minute, that's not
22  -- as I'm hearing it that's not answerable.
23  That's not a question that I think is -- there is
24  the ability to answer that.
25     Q.  Okay.  So you don't have an answer for

Page 91

1  that?
2      A.  No, I mean he did --
3      Q.  Okay.
4      A.  -- he didn't asphyxia, we have covered
5  that ground already.  I think this is -- you're
6  -- you're really get back into that area, he did
7  not asphyxia.  He did not die specifically
8  because he did not have enough oxygen, okay.
9      Q.  Okay. All right.  Fair enough.  So with
10  respect to the hypoxia, hypoxia means a decreased
11  oxygen, correct?
12     A.  Yes, decreased oxygen, you know, in the
13  blood, yes.
14     Q.  All right.  Decreased oxygen in the
15  blood?
16     A.  Yes.
17     Q.  Do you know how much Hector Arreola's
18  oxygen was decreased in his blood?
19     A.  No, there is not a way to know that
20  unless pulse oximeter had been put on his finger
21  at the time when the paramedics first got to him,
22  when he, you know, as they were -- just before or
23  when they loaded him onto the gurney.  I mean,
24  that at least would have given us an idea of his
25  oxygen saturation at that point.  But beyond

Page 92

1  that, no, there is no way to know.
2      Q.  Is it your opinion that Hector Arreola
3  had a reduction in ventilation that caused his
4  hypoxia?
5      A.  I think that that's -- yes.  I would
6  say that that is -- I mean, his ventilation
7  capacity, not the ventilation frequency.  But I
8  think his capacity to inspire -- in fact, I think
9  you said that one of the things that he said was
10  I can't breathe in which is rather interesting.
11  So he was exchanging oxygen -- exchanging air but
12  it was being impaired by the, you know, weight of
13  the officers on his chest.  Such that he was
14  experiencing a decrease in oxygen in his blood,
15  yet not enough to render him unconscious but he
16  physiologically could perceive it and had the
17  feeling that he couldn't breathe.
18     Q.  But you cannot tell me to what extent
19  his capacity was decreased, can you?
20     A.  No. No.
21     Q.  All right.  This is probably going to
22  be a poorly worded question, okay.  So I'll give
23  it that preface so you can be ready.  But what in
24  your opinion was the real culprit here that
25  caused the death, was it the acidosis or the

Page 93

1  hypoxia?
2      A.  I think -- well, okay.  That's why, you
3  know, I worded my opinions in the way that I
4  worded them.  Now, having said that, I mean, I
5  think that if he had not developed the acidosis
6  that he developed, then whatever hypoxia he
7  sustained during the course of the restraint, you
8  know, I've said this already once the restraint
9  stopped he clearly was breathing.  And he was
10  breathing as far anyone could tell normally, but
11  his level of consciousness -- who's off to the
12  -- someone is waving their hand at you or it's
13  the person that's passing you the questions, it's
14  just distracting.  Anyway --
15     Q.  Me?
16     A.  Yeah.
17     Q.  I'm sorry, were you talking about my
18  partner here?
19     A.  Yeah, yeah.  There is a hand waving
20  over the screen.
21     Q.  Oh, okay.  Sorry about that.
22     A.  He got in the camera, that's okay.
23  Because I'm looking at you and it was distracting
24  me.  So anyway the culprit, he did not
25  asphyxiate, otherwise I think we would -- I've

24 (Pages 90 - 93)

Dr. Kris Sperry                                      June 3, 2020
Arreola, Rodrigo v. Consolidated Government of Columbus, Georgia, et al

Page 94

1  said already if he had truly asphyxiated he would
2  have been dead, you know, dead right there
3  basically.  But once the restraint stopped and he
4  was -- well, you know, he was rolled over or sat
5  up, he clearly, you know, was neurologically not
6  right, but that was not appreciated.
7      So, but he was breathing so I think his
8  oxygen -- oxygenation probably came back to
9  normal because he was breathing adequately and,
10  you know, did not have any other diseases,
11  anything that would effect his ability to
12  oxygenate.  He didn't have emphysema or anything
13  like that.
14      So there was something else that was
15  resulting in the impairment.  And, you know, I've
16  talked about the acidosis already.  I mean I
17  think that was -- that had developed and
18  progressed to the point where even though he was
19  exchanging air adequately after the restraint was
20  terminated, he, you know, that wasn't enough to
21  just to revert him back to normal, there was
22  something else going on.
23      Q.  Okay.
24      A.  Progressing.
25      Q.  Was the acidosis in your opinion the

Page 95

1  primary cause of the death?
2      A.  Well, you see I'm just thinking -- I
3  mean, it's like -- I guess I said, as I said a
4  bit ago, if the only thing that had developed
5  during the course of his restraint was some
6  degree of hypoxia, once, you know, we -- well,
7  once the restraint was stopped he would be
8  breathing normally.  So I mean, the acidosis,
9  something else was intervening to result his
10  continual deterioration.  But everything
11  -- again, everything has to be taken, you know,
12  as a pathologist I mean, I think you can tell we
13  don't parse things out.  This is why it's a
14  combination of all these things together, you
15  know.
16      Q.  Okay.
17      A.  So I mean, you say if the restraint
18  never had occurred then, you know, the acidosis
19  probably wouldn't have occurred either.  So the
20  restraint -- well, that's why we word things in
21  the way we that we do, is combining --
22      Q.  Right.
23      A.  -- all these elements together.
24      Q.  Okay.  And I think -- I don't want to
25  go back over the ground with respect to what

Page 96

1  caused the acidosis, I think I understand that.
2  But just having weight on a suspect's back does
3  not in and of it cause acidosis, right?
4      A.  It shouldn't.  If that is the only
5  thing -- I mean simply having someone down and
6  putting weight on their back, you know, it depend
7  on how much weight you're talking about.  But,
8  you know, all that we know is experimental data
9  that was done on, you know, normal human beings
10  and that's all I can say.  And attempts have been
11  made to try to duplicate these scenarios that
12  occur and that it result in an unexpected death.
13      Q.  Okay.
14      A.  So alone and of itself -- well, like I
15  said, it depends on how much weight you, you
16  put on someone but I mean, that's
17  -- it's kind of not a good question altogether,
18  but I know what you're trying to say.
19      Q.  Another bad question for Mr. Clark.
20      A.  That's good, see you've --
21      Q.  All right.  I'll ask it this way.  I'll
22  ask it this way then to make it maybe a good
23  question.  The weight that was applied to Hector
24  Arreola's back in this case is not what caused
25  the acidosis, correct?

Page 97

1      A.  Okay.  Not alone and in and of itself,
2  no.
3      Q.  It was the struggle?
4      A.  Yeah.  The, you know, the struggle and
5  what I talked about, the exertion before, you
6  know, the stress related to that, the restraints,
7  and the stress related to that.  And, you know,
8  I've said I cannot exclude the methamphetamine as
9  an element that overall resulted in, you know,
10  excitatory stimulation and the progression of
11  acidosis as well.  So all these things have to be
12  taken in.
13      Q.  While you're on that let me jump over
14  to my questions that I had about excited
15  delirium.
16      A.  Sure.
17      Q.  Do you believe that Hector Arreola
18  suffered from excited delirium?
19      A.  No.
20      Q.  You don't?
21      A.  No.
22      Q.  All right.  You agree with me though
23  that excited delirium can result in a sudden
24  death, correct?
25      A.  Of course.

25 (Pages 94 - 97)

Dr. Kris Sperry                                    June 3, 2020
Arreola, Rodrigo v. Consolidated Government of Columbus, Georgia, et al

Page 98

1    Q. All right. And you would agree that
2  the symptoms of excited delirium are things such
3  as psychotic behavior?
4    A. Yes.
5    Q. Right?
6    A. Yes, you could include that.
7    Q. Hallucinations?
8    A. Yes.
9    Q. Being insensitive to pain,
10 insensitivity to pain?
11   A. Yes.
12   Q. Super human strength?
13   A. Yes. It's a funny word but that's was
14 what we kind of used, yeah. The strength
15 apparently above and beyond what someone normally
16 could exert, yes.
17   Q. Not following the commands of police?
18   A. Yeah. That's a poor -- because it's
19 nonspecific but, you know, that's often included
20 in the milieu, the syndrome anyway that is used,
21 that's called excited delirium.
22   Q. Okay. And methamphetamine use increase
23 the risk of excited delirium, correct?
24   A. Yes. It does, you know, if --
25   Q. All right.

Page 99

1    A. Yeah, methamphetamine abuse can
2  sometimes lead to the development of the excited
3  delirium syndrome, yes.
4    Q. All right. And you agree that Hector
5  Arreola had all of those symptoms that we just
6  went through? Would you agree with that?
7    A. Yes. I don't know about super human
8  strength but, you know, I have no disagreement
9  with Officer Aguilar saying that this was, you
10 know, the most intense struggle that he had ever
11 had. So, you know, Mr. Arreola was certainly was
12 struggling, fighting. You know, he was resisting
13 very significantly. I have no problem with that.
14   Q. Okay. So tell me then why you believe
15 that Mr. Arreola did not suffer from excited
16 delirium?
17   A. All right. Other elements of excited
18 delirium -- well, I'll preface this, the problem
19 that exits is excited delirium is a syndrom which
20 is a combination of different things that when
21 they occur together generally result in what is,
22 you know, has been given the name of excited
23 delirium.
24     Other things are -- that are usually seen
25 are profuse sweating, and also an increased body

Page 100

1  temperature that's often severely increased. And
2  I did not see anything in any of the records that
3  described that he was sweating more intensely,
4  you know, by anyone and also when he got to the
5  hospital I think medical records showed that his
6  temperature was actually low. It was something
7  like 23 point something degrees centigrade. I
8  saw that in one of the records.
9      So he was really hypothermic. Well, and
10 with the presence of methamphetamine I think as I
11 said a minute ago, the effects of methamphetamine
12 overlap to a great degree the syndrome and
13 definition of what excited delirium consists of.
14   Q. Okay. Bear with me --
15   A. Sure.
16   Q. -- a second here. I don't know that I
17 had it. I don't have a paper copy so I got to
18 look on the computer here real quick. Do you
19 agree that based on what the officer saw, based
20 on what Dudley and Aguilar specifically saw when
21 they first approached Mr. Arreola, that he was
22 exhibiting signs that indicated that he was at a
23 heightened risk for sudden death if a violent
24 struggle were to ensue?
25   A. Okay. I know what you're asking,

Page 101

1  because they had reached the conclusion when they
2  first encountered him that he should be seen by a
3  psychiatrist, he needed medical evaluation. And
4  that this was something a mental illness perhaps
5  or perhaps the effects of drugs, you know, drug
6  intoxication of some sort. You know, and with
7  that, you know, I think that to me was sufficient
8  enough information -- well, I mean I think they
9  were thinking the right things. That's, I
10 probably said think too many times. But they
11 were -- that -- those conclusions on their part I
12 think were accurate and appropriate.
13     And so in the broadest sense their
14 observation of Mr. Arreola at that time
15 hypothetically can increase the likelihood that,
16 you know, he -- Mr. Arreola could experience a
17 sudden death at some point or another.
18   Q. And that sudden death could be due to
19 excited delirium, correct?
20   A. Oh, if excited delirium, you know,
21 ultimately developed yes, it could be.
22   Q. All right. And two risk factors that
23 contribute to excited delirium are the
24 combination of drug use and mental illness or
25 paranoia, correct?

26 (Pages 98 - 101)

Dr. Kris Sperry                                          June 3, 2020
Arreola, Rodrigo v. Consolidated Government of Columbus, Georgia, et al

Page 102

1     A.  Well yeah.  Mental illness, I mean,
2  those are the two broad scenarios that excited
3  delirium is known to occur, and that is
4  underlying mental illness and then -- which of
5  course is broad but it's mentioned as broad, and
6  drug use whether illicit drug use or something
7  other -- whether there are prescription drugs
8  that are used therapeutically that evolve or
9  cause the excited delirium syndrom to evolve.
10  But yes, drug use and mental illness broadly are
11  the two categories of risk factors if you will,
12  that can contribute to the evolution and
13  development of excited delirium.
14     Q.  And the reason you believe Mr. Arreola
15  did not suffer from excited delirium was because
16  of the no evidence of profuse sweating and no
17  increased temperature; is that correct?
18     A.  Yeah.  Those are at least the two
19  objective things that I think count against
20  excited delirium here.
21     Q.  Is there anything else that you believe
22  indicate that he was not experiencing excited
23  delirium?
24     A.  I think that's really it.
25     Q.  Okay.  You don't -- again you don't

Page 103

1  rule out excited delirium, do you?
2     A.  Oh, I don't know about ruling it out,
3  it's not a conclusion I would have reached here.
4  And, you know Dr. Darrisaw did not reached that
5  neither in her conclusion and, you know, she
6  thought that the death was due to methamphetamine
7  toxicity.  And what she relied upon I think is a
8  different issue but, you know, she herself did
9  not reach that conclusion either.  And I think
10  from a limited -- well, I don't think that she
11  had all the information that she really needed to
12  have.  But none the less, you know, I can see in
13  the absence of knowing the sequence of events
14  that occurred, calling this a methamphetamine
15  toxicity death would not be inappropriate.
16     Q.  All right.  And we're going to get to
17  that in a minute, so let me hold that one.  Let's
18  move to the third opinion which is your
19  criticisms of the EMS personnel, okay.
20     A.  Yes.
21     Q.  Why don't you just tell me what they
22  are.  What are your criticisms of the EMS?
23     A.  Well, when they first arrived at Mr.
24  Arreola's side, and I can say that, you know,
25  once I read through Mr. Barnes' deposition I

Page 104

1  think it, you know, it clarified to me a great
2  deal of, you know, what he saw and what he did at
3  the time.  He recognized that Mr. Arreola
4  -- there was something wrong with Mr. Arreola,
5  that as he was not responding to questions, he
6  really wasn't moving, he was breathing.  There
7  was -- there was some sluggishness of pupils but
8  that was hard to ascertain there in the, you
9  know, where Mr. Arreola was.
10     Once they got him into the ambulance they
11  began looking at him, but I don't think they
12  appreciated, you know, what, you know, that
13  something was wrong until he had sustained a
14  cardiac arrest.  At which point -- well, they had
15  gone beyond the point where there was anything
16  that could be done other than just start CPR.
17     Q.  All right.  So I'm not sure I'm
18  following what your criticisms of the EMS are,
19  but what did they do wrong?
20     A.  All right.  Well, they didn't obtain
21  any vital signs that are recorded until he had
22  really arrested.  And so they did not know what
23  his condition was prior to his cardiac arrest.
24  And I think had they obtained, you know, tried to
25  obtain a blood pressure -- well, it would have

Page 105

1  been a blood pressure to some extent, and an
2  oxygen saturation, excuse me, they would have
3  been able to figure out or ascertain very rapidly
4  that Mr. Arreola was in extreme risk.
5     Q.  All right.  And you believe that as you
6  put in your report had they done that they
7  would have been able to have corrected the
8  situation; is that right?
9     A.  Possibly.  I mean, they at least would
10  have know that there were physiologic
11  abnormalities, you know, going on and they could
12  have instituted pretty -- and even, well radioed
13  ahead to -- radioed the hospital.  I mean,
14  relayed all this information and started at least
15  administering oxygen if nothing else and probably
16  an IV, they could put an IV in.
17     Q.  Okay.
18     A.  Give him drugs.
19     Q.  Other than the vitals that should have
20  been taken sooner, is there anything else that
21  you believe that they did wrong?
22     A.  Those are the only things.  Well, their
23  initial assessment again, that Mr. Arreola was
24  not normal and he was not answering questions,
25  but at least he was breathing.  And, you know,

27 (Pages 102 - 105)

Dr. Kris Sperry                                          June 3, 2020
Arreola, Rodrigo v. Consolidated Government of Columbus, Georgia, et al

Page 106

1   they would have to, I think obtain more
2   information from vital signs in order to
3   ascertain that there were problems.  And so, you
4   know, I wouldn't expect them to initiate some
5   treatment without objective information that told
6   them, you know, what they should do.
7       Q.  Do you believe that the actions of the
8   EMS personnel or the omission of action by the
9   EMS personnel contributed to Hector Arreola's
10  death?
11      A.  You know, that's an excellent question.
12      Q.  It's a good one.
13      A.  Excuse me, Mr. Arreola was going to
14  have a cardiac arrest, I mean, realistically I
15  think that was going to happen at some point.
16      Q.  All right.  But you believe that EMS
17  possibly could have prevented that from
18  happening?
19      A.  I think possibly, yes.  They would have
20  had information that they could, you know, they
21  could then rely upon to try and institute some
22  treatment right there.  I mean, giving him a
23  injection of bicarbonate would have helped
24  alleviate the acidosis pretty quickly.  But, you
25  know, at least --

Page 107

1       Q.  Right.
2       A.  -- could have been seen by whatever
3   rhythm he had, whatever cardiac rhythm was
4   present they did not know until he had pulseless
5   electrical activity.  I mean his heart had
6   stopped.
7       Q.  All right.  In your report you
8   indicated that their report, I think you're
9   talking about the EMS report, includes a possible
10  traumatic origin for the arrest; do you remember
11  that?
12      A.  Where are you finding that?
13      Q.  Yeah, let me see if I can find it,
14  because I didn't understand that sentence.  And
15  now you're going to ask me to find it, so I've
16  got to find it.
17      A.  Oh, yeah.  It says possibly cardiac, I
18  quoted possible cardiac respiratory trauma
19  arrest.  That was -- I'm sorry, that's on page 2
20  in the center paragraph.  Do you see that?
21      Q.  I don't.
22      A.  The paragraph according to the EMS
23  record.
24      Q.  Yeah, I see that.
25      A.  Okay.  Go down about five or six

Page 108

1   sentences and it says, "At some point during the
2   transfer Mr. Arreola's condition abruptly
3   deteriorated into a, quote, possible
4   cardiac/respiratory/trauma arrest," unquote.
5       Q.  All right, I see that.
6       A.  Yeah.  That's what's in their report.
7   I mean, I think that reflects that he had a
8   cardiac arrest and they didn't know what it was
9   from.  Now of course, that verbiage was
10  generated, you know, afterwards but they, you
11  know, he had a cardiac arrest and they did not
12  know why.
13      Q.  Go to page 4.
14      A.  Okay.
15      Q.  And go to the fourth bullet point down
16  from the top.
17      A.  Okay.
18      Q.  And the, you know, like third -- like
19  second sentence, this was apparently completely
20  unanticipated by the EMS personnel, as their
21  report also includes a possible traumatic origin
22  for the arrest?
23      A.  Yes.
24      Q.  I didn't understand that sentence, so
25  if you could just explain that to me, please.

