

Deposition of:
## Lora Darrisaw , M.D.

*June 30, 2020*

In the Matter of:

## Arreola, Rodrigo Vs. The Consolidated Government Of Columbus, Georgia

Veritext Legal Solutions
800.808.4958 | calendar-atl@veritext.com | 770.343.9696

Page 1

```
 1              IN THE UNITED STATES DISTRICT COURT
             FOR THE MIDDLE DISTRICT OF GEORGIA
 2                     COLUMBUS DIVISION
 3
             RODRIGO ARREOLA, as
 4           parent of Hector Arreola,
             Deceased, and as Personal
 5           Representative and
             Administrator of the          CIVIL ACTION FILE
 6           Estate of Hector Arreola,
             CONCEPCION ARREOLA, as         NO. 4:19-cv-00005-CDL
 7           parent of Hector Arreola,
             and S.A., minor child of
 8           Jector Arreola, by next
             friend Jezreel Imee
 9           Custodio
10                   Plaintiffs,
11           vs.
12           THE CONSOLIDATED
             GOVERNMENT OF COLUMBUS,
13           GEORGIA, OFFICER MICHAEL
             AGUILAR, in his
14           individual and official
             capacity, OFFICER BRIAN
15           DUDLEY, in his individual
             and official capacity,
16           OFFICER AARON EVRARD, in
             his individual and
17           official capacity, and
             COLUMBUS POLICE
18           DEPARTMENT CHIEF OF
             POLICE RICHARD T. BOREN,
19           in his individual and
             official capacity,
20
                     Defendants.
21
22
23                   DEPOSITION OF
24
25               LORA DARRISAW, M.D.
```

Lora Darrisaw , M.D.                                    June 30, 2020
Arreola, Rodrigo Vs. The Consolidated Government Of Columbus, Georgia

---

Page 2

```
 1
 2
 3
 4              DEPOSITION OF
 5          LORA DARRISAW, M.D.
 6
 7
 8
 9
10          June 30, 2020
11            9:59 a.m.
12
13
14
15
16      3121 Panthersville Road
          Decatur, Georgia
17
18
19
20
21
      Tracy A. Williams, B-2168, RPR
22
23
24
25
```

---

Page 4

```
 1 Defendant's
 2 Exhibit D1   Midtown Medical Center Discharge   108
 3            Summary
 4
 5
 6
 7
 8
 9          INDEX OF EXAMINATION
10
11 Examination by Mr. Post            6
12 Examination by Mr. Clark           89
13
14
15
16
17
18
19
20
21
22
23
24
25
```

---

Page 3

```
 1        INDEX OF EXHIBITS
 2
 3 EXHIBIT      DESCRIPTION       PAGE
 4 Exhibit 1   Amended Notice of Taking      6
 5             Deposition Duces Tecum of
 6             Dr. Lora Darrisaw
 7 Exhibit 2   Subpoena to Produce Documents,   6
 8             Information, or Objects or to
 9             Permit Inspection of Premises in
10             a Civil Action
11 Exhibit 3   Curriculum Vitae of Lora A.     14
12             Darrisaw, M.D.
13 Exhibit 4   Record of Medical Examiner      26
14 Exhibit 5   H. Arreola Material Reviewed    26
15 Exhibit 6   Official Coroner's Report       29
16             dated 3/22/17
17 Exhibit 7   Medical Examiner's Official     30
18             Report dated 3/22/17
19 Exhibit 8   Lab Official Report dated 3/24/17  31
20 Exhibit 9   Lab Official Report dated 1/19/17  31
21 Exhibit 10  Lab Official Report dated 1/26/17  32
22 Exhibit 11  Draft Copy of Dr. Darrisaw's Report 32
23 Exhibit 12  Georgia Bureau of Investigation's  34
24             Fee Schedule
25 Exhibit 13  CD of Open Records              77
```

---

Page 5

```
 1 APPEARANCES OF COUNSEL:
 2 On behalf of the Plaintiffs:
 3       MARK C. POST, ESQ.
 4       Mark Post Law, LLC
 5       Suite F
 6       3 Bradley Park Court
 7       Columbus, Georgia  31904
 8       (706) 221-9371
 9 On behalf of the Defendants:
10       JAMES C. CLARK, JR., ESQ.
11       ALAN SNIPES, ESQ.  (Via speakerphone)
12       Page, Scrantom, Sprouse, Tucker &
13       Ford, P.C.
14       Synovus Centre, Third Floor
15       1111 Bay Avenue
16       Columbus, Georgia  31901
17       (706) 324-0251
18
19
20       (Pursuant to Article 10(B) of the Rules and
21 Regulations of the Georgia Board of Court Reporting,
22 a written disclosure statement was submitted by the
23 court reporter to all counsel present at the
24 proceeding.)
25
```

2 (Pages 2 - 5)

Lora Darrisaw , M.D.                                        June 30, 2020
Arreola, Rodrigo Vs. The Consolidated Government Of Columbus, Georgia

Page 6

1     (Plaintiffs' Exhibit 1 and Exhibit 2 were
2  marked for identification.)
3           LORA DARRISAW, M.D.,
4  having been first duly sworn, was examined and
5  testified as follows:
6       MR. POST:  This will be the deposition of
7  the Dr. Lora Darrisaw taken by the plaintiffs for
8  purposes of discovery and all purposes allowed by
9  law.  The deposition is taken by agreement of counsel
10  and pursuant to notice.
11            EXAMINATION
12  BY MR. POST:
13     Q.  Dr. Darrisaw, if you would, tell the --
14       MR. CLARK:  Can we -- objections?  We're
15  going to, as we've done in the other depositions,
16  just reserve except form of question and
17  responsiveness of the answer?  Is that agreeable?
18       MR. POST:  Yes.
19  BY MR. POST:
20     Q.  Dr. Darrisaw, if you would tell the court
21  reporter your name and spell it for her, if you
22  would?
23     A.  Yeah.  My name is Lora, L-o-r-a, is my
24  first, Darrisaw, D-a-r-r-i-s-a-w.
25     Q.  And, Dr. Darrisaw, I expect you've given

Page 7

1  depositions before, correct?
2     A.  That's correct.
3     Q.  Obviously, you know you're under oath
4  today, right?
5     A.  Correct.
6     Q.  And you know that this testimony is just as
7  important as trial testimony, right?
8     A.  Correct.
9     Q.  I would ask that you wait until I finish my
10  question to answer, and I'll try to let you finish
11  your answer before I ask another question.  Lawyers
12  are bad about that sometimes.  So I will do my best
13  to do that, if you'll try as well.  Is that okay with
14  you?
15     A.  Absolutely.
16     Q.  How many times have you given depositions,
17  approximately?  Do you have any idea?
18     A.  25.
19     Q.  What about jury trials?
20     A.  215.
21     Q.  Do you have any difficulty with hearing?
22     A.  No, I do not.
23     Q.  For any reason you think that you didn't
24  fully understand a question I ask or didn't
25  completely hear it or even if it's just unclear, let

Page 8

1  me know that so I can rephrase it or restate it, if
2  you don't mind.
3     A.  Absolutely, yes, sir.
4       MR. CLARK:  You've got more trial
5  experience than anybody here, it sounds like.
6  You've testified 250 times.
7       THE WITNESS:  15.
8       MR. CLARK:  Oh, I thought you said 250.
9       THE WITNESS:  I'm sorry.  Did you miss it?
10       THE COURT REPORTER:  I have 215.
11       THE WITNESS:  Yeah, 215.
12       MR. CLARK:  Oh, 215.  Okay.  Gotcha.
13  BY MR. POST:
14     Q.  Are you suffering from any physical or
15  mental condition today that would cause not be able
16  to testify truthfully and fully, Doctor?
17     A.  No, sir.
18     Q.  And you're not under the influence of any
19  drugs or alcohol that would affect your ability to
20  testify truthfully and completely; is that right?
21     A.  No, sir.  Correct.
22     Q.  Where do you live, Dr. Darrisaw?  And just
23  the general area is fine, not the specific address.
24     A.  Sure.  I live in Snellville, Georgia.
25     Q.  And are you married?

Page 9

1     A.  Yes, sir.
2     Q.  What's your spouse's employment?
3     A.  He is a mathematics professor.
4     Q.  Where?
5     A.  At Georgia State University.
6     Q.  Has he been employed there for a while?
7     A.  Yes, sir.
8     Q.  How long approximately?
9     A.  Since 2001.
10     Q.  Do you have any children?
11     A.  Yes, sir.
12     Q.  Ages, approximately?
13     A.  How old are they?  Born in 1986.  What is
14  that?  I think they're 33, 31, 26, and 21.  Close
15  enough?
16     Q.  That's close enough.  And, really, what I'm
17  interested in is who they're employed by.  And I'm
18  also going to ask you generally where they live.  But
19  start with their employment and go from eldest to
20  youngest.
21     A.  The oldest lives in Carbondale, Illinois,
22  and he's a graduate student at Southern Illinois
23  University.  My oldest daughter lives in Alpharetta.
24  I'm not sure the name of the company that she works
25  for.  My second oldest daughter lives in Canton,

3 (Pages 6 - 9)

Lora Darrisaw , M.D.                    June 30, 2020
Arreola, Rodrigo Vs. The Consolidated Government Of Columbus, Georgia

Page 10

1 Georgia, and she's employed with Sysco. And my
2 youngest daughter lives in Loganville, and she is an
3 undergraduate student at Embry-Riddle University.
4    Q. That's an engineering and aeronomics type
5 school; is that correct?
6    A. Aeronautics, yes.
7    Q. And the reason I ask that is chiefly to in
8 case we pick a jury in this case to see if anybody in
9 your family is in the Middle District of Georgia, and
10 if there would be any employment conflicts, that type
11 of thing.
12    A. Sure.
13    Q. Not trying to get too deep into your
14 personal life. By whom are you currently employed?
15    A. I'm employed by the Georgia Bureau of
16 Investigations Medical Examiner's Office.
17    Q. And what is -- do you have a title?
18    A. Yes, sir. My title is director of
19 pediatric forensic pathology.
20    Q. What does that mean?
21    A. It means that I have administrative
22 obligations and duties as it relates to our
23 pediatrics deaths, and I oversee two of the programs
24 that our office is involved with with Emory
25 University's fellowship programs. I will say it does

Page 11

1 not mean that that I only do pediatric autopsies.
2    Q. And how long have you been in this
3 particular position with the Georgia Bureau of
4 Investigation?
5    A. That particular title I've held since 2014,
6 I believe around October of 2014.
7    Q. You do autopsies, obviously?
8    A. Correct.
9    Q. And you're a forensic pathologist?
10    A. Correct.
11    Q. Can you tell us what a forensic pathologist
12 is and what you do?
13    A. Sure. A forensic pathologist specializes
14 in doing autopsies on individuals who die under
15 either suspicious circumstances or they may die under
16 circumstances where the cause of manner of death are
17 not immediately evident based upon their history or
18 the circumstances by which they die. They involve
19 cases where people died from up unnatural deaths,
20 such as suicides or homicides or accidents; deaths in
21 which people died in custody or under the influence
22 of drugs. So there's a wide variety of types of
23 deaths that come to the attention of a forensic
24 pathologist.
25    Q. And you've been in the medical examiner's

Page 12

1 office for the GBI for how many years?
2    A. Since July 2001.
3    Q. And you've performed autopsies regularly
4 since July of 2001 for the GBI; is that right?
5    A. That's correct.
6    Q. Do you have an estimate of how many
7 autopsies you have performed in your career with the
8 GBI?
9    A. Over 5,000.
10    Q. The GBI Medical Examiner's Office serves
11 153 of the 159 counties in Georgia; is that right?
12    A. In and about that amount, yes.
13    Q. And you supervise or set out rules for some
14 of the others; is that right, some of the other
15 counties that have medical examiner's offices?
16    A. No, only ours. The other counties that
17 have medical examiner's office, we don't have any
18 jurisdiction over, as far as I know.
19    Q. As far as you know?
20    A. Correct.
21    Q. Okay. So you just essentially handl the
22 GBI's business yourself?
23    A. Correct.
24    Q. So what would you say are your areas of
25 expertise?

Page 13

1    A. My areas of expertise are in forensic
2 pathology and pediatric pathology.
3    Q. Have you ever been qualified as an expert
4 in any other discipline?
5    A. No, sir.
6    Q. Did you bring your curriculum vitae with
7 you or your --
8    A. Yes, sir.
9    Q. -- also known as your résumé?
10    A. Yes, sir.
11    Q. Do you have any extra copies of these?
12    A. There may be one in the packet. Let me
13 see.
14    Q. I just know the defense lawyer would
15 probably like to look at it as we talk about it.
16    MR. CLARK: Thank you.
17 BY MR. POST:
18    Q. How many times have you testified as an
19 expert in forensic pathology?
20    A. The 215.
21    Q. All of those 215 were with regard to
22 forensic pathology, correct?
23    A. Correct.
24    Q. And when I say "testified," I meant trials,
25 and that's you answered --

4 (Pages 10 - 13)

Lora Darrisaw , M.D.                                                June 30, 2020
Arreola, Rodrigo Vs. The Consolidated Government Of Columbus, Georgia

Page 14

1   A. Correct.
2   Q. -- just to be clear.
3       MR. POST: We'll mark this as Plaintiffs'
4 Exhibit 3. I had already premarked a couple more.
5       (Plaintiffs' Exhibit 3 was marked for
6 identification.)
7 BY MR. POST:
8   Q. Doctor, I'm showing you Plaintiffs' Exhibit
9 No. 3. That's the curriculum vitae that you just
10 handed me; is that right?
11   A. That's correct.
12   Q. And is that up to date for your background,
13 your education, and everything on it?
14   A. It's up to date through 2019, and I would
15 say about March or April of 2019.
16   Q. It's up to date and accurate through that
17 date, right?
18   A. Correct.
19   Q. I see on here that it says you were
20 associate medical examiner from July 2002 until July
21 of 2009?
22   A. Correct.
23   Q. I think you said you were employed by the
24 GBI in July of 2001?
25   A. Yes.

Page 15

1   Q. So --
2   A. From July 2001 to 2002, I was the forensic
3 pathology fellow. I did my fellowship here. And
4 then I was employed as an associate medical examiner.
5 So I've been at the GBI since July 2001.
6   Q. Understand. You actually attended Columbus
7 State University for a master's in public
8 administration; is that right?
9   A. That's correct.
10   Q. Did you do that in person or online?
11   A. It was in person.
12   Q. So you're quite familiar with Columbus or
13 somewhat --
14   A. Well, somewhat. It was a program that they
15 offered for employees at the GBI. So we had
16 occasions where we would go down there for a week and
17 do a whole course in a week. So I wasn't there as a
18 student on a --
19   Q. Not on a regular basis?
20   A. Correct, yeah. For the weeks that I was
21 there, I was familiar with only going from the hotel
22 to the school.
23   Q. So you went to the Medical College of
24 Wisconsin. Are you from Wisconsin originally?
25   A. Yes, sir. I'm from Milwaukee, Wisconsin.

Page 16

1   Q. And you got your B.S. in electrical
2 engineering in December of 1985, correct?
3   A. Correct.
4   Q. That's a pretty big change to go from being
5 an engineer to graduate school and molecular biology
6 and then into being a doctor.
7   A. Well, I wasn't an engineer. That's just
8 the major that I selected. I was always premed and
9 undergraduate.
10   Q. I guess that's the equivalent having to me
11 having an economics degree, which doesn't mean a lot.
12       Civil Air Patrol, tell me about that.
13   A. The Civil Air Patrol is responsible for
14 search-and-rescue missions throughout the state
15 primarily.
16   Q. Do you fly?
17   A. I have a private pilot's license. It
18 hasn't been active in a few years, so. But, yes, I
19 do have a private pilot's license.
20   Q. That was interesting.
21       MR. CLARK: Back in the day, that was our
22 protection, Civil Air Patrol.
23       THE WITNESS: Yes.
24       MR. CLARK: My grandfather was in it in
25 World War II.

Page 17

1 BY MR. POST:
2   Q. Has a Court ever declined to qualify you as
3 an expert in forensic pathology?
4   A. No, sir.
5   Q. To your knowledge, has your testimony ever
6 been restricted by a court by virtue of a Daubert
7 motion or a similar motion?
8   A. I think I'm only aware that I've been
9 restricted only to testify as it relates to forensic
10 pathology and/or pediatric pathology.
11   Q. Did you bring with you a list of your
12 depositions or trials?
13   A. No, I did not.
14   Q. Well, let me just ask you this: In the
15 course of the trials and depositions that you have
16 experienced in your career, did any of them involve
17 deaths of suspects that were detained or in the
18 custody of law enforcement?
19   A. No, sir. I did not see that in my records,
20 which -- and that's what I -- I understood that to
21 mean that I should bring anything that related to
22 *billed trials. That's why I don't have a copy
23 today. And I didn't see any record that I testified
24 in such cases in the past.
25   Q. Okay. And I was going to go through that

Veritext Legal Solutions
800.808.4958                                                 770.343.9696

Lora Darrisaw , M.D.                                     June 30, 2020
Arreola, Rodrigo Vs. The Consolidated Government Of Columbus, Georgia

---

Page 18

1 list in Exhibit A in a few minutes, so we'll do that,
2 and I'll circle back around to that.
3    A.  Okay.  Sure.
4       MR. CLARK:  Is it Exhibit A or Exhibit 1?
5       MR. POST:  A.
6       MR. CLARK:  Exhibit A?  I didn't see what
7 you premarked.  What do you have an A and B
8 premarked?  I'm sorry.  I don't mean to interrupt,
9 but I'm a little confused on --
10      MR. POST:  Exhibit 1 and 2 are plaintiffs'
11 exhibits.  When I'm talking about Exhibit A, it's
12 what was attached to the notice of deposition and
13 also attached to the subpoena.
14      MR. CLARK:  Okay.  So it's Exhibit A to
15 1 -- to Exhibit 1 and 2.
16      MR. POST:  That's correct.  Exactly.
17      MR. CLARK:  Sorry.
18      MR. POST:  And I'll have a copy for you.
19      MR. CLARK:  Yeah, no problem.  I didn't
20 mean to interrupt.  I just wasn't following.
21      MR. POST:  I'll come back to it and give
22 you a copy in a minute, Jimmy.
23 BY MR. POST:
24    Q.  Are you familiar with the syndrome known as
25 excited delirium, Doctor?

---

Page 19

1    A.  I'm familiar with that terminology.  Yes, I
2 am.
3    Q.  Okay.  And can you tell us what the
4 symptoms and behaviors associated with excited
5 delirium are, at least?
6    A.  Well, I will say I'm not an expert on it.
7 I'm familiar with the fact that it's a state of
8 hyperactivity.  Oftentimes when someone is under the
9 influence of drugs, certain types of drugs, they
10 oftentimes have elevated temperature, elevated blood
11 pressure, elevated heart rate.  But I'm not an expert
12 in excited delirium.
13      MR. CLARK:  So just for the record, I'll
14 object to the question and the responsiveness.  She's
15 stating she's not an expert in that field.
16 BY MR. POST:
17    Q.  Well, Doctor, let me ask you this -- and
18 I'm not asking you to be an expert in the field of
19 excited delirium.  I'm asking you as an expert
20 forensic pathologist.  If you encountered excited
21 delirium and found that to be a cause -- you could
22 find that to be a cause of death in a situation; is
23 that true?
24    A.  That's correct.
25    Q.  And you know enough about it to be able to

---

Page 20

1 say whether that was a cause of death or not; is that
2 correct?
3       MR. CLARK:  Let me object to the form as
4 leading.
5       MR. POST:  This is cross-examination.  So
6 I'm entitled --
7       MR. CLARK:  It's not your witness.  I don't
8 any you're entitled to lead.
9       MR. POST:  I think it's your witness, but
10 in any event --
11      MR. CLARK:  You noticed the deposition.
12 It's my witness?
13      MR. POST:  Well, she's associated --
14      MR. CLARK:  I object to the form
15      MR. POST:  She's associated with you under
16 Rule 611.  So believe I'm entitled to lead.  In any
17 event, objection --
18      MR. CLARK:  How is she associated with me?
19      MR. POST:  The objection is noted.
20      MR. CLARK:  I represent the CCG and some
21 Columbus Police Department officers.
22      MR. POST:  Well, we can fight about that
23 later.
24 BY MR. POST:
25    Q.  If you would answer the question, Doc.

---

Page 21

1    A.  Yeah, as much as I would keep my answer,
2 the answer that I provided.
3    Q.  Some of the behaviors that we've been told
4 are associated with excited delirium include bipolar
5 disorder, schizophrenia, chronic use of cocaine,
6 methamphetamine, alcohol, or adverse reactions to
7 medications and head trauma.  Would that be
8 consistent with your understanding of behaviors
9 associated with excited delirium?
10      MR. CLARK:  Object to form.
11      THE WITNESS:  Yes, sir.
12 BY MR. POST:
13    Q.  In some of the symptoms of excited delirium
14 that we have -- that have been described to us in
15 some of the depositions and some of the materials we
16 have associated with this case are superhuman
17 strength; imperviousness to pain; hyperthermia -- and
18 just to be clear, hyperthermia -- sweating;
19 aggressive, bizarre, or violent behavior; paranoia;
20 hyperactivity; sometimes hallucinations; confusion;
21 disorientation, and that sort of thing.  Is that
22 consistent with your understanding of excited
23 delirium as well?
24    A.  I am familiar with those activities being
25 associated with excited delirium, yes, I am.

---

6 (Pages 18 - 21)

Lora Darrisaw , M.D.                                    June 30, 2020
Arreola, Rodrigo Vs. The Consolidated Government Of Columbus, Georgia

Page 22

1    Q. And can you tell us what positional or
2  compressional affixation is?
3    A. Positional asphyxia is something where you
4  are unable to gain enough oxygen when you're in a
5  certain position. That's the basic definition of it.
6  It means it's asphyxia as the general underlying
7  abnormality. That means that you can't get enough
8  oxygen to your brain. And position just means you're
9  in some position that impedes your ability to get
10 oxygen to your brain.
11   Q. Okay. And what does compressional
12 afixiation?
13   A. They can somewhat be used interchangeably
14 sometimes but more specifically the compression means
15 that you're being compressed. So you may not be in a
16 specific position, but if someone sits on your chest,
17 for instance, they're compressing your ability to
18 breathe.
19   Q. And is that dangerous?
20   MR. CLARK: Object to form.
21   THE WITNESS: If your breathing is
22 impaired, well, yes. It's a risk factor for death
23 for sure.
24 BY MR. POST:
25   Q. Are you familiar with sudden in-custody

Page 23

1  deaths due to restraint or other factors?
2    A. Yes.
3    Q. What are some of the symptoms that you
4  would watch for to be on alert that that could occur?
5    MR. CLARK: Object to form. When you say
6  "you," are you asking her what she looks for to be
7  alerted as to, or are you -- object to the form of
8  the question.
9    MR. POST: What one would look for.
10   MR. CLARK: Object to the form of that
11 question. Who is "one"?
12   MR. POST: Any --
13   THE WITNESS: I don't know the answer to
14 that.
15 BY MR. POST:
16   Q. What materials have you reviewed to prepare
17 for this deposition?
18   A. I reviewed my autopsy report. I reviewed
19 our initial record of the medical examiner, which is
20 called a ROAM. And then I have a document of several
21 other things that I reviewed which were provided by
22 you and your office. That included a 911 transcript,
23 Piedmont Columbus Regional medical records,
24 St. Francis Hospital medical records, Office of
25 Professional Standard Interviews of Alan Tarvin,

Page 24

1  Chris Moreland, Officer Aguilar, Officer Dudley,
2  Officer -- I believe his name is pronounced Evrard,
3  E-v-r-a-r-d, Officer Oaks, and Mr. Raymond Tarvin.
4       I reviewed Office of Professional Standards
5  investigative summary, Dr. Sperry's opinion letter, a
6  document that is -- was titled Plaintiffs' Statement
7  of Facts and Response to Defendants' Statement of
8  Disputed Facts. And body cam videos of Officer
9  Evrard, Officer Aguilar, and Officer Dudley. And
10 those are all provided to me by you.
11   Q. Okay. And, obviously -- well, I have
12 marked Plaintiffs' Exhibit 1, which is an amended
13 notice of taking deposition duces tecum of Dr. Lora
14 Darrisaw. I'm going to hand that to you, and I'm
15 going to give a copy of to -- well, let me do it this
16 way -- and also Plaintiffs' Exhibit 2 which is the
17 subpoena to produce document and information which
18 has the same Exhibit A attached to it as is attached
19 to the notice here as a notice of deposition. You
20 received both of those; is that correct, Doctor?
21   A. That's correct.
22   Q. And you brought some things with you,
23 obviously, for the deposition today. You brought us
24 your curriculum vitae, which is Exhibit -- or No. 2
25 on Exhibit A. Did you bring the autopsy photos with

Page 25

1  you?
2    A. The packet of things that I brought with me
3  today were supplied to me by the medical examiner's
4  office. I have a disc here from Open Records, and
5  it's my assumption that the autopsy photos are on
6  here. But I am not 100 percent sure.
7    Q. We'll take a look at that shortly.
8    A. Okay.
9    Q. And you said you brought the report of the
10 medical examiner, correct?
11   A. Correct.
12   MR. CLARK: Do we have -- let's go off the
13 record for a second.
14       (A recess was taken from 10:28 a.m.
15 to 10:51 a.m.)
16 BY MR. POST:
17   Q. Dr. Darrisaw, thank you for making those
18 copies. We were going through Exhibit A when we
19 stopped to make copies. And we discovered while you
20 were making the copies that none of us has a DVD or
21 CD player on our laptops. So we're going to assume
22 the autopsy photos are on that disc. I'll take it
23 with me and find out and then send a copy to --
24   MR. CLARK: Is that her only disc?
25   THE WITNESS: That was the disc prepared --

7 (Pages 22 - 25)

Lora Darrisaw , M.D.                                    June 30, 2020
Arreola, Rodrigo Vs. The Consolidated Government Of Columbus, Georgia

Page 26

1 the whole packet of information was prepared per
2 Exhibit A for me to bring with me to the deposition.
3     MR. POST: It was a response to my
4 subpoena.
5     THE WITNESS: Yeah, it was a response. It
6 was never indicated we should bring multiple copies
7 but, yes --
8     MR. CLARK: Could we -- could you make
9 copies for us if that CD goes with you?
10     THE COURT REPORTER: Production can, yeah.
11     MR. POST: Let's go off the record.
12     (Off-the-record discussion.)
13 BY MR. POST:
14     Q. So we have a number of things that you
15 brought with you today. Obviously, one of them is
16 the report of the medical examiner, correct?
17     A. Correct.
18     Q. I'm going to mark that -- I think we're on
19 Exhibit 4.
20     MR. POST: Let's go off the record.)
21     (Off-the-record discussion.)
22     (Plaintiffs' Exhibit 4 and Exhibit 5 was
23 marked for identification.)
24 BY MR. POST:
25     Q. Dr. Darrisaw, we were going through what

Page 27

1 you brought to this deposition. I'm going to show
2 you what's been marked as Plaintiffs' Exhibit No. 4,
3 which is entitled with a GBI case number and states
4 "Record of Medical Examiner." Can you tell us what
5 that is, please?
6     A. The record of medical examiner begins with
7 the narrative that's prepared by the investigator
8 that is initially informed of the death of an
9 individual. And they have a narrative of the
10 circumstances and information as provided by the
11 coroner of the county.
12     And then this is considered a fluid
13 document because it has things and information
14 provided as it relates to the case that is added to
15 the Record of the Medical Examiner.
16     Q. Okay. And when you say the investigator
17 collects that information, you mean it's a GBI
18 investigator that collects --
19     A. The medical examiner's office death
20 investigator specialist.
21     Q. Okay. And essentially what they do is they
22 call the coroner and get a report about what the
23 coroner knows happened.
24     A. The coroner calls. The coroner calls in
25 the death. A death investigator specialist in our

Page 28

1 medical examiner's office takes that call, gets the
2 information about the death. And that is the initial
3 narrative in this document. And as I say, as things
4 happen, maybe a relative calls and someone asks for
5 information, that is going to be added. It's
6 considered a fluid working document.
7     For instance, I had a phone call with you
8 yesterday or Sunday. And that, I added.
9     Q. Right.
10     A. So that may not be in this particular copy,
11 but that -- the Record of the Medical Examiner stays
12 as a fluid document.
13     Q. Understood. And that Record of the Medical
14 Examiner, Plaintiffs' Exhibit No. 4, is the document
15 that you would have had access to and the information
16 you would have had access to on January the 11th of
17 2017, when you performed the autopsy?
18     A. Yes, sir. Well, at least this initial
19 summary. Obviously, not added stuff.
20     Q. Right. That's all you would have had
21 access to at that time other than --
22     A. At that particular time, yes, sir.
23     Q. Thank you. And Plaintiffs' Exhibit No. 5
24 is the list of materials that you've already went
25 over with us that you reviewed for this deposition,

Page 29

1 which was received from me?
2     A. I should say with the exception of the
3 investigative summary. I received that from my
4 office.
5     MR. CLARK: Does your file reflect a
6 date --
7     THE WITNESS: That I received those?
8     MR. CLARK: -- for these materials on
9 Exhibit 5?
10     THE WITNESS: I don't understand.
11     MR. CLARK: And I'm sorry I'm jumping in.
12 But I know you got a list of things that were
13 received -- this Exhibit 5 were things that were
14 received from Mark Post's office, the way I
15 understand it. And I'm just curious does your file
16 reflect when these items, 1 through 10, were
17 received.
18     THE WITNESS: No, sir. I received an
19 e-mail with a link to a Dropbox. And, no, I do not
20 have -- I did not print that e-mail, no.
21     MR. CLARK: Okay.
22     (Plaintiffs' Exhibit 6 was marked for
23 identification.)
24 BY MR. POST:
25     Q. All right. Plaintiffs' Exhibit 6, can you

8 (Pages 26 - 29)

Lora Darrisaw , M.D.                                          June 30, 2020
Arreola, Rodrigo Vs. The Consolidated Government Of Columbus, Georgia

Page 30

1  tell us what that is, please, ma'am?
2     A. This is a copy of my initial official
3  autopsy report that is dated 3/22/2017.
4     Q. And Plaintiffs' Exhibit 6 is a seven-page
5  document, and it contains a Department of Forensic
6  Services Case No. 2017-1000874. That's three zeros
7  in there; is that correct?
8     A. Correct.
9        (Plaintiffs' Exhibit 7 was marked for
10 identification.)
11 BY MR. POST:
12    Q. I'm showing you what's been marked as
13 Plaintiffs' Exhibit 7. Could you tell us what that
14 is?
15    A. This is stapled together just because I
16 stapled them together. But on Page 1 of this is the
17 official what's considered peer review document that
18 was prepared by Dr. Eisenstat. He peer-reviewed this
19 initial autopsy, and that's his official report of
20 that.
21       Page 2 of this is an e-mail sent to
22 Brittany Roberts from Tyler Cashbaugh. And then the
23 remainder of this packet is the Office of
24 Professional Standards Investigative Summary that I
25 reviewed.

