IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
COLUMBUS DIVISION

RODRIGO ARREOLA, CONCEPCION     *
ARREOLA, and S.A., *ex rel.*
JEZREEL IMEE CUSTODIO,     *

    Plaintiffs,     *

vs.     *

                     CASE NO. 4:19-CV-5 (CDL)
COLUMBUS GEORGIA CONSOLIDATED     *
GOVERNMENT, OFFICER MICHAEL
AGUILAR, OFFICER BRIAN J.     *
DUDLEY, and OFFICER AARON
EVRARD,     *

    Defendants.     *

_____     *

O R D E R

Hector Arreola died in the ambulance on his way to the emergency room after Columbus Police Department officers applied significant force to his back during his arrest. Plaintiffs brought this action against the officers who participated in Arreola's arrest, alleging claims against them in their individual capacities under 42 U.S.C. § 1983 for excessive force and deliberate indifference to medical needs. Plaintiffs also assert a claim against the Columbus Georgia Consolidated Government ("CCG") for inadequately training these officers.

Discovery in this action was bifurcated. The first phase focused on the alleged constitutional violations. After completion of that discovery, the Court granted Defendants' motion

for summary judgment on Plaintiffs' deliberate indifference to medical needs claims but denied summary judgment on Plaintiffs' excessive force claims. Order on Defs.' 1st Mot. for Summ. J., ECF No. 30. Following those rulings, the parties commenced the second phase of discovery, which focused on two specific issues: (1) whether the excessive force constitutional violation caused Arreola's injuries and death; and (2) whether evidence exists supporting liability against CCG. That discovery has been completed and Defendants now bring a second motion for summary judgment (ECF No. 35), arguing that Plaintiffs cannot prove that the officers caused Arreola's death and that Plaintiffs cannot show a custom or policy sufficient to subject CCG to § 1983 liability.

For the following reasons, the Court finds a genuine fact dispute exists as to whether the use of excessive force by the officer Defendants caused Arreola's injuries and death, and thus the officers are not entitled to summary judgment on Plaintiffs' claims against them in their individual capacities. The Court further finds, however, that no evidence or legal basis exists supporting Plaintiffs' claims against CCG; therefore, CCG's motion for summary judgment is granted as to the claims against it.

## SUMMARY JUDGMENT STANDARD

Summary judgment may be granted only "if the movant shows that there is no genuine dispute as to any material fact and the

2

movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In determining whether a *genuine* dispute of *material* fact exists to defeat a motion for summary judgment, the evidence is viewed in the light most favorable to the party opposing summary judgment, drawing all justifiable inferences in the opposing party's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). A fact is *material* if it is relevant or necessary to the outcome of the suit. *Id.* at 248. A factual dispute is *genuine* if the evidence would allow a reasonable jury to return a verdict for the nonmoving party. *Id.*

FACTUAL BACKGROUND

Viewed in the light most favorable to Plaintiffs, the record reveals the following facts.

**I. Arreola's Arrest and Death**

The Court previously recounted in detail the facts regarding Arreola's arrest and death. *See* Order on Defs.' 1st Mot. for Summ. J. 1-10, ECF No. 30. The Court summarizes those facts here. Arreola made two 911 calls on January 9, 2017 requesting a welfare check on his mother. Officers Michael Aguilar and Brian Dudley responded to both calls. *Id.* at 3. After Arreola's second call, Arreola entered a neighbor's yard and did not leave despite police commands to do so. *Id.* at 4. When Arreola refused to leave the neighbor's yard, the officers attempted to arrest him for disorderly conduct, and a struggle ensued. *Id.* at 4-5. The officers

