

Deposition of:

**Rodrigo Arreola**

*April 23, 2020*

In the Matter of:

**Arreola, Rodrigo v. Consolidated Government of Columbus, Georgia, et al**

Veritext Legal Solutions

800.808.4958 | calendar-atl@veritext.com | 770.343.9696

Case 4:19-cv-00005-CDL   Document 71   Filed 03/15/21   Page 3 of 68
Rodrigo Arreola                                    April 23, 2020
Arreola, Rodrigo v. Consolidated Government of Columbus, Georgia, et al

Page 1

 1            IN THE UNITED STATES DISTRICT COURT
             FOR THE MIDDLE DISTRICT OF GEORGIA
 2                   COLUMBUS DIVISION
 3    RODRIGO ARREOLA, as parent
      of Hector Arreola, Deceased,
 4    and as Personal Representative
      and Administrator of the
 5    Estate of Hector Arreola,
      CONCEPCION ARREOLA, as
 6    parent of Hector Arreola,
      and S.A., minor child of
 7    Hector Arreola, by next
      friend Jezreel Imee Custodio,
 8
             Plaintiffs,
 9                            CASE NO. 4:19-cv-00005
         vs.
10
      THE CONSOLIDATED GOVERNMENT
11    OF COLUMBUS, GEORGIA,
      OFFICER MICHAEL AGUILAR, in
12    his individual and official
      capacity, OFFICER BRIAN
13    DUDLEY, in his individual
      and official capacity, OFFICER
14    AARON EVRARD, in his individual
      and official capacity, and
15    COLUMBUS POLICE DEPARTMENT
      CHIEF OF POLICE RICHARD T.
16    BOREN, in his individual and
      official capacity,
17
             Defendants.
18    _____
19           DEPOSITION OF RODRIGO ARREOLA
20        TAKEN BY REMOTE VIDEOCONFERENCE
21
                    April 23, 2020
22
                     10:04 a.m.
23
24
25        LAURA R. SINGLE, CCR-B-1343

Page 2

1                      A P P E A R A N C E S
2
3    For the Plaintiffs:
4              MARK C. POST, Esq.
               (via remote videoconference)
5              Mark Post Law, LLC
               3 Bradley Park Court
6              Suite F
               Columbus, Georgia 31904
7                (706) 221-9371
                 mpost@markpostlaw.com
8
9
10
11
12
13
14   For the Defendants:
15             ALAN G. SNIPES, Esq.
               JAMES C. CLARK, JR., Esq.
16             (via remote videoconference)
               Page Scrantom, Sprouse, Tucker & Ford, P.C.
17             1111 Bay Avenue
               Third Floor
18             Columbus, Georgia 31901
                 (706) 324-0251
19               ags@psstf.com
                 jcc@psstf.com
20
21
22
23
24
25

Page 3

1                        I N D E X

2

3    EXAMINATION  OF  RODRIGO  ARREOLA                 PAGE

4    BY MR. SNIPES..................................    4

5    BY MR. POST...................................48

6

7

8                    *         *         *

9

10

11   NUMBER                  DESCRIPTION            PAGE

12   For the Defendants:

13   Exhibit  1      Notice of Taking Deposition      13

14   Exhibit  2      Petition for Letters of          14
                     Administration

15

16

17

18

19

20

21

22

23

24

25

Case 4:19-cv-00005-CDL   Document 71   Filed 03/15/21   Page 6 of 68
Rodrigo Arreola                                    April 23, 2020
Arreola, Rodrigo v. Consolidated Government of Columbus, Georgia, et al

Page 4

```
 1              P R O C E E D I N G S
 2          (Pursuant to Article 10(B) of the Rules and
 3      Regulations of the Georgia Board of Court
 4      Reporting, a written disclosure statement was
 5      submitted by the court reporter to all counsel
 6      present at the proceeding.)
 7                    *        *        *
 8              RODRIGO ARREOLA,
 9  Having been first duly sworn to state the truth, was
10  examined and testified as follows:
11                  EXAMINATION
12  BY MR. SNIPES:
13      Q.   Good morning, Mr. Arreola. We just met by
14  video a few minutes ago. My name is Alan Snipes.  I
15  represent the Defendants in this lawsuit along with
16  Jim Clark, who is also on this video deposition.
17          Have you ever given a deposition before?
18      A.   No, I have not.
19      Q.   Let me go through the ground rules.
20          MR. POST: Before we get started, Alan, are
21      we reserving objections other than form of the
22      question and privilege?
23          MR. SNIPES: Yes.
24          MR. POST: Okay.
25  BY MR. SNIPES:
```

Page 5

1        Q.    Mr. Arreola, let me go through a few ground

2    rules with you. I'm going to ask you a series of

3    questions today about your lawsuit. If you could let

4    me finish my question before you answer -- and that

5    may be even more important today doing this

6    virtually -- it will make the record much clearer.

7               Is that fair?

8        A.    That's fair enough.

9        Q.    If you could also answer verbally with a yes

10   or a no or an explanation, if necessary, that will

11   also make it easier for the court reporter who is

12   online with us and who is taking down everything that

13   we say.  So please try to answer verbally if you can.

14               Is that fair?

15       A.    Yes, sir.

16       Q.    Could you state your full name for the

17   record, please?

18       A.    My name is Rodrigo Arreola.

19       Q.    Where do you live, Mr. Arreola?

20       A.    I live ████████████████████, Georgia.

21       Q.    How long have you lived in Midland?

22       A.    I've owned the property since 2005, May of

23   2005. I have lived there on and off based on a

24   military career.

25       Q.    I know you're retired military. Can you

Page 6

1    give me a rundown of your work history since high

2    school?

3         A.    Sure. In high school I worked in grocery

4    stores as a meat cutter. In my profession, I was a

5    meet cutter in Arizona, in Phoenix, Arizona. I

6    joined the Army in 1983. I retired in 1 August 2005.

7    I served as an infantryman, airborne ranger in the

8    Army and both special operations was well. My

9    service was 22 years of service, and that's a quick

10   rundown on my work history.

11           I still work on Fort Benning as an Army

12   civilian. I have been doing that for 15 years now.

13   I'm still there today working there.

14        Q.    What was the highest rank that you achieved

15   in the Army?

16        A.    I was E9. I was a sergeant major in the

17   Army.

18        Q.    I assume based on your years of service you

19   were honorably discharged?

20        A.    Absolutely.

21        Q.    Tell me about your training through the

22   years as an infantryman in the Army. Were you

23   trained in physical combat?

24        A.    Yes. I'm combat trained as well.  An

25   infantryman and airborne ranger is to prepare in

Rodrigo Arreola                                                    April 23, 2020
Arreola, Rodrigo v. Consolidated Government of Columbus, Georgia, et al

Page 7

1    defense of the nation. So my training is extensive

2    in that area.

3         Q.   What about hand-to-hand combat?

4         A.   Hand-to-hand combat is part of the training

5    as well.

6         Q.   Now, as part of your military training, if

7    you were confronted with a hand-to-hand combat, what

8    would you be trained to do?

9         A.   I'll be trained to defeat the opponent using

10   all means necessary, apply the necessary force to

11   restrain and diffuse the situation, and be able to

12   determine and use sound judgment as to when, you

13   know, enough was enough.

14        Q.   So your military training trained you in a

15   hand-to-hand combat situation to use your own

16   judgment to determine when you thought the situation

17   was diffused; is that right?

18        A.   That's correct. That's leadership 101.

19   That's how key leaders in the Army empower

20   individuals to use sound judgment based on their

21   training and experience during their time in service.

22        Q.   And you, as an officer in the Army if

23   confronted with a hand-to-hand combat situation,

24   would rely on your subordinates to use their training

25   to handle the situation; is that right?

Rodrigo Arreola                    April 23, 2020
Arreola, Rodrigo v. Consolidated Government of Columbus, Georgia, et al

Page 8

1      A.    That's correct. We train to fight, and we
2    empower our soldiers to do exactly -- not exactly but
3    do as close as possible the right thing under the
4    circumstances.
5      Q.    You broke up on me a little bit. I'm sorry
6    to ask you to repeat that, but could you repeat your
7    answer?  You said something to the effect of you rely
8    on your soldiers to do as close as possible to their
9    training?
10     A.    Yes.
11           So we empower them to exercise what they're
12   taught in training to the best of their ability based
13   on the situation, based on the threat, the risk.  We
14   trust that they will do what they were taught to do
15   during in training, to rely on their judgment to make
16   that call on the spot.
17     Q.    You would agree with me that a soldier
18   confronted with a hand-to-hand combat situation is in
19   a fluid situation; is that right?
20     A.    That's right.
21     Q.    And their response to a hand-to-hand combat
22   situation would fall solely within their personal
23   judgment; is that right?
24     A.    It would fall under the training aspect; the
25   training principes; and what, you know, the rules of

Rodrigo Arreola                                    April 23, 2020
Arreola, Rodrigo v. Consolidated Government of Columbus, Georgia, et al

Page 9

1    the engagement are based on the command input.  So

2    there's rules of engagement that we have to follow

3    published by, you know, the command. They just don't

4    act on their own. There's rules that they have to

5    follow, rules of engagement. So they have to follow

6    that; and then under personal engagement, you know,

7    they fall under good judgment, under the judgment of

8    the situation based on threat and risk.

9         Q.   And that judgment would be based on the

10   soldier who is involved in the particular situation;

11   is that right?

12        A.   That's correct. It is based on his

13   experience level and what he's been trained to do.

14        Q.   But you would agree with me that only the

15   person involved in the hand-to-hand combat situation

16   really knows everything that's going on; is that

17   right?

18        A.   I would partially agree with that, yes.

19        Q.   And what part would you disagree with?

20        A.   Not necessarily disagree. It's just not

21   explaining the full story. So part of that is

22   judgment, sound judgment, at the time of the

23   engagement. The other part is also know what you're

24   supposed to do and not supposed to do.  You can't

25   just go out there and do whatever you want to do.

Page 10

 1  There's always rules and there's always boundaries

 2  for soldiers to follow as well.

 3       Q.   You would expect soldiers under your command

 4  to use the force necessary to diffuse what they

 5  perceive to be the threat; is that right?

 6       A.   Based on the rules of engagement, yes.

 7       Q.   Have you ever personally been involved in a

 8  hand-to-hand combat situation in combat?

 9       A.   I have many times.

10       Q.   Okay. Have you ever personally had to

11  restrain someone?

12       A.   Absolutely.

13       Q.   Have you ever hogtied anyone?

14       A.   Well, we don't hogtie, but we've restrained

15  individuals before, yes.

16       Q.   Do you understand when I use the word

17  "hogtie" what I mean? Well, what are you meaning by

18  a similar term?

19       A.   Hogtied to me is not a professional term.

20  It's what you do, you know, behind the barn to

21  somebody. Obviously, we don't do that in the

22  military. We treat everybody --

23       Q.   Mr. -- excuse me, sir. I talked over you.

24  Let me ask it this way.

25            Have you ever in combat restrained someone

Page 11

1   with either handcuffs or zip ties with their hands

2   behind their back?

3          A.    Zip ties are commonly used, yes.

4          Q.    Have you ever restrained somebody's feet in

5   addition to the zip ties on their hands behind their

6   back while you have personally been in combat?

7          A.    Yes.

8          Q.    And you do that because even after their

9   hands were restrained they were continuing to kick;

10  is that right?

11         A.    Not necessarily kick but we want to restrict

12  the movement of an individual possibly getting away.

13         Q.    According to your military training, if you

14  have to restrain a combative suspect, do you restrain

15  his hands and his feet?

16         A.    Not necessarily, not all the time. Mostly

17  his hands.

18         Q.    It would be the judgment of you as a soldier

19  in the particular circumstance as to whether you need

20  to restrain his feet also; is that right?

21         A.    Well, it would depend on what the rules of

22  engagement are there.

23         Q.    Are there rules of engagement published as

24  to whether you restrain people's hands and feet?

25         A.    In some instances, yes.

Page 12

1      Q.    In the course of restraining someone in your

2   experience in combat, have you ever had to sit on

3   their back?

4      A.    Never.

5      Q.    Have you ever had a suspect while you're

6   trying to restrain them in combat continue to resist

7   when you were trying to get zip ties on their hands?

8      A.    No.

9      Q.    During your time as sergeant major, have you

10  ever disciplined any soldier under your command for

11  any efforts they made to restrain someone?

12     A.    No, I never had that experience.

13     Q.    During your time in the military, do you

14  recall a situation ever where any soldier was

15  second-guessed regarding their use of force in

16  restraining someone?

17     A.    No. I don't recall a situation like that,

18  no.