Page 109

1       A.  Oh, I guess it's actually just kind of
2   what I just said, better.  Mr. Arreola had a
3   cardiac arrest and they did not know why.  And,
4   you know, they did not know the mechanism behind
5   why he had a cardiac arrest.  And so that's why I
6   think the verbiage that I quoted, it's actually
7   quoted directly from their report, that I put on
8   page 2 of my report.  Their report says, quote,
9   possible cardiac/respiratory/trauma arrest.
10      In other words, they did not know why at
11  all.  And not knowing they concluded -- it was
12  -- trauma was include in the differential because
13  they had no idea what caused it.
14      Q.  What do you mean by possible traumatic
15  origin?
16      A.  Well, I mean that's -- that somehow
17  Mister -- I mean, you're asking me as to why I
18  think that they put, you know, trauma as part of
19  the differential of what he had?
20      Q.  No, I'm asking you what do your words
21  mean.  What does traumatic origin mean in your
22  report?
23      A.  Oh, traumatic origin as, you know,
24  something like a -- I'm just trying to think of
25  -- oh, an injury that resulted in internal

28 (Pages 106 - 109)

Dr. Kris Sperry                                                                    June 3, 2020
Arreola, Rodrigo v. Consolidated Government of Columbus, Georgia, et al

Page 110

1  hemorrhage, saying in loss of blood such that he
2  had a cardiac arrest.  A rib, a fractured rib
3  that had punctured through the heart, that's the
4  kind of, you know, acute traumatic event that
5  could resulted in a cardiac arrest.
6      Q.  All right.  I think I've got it.  Okay.
7  Let's move onto opinion number 4 that I listed in
8  the very beginning.  And that was that your
9  opinions that the police officers delayed the
10  treatment by the EMS personnel.
11     A.  Yes.
12     Q.  All right.  And did -- and you have
13  that opinion; is that right?
14     A.  Yes.
15     Q.  All right.  Tell me what did they do
16  that delayed it?
17     A.  Well, they -- I think fundamentally
18  they did not understand that Mr. Arreola was
19  -- well, even as you've kind of asked a little
20  bit ago, I mean, potentially at risk for a sudden
21  cardiac arrest or complications of the, you know,
22  whatever the problem was that was causing his
23  mental abnormalities.  In fact, they concluded
24  initially, as I said earlier that he possibly had
25  a mental illness or was under the influence of

Page 111

1  some drugs.  And knowing that or having those
2  -- having those initial conclusions then he would
3  be at risk for other profound complications that
4  could arise and, you know, they -- when they
5  radioed, initially radioed for EMS they
6  communicated -- it was communicated that they did
7  not need, you know, lights or siren and it was
8  routine and even later on when they communicated
9  it with dispatch they still classified this as
10  routine.
11     In other words, there was no sense of
12  urgency that was passed on to have EMS get there
13  faster.  So I think if EMS had gotten there, well
14  sooner -- I mean, even if perhaps if they had
15  gotten there before the restraint every started,
16  you know, who knows, that comes into an area that
17  I can't tell you.  But at least at no time was
18  the urgency of Mr. Arreola's physical situation
19  appreciated.
20     Q.  Well, would you not agree that police
21  officers that called for EMS prior to even
22  effectuating an arrest were being diligent in
23  getting medical care for the suspect?
24     A.  Yes.  I think at that in point in time
25  they supplied what they, you know, what they saw

Page 112

1  and what their initial conclusions were.  Calling
2  for EMS was completely appropriate, absolutely.
3      Q.  All right.  So is it your point that
4  they just should have been more urgent about
5  their call for EMS?
6      A.  Well, I think as the situation in their
7  handling, in their interaction with Mr. Arreola
8  changed, then I think the -- or having EMS,
9  excuse me, respond more rapidly or even be on
10  scene if they were going to try to restrain Mr.
11  Arreola would have been -- well, I think that
12  would have made a -- possibly made a difference.
13     Q.  Do you agree with me that Hector
14  Arreola was conscious and alert when the EMS
15  started treating him, correct?
16     A.  When they started what?
17     Q.  When the EMS personnel started treating
18  Mr. Arreola he was conscious and alert?
19     A.  Oh, okay.  Well, the assessment was he
20  was conscious which I agree with.  Him being
21  alert I think was much more difficult to
22  appreciate because I don't -- he was not
23  neurologically normal.  He was not responding to
24  questions and was actually not saying anything at
25  all.  He was not unconscious, but so he was

Page 113

1  conscious, but I think the initial assessment
2  that he was alert was -- was not correct.
3      Q.  Okay.  Is there anything else about the
4  actions of the police officers with respect to
5  delaying medical treatment that you intend to
6  offer an opinion about?
7      A.  No, I don't think so.
8      Q.  All right.  All right.  The last ten
9  minutes.
10     A.  Would you just give me a second, I just
11  want to get another bottle of water from my
12  fringe.
13     Q.  Take your time.
14     A.  Thirty seconds.
15     Q.  Yes, sir.
16          OFF THE RECORD.
17          ON THE RECORD.
18  BY MR. CLARK:
19     Q.  We're back on the record.  So now this
20  leads me to the last opinion, which as I
21  understand it is your opinion that the manner of
22  death on the, I guess the death certificate
23  should be listed as homicide; is that correct?
24     A.  Yes.
25     Q.  All right.  And the -- let's see, let

29 (Pages 110 - 113)

Dr. Kris Sperry                                      June 3, 2020
Arreola, Rodrigo v. Consolidated Government of Columbus, Georgia, et al

Page 114

1  me just introduce that, the death certificate.
2  Bear with me, here it is.  Well, I guess it's
3  going to be on the -- what you're quarreling with
4  I suppose is on the autopsy report; is that
5  right?
6      A.  Yes.  Yeah.  I'm not quarreling but
7  that's what I'm commenting on, yes.
8      Q.  Okay.  Yeah, I probably shouldn't have
9  used that word.  By the way, do you know -- Dr.
10  Darrisaw, did she work for you when you were at
11  -- when were you were at the GBI?
12     A.  Absolutely.  I actually had a hand in
13  training her.  She was the first forensic fellow
14  we had in 2000 and I hired her.  So yes, I know
15  Dr. Darrisaw very well.
16     Q.  Good deal.  She's a good doctor; isn't
17  she?
18     A.  Yes, she is.
19         MR. CLARK:  Rusty, do you know what
20  exhibit number we're on?
21         COURT REPORTER:  All right.  Number 5,
22  Jim.
23         MR. CLARK:  So this one should be
24  number 5?
25         COURT REPORTER:  Correct.

Page 115

1  BY MR. CLARK:
2      Q.  All right.  So I'll introduce Dr.
3  -- Exhibit 5 which is the autopsy report.  Do you
4  see that?
5      A.  Oh, I mean, I have the autopsy in front
6  me, so.
7      Q.  All right.  Well, that's fine.  So you
8  use yours.  So the part of the autopsy report
9  that you're commenting on is where?
10     A.  This is not --
11     Q.  Page 6 or 7?
12     A.  Page 6, the opinion/summary.
13     Q.  All right.
14     A.  And actually the summary of findings of
15  pathologic diagnoses and then the manner of
16  death.
17     Q.  And your comment is that the manner of
18  death should be listed as homicide; is that
19  right?
20     A.  Yes.
21     Q.  And by saying homicide, you know, that
22  word means that -- well, you tell me what does it
23  mean if it's a homicide versus an accident?
24     A.  Sure.  A homicide means is a very
25  sterile terminology to medical examiners and it

Page 116

1  means specifically that the action or actions of
2  another person or others caused or contributed to
3  the death of someone, that's it.  Homicide does
4  not mean murder, manslaughter, does not -- for us
5  to utilize the term homicide does not imply
6  negligence, it carries none of those associations
7  whatsoever.  It just means that again, as I said
8  the action or actions of someone else or other
9  people caused or contributed to the death, you
10  know, in some way or percentage or some degree.
11     Q.  All right.  And so if a person dies
12  while in police custody, a suspect dies while in
13  police custody, do you always declare the manner
14  of death in those circumstances as being a
15  homicide as opposed to an accident?
16     A.  Well, no.  It's -- I think as you
17  should be able to see, much of it is
18  circumstantial, in the sense that if someone is
19  being -- they're transported from, you know, one
20  place to another in the back of a police car and
21  when they get to wherever the destination is and
22  they're dead, then that doesn't necessarily
23  -- depending on what's found at the autopsy for
24  instance, that doesn't necessarily mean that the
25  actions of officers or anyone else caused or

Page 117

1  contributed to the death.  So it's really based
2  upon the nature of the events and the
3  circumstances.
4      Just kind of the opposite extreme would be
5  if a police officer shoots someone in the line of
6  duty who is, you know, welding a gun and firing
7  at people, we classify those as homicides.  But
8  again that just simply means that the actions of
9  the officer resulted in the death of someone
10  else.  But it carries no legal interpretation
11  whatsoever.
12     So it's -- but that -- and that terminology
13  or this, what I'm describing in relationship to
14  events such as Mr. Arreola's death or his death
15  specifically, there was clearly a struggle and
16  restraint by, excuse me, the officers.  And the
17  -- I don't know at least from Dr. Darrisaw's
18  report and what she's written in her opinions, I
19  don't think she was aware of that, because again
20  she knows what she's doing but the convention
21  that, you know, that has been used -- well, among
22  medical examiners across the country, as well as
23  at the GBI was that the proper characterization
24  or the proper manner of death classification
25  would be a homicide, because it's the multi-

30 (Pages 114 - 117)

Dr. Kris Sperry                                                   June 3, 2020
Arreola, Rodrigo v. Consolidated Government of Columbus, Georgia, et al

Page 118

1  factorial element we have been talking about.
2      Q.  All right.  So just so I'm clear,
3  classifying the manner of death as homicide does
4  not mean that any law enforcement officer did
5  anything wrong, correct?
6      A.  Absolutely.
7      Q.  All right.  And if a -- if for instance
8  an -- officers are attempting to effectuate an
9  arrest on a suspect and that suspect suffers
10 excited delerium and suffers a heart attack, in
11 that circumstance you are going to classify the
12 manner of death as a homicide, correct?
13     A.  Yes.  Again I think, you know, I know
14 what you're asking me and if officers -- that
15 person who was suffering excited delirium, the
16 officers were restraining him in order, you know,
17 to stop him from being violent or hurting someone
18 else, and he had a heart attack and died we would
19 call that a homicide.
20     Now, if the guy with the excited delirium
21 was, you know, running through alleys and streets
22 and suddenly collapsed and died, well that, you
23 know, that -- we probably would classify that
24 was, you know, if you're saying he had drugs in
25 his system, we would call that an accident.

Page 119

1  Otherwise, you know, without anything else that
2  showed the precipitation we would call it a
3  natural death.  But he had coronary artery
4  disease and he was collapsed over dead as he was
5  running to evade the police, well, that's a
6  natural death.
7      Q.  Okay.  So if officers have a struggle
8  with a suspect and during that struggle the
9  officers don't do anything improper or wrong, but
10 the suspect suffers a cardiac event and dies or
11 for that matter dies for any other reason, that
12 would be deemed to be a homicide?
13     A.  Yes.  If, you know, the restraint as,
14 you know, without you saying any other reason, I
15 mean just exactly as you outlined it --
16     Q.  Fair enough.
17     A.  -- that would be properly classified as
18 a homicide.
19     Q.  All right.
20     A.  If he had no implication of blame, you
21 know, intent, nothing like that.  Those are legal
22 conclusions.
23     Q.  Got you.  All right.  Doctor, I think
24 that's all I've got.  I appreciate it.
25     A.  Good.  Well thank you.

Page 120

1      MR. POST:  Doctor, don't leave.  I've
2  got a couple of things I need to ask just to
3  follow up, if that's okay, Jim.
4      MR. CLARK:  Sure.  He's your witness,
5  but go ahead.  Sure.
6      DIRECT EXAMINATION
7  BY MR. POST:
8      Q.  Yeah.  Just because I had some trouble
9  hearing from time to time on this thing, one
10 question, one thing I think I heard Mr. Clark ask
11 you, Dr. Sperry, was if point nine milligrams per
12 liter of methamphetamine was sufficient to be
13 toxic in this case, which was what I think they
14 found in his blood at the crime lab.  And I don't
15 recall what your answer was to that?
16     A.  Sure.  And my answer was it's in the
17 low level, excuse me, it's a relatively low level
18 with respect to the majority of people who are
19 toxic from methamphetamine.  I mean, the usual
20 blood levels in individuals who die of
21 methamphetamine toxicity is somewhere between
22 five and ten milligrams per liter.  So Mr.
23 Arreola's is one-fifth of the lower level of
24 that.  So, you know, it's not overtly in the most
25 commonly encountered toxic ranges, toxic levels

Page 121

1  but in and of itself it potentially could be
2  toxic.
3      Q.  Okay.  I think you characterized it as
4  a contributing factor and -- is that correct?
5      A.  Exactly, yes.
6      Q.  Okay.  Or a potential contributing
7  factor.  I think you left some room as to where
8  it would not necessarily contribute?
9      A.  Yes.  And I think I answered that, the
10 fact I think that's, you know, but for the
11 restraint and the, you know, the complications
12 relating to -- the physiologic complications
13 relating to the restraint and everything that
14 occurred during that, in my opinion Mr. Arreola
15 would not have died of the methamphetamine alone
16 in and of itself.
17     Q.  Okay.  And Mr. Clark asked you about
18 some studies that Dr. Newman and Dr. Chan, C-H-A-
19 N, did with regard to weight on a subject's back.
20 My question is were there shortcomings with
21 regard to applying those studies to the situation
22 or Hector Arreola's situation?
23     A.  Well yes.  The first one is that if you
24 put enough weight on someone's back, you know,
25 there is going to come a point where everybody

31 (Pages 118 - 121)

Dr. Kris Sperry

June 3, 2020

Arreola, Rodrigo v. Consolidated Government of Columbus, Georgia, et al

Page 122

1  starts having trouble breathing, because their
2  chest is compressed.  And that's a limitation of
3  the studies that were done because, you know, I
4  mean for obvious reasons we can't, you know,
5  subject people to experimental situations that
6  could be life threatening at all.
7      So that, you know, that's one element.  And
8  the other is that even, you know, looking at all
9  of that just alone, I mean the study's looking at
10  weight on someone's back it still does -- there
11  are limitations.  It just does not translate into
12  the real world situations like Mr. Arreola's,
13  that culminated in death.
14      Q.  Okay.  Thank you.  In your opinion was
15  cardiac arrest the cause of Hector Arreola's
16  statements that he couldn't breathe?
17      A.  Oh, no.  No, he did not have a cardiac
18  arrest then.  His heart was still beating and
19  pumping otherwise he would not have been
20  conscious and could not have made those
21  statements at all, if I understand your question.
22      Q.  Yes, sir.
23      A.  Okay.  Good.
24      Q.  I think we are communicating.  I'm just
25  trying to read some of my notes here.  You talked

Page 123

1  a lot about acidosis.  From what I gathered, the
2  acidosis in this case was caused by hypoxia
3  basically; is that right?
4      A.  Well the --
5      MR. CLARK:  Objection, leading.
6      THE WITNESS:  The struggle during the
7      course of the restraint and the restraint
8      itself and then hypoxia that developed
9      during the course of the restraint.  All of
10     those factors led to the development and
11     progression of the acidosis.
12  BY MR. POST:
13      Q.  Without the restraint -- let me ask you
14  this.  I know Mr. Clark listed a number of
15  opinions, but the full set of your opinions are
16  obtained or are contained in your written report;
17  is that right?
18      A.  Yes.
19      Q.  With respect to excited delirium; is
20  that an actual cause of death?
21      A.  You say is it?
22      Q.  Is it an actual medical cause of death?
23      A.  Well, it is a syndrom, it's an
24  association.  A syndrome means an association of
25  a variety of different situational and medical

Page 124

1  findings that result in an identifiable pattern.
2  And it's hard to understand sometimes because
3  syndrome is not necessarily a cause of death but,
4  you know, the syndrome of excited delirium that
5  has all of the different features, they culminate
6  in someone dying, but it does not always do that.
7      And it's -- well, physicians have to be
8  careful and we're careful not to assign the
9  terminology of exited delirium to a death unless
10  there is all of the different factual elements
11  present that define what excited delirium consist
12  of.  So it's, you know, it's easy to say someone
13  died of excited delirium when, you know, all the
14  features are just not there.  And, you know, so
15  anyway that's -- so yes, it's recognized that
16  someone can die of what is defined as excited
17  delirium but there is all these different
18  features that go -- that really must be present
19  in order to use that designation.
20      Q.  So if someone died from excited
21  delirium would there be an underlying mechanism
22  of death a doctor might identify even then?
23      A.  Sometimes yes, I mean and sometimes
24  there's not.  I mean otherwise healthy people who
25  have no underlying heart disease or other medical

Page 125

1  conditions when they die of excited delirium
2  there is often really no autopsy findings that
3  really one can see at all.  But the diagnosis is
4  only arrived at by the pathologist through
5  scrutiny of the sequence of events and also
6  objective findings on the individual, such as I
7  mentioned excessive sweating which is one of the
8  hallmarks of excited delirium.  And elevated body
9  temperature, that's, you know, quite elevated
10  even up to 107 or 108 degrees.
11      So those are key features that are
12  objectively obtained by medical personnel and
13  without those key features despite paranoia,
14  fighting with the law enforcement officers, not
15  obeying obeying their commands and things like
16  that, those are very subjective and they're not
17  sufficient enough -- in and of themselves to call
18  a death excited delirium.
19      Q.  Would you have expected sweating and/or
20  temperature elevation to still be there if the
21  temperature was 24 degrees or so, as it was that
22  morning?
23      A.  Well, the sweating is -- I say in that
24  situation, you know, that we know what we know it
25  might be a little hard to observe that, but at

32 (Pages 122 - 125)

Dr. Kris Sperry                                June 3, 2020
Arreola, Rodrigo v. Consolidated Government of Columbus, Georgia, et al

Page 126

1  the same time, you know, he -- well, you could
2  see that -- one you would be able to see that,
3  you know, his face and his hands, the exposed
4  parts of his body would be sweating and when he
5  ultimately -- well that's before he had the
6  cardiac arrest.
7      Now, the elevated body temperature even
8  though the environment was 24 degrees when
9  excited delirium as I said, the body temperature
10  goes very high, through the roof, 107, 108
11  degrees and that will -- if that had been -- if
12  he had died of excited delirium and that elevated
13  body temperature would have persisted all the way
14  to the time when he got to the emergency room.
15  That is usually one of the first observations
16  actually that is made by the emergency personnel.
17  They take the temperature and find that it's
18  well, through the roof.  That it's abnormally
19  high and his was actually low which is more in
20  keeping with the cold, you know, environment that
21  he was in.
22      Q.  You've reviewed all of the medical
23  records in this case which were, I think they're
24  numbered by the Defense as CCG 3884 through 3
25  -- excuse me, 45 -- CCG 4539.  And also -- well,

Page 127

1  you reviewed all the medical records supplied to
2  you; is that correct?
3      A.  Yes, sir.
4      Q.  And the page numbers that you used
5  earlier were consecutively numbered, correct?
6      A.  Yeah.  So they were -- they aren't
7  -- they were not the Bate stamped ones, they were
8  the page numbers of the medical record itself.
9      Q.  And you also looked at Bates numbered
10  medical records and know that the documents that
11  you reviewed are the same for all practical
12  purposes as the Bates stamped medical records; is
13  that right?
14      A.  Yes, it is.  And oddly for some reason,
15  I mean, I have all of those but I was unable to
16  print them.  I couldn't -- for whatever reason
17  the -- I could not -- I would have printed out
18  some of the things from the Bates numbered pages
19  but the -- you know, again I don't know the
20  technical reason but I couldn't do it, so anyway.
21      MR. POST:  Jim, just show you know I
22  did share the Bates numbered ones with Dr.
23  Sperry.  We could try to work off the same
24  page numbers but I don't know if we need to
25  attach those records to this deposition, the

Page 128

1  CCG ones or the ones I numbered.
2      MR. CLARK:  Well, if you're going to
3  use an exhibit with him, I guess I'd need to
4  -- I'd like to be able to see it, so I don't
5  have all of that.
6      MR. POST:  Well, I don't know that I
7  need to necessarily use it as an exhibit
8  right now.  But I did want to ask him a
9  question about the medical records as soon
10  as my telephone here stops ringing.  Give a
11  second, the voicemail will pick up I hope.
12      Let me close this door.  Well, let me
13  just do this, Jim, do you have the medical
14  -- your CCG stamped medical records?
15      MR. CLARK:  No.
16      MR. POST:  You don't.
17      MR. CLARK:  But I'm okay if you just
18  want to ask him a question in reference to a
19  number, that's okay I guess.
20  BY MR. POST:
21      Q.  I may have to grab my notes actually to
22  do it momentarily, but Dr. Sperry, let me ask you
23  this.  When you reviewed the medical records in
24  this case were there any physical injuries that
25  you observed that support your conclusions and

Page 129

1  include the autopsy in that when I ask what you
2  reviewed too, okay?
3      A.  Oh, okay.  I know what you're saying.
4  Yes, I mean really the autopsy report describes
5  the injuries.  Specifically there were contusions
6  and subcutaneous hemorrhage or hemorrhage below
7  the skin on the wrists, which are consistent with
8  handcuff injuries.  But also bruises in the -- on
9  the upper arms that, you know, well, I think came
10  from the restraint.  That is gripping and holding
11  Mr. Arreola during the course of the struggle of
12  the restraint.  And then also was a contusion of
13  the lower back that Dr. Darrisaw found that would
14  be consistent with a point of force applied by
15  one of the officers to that region on his back.
16      And oddly there was hemorrhage on the
17  surface of the left lung in the upper lobe which
18  would, excuse me, that is something that would be
19  produced from, excuse me, externally applied
20  force to the chest resulting in a contusion or a
21  bruise there, bleeding in the upper lobe of the
22  left lung.  So those were injuries that were
23  found that I think were compatible -- well,
24  correlated with the events of the struggle and
25  forces that were applied to Mr. Arreola.