Page 31

1     Q. And that's actually No. 4 on the list of
2  Plaintiffs' Exhibit 4, correct?
3     A. Correct, yes.
4     Q. And that was received from the defense
5  lawyer, Tyler Cashbaugh via e-mail; is that right?
6     A. Yes.
7        (Plaintiffs' Exhibit 8 was marked for
8  identification.)
9  BY MR. POST:
10    Q. And I'm showing you what's been marked as
11 Plaintiffs' Exhibit 8 that you brought for us. What
12 is that?
13    A. This is a Division of Forensic Sciences
14 official report of -- the requested service listed
15 here is glass.
16    Q. And that's fine. That's good enough.
17       (Plaintiffs' Exhibit 9 was marked for
18 identification.)
19 BY MR. POST:
20    Q. And Plaintiffs' Exhibit 9, can you identify
21 that for us?
22    A. This is the official report of the Division
23 of Forensic Science's service for postmortem blood
24 alcohol.
25       (Plaintiffs' Exhibit 10 was marked for

Page 32

1  identification.)
2  BY MR. POST:
3     Q. And Plaintiffs' Exhibit 10?
4     A. This is the official report of the
5  postmortem toxicology service.
6        (Plaintiffs' Exhibit 11 was marked for
7  identification.)
8  BY MR. POST:
9     Q. And Plaintiffs' Exhibit No. 11?
10    A. This is a draft copy of the amended autopsy
11 report.
12    Q. Okay. I'm going to talk to you about that
13 later in the deposition. But when will the draft
14 turn into an official report?
15    A. Our administrative assistant of this office
16 has requested that it be peer-reviewed today as the
17 draft was completed yesterday. So the peer review is
18 being requested to be done today, and she indicated
19 that she could get an e-mail and e-mail you guys a
20 copy of the final, if you'd like
21    Q. That would be great. That was going to be
22 my next question. You anticipated it. Thank you.
23       Did you review any of the use-of-force
24 expert reports in this case?
25    A. Not that I'm aware of. I don't know what

Page 33

1  those are.
2     Q. Do you hold yourself out as a use-of-force
3  expert, that is, an expert in the -- in proper police
4  practices and techniques?
5     A. No, I am not.
6     Q. So it would be outside of your area of
7  expertise to suggest or give an opinion whether
8  police officers' use of force was proper or improper;
9  is that right?
10    A. That's correct.
11    Q. Did you review any of the expert reports in
12 this case, specifically the report by Dr. Tom Newman?
13    A. No, sir, I did not.
14    Q. And indicated earlier, I think, that you
15 did review the report by Dr. Kris Sperry; is that
16 right?
17    A. That's correct.
18    Q. You and Dr. Sperry were colleagues at one
19 time; is that correct?
20    A. Correct.
21    Q. Worked in the same office here at the GBI
22 in the medical examiner's office; is that right?
23    A. That's correct.
24    Q. At the time, you knew Dr. Sperry to be an
25 expert in the field of forensic pathology; is that

9 (Pages 30 - 33)

Lora Darrisaw , M.D.                                    June 30, 2020
Arreola, Rodrigo Vs. The Consolidated Government Of Columbus, Georgia

Page 34

1  right?
2      A.  Correct.
3      Q.  Did anybody share Dr. Sperry's deposition
4  transcript or a draft of his deposition transcript
5  with you?
6      A.  No, sir.
7      Q.  Have you received any income or other
8  compensation by anyone other than the GBI for your
9  testimony today or assistance in this case?
10     A.  No, sir.
11     Q.  And we actually have a fee schedule -- or
12  the GBI actually has a fee schedule for --
13     MR. POST:  Let me mark this as 12.
14     (Plaintiffs' Exhibit 12 was marked for
15  identification.)
16  BY MR. POST:
17     Q.  A fee schedule which sets out the costs per
18  hour for a depositions which lawyers would have to
19  pay the GBI; is that right?
20     A.  That's correct.
21     Q.  And that is Plaintiffs' Exhibit 12.  Is
22  that the fee schedule that is applicable to you?
23     A.  As far as I know, yes.  It's the GBI fee
24  schedule, correct?
25     Q.  They don't give you any of that money, do

Page 35

1  they?
2      A.  Correct.  No, they do not.
3      Q.  Unfortunately, right, Doc?
4      A.  It benefits the medical examiner's office,
5  so.
6      Q.  Especially in this era of budget cuts that
7  are coming, right?
8      A.  Correct.
9      Q.  And you said you had reviewed the medical
10  records provided to you in this case, that being from
11  Midtown Medical Center and St. Francis Hospital
12  records; is that right?
13     A.  I don't recall Midtown.  I thought it was
14  Piedmont.
15     Q.  Piedmont.  Excuse me.  They've changed the
16  name.
17     A.  Piedmont.  I recall Piedmont and
18  St. Francis.
19     Q.  Obviously, you performed an autopsy on
20  Hector Rodrigo Arreola in this case; is that right?
21     A.  Yes.
22     Q.  When did you do that?
23     A.  The autopsy was performed on Wednesday,
24  January 11th, 2017.
25     Q.  And I'm giving you Plaintiffs' Exhibit 6,

Page 36

1  which I believe you identified earlier as your report
2  from the autopsy performed on Hector Arreola; is that
3  right?
4      A.  That's correct.
5      Q.  Does that autopsy report in Plaintiffs'
6  Exhibit's 6 completely and truly document the
7  observations that you made during the autopsy of
8  Hector Arreola?
9      A.  Yes, sir.
10     Q.  And I understand, of course, that you
11  prepared an amended report, which is Plaintiffs'
12  Exhibit 11.  Can you tell us what the difference is
13  in those two reports?
14     A.  Yes, sir.  The differences in the two
15  reports are reflected on Page 6 and Page 7.  They're
16  amendments to the cause of death and manner of death.
17  And as those being amended, those particular changes
18  in the amendment are reflected in the opinion summary
19  section as well.
20     Q.  And that's the only -- those are the only
21  changes from the draft report from the original
22  report; is that correct?
23     A.  That's correct.
24     Q.  So the cause of death in the amended report
25  is listed as sudden cardiac death following struggle

Page 37

1  with the law enforcement including prone position
2  restraint complicated acute methanphetimine toxicity,
3  correct?
4      A.  Correct.
5      Q.  And that was amended from methamphetamine
6  toxicity; is that right?
7      A.  That's correct.
8      Q.  And the manner of death is now listed as
9  homicide, correct?
10     A.  Correct.
11     Q.  And that was amended from accident, true?
12     A.  Correct.  And those changes are reflected
13  in the last sentence or maybe two sentences of the
14  opinion summary.
15     Q.  Who first contacted you to let you know
16  that a deposition was anticipated in this case?
17     A.  For me individually, it would have been the
18  office, likely an e-mail from Brittany Roberts, who
19  is our administrative assistant.
20     Q.  In response to Mr. Cashbaugh's e-mail and
21  contact; is that right?
22     A.  Apparently so, yes, sir.
23     Q.  Have you had an opportunity to speak with
24  any of the defense lawyers about the autopsy of
25  Hector Arreola?

10 (Pages 34 - 37)

Lora Darrisaw , M.D.                    June 30, 2020
Arreola, Rodrigo Vs. The Consolidated Government Of Columbus, Georgia

Page 38

1    A. Yes, sir.
2    Q. When did that happen, and who did you speak
3  with?
4    A. I spoke with Mr. Tyler Cashbaugh and --
5    MR. CLARK: Mr. Clark.
6    THE WITNESS: I'm sorry, Mr. Clark.
7    MR. CLARK: That's okay.
8    THE WITNESS: And one other person from
9  your office.
10   MR. CLARK: Mr. Snipes, probably.
11   THE WITNESS: Mr. Snipes.
12 BY MR. POST:
13   Q. And did you discuss with him your findings?
14   A. Correct. Yes, I did.
15   Q. Were those discussions before you talked to
16 me the first time?
17   A. Before I talked to you the first time, yes,
18 sir.
19   Q. Have you talked with those lawyers since?
20   A. Yes, I have.
21   Q. So you've had an opportunity to speak with
22 the defense lawyers more than once, true?
23   A. Correct.
24   Q. Have you spoken with the defense lawyers
25 since you had an opportunity to review the documents

Page 39

1  that I sent to you and the materials I sent to you?
2    A. Yes, I informed them of the amendment to
3  the cause and manner of death.
4    Q. And did you let them know about the
5  materials that I sent to you?
6    A. Yes. I don't know if I gave them each
7  individual as listed. But, yes, I did inform them I
8  received a lot of material that I reviewed, and that
9  that was the basis --
10   Q. Did they send you anything other than what
11 you've already shown us?
12   A. No, sir.
13   Q. Now, I'm going to talk to you a little bit
14 about the autopsy itself.
15   MR. POST: Go off the record for a minute.
16   (Off-the-record discussion.)
17 BY MR. POST:
18   Q. Looking at the first page of your original
19 report, autopsy report --
20   MR. CLARK: Sorry. This is Exhibit 6, just
21 so I'm clear?
22   MR. POST: Yes.
23   MR. CLARK: Thanks.
24 BY MR. POST:
25   Q. You captioned it throughout. And on the

Page 40

1  first page, one of the captions is "Evidence of
2  diagnostic and therapeutic intervention," correct?
3    A. That's correct.
4    Q. And, essentially, that's self-explanatory .
5  That is what you have listed as evidence of hospital
6  or other medical personnel involvement with Hector
7  Arreola; is that fair to say?
8    A. That's correct.
9    Q. For instance, on Page 2, it says "An
10 intravascular catheter is in the left antecubital
11 fossa secured with adhesive tape," right?
12   A. Correct.
13   MR. POST: Antecubital fossa,
14 a-n-t-e-c-u-b-i-t-a-l, for the court reporter,
15 f-o-s-s-a.
16 BY MR. POST:
17   Q. It essentially means the anterior elbow; is
18 that correct?
19   A. Correct.
20   Q. And I want to talk about the evidence of
21 injury that you noted, specifically No. 20 and 21,
22 Nos. 20 and 21.  And what does No. 20, or what did
23 the number 20 on the evidence tell you, which says
24 "Obviously, the left lateral back has a
25 5x2.6-centimeter dark, purple mark within an area of

Page 41

1  lividity.
2    MR. CLARK: Object to the form.  What does
3  it tell her?
4  BY MR. POST:
5    Q. What does it mean?
6    A. It's a description of a mark of that
7  particular size that I saw on the back in an area
8  lividity -- lividity is a region where blood settles
9  in the *depending portions of the back.  So the back
10 shows lividity, and there was a dark, purple mark
11 there.  These are essentially objective findings that
12 are listed.
13   Q. And the same with the -- with No. 21, the
14 central lower back; is that correct?
15   A. Correct.  There was a 2x2-centimeter
16 irregular purple mark also within an area of
17 lividity.
18   Q. Those would have essentially been
19 contusions or bruises in life; is that right?
20   A. I don't know.  I've listed things that I'm
21 pretty confident were contusions by me looking at
22 them as contusions in my report.  If I'm not
23 confident that it's actually a contusion, I list it
24 as a mark.
25   Q. And under that, No. 6, "Maximally

11 (Pages 38 - 41)

Lora Darrisaw , M.D.                          June 30, 2020
Arreola, Rodrigo Vs. The Consolidated Government Of Columbus, Georgia

Page 42

1  2.5 centimeters midline lower back," what does that
2  refer to?
3      A.  This is a list, 1 through 6, of areas of
4  hemorrhage or bleeding that were in the subcutaneous
5  tissues of the back.  So I made incisions in the
6  back.  I reflected the skin to look for any bleeding
7  underneath the skin surface, and No. 6 was an area in
8  the midline lower back.
9      Q.  So what does "subcutaneous hemorrhage"
10  mean?
11      A.  Bleeding in the superficial layers of the
12  skin, so just underneath the skin, if you make a cut
13  in the skin, the fatty tissue of the skin itself.
14      Q.  And photographs of what you saw would have
15  been taken, correct?
16      A.  That's correct.
17      Q.  And as I have referred to earlier, those
18  would be what would commonly be referred to as
19  autopsy photos, correct?
20      A.  That's correct.
21      Q.  And that's your practice that you do in
22  every autopsy that you perform, correct?
23      A.  Yes, sir.
24      Q.  Just under the subcutaneous hemorrhages
25  listed, there's a sentence that says "The incised

Page 43

1  reflected skin of the scalp reveals a 4-and-a-half by
2  4 centimeter region of hemorrhage involving the left
3  frontal region underlying the previously described
4  laceration."  And then just after that sentence, it
5  says "A 3.0 by 2.7 centimeter subscapular hemorrhage
6  involving the left lateral frontal scalp."
7      Are those two separate injuries?
8      A.  They were at least separated by their
9  actual position on the body.  They're both on the
10  left lateral frontal side, and they could be related
11  to the laceration but they are separate in space.  So
12  they're listed as separately.
13      Q.  So one of these says the skin of the
14  scalp -- "reflective skin of the scalp reveals a
15  hemorrhage."  And the other one says "There was a
16  subscapular hemorrhage involving the left lateral
17  frontal scalp?
18      A.  They're both subscapular.  They're both --
19  one is the skin -- the incision is made and the skin
20  is reflected.  So I'm looking at the undersurface of
21  the skin.
22      Q.  On both of them?
23      A.  Yes.  One is directly underneath the
24  laceration that is described, and the other one is in
25  the same region of the left frontal scalp.  But

Page 44

1  they're separate.  And there's not a indication here
2  of how far separate they are.  But they are in the
3  same area of the body, the left frontal region.
4      Q.  That's where the autopsy photos would be
5  helpful to both of us because I'm trying to determine
6  whether the -- one injury is connected to the last
7  ration above the left eye.
8      A.  Yes, one is specifically indicated as such.
9      Q.  One is, but not the second one, right?
10      A.  Correct.
11      Q.  Since you didn't specifically indicate the
12  second one being involved with that laceration --
13  then it would not --
14      A.  It's not directly under it, but it's in the
15  left frontal scalp.  And the left frontal scalp
16  involves just that left frontal scalp region.
17      Q.  And the reason I'm getting at that is
18  because, as you read the St. Francis records all the
19  way back to 2007, there was a car wreck.  You saw
20  that, correct?
21      A.  I don't recall specifically.  I don't know
22  if I focused on every detail in those.
23      Q.  Because there was a piece of glass that
24  came out of Hector Arreola's -- from that laceration,
25  correct?

Page 45

1      A.  I don't recall that.  That was not my
2  focus.
3      Q.  Well, you didn't notice that it was
4  reflected in the medical records from Piedmont?
5      A.  I don't recall that.  I didn't focus on
6  that.
7      Q.  External examination, you noted that Hector
8  Arreola's teeth were in good repair, correct?
9      A.  Correct.
10      Q.  That would tend to indicate that Hector
11  Arreola was not a long-term methamphetamine addict;
12  is that true?
13          MR. CLARK:  Object to the form.
14          THE WITNESS:  I don't have an answer for
15  that.  I don't know.
16  BY MR. POST:
17      Q.  Well, you've performed autopsies on people
18  that were obvious methamphetamine addicts, correct?
19      A.  I performed autopsies on people where
20  methamphetamine has been positive, yes.
21      Q.  And you've seen their teeth in substantial
22  disrepair, I would presume quite frequently; is that
23  true?
24          MR. CLARK:  Object to form.
25          THE WITNESS:  I would not say all of them.

12 (Pages 42 - 45)

Lora Darrisaw , M.D.                                    June 30, 2020
Arreola, Rodrigo Vs. The Consolidated Government Of Columbus, Georgia

Page 46

1  I've seen a whole spectrum of conditions of the teeth
2  in methanphetamine.
3      Q.  One of the indicators of methamphetamine
4  abuse is teeth in disrepair; is that true?
5      MR. CLARK:  Object to form.
6      THE WITNESS:  Yes.  I've certainly seen and
7  I'm aware of teeth being in poor condition with
8  methamphetamine.
9  BY MR. POST:
10     Q.  Flip over to Page 4, if you would.
11     A.  (Witness complies.)
12     Q.  And look under the heading of
13  "Extremities."  Did you find any evidence of
14  intravenous drug use?
15     A.  I didn't identify any marks or scars on the
16  extremities that were indicative of such, no.
17     Q.  And with regard to the cardiovascular
18  system, did you find any evidence of heart disease?
19     A.  No, sir, I did not.
20     Q.  Did you find any evidence abnormalities of
21  the heart?
22     A.  No, sir.
23     Q.  Was the heart enlarged?
24     A.  No, sir.
25     Q.  What did you see when you looked at the

Page 47

1  respiratory system?
2      A.  I identified an area of hemorrhage on the
3  left medial upper lung lobe that I measured by 4 by
4  2 centimeters.
5      Q.  Why did you note that?
6      A.  It's an autopsy finding.  That's what the
7  autopsy -- the purpose of the autopsy is to identify,
8  document findings, list all objective findings.
9      Q.  Why is that important?
10     A.  Why is what important?  To list objective
11  findings or that particular --
12     Q.  Right, that particular finding.
13     MR. CLARK:  Object to form.  She said she'd
14  list findings.  She --
15     THE WITNESS:  I don't know if I noted any
16  significance importance to it.  Part of the autopsy
17  is to list the findings.  This was a finding on the
18  lung, and it's listed as such.
19  BY MR. POST:
20     Q.  What would cause such an injury?
21     MR. CLARK:  Object to form.
22     THE WITNESS:  I didn't particularly list it
23  as an injury.  I did summarize the findings on Page 6
24  as isolated left upper lung pleural hemorrhage.
25  BY MR. POST:

Page 48

1      Q.  We'll come back to that.
2      MR. CLARK:  You said Page 6?
3      THE WITNESS:  Yes, sir, Page 6, summary of
4  findings, Roman numeral 7 --
5      MR. CLARK:  Got it.
6      THE WITNESS:  -- that finding has been
7  summarized as an isolated left upper lung pleural
8  hemorrhage.
9  BY MR. POST:
10     Q.  And still -- well, at the very top of the
11  Page 6, you made some notations about the parenchyma?
12     A.  Parenchyma?
13     Q.  Thank you for correcting my pronunciation.
14     MR. POST:  And the spelling is
15  p-a-r-e-n-c-h-y-m-a, for the court reporter's
16  benefit.
17  BY MR. POST:
18     Q.  What does that mean?
19     A.  That's the substance of the brain itself,
20  and so it's just the brain.
21     Q.  What did you see?
22     A.  I noted that there was some moderate edema
23  and mild congestion of the brain.
24     Q.  What does that mean?
25     A.  The moderate edema is swelling, so the

Page 49

1  brain was moderately swollen.  And there's some mild
2  congestion, meaning the vessels have congestion of
3  blood.
4      Q.  Is that something that is expected to be
5  seen with brain death?
6      A.  Swelling of the brain is very nonspecific.
7  You can see it in a large variety of various types of
8  death.
9      Q.  Well, in this case, from reviewing the
10  medical records, you know that Hector Arreola was
11  diagnosed with brain death, correct?
12     A.  Yeah.  He was in the hospital for at least
13  a day and on a ventilator and a respirator.  So it's
14  not an unexpected finding that his brain would be
15  swollen.
16     Q.  Okay.  You listed a summary of findings in
17  this report.  And the first one was methamphetamine
18  toxicity, correct?
19     A.  That's correct.
20     Q.  What was the amount of methamphetamine
21  found in Hector Arreola's blood based on the
22  toxicology report you received?
23     A.  My autopsy refers to the separate report.
24  And if you want to me to specify the actual exhibit
25  number --

13 (Pages 46 - 49)

Lora Darrisaw , M.D.                    June 30, 2020
Arreola, Rodrigo Vs. The Consolidated Government Of Columbus, Georgia

Page 50

1     MR. CLARK: Yeah, let's do that.
2 BY MR. POST:
3     Q. It's Plaintiffs' Exhibit 10.
4     A. So my autopsy refers to the *toxicology as
5 Plaintiffs' Exhibit 10. The methamphetamine was
6 0.90 milligrams per liter.
7     Q. Both 0.9 millimeters per liter; is that
8 correct?
9     A. That was in the -- it should be the
10 hospital blood. Item No. 2, yes, the blood
11 identified as...
12     Q. Take your time, Doctor. I know it's there,
13 but it's hard to see. I've had the same difficulty.
14     A. All right. The toxicology report indicates
15 the 0.90 milligrams per liter of methamphetamine on
16 the specimen collected, that should be the
17 hospital-received blood. And then they have the
18 methamphetamine of 0.68 milligrams per liter from the
19 blood collected at the time of autopsy from the iliac
20 blood.
21     Q. So the blood that you collected had 0.68
22 milligrams per liter?
23     A. Yes. It's coming down after having been in
24 the hospital for a day and a half or a day or
25 whatever the time frame was.

Page 51

1     Q. And 0.9 milligrams per liter was collected
2 by the coroner and sent to you all; is that right?
3     A. No. That was from the hospital admission
4 blood. So we received blood from the hospital.
5     Q. They ship it to you directly, or do they
6 give it to coroner and he ships it?
7     A. I can't tell you how this was obtained.
8     Q. 0.9 milligrams per liter of methamphetamine
9 in the blood is not normally a toxic level to an
10 adult on its own; is that right?
11     A. I consider it to be so, yes, sir.
12     Q. So what is a safe level of methamphetamine
13 in the blood for an adult?
14     A. For illicit --
15     MR. CLARK: Object --
16     THE WITNESS: -- methamphetamine -- this
17 would be the illicit form of methamphetamine is
18 tested for, I don't consider a safe level.
19 Methamphetamine as an illicit drug is cardiotoxic and
20 at almost any level, it could potentially cause a
21 cardiac arrythemia.
22 BY MR. POST:
23     Q. So, essentially, there's no safe level of
24 methamphetamine in the blood; is that right?
25     A. Correct, yes. And illicit methamphetamine

Page 52

1 should not be in the blood. It's an illicit drug.
2     Q. Is there a level or a range of
3 methamphetamine which is absolutely not survivable?
4     A. I don't know the answer to that.
5     Q. Isn't methamphetamine used by thousands of
6 people in Georgia every year?
7     A. I don't have an answer to that.
8     Q. Well, the crime lab tests thousands of
9 samples of methamphetamine a year, don't they?
10     A. I don't know. I don't know. My particular
11 position in the crime lab is in the medical
12 examiner's office. I mean, I've signed off several
13 cases of methamphetamine toxicity, but I don't have
14 any knowledge of how much they test in the department
15 of forensic science.
16     Q. What I'm getting at is -- well, let me ask
17 you this way: Can you explain to me why we don't
18 have thousands of deaths from methamphetamine
19 toxicity every year?
20     A. No, I can't explain that to you.
21     MR. CLARK: Object to form.
22 BY MR. POST:
23     Q. A lot of people survive methamphetamine
24 use, true?
25     MR. CLARK: Object to form.

Page 53

1     THE WITNESS: I don't -- I would say
2 everyone that uses methamphetamine doesn't die. So
3 is that your question?
4 BY MR. POST:
5     Q. Yes.
6     A. Oh, okay. Yes.
7     Q. So some level of methamphetamine in the
8 blood is survivable for some people; is that fair to
9 say?
10     MR. CLARK: At some time or any time?
11     THE WITNESS: Apparently so.
12 BY MR. POST:
13     Q. How many deaths attributed solely to
14 methamphetamine use have you seen this year?
15     A. I don't have the answer to that.
16     Q. Do you remember any?
17     A. Yes.
18     Q. More than five?
19     A. I don't have the answer to that. I don't
20 have the answer to that. I don't have the data.
21     Q. You don't remember?
22     A. Correct, I don't remember. And I don't
23 remember if I've seen solely, but I've certainly have
24 seen methamphetamine use positive of death.
25     Q. In your experience, most of the time,

14 (Pages 50 - 53)

Lora Darrisaw , M.D.                                      June 30, 2020
Arreola, Rodrigo Vs. The Consolidated Government Of Columbus, Georgia

Page 54

1  methamphetamine use is a cause of death in
2  combination with other factors; is that true?
3      A.  No, sir.  I've seen methamphetamine as
4  isolated as a drug itself.  I've seen methamphetamine
5  with other drugs, other illicit drugs or other
6  prescription drugs.  And I've seen it with and
7  without underlying natural disease.  I've seen a
8  whole variety of cases of methamphetamine toxicity in
9  my career.
10     Q.  Now, I remember Dr. Sperry mentioning a
11 book by the name of the "Pathology of Drug Abuse" by
12 Dr. Steven Karch.  Are you familiar with that book?
13     A.  I'm familiar with it, yes.
14     Q.  Do you use it?
15     A.  Not often.
16     Q.  What is that book?
17     A.  It's as the title indicates.
18     Q.  What do you use it for?
19     A.  I don't use it very often.
20     Q.  What would it be used for?  I mean, what's
21 the subject matter of the book?  Explain it to me.
22     A.  The subject matter is drugs and their
23 toxicity in *men.
24     Q.  Is there another reference manual or book
25 that you use instead of that?