3

took Arreola to the ground and applied weight to his back while Arreola struggled. *Id.* at 7-8. The officers continued to apply weight to Arreola's back after he was handcuffed. *Id.* Aguilar, who weighed over 300 pounds, sat on Arreola's lower back/rear end after Arreola was handcuffed. *Id.* Dudley likewise dug his knee into Arreola's back after he was handcuffed. *Id.* Officer Aaron Evrard, who arrived on the scene to assist Dudley and Aguilar, replaced Dudley and positioned himself on Arreola's back while Dudley retrieved leg irons. *Id.* Over the course of the struggle, Arreola repeatedly screamed that he could not breathe, and these screams eventually dwindled to sobbing, moaning, and panting. *Id.* at 5-6. Arreola was loaded into an ambulance when one arrived and suffered cardiac arrest en route to the emergency room. *Id.* at 9. Arreola died soon thereafter. *Id.*

The Court previously concluded that the officers were not entitled to qualified immunity on Plaintiffs' excessive force claim based on the evidence viewed in the light most favorable to Plaintiffs. *Id.* at 27. Because discovery was bifurcated and the first phase focused only on whether the officers violated Arreola's constitutional rights, the Court did not address whether Plaintiffs pointed to sufficient evidence to create genuine fact disputes on causation or municipal liability to avoid summary judgment. The Court analyzes those issues in the remainder of this order.

## II. Arreola's Cause of Death

Plaintiffs retained Dr. Kris Sperry as an expert to testify as to Arreola's cause of death. Dr. Sperry concluded that Arreola's death was a homicide and that Arreola died because he "developed gradual systemic acidosis and hypoxia as a direct result of an intense struggle with law enforcement officers, which included prolonged restraint in a prone position with weight upon his back and other areas." Sperry Dep., Ex. 4, Mem. from Dr. Kris Sperry (Nov. 27, 2018) 4-5, ECF No. 39-4. Dr. Sperry concluded that this acidosis developed over the course of Arreola's struggle with the police, and that acidosis is "an evolution . . . it's not flicking a light switch." Sperry Dep. 73:23-24, ECF No. 39. Dr. Sperry acknowledged that Arreola had methamphetamine in his system at the time of his death and agreed that methamphetamine use can cause sudden death. *Id.* at 46:6-47:13, 47:21-48:2. Dr. Sperry has seen "hundreds" of cases of sudden death related to methamphetamine use during his career, but he explained that methamphetamine use alone rarely causes death and that, in his opinion, Arreola would not have died absent the restraint applied by the officers. *Id.* at 47:21-48:2, 121:10-16. Further, while Dr. Sperry admitted that methamphetamine use contributed to Arreola's death, Dr. Sperry reasoned that it did so because it led to the abnormal behavior that prompted Arreola's encounter with the officers. *Id.* at 46:6-17.

5

## III. The Officers' Training

Ricky Boren is the chief of the Columbus Police Department ("CPD"). Boren was authorized to delegate "any of the responsibilities of [his] office" to his subordinates. Boren Dep. 21:16-21, ECF No. 38. Lieutenant Tim Wynn, the training officer for CPD's Training Division, selected and approved the training material for CPD's required annual in-service training. Wynn Dep. 38:12-21, ECF No. 37. Boren approved Wynn's curriculum; Wynn sent the categories of training to be covered to Boren for approval, and Wynn noted that "the chief will have the final say on anything we do." *Id.* at 38:7-11, 40:3-6.

CPD officers, including Dudley, Aguilar, and Evrard, participated in the annual training created by Wynn and approved by Boren. *Id.* at 20:24-25:10. This training covered, among other topics, sudden in-custody death, excited delirium, and positional asphyxia. *Id.* at 40:11-17, 48:23-49:16, 60:9-25. The training taught that after a detainee was handcuffed and had stopped resisting, the officer "[was] not to compress the chest in any way." *Id.* at 79:9-22. Officers were also taught that suspects who were "yelling and screaming" were able to breathe, and Dudley and Aguilar both testified that they believed that Arreola could breathe because he was yelling and crying during his struggle with the officers. *Id.* at 86:6-87:11; Dudley Dep. 40:32-41:3, ECF No.