19     Q.    Do you think soldiers should be

20  second-guessed when they exercise the judgment as to

21  the amount of force necessary to restrain someone?

22     A.    Well, what I think is that every situation

23  is different. I think what we do in the military is

24  we engage in an investigation to find out what really

25  happened and how it happened and determine whether he

Page 13

1    acted under restraining principles and he acted based

2    on, you know, regulations that are published in the

3    Army, those determinations.

4         Q.   What conflicts did you serve in, sir?

5         A.   I serve in OIF.

6         Q.   Any other conflicts?

7         A.   No.

8         Q.   During that service, did you personally have

9    to restrain any combative suspects?

10        A.   Not restrain physically but, you know,

11   observe some of the -- those actions taking place.

12   At that level when I was sergeant major, it was

13   mostly supervisory. I have never witnessed

14   apprehension or any restraint that was outside of the

15   normal practice that we were taught.

16        Q.   I'm going to show you an exhibit,

17   Mr. Arreola, if I can figure out how to do this

18   properly. I'll mark this as Exhibit 1.  It should

19   appear on your screen shortly.

20             Can you see that exhibit that I just sent to

21   you, Mr. Arreola?

22        A.   I cannot see it.

23             MR. CLARK: Let's go off the record a

24        second.

25             (A discussion was held off the

Rodrigo Arreola                          April 23, 2020
Arreola, Rodrigo v. Consolidated Government of Columbus, Georgia, et al

Page 14

```
 1        record.)

 2   BY MR. SNIPES:

 3        Q.   Mr. Arreola, I've sent you virtually

 4   something I marked as Exhibit 1. It's titled, Notice

 5   of Taking Deposition.

 6             Are you able to see that?

 7        A.   Yes. I think I am, yes.

 8        Q.   And you understand that that's a notice for

 9   your deposition to be taken today and you're

10   appearing pursuant to that notice; is that right?

11        A.   That's right.

12        Q.   All right, Mr. Arreola. I sent you another

13   document that we marked as Exhibit 2. This is a

14   document that is a petition for administrator.

15             Do you see that document?

16        A.   Yes.

17        Q.   You are the administrator of the estate of

18   Hector Arreola; is that right?

19        A.   That's correct.

20        Q.   Mr. Arreola did not have a will when he

21   passed away?

22        A.   Hector did not.

23        Q.   And according to the petition for letters of

24   administration, it lists one child, ████████████

25   ████████; is that correct?
```

Page 15

1       A.    That's correct.

2       Q.    Was that Hector's only child?

3       A.    Yes.

4       Q.    How old is she?

5       A.    I believe she's now around between six and

6    six approximately.

7       Q.    Where does she live?

8       A.    She lives with her mother, Jezreel, in

9    Hawaii.

10      Q.    Where do they live?

11      A.    Hawaii.

12      Q.    When is the last time you saw ████?

13      A.    It has to be approximately between 8 and 12

14   months, I would say.

15      Q.    Do you see her regularly?

16      A.    No, not on a regular basis.

17      Q.    In the six or eight years since she was

18   born, how many times do you think you've seen ████?

19      A.    I've seen her around, I would say, an

20   approximate five times.

21      Q.    So she would have been roughly born

22   somewhere around 2012 to 2014; is that right?

23      A.    Approximate, yes.

24      Q.    Now, prior to Mr. Arreola's death, how many

25   times did he see ████?

Rodrigo Arreola                                        April 23, 2020
Arreola, Rodrigo v. Consolidated Government of Columbus, Georgia, et al

Page 16

1      A.    You know, I can't answer that question. I

2  really -- I really don't know how many times. I know

3  he talked to Jezreel several times on the phone

4  occasionally on a regular basis. He always got in

5  touch with her to find out what -- you know, how

6  █████████ was doing and just get tabs on them. I can't

7  say how many times.

8      Q.    Would you say that Hector saw his daughter

9  in person often?

10     A.    No. I can't confirm that.

11     Q.    Would you say he saw his daughter in

12 personal rarely?

13     A.    I can't confirm that. I'm sorry.

14     Q.    Was he at the hospital when she was born?

15     A.    Yes.

16     Q.    Is Hector's name on ████████'s birth

17 certificate?

18     A.    Yes.

19     Q.    Do you know if Hector paid any child support

20 for the benefit of ████████?

21     A.    I have no knowledge of that.

22     Q.    Do you know if Hector was ever arrested for

23 failure to pay child support prior to his death?

24     A.    I have no knowledge of that.

25     Q.    Do you know if prior to Hector's death he

Case 4:19-cv-00005-CDL   Document 71   Filed 03/15/21   Page 19 of 68
Rodrigo Arreola                    April 23, 2020
Arreola, Rodrigo v. Consolidated Government of Columbus, Georgia, et al

Page 17

1    was ever arrested for family violence towards ████?

2         A.   No, I have no knowledge.

3         Q.   You do know that prior to Hector's death he

4    was arrested for family violence towards ████'s

5    mother, though, right?

6         A.   I'm unaware of that.

7         Q.   Do you have any relatives that live in

8    Midland?

9         A.   Relatives? No.  I -- no.  You know, myself

10   and my wife.

11        Q.   What's your wife's name?

12        A.   ████████████████

13        Q.   And how long have you been married to

14   Therese?

15        A.   July will be ten years.

16        Q.   Now, since Midland is within the judicial

17   district where this case might be tried, I need to

18   ask you about any other clubs or social groups or

19   churches that you might be involved in in this area.

20        A.   No, I'm not involved in them.

21        Q.   What is your job title now as a civil

22   service worker at Fort Benning?

23        A.   I'm a safety and health occupational

24   officer, safety and health; and I'm also a

25   combat capabilities developer.

Page 18

1       Q.    Could you repeat that, Mr. Arreola. It

2    broke up a little.

3       A.    Sure.

4             I'm currently a safety and occupational

5    health officer and I'm combat capabilities developer.

6       Q.    You said combat capabilities developer. Is

7    that what you said?

8       A.    Yeah. I was trying to making it easier.

9    It's a combat capabilities developer.

10            MR. POST: Can we go off the record for just

11        a moment?

12            MR. SNIPES: Sure.

13            (A recess was taken.)

14   BY MR. SNIPES:

15      Q.    Mr. Arreola, you understand I represent The

16   Consolidated Government of Columbus, Michael Aguilar,

17   Brian Dudley, and Aaron Evrard; is that right?

18      A.    Yes, I understand.

19      Q.    Have you ever met Officers Aguilar, Dudley,

20   or Evrard?

21      A.    No, I have not. I don't even know what they

22   look like.

23      Q.    Have you ever talked to any of those

24   officers?

25      A.    No, I have not.

Rodrigo Arreola                                  April 23, 2020
Arreola, Rodrigo v. Consolidated Government of Columbus, Georgia, et al

                                              Page 19

1        Q.    Have you ever talked to any Columbus police

2    officer about the events that caused the death of

3    Hector Arreola on January 9, 2017?

4        A.    No, I have not.

5        Q.    Have you talked to any paramedic or

6    ambulance driver about Hector Arreola's death?

7        A.    No.

8        Q.    Have you talked to any doctors about Hector

9    Arreola's death?

10       A.    No.

11       Q.    When was Hector born?

12       A.    He was born in ███████████.

13       Q.    And his mother is Concepcion Arreola; is

14   that right?

15       A.    That's correct.

16       Q.    Were you married to her?

17       A.    Yes.

18       Q.    Were you married to her prior to Hector's

19   birth?

20       A.    Yes.

21       Q.    All right. When did you and Concepcion

22   Arreola marry?

23       A.    We married ██████████.

24       Q.    And when did you divorce?

25       A.    We divorced in approximately May 2010.

Rodrigo Arreola                                    April 23, 2020
Arreola, Rodrigo v. Consolidated Government of Columbus, Georgia, et al

Page 20

1      Q.   Did you both live in the same household all

2   the way from 1981 to 2010?

3      A.   No.

4      Q.   How long were you separated?

5      A.   Let me make sure I understand that question.

6   The question was, did we live together since 1981; is

7   that correct?

8      Q.   Yes.

9      A.   Yes. Let me rephrase my answer.  Since 1981

10  we lived together until we divorced, yes.

11     Q.   And I understand there may be some periods

12  in there when you were away for training or combat or

13  so forth; but my question is, during that time period

14  from 1981 to 2010 when you were at home, you lived

15  with Concepcion Arreola; is that right?

16     A.   Yes.

17     Q.   And so by the time you divorced, Hector was

18  roughly 24 years old; is that right?

19     A.   That's approximate, yes.

20     Q.   Now, when Hector was born, where did you and

21  Concepcion Arreola live?

22     A.   We lived in Fort Ord, California.

23     Q.   And how long after Hector was born did you

24  live in California?

25     A.   My best approximate time that we lived

Page 21

1    there -- we were there for a period of about four or

2    five years. So after he was born, we probably stayed

3    there around another 24 months.

4        Q.   All right. Basically, while Hector was a

5    toddler you moved from California to where?

6        A.   I deployed to Korea for 12 months. Then

7    after my return back to Fort Ord, we moved to Fort

8    Benning, Georgia, as a family together.

9        Q.   So approximately from the time Hector was a

10   three- or four-year-old child through 2010, you-all

11   lived in Columbus or the surrounding area; is that

12   right?

13       A.   Yes, that's right.

14       Q.   Where did Hector go to grade school?

15       A.   Okay. So let me -- again, I'm sorry to keep

16   going back. We came -- after Fort Ord in 1989, '90

17   we came to this area here of Fort Benning; and then

18   we -- we've always come back to this area.  We left

19   once to go to Italy for a period of about four or

20   five years. And then after that assignment, we came

21   back to this area of Fort Benning, Georgia, again.

22       Q.   When you came back from Italy, how old was

23   Hector?

24       A.   Hector was a teenager. I would say about

25   13, 14 approximate.

Page 22

1      Q.    Let's start from that time frame until

2  Hector left high school. Were you-all living in

3  Columbus, Georgia, during that time?

4      A.    Yes.

5      Q.    And what address did you live at then?

6      A.    The ███████████, Midland, Georgia,

7  address.

8      Q.    Where did Hector go to high school?

9      A.    So, again, I apologize. I have to go back

10 to that answer again.  So we did live in -- prior to

11 moving to Midland, we lived in Columbus.  I think it

12 was ███████████████ off of Double Churches Road.

13 Then we purchased the property out in Midland and

14 then we moved there. So we had that transition

15 between those two homes.

16     Q.    All right. I'm not interested exactly where

17 you were living at the time, but where did Hector

18 start high school?

19     A.    High school? He started when we were off of

20 Double Churches Road.

21     Q.    So did he go to Northside or Shaw or --

22     A.    He went to Jordan.

23     Q.    What is the last grade of education that

24 Hector completed?

25     A.    I believe it was tenth grade, between tenth

Rodrigo Arreola                                          April 23, 2020
Arreola, Rodrigo v. Consolidated Government of Columbus, Georgia, et al

Page 23

1    and eleventh approximate.

2         Q.   And what did he do when he dropped out of

3    high school?

4         A.   He worked several odd jobs. He landscaped.

5    He worked at auto body shops. He just worked odd

6    jobs, never really anything consistent. He did work

7    for me. I owned a business at one point in Columbus,

8    and he did some stocking for me. So just jobs like

9    that, nothing permanent. He was a gas station

10   attendant on Fort Benning. Those are the things that

11   come to mind right now.

12        Q.   All right. And by the time he dropped out

13   of high school in tenth or eleventh grade, was he

14   already getting in trouble?

15        A.   I'm not sure of that question getting in

16   trouble. I mean, it's kind of hard for me to answer

17   that.

18        Q.   Was he ever incarcerated as a juvenile?

19        A.   As a juvenile, no.

20        Q.   Was he ever arrested as a juvenile?

21        A.   I'm pausing because I'm trying to think and

22   provide you the right answer. It kind of gets

23   blurry. When we were out in Midland, I believe he

24   was still under 18. I think --

25             MR. POST: A juvenile in Georgia would be

Case 4:19-cv-00005-CDL   Document 71   Filed 03/15/21   Page 26 of 68
Rodrigo Arreola                    April 23, 2020
Arreola, Rodrigo v. Consolidated Government of Columbus, Georgia, et al

Page 24

1        anything under 17.

2                THE WITNESS:  Under 17? I'm not  --

3                MR. POST: 17  or under, I should say.

4                THE WITNESS:  Yeah.

5                He didn't get in trouble. He -- you know,

6        he got in trouble just like any other kid his

7        age, but -- I'm not sure if I answered your

8        question.