33 (Pages 126 - 129)

Dr. Kris Sperry                                                    June 3, 2020
Arreola, Rodrigo v. Consolidated Government of Columbus, Georgia, et al

Page 130

1    Q. Okay. What is the significance of
2  sepsis in the medical records, if any?
3    A. Well, when Mister -- after Mr.
4  Arreola's heart was started again, he developed
5  multiple organ systems failure which is the
6  complication of, you know, having a cardiac
7  arrest and the severe acidosis and all of this
8  damages, really all the organ systems in the
9  body. And one of the things that occurs is the
10  invasion of bacteria into the bloodstream from
11  all damaged organs, whether it's the bowel that's
12  damaged from low blood flow, and has what's
13  called ischemic damage, or the aspiration or
14  inhalation of stomach contents that occurs during
15  the course, you know, just before a cardiac
16  arrest to many people that results in pneumonia
17  and sepsis. So the sepsis is a complication of
18  the cardiac arrest and all of the events that led
19  up to that.
20    Q. There was some notation about fatty
21  liver, was there any significance with regard to
22  that finding in the autopsy and medical records?
23    A. Well, it's -- fatty liver can be seen
24  in someone who drinks alcohol regularly, not
25  necessarily to excess but it's very common among

Page 131

1  college students who binge drink on a Friday
2  night and, you know, they have -- when the week
3  starts the fat will go away, you know, as they
4  start eating normally.
5    But also, excuse me, it's recognized as
6  what's called non-alcoholic parasteatosis which
7  means fatty liver that develops in people who are
8  not alcoholics or consuming alcohol on a regular
9  basis. And it's often associated with obesity
10  and with poor diet and things like that.
11    So in and of itself it's -- well, like I
12  said, it can be seen in a variety of different
13  places different causes, different things that
14  could cause it, but beyond that it doesn't really
15  have any significance as far as Mr. Arreola's
16  concerned.
17    Q. Thank you. I want to ask you again,
18  you note -- you mentioned bruising of the lung.
19  Did you note any evidence or reference to that in
20  the radiology reports contained in the medical
21  records or the summaries of the medical records?
22    A. Actually there was. That was described
23  in, as I recall in the -- a CAT scan record that
24  was done of his chest. There was plural
25  hemorrhage which means bleeding on the surface of

Page 132

1  the lung. So that was found during the medical
2  evaluation of Mr. Arreola.
3    Q. Let me see if there is anything else
4  that I need to ask you. In your opinion, without
5  the restraint and weight applied to Mister
6  -- well, by the police officers in this case,
7  would this death have occurred?
8    A. No.
9    Q. That's all I have.
10    MR. CLARK: Okay, I think we're done.
11    COURT REPORTER: Doctor, I assume you
12  want to read and sign?
13    THE WITNESS: Yes.
14    COURT REPORTER: Copy, Mr. Clark?
15    MR. CLARK: Yes, please.
16    COURT REPORTER: Copy, Mr. Post?
17    MR. POST: Yes, please.
18    MR. CLARK: All right. Doctor, thanks
19  for your time today, I appreciate it.
20    DEPOSITION CONCLUDED AT 1:35 P.M.
21
22
23
24
25

Page 133

1          CERTIFICATE
2  STATE OF GEORGIA
3  COUNTY OF MUSCOGEE
4    I, Russell D. Anderson, a Georgia Certified
5  Court Reporter, in and for Muscogee County,
6  Georgia, do hereby certify that the aforegoing
7  pages numbered 2 through 132, inclusive, contain
8  a true and correct transcription of the
9  stenographic notes taken by me on the 3rd of
10  June, 2020 of the testimony of Dr. Kris Sperry,
11  held at Forensic Pathology Consultants, 302
12  Watermark Drive, Peachtree City, Georgia, 30269,
13  to the best of my skill and ability.
14    I further certify that I am not of counsel,
15  nor am I related to the parties in this action,
16  nor am I in anywise interested in the result of
17  said action.
18  WITNESS MY HAND, this 15th day of June, 2020.
19
20
21
22  RUSSELL D. ANDERSON
23  COURT REPORTER
24  CERTIFICATE NO. B-403
25

34 (Pages 130 - 133)

Dr. Kris Sperry

June 3, 2020

Arreola, Rodrigo v. Consolidated Government of Columbus, Georgia, et al

Page 134

1    Dr. Kris Sperry

2

3             June 16, 2020

4    Arreola, Rodrigo v. The Consolidated Government Of Columbus

5    6/3/2020, Dr. Kris Sperry (#4091910)

6        The above-referenced transcript is available for

7    review.

8        Within the applicable timeframe, the witness should

9    read the testimony to verify its accuracy. If there are

10   any changes, the witness should note those with the

11   reason, on the attached Errata Sheet.

12       The witness should sign the Acknowledgment of

13   Deponent and Errata and return to the deposing attorney.

14   Copies should be sent to all counsel, and to Veritext at

15   litsup-ga@veritext.com

16

17   Return completed errata within 30 days from

18   receipt of testimony.

19   If the witness fails to do so within the time

20   allotted, the transcript may be used as if signed.

21

22         Yours,

23         Veritext Legal Solutions

24

25

Page 135

1    Arreola, Rodrigo v. The Consolidated Government Of Columbus

2    Dr. Kris Sperry (#4091910)

3         E R R A T A  S H E E T

4    PAGE____ LINE____ CHANGE_____

5    _____

6    REASON_____

7    PAGE____ LINE____ CHANGE_____

8    _____

9    REASON_____

10   PAGE____ LINE____ CHANGE_____

11   _____

12   REASON_____

13   PAGE____ LINE____ CHANGE_____

14   _____

15   REASON_____

16   PAGE____ LINE____ CHANGE_____

17   _____

18   REASON_____

19   PAGE____ LINE____ CHANGE_____

20   _____

21   REASON_____

22

23   _____  _____

24   Dr. Kris Sperry            Date

25

Page 136

1    Arreola, Rodrigo v. The Consolidated Government Of Columbus

2    Dr. Kris Sperry (#4091910)

3         ACKNOWLEDGEMENT OF DEPONENT

4        I, Dr. Kris Sperry, do hereby declare that I

5    have read the foregoing transcript, I have made any

6    corrections, additions, or changes I deemed necessary as

7    noted above to be appended hereto, and that the same is

8    a true, correct and complete transcript of the testimony

9    given by me.

10

11   _____  _____

12   Dr. Kris Sperry            Date

13   *If notary is required

14       SUBSCRIBED AND SWORN TO BEFORE ME THIS

15       _____ DAY OF _____, 20___.

16

17

18       _____

19   NOTARY PUBLIC

20

21

22

23

24

25

35 (Pages 134 - 136)

Dr. Kris Sperry                                                      June 3, 2020
Arreola, Rodrigo v. Consolidated Government of Columbus, Georgia, et al

**[& - accuracy]**                                                    Page 1

| & |
|---|
| **&**   2:13 |

| 0 |
|---|
| **00005**   1:4 |

| 1 |
|---|
| **10**   30:7 49:17,18 |
| 51:18 89:6,14 |
| **107**   125:10 126:10 |
| **108**   125:10 126:10 |
| **10:00**   1:25 4:9 |
| **115**   5:11 66:5 |
| **12**   89:6,14 |
| **120**   5:4 |
| **121**   70:22 |
| **12290**   133:21 |
| **125**   67:8 |
| **132**   133:7 |
| **133**   5:5 |
| **14**   5:8 18:19 |
| **15**   25:24 |
| **15-14-37**   3:21 |
| **150**   37:22 |
| **15th**   133:18 |
| **16**   19:11,16 134:3 |
| **160**   37:22 |
| **17th**   8:16 |
| **18**   19:21 |
| **19**   19:25 20:2 |
| **1992**   18:9 19:11 |
| **1:35**   132:20 |

| 2 |
|---|
| **2**   5:8 14:20 107:19 |
| 109:8 133:7 |
| **2,800**   35:19 36:16 |
| **20**   15:6 21:19 |
| 136:15 |
| **2000**   114:14 |
| **2000's**   85:7 |
| **2005**   25:23 |

| 2015 |
|---|
| **2015**   28:13 29:1 |
| 32:8 |
| **2016**   32:5 |
| **2017**   29:6 |
| **2018**   8:6,8,10,17 |
| 12:18 13:12 40:23 |
| 41:5,9 |
| **2019**   15:6 |
| **2020**   1:25 4:9 |
| 133:10,18 134:3 |
| **21**   71:2 |
| **22**   20:12 |
| **225**   85:11 |
| **226**   34:7 |
| **23**   100:7 |
| **24**   125:21 126:8 |
| **240**   35:8 |
| **246**   35:5 |
| **24th**   29:6 |
| **27**   5:9 40:23 41:5 |
| 41:9 |

| 3 |
|---|
| **3**   2:6 5:9 27:24 |
| 126:24 |
| **30**   21:20 35:24 |
| 134:17 |
| **300**   57:5,24 |
| **302**   1:23 4:7 |
| 133:11 |
| **30269**   1:24 4:8 |
| 133:12 |
| **31**   71:2 |
| **31902**   2:16 |
| **31904**   2:7 |
| **350**   57:5,9,24 |
| **37**   7:13 37:22 |
| **3884**   126:24 |
| **3rd**   1:24 2:14 4:8 |
| 133:9 |

| 4 |
|---|
| **4**   5:10 40:22 |
| 108:13 110:7 |
| **40**   5:10 |
| **403**   133:24 |
| **4091910**   134:5 |
| 135:2 136:2 |
| **45**   126:25 |
| **450**   57:10,15 |
| **4539**   126:25 |
| **460**   57:17 |
| **4:19**   1:4 |
| **4th**   53:4 |

| 5 |
|---|
| **5**   5:11 49:17,18 |
| 51:18 68:17 |
| 114:21,24 115:3 |
| **50**   54:12,16,21,25 |
| 55:12 |

| 6 |
|---|
| **6**   5:3 29:5,10,12 |
| 68:17 115:11,12 |
| **6.8**   66:17 68:1,5 |
| **6.852**   67:11 |
| **6/3/2020**   134:5 |
| **6:32**   70:24 71:10 |
| **6th**   29:1 |

| 7 |
|---|
| **7**   115:11 |
| **7.00.**   77:13 |
| **7.1**   77:7 |
| **7.2**   77:7 |
| **7.44**   77:6 |
| **771**   37:18 |

| 8 |
|---|
| **8**   29:15,16 66:17 |
| 68:9 69:19 |
| **8:04**   67:9,25 |

| 9 |
|---|
| **90's**   84:18 |
| **911**   12:25 |
| **95th**   55:7 |

| a |
|---|
| **a.m.**   1:25 4:9 |
| **aaron**   1:13 |
| **ability**   61:17,25 |
| 63:22 64:5 78:3 |
| 81:9,11 89:23 |
| 90:24 94:11 |
| 133:13 |
| **able**   28:22 61:8,22 |
| 68:6 73:6 74:11 |
| 74:13 75:13,22 |
| 79:9 80:21 81:8 |
| 86:8 87:25 88:4 |
| 105:3,7 116:17 |
| 126:2 128:4 |
| **abnormalities** |
| 16:10 46:12 57:1 |
| 105:11 110:23 |
| **abnormally**   57:17 |
| 126:18 |
| **abruptly**   108:2 |
| **absence**   47:7 |
| 63:22 103:13 |
| **absent**   46:21 47:6 |
| 63:12 |
| **absolutely**   112:2 |
| 114:12 118:6 |
| **abuse**   48:9,11,13 |
| 52:9 53:3,9,17 |
| 99:1 |
| **accessible**   36:10 |
| **accident**   115:23 |
| 116:15 118:25 |
| **accuracy**   28:24 |
| 134:9 |

Dr. Kris Sperry                                  June 3, 2020
Arreola, Rodrigo v. Consolidated Government of Columbus, Georgia, et al

[accurate - appropriate]                                Page 2

**accurate** 64:4
101:12
**accurately** 41:25
**achieved** 74:14
78:20 79:21
**achieving** 74:20
**acid** 69:10
**acidosis** 42:11,19
62:7,11 65:18
66:19,24 67:11
68:2,6,12,25 69:6
69:12,20,23,25
70:5,10,13,18 71:3
71:7 73:2,8,17,18
74:2,3,14,20,25
75:2,16 77:4,19
78:1,6,10,17,21
79:14,21 80:17,20
81:16 82:6,8,13,25
83:8 87:10,13,23
88:9,16 92:25
93:5 94:16,25
95:8,18 96:1,3,25
97:11 106:24
123:1,2,11 130:7
**acidotic** 75:12,21
75:22 76:22,23,24
**acknowledge**
33:25 35:1
**acknowledged**
37:11
**acknowledgement**
136:3
**acknowledgment**
134:12
**action** 106:8 116:1
116:8 133:15,17
**actions** 10:3,21
106:7 113:4 116:1
116:8,25 117:8

**activity** 62:6 66:7
76:8 107:5
**actual** 123:20,22
**acute** 110:4
**add** 43:2
**added** 35:13
**additional** 85:10
**additions** 136:6
**adequate** 70:7
**adequately** 22:25
23:9 94:9,19
**adjusted** 49:13
**administering**
105:15
**administrator** 1:5
**adrenalin** 50:5
**adult** 54:7 55:2
67:12
**adults** 77:11,12
**aforegoing** 133:6
**age** 55:15
**agency** 31:18 34:4
**agitated** 76:7
**ago** 19:7 48:9
65:17 95:4 100:11
110:20
**agree** 24:23 36:12
45:25 48:5 53:24
54:11,20 56:5
57:4 58:1,6,22
59:7 64:10 67:20
71:21,24 84:22
85:4,14 97:22
98:1 99:4,6
100:19 111:20
112:13,20
**agreed** 4:2,10,16
4:23 26:15 35:4
35:21 57:24 72:1
**ags** 2:18

**aguilar** 1:11 13:14
60:20 62:2 72:4
99:9 100:20
**ahead** 19:2 105:13
120:5
**air** 61:22 92:11
94:19
**airway** 88:12
**alan** 2:12 6:6
**alcohol** 130:24
131:8
**alcoholic** 131:6
**alcoholics** 131:8
**alert** 44:8 112:14
112:18,21 113:2
**allegation** 30:15
38:21,24 39:16
**allegations** 31:6
39:2
**alleviate** 106:24
**alleys** 118:21
**allotted** 134:20
**allowing** 44:3
**altogether** 96:17
**ambulance** 64:23
65:3,6 66:1 71:13
104:10
**amount** 35:21
49:12 51:12
**amounted** 36:2,13
**amphetamine**
47:8,11
**anatomic** 52:5
**ancillary** 3:23
**anderson** 1:22 4:5
133:4,22
**angry** 33:18
**animals** 80:14
**answer** 17:21
56:17 74:17 82:10
88:8 89:3,18

90:24,25 120:15
120:16
**answerable** 90:13
90:19,22
**answered** 82:20
121:9
**answering** 105:24
**answers** 3:7
**anybody** 34:4
**anyway** 29:22
32:5 53:2 58:11
58:12 93:14,24
98:20 124:15
127:20
**anywise** 133:16
**aphasic** 75:10
**apparently** 98:15
108:19
**appearing** 56:23
**appears** 28:12
56:24
**appended** 136:7
**applicable** 134:8
**application** 11:4
26:17
**applications** 11:9
24:21
**applied** 3:22 96:23
129:14,19,25
132:5
**applying** 84:24
85:10 121:21
**appreciate** 50:11
112:22 119:24
132:19
**appreciated** 94:6
104:12 111:19
**approached**
100:21
**appropriate** 11:5
57:18 75:19

Dr. Kris Sperry                                                June 3, 2020
Arreola, Rodrigo v. Consolidated Government of Columbus, Georgia, et al

**[appropriate - bad]**                                      Page 3

101:12 112:2
**approximately**
8:13
**april** 8:7,8,16
12:18
**area** 9:2 12:5 16:2
16:5,11 23:16
24:6 25:1 26:14
27:3 83:15 91:6
111:16
**areas** 9:10 16:17
17:18 25:2 27:3
**arms** 129:9
**arreola** 1:3,4,5,6,6
1:7 13:14 42:5,10
42:18 43:7,17
44:4,7 45:7,25
49:19 60:1,18
62:23 63:15 64:19
65:10,25 66:23
68:12 70:17 71:22
72:1 73:17 74:12
74:14 77:18 80:19
87:8,13 90:11,16
92:2 97:17 99:5
99:11,15 100:21
101:14,16 102:14
104:3,4,9 105:4,23
106:13 109:2
110:18 112:7,11
112:14,18 121:14
129:11,25 132:2
134:4 135:1 136:1
**arreola's** 8:25
10:5 61:16 88:2
91:17 96:24
103:24 106:9
108:2 111:18
117:14 120:23
121:22 122:12,15
130:4 131:15

**arrest** 38:7,22
39:7,20,23 43:11
43:12 49:3,7,22
50:14,16 51:4
54:1 59:21,23
62:21,24 66:2
69:4,6,21 70:1,4
71:14,22 77:15
81:13 88:19,22,25
89:5,9,21 90:2,8
104:14,23 106:14
107:10,19 108:4,8
108:11,22 109:3,5
109:9 110:2,5,21
111:22 118:9
122:15,18 126:6
130:7,16,18
**arrested** 104:22
**arrhythmia** 59:22
62:16,20
**arrhythmias**
49:15
**arrived** 70:25
103:23 125:4
**arteriosclerotic**
56:21
**artery** 56:21 59:2
119:3
**article** 32:9,16,23
33:3,19
**articles** 15:22
**ascertain** 104:8
105:3 106:3
**asked** 8:20,22 9:7
9:11,12 31:15
32:25 38:11,17,23
56:17 72:17 82:3
82:9,20 110:19
121:17
**asking** 26:11
39:23 50:13 67:2

80:4 83:3 100:25
109:17,20 118:14
**aspect** 23:23
**aspects** 19:13,18
**asphyxia** 16:3,3
16:20 18:1 20:13
20:20 21:7,7,13
22:2 26:7,23
28:16,18,19,21
30:2,16 31:7
39:15,18 63:15,16
63:20,21 64:1,12
65:9,11,15 81:1
85:13 86:4 91:4,7
**asphyxial** 21:16
**asphyxiate** 93:25
**asphyxiated** 94:1
**asphyxiation**
17:21
**aspiration** 130:13
**assessment** 105:23
112:19 113:1
**assign** 4:20 124:8
**assisted** 15:24
**associated** 131:9
**association** 123:24
123:24
**associations** 116:6
**assume** 6:9 45:4
47:24 132:11
**atherosclerotic**
58:9
**atlanta** 32:10,16
33:6
**attach** 127:25
**attached** 3:9
134:11
**attack** 32:9,16
118:10,18
**attempted** 83:10

**attempting** 118:8
**attempts** 96:10
**attorney** 77:3
134:13
**attorneys** 3:12
33:17
**audience** 53:16
**audio** 12:20
**authored** 24:15
**authors** 15:23
**automatically**
3:22
**autopsy** 12:21
114:4 115:3,5,8
116:23 125:2
129:1,4 130:22
**available** 3:17,25
134:6
**avenue** 2:15
**average** 57:7
**aware** 16:2 24:3
25:12 38:3 55:24
82:22 83:9 86:1,6
117:19
**awful** 10:13

**b**

**b** 3:21 133:24
**back** 12:4,17 17:6
18:9 28:12 37:19
42:13 43:25 60:3
64:11 82:25 84:18
84:24 85:6,11
86:3 87:6 91:6
94:8,21 95:25
96:2,6,24 113:19
116:20 121:19,24
122:10 129:13,15
**bacteria** 130:10
**bad** 37:3 43:10
58:21 96:19

Dr. Kris Sperry                                                    June 3, 2020
Arreola, Rodrigo v. Consolidated Government of Columbus, Georgia, et al

[badly - cardiac]                                                    Page 4

**badly** 29:24
**baker** 29:17
**bank** 35:10
**barnes** 13:17 66:8
  75:11 103:25
**based** 11:10 34:15
  34:25 57:14 58:13
  65:21 75:4 76:17
  85:15 100:19,19
  117:1
**basically** 8:23
  19:17 64:14 94:3
  123:3
**basis** 36:5,17
  131:9
**bate** 127:7
**bates** 127:9,12,18
  127:22
**bay** 2:15
**bear** 14:19 27:15
  100:14 114:2
**beaten** 29:24
**beating** 122:18
**began** 73:7,17,18
  74:2 75:3 76:2
  104:11
**beginning** 1:25
  74:6 110:8
**behalf** 30:13,23
  31:5
**behavior** 75:5
  98:3
**behavioral** 46:12
**behaviors** 46:16
**beings** 51:2 55:2
  96:9
**believe** 16:7 40:22
  41:20 42:5,9 44:2
  44:12 45:16,18
  63:14,19 65:10
  75:21 76:24 80:8