Page 55

1      A.  Yes.
2      Q.  What would you refer to?
3      A.  The author is Besalt B-e-s-a-l-t, I
4  believe.  And it's the disposition of -- The
5  Disposition of Toxic Drugs of Man or something to
6  that effect.  And it's used as -- you know, by
7  toxicologists and medical examiners as a reference
8  for drugs and their concentrations in the body under
9  conditions that may be therapeutic as it relates to
10 the prescription medications and toxic level as seen
11 in trace studies.
12     Q.  And that's prescription drugs only?
13     A.  No.  It's all -- it a whole list of drugs,
14 prescription, illicit.  It's considered -- it's
15 highly regarded as a standard reference for the
16 disposition of drugs, illicit drugs, prescription
17 drugs.  And I use that on a regular basis.  I don't
18 Karch on a regular basis.
19     Q.  What does it say about the 0.9 milligrams
20 per liter amount of methamphetamine in Hector
21 Arreola's blood?
22         MR. CLARK:  Object to form.
23         THE WITNESS:  Well, I can't quote you -- I
24 haven't looked at it recently, but that's
25 considered -- that is a high level of

Page 56

1  methamphetamine.
2      Q.  I guess what I'm asking is:  Does that
3  textbook or reference manual give a level that is not
4  considered a high level of methamphetamine?
5      A.  No.  That's not the way that the Besalt
6  text is.  It doesn't tell you.  It gives you
7  information.  It has a section on -- the first
8  section is just an introduction to the drug.  It list
9  what it is, what it's used for.  And then they have
10 an area of metabolism of the drug.
11         They'll talk about concentrations that are
12 typically seen after -- particularly as it relates to
13 prescription drugs.  If you take a 10-milligram
14 tablet, the expectation is this as seen in a certain
15 amount of people.  And then they list area of
16 toxicity as it relates to case studies.  In 30 cases,
17 this level was seen in people that were driving under
18 influence.
19         So that's what it is.  One has to look at
20 that and interpret that in light of your own case.
21 They don't just say, this is a toxic level.  One
22 interprets it based upon looking at, okay, this is
23 what's typically seen here.  This is the metabolism.
24 This is five people were under the influence.  So
25 it's something that you have to interpret as a doctor

Page 57

1  and in light of your own circumstances.  It's not
2  just here's a number and this means toxicity.
3      Q.  Okay.
4      A.  But in reference -- in looking at the
5  reference, not immediately for this case, it's
6  just -- I'm aware of that.  I've seen methamphetamine
7  a lot, and that's a high number.
8      Q.  And you would look to that reference or
9  that manual Besalt's reference manual in this case,
10 right?
11     A.  I likely would have.  I can't tell you
12 exactly if I did or did not because certain drugs I'm
13 quite aware of because I have a number of cases.
14         So for instance, we see so many fentanyl
15 cases that every time I get fentanyl and I see the
16 toxicology level, I don't have to go to that book and
17 look.  So certain drugs, I have a good understanding
18 of.
19     Q.  Because you already know what the book
20 says, right?
21     A.  Well, I wouldn't say I know what the books
22 says.  I know my experience and how many I've seen,
23 and I know levels of different ones I've seen.  So I
24 may have looked specifically on this case or I may
25 not.  I don't have an independent recollection of

15 (Pages 54 - 57)

Lora Darrisaw , M.D.                    June 30, 2020
Arreola, Rodrigo Vs. The Consolidated Government Of Columbus, Georgia

Page 58

1  what I did back in March 2017. But methamphetamine
2  is something -- a drug we see quite often in out
3  population here. So we see -- I see levels of
4  methamphetamine quite often.
5      Q. Okay. How did you originally conclude that
6  methamphetamine toxicity is what killed Hector
7  Arreola?
8      A. My original professional judgment that
9  methamphetamine toxicity was the cause of death was
10  based upon the toxicology analysis of the
11  0.9 milligrams per liter in hospital admission blood.
12  The circumstances surrounding the death included a
13  struggle with police officers.
14      But my -- I did not attribute the struggle
15  as contributory to his death at that point in time
16  because I felt that he had regained some level of
17  being, I will say okay, after the struggle. And that
18  was based upon whatever information I received at
19  that point in time -- at the time that I had
20  certified the death in March of 2017.
21      Q. Okay. So were you saying based on the
22  facts as you understood them for the original report
23  that even without the struggle with law enforcement,
24  Hector Arreola would have died?
25      A. Correct, yes. My cause of death was

Page 59

1  methamphetamine toxicity.
2      Q. But now you're saying that but for the
3  weight applied by the police before and after the
4  handcuffing of Hector Arreola, he would not have
5  suffered cardiopulmonary arrest on January of 2017;
6  is that right?
7      MR. CLARK: Let me object to form. That is
8  a gross mischaracterization of what her testimony
9  is --
10      MR. POST: Well, I'm entitled to ask the
11  question.
12      MR. CLARK: -- so I object to the form.
13  The only thing she told was the struggle, and then
14  you added a lot of information in that question --
15      MR. POST: I object to you --
16      MR. CLARK: -- so I object to the form of
17  it. I'm sure the doctor caught that, but.
18      MR. POST: Yeah. I'm entitled to ask my
19  question, and --
20      MR. CLARK: You're not entitle to
21  mischaracterize what this witness is saying.
22      MR. POST: I don't have to mischaracterize
23  anything. I can ask her a question, and she can
24  answer it.
25      MR. CLARK: And I can object to it.

Page 60

1  BY MR. POST:
2      Q. Doctor, what I asked you is: Are you
3  saying that -- now you're saying that but for the
4  weight that was applied to Hector Arreola by the
5  police before and after handcuffing in the case, but
6  for that, he would not have suffered cardiopulmonary
7  arrest on January 9th of 2017; is that correct?
8      MR. CLARK: Same objection. Again, you're
9  mischaracterizing what this witness has said.
10      THE WITNESS: No, that's not what I'm
11  saying, no.
12  BY MR. POST:
13      Q. I'm going to come back to that. I was to
14  ask you about -- you listed a summary of findings and
15  pathologic diagnoses on page 6, correct?
16      A. Correct.
17      Q. And what was does the fifth diagnosis --
18  the isolated contusion on the low back, what is that
19  diagnosis?
20      A. There was a contusion on the lower back.
21      Q. Well, when I think of a diagnosis, it's a
22  finding of some sort. How does that play into your
23  analysis in this case or your opinion in this case?
24      A. It's a summary of one of the findings that
25  I found, and I think we already talked about it as

Page 61

1  that would be the No. 6 on page 3, that there was
2  hemorrhage in the subcutaneous tissue of the lower
3  back. And so that is a description of a contusion,
4  and so he had a contusion on the lower back.
5      Q. Now, in your opinions and summary section,
6  you said that there were no other significant
7  anatomic abnormalities other than -- I think you said
8  something about his liver; is that right?
9      A. Yes, a fatty liver.
10      Q. And the fatty liver didn't have anything to
11  do with the cause of death in this case; is that fair
12  to say?
13      A. I didn't attribute it to being causative or
14  contributory to his death, no, sir.
15      Q. Okay. When you gave your original opinion
16  in this case regarding cause of death, had you seen
17  all the body cam video in this case that you've seen
18  now?
19      A. I don't have a recollection -- an
20  independent recollection of seeing that, no, sir.
21      Q. If you had seen it, do you believe that
22  your diagnosis or your findings in the case would
23  have been different at the time?
24      A. Yes, sir. Based upon everything that I
25  looked at up until today in preparation for

16 (Pages 58 - 61)

Lora Darrisaw , M.D.                          June 30, 2020
Arreola, Rodrigo Vs. The Consolidated Government Of Columbus, Georgia

Page 62

1 deposition, had I looked at all that in 2017, yes, my
2 cause and manner of death would have been as I've
3 amended it.
4    Q. And does your amended report, which I think
5 is No. 11, Plaintiffs' Exhibit 11 -- did I hand it to
6 you already?
7    A. No, sir. Maybe -- I'm sorry.
8    Q. You've got it?
9    A. Yes, I do.
10   Q. Makes me feel better that I couldn't find
11 it, then.
12      Plaintiffs' Exhibit No. 11 is your amended
13 autopsy report, correct?
14   A. Yes, sir.
15   Q. And does your amended autopsy report
16 completely and truly document you observations made
17 during the autopsy of Hector Arreola?
18   A. Yes, sir. There are no changes in the
19 observations of the autopsy.
20   Q. And now your amended report completely and
21 accurately reflects your expert opinions and
22 conclusions regarding Hector Arreola's cause of
23 death; is that right?
24   A. That's correct.
25   Q. We've already gone over the differences

Page 63

1 between the two reports. Hector Arreola did not die
2 solely due to methamphetamine toxicity, correct?
3      MR. CLARK: Object to form.
4      THE WITNESS: Correct.
5 BY MR. POST:
6    Q. What is the significance of the word
7 "sudden" in relation to cardiac death in your cause
8 of death?
9    A. The "sudden" reflects the acute nature of
10 his heart stopping. Based upon the material
11 reviewed, he was in an ambulance and then his
12 heart -- so he had a sudden cardiac arrest.
13   Q. And that's kind of what I was getting at.
14 Obviously, he died the following day. He was
15 pronounced dead the following day; is that right?
16   A. Correct. But the sudden nature of the
17 acute event in the ambulance kind of reflects the
18 "sudden." That's was -- outside of the fact that it
19 was a delayed death following that.
20   Q. And the "sudden" is related -- really
21 modifies the cardiac arrest; is that true?
22   A. Correct.
23   Q. You watched and listened to the videotapes
24 of the interactions of police officers Dudley,
25 Aguilar and Evrard with Hector Arreola; is that

Page 64

1 correct?
2    A. Correct. And I believe there were some
3 other videos, but I didn't focus on those. I focused
4 on those three.
5    Q. Okay. And you did that because that's what
6 forensic pathologists do; is that right?
7    A. Correct.
8    Q. And did you consider what happened to
9 Hector Arreola to determine the manner and cause of
10 his death?
11   A. Yes, I did.
12   Q. So you watched and listened to all the
13 videos -- relevant videos -- so that you would
14 know what Hector Arreola's body went through and how
15 it affected Hector Arreola; is that right?
16   A. Correct.
17   Q. What parts of the struggle with the police
18 officers were significant to you?
19   A. I don't understand the question in terms
20 what parts. I mean, I focused on the events that
21 happened surrounding his death, and there was a
22 struggle and the events after the struggle and the
23 condition of Mr. Arreola following that struggle.
24   Q. And I'm trying to determine what was
25 important to you. What did you see that was

Page 65

1 important to you forming your opinion?
2    A. Sure. So for a medical examiner in
3 determining cause and manner of death, the focus for
4 me in looking at the video was the condition of
5 Mr. Arreola following the struggle. And so that was
6 a big focus for me when we look at any deaths where a
7 death doesn't occur during the struggle, whether that
8 be with law enforcement or maybe a domestic violence
9 situation with a boyfriend. If one survives the
10 struggle, the focus is looking at what happened in
11 the interim between that struggle and the death
12 itself, the time frame, what's the time frame, what
13 is the person doing following that. And so that was
14 my focus to determine what his condition was
15 following the struggle.
16   Q. And what did you see?
17   A. What I saw was that there was a struggle
18 that started around 5:25 per the time in the video.
19 At some point in time when Mr. -- excuse me,
20 officer -- Officer Evrard was the third officer on
21 the scene, the video showed that there's an officer
22 straddled on his lower back area. There's another
23 officer kind of in his mid back area, so I saw that.
24      Shortly after Officer Evrard arrived,
25 Mr. Arreola is then placed in a seated position. And

17 (Pages 62 - 65)

Lora Darrisaw , M.D.                                June 30, 2020
Arreola, Rodrigo Vs. The Consolidated Government Of Columbus, Georgia

Page 66

1 audio notes that he's breathing and his eyes are
2 open. And one of the officers puts his hand on his
3 neck obviously checking carotid pulses.
4      But at that point in time in the video,
5 Mr. Arreola is not speaking anymore. So -- and
6 what's not in the video but what is reflected in the
7 officer's statement is that Mr. Arreola is seated
8 against one of the officer's legs. So he's not
9 seated under his own weight, I should say -- I blank
10 on the word I want to use. But he's seated against
11 the officer. He's not speaking, and that was -- one
12 of the main things I focused on was his condition
13 after the struggle, that he had not returned to being
14 what -- the terminology I use is baseline, and
15 everyone's baseline is going to be different. But
16 his baseline was he was screaming, yelling, making
17 all this noise beforehand, and he never returned to
18 that.
19      So in that regard, I -- it was my judgment
20 that the struggle played a role in his death and,
21 therefore, cannot be excluded as playing a role in
22 his death.
23    Q. Okay. So, obviously, you saw that Hector
24 Arreola was talking with the police before the
25 struggle started, correct?

Page 67

1    A. Correct.
2    Q. And he exhibited some signs of paranoia and
3 possible drug use; is that fair to say?
4    A. Yeah. He's kind of yelling and screaming,
5 yes.
6    Q. And the yelling and screaming really
7 started after the struggle started, right?
8    A. Yes.
9    Q. And do you recall Hector Arreola screaming
10 and yelling fairly loudly during the initial part of
11 the struggle?
12    A. Correct.
13    Q. What did the tapering off of Hector
14 Arreola's cries of, please, I didn't breathe, and,
15 Mom, they're going to kill me, tell you?
16    A. I don't know if I -- I just noted that it
17 happened.
18    Q. Okay. Well, you're looking at the
19 events --
20    A. Correct.
21    Q. -- to form your opinion, right?
22    A. Yes, sir.
23    Q. And Hector Arreola screamed and yelled
24 loudly, and then his screams and yelling tapered off
25 into begging and crying. Do you recall that?

Page 68

1    A. Yeah. They tapered off. His vocalization
2 tapered off.
3    Q. And even when Officer Evrard was on Hector
4 Arreola, you could softly hear him begging, "please,
5 please," still at this point, correct?
6    A. Yes. He's still vocalizing at a low voice
7 level.
8    Q. And then, of course, you noted that for
9 about 30 seconds when an Officer Evrard was on Hector
10 Arreola, he made low-sounding humming sounds, moaning
11 sounds, like (indicating)?
12    A. Yeah. I don't recall who's on him at that
13 time. But, yeah, at some point in time, his -- the
14 vocalization gets a lot lower. And then he finally
15 stops making any audible sounds, and there's a few
16 moaning sounds, and then there's -- he's quiet and
17 he's not making any more sounds.
18    Q. And why is that significant?
19      MR. CLARK: Object to form.
20      THE WITNESS: Well, for me, the
21 significance is, as I previously stated, when I'm
22 looking at an event that happened surrounding
23 someone's death and whether it was plays a role in
24 their death is to look at whether the person returns
25 to a baseline and that just -- for me, that

Page 69

1 significance is that he did not return to baseline.
2 BY MR. POST:
3    Q. Okay. Was there an indication that Hector
4 Arreola's breathing was affected?
5    A. I don't have an answer to that outside of
6 hearing him -- his statements.
7    Q. Well, you found that the prone position
8 restraint was significant; is that right?
9      MR. CLARK: Object to form.
10      THE WITNESS: I don't understand the
11 question. What I found was that he had a sudden --
12 well, let me put it this way: I made a change and
13 amended the cause of death to sudden cardiac death
14 following struggle with law enforcement that included
15 prone position as those being the facts of the
16 struggle and prone position being a part of that
17 struggle.
18 BY MR. POST:
19    Q. Obviously, the prone position restraint was
20 important to you for some reason --
21      MR. CLARK: Object to form --
22 BY MR. POST:
23    Q. -- is that true?
24      MR. CLARK: Asked and answered.
25      THE WITNESS: The prone position was part

18 (Pages 66 - 69)

Lora Darrisaw , M.D.                                June 30, 2020
Arreola, Rodrigo Vs. The Consolidated Government Of Columbus, Georgia

Page 70

1  of the struggle, and it's listed as such.
2  BY MR. POST:
3      Q.  Okay.  I guess what I'm getting at is why
4  is that listed as part of the cause of death?
5      A.  That's a fact of the struggle.  His cardiac
6  death came following this struggle that included
7  prone position.
8      Q.  Okay.  Let me phrase it this way:  How did
9  the prone position restraint contribute to Hector
10  Arreola's death?
11         MR. CLARK:  Object to form.
12         THE WITNESS:  I would have to just repeat.
13  The way that I certified the cause of death is
14  related to the facts of the case as it relates to the
15  struggle that he was involved with.  There was the
16  struggle, and the struggle included prone position.
17  BY MR. POST:
18      Q.  And that's important to you, right?
19         MR. CLARK:  Object to form.
20         THE WITNESS:  It's part of the struggle.
21  It's important in that, yes, he was involved in a
22  struggle with the prone position, and he never
23  returned to baseline, and he had a sudden cardiac
24  death following that entire event.
25  BY MR. POST:

Page 71

1      Q.  And the prone position restraint was part
2  of the reason he did not return to baseline; is that
3  right?
4         MR. CLARK:  Object to form.
5         THE WITNESS:  No, sir.  I can't say why he
6  returned the baseline.  He didn't return -- I just
7  know factually he did not return to baseline.  And
8  that's what plays role in how not only I but our
9  office certifies deaths in these cases that it's a
10  statement of the death following an event where he
11  did not return to baseline.  The event in this case
12  was the struggle that included prone position.
13  BY MR. POST:
14      Q.  Well, let me ask you this --
15      A.  Had it not included prone position, it just
16  would have been struggle.  So there could have been
17  prone position or there could not have been prone
18  position.  I'm not really -- there's not a focus on
19  the prone position, I should say.
20      Q.  Prone position restraint -- well, let me
21  ask you this:  How did the prone position restraint
22  complicate the acute methamphetamine toxicity?
23      A.  The entire struggle with the prone position
24  complicated the methamphetamine toxicity.  The
25  underlying -- the underlying major issue here is

Page 72

1  methamphetamine toxicity.  That's why everything else
2  following it was complicating that.  So here's an
3  individual with methamphetamine toxicity.  And that's
4  the underlying statement of the cause of death.  And
5  so that's just who this individual is.  He's an
6  individual with methamphetamine toxicity, and as
7  such, he has a risk of having a sudden cardiac death
8  with or without a struggle.
9         And so the struggle that included the prone
10  position, that whole event, he never returned to
11  baseline from that event.  And, therefore, I
12  attributed that as playing a role in the death of
13  this individual who had acute methamphetamine
14  toxicity.
15      Q.  Okay.  So the prone position restraint
16  played a role in the death?
17         MR. CLARK:  Object to form.
18         THE WITNESS:  Yes, the struggle with the
19  prone position.
20  BY MR. POST:
21      Q.  What specifically do you mean by
22  "restraint"?
23      A.  What I mean by restraint is what the word
24  means.  He was restrained in that position.
25      Q.  Does that include weight applied to the

Page 73

1  back?
2      A.  Yeah.  Restraint -- what I mean by
3  restraint is being held in a particular position.
4  And from the videos, I mean, I can't judge how much
5  weight is on him or how much force was applied.  But
6  from the video, I see someone straddled over his back
7  and someone near his midback.  So he's restrained
8  here held in position.  I have no knowledge of how
9  how much weight was applied.
10      Q.  Would the application of an officer's body
11  weight or a knee be consistent with your findings of
12  the bruise or the contusion in the lower back?
13      A.  Yes, that could be, sure.
14      Q.  And would the application of an office's
15  body weight or knee be consistent with your findings
16  of the left upper lung pleural hemorrhage?
17      A.  I'm not sure of that.  I don't know I
18  isolated hemorrhage in the pleural in an individual
19  who's been in the hospital for a day on a ventilator.
20  I can't contribute that to being necessarily the
21  focus of an injury, so I'm not sure of that.
22      Q.  But it could be consistent with the
23  application of substantial weight and force to the
24  upper back, couldn't it?
25         MR. CLARK:  She just answered it.

19 (Pages 70 - 73)

Lora Darrisaw , M.D.                                June 30, 2020
Arreola, Rodrigo Vs. The Consolidated Government Of Columbus, Georgia

Page 74

1 Objection.
2        THE WITNESS:  In an individual that's been
3 in the hospital on a ventilator, I can't make that
4 assessment of the pleural hemmorhage in terms of
5 specifically what it is.
6 BY MR. POST:
7        Q.  Did you know that Officer Agular weighed
8 300 pounds or so at the time he sat on Hector
9 Arreola?
10        MR. CLARK:  Object to form.  He didn't sit.
11 That is a mischaracterizing.
12        MR. POST:  I can phrase the question
13 however -- he did sit --
14        MR. CLARK:  Well, trying --
15        MR. POST:  -- so we disagree on this.
16        MR. CLARK:  -- to trick the witness is
17 really, really a problem.
18        MR. POST:  I'm not trying to trick anybody.
19 He did sit on her.
20        MR. CLARK:  Why don't you ask --
21        MR. POST:  Any jury will find that, too.
22        MR. CLARK:  -- real questions.
23        THE WITNESS:  I was aware of his weight of
24 being 300 pounds based upon the material that I
25 reviewed.

Page 75

1 BY MR. POST:
2        Q.  And what do you mean by "acute
3 methamphetamine toxicity, acute"?
4        MR. CLARK:  Form.
5 BY MR. POST:
6        Q.  I mean I understand what you mean by
7 methamphetamine toxicity.  I just don't understand --
8        A.  Acute means -- methamphetamine leaves the
9 body relatively quickly.  So the toxicology analysis
10 of the methamphetamine there, meaning that it's
11 current at that point in time when he presented as
12 opposed to someone, say, going to a hospital and
13 having a urine and drug screen that shows the
14 methamphetamine in the urine but nothing in the
15 blood, that reflects, okay, they may have used
16 methamphetamine recently or a few days in the past as
17 opposed to it being present acutely.
18        Q.  So --
19        A.  The means at the present time, he --
20 "acute" means at the present time.
21        Q.  That explains my?
22        A.  Yes.
23        Q.  -- answers my question.  Thank you.
24        What did you note or notice regarding the
25 treatment of Hector Arreola by the EMTs?

Page 76

1        A.  I'm not aware specifically of their
2 treatment outside of them giving CPR.  I didn't
3 witness it, per se.  But they called in a sudden
4 cardiac arrest on route to the hospital, and they
5 provided CPR.
6        Q.  Okay.  Why did the GBI do its own test to
7 determine what drugs were actually present in Hector
8 Arreola's blood?
9        A.  That's part of standard protocol for an
10 autopsy.  We do a toxicology analysis.
11        Q.  And in the medical records, there is a lab
12 test that says "reactive for methamphetamine,
13 amphetamine, benzodiazapine, cocaine, oxycodone,
14 THC."  Do you remember seeing that?
15        A.  I don't know what you're referring to.
16        Q.  I can pull it up for you.
17        MR. CLARK:  Here.  I've got a copy, if you
18 want to use mine.
19        MR. POST:  I was going to put it on the
20 screen, but that will be fine.
21        MR. CLARK:  We can just attach one.  Is
22 this what you're talking about?
23        MR. POST:  I'm talking about 4021 through
24 4022.
25        MR. CLARK:  This is probably the -- you're

Page 77

1 probably talking about the actual report.  This is in
2 the discharge summary where it lists the same thing.
3        MR. POST:  Let's go off the record for a
4 second.
5        (A recess was taken from 12:10 p.m.
6 to 12:36 p.m.)
7        (Plaintiffs' Exhibit 13 was marked for
8 identification.)
9 BY MR. POST:
10        Q.  Dr. Darrisaw, thank you for looking at
11 Plaintiffs' Exhibit No. 13 for us to -- since we
12 don't have access to a DVD or CD player here in the
13 deposition.  You've indicated that Plaintiffs'
14 Exhibit 13 contains the autopsy photos for this case;
15 is that correct?
16        A.  That's correct.
17        Q.  And we'll give those to the court reporter.
18        Doctor, I'm going to show you the medical
19 records in this case, specifically referring to
20 what's been marked CCG 4021 and 4022.  The little CCG
21 numbers are markings which the defense put on the
22 records Bates stamped for identification purposes.
23 And that's what I provided to you.
24        My question was:  Did you notice the
25 reactive lab tests for the drugs that I mentioned

20 (Pages 74 - 77)

Lora Darrisaw , M.D.                                      June 30, 2020
Arreola, Rodrigo Vs. The Consolidated Government Of Columbus, Georgia

Page 78

1  previously in the disclaimer that's attached to it,
2  and you said you didn't recall.  So I'm going to let
3  you take a look at it on 4021 and 4022.  If you want
4  to scroll down --
5      A.  I don't know what you're referring to on
6  this screen here.
7      MR. CLARK:  What's the question?
8      MR. POST:  I'm just letting her refresh --
9      THE WITNESS:  You're talking about the
10 hospital drug screen?
11     MR. POST:  Right.
12     THE WITNESS:  And I'm sorry.  You'll have
13 to ask the question again.
14 BY MR. POST:
15     Q.  Well, I had asked you why the GBI did their
16 own toxicology tests.
17     A.  Okay.
18     Q.  And why don't they use the tests in the
19 medical records?
20     A.  Well, this is not a drug screen on blood.
21 I mean, our toxicology analysis is on blood to see
22 what's in the blood of an individual.  The urine drug
23 screen in the hospital are urine drug screens.  And
24 our protocol in terms of determining whether a drug
25 is involved in a person's death is looking at blood

Page 79

1  that's in either blood -- I'm sorry.  Drugs that are
2  either in blood or if we don't have blood, we may get
3  other specimens such as liver or -- but a urine drug
4  screen does not indicate always an acute drug
5  toxicity.  I mean, drugs in the urine are metabolized
6  already.  So this is a hospital urine drug screen as
7  far as I'm aware.
8      Q.  Okay.  Where did you see urine noted on
9  that?
10     A.  I don't know if I see it noted on there,
11 but that's what the hospitals do.  They do urine drug
12 screens, and our -- toxicology analysis is done on
13 our autopsies on blood.
14     Q.  And on this urine drug screen, it has a
15 disclaimer that says "Reactive does not indicate a
16 confirmed positive result.  This is a qualitative
17 screening procedure intended for treatment purposes
18 only.  A reactive result should be considered
19 indeterminate until confirmed as either positive or
20 negative by an alternate, more specific chemical
21 method designed specifically for the types of drugs
22 in question," right?
23     A.  Yeah.  That's what I'm indicating.  This is
24 a urine drug screen in the hospital.  That's why for
25 autopsy purposes, we do a blood drug screen that's

Page 80

1  not only qualitative and quantitative in which we --
2  that's why we have a quantitation of the
3  methamphetamine.  It's not a qualitative urine drug
4  screen.
5      Q.  And you do that so you can be sure of what
6  the -- what drugs are in the blood and be positive of
7  that, right?
8      A.  Correct.
9      Q.  And you don't rely on the urine drug
10 screens in the medical records, true?
11     A.  That's correct.
12     Q.  Now, in the medical records, I noticed
13 sepsis with shock as coding diagnosis and referenced
14 a few times in those records.  Was there any
15 relevance to sepsis?
16     A.  I don't how the answer to that.  I would
17 defer that to the clinicians.
18     Q.  That was not part of the cause of death, I
19 guess is what I'm asking; is that right?
20     A.  It was not part of what I listed as cause
21 of death.
22     Q.  In your opinion, would Hector Arreola have
23 suffered cardiac arrest and died without the prone
24 position restraint?
25     MR. CLARK:  Object to form.