6

17; Aguilar Dep. 40:16-21, ECF No. 18.[1] Finally, the training encouraged officers to "flatten" suspects even after the suspect was handcuffed.[2] Wynn Dep. 70:23-71:25. Boren, however, agreed that "[CPD] policy would have prohibited putting weight on the torso and back of [Arreola] after he was handcuffed and had ceased resisting" and denied that CPD officers were taught that a person who is screaming and yelling must be able to breathe. Boren Dep. 52:10-15, 62:16-63:7.

## DISCUSSION

The officer Defendants argue that they are entitled to summary judgment on Plaintiffs' claims against them in their individual capacities because no evidence exists from which a reasonable jury could conclude that their use of force proximately caused Arreola's injuries and death. CCG maintains that it is entitled to summary judgment because no evidence exists that CCG had an unconstitutional policy or custom that led to Arreola's death. CCG also argues that no evidence exists that it was deliberately

---

[1] Specifically, when asked "What I think these officers were saying and what I think has been trained, is that if [a] suspect is yelling and screaming then that's an indication that he's breathing and he's taking in air; is that true?", Wynn responded "I agree with that." Wynn Dep. 86:6-87:11.

[2] Neither Plaintiffs nor Defendants explain precisely what "flattening" means. However, the testimony supports the conclusion that "flattening" is the process of applying weight to a suspect's back while the suspect is lying flat on the ground in order to gain control of the suspect. *See* Wynn Dep. 70:23-71:25 (discussing the CPD's use of flattening). When asked about flattening, Wynn admitted that "yes, that would be along the guidelines of what we teach with handcuffing if you're struggling with a subject, yes." *Id.* at 71:5-25.

indifferent in its alleged failure to properly train the officer Defendants.

## I. § 1983 Excessive Force Claims Against the Officers and Causation

A plaintiff bringing a § 1983 claim must, as with "any common law tort," establish causation. *Dixon v. Burke Cnty., Ga.*, 303 F.3d 1271, 1275 (11th Cir. 2002). Generally, "[f]or damages to be proximately caused by a constitutional tort, a plaintiff must show that, except for that constitutional tort, such injuries and damages would not have occurred and further that such injuries and damages were the reasonably foreseeable consequences of the tortious acts or omissions in issue." *Jackson v. Sauls*, 206 F.3d 1156, 1168 (11th Cir. 2000). If a party relies on expert testimony to establish causation, it is normally the jury's duty to decide whether to believe that expert, as "[o]ne of the most generally accepted rules of all jurisprudence, state and federal, civil and criminal, is that questions of *credibility* and *weight* of expert opinion testimony are for the trier of fact." *Hamer v. City of Atlanta*, 872 F.2d 1521, 1531 (11th Cir. 1989) (quoting *Mims v. United States*, 375 F.2d 135, 140 (5th Cir. 1967)).

Defendants argue that Plaintiffs' causation expert, Dr. Sperry, is unable to establish whether a particular officer injured Arreola because he cannot state precisely when Arreola received the final blow that actually killed him or which officer delivered that final deadly blow. Specifically, Defendants state that Dr.

8

Sperry "has no opinion as to which officer actually injured Mr. Arreola" and "cannot testify at what point in the process of the 'struggle' that Mr. Arreola's condition became critical." Br. in Supp. of Defs.' Mot. for Summ. J. 17, ECF No. 35-2. Defendants also contend that Dr. Sperry cannot rule out methamphetamine toxicity as Arreola's cause of death, noting that Dr. Sperry testified that he had seen "hundreds" of cases of sudden death due to methamphetamine use during his career. *Id.* n.15. Thus, according to Defendants, a jury would be forced to speculate as to when Arreola's injury occurred, which officer caused the injury, and whether Arreola's death was actually caused by his struggle with the officers or by Arreola's methamphetamine use. *Id.* at 18-19.