9                Can you please repeat your question?

10   BY MR. SNIPES:

11       Q.   Well, Mr. Arreola passed away when he was 30

12   years old; is that right?

13       A.   Yes.

14       Q.   And by the time he was 30 years old, he had

15   six arrests for driving under the influence, right?

16       A.   I was unaware it was six.

17       Q.   Were you aware he had a domestic violence

18   arrest?

19       A.   Is that the one you referenced earlier with

20   Jezreel?

21       Q.   Yes.

22       A.   I wasn't tracking that one. I was unaware

23   of that one.

24       Q.   When did Hector start having an alcohol

25   problem?

Case 4:19-cv-00005-CDL   Document 71   Filed 03/15/21   Page 27 of 68
Rodrigo Arreola                        April 23, 2020
Arreola, Rodrigo v. Consolidated Government of Columbus, Georgia, et al

Page 25

1      A.    I think early on. He consumed alcohol.

2   Once it became a real problem to him, I would

3   probably say he was, you know, in his 20s. You know,

4   again, the line gets blurry as far as, you know,

5   problems, you know, with alcohol. I'm not sure what

6   the definition of that is.

7      Q.    At least your perception was in his early

8   20s he began to have a real problem with alcohol; is

9   that right?

10      A.    He consumed alcohol in large amounts at that

11   time, yes. That I was aware of, yes.

12      Q.    Did his consumption of alcohol interfere

13   with his ability to find work?

14      A.    I really don't know -- I really don't know

15   if it did or not.

16      Q.    Did you ever witness any incident when

17   Hector was under the influence of alcohol and he

18   acted in a bizarre fashion?

19      A.    No.

20      Q.    Did you ever witness an incident where

21   Hector was under the influence of alcohol when he

22   became combative?

23      A.    I would say at home once, yes.

24      Q.    Can you describe that incident for me,

25   please.

Case 4:19-cv-00005-CDL   Document 71   Filed 03/15/21   Page 28 of 68
Rodrigo Arreola                                    April 23, 2020
Arreola, Rodrigo v. Consolidated Government of Columbus, Georgia, et al

Page 26

1        A.    I wouldn't describe it as combative, but

2    he -- I could tell he was under an influence. He

3    wouldn't follow, you know, the instructions or you

4    know, what my desires were. He got aggressive a

5    little bit as far as, you know, behavior, movements

6    but nothing really combative as you stated.

7        Q.    When you say he got aggressive, you're

8    meaning he got aggressive with you?

9        A.    Yes.

10        Q.    Did you have to physically restrain him in

11   any way?

12        A.    Not restrain him but, you know, he did

13   challenge me with a little push and shoving; but it

14   didn't escalate from there.

15        Q.    Have you ever needed to call the police on

16   Hector yourself?

17        A.    I did once. The incident I just referenced

18   is -- I had to call the Harris County Police.

19        Q.    So the incident we're talking about when he

20   came home drunk and belligerent and was aggressive

21   towards you you called the police at that time; is

22   that right?

23        A.    I did. I did.

24        Q.    Can you tell me about when that incident

25   occurred?

Case 4:19-cv-00005-CDL   Document 71   Filed 03/15/21   Page 29 of 68
Rodrigo Arreola                          April 23, 2020
Arreola, Rodrigo v. Consolidated Government of Columbus, Georgia, et al

Page 27

1      A.    I really can't give you a good point of

2    reference as far as dates, but it was -- I believe he

3    was around, I want to say, 18, 19 maybe, possibly 20

4    when that incident occurred.

5      Q.    At the time of that incident or at any time

6    thereafter, did you ever try to help Hector get

7    treatment for alcoholism?

8      A.    Yes.

9      Q.    What type of treatment did you try to help

10   him get?

11     A.    I tried to get him enrolled in a program

12   where, you know, it treated his, you know, alcohol

13   consumption; but it just didn't work. I think after

14   his first DUI that I recall he had to go to mandatory

15   classes. He went to those; and, you know, I asked

16   him if he wanted to follow on and I just couldn't get

17   him on the program.

18     Q.    What program did he do? Was it New Horizons

19   or anything like that?

20     A.    You know, New Horizons sounds familiar. I

21   think it might have been New Horizons.

22     Q.    Other than that one time he got treatment

23   for alcoholism, are you aware of any other treatment

24   that Hector sought for alcohol dependency?

25     A.    I'm not aware, no.

Page 28

1      Q.   Do you know if Hector had ever received any

2   treatment for drug addiction other than alcohol?

3      A.   No.

4      Q.   Prior to Hector's death, were you aware that

5   he was a chronic drug user?

6      A.   I was not aware.

7      Q.   Prior to his death --

8      A.   I was not aware that he was, you know,

9   chronically dependent on a particular substance.

10      Q.   So prior to his death, you were aware that

11   he had at times used elicit drugs; is that right?

12      A.   I'm sorry. I didn't catch the whole thing,

13   the whole question.

14      Q.   Prior to Hector's death, you were aware that

15   he had at least used elicit drugs at times; is that

16   right?

17      A.   I'm aware he was using drugs, yes.

18      Q.   What drugs did you understand that he was

19   using?

20      A.   I knew about the alcohol. I think he was

21   using some marijuana. Those are the extent that I

22   knew he was using. I'm not sure if he was using

23   anything else on a regular basis.

24      Q.   Prior to Hector's death, did you know that

25   he was a chronic user of methamphetamine?

Page 29

1      A.   I did not know.

2      Q.   Prior to Hector's death, did you ever know

3  he used methamphetamine?

4      A.   I have no knowledge of that.

5      Q.   Prior to Hector's death, did you know that

6  he was an intravenous drug user?

7      A.   No, I did not know that.

8      Q.   Prior to Hector's death, did you know that

9  his girlfriend was a chronic intravenous drug user?

10      A.   I did not know. I don't even know who his

11  girlfriend was.

12      Q.   When did Hector move out of the house?

13      A.   I'm trying to remember now. He was still

14  living in Midland in 2010 when his mother and I

15  divorced. He was living with her; but then after she

16  moved on to a different residential area, he went

17  with her.  So I'm not quite sure, you know, if he

18  ever left living with her.

19      Q.   All right. So when you and Concepcion

20  Arreola divorced in 2004, you think that Hector went

21  on to live with his mother; is that right?

22      A.   Yes.

23      Q.   After you and Hector's mother divorced in

24  2004, how often did you see Hector?

25      A.   I saw him on occasions, nothing frequent.

Page 30

1    We talked on occasions as well about three or four

2    times a week.  We met for lunch, breakfast on some

3    occasions. That's the relationship we had.

4         Q.   How often did you see him personally?

5         A.   About three or four times -- well, I've seen

6    him -- it's kind of hard to get an estimate because

7    it was so fragmented. I would say on a weekly basis

8    I had probably seen him once or twice a week.

9         Q.   Once or twice a week since 2004?

10        A.   Yes. Sometimes more.  Sometimes less.

11   There were some breaks in between there, but those

12   are just approximate times.

13        Q.   Since 2004 did you get together with Hector

14   for holidays?

15        A.   On occasions we did, yes.

16        Q.   Since 2004 when you divorced Hector's

17   mother, had you provided financial assistance to

18   Hector?

19        A.   On occasions I did. You know, if he asked

20   me for money, you know, I would help him out. I did

21   buy him a car, several cars actually.  So I did that

22   for him and, you know, I helped him out as much as I

23   could since 2005 when we divorced.

24        Q.   Can you describe for me Hector's work

25   history between 2005 and 2017 when he passed away?

Case 4:19-cv-00005-CDL   Document 71   Filed 03/15/21   Page 33 of 68
Rodrigo Arreola                         April 23, 2020
Arreola, Rodrigo v. Consolidated Government of Columbus, Georgia, et al

Page 31

1       A.   So, again, going back to the odd jobs again,

2   he did landscaping. He worked whatever -- so

3   garages, grocery stores. I know there was a break

4   there when he went out to Phoenix, Arizona, with my

5   dad; and he worked in a food store, a grocery store.

6   I believe it was Fry's Food Store. He worked there

7   for a period between six to eight months, maybe a

8   year. He came back here and just did odd jobs,

9   nothing that I can recall that was consistent. He

10  worked as a gas station assistant at Fort Benning.

11  Just, you know, odd jobs like that, for example.

12      Q.   Were there periods of time since 2005 that

13  Hector was unemployed?

14      A.   Yes.

15      Q.   Was he unemployed more often than he was

16  employed?

17      A.   It's hard for me to say because he didn't

18  live with me. I really don't know the answer to that

19  question.

20      Q.   Has Hector received government assistance?

21      A.   Not that I'm aware of, no.

22      Q.   Based on your answers, prior to Hector's

23  death in 2017, he had never really held a steady job;

24  is that right?

25      A.   Prior to 2017, not to my knowledge, no, sir.

Case 4:19-cv-00005-CDL   Document 71   Filed 03/15/21   Page 34 of 68
Rodrigo Arreola                          April 23, 2020
Arreola, Rodrigo v. Consolidated Government of Columbus, Georgia, et al

Page 32

1      Q.   Is it fair to say that you were disappointed
2   in how Hector was leading his life prior to his
3   death?
4      A.   That's a hard question. I wouldn't say
5   disappointed; but, you know, there were times I did
6   expect, you know, more of him in different ways,
7   behavior and activities and things of that nature.  I
8   was never disappointed that he was my son, no; but I
9   would, you know, have preferred that he walked a
10  different path to that extent.
11          MR. SNIPES: We have been going about an
12      hour. Does anybody mind if we took about a
13      ten-minute break?
14          MR. POST: Suits us.
15          MR. SNIPES: I'm going to put my phone on
16      mute. I'm showing 11:03.  Why don't we come back
17      at 11:15.
18          MR. POST:  All right.
19          (A recess was taken.)
20  BY MR. SNIPES:
21      Q.   Thank you for the break, Mr. Arreola.
22          Can you list for me all the times you're
23  aware of that Hector was arrested?
24      A.   The approximate figure that I'm aware of of
25  arrests he had -- I want to say three.

Page 33

1       Q.    What were those arrests for?

2       A.    One is that I called in that we spoke about

3   earlier in Harris County.

4       Q.    He was arrested for what, family violence or

5   battery?

6       A.    Yes, I believe so.

7       Q.    What about the other two?

8       A.    I know he got arrested for a DUI. That

9   was -- I think it was in Alabama. I know he was

10  arrested for that. I can't --

11      Q.    What about the --

12      A.    Go ahead.

13      Q.    And you can't think of the third one right

14  now?

15      A.    I know there's a third one, but I just can't

16  think of what the circumstance would have been behind

17  that one. I think there might have been three.  I

18  can't recall but between two or three.

19      Q.    Has Hector ever been incarcerated?

20      A.    Incarcerated as more than overnight, two

21  days, three days?

22      Q.    Yeah. I'm not meaning just incarcerated for

23  a couple of days until he made bond but incarcerated

24  for any significant period of time.

25      A.    No, I don't have knowledge of that.

Page 34

1      Q.   I want to talk about the events of January

2  9, 2017, that are the subject of this lawsuit,

3  Mr. Arreola.  You understand that there was an

4  incident that occurred at the home of your ex-wife,

5  Concepcion Arreola?

6      A.   There was an incident leading to the arrest.

7  Is that what you mean?

8      Q.   Yes.

9      A.   I'm talking about the arrest, the attempted

10 arrest -- the arrest was the incident. That's what I

11 understand.

12     Q.   All right. Did Hector call you that day?

13     A.   No. I did not receive a call from Hector,

14 no.

15     Q.   All right. So prior to him going to his

16 mother's home that evening or early the next morning,

17 he didn't call you and tell you he was having any

18 sorts of problems?

19     A.   No, he did not call me.

20     Q.   In the days leading up to January 9, 2017,

21 had Hector called you to tell you that he was having

22 any particular problems?

23     A.   Prior to 9 January 2017, is that --

24     Q.   Yes.

25     A.   No. I don't recall any phone calls from him

Page 35

1   stating that he was in any kind of trouble.

2       Q.   Leading into January 9, 2017, had you

3   personally witnessed any sort of deterioration in

4   Hector's health or physical condition?

5       A.   No. The last time I saw him he was just

6   fine. I bought him a car, a used car, to get him

7   transportation. We spent time together.  We had a

8   Coke, Coca-Cola, together; and, you know, I just

9   passed the keys on to him and drove around and made

10  sure he -- it was a standard shift.  He looked just

11  fine to me that day.

12      Q.   How long before January 9, 2017, did that

13  meeting with your son take place?

14      A.   Approximately, four to six weeks.

15      Q.   Prior to January 9, 2017, did your ex-wife,

16  Concepcion Arreola, make you aware that Hector was

17  having some problems?