80:19 82:12 83:16
  84:11 97:17 99:14
  102:14,21 105:5
  105:21 106:7,16
**benefit** 17:3
**best** 61:24 64:20
  78:1 85:19,24
  133:13
**better** 43:14 109:2
**beyond** 55:7 91:25
  98:15 104:15
  131:14
**bible** 52:22,24
  53:12
**bicarbonate** 71:4
  71:6 106:23
**binge** 131:1
**bit** 18:7 82:4 86:22
  86:24 95:4 110:20
**blame** 119:20
**blank** 66:13
**bleeding** 129:21
  131:25
**blood** 49:14,16
  51:20 52:2 62:10
  65:14 66:4,15
  67:9,10 70:20,24
  71:1,5,13 76:1,9
  76:11,17 77:4,6,7
  77:13 89:24 91:13
  91:15,18 92:14
  104:25 105:1
  110:1 120:14,20
  130:12
**bloodstream**
  130:10
**blown** 71:25
**body** 12:19 45:25
  50:6 51:13 57:14
  59:15 60:17 61:6
  61:9 62:7 99:25

125:8 126:4,7,9,13
  130:9
**book** 34:16
**boren** 1:16
**bottle** 113:11
**bottom** 15:5 19:22
  20:2,14 29:16
**bowel** 130:11
**box** 66:13
**brad** 13:17
**bradley** 2:6
**brain** 61:11 89:6
**break** 86:15
**breath** 60:22,23
  61:10,12 90:6
**breathe** 21:22
  22:23,24 23:4
  60:19,20,23 61:4,6
  61:11,14,18,21
  62:1 79:1,1 89:10
  89:15 92:10,17
  122:16
**breathing** 61:8
  75:13 80:25 81:8
  88:20,23 89:1,9,20
  89:25 93:9,10
  94:7,9 95:8 104:6
  105:25 122:1
**brian** 1:12 13:18
**bridge** 25:21
**brief** 17:4
**broad** 56:16 102:2
  102:5,5
**broaden** 39:12,14
**broadest** 101:13
**broadly** 102:10
**brought** 62:24
  74:5 76:2
**bruise** 129:21
**bruises** 129:8

**bruising** 131:18
**building** 2:14
**bullet** 41:24 42:16
  108:15
**bunch** 7:11 8:22
  51:2
**buried** 50:18

**c**

**c** 2:1,11 3:1 24:11
  53:5 121:18
**calendar** 3:24
  34:16,17,22 35:9
  37:1
**california** 29:8
**call** 112:5 118:19
  118:25 119:2
  125:17
**called** 19:12,22
  20:3,15 32:16
  53:2 98:21 111:21
  130:13 131:6
**calling** 103:14
  112:1
**calls** 12:25
**cam** 12:19
**camera** 93:22
**camp** 40:7
**cams** 12:20
**cans** 76:6
**capabilities** 75:18
**capacity** 1:12,13
  1:14,16 25:9
  30:24 31:4,20
  92:7,8,19
**car** 116:20
**carbon** 61:19 62:8
  71:6
**cardiac** 49:2,7,9
  49:15,21 50:14,16
  51:4 52:11 54:1
  54:10 57:3 59:21

Dr. Kris Sperry                                          June 3, 2020
Arreola, Rodrigo v. Consolidated Government of Columbus, Georgia, et al

[cardiac - clinicians]                                          Page 5

59:22,23 62:15,20
62:21,24 66:6
67:22,23 69:21
70:1,4 77:15
81:13 88:19,22,25
89:5,8,21 90:2,7
104:14,23 106:14
107:3,17,18 108:4
108:8,11 109:3,5,9
110:2,5,21 119:10
122:15,17 126:6
130:6,15,18
cardio  58:8
cardiomyopathy
  56:19
cardiopulmonary
  43:11 66:2
cardiovascular
  56:20
care  44:3 111:23
career  16:7 22:16
careful  124:8,8
carried  23:25
  24:15
carries  116:6
  117:10
carry  54:9
case  1:3 3:8,12,21
  8:5,10,21 9:7,20
  10:22 13:23 14:6
  14:11,16 15:16
  16:1 25:14 28:25
  29:14 30:4,14
  38:5 39:6,16,20
  40:1,5,22 41:14,16
  41:21 42:18 44:21
  45:11 61:16,20
  96:24 120:13
  123:2 126:23
  128:24 132:6

cases  18:12 22:17
  28:15 30:17,19
  31:3,11 34:11
  37:23 38:20 39:15
  51:7,8,9,22 52:7
cash  35:11,17
cat  131:23
categories  44:21
  102:11
category  35:13
  36:9
cause  9:8,18 12:5
  47:21 50:13 51:8
  51:10 52:6,11
  69:5 70:4,9,13
  76:9 79:15 85:13
  88:19 95:1 96:3
  102:9 122:15
  123:20,22 124:3
  131:14
caused  8:24 30:12
  45:6 61:20 62:19
  82:7 84:11 87:12
  87:22 92:3,25
  96:1,24 109:13
  116:2,9,25 123:2
causes  23:9 49:6,9
  49:14 50:15 62:6
  86:4 89:24 131:13
causing  110:22
ccg  126:24,25
  128:1,14
cdl  1:4
center  12:24 67:8
  70:23 107:20
centigrade  100:7
central  75:18
  77:10 78:3
certain  21:18 50:4
  77:5 78:15

certainly  32:19
  55:16 56:18,21
  70:2,6 78:24
  99:11
certificate  3:2 5:5
  113:22 114:1
  133:1,24
certificates  3:16
certified  1:22 3:5
  3:8,11,15 4:6
  133:4
certify  133:6,14
chan  24:11,17,24
  25:11 26:5 84:23
  121:18
change  135:4,7,10
  135:13,16,19
changed  23:1
  112:8
changes  41:8
  134:10 136:6
characterization
  117:23
characterize  41:20
  53:12
characterized
  72:4 121:3
charge  40:15
checks  64:8
cherokee  40:13
chest  21:17 60:17
  92:13 122:2
  129:20 131:24
chief  1:15 31:10
child  1:7
choice  18:13
cholesterol  58:13
  58:25 59:6
chords  61:23
chronic  49:25 50:2

circumstance
  118:11
circumstances
  32:2 116:14 117:3
circumstantial
  116:18
cite  18:18
city  1:24 4:8
  133:12
civil  40:17
clarified  104:1
clarify  44:18
clark  2:11 5:3 6:5
  6:13,23 7:1,2
  18:17 32:13 38:14
  86:14,20 87:5
  96:19 113:18
  114:19,23 115:1
  120:4,10 121:17
  123:5,14 128:2,15
  128:17 132:10,14
  132:15,18
classification
  117:24
classified  52:7
  111:9 119:17
classify  117:7
  118:11,23
classifying  118:3
clear  26:20 65:8
  118:2
clearly  55:23
  75:15 76:6 79:7
  93:9 94:5 117:15
clinical  23:25 25:3
  58:24
clinically  74:4
  76:17
clinician  26:24
clinicians  59:5

Dr. Kris Sperry                                June 3, 2020
Arreola, Rodrigo v. Consolidated Government of Columbus, Georgia, et al

[close - correct]                                         Page 6

close  128:12
co2  68:23 69:9
    71:1,5
cocaine  50:4
cold  126:20
collapsed  118:22
    119:4
collections  22:16
college  131:1
colloquies  3:7
columbus  1:2,11
    1:15 2:7,16 134:4
    135:1 136:1
combination
    63:11 95:14 99:20
    101:24
combining  95:21
come  6:17 28:13
    40:20 121:25
comes  9:25 58:19
    58:23 111:16
comfortable  11:25
commands  75:9
    98:17 125:15
comment  115:17
commenting  39:13
    114:7 115:9
common  22:7
    48:15 130:25
commonly  49:10
    120:25
communicate
    80:11,17
communicated
    111:6,6,8
communicating
    122:24
compared  36:15
    48:13 56:2
comparison  34:16

compatible  129:23
compensate  76:15
compensation
    35:6
complain  89:9
complains  61:13
complaint  13:11
complaints  46:24
complete  3:6,11
    7:6 23:4 63:22
    136:8
completed  134:17
completely  34:18
    52:3 89:13 108:19
    112:2
compliance  4:13
complication  52:8
    130:6,17
complications
    110:21 111:3
    121:11,12
compound  23:10
compressed  122:2
compression  21:6
    21:16 22:21,24
    23:3,7 81:1
computer  12:17
    100:18
concepcion  1:6
    13:14
concept  21:15
concerned  131:16
concerning  15:23
concluded  109:11
    110:23 132:20
conclusion  101:1
    103:3,5,9
conclusions
    101:11 111:2
    112:1 119:22
    128:25

condition  104:23
    108:2
conditions  50:5
    90:4 125:1
conducted  86:11
conduction  50:8
conjunction  24:16
connect  12:4
conscious  112:14
    112:18,20 113:1
    122:20
consciousness
    75:15 89:14 93:11
consecutively
    127:5
consequence  44:8
    62:11
consider  57:1
consideration
    20:15 32:20
considered  51:12
    52:14,22 57:5
consist  124:11
consistent  129:7
    129:14
consists  100:13
consolidated  1:10
    134:4 135:1 136:1
constitution  32:10
    32:17 33:6
constitutional
    10:23 11:1,4
consultants  1:23
    4:7 133:11
consulting  31:5
    34:18
consume  48:24
    90:11
consuming  131:8
contacted  8:4,12
    8:18

contain  133:7
contained  12:16
    27:9 41:16 123:16
    131:20
contents  130:14
context  16:9
continual  95:10
continuum  20:23
contract  29:19
contribute  46:7,7
    46:15 101:23
    102:12 121:8
contributed  8:25
    47:18 73:3 106:9
    116:2,9 117:1
contributing  47:5
    47:11 88:16 121:4
    121:6
control  72:1
contusion  129:12
    129:20
contusions  129:5
convention  117:20
conversation
    78:12
cool  27:18 80:10
coordinators  3:5
    3:14
copies  3:15 20:7,9
    134:14
copy  3:11 13:10
    16:22 41:1,4
    100:17 132:14,16
coronary  56:21
    58:9 59:2 119:3
corporal  13:14
correct  3:6,10
    6:22 8:2,10 10:10
    10:24 12:6 14:7
    14:11,12,16,17
    23:17 24:25 26:23

Dr. Kris Sperry
June 3, 2020
Arreola, Rodrigo v. Consolidated Government of Columbus, Georgia, et al

[correct - defendant's]
Page 7

| | | | |
|---|---|---|---|
| 26:24 34:12,13 36:14,24 41:17 42:6,12,17 45:1,2 45:4,8,13,20 46:1 47:15,19,22 48:1 48:24 49:1 52:16 60:8 63:1,15 64:2 64:13,17,18 65:11 65:12,15,16 71:11 71:19,22 74:15 75:23 78:7 81:20 82:1 83:19 84:12 84:14 86:5 91:11 96:25 97:24 98:23 101:19,25 102:17 112:15 113:2,23 114:25 118:5,12 121:4 127:2,5 133:8 136:8<br>**corrected** 105:7<br>**corrections** 136:6<br>**correlated** 129:24<br>**counsel** 4:3,18,19 133:14 134:14<br>**counselors** 40:8,10 40:16<br>**count** 102:19<br>**country** 84:3 117:22<br>**county** 29:7 40:13 133:3,5<br>**couple** 13:16 15:22 33:15,17 40:10 56:7 86:14 120:2<br>**coupled** 59:16 62:25 79:14 81:19<br>**course** 12:21 23:7 58:10 60:15 62:12 72:3 76:23 87:17 88:24 93:7 95:5 | 97:25 102:5 108:9 123:7,9 129:11 130:15<br>**court** 1:1,22 2:6 3:8 4:6,14,24 17:6 17:10,13,23 37:13 37:19 38:2 114:21 114:25 132:11,14 132:16 133:5,23<br>**covered** 44:24 82:15 91:4<br>**cpr** 70:8 104:16<br>**crime** 12:22 120:14<br>**criminal** 33:17 40:17<br>**criminally** 40:15<br>**critical** 76:12 78:1 78:6,10,17,21 79:21 80:9,17,20 81:17 82:6,8 87:9 87:13,22<br>**criticism** 43:16<br>**criticisms** 43:20 58:16 103:19,22 104:18<br>**culminate** 124:5<br>**culminated** 64:22 122:13<br>**culprit** 92:24 93:24<br>**curious** 16:15 17:15<br>**current** 15:9 69:15 69:16,17<br>**custodio** 1:8<br>**custody** 18:3,5,14 19:13,19,23 20:1,4 22:18 30:20 116:12,13 | **cv** 1:4 14:18,23 15:2,12 16:14,16 16:17,22 17:14,17 17:18 18:9 27:2,4<br>**d**<br>**d** 1:21 3:1 4:5 6:1 133:4,22<br>**damage** 45:7 50:3 77:16 130:13<br>**damaged** 130:11 130:12<br>**damages** 130:8<br>**danger** 44:7<br>**dangerous** 48:23 74:14,20<br>**darrisaw** 103:4 114:10,15 129:13<br>**darrisaw's** 117:17<br>**dash** 12:20<br>**data** 96:8<br>**date** 15:5 41:4,5 135:24 136:12<br>**dated** 8:16 40:23<br>**dates** 33:13<br>**day** 12:25 13:1 33:1 35:24 133:18 136:15<br>**days** 58:14 134:17<br>**dead** 64:9,15,16 64:25 65:2 80:25 94:2,2 116:22 119:4<br>**deal** 57:14 104:2 114:16<br>**dealt** 28:20 31:11<br>**death** 8:25 9:8,19 10:6 12:6 19:19 21:23,25 22:4,8 29:19 30:12 38:6 38:21 39:7,20 44:13 45:20 46:7 | 46:20 47:19,21 48:20 49:7 50:10 50:14 51:9,10,22 52:6 54:10,14,23 56:1,9 57:3 58:10 59:2,10,18,20 64:22 73:3 83:24 92:25 95:1 96:12 97:24 100:23 101:17,18 103:6 103:15 106:10 113:22,22 114:1 115:16,18 116:3,9 116:14 117:1,9,14 117:14,24 118:3 118:12 119:3,6 122:13 123:20,22 124:3,9,22 125:18 132:7<br>**deaths** 18:3,14 19:13,23 20:2,3,17 21:15,16 30:19 48:1 49:9 51:18 52:11 63:4,10 84:1<br>**deceased** 1:4 61:19<br>**decision** 32:21 40:14 84:9<br>**declare** 116:13 136:4<br>**decrease** 92:14<br>**decreased** 88:2,5 89:23 91:10,12,14 91:18 92:19<br>**deemed** 119:12 136:6<br>**defacs** 40:7<br>**defendant** 1:21<br>**defendant's** 13:8 14:1 |

Veritext Legal Solutions
800.808.4958
770.343.9696

Dr. Kris Sperry                                                    June 3, 2020
Arreola, Rodrigo v. Consolidated Government of Columbus, Georgia, et al

[defendants - distracting]                                          Page 8

**defendants** 1:17 2:10
**defense** 33:17 126:24
**deferred** 35:6,6
**define** 54:16 72:11 72:14,20 83:21 124:11
**defined** 124:16
**definite** 34:20 57:1
**definition** 54:19 100:13
**degree** 24:2 28:23 69:24 75:2,14 76:16 95:6 100:12 116:10
**degrees** 100:7 125:10,21 126:8 126:11
**delayed** 43:6,9 44:3 110:9,16
**delaying** 113:5
**delerium** 102:23 118:10
**delirium** 27:3,4,6 27:10 28:16,21 97:15,18,23 98:2 98:21,23 99:3,16 99:18,19,23 100:13 101:19,20 101:23 102:3,9,13 102:15,20 103:1 118:15,20 123:19 124:4,9,11,13,17 124:21 125:1,8,18 126:9,12
**demand** 69:9
**department** 1:15
**depend** 96:6
**dependent** 11:17

**depending** 11:12 30:20 72:10 89:10 90:3 116:23
**depends** 11:6 26:9 72:13,19 89:18 96:15
**deponent** 134:13 136:3
**deposed** 7:10,12
**deposing** 134:13
**deposition** 1:20 3:19 4:4,11,12,21 4:24 7:4 9:16 12:10 28:11 29:1 38:4,19 39:19,25 42:1 60:21 103:25 127:25 132:20
**depositions** 4:15 6:20 7:16 13:13 13:17 14:11
**depths** 16:9
**described** 66:8 75:11 100:3 131:22
**describes** 129:4
**describing** 117:13
**design** 85:16,18
**designation** 124:19
**despite** 68:23 125:13
**destination** 116:21
**detail** 44:17
**deteriorated** 62:20 108:3
**deterioration** 95:10
**determine** 50:12
**determined** 21:8
**determining** 55:25

**develop** 24:20 62:10 73:22 74:2
**developed** 42:10 42:19 77:18 93:5 93:6 94:17 95:4 101:21 123:8 130:4
**developing** 62:19 73:18 75:25
**development** 62:7 99:2 102:13 123:10
**develops** 131:7
**diagnoses** 115:15
**diagnosis** 125:3
**die** 42:5 45:17 48:11,17 49:21,22 54:22 60:11,13 61:12 64:6 65:10 76:15 91:7 120:20 124:16 125:1
**died** 22:17 24:2 30:9 46:1,25 47:7 51:5 60:1,2,9 62:23 63:15,19 118:18,22 121:15 124:13,20 126:12
**diego** 29:7,8 40:1
**dies** 63:25 64:1,13 116:11,12 119:10 119:11
**diet** 131:10
**differ** 72:6
**difference** 37:8 112:12
**different** 10:14,25 12:2,21 18:15,15 19:18 20:23 25:5 45:22 53:17 55:2 60:16 61:15 62:18 80:13 82:4 99:20

**103**:8 123:25 124:5,10,17 131:12,13,13
**differential** 109:12 109:19
**difficult** 112:21
**difficulties** 7:24 86:21 88:25
**difficulty** 7:19 89:19
**diligent** 111:22
**dioxide** 61:19 62:8 71:6
**direct** 6:12 65:19 65:20 82:14 120:6
**directly** 20:21 109:7
**director** 32:7,24
**disagreement** 99:8
**disasters** 77:14
**disclosure** 3:2 13:15
**discount** 3:23
**discounts** 3:21
**discrepancies** 33:14 34:7
**discrepancy** 33:8
**discs** 12:17,17
**discussed** 32:6
**discusses** 53:7,16
**discussion** 35:3
**discussions** 27:10
**disease** 56:20,22 58:9 59:2 119:4 124:25
**diseased** 56:6,11
**diseases** 94:10
**dispatch** 111:9
**disproven** 84:14
**distracting** 93:14 93:23

Dr. Kris Sperry
June 3, 2020
Arreola, Rodrigo v. Consolidated Government of Columbus, Georgia, et al

**[district - essence]**

Page 9

district  1:1,1
disturbance  50:23
disturbances
  50:21
division  1:2
docked  34:7
doctor  26:2 32:14
  45:12 53:25 73:12
  77:2 86:21 87:7
  114:16 119:23
  120:1 124:22
  132:11,18
documents  127:10
dog  6:17
doing  7:17 85:19
  85:21,24 117:20
door  128:12
doors  6:16
dr  1:20 4:4 6:2,14
  7:2 14:3,6 15:12
  15:13,21 16:2
  17:3 24:6,11,14,17
  24:23,24 25:10
  26:5,5,21 53:4,10
  83:4 84:23,23
  103:4 114:9,15
  115:2 117:17
  120:11 121:18,18
  127:22 128:22
  129:13 133:10
  134:1,5 135:2,24
  136:2,4,12
drawn  70:24
drink  131:1
drinks  130:24
drive  1:24 4:8 61:6
  133:12
driving  26:2 38:16
  60:12 74:21
drop  76:1,9,16
  89:16

dropped  71:7
drops  77:4,12
drug  48:9,14
  51:16 53:3,9
  101:5,24 102:6,6
  102:10
drugs  53:17 101:5
  102:7 105:18
  111:1 118:24
dudley  1:12 13:18
  100:20
due  101:18 103:6
duly  6:3
duplicate  96:11
duty  117:6
dying  40:11 63:23
  124:6