Page 81

1      THE WITNESS:  Yes, sir.  He certainly could
2  have.
3  BY MR. POST:
4      Q.  Could have?
5      A.  Yeah.  Obviously, I can't answer would
6  someone have died.  But, yeah, based upon as my
7  previous indication of cause of death was
8  methamphetamine toxicity.  So, yeah, he has a high
9  level of methamphetamine that is -- puts him at risk
10 for a sudden cardiac arrest with or without struggle
11 and/or prone position.
12     Q.  Well, part of the problem or the risk --
13 well, let me ask you this:  The prone position
14 restraint increases the risk of cardiac arrest,
15 correct?
16     A.  I would not answer that affirmatively.
17     Q.  How would you answer it?
18     A.  I would answer that I'm not really sure.
19     Q.  Well, does prone position restraint
20 restrict breathing?
21     A.  It could.
22     MR. CLARK:  Object to form.
23     THE WITNESS:  It may or may not.
24 BY MR. POST:
25     Q.  And prone position restraint is known to

21 (Pages 78 - 81)

Lora Darrisaw , M.D.                                    June 30, 2020
Arreola, Rodrigo Vs. The Consolidated Government Of Columbus, Georgia

Page 82

1 cause sudden in-custody deaths at times, true?
2     A.  That's true, yeah.
3     Q.  And so that's one of the reasons police
4 officers are taught to sit people up immediately,
5 correct?
6        MR. CLARK:  Object to form.  She not --
7        THE WITNESS:  I can't address how police
8 officers are taught.
9 BY MR. POST:
10    Q.  Well, let me ask you this way:  Would it
11 have made a difference if the police sat Hector
12 Arreola up 30 seconds sooner?
13    A.  Not in terms of my particular cause and
14 manner of death statement.
15    Q.  I'm talking about the outcome.
16    A.  I don't know the answer that.
17    Q.  What about a minute sooner?
18    A.  I don't know the answer to that.
19    Q.  What about a minute and 15 seconds sooner?
20    A.  I don't know the answer to that.
21    Q.  What about a minute and 30 seconds earlier?
22    MR. CLARK:  Mark.
23        THE WITNESS:  I don't know the answer to
24 that.
25 BY MR. POST:

Page 83

1     Q.  What about if they had sat him up before
2 Hector Arreola quit talking?
3     A.  I don't know the answer to that.
4     Q.  What about if they had sat him up before he
5 quit moaning?
6     A.  I don't know the answer to that.
7     Q.  What about if they had set him up before --
8 as soon as they handcuffed Hector Arreola?
9     A.  I don't know the answer to that.  I mean, I
10 can't address the outcome.  As a medical examiner,
11 when I look at the circumstances surrounding a death,
12 I already have an outcome.  So I can't project what
13 an outcome would have or could have been.  I have an
14 outcome and my role and my process is to determine
15 the cause of that death.  I really can't address what
16 would have or could have happened under different
17 circumstances.
18    Q.  So one of the causes of death is prone
19 position restraint, right?
20        MR. CLARK:  Object to form.
21        THE WITNESS:  Not in terms of the way it's
22 worded.  The wording of the cause of death as listed
23 on the Exhibit 11 that sudden cardiac death following
24 law enforcement struggle that included prone position
25 restraint complicating acute methamphetamine

Page 84

1 toxicity.  I'm haven't really isolated any particular
2 word in that statement.  It's a statement of...
3     Q.  Well, prone position restraint was a
4 substantial contributing factor in Hector Arreola's
5 death, correct?
6        MR. CLARK:  Object to form,
7 mischaracterizes, asked and answered.
8        THE WITNESS:  As my amended cause-of-death
9 statement indicates, I haven't stressed any
10 particular event.  I've made a statement that the
11 cause of death is sudden cardiac death following law
12 enforcement struggle -- or struggle with law
13 enforcement including prone position restraint
14 complicated acute --
15    Q.  Well, understand what you --
16    MR. CLARK:  Well, let her finish.
17 BY MR. POST:
18    Q.  I understand what you wrote --
19    MR. CLARK:  Were you finished, Doctor?
20        Did you get all that?  Because they were
21 talking over each other.
22        THE WITNESS:  Yeah.
23        THE COURT REPORTER:  I got, including prone
24 position restraint on acute --
25        THE WITNESS:  Complicating acute

Page 85

1 methamphetimine toxicity.  That's the cause-of-death
2 statement.
3 BY MR. POST:
4     Q.  And I understand what you wrote, but that
5 was not my question.  I'm asking you if prone
6 position restraint was a substantial contributing
7 factor to -- in Hector Arreola's death?
8        MR. CLARK:  Asked and answered.
9        MR. POST:  It's been asked, but it has not
10 answered.
11        MR. CLARK:  It's been asked multiple times.
12        Go ahead, Doctor.
13    MR. POST:  It has not.
14        THE WITNESS:  Yeah.  My answer was that was
15 not a statement that I made.
16 BY MR. POST:
17    Q.  Well, I'm asking you yes or no.  Was it
18 substantial contributing factor or not?
19    A.  I haven't indicated it was a substantial
20 factor.
21    Q.  So you're saying it was not a factor in
22 Hector Arreola's death?
23    A.  I'm saying I have not isolated prone
24 position restraint as a substantial -- however you
25 phrased it.

22 (Pages 82 - 85)

Lora Darrisaw , M.D.                                  June 30, 2020
Arreola, Rodrigo Vs. The Consolidated Government Of Columbus, Georgia

Page 86

1    Q. Well, you put it the in cause of death, so
2 it was a contributing factor, right?
3       MR. CLARK: Asked and answered.
4       THE WITNESS: The struggle with law
5 enforcement that included prone position restraint
6 played a role in his death. That's that -- my
7 cause-of-death statement reflects that the struggle
8 with law enforcement that included prone position
9 restraint played a role in his death. That's my
10 answer to the question.
11 BY MR. POST:
12    Q. Okay. And played a role means contributed,
13 right?
14    A. Yes. Yeah. But, I mean, you qualified
15 that with a lot of substantial -- but, understand, I
16 haven't made that statement. I made a statement in
17 the way my cause of death is phrased as that whole
18 struggle with law enforcement that included prone
19 position restraint played a role in his death, yes.
20    Q. So to a reasonable degree of medical
21 certainty, absent the prone position restraint,
22 Hector Arreola would not have died on January 9th of
23 2017, correct?
24       MR. CLARK: Object to form,
25 mischaracterizes. It's been asked and answered

Page 87

1 several times.
2       THE WITNESS: I can't say that.
3       MR. CLARK: You keep separating out prone
4 restraint, and her multiple answers before this does
5 not do that. Object to it.
6       THE WITNESS: I can't say that. I can't
7 answer that affirmatively that he would not have died
8 without prone position restraint.
9 BY MR. POST:
10    Q. So you're saying you don't know one way or
11 the other is what you're saying?
12    A. Well, I'm saying that prior to my amending
13 the report and the cause of death to the statement
14 that I have to date, I indicated that his cause of
15 death was methamphetamine toxicity.
16    Q. But after --
17    A. And so as such, methamphetamine toxicity
18 certainly stood alone as his cause of death prior to
19 me looking at additional stuff and finding that he
20 did not return to a baseline. Therefore, I included
21 the struggle that involved the prone position
22 restraint as playing a role in his death. Absent the
23 struggle, the methamphetamine -- acute
24 methamphetamine toxicity certainly was sufficient to
25 cause his death.

Page 88

1    Q. But that's not what you found to be the
2 cause of death, correct?
3    A. I amended it to -- again, I'll repeat it --
4 sudden cardiac death following struggle with law
5 enforcement including prone position restraint
6 complicating acute methamphetamine toxicity. That's
7 the cause-of-death statement to date.
8    Q. You said your amended report will probably
9 come out tomorrow, you think?
10    A. Whenever someone peer-reviews it. She's
11 asked someone today -- well, she's asked to see if
12 anyone is available today, and she indicated that she
13 could e-mail it to the appropriate parties after it's
14 complete.
15       MR. POST: And I'll ask that we attach the
16 peer-reviewed report as part of the deposition once
17 we get it, if that's okay with you. I think it
18 should be the same.
19       MR. CLARK: If it's the same, I would have
20 no objection.
21       THE WITNESS: It should be the same as the
22 draft.
23       MR. POST: Your witness.
24       MR. CLARK: Can we take -- do you mind if
25 we take a short break?

Page 89

1       THE WITNESS: That's fine.
2       (A recess was taken from 12:51 p.m.
3 to 1:02 p.m.)
4       EXAMINATION
5 BY MR. CLARK:
6    Q. Doctor, Jim Clark. We just met today face
7 to face. It's nice to meet you. We -- I think I've
8 talked to you maybe once on the telephone.
9       The items -- first of all, I'm going to
10 jump around a little bit, and then I'll get my
11 questions that I wanted to ask you. But the items
12 that you reviewed fairly recently before your amended
13 report is kind of what I'm trying to focus on --
14    A. Okay.
15    Q. -- for right now. What were those items?
16 Is that what's contained in that list --
17    A. Yes, sir
18    Q. -- that we attached? And would you mind
19 pulling that list out? I don't know what exhibit
20 number it was.
21       MR. POST: Plaintiffs' Exhibit 5.
22       MR. CLARK: 5, okay. Thank you.
23       THE WITNESS: Yes, sir.
24 BY MR. CLARK:
25    Q. All right. So Exhibit 5, is that -- are

23 (Pages 86 - 89)

Lora Darrisaw , M.D.                                    June 30, 2020
Arreola, Rodrigo Vs. The Consolidated Government Of Columbus, Georgia

Page 90

1 those items on there -- except for the investigative
2 summary that you talked about, are the items listed
3 on Exhibit 5 things that were provided to you within
4 the last couple of weeks or few weeks?
5     A. Yes, towards the beginning of this month,
6 June.
7     Q. Okay. Towards beginning of June?
8     A. Correct.
9     Q. Because that exhibit is not dated. So is
10 that -- those new items is what led to you amending
11 your report, or was there something else?
12     A. Yes. It includes No. 5. No. 5 was also
13 something I received. It wasn't received by
14 Mr. Post. But 5 was also received towards the
15 beginning of June, and all of these I received to
16 date. And based upon the totality of these findings
17 in conjunction with previous autopsy findings and
18 toxicology, I amended the cause and manner of death.
19     Q. All right. So correct me if I'm wrong, but
20 it sounds like you -- you had a report that's been in
21 existence for a little over three years, correct?
22     A. Correct.
23     Q. But as you prepared for this deposition,
24 you reviewed -- started reviewing items and you asked
25 for items from the parties in this case; is that

Page 91

1 fair?
2     A. I didn't specifically ask for items from
3 the parties. The practice of having a -- doing an
4 autopsy and coming to determination of cause and
5 manner of death is during the autopsy and then
6 getting any ancillary information as it relates to
7 the circumstances of the death.
8         And my autopsy -- my original autopsy
9 report indicates that based upon -- let me look at
10 it. This is Exhibit No. 6. "Following review of the
11 autopsy findings and toxicology analysis in
12 conjunction with the investigative information
13 concerning the circumstances of the death, the cause
14 of death as certified is methamphetimine toxicity.
15         Now, as it relates to the specific
16 investigative information that I had at the time, I
17 don't have an independent recollection of what it
18 was, so I can't speak to that today. But there was
19 investigative information, and I certified the cause
20 and manner of death as such.
21         When I got the notice of the deposition --
22 it was originally going to be at a different date --
23 we don't maintain outside investigative information
24 in our office after it's used. So at that point in
25 time, to prepare for a deposition, I needed to kind

Page 92

1 of reconstruct my opinions and needed to see
2 investigative information. So I initially asked my
3 office, hey, can I get -- go get some information
4 because I don't remember what I looked at. And Tyler
5 indicated that, hey, I've got -- do you recall having
6 this? I have this investigative summary that was
7 e-mailed to us. And then Mr. Pope indicated, I have
8 everything, I have all this, I can send you that.
9     Q. Got it.
10     A. So I got that, and all of that was
11 sufficient for me to prepare for the deposition, some
12 of which I'm sure I had never seen before. But, of
13 course, looking at everything to date, my opinion
14 changed.
15     Q. Okay. And did I or anyone from my office
16 ask you to change any report?
17     A. No one asked me to change any report.
18     Q. Is your -- your original report, which I
19 believe is Exhibit 6 --
20     A. Yes.
21     Q. Is that -- do you still consider that to be
22 an accurate report? And let me elaborate a little
23 bit. All I'm driving at is: It seems to me that
24 what you've testified here in this deposition is that
25 you have essentially added on to that report, that

Page 93

1 that report is not invalid or inaccurate, but you've
2 added on to it. Is that the way you view it, or is
3 it different?
4         MR. POST: Object to form.
5         THE WITNESS: I've amended the cause of
6 death and the manner of death. And having amended
7 those two parts of the report, the relevant reference
8 to the cause and manner of death in the opinion
9 section was amended.
10 BY MR. CLARK:
11     Q. And so with the amended pieces added, it --
12 you now have a complete report that you believe will
13 be official today or tomorrow?
14     A. Correct. Those are the only changes in the
15 report.
16     Q. Right. And you earlier testify to the only
17 changes in the reports in what I believe are three
18 locations, correct?
19     A. Opinion summary section, cause of death,
20 and manner of death.
21     Q. Got it. All right. Jumping around a
22 little bit. But the enlarged -- the heart, you
23 testified earlier that you don't believe it to be an
24 enlarged heart. Help me understand that. Is there a
25 definite criteria that you as a medical examiner go

24 (Pages 90 - 93)

Lora Darrisaw , M.D.                                     June 30, 2020
Arreola, Rodrigo Vs. The Consolidated Government Of Columbus, Georgia

Page 94

1 from to determine whether a person's heart is
2 clinically enlarged?  And if so, what is that?
3     A.  Yes.  There are -- what I use is the -- I
4 believe it's the Mayo Clinic.  I have a document that
5 I refer to and look at if the heart is within the
6 range of either the means range for the weight of the
7 individual or falls within the normal 25 to
8 75 percent range.  So, yeah, there are documents that
9 show heart weight as it relates to height as well as
10 weight.  And I refer to those charts.
11     Q.  Would it surprise you that other experts
12 might view the weight of Mr. Arreola's heart as being
13 enlarged?
14     A.  I don't know if it would surprise me.
15     Q.  And I guess what I'm driving at:  Is that
16 an area that there is some subjectivity to whether
17 someone who might be more of an expert in the field
18 of hearts might consider the weight of Mr. Arreola's
19 heart with respect to his size, et cetera, as being
20 enlarged different from what you as a medical
21 examiner might view it?
22     MR. POST:  Object as to form, leading.
23     THE WITNESS:  Maybe.  I mean, I can't speak
24 to another person's opinion as to whether the heart
25 was enlarged or not.

Page 95

1 BY MR. CLARK:
2     Q.  Yeah.
3     A.  Based on my criteria looking at his
4 weight --
5     Q.  Okay.
6     A.  -- I did not consider --
7     MR. POST:  Let her answer the question,
8 please.
9     MR. CLARK:  She did.  Did you answer it?
10     MR. POST:  She was still talking.
11     THE WITNESS:  Yeah.  I was just saying
12 based upon my criteria, I did not consider it to be
13 enlarged.
14 BY MR. CLARK:
15     Q.  Thank you.  And I guess the only thing I
16 was driving at is I get, basically, your criteria.  I
17 was just trying to get a feel for whether you as a
18 medical examiner believe there's other criteria that
19 other doctors might consider when determining whether
20 it's enlarged or not.  I mean --
21     A.  Are you talking about clinicians or medical
22 examiners?
23     Q.  Not medical examiners.  Yeah, I'm talking
24 about clinicians.
25     A.  I can't speak to -- I can't offer an

Page 96

1 opinion as to the criteria that clinicians use or
2 their basis thereof because they don't have a heart
3 weight unless -- as a clinician because you can't
4 take it out and weight it.
5     Q.  Right.
6     A.  So I can't speak to a clinician's criteria
7 for cardiomegaly as opposed to a medical examiner
8 where we actually have the heart weight.
9     Q.  And that's part of the problem, isn't it,
10 with determining whether hearts are -- you know,
11 getting an average size heart is having a subset of
12 hearts that you can measure and come up with a mean,
13 right?
14     A.  Yes.
15     Q.  That are otherwise nondiseased or other
16 issues?  But, anyway, I don't want to waste much time
17 on that.  You've answered my question.  I appreciate
18 it.  You testified earlier about -- that you have
19 done autopsies where methamphetamine toxicity was the
20 cause of death.
21     A.  Correct.
22     Q.  Have you done autopsies where the level of
23 methamphetamine in the decedent was less than
24 90 milligrams per liter where you believed
25 methamphetamine toxicity was the cause of death?

Page 97

1     A.  0.9 not 90.
2     Q.  I'm sorry if I misstated, 0.90?
3     A.  Yes.
4     Q.  You have done autopsies such as that?
5     A.  Yes, sir.
6     Q.  Help me understand as a physician -- from
7 your earlier testimony, I think I understand that
8 methamphetamine can cause sudden cardiac arrest?
9     MR. POST:  Objection to the leading.
10 BY MR. CLARK:
11     Q.  Well, it's not leading because I suggested
12 that that was my understanding from your earlier
13 testimony.  Is that what you -- did you not testify
14 to that?
15     A.  I did.  Methamphetamine as a drug is
16 cardiotoxic.  And so it is a risk factor for sudden
17 cardiac death, yes.
18     Q.  And I guess what I wanted to get a feel for
19 is:  How does meth cause sudden cardiac arrest?
20     A.  I can't speak to the actual mechanism.
21 It's a drug that is toxic to the heart, and it causes
22 arrhythmias.  And outside of being that general --
23     Q.  And what is an arrhythmia?
24     A.  A rhythm disturbance, a disturbance in the
25 rhythm of the heart.

25 (Pages 94 - 97)

Lora Darrisaw , M.D.                                June 30, 2020
Arreola, Rodrigo Vs. The Consolidated Government Of Columbus, Georgia

Page 98

1    Q. Okay. How does exertion coupled with
2  methamphetamine use relate to sudden cardiac arrest,
3  if it does?
4    A. Well, inasmuch as methamphetamine is cardio
5  toxic, it can cause the heart to go into a rhythm
6  disturbance. Exertion increases the heart rate so
7  the combination of those can certainly be related in
8  that respect.
9    Q. As a medical examiner, have you seen cases
10 where you've done autopsies where methamphetamine
11 toxicity coupled with exertion was the cause of
12 death -- caused sudden cardiac arrest, which was the
13 cause of death.
14   A. Well, in the cases of methamphetamine
15 toxicity, there's all kinds of different
16 circumstances surrounding their death. Exertion
17 itself without any other outside involvement in that
18 exertion would not be listed in the cause-of-death
19 statement. It would just be something that's known.
20      One would not say methamphetamine toxicity
21 associated with exertion, for instance. I mean, if
22 you're out jogging and you're under the influence of
23 methamphetamine and you have a sudden cardiac death,
24 your death is just methamphetamine toxicity. But if
25 someone else's actions is involved with that

Page 99

1  exertion, then it would be something that is
2  all-inclusive in a cause-of-death statement.
3    Q. Hence, why you mentioned the struggle in
4  this case; is that right?
5    A. Correct.
6    Q. Okay. Now, I want to make sure I
7  understand -- I think I do -- that the reason you
8  decided to amend your report is because what you
9  reviewed showed that Mr. Arreola never returned to
10 his baseline -- his prestruggle baseline; is that
11 correct?
12   A. Correct.
13   Q. And why was that important to you, or why
14 did that trigger you to amend the report? Help me
15 understand -- he didn't return the baseline. I
16 understand that. Why does that cause you to want to
17 amend the report to be more accurate?
18      MR. POST: Object as to form, multiple
19 compound questions.
20 BY MR. CLARK:
21   Q. Do you understand it?
22   A. I think I understand because it makes it
23 more accurate. I mean, that's the role of the
24 medical examiner is to provide a cause of manner of
25 death that's accurate. And the cause of death -- let

Page 100

1  me start with the manner of death. The manner of
2  death for sure is determined based upon the
3  circumstances of the death. The cause of death also
4  includes -- the circumstances play a role in the
5  cause-of-death statement.
6       So in -- there's no science particularly
7  into a cause of manner of death. It's all
8  circumstantial. You take a certain individual. You
9  look their circumstances. And, oftentimes, the
10 circumstances and the information as it relates to
11 the circumstances come from outside parties.
12      And anytime we get additional information
13 that may change an original view that we had of the
14 circumstances, it's accurate to change the cause of
15 manner of death to accurately reflect what that cause
16 of manner is, and that's what I did in this case.
17   Q. Thank you. I appreciate that. And while
18 I'm thinking of it, you did an autopsy here, and
19 you -- there are certain what I'll call -- you help
20 me with the terminology -- clinical findings that
21 come out of an autopsy?
22   A. They're objective findings.
23   Q. That's a better term. So you do an
24 autopsy, and there are certain objective findings
25 that come out of an autopsy; is that correct?

Page 101

1    A. Yes. Most of of the autopsy is just
2  listing what is seen with the naked eye.
3    Q. All right. Can you --
4    A. Objectively.
5    Q. Are there certain -- well, let me strike
6  that.
7       It's not part of your autopsy but part of
8  your -- the GBI's role here is to do a toxicology
9  report as well. You testified to that earlier,
10 correct?
11   A. Correct.
12   Q. And that toxicology report in this case,
13 which is attached as an exhibit, is what showed the
14 methamphetamine levels in Mr. Arreola's blood,
15 correct?
16   A. Correct.
17   Q. All right. What I want to try to
18 understand is separating out things that you as a
19 medical examiner reviewed that were provided to you
20 outside of the autopsy and outside of the toxicology
21 report -- I understand how those find their way into
22 your findings. But I want to separate out and I want
23 to to ask you, what objective items did you rely upon
24 to issue your report as to manner of death and cause
25 of death? Does that question make sense first?

26 (Pages 98 - 101)

Lora Darrisaw , M.D.                          June 30, 2020
Arreola, Rodrigo Vs. The Consolidated Government Of Columbus, Georgia

Page 102

1    A.  Yes.  I -- the items that come into play in
2  my cause and manner of death are the totality of my
3  autopsy findings, any ancillary studies.  Ancillary
4  studies would include toxicology analysis.  In this
5  particular case, I don't believe there are any other
6  ancillary studies such as labs, postmortem labs.  So
7  in this case, the ancillary study was the toxicology
8  analysis and then investigative information.  And in
9  this particular case, at least to date with the
10 amended report, the investigative information is
11 what's listed in Exhibit 5.
12   Q.  Okay.  So, for instance, with respect to
13 your cause of death that you find, the sudden cardiac
14 death -- the sudden cardiac arrest, that is not
15 something that you determine from the autopsy?
16   A.  No.  That's more or less a fact of the case
17 of what happened.  He had a sudden cardiac death.
18   Q.  Agree.  And the struggle with law
19 enforcement, including prone position restraint,
20 that's not something that you find -- or that you
21 found from the autopsy, correct?
22   A.  Well, it's a fact of the case.  There are
23 some autopsy findings that correlate with those facts
24 that I found.  And we've previously talked about one
25 of them being isolated contusion of the lower back.

Page 103

1  That's consistent with the struggle as the fact of
2  the case and as I look at the videos.  He had some
3  contusion and abrasions of the lower extremities that
4  may or may not have been related to the struggle, but
5  it certainly could be consistent with it.
6      He had contusions involving the
7  subcutaneous tissue of both his wrists.  That's
8  consistent with knowing that he was in the struggle
9  and had handcuffs on him.  So I had some objective
10 findings that correlated with the fact of the matter
11 of a struggle that included prone position.
12   Q.  Good.  That's fair enough.  So there's
13 various places within your autopsy where you had
14 findings that showed that Mr. Arreola had been in a
15 struggle?
16   A.  Correct.
17   Q.  All right.  And then the methamphetamine
18 toxicity, that was -- your finding there was based
19 upon -- was it based upon the toxicology report --
20   A.  Yes.
21   Q.  -- that was Exhibit 10?
22   A.  Correct.
23   Q.  Under your cause of death, you use the word
24 "complicating acute methamphetamine toxicity."  Do
25 you see that?

Page 104

1    A.  Yes.
2    Q.  I'm curious what is meant by
3  "complicating," if there's a technical meaning to it?
4    A.  Well, what's meant by that is that acute
5  methamphetamine toxicity is kind of the underlying
6  abnormality of this individual, that he has acute
7  methamphetamine toxicity.
8    Q.  Okay.
9    A.  And then this whole struggle with the law
10 enforcement complicated that in terms of he's at risk
11 for sudden cardiac death because he has acute
12 methamphetamine toxicity.  And all these other
13 actions increase for that risk or at least played a
14 role in the risk.  And then him having a sudden
15 cardiac death following all this activity while under
16 the influence of methamphetamine.
17   Q.  All right.  And so your mentioning of
18 struggle with law enforcement including prone
19 position restraint is inserted because that is a
20 condition that existed and you felt since he did not
21 return to baseline, that that struggle should be
22 mentioned.  Is that essentially --
23   A.  Correct, yes.
24     MR. POST:  Objection to leading.
25 BY MR. CLARK:

Page 105

1    Q.  And if I understand your previous
2  testimony, your questions of Mr. Post, you are not
3  singling out any part of the struggle, or are you?
4    A.  I repeated several times the cause of death
5  is a statement of sudden cardiac death following
6  struggle with law enforcement including prone
7  position restraint complicated an acute
8  methamphetamine toxicity.
9    Q.  And what do you mean by that?  Because you
10 did say that several times.  What do you mean by that
11 when you say "it's a statement."
12   A.  It's listed as a statement.  So, I mean, a
13 cause of death can be gunshot wound to the head,
14 acute bronchopneumonia.  Those kind of list the cause
15 of death.  In the complex arena where we are with
16 everything involved here, we make a statement as
17 opposed to just an isolated word or phrase, for
18 instance.
19     So this actually more of a sentence.
20 That's what I mean by "statement."  I'm making a
21 statement as opposed to just saying, for instance,
22 affixia due to something.  This is a sentence.  It's
23 a statement that's trying to reflect everything that
24 happened in and around his death.  Because of the
25 complexity of it, one can't isolate a single word or

27 (Pages 102 - 105)

Lora Darrisaw , M.D.                                    June 30, 2020
Arreola, Rodrigo Vs. The Consolidated Government Of Columbus, Georgia

Page 106

1 phrase.
2     Q.  Okay.  Is there any question in your mind
3 that Hector Arreola at the time of his death had
4 significant quantities of methamphetamine in his
5 system?
6     A.  I don't know how to answer that.  I would
7 just refer to the toxicology report had a
8 quantitation of the methamphetamine that was in the
9 hospital admission blood.  That's all I can relate
10 to.
11     Q.  All right.  That's fair enough.  And I want
12 to make sure -- let me ask you this way:  Is there
13 any question in your mind that Exhibit 10, toxicology
14 report, is accurate?
15     A.  It's a report that I relied upon.  In terms
16 being an expert in the analysis and -- that would be
17 something you would have to address with the
18 toxicologist.
19     Q.  And who --
20     A.  I rely upon the toxicology reports that I
21 get from our lab.
22     Q.  All right.  And do you find them to be
23 accurate, generally speaking?
24     A.  In as much as I'm able to judge the
25 accuracy thereof.

Page 107

1     Q.  Who's the toxicologist?
2     A.  I can read you the name.
3     Q.  Yeah.  Is that listed on your -- I guess it
4 is.
5     A.  Yes, Exhibit 10, Jessica Mehan.
6     Q.  Do you have any -- as you sit here today,
7 do you have any reason to believe that Exhibit 10 is
8 not accurate?
9     A.  No, sir, I do not.
10     Q.  If I told you that Hector Arreola at the
11 time of this incident we've been talking about was
12 high on methamphetamine, was paranoid, was engaged in
13 a fight with police officers for over four minutes,
14 and then suffered cardiac arrest, is that consistent
15 with your findings, just generally?
16     MR. POST:  Objection to a hypothetical
17 question.  Objection to form.  Objection to leading,
18 and objection to misstating facts.
19     MR. CLARK:  Leading?  Okay.
20 BY MR. CLARK:
21     Q.  Go ahead you can answer.  Is it consistent,
22 is all I'm asking, with your report?
23     A.  Well, my findings are that he had acute
24 methamphetamine toxicity.  I guess you've made a
25 statement of being high on methamphetamine --

Page 108

1 acute -- he has --
2     Q.  Fair.
3     A.  -- acute methamphetamine toxicity, and he
4 was in a struggle with law enforcement.  And as I
5 viewed the -- everything I viewed, he was -- you
6 know, he was arguing and yelling with police
7 officers.
8     Q.  Okay.  Did you make any findings of
9 asphyxia in this case?
10     A.  That's kind of difficult to answer because
11 asphyxia oftentimes doesn't really have any findings.
12 But findings that make me think it's a asphyxia case
13 such as is petecci, which are very nonspecific.  I
14 did not see that.
15     Q.  I think Mr. Post --
16     MR. CLARK:  Let's mark this first.
17     (Defendants' Exhibit 1 was marked for
18 identification.)
19 BY MR. CLARK:
20     Q.  I'll show what's been marked Defendants'
21 Exhibit 1, which is a -- I'll represent to you is a
22 part of the Piedmont records.
23     A.  Oh, it does say Midtown.
24     Q.  Yeah.  It's Midtown.  I think --
25     A.  Oh, okay.

Page 109

1     Q.  I think it's the same thing as Piedmont.
2 They got bought or something.
3     You were shown a lab result, and I wanted
4 to show you this discharge summary.  And it's a
5 simple question.  It shows that Mr. Arreola not only
6 had meth in his system but also oxycodone, cocaine,
7 and marijuana.  Do you see that?
8     A.  Yes.  This is a Midtown Medical Center
9 discharge summary.  It indicates urine drug screen
10 positive for oxycodone amphetamines,
11 methamphetamines, benzodiazapines, cocaine, and
12 tetrahydrocannabinol, which is marijuana.
13     Q.  And my question was:  If that was shown --
14 is there a date on that?
15     A.  1/9/2017.
16     Q.  If that was shown in the hospital on
17 January 9th, 2017, what would -- would that
18 necessarily show up in the toxicology reports that
19 are done by the GBI?
20     A.  These are two different specimen.  This is
21 a urine drug screen.  And as we previously looked at,
22 these are qualitative tests.  So the blood tests are
23 going to be very different as to drugs that are in
24 the blood as opposed to metabolized drugs in the
25 urine.