Defendants' skillful attempt to compartmentalize the tragic episode ignores the concept of joint causation. When more than one act joins together with other acts to produce a foreseeable indivisible injury, all of the actors who produced the individual acts can be jointly liable for that injury. *See Zurich Am. Ins. Co. v. Heard*, 740 S.E.2d 429, 433 (Ga. Ct. App. 2013) ("The test for determining joint tortfeasors is whether 'the separate and independent acts of negligence of two or more persons or corporations combine naturally and directly to produce a single indivisible injury.'") (quoting *Zimmerman's Inc. v. McDonough*

*Constr. Co.*, 240 S.E.2d 864, 866 (1977)).[3] Dr. Sperry testified

that hypoxia and acidosis were "a process rather than something

immediate."[4] Sperry Dep. 88:7-10. He further opined that all of

the individual officers' unconstitutional excessive force

contributed in some part to Arreola's injury, which led to his

death.[5] *Id.* at 45:4-14, 73:23-24, 132:3-8. A jury question exists

on these causation issues.

As to the contention that methamphetamine may have

contributed to Arreola's death, Dr. Sperry did testify that he had

seen hundreds of cases of sudden death caused by methamphetamine

use. But he clearly testified here that he did not think Arreola

"would have died of methamphetamine alone." Sperry Dep. 121:10-

16. Instead, he testified that Arreola would not have died absent

---

[4] Defendants' primary issue with Dr. Sperry's inability to pinpoint the precise moment that Arreola's condition became critical appears to relate to this Court's prior finding that, if Arreola stopped resisting after he was handcuffed, the officers only violated Arreola's constitutional rights when the officers applied force to Arreola's back in the time period after Arreola was handcuffed but before leg irons were applied. Order on Defs.' 1st Mot. for Summ. J. 13-19. But evidence exists from which a reasonable jury could conclude that all of the officer Defendants participated in the application of excessive unconstitutional force to Arreola, and that this application of force together jointly caused his death. Sperry Dep. 45:4-14, 73:23-24, 132:3-8.
[5] Defendants argue that Dudley was not present during the time period for which the officers may be subject to § 1983 liability. Defendants also admit, however, that Evrard's body cam video showed a seven-second clip of Dudley's "knee digging into Mr. Arreola's back" after Aguilar and Dudley secured Arreola with handcuffs. Br. in Supp. of Defs.' 1st Mot. for Summ. J. 16-17. Even if a jury believes that Dudley only applied pressure to Arreola's back for seven seconds of the relevant time period, Dudley may still be liable if the jury believes Dr. Sperry's testimony and finds that each officer contributed to a single, indivisible injury.

excessive restraint from the police. *Id.* at 132:4-8. Genuine factual disputes exist regarding causation, and therefore, summary judgment is not appropriate.

## II. § 1983 Municipal Liability Claim Against CCG

Section 1983 does not impose respondeat superior liability against local governments and municipalities like CCG for the unconstitutional conduct of their employees. For CCG to be liable, Plaintiffs must prove that Arreola's injuries were caused by CCG's policy or custom. *Board of Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 403 (1997). A plaintiff may establish municipal liability in this way by identifying an officially promulgated municipal policy or by identifying "an unofficial custom or practice . . . shown through the repeated acts of a final policymaker." *Grech v. Clayton Cnty., Ga.*, 335 F.3d 1326, 1329 (11th Cir. 2003). The official policy or custom "must be 'the moving force of the constitutional violation' in order to establish liability of a government body under § 1983." *Gilmere v. City of Atlanta*, 737 F.2d 894, 901 (11th Cir. 1984) (quoting *Polk Cnty. v. Dodson*, 454 U.S. 312, 326 (1981)).

Here, Plaintiffs pointed to no evidence that the CPD had an official policy or custom that contributed to the excessive and unconstitutional force suffered by Arreola. Wynn testified that officers were taught to flatten suspects that they struggled to handcuff. Wynn Dep. 70:23-71:25. But the mere flattening of

11

suspects does not rise to the level of excessive force. The key is whether the training informed officers that force should cease once the suspect is no longer resisting. And the only evidence on that issue establishes that CPD officers were told exactly that. Wynn testified that officers "have not been trained to stay on [a suspect's] back if [the officer] doesn't have resistance." Wynn Dep. 81:1-2. Further, Boren, who was the final policymaker for the CPD on training issues, confirmed that "[CPD] policy would have prohibited putting weight on the torso and back of [a detainee] after [the detainee] was handcuffed and had ceased resisting." Boren Dep. 52:10-15. Obviously, the official CPD policy that officers should *not* continue to apply unnecessary force once a suspect is subdued could not have had a causal connection to Arreola's injuries and death.