18      A.   No, not -- is this a health-related

19  question?

20      Q.   Yes.

21      A.   No. She never called me and mentioned

22  anything going on with his health.

23      Q.   Had Concepcion Arreola ever called you to

24  let you know that Hector had an alcohol problem?

25      A.   No. I remember we had conversations about

Case 4:19-cv-00005-CDL   Document 71   Filed 03/15/21   Page 38 of 68
Rodrigo Arreola                                    April 23, 2020
Arreola, Rodrigo v. Consolidated Government of Columbus, Georgia, et al

Page 36

1    it in the past about his excessive drinking; but she

2    never really called me and mentioned to me that, you

3    know, he's an alcoholic or he's this or that.

4         Q.    Had Concepcion Arreola and you ever had any

5    discussions about Hector's addiction to elicit drugs?

6         A.    No.

7         Q.    What do you know about the events leading up

8    to the arrest that occurred on January 9, 2017?

9         A.    I don't know any specifics other than what

10   has been published and I read and shown -- I read the

11   scripts on the videos. I haven't watched videos.  I

12   don't know what exactly is on the video or what was

13   said. All I know is what documents are available to

14   the public for reading purposes. That's all I know

15   about that event.

16        Q.    I didn't quite hear the last part of what

17   you just said. Could you repeat it, please?

18        A.    Everything that was made public for reading

19   is what I know about the event.

20        Q.    So obviously you weren't there when it

21   happened, right?

22        A.    No. That's correct, I was not there.

23        Q.    And you hadn't talked to any of the officers

24   that were there, right?

25        A.    No, I have not talked to any officers.

Case 4:19-cv-00005-CDL   Document 71   Filed 03/15/21   Page 39 of 68
Rodrigo Arreola                                        April 23, 2020
Arreola, Rodrigo v. Consolidated Government of Columbus, Georgia, et al

Page 37

1       Q.    So anything that you know about what
2  happened on January 9, 2017, is something that you
3  heard from somebody else; is that right?
4       A.    Or something that I read, yes.
5       Q.    Or an account that you read that somebody
6  else wrote; is that right?
7       A.    I guess that's a fair assumption, yes.
8       Q.    So you don't have any personal knowledge of
9  what happened on January 9, 2017, at all; is that
10  right?
11       A.    That's right. I have no knowledge.
12       Q.    Were you aware that the police officers that
13  attempted to arrest Hector that night tried to talk
14  with him for over ten minutes to get him some help?
15       A.    I'm aware there was a discussion. I'm not
16  sure what the discussion was in detail or whether it
17  was for health or anything else.
18       Q.    Were you aware that on January 9, 2017, when
19  Hector went to the home of your ex-wife that he was
20  high on methamphetamine?
21       A.    I don't know. I don't know if he was or was
22  not.
23       Q.    Were you aware that on January 9, 2017, when
24  Hector went to the home of Concepcion Arreola that he
25  had a lethal dose of methamphetamine in his symptom?

Rodrigo Arreola                                       April 23, 2020
Arreola, Rodrigo v. Consolidated Government of Columbus, Georgia, et al

Page 38

1          A.    No, I did not know that.

2          Q.    Do you know what the autopsy showed as

3     Hector Arreola's cause of death?

4          A.    Yes. I read the autopsy.

5          Q.    What was the cause of found?

6          A.    The cause of death listed on his death

7     certificate was methamphetamine.

8          Q.    And you don't have any reason to dispute

9     that, do you?

10         A.    I'm not sure. I don't know.

11         Q.    You're not a doctor, right?

12         A.    I'm not a doctor, no.

13         Q.    A doctor is the one who did the autopsy,

14    right?

15         A.    Yes. I don't know that doctors are always

16    right.

17         Q.    You don't know one way or the other; is that

18    right?

19         A.    I don't know.

20         Q.    Now, in this case you have sued The Columbus

21    Consolidated Government. What do you understand your

22    claims to be against The Columbus Consolidated

23    Government?

24         A.    Well, here's what I think. I think, you

25    know, based on the situation, based on what I read, I

Rodrigo Arreola                                    April 23, 2020
Arreola, Rodrigo v. Consolidated Government of Columbus, Georgia, et al

Page 39

1    don't think that Hector should have died that night.

2    Those are my thoughts. You know, I'm 100 percent

3    true about that. Based on what happened, based on

4    the use of force, how quickly the situation escalated

5    and before judgment exercised, I don't think Hector

6    should be dead right now.

7        Q.   You think that is -- and that would be the

8    responsibility of The Columbus Consolidated

9    Government --

10       A.   Yes.

11       Q.   -- is that right?

12       A.   Yes.

13       Q.   So you don't blame the individual officers

14   for it, do you?

15       A.   Other than the ones that did the action. I

16   mean, they were represented together, the Columbus

17   Police Department and their representatives, if they

18   tried do the right thing and exercise sound judgment

19   and be able to differentiate, you know, a risk and a

20   threat and be able to deal with it accordingly

21   without, you know, escalating it to the outcome that

22   we had that night.

23       Q.   The three officers involved in arresting

24   Mr. Arreola was Officers Aguilar, Dudley, and Evrard.

25   Are you aware of that?

Case 4:19-cv-00005-CDL   Document 71   Filed 03/15/21   Page 42 of 68
Rodrigo Arreola                        April 23, 2020
Arreola, Rodrigo v. Consolidated Government of Columbus, Georgia, et al

Page 40

1      A.    I'm aware of that, yes.

2      Q.    What do you think Officer Aguilar did wrong

3   in attempting to control Mr. Arreola?

4      A.    Well, again, I wasn't there. I only know

5   what I read and what I've listened to. Obviously,

6   none of the three were able to deescalate the

7   situation based on, you know, threat and risk. I

8   think they just let the situation get out of hand to

9   the point where they couldn't control it other than

10  use brute force; and the outcome of that was my son's

11  death.  So a failure on their part, all three of them

12  really, to be able to control the situation and deal

13  with it accordingly.  Again, I keep going back to the

14  threat and to the risk.  It just doesn't justify it.

15     Q.    You think Officers Aguilar, Dudley, and

16  Evrard were acting on behalf of the City when they

17  confronted Hector; is that right?

18     A.    As far as I know, they were in uniform, so

19  the answer to that question would be yes.

20     Q.    But you don't think they should be

21  personally responsible for anything that happened, do

22  you?

23     A.    Well, I think that's a matter for the law to

24  decide moving forward with the situation and the

25  outcome. I trust in the law to do the right thing

Page 41

1   based on the outcome of the situation.

2        Q.   So you think Officers Aguilar, Dudley, and

3   Evrard should pay you damages out of their pockets?

4        A.   I'm not sure about what that question really

5   means. What I do know is that they took it upon

6   themselves to exercise a certain amount of force that

7   led to my son's death. I want to go through the law

8   system to figure all that out. I can give you my

9   opinion; but that doesn't, you know, amount to much.

10  I want the law -- the justice to decide that.

11       Q.   Well, you are seeking damages in this case;

12  is that right?

13       A.   Yes.

14       Q.   How much?

15       A.   Well, I can't put a number on my son's

16  death. No number is ever going to bring him back.

17  There's a lot of emotional stressors that's happened

18  that's disrupted our whole life. You know, there's

19  funeral costs. There's other costs.  There's the

20  child in between here, you know, that will never have

21  a father. So, you know, I can't give you an amount.

22  Again, I'll let the system figure that out, but I do

23  want justice and I want accountability for my son's

24  death.

25       Q.   Whatever that number is that you ultimately

Page 42

1    decide you'll ask for, do you think Officer Aguilar

2    should pay that to you and your family out of his

3    pocket?

4              MR. POST: I'm going to object to the form

5         of the question. That's been asked and answered.

6    BY MR. SNIPES:

7         Q.   You can answer.

8         A.   I'll go back to my original answer. I can't

9    honestly, you know, say. What I want is totally

10   different than what you're asking me; but, you know,

11   it's not for me to say.  It's not for me to say if it

12   comes out of their pockets or not. It's up to the

13   system to define that.

14        Q.   Let me ask the same question with regard to

15   Officer Dudley. When you ultimately ask a jury for

16   damages, do you think he should have to pay it out of

17   his pocket?

18        A.   Again, I'm sorry for being redundant. I

19   can't say if it should come out of his pockets. I

20   don't know where else would it come from.

21        Q.   Would your answer be the same for Officer

22   Evrard?

23        A.   Yes. It's very difficult for me to

24   determine what comes out of their pocket or not. I

25   just want accountability. That's what I want.  I

Case 4:19-cv-00005-CDL   Document 71   Filed 03/15/21   Page 45 of 68
Rodrigo Arreola                    April 23, 2020
Arreola, Rodrigo v. Consolidated Government of Columbus, Georgia, et al

Page 43

1    want accountability. I want people to be accountable

2    for their actions. I don't think that's too much to

3    ask for. Whatever the numbers come out to be, you

4    know, it's not for me to decide. Nothing is going to

5    bring my son back.

6        Q.    Now, you have sued Officers Aguilar, Dudley,

7    and Evrard, correct?

8        A.    Yes.

9        Q.    Which one of those officers caused Hector's

10   death?

11       A.    Again, I don't know. I haven't seen the

12   video. What I know is what's been made public.  I

13   don't think it was just one. I think it was a

14   combination. I think it was all three of them.  I

15   think they all played an equal part in Hector's

16   death.

17       Q.    Why do you believe all three officers play a

18   part in his death?

19       A.    They were all involved. They were all at

20   the scene.  They all put their hands on him at some

21   point or another.  They all worked together as a team

22   that night. You know, among those three, the

23   situation still got out of control.

24       Q.    You're aware that the judge has ruled that

25   the officers' arrest of Mr. Arreola was justified?

Page 44

1           MR. POST: I object to the question.  It

2       calls for a legal conclusion.

3           You can answer.

4           MR. SNIPES: I don't think it's a legal

5       conclusion. It's entirely consistent with what

6       your own expert said.

7   BY MR. SNIPES:

8       Q.   My question to you is, are you aware that

9   the judge has ruled that the officers' arrest of

10  Hector on January 9, 2017, was justified?

11          MR. POST: The judge's opinion speaks for

12      itself. Whether he recalls exactly what the

13      judge's opinion says, I don't see how that is

14      relevant. We're reserving our objections, so I'm

15      letting him answer.

16          Go ahead and answer, if you can.

17          THE WITNESS: Restate the question, please.

18  BY MR. SNIPES:

19      Q.   Let me ask it this way. Do you believe the

20  decision of Officers Aguilar, Dudley, and Evrard to

21  arrest Hector Arreola on January 9, 2017, was

22  justified?

23      A.   Based on what I know and the knowledge that

24  I have, I don't think personally that it was

25  justified.

Rodrigo Arreola                                    April 23, 2020
Arreola, Rodrigo v. Consolidated Government of Columbus, Georgia, et al

                                                    Page 45

1        Q.   Are you aware that Judge Land feels

2   differently in his order as such in this case?

3        A.   I haven't read his decision or have any

4   preview to it, so I can't really answer that

5   question.

6        Q.   Are you aware at the time Officers Aguilar,

7   Dudley, and Evrard attempted to take Hector Arreola

8   into custody that he began to fight?

9        A.   Again, I wasn't on the scene, so I can't --

10  you know, I can't give you a solid answer on that. I

11  don't know.

12       Q.   If Hector Arreola was not following the

13  officers' instructions on January 9, 2017, do you

14  think they were justified in arresting him?

15            MR. POST:  Object to the form of the

16       question.  It asks for a legal conclusion.

17       Objection.

18            Go on and answer.

19            THE WITNESS: Can you restate, please?

20  BY MR. SNIPES:

21       Q.   If Hector was not following the officers'

22  instructions on January 9, 2017, do you think they

23  were justified in arresting him?

24       A.   I do not think it was justified to arrest

25  him for not following instructions.

Page 46

1      Q.   Let's put aside the decision to arrest.

2    Once the officers attempted to arrest Mr. Arreola and

3    he began to fight, do you believe their use of force

4    was justified at that point?

5      A.   That's where I have a problem is -- you

6    know, you're trying to arrest someone without

7    having -- you know, with someone who doesn't present

8    a threat or a risk. Why would you try to put your

9    hands on somebody -- I mean, people have rights. If

10   there's no threat and there's no risk, then why

11   should you physically attempt to put your hands on an

12   individual that's already showing, you know, a

13   certain type of behavior.

14     Q.   Why do you believe that Hector Arreola did

15   not pose a risk on January 9, 2017?