**e**

e  2:1,1 3:1 6:1 7:9
  135:3,3,3
earlier  27:8 77:11
  77:20 110:24
  127:5
early  8:7 22:15
  85:6
easier  89:3
easy  124:12
eating  131:4
edema  90:5
edition  53:4
effect  4:13 11:10
  12:1 81:23 88:17
  94:11
effects  10:15 24:19
  46:18 61:18
  100:11 101:5
effectuate  118:8
effectuating
  111:22
eight  8:12 37:7

eighteen  31:23
either  16:18 17:18
  25:9 38:4,19
  71:16 84:4 95:19
  103:9
electrical  50:8,20
  66:7 107:5
electronically  7:3
  7:18,24 27:16
element  62:15
  74:3 87:16 88:14
  97:9 118:1 122:7
elements  27:11
  32:20 46:15 62:18
  63:11 69:7 73:3
  87:18,20 95:23
  99:17 124:10
elevated  52:12
  59:6 125:8,9
  126:7,12
elevation  49:14
  69:10 125:20
eliminated  52:3
embolism  89:22
emergency  16:8
  126:14,16
emphysema  94:12
employee  35:7,12
  37:5
employees  37:4
ems  12:24 43:6,16
  43:16,21 44:3,8
  66:10 103:19,22
  104:18 106:8,9,16
  107:9,22 108:20
  110:10 111:5,12
  111:13,21 112:2,5
  112:8,14,17
emts  65:4
encounter  74:11

encountered  101:2
  120:25
endeavor  36:8
ended  24:17 30:22
  40:11
enforcement
  10:10 11:13,22,24
  18:4 20:4 28:20
  30:14,23 31:6,18
  40:2 44:25 45:2
  84:6 118:4 125:14
engagements
  16:18 17:19
engages  59:9
enlarged  53:25
  54:2,4,5,8,9 55:6
  55:23 57:17 59:8
  59:12,16
enlargement  50:1
  50:7
ensue  100:24
entire  16:16 17:17
entity  21:17
entries  34:9
environment
  126:8,20
epidemic  48:4
episode  77:12
episodes  22:18
equate  61:23
errata  134:11,13
  134:17
erroneous  61:1
errors  33:12,24
  34:15,23 37:10
escalation  10:15
especially  7:17
  25:6 30:17 53:22
  58:13 76:13
essence  36:21

**essentially** 22:21
  22:23
**estate** 1:5
**evade** 119:5
**evaluation** 101:3
  132:2
**event** 13:1 64:22
  67:22,24 110:4
  119:10
**events** 47:6 103:13
  117:2,14 125:5
  129:24 130:18
**eventually** 10:5
  61:11 62:19
**everybody** 121:25
**evidence** 4:22
  19:23 20:1 85:1
  88:11 102:16
  131:19
**evidences** 69:20
**evolution** 62:11
  69:12 73:10,23
  88:14 102:12
**evolve** 102:8,9
**evolving** 73:14
  89:11,12
**evrard** 1:14 13:15
**exacerbated** 62:8
**exactly** 8:19 11:17
  30:21 119:15
  121:5
**examination** 5:3,4
  6:12 120:6
**examiner** 31:10
  47:25 51:1
**examiners** 115:25
  117:22
**example** 9:22
**excellent** 106:11
**excess** 50:5 130:25

**excessive** 11:10
  125:7
**exchange** 87:16
**exchanging** 92:11
  92:11 94:19
**excitatory** 97:10
**excited** 27:3,4,6,10
  28:16,21 97:14,18
  97:23 98:2,21,23
  99:2,15,17,19,22
  100:13 101:19,20
  101:23 102:2,9,13
  102:15,20,22
  103:1 118:10,15
  118:20 123:19
  124:4,11,13,16,20
  125:1,8,18 126:9
  126:12
**exclude** 97:8
**excluded** 38:2
**exclusively** 3:14
**excreted** 52:3
**excuse** 11:25
  17:25 26:18 30:19
  35:3 52:15,17
  62:4 65:23 66:9
  105:2 106:13
  112:9 117:16
  120:17 126:25
  129:18,19 131:5
**exercise** 76:10
**exert** 98:16
**exerting** 76:4
**exertion** 56:8 57:3
  59:9,17 62:24
  76:18 81:19 87:14
  97:5
**exhibit** 5:8,9,10,11
  14:19,20 27:24
  28:6 33:5 40:21
  114:20 115:3

**128**:3,7
**exhibiting** 100:22
**exhibits** 3:10,13
  5:7 27:17
**existed** 69:6,20
**exited** 124:9
**exits** 99:19
**expand** 44:18
**expect** 80:3 106:4
**expected** 125:19
**experience** 48:20
  49:21 64:21 88:25
  90:6 101:16
**experienced** 80:20
  80:22,23 87:9
**experiencing**
  73:17,20 92:14
  102:22
**experiment** 62:12
  85:22
**experimental**
  85:15,18 86:7
  96:8 122:5
**experimentally**
  83:6
**experimentation**
  24:1
**experiments** 86:12
**expert** 7:15 8:2
  10:8 11:21,24
  13:16,22 14:2,4,5
  16:2 25:9,15
  26:22 31:4,5,17
  37:13,14
**expertise** 9:2,11
  9:13 12:5
**experts** 14:10
  24:24 26:6
**explain** 108:25
**explained** 81:5

**explanation** 68:5
**exposed** 126:3
**extent** 34:24 62:13
  69:24 92:18 105:1
**externally** 119:19
**extreme** 59:9
  105:4 117:4

**f**

**f** 2:6
**face** 69:8 126:3
**facilitate** 84:7
**fact** 13:3,24 23:15
  25:10 27:9 32:24
  34:7,10 36:23
  47:24 68:24 75:5
  92:8 110:23
  121:10
**factor** 23:6 47:12
  121:4,7
**factorial** 21:14
  23:12 118:1
**factors** 21:24
  45:22 47:5 101:22
  102:11 123:10
**facts** 13:7,9 30:21
  63:5
**factual** 124:10
**fails** 134:19
**failure** 80:11 90:5
  130:5
**faint** 43:22
**fair** 27:14 76:25
  80:23 81:2 91:9
  119:16
**fairly** 38:17 82:19
**fall** 89:16
**familiar** 23:19,21
  23:22 24:4,8,12
  58:3 85:9
**far** 9:24 10:11,17
  11:1 20:8 37:8

Dr. Kris Sperry
June 3, 2020
Arreola, Rodrigo v. Consolidated Government of Columbus, Georgia, et al

39:2 46:18 47:7
48:9 55:12 62:14
63:21 93:10
131:15
**faster** 111:13
**fat** 131:3
**fate** 27:22
**fatty** 130:20,23
131:7
**features** 124:5,14
124:18 125:11,13
**february** 29:1
**feel** 6:7
**feeling** 61:18
92:17
**fell** 37:3
**fellow** 114:13
**female** 57:7
**fibrosis** 56:24
**field** 24:24 26:6,22
48:23
**fifth** 20:14 44:11
120:23
**fight** 71:25
**fighting** 99:12
125:14
**figure** 105:3
**figured** 35:23
**filing** 4:24
**fill** 37:7
**finally** 77:21 81:13
**financial** 3:24
**find** 107:13,15,16
126:17
**finding** 52:4
107:12 130:22
**findings** 115:14
124:1 125:2,6
**finds** 64:8
**fine** 6:23,24 33:2
41:3 115:7

**finger** 91:20
**firing** 117:6
**firm** 3:2
**first** 6:3 7:8 8:4
18:8,20 28:24
33:16 34:13 41:14
42:3 45:15 54:18
66:3,14 67:10
68:20,21 73:8
81:2 91:21 100:21
101:2 103:23
114:13 121:23
126:15
**five** 12:16 34:8
36:2,13 107:25
120:22
**flicking** 73:24
**floor** 2:14
**florida** 29:20
**flow** 130:12
**focus** 16:12 79:18
**focused** 16:6
**folks** 44:3
**follow** 120:3
**following** 32:5
98:17 104:18
**follows** 6:4
**footage** 71:18
**force** 4:13 10:9,12
10:14,15,22 11:7,9
11:22,24 12:2
14:10 129:14,20
**forces** 11:5 129:25
**ford** 2:13
**foregoing** 3:3
136:5
**forensic** 1:23 4:7
9:3,3,4,14,14
18:11 19:12,18
23:23 29:6 53:15
114:13 133:11

**forgotten** 19:7
**form** 4:19 6:21
**forth** 22:13
**forum** 28:11
**forward** 28:13
**found** 19:6 27:23
33:8,12,23,24 34:6
34:14,22 37:11
49:19,24 51:8,20
51:23,25 52:6
116:23 120:14
129:13,23 132:1
**four** 31:23
**fourteen** 18:23,24
**fourth** 19:12 28:25
28:25 30:7 108:15
**fractured** 110:2
**framingham** 58:3
58:16 59:3
**francis** 12:23
**frankly** 7:16
**frequency** 84:2
92:7
**frequently** 22:4
**friday** 131:1
**friend** 1:7
**fringe** 113:12
**front** 41:1,6 115:5
**full** 4:13 71:24
123:15
**function** 77:9
81:11
**fundamental**
60:24
**fundamentally**
110:17
**funny** 98:13
**further** 3:9 4:16
4:23 133:14

## g

**g** 2:12
**ga** 3:18 134:15
**gain** 18:5
**gas** 67:9,10 70:20
**gathered** 123:1
**gbi** 30:18 31:22,25
34:1,4,5,10 36:23
36:23 47:25
114:11 117:23
**geared** 53:15
**general** 57:8
**generally** 9:17
43:20 45:12 99:21
**generated** 13:20
108:10
**georgia** 1:1,11,22
1:24 2:7,16 3:5,15
4:5,8 40:7 84:5
133:2,4,6,12
**getting** 27:16
43:22 55:10 61:5
81:12 111:23
**give** 7:5 8:23 10:1
17:6 18:10 27:6
35:4,21 42:15
47:10 74:18 88:8
92:22 105:18
113:10 128:10
**given** 17:24 18:1
19:8 43:13 55:14
70:7 91:24 99:22
136:9
**gives** 59:4
**giving** 11:25 68:24
106:22
**glean** 42:9 43:5
44:1,11
**go** 7:14 12:13
16:15 17:16 19:2
21:24 28:12,14

Dr. Kris Sperry                                    June 3, 2020
Arreola, Rodrigo v. Consolidated Government of Columbus, Georgia, et al

[go - human]                                                Page 12

35:10 37:17 39:3
41:12,19,23,25
42:13 43:19 44:16
50:15 52:20 76:14
80:1 86:16 87:6
95:25 107:25
108:13,15 120:5
124:18 131:3
**goes** 55:11 60:3
126:10
**going** 7:14 9:15
13:4 14:18 20:5
27:20 29:5 37:17
41:12 42:13 44:16
44:24 78:5 79:19
82:4 83:13 86:24
86:25 92:21 94:22
103:16 105:11
106:13,15 107:15
112:10 114:3
118:11 121:25
128:2
**good** 6:24 27:16
44:23 58:7,21
80:7 96:17,20,22
106:12 114:16,16
119:25 122:23
**gotten** 67:24
111:13,15
**government** 1:10
134:4 135:1 136:1
**grab** 128:21
**gradual** 42:10,19
**gradually** 21:20
**gram** 57:15
**grams** 54:12,16,21
54:25 55:13 57:6
57:9,10,17,24
**great** 17:9 57:13
100:12 104:1

**greater** 55:16
**gripping** 129:10
**gross** 56:22
**grossly** 56:23,25
**ground** 72:25 74:5
76:3 91:5 95:25
**grounds** 4:20
**guess** 14:25 26:10
28:19 50:17 60:7
61:23 64:20 78:1
95:3 109:1 113:22
114:2 128:3,19
**guidance** 59:4
**gun** 117:6
**gurney** 65:5 91:23
**guy** 33:19 118:20
**guys** 37:20

**h**

**h** 24:11 53:5
121:18 135:3
**habit** 37:4
**half** 34:8 36:3,13
**halfway** 19:15
**hallmarks** 125:8
**hallucination**
46:13
**hallucinations**
98:7
**hand** 31:8 80:10
93:12,19 114:12
133:18
**handcuff** 129:8
**handled** 3:13
**handling** 112:7
**hands** 126:3
**hangout** 6:11
**happen** 64:17 84:1
84:2 106:15
**happening** 11:18
106:18

**happens** 50:4 79:8
**hard** 74:16 104:8
124:2 125:25
**hardest** 62:3
**harp** 8:15
**healthy** 124:24
**hear** 22:10
**heard** 15:15
120:10
**hearing** 40:12
90:22 120:9
**heart** 50:1,2,6,7,9
50:15,21 53:25
54:7,7,9,12,13,16
54:19,20,21 55:1,3
55:12,23 56:3,6,11
57:5,13,16 59:8,14
59:16 67:24 68:3
68:6,21 77:15
89:12 90:5 107:5
110:3 118:10,18
122:18 124:25
130:4
**heartbeat** 65:14
**hearts** 51:3 55:14
57:22 59:12
**hector** 1:4,5,6,7
42:5,10,18 43:7
44:4 45:7,17,25
63:14 65:10 66:23
70:17 71:21 80:19
87:13 88:1 90:11
90:16 91:17 92:2
96:23 97:17 99:4
106:9 112:13
121:22 122:15
**heightened** 100:23
**held** 133:11
**help** 25:21 49:5
78:6

**helped** 106:23
**helps** 42:24
**hemorrhage** 110:1
129:6,6,16 131:25
**hereto** 136:7
**hey** 58:20 80:8
**hiding** 76:5
**high** 68:24 126:10
126:19
**highly** 52:12
**hired** 8:1 9:19
114:14
**hog** 83:17,23 84:3
84:6,7,11
**hold** 16:24 61:10
61:12 103:17
**holding** 11:20,21
11:23 129:10
**homicide** 44:13
113:23 115:18,21
115:23,24 116:3,5
116:15 117:25
118:3,12,19
119:12,18
**homicides** 117:7
**hon** 2:5,11,12
**honestly** 29:20
30:24
**hope** 128:11
**hopefully** 90:8
**horizon** 29:17
**hospital** 12:23
66:16 67:21 69:19
70:23 71:1,11
100:5 105:13
**hour** 36:5,17,17
86:25 89:25
**hours** 34:8 35:5,8
35:19 36:16
**human** 12:2 51:2
55:2 64:14 96:9

Dr. Kris Sperry                                                    June 3, 2020
Arreola, Rodrigo v. Consolidated Government of Columbus, Georgia, et al

[human - internal]                                                    Page 13

98:12 99:7
humans  24:1
hundreds  48:2
hurting  118:17
hypertension
  46:10
hypertensive
  56:20
hypothermic
  100:9
hypothetical
  55:12
hypothetically
  101:15
hypoventilation
  85:1 86:5
hypoxia  38:6,20
  38:23 39:6 42:11
  42:19 65:19 66:24
  68:12 70:18 73:2
  82:14,25 83:8
  84:11 85:1 86:4
  87:16 88:13,15
  91:10,10 92:4
  93:1,6 95:6 123:2
  123:8

                    i

idea  91:24 109:13
identifiable  124:1
identify  6:5,8
  124:22
illicit  48:14 102:6
illness  101:4,24
  102:1,4,10 110:25
imee  1:7
immediate  88:10
immediately  74:4
  83:3
imminent  44:7
impaired  61:6,25
  65:1 75:15 83:22

85:22 92:12
impairing  75:3
  81:10
impairment  79:12
  94:15
implication
  119:20
imply  116:5
important  6:8
  7:17 14:15
impossible  36:19
improper  10:23
  119:9
impulses  50:9
inability  21:22
  22:22 23:4,8
inaccuracies  34:6
inadequate  23:11
  69:8 79:13 87:16
inappropriate
  11:6 103:15
inaudible  67:14
  73:14
incarceration  38:7
  38:22 39:7,21,24
incident  11:15
incidentally  21:9
  88:18
include  59:23 98:6
  109:12 129:1
included  98:19
includes  12:18
  77:14 107:9
  108:21
including  53:17
inclusive  133:7
incoherent  79:2
incorporated  21:6
increase  55:22
  56:1 57:2 98:22
  101:15

increased  54:1,10
  54:13 55:17,19
  56:8 59:10,17,19
  59:21 61:19 62:8
  62:9 69:9,11 76:7
  99:25 100:1
  102:17
increasing  81:11
index  5:1,7
indicate  71:13
  102:22
indicated  38:16
  71:18 100:22
  107:8
indicates  68:11
  69:22
indicative  69:23
indicator  71:3
individual  1:12,13
  1:14,16 22:6,22
  34:4 59:5 64:16
  125:6
individual's  59:15
individuals  10:16
  22:17 49:25 77:8
  120:20
induce  50:20
induced  52:5
induces  49:15
inescapable  45:23
influence  110:25
information  12:16
  33:15,20 34:14
  37:2 101:8 103:11
  105:14 106:2,5,20
ingesting  51:16
inhalation  130:14
initial  105:23
  111:2 112:1 113:1
initially  12:14
  110:24 111:5

initiate  106:4
injection  106:23
injured  24:2
injuries  30:11
  128:24 129:5,8,22
injury  83:24
  109:25
inmate  29:19,22
  30:8,11
insensitive  98:9
insensitivity  98:10
inside  64:23
insignificant  74:4
  76:17
inspire  92:8
instance  10:9
  65:14 84:5 88:12
  90:15 116:24
  118:7
institute  106:21
instituted  105:12
intend  41:16 44:20
  113:5
intense  42:11,20
  62:25 70:9 72:3
  99:10
intensely  100:3
intensity  72:5
intent  119:21
interaction  112:7
interest  16:6
interested  31:2
  67:1 133:16
interesting  92:10
interfered  61:17
interferes  50:7
  64:5
interferring  75:17
  77:9 78:2
internal  109:25

Dr. Kris Sperry
June 3, 2020

Arreola, Rodrigo v. Consolidated Government of Columbus, Georgia, et al

[interpretation - kris]