28 (Pages 106 - 109)

Lora Darrisaw , M.D.                    June 30, 2020
Arreola, Rodrigo Vs. The Consolidated Government Of Columbus, Georgia

Page 110

1    Q. And does that mean, though, that -- I just
2 want to make sure I understand. That doesn't mean
3 that the urine analysis that was done at the hospital
4 is inaccurate; it just means it's testing something
5 different than what the GBI tested with the blood
6 toxicology. Is that correct?
7    A. Yeah. It also means it's a different type
8 of test. It's a qualitative test, and it sees drugs
9 that have been metabolized.
10    Q. Right. What does "qualitative" mean when
11 you say it's a qualitative type of test?
12    A. Qualitative meaning present or not present
13 as opposed to quantitative and getting the quantity
14 of something.
15    Q. Make sense. Thank you.
16    A. And a qualitative test, for instance, just
17 to elaborate a little bit, I mean, a cocaine
18 qualitative test in urine includes not only terant
19 cocaine but metabolized cocaine would also -- could
20 be present. So the cocaine there could be some
21 metabolite that he's had for sometime. So
22 qualitative mean this class of drugs is present, and
23 that's what the urine drug screen would identify.
24    Q. So meaning metabolized, that would mean,
25 then, that -- on the cocaine, for instance, that it

Page 111

1 could be possible there was cocaine used previously
2 that has now been metabolized and is showing up in
3 the urine test. Is that --
4    A. Correct. That cocaine qualitative positive
5 in urine, it could be benzoylecgonine, which is a
6 metabolite of cocaine. It could be some other
7 metabolite of cocaine.
8    Q. Okay. I think I know the answer to this
9 question. But your report, your autopsy report is
10 not intended nor does it suggest that any law
11 enforcement officer in this case did anything wrong,
12 does it?
13    A. I don't have -- my autopsy report is not an
14 opinion as to wrongdoing or right doing. It's an
15 opinion as to how his death came about.
16    Q. I've got an expert in this case that's a
17 well-renowned expert, got a couple of them. And one
18 of them is going to testify that the amount of
19 methamphetamine found in Mr. Arreola, the
20 0.90 milligrams per liter, is ten times the lethal
21 dose. Just tell you that.
22        And my question to you is: Would you agree
23 or disagree with that statement or not have an
24 opinion one way or the other?
25    A. I would defer to that expert to discuss

Page 112

1 that.
2    Q. All right. Dr. Sperry, you were provided
3 his report by Mr. Post, correct?
4    A. Yes, sir.
5    Q. Did Mr. Post provide any of our expert
6 reports?
7    A. No, sir.
8    Q. Dr. Sperry said that methamphetamine was an
9 inescapable factor in Hector Arreola's death. I'll
10 just represent that to you.
11    A. Okay.
12    Q. Would you agree with that?
13    A. It's certainly a factor in his death, which
14 is, in my cause-of-death statement it's certainly
15 there. It can't be excluded.
16    Q. Dr. Sperry also will testify that
17 methamphetamine causes sudden death. We've already
18 talked about that. But you would agree with that,
19 wouldn't you?
20    A. I think I've indicated that already, yes.
21 Methamphetamine is cardiotoxic. It can cause sudden
22 cardiac death.
23    Q. And as you probably know, lawyers are bad
24 about being repetative. I'm trying not to, but I
25 appreciate that.

Page 113

1        Does an enlarged heart, when coupled with
2 methamphetamine, use increase risk of sudden death in
3 general?
4    A. An enlarged heart in and of itself is a
5 risk factor for sudden cardiac death. So anytime you
6 have multiple factors that are risk factors for
7 sudden cardiac death, those would all listed in a
8 cause-of-death statement.
9    Q. All right. You've touched on this. But in
10 general, your office, the medical examiner's office,
11 obviously don't do autopsies on every death in the
12 state of Georgia, correct?
13    A. Correct.
14    Q. And there's certain criteria foe when you
15 guys will be called upon to do an autopsy; is that
16 correct?
17    A. That's correct.
18    Q. And I've pulled something off of your
19 website to answer this question, but I want to make
20 sure I understand. There's two instances where I
21 believe fit the Arreola case. One is if a death
22 results from the unlawful use of controlled
23 substances, and then the second one is if a death
24 occurs while incarcerated or while in the custody of
25 a law enforcement officer.

29 (Pages 110 - 113)

Lora Darrisaw , M.D.                                          June 30, 2020
Arreola, Rodrigo Vs. The Consolidated Government Of Columbus, Georgia

Page 114

1  A. Correct.
2  Q. Is that accurate for why an autopsy was
3  done in Mr. Arreola's case?
4  A. Yes. His death involved him being in
5  custody or -- I guess he technically was in custody
6  at the time of his death --
7  Q. Correct.
8  A. -- being handcuffed already.
9  Q. All right. In your amended report, the
10 manner of death was amended to homicide, correct?
11 A. Correct.
12 Q. And the word "homicide" in your field is
13 the medical definition of homicide; is that correct?
14 A. Yes.
15 Q. And that's different from the legal
16 definition of homicide; is that correct?
17 A. I imagine. I'm not all that familiar with
18 all the legal terms. But for a medical examiner, the
19 definition of homicide means that the actions of
20 another played a role in the person's death either
21 solely or contributory.
22 Q. All right. And put just slightly
23 differently off of the medical examiner's website, it
24 indicates that homicide in medical terms means that
25 the death is caused by either direct or indirect

Page 115

1  actions of another person or persons.
2  A. Correct.
3  Q. All right. And in this case, the reason
4  you listed homicide is because of the struggle.
5  A. Correct.
6  Q. All right. And you would agree that
7  homicide does not mean murder?
8  A. Murder is a legal term that I don't really
9  have all the definitions of the legal terms. I'm not
10 an expert in legal terms.
11 Q. Okay. All right. It doesn't mean
12 manslaughter, as far as you know?
13 A. I'm not an expert in those legal terms.
14 Q. It doesn't even mean that there was
15 negligence or anyone was at fault, does it?
16 A. Again, the homicide means that the actions
17 of another played a role in their death either
18 directly or indirectly.
19 Q. Okay. You may have answered this earlier.
20 I apologize. But you're not -- you don't consider
21 yourself an expert in positional asphyxia, do you?
22 A. I wouldn't say I'm not -- no, I'm not an
23 expert in positional asphyxia. Of course, I sign
24 cases out -- I'm an expert in forensic pathology, and
25 that is a cause of death that I see in forensic

Page 116

1  pathology as a forensic pathologist.
2  Q. But in terms of what causes positional
3  asphyxia, you're not an expert in that area, are you?
4  A. I wouldn't say I'm an expert in it, but I
5  know what causes positional asphyxia, as we talked
6  about, being in a position where you don't get enough
7  oxygen to your brain. I'm qualified to make a
8  determination of cause of death being positional
9  asphyxia. I'm not an independent expert in death**?
10 Q. And if you felt that positional asphysia or
11 compressional asphyxia is a cause of death, is that
12 something that you list in autopsy reports?
13 A. Yes.
14 Q. You did not list that in Mr. Arreola's
15 autopsy report, correct?
16 A. I did not.
17 MR. CLARK: I think that's all the
18 questions I've got. Thank you.
19 MR. POST: No more.
20 (Deposition concluded at 1:40 p.m.)
21 (Signature waived.)
22
23
24
25

Page 117

1  The following reporter and firm disclosures were
   presented at this proceeding for review by counsel:
2
   REPORTER DISCLOSURES
   The following representations and
3  disclosures are made in compliance with Georgia Law,
4  more specifically:
5  Article 10(B) of the Rules and Regulations of the
   Board Of Court Reporting (disclosure forms)
6  OCGA 9-11-28(c) (disqualification of reporter
   for financial interest)
7  OCGA 15-14-37(a) and (b) (prohibitions against
   contracts except on a case-by-case basis).
8  - I am a certified reporter in the State of Georgia.
   - I am a subcontractor for Veritext Legal Solutions.
9  - I have been assigned to make a complete and
   accurate record of these proceedings.
10 - I have no relationship of interest in the matter
   on which I am about to report which would
11 disqualify me from making a verbatim record or
   maintaining my obligation of impartiality in
12 compliance with the Code of Professional Ethics.
   - I have no direct contract with any party in this
13 action and my compensation is determined solely
   by the terms of my subcontractor agreement.
14
   FIRM DISCLOSURES
15
   - Veritext Legal Solutions was contacted to
16 provide reporting services by the noticing or
   taking attorney in this matter.
17 - There is no agreement in place that is
   prohibited by OCGA 15-14-37(a) and (b). Any
18 case-specific discounts are automatically
   applied to all parties, at such time as any
19 party receives a discount.
   - Transcripts: The transcript of this proceeding
20 as produced will be a true, correct, and
   complete record of the colloquies, questions,
21 and answers as submitted by the certified court
   reporter.
22 - Exhibits: No changes will be made to the
   exhibits as submitted by the reporter,
23 attorneys, or witnesses.
   - Password-Protected Access: Transcripts and
24 exhibits relating to this proceeding will be
   uploaded to a password-protected repository, to
25 which all ordering parties will have access.

Lora Darrisaw , M.D.                                        June 30, 2020
Arreola, Rodrigo Vs. The Consolidated Government Of Columbus, Georgia

Page 118

1                    CERTIFICATE
    STATE OF GEORGIA:
2   COUNTY OF FULTON:
           I hereby certify that the foregoing
3   transcript was taken down, as stated in the caption,
    and the colloquies, questions and answers were
4   reduced to typewriting under my direction; that the
    transcript is a true and correct record of the
5   evidence given upon said proceeding.
           I further certify that I am not a relative
6   or employee or attorney of any party, nor am I
    financially interested in the outcome of this action.
7          I have no relationship of interest in this
    matter which would disqualify me from maintaining my
8   obligation of impartiality in compliance with the
    Code of Professional Ethics.
9          I have no direct contract with any party in
    this action and my compensation is based solely on
10  the terms of my subcontractor agreement.
           Nothing in the arrangements made for this
11  proceeding impacts my absolute commitment to serve
    all parties as an impartial officer of the court.
12
           This the 14th day of July, 2020.
13
14
15      _Tracy Williams_____

16
        Tracy A. Williams, B-2168, RPR
17
18
19
20
21
22
23
24
25

Veritext Legal Solutions
800.808.4958                                               770.343.9696

Lora Darrisaw , M.D.                    June 30, 2020
Arreola, Rodrigo Vs. The Consolidated Government Of Columbus, Georgia

**[& - absolutely]**                    Page 1

| & |
|---|
| **&**   5:12 |

| **0** |
|---|
| **0.68**  50:18,21 |
| **0.9**  50:7 51:1,8 |
| 55:19 58:11 97:1 |
| **0.90**  50:6,15 97:2 |
| 111:20 |
| **00005**  1:6 |

| **1** |
|---|
| **1**  3:4 6:1 18:4,10 |
| 18:15,15 24:12 |
| 29:16 30:16 42:3 |
| 108:17,21 |
| **1/19/17**  3:20 |
| **1/26/17**  3:21 |
| **1/9/2017**  109:15 |
| **10**  3:21 5:20 29:16 |
| 31:25 32:3 50:3,5 |
| 56:13 103:21 |
| 106:13 107:5,7 |
| 117:5 |
| **100**  25:6 |
| **108**  4:2 |
| **10:28**  25:14 |
| **10:51**  25:15 |
| **11**  3:22 32:6,9 |
| 36:12 62:5,5,12 |
| 83:23 |
| **1111**  5:15 |
| **11th**  28:16 35:24 |
| **12**  3:23 34:13,14 |
| 34:21 |
| **12:10**  77:5 |
| **12:36**  77:6 |
| **12:51**  89:2 |
| **13**  3:25 77:7,11,14 |
| **13612**  118:15 |
| **14**  3:11 |

| **14th**  118:12 |
|---|
| **15**  8:7 82:19 |
| **15-14-37**  117:7,17 |
| **153**  12:11 |
| **159**  12:11 |
| **1985**  16:2 |
| **1986**  9:13 |
| **1:02**  89:3 |
| **1:40**  116:20 |

| **2** |
|---|
| **2**  3:7 6:1 18:10,15 |
| 24:16,24 30:21 |
| 40:9 47:4 50:10 |
| **2.5**  42:1 |
| **2.7**  43:5 |
| **20**  40:21,22,22,23 |
| **2001**  9:9 12:2,4 |
| 14:24 15:2,5 |
| **2002**  14:20 15:2 |
| **2007**  44:19 |
| **2009**  14:21 |
| **2014**  11:5,6 |
| **2017**  28:17 35:24 |
| 58:1,20 59:5 60:7 |
| 62:1 86:23 109:17 |
| **2017-1000874** |
| 30:6 |
| **2019**  14:14,15 |
| **2020**  2:10 118:12 |
| **21**  9:14 40:21,22 |
| 41:13 |
| **215**  7:20 8:10,11 |
| 8:12 13:20,21 |
| **2168**  2:21 118:16 |
| **221-9371**  5:8 |
| **25**  7:18 94:7 |
| **250**  8:6,8 |
| **26**  3:13,14 9:14 |
| **29**  3:15 |
| **2x2**  41:15 |

| **3** |
|---|
| **3**  3:11 5:6 14:4,5,9 |
| 61:1 |
| **3.0**  43:5 |
| **3/22/17**  3:16,18 |
| **3/22/2017**  30:3 |
| **3/24/17**  3:19 |
| **30**  2:10 3:17 56:16 |
| 68:9 82:12,21 |
| **300**  74:8,24 |
| **31**  3:19,20 9:14 |
| **3121**  2:16 |
| **31901**  5:16 |
| **31904**  5:7 |
| **32**  3:21,22 |
| **324-0251**  5:17 |
| **33**  9:14 |
| **34**  3:23 |

| **4** |
|---|
| **4**  3:13 26:19,22 |
| 27:2 28:14 31:1,2 |
| 43:1,2 46:10 47:3 |
| **4021**  76:23 77:20 |
| 78:3 |
| **4022**  76:24 77:20 |
| 78:3 |
| **4:19**  1:6 |

| **5** |
|---|
| **5**  3:14 26:22 28:23 |
| 29:9,13 89:21,22 |
| 89:25 90:3,12,12 |
| 90:14 102:11 |
| **5,000**  12:9 |
| **5:25**  65:18 |
| **5x2.6**  40:25 |

| **6** |
|---|
| **6**  3:4,7,15 4:11 |
| 29:22,25 30:4 |
| 35:25 36:6,15 |
| 39:20 41:25 42:3 |

| 42:7 47:23 48:2,3 |
|---|
| 48:11 60:15 61:1 |
| 91:10 92:19 |
| **611**  20:16 |

| **7** |
|---|
| **7**  3:17 30:9,13 |
| 36:15 48:4 |
| **706**  5:8,17 |
| **75**  94:8 |
| **77**  3:25 |

| **8** |
|---|
| **8**  3:19 31:7,11 |
| **89**  4:12 |

| **9** |
|---|
| **9**  3:20 31:17,20 |
| **9-11-28**  117:6 |
| **90**  96:24 97:1 |
| **911**  23:22 |
| **9:59**  2:11 |
| **9th**  60:7 86:22 |
| 109:17 |

| **a** |
|---|
| **a.m.**  2:11 25:14,15 |
| **aaron**  1:16 |
| **ability**  8:19 22:9 |
| 22:17 |
| **able**  8:15 19:25 |
| 106:24 |
| **abnormalities** |
| 46:20 61:7 |
| **abnormality**  22:7 |
| 104:6 |
| **abrasions**  103:3 |
| **absent**  86:21 |
| 87:22 |
| **absolute**  118:11 |
| **absolutely**  7:15 |
| 8:3 52:3 |

Lora Darrisaw , M.D.                          June 30, 2020
Arreola, Rodrigo Vs. The Consolidated Government Of Columbus, Georgia

**[abuse - area]**                          Page 2

**abuse** 46:4 54:11
**access** 28:15,16,21
  77:12 117:23,25
**accident** 37:11
**accidents** 11:20
**accuracy** 106:25
**accurate** 14:16
  92:22 99:17,23,25
  100:14 106:14,23
  107:8 114:2 117:9
**accurately** 62:21
  100:15
**action** 1:5 3:10
  117:13 118:6,9
**actions** 98:25
  104:13 114:19
  115:1,16
**active** 16:18
**activities** 21:24
**activity** 104:15
**actual** 43:9 49:24
  77:1 97:20
**acute** 37:2 63:9,17
  71:22 72:13 75:2
  75:3,8,20 79:4
  83:25 84:14,24,25
  87:23 88:6 103:24
  104:4,6,11 105:7
  105:14 107:23
  108:1,3
**acutely** 75:17
**added** 27:14 28:5
  28:8,19 59:14
  92:25 93:2,11
**addict** 45:11
**addicts** 45:18
**additional** 87:19
  100:12
**address** 8:23 82:7
  83:10,15 106:17

**adhesive** 40:11
**administration**
  15:8
**administrative**
  10:21 32:15 37:19
**administrator** 1:5
**admission** 51:3
  58:11 106:9
**adult** 51:10,13
**adverse** 21:6
**aeronautics** 10:6
**aeronomics** 10:4
**affect** 8:19
**affirmatively**
  81:16 87:7
**affixation** 22:2
**affixia** 105:22
**afixiation** 22:12
**ages** 9:12
**aggressive** 21:19
**agree** 102:18
  111:22 112:12,18
  115:6
**agreeable** 6:17
**agreement** 6:9
  117:13,17 118:10
**aguilar** 1:13 24:1
  24:9 63:25
**agular** 74:7
**ahead** 85:12
  107:21
**air** 16:12,13,22
**alan** 5:11 23:25
**alcohol** 8:19 21:6
  31:24
**alert** 23:4
**alerted** 23:7
**allowed** 6:8
**alpharetta** 9:23
**alternate** 79:20

**ambulance** 63:11
  63:17
**amend** 99:8,14,17
**amended** 3:4
  24:12 32:10 36:11
  36:17,24 37:5,11
  62:3,4,12,15,20
  69:13 84:8 88:3,8
  89:12 90:18 93:5
  93:6,9,11 102:10
  114:9,10
**amending** 87:12
  90:10
**amendment** 36:18
  39:2
**amendments**
  36:16
**amount** 12:12
  49:20 55:20 56:15
  111:18
**amphetamine**
  76:13
**amphetamines**
  109:10
**analysis** 58:10
  60:23 75:9 76:10
  78:21 79:12 91:11
  102:4,8 106:16
  110:3
**anatomic** 61:7
**ancillary** 91:6
  102:3,3,6,7
**answer** 6:17 7:10
  7:11 20:25 21:1,2
  23:13 45:14 52:4
  52:7 53:15,19,20
  59:24 69:5 80:16
  81:5,16,17,18
  82:16,18,20,23
  83:3,6,9 85:14
  86:10 87:7 95:7,9

106:6 107:21
  108:10 111:8
  113:19
**answered** 13:25
  69:24 73:25 84:7
  85:8,10 86:3,25
  96:17 115:19
**answers** 75:23
  87:4 117:21 118:3
**antecubital** 40:10
  40:13
**anterior** 40:17
**anticipated** 32:22
  37:16
**anybody** 8:5 10:8
  34:3 74:18
**anymore** 66:5
**anytime** 100:12
  113:5
**anyway** 96:16
**apologize** 115:20
**apparently** 37:22
  53:11
**appearances** 5:1
**applicable** 34:22
**application** 73:10
  73:14,23
**applied** 59:3 60:4
  72:25 73:5,9
  117:18
**appreciate** 96:17
  100:17 112:25
**appropriate** 88:13
**approximately**
  7:17 9:8,12
**april** 14:15
**area** 8:23 33:6
  40:25 41:7,16
  42:7 44:3 47:2
  56:10,15 65:22,23
  94:16 116:3

Lora Darrisaw , M.D.                    June 30, 2020
Arreola, Rodrigo Vs. The Consolidated Government Of Columbus, Georgia

[areas - benefits]                                  Page 3

**areas** 12:24 13:1
42:3
**arena** 105:15
**arguing** 108:6
**arrangements**
118:10
**arreola** 1:3,4,6,6,7
1:8 3:14 35:20
36:2,8 37:25 40:7
45:11 49:10 58:7
58:24 59:4 60:4
62:17 63:1,25
64:9,15,23 65:5,25
66:5,7,24 67:9,23
68:4,10 74:9
75:25 80:22 82:12
83:2,8 86:22 99:9
103:14 106:3
107:10 109:5
111:19 113:21
**arreola's** 44:24
45:8 49:21 55:21
62:22 64:14 67:14
69:4 70:10 76:8
84:4 85:7,22
94:12,18 101:14
112:9 114:3
116:14
**arrest** 59:5 60:7
63:12,21 76:4
80:23 81:10,14
97:8,19 98:2,12
102:14 107:14
**arrhythmia** 97:23
**arrhythmias**
97:22
**arrived** 65:24
**arryhemia** 51:21
**article** 5:20 117:5
**asked** 60:2 69:24
78:15 84:7 85:8,9

85:11 86:3,25
88:11,11 90:24
92:2,17
**asking** 19:18,19
23:6 56:2 80:19
85:5,17 107:22
**asks** 28:4
**asphysia** 116:10
**asphyxia** 22:3,6
108:9,11,12
115:21,23 116:3,5
116:9,11
**assessment** 74:4
**assigned** 117:9
**assistance** 34:9
**assistant** 32:15
37:19
**associate** 14:20
15:4
**associated** 19:4
20:13,15,18 21:4,9
21:16,25 98:21
**assume** 25:21
**assumption** 25:5
**attach** 76:21 88:15
**attached** 18:12,13
24:18,18 78:1
89:18 101:13
**attended** 15:6
**attention** 11:23
**attorney** 117:16
118:6
**attorneys** 117:23
**attribute** 58:14
61:13
**attributed** 53:13
72:12
**audible** 68:15
**audio** 66:1
**author** 55:3

**automatically**
117:18
**autopsies** 11:1,7
11:14 12:3,7
45:17,19 79:13
96:19,22 97:4
98:10 113:11
**autopsy** 23:18
24:25 25:5,22
28:17 30:3,19
32:10 35:19,23
36:2,5,7 37:24
39:14,19 42:19,22
44:4 47:6,7,7,16
49:23 50:4,19
62:13,15,17,19
76:10 77:14 79:25
90:17 91:4,5,8,8
91:11 100:18,21
100:24,25 101:1,7
101:20 102:3,15
102:21,23 103:13
111:9,13 113:15
114:2 116:12,15
**available** 88:12
**avenue** 5:15
**average** 96:11
**aware** 17:8 32:25
46:7 57:6,13
74:23 76:1 79:7

**b**

**b** 2:21 5:20 18:7
40:14 55:3 117:5
117:7,17 118:16
**b.s.** 16:1
**back** 16:21 18:2
18:21 40:24 41:7
41:9,9,14 42:1,5,6
42:8 44:19 48:1
58:1 60:13,18,20
61:3,4 65:22,23

73:1,6,12,24
102:25
**background** 14:12
**bad** 7:12 112:23
**based** 11:17 49:21
56:22 58:10,18,21
61:24 63:10 74:24
81:6 90:16 91:9
95:3,12 100:2
103:18,19 118:9
**baseline** 66:14,15
66:16 68:25 69:1
70:23 71:2,6,7,11
72:11 87:20 99:10
99:10,15 104:21
**basic** 22:5
**basically** 95:16
**basis** 15:19 39:9
55:17,18 96:2
117:7
**bates** 77:22
**bay** 5:15
**begging** 67:25
68:4
**beginning** 90:5,7
90:15
**begins** 27:6
**behalf** 5:2,9
**behavior** 21:19
**behaviors** 19:4
21:3,8
**believe** 11:6 20:16
24:2 36:1 55:4
61:21 64:2 92:19
93:12,17,23 94:4
95:18 102:5 107:7
113:21
**believed** 96:24
**benefit** 48:16
**benefits** 35:4

Lora Darrisaw , M.D.                          June 30, 2020
Arreola, Rodrigo Vs. The Consolidated Government Of Columbus, Georgia

**[benzodiazapine - causes]**                          Page 4

**benzodiazapine** 76:13
**benzodiazapines** 109:11
**benzoylecgonine** 111:5
**besalt** 55:3 56:5
**besalt's** 57:9
**best** 7:12
**better** 62:10 100:23
**big** 16:4 65:6
**billed** 17:22
**biology** 16:5
**bipolar** 21:4
**bit** 39:13 89:10 92:23 93:22 110:17
**bizarre** 21:19
**blank** 66:9
**bleeding** 42:4,6,11
**blood** 19:10 31:23 41:8 49:3,21 50:10,10,17,19,20 50:21 51:4,4,9,13 51:24 52:1 53:8 55:21 58:11 75:15 76:8 78:20,21,22 78:25 79:1,2,2,13 79:25 80:6 101:14 106:9 109:22,24 110:5
**board** 5:21 117:5
**body** 24:8 43:9 44:3 55:8 61:17 64:14 73:10,15 75:9
**book** 54:11,12,16 54:21,24 57:16,19
**books** 57:21

**boren** 1:18
**born** 9:13
**bought** 109:2
**boyfriend** 65:9
**bradley** 5:6
**brain** 22:8,10 48:19,20,23 49:1,5 49:6,11,14 116:7
**break** 88:25
**breathe** 22:18 67:14
**breathing** 22:21 66:1 69:4 81:20
**brian** 1:14
**bring** 13:6 17:11 17:21 24:25 26:2 26:6
**brittany** 30:22 37:18
**bronchopneumo...** 105:14
**brought** 24:22,23 25:2,9 26:15 27:1 31:11
**bruise** 73:12
**bruises** 41:19
**budget** 35:6
**bureau** 3:23 10:15 11:3
**business** 12:22

**c**

**c** 5:3,10 40:14 48:15 117:6
**call** 27:22 28:1,7 100:19
**called** 23:20 76:3 113:15
**calls** 27:24,24 28:4
**cam** 24:8 61:17
**canton** 9:25

**capacity** 1:14,15 1:17,19
**caption** 118:3
**captioned** 39:25
**captions** 40:1
**car** 44:19
**carbondale** 9:21
**cardiac** 36:25 51:21 63:7,12,21 69:13 70:5,23 72:7 76:4 80:23 81:10,14 83:23 84:11 88:4 97:8 97:17,19 98:2,12 98:23 102:13,14 102:17 104:11,15 105:5 107:14 112:22 113:5,7
**cardio** 98:4
**cardiomegaly** 96:7
**cardiopulmonary** 59:5 60:6
**cardiotoxic** 51:19 97:16 112:21
**cardiovascular** 46:17
**career** 12:7 17:16 54:9
**carotid** 66:3
**case** 10:8,8 21:16 27:3,14 30:6 32:24 33:12 34:9 35:10,20 37:16 49:9 56:16,20 57:5,9,24 60:5,23 60:23 61:11,16,17 61:22 70:14 71:11 77:14,19 90:25 99:4 100:16 101:12 102:5,7,9 102:16,22 103:2

108:9,12 111:11 111:16 113:21 114:3 115:3 117:7 117:7,18
**cases** 11:19 17:24 52:13 54:8 56:16 57:13,15 71:9 98:9,14 115:24
**cashbaugh** 30:22 31:5 38:4
**cashbaugh's** 37:20
**catheter** 40:10
**caught** 59:17
**causative** 61:13
**cause** 8:15 11:16 19:21,22 20:1 36:16,24 39:3 47:20 51:20 54:1 58:9,25 61:11,16 62:2,22 63:7 64:9 65:3 69:13 70:4 70:13 72:4 80:18 80:20 81:7 82:1 82:13 83:15,22 84:8,11 85:1 86:1 86:7,17 87:13,14 87:18,25 88:2,7 90:18 91:4,13,19 93:5,8,19 96:20,25 97:8,19 98:5,11,13 98:18 99:2,16,24 99:25 100:3,5,7,14 100:15 101:24 102:2,13 103:23 105:4,13,14 112:14,21 113:8 115:25 116:8,11
**caused** 98:12 114:25
**causes** 83:18 97:21 112:17 116:2,5

Lora Darrisaw , M.D.                              June 30, 2020
Arreola, Rodrigo Vs. The Consolidated Government Of Columbus, Georgia