Plaintiffs have also failed to point to evidence that the CPD training in this area was sufficiently deficient to support their claims against CCG. A municipality may only be held liable for inadequate police training when "the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact." *City of Canton v. Harris*, 489 U.S. 378, 388 (1989). To establish deliberate indifference, there must ordinarily be a "pattern of similar constitutional violations by untrained employees." *Connick v. Thompson*, 563 U.S. 51, 62 (2011); *see also Speight v. Griggs*, 620 F. App'x 806, 810 (11th Cir. 2015)

(per curiam) ("If the policy itself is not unconstitutional, we require 'considerably more proof than [a] single incident.'") (quoting *City of Springfield v. Kibbe*, 480 U.S. 257, 267 (1987)). This pattern is necessary because "[w]ithout notice that a course of training is deficient in a particular respect, decisionmakers can hardly be said to have deliberately chosen a training program that will cause violations of constitutional rights." *Connick*, 563 U.S. at 62. A pattern of prior violations may not be required, however, if "the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the [municipality] can reasonably be said to have been deliberately indifferent to the need." *City of Canton*, 489 U.S. at 390.

Plaintiffs do not, however, point to evidence that the CPD's officers are responsible for a pattern of constitutional violations similar to that suffered by Arreola.[6] Thus, for Plaintiffs' municipal liability claim to survive summary judgment, the officers' need for different training must have been so obvious or so likely to result in a constitutional violation that CCG can fairly be said to have been deliberately indifferent to this need. This is a limited exception, and only applies in "a narrow range of circumstances [where] a violation of federal rights may be a

---

[6] Notably, Plaintiffs do not appear to argue that there was a pattern of prior violations in their complaint or in their response brief.

highly predictable consequence" of a failure to train. *Lewis v. City of West Palm Beach*, 561 F.3d 1288, 1293 (11th Cir. 2009) (quoting *Brown*, 520 U.S. at 409).

Here, the risk that officers would violate an individual's constitutional rights in the manner that Arreola's rights were allegedly violated is far from obvious. Even if the Court accepts that the officers were taught to use flattening techniques, the evidence shows – and Plaintiffs appear to admit – that "[CPD] policy would have prohibited putting weight on the torso and back of [a detainee] after [the detainee] was handcuffed and had ceased resisting." Boren Dep. 52:10-15. It is not obvious that the officers would violate Arreola's rights when they were given such training, even if they were also given instruction that "flattening" a detainee after the detainee is handcuffed was acceptable. If officers received such conflicting instruction, CCG could have known it was possible – but not highly predictable – that officers would violate an individual's constitutional rights. This falls short of what is required to establish deliberate indifference absent a pattern of prior violations or an official unconstitutional policy. Thus, CCG is entitled to summary judgment on Plaintiffs' municipal liability claim.

CONCLUSION

For the foregoing reasons, the Court grants CCG's motion for summary judgment (ECF No. 35) as to Plaintiffs' claims against it

14

but denies Defendants' motion for summary judgment as to Plaintiffs' claims against the officer Defendants in their individual capacities. Based on today's rulings and those in the Court's previous order (ECF No. 30), the only claims remaining to be tried in this action are Plaintiffs' excessive force claims against the officer Defendants in their individual capacities.

IT IS SO ORDERED, this 22nd day of December, 2020.

<div style="margin-left:40%;">

S/Clay D. Land
———————————————
CLAY D. LAND
U.S. DISTRICT COURT JUDGE
MIDDLE DISTRICT OF GEORGIA

</div>