16     A.   He didn't pose a risk for anyone. There was

17   nobody he could harm. There was no -- there was no

18   weapon that he had with him. There was no aggression

19   towards anyone that he was trying to violate their --

20   you know, their wellbeing. The environment was just

21   not a threatful environment. You know, he was not --

22   you know, people knock on people's doors all the

23   time.

24     Q.   So you don't think Hector knocking on the

25   neighbor's door presented any sort of threat?

Case 4:19-cv-00005-CDL   Document 71   Filed 03/15/21   Page 49 of 68
Rodrigo Arreola                          April 23, 2020
Arreola, Rodrigo v. Consolidated Government of Columbus, Georgia, et al

Page 47

1    A.   Of course not. People knock on doors all
2    the time.
3    Q.   You understand that your attorneys have
4    employed certain experts in this case?
5    A.   Yes, I'm aware.
6    Q.   You understand that one expert, who already
7    testified, was a use-of-force expert named
8    Mr. Harmony. Did you know that?
9    A.   I was not aware of his name, no.
10   Q.   Were you aware that he's provided an opinion
11   in this case that your son should have been arrested
12   sooner than he was by the Columbus police?
13   A.   No. That's the first time I am hearing
14   that.
15   Q.   Were you aware that Mr. Harmony opined that
16   the police officers absolutely had the right to
17   arrest Mr. Arreola and to use force?
18   A.   I'm not aware. Is this individual one of
19   your experts?
20   Q.   No. He's on your side.
21   A.   He's on our side?
22   Q.   Yes.
23   A.   I wasn't tracking that.
24        MR. SNIPES:   Let's take a five-minute break,
25   if you don't mind, and I think we'll be about

Case 4:19-cv-00005-CDL   Document 71   Filed 03/15/21   Page 50 of 68
Rodrigo Arreola                                    April 23, 2020
Arreola, Rodrigo v. Consolidated Government of Columbus, Georgia, et al

Page 48

1        done.

2               MR. POST: Okay.

3               (A recess was taken.)

4               MR. SNIPES: I have no further questions.

5               MR. POST: I have one question.

6                         EXAMINATION

7        BY MR. POST:

8               Q.   You mentioned some transcripts of a video.

9        Is what you saw as far as a transcript of the video,

10       Mr. Arreola, what was contained in the legal brief or

11       the opinion of the Court, something you read?

12              A.   Right. So that's what I was able to read.

13       I also listened to the 911 calls that were on the

14       news.

15              Q.   Okay. It's not anything you have done with

16       my office, but it's what you heard on TV; is that

17       right?

18              A.   That's correct.

19              MR. POST: That's all I had to clear up.

20              MR. SNIPES: All right.  I have no further

21       questions.

22              Thank you for your time, Mr. Arreola.

23              (It was stipulated and agreed by

24       and between counsel for the respective

25       parties and the witness that the

Rodrigo Arreola                    April 23, 2020
Arreola, Rodrigo v. Consolidated Government of Columbus, Georgia, et al

Page 49

1          reading and signing of the deposition

2          by the witness be waived.)

3               (Proceedings concluded at 11:50 a.m.)

4                         *        *        *

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Rodrigo Arreola                                    April 23, 2020
Arreola, Rodrigo v. Consolidated Government of Columbus, Georgia, et al

Page 50

1                      VERITEXT LEGAL SOLUTIONS

2                   FIRM CERTIFICATE AND DISCLOSURE

3

4     Veritext represents that the foregoing transcript as

5     produced by our Production Coordinators, Georgia

6     Certified Notaries, is a true, correct and complete

7     transcript of the colloquies, questions and answers

8     as submitted by the certified court reporter in this

9     case.  Veritext further represents that the attached

10    exhibits, if any, are a true, correct and complete

11    copy as submitted by the certified reporter,

12    attorneys or witness in this case; and that the

13    exhibits were handled and produced exclusively

14    through our Production Coordinators, Georgia

15    Certified Notaries. Copies of notarized production

16    certificates related to this proceeding are available

17    upon request to litsup-ga@veritext.com.

18

19    Veritext is not taking this deposition under any

20    relationship that is prohibited by OCGA

21    15-14-37(a)and(b).  Case-specific discounts are

22    automatically applied to all parties, at such time as

23    any party receives a discount. Ancillary services

24    such as calendar and financial reports are available

25    to all parties upon request.

Case 4:19-cv-00005-CDL   Document 71   Filed 03/15/21   Page 53 of 68
Rodrigo Aneola                                          April 23, 2020
An eola, Rodrigo v. ConsolidatedGovernment of Colllllllbus, Georgia, et al

Page 51

                          CERTIFICATE
1
STATE OF GEORGIA:
2
COUNTY OF GWINNETT:
3
                    I hereby certify that the foregoing
4
transcript      was taken down, as stated in the caption,
and the colloquies, questions and answers were
5
reduced to typewriting under my direction; that the
transcript is a true and correct record of the
6
evidence given upon said proceeding.
7                   I further certify that I am not a
relative or employee or attorney of any party, nor am
8
I financially interested in the outcome of this
action.
9                   I have no relationship of interest in
this matter which would disqualify me from
10
maintaining my obligation of impartiality in
compliance with the Code of Professional Ethics.
11                  I have no direct contract with any
party in this action and my compensation is based
12
solely on the terms of my subcontractor agreement.
                    Nothing in the arrangements made for
13
this proceeding impacts my absolute commitment to
serve all parties as an impartial officer of the
14
court.
                    This the 4th day of May, 2020.
15

16

17

18

19
                    LAURA R. SINGLE, CCR-B-1343
20

21

22

23

24

25

Rodrigo Arreola
April 23, 2020
Arreola, Rodrigo v. Consolidated Government of Columbus, Georgia, et al

**[& - approximate]**                                                                                          Page 1

| & | | | |
|---|---|---|---|

**&**   2:16

**0**

**00005**   1:9

**1**

**1**   3:13 6:6 13:18
14:4
**10**   4:2
**100**   39:2
**101**   7:18
**10:04**   1:22
**1111**   2:17
**11:03**   32:16
**11:15**   32:17
**11:50**   49:3
**12**   15:13 21:6
**12314**   51:18
**13**   3:13 21:25
**1343**   1:25 51:19
**14**   3:14 19:12
21:25
**15**   6:12
**15-14-37**   50:21
**17**   24:1,2,3
**18**   23:24 27:3
**189**   5:20 22:6
**19**   27:3
**1981**   19:23 20:2,6
20:9,14
**1983**   6:6
**1986**   19:12
**1989**   21:16

**2**

**2**   3:14 14:13 19:23

**2010**   19:25 20:2,14
21:10 29:14
**2012**   15:22
**2014**   15:22
**2017**   19:3 30:25
31:23,25 34:2,20
34:23 35:2,12,15
36:8 37:2,9,18,23
44:10,21 45:13,22
46:15
**2020**   1:21 51:14
**20s**   25:3,8
**22**   6:9
**221-9371**   2:7
**23**   1:21
**24**   20:18 21:3

**3**

**3**   2:5
**30**   24:11,14
**31901**   2:18
**31904**   2:6
**324-0251**   2:18

**4**

**4**   3:4
**48**   3:5
**4:19**   1:9
**4th**   51:14

**7**

**706**   2:7,18
**7200**   22:12

**8**

**8**   15:13

**9**

**90**   21:16
**911**   48:13

| a | | | |
|---|---|---|---|

**a.m.**   1:22 49:3
**aaron**   1:14 18:17
**ability**   8:12 25:13
**able**   7:11 14:6
39:19,20 40:6,12
48:12
**absolute**   51:13
**absolutely**   6:20
10:12 47:16
**account**   37:5
**accountability**
41:23 42:25 43:1
**accountable**   43:1
**achieved**   6:14
**act**   9:4
**acted**   13:1,1 25:18
**acting**   40:16
**action**   39:15 51:8
51:11
**actions**   13:11 43:2
**activities**   32:7
**addiction**   28:2
36:5
**addition**   11:5
**address**   22:5,7
**administration**
3:14 14:24
**administrator**   1:4
14:14,17
**age**   24:7
**aggression**   46:18
**aggressive**   26:4,7

**ags**   2:19
**aguilar**   1:11 18:16
18:19 39:24 40:2
40:15 41:2 42:1
43:6 44:20 45:6
**ahead**   33:12 44:16
**airborne**   6:7,25
**alabama**   33:9
**alan**   2:15 4:14,20
**alcohol**   24:24 25:1
25:5,8,10,12,17,21
27:12,24 28:2,20
35:24
**alcoholic**   36:3
**alcoholism**   27:7
27:23
**ambulance**   19:6
**amount**   12:21
41:6,9,21
**amounts**   25:10
**ancillary**   50:23
**answer**   5:4,9,13
8:7 16:1 20:9
22:10 23:16,22
31:18 40:19 42:7
42:8,21 44:3,15,16
45:4,10,18
**answered**   24:7
42:5
**answers**   31:22
50:7 51:5
**anybody**   32:12
**apologize**   22:9
**appear**   13:19
**appearing**   14:10
**applied**   50:22

Rodrigo Arreola                                         April 23, 2020
Arreola, Rodrigo v. Consolidated Government of Columbus, Georgia, et al

| | | | |
|---|---|---|---|
| **20**  27:3<br>**2004**  29:20,24 30:9<br>30:13,16<br>**2005**  5:22,23 6:6<br>30:23,25 31:12 | **9**  19:3 34:2,20,23<br>35:2,12,15 36:8<br>37:2,9,18,23 44:10<br>44:21 45:13,22<br>46:15 | 26:8,20<br>**ago**  4:14<br>**agree**  8:17 9:14,18<br>**agreed**  48:23<br>**agreement** 51:12 | **apply**  7:10<br>**apprehension**<br>13:14<br>**approximate**<br>15:20,23 20:19,25 |

Rodrigo Arreola                                                          April 23, 2020
Arreola, Rodrigo v. Consolidated Government of Columbus, Georgia, et al

**[approximate - career]**                                              Page 2

21:25 23:1 30:12
32:24
**approximately**
15:6,13 19:25
21:9 35:14
**april** 1:21
**area** 7:2 17:19
21:11,17,18,21
29:16
**arizona** 6:5,5 31:4
**army** 6:6,8,11,15
6:17,22 7:19,22
13:3
**arrangements**
51:12
**arreola** 1:3,3,5,5,6
1:7,19 3:3 4:8,13
5:1,18,19 13:17,21
14:3,12,18,20,25
18:1,15 19:3,13,22
20:15,21 24:11
29:20 32:21 34:3
34:5 35:16,23
36:4 37:24 39:24
40:3 43:25 44:21
45:7,12 46:2,14
47:17 48:10,22
**arreola's** 15:24
19:6,9 38:3
**arrest** 24:18 34:6
34:9,10,10 36:8
37:13 43:25 44:9
44:21 45:24 46:1
46:2,6 47:17
**arrested** 16:22
17:1,4 23:20
32:23 33:4,8,10
47:11
**arresting** 39:23
45:14,23

**arrests** 24:15
32:25 33:1
**article** 4:2
**aside** 46:1
**asked** 27:15 30:19
42:5
**asking** 42:10
**asks** 45:16
**aspect** 8:24
**assignment** 21:20
**assistance** 30:17
31:20
**assistant** 31:10
**assume** 6:18
**assumption** 37:7
**attached** 50:9
**attempt** 46:11
**attempted** 34:9
37:13 45:7 46:2
**attempting** 40:3
**attendant** 23:10
**attorney** 51:7
**attorneys** 47:3
50:12
**august** 6:6 19:12
**auto** 23:5
**automatically**
50:22
**autopsy** 38:2,4,13
**available** 36:13
50:16,24
**avenue** 2:17
**aware** 24:17 25:11
27:23,25 28:4,6,8
28:10,14,17 31:21
32:23,24 35:16
37:12,15,18,23
39:25 40:1 43:24
44:8 45:1,6 47:5,9
47:10,15,18

**b**

**b** 1:25 4:2 50:21
51:19
**back** 11:2,6 12:3
21:7,16,18,21,22
22:9 31:1,8 32:16
40:13 41:16 42:8
43:5
**barn** 10:20
**based** 5:23 6:18
7:20 8:12,13 9:1,8
9:9,12 10:6 13:1
31:22 38:25,25
39:3,3 40:7 41:1
44:23 51:11
**basically** 21:4
**basis** 15:16 16:4
28:23 30:7
**battery** 33:5
**bay** 2:17
**began** 25:8 45:8
46:3
**behalf** 40:16
**behavior** 26:5
32:7 46:13
**believe** 15:5 22:25
23:23 27:2 31:6
33:6 43:17 44:19
46:3,14
**belligerent** 26:20
**benefit** 16:20
**benning** 6:11
17:22 21:8,17,21
23:10 31:10
**best** 8:12 20:25
**birth** 16:16 19:19
**bit** 8:5 26:5
**bizarre** 25:18
**blame** 39:13
**blurry** 23:23 25:4