Page 14

| | | | |
|---|---|---|---|
| **interpretation** 117:10 | **journal** 32:10,16 33:6 | 35:15,16,21 36:15 36:18 37:1,2,16,21 | 97:4,6,7,9 98:19 98:24 99:7,8,10,11 |
| **interrupt** 60:5 | **jr** 2:11 | 37:23 38:9,11,23 | 99:12,22 100:4,16 |
| **intervening** 95:9 | **july** 29:6 | 38:24 39:2,3,8,8 | 100:25 101:5,6,7 |
| **intervention** 90:9 | **jump** 97:13 | 39:22,24,25,25 | 101:16,20 103:2,4 |
| **interviews** 12:20 | **june** 1:25 4:9 | 40:3,14,15,16,17 | 103:5,8,12,24 |
| **intoxication** 101:6 | 133:10,18 134:3 | 41:23,25 43:1 | 104:1,2,9,12,12,22 |
| **introduce** 33:4 114:1 115:2 | | 44:18 45:21,23 | 104:24 105:10,11 |
| **introduced** 14:20 40:21 | **k** | 46:2,12,20 47:9,10 48:15 49:18 50:21 | 105:25 106:4,6,11 106:20,25 107:4 |
| **introducing** 14:24 | **k** 7:8 53:5 | 50:23 52:24 53:11 | 108:8,10,11,12,18 |
| **invasion** 130:10 | **karch** 53:4,10 | 53:16 54:3,5,15,24 | 109:3,4,4,10,18,23 |
| **investigated** 34:1 | **keenan** 32:6,24 34:24 35:3,20 | 55:3,5,8,9,15,20 | 110:4,21 111:4,7 |
| **investigation** 18:11 20:3 33:6 34:3 | **keenan's** 34:21 **keep** 86:25 | 55:21,21,22 56:2,4 56:22 57:10,12,17 57:19,23 58:8,10 | 111:16,25 114:9 114:14,19 115:21 116:10,19 117:6 |
| **involved** 11:16 25:2,5,8 26:13 | **keeping** 126:20 **kept** 34:18 | 58:11,17,20 59:23 60:18,24 61:10,13 | 117:17,21 118:13 118:13,16,21,23 |
| 28:15 29:18 30:8 38:18 40:1,5 45:6 | **key** 125:11,13 **keyboard** 13:4 | 62:13 63:6,11 64:6,7,15,20,25 | 118:24 119:1,13 119:14,21 120:24 |
| 62:4 63:7 83:5 | **killing** 85:20 | 65:2 66:12,18,25 | 121:10,11,24 |
| **involving** 30:14 38:6 39:6,15 | **kills** 51:17 **kind** 11:7 27:20 | 67:25 68:2,17,20 68:22,22 70:3,7 | 122:3,4,7,8 123:14 124:4,12,13,14 |
| **ischemic** 130:13 | 32:7 50:19 74:16 | 72:4,4,6,8,16,25 | 125:9,24,24,24 |
| **isolated** 21:17 23:3 | 83:2 90:20 96:17 98:14 109:1 110:4 | 73:9,10,19 74:8,23 74:24 75:9,24 | 126:1,3,20 127:10 127:19,19,21,24 |
| **issue** 103:8 | 110:19 117:4 | 76:2,5,5,8,23 77:2 | 128:6 129:3,9 |
| **issued** 8:10 | **know** 7:10,11,20 | 77:17,19 78:23 | 130:6,15 131:2,3 |
| **item** 18:20 | 7:24,25 8:17,23 | 79:7,12,15,20,24 | |
| **iv** 105:16,16 | 10:1,2,3,4,17,19 | 80:3,4,25 81:5,22 | **knowing** 103:13 |
| | 11:3,8,16 12:2,19 | 81:24 82:19 83:2 | 109:11 111:1 |
| **j** | 13:5,25 14:13 | 83:4,4,5,8,21,22 | **knowledge** 10:13 |
| **james** 2:11 13:17 | 15:13,15,17,18,24 16:5,9,11 20:6,21 | 83:23,25 84:15 85:20,21,23 87:18 | 11:3 |
| **jcc** 2:17 | 22:3,4,5,20 23:22 | 88:15 89:10,11,17 | **known** 48:22 49:20 83:17 102:3 |
| **jezreel** 1:7 | 23:24 24:7,13,15 | 90:10,15,18 91:12 | **knows** 64:18 |
| **jim** 6:19 7:2 17:1 | 24:17,17 25:4,7 | 91:17,19,22 92:1 | 111:16 117:20 |
| 114:22 120:3 | 26:8,16 28:20 | 92:12 93:3,8 94:2 | **kris** 1:20 4:4 6:2 |
| 127:21 128:13 | 29:23 30:20,23,25 | 94:4,5,10,15,20 | 7:7 133:10 134:1 |
| **job** 37:25 | 31:9,12,14,15,15 | 95:6,11,15,18 96:6 | 134:5 135:2,24 |
| **join** 6:17 | 31:19 32:7,21,24 | 96:8,8,9,16,18 | 136:2,4,12 |
| | 33:10,13,21,23,24 | | |
| | 34:14,20,23,25 | | |

Dr. Kris Sperry                                           June 3, 2020
Arreola, Rodrigo v. Consolidated Government of Columbus, Georgia, et al

**[l - mean]**                                                    Page 15

| l | | | |
|---|---|---|---|
| **l** 3:1 | **lengthen** 86:23 | **liter** 49:18 51:19 | **luke** 80:10 |
| **lab** 12:22 66:21 | **lethal** 24:20 49:13 | 52:14 120:12,22 | **lunch** 86:25 |
| 70:15 120:14 | 50:22,24 51:12 | **liters** 90:16,21 | **lung** 129:17,22 |
| **lack** 21:22 63:23 | 52:15,15,21 | **litigation** 25:6,8 | 131:18 132:1 |
| **lactic** 69:10 | **letter** 8:14 12:15 | 31:13 34:11,12 | |
| **lapses** 89:7 | **letters** 33:21 | **litsup** 3:18 134:15 | **m** |
| **lasted** 72:9 | **level** 49:19 51:23 | **little** 6:17 18:7 | **magical** 55:4,11 |
| **lastly** 44:10 | 52:12,15,16,21 | 28:17 66:17 82:4 | **main** 87:18 |
| **late** 17:4 84:18 | 71:14 74:25 75:1 | 86:22,24 110:19 | **major** 77:14 |
| **law** 10:9 11:4,13 | 75:17,25 76:22 | 125:25 | **majority** 77:8 |
| 11:22,24 18:4 | 77:5,25 79:11 | **liver** 130:21,23 | 120:18 |
| 20:3 28:20 30:14 | 81:17 93:11 | 131:7 | **making** 32:21 79:2 |
| 30:23 31:6,17 | 120:17,17,23 | **loaded** 65:5 91:23 | 79:4 |
| 40:2 44:25 45:2 | **levels** 49:16,22 | **loading** 33:4 | **male** 57:9,25 |
| 84:5 118:4 125:14 | 52:10 58:13 59:1 | **lobe** 129:17,21 | **man** 40:6,8 55:14 |
| **laws** 4:14 | 62:8,10 68:24 | **logged** 36:22 | 57:14 |
| **lawsuit** 8:2 31:5,7 | 74:14,20 120:20 | **long** 31:21 50:3 | **manner** 9:8,18 |
| **lawyer** 80:5,5 | 120:25 | 72:8,11,18 90:7 | 12:6 44:12 46:17 |
| **laying** 63:17 | **life** 122:6 | **longer** 86:24 | 61:17 113:21 |
| **lead** 49:2 50:9 | **light** 73:24 | **look** 14:25 15:4 | 115:15,17 116:13 |
| 82:25 99:2 | **lights** 111:7 | 47:1 51:14 61:24 | 117:24 118:3,12 |
| **leading** 89:22 | **likelihood** 101:15 | 79:19 100:18 | **manslaughter** |
| 123:5 | **limitation** 122:2 | **looked** 20:9 24:8 | 116:4 |
| **leads** 113:20 | **limitations** 85:25 | 33:11 34:5 40:3 | **manufacturers** |
| **leaning** 77:22 | 122:11 | 127:9 | 24:18 |
| **leave** 35:7,12,19 | **limited** 103:10 | **looking** 16:13 | **marathons** 76:14 |
| 36:6,9 120:1 | **limits** 55:8,13 | 17:14 19:4 58:8 | **mark** 2:5 6:9 |
| **lecture** 17:25 | **line** 117:5 135:4,7 | 58:25 93:23 | 14:18 17:7 27:14 |
| **lectures** 18:2 | 135:10,13,16,19 | 104:11 122:8,9 | 86:15 |
| **led** 46:16 123:10 | **lines** 86:12 | **loss** 110:1 | **marked** 27:24 |
| 130:18 | **lipids** 58:12,25 | **lot** 10:13 12:11 | **marking** 27:17 |
| **lee** 7:7 | **list** 12:12 27:15 | 16:14 17:15 25:20 | **markpostlaw.com** |
| **left** 35:16 52:2 | 28:11,15 37:17 | 33:19 46:11 58:12 | 2:8 |
| 121:7 129:17,22 | 82:13 | 123:1 | **massive** 67:22 |
| **legal** 3:1 20:15 | **listed** 27:8 44:17 | **low** 51:24 52:9 | **material** 13:7,8 |
| 117:10 119:21 | 51:10 87:21 110:7 | 68:23 79:14 100:6 | 16:14 17:15 |
| 134:23 | 113:23 115:18 | 120:17,17 126:19 | **materials** 8:23 |
| **legs** 77:23 | 123:14 | 130:12 | 19:5 |
| **length** 86:22 | **listing** 12:15 14:2 | **lower** 49:22 | **matter** 13:3 61:2 |
| | 42:25 | 120:23 129:13 | 119:11 |
| | | | **mean** 6:20 8:17 |
| | | | 9:21 11:1,13 |

Dr. Kris Sperry                                                    June 3, 2020
Arreola, Rodrigo v. Consolidated Government of Columbus, Georgia, et al

[mean - necessary]                                                    Page 16

12:14,18 15:8
16:7 21:15 22:2
22:21 24:13 25:24
26:14 28:4,6
29:18,21 30:18,22
31:11,14,16 36:18
37:18 41:2 45:22
46:5,9,25 48:14
49:8,10 52:25
54:2,4 55:3 56:10
56:11,18,20,25
57:11 58:24 59:3
63:6 66:3 68:16
69:2 72:2,14,21
73:10,12,19 74:16
75:11 77:5 78:25
79:8,16 80:3,24
83:25 88:13,21
89:18,19 90:21
91:2,23 92:6 93:4
94:16 95:3,8,12,17
96:5,16 101:8
102:1 105:9,13
106:14,22 107:5
108:7 109:14,16
109:17,21,21
110:20 111:14
115:5,23 116:4,24
118:4 119:15
120:19 122:4,9
124:23,24 127:15
129:4
**meaning** 63:22
**means** 55:6 61:4
91:10 115:22,24
116:1,7 117:8
123:24 131:7,25
**meant** 56:16
**measurement** 66:9
**measurements**
70:19

**mechanism** 50:25
109:4 124:21
**medical** 12:22,23
18:11 19:23 20:1
20:15 31:10 44:7
47:25 48:23 49:6
50:4 51:1 67:8
70:22 90:8 100:5
101:3 111:23
113:5 115:25
117:22 123:22,25
124:25 125:12
126:22 127:1,8,10
127:12 128:9,13
128:14,23 130:2
130:22 131:20,21
132:1
**medicine** 9:4,14
10:7
**meet** 61:9
**mental** 101:4,24
102:1,4,10 110:23
110:25
**mention** 83:12
**mentioned** 22:11
23:14 32:14 72:3
77:11,20 102:5
125:7 131:18
**met** 7:3
**metabolic** 69:12
69:23,25 70:4,10
70:13 71:3
**meth** 48:19 49:24
50:13
**methamphetamine**
42:6 45:17,19,24
46:6,9,14,19,21
47:18,21 48:1,3,11
48:23 49:2,6,8,12
49:23 51:4,9,13,19
51:24 52:1,8,10,14

52:16,21 53:18
59:9,16 60:10,11
62:16,25 70:12
81:19,22,23 97:8
98:22 99:1 100:10
100:11 103:6,14
120:12,19,21
121:15
**michael** 1:11
**microscopic** 56:22
**microscopically**
56:24
**middle** 1:1
**midtown** 12:23
67:8 70:22
**milieu** 98:20
**milligrams** 49:17
51:19 52:13
120:11,22
**mind** 17:2 40:20
58:19,23
**mine** 77:6
**minor** 1:7
**minute** 14:19,22
19:7 43:20 65:17
86:15 90:16,21
100:11 103:17
**minutes** 40:10
72:12,22 81:5
89:25 113:9
**misconduct** 18:12
**missed** 43:1
**mistakes** 33:11
35:1 36:25
**mister** 109:17
130:3 132:5
**misunderstanding**
60:24
**moaning** 79:2
**moment** 29:16

**momentarily**
128:22
**monitor** 66:6
**month** 35:24
**months** 8:13 31:23
36:7
**morning** 68:1,9,16
68:18 69:19 70:25
71:10 125:22
**move** 13:4 61:22
103:18 110:7
**moved** 28:6
**moving** 104:6
**mpost** 2:8
**multi** 21:14 23:12
117:25
**multiple** 21:24
60:19 130:5
**multiplier** 55:22
**murder** 116:4
**muscle** 50:2,6
**muscogee** 133:3,5
**myocardial** 56:23

**n**

**n** 2:1 6:1 24:11
121:19
**name** 7:6,7,8,8
15:16 18:10 33:23
99:22
**names** 14:13
**natural** 119:3,6
**nature** 11:15 90:3
117:2
**nearly** 52:7
**necessarily** 21:21
42:23 116:22,24
121:8 124:3 128:7
130:25
**necessary** 4:17
136:6

Veritext Legal Solutions

Dr. Kris Sperry
June 3, 2020
Arreola, Rodrigo v. Consolidated Government of Columbus, Georgia, et al

**[need - okay]**

**need** 13:5 17:7 111:7 120:2 127:24 128:3,7 132:4
**needed** 90:11,17 101:3 103:11
**needs** 61:9
**negligence** 116:6
**neighborhood** 49:17
**neither** 103:5
**nervous** 75:18 77:10 78:3
**neurologically** 81:11 94:5 112:23
**never** 9:22 17:24 27:6 36:6,7 40:16 75:7,8 95:18
**new** 33:17
**newman** 14:3 15:13,21 16:2 24:6,14,23 26:5,22 83:4 84:23 121:18
**newman's** 14:6 15:12
**night** 131:2
**nine** 52:13 71:2 120:11
**non** 83:21,22 131:6
**nonsensical** 79:4
**nonspecific** 98:19
**normal** 50:8 51:3 54:7,13,16,19,21 55:1,3,8,13 57:4 57:13,21,25 59:14 71:2 77:6 83:20 83:21 94:9,21 96:9 105:24 112:23

**normally** 71:4 77:5 93:10 95:8 98:15 131:4
**north** 40:7
**notaries** 3:5,15
**notarized** 3:15
**notary** 136:13,19
**notation** 130:20
**note** 131:18,19 134:10
**noted** 24:24 136:7
**notes** 122:25 128:21 133:9
**notice** 4:24
**november** 8:10 40:23 41:5,9
**number** 27:24 40:22 46:11 48:19 48:19 55:5,6,11 57:8,15 58:11 110:7 114:20,21 114:24 123:14 128:19
**numbered** 126:24 127:5,9,18,22 128:1 133:7
**numbers** 48:10 127:4,8,24
**numerous** 23:16

**o**

**o** 3:1 6:1,1
**o'clock** 66:17 68:9 68:17,18 69:19
**obese** 83:22
**obesity** 131:9
**obeying** 125:15,15
**objection** 123:5
**objections** 4:17,20 6:20
**objective** 102:19 106:5 125:6

**objectively** 125:12
**observation** 72:5 101:14
**observations** 126:15
**observe** 125:25
**observed** 63:6 128:25
**obstruction** 88:12
**obtain** 104:20,25 106:1
**obtained** 43:12 104:24 123:16 125:12
**obvious** 65:1 89:24 122:4
**obviously** 7:24 9:16 85:21
**occasion** 51:25 53:21,21
**occasional** 31:1 51:21
**occur** 16:10 18:3 18:14 27:11 63:4 96:12 99:21 102:3
**occurred** 13:1 30:19 73:3,4 95:18,19 103:14 121:14 132:7
**occurring** 38:21
**occurs** 21:15,25 22:4 63:8 77:17 130:9,14
**ocga** 3:20
**october** 15:6 32:8
**odd** 88:21
**oddly** 38:8 127:14 129:16
**offer** 41:16 44:20 44:24 113:6

**offered** 4:22
**offering** 39:17 41:14 45:5,9 82:6
**officer** 1:11,12,13 9:22,23 13:13 45:9 60:20 62:2 64:11 72:4 82:10 99:9 100:19 117:5 117:9 118:4
**officer's** 10:21 64:15
**officers** 10:4 11:5 11:14 44:3 45:6 45:13 46:16 60:16 63:1 65:20 71:25 74:12 75:6 76:2 77:21,23 79:11 82:7,15 84:6 92:13 110:9 111:21 113:4 116:25 117:16 118:8,14,16 119:7 119:9 125:14 129:15 132:6
**offices** 4:6
**official** 1:12,13,14 1:16 30:24 31:4 31:20
**oh** 10:11 19:6 22:15 23:18 29:2 29:10 37:14 41:1 47:16 49:17 54:10 58:5,17 63:3 69:3 71:12 86:11 93:21 101:20 103:2 107:17 109:1,23 109:25 112:19 115:5 122:17 129:3
**okay** 6:18 7:10,14 7:21 9:6,10,15

Dr. Kris Sperry
June 3, 2020
Arreola, Rodrigo v. Consolidated Government of Columbus, Georgia, et al

**[okay - partially]**
Page 18

| | | | |
|---|---|---|---|
| 11:23 13:21 14:5 | 132:10 | ops 12:20 | **p** |
| 14:19,21 15:6,11 | older 30:17 | order 42:22,24,25 | |
| 15:18,20 16:1,13 | omission 106:8 | 72:11,22 90:11,17 | p 2:1,1 6:1 7:9 |
| 16:21,25 17:5,11 | once 17:1 33:11,14 | 106:2 118:16 | p.m. 132:20 |
| 17:12,22,24 18:6 | 93:8 94:3 95:6,7 | 124:19 | page 2:13 5:2 15:4 |
| 18:24 19:2,9,14,24 | 103:25 104:10 | organ 52:5 77:16 | 18:18,19,21,22 |
| 20:11,24 25:14,17 | ones 21:2 23:24 | 130:5,8 | 19:11,16,16,21,25 |
| 25:24 26:1,8,19 | 27:7 31:1 40:19 | organs 130:11 | 20:2,12 28:8,25 |
| 27:24 28:1,7 29:3 | 64:7 127:7,22 | origin 107:10 | 29:5,10,11,15,16 |
| 29:4,9,13,14 30:6 | 128:1,1 | 108:21 109:15,21 | 30:7 33:16 67:8 |
| 31:2,24 32:2 33:3 | open 28:8 33:20 | 109:23 | 70:22 107:19 |
| 37:20 40:21,24 | operate 78:4 | originally 13:11 | 108:13 109:8 |
| 41:3 42:1,14 43:2 | operative 63:12 | orleans 33:18 | 115:11,12 127:4,8 |
| 43:8,8,24,25 45:11 | opinion 8:24 9:7 | outlawed 84:4 | 127:24 135:4,7,10 |
| 46:4 48:16 49:8 | 9:18 26:12,21 | outlined 119:15 | 135:13,16,19 |
| 52:13 53:6,13 | 38:5 39:6,17 42:3 | outside 9:13 10:19 | pages 12:15 |
| 54:11,18 55:18 | 42:4,8,18 43:6,15 | 10:20 31:4 34:12 | 127:18 133:7 |
| 56:5,10 57:4,7 | 43:15 44:1,5,11,11 | 54:6 55:7 59:13 | paid 34:11 37:13 |
| 58:6,19 60:6 | 44:25 45:5,9,16 | overall 88:16 97:9 | 37:14 |
| 62:22 63:3 65:23 | 47:10 59:25 65:21 | overlap 100:12 | pain 98:9,10 |
| 66:20,25 67:7,19 | 66:23 67:6 69:18 | overtly 120:24 | paper 33:22 |
| 68:15,19 69:5 | 70:17 73:1 82:6 | oximeter 91:20 | 100:17 |
| 71:15 72:8,13,23 | 82:12,15,23 87:7 | oxygen 21:22 61:5 | paragraph 107:20 |
| 73:21 74:7,16 | 87:12 92:2,24 | 61:8,9,20 63:24 | 107:22 |
| 75:20 76:19 78:12 | 94:25 103:18 | 66:9 68:25 69:9 | paramedics 91:21 |
| 81:18 82:11,17 | 110:7,13 113:6,20 | 70:20 71:14 79:12 | paranoia 46:13 |
| 86:1,9,15 87:20 | 113:21 115:12 | 79:13 87:16 88:2 | 101:25 125:13 |
| 88:24 89:2,4 | 121:14 122:14 | 88:6 89:6,23 | parasteatosis |
| 90:15,25 91:3,8,9 | 132:4 | 90:10,16 91:8,11 | 131:6 |
| 92:22 93:2,21,22 | opinions 9:16,18 | 91:12,14,18,25 | pardon 65:4 |
| 94:23 95:16,24 | 9:24 10:1 11:25 | 92:11,14 94:8 | parent 1:3,6 |
| 96:13 97:1 98:22 | 14:15 38:1 41:13 | 105:2,15 | parenthesis 29:17 |
| 99:14 100:14,25 | 41:15,21 44:16,17 | oxygenate 23:9 | paretically 22:3 |
| 102:25 103:19 | 44:19,20,21 45:11 | 63:23 64:6 75:13 | park 2:6 |
| 105:17 107:25 | 65:8 93:3 110:9 | 81:9 94:12 | parse 95:13 |
| 108:14,17 110:6 | 117:18 123:15,15 | oxygenation 23:11 | part 8:7 20:22 |
| 112:19 113:3 | opportunity 42:15 | 69:8 79:14 83:18 | 22:7 37:24 45:19 |
| 114:8 119:7 120:3 | opposed 45:10 | 94:8 | 45:21 53:20 60:14 |
| 121:3,6,17 122:14 | 56:2 116:15 | | 84:4 101:11 |
| 122:23 128:17,19 | opposite 117:4 | | 109:18 115:8 |
| 129:2,3 130:1 | | | partially 60:9 |

Dr. Kris Sperry                                      June 3, 2020
Arreola, Rodrigo v. Consolidated Government of Columbus, Georgia, et al