**[ccg - concluded]**                                    Page 5

| | | | |
|---|---|---|---|
| **ccg** 20:20 77:20,20 | **chief** 1:18 | 84:16,19 85:8,11 | **coming** 35:7 50:23 |
| **cd** 3:25 25:21 26:9 | **chiefly** 10:7 | 86:3,24 87:3 | 91:4 |
| 77:12 | **child** 1:7 | 88:19,24 89:5,6,22 | **commitment** |
| **cdl** 1:6 | **children** 9:10 | 89:24 93:10 95:1 | 118:11 |
| **center** 4:2 35:11 | **chris** 24:1 | 95:9,14 97:10 | **commonly** 42:18 |
| 109:8 | **chronic** 21:5 | 99:20 104:25 | **company** 9:24 |
| **centimeter** 40:25 | **circle** 18:2 | 107:19,20 108:16 | **compensation** |
| 41:15 43:2,5 | **circumstances** | 108:19 116:17 | 34:8 117:13 118:9 |
| **centimeters** 42:1 | 11:15,16,18 27:10 | **class** 110:22 | **complete** 88:14 |
| 47:4 | 57:1 58:12 83:11 | **clear** 14:2 21:18 | 93:12 117:9,20 |
| **central** 41:14 | 83:17 91:7,13 | 39:21 | **completed** 32:17 |
| **centre** 5:14 | 98:16 100:3,4,9,10 | **clinic** 94:4 | **completely** 7:25 |
| **certain** 19:9 22:5 | 100:11,14 | **clinical** 100:20 | 8:20 36:6 62:16 |
| 56:14 57:12,17 | **circumstantial** | **clinically** 94:2 | 62:20 |
| 100:8,19,24 101:5 | 100:8 | **clinician** 96:3 | **complex** 105:15 |
| 113:14 | **civil** 1:5 3:10 | **clinician's** 96:6 | **complexity** 105:25 |
| **certainly** 46:6 | 16:12,13,22 | **clinicians** 80:17 | **compliance** 117:4 |
| 53:23 81:1 87:18 | **clark** 4:12 5:10 | 95:21,24 96:1 | 117:12 118:8 |
| 87:24 98:7 103:5 | 6:14 8:4,8,12 | **close** 9:14,16 | **complicate** 71:22 |
| 112:13,14 | 13:16 16:21,24 | **cocaine** 21:5 76:13 | **complicated** 37:2 |
| **certainty** 86:21 | 18:4,6,14,17,19 | 109:6,11 110:17 | 71:24 84:14 |
| **certificate** 118:1 | 19:13 20:3,7,11,14 | 110:19,19,20,25 | 104:10 105:7 |
| **certified** 58:20 | 20:18,20 21:10 | 111:1,4,6,7 | **complicating** 72:2 |
| 70:13 91:14,19 | 22:20 23:5,10 | **code** 117:12 118:8 | 83:25 84:25 88:6 |
| 117:8,21 | 25:12,24 26:8 | **coding** 80:13 | 103:24 104:3 |
| **certifies** 71:9 | 29:5,8,11,21 38:5 | **colleagues** 33:18 | **complies** 46:11 |
| **certify** 118:2,5 | 38:5,6,7,10 39:20 | **collected** 50:16,19 | **compound** 99:19 |
| **cetera** 94:19 | 39:23 41:2 45:13 | 50:21 51:1 | **compressed** 22:15 |
| **change** 16:4 69:12 | 45:24 46:5 47:13 | **collects** 27:17,18 | **compressing** |
| 92:16,17 100:13 | 47:21 48:2,5 50:1 | **college** 15:23 | 22:17 |
| 100:14 | 51:15 52:21,25 | **colloquies** 117:20 | **compression** |
| **changed** 35:15 | 53:10 55:22 59:7 | 118:3 | 22:14 |
| 92:14 | 59:12,16,20,25 | **columbus** 1:2,12 | **compressional** |
| **changes** 36:17,21 | 60:8 63:3 68:19 | 1:17 5:7,16 15:6 | 22:2,11 116:11 |
| 37:12 62:18 93:14 | 69:9,21,24 70:11 | 15:12 20:21 23:23 | **concentrations** |
| 93:17 117:22 | 70:19 71:4 72:17 | **combination** 54:2 | 55:8 56:11 |
| **charts** 94:10 | 73:25 74:10,14,16 | 98:7 | **concepcion** 1:6 |
| **checking** 66:3 | 74:20,22 75:4 | **come** 11:23 18:21 | **concerning** 91:13 |
| **chemical** 79:20 | 76:17,21,25 78:7 | 48:1 60:13 88:9 | **conclude** 58:5 |
| **chest** 22:16 | 80:25 81:22 82:6 | 96:12 100:11,21 | **concluded** 116:20 |
| | 82:22 83:20 84:6 | 100:25 102:1 | |

Lora Darrisaw , M.D.                          June 30, 2020
Arreola, Rodrigo Vs. The Consolidated Government Of Columbus, Georgia

[conclusions - dated]                          Page 6

**conclusions** 62:22
**condition** 8:15
  46:7 64:23 65:4
  65:14 66:12
  104:20
**conditions** 46:1
  55:9
**confident** 41:21,23
**confirmed** 79:16
  79:19
**conflicts** 10:10
**confused** 18:9
**confusion** 21:20
**congestion** 48:23
  49:2,2
**conjunction** 90:17
  91:12
**connected** 44:6
**consider** 51:11,18
  64:8 92:21 94:18
  95:6,12,19 115:20
**considered** 27:12
  28:6 30:17 55:14
  55:25 56:4 79:18
**consistent** 21:8,22
  73:11,15,22 103:1
  103:5,8 107:14,21
**consolidated** 1:12
**contact** 37:21
**contacted** 37:15
  117:15
**contained** 89:16
**contains** 30:5
  77:14
**contract** 117:12
  118:9
**contracts** 117:7
**contribute** 70:9
  73:20
**contributed** 86:12

**contributing** 84:4
  85:6,18 86:2
**contributory**
  58:15 61:14
  114:21
**controlled** 113:22
**contusion** 41:23
  60:18,20 61:3,4
  73:12 102:25
  103:3
**contusions** 41:19
  41:21,22 103:6
**copies** 13:11 25:18
  25:19,20 26:6,9
**copy** 3:22 17:22
  18:18,22 24:15
  25:23 28:10 30:2
  32:10,20 76:17
**coroner** 27:11,22
  27:23,24,24 51:2,6
**coroner's** 3:15
**correct** 7:1,2,5,8
  8:21 10:5 11:8,10
  12:5,20,23 13:22
  13:23 14:1,11,18
  14:22 15:9,20
  16:2,3 18:16
  19:24 20:2 24:20
  24:21 25:10,11
  26:16,17 30:7,8
  31:2,3 33:10,17,19
  33:20,23 34:2,20
  34:24 35:2,8 36:4
  36:22,23 37:3,4,7
  37:9,10,12 38:14
  38:23 40:2,3,8,12
  40:18,19 41:14,15
  42:15,16,19,20,22
  44:10,20,25 45:8,9
  45:18 49:11,18,19
  50:8 51:25 53:22

58:25 60:7,15,16
  62:13,24 63:2,4,16
  63:22 64:1,2,7,16
  66:25 67:1,12,20
  68:5 77:15,16
  80:8,11 81:15
  82:5 84:5 86:23
  88:2 90:8,19,21,22
  93:14,18 96:21
  99:5,11,12 100:25
  101:10,11,15,16
  102:21 103:16,22
  104:23 110:6
  111:4 112:3
  113:12,13,16,17
  114:1,7,10,11,13
  114:16 115:2,5
  116:15 117:20
  118:4
**correcting** 48:13
**correlate** 102:23
**correlated** 103:10
**costs** 34:17
**counsel** 5:1,23 6:9
  117:1
**counties** 12:11,15
  12:16
**county** 27:11
  118:2
**couple** 14:4 90:4
  111:17
**coupled** 98:1,11
  113:1
**course** 15:17
  17:15 36:10 68:8
  92:13 115:23
**court** 1:1 5:6,21
  5:23 6:20 8:10
  17:2,6 26:10
  40:14 48:15 77:17
  84:23 117:5,21

118:11
**cpr** 76:2,5
**cries** 67:14
**crime** 52:8,11
**criteria** 93:25 95:3
  95:12,16,18 96:1,6
  113:14
**cross** 20:5
**crying** 67:25
**curious** 29:15
  104:2
**current** 75:11
**currently** 10:14
**curriculum** 3:11
  13:6 14:9 24:24
**custodio** 1:9
**custody** 11:21
  17:18 22:25 82:1
  113:24 114:5,5
**cut** 42:12
**cuts** 35:6
**cv** 1:6

|   d   |
|-------|

**d** 6:24 24:3
**d1** 4:2
**dangerous** 22:19
**dark** 40:25 41:10
**darrisaw** 1:25 2:5
  3:6,12 6:3,7,13,20
  6:24,25 8:22
  24:14 25:17 26:25
  77:10
**darrisaw's** 3:22
**data** 53:20
**date** 14:12,14,16
  14:17 29:6 87:14
  88:7 90:16 91:22
  92:13 102:9
  109:14
**dated** 3:16,18,19
  3:20,21 30:3 90:9

Lora Darrisaw , M.D.                    June 30, 2020
Arreola, Rodrigo Vs. The Consolidated Government Of Columbus, Georgia

**daubert** 17:6
**daughter** 9:23,25
  10:2
**day** 16:21 49:13
  50:24,24 63:14,15
  73:19 118:12
**days** 75:16
**dead** 63:15
**death** 11:16 19:22
  20:1 22:22 27:8
  27:19,25,25 28:2
  36:16,16,24,25
  37:8 39:3 49:5,8
  49:11 53:24 54:1
  58:9,12,15,20,25
  61:11,14,16 62:2
  62:23 63:7,8,19
  64:10,21 65:3,7,11
  66:20,22 68:23,24
  69:13,13 70:4,6,10
  70:13,24 71:10
  72:4,7,12,16 78:25
  80:18,21 81:7
  82:14 83:11,15,18
  83:22,23 84:5,8,11
  84:11 85:1,7,22
  86:1,6,7,9,17,19
  87:13,15,18,22,25
  88:2,4,7 90:18
  91:5,7,13,14,20
  93:6,6,8,19,20
  96:20,25 97:17
  98:12,13,16,18,23
  98:24 99:2,25,25
  100:1,2,3,3,5,7,15
  101:24,25 102:2
  102:13,14,17
  103:23 104:11,15
  105:4,5,13,15,24
  106:3 111:15
  112:9,13,14,17,22

113:2,5,7,8,11,21
113:23 114:4,6,10
114:20,25 115:17
115:25 116:8,9,11
**deaths** 10:23
  11:19,20,23 17:17
  23:1 52:18 53:13
  65:6 71:9 82:1
**decatur** 2:16
**deceased** 1:4
**decedent** 96:23
**december** 16:2
**decided** 99:8
**declined** 17:2
**deep** 10:13
**defendant's** 4:1
**defendants** 1:20
  5:9 24:7 108:17
  108:20
**defense** 13:14 31:4
  37:24 38:22,24
  77:21
**defer** 80:17 111:25
**definite** 93:25
**definition** 22:5
  114:13,16,19
**definitions** 115:9
**degree** 16:11
  86:20
**delayed** 63:19
**delirium** 18:25
  19:5,12,19,21 21:4
  21:9,13,23,25
**department** 1:18
  20:21 30:5 52:14
**depending** 41:9
**deposition** 1:23
  2:4 3:5 6:6,9
  18:12 20:11 23:17
  24:13,19,23 26:2
  27:1 28:25 32:13

34:3,4 37:16 62:1
77:13 88:16 90:23
91:21,25 92:11,24
116:20
**depositions** 6:15
  7:1,16 17:12,15
  21:15 34:18
**described** 21:14
  43:3,24
**description** 3:3
  41:6 61:3
**designed** 79:21
**detail** 44:22
**detained** 17:17
**determination**
  91:4 116:8
**determine** 44:5
  64:9,24 65:14
  76:7 83:14 94:1
  102:15
**determined** 100:2
  117:13
**determining** 65:3
  78:24 95:19 96:10
**diagnosed** 49:11
**diagnoses** 60:15
**diagnosis** 60:17,19
  60:21 61:22 80:13
**diagnostic** 40:2
**die** 11:14,15,18
  53:2 63:1
**died** 11:19,21
  58:24 63:14 80:23
  81:6 86:22 87:7
**difference** 36:12
  82:11
**differences** 36:14
  62:25
**different** 57:23
  61:23 66:15 83:16
  91:22 93:3 94:20

98:15 109:20,23
110:5,7 114:15
**differently** 114:23
**difficult** 108:10
**difficulty** 7:21
  50:13
**direct** 114:25
  117:12 118:9
**direction** 118:4
**directly** 43:23
  44:14 51:5 115:18
**director** 10:18
**disagree** 74:15
  111:23
**disc** 25:4,22,24,25
**discharge** 4:2 77:2
  109:4,9
**discipline** 13:4
**disclaimer** 78:1
  79:15
**disclosure** 5:22
  117:5
**disclosures** 117:1
  117:2,4,14
**discount** 117:19
**discounts** 117:18
**discovered** 25:19
**discovery** 6:8
**discuss** 38:13
  111:25
**discussion** 26:12
  26:21 39:16
**discussions** 38:15
**disease** 46:18 54:7
**disorder** 21:5
**disorientation**
  21:21
**disposition** 55:4,5
  55:16
**disputed** 24:8

Lora Darrisaw , M.D.                                      June 30, 2020
Arreola, Rodrigo Vs. The Consolidated Government Of Columbus, Georgia

**[disqualification - examiner]**                                      Page 8

| | | | |
|---|---|---|---|
| **disqualification** 117:6 | **dropbox** 29:19 | **eisenstat** 30:18 | **entitle** 59:20 |
| **disqualify** 117:11 118:7 | **drug** 46:14 51:19 52:1 54:4,11 56:8 56:10 58:2 67:3 75:13 78:10,20,22 78:23,24 79:3,4,6 79:11,14,24,25 80:3,9 97:15,21 109:9,21 110:23 | **either** 11:15 79:1,2 79:19 94:6 114:20 114:25 115:17 | **entitled** 20:6,8,16 27:3 59:10,18 |
| **disrepair** 45:22 46:4 | | **elaborate** 92:22 110:17 | **equivalent** 16:10 |
| **district** 1:1,1 10:9 | | **elbow** 40:17 | **era** 35:6 |
| **disturbance** 97:24 97:24 98:6 | | **eldest** 9:19 | **especially** 35:6 |
| **division** 1:2 31:13 31:22 | | **electrical** 16:1 | **esq** 5:3,10,11 |
| **doc** 20:25 35:3 | **drugs** 8:19 11:22 19:9,9 54:5,5,6,22 55:5,8,12,13,16,16 55:17 56:13 57:12 57:17 76:7 77:25 79:1,5,21 80:6 109:23,24 110:8 110:22 | **elevated** 19:10,10 19:11 | **essentially** 12:21 27:21 40:4,17 41:11,18 51:23 92:25 104:22 |
| **doctor** 8:16 14:8 16:6 18:25 19:17 24:20 50:12 56:25 59:17 60:2 77:18 84:19 85:12 89:6 | | **else's** 98:25 | **estate** 1:6 |
| | | **embry** 10:3 | **estimate** 12:6 |
| | | **emory** 10:24 | **et** 94:19 |
| | | **employed** 9:6,17 10:1,14,15 14:23 15:4 | **ethics** 117:12 118:8 |
| **doctors** 95:19 | **duces** 3:5 24:13 | | **event** 20:10,17 63:17 68:22 70:24 71:10,11 72:10,11 84:10 |
| **document** 23:20 24:6,17 27:13 28:3,6,12,14 30:5 30:17 36:6 47:8 62:16 94:4 | **dudley** 1:15 24:1,9 63:24 | **employee** 118:6 | |
| | **due** 23:1 63:2 105:22 | **employees** 15:15 | |
| | | **employment** 9:2 9:19 10:10 | **events** 64:20,22 67:19 |
| | **duly** 6:4 | | **everyone's** 66:15 |
| **documents** 3:7 38:25 94:8 | **duties** 10:22 | **emts** 75:25 | **evidence** 40:1,5,20 40:23 46:13,18,20 118:5 |
| | **dvd** 25:20 77:12 | **encountered** 19:20 | |
| **doing** 11:14 65:13 91:3 111:14 | | **enforcement** 17:18 37:1 58:23 65:8 69:14 83:24 84:12,13 86:5,8,18 88:5 102:19 104:10,18 105:6 108:4 111:11 113:25 | **evident** 11:17 |
| | **e** | | **evrard** 1:16 24:2,9 63:25 65:20,24 68:3,9 |
| **domestic** 65:8 | **e** 24:3 29:19,20 30:21 31:5 32:19 32:19 37:18,20 40:14 48:15 55:3 88:13 92:7 | | |
| **dose** 111:21 | | | **exactly** 18:16 57:12 |
| **dr** 3:6,22 6:7,13,20 6:25 8:22 24:5,13 25:17 26:25 30:18 33:12,15,18,24 34:3 54:10,12 77:10 112:2,8,16 | | | **examination** 4:9 4:11,12 6:11 20:5 45:7 89:4 |
| | **earlier** 33:14 36:1 42:17 82:21 93:16 93:23 96:18 97:7 97:12 101:9 115:19 | **engaged** 107:12 | |
| | | **engineer** 16:5,7 | **examined** 6:4 |
| | | **engineering** 10:4 16:2 | **examiner** 3:13 14:20 15:4 23:19 25:10 26:16 27:4 27:6,15 28:11,14 65:2 83:10 93:25 |
| **draft** 3:22 32:10 32:13,17 34:4 36:21 88:22 | **economics** 16:11 | **enlarged** 46:23 93:22,24 94:2,13 94:20,25 95:13,20 113:1,4 | |
| | **edema** 48:22,25 | | |
| **driving** 56:17 92:23 94:15 95:16 | **education** 14:13 | **entire** 70:24 71:23 | |
| | **effect** 55:6 | | |

Lora Darrisaw , M.D.                    June 30, 2020
Arreola, Rodrigo Vs. The Consolidated Government Of Columbus, Georgia

94:21 95:18 96:7
98:9 99:24 101:19
114:18
**examiner's** 3:17
10:16 11:25 12:10
12:15,17 25:3
27:19 28:1 33:22
35:4 52:12 113:10
114:23
**examiners** 55:7
95:22,23
**exception** 29:2
**excited** 18:25 19:4
19:12,19,20 21:4,9
21:13,22,25
**excluded** 66:21
112:15
**excuse** 35:15
65:19
**exertion** 98:1,6,11
98:16,18,21 99:1
**exhibit** 3:3,4,7,11
3:13,14,15,17,19
3:20,21,22,23,25
4:2 6:1,1 14:4,5,8
18:1,4,4,6,10,11
18:14,15 24:12,16
24:18,24,25 25:18
26:2,19,22,22 27:2
28:14,23 29:9,13
29:22,25 30:4,9,13
31:2,7,11,17,20,25
32:3,6,9 34:14,21
35:25 36:12 39:20
49:24 50:3,5 62:5
62:12 77:7,11,14
83:23 89:19,21,25
90:3,9 91:10
92:19 101:13
102:11 103:21
106:13 107:5,7

108:17,21
**exhibit's** 36:6
**exhibited** 67:2
**exhibits** 3:1 18:11
117:22,22,24
**existed** 104:20
**existence** 90:21
**expect** 6:25
**expectation** 56:14
**expected** 49:4
**experience** 8:5
53:25 57:22
**experienced** 17:16
**expert** 13:3,19
17:3 19:6,11,15,18
19:19 32:24 33:3
33:3,11,25 62:21
94:17 106:16
111:16,17,25
112:5 115:10,13
115:21,23,24
116:3,4,9
**expertise** 12:25
13:1 33:7
**experts** 94:11
**explain** 52:17,20
54:21
**explains** 75:21
**explanatory** 40:4
**external** 45:7
**extra** 13:11
**extremities** 46:13
46:16 103:3
**eye** 44:7 101:2
**eyes** 66:1

**f**

**f** 5:5 40:15
**face** 89:6,7
**fact** 19:7 63:18
70:5 102:16,22
103:1,10

**factor** 22:22 84:4
85:7,18,20,21 86:2
97:16 112:9,13
113:5
**factors** 23:1 54:2
113:6,6
**facts** 24:7,8 58:22
69:15 70:14
102:23 107:18
**factually** 71:7
**fair** 40:7 53:8
61:11 67:3 91:1
103:12 106:11
108:2
**fairly** 67:10 89:12
**falls** 94:7
**familiar** 15:12,21
18:24 19:1,7
21:24 22:25 54:12
54:13 114:17
**family** 10:9
**far** 12:18,19 34:23
44:2 79:7 115:12
**fatty** 42:13 61:9
61:10
**fault** 115:15
**fee** 3:24 34:11,12
34:17,22,23
**feel** 62:10 95:17
97:18
**fellow** 15:3
**fellowship** 10:25
15:3
**felt** 58:16 104:20
116:10
**fentanyl** 57:14,15
**field** 19:15,18
33:25 94:17
114:12
**fifth** 60:17

**fight** 20:22 107:13
**file** 1:5 29:5,15
**final** 32:20
**finally** 68:14
**financial** 117:6
**financially** 118:6
**find** 19:22 25:23
46:13,18,20 62:10
74:21 101:21
102:13,20 106:22
**finding** 47:6,12,17
48:6 49:14 60:22
87:19 103:18
**findings** 38:13
41:11 47:8,8,11,14
47:17,23 48:4
49:16 60:14,24
61:22 73:11,15
90:16,17 91:11
100:20,22,24
101:22 102:3,23
103:10,14 107:15
107:23 108:8,11
108:12
**fine** 8:23 31:16
76:20 89:1
**finish** 7:9,10 84:16
**finished** 84:19
**firm** 117:1,14
**first** 6:4,24 37:15
38:16,17 39:18
40:1 49:17 56:7
89:9 101:25
108:16
**fit** 113:21
**five** 53:18 56:24
**flip** 46:10
**floor** 5:14
**fluid** 27:12 28:6,12
**fly** 16:16

Lora Darrisaw , M.D.                                    June 30, 2020
Arreola, Rodrigo Vs. The Consolidated Government Of Columbus, Georgia

| focus 45:2,5 64:3 | forming 65:1 | 91:6 96:11 110:13 | h |
|---|---|---|---|
| 65:3,6,10,14 71:18 | forms 117:5 | give 18:21 24:15 | |
| 73:21 89:13 | fossa 40:11,13 | 33:7 34:25 51:6 | h 3:14 48:15 |
| focused 44:22 64:3 | found 19:21 49:21 | 56:3 77:17 | half 43:1 50:24 |
| 64:20 66:12 | 60:25 69:7,11 | given 6:25 7:16 | hallucinations |
| foe 113:14 | 88:1 102:21,24 | 118:5 | 21:20 |
| following 18:20 | 111:19 | gives 56:6 | hand 24:14 62:5 |
| 36:25 63:14,15,19 | four 107:13 | giving 35:25 76:2 | 66:2 |
| 64:23 65:5,13,15 | frame 50:25 65:12 | glass 31:15 44:23 | handcuffed 83:8 |
| 69:14 70:6,24 | 65:12 | go 9:19 15:16 16:4 | 114:8 |
| 71:10 72:2 83:23 | francis 23:24 | 17:25 25:12 26:11 | handcuffing 59:4 |
| 84:11 88:4 91:10 | 35:11,18 44:18 | 26:20 39:15 57:16 | 60:5 |
| 104:15 105:5 | frequently 45:22 | 77:3 85:12 92:3 | handcuffs 103:9 |
| 117:1,3 | friend 1:8 | 93:25 98:5 107:21 | handed 14:10 |
| follows 6:5 | frontal 43:3,6,10 | goes 26:9 | handl 12:21 |
| force 32:23 33:2,8 | 43:17,25 44:3,15 | going 6:15 9:18 | happen 28:4 38:2 |
| 73:5,23 | 44:15,16 | 15:21 17:25 24:14 | happened 27:23 |
| ford 5:13 | fully 7:24 8:16 | 24:15 25:18,21 | 64:8,21 65:10 |
| foregoing 118:2 | fulton 118:2 | 26:18,25 27:1 | 67:17 68:22 83:16 |
| forensic 10:19 | further 118:5 | 28:5 32:12,21 | 102:17 105:24 |
| 11:9,11,13,23 13:1 | | 39:13 60:13 66:15 | hard 50:13 |
| 13:19,22 15:2 | g | 67:15 75:12 76:19 | head 21:7 105:13 |
| 17:3,9 19:20 30:5 | | 77:18 78:2 89:9 | heading 46:12 |
| 31:13,23 33:25 | gain 22:4 | 91:22 109:23 | hear 7:25 68:4 |
| 52:15 64:6 115:24 | gbi 12:1,4,8,10 | 111:18 | hearing 7:21 69:6 |
| 115:25 116:1 | 14:24 15:5,15 | good 31:16 45:8 | heart 19:11 46:18 |
| form 6:16 20:3,14 | 27:3,17 33:21 | 57:17 103:12 | 46:21,23 63:10,12 |
| 21:10 22:20 23:5 | 34:8,12,19,23 76:6 | gotcha 8:12 | 93:22,24 94:1,5,9 |
| 23:7,10 41:2 | 78:15 109:19 | government 1:12 | 94:12,19,24 96:2,8 |
| 45:13,24 46:5 | 110:5 | graduate 9:22 | 96:11 97:21,25 |
| 47:13,21 51:17 | gbi's 12:22 101:8 | 16:5 | 98:5,6 113:1,4 |
| 52:21,25 55:22 | general 8:23 22:6 | grandfather 16:24 | hearts 94:18 96:10 |
| 59:7,12,16 63:3 | 97:22 113:3,10 | great 32:21 | 96:12 |
| 67:21 68:19 69:9 | generally 9:18 | gross 59:8 | hector 1:4,6,7 |
| 69:21 70:11,19 | 106:23 107:15 | guess 16:10 56:2 | 35:20 36:2,8 |
| 71:4 72:17 74:10 | georgia 1:1,13 | 70:3 80:19 94:15 | 37:25 40:6 44:24 |
| 75:4 80:25 81:22 | 2:16 3:23 5:7,16 | 95:15 97:18 107:3 | 45:7,10 49:10,21 |
| 82:6 83:20 84:6 | 5:21 8:24 9:5 10:1 | 107:24 114:5 | 55:20 58:6,24 |
| 86:24 93:4 94:22 | 10:9,15 11:3 | gunshot 105:13 | 59:4 60:4 62:17 |
| 99:18 107:17 | 12:11 52:6 113:12 | guys 32:19 113:15 | 62:22 63:1,25 |
| | 117:4,8 118:1 | | 64:9,14,15 66:23 |
| | getting 44:17 | | 67:9,13,23 68:3,9 |
| | 52:16 63:13 70:3 | | |

Lora Darrisaw , M.D.                                    June 30, 2020
Arreola, Rodrigo Vs. The Consolidated Government Of Columbus, Georgia

69:3 70:9 74:8
75:25 76:7 80:22
82:11 83:2,8 84:4
85:7,22 86:22
106:3 107:10
112:9
**height** 94:9
**held** 11:5 73:3,8
**help** 93:24 97:6
99:14 100:19
**helpful** 44:5
**hemmorhage** 74:4
**hemorrhage** 42:4
42:9 43:2,5,15,16
47:2,24 48:8 61:2
73:16,18
**hemorrhages**
42:24
**hey** 92:3,5
**high** 55:25 56:4
57:7 81:8 107:12
107:25
**highly** 55:15
**history** 11:17
**hold** 33:2
**homicide** 37:9
114:10,12,13,16
114:19,24 115:4,7
115:16
**homicides** 11:20
**hospital** 23:24
35:11 40:5 49:12
50:10,17,24 51:3,4
58:11 73:19 74:3
75:12 76:4 78:10
78:23 79:6,24
106:9 109:16
110:3
**hospitals** 79:11
**hotel** 15:21

**hour** 34:18
**humming** 68:10
**hyperactivity** 19:8
21:20
**hyperthermia**
21:17,18
**hypothetical**
107:16

**i**

**idea** 7:17
**identification** 6:2
14:6 26:23 29:23
30:10 31:8,18
32:1,7 34:15 77:8
77:22 108:18
**identified** 36:1
47:2 50:11
**identify** 31:20
46:15 47:7 110:23
**ii** 16:25
**iliac** 50:19
**illicit** 51:14,17,19
51:25 52:1 54:5
55:14,16
**illinois** 9:21,22
**imagine** 114:17
**imee** 1:8
**immediately** 11:17
57:5 82:4
**impacts** 118:11
**impaired** 22:22
**impartial** 118:11
**impartiality**
117:11 118:8
**impedes** 22:9
**imperviousness**
21:17
**importance** 47:16
**important** 7:7
47:9,10 64:25
65:1 69:20 70:18