**board** 4:3
**body** 23:5
**bond** 33:23
**boren** 1:16
**born** 15:18,21
16:14 19:11,12
20:20,23 21:2
**bought** 35:6
**boundaries** 10:1
**bradley** 2:5
**break** 31:3 32:13
32:21 47:24
**breakfast** 30:2
**breaks** 30:11
**brian** 1:12 18:17
**brief** 48:10
**bring** 41:16 43:5
**broke** 8:5 18:2
**brute** 40:10
**business** 23:7
**buy** 30:21

**c**

**c** 2:1,4,15 4:1
**calendar** 50:24
**california** 20:22
20:24 21:5
**call** 8:16 26:15,18
34:12,13,17,19
**called** 26:21 33:2
34:21 35:21,23
36:2
**calls** 34:25 44:2
48:13
**capabilities** 17:25
18:5,6,9
**capacity** 1:12,13
1:14,16
**caption** 51:4
**car** 30:21 35:6,6
**career** 5:24

Rodrigo Arreola                                                    April 23, 2020
Arreola, Rodrigo v. Consolidated Government of Columbus, Georgia, et al

**[cars - department]**                                                    Page 3

cars  30:21
case  1:9 17:17
  38:20 41:11 45:2
  47:4,11 50:9,12,21
catch  28:12
cause  38:3,5,6
caused  19:2 43:9
ccr  1:25 51:19
certain  41:6 46:13
  47:4
certificate  16:17
  38:7 50:2 51:1
certificates  50:16
certified  50:6,8,11
  50:15
certify  51:4,7
challenge  26:13
chief  1:15
child  1:6 14:24
  15:2 16:19,23
  21:10 41:20
chronic  28:5,25
  29:9
chronically  28:9
churches  17:19
  22:12,20
circumstance
  11:19 33:16
circumstances 8:4
city  40:16
civil  17:21
civilian  6:12
claims  38:22
clark  2:15 4:16
  13:23
classes  27:15
clear  48:19
clearer  5:6
close  8:3,8
clubs  17:18

coca  35:8
code  51:10
coke  35:8
cola  35:8
colloquies  50:7
  51:5
columbus  1:2,11
  1:15 2:6,18 18:16
  19:1 21:11 22:3
  22:11 23:7 38:20
  38:22 39:8,16
  47:12
combat  6:23,24
  7:3,4,7,15,23 8:18
  8:21 9:15 10:8,8
  10:25 11:6 12:2,6
  17:25 18:5,6,9
  20:12
combative  11:14
  13:9 25:22 26:1,6
combination
  43:14
come  21:18 23:11
  32:16 42:19,20
  43:3
comes  42:12,24
command  9:1,3
  10:3 12:10
commitment
  51:13
commonly 11:3
compensation
  51:11
complete  50:6,10
completed 22:24
compliance 51:10
concepcion  1:5
  19:13,21 20:15,21
  29:19 34:5 35:16
  35:23 36:4 37:24

concluded  49:3
conclusion  44:2,5
  45:16
condition  35:4
confirm  16:10,13
conflicts  13:4,6
confronted  7:7,23
  8:18 40:17
consistent  23:6
  31:9 44:5
consolidated  1:10
  18:16 38:21,22
  39:8
consumed 25:1,10
consumption
  25:12 27:13
contained  48:10
continue  12:6
continuing  11:9
contract  51:11
control  40:3,9,12
  43:23
conversations
  35:25
coordinators  50:5
  50:14
copies  50:15
copy  50:11
correct  7:18 8:1
  9:12 14:19,25
  15:1 19:15 20:7
  36:22 43:7 48:18
  50:6,10 51:6
costs  41:19,19
counsel  4:5 48:24
county  26:18 33:3
  51:3
couple  33:23
course  12:1 47:1
court  1:1 2:5 4:3,5
  5:11 48:11 50:8

51:14
currently  18:4
custodio  1:7
custody  45:8
cutter  6:4,5
cv  1:9

**d**

d  3:1 4:1
dad  31:5
damages 41:3,11
  42:16
dates  27:2
daughter  16:8,11
day  34:12 35:11
  51:14
days  33:21,21,23
  34:20
dead  39:6
deal  39:20 40:12
death  15:24 16:23
  16:25 17:3 19:2,6
  19:9 28:4,7,10,14
  28:24 29:2,5,8
  31:23 32:3 38:3,6
  38:6 40:11 41:7
  41:16,24 43:10,16
  43:18
deceased  1:3
decide  40:24 41:10
  42:1 43:4
decision  44:20
  45:3 46:1
deescalate  40:6
defeat  7:9
defendants  1:17
  2:14 3:12 4:15
defense  7:1
define  42:13
definition  25:6
department 1:15
  39:17

Rodrigo Arreola                                    April 23, 2020
Arreola, Rodrigo v. Consolidated Government of Columbus, Georgia, et al

**[depend - fall]**                                              Page 4

depend  11:21
dependency  27:24
dependent  28:9
deployed  21:6
deposition  1:19
  3:13 4:16,17 14:5
  14:9 49:1 50:19
describe  25:24
  26:1 30:24
description  3:11
desires  26:4
detail  37:16
deterioration  35:3
determinations
  13:3
determine  7:12,16
  12:25 42:24
developer  17:25
  18:5,6,9
died  39:1
different  12:23
  29:16 32:6,10
  42:10
differentiate  39:19
differently  45:2
difficult  42:23
diffuse  7:11 10:4
diffused  7:17
direct  51:11
direction  51:5
disagree  9:19,20
disappointed 32:1
  32:5,8
discharged  6:19
disciplined  12:10
disclosure  4:4
  50:2
discount  50:23
discounts  50:21
discussion  13:25
  37:15,16

discussions  36:5
dispute  38:8
disqualify  51:9
disrupted  41:18
district  1:1,1
  17:17
division  1:2
divorce  19:24
divorced  19:25
  20:10,17 29:15,20
  29:23 30:16,23
doctor  38:11,12,13
doctors  19:8 38:15
document 14:13
  14:14,15
documents 36:13
doing  5:5 6:12
  16:6
domestic 24:17
door  46:25
doors  46:22 47:1
dose  37:25
double  22:12,20
drinking  36:1
driver  19:6
driving  24:15
dropped  23:2,12
drove  35:9
drug  28:2,5 29:6,9
drugs  28:11,15,17
  28:18 36:5
drunk  26:20
dudley  1:13 18:17
  18:19 39:24 40:15
  41:2 42:15 43:6
  44:20 45:7
dui  27:14 33:8
duly  4:9

**e**

e  2:1,1 3:1 4:1,1
  17:12,12,12
e9  6:16
earlier  24:19 33:3
early  25:1,7 34:16
easier  5:11 18:8
education  22:23
effect  8:7
efforts  12:11
eight  15:17 31:7
either  11:1
eleventh  23:1,13
elicit  28:11,15
  36:5
emotional  41:17
employed  31:16
  47:4
employee  51:7
empower  7:19 8:2
  8:11
engage  12:24
engagement  9:1,2
  9:5,6,23 10:6
  11:22,23
enrolled  27:11
entirely  44:5
environment
  46:20,21
equal  43:15
escalate  26:14
escalated  39:4
escalating  39:21
esq  2:4,15,15
estate  1:5 14:17
estimate 30:6
ethics  51:10
evening  34:16
event  36:15,19
events  19:2 34:1
  36:7

everybody  10:22
evidence  51:6
evrard  1:14 18:17
  18:20 39:24 40:16
  41:3 42:22 43:7
  44:20 45:7
ex  34:4 35:15
  37:19
exactly  8:2,2
  22:16 36:12 44:12
examination  3:3
  4:11 48:6
examined  4:10
example  31:11
excessive  36:1
exclusively  50:13
excuse  10:23
exercise  8:11
  12:20 39:18 41:6
exercised  39:5
exhibit  3:13,14
  13:16,18,20 14:4
  14:13
exhibits  50:10,13
expect  10:3 32:6
experience  7:21
  9:13 12:2,12
expert  44:6 47:6,7
experts  47:4,19
explaining  9:21
explanation  5:10
extensive  7:1
extent  28:21 32:10

**f**

f  2:6
failure  16:23
  40:11
fair  5:7,8,14 32:1
  37:7
fall  8:22,24 9:7

Rodrigo Arreola                                                April 23, 2020
Arreola, Rodrigo v. Consolidated Government of Columbus, Georgia, et al

**familiar** 27:20
**family** 17:1,4 21:8
  33:4 42:2
**far** 25:4 26:5 27:2
  40:18 48:9
**fashion** 25:18
**father** 41:21
**feels** 45:1
**feet** 11:4,15,20,24
**fight** 8:1 45:8 46:3
**figure** 13:17 32:24
  41:8,22
**financial** 30:17
  50:24
**financially** 51:8
**find** 12:24 16:5
  25:13
**fine** 35:6,11
**finish** 5:4
**firm** 50:2
**first** 4:9 27:14
  47:13
**five** 15:20 21:2,20
  47:24
**floor** 2:17
**fluid** 8:19
**follow** 9:2,5,5 10:2
  26:3 27:16
**following** 45:12,21
  45:25
**follows** 4:10
**food** 31:5,6
**force** 7:10 10:4
  12:15,21 39:4
  40:10 41:6 46:3
  47:7,17
**ford** 2:16
**foregoing** 50:4
  51:4
**form** 4:21 42:4
  45:15

**fort** 6:11 17:22
  20:22 21:7,7,16,17
  21:21 23:10 31:10
**forth** 20:13
**forward** 40:24
**found** 38:5
**four** 21:1,10,19
  30:1,5 35:14
**fragmented** 30:7
**frame** 22:1
**frequent** 29:25
**friend** 1:7
**fry's** 31:6
**full** 5:16 9:21
**funeral** 41:19
**further** 48:4,20
  50:9 51:7

**g**

**g** 2:15 4:1
**ga** 50:17
**garages** 31:3
**gas** 23:9 31:10
**georgia** 1:1,11 2:6
  2:18 4:3 5:20 21:8
  21:21 22:3,6
  23:25 50:5,14
  51:2
**getting** 11:12
  23:14,15
**girlfriend** 29:9,11
**give** 6:1 27:1 41:8
  41:21 45:10
**given** 4:17 51:6
**go** 4:19 5:1 9:25
  13:23 18:10 21:14
  21:19 22:8,9,21
  27:14 33:12 41:7
  42:8 44:16 45:18
**going** 5:2 9:16
  13:16 21:16 31:1
  32:11,15 34:15

  35:22 40:13 41:16
  42:4 43:4
**good** 4:13 9:7 27:1
**government** 1:10
  18:16 31:20 38:21
  38:23 39:9
**grade** 21:14 22:23
  22:25 23:13
**grocery** 6:3 31:3,5
**ground** 4:19 5:1
**groups** 17:18
**guess** 37:7
**guessed** 12:15,20
**gwinnett** 51:3

**h**

**h** 17:12
**hand** 7:3,3,4,4,7,7
  7:15,15,23,23 8:18
  8:18,21,21 9:15,15
  10:8,8 40:8
**handcuffs** 11:1
**handle** 7:25
**handled** 50:13
**hands** 11:1,5,9,15
  11:17,24 12:7
  43:20 46:9,11
**happened** 12:25
  12:25 36:21 37:2
  37:9 39:3 40:21
  41:17
**hard** 23:16 30:6
  31:17 32:4
**harm** 46:17
**harmony** 47:8,15
**harris** 26:18 33:3
**hawaii** 15:9,11
**health** 17:23,24
  18:5 35:4,18,22
  37:17
**hear** 36:16

**heard** 37:3 48:16
**hearing** 47:13
**hector** 1:3,5,6,7
  14:18,22 16:8,19
  16:22 19:3,6,8,11
  20:17,20,23 21:4,9
  21:14,23,24 22:2,8
  22:17,24 24:24
  25:17,21 26:16
  27:6,24 28:1
  29:12,20,24 30:13
  30:18 31:13,20
  32:2,23 33:19
  34:12,13,21 35:16
  35:24 37:13,19,24
  38:3 39:1,5 40:17
  44:10,21 45:7,12
  45:21 46:14,24
**hector's** 15:2
  16:16,25 17:3
  19:18 28:4,14,24
  29:2,5,8,23 30:16
  30:24 31:22 35:4
  36:5 43:9,15
**held** 13:25 31:23
**help** 27:6,9 30:20
  37:14
**helped** 30:22
**high** 6:1,3 22:2,8
  22:18,19 23:3,13
  37:20
**highest** 6:14
**history** 6:1,10
  30:25
**hogtie** 10:14,17
**hogtied** 10:13,19
**holidays** 30:14
**home** 20:14 25:23
  26:20 34:4,16
  37:19,24