[particular - post]                                      Page 19

particular   10:22
  21:10 37:6 44:19
  52:19 58:15 76:21
  79:20
particularly   9:25
parties   3:22,25 4:3
  4:20 133:15
partner   93:18
parts   126:4
party   3:23
passed   111:12
passing   93:13
passtf.com   2:18
pathologic   115:15
pathologically
  54:5,8,9
pathologist   9:3
  25:3 53:15 95:12
  125:4
pathology   1:23 4:7
  9:4,14 22:20
  23:23 53:3,9
  133:11
patients   59:5
pattern   124:1
pc   2:13
peachtree   1:24 4:8
  133:12
pension   35:25
people   24:20
  48:10 49:21 52:10
  62:12 76:13 83:22
  89:15 116:9 117:7
  120:18 122:5
  124:24 130:16
  131:7
perceive   92:16
percentage   55:21
  55:21 116:10
percentages   48:18

percentile   55:7
performed   65:22
  65:24 66:15 68:9
performing   15:25
period   24:14
  46:24 90:7
persisted   126:13
person   11:11 56:6
  56:7,7,9 59:8
  84:25 85:11 90:1
  90:5 93:13 116:2
  116:11 118:15
personal   1:4 34:16
  37:1
personally   40:5
personnel   44:8
  103:19 106:8,9
  108:20 110:10
  112:17 125:12
  126:16
perspective   25:3
  45:3 51:15
ph   66:15,17 67:10
  68:1,5,21 69:18
  71:14 76:1,9,11,17
  77:4,6,7,13
phrase   54:3
physical   61:25
  62:6 69:7 76:7
  87:14 111:18
  128:24
physically   61:18
  62:1 76:4
physician   16:8
physicians   124:7
physiologic   16:10
  23:9 76:10 77:13
  79:25 105:10
  121:12
physiologically
  46:19 92:16

pick   128:11
picky   56:14
picture   69:13,15
  69:16,17
piece   33:22
place   57:10,16
  64:13 116:20
places   131:13
plaintiff   2:4 29:14
  30:3
plaintiff's   13:6,7
  13:15
plaintiffs   1:8
planned   32:22
planning   32:4
plans   32:7
played   45:19
please   7:6 27:1
  108:25 132:15,17
plural   131:24
plus   36:16
pneumonia   130:16
point   16:17 17:17
  18:21 27:3 41:24
  52:13 62:20 65:3
  65:25 66:22 68:23
  70:16 73:7,16
  74:1,11,13 75:2,12
  75:16,21 76:21
  77:25 78:15,24
  79:20 80:19,21
  81:13,17 87:8
  88:1,4 90:1 91:25
  94:18 100:7
  101:17 104:14,15
  106:15 108:1,15
  111:24 112:3
  120:11 121:25
  129:14
points   42:16

poison   51:17
police   1:15,15 9:22
  9:23,24 10:4,21
  11:5 18:11 19:13
  19:19 22:18 42:12
  42:20 44:2 63:1
  64:11 74:12 98:17
  110:9 111:20
  113:4 116:12,13
  116:20 117:5
  119:5 132:6
policy   20:15
poor   98:18 131:10
poorly   92:22
position   63:17
  64:4 82:24 83:17
  83:17 84:7,11,25
  85:12 86:4
positional   16:3,19
  17:21,25 20:13,20
  21:6 26:23 28:16
  28:18,21 29:21
  30:2,10 43:25
  63:15,16 64:1,12
  65:9,11,15
positions   26:16
possibility   47:15
  47:18 57:2 62:23
possible   39:9,22
  73:9 83:11 107:9
  107:18 108:3,21
  109:9,14
possibly   81:21
  105:9 106:17,19
  107:17 110:24
  112:12
post   2:5 5:4 6:10
  6:19,25 8:15,16
  14:25 17:1,8,12,22
  86:16 120:1,7
  123:12 127:21

Dr. Kris Sperry                                    June 3, 2020
Arreola, Rodrigo v. Consolidated Government of Columbus, Georgia, et al

[post - quoted]                                    Page 20

128:6,16,20
132:16,17
**postulated** 62:14
**potassium** 62:10
69:11
**potential** 121:6
**potentially** 52:17
52:18 70:14
110:20 121:1
**pounds** 85:11
**poydasheff** 8:16
**practical** 127:11
**practice** 10:7
**precipitation**
119:2
**preface** 92:23
99:18
**prefer** 87:1,2
**preparation** 12:9
**prescription** 102:7
**presence** 100:10
**present** 45:23
107:4 124:11,18
**pressure** 49:14
65:14 66:4 104:25
105:1
**pretty** 27:16 33:21
53:7 65:1 88:22
105:12 106:24
**prevalence** 48:13
**prevalent** 48:8
**prevented** 106:17
**primarily** 9:4
**primary** 50:10,12
50:24 95:1
**print** 127:16
**printed** 17:1
127:17
**printout** 16:22
**prior** 4:22 43:12
69:3,6,20 71:14

74:5 76:1 89:8
104:23 111:21
**prison** 29:19,19
30:10
**privilege** 6:22
**probability** 57:2
**probably** 21:12
22:1 25:21 27:9
28:23 37:17,21
47:3,6,25 48:4
53:2 66:5 69:3,10
92:21 94:8 95:19
101:10 105:15
114:8 118:23
**problem** 27:20
55:17,19 77:2
99:13,18 110:22
**problematic** 81:12
**problems** 23:10
106:3
**proceeding** 3:17
**proceeds** 89:20
**process** 27:13
73:23 77:4,18
88:9 89:21
**produced** 3:4,13
129:19
**produces** 23:6
46:10,11
**production** 3:4,14
3:16
**professional** 16:6
**profound** 67:11
68:2 111:3
**profuse** 99:25
102:16
**progressed** 94:18
**progressing** 89:12
94:24
**progression** 83:14
97:10 123:11

**prohibited** 3:20
**prolonged** 47:4
**promulgated**
60:25
**promulgating**
10:18
**prone** 22:5 23:8
63:17 82:24 83:17
83:23 84:25 85:12
86:4
**proper** 10:9,12,23
44:25 117:23,24
**properly** 64:6 78:4
119:17
**proved** 84:20
**provide** 9:7,11,13
**provided** 13:22
14:24 27:15 28:12
33:18 41:5 45:12
**providing** 9:17
**psstf.com** 2:17
**psychiatrist** 101:3
**psychological**
46:12
**psychotic** 98:3
**public** 136:19
**publication** 52:20
53:19
**publications** 16:18
17:19 18:6 52:25
**published** 22:17
**pulmonary** 89:22
90:5
**pulse** 66:5 91:20
**pulseless** 66:6
107:4
**pumping** 122:19
**punctured** 110:3
**pupils** 104:7
**purely** 23:13

**purpose** 36:10
37:6
**purposes** 21:9
35:14 78:12
127:12
**put** 9:9 42:24
43:14 64:21 65:6
78:2 91:20 96:16
105:6,16 109:7,18
121:24
**puts** 53:25
**putting** 96:6

**q**

**quantify** 55:25
**quarrel** 85:18
**quarreling** 114:3
114:6
**question** 4:19 6:21
7:19,20 10:25
17:2,13 26:4 38:8
38:15,17 39:5
54:4 56:17 74:17
82:5 90:14,19,23
92:22 96:17,19,23
106:11 120:10
121:20 122:21
128:9,18
**questions** 3:7 4:18
14:23 75:10 80:5
80:7,9 82:20
83:14 93:13 97:14
104:5 105:24
112:24
**quick** 21:5 37:18
100:18
**quickly** 106:24
**quite** 48:4 69:1,2
75:24 125:9
**quote** 108:3 109:8
**quoted** 107:18
109:6,7

Dr. Kris Sperry

June 3, 2020

Arreola, Rodrigo v. Consolidated Government of Columbus, Georgia, et al

**[r - report]**

Page 21

| r |
|---|
| **r** 2:1 3:1 7:9,9 53:5 135:3,3 |
| **radioed** 105:12,13 111:5,5 |
| **radiology** 131:20 |
| **range** 55:1,13 57:21 59:14 |
| **ranges** 54:7 55:4 55:14 57:12 120:25 |
| **rapid** 88:13 |
| **rapidly** 50:24 70:7 105:3 112:9 |
| **rare** 51:25 |
| **rarely** 53:23 84:1 84:2 |
| **reach** 103:9 |
| **reached** 75:2,16 81:16 101:1 103:3 103:4 |
| **reaches** 90:1 |
| **react** 75:9 |
| **read** 41:22 58:17 103:25 122:25 132:12 134:9 136:5 |
| **readily** 75:25 |
| **reading** 4:11 17:11 |
| **ready** 92:23 |
| **real** 26:18,18 37:18 65:8 92:24 100:18 122:12 |
| **realistically** 106:14 |
| **really** 9:12 11:2,6 13:2 15:19 21:19 25:12 26:1,2,3 31:2 32:23 35:22 37:6 43:10 50:13 |

57:23 59:4 61:4 64:7 67:1 75:8 79:5 81:24 84:8 86:23 91:6 100:9 102:24 103:11 104:6,22 117:1 124:18 125:2,3 129:4 130:8 131:14
**realm** 10:6,19,20 51:18
**reason** 32:23 33:4 35:16 36:20 102:14 119:11,14 127:14,16,20 134:11 135:6,9,12 135:15,18,21
**reasonable** 47:17 78:13
**reasonably** 84:15 88:11
**reasons** 122:4
**recall** 9:12 16:8 20:16 25:16 27:7 29:18,20,24 59:4 120:15 131:23
**receipt** 134:18
**received** 13:6,11 13:19
**receives** 3:23
**recognize** 44:6
**recognized** 21:20 49:20 104:3 124:15 131:5
**record** 7:5 12:24 32:11,12 38:12,13 86:16,18,19 87:3,4 87:6 107:23 113:16,17,19 127:8 131:23

**recorded** 60:18 66:10 104:21
**recording** 78:24
**records** 12:22 33:21 67:8 70:23 100:2,5,8 126:23 127:1,10,12,25 128:9,14,23 130:2 130:22 131:21,21
**recover** 64:2,13
**recovered** 81:9
**recreate** 83:6,10
**reduced** 76:11 83:18
**reduction** 76:11 92:3
**refer** 53:20
**reference** 57:11,20 128:18 131:19
**referenced** 134:6
**referred** 67:5
**referring** 22:14 65:9
**reflect** 53:1
**reflects** 68:2 108:7
**refresh** 28:5
**regain** 71:25
**regained** 81:8
**regains** 65:13
**regard** 27:2 65:21 86:10 121:19,21 130:21
**regarded** 26:5,9 26:22
**regarding** 11:4 38:20 39:6,19 40:12
**region** 129:15
**regular** 131:8
**regularly** 130:24

**relate** 16:17,19 17:20 59:20
**related** 3:16 10:5 17:18 20:13,18 29:21 38:6 46:14 63:5 97:6,7 133:15
**relates** 27:4
**relating** 4:14 18:2 121:12,13
**relation** 38:10 45:10
**relationship** 3:20 10:1,18 18:4 46:19 59:1 117:13
**relatively** 21:17 48:12,17 120:17
**relayed** 105:14
**relevant** 52:4 82:20
**relied** 103:7
**rely** 106:21
**remained** 75:10
**remember** 25:11 30:25 31:3,8 40:3 40:4,5 58:20 107:10
**remote** 1:20
**render** 14:15 92:15
**rendered** 39:5
**rephrase** 7:21 73:15
**report** 8:9,13 12:21 13:20,25 14:3,4,5,7 15:12 40:22 41:4,9,12,17 41:22 42:9 43:5 44:2,12 60:10 105:6 107:7,8,9 108:6,21 109:7,8,8

Veritext Legal Solutions

Dr. Kris Sperry                                           June 3, 2020
Arreola, Rodrigo v. Consolidated Government of Columbus, Georgia, et al

**[report - risk]**                                              Page 22

109:22 114:4
115:3,8 117:18
123:16 129:4
**reported** 55:14
**reporter** 1:22 3:8
3:12 4:6,25 5:5
17:6,10,13,23
114:21,25 132:11
132:14,16 133:5
133:23
**reports** 3:24 12:21
12:22 13:22 14:10
66:22 131:20
**representative** 1:4
**represents** 3:3,9
**reputable** 26:6
**reputation** 15:18
**request** 3:17,25
34:21
**required** 136:13
**research** 24:5
26:17 82:23 83:1
83:4 86:2
**reserve** 89:7
**reserving** 6:20
**resisted** 71:22
**resisting** 99:12
**resource** 33:20
**respect** 10:22
11:22 38:21 39:5
39:14,17 60:1
65:18 80:17 82:5
83:14,15 91:10
95:25 113:4
120:18 123:19
**respective** 4:3
**respiratory**
107:18 108:4
109:9
**respond** 75:18
112:9

**responding** 75:5
77:24 104:5
112:23
**response** 13:7 26:4
76:10
**restarted** 68:22
**restating** 17:2
**restrain** 76:3
112:10
**restrained** 10:16
16:3 23:7 26:6
27:13 28:19 40:6
40:9 46:23 60:16
61:16 79:10
**restraining** 46:17
62:4 118:16
**restraint** 16:11
20:23 21:12 22:2
22:5,6,8,18 23:8,8
29:21 30:10,15,16
31:7 39:15,18
40:1 47:4 61:25
63:7,12 68:13,14
68:16 69:8 74:6
77:18 83:23 87:15
87:17 93:7,8 94:3
94:19 95:5,7,17,20
111:15 117:16
119:13 121:11,13
123:7,7,9,13
129:10,12 132:5
**restraints** 47:12
97:6
**restrict** 28:17
**result** 32:15,19
42:11,20 62:23
65:19,20 83:7,18
83:24 84:25 85:12
95:9 96:12 97:23
99:21 124:1
133:16

**resulted** 62:15
82:14 97:9 109:25
110:5 117:9
**resulting** 22:23
94:15 129:20
**results** 21:23 22:7
23:3 64:12 66:21
69:11 70:16 89:23
130:16
**resuscitated** 70:7
**retained** 20:7
31:16,16,20 37:23
**retention** 69:9
**retire** 32:3,22 33:1
33:1,2
**retired** 32:1,15,18
**retirement** 32:3
35:14,18,22 36:11
36:20
**retires** 35:12
**retiring** 32:4
**return** 134:13,17
**revert** 94:21
**review** 8:22 134:7
**reviewed** 12:9,11
13:21 14:6,9
15:12,20 24:4
126:22 127:1,11
128:23 129:2
**rhythm** 50:20,23
107:3,3
**rib** 110:2,2
**richard** 1:15
**right** 7:23 8:9,20
9:1 10:8 11:19
12:4,8,12 14:9,14
14:18 15:11 16:13
16:23 17:13 18:20
19:2,20 21:1,4
22:10 25:14,19
26:19,19 27:1,12

28:10 29:4,24
30:1,13 31:21
32:14 34:5 36:12
38:15 39:1,4,10,12
41:8,11,19 42:3,8
42:23 43:4,14,19
44:10,15,23,23
45:4,15 47:14,17
48:3,20,22 49:1
51:1 53:9,24 56:5
56:13 59:7,19,25
63:9,13,25 64:1,15
65:7,13 69:14
70:12,15 71:8,17
71:21 73:1,6,15,25
74:9 78:5,14,17,19
79:6,17 80:6,12,16
81:15 82:3,11,22
82:22 83:12 84:10
84:17 85:8,17
86:13 87:25 88:18
89:18 90:10 91:9
91:14 92:21 94:2
94:6 95:22 96:3
96:21 97:22 98:1
98:5,25 99:4,17
101:9,22 103:16
104:17,20 105:5,8
106:16,22 107:1,7
108:5 110:6,12,13
110:15 112:3
113:8,8,25 114:5
114:21 115:2,7,13
115:19 116:11
118:2,7 119:19,23
123:3,17 127:13
128:8 132:18
**ringing** 128:10
**risk** 54:1,10,14
55:16 56:1,8 58:9
59:10,18,20,21

Dr. Kris Sperry                    June 3, 2020
Arreola, Rodrigo v. Consolidated Government of Columbus, Georgia, et al

[risk - skin]                                      Page 23

98:23 100:23
  101:22 102:11
  105:4 110:20
  111:3
**rodrigo** 1:3 134:4
  135:1 136:1
**roll** 77:22
**rolled** 78:16 94:4
**roof** 126:10,18
**room** 6:6,7,15
  16:8 57:20 121:7
  126:14
**routine** 111:8,10
**rule** 47:14,16
  62:22 63:2,3
  81:25 82:23 103:1
**rules** 4:14 7:15
**ruling** 103:2
**run** 12:24,24 40:7
  66:11 76:14
**running** 76:5
  118:21 119:5
**russell** 1:21 4:5
  133:4,22
**rusty** 114:19

**s**

**s** 2:1 3:1,1 6:1 7:9
  135:3
**s.a.** 1:6
**salaried** 37:5
**salary** 37:9
**san** 29:7,7 40:1
**sat** 61:3 75:7 94:4
**satisfied** 82:19
**saturation** 66:10
  91:25 105:2
**saw** 29:3 32:23
  47:25 100:8,19,20
  104:2 111:25
**saying** 9:24 54:2
  61:3 74:24 78:14

78:25 99:9 110:1
  112:24 115:21
  118:24 119:14
  129:3
**says** 60:11 107:17
  108:1 109:8
**scan** 18:6 21:5
  131:23
**scarring** 50:1,6
**scenario** 83:6,11
**scenarios** 96:11
  102:2
**scene** 112:10
**scrantom** 2:13
**screen** 28:2 93:20
**scrutiny** 125:5
**second** 13:15
  19:22,25 42:8
  43:4 67:17 82:12
  86:17,17 100:16
  108:19 113:10
  128:11
**seconds** 16:23
  89:6,14 113:14
**see** 8:23 12:20
  13:6 16:25 18:8
  19:3,15,21 20:25
  27:21,23 28:5,24
  29:9 30:2 33:16
  37:20 40:25 42:4
  42:21,22 95:2
  96:20 100:2
  103:12 107:13,20
  107:24 108:5
  113:25 115:4
  116:17 125:3
  126:2,2 128:4
  132:3
**seeing** 29:9
**seen** 14:4 15:22
  49:10 51:2 53:23

99:24 101:2 107:2
  130:23 131:12
**seminar** 19:18
**seminars** 18:2
**sense** 12:8 42:1
  78:9 101:13
  111:11 116:18
**sent** 12:17 14:23
  134:14
**sentence** 63:4
  107:14 108:19,24
**sentences** 108:1
**separate** 34:18
  36:9
**sepsis** 130:2,17,17
**sequence** 63:5
  103:13 125:5
**service** 35:13
**services** 3:24
**set** 123:15
**settled** 40:18
**severe** 66:19 68:5
  71:3 130:7
**severely** 100:1
**share** 28:2 127:22
**sheet** 12:24 66:11
  134:11
**sheets** 33:7,9
  34:17,22 35:2
  37:3,5
**shoot** 11:14
**shoots** 117:5
**shortcomings**
  121:20
**shortly** 8:18 70:25
**shortness** 89:10
  90:6
**shot** 24:21 74:18
**shotguns** 24:22
**show** 66:15 86:8
  127:21

**showed** 34:9 66:4
  66:6 100:5 119:2
**shown** 85:6
**shows** 68:25
**shut** 6:17
**side** 25:15 103:24
**sign** 132:12 134:12
**signature** 4:11
  133:21
**signed** 134:20
**significance** 130:1
  130:21 131:15
**significantly** 99:13
**signs** 43:12 66:3
  100:22 104:21
  106:2
**similar** 50:3
**simms** 29:16
**simple** 9:6
**simply** 9:9 96:5
  117:8
**sir** 17:23 27:14,24
  41:11 42:4 46:8
  113:15 122:22
  127:3
**siren** 111:7
**sitting** 77:22
**situation** 11:7,12
  22:9 23:11 105:8
  111:18 112:6
  121:21,22 125:24
**situational** 123:25
**situations** 16:11
  21:19 23:2 26:18
  30:21 31:9 49:11
  50:10,12 122:5,12
**six** 37:7 72:12,22
  107:25
**skill** 133:13
**skin** 129:7

sluggishness  104:7
snipes  2:12 6:6
solely  42:6 45:17
  60:11,13
solo  6:15
solutions  3:1
  134:23
someone's  22:8
  58:11 76:9 121:24
  122:10
somewhat  11:6
  61:19
soon  27:19 128:9
sooner  105:20
  111:14
sorry  6:19 15:8
  18:21 29:2,2,2,2,3
  29:4 43:23 60:4
  93:17,21 107:19
sort  7:3 21:14 25:8
  36:8 40:19 41:24
  101:6
sorted  7:25
sorts  53:17
sounds  57:25 79:4
  79:5
sowers  8:16
speak  15:8 52:23
  79:16
speaking  9:17
  16:18 17:19 26:10
  26:11 48:18 70:21
  75:8 82:11 90:4
specific  3:21 13:1
  38:8,17 45:9 47:5
  55:6,20 56:19
  66:21
specifically  18:2
  20:13 28:18 39:11
  45:6 49:7 50:14
  53:15 58:25 59:20