70:21 99:13
**improper** 33:8
**inaccurate** 93:1
110:4
**inasmuch** 98:4
**incarcerated**
113:24
**incident** 107:11
**incised** 42:25
**incision** 43:19
**incisions** 42:5
**include** 21:4 72:25
102:4
**included** 23:22
58:12 69:14 70:6
70:16 71:12,15
72:9 83:24 86:5,8
86:18 87:20
103:11
**includes** 90:12
100:4 110:18
**including** 37:1
84:13,23 88:5
102:19 104:18
105:6
**inclusive** 99:2
**income** 34:7
**increase** 104:13
113:2
**increases** 81:14
98:6
**independent** 57:25
61:20 91:17 116:9
**indeterminate**
79:19
**index** 3:1 4:9
**indicate** 44:11
45:10 79:4,15
**indicated** 26:6
32:18 33:14 44:8
77:13 85:19 87:14

88:12 92:5,7
112:20
**indicates** 50:14
54:17 84:9 91:9
109:9 114:24
**indicating** 68:11
79:23
**indication** 44:1
69:3 81:7
**indicative** 46:16
**indicators** 46:3
**indirect** 114:25
**indirectly** 115:18
**individual** 1:14,15
1:16,19 27:9 39:7
72:3,5,6,13 73:18
74:2 78:22 94:7
100:8 104:6
**individually** 37:17
**individuals** 11:14
**inescapable** 112:9
**influence** 8:18
11:21 19:9 56:18
56:24 98:22
104:16
**inform** 39:7
**information** 3:8
24:17 26:1 27:10
27:13,17 28:2,5,15
56:7 58:18 59:14
91:6,12,16,19,23
92:2,3 100:10,12
102:8,10
**informed** 27:8
39:2
**initailly** 92:2
**initial** 23:19 28:2
28:18 30:2,19
67:10
**initially** 27:8

Lora Darrisaw , M.D.                     June 30, 2020
Arreola, Rodrigo Vs. The Consolidated Government Of Columbus, Georgia

**[injuries - left]**                                    Page 12

| | | | |
|---|---|---|---|
| **injuries** 43:7 | **investigator** 27:7 | **july** 12:2,4 14:20 | **knowing** 103:8 |
| **injury** 40:21 44:6 | 27:16,18,20,25 | 14:20,24 15:2,5 | **knowledge** 17:5 |
| 47:20,23 73:21 | **involve** 11:18 | 118:12 | 52:14 73:8 |
| **inserted** 104:19 | 17:16 | **jump** 89:10 | **known** 13:9 18:24 |
| **inspection** 3:9 | **involved** 10:24 | **jumping** 29:11 | 81:25 98:19 |
| **instance** 22:17 | 44:12 70:15,21 | 93:21 | **knows** 27:23 |
| 28:7 40:9 57:14 | 78:25 87:21 98:25 | **june** 2:10 90:6,7 | **kris** 33:15 |
| 98:21 102:12 | 105:16 114:4 | 90:15 | |
| 105:18,21 110:16 | **involvement** 40:6 | **jurisdiction** 12:18 | **l** |
| 110:25 | 98:17 | **jury** 7:19 10:8 | |
| **instances** 113:20 | **involves** 44:16 | 74:21 | **l** 6:23 40:14 55:3 |
| **intended** 79:17 | **involving** 43:2,6 | | **lab** 3:19,20,21 |
| 111:10 | 43:16 103:6 | **k** | 52:8,11 76:11 |
| **interactions** 63:24 | **irregular** 41:16 | | 77:25 106:21 |
| **interchangeably** | **isolate** 105:25 | **karch** 54:12 55:18 | 109:3 |
| 22:13 | **isolated** 47:24 | **keep** 21:1 87:3 | **labs** 102:6,6 |
| **interest** 117:6,10 | 48:7 54:4 60:18 | **kill** 67:15 | **laceration** 43:4,11 |
| 118:7 | 73:18 84:1 85:23 | **killed** 58:6 | 43:24 44:12,24 |
| **interested** 9:17 | 102:25 105:17 | **kind** 63:13,17 | **laptops** 25:21 |
| 118:6 | **issue** 71:25 101:24 | 65:23 67:4 89:13 | **large** 49:7 |
| **interesting** 16:20 | **issues** 96:16 | 91:25 104:5 | **lateral** 40:24 43:6 |
| **interim** 65:11 | **item** 50:10 | 105:14 108:10 | 43:10,16 |
| **interpret** 56:20,25 | **items** 29:16 89:9 | **kinds** 98:15 | **law** 5:4 6:9 17:18 |
| **interprets** 56:22 | 89:11,15 90:1,2,10 | **knee** 73:11,15 | 37:1 58:23 65:8 |
| **interrupt** 18:8,20 | 90:24,25 91:2 | **knew** 33:24 | 69:14 83:24 84:11 |
| **intervention** 40:2 | 101:23 102:1 | **know** 7:3,6 8:1 | 84:12 86:4,8,18 |
| **interviews** 23:25 | | 12:18,19 13:14 | 88:4 102:18 104:9 |
| **intravascular** | **j** | 19:25 23:13 29:12 | 104:18 105:6 |
| 40:10 | | 32:25 34:23 37:15 | 108:4 111:10 |
| **intravenous** 46:14 | **james** 5:10 | 39:4,6 41:20 | 113:25 117:4 |
| **introduction** 56:8 | **january** 28:16 | 44:21 45:15 47:15 | **lawyer** 13:14 31:5 |
| **invalid** 93:1 | 35:24 59:5 60:7 | 49:10 50:12 52:4 | **lawyers** 7:11 |
| **investigation** 11:4 | 86:22 109:17 | 52:10,10 55:6 | 34:18 37:24 38:19 |
| **investigation's** | **jector** 1:8 | 57:19,21,22,23 | 38:22,24 112:23 |
| 3:23 | **jessica** 107:5 | 64:14 67:16 71:7 | **layers** 42:11 |
| **investigations** | **jezreel** 1:8 | 73:17 74:7 76:15 | **lead** 20:8,16 |
| 10:16 | **jim** 89:6 | 78:5 79:10 82:16 | **leading** 20:4 94:22 |
| **investigative** 24:5 | **jimmy** 18:22 | 82:18,20,23 83:3,6 | 97:9,11 104:24 |
| 29:3 30:24 90:1 | **jogging** 98:22 | 83:9 87:10 89:19 | 107:17,19 |
| 91:12,16,19,23 | **jr** 5:10 | 94:14 96:10 106:6 | **leaves** 75:8 |
| 92:2,6 102:8,10 | **judge** 73:4 106:24 | 108:6 111:8 | **led** 90:10 |
| | **judgment** 58:8 | 112:23 115:12 | **left** 40:10,24 43:2 |
| | 66:19 | 116:5 | 43:6,10,16,25 44:3 |

Lora Darrisaw , M.D.
June 30, 2020
Arreola, Rodrigo Vs. The Consolidated Government Of Columbus, Georgia

**[left - mean]**
Page 13

44:7,15,15,16 47:3
47:24 48:7 73:16
**legal**  114:15,18
115:8,9,10,13
117:8,15
**legs**  66:8
**lethal**  111:20
**letter**  24:5
**letting**  78:8
**level**  51:9,12,18,20
51:23 52:2 53:7
55:10,25 56:3,4,17
56:21 57:16 58:16
68:7 81:9 96:22
**levels**  57:23 58:3
101:14
**license**  16:17,19
**life**  10:14 41:19
**light**  56:20 57:1
**link**  29:19
**list**  17:11 18:1
28:24 29:12 31:1
41:23 42:3 47:8
47:10,14,17,22
55:13 56:8,15
89:16,19 105:14
116:12,14
**listed**  31:14 36:25
37:8 39:7 40:5
41:12,20 42:25
43:12 47:18 49:16
60:14 70:1,4
80:20 83:22 90:2
98:18 102:11
105:12 107:3
113:7 115:4
**listened**  63:23
64:12
**listing**  101:2
**lists**  77:2

**liter**  50:6,7,15,18
50:22 51:1,8
55:20 58:11 96:24
111:20
**little**  18:9 39:13
77:20 89:10 90:21
92:22 93:22
110:17
**live**  8:22,24 9:18
**liver**  61:8,9,10
79:3
**lives**  9:21,23,25
10:2
**lividity**  41:1,8,8,10
41:17
**llc**  5:4
**lobe**  47:3
**locations**  93:18
**loganville**  10:2
**long**  9:8 11:2
45:11
**look**  13:15 23:9
25:7 42:6 46:12
56:19 57:8,17
65:6 68:24 78:3
83:11 91:9 94:5
100:9 103:2
**looked**  46:25
55:24 57:24 61:25
62:1 92:4 109:21
**looking**  39:18
41:21 43:20 56:22
57:4 65:4,10
67:18 68:22 77:10
78:25 87:19 92:13
95:3
**looks**  23:6
**lora**  1:25 2:5 3:6
3:11 6:3,7,23
24:13

**lot**  16:11 39:8
52:23 57:7 59:14
68:14 86:15
**loudly**  67:10,24
**low**  60:18 68:6,10
**lower**  41:14 42:1,8
60:20 61:2,4
65:22 68:14 73:12
102:25 103:3
**lung**  47:3,18,24
48:7 73:16

**m**

**m**  48:15
**m.d.**  1:25 2:5 3:12
6:3
**ma'am**  30:1
**mail**  29:19,20
30:21 31:5 32:19
32:19 37:18,20
88:13
**mailed**  92:7
**main**  66:12
**maintain**  91:23
**maintaining**
117:11 118:7
**major**  16:8 71:25
**making**  25:17,20
66:16 68:15,17
105:20 117:11
**man**  55:5
**manner**  11:16
36:16 37:8 39:3
62:2 64:9 65:3
82:14 90:18 91:5
91:20 93:6,8,20
99:24 100:1,1,7,15
100:16 101:24
102:2 114:10
**manslaughter**
115:12

**manual**  54:24 56:3
57:9,9
**march**  14:15 58:1
58:20
**marijuana**  109:7
109:12
**mark**  5:3,4 14:3
26:18 29:14 34:13
40:25 41:6,10,16
41:24 82:22
108:16
**marked**  6:2 14:5
24:12 26:23 27:2
29:22 30:9,12
31:7,10,17,25 32:6
34:14 77:7,20
108:17,20
**markings**  77:21
**marks**  46:15
**married**  8:25
**master's**  15:7
**material**  3:14 39:8
63:10 74:24
**materials**  21:15
23:16 28:24 29:8
39:1,5
**mathematics**  9:3
**matter**  54:21,22
103:10 117:10,16
118:7
**maximally**  41:25
**mayo**  94:4
**mean**  10:20 11:1
16:11 17:21 18:8
18:20 27:17 41:5
42:10 48:18,24
52:12 54:20 64:20
72:21,23 73:2,4
75:2,6,6 78:21
79:5 83:9 86:14
94:23 95:20 96:12

Lora Darrisaw , M.D.                                    June 30, 2020
Arreola, Rodrigo Vs. The Consolidated Government Of Columbus, Georgia

**[mean - new]**                                          Page 14

98:21 99:23 105:9
105:10,12,20
110:1,2,10,17,22
110:24 115:7,11
115:14
**meaning** 49:2
75:10 104:3
110:12,24
**means** 10:21 22:6
22:7,8,14 40:17
57:2 72:24 75:8
75:19,20 86:12
94:6 110:4,7
114:19,24 115:16
**meant** 13:24 104:2
104:4
**measure** 96:12
**measured** 47:3
**mechanism** 97:20
**medial** 47:3
**medical** 3:13,17
4:2 10:16 11:25
12:10,15,17 14:20
15:4,23 23:19,23
23:24 25:3,10
26:16 27:4,6,15,19
28:1,11,13 33:22
35:4,9,11 40:6
45:4 49:10 52:11
55:7 65:2 76:11
77:18 78:19 80:10
80:12 83:10 86:20
93:25 94:20 95:18
95:21,23 96:7
98:9 99:24 101:19
109:8 113:10
114:13,18,23,24
**medications** 21:7
55:10
**meet** 89:7

**mehan** 107:5
**men** 54:23
**mental** 8:15
**mentioned** 77:25
99:3 104:22
**mentioning** 54:10
104:17
**met** 89:6
**metabolism** 56:10
56:23
**metabolite** 110:21
111:6,7
**metabolized** 79:5
109:24 110:9,19
110:24 111:2
**meth** 97:19 109:6
**methamphetamine**
21:6 37:5 45:11
45:18,20 46:3,8
49:17,20 50:5,15
50:18 51:8,12,16
51:17,19,24,25
52:3,5,9,13,18,23
53:2,7,14,24 54:1
54:3,4,8 55:20
56:1,4 57:6 58:1,4
58:6,9 59:1 63:2
71:22,24 72:1,3,6
72:13 75:3,7,8,10
75:14,16 76:12
80:3 81:8,9 83:25
87:15,17,23,24
88:6 96:19,23,25
97:8,15 98:2,4,10
98:14,20,23,24
101:14 103:17,24
104:5,7,12,16
105:8 106:4,8
107:12,24,25
108:3 111:19
112:8,17,21 113:2

**methamphetami...**
109:11
**methamphetimine**
85:1 91:14
**methanphetamine**
46:2
**methanphetimine**
37:2
**method** 79:21
**michael** 1:13
**mid** 65:23
**midback** 73:7
**middle** 1:1 10:9
**midline** 42:1,8
**midtown** 4:2
35:11,13 108:23
108:24 109:8
**mild** 48:23 49:1
**milligram** 56:13
**milligrams** 50:6
50:15,18,22 51:1,8
55:19 58:11 96:24
111:20
**millimeters** 50:7
**milwaukee** 15:25
**mind** 8:2 88:24
89:18 106:2,13
**mine** 76:18
**minor** 1:7
**minute** 18:22
39:15 82:17,19,21
**minutes** 18:1
107:13
**mischaracterizat...**
59:8
**mischaracterize**
59:21,22
**mischaracterizes**
84:7 86:25
**mischaracterizing**
60:9 74:11

**missions** 16:14
**misstated** 97:2
**misstating** 107:18
**moaning** 68:10,16
83:5
**moderate** 48:22
48:25
**moderately** 49:1
**modifies** 63:21
**molecular** 16:5
**mom** 67:15
**money** 34:25
**month** 90:5
**moreland** 24:1
**motion** 17:7,7
**multiple** 26:6
85:11 87:4 99:18
113:6
**murder** 115:7,8

**n**

**n** 40:14 48:15
**naked** 101:2
**name** 6:21,23 9:24
24:2 35:16 54:11
107:2
**narrative** 27:7,9
28:3
**natural** 54:7
**nature** 63:9,16
**near** 73:7
**necessarily** 73:20
109:18
**neck** 66:3
**needed** 91:25 92:1
**negative** 79:20
**negligence** 115:15
**never** 26:6 66:17
70:22 72:10 92:12
99:9
**new** 90:10

Veritext Legal Solutions
800.808.4958                                          770.343.9696

Lora Darrisaw , M.D.                                   June 30, 2020
Arreola, Rodrigo Vs. The Consolidated Government Of Columbus, Georgia

**[newman - oxycodone]**                                   Page 15

| | | | |
|---|---|---|---|
| **newman**  33:12 | 71:4 72:17 74:10 | 71:9 91:24 92:3 | 108:8,25 111:8 |
| **nice**  89:7 | 80:25 81:22 82:6 | 92:15 113:10,10 | 112:11 115:11,19 |
| **noise**  66:17 | 83:20 84:6 86:24 | **office's**  73:14 | **old**  9:13 |
| **nondiseased**  96:15 | 87:5 93:4 94:22 | **officer**  1:13,14,16 | **oldest**  9:21,23,25 |
| **nonspecific**  49:6 | 99:18 | 24:1,1,2,3,8,9,9 | **once**  38:22 88:16 |
| 108:13 | **objection**  20:17,19 | 65:20,20,20,21,23 | 89:8 |
| **normal**  94:7 | 60:8 74:1 88:20 | 65:24 66:11 68:3 | **ones**  57:23 |
| **normally**  51:9 | 97:9 104:24 | 68:9 74:7 111:11 | **online**  15:10 |
| **nos**  40:22 | 107:16,17,17,18 | 113:25 118:11 | **open**  3:25 25:4 |
| **notations**  48:11 | **objections**  6:14 | **officer's**  66:7,8 | 66:2 |
| **note**  47:5 75:24 | **objective**  41:11 | 73:10 | **opinion**  24:5 33:7 |
| **noted**  20:19 40:21 | 47:8,10 100:22,24 | **officers**  20:21 33:8 | 36:18 37:14 60:23 |
| 45:7 47:15 48:22 | 101:23 103:9 | 58:13 63:24 64:18 | 61:15 65:1 67:21 |
| 67:16 68:8 79:8 | **objectively**  101:4 | 66:2 82:4,8 | 80:22 92:13 93:8 |
| 79:10 | **objects**  3:8 | 107:13 108:7 | 93:19 94:24 96:1 |
| **notes**  66:1 | **obligation**  117:11 | **offices**  12:15 | 111:14,15,24 |
| **notice**  3:4 6:10 | 118:8 | **official**  1:14,15,17 | **opinions**  61:5 |
| 18:12 24:13,19,19 | **obligations**  10:22 | 1:19 3:15,17,19,20 | 62:21 92:1 |
| 45:3 75:24 77:24 | **observations**  36:7 | 3:21 30:2,17,19 | **opportunity**  37:23 |
| 91:21 | 62:16,19 | 31:14,22 32:4,14 | 38:21,25 |
| **noticed**  20:11 | **obtained**  51:7 | 93:13 | **opposed**  75:12,17 |
| 80:12 | **obvious**  45:18 | **oftentimes**  19:8,10 | 96:7 105:17,21 |
| **noticing**  117:16 | **obviously**  7:3 11:7 | 100:9 108:11 | 109:24 110:13 |
| **number**  26:14 | 24:11,23 26:15 | **oh**  8:8,12 53:6 | **ordering**  117:25 |
| 27:3 40:23 49:25 | 28:19 35:19 40:24 | 108:23,25 | **original**  36:21 |
| 57:2,7,13 89:20 | 63:14 66:3,23 | **okay**  7:13 8:12 | 39:18 58:8,22 |
| **numbers**  77:21 | 69:19 81:5 113:11 | 12:21 17:25 18:3 | 61:15 91:8 92:18 |
| **numeral**  48:4 | **occasions**  15:16 | 18:14 19:3 22:11 | 100:13 |
| | **occur**  23:4 65:7 | 24:11 25:8 27:16 | **originally**  15:24 |
| **o** | **occurs**  113:24 | 27:21 29:21 32:12 | 58:5 91:22 |
| | **ocga**  117:6,7,17 | 38:7 49:16 53:6 | **outcome**  82:15 |
| **o**  6:23 40:15 | **october**  11:6 | 56:22 57:3 58:5 | 83:10,12,13,14 |
| **oaks**  24:3 | **offer**  95:25 | 58:17,21 61:15 | 118:6 |
| **oath**  7:3 | **offered**  15:15 | 64:5 66:23 67:18 | **outside**  33:6 63:18 |
| **object**  19:14 20:3 | **office**  10:16,24 | 69:3 70:3,8 72:15 | 69:5 76:2 91:23 |
| 20:14 21:10 22:20 | 12:1,10,17 23:22 | 75:15 76:6 78:17 | 97:22 98:17 |
| 23:5,7,10 41:2 | 23:24 24:4 25:4 | 79:8 86:12 88:17 | 100:11 101:20,20 |
| 45:13,24 46:5 | 27:19 28:1 29:4 | 89:14,22 90:7 | **oversee**  10:23 |
| 47:13,21 51:15 | 29:14 30:23 32:15 | 92:15 95:5 98:1 | **oxycodone**  76:13 |
| 52:21,25 55:22 | 33:21,22 35:4 | 99:6 102:12 104:8 | 109:6,10 |
| 59:7,12,15,16,25 | 37:18 38:9 52:12 | 106:2 107:19 | |
| 63:3 68:19 69:9 | | | |
| 69:21 70:11,19 | | | |

Lora Darrisaw , M.D.                                    June 30, 2020
Arreola, Rodrigo Vs. The Consolidated Government Of Columbus, Georgia

[oxygen - positive]                                         Page 16

| | | | |
|---|---|---|---|
| **oxygen**  22:4,8,10 116:7 | **parts**  64:17,20 93:7 | **persons**  115:1 | **player**  25:21 77:12 |
| **p** | **party**  117:12,19 118:6,9 | **petecci**  108:13 | **playing**  66:21 72:12 87:22 |
| **p**  48:15 | **password**  117:23 117:24 | **phone**  28:7 | **plays**  68:23 71:8 |
| **p.c.**  5:13 | **pathologic**  60:15 | **photographs** 42:14 | **please**  27:5 30:1 67:14 68:4,5 95:8 |
| **p.m.**  77:5,6 89:2,3 116:20 | **pathologist**  11:9 11:11,13,24 19:20 116:1 | **photos**  24:25 25:5 25:22 42:19 44:4 77:14 | **pleural**  47:24 48:7 73:16,18 74:4 |
| **packet**  13:12 25:2 26:1 30:23 | **pathologists**  64:6 | **phrase**  70:8 74:12 105:17 106:1 | **point**  58:15,19 65:19 66:4 68:5 68:13 75:11 91:24 |
| **page**  3:3 5:12 30:4 30:16,21 36:15,15 39:18 40:1,9 46:10 47:23 48:2 48:3,11 60:15 61:1 | **pathology**  10:19 13:2,2,19,22 15:3 17:3,10,10 33:25 54:11 115:24 116:1 | **phrased**  85:25 86:17 | **police**  1:17,18 20:21 33:3,8 58:13 59:3 60:5 63:24 64:17 66:24 82:3,7,11 107:13 108:6 |
| **pain**  21:17 | **patrol**  16:12,13,22 | **physical**  8:14 | **poor**  46:7 |
| **panthersville**  2:16 | **pay**  34:19 | **physician**  97:6 | **pope**  92:7 |
| **paranoia**  21:19 67:2 | **pediatric**  10:19 11:1 13:2 17:10 | **pick**  10:8 | **population**  58:3 |
| **paranoid**  107:12 | **pediatrics**  10:23 | **piece**  44:23 | **portions**  41:9 |
| **parenchyma** 48:11,12 | **peer**  30:17,18 32:16,17 88:10,16 | **pieces**  93:11 | **position**  11:3 22:5 22:8,9,16 37:1 |
| **parent**  1:4,7 | **people**  11:19,21 45:17,19 52:6,23 53:8 56:15,17,24 82:4 | **piedmont**  23:23 35:14,15,17,17 45:4 108:22 109:1 | 43:9 52:11 65:25 69:7,15,16,19,25 70:7,9,16,22 71:1 |
| **park**  5:6 | | **pilot's**  16:17,19 | 71:12,15,17,18,19 |
| **part**  47:16 67:10 69:16,25 70:4,20 71:1 76:9 80:18 80:20 81:12 88:16 96:9 101:7,7 105:3 108:22 | **percent**  25:6 94:8 | **place**  117:17 | 71:20,21,23 72:10 72:15,19,24 73:3,8 80:24 81:11,13,19 81:25 83:19,24 84:3,13,24 85:6,24 86:5,8,19,21 87:8 87:21 88:5 102:19 103:11 104:19 105:7 116:16 |
| | **perform**  42:22 | **placed**  65:25 | |
| | **performed**  12:3,7 28:17 35:19,23 36:2 45:17,19 | **places**  103:13 | |
| | **permit**  3:9 | **plaintiffs**  1:10 5:2 6:1,7 14:3,5,8 18:10 24:6,12,16 26:22 27:2 28:14 28:23 29:22,25 30:4,9,13 31:2,7 31:11,17,20,25 32:3,6,9 34:14,21 35:25 36:5,11 50:3,5 62:5,12 77:7,11,13 89:21 | |
| **particular**  11:3,5 28:10,22 36:17 41:7 47:11,12 52:10 73:3 82:13 84:1,10 102:5,9 | **person**  15:10,11 38:8 65:13 68:24 115:1 | | |
| **particularly**  47:22 56:12 100:6 | **person's**  78:25 94:1,24 114:20 | **play**  60:22 100:4 102:1 | **positional**  22:1,3 115:21,23 116:2,5 116:8,10 |
| **parties**  88:13 90:25 91:3 100:11 117:18,25 118:11 | **personal**  1:4 10:14 | **played**  66:20 72:16 86:6,9,12,19 104:13 114:20 115:17 | **positive**  45:20 53:24 79:16,19 |
| | **personnel**  40:6 | | |

Lora Darrisaw , M.D.                                                June 30, 2020
Arreola, Rodrigo Vs. The Consolidated Government Of Columbus, Georgia

[positive - question]                                                Page 17

80:6 109:10 111:4
**possible** 67:3
111:1
**post** 4:11 5:3,4 6:6
6:12,18,19 8:13
13:17 14:3,7 17:1
18:5,10,16,18,21
18:23 19:16 20:5
20:9,13,15,19,22
20:24 21:12 22:24
23:9,12,15 25:16
26:3,11,13,20,24
29:24 30:11 31:9
31:19 32:2,8
34:13,16 38:12
39:15,17,22,24
40:13,16 41:4
45:16 46:9 47:19
47:25 48:9,14,17
50:2 51:22 52:22
53:4,12 59:10,15
59:18,22 60:1,12
63:5 69:2,18,22
70:2,17,25 71:13
72:20 74:6,12,15
74:18,21 75:1,5
76:19,23 77:3,9
78:8,11,14 81:3,24
82:9,25 84:17
85:3,9,13,16 86:11
87:9 88:15,23
89:21 90:14 93:4
94:22 95:7,10
97:9 99:18 104:24
105:2 107:16
108:15 112:3,5
116:19
**post's** 29:14
**postmortem** 31:23
32:5 102:6

**potentially** 51:20
**pounds** 74:8,24
**practice** 42:21
91:3
**practices** 33:4
**premarked** 14:4
18:7,8
**premed** 16:8
**premises** 3:9
**preparation** 61:25
**prepare** 23:16
91:25 92:11
**prepared** 25:25
26:1 27:7 30:18
36:11 90:23
**prescription** 54:6
55:10,12,14,16
56:13
**present** 5:23 75:17
75:19,20 76:7
110:12,12,20,22
**presented** 75:1
117:1
**pressure** 19:11
**prestruggle** 99:10
**presume** 45:22
**pretty** 16:4 41:21
**previous** 81:7
90:17 105:1
**previously** 43:3
68:21 78:1 102:24
109:21 111:1
**primarily** 16:15
**print** 29:20
**prior** 87:12,18
**private** 16:17,19
**probably** 13:15
38:10 76:25 77:1
88:8 112:23
**problem** 18:19
74:17 81:12 96:9

**procedure** 79:17
**proceeding** 5:24
117:1,19,24 118:5
118:11
**proceedings** 117:9
**process** 83:14
**produce** 3:7 24:17
**produced** 117:20
**production** 26:10
**professional** 23:25
24:4 30:24 58:8
117:12 118:8
**professor** 9:3
**program** 15:14
**programs** 10:23
10:25
**prohibited** 117:17
**prohibitions** 117:7
**project** 83:12
**prone** 37:1 69:7,15
69:16,19,25 70:7,9
70:16,22 71:1,12
71:15,17,17,19,20
71:21,23 72:9,15
72:19 80:23 81:11
81:13,19,25 83:18
83:24 84:3,13,23
85:5,23 86:5,8,18
86:21 87:3,8,21
88:5 102:19
103:11 104:18
105:6
**pronounced** 24:2
63:15
**pronunciation**
48:13
**proper** 33:3,8
**protected** 117:23
117:24
**protection** 16:22

**protocol** 76:9
78:24
**provide** 99:24
112:5 117:16
**provided** 21:2
23:21 24:10 27:10
27:14 35:10 76:5
77:23 90:3 101:19
112:2
**public** 15:7
**pull** 76:16
**pulled** 113:18
**pulling** 89:19
**pulses** 66:3
**purple** 40:25
41:10,16
**purpose** 47:7
**purposes** 6:8,8
77:22 79:17,25
**pursuant** 5:20
6:10
**put** 69:12 76:19
77:21 86:1 114:22
**puts** 66:2 81:9