Rodrigo Arreola                                    April 23, 2020
Arreola, Rodrigo v. Consolidated Government of Columbus, Georgia, et al

**[homes - lived]**                                              Page 6

| | | k | korea  21:6 |
|---|---|---|---|

homes  22:15
honestly  42:9
honorably  6:19
horizons  27:18,20
  27:21
hospital  16:14
hour  32:12
house  29:12
household  20:1

**i**

imee  1:7
impacts  51:13
impartial  51:13
impartiality  51:10
important  5:5
incarcerated
  23:18 33:19,20,22
  33:23
incident  25:16,20
  25:24 26:17,19,24
  27:4,5 34:4,6,10
individual  1:12,13
  1:14,16 11:12
  39:13 46:12 47:18
individuals  7:20
  10:15
infantryman  6:7
  6:22,25
influence  24:15
  25:17,21 26:2
input  9:1
instances  11:25
instructions  26:3
  45:13,22,25
interest  51:9
interested  22:16
  51:8
interfere  25:12
intravenous  29:6
  29:9

investigation
  12:24
involved  9:10,15
  10:7 17:19,20
  39:23 43:19
italy  21:19,22

**j**

james  2:15
january  19:3 34:1
  34:20,23 35:2,12
  35:15 36:8 37:2,9
  37:18,23 44:10,21
  45:13,22 46:15
jcc  2:19
jezreel  1:7 15:8
  16:3 24:20
jim  4:16
job  17:21 31:23
jobs  23:4,6,8 31:1
  31:8,11
joined  6:6
jordan  22:22
jr  2:15
judge  43:24 44:9
  45:1
judge's  44:11,13
judgment  7:12,16
  7:20 8:15,23 9:7,7
  9:9,22,22 11:18
  12:20 39:5,18
judicial  17:16
july  17:15 19:23
jury  42:15
justice  41:10,23
justified  43:25
  44:10,22,25 45:14
  45:23,24 46:4
justify  40:14
juvenile  23:18,19
  23:20,25

keep  21:15 40:13
key  7:19
keys  35:9
kick  11:9,11
kid  24:6
kind  23:16,22 30:6
  35:1
knew  28:20,22
knock  46:22 47:1
knocking  46:24
know  5:25 7:13
  8:25 9:3,6,23
  10:20 13:2,10
  16:1,2,2,5,19,22
  16:25 17:3,9
  18:21 24:5 25:3,3
  25:4,5,14,14 26:3
  26:4,5,12 27:12,12
  27:15,20 28:1,8,24
  29:1,2,5,7,8,10,10
  29:17 30:19,20,22
  31:3,11,18 32:5,6
  32:9 33:8,9,15
  35:8,24 36:3,7,9
  36:12,13,14,19
  37:1,21,21 38:1,2
  38:10,15,17,19,25
  39:2,19,21 40:4,7
  40:18 41:5,9,18,20
  41:21 42:9,10,20
  43:4,11,12,22
  44:23 45:10,11
  46:6,7,12,20,21,22
  47:8
knowledge  16:21
  16:24 17:2 29:4
  31:25 33:25 37:8
  37:11 44:23
knows  9:16

**l**

land  45:1
landscaped  23:4
landscaping  31:2
large  25:10
laura  1:25 51:19
law  2:5 40:23,25
  41:7,10
lawsuit  4:15 5:3
  34:2
leaders  7:19
leadership  7:18
leading  32:2 34:6
  34:20 35:2 36:7
led  41:7
left  21:18 22:2
  29:18
legal  44:2,4 45:16
  48:10 50:1
lethal  37:25
letters  3:14 14:23
letting  44:15
level  9:13 13:12
life  32:2 41:18
line  25:4
list  32:22
listed  38:6
listened  40:5
  48:13
lists  14:24
litsup  50:17
little  8:5 18:2 26:5
  26:13
live  5:19,20 15:7
  15:10 17:7 20:1,6
  20:21,24 22:5,10
  29:21 31:18
lived  5:21,23
  20:10,14,22,25
  21:11 22:11

**lives** 15:8
**living** 22:2,17
  29:14,15,18
**llc** 2:5
**long** 5:21 17:13
  20:4,23 35:12
**look** 18:22
**looked** 35:10
███████████
**lot** 41:17
**lunch** 30:2

**m**

**maintaining** 51:10
**major** 6:16 12:9
  13:12
**making** 18:8
**mandatory** 27:14
**maplewood** 22:12
**maria** 14:24
**marijuana** 28:21
**mark** 2:4,5 13:18
**marked** 14:4,13
**markpostlaw.com**
  2:7
 **married** 17:13
  19:16,18,23
**marry** 19:22
**matter** 40:23 51:9
**mean** 10:17 23:16
  34:7 39:16 46:9
**meaning** 10:17
  26:8 33:22
**means** 7:10 41:5
**meat** 6:4
**meet** 6:5
**meeting** 35:13
**mentioned** 35:21
  36:2 48:8
**met** 4:13 18:19
  30:2

**methamphetamine**
  28:25 29:3 37:20
  37:25 38:7
**michael** 1:11
  18:16
**middle** 1:1
**midland** 5:20,21
  17:8,16 22:6,11,13
  23:23 29:14
**military** 5:24,25
  7:6,14 10:22
  11:13 12:13,23
**mind** 23:11 32:12
  47:25
**minor** 1:6
**minute** 32:13
  47:24
**minutes** 4:14
  37:14
**moment** 18:11
**money** 30:20
**months** 15:14 21:3
  21:6 31:7
**morning** 4:13
  34:16
**mother** 15:8 17:5
  19:13 29:14,21,23
  30:17
**mother's** 34:16
**move** 29:12
**moved** 21:5,7
  22:14 29:16
**movement** 11:12
**movements** 26:5
**moving** 22:11
  40:24
**mpost** 2:7
**mute** 32:16

**n**

**n** 2:1 3:1 4:1
**name** 4:14 5:16,18
  16:16 17:11 47:9
**named** 47:7
**nation** 7:1
**nature** 32:7
**necessarily** 9:20
  11:11,16
**necessary** 5:10
  7:10,10 10:4
  12:21
**need** 11:19 17:17
**needed** 26:15
**neighbor's** 46:25
**never** 12:4,12
  13:13 23:6 31:23
  32:8 35:21 36:2
  41:20
**new** 27:18,20,21
**news** 48:14
**night** 37:13 39:1
  39:22 43:22
 **normal** 13:15
**northside** 22:21
**notaries** 50:6,15
**notarized** 50:15
**notice** 3:13 14:4,8
  14:10
 **number** 3:11
  41:15,16,25
 **numbers** 43:3

**o**

**o** 4:1
**object** 42:4 44:1
  45:15
**objection** 45:17
**objections** 4:21
  44:14

**obligation** 51:10
**observe** 13:11
**obviously** 10:21
  36:20 40:5
**occasionally** 16:4
**occasions** 29:25
  30:1,3,15,19
**occupational**
  17:23 18:4
**occurred** 26:25
  27:4 34:4 36:8
**ocga** 50:20
**odd** 23:4,5 31:1,8
  31:11
**office** 48:16
**officer** 1:11,12,13
  7:22 17:24 18:5
  19:2 40:2 42:1,15
  42:21 51:13
**officers** 18:19,24
  36:23,25 37:12
  39:13,23,24 40:15
  41:2 43:6,9,17,25
  44:9,20 45:6,13,21
  46:2 47:16
**official** 1:12,13,14
  1:16
**oif** 13:5
**okay** 4:24 10:10
  21:15 48:2,15
**old** 15:4 20:18
  21:10,22 24:12,14
**once** 21:19 25:2,23
  26:17 30:8,9 46:2
**ones** 39:15
**online** 5:12
**operations** 6:8
**opined** 47:15
**opinion** 41:9 44:11
  44:13 47:10 48:11

Rodrigo Arreola                                              April 23, 2020
Arreola, Rodrigo v. Consolidated Government of Columbus, Georgia, et al

**[opponent - real]**                                                Page 8

**opponent** 7:9
**ord** 20:22 21:7,16
**order** 45:2
**original** 42:8
**outcome** 39:21
  40:10,25 41:1
  51:8
**outside** 13:14
**overnight** 33:20
**owned** 5:22 23:7

**p**

**p** 2:1,1 4:1
**p.c.** 2:16
**page** 2:16 3:3,11
**paid** 16:19
**paramedic** 19:5
**parent** 1:3,6
**park** 2:5
**part** 7:4,6 9:19,21
  9:23 36:16 40:11
  43:15,18
**partially** 9:18
**particular** 9:10
  11:19 28:9 34:22
**parties** 48:25
  50:22,25 51:13
**party** 50:23 51:7
  51:11
**passed** 14:21
  24:11 30:25 35:9
**path** 32:10
**pausing** 23:21
**pay** 16:23 41:3
  42:2,16
**people** 43:1 46:9
  46:22 47:1
**people's** 11:24
  46:22
**perceive** 10:5
**percent** 39:2

**perception** 25:7
**period** 20:13 21:1
  21:19 31:7 33:24
**periods** 20:11
  31:12
**permanent** 23:9
**person** 9:15 16:9
**personal** 1:4 8:22
  9:6 16:12 37:8
**personally** 10:7,10
  11:6 13:8 30:4
  35:3 40:21 44:24
**petition** 3:14
  14:14,23
**phoenix** 6:5 31:4
**phone** 16:3 32:15
  34:25
**physical** 6:23 35:4
**physically** 13:10
  26:10 46:11
**place** 13:11 35:13
**plaintiffs** 1:8 2:3
**play** 43:17
**played** 43:15
**please** 5:13,17
  24:9 25:25 36:17
  44:17 45:19
**pocket** 42:3,17,24
**pockets** 41:3 42:12
  42:19
**point** 23:7 27:1
  40:9 43:21 46:4
**police** 1:15,15 19:1
  26:15,18,21 37:12
  39:17 47:12,16
**pose** 46:15,16
**possible** 8:3,8
**possibly** 11:12
  27:3
**post** 2:4,5 3:5 4:20
  4:24 18:10 23:25

24:3 32:14,18
  42:4 44:1,11
  45:15 48:2,5,7,19
**practice** 13:15
**preferred** 32:9
**prepare** 6:25
**present** 4:6 46:7
**presented** 46:25
**preview** 45:4
**principes** 8:25
**principles** 13:1
**prior** 15:24 16:23
  16:25 17:3 19:18
  22:10 28:4,7,10,14
  28:24 29:2,5,8
  31:22,25 32:2
  34:15,23 35:15
**privilege** 4:22
**probably** 21:2
  25:3 30:8
**problem** 24:25
  25:2,8 35:24 46:5
  **problems** 25:5
  34:18,22 35:17
**proceeding** 4:6
  50:16 51:6,13
**proceedings** 49:3
**produced** 50:5,13
**production** 50:5
  50:14,15
**profession** 6:4
**professional** 10:19
  51:10
**program** 27:11,17
  27:18
**prohibited** 50:20
**properly** 13:18
**property** 5:22
  22:13
**provide** 23:22

**provided** 30:17
  47:10
**psstf.com** 2:19,19
**public** 36:14,18
  43:12
**published** 9:3
  11:23 13:2 36:10
**purchased** 22:13
**purposes** 36:14
**pursuant** 4:2
  14:10
**push** 26:13
**put** 32:15 41:15
  43:20 46:1,8,11

**q**

**question** 4:22 5:4
  16:1 20:5,6,13
  23:15 24:8,9
  28:13 31:19 32:4
  35:19 40:19 41:4
  42:5,14 44:1,8,17
  45:5,16 48:5
**questions** 5:3 48:4
  48:21 50:7 51:5
**quick** 6:9
**quickly** 39:4
**quite** 29:17 36:16

**r**

**r** 1:25 2:1 4:1
  17:12 51:19
**ranger** 6:7,25
**rank** 6:14
**rarely** 16:12
**read** 36:10,10 37:4
  37:5 38:4,25 40:5
  45:3 48:11,12
**reading** 36:14,18
  49:1
**real** 25:2,8

Case 4:19-cv-00005-CDL   Document 71   Filed 03/15/21   Page 63 of 68
Rodrigo Arreola                    April 23, 2020
Arreola, Rodrigo v. Consolidated Government of Columbus, Georgia, et al