82:10 83:1 84:4
  91:7 100:20 116:1
  117:15 129:5
specificity  38:10
  39:14
specifics  30:25
  40:4
spelled  7:8
sperry  1:20 4:4
  6:2,14 7:2,7
  120:11 127:23
  128:22 133:10
  134:1,5 135:2,24
  136:2,4,12
sperry's  17:3
spoke  75:8
sprouse  2:13
st  12:23
stamped  127:7,12
  128:14
standards  9:24
  10:18
standpoint  22:20
start  12:19 29:4
  43:10 57:11 62:19
  104:16 131:4
started  40:9 57:8
  67:24 68:3,7 75:3
  77:16 105:14
  111:15 112:15,16
  112:17 130:4
starting  57:15
starts  122:1 131:3
state  31:19 33:22
  34:19 35:7,11
  37:4 133:2
statement  13:8
  14:2 48:5 60:21
  81:2
statements  13:6
  122:16,21

states  1:1
statistical  54:6
statistically  55:1
  59:13
stem  61:11
stenographic
  133:9
stephen  53:4
sterile  115:25
stimulant  50:3
stimulants  53:18
stimulate  46:10
stimulation  97:10
stipulated  4:2,10
  4:16,23
stipulations  4:1
stomach  130:14
stop  7:25 60:4
  67:17 88:22
  118:17
stopped  75:8
  77:24,24 89:13
  93:9 94:3 95:7
  107:6
stops  78:25 79:9,9
  128:10
straight  21:7
streets  118:21
strength  98:12,14
  99:8
stress  97:6,7
strongest  62:3
struggle  42:12,20
  47:4 62:1,3,6 63:1
  65:20 70:9 72:3,6
  72:9,14,18 73:4,7
  73:16 76:21,24
  80:22 82:14 87:8
  87:15,15 88:1,5
  97:3,4 99:10
  100:24 117:15

119:7,8 123:6
  129:11,24
struggling  99:12
students  131:1
studied  84:23
studies  15:20,24
  22:13,16 23:16,20
  24:5,16 55:24
  82:23 83:1,9,15
  86:2,7,9 121:18,21
  122:3
study  58:4,7,16,20
  58:21,24 59:3
study's  122:9
subcutaneous
  129:6
subdued  10:16
subject  122:5
subject's  121:19
subjective  125:16
submitted  3:7,11
subscribed  136:14
substance  48:24
substantial  47:5
subtract  43:2
sudden  47:21 48:1
  48:20 49:2,7,9,21
  50:9,14 51:22
  52:11 54:10,14,23
  56:1,9 57:3 58:10
  59:2,10,18,20
  83:24 97:23
  100:23 101:17,18
  110:20
suddenly  118:22
suffer  73:7 88:5
  99:15 102:15
suffered  51:4
  66:24 67:21,23
  68:12 70:17 97:18

Dr. Kris Sperry June 3, 2020
Arreola, Rodrigo v. Consolidated Government of Columbus, Georgia, et al

**[suffering - textbooks]** Page 25

**suffering** 73:11
118:15
**suffers** 88:19,21
118:9,10 119:10
**sufficient** 85:13
101:7 120:12
125:17
**sufficiently** 75:14
**suffocation** 22:23
23:13 61:23
**suggest** 10:21 86:2
**suit** 40:18
**suite** 2:6
**summaries** 131:21
**summary** 34:23
115:12,14
**super** 98:12 99:7
**superimposed**
62:17 88:15
**supplied** 111:25
127:1
**supply** 61:8
**support** 66:23
67:6 70:17 128:25
**supports** 82:23
**suppose** 114:4
**sure** 7:7,22 11:20
26:3 41:13,15
42:2 43:3 49:8
54:24 56:16 60:7
60:15 63:13 67:7
73:11 74:10 78:19
79:18 80:16 90:13
97:16 100:15
104:17 115:24
120:4,5,16
**surface** 129:17
131:25
**survive** 47:13
76:13 77:12 90:12
90:17

**survivorable**
67:16
**suspect** 64:12
65:13 86:3 111:23
116:12 118:9,9
119:8,10
**suspect's** 64:11
82:25 96:2
**sustained** 30:11
66:2 93:7 104:13
**sweating** 99:25
100:3 102:16
125:7,19,23 126:4
**switch** 73:24
**sworn** 6:3 9:23
136:14
**symptomatic**
74:25
**symptoms** 86:5
98:2 99:5
**syndrom** 99:19
102:9 123:23
**syndrome** 98:20
99:3 100:12
123:24 124:3,4
**synovus** 2:14
**system** 49:23
75:18 77:10 78:3
118:25
**systematic** 82:13
**systemic** 42:10,19
65:18 66:24 70:18
**systems** 130:5,8

**t**

**t** 1:15 6:1 135:3,3
**tactics** 44:25
**take** 14:25 16:23
18:6 36:6 45:15
54:4 73:8 86:14
113:13 126:17

**taken** 1:21 4:5
26:16 47:1 66:3
69:13,19 87:22
95:11 97:12
105:20 133:9
**talk** 19:22 20:3,14
**talked** 47:3 94:16
97:5 122:25
**talking** 25:13 47:3
53:8 59:12,12
77:24 78:25 81:24
83:7 87:7 93:17
96:7 107:9 118:1
**talks** 27:6,7
**taser** 20:16,18
24:18
**tasers** 20:22 24:19
24:21
**taught** 18:1
**technical** 55:10
127:20
**technicians** 65:4
**telephone** 128:10
**tell** 8:17,19 9:2
11:2 14:12 15:1
16:24 20:8 23:21
24:8 25:21 26:15
27:9 28:14 30:9
38:9 39:11 52:20
57:12,20 70:1,2
73:6,16 74:1,11,13
75:1 76:20 78:22
78:23 79:12,19,23
80:1,21 87:25
88:4 92:18 93:10
95:12 99:14
103:21 110:15
111:17 115:22
**telling** 53:1 67:2
76:20

**temperature**
100:1,6 102:17
125:9,20,21 126:7
126:9,13,17
**tempt** 27:22
**ten** 48:8 113:8
120:22
**term** 21:10 50:3
74:21 78:5,9
116:5
**termed** 82:12
**terminated** 31:24
94:20
**terming** 87:9
**terminology** 22:3
80:16 115:25
117:12 124:9
**terms** 9:6 48:18
55:25 74:22
**terribly** 60:23
**terrific** 28:7,10
**test** 66:14,21 67:20
68:8,11 69:18
**testified** 6:3 37:12
37:18,22,24 38:4
39:18
**testify** 40:12
**testifying** 38:18
78:20 79:22
**testimony** 27:15
28:11 37:16 38:19
39:19,25 40:19
68:10 80:18
133:10 134:9,18
136:8
**tests** 65:22,24
70:16,24
**text** 15:5
**textbook** 53:3,14
**textbooks** 56:12

Dr. Kris Sperry                                          June 3, 2020
Arreola, Rodrigo v. Consolidated Government of Columbus, Georgia, et al

**[thank - true]**                                          Page 26

**thank** 6:18,24 17:8
17:22 119:25
122:14 131:17
**thanks** 6:25
132:18
**therapeutically**
102:8
**thereto** 4:22
**thing** 20:1 21:14
23:12 27:2 51:23
95:4 96:5 120:9
120:10
**things** 10:3 12:11
13:9,19 16:4,19
17:20 18:15 24:7
24:10,15,22 25:5
46:13,22 53:8,22
56:19,25 61:15
67:2,5 80:2 92:9
95:13,14,20 97:11
98:2 99:20,24
101:9 102:19
105:22 120:2
125:15 127:18
130:9 131:10,13
**think** 7:15 8:7,12
9:21 10:5 12:8,25
13:11,18,24 14:1
15:10 18:8 19:11
19:17 21:15,19
27:5 28:4 29:15
30:12 32:8 35:8
35:23 36:16 38:15
44:22,23 46:15,25
47:2 53:4 58:21
60:2,2,15 61:15
62:1,17 64:3,14,19
65:1 66:5,7,16
69:22,22,24 70:1
71:17 74:9,23,23
75:11,16,20 76:19

77:17,19,25 78:16
79:13,24 80:16,18
81:4 82:3,16,18,19
82:21 83:7 84:15
85:8 87:17 88:10
89:2 90:23 91:5
92:5,8,8 93:2,5,25
94:7,17 95:12,24
96:1 100:5,10
101:7,8,10,12
102:19,24 103:7,9
103:10 104:1,11
104:24 106:1,15
106:19 107:8
108:7 109:6,18,24
110:6,17 111:13
111:24 112:6,8,11
112:21 113:1,7
116:16 117:19
118:13 119:23
120:10,13 121:3,7
121:9,10 122:24
126:23 129:9,23
132:10
**thinking** 39:23,24
74:19 95:2 101:9
**third** 18:19 19:1
29:5,11 43:5
103:18 108:18
**thirty** 113:14
**thought** 8:24
22:19 62:9 72:17
72:18 86:24 103:6
**thoughts** 22:25
23:15
**thousand** 7:13
**threatening** 122:6
**three** 45:6,12
54:13,22 55:15,18
82:7

**tie** 83:17,23 84:7,7
84:11
**time** 3:23 4:21,21
11:18 13:2,19
19:16 22:19 24:14
33:7,8 34:9,9,17
34:21 35:1,8,10,13
35:22 36:3,8,21,22
37:3,5 46:23
53:20,20 67:10,25
68:13 69:3,25
71:1,8 72:24
75:16 76:1 77:25
81:17 90:7 91:21
101:14 104:3
111:17,24 113:13
120:9,9 126:1,14
132:19 134:19
**timeframe** 134:8
**times** 7:11,11 16:7
31:13 33:13 37:12
37:19,20,22,24
49:18 54:13,22
55:16,18 60:17,19
101:10
**titles** 18:13
**today** 11:9 12:10
132:19
**told** 28:5 32:25
50:17 60:9 82:1
106:5
**top** 29:10 108:16
**topic** 18:9 52:23
**total** 48:18
**totality** 62:18
**touched** 65:17
**toxic** 46:18 52:12
52:15 120:13,19
120:25,25 121:2
**toxicity** 42:6 45:18
45:19 46:14 49:12

51:10,15 60:10,12
103:7,15 120:21
**toxicology** 66:22
**trained** 10:12 84:6
**training** 84:5
114:13
**transcript** 3:4,6
134:6,20 136:5,8
**transcription**
133:8
**transfer** 108:2
**translate** 122:11
**transmittal** 8:14
12:15
**transported**
116:19
**transposing** 37:2
**trash** 76:6
**trauma** 107:18
108:4 109:9,12,18
**traumatic** 107:10
108:21 109:14,21
109:23 110:4
**treat** 43:10 59:5
**treating** 112:15,17
**treatment** 43:7,8
43:13,17 58:12
106:5,22 110:10
113:5
**tremendous** 49:14
**trial** 4:21 38:5,19
39:19 40:17
**tried** 55:25 66:12
77:21 83:5 104:24
**triglycerides** 59:1
**trouble** 88:20 89:9
89:19,24 120:8
122:1
**true** 3:6,10 33:5
44:4 133:8 136:8

Dr. Kris Sperry                                   June 3, 2020
Arreola, Rodrigo v. Consolidated Government of Columbus, Georgia, et al

**truly** 59:15 94:1
**try** 78:6 80:6
　96:11 106:21
　112:10 127:23
**trying** 13:9 18:4
　24:20 33:4 54:3
　56:14 66:20 79:17
　79:23 89:2 96:18
　109:24 122:25
**tucker** 2:13
**two** 12:15 36:7
　45:10 49:11 51:14
　90:1 101:22 102:2
　102:11,18
**tying** 84:3
**type** 16:19 17:20
　50:23
**types** 12:2 16:4
　21:18 53:22

**u**

**u** 3:1
**ultimate** 64:21
**ultimately** 37:10
　59:23 101:21
　126:5
**unable** 66:13
　79:16 127:15
**unanticipated**
　108:20
**uncommon** 21:18
　48:12,17
**unconscious** 92:15
　112:25
**unconsciousness**
　89:8
**unconstitutional**
　10:24 11:2
**underlying** 23:10
　102:4 124:21,25
**understand** 7:18
　26:3 41:13 49:5

63:14 68:10 74:10
　75:20 76:19 80:18
　96:1 107:14
　108:24 110:18
　113:21 122:21
　124:2
**understanding**
　7:20 8:1 59:11
　60:8
**undertaken** 10:4
**undisputed** 13:8
**unexpected** 51:22
　96:12
**united** 1:1
**unknown** 48:10
**unquote** 108:4
**unused** 35:7,9,12
　35:19 36:4,5
**unusual** 53:22
**update** 15:9
**updated** 15:2,2
**upper** 55:8,13
　129:9,17,21
**urgency** 111:12,18
**urgent** 112:4
**urine** 49:24 52:1
**use** 10:9,12,22
　11:22,24 14:10
　20:16 36:6,19
　41:3 49:2 50:13
　69:14 70:12 73:21
　74:22 78:5 84:6
　98:22 101:24
　102:6,6,10 115:8
　124:19 128:3,7
**useful** 53:2
**users** 49:25
**uses** 48:19
**usual** 120:19
**usually** 21:14
　22:16 49:9,16

83:22 89:19 99:24
　126:15
**utilization** 12:1
　20:18
**utilizations** 10:14
**utilize** 116:5
**utilizing** 11:8

**v**

**v** 1:9 134:4 135:1
　136:1
**vacation** 34:8 35:8
　35:10 36:3,5
**value** 35:11,17
**variance** 54:6
**variation** 55:1
**variety** 18:14 25:5
　61:15 123:25
　131:12
**various** 10:17 16:7
**vary** 57:13
**vast** 77:8
**ventilation** 83:19
　85:13 92:3,6,7
**verbalizing** 79:10
**verbiage** 108:9
　109:6
**verify** 134:9
**veritext** 3:1,3,9,19
　134:14,23
**veritext.com**
　134:15
**veritext.com.** 3:18
**version** 15:3
**versus** 11:6 29:7
　29:17 48:19 56:1
　115:23
**video** 7:4 71:18
　79:19,21
**videos** 12:19
**view** 26:5

**viewed** 71:18
**violent** 40:9
　100:23 118:17
**visually** 56:23
**vital** 43:12 66:3
　104:21 106:2
**vitals** 105:19
**vocal** 61:22
**voice** 43:22 75:9
**voicemail** 128:11

**w**

**wait** 32:24
**waived** 4:12,25
**waned** 48:6
**want** 6:5 11:19
　16:15 17:16 26:3
　28:2 41:13,20,23
　43:2 57:19,23
　60:7 63:13 65:7
　74:10 78:19 80:15
　87:1 95:24 113:11
　128:8,18 131:17
　132:12
**wanted** 6:10 33:2
　36:6
**warning** 89:17
**water** 25:20
　113:11
**watermark** 1:23
　4:7 133:12
**waving** 93:12,19
**waxed** 48:6
**way** 13:4 26:21
　31:20 38:19 39:18
　42:1 46:23 47:2
　49:6 56:17 61:5
　61:24,24 64:20
　73:12 74:8 78:2
　82:5 85:23 89:2
　91:19 92:1 93:3
　95:21 96:21,22

Dr. Kris Sperry                                    June 3, 2020
Arreola, Rodrigo v. Consolidated Government of Columbus, Georgia, et al

**[way - zoom]**                                               Page 28

| | | |
|---|---|---|
| 114:9 116:10 126:13 | **work** 24:18 29:13 31:21 34:10,18,19 36:22,23 53:20 114:10 127:23 | 108:6 114:6,8 120:8 127:6 |
| **ways** 10:17 51:15 | **worked** 8:15 25:10 25:14 30:3,13,18 31:3,15,17 79:15 | **year** 25:22 28:13 32:5,22 35:8,9 48:7 |
| **week** 131:2 | | |
| **weekly** 33:7 | | |
| **weeks** 34:8 36:3 36:13 37:8 | **working** 8:5 34:11 | **years** 7:13 21:20 22:12 23:1,16 25:6,24 31:23 36:17 37:22 38:25 40:2 48:2,8 51:2 58:11,18 85:9 |
| **weighed** 57:16 | **works** 90:20 | |
| **weight** 54:13,16 54:19,21 57:5,14 57:25 59:15 64:11 82:24 84:24 85:10 86:3 92:12 96:2,6 96:7,15,23 121:19 121:24 122:10 132:5 | **world** 26:18,18 122:12 | |
| | **worth** 35:18 36:14 | **young** 40:6,8 |
| | **wrists** 129:7 | **younger** 69:13 |
| | **writing** 17:4 | **youth** 40:6 |
| | **written** 32:9 56:12 117:18 123:16 | **z** |
| **weights** 54:7 55:2 55:3,4 56:3 57:13 57:21 59:14 | **wrong** 57:18 104:4 104:13,19 105:21 118:5 119:9 | **zero** 66:4,5 **zoom** 7:4 |
| **welding** 117:6 | **wrote** 33:19 | |
| **went** 13:24 34:21 99:6 | **y** | |
| **whatsoever** 80:9 89:17 116:7 117:11 | **y** 7:9 | |
| | **yeah** 6:10,16 8:14 13:10,17 18:8 19:15 20:8 27:5 28:6,8,23,25 29:11 29:15 30:7 32:18 37:15 43:9 45:8 48:16 52:19 53:11 55:20 57:3 58:15 63:21 64:3,10 67:23 68:19 69:14 69:16 71:12 73:21 74:19 78:13 80:15 81:4,7,22 82:18,21 83:21 84:15,21 85:8,15 86:6 87:11 93:16,19,19 97:4 98:14,18 99:1 102:1,18 107:13,17,24 | |
| **win** 29:6 | | |
| **witness** 3:12 4:12 8:2 17:5,24 30:23 120:4 123:6 132:13 133:18 134:8,10,12,19 | | |
| **witnesses** 13:16 14:2 | | |
| **woman's** 57:14 | | |
| **word** 73:21 95:20 98:13 114:9 115:22 | | |
| **worded** 47:2 92:22 93:3,4 | | |
| **words** 109:10,20 111:11 | | |

Georgia Code

Title 9, Chapter 11

Article 5, Section 9-11-30

(e) Review by witness; changes; signing.
If requested by the deponent or a party before
completion of the deposition, the deponent shall
have 30 days after being notified by the officer
that the transcript or recording is available in
which to review the transcript or recording and, if
there are changes in form or substance, to sign a
statement reciting such changes and the reasons
given by the deponent for making them. The officer
shall indicate in the certificate prescribed by
paragraph (1) of subsection (f) of this Code
section whether any review was requested and, if
so, shall append any changes made by the deponent
during the period allowed. If the deposition is not
reviewed and signed by the witness within 30 days
of its submission to him or her, the officer shall
sign it and state on the record that the deposition
was not reviewed and signed by the deponent within
30 days. The deposition may then be used as fully
as though signed unless, on a motion to suppress
under paragraph (4) of subsection (d) of Code

Section 9-11-32, the court holds that the reasons given for the refusal to sign require rejection of the deposition in whole or in part.

DISCLAIMER:  THE FOREGOING CIVIL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019.  PLEASE REFER TO THE APPLICABLE STATE RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted
fashion to authenticated parties who are permitted to
access the material. Our data is hosted in a Tier 4
SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and
State regulations with respect to the provision of
court reporting services, and maintains its neutrality
and independence regardless of relationship or the
financial outcome of any litigation. Veritext requires
adherence to the foregoing professional and ethical
standards from all of its subcontractors in their
independent contractor agreements.

Inquiries about Veritext Legal Solutions'
confidentiality and security policies and practices
should be directed to Veritext's Client Services
Associates indicated on the cover of this document or
at www.veritext.com.