**q**

**qualified** 13:3
86:14 116:7
**qualify** 17:2
**qualitative** 79:16
80:1,3 109:22
110:8,10,11,12,16
110:18,22 111:4
**quantitation** 80:2
106:8
**quantitative** 80:1
110:13
**quantities** 106:4
**quantity** 110:13
**question** 6:16 7:10
7:11,24 19:14
20:25 23:8,11

Lora Darrisaw , M.D.                              June 30, 2020
Arreola, Rodrigo Vs. The Consolidated Government Of Columbus, Georgia

32:22 53:3 59:11
59:14,19,23 64:19
69:11 74:12 75:23
77:24 78:7,13
79:22 85:5 86:10
95:7 96:17 101:25
106:2,13 107:17
109:5,13 111:9,22
113:19
**questions** 74:22
89:11 99:19 105:2
116:18 117:20
118:3
**quickly** 75:9
**quiet** 68:16
**quit** 83:2,5
**quite** 15:12 45:22
57:13 58:2,4
**quote** 55:23

**r**

**r** 6:23,24,24 24:3,3
48:15
**range** 52:2 94:6,6
94:8
**rate** 19:11 98:6
**ration** 44:7
**raymond** 24:3
**reactions** 21:6
**reactive** 76:12
77:25 79:15,18
**read** 44:18 107:2
**real** 74:22
**really** 9:16 63:20
67:6 71:18 74:17
74:17 81:18 83:15
84:1 108:11 115:8
**reason** 7:23 10:7
44:17 69:20 71:2
99:7 107:7 115:3
**reasonable** 86:20

**reasons** 82:3
**recall** 35:13,17
44:21 45:1,5 67:9
67:25 68:12 78:2
92:5
**received** 24:20
29:1,3,7,13,14,17
29:18 31:4 34:7
39:8 49:22 50:17
51:4 58:18 90:13
90:13,14,15
**receives** 117:19
**recess** 25:14 77:5
89:2
**recollection** 57:25
61:19,20 91:17
**reconstruct** 92:1
**record** 3:13 17:23
19:13 23:19 25:13
26:11,12,20,21
27:4,6,15 28:11,13
39:15,16 77:3
117:9,11,20 118:4
**records** 3:25 17:19
23:23,24 25:4
35:10,12 44:18
45:4 49:10 76:11
77:19,22 78:19
80:10,12,14
108:22
**reduced** 118:4
**refer** 42:2 55:2
94:5,10 106:7
**reference** 54:24
55:7,15 56:3 57:4
57:5,8,9 93:7
**referenced** 80:13
**referred** 42:17,18
**referring** 76:15
77:19 78:5

**refers** 49:23 50:4
**reflect** 29:5,16
100:15 105:23
**reflected** 36:15,18
37:12 42:6 43:1
43:20 45:4 66:6
**reflective** 43:14
**reflects** 62:21 63:9
63:17 75:15 86:7
**refresh** 78:8
**regained** 58:16
**regard** 13:21
46:17 66:19
**regarded** 55:15
**regarding** 61:16
62:22 75:24
**region** 41:8 43:2,3
43:25 44:3,16
**regional** 23:23
**regular** 15:19
55:17,18
**regularly** 12:3
**regulations** 5:21
117:5
**relate** 98:2 106:9
**related** 17:21
43:10 63:20 70:14
98:7 103:4
**relates** 10:22 17:9
27:14 55:9 56:12
56:16 70:14 91:6
91:15 94:9 100:10
**relating** 117:24
**relation** 63:7
**relationship**
117:10 118:7
**relative** 28:4 118:5
**relatively** 75:9
**relevance** 80:15
**relevant** 64:13
93:7

**relied** 106:15
**rely** 80:9 101:23
106:20
**remainder** 30:23
**remember** 53:16
53:21,22,23 54:10
76:14 92:4
**renowned** 111:17
**repair** 45:8
**repeat** 70:12 88:3
**repeated** 105:4
**repetative** 112:24
**rephrase** 8:1
**report** 3:15,18,19
3:20,21,22 23:18
25:9 26:16 27:22
30:3,19 31:14,22
32:4,11,14 33:12
33:15 36:1,5,11,21
36:22,24 39:19,19
41:22 49:17,22,23
50:14 58:22 62:4
62:13,15,20 77:1
87:13 88:8,16
89:13 90:11,20
91:9 92:16,17,18
92:22,25 93:1,7,12
93:15 99:8,14,17
101:9,12,21,24
102:10 103:19
106:7,14,15
107:22 111:9,9,13
112:3 114:9
116:15 117:10
**reporter** 5:23 6:21
8:10 26:10 40:14
77:17 84:23 117:1
117:2,6,8,21,22
**reporter's** 48:15
**reporting** 5:21
117:5,16

Lora Darrisaw , M.D.                     June 30, 2020
Arreola, Rodrigo Vs. The Consolidated Government Of Columbus, Georgia

**[reports - scroll]**                                            Page 19

reports   32:24
  33:11 36:13,15
  63:1 93:17 106:20
  109:18 112:6
  116:12
repository   117:24
represent   20:20
  108:21 112:10
representations
  117:3
representative   1:5
requested   31:14
  32:16,18
rescue   16:14
reserve   6:16
respect   94:19 98:8
  102:12
respirator   49:13
respiratory   47:1
response   24:7 26:3
  26:5 37:20
responsible   16:13
responsiveness
  6:17 19:14
restate   8:1
restrained   72:24
  73:7
restraint   23:1 37:2
  69:8,19 70:9 71:1
  71:20,21 72:15,22
  72:23 73:2,3
  80:24 81:14,19,25
  83:19,25 84:3,13
  84:24 85:6,24
  86:5,9,19,21 87:4
  87:8,22 88:5
  102:19 104:19
  105:7
restrict   81:20
restricted   17:6,9

result   79:16,18
  109:3
results   113:22
return   69:1 71:2,6
  71:7,11 87:20
  99:15 104:21
returned   66:13,17
  70:23 71:6 72:10
  99:9
returns   68:24
reveals   43:1,14
review   30:17
  32:17,23 33:11,15
  38:25 91:10 117:1
reviewed   3:14
  23:16,18,18,21
  24:4 28:25 30:18
  30:25 32:16 35:9
  39:8 63:11 74:25
  88:16 89:12 90:24
  99:9 101:19
reviewing   49:9
  90:24
reviews   88:10
rhythm   97:24,25
  98:5
richard   1:18
riddle   10:3
right   7:4,7 8:20
  12:4,11,14 14:10
  14:17 15:8 28:9
  28:20 29:25 31:5
  33:9,16,22 34:1,19
  35:3,7,12,20 36:3
  37:6,21 40:11
  41:19 44:9 47:12
  50:14 51:2,10,24
  57:10,20 59:6
  61:8 62:23 63:15
  64:6,15 67:7,21
  69:8 70:18 71:3

78:11 79:22 80:7
  80:19 83:19 86:2
  86:13 89:15,25
  90:19 93:16,21
  96:5,13 99:4
  101:3,17 103:17
  104:17 106:11,22
  110:10 111:14
  112:2 113:9 114:9
  114:22 115:3,6,11
risk   22:22 72:7
  81:9,12,14 97:16
  104:10,13,14
  113:2,5,6
road   2:16
roam   23:20
roberts   30:22
  37:18
rodrigo   1:3 35:20
role   66:20,21
  68:23 71:8 72:12
  72:16 83:14 86:6
  86:9,12,19 87:22
  99:23 100:4 101:8
  104:14 114:20
  115:17
roman   48:4
route   76:4
rpr   2:21 118:16
rule   20:16
rules   5:20 12:13
  117:5
résumé   13:9

**s**

s   6:24 40:15,15
  55:3
s.a.   1:7
safe   51:12,18,23
samples   52:9
sat   74:8 82:11 83:1
  83:4

saw   41:7 42:14
  44:19 65:17,23
  66:23
saying   58:21 59:2
  59:21 60:3,3,11
  85:21,23 87:10,11
  87:12 95:11
  105:21
says   14:19 40:9,23
  42:25 43:5,13,15
  57:20,22 76:12
  79:15
scalp   43:1,6,14,14
  43:17,25 44:15,15
  44:16
scars   46:15
scene   65:21
schedule   3:24
  34:11,12,17,22,24
schizophrenia
  21:5
school   10:5 15:22
  16:5
science   52:15
  100:6
science's   31:23
sciences   31:13
scrantom   5:12
screamed   67:23
screaming   66:16
  67:4,6,9
screams   67:24
screen   75:13 76:20
  78:6,10,20,23 79:4
  79:6,14,24,25 80:4
  109:9,21 110:23
screening   79:17
screens   78:23
  79:12 80:10
scroll   78:4

Lora Darrisaw , M.D.                                    June 30, 2020
Arreola, Rodrigo Vs. The Consolidated Government Of Columbus, Georgia

se  76:3
search  16:14
seated  65:25 66:7
  66:9,10
second  9:25 25:13
  44:9,12 77:4
  113:23
seconds  68:9
  82:12,19,21
section  36:19 56:7
  56:8 61:5 93:9,19
secured  40:11
see  10:8 13:13
  14:19 17:19,23
  18:6 46:25 48:21
  49:7 50:13 57:14
  57:15 58:2,3,3
  64:25 65:16 73:6
  78:21 79:8,10
  88:11 92:1 103:25
  108:14 109:7
  115:25
seeing  61:20 76:14
seen  45:21 46:1,6
  49:5 53:14,23,24
  54:3,4,6,7 55:10
  56:12,14,17,23
  57:6,22,23 61:16
  61:17,21 92:12
  98:9 101:2
sees  110:8
selected  16:8
self  40:4
send  25:23 39:10
  92:8
sense  101:25
  110:15
sent  30:21 39:1,1,5
  51:2
sentence  37:13
  42:25 43:4 105:19

105:22
sentences  37:13
separate  43:7,11
  44:1,2 49:23
  101:22
separated  43:8
separately  43:12
separating  87:3
  101:18
sepsis  80:13,15
serve  118:11
serves  12:10
service  31:14,23
  32:5
services  30:6
  117:16
set  12:13 83:7
sets  34:17
settles  41:8
seven  30:4
share  34:3
she'd  47:13
ship  51:5
ships  51:6
shock  80:13
short  88:25
shortly  25:7 65:24
show  27:1 77:18
  94:9 108:20 109:4
  109:18
showed  65:21 99:9
  101:13 103:14
showing  14:8
  30:12 31:10 111:2
shown  39:11 109:3
  109:13,16
shows  41:10 75:13
  109:5
side  43:10
sign  115:23

signature  116:21
  118:15
signed  52:12
significance  47:16
  63:6 68:21 69:1
significant  61:6
  64:18 68:18 69:8
  106:4
signs  67:2
similar  17:7
simple  109:5
single  105:25
singling  105:3
sir  8:3,17,21 9:1,7
  9:11 10:18 13:5,8
  13:10 15:25 17:4
  17:19 21:11 28:18
  28:22 29:18 33:13
  34:6,10 36:9,14
  37:22 38:1,18
  39:12 42:23 46:19
  46:22,24 48:3
  51:11 54:3 61:14
  61:20,24 62:7,14
  62:18 67:22 71:5
  81:1 89:17,23
  97:5 107:9 112:4
  112:7
sit  74:10,13,19
  82:4 107:6
sits  22:16
situation  19:22
  65:9
size  41:7 94:19
  96:11
skin  42:6,7,12,12
  42:13,13 43:1,13
  43:14,19,19,21
slightly  114:22
snellville  8:24

snipes  5:11 38:10
  38:11
softly  68:4
solely  53:13,23
  63:2 114:21
  117:13 118:9
solutions  117:8,15
someone's  68:23
somewhat  15:13
  15:14 22:13
soon  83:8
sooner  82:12,17
  82:19
sorry  8:9 18:8,17
  29:11 38:6 39:20
  62:7 78:12 79:1
  97:2
sort  21:21 60:22
sounding  68:10
sounds  8:5 68:10
  68:11,15,16,17
  90:20
southern  9:22
space  43:11
speak  37:23 38:2
  38:21 91:18 94:23
  95:25 96:6 97:20
speakerphone
  5:11
speaking  66:5,11
  106:23
specialist  27:20,25
specializes  11:13
specific  8:23 22:16
  79:20 91:15
  117:18
specifically  22:14
  33:12 40:21 44:8
  44:11,21 57:24
  72:21 74:5 76:1
  77:19 79:21 91:2

Lora Darrisaw , M.D.                    June 30, 2020
Arreola, Rodrigo Vs. The Consolidated Government Of Columbus, Georgia

**[specifically - system]**                    Page 21

117:4
specify  49:24
specimen  50:16
  109:20
specimens  79:3
spectrum  46:1
spell  6:21
spelling  48:14
sperry  33:15,18
  33:24 54:10 112:2
  112:8,16
sperry's  24:5 34:3
spoke  38:4
spoken  38:24
spouse's  9:2
sprouse  5:12
st  23:24 35:11,18
  44:18
stamped  77:22
standard  23:25
  55:15 76:9
standards  24:4
  30:24
stapled  30:15,16
start  9:19 100:1
started  65:18
  66:25 67:7,7
  90:24
state  9:5 15:7
  16:14 19:7 113:12
  117:8 118:1
stated  68:21 118:3
statement  5:22
  24:6,7 66:7 71:10
  72:4 82:14 84:2,2
  84:9,10 85:2,15
  86:7,16,16 87:13
  88:7 98:19 99:2
  100:5 105:5,11,12
  105:16,20,21,23
  107:25 111:23

112:14 113:8
statements  69:6
states  1:1 27:3
stating  19:15
stays  28:11
steven  54:12
stood  87:18
stopped  25:19
stopping  63:10
stops  68:15
straddled  65:22
  73:6
strength  21:17
stressed  84:9
strike  101:5
struggle  36:25
  58:13,14,17,23
  59:13 64:17,22,22
  64:23 65:5,7,10,11
  65:15,17 66:13,20
  66:25 67:7,11
  69:14,16,17 70:1,5
  70:6,15,16,16,20
  70:22 71:12,16,23
  72:8,9,18 81:10
  83:24 84:12,12
  86:4,7,18 87:21,23
  88:4 99:3 102:18
  103:1,4,8,11,15
  104:9,18,21 105:3
  105:6 108:4 115:4
student  9:22 10:3
  15:18
studies  55:11
  56:16 102:3,4,6
study  102:7
stuff  28:19 87:19
subcontractor
  117:8,13 118:10
subcutaneous  42:4
  42:9,24 61:2

103:7
subject  54:21,22
subjectivity  94:16
submitted  5:22
  117:21,22
subpoena  3:7
  18:13 24:17 26:4
subscapular  43:5
  43:16,18
subset  96:11
substance  48:19
substances  113:23
substantial  45:21
  73:23 84:4 85:6
  85:18,19,24 86:15
sudden  22:25
  36:25 63:7,9,12,16
  63:18,20 69:11,13
  70:23 72:7 76:3
  81:10 82:1 83:23
  84:11 88:4 97:8
  97:16,19 98:2,12
  98:23 102:13,14
  102:17 104:11,14
  105:5 112:17,21
  113:2,5,7
suffered  59:5 60:6
  80:23 107:14
suffering  8:14
sufficient  87:24
  92:11
suggest  33:7
  111:10
suggested  97:11
suicides  11:20
suite  5:5
summarize  47:23
summarized  48:7
summary  4:3 24:5
  28:19 29:3 30:24
  36:18 37:14 48:3

49:16 60:14,24
  61:5 77:2 90:2
  92:6 93:19 109:4
  109:9
sunday  28:8
superficial  42:11
superhuman
  21:16
supervise  12:13
supplied  25:3
sure  8:24 9:24
  10:12 11:13 18:3
  22:23 25:6 59:17
  65:2 73:13,17,21
  80:5 81:18 92:12
  99:6 100:2 106:12
  110:2 113:20
surface  42:7
surprise  94:11,14
surrounding
  58:12 64:21 68:22
  83:11 98:16
survivable  52:3
  53:8
survive  52:23
survives  65:9
suspects  17:17
suspicious  11:15
sweating  21:18
swelling  48:25
  49:6
swollen  49:1,15
sworn  6:4
symptoms  19:4
  21:13 23:3
syndrome  18:24
synovus  5:14
sysco  10:1
system  46:18 47:1
  106:5 109:6

Lora Darrisaw , M.D.                     June 30, 2020
Arreola, Rodrigo Vs. The Consolidated Government Of Columbus, Georgia

**[t - toxicity]**                                      Page 22

| t |
|---|
| **t**  1:18 40:14,14 55:3 |
| **tablet**  56:14 |
| **take**  25:7,22 50:12 56:13 78:3 88:24 88:25 96:4 100:8 |
| **taken**  6:7,9 25:14 42:15 77:5 89:2 118:3 |
| **takes**  28:1 |
| **talk**  13:15 32:12 39:13 40:20 56:11 |
| **talked**  38:15,17,19 60:25 89:8 90:2 102:24 112:18 116:5 |
| **talking**  18:11 66:24 76:22,23 77:1 78:9 82:15 83:2 84:21 95:10 95:21,23 107:11 |
| **tape**  40:11 |
| **tapered**  67:24 68:1,2 |
| **tapering**  67:13 |
| **tarvin**  23:25 24:3 |
| **taught**  82:4,8 |
| **technical**  104:3 |
| **technically**  114:5 |
| **techniques**  33:4 |
| **tecum**  3:5 24:13 |
| **teeth**  45:8,21 46:1 46:4,7 |
| **telephone**  89:8 |
| **tell**  6:13,20 11:11 16:12 19:3 22:1 27:4 30:1,13 36:12 40:23 41:3 51:7 56:6 57:11 67:15 111:21 |

**temperature** 19:10
**ten** 111:20
**tend** 45:10
**terant** 110:18
**term** 45:11 100:23 115:8
**terminology** 19:1 66:14 100:20
**terms** 64:19 74:4 78:24 82:13 83:21 104:10 106:15 114:18,24 115:9 115:10,13 116:2 117:13 118:10
**test** 52:14 76:6,12 110:8,8,11,16,18 111:3
**tested** 51:18 110:5
**testified** 6:5 8:6 13:18,24 17:23 92:24 93:23 96:18 101:9
**testify** 8:16,20 17:9 93:16 97:13 111:18 112:16
**testimony** 7:6,7 17:5 34:9 59:8 97:7,13 105:2
**testing** 110:4
**tests** 52:8 77:25 78:16,18 109:22 109:22
**tetrahydrocanna...** 109:12
**text** 56:6
**textbook** 56:3
**thank** 13:16 25:17 28:23 32:22 48:13 75:23 77:10 89:22 95:15 100:17

110:15 116:18
**thanks** 39:23
**thc** 76:14
**therapeutic** 40:2 55:9
**thereof** 96:2 106:25
**thing** 10:11 21:21 59:13 77:2 95:15 109:1
**things** 23:21 24:22 25:2 26:14 27:13 28:3 29:12,13 41:20 66:12 90:3 101:18
**think** 7:23 9:14 14:23 17:8 20:9 26:18 33:14 60:21 60:25 61:7 62:4 88:9,17 89:7 97:7 99:7,22 108:12,15 108:24 109:1 111:8 112:20 116:17
**thinking** 100:18
**third** 5:14 65:20
**thought** 8:8 35:13
**thousands** 52:5,8 52:18
**three** 30:6 64:4 90:21 93:17
**time** 28:21,22 33:19,24 38:16,17 50:12,19,25 53:10 53:10,25 57:15 58:15,19,19 61:23 65:12,12,18,19 66:4 68:13,13 74:8 75:11,19,20 91:16,25 96:16 106:3 107:11

114:6 117:18
**times** 7:16 8:6 13:18 80:14 82:1 85:11 87:1 105:4 105:10 111:20
**tissue** 42:13 61:2 103:7
**tissues** 42:5
**title** 10:17,18 11:5 54:17
**titled** 24:6
**today** 7:4 8:15 17:23 24:23 25:3 26:15 32:16,18 34:9 61:25 88:11 88:12 89:6 91:18 93:13 107:6
**told** 21:3 59:13 107:10
**tom** 33:12
**tomorrow** 88:9 93:13
**top** 48:10
**totality** 90:16 102:2
**touched** 113:9
**toxic** 51:9 55:5,10 56:21 97:21 98:5
**toxicity** 37:2,6 49:18 52:13,19 54:8,23 56:16 57:2 58:6,9 59:1 63:2 71:22,24 72:1,3,6,14 75:3,7 79:5 81:8 84:1 85:1 87:15,17,24 88:6 91:14 96:19 96:25 98:11,15,20 98:24 103:18,24 104:5,7,12 105:8 107:24 108:3

Lora Darrisaw , M.D.                                    June 30, 2020
Arreola, Rodrigo Vs. The Consolidated Government Of Columbus, Georgia

**toxicologist**
106:18 107:1
**toxicologists** 55:7
**toxicology** 32:5
49:22 50:4,14
57:16 58:10 75:9
76:10 78:16,21
79:12 90:18 91:11
101:8,12,20 102:4
102:7 103:19
106:7,13,20
109:18 110:6
**trace** 55:11
**tracy** 2:21 118:16
**transcript** 23:22
34:4,4 117:19
118:3,4
**transcripts** 117:19
117:23
**trauma** 21:7
**treatment** 75:25
76:2 79:17
**trial** 7:7 8:4
**trials** 7:19 13:24
17:12,15,22
**trick** 74:16,18
**trigger** 99:14
**true** 19:23 37:11
38:22 45:12,23
46:4 52:24 54:2
63:21 69:23 80:10
82:1,2 117:20
118:4
**truly** 36:6 62:16
**truthfully** 8:16,20
**try** 7:10,13 101:17
**trying** 10:13 44:5
64:24 74:14,18
89:13 95:17
105:23 112:24

**tucker** 5:12
**turn** 32:14
**two** 10:23 36:13
36:14 37:13 43:7
63:1 93:7 109:20
113:20
**tyler** 30:22 31:5
38:4 92:4
**type** 10:4,10 110:7
110:11
**types** 11:22 19:9
49:7 79:21
**typewriting** 118:4
**typically** 56:12,23

**u**

**u** 40:14
**unable** 22:4
**unclear** 7:25
**undergraduate**
10:3 16:9
**underlying** 22:6
43:3 54:7 71:25
71:25 72:4 104:5
**underneath** 42:7
42:12 43:23
**understand** 7:24
15:6 29:10,15
36:10 64:19 69:10
75:6,7 84:15,18
85:4 86:15 93:24
97:6,7 99:7,15,16
99:21,22 101:18
101:21 105:1
110:2 113:20
**understanding**
21:8,22 57:17
97:12
**understood** 17:20
28:13 58:22
**undersurface**
43:20

**unexpected** 49:14
**unfortunately**
35:3
**united** 1:1
**university** 9:5,23
10:3 15:7
**university's** 10:25
**unlawful** 113:22
**unnatural** 11:19
**uploaded** 117:24
**upper** 47:3,24
48:7 73:16,24
**urine** 75:13,14
78:22,23 79:3,5,6
79:8,11,14,24 80:3
80:9 109:9,21,25
110:3,18,23 111:3
111:5
**use** 21:5 32:23
33:2,8 46:14
52:24 53:14,24
54:1,14,18,19,25
55:17 66:10,14
67:3 76:18 78:18
94:3 96:1 98:2
103:23 113:2,22
**uses** 53:2

**v**

**v** 24:3
**variety** 11:22 49:7
54:8
**various** 49:7
103:13
**ventilator** 49:13
73:19 74:3
**verbatim** 117:11
**veritext** 117:8,15
**vessels** 49:2
**video** 61:17 65:4
65:18,21 66:4,6
73:6

**videos** 24:8 64:3
64:13,13 73:4
103:2
**videotapes** 63:23
**view** 93:2 94:12,21
100:13
**viewed** 108:5,5
**violence** 65:8
**violent** 21:19
**virtue** 17:6
**vitae** 3:11 13:6
14:9 24:24
**vocalization** 68:1
68:14
**vocalizing** 68:6
**voice** 68:6
**vs** 1:11

**w**

**w** 6:24
**wait** 7:9
**waived** 116:21
**want** 40:20 49:24
66:10 76:18 78:3
96:16 99:6,16
101:17,22,22
106:11 110:2
113:19
**wanted** 89:11
97:18 109:3
**war** 16:25
**waste** 96:16
**watch** 23:4
**watched** 63:23
64:12
**way** 24:16 29:14
44:19 52:17 56:5
69:12 70:8,13
82:10 83:21 86:17
87:10 93:2 101:21
106:12 111:24

Lora Darrisaw , M.D.                June 30, 2020
Arreola, Rodrigo Vs. The Consolidated Government Of Columbus, Georgia

**we've**  6:15 21:3
   62:25 102:24
   107:11 112:17
**website**  113:19
   114:23
**wednesday**  35:23
**week**  15:16,17
**weeks**  15:20 90:4
   90:4
**weighed**  74:7
**weight**  59:3 60:4
   66:9 72:25 73:5,9
   73:11,15,23 74:23
   94:6,9,10,12,18
   95:4 96:3,4,8
**went**  15:23 28:24
   64:14
**wide**  11:22
**williams**  2:21
   118:16
**wisconsin**  15:24
   15:24,25
**witness**  8:7,9,11
   16:23 20:7,9,12
   21:11 22:21 23:13
   25:25 26:5 29:7
   29:10,18 38:6,8,11
   45:14,25 46:6,11
   47:15,22 48:3,6
   51:16 53:1,11
   55:23 59:21 60:9
   60:10 63:4 68:20
   69:10,25 70:12,20
   71:5 72:18 74:2
   74:16,23 76:3
   78:9,12 81:1,23
   82:7,23 83:21
   84:8,22,25 85:14
   86:4 87:2,6 88:21
   88:23 89:1,23
   93:5 94:23 95:11

**witnesses**  117:23
**word**  63:6 66:10
   72:23 84:2 103:23
   105:17,25 114:12
**worded**  83:22
**wording**  83:22
**worked**  33:21
**working**  28:6
**works**  9:24
**world**  16:25
**wound**  105:13
**wreck**  44:19
**wrists**  103:7
**written**  5:22
**wrong**  90:19
   111:11
**wrongdoing**
   111:14
**wrote**  84:18 85:4

**y**

**y**  48:15
**yeah**  6:23 8:11
   15:20 18:19 21:1
   26:5,10 49:12
   50:1 59:18 67:4
   68:1,12,13 73:2
   79:23 81:5,6,8
   82:2 84:22 85:14
   86:14 94:8 95:2
   95:11,23 107:3
   108:24 110:7
**year**  52:6,9,19
   53:14
**years**  12:1 16:18
   90:21
**yelled**  67:23
**yelling**  66:16 67:4
   67:6,10,24 108:6
**yesterday**  28:8
   32:17

**youngest**  9:20
   10:2

**z**

**zeros**  30:6

Georgia Code

Title 9, Chapter 11

Article 5, Section 9-11-30

(e) Review by witness; changes; signing.

If requested by the deponent or a party before
completion of the deposition, the deponent shall
have 30 days after being notified by the officer
that the transcript or recording is available in
which to review the transcript or recording and, if
there are changes in form or substance, to sign a
statement reciting such changes and the reasons
given by the deponent for making them. The officer
shall indicate in the certificate prescribed by
paragraph (1) of subsection (f) of this Code
section whether any review was requested and, if
so, shall append any changes made by the deponent
during the period allowed. If the deposition is not
reviewed and signed by the witness within 30 days
of its submission to him or her, the officer shall
sign it and state on the record that the deposition
was not reviewed and signed by the deponent within
30 days. The deposition may then be used as fully
as though signed unless, on a motion to suppress
under paragraph (4) of subsection (d) of Code

Section 9-11-32, the court holds that the reasons
given for the refusal to sign require rejection of
the deposition in whole or in part.

DISCLAIMER:  THE FOREGOING CIVIL PROCEDURE RULES
ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY.
THE ABOVE RULES ARE CURRENT AS OF APRIL 1,
2019.  PLEASE REFER TO THE APPLICABLE STATE RULES
OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted
fashion to authenticated parties who are permitted to
access the material. Our data is hosted in a Tier 4
SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and
State regulations with respect to the provision of
court reporting services, and maintains its neutrality
and independence regardless of relationship or the
financial outcome of any litigation. Veritext requires
adherence to the foregoing professional and ethical
standards from all of its subcontractors in their
independent contractor agreements.

Inquiries about Veritext Legal Solutions'
confidentiality and security policies and practices
should be directed to Veritext's Client Services
Associates indicated on the cover of this document or
at www.veritext.com.