[really - single]                                              Page 9

**really**  9:16 12:24
  16:2,2 23:6 25:14
  25:14 26:6 27:1
  31:18,23 36:2
  40:12 41:4 45:4
**reason**  38:8
**recall**  12:14,17
  27:14 31:9 33:18
  34:25
**recalls**  44:12
**receive**  34:13
**received**  28:1
  31:20
**receives**  50:23
**recess**  18:13 32:19
  48:3
**record**  5:6,17
  13:23 14:1 18:10
  51:6
**reduced**  51:5
**redundant**  42:18
**reference**  27:2
**referenced**  24:19
  26:17
**regard**  42:14
**regarding**  12:15
**regular**  15:16 16:4
  28:23
**regularly**  15:15
**regulations**  4:3
  13:2
**related**  35:18
  50:16
**relationship**  30:3
  50:20 51:9
**relative**  51:7
**relatives**  17:7,9
**relevant**  44:14
**rely**  7:24 8:7,15
**remember**  29:13
  35:25

**remote**  1:20 2:4,16
**repeat**  8:6,6 18:1
  24:9 36:17
**rephrase**  20:9
**reporter**  4:5 5:11
  50:8,11
**reporting**  4:4
**reports**  50:24
**represent**  4:15
  18:15
**representative**  1:4
**representatives**
  39:17
**represented**  39:16
**represents**  50:4,9
**request**  50:17,25
**reserving**  4:21
  44:14
**residential**  29:16
**resist**  12:6
**respective**  48:24
**response**  8:21
**responsibility**
  39:8
**responsible**  40:21
**restate**  44:17
  45:19
**restrain**  7:11
  10:11 11:14,14,20
  11:24 12:6,11,21
  13:9,10 26:10,12
**restrained**  10:14
  10:25 11:4,9
**restraining**  12:1
  12:16 13:1
**restraint**  13:14
**restrict**  11:11
**retired**  5:25 6:6
**return**  21:7
**richard**  1:15

**right**  7:17,25 8:3
  8:19,20,23 9:11,17
  10:5 11:10,20
  14:10,11,12,18
  15:22 17:5 18:17
  19:14,21 20:15,18
  21:4,12,13 22:16
  23:11,12,22 24:12
  24:15 25:9 26:22
  28:11,16 29:19,21
  31:24 32:18 33:13
  34:12,15 36:21,24
  37:3,6,10,11 38:11
  38:14,16,18 39:6
  39:11,18 40:17,25
  41:12 47:16 48:12
  48:17,20
**rights**  46:9
**risk**  8:13 9:8 39:19
  40:7,14 46:8,10,15
  46:16
**road**  22:12,20
**rodrigo**  1:3,19 3:3
  4:8 5:18
**roughly**  15:21
  20:18
**ruled**  43:24 44:9
**rules**  4:2,19 5:2
  8:25 9:2,4,5 10:1
  10:6 11:21,23
**rundown**  6:1,10

**s**

**s**  2:1 4:1 17:12
**s.a.**  1:6
**safety**  17:23,24
  18:4
**saw**  15:12 16:8,11
  29:25 35:5 48:9
**says**  44:13
**scene**  43:20 45:9

**school**  6:2,3 21:14
  22:2,8,18,19 23:3
  23:13
**scrantom**  2:16
**screen**  13:19
**scripts**  36:11
**second**  12:15,20
  13:24
**see**  13:20,22 14:6
  14:15 15:15,25
  29:24 30:4 44:13
**seeking**  41:11
**seen**  15:18,19 30:5
  30:8 43:11
**sent**  13:20 14:3,12
**separated**  20:4
**sergeant**  6:16 12:9
  13:12
**series**  5:2
**serve**  13:4,5 51:13
**served**  6:7
**service**  6:9,9,18
  7:21 13:8 17:22
**services**  50:23
**shaw**  22:21
**shift**  35:10
**shops**  23:5
**shortly**  13:19
**shoving**  26:13
**show**  13:16
**showed**  38:2
**showing**  32:16
  46:12
**shown**  36:10
**side**  47:20,21
**signature**  51:18
**significant**  33:24
**signing**  49:1
**similar**  10:18
**single**  1:25 51:19

Rodrigo Arreola                                    April 23, 2020
Arreola, Rodrigo v. Consolidated Government of Columbus, Georgia, et al

**[sir - time]**                                                    Page 10

**sir** 5:15 10:23 13:4
  31:25
**sit** 12:2
**situation** 7:11,15
  7:16,23,25 8:13,18
  8:19,22 9:8,10,15
  10:8 12:14,17,22
  38:25 39:4 40:7,8
  40:12,24 41:1
  43:23
**six** 15:5,6,17 24:15
  24:16 31:7 35:14
**snipes** 2:15 3:4
  4:12,14,23,25 14:2
  18:12,14 24:10
  32:11,15,20 42:6
  44:4,7,18 45:20
  47:24 48:4,20
**social** 17:18

**soldier** 8:17 9:10
  11:18 12:10,14
**soldiers** 8:2,8 10:2
  10:3 12:19
**solely** 8:22 51:12
**solid** 45:10
**solutions** 50:1
**somebody** 10:21
  37:3,5 46:9
**somebody's** 11:4
**son** 32:8 35:13
  43:5 47:11
**son's** 40:10 41:7
  41:15,23
  ███████ 47:12
      14:24
  15:12,18,25 16:6
  ██████17:1
      16:16
  17:4
**sorry** 8:5 16:13

**sort** 35:3 46:25
**sorts** 34:18
**sought** 27:24
**sound** 7:12,20
  9:22 39:18
**sounds** 27:20
**speaks** 44:11
**special** 6:8
**specific** 50:21
**specifics** 36:9
**spent** 35:7
**spoke** 33:2
**spot** 8:16
**sprouse** 2:16
**standard** 35:10
**start** 22:1,18 24:24
**started** 4:20 22:19
**state** 4:9 5:16 51:2
**stated** 26:6 51:4
**statement** 4:4
**states** 1:1
**stating** 35:1
**station** 23:9 31:10
**stayed** 21:2
**steady** 31:23
**stipulated** 48:23
**stocking** 23:8
**store** 31:5,5,6
**stores** 6:4 31:3
**story** 9:21
**stressors** 41:17
**subcontractor**
  51:12
**subject** 34:2
**submitted** 4:5
  50:8,11
**subordinates** 7:24
**substance** 28:9
**sued** 38:20 43:6
**suite** 2:6

**suits** 32:14
**supervisory** 13:13
**support** 16:19,23
**supposed** 9:24,24
**sure** 6:3 18:3,12
  20:5 23:15 24:7
  25:5 28:22 29:17
  35:10 37:16 38:10
  41:4
**surrounding**
  21:11
**suspect** 11:14 12:5
**suspects** 13:9
**sworn** 4:9
**symptom** 37:25
**system** 41:8,22
  42:13

## t

**t** 1:15 17:12
**tabs** 16:6
**take** 35:13 45:7
  47:24
**taken** 1:20 14:9
  18:13 32:19 48:3
  51:4
**talk** 34:1 37:13
**talked** 10:23 16:3
  18:23 19:1,5,8
  30:1 36:23,25
**talking** 26:19 34:9
**taught** 8:12,14
  13:15
**team** 43:21
**teenager** 21:24
**tell** 6:21 26:2,24
  34:17,21
**ten** 17:15 32:13
  37:14
**tenth** 22:25,25

**term** 10:18,19
**terms** 51:12
**testified** 4:10 47:7
**thank** 32:21 48:22
**therese** 17:12,14
**thing** 8:3 28:12
  39:18 40:25
**things** 23:10 32:7
**think** 12:19,22,23
  14:7 15:18 22:11
  23:21,24 25:1
  27:13,21 28:20
  29:20 33:9,13,16
  33:17 38:24,24
  39:1,5,7 40:2,8,15
  40:20,23 41:2
  42:1,16 43:2,13,13
  43:14,15 44:4,24
  45:14,22,24 46:24

  47:25
**third** 2:17 33:13
  33:15
**thought** 7:16
**thoughts** 39:2
**threat** 8:13 9:8
  10:5 39:20 40:7
  40:14 46:8,10,25
**threatful** 46:21
**three** 21:10 30:1,5
  32:25 33:17,18,21
  39:23 40:6,11
  43:14,17,22
**ties** 11:1,3,5 12:7
  ███████████████
**time** 7:21 9:22
  11:16 12:9,13
  15:12 20:13,17,25
  21:9 22:1,3,17
  23:12 24:14 25:11
  26:21 27:5,5,22

| 21:15 28:12 42:18 | | 23:13 | 31:12 33:24 35:5 |
|---|---|---|---|

Rodrigo Arreola                                          April 23, 2020
Arreola, Rodrigo v. Consolidated Government of Columbus, Georgia, et al

35:7 45:6 46:23
47:2,13 48:22
50:22
**times** 10:9 15:18
15:20,25 16:2,3,7
28:11,15 30:2,5,12
32:5,22
**title** 17:21
**titled** 14:4
**today** 5:3,5 6:13
14:9
**toddler** 21:5
**totally** 42:9
**touch** 16:5
**tracking** 24:22
47:23
**train** 8:1
**trained** 6:23,24
7:8,9,14 9:13
**training** 6:21 7:1,4
7:6,14,21,24 8:9
8:12,15,24,25
11:13 20:12
**transcript** 48:9
50:4,7 51:4,6
**transcripts** 48:8
**transition** 22:14
**transportation**
35:7
**treat** 10:22
**treated** 27:12
**treatment** 27:7,9
27:22,23 28:2
**tried** 17:17 27:11
37:13 39:18
**trouble** 23:14,16
24:5,6 35:1
**true** 39:3 50:6,10
51:6
**trust** 8:14 40:25

**truth** 4:9
**try** 5:13 27:6,9
46:8
**trying** 12:6,7 18:8
23:21 29:13 46:6
46:19
**tucker** 2:16
**tv** 48:16
**twice** 30:8,9
**two** 22:15 33:7,18
33:20
**type** 27:9 46:13
**typewriting** 51:5

**u**

**ultimately** 41:25
42:15
**unaware** 17:6
24:16,22
**understand** 10:16
14:8 18:15,18
20:5,11 28:18
34:3,11 38:21
47:3,6
**unemployed** 31:13
31:15
**uniform** 40:18
**united** 1:1
**use** 7:12,15,20,24
10:4,16 12:15
39:4 40:10 46:3
47:7,17
**user** 28:5,25 29:6
29:9

**v**

**verbally** 5:9,13
**veritext** 50:1,4,9
50:19
**veritext.com.**
50:17

**video** 4:14,16
36:12 43:12 48:8
48:9
**videoconference**
1:20 2:4,16
**videos** 36:11,11
**violate** 46:19
**violence** 17:1,4
24:17 33:4
**virtually** 5:6 14:3
**vs** 1:9

**w**

**waived** 49:2
**walked** 32:9
**want** 9:25 11:11
27:3 32:25 34:1
41:7,10,23,23 42:9
42:25,25 43:1,1
**wanted** 27:16
**watched** 36:11
**way** 10:24 20:2
22:12 26:11 38:17
44:19
**ways** 32:6
**we've** 10:14 21:18
**weapon** 46:18
**week** 30:2,8,9
**weekly** 30:7
**weeks** 35:14
**wellbeing** 46:20
**went** 22:22 27:15
29:16,20 31:4
37:19,24
**wife** 17:10 34:4
35:15 37:19
**wife's** 17:11
**witness** 24:2,4
25:16,20 44:17
45:19 48:25 49:2
50:12

**witnessed** 13:13
35:3
**word** 10:16
**work** 6:1,10,11
23:6 25:13 27:13
30:24
**worked** 6:3 23:4,5
23:5 31:2,5,6,10
43:21
**worker** 17:22
**working** 6:13
**written** 4:4
**wrong** 40:2
**wrote** 37:6

**x**

**x** 3:1

**y**

**yeah** 18:8 24:4
33:22
**year** 21:10 31:8
**years** 6:9,12,18,22
15:17 17:15 20:18
21:2,20 24:12,14

**z**

**zip** 11:1,3,5 12:7

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

## VERITEXT LEGAL SOLUTIONS
### COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted
fashion to authenticated parties who are permitted
to access the material. Our data is hosted in a Tier 4
SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and
State regulations with respect to the provision of
court reporting services, and maintains its neutrality
and independence regardless of relationship or the
financial outcome of any litigation. Veritext requires
adherence to the foregoing professional and ethical
standards from all of its subcontractors in their
independent contractor agreements.

Inquiries about Veritext Legal Solutions'
confidentiality and security policies and practices
should be directed to Veritext's Client Services
Associates indicated on the cover of this document or
at www.veritext.com.